DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongd@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine Zoladz, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| CRITERION WEALTH MANAGEMENT INSURANCE SERVICES, INC., ROBERT ALLEN GRAVETTE, and MARK ANDREW MACARTHUR, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

## <u>JURISDICTION AND VENUE</u>

1.    The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

COMPLAINT                                    1

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 214(a) of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Robert Allen Gravette ("Gravette") and Mark Andrew MacArthur ("MacArthur") reside in this judicial district.

## SUMMARY

4.     Defendants Criterion Wealth Management Insurance Services, Inc. ("Criterion"), Gravette, and MacArthur were investment advisers.  They owed their clients – who entrusted them with the discretionary management of their money – a fiduciary duty to act with loyalty, fairness, and good faith.  This civil enforcement action arises from defendants' breach of their fiduciary duty when failing to disclose a glaring conflict of their financial interests with those of their clients.  From the spring 2014 through the summer 2017, defendants recommended that their advisory clients invest more than $16 million in four private placement funds, without disclosing that the fund managers for these investments had paid them more than $1 million in side compensation – income on top of the fees that defendants were already charging their clients directly.  Because this additional side compensation was recurring and depended on Criterion's clients remaining invested in the subject funds, Criterion, Gravette, and MacArthur not only had a financial incentive to recommend that their clients invest in the first instance, they were also incentivized to keep their clients in the funds going forward, rather than allocating their capital elsewhere.  For two of the private placement funds, the undisclosed compensation that defendants received reduced the investment returns that defendants' advisory clients would have

otherwise received.  Defendants kept their clients in the dark as to all these material facts and, in doing so, they violated their fiduciary duty and defrauded their advisory clients.  What's more, these undisclosed compensation arrangements rendered Criterion's Form ADV filings with the Commission materially misleading, and no policies and procedures had been adopted and/or implemented at Criterion to prevent these compliance failures.

5.     By engaging in this conduct:  (i) Criterion violated Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 80b-7, and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7]; (ii) Gravette violated Sections 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-7] and, in the alternative,  aided and abetted Criterion's violations of Sections 206(1), 206(2), and 207 of the Advisers Act; and (iii) MacArthur violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and, in the alternative,  aided and abetted Criterion's violations of Sections 206(1) and 206(2) of the Advisers Act.

6.     With this complaint, the SEC seeks permanent injunctions prohibiting future violations of the federal securities laws and an order requiring defendants to disgorge their ill-gotten gains with prejudgment interest thereon, and imposing civil penalties.

### THE DEFENDANTS

7.     Defendant Criterion is a California corporation based in Santa Clarita, California that offers discretionary asset management services.  Until September 26, 2018, Criterion was registered with the Commission as an investment adviser.  Criterion is currently registered as an investment adviser in California and Idaho.

8.     Defendant Gravette, age 54, resides in Santa Clarita, California.  At the present time, he is the sole owner and president of Criterion.  From 2014 through 2017, Gravette and MacArthur were 50/50 co-owners of Criterion, and Gravette was Criterion's chief compliance officer.  Gravette has been a registered representative of

the broker-dealer at which Criterion investment advisory clients opened brokerage accounts ("Broker-Dealer") since November 2006. Gravette holds FINRA Series 7, 24, 63, and 65 licenses.

9.      Defendant MacArthur, age 52, resides in Newhall, California. At the present time, he is the president, managing member and chief compliance officer of a state-registered investment adviser, M2 Financial LLC, which he formed after leaving his employment with Criterion in June 2016. From 2004 to mid- 2016, MacArthur was Criterion's co-owner and chief investment officer. In mid-2016, MacArthur became an independent contractor for, but remained associated with, Criterion. Like Gravette, MacArthur has been a registered representative of Broker-Dealer since November 2006. MacArthur holds FINRA Series 7, 24, 63, and 65 licenses.

## THE ALLEGATIONS

### A.      Criterion's Investment Advisory Business

10.      Gravette started an investment advisory business in 2000, and in 2004, he changed the name of that firm to Criterion Wealth Management Insurances Services, Inc.

11.      Gravette hired MacArthur as a partner, and from 2004 to 2016, MacArthur and Gravette worked with Criterion's clients as their investment adviser representatives.

12.      In its Part 2A of Form ADV firm brochure, which Criterion was required to deliver to its investment advisory clients, Criterion described its business as follows:

> Our firm provides continuous advice to a client regarding the investment of client funds based on the individual needs of the client. Through personal discussions in which goals and objectives based on a client's particular circumstances are established, we develop a client's personal investment policy and create and provide investment advisory services to our clients on a discretionary basis based on that policy.

