# EXHIBIT 23

Name of Offeree _____          Copy No. _____

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# Southland Home Mortgage II, LLC

————————————

Limited Liability Company Units
1,500 Units at $10,000 Per Unit
Minimum Purchase: One Unit ($10,000)
$15,000,000 Maximum Offering Amount (1,500 Units)

————————————

Southland Home Mortgage II, LLC (the "**Company**") is a California limited liability company formed to invest in commercial and residential real estate to be rehabilitated and made available for sale. The Company's primary activities will be to acquire commercial and residential real estate ("**Properties**") located in California, although the Company may invest in Properties located in states other than California. The Company will acquire the Properties primarily at foreclosure auctions and directly from bank's REO departments. The Company expects to generate cash flow through the sale of the Properties. The Properties will be held by the Company primarily as available for sale. The Company expects to hold the Properties for a period of 2-12 months, though some or all of the properties may be held for shorter or longer than that period of time.

The offering is for 1,500 units of limited liability company interest in the Company ("**Units**") at a purchase price of $10,000 per Unit ("**Offering**") as set forth in this Confidential Private Placement Memorandum ("**Memorandum**"). The purchasers of the Units will become the members of the Company (the "**Members**") upon signing the Company's operating agreement ("**Operating Agreement**").

The proceeds of the Offering are intended to capitalize the Company with an amount sufficient, when coupled with proceeds from any financing, to acquire the Properties. The Company will offer the Units until the Maximum Offering Amount is sold or the expiration date. Bird Rock Management, LLC, a California limited liability company, is the Manager of the Company ("**Manager**").

The main goals of the Manager will be to (i) preserve the capital investment of the Members, (ii) realize income through the acquisition and sale of the Properties, (iii) make at least annual distributions to the Members from cash generated by operations in an amount equal to a 8% annual return on their investment, and (iv) if determined by the Manager, make additional distributions so the Members receive a greater return on their investment. Of course, there is no assurance that the Company will be able to meet any of these goals.

An investment in the Units is highly speculative and involves substantial risks including, but not limited to, those related to: (i) the start-up nature of the Company; (ii) the lack of liquidity of Units; (iii) acquiring the Properties; (iv) financing the Properties; (v) the potential lack of diversity of investment; (vi) reliance on the Manager to select the Properties; (vii) reliance on the Manager to manage the Company and collect rents on the Properties; (viii) uncertainty as to the Properties in which the Company will invest; (ix) lack of any binding financing commitment; (x) variations in interest rates; (xi) real estate investments generally; (xii) changes in economic conditions; (xiii) the existence of various conflicts of interest between the Manager and its affiliates and the Company; and (xiv) tax risks. **More information about the risks of investing in the Units can be found under "Risk Factors." You should read that section in its entirety before investing.**

The mailing address of the Company is 1590 S. Coast Highway, #16, Laguna Beach, CA 92651, and the telephone number of the Company is (949)715-0900.



GOVERNMENT EXHIBIT
16
Blumberg No. 5122

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or passed upon the accuracy or adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

These securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, applicable state securities laws, pursuant to registration or exemption therefrom, and the Operating Agreement. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

|  | Price to Investors | Selling Commissions and Expenses [1] | Proceeds to Company |
|---|---|---|---|
| Per Unit [2] | $      10,000 | $ 0 | $        10,000 |
| Maximum Offering | $  15,000,000 | $ 0 | $  15,000,000 |

*(footnotes on following page)*

Units may be offered and sold only to investors who meet the requirements set forth under "Who May Invest." You should read this entire Memorandum before making an investment decision.

This Memorandum is dated February 16th, 2015.

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1031
CRITERION_SEC_00034608

(1)    The Units are being offered and sold by the Manager. The Company has also engaged Ausdal Financial Partners, a broker-dealer regulated by the Financial Industry Regulatory Authority, to offer and sell Units on a "best efforts" basis. Ausdal Financial Partners will receive commissions of 2% annually on the purchase price of the Units sold by Ausdal Financial Partners, paid on a quarterly basis. Any commission will be paid by the Manager and not from the proceeds of this Offering.

(2)    The minimum purchase is one Unit for a total purchase price of $10,000, except that the Manager may permit certain investors to purchase a fractional Unit.

Before making an investment decision, you should carefully read this entire Memorandum and should carefully consider the risks of an investment in the Units set forth under "Risk Factors." You should also consider the following:

1.    The Manager may reject a Subscription Agreement for any reason in the Manager's sole discretion, including for failure to conform to the requirements of this Offering. A Subscription Agreement may not be revoked, canceled or terminated by the subscriber. The Manager may withdraw, cancel or modify this Offering without notice.

2.    There is no minimum offering amount and there is no guarantee that any certain amount of Units will be sold.

3.    This Memorandum was prepared solely for the benefit of persons buying Units. This Memorandum may not be copied or distributed, in whole or in part, nor may any of its contents be disclosed without the prior written consent of the Manager. By accepting delivery of this Memorandum, you agree to return this Memorandum and all other documents furnished in connection with this Memorandum to the Manager or its representatives immediately upon request if you do not buy any Units or if the offering of Units is withdrawn or terminated.

4.    This Offering is made exclusively by this Memorandum, which contains summaries of certain agreements and other documents. While the Manager believes these summaries are accurate, you should refer to the actual agreements and documents for more complete information about the rights, obligations and other matters in the agreements and documents. The Manager will make the agreements and documents relating to this investment available to you or your advisors upon request, if the requested agreements and documents are readily available to the Manager.

5.    Trustees, custodians and fiduciaries of retirement and other plans subject to the Employee Retirement Income Security Act of 1974 ("**ERISA**") or Internal Revenue Code Section 4975 (including individual retirement accounts) should consider, among other things: (i) the substantial likelihood that the plan, although generally exempt from federal income taxation, would be subject to income taxation were its unrelated business taxable income from an investment in the Company and other unrelated business taxable income to exceed $1,000 in any taxable year (it is anticipated that the Company will not generate unrelated business taxable income), (ii) whether an investment in the Company is advisable given the definition of plan assets under ERISA and the status of Department of Labor regulations regarding the definition of plan assets, (iii) whether the investment is in accordance with plan documents and satisfies the diversification requirements of Section 404(a) of ERISA, (iv) whether the investment is prudent under Section 404(a) of ERISA, considering the nature of an investment in, and the compensation structure of, the Company and the potential lack of liquidity of the Units, (v) that the Company has no history of operations, and (vi) whether the Company or any affiliate is a fiduciary or party in interest to the plan. The prudence of a particular investment must be determined by the responsible fiduciary taking into account all the facts and circumstances of the plan and of the investment. See "Federal Income Tax Consequences -- Investment by Qualified Plans and Individual Retirement Accounts -- Unrelated Business Taxable Income" and "Investment by Employee Benefit Plans and Individual Retirement Accounts."

---

These securities have not been registered under the Securities Act of 1933, as amended, or the securities laws of certain states and are being offered and sold in reliance on exemptions from the registration requirements of the Securities Act and such state securities laws.

---

(Cover Page - ii)

Exhibit 23 Page 1032
CRITERION_SEC_00034609

In making an investment decision, you must rely on your own examination of the person or entity creating the securities and the terms of the Offering, including the merits and risks involved. These securities have not been recommended by any federal or state securities commission or regulatory authority.

---

The Securities Act of 1933 and the securities laws of certain jurisdictions grant purchasers of securities sold in violation of the registration or qualification provisions of such laws the right to rescind their purchase of such securities and to receive back their consideration paid. The Manager believes that the Offering described in this Memorandum is not required to be registered or qualified. Many of the laws granting the right of rescission also provide that suits for such violations must be brought within a specified time, usually one year from discovery of facts constituting such violation. Should any investor institute such an action on the theory that the Offering conducted as described herein was required to be registered or qualified, the Manager will contend that the contents of this Memorandum constituted notice of the facts constituting such violation.

---

No person has been authorized to give any information or make any representations other than as set forth in this Memorandum, and, if given or made, such information or representations must not be relied upon as having been given by the Company, the Manager or their affiliates.

---

This Memorandum is not an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized, or in which the person making such an offer is not qualified to do so, or to any person to whom it is unlawful to make an offer or solicitation. This Memorandum is an offer only to the offeree whose name appears in the appropriate space on the first page of this cover page.

---

Neither the information contained in this Memorandum nor any prior, contemporaneous or subsequent communication should be construed by you as legal or tax advice. You should consult your own legal and tax advisors to ascertain the merits and risks of an investment in Units before investing.

---

This Memorandum contains forward-looking statements that involve risks and uncertainties. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," and "estimate," as well as similar expressions, are meant to identify such forward-looking statements. These statements are based on many assumptions and estimates and are not guarantees of future performance. Actual results may differ materially from those projected in any forward-looking statements, as they will depend on many factors, including many factors which are beyond the Company's control. Factors that may cause such differences include, but are not limited to, those discussed under "Risk Factors."

---

By receiving this Memorandum, you acknowledge and agree that: (i) you will keep all of the information contained herein or received in written or oral form from the Company or its representatives strictly confidential; (ii) you will not reproduce this Memorandum, in whole or in part; (iii) you will not distribute this Memorandum to any person other than those persons retained to advise you with respect to the Offering; and (iv) if you choose not to participate in the Offering, you will return this Memorandum to the Company, together with any other material relating to the Company or the Offering that you may have received from the Company or its agents.

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1033
CRITERION_SEC_00034610

## TABLE OF CONTENTS

Page

WHO MAY INVEST .................................................................................................................. 1

    Investor Suitability Requirements ....................................................................................... 1

HOW TO INVEST IN THE COMPANY ................................................................................... 3

SUMMARY .............................................................................................................................. 4

RISK FACTORS ....................................................................................................................... 7

    Real Property and Real Estate Risks ................................................................................... 7

    Operation and Company Risks ........................................................................................... 10

    Private Offering and Liquidity Risks ................................................................................. 12

    Tax Risks ............................................................................................................................. 14

ESTIMATED USE OF PROCEEDS ......................................................................................... 16

DESCRIPTION OF THE PROPERTIES .................................................................................. 16

    Types of Properties ............................................................................................................. 16

    Standards for Acquiring Properties .................................................................................... 16

    Borrowing Policies ............................................................................................................. 16

BUSINESS PLAN .................................................................................................................... 17

    Main Goals .......................................................................................................................... 17

    Operation ............................................................................................................................. 17

    Expenses .............................................................................................................................. 17

    Distribution of Cash Flow .................................................................................................. 17

DISTRIBUTION PLAN ............................................................................................................ 17

    Capitalization ...................................................................................................................... 17

    Qualifications of Investors .................................................................................................. 18

    How to Buy Units ............................................................................................................... 18

    Acceptance of Subscriptions .............................................................................................. 18

    Purchases of Units by the Manager or its Affiliates .......................................................... 18

    Marketing of Units ............................................................................................................. 18

    Sales Materials .................................................................................................................... 19

THE MANAGER ....................................................................................................................... 19

PRIOR EXPERIENCE OF THE MANAGER AND ITS AFFILIATES .................................. 19

THE MANAGER'S FIDUCIARY DUTIES .............................................................................. 20

CONFLICTS OF INTEREST .................................................................................................... 20

    Obligations to Other Entities .............................................................................................. 20

    Interests in Other Activities ............................................................................................... 21

    Receipt of Compensation by the Manager ......................................................................... 21

    Manager's Representation of Company in Tax Audit Proceedings ..................................... 21

    Legal Representation ........................................................................................................... 21

    Purchases of Units by the Manager or its Affiliates .......................................................... 21

(i)

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1034
CRITERION_SEC_00034611

<u>TABLE OF CONTENTS</u>

<u>Page</u>

Resolution of Conflicts of Interest ...................................................................................22

COMPENSATION OF THE MANAGER ..................................................................................22

DESCRIPTION OF THE UNITS.............................................................................................23

General Description...........................................................................................................23

Restrictions on Transferability ........................................................................................23

SUMMARY OF THE OPERATING AGREEMENT.................................................................23

General  23

Term and Dissolution .......................................................................................................24

Allocation of Net Income from Operations......................................................................24

Allocation of Net Loss .....................................................................................................24

Distributions of Cash from Operations.............................................................................24

Distributions upon Liquidation of the Company ..............................................................24

Reserves ...........................................................................................................................24

Authority of the Manager .................................................................................................24

Voting Rights of Members ...............................................................................................25

Liabilities of Members .....................................................................................................25

Liabilities of the Manager ................................................................................................25

Removal of Members ........................................................................................................25

Books and Records ...........................................................................................................25

Amendments .....................................................................................................................25

Prohibitions ......................................................................................................................26

FEDERAL INCOME TAX CONSEQUENCES..........................................................................26

Tax Consequences Regarding the Company .....................................................................27

Market Discount ...............................................................................................................34

Original Issue Discount ..............................................................**Error! Bookmark not defined.**

Depreciation and Cost Recovery ......................................................................................34

Organization and Syndication Expenses...........................................................................35

Tax-Exempt Use Property .................................................................................................35

Investment By Qualified Plans and Individual Retirement Accounts - Unrelated Business Taxable Income ..............................................................................................................................35

Accuracy-Related Penalties and Interest ..........................................................................36

Tax Shelter Registration and Investor Lists .....................................................................37

State and Local Taxes........................................................................................................37

United States Income Tax Considerations For Foreign Investors .....................................38

General Considerations .....................................................................................................40

INVESTMENT BY EMPLOYEE BENEFIT PLANS AND  INDIVIDUAL RETIREMENT ACCOUNTS ............41

In General..........................................................................................................................41

(ii)

## TABLE OF CONTENTS

| | Page |
|---|---|
| Plan Asset Regulations | 42 |
| Impact of Company's Holding Plan Assets | 43 |
| Annual Valuation | 44 |
| REPORTS TO MEMBERS | 44 |
| LITIGATION | 45 |
| LEGAL COUNSEL | 45 |
| ACCESS TO INFORMATION | 45 |

**EXHIBITS:**

A          Operating Agreement

B          Instructions to Investors and Subscription Agreement

(iii)

# WHO MAY INVEST

The Units are being offered and sold in reliance on an exemption from the registration requirements of the Securities Act of 1933, as amended ("**Securities Act**"). Accordingly, distribution of this Memorandum has been strictly limited to persons who meet the requirements and make the representations set forth below. The Manager reserves the right, in its sole discretion, to reject any Subscription Agreement based on any information that may become known or available to the Manager about the suitability of a prospective investor or for any other reason.

## Investor Suitability Requirements

An investment in the Units involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in this investment. Units will be sold only to investors who (i) buy a minimum of one Unit for a purchase price of $10,000, except that the Manager may permit certain investors to buy a fractional Unit, and (ii) represent in writing that they meet the investor suitability requirements established by the Manager and as may be required under federal or state law.

The written representations you make will be reviewed to determine your suitability. The Manager may, in its sole discretion, refuse a subscription for Units if the Manager believes that an investor does not meet the applicable investor suitability requirements, the Units are otherwise an unsuitable investment for the investor, or for any other reason.

There are two categories of investor suitability requirements that you must meet to buy Units. These include "issuer requirements" and "state requirements" as defined below.

**Issuer Requirements.** You must represent in writing that you meet, among others, all of the following requirements:

(a)      You have received, read and fully understand this Memorandum and the exhibits attached to this Memorandum and are basing your decision to invest on this Memorandum and such exhibits. You have relied only on the information contained in this Memorandum and the exhibits attached to this Memorandum and have not relied on any representations made by any other person;

(b)      You understand that an investment in the Units is speculative and involves substantial risks and you are fully cognizant of and understand all of the risks relating to an investment in the Units, including, but not limited to, those risks discussed in the section "Risk Factors" in this Memorandum;

(c)      Your overall commitment to investments that are not readily marketable is not disproportionate to your individual net worth, and your investment in the Units will not cause such overall commitment to become excessive;

(d)      You have adequate means of providing for your financial requirements, both current and anticipated, and have no need for liquidity in this investment;

(e)      You can bear and are willing to accept the economic risk of losing your entire investment in the Units;

(f)      You are acquiring the Units for your own account and for investment purposes only and have no present intention, agreement or arrangement for the distribution, transfer, assignment, resale or subdivision of the Units;

(g)      You have such knowledge and experience in financial and business matters that you are capable of evaluating the merits of investing in the Units and have the ability to protect your own interests in connection with such investment; and

1

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1037
CRITERION_SEC_00034614

(h)      You are an accredited investor as defined in Rule 501(a) of Regulation D under the Securities Act. An accredited investor is:

- Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000 (provided that for purposes of calculating net worth: (i) The person's primary residence shall not be included as an asset; (ii) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability; and (iii) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

- Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

- Any corporation, Massachusetts or similar business trust, Company, or organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended ("Code"), not formed for the specific purpose of acquiring Units, with total assets over $5,000,000;

- Any trust, with total assets over $5,000,000, not formed for the specific purpose of acquiring Units and whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in Units;

- Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity;

- Any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; a

- Any insurance company as defined in section 2(a)(13) of the Securities Act;

- Any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Securities Act;

- Any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958;

- Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000;

- Any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

- Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

2

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1038
CRITERION_SEC_00034615

- Any executive officer or Manager of the Company or of its Manager; or

- Any entity in which all of the equity owners are accredited investors.

In the case of fiduciary accounts, the net worth and/or income suitability requirements must be satisfied by the beneficiary of the account, or by the fiduciary, if the fiduciary directly or indirectly provides funds for the purchase of the Units.

The Manager may modify the investor suitability requirements stated above in its sole discretion, which may include raising the suitability requirements for investors.

**State Requirements**. You must meet the investor suitability requirements established by the laws and regulations of the State of California and your state of residence. The investor suitability requirements stated above represent minimum suitability requirements, as established by the Manager, for investors in Units. Accordingly, your satisfaction of applicable state requirements will not necessarily mean that the Units are a suitable investment for you, or that the Manager will accept your Subscription Agreement.

## HOW TO INVEST IN THE COMPANY

If, after carefully reading this Memorandum, you would like to invest in Units, please complete, execute and deliver the Subscription Agreement attached hereto as Exhibit B, with a check payable to "Southland Home Mortgage II, LLC" in the amount of the purchase price for the Units you wish to buy, to:

Southland Home Mortgage II, LLC
1590 S. Coast Highway, #16
Laguna Beach, CA 92651
Attn: Daniel Niednagel

Upon receipt of your signed Subscription Agreement, verification of your investment qualifications, and acceptance of your subscription by the Manager (in the Manager's sole discretion), the Manager will notify you of the receipt and acceptance of your subscription. For more information, see "Distribution Plan – How to Buy Units."

