**O**

# United States District Court
# Central District of California

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    v.

CRITERION WEALTH MANAGEMENT SERVICES, INC., et al.,

                Defendants.

Case № 2:20-cv-01402-ODW (JEMx)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [41]; ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [50] [51]**

## I.     INTRODUCTION

The Securities and Exchange Commission ("SEC") brought this enforcement action against Defendant Criterion Wealth Services and its co-owners, Defendants Robert A. Gravette and Mark A. MacArthur, for fraud and breach of fiduciary duty in violation of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-1 to 80b-18c.  Three summary judgment motions are pending.  First, the SEC moves for summary judgment in its favor as to liability on its first, second, and fourth claims.  (Notice SEC Mot., ECF No. 41.)  Second, Criterion and Gravette move together for summary judgment in their favor on the SEC's first, second, and fifth claims.  (Criterion Mot., ECF No. 51.)  Finally, MacArthur moves for summary judgment in his favor on the SEC's first, second, and sixth claims.  (MacArthur Mot.,

ECF No. 50.)   After carefully considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.   For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the SEC's Motion, and the Court **DENIES** Defendants' Motions.

## II.   FACTUAL BACKGROUND

Criterion is registered as an investment adviser with the SEC, and between 2014 and 2018, it managed $58 million to $190 million in investments.[1]  (Pl.'s Statement of Uncontroverted Facts ("PSUF") 1, 3, ECF No. 41-2; *see also* Criterion Resp. PSUF, ECF No. 62-1; MacArthur Resp. PSUF, ECF No. 65-1.)   Defendants Gravette and MacArthur are individual investment advisers who co-owned Criterion until 2016, at which time MacArthur converted to working for Criterion as an independent contractor.   (PSUF 4–14.)   In 2017, MacArthur left Criterion altogether.   (PSUF 15.) Throughout most of this period, Gravette and MacArthur were the only investment adviser representatives at Criterion.   (MacArthur Statement of Additional Uncontroverted Facts ("MacArthur SAUF") 262, ECF No. 65-1.)

Criterion, as a registered investment adviser, filed annual Form ADVs[2] from 2014 to 2020, with Gravette signing the Form ADVs for most of this period.   (PSUF 16–17.)   In describing its business, Criterion represented in Part 2 of its Form ADVs[3] that it provided "advisory services," including "continuous advice to a client regarding the investment of client funds based on the individual needs of the client" and "portfolio management services . . . using an asset allocation portfolio approach"

---

[1] Facts supported by citations to any party's Statement of Uncontroverted Facts or other separate statement-type document are undisputed unless otherwise specified.   *See* C.D. Cal. L.R. 56-3 (permitting courts to assume as undisputed facts in a separate statement not controverted by declaration or other written evidence filed in opposition).

[2] Financial advisers must annually submit to the SEC a Form ADV containing a description of their business and a disclosure of any conflicts of interest.   (Mem. SEC Mot. 1, ECF No. 41-1); *Vernazza v. S.E.C.*, 327 F.3d 851, 856 (9th Cir. 2003).

[3] Investment advisers are required to provide their investor clients with disclosure statements comprising the same information found in Part 2 of the Form ADV.  *Vernazza*, 327 F.3d at 856.

based on "a personalized variation of a model asset allocation portfolio which is designed to meet a particular investment goal." (PSUF 18.) Criterion further represented that its "investment recommendations . . . will generally include advice regarding the following securities," followed by a list of twenty-one types of assets Criterion might recommend. (PSUF 19.) One of these asset types was "Private Placement Offerings."[4] (*Id.*)

The majority of Criterion's clients were individual investors. (PSUF 24.) Criterion formalized its advisory relationships by having new clients sign an Investment Advisory Agreement. (PSUF 25.) This Advisory Agreement provided that Criterion, in its capacity as a registered investment adviser, would provide either or both of the following types of investment services: (1) Discretionary Investment Management Services, which were based on "an evaluation of clients['] goals, investment objectives, needs, financial and tax status, investment policies, guidelines, reasonable restrictions and risk tolerance among other factors;" and (2) Alternative Investment Consulting, which would "allow access to an alternative investment on a stand alone basis to accredited investors only." (PSUF 26–28.) Criterion charged fees for its advisory services in the form of a percentage of an investor's assets under management with Criterion. (PSUF 20.) Until 2016, Criterion had two different fee schedules. The first was a higher percentage-of-assets fee applied to services encompassing stocks, bonds, and cash. (PSUF 21.) The second was a lower percentage-of-assets fee, the "Alternative Investment Fee," applied to services encompassing hedge fund investments, private placement investments, and private equity investments.[5] (PSUF 22.)

---

[4] "Private Placement Offerings" refer to securities sold through a private offering to a small group of investors. Private placements are offered to a limited pool of accredited investors and are not offered to the public.

[5] In either 2016 or 2017, Criterion stopped offering its Alternative Investment Consulting (i.e., lower) fee schedule. (PSUF 35.)

The Advisory Agreement referred to Criterion's Form ADV and required clients to sign with their initials to indicate receipt of the Form ADV. (PSUF 36.) Gravette and MacArthur each signed the Advisory Agreements as a "Financial Advisor." (PSUF 37.)

In addition to their positions with Criterion, Gravette and MacArthur were also registered representatives of Ausdal Financial Partners, Inc. (PSUF 48, 51.) Ausdal is a registered broker-dealer. (PSUF 49.) Gravette and MacArthur operated Ausdal in concert with their operation of Criterion; specifically, when investors entered into a relationship with Criterion, those investors opened a brokerage account with Ausdal to invest in private securities. (Criterion's Statement of Uncontested Facts ("Criterion SUF") 12, ECF No. 51-1.) Ausdal, acting through Gravette and MacArthur, would then broker the transactions in the private placement investments for Criterion's clients. (PSUF 56.) This practice began as early as June 2014, with Ausdal brokering the private placement investments for Criterion's clients. (PSUF 61.) The majority of Ausdal's broker-dealer clients were also Criterion's advisory clients. (PSUF 55.)

Each investor who was to invest in private placements would complete and sign an Ausdal New Account Form. (Criterion SUF 10.) Moreover, before an investor made a particular investment in a private placement, the investor completed and signed an Ausdal Private Placement Information Form. (Criterion SUF 11.) The investor would also receive copies of the fund's offering documents, including the private placement memorandum. (Criterion SUF 12.)

With respect to these investments, Gravette and MacArthur would conduct due diligence, employ the above-mentioned "asset allocation portfolio approach," and perform continuing due diligence after the investments were made. (PSUF 41–44.) At regular intervals, Criterion offered its clients broader portfolio reports that integrated information about all of a given client's assets under management—including stocks, bonds, private placement offerings, and all other holdings—into a single digest. (PSUF 45.)

Defendants do not dispute this basic business structure; instead, they dispute in which capacity—investment adviser or broker-dealer—Gravette and MacArthur acted when recommending private placements, executing the transactions, and monitoring the investments on behalf of their dual Criterion/Ausdal clients. (*See* PSUF 61.)

## A.     T2's Funds: SREI and AOFIV

Four private placement offerings are at issue in this case. Two were offered by T2 Holdings, LLC, a company with whose two principals MacArthur had a pre-existing personal and professional relationship. (PSUF 92.) The first T2 fund is the Strategic Real Estate Income Fund ("SREI Fund"). (PSUF 88.) Initially, T2 made investments in the SREI Fund available to investors solely through Class A units. (PSUF 89.) Returns on Class A units came in three phases. First, Class A unitholders in the SREI Fund would receive all returns until profits achieved a 6% annualized return threshold (i.e., a 6% "hurdle"). Then, T2 was entitled to a performance allocation of 100% of all new investment income until its profit participation had caught up such that 80% of all profits to date had been allocated to Class A investors, and 20% had been allocated to T2. Third and finally, for any investment returns after that, Class A investors and T2 shared in investment income at 80% and 20%, respectively. (PSUF 90; Compl. ¶ 38, ECF No. 1.) In short, this was "an 80/20 profit split in favor of investors with a 6% hurdle." (Compl. ¶ 39.)

Ausdal entered into a placement agreement with T2 under which Ausdal would broker investor transactions in the SREI Fund, and in exchange, T2 would pay Ausdal 50% of the performance allocation that T2 received for as long as the investors Ausdal referred remained invested in the SREI Fund. (PSUF 95.) As part of this placement agreement, T2 created special Class C units for the SREI Fund, available only to Criterion clients. Class C units were identical to Class A units, except that after the investment cleared the hurdle, Class A investors and T2 would share income at 60% and 40%, respectively (rather than at 80% and 20%). In short, Class C units provided a 60/40 profit split in favor of investors with a 6% hurdle. (PSUF 103; *see* Compl.