13. In exchange for Gravette's and MacArthur's advisory services, Criterion charged clients advisory fees equal to a percentage of the dollar amount of the client's assets under management.

14. At all relevant times, Criterion, Gravette, and MacArthur were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11), as each of them were engaged in the business of providing investment advice as to the value of securities and as to the advisability of investing in, purchasing and selling securities.

15. In the relevant period, Gravette and MacArthur were also investment advisers due to their ownership, management, and control of Criterion.

16. Criterion represented to clients – in its Form ADV brochures – that it had adopted a Code of Ethics "which sets forth high ethical standards of business conduct that we require of our employees, including compliance with applicable securities laws."

17. Criterion also further represented to its clients –in its Form ADV brochures –that "CME [Criterion] and our personnel owe a duty of loyalty, fairness and good faith towards our clients[.]"

18. At all relevant times, defendants understood that receipt of additional undisclosed compensation by Criterion and its management persons or employees would create a conflict of interest that may impair their objectivity when making advisory recommendations.

**B.   Criterion Invested Client Funds in Private Placements**

19. Since 2014, Criterion invested a substantial portion of client funds under its discretionary management in private placement investments.

20. As of December 31, 2015, for example, private placement investments comprised about 36% of all of Criterion's assets under management.

21. Before deciding to invest their clients' funds, Gravette and MacArthur identified certain of these private placement opportunities through their own personal

and professional connections.

**1.    Fund Manager A and Fund Manager B**

22.    From 2012 to 2017, Criterion, acting through Gravette and MacArthur, recommended that clients invest in a series of real estate investment funds offered by a Midwest-based fund manager ("Fund Manager A").

23.    MacArthur was a former colleague and a social acquaintance of Fund Manager A's principals.

24.    In 2015 and 2016, Criterion recommended that clients invest in two real estate investment funds offered by a West Coast-based fund manager ("Fund Manager B").

25.    Both Gravette and MacArthur were long-time social acquaintances of Fund Manager B's principals, dating back to the 1980's, when they attended the same university.

26.    In both cases, MacArthur and Gravette negotiated arrangements with Fund Manager A and Fund Manager B in which those fund sponsors paid hundreds of thousands of dollars of non-advisory compensation – compensation that ultimately went to MacArthur and Gravette – in exchange for investing Criterion clients' assets in Fund Manager A's and Fund Manager B's real estate investment funds.

27.    Defendants never disclosed the existence, extent, nature, and details of these side compensation arrangements to their advisory clients, in breach of their fiduciary duty of loyalty, fairness and good faith.

**2.    Criterion's compensation arrangement with Fund Manager A**

28.    From 2012 to 2017, Criterion recommended four real estate investment funds offered by Fund Manager A to its advisory clients.

29.    With respect to each of those funds, defendants negotiated an undisclosed special compensation arrangement with Fund Manager A.

30.    Criterion clients held their investments in Fund Manager A's private placement funds in brokerage accounts that Criterion had opened for them at the

Midwest-based Broker-Dealer with which they were both associated.

31.    The special undisclosed compensation arrangements that Criterion had with Fund Manager A provided that Fund Manager A would make payments to Broker-Dealer, 95% of which were then transferred to MacArthur and Gravette.

32.    The compensation arrangements, however, caused Fund Manager A to reduce the profit participation that Criterion investors would have otherwise received.

33.    Since defendants had insisted on receiving non-advisory compensation from Fund Manager A, to offset that cost, Criterion clients were placed in a separate share class or separate feeder fund that paid Criterion investors lower returns than the returns paid to all other investors in the same Fund Manager A funds.

34.    Because Criterion was the only investment adviser who had negotiated for this side compensation from Fund Manager A, Criterion clients were the only investors placed in these disadvantaged feeder funds or share class.

35.    All other investors in Fund Manager A's real estate funds received higher investment returns, relative to the Criterion clients, even though their investments were based on the same underlying fund assets.

a.    **Real Estate Fund 1**

36.    For example, in 2014, Fund Manager A launched a real estate fund that sought to generate investment income through short-term debt as well as equity investments in commercial real estate ("Real Estate Fund 1").

37.    At defendants' request, Fund Manager A agreed to pay Criterion an amount equal to 50% of the performance allocation that Fund Manager A was entitled to receive on amounts invested by Criterion's clients for as long as they remained invested in the fund.

38.    For Class A units of Real Estate Fund 1, investors received all returns until profits achieved a 6% annualized return threshold (*i.e.*, a 6% "hurdle").  At that point, Fund Manager A was entitled to a performance allocation of 100% of all new investment income until its profit participation had caught up such that 80% of all

profits to date had been allocated to Class A investors, and 20% had been allocated to Fund Manager A.  Then, for any investment returns after that, Class A investors and Fund Manager A shared in investment income at 80% and 20%, respectively.