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1039
CRITERION_SEC_00034616

# SUMMARY

The following summary provides certain limited information about the Company and this Offering. It should be read in conjunction with, and is qualified in its entirety by, the detailed information appearing elsewhere in this Memorandum. **You are urged to read this entire Memorandum before making an investment.**

## The Offering

| | |
|---|---|
| Securities Offered: | The securities being offered are Units of limited liability company interests in the Company. The Company was recently formed to invest in commercial and residential real estate to be rehabilitated and made available for sale. See "Description of the Units" and "Description of the Properties." |
| Investor Suitability Requirements: | This Offering is strictly limited to investors who meet certain minimum financial and other requirements. See "Who May Invest." |
| Minimum Purchase: | The Company is offering up to 1,500 Units at $10,000 per Unit. The minimum purchase is one Unit ($10,000) for a purchase price of $10,000, except that the Manager may permit certain investors to buy a fractional Unit. See "Distribution Plan." |
| Offering Termination Date: | The Company will offer the Units until the earlier of the Maximum Offering Amount being sold and December 31, 2015, which may be extended to February 1, 2016 in the sole and absolute discretion of the Manager. If, however, the Company repurchases any Units from the Members, such Units may be resold by the Company provided that no more than 1,500 Units are outstanding at any time. |
| No Depository Account or Minimum Offering Amount: | All subscription payments received for Units and accepted by the Company will be deposited in the Company's account. This Offering will not have any depository account, escrow account or minimum offering amount required for subscription payments to be received and accepted. |
| Use of Proceeds: | This Offering is being made to capitalize the Company with an amount sufficient, when coupled with proceeds from any financing, to acquire the Properties. See "Estimated Use of Proceeds." |
| Risks: | An investment in Units is speculative and involves substantial risks. See "Risk Factors." |

## The Company

| | |
|---|---|
| Organization: | The Company was formed as a California limited liability company on November 6, 2014. |
| Company Goals: | The main goals of the Company will be to (i) preserve the Members' capital investment, (ii) realize income through the acquisition, and sale of the Properties, (iii) make at least annual distributions to the Members from cash generated by operations in an amount equal to a 8% annual return on their investment, and (iv) at the sole discretion of the Manager, make additional distributions so the Members receive a greater than 8% return on their investment. Of course, there is no assurance that the Company will be able to meet any of these goals. |

4

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1040
CRITERION_SEC_00034617

| | |
|---|---|
| Manager: | Bird Rock Management, LLC, a California limited liability company, is the Manager of the Company. The Manager's mailing address is 1590 S. Coast Highway, #16, Laguna Beach, CA 92651, and its telephone number is (949) 715-0900. See "The Manager." |
| Members: | Investors in the Units will be the Members of the Company. Each Member's liability will be limited to the amount of such Member's initial Capital Contribution to the Company (e.g., $10,000 per Unit and including, in some instances, portions returned to such Members), plus undistributed profits. Units are transferable only upon the satisfaction of certain requirements. The Company will be limited to ninety-nine (99) Members. The Manager became the initial member in order to form the Company. See "Summary of the Operating Agreement." |
| Term of the Company: | Pursuant to the Southland Home Mortgage II, LLC Operating Agreement of the Company ("**Operating Agreement**"), the Company shall continue until dissolved by the Manager. See "Summary of the Operating Agreement." |
| Expenses: | The Company will be responsible for expenses directly related to the operation of the Company, including, but not limited to, bank fees, legal and accounting fees and expenses related to the preparation of Company tax returns. |
| Distributions of Cash From Operations: | Net cash flow from operations will be distributed each fiscal year to the Members equal to an 8% Preferred Return (as defined below), then to the Members, in an amount determined by the Manager in its sole and absolute discretion, if any, to enhance their 8% Preferred Return, then to the Manager. The Manager anticipates that Cash from Operations will be distributed beginning the end of the first full year after the termination or expiration of the Offering. |
| Distributions Upon Liquidation of the Company: | Any cash remaining upon dissolution and termination of the Company shall be distributed to the Members until they have accrued an 8% Preferred Return, then to the Manager. |
| Allocation of Net Income From Operations: | Net income from operations shall, subject to certain limitations, be allocated:<br><br>(1)  First, to the Members until the Members have been allocated net income from operations equal to the prior net loss allocated to the Members in reverse order of priority of the prior allocations;<br><br>(2)  Second, to the Members equal to an 8% Preferred Return (as defined below);<br><br>(3)  Third, to the Members, in an amount equal to the amount of any distributions to enhance their 8% Preferred Return; and<br><br>(4)  Fourth, 100% to the Manager. |

USW 804765074.5

Exhibit 23 Page 1041
CRITERION_SEC_00034618

FOIA Confidential Treatment Requested by Criterion Wealth Management

| | |
|---|---|
| Allocation of Net Loss: | Net loss shall, subject to certain limitations, be allocated: |
| | (1)   First, to the Members in proportion to and in an amount equal to prior allocations of net income allocated to the Members in reverse order of priority of the prior net income allocations; |
| | (2)   Second, 100% to the Members, but such allocations shall only be made to a Member to the extent such allocations would not cause a Member to have an Adjusted Capital Account Deficit; and |
| | (3)   Thereafter, 100% to the Manager. |
| Subordination of Distributions and Allocations: | The distributions and allocations to the Manager described above are subordinated to the Members receiving an 8% cumulative but not compounded return on their Net Capital Contributions ("**8% Preferred Return**"). |
| Reserve: | The Company may, in the discretion of the Manager, establish a reserve, which would be used to repurchase Units held by Members in certain circumstances and to provide needed working capital to the Company. The Manager will attempt to redeem all requested Units by the Members in as short of a time period as possible, but no promises or guarantees regarding any redemptions being made or how quickly they may be made. |

**The Properties**

| | |
|---|---|
| Types of Properties: | The Company was formed to invest in commercial and residential real estate Properties. The Company's primary activities will be to purchase commercial and residential real property located in California, although the Company may invest in Properties located in states other than California. The Properties will primarily be made available for sale by the owner immediately or at the earliest point possible. |
| Financing: | The Company intends to fund and acquire the Properties with the proceeds of this Offering. If, however, sufficient funds have not been raised in this Offering at the time the Manager wishes to fund or acquire a Property on behalf of the Company, the Company may borrow funds from a third party lender to cover any shortfall. Additional financing may also be required to continue the operation of the Properties. The Manager intends to obtain a short-term line of credit for the Company but has not yet obtained a commitment for any such financing. The line of credit will be collateralized with all of the assets of the Company and may be guaranteed by the Manager and its members. |
| Operation: | The Company expects that each property will be held for 2 to 12 months though some or all of the properties may be held for shorter or longer than that period of time. If a Property is sold or is otherwise disposed of during the term of the Company, the Company will reinvest the proceeds unless otherwise determined by the Manager. |

**Defined Terms**

| | |
|---|---|
| Defined Terms: | Terms having their first letter capitalized in this Memorandum and not defined herein are defined in the Operating Agreement. |

6

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1042
CRITERION_SEC_00034619

# RISK FACTORS

**An investment in the Units is highly speculative and involves substantial risks.** Units should not be purchased by persons who cannot afford the loss of their entire investment. You should carefully consider the risks described below, as well as the other information in this Memorandum, when evaluating whether to make an investment in Units. You should also consult with your own legal, tax and financial advisors about an investment in the Units. If any of the following risks actually occur, the Company's business, financial condition and results of operation could be materially and adversely affected. In such case you could lose all or part of your investment.

You and your advisors are invited to ask questions of the Company and to request information about the terms and conditions of this Offering for the purpose of evaluating the merits and risks of an investment in Units. The Company will provide such information to the extent the Company possesses the information or can acquire it without unreasonable effort or expense.

This Memorandum contains certain forward-looking statements that involve risks and uncertainties. These statements relate to the Company's future plans, goals, expectations and intentions. These statements may be identified by the use of words such as "expects," "anticipates," "intends," "plans," "will," "may," and similar expressions. The Company's actual results could differ materially from the results anticipated in these forward-looking statements. Factors that could contribute to such differences include, but are not limited to, those discussed below and elsewhere in this Memorandum.

## Real Property and Real Estate Risks

**There are many general risks involved with investing in real estate and real property.** The Properties will be subject to the risks typically associated with investments in real estate. With respect to the Properties, fluctuations in inventory, market prices, operating expenses, and the Manager's ability to make acquire and sell the Properties can adversely affect operating results of the Properties. Operating performance will also depend on adverse changes in local population trends; market conditions; neighborhood values; national, regional or local economic and social conditions; federal, state or local regulations, controls or fiscal policies, including those affecting rents, prices of goods, fuel and energy consumption, environmental restrictions, real estate taxes, zoning and other factors affecting real property; the need for capital improvements and repairs; inflation; financial condition and profitability of tenants; uninsured losses; acts of nature such as floods and earthquakes; and other risks. Some or all of these factors may also affect the financial condition of prospective purchasers of the Properties and thus their ability to close on any given transaction.

**General economic conditions may affect return on investment.** Events related to the United States mortgage crisis several years ago have created uncertainty with respect to the condition of the economy in the United States. Certain economic factors and indicators have suggested that the United State mortgage crisis has had a substantial negative effect on the economy and several industries have experienced financial difficulties. It is impossible to determine at this time what the long-term effects on the economy will be. Any negative change in the general economic conditions in the United States could adversely affect the financial condition and operating results of the Company.

**Environmental liabilities may affect return on investment.** Federal, state and local laws impose liability on a landowner for the release or the otherwise improper presence on the premises of hazardous substances. This liability is without regard to fault for, or knowledge of, the presence of such substances. A landowner may be held liable for hazardous materials brought onto the property before it acquired title and for hazardous materials that are not discovered until after it sells the property. Similar liability may occur under applicable state law. If any hazardous materials are found within the Properties in violation of law at any time, the landowner, which may be the Company, could be held liable for cleanup costs, fines, penalties and other costs. If losses arise from hazardous substance contamination that cannot be recovered from other responsible parties, the financial viability of the property and the Company may be materially and adversely affected. In an extreme case, the property may be rendered worthless, or the landowner may be obligated to pay cleanup and other costs in excess of the value of the property.

7

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1043
CRITERION_SEC_00034620

**Tenant defaults may affect return on investment.** The Company intends to invest in Properties. which may or may not be currently leased to tenants. The Company does not intend to hold properties leased to tenants, but the Company may be bound by the terms of an existing lease and the tenants of the Properties may or may not be able to make the payments required under the Leases. Where necessary, the Company will try to make the leases performing. but if a tenant defaults, the Company may have to evict the tenant to protect its investment. If the Company does not evict, it may be forced to restructure the lease, which could adversely affect the return on the investment. If eviction becomes necessary, the Company will evict the tenant and secure a new tenant for the Property. In the meantime, the Company may not be able to collect rents on the Property. In that case, the Company may have to borrow funds to finance the operations of the Property. Such borrowing may not be available to the Company or may be available at unacceptable interest rates or otherwise on unacceptable terms. Further. the tenant of the Property may engage in activities intended to defer or prohibit an eviction. which could include a lawsuit against the Company as the owner of the Property. All of the above could adversely impact the financial condition of the Company and extend the period of time that Company funds are invested in the investment.

**You will not know or control what investments the Company makes.** At the commencement of the Offering, the Manager had not yet identified any Properties it would acquire on behalf of the Company with the proceeds of the Offering. The lack of information regarding the Properties, such as financial viability of tenants, operating history of real property and other relevant economic and financial information regarding the Properties, means that you will not have an opportunity to evaluate for yourself the relevant information regarding any Properties. Accordingly, the risk of investing in the Company may be increased. Although the Manager has established investment criteria to guide it in making investments on behalf of the Company, the Manager has broad authority and discretion when choosing Properties to acquire. Consequently, investors must rely exclusively on the Manager to make investment decisions. No assurance can be given that the Company will be able to obtain suitable investments or that the Company's goals will be achieved.

**Fluctuations in interest rates may affect return on investment.** Recent years have demonstrated that mortgage interest rates are subject to fluctuation. The Company may acquire Properties and finance the Properties with a variable interest rate. If interest rates rise, the Company may be forced to pay more interest and may not be able to collect additional rents. This, in turn, could affect the return to Members relative to other investments. Due to the lack of liquidity of an investment in the Company, if prevailing interest rates rise above the average return being paid by the Company, you may be unable to quickly liquidate your investment to take advantage of higher returns available from other investments.

**Lack of diversification may affect return on investment.** The total amount actually raised in the Offering and the number of Properties the Company will acquire are uncertain. It is possible that the Company will only acquire very few Properties, limiting the diversification of the Company's investments and increasing the risk of loss to investors. A limited number of Properties may place a substantial portion of the funds invested in just a few properties in the same geographical location with the same property-related risks. In that case. the decline in a particular real estate market could substantially and adversely impact the Company. A more diversified investment portfolio would not be impacted to the same extent upon such an occurrence.

**Bankruptcy of tenants may affect return on investment.** If a tenant becomes bankrupt. enforcement of the Company's rights under its lease, including eviction of the tenant, may be delayed. Such delay may result in loss to the Company by extending the period of non-payment of rent payments and by exposing the Company to possible depreciation in the value of the Property.

**The Company may use leverage to make investments.** The Company intends to acquire the Properties with the proceeds of this Offering. If, however. the Company does not have sufficient funds to acquire a Property, the Company may borrow funds from a third party lender to cover any shortfall. Additional financing may also be required to continue the operation of Properties. The Manager intends to obtain a line of credit for the Company but has not yet obtained a commitment for any such financing. The line of credit will be secured by all of the assets of the Company and may be guaranteed by the Manager and its members. Any borrowed funds are to be repaid out of the cash flow from the Properties. As a result of the use of leverage. a decrease or default on rent payments to the Company by a tenant may materially and adversely affect the Company's cash flow and, in turn, cash from operations. No assurance can be given that future cash flow will be sufficient to make the debt service payments on any borrowed funds and to cover all operating expenses. If the Company's revenues are insufficient to pay debt

8

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1044
CRITERION_SEC_00034621

service and operating costs, the Company will be required to use working capital or seek additional funds. There can be no assurance that additional funds will be available to the Company, if needed, or, if such funds are available, that they will be available on terms acceptable to the Company. If the Company is unable to pay debt service, the security underlying such debt could be foreclosed and you could lose your investment. If the Company borrows funds on a recourse basis, it is possible that assets of the Company may have to be sold to satisfy the indebtedness.

**The loan-to-value ratio will determined by the Manager.** For any loans placed on the Properties, the loan-to-value ratios on the Properties will be determined by the Manager and there is no requirement by the Company that an appraisal be obtained. The third party lender may require an appraisal be obtained before any funds are loaned. Consequently, it is possible that the actual value of the Properties may be different than the value determined by the Manager or it may even be different than a value determined by an appraisal.

**Using financing with a variable rate of interest may affect return on investment.** The Company may obtain variable rate financing. As a result, if interest rates increase. and the Company owns properties subject to variable rate financing, the return on the Properties could be less than if the Company had obtained fixed rate financing.

**Using financing with a fixed rate of interest may affect return on investment.** The Company may obtain fixed rate financing. As a result, if interest rates decrease and the Company owns properties subject to fixed rate financing, the return on the Properties could be less than if the Company had obtained variable rate financing.

**Lender to the Company may obtain control of it.** If the Company borrows funds, it is possible that the lender may obtain control or have certain rights over the Company. These rights may be exercised such that the results are in the best interest of the lender and not in the best interest of the Company.

**The Company may not be able to make balloon payments when due.** The financing obtained by the Company, if any, may have short terms. Consequently, the Company may be required to make a large balloon payment on the maturity date of a loan. If the Company is unable to make the balloon payment or to refinance the loan for any reason. the Company may be required to sell some or all of the Properties to make such payments which. in turn, could adversely affect the financial condition and returns of the Company and the Members.

**Delays in the sale of properties may affect return on investment.** The Company expects to hold the Properties for a period of 2-12 months. though some or all of the Properties may be held for shorter or longer than that period of time. If, however, the Company needs to sell a Property for any reason, including to make payments on any financing obtained by the Company, there is no assurance that the Company will be able to do so or that it will be able to do so on terms favorable to the Company.

**Earthquakes may cause damage and affect return on investment.** California is one of the most seismically active regions in the United States. Although research on earthquake prediction has increased in recent years, when and where an earthquake will occur cannot be predicted. An earthquake could cause structural damage to or destroy the Properties. If earthquake insurance is not obtained for the Properties, or if the earthquake insurance obtained is not adequate to cover losses incurred. an earthquake could have an adverse financial impact on the property and the Company.

**Toxic mold may cause damage and affect return on investment.** Litigation and concern about indoor exposure to certain types of toxic molds has been increasing as the public becomes aware that exposure to mold can cause a variety of health effects and symptoms, including allergic reactions. Toxic molds can be found almost anywhere: they can grow on virtually any organic substance, as long as moisture and oxygen are present. There are molds that can grow on wood, paper, carpet, foods, and insulation. When excessive moisture accumulates in buildings or on building materials. mold growth will often occur, particularly if the moisture problem remains undiscovered or unaddressed. It is impossible to eliminate all mold and mold spores in the indoor environment. In warm or humid climates. the likelihood of toxic mold can be exacerbated by the necessity of indoor air-conditioning year-round. The difficulty in discovering indoor toxic-mold growth could lead to an increased risk of lawsuits by affected persons, and the risk that the cost to remediate toxic mold will exceed the value of the property. Because of attempts to exclude damage caused by toxic mold growth from certain liability provisions in insurance policies. there is no guarantee that insurance coverage for toxic mold will be available now or in the future.

9

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1045
CRITERION_SEC_00034622

**Lack of representations and warranties from sellers may lead to losses.** The Company may acquire Properties from sellers or lenders who make only limited or no representations and warranties regarding the condition of such Property, the presence of hazardous substances within such Property, the status of governmental approvals and entitlements for such Property or other matters adversely affecting such Property are discovered. The Company may not be able to pursue a claim for damages against such sellers except in limited circumstances. The extent of damages that may be incurred as a result of such matters cannot be predicted but potentially could result in a significant adverse effect on the value of such Properties.

**Uninsured losses may affect return on investment.** The Company will try to ensure the Properties have adequate insurance coverage against liability for personal injury and property damage. However, there can be no assurance that insurance will be sufficient to cover any or all such liabilities. Furthermore, insurance against certain risks, such as earthquakes and/or floods, may be unavailable or may only be available at commercially unreasonable rates or in amounts that are less than the full market value or replacement cost of the underlying properties. In addition, there can be no assurance that particular risks that are currently insurable will continue to be insurable on an economical basis or that current levels of coverage will continue to be available. To the extent the Company obtains insurance with respect to the Properties, the insurance may help reduce the risk of loss to the Company but it will also increase costs to the Company and thus lower the Company's potential return.

**Competition from similar buyers may affect return on investment.** The Company will experience competition for Properties from individuals, corporations and other entities engaged in similar investment activities. The business of identifying and structuring real estate transactions of the types contemplated is highly competitive and involves a high degree of uncertainty. Many funds have already been formed and many are being formed now. Furthermore, the availability of investment opportunities generally will be subject to market conditions. In addition, the Company may face increasing competition for attractive investments from existing and new real estate investors with similar investment objectives. Accordingly, there can be no assurance that the Company will be able to identify and complete attractive investments in the future or that it will be able to fully invest its committed capital. Still further, competitor funds with similar strategies and investments may prevent the Company from selling investments properties at what it believes is market value by flooding the market with similar properties.

**Operation and Company Risks**

**New ventures are inherently risky.** The Company is a new entity with no prior operating history. The Company is subject to the risks involved with any speculative new venture. No assurance can be given that the Company will be profitable.