¶ 42.)   Criterion's clients who invested in the SREI Fund purchased only Class C units.  (PSUF 106.)  All other investors in the SREI Fund, who were referred to it by at least twenty other investment advisers, invested in Class A units.  (PSUF 105, 107.)

T2 had a separate fund called the T2 Opportunity Fund IV (Master), L.P. ("Master Fund"), which it launched in 2014 with a single feeder fund.  (PSUF 123.) The shares offered by that feeder provided an 80/20 profit split in favor of investors with an 8% hurdle.  (PSUF 127.)  To accommodate Criterion and Ausdal, T2 created a second feeder fund called T2 Asset Opportunity Fund IV ("AOFIV").  (PSUF 125– 126.)  Ausdal entered into a placement agreement with AOFIV under which Ausdal would broker investor transactions with AOFIV, and in exchange, T2 would pay Ausdal 50% of the allocation that T2 received from the Criterion funds in AOFIV for as long as the investors Ausdal referred remained invested in AOFIV.  (PSUF 135.) Shares in AOFIV provided a 60/40 profit split in favor of investors with an 8% hurdle. (PSUF 129.)   Thus, as with the SREI Fund's Class A and Class C shares, the main material difference between the first feeder fund and AOFIV was in the third phase of the distribution formula, which provided a less favorable profit split for Criterion investors than for other investors.  (PSUF 132.)  The effect of this difference, simply stated, is that the worse the SREI Fund or AOFIV performed, the better the returns for Criterion investors in relation to other investors; and conversely, the better the funds performed, the worse the returns for Criterion investors in relation to other investors. (PSUF 133.)

AOFIV's private placement memorandum contained a chart describing the internal rate of return for T2's vintage real estate funds as between 12% and 15%, well clear of the 8% hurdle.  (PSUF 130.)  The SREI Fund materials apparently did not contain such data, but both Gravette and MacArthur testified that, at the time they invested client funds in the SREI Fund, they expected the return on the investment to exceed the SREI Fund's 6% hurdle.  (Decl. Michael Sew Hoy ("Sew Hoy Decl.") Ex. 3 ("Gravette Dep.") 110:4-6, ECF No. 42-3; Sew Hoy Decl. Ex. 4 ("MacArthur

Test.") 159:16-20 ("[T]his was . . . going to be a 7 to 9 percent total return product.").)
That the SREI Fund and AOFIV were expected to clear their hurdles corresponds to
the T2 Chief Executive Officer's expectation that investor returns on AOFIV would
be approximately 2% lower than returns on the first feeder to the Master Fund.
(PSUF 151.)   Indeed, the respective financial statements for the two feeder funds
show lower reported returns for AOFIV than for the first feeder.  (PSUF 152.)

As discussed above, each private placement transaction in the SREI Fund and
AOFIV brokered by Ausdal generated commission fees paid to Ausdal.  The exact
fees paid to Ausdal depended upon T2's performance allocation, which in turn
depended on the interplay of the hurdle, catch-up, and profit-sharing provisions
associated with each fund.  But for the purpose of this analysis, it suffices to observe
that the commission fees paid to Ausdal were calculated as some percentage of the
Criterion investors' funds that were invested in placements brokered by Ausdal.  In
turn, Gravette and MacArthur took 95% of these commissions for themselves by first
accounting for the Ausdal commissions as income for Criterion and then taking
distributions from Criterion as Criterion's co-owners.  (PSUF 62–72.)

Commissions from Ausdal represented about half of Defendants' income
between 2014 and 2017.  (PSUF 71.)   At the same time Gravette and MacArthur
collected these broker commissions from Ausdal, Criterion continued to collect its
alternative investment fees from its clients invested in the SREI Fund and AOFIV, as
a percentage of the then-current value of the alternative investment under management
by Criterion.  (PSUF 122, 149.)

Gravette and MacArthur, in their capacities as representatives of Criterion, did
not disclose to their clients the nature or the amount of the commissions they were
taking on the private placement transactions that Ausdal brokered.   (PSUF 63.)
Furthermore, they did not disclose to their Criterion/Ausdal clients that SREI Class A
shares were available to investors through other channels.  (PSUF 113–114.)  And
although they did disclose, in their capacities as representatives of Ausdal, that Ausdal

was the selling agent and would therefore be receiving fees from brokering the private placement transactions, they did not disclose that they as individuals would ultimately receive 95% of the fees paid to Ausdal.  (PSUF 116, 118, 143, 145.)

The parties do not dispute these basic facts regarding the SREI Fund and its two classes of shares, and the AOFIV and its two feeder funds.  The SEC asserts that "Defendants' compensation arrangement with T2 diluted the returns of Criterion clients who invested in SREI by adding an extra layer of fees to the distribution waterfall."  (PSUF 121.)  Defendants disagree, pointing out that "the performance allocation would not come into play if the Fund met or fell short of the hurdle; in that case – or even if the Fund exceeded the hurdle slightly – Class A investors would earn lower returns because they invested through [other] investment advisers . . . ."  (*Id.*; *see also* MacArthur SAUF 295 (asserting this compensation arrangement benefitted investors by (1) "reduc[ing] the Investors' downside risk by eliminating or reducing either a recurring investment advisory fee or an up-front commission," and (2) "align[ing] MacArthur's interests with those of [his clients] by requiring that the Investors receive a certain return before MacArthur received any commissions").  Defendants assert that they properly disclosed all relevant details of their business structure to their Criterion/Ausdal clients, including all relevant conflicts of interest, and that they therefore did not breach any duty of any type to their clients.  The SEC disagrees and maintains that Defendants violated the Advisers Act by providing only partial or incomplete disclosures.

**B.     Bird Rock's Funds: Southland Home Mortgage II Fund and Pacific West Home Mortgage II Fund**

Two more funds are at issue in this case: the Southland Home Mortgage II Fund and the Pacific West Home Mortgage II Fund, launched by Bird Rock Ventures in 2015 and 2016, respectively.  (PSUF 172.)  Gravette and MacArthur had a pre-existing relationship with Bird Rock's principals through college- and church-related connections.  (PSUF 163).  Since 2008, Criterion's clients, acting under the advice of

Gravette and MacArthur, began investing in Bird Rock's legacy funds, and as of 2014, $9.5 million in Criterion client funds were invested in the Bird Rock legacy funds. (PSUF 171.)  The Bird Rock legacy funds are not at issue in this case.

Ausdal entered into private placement agreements with Bird Rock under which Ausdal would broker private placement transactions with Criterion clients in exchange for an annual commission equal to 2% of the assets referred to the fund for as long as investors remained invested in the fund.  (PSUF 176, 180.)  As with the SREI Fund and AOFIV, Gravette and MacArthur ultimately received 95% of this 2% commission.  (PSUF 177, 181.)  At the same time that Gravette and MacArthur collected these commissions through Ausdal, Criterion continued to collect its alternative investment fees from its clients invested in Bird Rock funds as a percentage of the then-current value of the Bird Rock investment under management by Criterion.  (PSUF 187.)

The private placement memoranda for both the Southland Home Mortgage II Fund and the Pacific West Home Mortgage II Fund disclose that Ausdal received "commissions of 2% annually on the purchase price of the [units] sold by Ausdal . . . . Any commissions will be paid by [Bird Rock] and not from the proceeds of the Offering."  (PSUF 193, 196.)  Bird Rock also disclosed some form of this information in its Form ADVs for the two Funds.  (PSUF 191.)

The parties dispute whether Gravette and MacArthur  went one step further in the disclosures and informed investors that Gravette and MacArthur as individuals would ultimately receive the commissions Bird Rock paid Ausdal.  The SEC asserts that Defendants did not disclose this information in any document they provided to their clients; Defendants assert that the private placement memoranda combined with the related private placement agreements disclose this information.  (PSUF 199.)

**C.    The SEC's Examination**

From November 1, 2014 to June 30, 2016, the SEC's Office of Compliance, Inspections, and Examinations ("OCIE") conducted an examination of Criterion.