39.   Fund Manager A agreed to these performance allocation terms – in short, an 80/20 profit split in favor of investors with a 6% hurdle – with respect to all non-Criterion investors in Real Estate Fund 1.

40.   Because Criterion had insisted on taking half of Fund Manager A's performance allocation for the investments of Criterion clients in Real Estate Fund 1, Fund Manager A created Class C units, a separate share class designated for Criterion clients only.

41.   For Class C units of Real Estate Fund 1, investors received all returns until profits achieved a 6% annualized return threshold (*i.e.*, a 6% "hurdle").  At that point, Fund Manager A was entitled to a performance allocation of 100% of all new investment income until its profit participation had caught up such that 60% of all profits to date had been allocated to Class C investors, and 40% had been allocated to Fund Manager A.  Then, for any investment returns after that, Class C investors and Fund Manager A shared in investment income at 60% and 40%, respectively.

42.   Fund Manager A agreed to these performance allocation terms – in short, a 60/40 profit split in favor of investors with a 6% hurdle – with respect to all Criterion investors in Real Estate Fund 1.

43.   Besides the lower profit split for Class C units (60% of returns to investors in Class C versus  80% of returns to investors in Class A), there was no difference between the Class A and Class C units.

44.   Criterion, MacArthur, and Gravette knew that this compensation arrangement would depress Criterion clients' investment returns because, *inter alia,* Fund Manager A's principal told them.

45.   Defendants did not disclose to their clients that they were restricted to Class C units, while other investors could invest in Class A units.

46.     Defendants did not disclose to their clients that Class C units would pay lower investment returns than Class A units if Real Estate Fund 1's performance exceeded the 6% hurdle.

47.     Defendants did not disclose to their clients that Criterion, through Broker-Dealer, had negotiated an agreement with Fund Manager A which entitled them to a portion of the investment returns that Criterion investors would otherwise have received, and that this compensation arrangement created a conflict of interest between defendants and their clients.

       **b.     Real Estate Fund 2**

48.     In 2015, Fund Manager A launched a new real estate fund that sought to exploit idiosyncratic price dislocations among commercial real estate assets in the Midwest.

49.     At defendants' request, Fund Manager A agreed to pay Criterion an amount equal to 50% of the "carried interest" (*i.e.*, the back-end profits allocated to Fund Manager A for managing Real Estate Fund 2) that Fund Manager A was entitled to receive on amounts invested by Criterion's clients in Real Estate Fund 2.

50.     Rather than creating a separate share class for Criterion clients, Fund Manager A established two separate Real Estate 2 "feeder" funds – one for non-Criterion investors, and one for Criterion investors ("Default Real Estate Fund 2" and "Criterion Real Estate Fund 2," respectively).

51.     For Default Real Estate Fund 2, investors received all investment returns until profits achieved an 8% annualized return threshold (*i.e.*, an 8% "hurdle").  At that point, Fund Manager A was entitled to carried interest equal to 100% of all new investment income until its profit participation had caught up such that 80% of all profits to date had been allocated to Default Real Estate Fund 2 investors, and 20% had been allocated to Fund Manager A.  Then, for any investment returns after that, Default Real Estate Fund 2 investors and Fund Manager A shared in investment income at 80% and 20%, respectively.

52.     Fund Manager A agreed to these carried interest terms – in short, an 80/20 profit split in favor of investors with an 8% hurdle – with respect to all non-Criterion investors in Real Estate Fund 2.

53.     Because Criterion's compensation arrangement with Fund Manager A entitled it to half of Fund Manager A's carried interest on the investments of Criterion clients in Real Estate Fund 2, Fund Manager A created Criterion Real Estate Fund 2, a separate feeder fund designated for Criterion clients only.

54.     For investors in Criterion Real Estate Fund 2, investors received all investment returns until profits achieved an 8% annualized return threshold (*i.e.*, an 8% "hurdle"). At that point, Fund Manager A was entitled to carried interest equal to 100% of all new investment income until its profit participation had caught up such that 60% of all profits to date had been allocated to Criterion Real Estate Fund 2 investors, and 40% had been allocated to Fund Manager A. Then, for any investment returns after that, Criterion Real Estate Fund 2 investors and Fund Manager A shared in investment income at 60% and 40%, respectively.

55.     Fund Manager A agreed to these carried interest terms – in short, a 60/40 profit split in favor of investors with an 8% hurdle – with respect to all Criterion investors in Real Estate Fund 2.

56.     Besides the lower profit split for Criterion investors (60% of post-hurdle returns to Criterion investors versus 80% of post-hurdle returns to all other investors), there was no difference between Criterion Real Estate Fund 2 and Default Real Estate Fund 2.