**An investment in the Company is speculative.** The Company's goals are highly speculative, and there is no assurance that the Company will be able to meet any of its goals. If you buy Units, you should be aware that you may not earn a substantial return on your investment and you may, in fact, lose your entire investment.

**Investors are not guaranteed any distributions.** While the Company intends to make cash distributions to Members, there can be no assurance with respect to the amount or timing of such distributions or that such distributions will, in fact, be made. Delays in making cash distributions could result from the inability of the Company to acquire or sell Properties or collect rents from tenants. Distributions, if any, will be subject to payment of Company expenses and may be restricted or suspended when the Manager determines in its sole discretion that to do so would be in the best interest of the Company. The Company intends to distribute sufficient cash from activities of the Company to enable the Members to pay any tax imposed on any taxable income generated by the Company but there can be no guarantee that the Company will be able to do so.

**The Company may need additional working capital.** The Manager intends to secure loans on behalf of the Company for working capital or to finance the Properties. The Company has not received a commitment from any third party to make such future loans, if needed, and there can be no assurance that such loans will be available when needed or that they will be available on attractive terms. If any additional necessary funds cannot be obtained, it could negatively affect the Company's ability to meet its goals.

**You will be required to rely on management.** All decisions regarding management of the Company's affairs will be made exclusively by the Manager and not by any of the Members. Accordingly, you should not buy

10

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1046
CRITERION_SEC_00034623

Units unless you are willing to entrust all aspects of management to the Manager or its successor(s), including, but not limited to, the selection of the Properties to acquire. You should carefully evaluate the personal experience and business performance of the Manager and its principals. See "The Manager." The Manager may retain independent contractors to provide services to the Company relating to the Properties. Such contractors have no fiduciary duty to the Members, and may not perform as expected.

**Lack of control of property management may affect return on investment.** In some cases, the Manager may not directly control the day-to-day operations of income-producing Properties, but will be dependent upon third party owners and/or property managers to manage the properties successfully. There can be no assurance that the owners and/or property managers will be successful in managing the properties.

**The Manager and its principals may have conflicts of interest.** The principals of the Manager are employed independently of the Company and will engage in other activities. The Manager, itself, is engaged in other activities and intends to continue to engage in such activities, some of which may compete with the Company. The Manager will have conflicts of interest in allocating management time, services and functions between the Company and other current and future activities. The Manager, however, believes that it will have sufficient staff, consultants, independent contractors and business managers to adequately perform its duties. The Members will not have any interest in any future entities or business ventures formed or developed by the Manager or its affiliates. Any conflict of interest may result in the rights of the Company not being adequately protected to the detriment of the Members. See "Conflicts of Interest."

**The Manager has limited resources.** The Manager believes it has the financial resources to serve and satisfy its obligations as the Manager. A significant financial reversal for the Manager could adversely affect the ability of the Manager to satisfy its financial obligations to the Company and to manage the Company.

**The Company does not intend to be well diversified.** The Company has no plans to acquire or develop any investments other than the Properties discussed in this Memorandum. Thus, the Company is not, and will not likely be, diversified as to the type of assets it owns and may not be diversified as to geography or location of the Properties. In addition, if insufficient funds are raised, the Company may only acquire one or a relatively few Properties. This lack of diversification could increase your risk of investing in the Company.

**If there is a Dissolution or Termination of the Company, creditors are paid first.** In the event of dissolution or termination of the Company, the proceeds realized from the liquidation of the Company's assets will be distributed among the Members, but only after the satisfaction of the claims of third-party creditors of the Company. The ability of a Member to recover all or any portion of his or her investment under such circumstances will, accordingly, depend on the amount of net proceeds realized from the liquidation and the amount of claims to be satisfied therefrom. There can be no assurance that the Company will recognize gains or realize net proceeds on liquidation.

**Successive owners of units will be allocated net income and net loss.** As between successive owners of Units, net income and net loss will be allocated (for income tax and other purposes) as provided in the Operating Agreement, to the extent permitted under the Code, regardless of the dates upon which cash distributions are made to the Members or the amount of any such cash distributions. The buyer or seller of Units may, accordingly, be required to report a share of the Company's net income on his or her personal income tax return, even though no cash distributions were received during the period in which the Units were held or, if any cash distributions were received, even though the amounts of the distributions bore no relation to the amount of net income required to be reported. See "Federal Income Tax Consequences -- Tax Consequences Regarding the Company -- Allocations of Net Income and Net Loss."

**Members may be liable to return distributions in certain circumstances.** In general, a Member may be liable for the return of a distribution to the extent that the Member knew at the time of the distribution that immediately after giving effect to the distribution, all liabilities of the Company would exceed the fair value of the Company's assets, or the Company would not be able to pay its debts as they become due in the ordinary course of activities. Otherwise, Members are generally not liable for the debts and obligations of the Company beyond the amount of the capital contributions they have made or are required to make under the Operating Agreement.

11

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1047
CRITERION_SEC_00034624

**The Manager's liability is limited.** The Manager and its attorneys, agents and employees may not be liable to the Company or the Members for errors of judgment or other acts or omissions not constituting gross negligence or willful malfeasance as a result of certain indemnification provisions in the Operating Agreement. A successful claim for such indemnification would deplete the Company's assets by the amount paid. See "Summary of the Operating Agreement."

**Members will be bound by the decision of a majority vote in certain circumstances.** Subject to certain limitations, Members holding a majority of Units may vote to, among other things, amend the Operating Agreement. Members who do not vote with the majority in interest of the Members nonetheless will be bound by the majority vote.

**The Company can issue additional Units without your approval, diluting your proportional ownership interest.** The Operating Agreement authorizes the Manager to issue 2,500 Units. This Offering is only for a maximum of 1,500 Units. Consequently, any Units issued after your purchase will dilute your proportional ownership interest in the Company. Our Units do not have preemptive rights. This means that you may not be entitled to buy additional Units if Units are offered to others after this Offering. Nothing restricts the Manager's ability to offer additional Units for fair value to others in the future.

### Private Offering and Liquidity Risks

**There are restrictions on the transferability of Units.** To buy Units, you must represent that you are acquiring the Units for investment and not with a view to distribution or resale, that you understand the Units are not freely transferable and, in any event, that you must bear the economic risk of investment in the Units for an indefinite period of time because the Units have not been registered under the Securities Act or applicable state "Blue Sky" or securities laws, and that the Units cannot be sold unless they are subsequently registered or an exemption from such registration is available and unless you comply with the other applicable provisions of the Operating Agreement. There is no public or other trading market for the Units, and it is highly unlikely that any market will develop. Thus, you cannot expect to be able to liquidate your investment in case of an emergency. Further, the sale of Units may have adverse federal income tax consequences. The transfer of Units requires the prior written consent of the Manager. Further, no transfer will be allowed unless the Manager determines that the transfer will not cause the Company to be "publicly traded." See "Federal Income Tax Consequences." There is no guarantee that the Manager will consent to any transfer.

**The Unit Price was determined arbitrarily.** The purchase price of the Units has been arbitrarily determined and is not the result of arm's-length negotiations. It has been determined primarily by the capital needs of the Company and bears no relationship to any established criteria of value such as book value or earnings per Unit, or any combination thereof. Further, the price of the Units is not based on past earnings of the Company, nor does that price necessarily reflect current market value for the Properties to be acquired by the Company. No valuation or appraisal of the Company's potential business has been prepared.

> **The Units are being sold on a "best efforts" basis.** The Units being sold in this Offering are being sold directly by the Company's Manager and its managers, directors and executive officers, none of whom will receive any commissions or other remuneration for such sales. We have also engaged Ausdal Financial Partners to assist in selling Units, but there is no firm commitment by Ausdal Financial Partners or any other firm to buy, sell or place any of the Units. Because the Offering is on a "best efforts" basis, no one is obligated to purchase or take for sale any Units. There is also no minimum offering amount, and the Units sold in this Offering may not be sufficient to capitalize the Company for its intended purposes.

**The Offering has not been registered.** The Offering will not be registered with the Securities and Exchange Commission under the Securities Act or with the securities agency of any state. The Units are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability requirements set forth herein. If the Company should fail to comply with the requirements of such exemption, investors may have the right to rescind their purchase of the Units. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Units will be offered without registration or qualification pursuant to a private offering or other exemption. If a number of Members were successful in seeking rescission, the Company and the

12

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1048
CRITERION_SEC_00034625

Manager would face severe financial demands that would adversely affect the Company as a whole and, thus, the investment in the Units by the remaining Members.

**There has been no agency review of the Offering.**  Since this Offering is a nonpublic offering and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the Securities and Exchange Commission or any state securities commission.  The terms and conditions of the Offering may not comply with the guidelines and regulations established for offerings and real estate programs that are required to be registered and qualified with those commissions.

**The failure of other offerings to comply with applicable law could lead to liability.**  Other offerings by the Manager and its affiliates have been made in reliance on exemptions under federal and state securities laws.  No assurance, however, can be given that such exemptions were available or that the compliance requirements were met.  If exemptions were not available for those offerings, the Managers of such programs could incur significant liability, including return of amounts paid.  Because the shareholders and officers of the Manager are also shareholders and officers of the Managers of those programs, the management resources of the Manager could be adversely affected by liabilities incurred by those programs.

**The Manager and its affiliates may purchase Units.**  The Manager and its affiliates will purchase at least 1 Unit and may, in their sole discretion, buy additional Units for any reason deemed appropriate by them.  Any purchase of Units by the Manager or its affiliates will be on the same terms as other investors, except that it will be subject to certain limitations in the Operating Agreement. Upon any additional acquisition of Units, the Manager or its affiliates will have the same rights as other Members, including the right to vote on all matters subject to the vote of Members (although the Manager and affiliates controlled by the Manager have agreed to vote any Units held by the Manager or such affiliates in proportion to the votes of the other Members). The Manager and its affiliates will acquire any Units for their own accounts and not with a view towards the resale or distribution of such Units. Should the Manager become a Member, the percentage interest of the Manager in the profits, gains, losses, deductions and credits of the Company will increase as against a corresponding reduction in the interest of the other Members.

**Projected aggregate cash flow and other forward-looking statements involve significant uncertainty.**  Any projected cash flows included in this Memorandum are forward-looking statements that involve significant risk and uncertainty. All materials or documents supplied by the Manager, including any such cash flows, should be considered speculative and are qualified in their entirety by the assumptions, information and risks disclosed in this Memorandum.  The assumptions and facts upon which such projections are based are subject to variations that may arise as future events actually occur and to a complex series of events, many of which are outside the control of the Manager and the Company.  The anticipated cash flows and returns described herein are based on assumptions made by the Manager regarding future events.  There is no assurance that actual events will correspond with these assumptions. Actual results for any period may or may not approximate projections and may differ significantly. You should consult with your tax and business advisors about the validity and reasonableness of any factual, accounting and tax assumptions.  Neither the Manager nor any other person or entity makes any representation or warranty as to the future profitability of the Company or of an investment in the Units.

**Counsel to the Company does not represent the Members.**  Under the Operating Agreement, each of the Members acknowledges and agrees that counsel representing the Company, the Manager and its affiliates does not represent and shall not be deemed under the applicable codes of professional responsibility to have represented or to be representing any or all of the Members in any respect.

**Tax-exempt investors may be subject to additional restrictions.**  In considering an investment in Units of a portion of the assets of a trust of a pension or profit-sharing plan qualified under Section 401(a) of the Code and exempt from tax under Section 501(a), a fiduciary should consider if (i) the investment satisfies the diversification requirements of Section 404 of the ERISA; (ii) the investment is prudent, since the Units are not freely transferable and there may not be a market created in which the fiduciary can sell or otherwise dispose of the Units; and (iii) the Units or the underlying assets owned by the Company are "plan assets" under ERISA.  See "Investment by Employee Benefit Plans and Individual Retirement Accounts."

13

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1049
CRITERION_SEC_00034626

**Subsequent investors may be able to review the Company's investments**. Investors who invest in the later stages of the Offering will have a greater opportunity to review information regarding the Company's investments that will not be available to early investors. Early investors will not have an opportunity to review any investments to be made with the proceeds of this Offering. In this regard, later investors may have an advantage in initially deciding whether to invest in the Company.

**Your subscription is irrevocable**. An offer to purchase Units in this Offering, including submission of a Subscription Agreement, whether with or without investment funds, is irrevocable. Funds you deliver in connection with your subscription will not be returned for any reason unless the Offering is cancelled or your subscription is rejected.

## Tax Risks

There are substantial risks associated with the federal income tax aspects of an investment in Units. The IRS has continued to examine numerous tax issues that could affect the Company. Moreover, the income tax consequences of an investment in the Company are complex, and recent tax legislation has made substantial revisions to the Code. Many of these changes, including changes in the taxation of limited liability companies and their Members, affect the tax benefits generally associated with an investment in a limited liability company. The following paragraphs summarize some of the tax risks to the Members. Because the tax aspects of this Offering are complex and certain of the tax consequences may differ depending on individual tax circumstances, you should consult with and rely on our own tax advisor with respect to this Offering's tax aspects and your individual situation. No representation or warranty of any kind is made with respect to the acceptance by the IRS of the treatment of any item by the Company or any Member.

You should read the following discussion of tax risks together with the section "Federal Income Tax Consequences," which includes a general discussion of the federal income tax consequences associated with an investment in Units, including other tax risks. This Memorandum does not discuss the consequences and risks of applicable state tax laws. For advice on state tax laws applicable to your tax situation, you should seek the advice of your tax advisor.

**There is a risk the Company is audited, which could impact its Members.** The Company's federal information returns may be audited by the IRS. An audit may result in the challenge and disallowance of some of the deductions described in the Company's returns. No assurance or warranty of any kind can be made with respect to the deductibility of any such items in the event of either an audit or any litigation resulting from an audit. If an audit of the Company's returns leads to adjustments, the federal income tax returns of Members will be affected and may result in significant interest and penalty payments due to an underpayment of federal income tax by the Company and by Members. In addition, an audit of the Company's returns could lead to an audit of a Member's individual tax return, which in turn could lead to adjustments other than those relating to the Member's investment in the Company. See "Federal Income Tax Consequences – Accuracy-Related Penalties and Interest" and "Federal Income Tax Consequences – Tax Consequences Regarding the Company – Tax Returns."

**Tax authorities may not treat the Company the way it desires to be classified.** The Company intends to elect to be taxed as a partnership for federal income tax purposes. The Company has not and does not intend to request a ruling from the IRS that the Company will be treated as a partnership, and not as a corporation, for tax purposes. Without such a ruling, there can be no assurances that the Company will be treated as a partnership. If the Company were to be treated as a corporation for tax purposes, the tax benefits associated with an investment in a limited liability company, if any, would not be available. The Company would, among other things, pay income tax on its earnings in the same manner and at the same rate as a corporation, and losses, if any, would not be deductible by the Members. A material risk of IRS treatment of the Company as a corporation may exist even if the Company obtains an opinion of counsel regarding Company tax status since such opinion is not binding on the IRS. See "Federal Income Tax Consequences – Tax Consequences Regarding the Company – Company Status."

**Unrelated business taxable income may be generated.** The Company may generate unrelated business taxable income subject to a possible exception for qualified plans. Tax-exempt entities should consult their own tax counsel about the effect of any unrelated business taxable income. See "Federal Income Tax Consequences -- Investment By Qualified Plans and Individual Retirement Accounts -- Unrelated Business Taxable Income."

14

USW 804765074.5

Exhibit 23 Page 1050
CRITERION_SEC_00034627

**Possible disallowance of various deductions might reduce the benefits of an investment.** The availability, timing and amount of deductions or allocations of income of the Company will depend not only on general legal principles but also on various determinations that are subject to potential controversy on factual and other grounds. Additional issues could arise regarding the allocation of basis to buildings, land, leaseholds and personal property. If the IRS were successful, in whole or in part, in challenging the Company on these issues, the federal income tax benefits of an investment in the Company, if any, might be materially reduced.

**Limitations on losses and credits from passive activities might reduce the benefits of an investment.** Deductions in excess of income, i.e., losses from passive trade or business activities, generally may not be used to offset "portfolio income," i.e., interest (other than interest received by a taxpayer engaged in the trade or business of lending money), dividends and royalties, or salary or other active business income. Interest income of the Company will be portfolio income. See "Federal Income Tax Consequences – Tax Consequences Regarding the Company – Limitations on Losses and Credits from Passive Activities."

**A change in the allocation of net income and net loss might reduce the benefits of an investment.** For the allocations of income, gains, deductions, losses and credits under the Operating Agreement to be recognized for tax purposes, such allocations must possess substantial economic effect. It is possible that the IRS may claim that such allocations lack substantial economic effect. If any challenge to the allocation of losses to any Member were upheld, the tax treatment of the investment for such Member could be adversely affected. See "Federal Income Tax Consequences – Tax Consequences Regarding the Company -- Allocation of Net Income and Net Loss."

**Investors may have taxable income in excess of cash receipts.** It is possible that your taxable income resulting from your investment in the Company will exceed the cash distributions attributable thereto. This may occur because funds received by the Company may be taxable income to the Company while the Company may use such funds for nondeductible operating or capital expenses of the Company. Further, taxable income may be used to repay loans. Thus, there may be years in which your tax liability exceeds your share of cash distributions from the Company, in which case the payment of such taxes, to the extent of the excess, will be an out-of-pocket expense for you. The same tax consequences may result from the voluntary or involuntary sale or other disposition (including gifts) of your Units, and may produce ordinary income or capital gain or loss.

**You are limited in your use of Net Loss.** You should be aware that you will only be able to use net loss up to the amount of your basis in your Units.

**The alternative minimum tax might reduce the benefits of an investment.** The alternative minimum tax applies to designated items of tax preference. The limitations on the deduction of passive losses also apply for purposes of computing alternative minimum taxable income. See "Federal Income Tax Consequences – General Considerations – Alternative Minimum Tax."

**Changes in federal income tax law might reduce the benefits of an investment.** Congress has enacted several major tax bills that substantially affect the tax treatment of limited liability companies. These changes will have a substantial effect on the types of activities in which the Company intends to engage, and certain of those effects are set forth in the section "Federal Income Tax Consequences." In many instances, Congressional Committee reports have been relied on for the interpretation and application of these new statutory provisions. While the Code authorizes the Treasury Department to issue extensive substantive regulations regarding recently adopted Code provisions, few have been issued to date. In addition, Congress could make substantial changes in the future that affect the income tax consequences of an investment in the Company. Congress is currently analyzing and reviewing numerous proposals regarding changes to federal income tax laws. The extent and effect of such changes, if any, are uncertain.

The discussion of tax aspects in this Memorandum is based on law presently in effect and certain proposed Treasury Regulations. Nonetheless, you should be aware that new administrative, legislative or judicial action could significantly change the tax aspects of an investment in the Company. Any such change may or may not be retroactive with respect to transactions entered into or contemplated before the effective date of such change and could have a material adverse effect on the Company and its Members.