(PSUF 222.)   In an April 20, 2017 letter to Criterion, the OCIE indicates that Criterion's Form ADVs "failed to provide adequate disclosures concerning compensation and conflicts of interest" arising from Defendants' receipt of carried interest, finder's fee payments, and commissions from Ausdal.  (PSUF 224.)   The OCIE also found that Criterion "failed to cause Form ADV Pt. 2B disclosures for Messrs. Gravette or MacArthur to be delivered to any clients or prospective clients." (PSUF 225.)

Criterion took remedial action, which included sending a letter to its clients disclosing that most of the alternative investments offered to Criterion clients through Ausdal "were sourced and sponsored by Ausdal and typically paid a one-time sales commission between 5-7%."  (PSUF 229.)  Criterion further acknowledged that:

> [G]iven the potentially considerable amounts of non-advisory compensation from [the funds], we should have provided more disclosure around the potential conflicts of interest in offering these funds to our clients.   Although disclosures of non-advisory compensation from commissions or finder's fees were provided in our Investment Management Agreement and Firm Brochure, a straight forward clear description would have been in your best interest.   Having known in more detail [about] these arrangements would have left our clients better informed in making a decision to invest.  Detailed disclosure always need to be our priority.

(PSUF 231 (second alteration in original) (citing Sew Hoy Decl. Ex. 26 ("Client Letter"), ECF No. 43-5.)  Gravette signed the letter and sent it to his Criterion clients (but not MacArthur's) two weeks before MacArthur left Criterion.  (PSUF 232–233.) Criterion took further remedial action by instituting a practice of providing clients with a one-page sheet summarizing, in "plain speech," the relevant disclosures regarding compensation agreements and conflicts of interest.  (PSUF 234–235.)

**D.    Criterion's Policies and Procedures Manual**

Separately, but relatedly, throughout most of the time period relevant to this lawsuit, Criterion had in place a Policies and Procedures Manual that it drafted and

instituted in 2008.  (PSUF 80, 240.)  Criterion updated its policies and procedures, including this in the Manual, only on an "as needed" basis.  (PSUF 239.)

In 2014, Criterion engaged NRS, a compliance consulting firm, to review Criterion's compliance practices.  (PSUF 241.)  NRS observed that Criterion lacked basic compliance infrastructure and proper procedures concerning Gravette's and MacArthur's affiliation with Ausdal.  (PSUF 242–243.)  NRS also noted that Criterion had not updated its Manual since 2008, (PSUF 244), and recommended adding seven sections to the 2008 Manual, including two sections addressing private placements, (PSUF 249).  Three years later, in 2017, the OCIE observed that Criterion "ha[d] not revised its Policies and Procedures in over seven years despite changes to its business and applicable regulatory requirements."  (PSUF 252.)  Shortly thereafter, Criterion updated its Manual.  (PSUF 253.)

### III.    PROCEDURAL BACKGROUND

On February 12, 2020, the SEC brought suit against Criterion, Gravette, and MacArthur, setting forth claims for (1) violation of section 206(1) of the Advisers Act, against all Defendants; (2) violation of section 206(2) of the Advisers Act, against all Defendants; (3) violation of section 207 of the Advisers Act, against Criterion and Gravette; (4) violation of section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder (the "Compliance Rule"), against Criterion; (5) aiding and abetting violations of the Advisers Act, against Gravette; and (6) aiding and abetting violations of the Advisers Act, against MacArthur.  (Compl. ¶¶ 122–151.)  On November 1, 2021, the SEC moved for partial summary judgment, seeking judgment in its favor on its first, second, and fourth claims.  (Notice SEC Mot.)  Criterion and Gravette opposed together, (Criterion Opp'n SEC Mot., ECF No. 62), and MacArthur opposed separately, (MacArthur Opp'n SEC Mot., ECF No. 65).  The SEC filed a consolidated Reply.  (SEC Reply, ECF No. 71.)

The same day, Criterion and Gravette, together, moved for partial summary judgment, seeking dismissal of claims one, two, and five, as asserted against them.

(Criterion Mot.)   MacArthur also moved for partial summary judgment, seeking dismissal of claims one, two, and six, as asserted against him.  (MacArthur Mot.)  The SEC filed a combined Opposition.  (SEC Opp'n Defs.' Mots., ECF No. 61.)  Criterion and Gravette replied together, (Criterion Reply, ECF No. 70), and MacArthur replied separately, (MacArthur Reply, ECF No. 72).

## IV.   EVIDENTIARY OBJECTIONS

Criterion and Gravette submit evidentiary objections to certain aspects of the SEC's  Statement of Uncontroverted Facts.  (Criterion Objs. PSUF, ECF No. 62-2.)  MacArthur also submits evidentiary objections.  (MacArthur Objs. PSUF, ECF No. 65-2.)   Defendants' objections all are all asserted on the following four bases: relevance, calls for a legal conclusion, lacks foundation, and hearsay.

First, as a general rule, most relevance-based evidentiary objections are moot in the context of summary judgment motions.  This is because at summary judgment, the question is whether there are genuine disputes of *material* fact, and accordingly, the relevance inquiry inheres throughout the determination of summary judgment motions.  *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant.  Instead of *objecting* parties should simply *argue* that the facts are not material.").  Accordingly, Defendants' relevance-based objections are all **OVERRULED**.

The same is true of objections that an assertion is or calls for a legal conclusion.  *Id.*  These objections are duplicative of the summary judgment standard itself and are accordingly **OVERRULED**.  This includes Criterion's and Gravette's objections to the testimony of Nakamura (the NRS agent primarily responsible for auditing Criterion) on the basis that it is improper expert opinion testimony.

As for Defendants' "lack of foundation" objections, these are not true evidentiary objections.   Defendants argue that certain assertions in the SEC's

Statement of Uncontroverted Facts do not follow from the cited evidence; Defendants do not argue that a particular piece of evidence is inadmissible because the declarant or deponent lacks personal knowledge of the subject matter.   Objections are to be made to individual items of evidence, not to argumentative assertions.   (*See* Scheduling & Case Management Order 8–9, ECF No. 28 (providing an example of a properly submitted evidentiary objection).)   Accordingly, Defendants' "lack of foundation" objections are all **OVERRULED**.

As for Defendants' hearsay objections, such objections on a motion for summary judgment are very unlikely to move the needle in a significant way unless the challenged evidence is key and no other admissible evidence on the matter is available.   *See Burch*, 433 F. Supp. 2d at 1120 ("[W]hen evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence."). With this in mind, the Court rules on the hearsay objections as follows.

*To Testimony Exhibit 36*.   **OVERRULED**.   Testimony Exhibit 36 is an email chain providing evidence Bird Rock paid additional referral fees to Ausdal or Criterion.   The SEC will be able to prove that Bird Rock paid referral fees to Defendants in ways other than with the challenged exhibit, such as with testimony.

*To Testimony Exhibit 19*.   **OVERRULED**.   Testimony Exhibit 19 is an examination letter containing the OCIE's determination that Criterion failed to disclose its conflicts of interest.   To the extent the letter is offered for the truth of its factual contents, the SEC will be able to prove those facts in ways other than with the letter, such as with testimony.   *Burch*, 433 F. Supp. 2d at 1120.   To the extent the letter is not offered for its truth and is offered for some other purpose such as demonstrating notice to Criterion or Criterion's state of mind, the exhibit is not hearsay. *Calmat Co. v. U.S. Dep't of Labor,* 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay.")

*To Testimony Exhibits 56 and 58*.  **OVERRULED**.  Testimony Exhibits 56 and 58 are documentation from the auditor, NRS, identifying the gaps in Criterion's compliance program.  To the extent the documentation is offered for the truth of its factual contents, the SEC will be able to prove those facts in other ways, such as with testimony.  To the extent it is not offered for its truth and is offered for some other purpose such as demonstrating notice to Criterion or Criterion's state of mind, the exhibit is not hearsay.

## V.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" where the resolution of that fact "might affect the outcome of the suit under the governing law," and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the moving party may meet this burden with arguments or evidence or both.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).  The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party."  *Franciscan Ceramics*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted).  Provided the moving party has satisfied its burden, the court should grant summary judgment against a party who fails to present evidence establishing an essential element of its claim or defense when

that party will ultimately bear the burden of proof on that claim or defense at trial. *See Celotex*, 477 U.S. at 322.