57.     Criterion, MacArthur, and Gravette knew that this compensation arrangement would depress Criterion clients' investment returns, *inter alia,* because Fund Manager A's principal told them.

58.     Defendants did not disclose to their clients that they were restricted to investments in a Criterion Real Estate Fund 2, while other investors could invest in Default Real Estate Fund 2, which yielded potentially higher returns.

59.     Defendants did not disclose to their clients that investments in Criterion Real Estate Fund 2 would pay lower investment returns than investments in Default Real Estate Feeder Fund 2 if Real Estate Fund 2's performance exceeded the 8% hurdle.

60.     Defendants did not disclose to their clients that Criterion, through Broker-Dealer, had negotiated an agreement with Fund Manager A which entitled it to a portion of the investment returns that Criterion investors would otherwise have received, and that this compensation arrangement created a conflict of interest between defendants and their clients.

**3.      Criterion's compensation arrangement with Fund Manager B**

61.     Criterion and Fund Manager B's business relationship had dated back to 2008, and in prior investments with Fund Manager B's real estate funds, Criterion had negotiated arrangements to receive referral fees that continued to pay out over time ("trailing referral fees") similar to that described below.

62.     In 2015 and 2016, Fund Manager B launched two real estate funds ("Real Estate Fund 3" and "Real Estate Fund 4").

63.     Real Estate Fund 3 and Real Estate Fund 4 both invested in real estate in San Diego County, and promised investors an annual preferred return of 8% on their net capital contributions.

64.     Criterion recommended Real Estate Fund 3 and Real Estate Fund 4 to its clients, and defendants similarly devised a special –and undisclosed –compensation arrangement with the Fund Manager B.

65.     Criterion clients held their investments in Fund Manager B's private placement funds in brokerage accounts that Criterion had opened for them at Broker-Dealer.

66.     Fund Manager B agreed to pay Criterion a trailing referral fee of 2%, every year, based on the amount of capital invested by Criterion clients in Real Estate Fund 3 and Real Estate Fund 4.

67.     Fund Manager B first paid these referral fees to Broker-Dealer, which then transferred 95% of those amounts to defendants.

68.     No other registered representative of Broker-Dealer besides MacArthur and Gravette referred investors to Real Estate Fund 3 and Real Estate Fund 4.

69.     Criterion clients ultimately accounted for half of all investors in Real Estate Fund 3 and Real Estate Fund 4.

70.     Defendants did not disclose to Criterion clients that their compensation arrangement with Fund Manager B created a conflict of interest between defendants and their clients.

**C.     Defendants' Failure to Disclose Their Conflicts of Interest and Misleading Form ADV's**

71.     Defendants failed to disclose the material conflicts of interest that arose from Criterion's special compensation arrangements with Fund Manager A and Fund Manager B in its Forms ADV or otherwise.

72.     Prior to September 26, 2018, Criterion was an investment adviser registered with the Commission.  Criterion was therefore required to file and annually update its disclosure in Forms ADV.  Criterion was also required to provide advisory clients with certain disclosures in brochures and brochure supplements on Forms ADV Part 2A and Part 2B.

73.     The general instructions to Form ADV Part 2A requires investment advisers to disclose all material conflicts of interest between the adviser and clients, whether in Part 2 of Form ADV or by some other means.

74.     Moreover, Item 14 of Form ADV Part 2A requires investment advisers to disclose all economic benefits provided to the advisory firm from external sources, as well as all conflicts of interest.

75.     Except for its 2017 Form ADV, Gravette signed each of Criterion's Forms ADV Part 1 and when doing so, certified under penalty of perjury that the information and statements made in exhibits and any other information submitted –

including Criterion's Form ADV Part 2A firm brochure and any Form ADV Part 2B firm brochure supplements – were true and correct and did not omit material information.

76.     In addition, Gravette had responsibility under Criterion's compliance manual for reviewing the firm's Forms ADV Part 1 and Part 2 and any supporting information for those filings.

77.     In Forms ADV filed by Criterion on or about March 10, 2014, March 17, 2015, and March 30, 2016, Criterion failed to disclose the material conflicts of interest arising from defendants' compensation arrangements with Fund Manager A and Fund Manager B.  Reasonable investors would have considered information concerning those compensation arrangements material because such arrangements could affect defendants' ability to render disinterested investment advice.

78.     With respect to Criterion's compensation arrangement with Fund Manager A, the firm's Forms ADV did not disclose all material facts, including that Criterion clients were restricted to investing in Class C units of Real Estate Fund 1, while other investors could invest in Class A units of Real Estate Fund 1.