15

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1051
CRITERION_SEC_00034628

## ESTIMATED USE OF PROCEEDS

The following table sets forth certain information about the estimated use of the Offering proceeds:

### Maximum Offering

|  | Amount | % of Gross Proceeds |
|---|---|---|
| Gross Offering Proceeds | $15,000,000 | 100.0% |
| Offering and Organization Expenses | $0 | 0.0% |
| Available for Investment and Reserves | $15,000,000 | 100.0% |
| Total Application of Proceeds | $15,000,000 | 100.0% |

## DESCRIPTION OF THE PROPERTIES

**Types of Properties**

The Company will seek to invest substantially all of the Offering proceeds available for investment in commercial and residential real estate. The Company's primary activities will be to acquire real property Properties located in California, although the Company may invest in Properties located in states other than California. The Properties will be held by the owner for resale. The Company expects to hold the Properties until the properties are sold. The Company expects that each Property will be held for at least 2 to 12 months though the Properties could be held for shorter or longer than that period.

The Company will seek to invest in Properties that will satisfy the goals of the Company, and, to the extent feasible, will strive to invest in a diversified portfolio of Properties. There are, however, no percentage limitations on the types of Properties in which the Company may invest and the Manager may, in its sole discretion, invest in any combination of Properties at any time and may invest up to 100% of the Company's assets in any type of property.

There are no specific limitations on the number or size of Properties to be acquired by the Company or on the percentage of net proceeds of this Offering that may be invested in a single property. The number and mix of Properties acquired will depend on real estate and market conditions and other circumstances existing at the time the Company is making its investments and the amount of the net proceeds of this Offering.

**Standards for Acquiring Properties**

In making investment decisions for the Company, the Manager will consider relevant real property and financial factors, including, but not limited to, the location and condition of the real property, the income-producing capacity of the real property, the prospects for long-range appreciation of the real property, and the liquidity and income tax considerations of the investment. In this regard, the Manager will have substantial discretion with respect to the selection of specific investments.

**Borrowing Policies**

The Company intends to acquire the Properties with the proceeds of this Offering. If, however, sufficient funds have not been raised in this Offering at the time the Manager wishes to acquire a Property on behalf of the Company, the Company may borrow funds from a third party lender to cover any shortfall. Additional financing may also be required to continue the operation of Properties. The Manager intends to obtain a line of credit for the Company but has not yet obtained a commitment for any such financing. The line of credit will be collateralized by all of the assets of the Company and may be guaranteed by the Manager and its members.

16

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1052
CRITERION_SEC_00034629

# BUSINESS PLAN

## Main Goals

The main goals of the Company will be to (i) preserve the Members' capital investment, (ii) realize income through the acquisition of the Properties, (iii) make distributions at least annually to the Members from cash generated by operations in an amount equal to an 8% annual return on their investment, and (iv) in the sole discretion of the Manger make additional distributions so the Members receive a greater than 8% return on their investment. Of course, there is no assurance that the Company will be able to meet any of these goals.

## Operation

It is the intent of the Manager on behalf of the Company to acquire the Properties on the terms specified herein. The Company expects to hold the Properties until the Properties are sold. The Company expects that each Property will be held for at least 2 to 12 months though the Properties could be held for shorter or longer than that period. If, however, the Manager, in its sole discretion, determines the sale or other disposition of a Property could be advantageous to achieve the Company's goals, the Manager may sell a Property. In deciding whether to sell Properties, the Manager will consider factors such as potential capital appreciation, cash flow and federal income tax considerations, including possible adverse federal income tax consequences to the Members. If a Property is disposed of during the term of the Company, the Company will reinvest the proceeds unless otherwise determined by the Manager.

The Manager expects the Properties to generate positive cash flow after payment of all expenses, so that no borrowing to fund working capital will be required after acquisition of the Properties. If the Properties do not generate positive cash flow, and additional funds are required to meet Company expenses, the Manager may seek to borrow such funds from third parties at commercially competitive rates.

## Expenses

The Company will be responsible for expenses directly related to the operation of the Company, including, but not limited to, bank fees, legal and accounting fees and expenses related to the preparation of Company tax returns.

## Distribution of Cash Flow

Beginning at the end of the first full year after the termination or expiration of the Offering, the Manager plans to begin and maintain, during the term of the Company, distributions to the Members of Cash from Operations of the Company in an amount equal to an 8% cumulative but not compounded return on their net capital contributions ("**8% Preferred Return**"). However, there can be no assurance that the Manager will be able to do so. Any distributable Cash from Operations remaining after the Members have received an 8% Preferred Return may be distributed to the Members, in an amount determined by the Manager in its sole and absolute discretion, if any, to enhance their 8% Preferred Return, and any remaining amounts to the Manager.

# DISTRIBUTION PLAN

## Capitalization

The Offering is for a maximum of 1,500 Units ($15,000,000). The Company intends to continue to offer Units until the Offering Termination Date, unless sooner terminated by the Manager, and the net proceeds from the sale of each Unit will be added to the Company's capital and used for the purposes described in this Memorandum. The capitalization of the Company, reflecting issuance and sale of the Units, will be as follows:

|  | Maximum |
|---|---|
| Company Units............................ | 1,500 |
| Total...................................... | $15,000,000 |

17

USW 804765074.5

Exhibit 23 Page 1053
CRITERION_SEC_00034630

FOIA Confidential Treatment Requested by Criterion Wealth Management

The Company will be capitalized and proceeds released to the Company immediately upon receipt of subscriptions. The total amount reflects cash contributions of investors as of the date of capitalization of the Company in the amount of $10,000 per Unit. The amount does not include any contribution to the Company by the Manager as the initial Member. The amounts shown are the gross proceeds of the Offering before deduction of expenses incurred in connection with the Offering and the organization of the Company, including, but not limited to, legal and accounting fees, marketing expenses and other expenses directly related to the Offering and the organization of the Company. However, the Manager anticipates paying such expenses on behalf of the Company as part of its capital contribution, and therefore such amount to be paid by the Company is expected to be $0.

**Qualifications of Investors**

The Units are being offered and sold in reliance on exemptions from registration under the Securities Act and state securities laws. Accordingly, distribution of this Memorandum has been strictly limited to investors who satisfy the investor suitability requirements described under "Who May Invest," and the Units may only be purchased by investors who meet those requirements. This Memorandum is not an offer to sell or a solicitation of an offer to buy with respect to any person not satisfying those requirements.

**How to Buy Units**

If, after carefully reading this entire Memorandum, you would like to subscribe for, or buy, Units, please complete and sign the Subscription Agreement. The full purchase price of $10,000 for each Unit is payable in cash, by check, when you buy the Units. The minimum purchase amount is one Unit ($10,000), except that the Manager may permit certain investors to buy a fractional Unit.

Please make your check payable to "Southland Home Mortgage II, LLC" and send your check with your completed and signed Subscription Agreement to:

> Southland Home Mortgage II, LLC
> 1590 S. coast Highway, #16
> Laguna Beach, CA 92651
> Attn: Daniel Niednagel

**Acceptance of Subscriptions**

The Manager may, in its sole discretion, accept or reject any subscription, in whole or in part, for a period of 30 days after receipt of the subscription. Any subscription not accepted within 30 days of receipt shall be deemed rejected. The Manager may terminate this Offering at any time.

**Purchases of Units by the Manager or its affiliates**

The Manager and/or its affiliates may, in their sole discretion, buy Units for any reason deemed appropriate by them. Any purchase of Units by the Manager or its affiliates will be on the same terms as other investors, except that it will be subject to certain limitations in the Operating Agreement. The Manager and its affiliates will acquire any Units for their own accounts and not with a view towards the resale or distribution of such Units. The Manager and/or its affiliates will not buy more than 24 of the Units sold in this Offering.

---

**Marketing of Units**

The Units are being offered and sold by the Manager. The Company has also engaged Ausdal Financial Partners, a broker-dealer regulated by the Financial Industry Regulatory Authority, to offer and sell Units on a "best efforts". Ausdal Financial Partners will receive commissions of 2% annually on the purchase price of the Units sold by Ausdal Financial Partners. Any commission will be paid by the Manager and not from the proceeds of this Offering.

---

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1054
CRITERION_SEC_00034631

Inquiries about subscriptions should be directed by mail to Southland Home Mortgage II, LLC, 1590 S. Coast Highway, #16, Laguna Beach, CA 92651, Attention: Daniel Niednagel, or by phone at (949) 715-0900.

**Sales Materials**

The Manager and its affiliates may respond to specific questions from prospective investors. The offering of Units is made only by means of this Memorandum. No other literature will be used in the offering of the Units.

No person has been authorized to give any information or to make any representations other than those contained in this Memorandum and, if given or made, such information or representations must not be relied upon.

## THE MANAGER

Bird Rock Management, LLC is the Manager of the Company. The Manager was formed as a California limited liability company on November 6, 2014. The Manager is a new entity with no operating history. See "Prior Experience of the Manager and its affiliates."

The only members of Bird Rock Management, LLC, which is managed by all of its members, are Three Arch Capital, Inc., and Skizzim.com, Inc. The principals of Three Arch Capital, Inc., and Skizzim.com, Inc. are Stephen Niednagel and Daniel Niednagel, respectively.

## PRIOR EXPERIENCE OF THE MANAGER AND ITS AFFILIATES

**Stephen Niednagel** began his career with AG Edwards in 1994 as an Investment Consultant working with high net worth clients in areas of Investment portfolio management and asset allocation. Niednagel later left AG Edwards to pursue self-directed entrepreneurial ventures in the areas of retail and business services. In 1998 Niednagel successfully launched a business technology recruiting services company, Silicon South Recruiters, with $2 million in annual sales. At the same time, he was a self-employed real estate investor and note buyer/servicer with a special focus in foreclosure and defaulted debt. From 2003 to 2008, Niednagel managed over $4 million in private funds invested in defaulted debt and generated over $13.5 million in receipts over that period. Since 2008 Niednagel has actively managed residential real estate funds with over $25 million in assets. Between 2008 and 2014 those funds have sold over 1,500 properties totaling over $500 million of sales. Niednagel specializes in foreclosure and bankruptcy matters relating to real property in California and several other states. Niednagel is also a licensed Real Estate Agent in the state of California. Niednagel earned his BA in Economics from UCLA in 1993.

**Daniel Niednagel** began his career in Tax and Accounting in 1997 with Coopers & Lybrand LLP in San Jose, CA and then with the Costa Mesa office of Deloitte & Touche LLP. Starting in 2000 Daniel served as a Tax Manager at McKennon, Wilson & Morgan in Irvine, CA and then at FileNet Corporation in Costa Mesa, CA as the Corporate Tax Specialist. From 2003-2008 Niednagel managed over $4 million in private funds invested in defaulted debt and generated over $13.5 million in receipts over that period. Since 2008 Niednagel has actively managed residential real estate funds with over $25 million in assets. Between 2008 and 2014 those funds have sold over 1,500 properties totaling over $500 million of sales. Niednagel specializes in foreclosure and bankruptcy matters relating to real property in California and several other states. Niednagel earned his BA in Economics from the University of California, Los Angeles in 1996 and also received a Masters of Business Taxation from the University of Southern California in 2000. Mr. Niednagel is a licensed Certified Public Accountant in the state of California.

It is anticipated that the operating results of, and the benefits to investors that purchase Units in, the Company, may be significantly different than those of prior funds managed by affiliates of the Manager. The information above should not be relied on to predict the performance of, or the benefits that might accrue to investors in, the Company.

19

USW 804765074.5

Exhibit 23 Page 1055

FOIA Confidential Treatment Requested by Criterion Wealth Management

## THE MANAGER'S FIDUCIARY DUTIES

The Manager is responsible for the control and management of the Company and must exercise good faith and integrity in handling the Company's affairs. The extent, if any, to which a Manager will have a fiduciary duty to Members of a Company under California law is an area of the law that is rapidly developing and changing. If you have questions about the fiduciary duties of the Manager, you should consult your own legal counsel.

The Manager has a fiduciary responsibility for the safekeeping and use of all of the Company's funds and assets, whether or not they are in the Manager's immediate possession and control. The Manager may not use or allow others to use Company funds or assets in any manner except for the exclusive benefit of the Company. The funds of the Company will not be commingled with the funds of any other person or entity. The Manager may employ persons or firms to carry out all or any portion of the business of the Company and has the authority to employ contractors, architects, attorneys, accountants, engineers, appraisers or other persons or entities to assist in the management and operation of the Company. Some or all of such persons or entities employed may be affiliates of the Manager.

Under the terms of the Operating Agreement, the Manager will not be liable to the Company or the Members for any act or omission performed or omitted by it in good faith, but will be liable only for gross negligence or willful misconduct. Members and other holders of Units may, accordingly, have a more limited right of action against the Manager than they would have absent the limitation in the Operating Agreement.

The Operating Agreement also generally provides for indemnification of the Manager (and its shareholders, affiliates, officers, Members, directors, employees, agents and assigns) by the Company, to the extent of Company assets, for any claims, liabilities and other losses that the Manager may suffer in dealings with third parties on behalf of the Company not arising out of gross negligence or willful misconduct. In the case of liability arising from an alleged violation of securities laws, the Manager may obtain indemnification only if: (i) the Manager is successful in defending the action; (ii) the action is settled and the court specifically approves the settlement and the indemnification of such settlement; or (iii) in the opinion of counsel for the Company, the right to indemnification has been settled by controlling precedent. It is the opinion of the Securities and Exchange Commission that indemnification for liabilities arising under the Securities Act is contrary to public policy and, therefore, unenforceable.

## CONFLICTS OF INTEREST

The Manager and its affiliates may act, and are acting, as the Managers of other limited liability companies. The Manager and its affiliates may form and manage additional limited liability companies or other business entities. The Manager and its affiliates have existing responsibilities and, in the future, may have additional responsibilities to provide management and services to a number of other entities in addition to the Company. As a result, conflicts of interest between the Company and the other activities of the Manager and its affiliates may occur from time to time. The principal areas in which conflicts may be anticipated to occur are described below.

**Obligations to Other Entities**

Conflicts of interest will occur with respect to the obligations of the Manager and its affiliates to the Company and similar obligations to other entities. Moreover, the Company will not have independent management, as it will rely on the Manager and its affiliates for all its management decisions. Other investment projects in which the Manager and its affiliates participate may compete with the Company for the time and resources of the Manager and its affiliates. The Manager will, therefore, have conflicts of interest in allocating management time, services and functions among the Company and other existing companies and businesses, as well as any future companies or business entities. Under the Operating Agreement, the Manager is obligated to devote as much time as it, in its sole discretion, deems to be reasonably required for the proper management of the Company and its assets. The Manager believes that it has the capacity to discharge its responsibilities to the Company, notwithstanding its participation in other present and future investment programs and projects.

20

USW 804765074.5

Exhibit 23 Page 1056
CRITERION_SEC_00034633

**Interests in Other Activities**

The Manager or any of its affiliates may engage for their own account, or for the account of others, in other business ventures. These ventures may or may not be related to the business of the Company. Neither the Company nor any Member will be entitled to any interest in such ventures solely by reason of any relationship with or to each other arising from the Company.

The Manager may form additional limited liability companies and other entities in the future to engage in activities similar to and with the same goals as those of the Company. The Manager may be engaged in sponsoring other such entities at approximately the same time as the Company's Units are being offered or its investments are being made. The Manager may also originate, sell or service loans or acquire and manage rental properties, or acquire and sell other real property for unaffiliated investors or itself or its affiliates. These activities may cause conflicts of interest between such activities and the Company, and the duties of the Manager concerning such activities and the Company. The Manager will try to reduce any conflicts of interest that may arise among these various activities.

Specifically, the Manager and its affiliates participate in Bird Rock Home Mortgage, LLC, which is a fund being formed to engage in activities almost identical to, and with goals almost identical as, those of the Company. These activities may cause conflicts of interest between such activities and the Company, and the duties of the Manager concerning such activities and the Company.

**Receipt of Compensation by the Manager**

The payments to the Manager set forth under "Compensation of the Manager" have not been determined by arm's-length negotiations. The Company will reimburse the Manager for all direct costs the Manager incurs when performing services on behalf of the Company and for certain expenses incurred with respect to the acquisition of the Properties.

**Manager's Representation of Company in Tax Audit Proceedings**

Situations may arise in which the Manager may act as Tax Matters Member on behalf of the Company in administrative and judicial proceedings involving the IRS or other enforcement authorities. These proceedings may involve or affect other entities for which the Manager or its affiliates may act as the Manager, or decisions made regarding other entities could adversely affect the Company. In such situations, the positions taken by the Manager may have differing effects on the Company and such other entities. Any decisions made by the Manager with respect to such matters will be made in good faith consistent with the Manager's fiduciary duties to the Company. Any Member who nonetheless does not want to be bound by any settlement reached by the Manager may file a statement within the period prescribed by applicable tax regulations stating that the Manager does not have authority to enter into a settlement on his or her behalf.

**Legal Representation**

Counsel to the Company, the Manager and some of its affiliates with respect to certain matters related to this Offering is the same, and it is anticipated that such multiple representation will continue in the future. Counsel has also represented other entities, and will also represent future entities, formed by the Manager and its affiliates. As a result, conflicts may arise in the future and, if those conflicts cannot be resolved or the consent of the respective parties to the continuation of the multiple representation cannot be obtained after full disclosure of any such conflict, counsel will withdraw from representing one or more of the conflicting interests with respect to the specific matter involved. In such event, additional counsel may be retained by one or more of the parties to assure their interests are adequately protected.

**Purchases of Units by the Manager or its affiliates**

The Manager and/or its affiliates will acquire at least 1 Unit and may, in their sole discretion, buy additional Units for any reason deemed appropriate by them. The acquisition of Units by the Manager and/or its

21

USW 804765074.5

Exhibit 23 Page 1057
CRITERION_SEC_00034634

affiliates may create a conflict of interest between the Company and the Manager or any affiliate who buys Units because the Manager or such affiliate may obtain voting power over matters subject to a vote of the Members (although the Manager and affiliates controlled by the Manager have agreed to vote any Units held in proportion to the votes of the other Members).

**Resolution of Conflicts of Interest**

The Manager and its affiliates have not developed, and do not expect to develop, any formal process for resolving conflicts of interest. While the foregoing conflicts could materially and adversely affect the Members, the Manager and its affiliates, in their sole judgment and discretion, will try to mitigate such potential adversity by the exercise of their business judgment in an attempt to fulfill any fiduciary obligations. There can be no assurance that such an attempt will prevent adverse consequences resulting from the numerous conflicts of interest.

## COMPENSATION OF THE MANAGER

The following is a description of the compensation that the Manager may receive in connection with this Offering or the operation of the Company. Other than as specified herein, no compensation will be paid to the Manager, although the Manager will be reimbursed for certain expenses that the Manager has advanced or may advance on behalf of the Company. The compensation arrangements described below have been established by the Manager and are not the result of arm's-length negotiations.

| Form of Compensation | Description | Estimated Amount of Compensation |
|---|---|---|
| **Interest in Company:** | | |
| Manager's Interest: | After the Members have received an 8% Preferred Return, the Manager will be entitled to receive 100% of all distributions of cash from operations from the Company unless the Manager decides, in its sole and absolute discretion, to distribute additional funds to Member to enhance their 8% Preferred Return. | The amount cannot be determined at this time. |
| **Operating Stage:** | | |
| Reimbursement of Manager's Expenses: | The Company will reimburse the Manager for all direct costs including, but not limited to bank fees, bookkeeping, legal and accounting fees and expenses related to the preparation of Company tax returns, the Manager incurs when performing services on behalf of the Company and for certain expenses incurred, including interest, with respect to the acquisition of the Properties. | The amount cannot be determined at this time. |

22

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1058
CRITERION_SEC_00034635

# DESCRIPTION OF THE UNITS

**General Description**

The Units represent equity interests in the Company and entitle the holder to participate in certain Company allocations and distributions. If you buy Units from the Company and your subscription is accepted by the Manager, you will become a Member in the Company and be entitled to vote on certain Company matters.