In ruling on summary judgment motions, courts draw all reasonable inferences in the light most favorable to the nonmoving party, refraining from making credibility determinations or weighing conflicting evidence. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1183 (C.D. Cal. 2004). However, "uncorroborated and self-serving" testimony will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)). "Conclusory" or "speculative" testimony is likewise "insufficient to raise genuine issues of fact and defeat summary judgment." *See Sterling*, 404 F. Supp. 2d at 1183. The nonmoving party must provide more than a "scintilla" of contradictory evidence to avoid summary judgment. *Anderson*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## VI.   DISCUSSION

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011); *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."). To avoid errors such as the application of the wrong presumption or burden to a party's showing, the Court analyzes the SEC's Motion first, followed by the Motions of the Defendants.

**A.     The SEC's Motion**

The SEC moves for summary judgment in its favor as to liability on its first claim for violation of section 206(1) of the Advisers Act (asserted against all three Defendants), its second claim for violation of section 206(2) of the Advisers Act (asserted against all three Defendants), and its fourth claim for violation of the Compliance Rule (asserted against Criterion only).

The Court finds that the SEC establishes Defendants violated section 206(2) of the Advisers Act and that Defendants fail to place that finding in genuine factual dispute. By contrast, genuine factual disputes remain as to whether Defendants violated section 206(1) and whether Criterion violated the Compliance Rule.

### 1.     Advisers Act Sections 206(1) and 206(2)

Section 206(1) of the Advisers Act prohibits "any investment adviser" from "directly or indirectly employ[ing] any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1). To establish a violation of section 206(1), the SEC must prove that (1) Defendants were investment advisers; (2) they utilized the mails or instrumentalities of interstate commerce to employ a device, scheme or artifice; (3) the device, scheme or artifice violated Defendants' fiduciary duty to their clients in that they made false and misleading statements or omissions of material fact to their clients; and (4) Defendants acted with scienter. *See S.E.C. v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1215 (D. Utah 2007).

Section 206(2) of the Advisers Act prohibits "any investment adviser" from "directly or indirectly" "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). While proving a violation of section 206(1) requires proof of scienter, "[p]roof of simple negligence suffices for a violation of Section 206(2)." *Robare Grp., Ltd. v. S.E.C.*, 922 F.3d 468, 472 (D.C. Cir. 2019); *Merrill Scott*, 505 F. Supp. 2d at 1215 ("The same elements apply for Section 206(2), except that no scienter is

required.  All that need be shown is that the investment adviser failed to disclose a material fact.").

Because the Advisers Act "was directed not only at dishonor, but also conduct that tempts dishonor," an investment adviser's "[f]ailure to disclose material facts must be deemed fraud or deceit" within the meaning of section 206.  *S.E.C. v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 200 (1963).  "[P]roof of intent to injure and actual injury to the client" are not required.  *Id.* at 195.  Actual and potential conflicts of interests are material facts that section 206 requires investment advisers to disclose.  *Robare Grp.*, 922 F.3d at 472 ("[T]he Securities and Exchange Commission has long held that failure by an investment adviser to disclose potential conflicts of interest to its clients constitutes fraud within the meaning of Sections 206(1) and (2)." (cleaned up)).

Because the analysis of section 206(2) provides opportunity for extended discussion, the Court begins there.

### a.    SEC's Second Claim: Violation of Section 206(2)

In this case, whether Defendants violated section 206(2), and whether the underlying material facts are in genuine dispute, center on two areas of inquiry.  The first is whether Defendants were acting as investment advisers.  If they were not, then they did not owe their clients the fiduciary duties the SEC asserts they did.  (Compl. ¶¶ 1, 112–113.)  If they were, then they owed fiduciary duties, including a duty to disclose conflicts of interest.   *Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003). The second area of inquiry centers on those conflicts of interest—what they were, whether Defendants needed to disclose them, and whether Defendants did in fact disclose them.

The SEC demonstrates it is entitled to judgment as a matter of law in both these areas, and Defendants fail to raise a genuinely disputed issue of fact that might change the result.

> i.  *Defendants acted as investment advisers in recommending the private placement offerings to their Criterion/Ausdal clients.*

First, the SEC must demonstrate that Defendants were acting in their capacities as investment advisors.  An "investment adviser" is "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11).  "Investment advisers typically provide ongoing, regular advice and services in the context of broad investment portfolio management, and are compensated based on the value of assets under management" or other fee-based arrangements.  Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34-86031, 2019 WL 2420297, at *3 (June 5, 2019); *see also United States v. Elliott*, 62 F.3d 1304, 1311 (11th Cir. 1995), *amended*, 82 F.3d 989 (11th Cir. 1996) (holding defendants were investment advisers when they "received compensation for providing investment advice" and "were also in the business of advising others" (cleaned up)); *Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977) ("[P]ersons who managed the funds of others for compensation are 'investment advisers' within the meaning of the statute.").  Under federal law, investment advisers owe fiduciary duties toward the clients whose investments they manage.  *See, e.g., Capital Gains*, 375 U.S. at 194.

A broker-dealer, by contrast, is "any person engaged in the business of effecting transactions in securities for the account of others."   15 U.S.C.  § 78c(a)(4)(A). "Broker-dealers typically provide transaction-specific recommendations and receive compensation on a transaction-by-transaction basis (such as commissions) . . . ." Exchange Act Release No. 34-86031, 2019 WL 2420297, at *3; *cf. S.E.C. v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984) (identifying six relevant factors for determining whether an individual acted as a broker).  In contrast to investment advisers, broker-dealers were subject to the less stringent "suitability"

standard at the times relevant to this action.[6]   FINRA Rule 2111(a).   Under this standard, broker-dealers must deal fairly with clients and broker transactions in a way that is suitable to those clients' individual traits and needs, but this duty does not rise to that of a fiduciary.  *Id.* ("A [broker-dealer] must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security is suitable for the customer . . . .").

No party disputes that at the relevant times, Gravette and MacArthur were each dual registrants, meaning that they were registered and regulated by the SEC as investment advisers and simultaneously registered and regulated by FINRA as broker-dealers.  (*See, e.g.*, MacArthur SUF 1.)  Dual registration in and of itself is permissible and is relatively common, though the practice presents ample opportunity for conflicts of interest to arise.  *See, e.g.*, *Malouf v. S.E.C.*, 933 F.3d 1248 (10th Cir. 2019).

Defendants argue that the fact that Gravette and MacArthur were also acting as broker-dealers in their capacities as principals of Ausdal somehow means that they were not acting as investment advisers.  (Criterion Opp'n SEC Mot 4–13; MacArthur Opp'n SEC Mot. 5–16.)   As part of their respective arguments, both sets of Defendants  cite the SEC's three-part test for determining the capacity or capacities in which a dual registrant is acting, Exchange Act Release No. 34-86031, 2019 WL 2420297, at *44, and argue that, under this test, they are broker-dealers.

Defendants' arguments miss the broader point.  No one argues that Criterion and Gravette were not broker-dealers when they brokered their clients' private placement transactions and otherwise acted as agents of Ausdal.  Therefore, it is not surprising that Defendants are able to marshal a significant amount of evidence and arguments to support their contentions that they qualify as broker-dealers under the SEC guidance.  But the question is not whether Gravette and MacArthur ever acted as broker-dealers.  The question is whether, regardless of when and to what extent they

---

[6] In July 2019, the SEC adopted a "best interest" standard of conduct for broker-dealers when making recommendations related to securities transactions.  17 C.F.R. § 240.15l-1.  The parties do not dispute that the prior "suitability" standard is the one that applies to this action.

acted as broker-dealers, they were *also* acting as investment advisers *when they recommended to a Criterion/Ausdal client that the client invest in a particular private placement offering.*

Based on the statutory definitions of investment adviser and broker-dealer, the answer to this question, as a matter of law, is "yes." Under those definitions, when Gravette or MacArthur presented a private placement offering to one of their Criterion/Ausdal clients, explained the upside and downside risks of the offering, and discussed whether the private placement would be a wise addition to the investor's portfolio, Gravette and MacArthur were acting as investment advisers, because they were providing investment advice in the context of broader portfolio management. Exchange Act Release No. 34-86031, 2019 WL 2420297, at *3. Once the investor decided to invest in a private placement and directed Gravette or MacArthur to execute the transaction, Gravette and MacArthur would then step into their roles as agents of Ausdal and broker the transaction in a suitable way on behalf of their client. *See id.* (observing that broker-dealers make "transaction-specific recommendations"). Simply put, when Gravette and MacArthur discussed or recommended *whether* a client should invest in a private placement, they were acting as investment advisers; when they discussed or recommended *how* to execute a private placement transaction (and actually brokered and executed the transaction), they were acting as broker-dealers. Importantly, even after an investor decided to invest in a private placement and Gravette and MacArthur stepped into their roles as broker-dealers, their roles as investment advisors did not cease, and instead continued in full force with respect to Criterion's management of the private placement investments. Furthermore, after Ausdal brokered the transactions and established the investors' positions in the private placements, Criterion continued to manage those investments and collect management fees. Thus, even after Ausdal brokered the private placement transactions, Gravette and MacArthur continued in their roles as investment advisors with respect to Criterion's management of the private placements. The fact that Gravette and

MacArthur at times stepped into their roles as broker-dealers did not invalidate their roles as investment advisers when they rendered services on behalf of Criterion.