79.     With respect to Criterion's compensation arrangement with Fund Manager A, the firm's Forms ADV did not disclose all material facts, including that Class C units of Real Estate Fund 1 paid potentially lower investment returns than Class A units of Real Estate Fund 1.

80.     With respect to Criterion's compensation arrangement with Fund Manager A, the firm's Forms ADV did not disclose all material facts, including that Criterion had negotiated for itself a portion of the investment returns that Criterion clients otherwise would have received in Real Estate Fund 1, and that this compensation arrangement created a conflict of interest.

81.     With respect to Criterion's compensation arrangement with Fund Manager A, the firm's Forms ADV did not disclose all material facts, including that clients were restricted to investing in Criterion Real Estate Fund 2, while other

investors could invest in a Default Real Estate Fund 2 that would likely yield higher returns.

82.     With respect to Criterion's compensation arrangement with Fund Manager A, the firm's Forms ADV did not disclose all material facts, including that investments in Criterion Real Estate Fund 2 would likely pay lower investment returns than investments in Default Real Estate Feeder Fund 2.

83.     With respect to Criterion's compensation arrangement with Fund Manager A, the firm's Forms ADV did not disclose all material facts, including that Criterion had negotiated for itself a portion of the investment returns that Criterion clients otherwise would have received in Real Estate Fund 2, and that this compensation arrangement created a conflict of interest.

84.     Defendants' special compensation arrangements with Fund Manager A inclined them to render advice to Criterion's clients that was not disinterested, and defendants' failure to disclose this conflict precluded clients from making informed investment decisions.

85.     With respect to Criterion's special compensation arrangement with Fund Manager B, the firm's Forms ADV did not disclose all material facts, including that Fund Manager B had agreed to pay Criterion a trailing referral fee of 2%, every year, based on the amount of capital invested by Criterion clients in Real Estate Fund 3 and Real Estate Fund 4, and that this compensation arrangement created a conflict of interest.

86.     Defendants' compensation arrangements with Fund Manager B inclined them to render advice that was not disinterested, and defendants' failure to disclose this conflict precluded clients from making informed investment decisions.

87.     Moreover, because the trailing referral fee was ongoing and would continue to be paid by Fund Manager B through the duration of a Criterion client's investment, defendants had a conflict of interest arising from their incentive to recommend that clients continue to invest in Fund Manager B's funds, rather than

exit those funds as they were permitted to do under the terms of their investment. Defendants' failure to disclose this conflict precluded clients from providing their informed consent to the conflict of interest.

88.     Rather, in its Forms ADV, Criterion disclosed only the general conflicts of interest occasioned by the association of unnamed Criterion employees with Broker-Dealer:

> Associated persons of [Criterion] are registered securities representatives and investment adviser representatives of [Broker-Dealer,] a registered broker-dealer … In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through [Broker-Dealer.]  Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients.

89.     This language was misleading as it did not disclose the material facts about the conflicts of interest alleged above.

90.     This language did not alert clients to the source, nature, scope, and ramifications of the actual financial conflicts of interest created by Criterion's compensation arrangements with Fund Manager A and Fund Manager B.

91.     This language misleadingly suggested, instead, that Criterion's investment adviser representatives might receive traditional transaction-based compensation in their capacity as registered representatives of a broker dealer that was simply executing securities transactions for Criterion clients.

92.     This language did not disclose the truth – that for client investments in Fund Manager A's funds, defendants were actually receiving a portion of the investment returns that would have otherwise been paid to their clients, and that for client investments in Fund Manager B's funds, defendants were in fact actually receiving ongoing payments based on the amounts that their clients had invested in those funds.

COMPLAINT                                      15

93.     Instead, in Item 14 of Criterion's Forms ADV Part 2A, the firm falsely represented that "It is CWM's policy not to accept or allow our related persons to accept any form of compensation, including cash, sales awards or other prizes, from a non-client in conjunction with the advisory services we provide to our clients."

94.     Staff from the SEC's Office of Compliance Inspections and Examinations ("OCIE") conducted an examination of Criterion in 2016 that was completed in April 2017.  The OCIE staff provided Criterion with a deficiency letter that detailed, among other things, the undisclosed conflicts of interest presented by its financial arrangements with third-party fund managers, including Fund Manager A and Fund Manager B.

95.     In June 2017, Criterion prepared a letter to clients acknowledging that its compensation arrangements with Fund Manager A, Fund Manager B, and other third-party fund managers had created potential conflicts of interest that Criterion had failed to fully disclose:

> Given the potentially considerable amounts of non-advisory compensation from the above-mentioned funds, we should have provided more disclosure around the potential conflicts of interest in offering these funds to our clients.… Having known in more detail these arrangements would have left our clients better informed in making a decision to invest.