The Company is offering up to 1,500 Units at $10,000 per Unit. The purchase price of $10,000 per Unit has been arbitrarily determined and is not the result of arm's-length negotiations. The minimum purchase is one Unit ($10,000), except that the Manager may permit certain investors to buy a fractional Unit.

**Restrictions on Transferability**

There are substantial restrictions on the transferability of the Units in the Operating Agreement and under federal and state securities laws. Before you sell or transfer your Units, you must first obtain the written consent of the Manager and comply with applicable requirements of federal and state securities laws and regulations, including the financial and other suitability requirements of such laws or regulations. It is highly unlikely that any market for the Units will develop and you should view an investment in Units as a long-term investment.

In addition, under the terms of the Operating Agreement, an assignee of Units may not become a Substituted Member (as that term is defined in the Operating Agreement) without meeting certain conditions and without the consent of the Manager, which consent is in the Manager's sole and absolute discretion. If an assignee of Units is not admitted to the Company as a Substituted Member, the assignee will have no right to vote on Company matters or to receive information about the Company's business, and will have only restricted access to other rights enjoyed by the Members. Further, no transfer will be allowed unless the Manager determines that the transfer will not cause the Company to be "publicly traded." See "Federal Income Tax Consequences -- Publicly Traded Company."

The Units have not been registered under the Securities Act or the securities laws of certain states. The Units may not be transferred or resold unless they are registered under the Securities Act and registered or qualified under applicable state securities laws or unless exemptions from such registration and qualification are available. Any certificates representing Units will include appropriate legends setting forth the restrictions on the transfer of Units.

# SUMMARY OF THE OPERATING AGREEMENT

The rights and obligations of the Members will be governed by the Operating Agreement. You should carefully review the entire Operating Agreement before making an investment. The following is a summary of some of the significant provisions of the Operating Agreement. It is qualified in its entirety by the full text of the Operating Agreement.

**General**

The Company was formed under the California Revised Uniform Limited Liability Company Act. Bird Rock Management, LLC, a California limited liability company, is the Manager. Investors in Units will become Members in the Company. The Company will be limited to ninety-nine (99) Members and 2,500 Units. The Manager became the initial member in order to form the Company.

The character and general nature of the business of the Company will be to invest in the Properties. The principal place of business of the Company and the Manager is 1590 S. Coast Highway #16, Laguna Beach, CA 92651. The telephone number is (949) 715-0900.

23

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1059
CRITERION_SEC_00034636

**Term and Dissolution**

The term of the Company will continue until dissolved by the Manager.

**Allocation of Net Income from Operations**

Net income from operations shall, subject to certain limitations, be allocated:

(1)      First, to the Members until the Members have been allocated net income from operations equal to the prior net loss allocated to the Members in reverse order of priority of the prior allocations.\

(2)      Second, to the Members up to an amount of their 8% Preferred Return.

(3)      Third, in the sole discretion of the Manager, an additional distribution to the Members to enhance their 8% Preferred Return.

(4)      Fourth, 100% to the Manager.

**Allocation of Net Loss**

Net loss shall, subject to certain limitations, be allocated:

(1)      First, to the Members in proportion to and in an amount equal to prior allocations of net income allocated to the Members in reverse order of priority of the prior net income allocations;

(2)      Second, 100% to the Members, but such allocations shall only be made to a Member to the extent such allocations would not cause a Member to have an adjusted capital account deficit; and

(3)      Thereafter, 100% to the Manager.

**Distributions of Cash from Operations**

Cash from Operations shall be distributed each fiscal year first to the Members to pay their 8% Preferred Return, and then in the sole discretion of the Manager, to the Members to enhance their 8% Preferred Return, then to the Manager.

**Distributions upon Liquidation of the Company**

Any cash remaining upon dissolution and termination of the Company shall be distributed to the Members until they have received an 8% cumulative, but not compounded Preferred Return, and then 100% to the Manager.

**Reserves**

The Manager may establish a cash reserve to be used to redeem Units offered for sale by the Members. The Manager will attempt to redeem all requested Units by the Members in as short of a time period as possible, but the Company is not obligated to redeem any Units, nor to do so within any specific time frame

**Authority of the Manager**

The Manager has the exclusive authority to   manage and control all aspects of the business of the Company.  In the course of its management, the Manager may, in its absolute discretion, employ such persons, including, under certain circumstances, affiliates of the Manager, as it deems necessary for the efficient operation of the Company; provided, however, that Members have the power to remove the Manager for cause by a Majority Vote.

24

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1060
CRITERION_SEC_00034637

**Voting Rights of Members**

Although they are not permitted to take part in the management or control of the business of the Company, the Members have the right by a Majority Vote to:

(a)      Remove the Manager for cause as provided in the Operating Agreement;

(b)      Admit a Manager or elect to continue the business of the Company after a Manager ceases to be a Manager when there is no remaining Manager; or

(c)      Amend the Operating Agreement.

The Manager may at any time call a meeting of the Members, or may call for a vote of the Members without a meeting on matters on which the Members are entitled to vote. In addition, a meeting of the Members will be called by the Manager upon receipt of written request therefore by Members holding more than 10% of the outstanding Units.

**Liabilities of Members**

A Member's capital is subject to the risks of the Company's business. Members are not permitted to take part in the management or control of the business of the Company. Assuming that the Company is operated in accordance with the terms of the Operating Agreement, a Member will not be liable for the liabilities of the Company in excess of his or her total Capital Contributions and share of undistributed profits. A Member is obligated to return a distribution from a limited liability company to the extent that the Member knew at the time of the distribution that immediately after giving effect to the distribution, all liabilities of the Company would exceed the fair value of the Company's assets, or the Company would not be able to pay its debts as they become due in the ordinary course of activities.

The Operating Agreement provides that the Members shall not be bound by, or be personally liable for, the expenses, liabilities or obligations of the Company.

**Liabilities of the Manager**

The Manager will have no liability for the debts and obligations of the Company after exhaustion of Company assets.

**Removal of Members**

A Member may be removed at any time for cause by the Manager. "Cause" is defined as fraud, willful malfeasance or gross negligence. Upon such removal, the Company will return all of the Member's capital contribution in cancellation of such Member's Units.

**Books and Records**

At all times during the term of the Company, the Manager is required to keep true and accurate books of account of all of the financial activities of the Company. Such books of account will be kept on the cash basis of accounting. The Manager may make such elections for federal and state income tax purposes as it deems appropriate.

**Amendments**

The Operating Agreement may be amended by the Manager with the consent of the Majority Vote, except that the Manager may amend the Operating Agreement without action by the Members to (i) modify the allocation provisions of the Operating Agreement to comply with Section 704(b) and Section 514(c)(9) of the Code; (ii) add to the representations, duties, services or obligations of the Manager or any affiliates for the benefit of the Members;

25

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1061
CRITERION_SEC_00034638

(iii) cure any ambiguity or mistake, correct or supplement any provision in the Operating Agreement that may be inconsistent with any other provision, or make any other provision with respect to matters or questions arising under the Operating Agreement that will not be inconsistent with the provisions of the Operating Agreement; (iv) delete or add any provision of the Operating Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission or by a state "Blue Sky" Commissioner or similar official, which addition or deletion is deemed by such Commission or official to be for the benefit or protection of the Members; (v) amend the Operating Agreement to reflect the addition or substitution of Members or the reduction of the Capital Accounts upon the return of capital to the Members; (vi) minimize the adverse impact of, or comply with, any "plan assets" regulations; (vii) reconstitute the Company under the laws of another state if beneficial to the Company; (viii) execute, acknowledge and deliver any and all instruments to effectuate the foregoing, including the execution, acknowledgment and delivery of any such instrument by the attorney-in-fact for the Manager under a special or limited power of attorney and to take all such actions in connection therewith as the Manager shall deem necessary or appropriate with the signature of the Manager acting alone; (ix) change the name and/or principal place of business of the Company; or (x) decrease the rights and powers of the Manager (so long as such decrease does not impair the ability of the Manager to manage the Company and conduct its business affairs). No amendment shall be adopted pursuant to (ix) or (x) above without the consent of the Members unless the adoption thereof (a) is for the benefit of and not adverse to the interests of the Members; (b) is not inconsistent with the sections of the Operating Agreement pertaining to the management and administration of the Company by the Manager; and (c) does not affect the limited liability of the Members or the status of the Company as a Company for federal income tax purposes.

**Prohibitions**

The Operating Agreement provides that the Manager may not receive any rebate, kick-back or give-up in connection with the operation of the Company, nor may the Manager participate in any reciprocal business arrangements that would circumvent the restrictions set forth in the Operating Agreement prohibiting certain types of dealings between the Manager, its affiliates and the Company.

# FEDERAL INCOME TAX CONSEQUENCES

The following general discussion applies only if you buy Units directly from the Company. You should not view the following analysis as a substitute for careful tax planning, particularly since the income tax consequences of an investment in a limited liability company are often uncertain and complex. Also, the tax consequences will not be the same for all investors. You should be aware that the following discussion necessarily condenses or eliminates many details that might adversely affect some investors significantly and does not address the tax issues that may be important to certain types of investors who are subject to special tax treatment. **You should consult your own tax advisor about the specific tax consequences to you before investing.**

The following discussion of tax consequences is based on laws and regulations presently in effect. Congress recently enacted several major tax bills that substantially affect the tax treatment of a real estate company. In many instances, Congressional Committee reports have been relied on for the interpretation and application of many of these new tax bills to the Company. While the Treasury Department is authorized to issue extensive substantive regulations on the tax bills, few have been issued to date.

Congress is currently reviewing numerous other proposed changes to the federal income tax laws. The extent and effect of such changes, if any, is uncertain. You should be aware that new administrative, legislative or judicial action could significantly change the tax aspects of the Company.

You should note that a number of issues discussed in this Memorandum have not been definitively resolved by statutes, regulations, rulings or judicial opinions and are the subject of interpretations. Thus, no assurance can be given that the conclusions expressed herein would be accepted by the IRS, or sustained by a court, if contested, or that legislative or administrative changes or court decisions will not be forthcoming that would significantly modify the statements and opinions expressed in this Memorandum. Any such changes may or may not be retroactive with respect to transactions before the date of such changes. Should the IRS challenge the tax treatment of an investment

26

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1062
CRITERION_SEC_00034639

in the Company, even if the challenge is unsuccessful, you could be faced with substantial legal and accounting costs in resisting the challenge.

You should not buy Units to obtain a tax shelter for income from sources other than the Company. It is unlikely that the Company will provide any such tax shelter. Even if a Member is entitled to deduct his or her share of the Company's losses on his or her personal tax return, any such deductions may be relatively small in relation to the amount invested in the Units. A significant portion of the amount invested may be allocated to items that are not depreciable for income tax purposes, or to other nondeductible expenses.

**Tax Consequences Regarding the Company**

**Company Status.** Treasury Regulations have been issued which provide that a limited liability company will be classified as a partnership for federal income tax purposes as long as an election is not made to treat the limited liability company as an association taxable as a corporation. The Manager has represented that no such election has been or will be made on behalf of the Company.

If the Company is treated as a partnership for federal income tax purposes, each Member will be required to include in income his or her distributive share of income, gain, deductions and loss of the Company. Consequently, each Member will be subject to tax on his or her distributive share of Company income, whether or not the Company actually distributes cash in an amount equal to the income.

If for any reason the Company is treated as a corporation for tax purposes, it will be deemed to have contributed all of its assets subject to all of its liabilities to a newly formed corporation in exchange for the corporation's stock. The stock of the corporation is treated as being distributed to the Members in a complete liquidation of the Company. The income and deductions of the Company will be reflected only on the Company's income tax return instead of being passed through to the Members, and the Members will be treated as corporate shareholders for tax purposes. In such event, the Company would be required to pay income tax at the corporate tax rates on its taxable income, thereby reducing the amount of cash available for distribution to Members. In addition, any distribution by the Company to the Members would be taxable to the Members as dividends, to the extent of current and accumulated earnings and profits, or treated as gain from the sale of their Company interests, to the extent such distributions exceeded both current and accumulated earnings and profits of the Company and the Member's tax basis for the Units.

**Anti-Abuse Rules.** Generally, limited liability companies are not liable for income taxes imposed by the Code. The Treasury Regulations set forth broad "anti-abuse" rules applicable to limited liability companies. These rules authorize the Commissioner of the IRS to recast transactions involving the use of limited liability companies either to reflect the underlying economic arrangement or to prevent the use of a limited liability company to circumvent the intended purpose of any provision of the Code. The Manager is not aware of any fact or circumstance that could cause the Commissioner of the IRS to exercise his authority under these rules. If any of the transactions entered into by the Company were to be re-characterized under these rules, or if the Company were to be recast as a taxable entity under these rules, this could have a material adverse effect on the Members.

**Publicly Traded Companies.** Certain publicly traded limited liability companies are taxed as corporations for federal income tax purposes. Publicly traded limited liability companies are defined as limited liability companies whose interests are (1) traded on an established securities market or (2) readily tradable on a secondary market or the substantial equivalent thereof. The Units will not be traded on an established securities market. The determination as to whether the Company will be considered "publicly traded" will depend on the number and type of subsequent transfers of Units.

The Operating Agreement provides that any transfer of Units will not be effective unless and until the Manager determines that such transfer will not cause the Company to be considered a publicly traded limited liability company under the applicable IRS guidelines. It is unclear whether the Manager will be able to effectively limit possible transfers.

27

USW 804765074.5

Exhibit 23 Page 1063
CRITERION_SEC_00034640

FOIA Confidential Treatment Requested by Criterion Wealth Management

A limited liability company, even though "publicly traded," will not be treated as a corporation for tax purposes if 90% or more of its gross income consists of "qualifying income." Qualifying income includes interest (other than interest derived in the conduct of a financial business), dividends, real property rents, gain from the disposition of real property and income and gains from certain natural resource activities. The Company will be engaged in the rental of commercial and residential real estate. The Manager will try to operate the Company so that at least 90% of the Company's income will be from interest, rent from real property (and not personal property), and the sale of real property or capital assets held for the production of interest. Accordingly, under the tests set forth above, if the Manager is successful, the Company likely will meet the 90% "qualifying income" test and will not be taxed as a corporation under the provisions governing publicly traded companies. Any income earned on the sale of a portion of an asset pursuant to a participation agreement will not qualify as qualifying income. In the event that the Company sells significant amounts of participation, the 90% test may not be met.

The Company and the Members will be subject to additional rules if the Company is publicly traded but the Company is not taxed as a corporation. The net income from publicly traded limited liability companies not taxed as corporations is not treated as passive income for purposes of the passive loss rules. Each Member in a publicly traded limited liability company treats the loss from the limited liability company as separate from the income or loss from any other publicly traded limited liability company and separate from any income or loss from passive activities. Net income from publicly traded limited liability companies is treated as portfolio income under the passive loss rules. In Treasury Notice 88-75, the IRS stated that forthcoming regulations will treat net passive income of a publicly traded limited liability company as investment income for purposes of the limitation on investment interest expense. Net losses attributable to a Member's interest in a publicly traded limited liability company are not allowed against the Member's other income but instead are suspended and carried forward. Such losses can be applied against the net income from the limited liability company in the next tax year (or the next succeeding tax year in which the holder of the interest in the limited liability company has net income from the limited liability company). Upon a complete disposition (within the meaning of the passive loss rules) of the Member's entire interest in a publicly traded limited liability company, any remaining suspended losses are allowed.

**Limitations on Losses and Credits from Passive Activities.** Losses from passive trade or business activities generally may not be used to offset "portfolio income," i.e., interest (other than interest received by a taxpayer engaged in the trade or business of lending money), dividends and royalties, or salary or other active business income. The income of the Company will be treated as portfolio income.

**Allocations of Net Income and Net Loss.** The Company's net income and net loss will generally be allocated by the Company as follows: Subject to certain limitations, net income from operations will be allocated (a) to the Members until the Members have been allocated net income from operations equal to the prior net loss allocated to the Members in reverse order of priority of the prior allocations; (b) to the Members in an amount equal to their 8% Preferred Return; (c) to the Members, in an amount equal to any distributions made to enhance their 8% Preferred Return; and (d) the remainder to the Manager. Subject to certain limitations, net loss will be allocated (x) to the Members in proportion to and in an amount equal to prior allocations of net income allocated to the Members in reverse order of priority of the prior net income allocations; (y) 100% to the Members, but only to the extent such allocations would not cause a Member to have an adjusted capital account deficit; and (z) thereafter, to the Manager.

Although such allocations are permitted under applicable law, the Code and Treasury Regulations require that such allocations satisfy certain requirements. Section 702 of the Code provides that, in determining income tax, a Member must take into income his or her "distributive share" of the Company's income, gain, loss, deduction or credit. The Members may specially allocate their distributive shares of such profits and losses, thus redistributing tax liability, by provision in the Operating Agreement. However, the IRS will disregard such an allocation, and will determine a Member's distributive share in accordance with the Member's interest in the Company, if the allocation lacks "substantial economic effect."

**Treasury Regulations.** The Treasury Regulations regarding the allocation of items of Company income, gain, loss, deduction and credit under Section 704(b) of the Code are concerned with whether an allocation of Company tax items has "substantial economic effect." Under the Treasury Regulations, an allocation has economic effect only if, throughout the term of the Company, the Members' capital accounts are maintained in accordance with the Treasury Regulations, liquidation proceeds are to be distributed in accordance with the Members' capital

28

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1064
CRITERION_SEC_00034641

account balances, and any Member with a deficit capital account following the distribution of liquidation proceeds is required to restore the amount of that deficit to the Company for payment to creditors or distribution to Members in accordance with their positive capital account balances. If the Members' obligations to restore deficit capital account balances are limited, the Operating Agreement must contain a "qualified income offset" provision, as described in the Treasury Regulations.

The Treasury Regulations also require that the economic effect of the allocation be "substantial." In general, the economic effect of an allocation is "substantial" if there is a reasonable possibility that the allocation will affect substantially the dollar amounts to be received by the Members from the Company, independent of tax consequences. The economic effect of an allocation is not substantial, however, if, at the time the allocation becomes part of the Operating Agreement, (1) the after-tax economic consequences of at least one Member may, in present value terms, be enhanced compared to such consequences if the allocation were not contained in the Operating Agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no Member will, in present value terms, be substantially diminished compared to such consequences if the allocation were not contained in the Operating Agreement. In determining the after-tax economic benefit or detriment to a Member, tax consequences that result from the interaction of the allocation of such Member's tax attributes that are unrelated to the Company will be taken into account.