No amount of written or oral representations can change this conclusion. Defendants may have had their investor clients sign agreements stating that, when recommending private placement offerings, Gravette and MacArthur were acting in their capacities as broker-dealers for Ausdal. (MacArthur SUF 16 (Firm Brochure stated that "associated persons" of Criterion may, in their "capacities" as investment adviser and broker-dealer, "recommend securities").) Gravette and MacArthur may also have conveyed as much to their clients orally. (*See, e.g.*, MacArthur Decl. ¶ 11, ECF No. 52 ("Acting in my capacity as a registered representative of Ausdal, I recommended that certain Criterion clients . . . invest in one or more of the Funds.").) But these representations do not render Gravette and MacArthur solely broker-dealers (i.e., non-investment advisers) in recommending private placements, for the simple fact that the Advisers Act governs investment advisers by operation of law, and advisers may not sign contracts with clients waiving the clients' rights under the Advisers Act by simply calling investment advising activity something else. Commission Interpretation Regarding Standard of Conduct of Investment Advisers, Inv. Adv. Act Rel. No. 5248, at 10–11 (June 5, 2019) (noting as "inconsistent" with Adviser's Act "[a] contract provision purporting to waive the adviser's federal fiduciary duty generally, such as (i) a statement that the adviser will not act as a fiduciary, (ii) a blanket waiver of all conflicts of interest, or (iii) a waiver of any specific obligation under the Advisers Act").

In support of their argument that they were not acting as investment advisers, Defendants also quote the SEC's own guidance issued in connection with the 2019 Regulation Best Interest. Assuming for the sake of argument that this guidance applies to this case, the guidance in fact supports the SEC's position, not Defendants'. The guidance provides:

> We are . . . confirming that Regulation Best Interest does not apply to advice provided by a broker-dealer that is dually registered as an investment adviser ("dual-registrant") when acting in the capacity of an investment adviser, and that a dual-registrant is an investment adviser solely with respect to accounts for which a dual-registrant provides advice and receives compensation that subjects it to the Advisers Act.

SEC Release No. 34-86031, at 34–35.

> Where a financial professional who is dually registered . . . is making an account recommendation to a retail customer, whether Regulation Best Interest or the Advisers Act will apply will depend on the capacity in which the financial professional making the recommendation is acting.

*Id.* at 99.  This guidance does not say anything remarkable about dual registrants and the law that applies to them.  The guidance does not, as Defendants suggest, indicate that a person cannot act as both an investment adviser and a broker-dealer at the same time.  It also does not indicate that a person acting as a broker-dealer cannot also act as an investment adviser.  The guidance simply iterates that, when a dual registrant is engaged in activities regulated by the Advisers Act, the dual registrant is acting as an investment adviser, and when the dual registrant is engaged in activities regulated by Regulation Best Interest, the dual registrant is acting as a broker-dealer.  Nothing about the SEC's guidance or anything in case law suggests that an individual cannot act in both these capacities at various times within the context of a given client relationship.

To summarize the discussion thus far, as a matter of law, when Gravette and MacArthur discussed whether an investor client should invest in a private placement, the advisability of the investment, and the effect of that investment on the client's overall portfolio, they were acting as investment advisers, and thus owed fiduciary duties to their clients.  *Vernazza*, 327 F.3d at 860.  One of those duties is the duty to disclose all actual and potential material conflicts of interest inhering in the private placement offerings, *id.*, discussed next.

*ii.      Defendants had conflicts of interest they did not fully disclose.*

Two main types of conflict of interest arose from Defendants' business structure and compensation arrangement. The first conflict relates specifically to the SREI Fund and AOFIV and the separate classes of shares T2 created for Criterion investors. Criterion created a conflict of interest by offering less favorable shares to Criterion investors and taking a commission while doing so. This created potential or actual conflict between (1) Gravette and MacArthur's best interest (directing their investors toward the SREI Fund's and AOFIV's Criterion-only shares, where the investments would generate broker commissions) and (2) Criterion investors' best interest (choosing the investment with the compensation structure most favorable to the investor).

A second conflict of a slightly different type arose with respect to all four funds. With all four funds, Ausdal continued to receive commissions from the fund managers (according to various formulas) as long as Criterion investors remained invested in the funds. But those commissions were funneling directly back to Gravette and MacArthur, the same individuals who were responsible for making recommendations to Criterion clients and for managing their investments. This created potential or actual conflict between (1) Gravette and MacArthur's best interest (keeping clients invested in the funds in order to receive commissions) and (2) Criterion investors' best interest (ensuring they are invested in funds with terms that are most favorable to them, even if it means exiting one of the funds from which Ausdal was receiving commissions).[7]

---

[7] This conflict of interest would have been reduced had, for example, Gravette and MacArthur drawn a steady salary from Ausdal rather than receiving commission revenue contingent on Criterion's clients remaining invested and the size of those clients' investments. Had Gravette and MacArthur done so, their interest in keeping those clients invested in the private placements would be significantly reduced, because their salaries would not be dependent on whether Criterion clients remained invested in the private placements, and they would be able to advise their clients to exit the private placements without directly harming their own personal interests. Thus, the specific nature

1  With the conflicts clearly delineated, the Court finds that (1) the SEC submits
2  evidence sufficient to substantiate its claim that Defendants failed to fully disclose
3  these conflicts, and (2) Defendants fail to raise a genuine factual dispute about this
4  conclusion, either by submitting evidence showing that they did sufficiently disclose
5  conflicts, or otherwise.

6  The Advisers Act requires "full and fair disclosure of all material facts."
7  *Capital Gains*, 375 U.S. at 194.  Both actual and potential conflicts of interest are
8  "indisputabl[y] . . . 'material' facts with respect to clients and the Commission."
9  *Vernazza*, 327 F.3d at 859 (citing *Capital Gains*, 375 U.S. at 201).   Investment
10 advisers owe a fiduciary duty to disclose all potential conflicts of interest "accurately
11 and completely," *id.* at 860, "in a manner that would enable their clients to understand
12 the source and nature of the conflicts," *Robare Grp.*, 922 F.3d at 477.   Vague
13 disclosures about how an adviser "*might* be deriving additional compensation from
14 their trading activities" are inadequate when the adviser is "*actually* doing so" and
15 fails to apprise clients of the same.  *S.E.C. v. Westport Capital Markets LLC*, 408 F.
16 Supp. 3d 93, 104 (D. Conn. 2019).  "[W]hat is required is a picture not simply of the
17 show window, but of the entire store[;] not simply truth in the statements volunteered,
18 but disclosure." *Capital Gains*, 375 U.S. at 201.

19 To determine if Gravette and MacArthur sufficiently disclosed the conflicts of
20 interest, the Court looks first to the written disclosures.  The existence and content of
21 the written disclosures is not in factual dispute; the parties generally agree on which
22 documents were available to investors and what the documents stated.

23 The Court begins with the first conflict of interest described above, the one that
24 arose when Criterion recommended investors purchase shares in T2 funds with less
25 favorable compensation structures than what was available to non-Criterion investors.
26 This part of the analysis, at least, is relatively simple.   Nothing in any of the

28 of the compensation agreement structure connecting the fund manager (T2 or Bird Rock), Ausdal,
Gravette, and MacArthur is material, because it directly affects the severity of the conflict of interest.

documents—the Firm Brochure, the Form ADVs, the client agreements, the investment agreements, or the private placement memoranda—discloses specifically that Criterion investors were investing in shares that provided a 60/40 profit split when other non-Criterion investors had access to shares that provided an 80/20 profit split.  This is a material fact that is part of the conflict of interest that arose when Criterion and T2 created Criterion-specific shares and offered them to Criterion investors.  By failing to disclose this information when it was clearly known to them and clearly material to investors' decisions, Gravette and MacArthur breached their fiduciary duties to their clients.[8]  (Client Letter 2–3 (disclosing difference in profit splits); *cf. id.* at 3 ("Given the potentially considerable amounts of non-advisory compensation from the above-mentioned funds, we should have provided more disclosure around the potential conflicts of interest in offering these funds to our clients.").)