96.     The June 2017 letter continued, however, to withhold the whole truth. For example, Criterion's letter did not disclose that Criterion clients were steered away from investments with more favorable performance allocation formulas such as Class A units of Real Estate Fund 1 because of Criterion's compensation arrangements with Fund Manager A.  The June 2017 letter failed to disclose that its compensation arrangements with Fund Manager A had in fact resulted – and continued to result – in lower returns to Criterion clients, relative to all other investors in Fund Manager A's funds.

### D.   Criterion's Inadequate Compliance Policies and Procedures

97.   Criterion did not conduct annual reviews of the adequacy of its compliance policies and procedures and the effectiveness of its implementation.

98.   Although Criterion's written policies and procedures required the firm to conduct review and testing of its compliance framework at least annually, Criterion did not do this.  Criterion failed to conduct the required annual reviews from at least 2008 to 2014, and failed to adopt appropriate compliance procedures from at least 2008 through 2016.

99.   During a 2014 compliance review with an outside compliance consulting ("Compliance Consultant"), the Compliance Consultant communicated to Criterion the following findings:  (i) the firm had not been complying with the requirement that advisers annually review their policies and procedures and specifically tailor those policies to fit the needs of their advisory business; (ii) the firm was still using a compliance manual that had last been updated in 2008 and the compliance manual needed to be updated; and (iii) key topics were missing from Criterion's written policies and procedures, including sections describing Criterion's investment process, fee calculations, valuation of private placement investments held by clients, and due diligence.

100.   Criterion did not implement many of the Compliance Consultant's recommendations.  When Criterion was examined by the SEC's OCIE examination staff in 2016, two years after its 2014 compliance review, Criterion had not completed updating its policies and procedures and was still using its 2008 compliance manual.

101.   Criterion's written policies and procedures also required the firm to maintain its Form ADV, Part 2A on a "current and accurate" basis.

102.   As discussed above, notwithstanding this requirement, Criterion's Forms ADV did not disclose the conflicts of interest arising from its compensation arrangements with Fund Manager A and Fund Manager B.

103.   Moreover, before 2017, Criterion had failed to deliver to clients Form ADV Part 2B firm brochure supplements to its clients.

### E.   Criterion Concealed the Compensation Arrangements From Its Outside Compliance Consultant

104.   When working with Compliance Consultant during its 2014 compliance review of Criterion, Criterion and Gravette did not tell Compliance Consultant that Criterion was receiving trailing commissions from fund managers, or that this income represented a substantial portion of Criterion's overall income from operations.

105.   Had Compliance Consultant known these facts, he would have recommended enhanced disclosure of the arrangements because trailing commissions create unique conflicts of interest requiring disclosure, including the risk of double compensation to the investment adviser to the client's detriment and the risk that the adviser would recommend that a client remain invested in the fund, even if not in the client's best interest, due to the adviser's ongoing receipt of commissions.

### F.   Gravette's and MacArthur's Scienter and Unreasonable Conduct as Investment Advisers

106.   At all relevant times, Gravette was a person who, for compensation, engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

107.   During the relevant period, Gravette was the founder, 50% partner, and president, and he made investment decisions for Criterion's advisory clients.

108.   During most of the relevant period, Gravette served as chief compliance officer for Criterion.

109.   At all relevant times, MacArthur was a person who, for compensation, engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

110.   In the relevant period, MacArthur was Criterion's chief investment officer and 50% partner, and he made investment decisions for Criterion's advisory

clients.

111.   When MacArthur and Gravette were partners in Criterion, they equally controlled Criterion, and equally split the advisory fees and other compensation that Criterion earned in connection with giving investment advice.

112.   As registered investment advisers, Gravette and MacArthur both knew that Criterion had a fiduciary duty to act in the best interest of its clients and to disclose to clients all material information relating to a potential investment.

113.   In spite of that fiduciary duty, Gravette and MacArthur knowingly placed their clients in lower-performing, higher cost funds (a consequence of the separate compensation that they had negotiated for from Fund Manager B), and enriched themselves at their clients' expense.

114.   In addition, Gravette and MacArthur concealed from Compliance Consultant the full extent of their compensation arrangements with third-party fund managers.

115.   From April 2014 to October 2018, defendants received approximately $1.1 million in undisclosed non-advisory compensation from Fund Manager A and Fund Manager B.

116.   Given the sums of compensation at issue and the frequency in which Criterion was placing clients in private placements for which the firm was receiving non-advisory compensation, Gravette and MacArthur's failure to disclose their obvious conflicts of interest was willful, knowing, intentional, or reckless, and their course of conduct was further unreasonable.