The Treasury Regulations provide that allocations of loss or deduction attributable to non-recourse liabilities of a Company ("non-recourse deductions") cannot have economic effect because, in the event there is an economic burden that corresponds to such an allocation, the creditor alone bears that burden. Thus, non-recourse deductions must be allocated in accordance with the Members' interests in the Company. Allocations of non-recourse deductions are deemed to be made in accordance with the Members' interests in the Company if, and only if, the following conditions are satisfied:

       1.     Throughout the full term of the Company, the Members' capital accounts are maintained in accordance with the Treasury Regulations, and upon liquidation of the Company, liquidating distributions are required to be made in accordance with the positive capital account balances of the Members.

       2.     Beginning in the first taxable year in which there are non-recourse deductions and thereafter throughout the full term of the Company, the Operating Agreement provides for allocations of non-recourse deductions among the Members in a manner that is reasonably consistent with allocations, which have substantial economic effect, of some other significant Company item attributable to the property securing non-recourse liabilities of the Company.

       3.     Beginning in the first taxable year of the Company in which the Company has non-recourse deductions and thereafter throughout the full term of the Company, the Operating Agreement contains a "minimum gain chargeback," as defined in the Treasury Regulations.

       4.     All other material allocations and capital account adjustments under the Operating Agreement are recognized in accordance with the Treasury Regulations.

The Operating Agreement requires that the Members' capital account balances be maintained in accordance with the Treasury Regulations, and liquidation proceeds are to be distributed 100% to the Members until they have received their 8% Preferred Return and then to the Manager (subject to the Members receiving a 8% Preferred Return) and net income will be allocated to match the amounts to be distributed. The Operating Agreement contains a "minimum gain chargeback" provision, and the non-recourse deductions are to be allocated under the Operating Agreement in a manner that is reasonably consistent with allocations, i.e. in accordance with allocations of net loss. Members are not required to restore a deficit capital account balance. The Operating Agreement, however, contains a "qualified income offset" provision.

In the event any non-recourse debt of the Company is guaranteed by the Manager or an affiliate, the IRS will treat this portion of the debt as recourse debt to the Manager. As a result, this portion of the debt or any other recourse financing obtained by the Company cannot be included in the Members' basis in their Company interests, and Members would be unable to take deductions in excess of their Capital Account balance as they would be allowed with non-recourse financing; such deductions would be allocated to the Manager.

29

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1065
CRITERION_SEC_00034642

**Transfers of Limited Liability Company Interests.** For federal income tax purposes, items of income, gain, loss, deduction or credit of a Company may be allocated to a Member only if they are received, paid or incurred by the Company during that portion of the year in which the Member is treated as a member of the Company for tax purposes.

If any Member's interest in a Company changes at any time during the Company's taxable year, each Member's share of each item of Company income, gain, loss, deduction and credit is to be determined by using any method prescribed by Treasury Regulations that takes into account the varying interests of the Members in the Company during the taxable year.

The legislative history concerning this provision indicates that a monthly convention will be provided for by regulation. Under this convention, Members entering on the sixteenth day of the month or later will be treated as entering on the first day of the following month, and Members entering during the first 15 days of the month will be treated as entering on the first day of the month. The regulations may also provide for other conventions and may deny the use of any convention when the occurrence of significant, discrete events (e.g., a large, unusual gain or loss) would result in significant tax avoidance.

The net income or net loss allocable to any Units transferred during any year will be allocated among the persons who were the holders thereof during such year in proportion to the number of months that each such holder was recognized as the owner of such Units during the year (for the purposes of such allocation, ownership for each month is determined as of the fifteenth day of each month). A holder who purchases a Unit during the first 15 days of a month will receive allocations of net income and net loss relative to such month. A holder who purchases a Unit on or after the sixteenth day of the month will be treated for income tax allocation purposes as acquiring his or her Unit on the first day of the following month. The holder of a Unit will be required to report a share of the Company's net income or net loss during the period of such holder's ownership on his or her personal income tax return even though the holder receives no distributions with respect to such period of ownership and/or the amount distributed to such holder has no relationship to the amount that he or she is required to report.

**Adjusted Basis.** Each Member's adjusted basis in his or her Units will be equal to such Member's cash capital contributions increased by (i) the amount of his or her share of the net income of the Company, and (ii) his or her share of non-recourse indebtedness to which the Company's property is subject, if any. A Member's share of non-recourse liabilities is the sum of (i) the Member's share of Company minimum gain; (ii) the amount of any taxable gain that would be allocated to the Member under Section 704(c); and (iii) the Member's share of the excess non-recourse liabilities. The Operating Agreement specifies that the excess non-recourse liabilities will be allocated 100% to the Manager.

A Member's basis in his or her Units is reduced, but not below zero, by (x) the amount of his or her share of Company net loss and expenditures that are neither properly deductible nor properly chargeable to his or her capital account and (y) the amount of cash distributions received by the Member from the Company. For purposes of calculating a Member's adjusted basis in his or her Units, any reduction in the amount of Company non-recourse indebtedness will be treated as a cash distribution to such Member in accordance with his or her allocable share of such indebtedness and accordingly will reduce the basis in such Member's Units.

The Treasury Regulations employ an economic risk of loss analysis to determine whether a Company liability is a recourse or non-recourse liability and to determine the Members' shares of any recourse liability of the Company. Under the Treasury Regulations, a Company liability is a recourse liability to the extent that any Member or related person bears the economic risk of loss for that liability. A Member's share of any recourse liability of a Company equals the portion, if any, of the economic risk of loss for such liability that is borne by the Member.

A Member bears the economic risk of loss for a Company liability to the extent that the Member (or a related person) would bear the economic burden of discharging the obligation represented by that liability if the Company were unable to do so (reduced by any right of reimbursement). In the case of a limited liability company, such as the Company, a Member generally will not bear the economic risk of loss for any Company liability because the Member has no obligation to contribute additional capital to the Company. Accordingly, a Member in the Company may not include in the tax basis of his or her Units any portion of any Company recourse liability.

30

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1066
CRITERION_SEC_00034643

If no Member bears the economic risk of loss for a Company liability, the liability is a non-recourse liability of the Company. An exception to this rule applies in the case of a Member (or related person) who makes a non-recourse loan to the Company. In such a case, the lending or related Member is considered to bear the economic risk of loss for such liability.

Any recourse indebtedness will be allocated solely to the Manager for purposes of tax basis in the Units. The Members will be entitled to include in their tax basis (to the extent such financing does not exceed the fair market value of such investment) his or her share of any non-recourse liabilities. If the Company incurs recourse indebtedness, such recourse indebtedness will not be included in any Member's basis in his or her Units.

To the extent that a Member's share of Company net loss exceeds the adjusted basis of such Member's Units at the end of the Company year in which such net loss occurs, such excess net loss cannot be utilized in that year by the Member for any purpose, but is allowed as a deduction at the end of the first succeeding Company taxable year, and subsequent Company taxable years, to the extent that the adjusted basis of such Member's Units at the end of any such year exceeds zero (before reduction by such excess net loss from a prior year).

**Cash Distributions**. The Operating Agreement provides for various forms of cash distributions resulting from operations of the Company. Cash distributions (including for federal income tax purposes, a Member's share of any reduction in non-recourse indebtedness) made to a Member, other than those made in exchange for or in redemption of all or part of his or her Units, will generally not affect the calculation of a Member's distributive share of net income or net loss from the Company. Such distributions are generally first applied against and reduce the Member's adjusted basis in his or her Units. To the extent that such distributions are so applied against and reduce the adjusted basis of the Member's Units, they will not give rise to a realization of income, gain or loss by the Member. Cash distributions in excess of a Member's adjusted basis in his or her Units will result in the recognition of gain to the extent of such excess. Ordinarily, any such recognized gain will be treated as gain from the sale or exchange of a Unit. See "Treatment of Gain or Loss on Disposition of Units" below.

**Net Income in Excess of Cash Distributions.** It is possible that a Member's share of the Company net income may exceed cash distributed to such Member with respect to his or her Units and such Member's tax liability on that share may even exceed such distributions.

**Liquidating Distributions.** Generally, upon liquidation or termination of the Company, gain will be recognized by a Member only to the extent that cash is distributed (including the Member's share of any reduction in Company non-recourse liabilities) in excess of such Member's adjusted basis in his or her Units at the time of distribution.

**Gain or Loss on Disposition of Units.** It is not expected that any public market will develop for the Units. Furthermore, Members may not be able to liquidate their Units promptly at reasonable prices since any transferee of Units will be required to comply with the minimum purchase requirements and the investor suitability requirements imposed by the transferee's state of residence or by the Company, and since all assignees of Units may be admitted as Substituted Members only with the consent of the Manager.

Any gain or loss realized by a Member upon the sale or exchange of Units will generally be treated as capital gain or loss, provided that such Member is not deemed to be a "dealer" in such securities. However, any portion of the gain that is attributable to unrealized receivables (which includes, for these purposes, depreciation recapture attributable to an investment) or inventory items of the Company will generally be treated as ordinary income. If the Member's holding period for the Units sold or exchanged is more than one year, the portion of any gain realized that is capital gain will be treated as long-term capital gain.

A transferor Member must notify the Company of a sale or exchange of his or her Company interest involving unrealized receivables or inventory. Once the Company is so notified, it must report to the IRS the transferor and the transferee on the sale or exchange. Penalties will apply to the failure by the transferor Member to report to the Company, and the failure by the Company to report to the IRS the transferor and the transferee.

31

Exhibit 23 Page 1067
CRITERION_SEC_00034644

FOIA Confidential Treatment Requested by Criterion Wealth Management

In determining the amount realized upon the sale or exchange of Units, a Member must include, among other things, his or her share of Company indebtedness. Therefore, it is possible that the gain realized on a Member's sale of Units may exceed the cash proceeds of the sale, and, in some cases, the income taxes payable with respect to the gain realized on the sale may exceed such cash proceeds.

**Treatment of Gifts of Units.** Generally, no gain or loss is recognized for federal income tax purposes as a result of a gift of property. However, in the event that a gift (including a charitable contribution) of a Unit is made at a time when a Member's share of the Company's non-recourse indebtedness exceeds the adjusted basis of his or her Units, such Member may recognize gain for income tax purposes upon the transfer. Such gain, if any, will generally be treated as capital gain except for the portion of any such gain attributable to any unrealized receivables (which includes, for these purposes, depreciation recapture attributable to the Company Property) or inventory items of the Company, which will generally be treated as ordinary income. Gifts of Units may also be subject to a gift tax imposed pursuant to the rules generally applicable to all gifts of property.

**Sale or Other Disposition of Company Property.** In general, if an investment constitutes a capital asset in the hands of the Company, any profit or loss realized by the Company on its sale or exchange (except to the extent that such profit represents depreciation recapture taxable as ordinary income) will be treated as capital gain or loss. Capital gain that is equal to or less than past depreciation (other than ordinary income recapture) taken on the investment will be taxed to individuals at 25%. Any additional capital gain attributable to property held more than 12 months will generally be taxed to individuals at a maximum of 15% or 20%. If, however, it is determined that the Company is a "dealer" in real property or loans for federal income tax purposes or that the assets sold constitute "Section 1231 assets" (such assets are capital assets involuntarily converted and depreciable business property held for more than 12 months), the gain or loss will not be capital gain or loss.

If the Company is deemed a "dealer" and the investment is not considered a capital asset or a Section 1231 asset, any gain or loss on the sale or other disposition of such investment would be treated as ordinary income or loss. As a general rule, the holding of parcels of real property or loans for investment is not the type of activity that would cause a person or entity to be considered a "dealer" in real property or loans. The Company will hold and operate only the Properties. Except as set forth below, it is likely, therefore, that the Company will be viewed as a "dealer" in real property. Because the question of "dealer" status is a question of fact to be determined at the time of a sale of a loan or real property, however, counsel has expressed no opinion on this issue. Notwithstanding the above, any gain attributable to the sale of a participation interest in a loan will result in ordinary income.

If assets sold or involuntarily converted constitute Section 1231 assets, a Member would combine his distributive share of Company gains or losses attributable to such assets with any other Section 1231 gains or losses realized by such Member in that year, and the resultant net Section 1231 gains or losses would be taxed as capital gains or constitute ordinary losses, as the case may be. This treatment may be altered depending on each Member's disposition of Section 1231 property over several years. In general, net Section 1231 gains are recaptured as ordinary income to the extent of net Section 1231 losses in the five preceding taxable years.

In determining the amount realized upon the sale, exchange or other disposition of an investment, the Company must include, among other things, the amount of any liability to which such investment is subject. Furthermore, the Company may take back purchase money obligations as part of the consideration for the sale of the investment. The Company may attempt to structure any such sale so as to qualify as an "installment sale" for federal income tax purposes, but there can be no assurance that any such sale could or would so qualify. Unless such sale qualifies as an "installment sale," the Company would generally be deemed to have received as proceeds of such sale the fair market value of such purchase money obligations.

Thus, the Company's gain on the disposition of any such property may exceed the cash proceeds, if any, of such disposition, and in some cases the income taxes payable by the Members with respect to such gain may exceed the cash proceeds, if any.

**Foreclosure.** In the event of a foreclosure of a mortgage or deed of trust on Company Property, the Company would realize gain, if any, in an amount equal to the excess of the outstanding mortgage over the adjusted tax basis of the Property, even though the Company might realize an economic loss upon such a foreclosure. In

32

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1068
CRITERION_SEC_00034645

addition, the Members could be required to pay income taxes with respect to such gain even though they receive no cash distributions as a result of such foreclosure.

**Termination for Tax Purposes.** The Company will terminate for tax purposes if within a 12-month period 50% or more of the capital and profits interests in the Company are sold or exchanged. Termination of the Company for tax purposes would not cause a Member to recognize gain unless such Member's share of the Company's cash (or cash deemed distributed as a result of relief of indebtedness) exceeded the adjusted basis of his or her Units. Nor would it cause a Member to recognize loss unless the Company's assets at the time of termination consisted solely of cash or certain unrealized receivables or substantially appreciated inventory and the Member's share thereof was exceeded by his or her adjusted basis.

**Dissolution.** A dissolution of the Company pursuant to state law before expiration of its term should not by itself create tax consequences for the Members unless the dissolution is followed by a liquidation of the Company. Such dissolution and liquidation might create adverse tax and economic consequences for the Company. For example, if, as a result of a dissolution, the Company were required to liquidate the Company's assets during a limited period of time, the Company might sustain substantial economic losses based on the original cost of the Property. Nevertheless, the Company might realize substantial taxable gain on such disposition as a result of the use of borrowing in connection with acquisition of the Company's assets. See "Sale or Other Disposition of Company Property" above.

**Tax Elections.** The Company may make certain elections for federal income tax reporting purposes that could result in various items of Company income, gain, loss, deduction and credit being treated differently for tax and Company purposes than for accounting purposes.

The Code provides for optional adjustments to the basis of Company property for purposes of measuring both depreciation and gain upon distributions of Company property (Section 734) and transfers of Units (Section 743) provided that a Company election has been made pursuant to Section 754. The general effect of such an election is that transferees of Units are treated, for purposes of computing depreciation and gain, as though they had acquired a direct interest in the Company assets, and the Company is treated for such purposes, upon certain distributions to Members, as though it had newly acquired an interest in the Company assets and therefore acquired a new cost basis for such assets. Any such election, once made, is irrevocable without the consent of the IRS.

As a result of the complexities and added expense of the tax accounting required to implement such an election, the Manager does not presently intend to make such an election, although it is empowered to do so by the Operating Agreement. Therefore, any benefits which might be available to the Members by reason of such an adjustment to basis will be foreclosed. In addition, a Member may have greater difficulty in selling Units since the purchaser will obtain no current tax benefits from the investment to the extent that such investment exceeds his or her allocable share of the Company's basis in its assets and may be required to recognize taxable income to the extent of such excess, even though the purchaser does not realize any economic profit.

**Pre-Opening Expenses.** The IRS takes the position that, with the exception of costs relating to deductions under Sections 163 (interest), 164 (taxes), and 165 (losses) of the Code, all costs incurred by a Company before its facilities are finished and operating should be capitalized under Section 263 of the Code. Thus, expenses otherwise deductible by the Company (for example, some reimbursements of costs and administrative expenses of the Manager) may be attributable to a pre-opening period and must be capitalized.

Section 195 of the Code provides taxpayers with an election to amortize start-up expenditures ratably over a period of at least 60 months commencing with the month in which the new business begins. A start-up expenditure eligible for such amortization must be paid or incurred in connection with investigating the creation or acquisition of an active trade or business or paid or incurred in connection with creating an active trade or business. Such amounts must also be of a type which, if paid or incurred in connection with the expansion to an existing trade or business in the same field, would be allowable as a current deduction in the year paid or incurred. In the case of a limited liability company, the eligibility for the new election to amortize is made at the Company level.

**Tax Returns.** The Company's federal income tax returns may be audited by the IRS and such audit may result in adjustments to the various items reported by the Company. For example, various deductions claimed by the

33

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1069
CRITERION_SEC_00034646

Company on its returns of income could be disallowed in whole or in part on audit, thereby resulting in an increase in the net income or a reduction in the net loss of the Company. The disallowance of such deductions in whole or in part could increase a Member's taxable income without the receipt of any additional cash distributions from the Company. Members may be bound by actions taken by the Manager at the Company level during the course of an audit.

An audit of the Company's tax returns may also result in an audit of the income tax returns of Members, which could result in adjustments to non-Company items of income, deduction or credit. Final disallowance of such deductions could adversely affect Members. In addition, state tax authorities may audit the Company's tax returns, which could result in unfavorable adjustments for Members.

Counsel will not prepare or review the Company's income tax returns, which will be prepared by the Company's management and independent accountants. The Company will make a number of decisions on tax matters, often with the advice of independent accountants retained by the Company, and such matters will not usually be reviewed with Counsel.

**Market Discount**

Debt instruments acquired at a price lower than their adjusted issue price (usually the face amount of the loan) will be acquired with market discount ("**Market Discount**"). Generally, Market Discount accrues until the loan is disposed of. Any gain on the disposition of a Market Discount obligation is ordinary income to the extent of the accrued Market Discount. Further, any partial principal payment on a Market Discount loan shall be included in gross income as ordinary income to the extent such payment does not exceed the accrued Market Discount. In addition, certain interest on indebtedness used to acquire a Market Discount loan must be deferred.

**Depreciation and Cost Recovery**

Current federal income tax law permits the Company, as an owner of improved real property, to take depreciation deductions based on the entire cost of the depreciable improvements, even though such improvements may be financed in part with borrowed funds. If, however, the purchase price of the Company Property and the non-recourse liabilities to which the Property may be subject are in excess of the fair market value of the Property, the Company will not be entitled to take depreciation deductions to the extent that deductions are derived from such excess. Any real property held by the Company will be depreciated on a straight line method, over 27.5 years using the mid-month convention. Under the mid-month convention, property is treated as placed in service during the mid-point of the month.

Depreciation deductions can only be claimed for that portion of real property that is depreciable. Since land is not depreciable, an allocation must be made between the value of improvements on real estate and the underlying land. The allocation of purchase price between depreciable and non-depreciable items is a question of fact, and if the amount allocated by the Company to depreciable items is decreased and the amount allocated to non-depreciable items such as land is increased, Company losses for federal income tax purposes will be decreased. Because the allocation of purchase price between buildings and land is a question of fact, counsel is unable to express an opinion regarding the Company's allocation of purchase price among land and buildings constituting any real property held by the Company.