The next conflict of interest is the broader one that arose as a result of Gravette and MacArthur receiving ongoing percentage-based commissions from T2 and Bird Rock for keeping Criterion clients invested in the four funds.  Upon careful review of all the written disclosure materials Defendants quoted in their briefs and statements of undisputed facts, the Court makes the following observations.

- Some written disclosures indicated that Ausdal *might*, at some point in the future, receive commissions or other fees for brokering transactions on behalf of Criterion clients.  (*See, e.g.*, Criterion Statement of Additional Uncontroverted Facts ("Criterion SAUF") 307, ECF No. 62-1 ("The Fund may

---

[8] Defendants' argument that the prohibition on selling away prevented them from mentioning the existence of other classes of shares is a red herring.  (*See, e.g.*, Criterion Opp'n SEC Mot. 21.)  The selling away rule prohibits a financial adviser from selling investment products without the authorization of the firm with which he is licensed.  *Bourdel v. Wells Fargo Advisors, LLC*, No. 2:12-cv-01213-MMD-CWH, 2013 WL 1855745, at *3 n.2 (D. Nev. Apr. 30, 2013).  However, Defendants' breach of fiduciary duty was not in their failure to *offer* their clients shares with better profit splits; it was in their failure to *inform* their clients of the existence of those shares.  Defendants could have provided their clients with this information without doing any selling away.

engage selling agents to offer and sell the Units.  Such selling agents may be paid a sales commission . . . .”).)

- Some written disclosures indicated that <u>Gravette and MacArthur</u> *might*, at some point in the future, receive commissions or other fees for brokering transactions on behalf of Criterion clients.  (*See, e.g.*, MacArthur SAUF 276 (Firm Brochure disclosed that “[i]n their separate capacity(ies) [as representatives of Ausdal], [associated persons] are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions . . .).”).)

- Some written disclosures indicated that <u>Ausdal</u> *would in fact*, in connection with a particular investment transaction, receive commissions or other fees for brokering those transactions on behalf of Criterion clients.  (*See, e.g.*, Criterion SAUF 311 (“The Fund has engaged Ausdal . . . to offer and sell interests in the Fund. . . . Such selling agents may be paid a sales commission . . . .”).)

Conspicuously absent from Defendants’ papers, however, is evidence of the natural fourth bullet point in this progression: any written disclosures indicating that <u>Gravette and MacArthur</u> as individuals, and not merely Ausdal, *would in fact* receive commissions from the brokering of these private placements, or that the commissions were ultimately calculated as some percentage of the Criterion investors’ brokered investment.

That Criterion’s clients understood that Gravette and MacArthur were the principals of Ausdal, or that they were the Ausdal agents through which Ausdal brokered the clients’ private placements, does not complete the puzzle.  That Ausdal received commissions, and that Gravette and MacArthur worked for Ausdal, do not together imply that Gravette and MacArthur, as individuals, were in fact receiving commissions on any given transaction (after funneling them through Criterion or otherwise).  Similarly, nothing suggests that Gravette and MacArthur told their clients that they were the only principals of Ausdal, or any other specific information from

which the clients could reasonably infer that commissions for Ausdal meant commissions for Gravette and MacArthur.

Ausdal's receipt of commission fees created a conflict of interest, and Defendants arguably disclosed this particular conflict. However, that *Gravette and MacArthur as individuals* ultimately received essentially all Ausdal's commission fees increased the severity of the conflict of interest, because it more directly tied Gravette's and MacArthur's personal incomes to whether their investors remained invested. (*See* n.7, *supra*.) This extra layer of conflict was undoubtedly material to investors' decisions because it increased the risk that Gravette and MacArthur would act in their own best interest rather than that of their clients. The written disclosures fail to demonstrate that Defendants disclosed this conflict with sufficient detail to permit their clients to understand its severity.

The next consideration is whether there is any evidence that Gravette or MacArthur made these disclosures orally. Having reviewed, to the best of its ability, the extremely voluminous record of this Motion (no less than three Xerox boxes' worth of courtesy copies delivered to Chambers), the Court finds exactly three pieces of evidence suggesting that Gravette or MacArthur may have made oral disclosures. The first is an assertion in Gravette's declaration which reads as follows:

> As part of my initial meeting with new investors, I explained that I was dually registered, meaning that I was both a registered representative for Ausdal, a broker-dealer, and associated with Criterion, an investment adviser. I explained that my association with Ausdal allowed me to offer private placement investments and offerings under Regulation D of the Securities Act of 1933. I explained that I would be acting as a registered representative of Ausdal with respect to any recommendations relating to private placement investments. *I explained that I received commissions on private placements.* I also explained that broker-dealers are regulated by the SEC and the Financial Industry Regulatory Authority ("FINRA"). I also explained the differences between investment advisers and broker-dealers, generally including that investment advisers typically provide ongoing advice, exercise discretion, receive fee-based compensation, and are regulated by the SEC, while broker-dealers typically provide

transaction-specific recommendations, do not exercise discretion, receive commissions, and are regulated by both the SEC and FINRA.

(Mot. Decl. Robert A. Gravette ("Mot. Gravette Decl.") ¶ 38, ECF No. 53 (emphasis added).) The italicized sentence is key, but it suffers from the same infirmity as the written disclosures. It is a generalized statement that, at some point in the future, there may be a private placement, and that, if there is a private placement, Gravette might receive commissions on it. It does not amount to a clear disclosure that, with respect to some particular private placement transaction, Gravette would receive a broker commission.

Given that the manner in which Gravette and MacArthur ultimately benefit from commissions on private placements is key to full disclosure of the conflict, the Court might have expected a more robust description of exactly what Gravette said to his clients regarding commissions on private placements.[9] As written, Gravette's statement could simply mean that Gravette told his clients he received commissions *as a Criterion investment adviser* when he directed an investor to a private placement. That proposition is unremarkable. Gravette's declaration does not indicate he clearly disclosed that he would individually receive an ongoing percentage-of-investment commission as a broker of the investment transaction.

MacArthur also submitted a declaration in support of his Motion. (Mot. MacArthur Decl., ECF No. 52.) Paragraph 11 of this declaration is functionally similar to paragraph 38 of Gravette's declaration in that MacArthur states that he explained to new clients (1) his dual capacity, (2) what he might do in each capacity, and (3) the general difference between the two capacities. (*Id.* ¶ 11.) There is one key

---

[9] The Court notes that when Criterion and Gravette cited Paragraph 11 of Gravette's declaration in their Memorandum of Points and Authorities in support of their Motion, they omitted reference to the italicized language altogether. (Criterion Mot. 11.) Several pages later, they again cite Gravette's Paragraph 11 and state that, "[a]s discussed above, Gravette disclosed to investors that he received commissions from the Fund Managers based on their investments in the Funds." (*Id.* at 15.) But Criterion and Gravette never discussed this particular matter before that point in the brief.

difference, however: MacArthur's declaration lacks any suggestion that he told his clients that he would individually receive percentage-of-investment commissions as a result of Ausdal's brokering activity.

The only other pieces of evidence that might remotely suggest that Gravette or MacArthur fully disclosed their compensation from Ausdal are the following statements of Gravette and MacArthur, respectively:

> Before the time of the investment . . . I explained that the investors' interest in the Four Funds was excluded [from] Criterion's standard investment management fee because the Fund Manager compensated me through Ausdal contingent upon the investor first receiving a certain return.

(Mot. Gravette Decl. ¶ 41.)

> Prior to the investment, I explained to each Investor that the Investor's interest in the Fund ("the "Interest") would be considered a non-billable asset – i.e., it would be excluded from the calculation of Criterion's standard investment management fee – because the Fund Manager would compensate me through Ausdal – my affiliated broker-dealer – contingent upon the Investor first receiving a certain return.