117.   Because Gravette and MacArthur co-owned and controlled Criterion, and acted within the scope of their authority as officers and/or associates of Criterion, their willfulness, knowledge, recklessness and negligence can be imputed to Criterion.

**G.    Gravette and MacArthur Aided and Abetted Criterion's Violations of Sections 206(1) & (2) of the Advisers Act**

118.   Both Gravette and MacArthur provided substantial assistance to

Criterion's violation of Sections 206(1) & (2) of the Advisers Act, by making special compensation agreements with Fund Managers A & B, receiving compensation based on those agreements, and by failing to disclose, in violation of Criterion's fiduciary duty to its clients, those special compensations agreements in Criterion's Form ADV or otherwise.

119.    Gravette and MacArthur's failure to disclose their obvious conflicts of interest was willful, knowing, intentional, or reckless, and their course of conduct was further unreasonable.

**H.    Statute of Limitations and Tolling Agreements**

120.    On information and belief, Criterion's, Gravette's and MacArthur's failure to disclose their financial conflicts of interests as a result of their compensation arrangements with Fund Manager A and B has been ongoing and continuous.

121.    In addition, Criterion, Gravette and MacArthur entered into two tolling agreements with the Commission for the periods April 1, 2019 through September 30, 2019, and November 7, 2019 through March 2, 2020.  Collectively these agreements toll the running of any limitations period or any other time-related defenses alleged in this Complaint for a period of 299 days.

<u>**FIRST CLAIM FOR RELIEF**</u>

**Violations of Section 206(1) of the Advisers Act**

**(against all Defendants)**

122.    The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

123.    Criterion, Gravette, and MacArthur are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11).  Until September 2018, Criterion was registered with the SEC as an investment adviser. Criterion, Gravette, and MacArthur are each in the business of providing investment advice concerning securities for compensation.  In the relevant period, Gravette and

MacArthur were also investment advisers due to their ownership, management, and control of Criterion.

124.   Criterion, Gravette, and MacArthur, knowingly or recklessly, employed a device, scheme or artifice to defraud their advisory clients by making special compensation agreements with Fund Managers A and B and by failing to disclose the material conflicts of interest inherent in their receipt of side compensation from the fund sponsors for investing Criterion clients' money in those sponsors' funds.

125.   Criterion, Gravette, and MacArthur had a financial incentive to recommend that their clients invest and further keep their capital in those funds going forward; and for two of the subject real estate funds, the undisclosed compensation that defendants negotiated for compensation that caused an actual reduction in the investment returns that defendants' advisory clients would have otherwise received.

126.   By engaging in the conduct described above, Criterion, Gravette, and MacArthur, each of them, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, employed a device, scheme, or artifice to defraud their advisory clients.

127.   By engaging in the conduct described above, Criterion, Gravette, and MacArthur violated, and unless restrained and enjoined will continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. §80b-6(1).

## SECOND CLAIM FOR RELIEF

### Violations of Section 206(2) of the Advisers Act
### (against all Defendants)

128.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

129.   Criterion, Gravette, and MacArthur are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11).  Until September 2018, Criterion was registered with the SEC as an investment adviser. Criterion, Gravette, and MacArthur are each in the business of providing investment

advice concerning securities for compensation.  In the relevant period, Gravette and MacArthur were also investment advisers due to their ownership, management, and control of Criterion.

130.   Criterion, Gravette, and MacArthur, acting negligently and in violation of applicable standards of care, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon their advisory clients by making special compensation agreements with Fund Managers A and B and by failing to disclose the material conflicts of interest inherent in their receipt of side compensation from fund sponsors for investing Criterion clients' money in those sponsors' funds.

131.   Criterion, Gravette, and MacArthur had a financial incentive to recommend that their clients invest and further keep their capital in those funds going forward; and for two of the subject real estate funds, the undisclosed compensation that defendants negotiated for compensation which caused an actual reduction in the investment returns that defendants' advisory clients would have otherwise received.

132.   By engaging in the conduct described above, Criterion, Gravette, and MacArthur, each of them, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon their advisory clients.

133.   By engaging in the conduct described above, Criterion, Gravette, and MacArthur violated, and unless restrained and enjoined will continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. §80b-6(2).

### THIRD CLAIM FOR RELIEF

**Violations of Section 207 of the Advisers Act**

**(against Defendants Criterion and Gravette)**

134.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

135.   Section 207 of the Advisers Act, 15 U.S.C. § 80b-7, provides that it is

unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under Section 203, or to omit to state in any such application or report any material fact which is required to be stated therein.

136.   Criterion made untrue statements in Forms ADV filed or deemed filed with the Commission by failing to disclose all material facts of the compensation arrangements alleged above, and by failing to explain why those arrangements created a conflict of interest.  These misleading statements and omissions concerning potential conflicts of interest and compensation were material, and concerned information that was required to be disclosed in Criterion's Forms ADV.