With respect to individual Members, a 20% penalty is imposed on all underpayment of tax attributable to a substantial valuation misstatement. A valuation misstatement is substantial when the value or adjusted basis claimed with respect to a property is determined to be at least 200% of its correct valuation or adjusted basis. The penalty will not be applicable unless the underpayment of tax is at least $5,000. The Manager does not anticipate that the value or adjusted basis assigned to the Company Property will equal or exceed 200% of its correct valuation or adjusted basis.

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1070
CRITERION_SEC_00034647

**Organization and Syndication Expenses**

Expenses paid or incurred in connection with the organization and syndication of a Company must be capitalized. Expenses of organizing a Company may be amortized over a period of not less than 60 months. However, syndication expenses may not be currently deducted nor amortized. The determination as to whether expenses are organization or syndication expenses is a factual determination that will initially be made by the Company. The IRS could challenge the Company's allocations between organization and syndication expenses. Consequently, expenses that are treated as subject to amortization could be re-characterized as nondeductible syndication expenses.

**Tax-Exempt Use Property**

Units may be purchased by both tax-exempt entities and entities not exempt from taxation. Section 168(h)(6) of the Code provides that in certain instances where a Company has as Members both tax-exempt entities and persons or entities not exempt from taxation, a portion of the property owned by the Company will be deemed tax-exempt use property and will be required to be depreciated over the greater of 40 years or 125% of any long-term lease. Under Section 168(h)(6) of the Code, unless the Company's allocation of Company tax items is determined to be a qualified allocation, any property owned by the Company will be deemed to be tax-exempt use property to the extent of the tax-exempt entities' proportionate share of the Company. One of the requirements to have a qualified allocation is that the allocations of Company items in the Company must have substantial economic effect under Section 704(b)(2) of the Code. Counsel has expressed no opinion as to whether a portion of Company Property must be depreciated over 40 years. If a portion of Company Property is required to be depreciated over 40 years, depreciation deductions to all Members will be decreased accordingly.

**Investment By Qualified Plans and Individual Retirement Accounts - Unrelated Business Taxable Income**

Qualified plans (i.e., any pension, profit sharing or stock bonus plan that is qualified under Section 401(a) of the Code, but excluding individual retirement accounts) ("**Qualified Plans**"), individual retirement accounts ("**IRAs**") and certain other tax-exempt entities ("**Tax-Exempt Entities**"), although generally exempt from federal income taxation under Section 501(a) of the Code, nevertheless are subject to tax to the extent that their unrelated business taxable income ("**UBTI**") exceeds $1,000 during any tax year. Generally, an allocation of income from property that is "debt financed property" will result in UBTI. Debt financed property is generally defined to mean any property as to which there is "acquisition indebtedness." The Company may generate UBTI as a result of debt financing, specifically the line of credit.

Qualified Plans (but not IRAs or Tax-Exempt Entities) may, under a special rule set forth in Section 514(c)(9) of the Code, avoid the characterization of their distributive share of income from debt-financed real estate (but not loans) of a Company as UBTI unless any of the following factors apply: (1) the price for the acquisition or improvement of the real property is not a fixed amount determined as of the date of the acquisition or the completion of the improvements; (2) the amount of indebtedness or any other amount payable with respect to such indebtedness, or the time for making any payments of any such amount, is dependent, in whole or in part, upon any revenue, income, or profits derived from such real property; (3) the real property is at any time after its acquisition leased to the person selling such property or certain persons related to the seller; (4) the real property is acquired from, or is at any time after the acquisition leased to certain related persons; (5) any person described in clause (3) or (4) provides financing in connection with the acquisition or improvements; or (6) none of the following is true: (a) all of the Members are "qualified organizations;" (b) each allocation to a Member that is a qualified organization is a "qualified allocation;" or (c) the "fractions" rule in Section 514(c)(9)(E) of the Code is met.

Properties that are acquired with debt financing are subject to UBTI. The Properties acquired by the Company may be classified as debt-financed property depending on the type of financing obtained on the Properties. If the receipt of UBTI from the Company will have an adverse impact on an investor, such investor should consult his or her own tax consultant before investing in the Company. Qualified Plans should be aware that if they buy their Units at a discount pursuant to the Operating Agreement, the fractions rule will not be complied with and the Section 514(c)(9) exception will not be available. If a Qualified Plan's, IRA's or Tax-Exempt Entity's share of the UBTI from the Company and other investments exceeds $1,000 during any tax year the Qualified Plan, IRA or Tax-Exempt Entity will be required to pay taxes on such UBTI. Whether a Qualified Plan's, IRA's or Tax-Exempt

35

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1071
CRITERION_SEC_00034648

Entity's UBTI will exceed this $1,000 exclusion in any year will depend upon whether or to what extent the Company qualifies for the exception, the actual operations of the Company, the size of the Qualified Plan's, IRA's or Tax-Exempt Entity's investment in the Company, the taxable income of the Company, and the amount of such Qualified Plan's, IRA's or Tax-Exempt Entity's UBTI from other investments. If any properties are financed, an allocable portion of the income directly associated with such financed property reduced by an allocable portion of deductions (computing depreciation on a straight-line basis) directly associated with such financed properties will be treated as UBTI. The allocable portion of income and deductions will be equal to the ratio of indebtedness on such properties outstanding from time to time to the basis in such properties as adjusted from time to time. When the Company disposes of a financed property, a Qualified Plan, IRA or Tax-Exempt Entity may be required to recognize an allocable portion of the gain as UBTI based on the ratio between the indebtedness as of the date of sale and the basis of such property.

The portion of the Company income that is not deemed to be UBTI will continue to be exempt for a Qualified Plan, IRA or Tax-Exempt Entity even if a portion of the Company's income is deemed to be UBTI. Moreover, such UBTI will not affect the exemption from taxation of a Qualified Plan's, IRA's or Tax-Exempt Entity's normal investment income from sources other than the Company nor will it affect its tax status. For more details on the application of UBTI, Qualified Plan, IRA or Tax-Exempt Entity investors are urged to consult their tax advisors.

For certain other tax-exempt entities, such as charitable remainder trusts and charitable remainder unitrusts (as defined in Section 664 of the Code), the receipt of any UBTI may have extremely adverse tax consequences. For example, if such a trust or unitrust received any UBTI during a taxable year, all of its taxable income from all sources will be taxable. Charitable remainder trusts and charitable remainder unitrusts should consult their own tax advisors before buying any Units.

In considering an investment in the Company of a portion of the assets of a Qualified Plan, a fiduciary should consider the factors discussed in "Investments By Employee Benefit Plans and Individual Retirement Accounts."

**Payments Between Related Parties.** There are limits on the deductibility of payments between related parties. No deduction is allowed for a payment by an accrual basis taxpayer to a related cash basis recipient until such time as the recipient includes the payment in income. The definition of related party for purposes of this provision includes a Company and any Member in the Company. The Company will not be on the accrual method of accounting. However, if the Company accrues liabilities to related parties that are on the cash basis, no deduction will be allowed until payment to the related party is actually made.

### Accuracy-Related Penalties and Interest

All penalties relating to the accuracy of tax returns are now consolidated into a single accuracy-related penalty equal to 20% of the portion of the underpayment to which the penalty applies. The penalty applies to any portion of any understatement that is attributable to: (i) negligence or disregard of rules or regulations, (ii) any substantial understatement of income tax, or (iii) any substantial valuation misstatement.

Negligence is generally any failure to make a reasonable attempt to comply with the provisions of the Code and the term "disregard" includes careless, reckless or intentional disregard.

A substantial understatement of income tax generally occurs if the amount of the understatement for the taxable year exceeds the greater of (i) 10% of the tax required to be shown on the return for the taxable year or (ii) $5,000. In the case of a C corporation, the amount is $10,000.

A substantial valuation misstatement occurs if the value of any property (or the adjusted basis) claimed on any return is 200% or more of the amount determined to be the correct valuation or adjusted basis. The penalty doubles if the property's valuation is misstated by 400% or more. No penalty will be imposed unless the underpayment attributable to the substantial valuation misstatement exceeds $5,000.

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1072
CRITERION_SEC_00034649

Except with respect to "tax shelters," an accuracy-related penalty will not be imposed on an underpayment attributable to negligence, a substantial understatement of income tax or a substantial valuation misstatement if it is shown that there was a reasonable cause for the underpayment and that the taxpayer acted in good faith. A "tax-shelter" includes a Company if a significant purpose of the Company is the avoidance or evasion of tax. Although the Manager does not believe the Company is a "tax shelter," there can be no assurance that the IRS would agree.

The interest rate on tax shelter underpayments is 120% of the otherwise applicable rate. The increased interest rate applies to an underpayment of tax attributable to one or more tax-motivated transactions, if the amount of the underpayment exceeds $1,000. A tax-motivated transaction is (i) any valuation misstatement of 150% or more, (ii) any activity with respect to which a loss or an investment tax credit is disallowed by reason of the at-risk rules, (iii) any tax straddle, (iv) any use of any accounting method specified in regulations as potentially resulting in a substantial distortion of income, or (v) any sham or fraudulent transaction. The Secretary of the Treasury is given regulatory authority to specify types of transactions that will be treated as tax motivated. In making this determination, the ratio of tax benefits to cash invested, the method of promoting the type of transaction and other relevant factors are to be considered.

**Tax Shelter Registration and Investor Lists**

The organizer of a "tax shelter" must register the tax shelter with the IRS. For this purpose, an investment will generally constitute a tax shelter if the ratio of anticipated tax deductions and 350% of the anticipated tax credits to capital contributions as of the end of any of the first five years (calculated as provided in the Treasury Regulations) exceeds 2 to 1. The Manager has represented that based on the intended operations of the Company, the Company will not satisfy the definitional requirements for a "tax shelter" and will not be registered with the IRS. Consequently, the Manager may be subject to penalty if the IRS determines that the Company was required to register as a tax shelter.

**State and Local Taxes**

In addition to the federal income tax aspects described above, you should consider potential state and local tax consequences of an investment in the Company. A Member's distributive share of the taxable income or loss of the Company generally will be required to be included in determining his or her reportable income for state and local tax purposes.

This Memorandum makes no attempt to summarize the state and local tax consequences to an investor in those states in which the Company may own properties or carry on activities. You are urged to consult your own tax advisors on all matters relating to state and local taxation, including but not limited to (i) whether the state in which you reside will impose a tax upon your share of the taxable income of the Company; (ii) whether an income tax or other return must also be filed in those states where the Company may own properties; and (iii) whether you will be subject to state income tax withholding in states where the Company may own properties.

Because the Company will conduct its activities and may own properties in different taxing jurisdictions, an investment in the Company may impose upon a Member the obligation to file annual tax returns in a number of different states or localities, as well as the obligation to pay taxes to a number of different states or localities. You should consider the additional costs incurred in having to prepare various state and local tax returns, as well as the additional state and local tax which may be payable, when deciding whether to make an investment in the Company.

Many states have implemented or are in the process of implementing programs to require limited liability companies to withhold and pay state income taxes owed by non-resident Members relating to income-producing properties located in their states. For example, limited liability companies which own property or do business within the State of California are subject to withholding tax in the amount of 7% of certain distributions paid to non-resident Members. This withholding requirement may have the effect of reducing the amount of cash that the Company would otherwise be able to distribute to non-resident Members. In addition, such collection and filing requirements at the state level may result in increases in the Company's administrative expenses, which would likely have the effect of reducing returns to the Members.

37

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1073
CRITERION_SEC_00034650

**United States Income Tax Considerations For Foreign Investors**

The federal income tax treatment applicable to a nonresident alien or foreign corporation investing in the Company is highly complex and will vary depending on the particular circumstances of such investor and the effect of any applicable income tax treaties. Each foreign investor should consult such investor's own tax advisors as to the advisability of investing in the Company. The federal income tax treatment will generally depend on whether the Company is deemed to be engaged in a United States trade or business. This determination must be made annually. The Code does not define what constitutes a United States trade or business; rather, this determination is based upon an examination of the facts and circumstances attending the Company's operations and activities. It is anticipated that the Company will be engaged in a United States trade or business.

**United States Withholding Tax on United States Source Income Not Derived in a United States Trade or Business.** If the Company is not engaged in any trade or business during a tax year, a foreign investor would be subject to a 30% withholding tax (subject to reduction or elimination by applicable income tax treaties) with respect to its distributive share of certain items of Company gross income, such as United States source interest (including original issue discount) dividends, rents and other portfolio or investment income. Various statutory exemptions from the 30% withholding tax (or a lower treaty rate) apply to interest income from bank deposits and certain portfolio indebtedness and the 30% withholding tax may be reduced by income tax treaties. A foreign Member who is entitled to income tax treaty benefits may claim such benefits by executing and filing with the Company an initial Form 1001 (Ownership, Exemption or Reduced Rate Certificate) in a timely manner. In such instance, the Company will require that a foreign Member properly execute and provide to the Company a Form 2848 (Power of Attorney and Declaration of Representative), which will enable the Company to complete Form 1001 for future years on behalf of the foreign Member. If a foreign Member claims a reduction in the 30% withholding tax in reliance on an income tax treaty, the Member may be required to disclose the claimed reduction in its United States income tax return or, if no return is filed, in the form the Treasury Department has prescribed in Treasury Regulations under Section 6114 of the Code. Market Discount not effectively connected with a United States trade or business should be treated as the sale of personal property. The sale of personal property by a Member is generally treated as foreign source income and not subject to withholding.

If the foreign investor's share of Company capital gain is not effectively connected with the foreign investor's conduct of a United States trade or business and the foreign investor, in the case of an individual, is not physically present in the United States for 183 days or more during a taxable year, the capital gain will not be subject to United States tax. However, if the capital gain is attributable to a sale or disposition of United States real property, the gain will be treated as effectively connected with a United States trade or business. See "Withholding on Dispositions of United States Real Property Interests" below. If the foreign investor's share of Company capital gain is United States source income and is derived by an individual foreign investor who is physically present in the United States for an aggregate of 183 days or more during a taxable year, the gain, net of United States source capital losses, will be subject to a flat 30% withholding tax (subject to reduction or elimination by an applicable income tax treaty).

**Tax Consequences to Foreign Investors If the Company is Engaged in a United States Trade or Business.** If in any year the Company is deemed to be engaged in a United States trade or business, a foreign Member will also be considered to be engaged in a United States trade or business. Thus, the Member would be required to file a United States federal income tax return and would be subject to tax at graduated rates on his or her distributive share of net income from the Company that was "effectively connected" with such trade or business. In determining the Member's United States taxable income, the Member would be permitted the same deductions allowed a United States resident individual or corporation to the extent the deductions are effectively connected with a United States trade or business. However, a prerequisite to receiving the benefit of deductions is the filing of a true and accurate United States income tax return. Any Company losses that are not effectively connected with a United States trade or business would not be deductible from the Member's United States source income. Additionally, foreign investors may be subject to federal and state estate, inheritance or gift taxes, state and local income taxes and to the alternative minimum tax.

If a foreign investor is subject to United States income tax on his or her distributive share of Company income at regular United States rates and is required to file United States income tax returns, such foreign investor's share of Company taxable income is not subject to the 30% withholding tax discussed above, provided the foreign

38

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1074
CRITERION_SEC_00034651

investor completes and files in duplicate with the Company Form 4224 (Exemption From Withholding of Tax on Income Effectively Connected With Conduct of a Trade or Business in the United States). This form must be filed with the Company before the acceptance by the Manager of the subscription of such foreign investor and annually thereafter for each year in which the foreign investor is a Member.

If the Company has "effectively connected" income that is allocable to a foreign Member, then the Company must pay a federal withholding tax presently equal to 35% and a California withholding tax equal to 9.3% in the case of a Member that is a corporation, or 39.1% and 9.3% for a Member who is an individual, Company, estate or trust, of the adjusted "effectively connected" taxable income that is allocable to that foreign Member.

If a foreign Member has filed a Form 4224 to claim exemption from the 30% withholding, that Member is deemed to have "effectively connected" income subject to withholding. The Company must make installment payments of withholding tax based on the amount of effectively connected income allocable to its foreign Members, without regard to whether distributions are made during the Company's taxable year and the foreign Member's distributive share of the Company's tax credits. The foreign Member's share of any withholding tax paid by the Company will be treated as distributed to that Member on the earlier of the day on which the tax is paid by the Company or the last day of the Company's tax year for which the tax is paid, and will reduce the foreign Member's adjusted basis in his or her Company interest. Amounts paid by the Company will be treated as loans by the Company to the foreign Member and will be subject to an interest charge equal to the Prime Rate. The amount of the loan and interest charge will be offset against the foreign Member's share of Distributions. Withholding is not required on any amount subject to the 30% withholding discussed earlier. The amount withheld attributable to a foreign Member is creditable against the United States income tax liability of that foreign Member subject to certain limitations. Withholding is not required with respect to a particular Member if that Member provides a Certificate of Non-Foreign Status in accordance with Revenue Procedure 89-31, 1989-1 C.B. 895.

For tax treaty purposes, a foreign Member may be deemed to have a "permanent establishment" in the United States for any year in which the Company is engaged in a United States trade or business.

**Withholding on Dispositions of United States Real Property Interests.** Under the Foreign Investment in Real Property Tax Act ("**FIRPTA**"), nonresident aliens and foreign corporations are subject to withholding on dispositions of United States real property interests. For this purpose, United States real property owned by the Company will be treated as held proportionately by its Members. Therefore, a foreign Member may be subject to withholding when he or she sells or exchanges his or her Company interest to a United States person. The Company is required to deduct and withhold from any cash Distribution an amount presently equal to 35% for United States tax purposes and an amount presently equal to 8.85% for California tax purposes to the extent the Distribution is attributable to gain from the sale of a United States real property that is allocable to a foreign Member that is a corporation. The Company is required to deduct and withhold from any cash Distribution an amount equal to 15% for United States tax purposes and an amount equal to 9.3% for California tax purposes to the extent the distribution is attributable to gain from the sale of a United States real property that is allocable to a foreign Member that is an individual. If the gain is effectively connected with a United States trade or business and the Company makes installment payments of withholding tax, the Company is not required to withhold tax on cash Distributions. See "Tax Consequences to Foreign Investors If the Company is Engaged in a United States Trade or Business" above. If the Company distributes a United States real property interest to a foreign Member, it is required to withhold 10% of the fair market value of the interest for federal income tax purposes and 3.3% of the fair market value of the interest for California income tax purposes.

**Miscellaneous Considerations.** Foreign corporate investors should also be aware that if the Company is deemed to be in a United States trade or business the United States Branch Profit Tax may apply to income from the Company to the extent the Company has income effectively connected with a United States trade or business.

In determining the advisability of an investment in the Company, foreign investors should consult their own tax advisors concerning (i) whether they will be treated as being engaged in a United States trade or business or having permanent establishment in the United States, (ii) whether gain from the sale of Units is effectively connected with their conduct of a United States trade or business or a permanent establishment in the United States, (iii) the income tax consequences relating to the ownership of Units in their own particular circumstances, and (iv) the tax consequences of owning Units under the internal tax laws of the foreign investor's home country.