(Mot. MacArthur Decl. ¶ 15.)  Neither of these statements passes muster.  First, both statements are primarily about Gravette and MacArthur explaining Criterion's fee structure to their clients and why certain investments were subject to a lower fee.  The main point is why the fee structure is the way it is; the  fact that Gravette and MacArthur would individually receive broker commissions is relegated to a subordinate clause whose purpose is to provide a reason for the main point. MacArthur's statement is particularly ambiguous and could be read as MacArthur not having communicated any of the "because" clause to his clients at all.  If this is the only context in which Gravette and MacArthur mentioned that they would individually receive compensation from Ausdal, then it is no wonder some of their clients were unaware of this fact.  (*See* PSUF 214–216.)

More fundamentally, though, the plain language of these declarations still fails to establish that Gravette and MacArthur conveyed to their clients the *material details* of the conflict of interest.  As discussed, the material details are that (1) Gravette and MacArthur, as individuals, were ultimately receiving money from Ausdal's brokering activity; and (2) the money ultimately came to Gravette and MacArthur as some sort of percentage of Criterion client funds invested in the private placements.  Nothing in the record—neither Gravette's Declaration nor MacArthur's Declaration nor anything else—indicates that Gravette or MacArthur ever conveyed this second detail to their clients.  The word "contingent" in the declarations is no talisman; in that context, "contingent" refers to the share structure that makes the fund manager's performance allocation initially "contingent" on whether the investment cleared the 6% or 8% hurdle, not that Gravette or MacArthur would obtain funds from Ausdal "contingent" on the investors' continued investment.

Moreover, when parties opposing summary judgment motions submit conclusory, self-serving declarations not supported by anything else in the record, courts may, in appropriate instances, find that the self-serving declaration does not place any fact in genuine dispute.  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.")  That is the case here.  Gravette's and MacArthur's self-serving declarations regarding what they told clients about their compensation from Ausdal are terse, patchy, and conclusory, and have no support anywhere else in the thousands of pages of record submitted in connection with these Motions.  *See Potter v. City of Lacey*, 517 F. Supp. 3d 1152, 1159 (W.D. Wash. 2021) ("Conclusory, non-specific statements in affidavits are not sufficient, and 'missing facts' will not be 'presumed.'" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990)).)  Defendants' declarations amount to no more than a "scintilla" of evidence that Gravette and MacArthur in fact fully disclosed the nature of the conflict of interest to their clients.

*Anderson*, 477 U.S. at 251–52. For that reason, they do not indicate a genuine dispute regarding Gravette's and MacArthur's failure to disclose the conflict.

For these reasons, the SEC makes a complete showing[10] that Gravette and MacArthur violated section 206(2) by failing to provide their clients with the material details of the conflicts of interest that arose from the Criterion/Ausdal business model and compensation structure.[11] Defendants submit no evidence suggesting that this conclusion is in genuine factual dispute. Accordingly, the Court **GRANTS** summary judgment in the SEC's favor as to liability on its second claim for violation of section 206(2) of the Advisers Act.

> *b.    SEC's First Claim: Violation of Section 206(1)*

The Court turns to the SEC's first claim, brought under section 206(1) of the Advisers Act. In order for the SEC to obtain summary judgment on its section 206(1) claim, it must submit evidence substantiating each element of the claim, and it must further demonstrate in the face of Defendants' rebuttals that no genuine factual dispute exists as to any element. *Celotex*, 477 U.S. at 322. If a genuine factual dispute exists as to any single element, then the SEC is not entitled to summary judgment in its favor, no matter how clearly or convincingly it demonstrates the other elements.

---

[10] Neither party, in any motion, opposition, or reply, makes anything beyond a passing mention of the interstate commerce requirement for Adviser Act violations. The Court assumes that this is because the parties do not dispute that Defendants used the mail, telephone, email, or other electronic communications in the course of their relationships with their investor clients. Indeed, no other assumption appears reasonable.

[11] The Court reads no special meaning into the "negligence" requirement for section 206(2) violations. The cases that articulate this negligence requirement all trace back to *Capital Gains Rsch. Bureau*, 375 U.S. 180. That opinion is devoid of the word "negligence," and instead strongly suggests that an adviser's failure to make "full and frank disclosure" of his or her conflicts of interest is itself the negligent act that violates section 206(2). *Capital Gains*, 375 U.S. at 196. This appears axiomatic; a fiduciary's breach of fiduciary duty is equivalent to a negligent act on the part of the fiduciary because a negligent fiduciary is simply one who failed to meet the applicable standard of care, which, for a fiduciary, is the fiduciary standard. *See U.S. Telesis, Inc. v. Ende*, 64 F. Supp. 3d 65, 68 (D.D.C. 2014) ("[C]laims for negligence and breach of fiduciary duty are evaluated similarly because they are governed by the same standard of care.").

As discussed, the main difference between section 206(1) and section 206(2) is that the former requires a showing of scienter. *Robare Grp.*, 922 F.3d at 472. Here, the issue of scienter remains in genuine factual dispute. In the Ninth Circuit, scienter under the Advisers Act refers to "knowing or reckless conduct." *Vernazza*, 327 F.3d at 860 (holding that this is the same standard for scienter under both section 10(b) of the Exchange Act of 1934 and section 17(a)(1) of the Securities Act of 1933). Under this standard, "[s]cienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (noting scienter may exist when the actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort").

"Scienter . . . is a subjective inquiry. It turns on the defendant's actual state of mind." *Gebhart*, 595 F.3d at 1042; *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976) ("There is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith."). For this reason, "[g]enerally, scienter should not be resolved by summary judgment." *S.E.C. v. Life Wealth Mgmt., Inc.*, No. 10-cv-04769-RSWL (MANx), 2012 WL 12919299, at *3–4 (C.D. Cal. Nov. 9, 2012) (finding a genuine dispute as to scienter).

To establish scienter, the SEC points to Gravette's deposition, in which Gravette indicates he understood that  he needed to disclose certain conflicts of interest. (Gravette Dep. 122:17-123:6.) The SEC also points to MacArthur's deposition suggesting that MacArthur also understood that there were conflicts of interest, and that MacArthur believed he had disclosed all material details of the conflicts to his clients. (Sew Hoy Decl. Ex. 5 ("MacArthur Dep.") 163:4-8, ECF No. 42-5.)

Based on this evidence, and citing *Vernazza*, the SEC argues that Defendants' failure to disclose their conflicts of interest accurately and completely constitutes evidence of scienter.   Even if it does, though, Defendants' evidence nevertheless places scienter in genuine dispute.   *Vernazza* was, at the trial court level, a review of the SEC's determination of scienter after an evidentiary hearing.   The holding from *Vernazza* concerns the evidentiary showing required to support scienter, not the showing required to eliminate genuine disputes as to scienter.   327 F.3d at 859–60. Here, Criterion did make some attempt to inform its clients of the potential for conflicts of interest; the Form ADVs and disclosure statements did not altogether avoid the topic.   Since 2014, Criterion's Form ADVs disclosed that "management and associated persons of [the] firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc., a FINRA member broker-dealer." (Criterion SAUF 305.)   The Form ADVs further disclosed that dual licensees such as Gravette and MacArthur were "able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation)." (*Id.*; MacArthur SAUF 276.)   The Form ADVs reiterated that "[w]hen appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to [Criterion] client[s] in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as a registered representative of Ausdal." (Criterion AMF 303.)   The Form ADVs further explained in various ways that, when Ausdal acted as the broker-dealer for private placement transactions of Criterion's clients, the arrangement "create[d] a conflict of interest between [Criterion] and its clients." (MacArthur SAUF 276; *see also id.* (citing another part of the Form ADV providing that the arrangement "presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals").)

Gravette's and MacArthur's declarations further indicate that they made oral disclosures to their investor clients related to the conflicts.  (Opp'n Decl. Robert A. Gravette ("Opp'n Gravette Decl.") ¶ 41, ECF No. 64; Opp'n Decl. Mark A. MacArthur ("Opp'n MacArthur Decl.") ¶ 11, ECF No. 66.)  Thus, Defendants did not altogether fail to disclose conflicts of interest.  Instead, they disclosed the conflicts to a certain degree through some combination of oral disclosures, Form ADVs, the Criterion investment adviser contract, and the private placement memoranda, and the record reflects that Defendants believed that their disclosures were legally sufficient. (Opp'n Gravette Decl. ¶ 38 (Gravette's oral disclosures to clients); Opp'n MacArthur Decl. ¶ 11 (MacArthur's oral disclosures to clients).)