137.   As alleged above, Gravette signed Criterion's Forms ADV and was responsible for their review.  In signing Criterion's Forms ADV, Gravette certified under penalty of perjury that the information and statements made in each ADV, including all exhibits and other information submitted, were true and correct and did not omit required information.

138.   As alleged above, Gravette's failure to disclose their obvious conflicts of interest was willful, knowing, intentional, or reckless.  Because Gravette either co-owned or owned and controlled Criterion, and acted within the scope of his  authority as President and Chief Compliance Officer of Criterion in reviewing, signing, and submitting Criterion's Forms ADV, his willfulness, knowledge, intent, or recklessness can be imputed to Criterion.

139.   By engaging in the conduct described above, Criterion and Gravette willfully violated, and unless restrained and enjoined will continue to violate, Section 207 of the Advisers Act, 15 U.S.C. §80b-7.

## FOURTH CLAIM FOR RELIEF

**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder (against Defendant Criterion)**

140.   The SEC realleges and incorporates by reference paragraphs 1 through

121 above.

141.   Rule 206(4)-7 under Section 206(4) of the Advisers Act requires registered investment advisers to adopt and implement written policies and procedures that are reasonably designed to prevent violations of the Advisers Act and its rules.  Rule 206(4)-7 also requires an investment adviser to conduct an annual review of both the adequacy of its written policies and procedures and the effectiveness of their implementation.

142.   Criterion violated Rule 206(4)-7 by failing to adopt written policies and procedures reasonably designed to prevent Advisers Act violations.  Even though private placement investments comprised a significant component of its business, Criterion's compliance manual failed to address due diligence and valuation of private placements.  Moreover, from 2008 through at least 2016, Criterion failed to conduct its required annual review of its compliance policies, procedures, and manual.  Last, from 2008 through at least 2016, Criterion did not implement written policies and procedures requiring full and accurate disclosures in its Forms ADV, which were materially misleading in light of Criterion's undisclosed conflicts of interest arising from its compensation arrangements with third-party fund sponsors.

143.   By engaging in the conduct described above, Defendant Criterion violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. §80b-4, and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

## FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Sections 206(1), 206(2), and 207 of the Advisers Act**

**(against Defendant Gravette)**

144.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

145.   By reason of the conduct described above, Defendant Criterion violated

Sections 206(1), 206(2) and 207 of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(7).

146.   In the alternative, by reason of his conduct described above, Defendant Gravette knowingly and recklessly provided substantial assistance to, and thereby aided and abetted Criterion in its violations of Sections 206(1), 206(2) and 207 of the Advisers Act.

147.   By engaging in the conduct described above, Defendant Gravette has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 209(f) of the Advisers Act, 15 U.S.C. §80b-9(f).

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act (against Defendant MacArthur)

148.   The SEC realleges and incorporates by reference paragraphs 1 through 121 above.

149.   By reason of the conduct described above, Defendant Criterion violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

150.   In the alternative, by reason of his conduct described above, Defendant MacArthur knowingly and recklessly provided substantial assistance to, and thereby aided and abetted Criterion in its violations of Sections 206(1) and 206(2) of the Advisers Act.

151.   By engaging in the conduct described above, Defendant MacArthur has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 209(f) of the Advisers Act, 15 U.S.C. §80b-9(f).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Criterion, and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)], Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)], Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7], and Section 207 of the Advisers Act [15 U.S.C. § 80b-6(7)], .

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Gravette, and his agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)], Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)], Section 207 of the Advisers Act [15 U.S.C. § 80b-6(7)], and Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining MacArthur, and his agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)], Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)], and Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

COMPLAINT                                    26

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Criterion, Gravette, and MacArthur, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise (including MacArthur's officers, agents, and employees at M2 Financial, LLC), from receiving any compensation, beyond an advisory fee paid by or on behalf of a client, from an advisory client's purchase or sale of securities or other investment products unless the following is disclosed, in writing, before the completion of each transaction:  (i) the type of compensation; (ii) the recipients of the compensation; (iii) the amount of compensation (or an annual approximation of any compensation, such as with trailing referral fees); (iv) the potential or actual impact of the compensation if any on clients' investment returns; and (v) the corresponding conflict of interest.

## VI.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order Defendants to pay civil penalties under Section 209(e) of the Advisers Act, 15 U.S.C. §80b-6(9)(e).

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

1   Dated:  February 11, 2020

2                                        */s/ Donald W. Searles*
3                                        DONALD W. SEARLES
                                         Attorney for Plaintiff
4                                        Securities and Exchange Commission

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28