39

USW 804765074.5

Exhibit 23 Page 1075
FOIA Confidential Treatment Requested by Criterion Wealth Management

It should be noted that a number of issues discussed in this Memorandum have not been definitively resolved by statutes, regulations, rulings or judicial opinions. Accordingly, no assurances can be given that the conclusions expressed herein will be accepted by the IRS, or, if contested, would be sustained by a court, or that legislative changes or administrative pronouncements or court decisions may not be forthcoming that would significantly alter or modify the conclusions expressed herein. You are urged to consult your own tax counsel regarding the tax consequences of an investment in Units.

### General Considerations

**At-Risk Rules.** A Member that is an individual or closely held corporation will be unable to deduct his or her distributive share of Company net loss, if any, to the extent such net loss exceeds the amount such Member has "at risk." A Member's initial amount at risk will equal the sum of (i) the amount of money invested by the Member in the Company, (ii) the basis of any property contributed by such Member to the Company, and (iii) the amount of borrowed funds used in Company activities to the extent that the Member is personally liable with respect to such indebtedness. A Member can include in the amount at risk such Member's share of qualified non-recourse financing in the event the Company holds real property.

A Member's amount at risk will be reduced by the amount of any cash distributed to such Member and the amount of net loss allocated to such Member, and will be increased by the amount of net income allocated to such Member. Net loss not allowed under the at-risk provisions may be carried forward to subsequent taxable years and used when the amount at risk increases.

**Alternative Minimum Tax.** Taxpayers may be subject to the alternative minimum tax in addition to the regular income tax. The alternative minimum tax applies to designated items of tax preference. Specifically, the tax is determined by subjecting alternative minimum taxable income in excess of \$40,000 in the case of a C corporation, and \$82,100 in the case of married couples filing a joint return or a surviving spouse (\$52,800 for a single taxpayer or \$41,050 for a married taxpayer filing separately, or \$23,500 for estates or trusts) to a flat rate of 26% (20% in the case of corporations) for alternative minimum taxable income in excess of the exemption up to \$175,000 and 28% on any excess. The exemption amounts are reduced, but not below zero, by 25 cents for each \$1 that alternative minimum taxable income exceeds \$150,000 for a C corporation, \$156,500 for married couples filing a joint return or a surviving spouse, \$117,300 for a single taxpayer, and \$78,250 for a married taxpayer filing separately and for estates and trusts. The limitations on the deduction of passive losses also apply for purposes of computing alternative minimum taxable income.

For more information about tax preferences and the alternative minimum tax, you should consult your tax advisors.

**Activities Not Engaged in for Profit.** Under Section 183 of the Code, certain losses from activities not engaged in for profit are not allowed as deductions from other income. The determination of whether an activity is engaged in for profit is based on all the facts and circumstances, and no one factor is determinative, although the Treasury Regulations indicate that an expectation of profit from the disposition of property will qualify as a profit motive. Section 183 contains a presumption that an activity is engaged in for profit if income exceeds deductions in at least three out of five consecutive years. Although it is reasonable for a prospective investor to conclude that he or she can realize a profit from an investment in the Company as a result of cash flow and appreciation of the Company's property, there can be no assurance that the Company will be found to be engaged in an activity for profit due to the fact that the applicable test is based on the facts and circumstances existing from time to time. The Company intends to conduct all operations in a businesslike manner in order to generate a profit from operations. In the event Section 183 were applied with respect to the Units of a Member, certain tax benefits associated with this Offering, if any, would be eliminated.

Based on the Company's goals, the Manager's representations regarding the Company's business motives and counsel's review of the proposed activities of the Company, although the issue is basically factual, it is more likely than not that, if litigated, the Company will be held to be engaged in a business for profit and not be subject to Section 183 of the Code.

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1076
CRITERION_SEC_00034653

**General Limitations on the Deductibility of Interest.** In addition to the limitations on the deductibility of interest incurred in connection with passive activities and those applicable to Market Discount obligations, the following are additional restrictions on the deduction of interest:

**Capitalized Interest.** Interest on debt incurred to finance construction of real property is not currently deductible and must be capitalized as part of the cost of the real property. Interest incurred on other debts of the Company will be limited by the rules concerning the deductibility of passive losses, discussed above. See "Limitations on Losses and Credits from Passive Activities" above.

**Interest Incurred to Carry Tax-Exempt Securities.** Section 265(a)(2) of the Code disallows any deductions for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of buying or carrying tax-exempt obligations. The IRS announced in Revenue Procedure 72-18, 1972-1 C.B. 740, that the prescribed purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment." The Revenue Procedure further states that while a Company's purpose in incurring indebtedness will be attributed to its Managers, a limited liability company interest will be considered a "portfolio investment." Therefore, in the case of a Member owning tax-exempt obligations, the IRS might take the position that his or her allocable portion of the interest incurred by the Company on its borrowings or of any interest incurred by the Member to buy his or her Units in the Company, should be viewed as incurred to enable him to continue to carry tax-exempt obligations, and that such Member should not be allowed to deduct his or her full allocable share of such interest.

The application of Section 265(2) turns upon each individual Member's purpose for acquiring an interest in the Company. Thus, Section 265(2) might be applied to a Member whose purpose for investing in the Company rather than in a non-leveraged investment is to enable such Member to continue to carry tax-exempt obligations or such shares of stock. It should be noted that Section 7701(f) of the Code directs the IRS to prescribe regulations as may be necessary or appropriate to prevent the avoidance of provisions of the Code that deal with the linking of borrowings to investments through the use of related persons, pass-through entities or other intermediaries. Therefore, the provisions of Section 265(2) may be applied to a Member if the Member does not himself own tax-exempt obligations or stock of a regulated investment company that distributes exempt interest dividends but rather such obligations or stock are owned by a person, entity or other intermediary related to the Member.

## INVESTMENT BY EMPLOYEE BENEFIT PLANS AND INDIVIDUAL RETIREMENT ACCOUNTS

**In General**

In considering an investment in the Company of the assets of an employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Securities Act of 1974 ("**ERISA**")) or an individual retirement account ("**IRA**"), a fiduciary or any other person responsible for investment of the plan or IRA investments, taking into account the facts and circumstances of such plan or IRA, should consider, among other things: (i) whether the investment is in accordance with the documents and instruments governing such plan or IRA, (ii) the definition of plan assets under ERISA, (iii) whether the investment satisfies the diversification requirements of Section 404(a)(1)(C) of ERISA (or other applicable law), (iv) whether, under Section 404(a)(1)(B) of ERISA (or other applicable law), the investment is prudent, considering the nature of an investment in and the compensation structure of the Company and the fact that there is not expected to be a market created in which the Units can be sold or otherwise disposed of, (v) that the Company has had no history of operations, (vi) whether the Company or any affiliate is a fiduciary or a party in interest to the plan or IRA, (vii) the need to annually value the Units, and (viii) whether an investment in the Company will cause the plan or IRA to recognize UBTI. See "Federal Income Tax Consequences -- Investment by Qualified Plans and Individual Retirement Accounts -- Unrelated Business Taxable Income." The prudence of a particular investment must be determined by the responsible fiduciary or other person (usually the trustee, plan administrator, or investment manager) with respect to each employee benefit plan or IRA, taking into account all of the facts and circumstances of the investment.

Potential employee benefit plan and IRA investors should also take into consideration the limited liquidity of an investment in the Company as it relates to applicable minimum distribution requirements of the Code. If the Units are held in the IRA or employee benefit plan at the time mandatory distributions are required to commence to

41

USW 804765074.5

Exhibit 23 Page 1077
CRITERION_SEC_00034654

the IRA beneficiary or plan participant, applicable law may require the in kind distribution of Units.  Such distribution must be included in the participant's or beneficiary's taxable income for the year of receipt of the Units (at then current fair market value) without any cash distributions with which to pay the tax liability.

ERISA provides that Units may not be purchased by an employee benefit plan if the Company or an affiliate of the Company is a fiduciary or party in interest (as defined in Sections 3(21) and 3(14) of ERISA) to the plan unless such purchase is exempt from the prohibited transaction provisions of Section 406 of ERISA.  Under ERISA, it is the duty of the fiduciary responsible for buying the Units not to engage in such transactions.

Section 4975 of the Code has similar restrictions applicable to transactions between disqualified persons and an employee benefit plan or IRA, which could result in the imposition of excise taxes on the Company or loss of tax-exempt status of the IRA.

**Plan Asset Regulations**

An investment in the Company by an employee benefit plan or IRA could also violate ERISA or the Code if, under applicable Department of Labor ("**DOL**") regulations, the Company assets are considered to be assets of the plan or IRA.  The DOL has promulgated final regulations ("**DOL Regulations**"), 29 C.F.R. Section 2510.3-101, that define what constitutes "Plan Assets" in a situation in which an employee benefit plan or IRA invests in a limited liability company, or other similar entity.  If assets of the Company are classified as Plan Assets, the significant penalties discussed below could be imposed under certain circumstances.

Under the DOL Regulations, if an employee benefit plan or IRA invests in an equity interest of an entity that is neither a publicly offered security nor a security issued by an investment company registered under the Investment Company Act of 1940, as amended, its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that the entity is an "operating company," or equity participation in the entity by benefit plan investors is not "significant."

The Units will not qualify as publicly offered securities nor will they be issued by an investment company registered under the Investment Company Act of 1940.

Nonetheless, if one of the exceptions described below is satisfied, Company assets may avoid being classified as Plan Assets.  Company assets may be excluded from Plan Assets under the DOL Regulations if the Company is an "operating company."  The term "operating company" includes an entity that is a "real estate operating company," as defined in the DOL Regulations.  Under the DOL Regulations, an entity is a "real estate operating company" if:

(i)	for any day during a 90-day annual valuation period at least 50% of its assets, valued at cost (other than short-term investments pending long-term commitment or distribution to investors), are invested in real estate that is managed or developed by such entity and with respect to which such entity has the right to substantially participate directly in the management or development activities, and

(ii)	the entity, in the ordinary course of its business, is engaged directly in real estate management or development activities.  Example (8) in the DOL Regulations indicates that an entity may still qualify as a "real estate operating company" when management of the entity's real estate may be done by independent contractors if the entity retains certain control over the independent contractors and frequently consults with and advises the independent contractors.

It is not anticipated that the Company will satisfy the definition of an operating company.

If the Company is classified as a "real estate operating company," an investment by an employee benefit plan or IRA in the Company should be treated only as an investment in an equity interest in the Company and not as an investment in an undivided interest in each of the Company's assets.

42

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1078
CRITERION_SEC_00034655

If the Company does not qualify as an "operating company" under DOL Regulations, an employee benefit plan or IRA investment in the Company will be treated as an investment in an equity interest in the Company, and not as an investment in an undivided interest in each of the underlying assets, only if equity participation in the Company by benefit plan investors (i.e., employee benefit plans and IRAs) is not "significant." Under the DOL Regulations, equity participation in the Company by benefit plan investors would be "significant" on any date if, immediately after the most recent acquisition of any equity interest in the Company, 25% or more of the total value of the Units is held by benefit plan investors. In determining whether the 25% benefit plan investors' ownership is met, the ownership of any person with discretionary authority with respect to Company assets is disregarded. The Operating Agreement prohibits benefit plan investors from acquiring 25% or more of the total value of the Units. If the Company complies with this prohibition, the Company should qualify for the exemption from the DOL Regulations afforded to entities in which benefit plan participation is not "significant." However, if, for any reason, the 25% limitation is not met, then the issues described below will arise (unless the Company is an operating company).

**Impact of Company's Holding Plan Assets**

If the Company is deemed to hold Plan Assets, additional issues relating to the Plan Assets, and "prohibited transaction" concepts of ERISA and the Code arise. Anyone with discretionary authority with respect to Company assets could become a "fiduciary" of the employee benefit plans or IRAs within the meaning of ERISA. As a fiduciary, such person would be required to meet the terms of the employee benefit plan or IRA regarding asset investment and would be subject to prudent investment and diversification standards. Any such fiduciary could be a defendant in an ERISA lawsuit brought by the DOL, an employee benefit plan participant or another fiduciary to require that Company assets and the investment and stewardship thereof meet these and other ERISA standards.

In addition, if the Company is deemed to hold Plan Assets, investment in the Company might constitute an improper delegation of fiduciary responsibility to the Manager and expose the fiduciary of an employee benefit plan investor to co-fiduciary liability under ERISA for any breach by the Manager of its ERISA fiduciary duties.

Section 406 of ERISA and Section 4975(c) of the Code also prohibit employee benefit plans from engaging in certain transactions with specified parties involving Plan Assets. Code Section 4975(c) also prevents IRAs from engaging in such transactions.

One of the transactions prohibited is the furnishing of services between a plan and a "party in interest" or a "disqualified person." Included in the definition of "party in interest" under Section 3(14) of ERISA and the definition of "disqualified person" in Section 4975(e)(2) of the Code are "persons providing services to the plan." If the Manager or certain entities and individuals related to the Manager have previously provided services to an employee benefit plan or IRA investor, then the Manager could be characterized as a "party in interest" under ERISA and/or a "disqualified person" under the Code with respect to such benefit plan investor.

If such a relationship exits, it could be argued that, because the Manager shares in certain Company distributions and tax allocations in a manner disproportionate to its capital contributions to the Company, the Manager is being compensated directly out of Plan Assets rather than Company assets for the provision of services, i.e., establishment of the Company and making it available as an investment to the employee benefit plan or IRA. If this were the case, absent a specific exemption applicable to the transaction, a prohibited transaction could be determined to have occurred between the employee benefit plan or IRA and the Manager.

If the Company's assets are treated as Plan Assets, a prohibited transaction would also occur if a party with whom the Company enters into a transaction is a "party in interest" or "disqualified person" with respect to an employee benefit plan or IRA.

Another type of transaction prohibited by ERISA and the Code is one in which fiduciaries of an employee benefit plan or the person who establishes an individual retirement account engage in self-dealing. Accordingly, affiliates of the Manager are not permitted to buy Units with assets of any benefit plan investor if they (i) have investment discretion with respect to such assets or (ii) regularly give individualized investment advice that serves as the primary basis for the investment decisions made with respect to such assets.

43

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1079
CRITERION_SEC_00034656

If the Company's assets are treated as Plan Assets and if it is determined that the acquisition of a Unit by an employee benefit plan (or another transaction of the Company) constitutes a prohibited transaction, then any party in interest, which may include a fiduciary or sponsor of an employee benefit plan, that has engaged in any such prohibited transaction could be required to: (i) restore to the employee benefit plan any profit realized on the transaction; (ii) make good to the employee benefit plan any losses suffered by the employee benefit plan as a result of such investment; (iii) pay an excise tax equal to 15% of the amount involved (i.e., the amount invested in the Company) for each year during which the investment is in place; and (iv) eliminate the prohibited transaction by reversing the transaction and making good to the Company any losses resulting from the prohibited transaction. Moreover, if any fiduciary or party in interest is ordered to correct the transaction by either the IRS or the DOL and such transaction is not corrected within a 90-day period, the party in interest involved could also be liable for an additional excise tax in an amount equal to 100% of the amount involved (i.e., the amount invested in the Company), for each taxable year commencing with the year in which the 90-day period expires and ending with the year in which the prohibited transaction is corrected. Also, the DOL could assert additional civil penalties against a fiduciary or any other person who knowingly participates in any such breach.

With respect to investing IRAs, the tax-exempt status of the IRA could be lost if the investment (or another transaction of the Company) constitutes a prohibited transaction under Section 408(e)(2) of the Code. If the IRA were to lose its tax-exempt status, the entire value of the IRA would be considered to be distributed and taxable to the IRA sponsor.

**Annual Valuation**

A fiduciary of an employee benefit plan subject to ERISA is required to determine annually the fair market value of each asset of the plan as of the end of the plan's fiscal year and to file an Annual Return/Report on Form 5500 reflecting that value. When no fair market value of a particular asset is available, the fiduciary is required to make a good faith determination of that asset's "fair market value" assuming an orderly liquidation at the time the determination is made. In addition, a trustee or custodian of an IRA must provide an IRA participant with a statement of the value of the IRA each year. In discharging its obligation to value assets of a plan, a fiduciary subject to ERISA must act consistently with the relevant provisions of the plan and the general fiduciary standards of ERISA.

To assist fiduciaries (and IRA trustees and custodians) in fulfilling their valuation and annual reporting responsibilities, the Company will provide reports of the Company's annual determination of the current value of Units in the Company to those fiduciaries (including IRA trustees and custodians) who identify themselves to the Company as such and request the reports. The Company valuation may be, but is not required to be, performed by independent appraisers.

There can be no assurance (i) that the value established by the Company could or will actually be realized by the Company or an investor upon liquidation (in part because appraisal or estimated values do not necessarily indicate the price at which assets could be sold and because no attempt will be made to estimate the expenses of selling any assets of the Company), (ii) that investors could realize such value if they were to try to sell their Units, or (iii) that such valuation complies with the requirements of ERISA or the Code.

## REPORTS TO MEMBERS

The Manager will keep proper and complete records and books of account for the Company at the Company's principal place of business. Members (or their duly authorized representatives) may inspect, examine and copy the Company's books and records at any time during reasonable business hours. The Manager will also provide a copy of the portion of the Company's federal income tax return or other information that the Members may need to prepare their federal income tax returns. The Manager will provide this information within 75 days after the close of each fiscal year.

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1080
CRITERION_SEC_00034657

## LITIGATION

There are no legal actions pending against the Company or the Manager, nor, to the knowledge of the Manager, are any such actions contemplated which, if determined adversely, would have a material adverse effect on the Company, the Manager, their financial condition or their operations.

## LEGAL COUNSEL

The law firm of McKenna Long & Aldridge LLP ("Counsel"), San Diego, California is counsel to the Company in connection with this Offering. In preparation of this Memorandum, Counsel has relied on the representations and statements of the Manager about the Manager, the Company and their affiliates. Counsel expresses no opinion on any factual matter in this Memorandum or the accuracy of this Memorandum.

Counsel does not represent the Members or their interests and the Members have not been represented in connection with this offering. Investors seeking legal advice should retain their own counsel, consult their own advisors about an investment in Units and conduct any due diligence they deem appropriate to verify the accuracy of the representations or information in this Memorandum.

## ACCESS TO INFORMATION

You are invited to ask questions of, and obtain more information from, the Manager about the terms and conditions of this Offering, the Company, the Manager, the Properties, and any other relevant matters, including, but not limited to, additional information necessary or desirable to verify the accuracy of the information in this Memorandum. The Manager will provide the information to the extent the Manager has such information or can obtain it without unreasonable effort or expense.

45

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1081
CRITERION_SEC_00034658

EXHIBIT A

OPERATING AGREEMENT

USW 804765074.5

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1082
CRITERION_SEC_00034659

EXHIBIT B

INSTRUCTIONS TO INVESTORS AND SUBSCRIPTION AGREEMENT

FOIA Confidential Treatment Requested by Criterion Wealth Management

Exhibit 23 Page 1083
CRITERION_SEC_00034660