Moreover, the record credibly supports the notion that, as to the SREI Fund and AOFIV, Gravette and MacArthur believed they were giving their clients a *better* deal by securing for them a preferred return and a 60/40 split while charging reduced investment adviser fees, because their clients would ostensibly receive a better return on their investment if the funds fell short of their hurdles, met their hurdles, or slightly exceeded them.  (Opp'n Gravette Decl. ¶¶ 48, 53; Opp'n MacArthur Decl. ¶ 27 ("This contingent commission structure . . . reduced the Investors' downside risk by eliminating or reducing either a recurring investment advisory fee or an up-front commission, which the Investors would have paid even if the Investments underperformed."); *id.* ¶ 30; Client Letter 2 ("[W]e felt this arrangement represented the cheapest way to own this type of asset over the course of time.").)  To determine whether or not Gravette and MacArthur were acting in good faith would require the Court to weigh evidence and make credibility determinations, which it is not permitted to do on summary judgment.  *See In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1148 (C.D. Cal. 2007) (noting scienter is a "fact-specific issue[] which should ordinarily be left to the trier of fact" (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017))).

Although the Court can examine these declarations and determine as a matter of law *what* details were and were not disclosed (and thereby rule as a matter of law on negligence), this does not resolve the question of scienter, because scienter goes to the state of mind of the actor.  *Gebhart*, 595 F.3d at 1042.  The Court cannot conclude that Defendants' failures to disclose were so egregious, extensive, or pervasive that a finding of scienter is required as a matter of law.  Defendants thus demonstrate a genuine factual dispute about whether they engaged in "knowing or reckless conduct" in their failures to fully disclose their conflicts of interest.  *Vernazza*, 327 F.3d at 860.  Thus, the SEC is not entitled to summary judgment in its favor on its first claim, and the Court **DENIES** the SEC's Motion to this extent.

2. *SEC's Fourth Claim: Violation of Compliance Rule*

The SEC asserts its fourth claim against Criterion for violation of the Compliance Rule.  Section 206(4) of the Advisers Act renders it unlawful for investment advisers to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b–6(4).  To implement Section 206(4), the SEC adopted Rule 206(4)-7, the Compliance Rule, which requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation[s]" of the Advisers Act, 17 C.F.R. § 275.206(4)–7(a), and to review at least annually the adequacy and effectiveness these policies and procedures, 17 C.F.R. § 275.206(4)-7(b).  By way of its fourth claim, the SEC asserts Criterion violated the Compliance Rule by failing to keep its policies and procedures current and appropriately tailored to their business.

Generic policies that are not tailored to the specific risks of an adviser's business do not satisfy the Compliance Rule.  *See In re Sierra Fin. Adv., LLC*, 99 S.E.C. 1336, 2010 WL 3725370, at *3 (Sept. 23, 2010) (finding violation of the Compliance Rule when compliance manual "recited general legal requirements . . . but did not contain procedures designed to specifically address [its] business operations and investment practices").  Rather, investment advisers should "identify

conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks." *Compliance Programs of Inv. Cos. & Inv. Adv.*, 68 Fed. Reg. 74714, 74716 (Dec. 24, 2003). An adviser's failure to maintain adequate compliance policies and procedures "constitute[s] a violation of [the Compliance Rule] independent of any other securities law violation." *Id.* at 74715. A violation of the Compliance Rule does not require a showing of scienter and may rest on a finding of simple negligence. *See, e.g., S.E.C. v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).

Although the SEC submits evidence suggesting that Criterion did not update its manual for several years and that the manual was therefore out of date in several respects, this showing does not require the Court to conclude as a matter of law that Criterion was *negligent* in not updating its manual. Gravette testified that he met yearly with compliance consultants and reviewed the adequacy and effectiveness of Criterion's written policies and procedures. (Criterion AMF 327–328.) The record does not preclude the possibility that Criterion's failure to update the manual with material related to private placement offerings was an innocent or otherwise non-culpable omission. Moreover, the fact that other aspects of the manual, such as the organizational chart, were out of date, is not relevant to the analysis, because the Compliance Rule requires written policies and procedures that ensure conflicts and other compliance factors are sufficiently operationalized within a firm; it does not require firms to have handbooks that at all times contain a complete set of up-to-date details about the firm. Finally, the fact that Criterion's compliance consultant recommended updating its policies and procedures manual concerning private offerings, and that Criterion did not update the manual until 2017, likewise does not require a finding of negligence as a matter of law. It is possible that letting three years go by was negligent; or, it is possible that Criterion was justified (that is, was non-negligent) in taking three years to fully update its manual given that it was under

investigation by the SEC.  These factual determinations remain in genuine dispute and must be tried.  Accordingly, the SEC is not entitled to summary judgment in its favor on its second claim, and the Court DENIES the SEC's Motion to this extent.

In summary, the Court **GRANTS IN PART and DENIES IN PART** the SEC's Motion.  The Court grants judgment in favor of the SEC on its second claim against all three Defendants, and the SEC's Motion is otherwise denied.

**B.    Defendants' Motions**

The Court now turns to Defendants' Motions, which are directed toward the SEC's first claim for section 206(1) violations, second claim for 206(2) violations, and fifth and sixth claims for aiding and abetting by Gravette and MacArthur, respectively.  As a preliminary matter, the Court **DENIES** Defendants' Motions as to the SEC's second claim.  The Court grants judgment as a matter of law in favor of the SEC on that claim, so Defendants cannot possibly demonstrate that it is beyond genuine dispute that they have *not* violated section 206(2).

*1.    Section 206(1)*

Defendants all move for summary judgment in their favor on the SEC's first claim for violations of section 206(1) of the Advisers Act.  As with the SEC's Motion, scienter is the issue that defeats both Motions of Defendants.   In this context, Defendants bear the initial burden of demonstrating with arguments and evidence that the SEC *will not* be able to establish scienter.  This is a rather high burden; Defendants must establish a lack of a certain subjective state of mind (bad faith) as a matter of law.  *Gebhart*, 595 F.3d at 1042.  Even if Defendants do meet this burden on each of their Motions, the SEC successfully demonstrates that the existence of scienter remains in genuine dispute.  Gravette and MacArthur were indisputably aware of the details of the compensation structure underpinning their clients' investment in the four funds.  They eventually admitted in their Client Letter that they should have provided their clients with this information.  Nothing in the record precludes the possibility that Defendants were aware earlier on that they should have provided this information and

failed to do so anyway.  Thus, the Court cannot conclude as a matter of law that Defendants lacked scienter.  The Court **DENIES** Defendants' Motions as to the first claim.

### 2.    Aiding and Abetting Claims

Finally, Defendants move for summary judgment on the SEC's fifth and sixth claims, for aiding and abetting violations of the Advisers Act, asserted against Gravette and MacArthur, respectively.  Defendants argue that, because the underlying claims for violation of sections 206(1) and 206(2) of the Advisers Act fail, so too do the aiding and abetting claims.  (Criterion Mot. 24–25; MacArthur Mot. 21.)  But, as discussed, the SEC demonstrates that, as a matter of law, Defendants each violated section 206(2).  That being the case, there is certainly a genuine factual dispute as to whether Gravette or MacArthur aided or abetted the other (or Criterion) in violating section 206(2).  Defendants proffer nothing to suggest otherwise.  Accordingly, the Court **DENIES** Defendants' Motions as to the aiding and abetting claims.

Thus, Defendants' Motions are **DENIED** in their entireties.

## VII.   STIPULATION TO CONTINUE TRIAL

On April 8, 2022, while these Motions were under submission, the parties filed a Stipulation to continue the trial and pre-trial dates.  (Stip., ECF No. 80.)  The good cause supporting the Stipulation was that the Court had not yet ruled on the instant summary judgment Motions.  Now that the Court has ruled on the Motions, the Stipulation is moot and is **DENIED** as such.  The Court will consider continuing the trial if the parties submit with their request a concrete, fact-specific proposal to engage in another round of mediation by a specific date.  Unless the parties demonstrate good cause in this way or otherwise, trial will remain on calendar as scheduled.

## VIII.  CONCLUSION

For these reasons, the Court **GRANTS IN PART and DENIES IN PART** the SEC's Motion.  (ECF No. 41.)  The SEC is entitled to judgment as a matter of law as

to Defendants' liability on the second claim for violation of section 206(2) of the Advisers Act.  The SEC's Motion is otherwise denied.

The Court **DENIES** both Motions of Defendants in their entireties.   (ECF Nos. 50, 51.)   The Stipulation to Continue Trial is **DENIED AS MOOT**.   (ECF No. 80.)


**IT IS SO ORDERED.**


April 25, 2022

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**