# EXHIBIT 1

## <u>DECLARATION OF PATRICK DENARD, M.D.</u>

I, Patrick Denard, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I make this declaration at the request of the U.S. Securities and Exchange Commission ("SEC") in connection with an investigation into Criterion Wealth Management Insurance Services, Inc. ("Criterion") and in response to certain questions asked by the SEC staff.

2.     Unless otherwise stated herein, I have personal knowledge of the matters set forth below and, if called as a witness, I could and would testify to the facts stated herein.

3.     I am 40 years old, and I practice medicine at Southern Oregon Orthopedics, Inc. where I specialize in shoulder injuries.  In addition, I am an instructor at Oregon Health & Science University and serve as Director of Shoulder and Sports Medicine at Providence Medford Hospital.

4.     I earned a Bachelor of Science degree from The University of Puget Sound in 2001 and a medical degree from Dartmouth College in New Hampshire in 2005.  I have no formal education or training in accounting, investments or finance.

5.     I have been investing for almost 20 years.  My investment activity has consisted primarily of buying real estate and publicly traded stocks and mutual funds.

6.     I have known Robert Gravette ("Gravette") since 2011.  I became acquainted with Gravette because his firm Criterion was hired to manage Southern Oregon Orthopedics, Inc.'s (SOOI) 401K plan and he advised several of my colleagues at SOOI on their investments.  Based on his role as manager of SOOI's 401K plan, I contacted Gravette around 2014 to discuss my personal investments.  At that time, my primary investment objective was long-term growth.

7.     Although Gravette was my primary contact at Criterion for investment advice and substantive information about my investments, I directed routine requests, such as requests for tax documentation, to his administrative staff.

8.     I understood that Criterion charged its clients investment management fees which were based on percentage of the assets they managed because a fee schedule appeared on the

investment management agreement I signed.  I was not aware that Criterion or Gravette earned compensation from third parties in connection with my investments.  If I had known that such compensation was being paid, I would have asked additional questions regarding whether such compensation impacted the investment advice I received or the potential return on my investments.  At a minimum, I would want to consider such information before making an investment decision.

9.      While I am not a very experienced investor, I do understand the role of diversification in reducing risk and I told Gravette that I wanted a diversified investment portfolio and long-term growth.  In my communications with Gravette, I emphasized that while I could tolerate risk, I did not want to lose my principal, which represented my hard-earned savings.

10.      After we discussed my investment objectives and risk tolerance, Gravette suggested I consider investing in alternative investments, i.e., private placements.  Gravette emphasized that these investments were safer than the stock market because they represented a direct ownership stake in the subject companies whereas the stock market was subject to fluctuations that were beyond the control of an individual investor in a single company.  I had no prior experience with alternative investments, but Gravette told me they could provide a healthy return without substantial risk of loss.  Because Gravette was an experienced investment professional whose advice I trusted, I did not do independent research on his investment recommendations.

11.      After these initial discussions, I elected to invest my money with Gravette.  I made this decision based on Gravette's recommendations and assurances that he would identify sound investments that could generate substantial returns without exposing me to undue risk.  In order to formalize this relationship, I signed an advisory agreement with Criterion in December 2014.  Attached hereto as Exhibit 1 is a true and correct copy of that December 2014 agreement.  About a year later, in December 2015, I signed another advisory agreement in my capacity as a

participant in the SOOI 401K plan.  A true and correct copy of that December 2015 agreement is attached hereto as Exhibit 2.

12.     Based on my discussions with Gravette and the advisory agreements I signed, it was my understanding that Gravette and/or Criterion would collect an advisory fee based on a percentage of the value of the assets they managed for me.  I received fee statements on a quarterly basis reflecting the amount of advisory fees Criterion was deducting from my account.

13.     I typically communicated with Gravette on a semi-annual basis.  He traveled to Oregon at least once a year to meet with me.  Between these visits, we communicated by phone and email as needed.

14.     In early 2015, Gravette recommended that I invest in T2 Asset Opportunity Fund IV ("Fund IV"), a real estate fund operated by some people he knew at a firm known as T2 Realty Capital Management, LLC ("T2 Management").  Among the offering materials I received for Fund IV was a private placement memorandum dated March 2015.  A true and correct copy of the March 6, 2015 email his office sent to me forwarding the Fund IV private placement memorandum and other materials is attached hereto as Exhibit 3.

15.     I was concerned about investing in a real estate fund because I already owned multiple properties and wanted to diversify my holdings beyond real estate; however, Gravette advised me that "[t]his opportunity is too good to pass up" and he assured me that we could try to diversify my investments outside the real estate sector in the future.  A true and correct copy of a February 11-13, 2015 email chain documenting this exchange between me and Gravette is attached hereto as Exhibit 4.

16.     Based on Gravette's recommendation, I decided to invest in Fund IV.  In April 2015, I committed $100,000 in capital to Fund IV.  In connection with that commitment, I completed several subscription documents.  A true and correct copy of the Fund IV subscription documents I executed is attached hereto as Exhibit 5.  I received a form from TD Ameritrade confirming that they had received my subscription documents.  A true and correct copy of the

TD Ameritrade form confirming receipt of the Fund IV subscription documents I executed is attached hereto as Exhibit 6.

17.     I have since been informed that I actually invested in a Fund IV feeder fund created specifically for Criterion clients ("Criterion Feeder"), while the majority of Fund IV investors were placed in the other feeder fund ("General Feeder").  I am further informed that the only difference between the two feeder funds was the carried interest formula, which entitled the limited partner (investor) to 80% of the profits for the General Feeder and 60% of the profits for Criterion Feeder after the preferred rate is paid to the investor.  In other words, the profits of the General Feeder were split between the limited partner and the general partner 80/20; and the profits of the Criterion Feeder were split between the limited partner and the general partner 60/40.  I am also told that Criterion was entitled to receive approximately 50% of the general partner's carried interest from the Criterion Feeder.  Gravette did not tell me that another investment, the General Feeder, was available and that investment offered potentially high returns while exposing me to the same amount of risk.

18.     Nor did Gravette advise me that Criterion would be receiving any portion of the general partner's share of Fund IV distributions.  In fact, before I decided to invest, I specifically asked him about the "waterfall," which is a term he used to refer to Fund IV distributions.  Gravette told me that "[w]aterfall is revenue sharing with investor and sponsor after preferred rate is paid."  See Exhibit 3 at page 2.  He did not mention that Criterion participated in this revenue-sharing arrangement and was entitled to a portion of the Fund IV's profits.

19.     At the time of my investment, I was not aware of several facts that would have been significant to me and would have influenced my decision to invest:  (1) the source, nature and amount of the compensation Criterion was receiving in connection with my investment in Fund IV, (2) that a different Fund IV feeder fund was available, and (3) that the other feeder fund had a carried interest formula that granted a greater share of Fund IV's profits to the limited partners.  All things being equal, I would have preferred to invest in the General Feeder, as my

4

returns would have likely been higher.  At a minimum, this additional information would have prompted me to ask Gravette more questions about Fund IV before I made a decision to invest.

20.     In March 2015, Gravette also recommended that I invest in Coachman Energy VI LP ("Coachman"), an oil and gas fund that he said would offer a greater return than other investments with a similar moderate risk profile.  He further explained that Coachman was a "no lose" proposition, because any losses could be written off on my taxes given the nature of the investment.  I did not fully understand the tax benefits of the Coachman investment, but I assumed Gravette knew what he was talking about and trusted his expertise on these matters.  Gravette also recommended T2 Strategic Real Estate Income Fund, LLC ("SREI"), another real estate fund operated by T2 Management, which manages Fund IV.

21.     Because I was concerned that my investment portfolio was still dominated by real estate and real estate-related investments, I opted to invest in Coachman, the oil and gas fund.  Among the offering documents I received for Coachman was a private placement memorandum dated March 19, 2015.  A true and correct copy of the Coachman private placement memorandum I received is attached hereto as Exhibit 7.

22.     Based on Gravette's recommendation, I made an investment of $150,000 in Coachman in 2016.  I completed several documents in connection with that investment.  A true and correct copy of the subscription package I completed in connection with my 2016 Coachman investment is attached hereto as Exhibit 8.

23.     In late 2017 or early 2018, it appeared that Coachman was not performing as well as anticipated.  Gravette informed me that the company would be sold off.  In 2018, I felt that Gravette was not giving me sufficient information about the status of my Coachman investment, so I began to do my own Internet research.  Through a Google search for "Coachman Bakken" I learned that Coachman Energy Partners ("CEP") had been subject to legal action and there was a law firm in Illinois seeking to represent people who had lost money investing in oil and gas funds CEP had managed.  On May 8, 2018, I emailed Gravette about what I had found and asked him for an update on Coachman and CEP.  He responded by sending me two documents: an

5

October 9, 2017 letter on CEP letterhead describing their settlement with the SEC and enclosing updated ADV documents, and a due diligence questionnaire completed by CEP in which they discussed their settlement with the SEC. When I asked Gravette for a "lay translation" of the documents Gravette had sent me, he appeared to copy a portion of CEP's updated ADV documents. True and correct copies of my May 8, 2018 email exchange with Gravette and the documents he sent me are attached hereto as Exhibit 9.

24.     I felt that Gravette's response to my inquiry about Coachman was not forthright. As a result, after due consideration, I sought legal counsel. With the assistance of counsel, I threatened legal action against Gravette, Criterion, and Ausdal Financial Partners, Inc. ("Ausdal") in September 2018. That complaint was settled for $42,500 in October 2018. A true and correct copy of the October 2018 settlement agreement between me, Ausdal, and Gravette is attached hereto as Exhibit 10.

25.     In September 2018, while my dispute with Criterion over the Coachman investment was pending, I reached out to T2 Management to inquire about the status of my Fund IV investment because I no longer trusted Gravette to give me accurate information about my investments. I spoke to a gentleman named Jeff Baxter. I understand that Baxter is responsible for investor relations at T2 Management. Baxter explained that Criterion had requested that T2 Management employees avoid speaking directly to Criterion clients. Baxter informed me that Criterion was compensated by T2 in connection with my investment in Fund IV. Baxter discussed the investment and then attempted to persuade me to invest in SREI, but I was unwilling. I told him that I had had a bad experience with Criterion and Gravette. Based on what I had learned, I believed that Gravette had misled me about Coachman and been dishonest about his compensation on Fund IV. A true and correct copy of my September 2018 email

///

///

///

correspondence with Baxter is attached hereto as Exhibit 11.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January _16th__, 2020, at Jacksonville, Oregon.


\_\_ _(signature)_ _____

Patrick Denard, M.D.

# EXHIBIT 1



# CRITERION
WEALTH MANAGEMENT

# Investment Advisory Agreement

By this agreement, you (hereinafter referred to as "Client") engage Criterion Wealth Management Insurance Services, Inc. dba **Criterion Wealth Management** and **Criterion Capital Investments**, a Registered Investment Advisor (hereinafter referred to as "CWM") to provide one or more of the following services as described below:

☐ **OPTION 1  DISCRETIONARY INVESTMENT MANAGEMENT SERVICES**

CWM will provide investment management services based upon an evaluation of clients goals, investment objectives, needs, financial and tax status, investment policies, guidelines, reasonable restrictions and risk tolerance among other factors. CWM shall have limited investment authority and discretion and may purchase, sell, generally deal in or exchange assets for the client's account as it shall determine without obtaining specific client consent. CWM will not act as custodian of the assets held in the account. CWM will send out a monthly summary statement of all transactions in client's accounts for review and signed acknowledgement.

_____
*Client(s) Initial(s)*

☒ **OPTION 2  ALTERNATIVE INVESTMENT CONSULTING (offered through Criterion Capital Investments)**

In certain situations, CWM will allow access to an alternative investment on a stand alone basis to accredited investors only.  This access is offered through Criterion Capital Investments and in most cases, both the investment management and alternative fee schedule (as described in section 2) will apply.


_____
*Client(s) Initial(s)*

## 1.    INFORMATION

Client agrees to provide current and accurate information to CWM concerning Client's assets, liabilities, income, investment objectives, income tax situation, estate plan, investment policy, and to discuss with CWM, Client's financial needs and goals. Client agrees to inform CWM on a timely basis of any changes in the foregoing information. Client also agrees to permit CWM to consult with and obtain information concerning financial matters from their accountant, attorney, and other advisors, provided Client gives prior approval before any such consultation. CWM shall have no obligation to consult or to obtain such information, or to verify any information obtained from Client or their accountant, attorney, or other advisors.

## 2.    FEES

☐  **OPTION 1**

_____     CWM will bill client(s) for all fees and will not deduct fees directly from Client's account(s).
*Initial(s) here*

☒  **OPTION 2**

PD
_____     CWM will deduct fees directly from Client's account(s).
*Initial(s) here*

Fees are paid quarterly in arrears and are payable on the first day of the calendar quarter. Fees are based on the three month average portfolio value as of the last business day of the prior calendar quarter.  The fees for the first quarter under management will be prorated.

FOIA Confidential Treatment Requested by Criterion Wealth Management                  CRITERION_SEC_00070602

## Investment Management Fees

| From | To | Per Year |
|---|---|---|
| $0 | $499,999 | 1.50% |
| $500,000 | $999,999 | 1.25% |
| $1,000,000 | $1,999,999 | 1.00% |
| $2,000,000 | $4,999,999 | 0.65% |
| $5,000,000 | $10,000,000 | 0.50% |
| Above $10,000,000 | | 0.40% |

*fees are annualized and applied to the aggregate household account balance

CWM charges 0.15% for managing short-term liquid investment accounts.

Investment management services include needs analysis interview, investment policy statement, investment plan, asset allocation, diversification strategies, strategic and tactical management using multiple asset categories and securities investment selection and monitoring, quarterly performance reporting, account rebalancing, and a wealth management needs assessment.

In addition to the investment management fee accounts may incur transaction costs, retirement plan administration fees, deferred sales charges on mutual funds initially deposited in the account, mutual fund marketing fees, and other mutual fund annual expenses as described in the fund's prospectus.

## Alternative Investment Consulting Fee

| From | To | Per Year |
|---|---|---|
| $0 | $2,000,000 | 0.50% |
| Above $2,000,000 | | 0.25% |

*fees are annualized

The alternative fee includes investment research and due diligence, on-site travel and follow-up, ongoing monitoring, opportunity identification, tax coordination, and report integration.

In the event CWM is compensated directly by the fund manager or broker dealer per SEC regulation D requirements, this asset is not subject to the investment management fee. Only the alternative fee will apply.

## Comprehensive Wealth Management Fee

For household accounts above $5,000,000 a **$10,000 per quarter** wealth management fee will be charged for the coordination of experts, (i.e. accountants, attorneys, etc.), cash flow analysis and reporting, detailed performance attribution and reporting, private equity research and introduction, annual wealth management review.

Some fees may be overlapping and therefore negotiable. Any adjustments made to this fee will be added to the "comments and modifications" section on page 5.

PD
_Acknowledgment: Client(s) Initial(s)_

FOIA Confidential Treatment Requested by Criterion Wealth Management                    CRITERION_SEC_00070603

3.    **ASSIGNMENT**

This Agreement may not be amended, transferred, or assigned by either party without the prior consent of the other party.

4.    **ACCOUNTING AND LEGAL ADVICE**

The Client acknowledges and understands that CWM does not and will not practice law or accounting in providing advice to the Client and that none of the fees for services under this Agreement relate to accounting or legal services. If client needs accounting or legal services, CWM can make a recommendation from CWM's professional services relationships.

5.    **PROXIES**

It is the policy of the CWM to vote proxies on behalf of clients. Custodians are directed to forward all shareholder related materials to CWM.

6.    **GOVERNING LAW**

This Agreement constitutes the entire agreement of the parties with respect to management of the Account and can be amended only by a written document signed by the parties. It shall be governed by the laws of the State of California.

7.    **CONFIDENTIALITY**

All information shall be treated as confidential and shall not be disclosed to third parties except as agreed in writing or except as required by an order of a court of competent jurisdiction.

8.    **ACCEPTANCE**

Client understands that this agreement will not be effective until it has been accepted by CWM. If not accepted by CWM within thirty (30) days of execution by the Client, it will be deemed rejected and of no force and affect.

9.    **TERMINATION**

The initial term of this agreement shall extend from the date of acceptance by CWM through the end of the Client's first billing period and shall thereafter automatically be extended for additional three-month terms unless terminated prior thereto as hereinafter provided. Thereafter, the client may terminate the investment advisory agreement by providing CWM with thirty (30) days written notice. Upon termination, fees will be prorated to the date of termination and deducted from the clients account.

10.    **AGREEMENT TO ARBITRATE CONTROVERSIES**

To the extent not inconsistent with applicable law, any controversy or claim arising out of or relating to this agreement or any other agreement between Client and CWM (each, a "CWM Agreement"), or the breach of any CWM Agreement, shall be settled by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules.  Any arbitration proceeding pursuant to this provision shall be held in a location as determined by the rules of the AAA, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. If any party files any action or commences any proceeding against the other arising out of or relating to any CWM Agreement, or the breach thereof, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which such party might be entitled.

11.    **LIABILITY**

Client acknowledges that CWM obtains information from a wide variety of publicly available sources. The recommendations made by CWM will be based upon the professional judgment of CWM and CWM does not guarantee the results of any recommendation or any level of return. Advisor shall not be liable for any act or failure to act except for negligence, willful misconduct, or bad faith. This is not to be deemed a waiver, by Client, of compliance of CWM with any applicable federal or state securities laws or any rule, regulation or any rights Client may have under any such act, statue, rule, regulation or order.

FOIA Confidential Treatment Requested by Criterion Wealth Management                    CRITERION_SEC_00070604

## 12.   FORM ADV PART II & PRIVACY POLICY

The Form ADV contains important disclosures about the CWM's process, fees, and the background and experience of associates. Additional information about the CWM is publicly available and may be viewed at http://www.adviserinfo.sec.gov/. Clients are encouraged to review this information. By signing this Agreement the Client agrees to its provisions and acknowledges receipt of the CWM's:

- Part 2A of Form ADV: Firm Brochure & Form ADV
- Privacy Policy

_____

*Acknowledgment: Client(s) Initial(s)*

## 13.   NOTICE

Any notice, request, instruction or other communication to be given hereunder shall be in writing and delivered personally or sent by first class mail, postage prepaid, addressed:  if to CWM, to Criterion Wealth Management, 26650 The Old Road, Suite 212, Valencia, California 91381; and, if to Client, to the address of Client set forth below.

*Updated 05/2014*                    Page 4 of 6

**This agreement is applicable to the following account(s):**

**Account Registration (1):**

Account Type: __Individual_____    Account #: _____934046100_____

Account Name: _Patrick J. Denard_____    SSN/TAX ID: __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_____

Account Holder: _Patrick J. Denard_____    SSN: __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_____

**Account Registration (2):**

Account Type: _____    Account #: _____

Account Name: _____    SSN/TAX ID: _____

Account Holder: _____    SSN: _____

Account Holder: _____    SSN: _____

**Account Registration (3):**

Account Type: _____    Account #: _____

Account Name: _____    SSN/TAX ID: _____

Account Holder: _____    SSN: _____

Account Holder: _____    SSN: _____

**Account Registration (4):**

Account Type: _____    Account #: _____

Account Name: _____    SSN/TAX ID: _____

Account Holder: _____    SSN: _____

Account Holder: _____    SSN: _____

FOIA Confidential Treatment Requested by Criterion Wealth Management          CRITERION_SEC_00070606

**Comments or modifications:**

_____

_____

_____

_____

**Authorized Account Holder(s):**

Client Name: ____Patrick J. Denard_____        SSN: _____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_____

Home/Legal Address: ____420 G. Street_____   City: __Jacksonville____ State: __Oregon__  Zip: _97530_

Home Phone: ___(503) 320-8557_____

Client Signature: _____   Date: ___12__ / _18_/_14_____

By:     ____Robert A. Gravette____
        _(Financial Advisor)_


        ____Mark A. Mac Arthur____        _____
        _(Financial Advisor)_             _(Signature)_

T 661 254 2543  TF 800 550 1095
26650 The Old Road • Suite 212 • Valencia • CA • 91381
_CriterionWealth.com_

Securities and advisory services are offered through Ausdal Financial Partners, Inc.  Member FINRA/SIPC 5187 Utica Ridge Road  Davenport  IA 52807 (563) 326-2064  Investment
Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners, Inc. and any subsidiaries or affiliates.  CA Insurance License # 0786908

FOIA Confidential Treatment Requested by Criterion Wealth Management                CRITERION_SEC_00070607

# EXHIBIT 2



## CRITERION
WEALTH MANAGEMENT

# Investment Advisory Agreement

By this agreement, you (hereinafter referred to as "Client") engage Criterion Wealth Management Insurance Services, Inc. dba **Criterion Wealth Management** and **Criterion Capital Investments**, a Registered Investment Advisor (hereinafter referred to as "CWM") to provide one or more of the following services as described below:

☒ **OPTION 1 DISCRETIONARY INVESTMENT MANAGEMENT SERVICES**

> CWM will provide investment management services based upon an evaluation of clients goals, investment objectives, needs, financial and tax status, investment policies, guidelines, reasonable restrictions and risk tolerance among other factors. CWM shall have limited investment authority and discretion and may purchase, sell, generally deal in or exchange assets for the client's account as it shall determine without obtaining specific client consent. CWM will not act as custodian of the assets held in the account. CWM will send out a monthly summary statement of all transactions in client's accounts for review and signed acknowledgement.




_____
Client(s) Initial(s)

☐ **OPTION 2 ALTERNATIVE INVESTMENT CONSULTING (offered through Criterion Capital Investments)**

> In certain situations, CWM will allow access to an alternative investment on a stand alone basis to accredited investors only. This access is offered through Criterion Capital Investments and in most cases, both the investment management and alternative fee schedule (as described in section 2) will apply.

_____
Client(s) Initial(s)

**1. INFORMATION**

Client agrees to provide current and accurate information to CWM concerning Client's assets, liabilities, income, investment objectives, income tax situation, estate plan, investment policy, and to discuss with CWM, Client's financial needs and goals. Client agrees to inform CWM on a timely basis of any changes in the foregoing information. Client also agrees to permit CWM to consult with and obtain information concerning financial matters from their accountant, attorney, and other advisors, provided Client gives prior approval before any such consultation. CWM shall have no obligation to consult or to obtain such information, or to verify any information obtained from Client or their accountant, attorney, or other advisors.

**2. FEES**

☐ **OPTION 1**



_____ CWM will bill client(s) for all fees and will not deduct fees directly from Client's account(s).
Initial(s) here

☒ **OPTION 2**

_____ CWM will deduct fees directly from Client's account(s).
Initial(s) here

Fees are paid quarterly in arrears and are payable on the first day of the calendar quarter. Fees are based on the three month average portfolio value as of the last business day of the prior calendar quarter. The fees for the first quarter under management will be prorated.

*Updated 05/2014*                    Page 1 of 6

FOIA Confidential Treatment Requested by Criterion Wealth Management                    CRITERION_SEC_00600501

## Investment Management Fees

| From | To | Per Year |
|---|---|---|
| $0 | $499,999 | 1.50% |
| $500,000 | $999,999 | 1.25% |
| $1,000,000 | $1,999,999 | 1.00% |
| $2,000,000 | $4,999,999 | 0.65% |
| $5,000,000 | $10,000,000 | 0.50% |
| Above $10,000,000 | | 0.40% |

*fees are annualized and applied to the aggregate household account balance*

CWM charges 0.15% for managing short-term liquid investment accounts.

Investment management services include needs analysis interview, investment policy statement, investment plan, asset allocation, diversification strategies, strategic and tactical management using multiple asset categories and securities investment selection and monitoring, quarterly performance reporting, account rebalancing, and a wealth management needs assessment.

In addition to the investment management fee accounts may incur transaction costs, retirement plan administration fees, deferred sales charges on mutual funds initially deposited in the account, mutual fund marketing fees, and other mutual fund annual expenses as described in the fund's prospectus.

## Alternative Investment Consulting Fee

| From | To | Per Year |
|---|---|---|
| $0 | $2,000,000 | 0.50% |
| Above $2,000,000 | | 0.25% |

*fees are annualized*

The alternative fee includes investment research and due diligence, on-site travel and follow-up, ongoing monitoring, opportunity identification, tax coordination, and report integration.

In the event CWM is compensated directly by the fund manager or broker dealer per SEC regulation D requirements, this asset is not subject to the investment management fee. Only the alternative fee will apply.

## Comprehensive Wealth Management Fee

For household accounts above $5,000,000 a **$10,000 per quarter** wealth management fee will be charged for the coordination of experts, (i.e. accountants, attorneys, etc.), cash flow analysis and reporting, detailed performance attribution and reporting, private equity research and introduction, annual wealth management review.

Some fees may be overlapping and therefore negotiable. Any adjustments made to this fee will be added to the "comments and modifications" section on page 5.

*Acknowledgment: Client(s) Initial(s)*

*Updated 05/2014*          Page 2 of 6

FOIA Confidential Treatment Requested by Criterion Wealth Management          CRITERION_SEC_00600502

3.    **ASSIGNMENT**

This Agreement may not be amended, transferred, or assigned by either party without the prior consent of the other party.

4.    **ACCOUNTING AND LEGAL ADVICE**

The Client acknowledges and understands that CWM does not and will not practice law or accounting in providing advice to the Client and that none of the fees for services under this Agreement relate to accounting or legal services. If client needs accounting or legal services, CWM can make a recommendation from CWM's professional services relationships.

5.    **PROXIES**

It is the policy of the CWM to vote proxies on behalf of clients. Custodians are directed to forward all shareholder related materials to CWM.

6.    **GOVERNING LAW**

This Agreement constitutes the entire agreement of the parties with respect to management of the Account and can be amended only by a written document signed by the parties. It shall be governed by the laws of the State of California.

7.    **CONFIDENTIALITY**

All information shall be treated as confidential and shall not be disclosed to third parties except as agreed in writing or except as required by an order of a court of competent jurisdiction.

8.    **ACCEPTANCE**

Client understands that this agreement will not be effective until it has been accepted by CWM. If not accepted by CWM within thirty (30) days of execution by the Client, it will be deemed rejected and of no force and affect.

9.    **TERMINATION**

The initial term of this agreement shall extend from the date of acceptance by CWM through the end of the Client's first billing period and shall thereafter automatically be extended for additional three-month terms unless terminated prior thereto as hereinafter provided. Thereafter, the client may terminate the investment advisory agreement by providing CWM with thirty (30) days written notice. Upon termination, fees will be prorated to the date of termination and deducted from the clients account.

10.    **AGREEMENT TO ARBITRATE CONTROVERSIES**

To the extent not inconsistent with applicable law, any controversy or claim arising out of or relating to this agreement or any other agreement between Client and CWM (each, a "CWM Agreement"), or the breach of any CWM Agreement, shall be settled by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules.  Any arbitration proceeding pursuant to this provision shall be held in a location as determined by the rules of the AAA, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. If any party files any action or commences any proceeding against the other arising out of or relating to any CWM Agreement, or the breach thereof, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which such party might be entitled.

11.    **LIABILITY**

Client acknowledges that CWM obtains information from a wide variety of publicly available sources. The recommendations made by CWM will be based upon the professional judgment of CWM and CWM does not guarantee the results of any recommendation or any level of return. Advisor shall not be liable for any act or failure to act except for negligence, willful misconduct, or bad faith. This is not to be deemed a waiver, by Client, of compliance of CWM with any applicable federal or state securities laws or any rule, regulation or any rights Client may have under any such act, statue, rule, regulation or order.

FOIA Confidential Treatment Requested by Criterion Wealth Management                    CRITERION_SEC_00600503

12.   **FORM ADV PART II & PRIVACY POLICY**

The Form ADV contains important disclosures about the CWM's process, fees, and the background and experience of associates. Additional information about the CWM is publicly available and may be viewed at http://www.adviserinfo.sec.gov/. Clients are encouraged to review this information. By signing this Agreement the Client agrees to its provisions and acknowledges receipt of the CWM's:

- Part 2A of Form ADV: Firm Brochure & Form ADV
- Privacy Policy

_Acknowledgment: Client(s) initial(s)_

13.   **NOTICE**

Any notice, request, instruction or other communication to be given hereunder shall be in writing and delivered personally or sent by first class mail, postage prepaid, addressed: if to CWM, to Criterion Wealth Management, 26650 The Old Road, Suite 212, Valencia, California 91381; and, if to Client, to the address of Client set forth below.

FOIA Confidential Treatment Requested by Criterion Wealth Management                    CRITERION_SEC_00600504

**This agreement is applicable to the following account(s):**

**Account Registration (1):**

Account Type: __401(k) Employee Participant__                    Account #: ____939003641_____

Account Name: __Southern Oregon Orthopedics, Inc. 401(k) PSP FBO: Patrick J. Denard, M.D._____

TAX ID: _93-0587572_____            Trust Dated: ____01/01/2009_____

Account Trustee: _____Charles N. Versteeg, Jr., M.D._____    SSN: __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_____

Employee Participant: ___Patrick J. Denard, M.D._____    SSN: __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_____

**Account Registration (2):**

Account Type: _____            Account #: _____

Account Name: _____            SSN/TAX ID: _____

Account Holder: _____            SSN: _____

Account Holder: _____            SSN: _____

**Account Registration (3):**

Account Type: _____            Account #: _____

Account Name: _____            SSN/TAX ID: _____

Account Holder: _____            SSN: _____

Account Holder: _____            SSN: _____

**Account Registration (4):**

Account Type: _____            Account #: _____

Account Name: _____            SSN/TAX ID: _____

Account Holder: _____            SSN: _____

Account Holder: _____            SSN: _____

FOIA Confidential Treatment Requested by Criterion Wealth Management        CRITERION_SEC_00600505

**Comments or modifications:** This is an Individual Brokerage Account for Employee Participant of Southern Oregon Orthopedics, Inc. 401(k) PSP. TD Ameritrade only requires Trustee of the Plan/Employer to sign application; all other CWM forms will be signed by Employee Participant.

**Authorized Account Holder(s):**

Employee Participant: ___Patrick J. Denard, M.D.___   SSN: _____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_____

Home/Legal Address: ___420 G. Street___   City: _Jacksonville_   State: _OR_   Zip: _97530_

Phone: _(541) 779-7593_

Employee Participant Signature: _____   Date: __12/10/15__

Account Trustee: _Charles N. Versteeg, Jr., M.D._   SSN: _____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_____

Mailing Address: _2780 E. Barnett Road, Ste. 200_   City: _Medford_   State: _OR_   Zip: _97504_

Home Phone: ___(541) 779-7593_

Account Trustee Signature: _____   Date: _____

By:   ___Robert A. Gravette___   _____
       *(Financial Advisor)*                              *(Signature)*

       ___Mark A. Mac Arthur___   _____
       *(Financial Advisor)*                              *(Signature)*

T 661 254 2543  TF 800 550 1095
26650 The Old Road • Suite 110 • Valencia • CA • 91381
*CriterionWealth.com*

Securities offered through Ausdal Financial Partners, Inc. Member FINRA/SIPC 5187 Utica Ridge Road Davenport, IA 52807 (563) 326-2064. Investment Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners, Inc. and any subsidiaries or affiliates. CA Insurance License # 0786596

*Updated 05/2014*                    Page 6 of 6

FOIA Confidential Treatment Requested by Criterion Wealth Management   CRITERION_SEC_00600506

# EXHIBIT 3A

| | |
|---|---|
| **From:** | Yumiko Odama |
| **To:** | Patrick Denard (pjdenard@gmail.com) |
| **CC:** | Robert Gravette; Carmen Garcia Hoffman; Jason Stauffer |
| **Sent:** | 3/6/2015 8:02:20 PM |
| **Subject:** | Memorandum: T2 Asset Opportunity Fund IV, LP |
| **Attachments:** | T2 Asset Opportunity Fund IV, LP - Agreement of LP.pdf; T2 Asset Opportunity Fund IV, LP PPM #102.pdf |

Dr. Denard,

Good afternoon. On behalf of Robert Gravette, please review the attached items listed below regarding the alternative investment T2 Asset Opportunity Fund IV, LP:

> **T2 Asset Opportunity Fund IV, LP**
> a. Private Placement Memorandum (PPM #102)
> b. Agreement of Limited Partnership

Bob will be in Oregon next week and will be able to discuss with you.

Should you have any questions, please do not hesitate to contact me at (661) 254-2543.

Sincerely,

Yumiko Odama
Executive Assistant

**Criterion Wealth Management**
**T** 661 254 2543  **TF** 800 550 1095
26650 The Old Road, Ste. 212
Valencia, CA 91381
*CriterionWealth.com*

Criterion Insurance Services, Inc. DBA: Criterion Wealth Management does not accept buy, sell or cancel orders by e-mail, or any instructions by e-mail that would require your signature. Securities and advisory services are offered through Ausdal Financial Partners, Inc., Member FINRA/SIPC 5187 Utica Ridge Road, Davenport, IA 52807 (563) 326-2064. Investment Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners, Inc. and any subsidiaries or affiliates. CA Insurance License # 0786906. Information contained in this communication is not considered an official record of your account and does not supersede normal trade confirmations or statements. Any information provided has been prepared from sources believed to be reliable but is not guaranteed, does not represent all available data necessary for making investment decisions and is for informational purposes only.
This e-mail may be privileged and/or confidential, and the sender does not waive any related rights and obligations. Any distribution, use or copying of this e-mail or the information it contains by other than an intended recipient is unauthorized. If you receive this e-mail in error, please advise me (by return e-mail or otherwise) immediately. Information received by or sent from this system is subject to review by supervisory personnel, is retained and may be produced to regulatory authorities or others with a legal right to the information.
E-mail messages are not encrypted

   CRITERION_SEC_00118968

# EXHIBIT 3B

PPM #102

INVESTMENTS
WORTH
BUILDING

T2 | CAPITAL
MANAGEMENT™

# *T2 Asset Opportunity Fund IV, LP*

## $100,000,000

## LIMITED PARTNERSHIP INTERESTS

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**March 2015**

CHICAGO/#2574756.8

# T2 ASSET OPPORTUNITY FUND IV, LP

## (A Delaware Limited Partnership)

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

This Private Placement Memorandum (this "Memorandum") is furnished on a confidential basis for the purpose of evaluating an investment in limited partner interests in T2 Asset Opportunity Fund IV, LP (the "Fund"). This Memorandum and the information contained herein may not be reproduced or used by or distributed to others, at any time, in whole or in part, for any other purpose without the prior written consent of T2 Asset Opportunity Fund IV GP, LLC (the "General Partner" or "T2"), and all recipients agree that they will keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms. Notwithstanding anything else contained in this Memorandum, each prospective investor may disclose, without limitation, the tax treatment and tax structure (as such terms are used in § 6011 of the U.S. Internal Revenue Code of 1986, as amended, and the U.S. Treasury regulations promulgated thereunder) of the Fund and of any transactions entered into by the Fund; <u>provided</u> that this authorization is not intended to permit disclosure of any term or detail not relevant to the tax treatment or the tax structure of the Fund or of transactions entered into by it.

Prospective investors are not to construe the contents of this Memorandum as legal, tax, accounting, investment, or other advice. Each prospective investor should consult its own advisers as to legal, business, tax, accounting, U.S. Employee Retirement Income Security Act of 1974, as amended, and other related matters concerning an investment in the Fund.

The limited partner interests are being offered as a private placement to a limited number of investors and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or non-U.S. jurisdiction and may not be sold or transferred without compliance with all applicable U.S. federal and state and non-U.S. securities laws. The Fund will not be registered as an investment company under the U.S. Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder (collectively, the "Investment Company Act"). The Fund shall be exempt from registration under Section 3(c)(5) of the Investment Company Act. Consequently, investors will not be afforded the protections of the Investment Company Act. Neither the U.S. Securities and Exchange Commission nor any state or non-U.S. securities commission has reviewed or passed upon the accuracy or adequacy of this Memorandum or the merits of the offering described herein. Any representation to the contrary is unlawful.

Investment in the limited partner interests will involve significant risks due to, among other things, the nature of the Fund's investments. See Section III—"Risk Factors" in this Memorandum. Investors must have the financial ability and willingness to accept the risks and lack of liquidity characteristic of the investment described herein. There will be no public market for the limited partner interests and such interests, subject to certain limited exceptions, will not be transferable.

This Memorandum is not an offer to sell to any person, or a solicitation to any person to buy, limited partner interests in the Fund in any state or jurisdiction in which such an offer would be prohibited by law or to any person who is not an "accredited investor" as defined in the rules and regulations promulgated under the Securities Act. Interests in the Fund will be offered only in such non-U.S. jurisdictions, if any, as the General Partner approves in advance at its sole discretion. No person other than the General Partner has been authorized to give any information or to make any representation concerning the Fund or this offering outside of this Memorandum. To invest in the Fund, each prospective limited partner will be required to execute an agreement of limited partnership, a limited power of attorney, and a subscription agreement. In the event that any terms, conditions, or other provisions of such agreements (or any related agreements) are inconsistent with or contrary to the description of terms set forth in this Memorandum, the terms, conditions, and other provisions of such agreements shall control. Before the final closing of the Fund, the General Partner and its affiliates reserve the right to modify any of the terms of the offering and the limited partner interests described

CHICAGO/#2574756.8

herein.  Upon request, this Memorandum and any copies thereof are to be returned in their entirety to the General Partner.

Certain information contained in this Memorandum constitutes "forward-looking statements" that can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "estimate," "intend," "continue," or "believe" or the negatives thereof or other variations thereon or comparable terminology.   Furthermore, any projections or other estimates in this Memorandum, including estimates of returns or performance, are "forward-looking statements" and are based upon certain assumptions that may change.  Due to various risks and uncertainties, including those set forth under Section III – "Risk Factors" actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements. Moreover, actual events are difficult to project and often depend upon factors that are beyond the control of the General Partner and its affiliates.  Neither the delivery of this Memorandum at any time nor any sale hereunder shall under any circumstances create an implication that the information contained herein is correct as of any time after the earlier of the relevant date specified herein or the date of this Memorandum.

The representation by Vedder Price P.C. of the Fund and the General Partner in connection with the private placement described herein is limited to the specific matters discussed under Section IV – "Legal and Tax Matters – Legal Counsel" in this Memorandum.

Any questions regarding this Memorandum should be directed to Jeff Baxter at (630) 590-9511. The General Partner is located at 111 W. Wesley Street, Suite 5, Wheaton, Illinois  60187.

**March 2015**

CHICAGO/#2574756.8

# *TABLE OF CONTENTS*

**Section**                                                                    **Page**

I.      Executive Summary ........................................................................................ 1

II.     Summary of Principal Terms ..........................................................................5

III.    Risk Factors ....................................................................................................13

IV.     Legal and Tax Matters ................................................................................... 20

V.      Additional Information...................................................................................33

*Appendix A – Amended and Restated Agreement of Limited Partnership*

*Appendix B – Subscription Agreement*

CHICAGO/#2574756.8

# I.    Executive Summary

## The Fund and the General Partner

The Fund employs an opportunistic investment strategy focused on exploiting idiosyncratic price dislocations among commercial real estate assets within the Midwestern United States.  Specifically, the Fund will seek to acquire real estate properties that have a clear value-add component and also originate, invest in, or acquire first, junior or participation interests in loans, debt instruments and other financings secured by a broad range of commercial real properties or interests in commercial real properties. Financings will be structured as senior debt (secured by first mortgages on the related property), mezzanine debt (secured by junior mortgages on a property or properties or equity interests in the entities owning a property or properties), preferred equity investments or hybrid investments in entities that own the related property (each such loan, debt interest, equity investment or other financing, an "Investment," and collectively, "Investments").

The Fund's general partner, T2 Asset Opportunity Fund IV GP, LLC (the "General Partner" or "T2"), conducts due diligence on each Investment.  T2's due diligence process attempts to maximize value and minimize risk through disciplined investing and active management.   While T2's investments typically have been focused in the Midwest, T2 has managed and overseen investments on behalf of itself and other funds throughout the U.S.  T2 believes its strengths lie in its relationships, experience and its ability to quickly, creatively and intelligently deploy and manage capital.

The Fund is a Parallel Fund (as defined below) of T2 Opportunity Fund IV, LP (the "Flagship Fund").  In general, the Fund will invest proportionately in all transactions on effectively the same terms and conditions as the Flagship Fund, except as necessary to address tax, regulatory or other investor considerations.  The Fund is not identical to the Flagship Fund which is subject to different investor qualification standards and charges different fees than the Flagship Fund.

## Fund Investment Strategy and Criteria

The Fund will focus primarily on property types that the General Partner believes to be undervalued or poised for recovery, including assets that may be overlooked by other institutional investors.  The Fund expects to seek Investments in turnaround situations, repositioning opportunities, recapitalizations, partner buyouts, and value-added situations.

The Fund will seek to invest in projects that the General Partner believes provide opportunistic discounts to present market value, as well as non-institutional assets, often in out-of-favor categories, where yields may be more attractive and debt coverage is higher.  Where partnering opportunities arise, the Fund will seek experienced partners that T2 believes will be effective collaborators.

The General Partner also intends to offer through the Fund a bridge-financing program to real estate developers and mortgage brokers.  Both debt and preferred equity financing may be provided for borrowers seeking an opportunity that may require a rapid closing or loans discounted by conventional lenders due to special situations relating to the property or borrower.

The Fund may seek to acquire commercial real estate loans secured by various property types throughout the U.S., subject to availability and completion of due diligence.  The loans may be single loans or portfolios of loans that are current or in default.

## Prior Performance

The following is a summary of T2's performance for its prior vintage real estate funds from inception through September 30, 2014:

|    | Fund | Investment period | Capital invested | % capital returned | Net IRR [1] |
|----|------|-------------------|------------------|--------------------|-------------|
| 1. | Fund I | 2011 | $8,790,859 | 86% | 15.5% |
| 2. | Fund II | 2012 - 13 | $55,813,087 | 46% | 15.5% |
| 3. | Fund III | 2013 - Present | $51,997,101 | 3% | 12.0% |
|    | Total / Avg. | — | $116,601,047 | 32.5% [2] | 14.1% [2] |

[1]   For illustrative purposes only.  Past performance is not indicative of future results.  IRR represents the internal rate of return of the fund. IRR is a time-weighted average expressed as a percentage. The IRR of an investment is the discount rate at which the net present value of costs (negative cash flows) of the investment equals the net present value of the benefits (positive cash flows) of the investment, including the current value of unrealized investments. The Net IRR is calculated net of all fees and expenses.  The Net IRRs presented herein may not be indicative of the ultimate performance of the fund due to a number of factors.

[2]   The percentage of capital returned and Net IRR were calculated on an asset weighted basis.

## Fund Management Team

The Fund's General Partner is led by Jeff D. Brown and John W. Southard, each of whom are experienced investment professionals.

### Jeff D. Brown—Founder, CEO and CIO

As founder and CEO of T2 Capital Management, LLC, upon which T2 is a relying investment adviser, Mr. Brown works closely with the principals of the firm in providing corporate direction, investment strategies, and overseeing implementation of both.  As CIO of the firm, Mr. Brown also oversees the origination, underwriting, closing, and management of all portfolio investments.

Prior to T2 Capital Management, LLC, Mr. Brown was the President of a privately held, entrepreneurial commercial real estate finance company based in the Chicago suburbs (2001-2010).  Before being promoted to President, Mr. Brown was an Executive Vice President at the firm responsible for overseeing the Credit and Syndications division. In that capacity, he originated, evaluated, underwrote, and syndicated a total of over $1 billion in commercial real estate financings across the United States while co-managing a $300 million portfolio.  The portfolio consisted of a wide variety of financing structures on multiple different property types including office, retail, industrial, healthcare, multi-family, for-sale residential, and hospitality.

Mr. Brown received his MBA from the University of Chicago Booth School of Business and Bachelor's degree from Wheaton College (Wheaton, Illinois).  While at Wheaton, Mr. Brown was captain of the football team and a First Team GTE Academic All-American quarterback.

### John W. Southard—Founder and Principal

Mr. Southard has over twenty years of experience in the areas of portfolio management, product development and quantitative modeling.  As founder and principal of T2 Capital Management, LLC, Mr.

2

Southard provides capital and strategic direction to the company.  He is involved in fund formation, administration and key client relationships for the firm.

Prior to T2 Capital Management, LLC, Mr. Southard co-founded PowerShares Capital Management, LLC, an exchange traded fund (ETF) company established in 2002.  Mr. Southard oversaw all research initiatives, portfolio management and trading operations of the company.  PowerShares was sold to Invesco in 2006, and Mr. Southard left the company in 2009.  Before PowerShares, Mr. Southard was a Senior Equity Analyst for Charles Schwab & Co. and was involved in the development of the quantitative modeling behind Schwab's research initiatives.

Mr. Southard has been quoted in the *Wall Street Journal, Crain's, Investment News, Morningstar, TheStreet.com* and other periodicals.  He is a CFA charterholder, has a Master's degree in Finance from DePaul University and a Bachelor's degree in Business/Economics with an emphasis in Mathematics from Wheaton College (Wheaton, Illinois).  He is a member of the CFA Society of Chicago and the CFA Institute.

### Linda Searcy—Chief Operating Officer

Ms. Searcy has over 20 years of experience in the commercial real estate finance industry.  As Chief Operating Officer of T2 Capital Management, LLC, Ms. Searcy oversees fund administration, compliance and operations.

Prior to joining T2 Capital Management, LLC, Ms. Searcy was a director at a privately-held commercial real estate company in the Chicago suburbs and oversaw all aspects of managing its $300 million portfolio.  Prior to this, Ms. Searcy was Vice President of the Specialty Finance division of a $13 billion publicly traded finance company based in Scottsdale, Arizona.  During her 15-year tenure with the company, Ms. Searcy's various roles included overseeing loan administration, underwriting, due diligence, compliance, strategic planning and financial reporting.

Ms. Searcy has a Master's degree in Accounting with Distinction from DePaul University and a Bachelor's degree in Finance and Economics from Western Illinois University.  Ms. Searcy is also a CPA candidate.

### Jeff Baxter—Vice President

Mr. Baxter spearheads the investor relations and fund raising efforts for T2 Capital Management, LLC.  Prior to T2 Capital Management, LLC, Mr. Baxter was a broker at a national investment real estate company.  Prior to this, he served his alma mater, Wheaton College, as the Director of Principal Gifts.  During his time there, Jeff assisted in securing leadership level planned and outright gifts as part of the $260 million Promise of Wheaton campaign.  Prior to working at Wheaton College, Mr. Baxter worked in Private Client Services for UBS Financial Services, Inc. While at UBS, Mr. Baxter excelled in business development, portfolio management, and generating tax-efficient strategies for high net worth clients.

Mr. Baxter graduated from Wheaton College (Wheaton, Illinois) with his Bachelor's degree in Business/Economics.  While at Wheaton, Mr. Baxter was a member of the baseball, lacrosse, and debate teams.

### John Felker—Associate

Mr. Felker joined T2 Capital Management, LLC in July 2013 as an Associate.  In this capacity he evaluates prospective investments, conducts due diligence, manages existing investments and assists with various fund administration activities.  Prior to joining T2 Capital Management, LLC, Mr. Felker was a Senior Analyst at a private equity real estate firm based in Colorado, which focuses on properties across the United States and has approximately $500 million under management.  Mr. Felker was primarily responsible for completing due diligence on prospective investments, managing existing real estate holdings, and working with various financiers to assist with both acquisitions and recapitalizations.  He

joined the firm in 2010 after working as an intern within the research department at Invesco PowerShares.

Mr. Felker is a CFA charterholder and graduated summa cum laude from Wheaton College (Wheaton, Illinois) where he received his Bachelor's degrees in Economics and Mathematics.  He is a member of the CFA Society of Chicago and the CFA Institute.

CHICAGO/#2574756.8

# II.   *Summary of Principal Terms*

The following summary of the terms of the offering and the limited partner interests of the Fund is subject to the detailed provisions of the Amended and Restated Agreement of Limited Partnership of T2 Asset Opportunity Fund IV, LP (as amended, restated or otherwise modified from time to time, the "Partnership Agreement") and is qualified in its entirety by reference to the Partnership Agreement, a copy of which is attached as Appendix A to this memorandum.  In the event that the description of terms in this Summary of Principal Terms is inconsistent with or contrary to the description in, or terms of, the Partnership Agreement or related documents (including the subscription agreement), the terms of the Partnership Agreement and the related documents will control.

| | |
|---|---|
| **The Fund** | T2 Asset Opportunity Fund IV, LP, a Delaware limited partnership (the "Fund").  The Fund is a Parallel Fund (as defined below) of T2 Opportunity Fund IV, LP (the "Flagship Fund").  In general, the Fund will invest proportionately in all transactions on effectively the same terms and conditions as the Flagship Fund, except as necessary to address tax, regulatory or other investor considerations.  The Fund is not identical to the Flagship Fund, which is subject to different investor qualification standards and charges different fees than the Flagship Fund.  In addition, the portfolio of the Flagship Fund may differ from the Fund for various reasons, including the launch date for each fund.  The Flagship Fund commenced operations in early 2015. |
| **The Flagship Fund** | T2 Opportunity Fund IV, LP, a Delaware limited partnership, is managed by T2 Capital Management IV, LLC, an affiliate of the General Partner (as defined below). |
| **The General Partner** | The general partner of the Fund will be T2 Asset Opportunity Fund IV GP, LLC, a Delaware limited liability company (the "General Partner").  The General Partner will control the business and affairs of the Fund. |
| **Management of the Fund** | The General Partner may cause the Fund to appoint a management company (the "Management Company") to manage the affairs of the Fund.  The Management Company shall be included in all references to the General Partner herein as appropriate. |
| **Committed Capital** | The Fund is seeking partner commitments aggregating $100 million, including the General Partner's commitment (each, a "Commitment" and collectively, the "Commitments").  The General Partner will not accept Commitments in excess of $100 million.  The aggregate Commitments may include Commitments received by one or more parallel funds that invest substantially all of their assets in the Fund.  See "Parallel Investment Entities" below. |
| **Minimum Investment** | The minimum Commitment of a limited partner in the Fund (collectively, the "Limited Partners") will be $250,000, although individual Commitments of lesser amounts may be accepted at the discretion of the General Partner.  The General Partner and the Limited Partners are sometimes referred to collectively as the "Partners." |

| | |
|---|---|
| **Investor Qualifications** | The Fund only will offer and sell interests to a limited number of "accredited investors," as defined in Regulation D promulgated under the U.S. Securities Act of 1933, as amended, and "qualified clients" as that term is defined under Rule 205-3 of the Investment Advisers Act of 1940, as amended ("Advisers Act"). |
| **General Partner Commitment** | The principals of the General Partner (the "Principals") will commit to the Flagship Fund an aggregate amount of at least $1 million. |
| **Closing** | The initial closing is expected to occur in the first quarter of 2015 (the "Initial Closing Date"). Thereafter, one or more additional closings may occur. The last closing for this offering (the "Final Closing") will occur 12 months after the Initial Closing Date (the "Final Closing Date") subject to the General Partner's ability to close earlier than the Final Closing Date in its sole discretion. The General Partner may extend the Final Closing Date by up to 3 months in its sole discretion. |
| **Investment Period** | At the end of the period commencing on the Initial Closing Date and ending on the date that is 18 months from the Final Closing Date or such earlier date as determined by the General Partner (the "Investment Period"), all Partners will be released from any further obligation with respect to their unfunded Commitments, except to the extent necessary to: (i) cover expenses, liabilities and obligations of the Fund, including Management Fees (as defined below); (ii) fund then existing commitments; (iii) effect follow-on investments in existing Investments (as defined under "Executive Summary"); and (iv) repay any advances made by a creditor of the Fund to fund existing Investments and secured by the unfunded Commitments. |
| **Term** | The term of the Fund will terminate on the third anniversary of the Final Closing Date, but may be extended for 2 additional one-year periods at the discretion of the General Partner. Further extensions require the approval of the General Partner and at least 80% of the Limited Partners who are not affiliated with the General Partner. The Fund's term is subject to earlier termination upon certain circumstances as set forth in the Partnership Agreement, including upon the agreement of all the Partners. |
| **Investment Guidelines and Restrictions** | As an investment guideline, once the Fund has accepted in excess of $50 million in Commitments, the Fund generally will not invest in any Investment that exceeds more than 15% of the Fund's aggregate Commitments at the time of the Investment. For purposes of the guidelines and restrictions, each loan in a portfolio of Investments not originated by the Fund shall be treated as a separate Investment. No Investment of the Fund shall be made outside the United States. For the avoidance of doubt, these investment guidelines shall not apply to subsidiary entities created by the General Partner to make Investments. This may include subsidiary entities which include Parallel Investment Entities as investors. |
| **Drawdowns** | Commitments are expected to be drawn down as needed, with not less than 10 days' prior written notice. Any amounts returned to the Partners (i) as a return of Commitments called in anticipation of an unconsummated Fund Investment or (ii) at the General Partner's sole discretion, as repayment or recoupment of capital contributions with respect to an Investment realized during the Investment Period will be |

available for future Fund Investments (as described in "Reinvestment," below) and payment of expenses.  In addition, (a) to the extent Partners' capital contributions are used to pay Fund expenses (including Management Fees (as defined below)), any amounts returned to the Partners will be available for future Fund Investments and expenses, and (b) distributions to the Partners will be subject to recall by the Fund pursuant to the partner giveback described in "Partner Giveback" below.

The initial drawdown for each Limited Partner generally will include such Limited Partner's proportionate share of:  (i) the Management Fee (as defined below) retroactive to the Initial Closing Date or such later date when Management Fees were first taken; (ii) organizational and other expenses attributable to the Fund; and (iii) the original cost of any Investment made at or prior to such drawdown.  In addition, Limited Partners admitted after the first 3 months following the Initial Closing Date generally will be required to pay to the Fund an amount calculated at the greater of (a) the prime rate plus 3.5% per annum, and (b) 8% per annum, on the amount of such drawdown from the date such amount would have been due if such Limited Partner had been admitted as such for its full Commitment on the Initial Closing Date.  Additional amounts paid by a Limited Partner who is admitted at any closing subsequent to the Initial Closing Date pursuant to this paragraph will not reduce such Limited Partner's unfunded Commitment to the Fund.

**Reinvestment**

During the Investment Period, any amounts received by the Fund as a repayment or recoupment of capital contributions (as determined by the General Partner in its sole discretion) with respect to a Fund Investment may, in the discretion of the General Partner, be retained by the Fund, without reducing the Partners' unfunded Commitments, for the purpose of making Fund Investments and/or paying Fund expenses, or may be returned to the Partners, thereby increasing their unfunded Commitments (but not above their total Commitments to the Fund).

**Subscription Line**

The Fund may arrange for one or more credit facilities (including, if available, an equity commitment line of credit secured by the Fund's pledge of its rights in the Limited Partners' unfunded Capital Commitments (the "Subscription-Backed Facility")) to enable the Fund to pay expenses, make deposits and acquire assets through borrowings in lieu of, or in advance of, Capital Contributions.  The Subscription-Backed Facility will not exceed 100% of its Commitments to fund Investments.

Under the terms of any Subscription-Backed Facility, the Limited Partners may be required to confirm the terms of their Capital Commitments to the lenders under such equity commitment line, honor capital calls made by such lenders under certain circumstances, provide certain financial information to such lenders and execute certain documents in connection with such commitment line.

CHICAGO/#2574756.8

| | |
|---|---|
| **Leverage** | The Fund may incur indebtedness on certain assets if available and as deemed appropriate by the Fund in seeking to achieve its investment objective.  To the extent the Fund utilizes a REIT Subsidiary, it is contemplated that the REIT Subsidiary will be the borrower for all Investments it holds.  The Fund does not anticipate borrowing in excess of 50% of its net asset value, excluding indebtedness under any Subscription-Backed Facility and indebtedness of entities in which an Investment is an equity interest, determined at the time such indebtedness is incurred.  The Fund may finance certain assets in its portfolio through a variety of debt instruments including lines of credit, repurchase financings, collateralized debt obligations, securitized financing and other secured and unsecured borrowings. |
| **Distributions** | Subject to repayments of amounts due under a Subscription-Backed Facility or other Fund indebtedness, net proceeds attributable to the disposition of Investments (other than temporary Investments), as well as distributions of securities in kind, together with any dividends or interest income received with respect to any Investments, generally will be distributed to all Partners (other than a Defaulting Partner) participating in such Investment pro rata according to their respective capital contributions in respect of such Investment.  Each Limited Partner's pro rata share thereof will be further divided between such Limited Partner and the General Partner in the following order of priority: |

(a)  first, 100% to such Limited Partner until the cumulative amount distributed to such Limited Partner in respect of Investments then and previously disposed of equals the aggregate of the following:

    (i)  the funded Commitments of such Limited Partner attributable to all realized Investments, plus the amount of write-down, if any, with respect to each unrealized Investment written down;

    (ii)  the funded Commitments of such Limited Partner attributable to all organizational expenses, Management Fees and other expenses paid to date and allocated to realized Investments and unrealized Investments to the extent they are permanently written down as of that time; and

    (iii)  a preferred return on such Limited Partner's funded Commitments attributable to all realized Investments in an amount sufficient to cause the internal rate of return on such funded Commitments (measured beginning on the date each applicable capital contribution was due) to equal 8% per annum (the "Preferred Return");

(b)  second, 100% to the General Partner until such time as the General Partner has received, as its carried interest, 40% of the sum of the distributed Preferred Return and distributions made or being made to such Limited Partner and General Partner pursuant to this paragraph (b); and

(c)  thereafter, 60% to such Limited Partner and 40% to the General Partner as carried interest.

Half of the General Partner's carried interest received under provisions (b) and (c) above will be paid to Ausdal Financial Partners, Inc., a

placement agent retained by the Fund ("Ausdal"), pursuant to a placement agreement entered into by and among the Fund, the General Partner and Ausdal.

All short-term interest income, other than short-term interest income received from Investments, will be distributed 100% to the Partners in proportion to Commitments; provided that any short-term Investment income on the undistributed net profits from the disposition of, or otherwise with respect to, an Investment will be distributed to the Partners pro rata according to their respective shares of such undistributed net profits. Current income such as interest received from an Investment that is not a realized Investment will be distributed in the same manner as if such Investment were a realized Investment.

The Fund will, subject to the reinvestment rights described above, distribute net cash proceeds from disposition of Investments within 30 days of realization and will distribute dividends, interest and other income received with respect to Investments at least quarterly or such other frequency the General Partner determines in its discretion, in each case after paying Fund expenses and setting aside reserves to satisfy Fund expenses, obligations and liabilities.

**Tax Distributions**

Notwithstanding the priority of Distributions set forth above, the Fund may make distributions to the General Partner to enable its beneficial owners to pay tax on allocations of taxable income attributable to the General Partner's carried interest. Any such distributions shall reduce future distributions of carried interest otherwise payable to the General Partner.

**General Partner Clawback**

Upon termination of the Fund, the General Partner will be required to restore distributions to the Fund to the extent that it received cumulative distributions in excess of amounts otherwise distributable to the General Partner pursuant to the distribution formula set forth above, applied on an aggregate basis covering all transactions of the Fund, but in no event more than the cumulative distributions received by the General Partner with respect to its 40% carried interest, less income taxes thereon.

**Allocation of Income, Expenses, Gains and Losses**

Income, expenses, gains, and losses of the Fund generally will be allocated among the Partners in a manner consistent with the distribution of proceeds described above.

**Partner Giveback**

If the Fund incurs any liability, the General Partner may, subject to certain limitations set forth in the Partnership Agreement, cause each Partner to contribute to the Fund its pro rata share of such liability (based upon the amount by which such Partner's distributions from the Fund would have been reduced if the amount to be returned to the Fund by the Partners had not been distributed but rather had been used by the Fund to pay such liability).

**Management Fee**

Commencing on the Initial Closing Date, the Fund will pay to the General Partner an annual management fee (the "Management Fee"), payable monthly in arrears. During the Investment Period, the per annum Management Fee will be equal to 1.5% of the Commitments. To the extent that the General Partner does not call all Commitments on or before the end of the Investment Period, the Management Fee assessed against such uncalled Commitments will be refunded. After the Investment Period, the

9

per annum Management Fee will equal 1.5% of Commitments attributable to unrealized Investments.  The General Partner may elect to waive all or a portion of the Management Fee or carried interest for certain investors, including employees and affiliates of the General Partner.

Notwithstanding the above, the Management Fee otherwise assessed against a Limited Partner shall be reduced:  (i) by 25 basis points per annum, if such Limited Partner commits $3 million or more to the Fund (regardless of when such Commitment is made), and (ii) by 25 basis points per annum, if such Limited Partner makes its Commitment during the first 3 months following the Initial Closing Date (regardless of the amount of such Commitment).  For the avoidance of doubt, a Limited Partner that commits the minimum amount set forth in clause (i) and also makes such commitment within the time period set forth in clause (ii) shall be entitled to a reduction of 50 basis points per annum.

No Management Fee will be charged beyond the term of the Fund.  The Management Fee will be paid out of current income and disposition proceeds realized by the Fund and, in the General Partner's discretion, from drawdowns that will reduce unfunded Commitments.

| | |
|---|---|
| **Organizational and Operational Expenses** | The Fund will reimburse the General Partner for all costs, fees and expenses incurred by the General Partner associated with (i) the Fund's organization, including legal, accounting and other organizational costs and (ii) the pursuit and investigation of any Investment to be made by the Fund and the operation of the Fund such as travel and related expenses in originating and monitoring Investments and including subsequent legal, accounting and other costs. |
| **Other Expenses** | The General Partner will bear the costs of its overhead expenses, including employees' salaries, rent and utilities.<br><br>In addition to the Management Fee, the Fund will pay all other costs and expenses of the Fund, including legal, auditing, consulting, financing, accounting and custodian fees and expenses; expenses associated with the Fund's financial statements, tax returns and Schedule K-1s; out-of-pocket expenses incurred in connection with transactions not consummated; insurance; other expenses associated with the acquisition, holding and disposition of its Investments, including extraordinary expenses (such as litigation, if any); and any taxes, fees or other governmental charges levied against the Fund. |
| **Co-investment Policy** | The General Partner may, but will be under no obligation to, provide co-investment opportunities to one or more Limited Partners.  Affiliates of the General Partner may make co-investments with the Fund.  In addition, the General Partner may advise other entities, including Parallel Funds (as defined below), which may co-invest with the Fund.  For any particular co-investment, the investment terms applicable to the Fund will be no less favorable than the investment terms applicable to the co-investor. |
| **Other Funds** | The General Partner will not form or commence management of a pooled investment fund with objectives substantially similar to those of the Fund until the earlier of: (i) the expiration of the Investment Period; or (ii) such time as at least 75% of the Commitments have been invested or have been committed for investment, as determined by the General Partner in its |

CHICAGO/#2574756.8

sole discretion.  Notwithstanding the foregoing, the General Partner may establish Parallel Funds (as defined below) to invest substantially all of their assets in the Fund or proportionately alongside the Fund and on effectively the same terms as the Fund.  For the avoidance of doubt, a pooled investment fund that invests primarily in either short-term debt or equity investments in commercial real estate (i.e., does not primarily invest in equity investments in commercial real estate like the Partnership) shall not be deemed to have a substantially similar investment objective to Partnership.

**Default Provisions**

The Partnership Agreement includes default provisions to address situations in which a Limited Partner fails to fund any portion of its Commitment when called by the General Partner or to otherwise make a payment when due.  If a Limited Partner is a "Defaulting Partner," one-half of the Defaulting Partner's capital account may be forfeited and the forfeited portion will be allocated to the remaining non-defaulting Limited Partners in proportion to their percentage interest in the Fund.  Prospective Limited Partners should carefully review the Fund's default provisions.  In addition, the forfeiture of a Defaulting Partner's capital account may not relieve such Defaulting Partner from its obligation  to make capital contributions for the purpose of satisfying certain existing Fund liabilities.

**Investment Structure**

The Fund is permitted, but not required, to utilize a subsidiary (the "REIT Subsidiary") that will elect to be taxed as a real estate investment trust ("REIT") for some or all Investments that the Fund makes in assets that may be held by a REIT under the applicable provisions of the Code (as defined below).  To the extent the REIT Subsidiary is not utilized, and for other assets which may not be held by a REIT, the Fund intends to utilize limited liability companies or other limited liability entities that will be directly or indirectly owned by the Fund.

The governing documents of the REIT Subsidiary will contain provisions (the "Ownership Restrictions") that restrict the beneficial ownership of the REIT Subsidiary's shares by a single person (other than the Fund) or persons acting as a group.  The purpose of the Ownership Restrictions is to assist in protecting and preserving the REIT Subsidiary's status as a REIT.

Each Limited Partner will be required to provide to the Fund such information as the General Partner may reasonably request to determine the effect of that Limited Partner's investment in the Fund on the ability of the REIT Subsidiary to qualify as a REIT.

**Alternative Investment Vehicles**

For legal, tax, regulatory, or other reasons, the Fund may form one or more alternative investment entities to make investments outside of the Fund.  Generally, in such event, each Limited Partner would participate in such an alternative investment vehicle on substantially the same terms and conditions as it participates in the Fund.   See the Partnership Agreement for details on alternative investment vehicles.

**Parallel Investment Entities**

The General Partner or its affiliates may, at its discretion, create one or more parallel investment entities to accommodate the investment requirements of certain non-U.S. and other investors ("Parallel Funds"), the structure of which may differ from that of the Fund.  Parallel Funds will either (i) invest substantially all of their assets directly in the Fund,

11

(ii) invest proportionately in all transactions on effectively the same terms and conditions as the Fund, except as necessary to address tax, regulatory or other investor considerations or (iii) invest in an entity owed by the Fund and the Parallel Fund, in proportion to their commitments to such entity, to make Investments.  To the extent a Parallel Fund invests directly in the Fund, the Fund shall be responsible for the fees and expenses of such entity.  The Fund is a Parallel Fund to the Flagship Fund.

It is possible that due to the timing of an Investment or the initial closing date of the Parallel Fund, both the Parallel Fund and Fund may not be able to participate or there will be a delay in when both the Fund and Parallel Fund can participate.  While it is intended that each Parallel Fund and the Fund participate on the same terms and in the same proportion to their aggregate capital commitments, it is possible that a Parallel Fund will invest under scenario (ii) or (iii) above at a later time than the Fund or not at all.  To the extent a Parallel Fund invests after the Fund in a particular Investment, the Fund's ownership of such Investment will be decreased by the amount of the Parallel Fund's investment and the Fund's opportunity for returns will be reduced accordingly.  Investors should also understand that because of regulatory, tax or for other reasons the portfolio of the Fund and a Parallel Fund may differ.

| | |
|---|---|
| **Reports to Limited Partners** | The Fund will furnish to the Limited Partners (i) audited financial statements annually commencing with the first year in which it either is in operation for the full year or makes an Investment and (ii) annual tax information necessary for each Partner's U.S. tax returns. |
| **Side Letters** | The Fund or the General Partner, without any further act, approval or vote of any Partner, may enter into side letters or other similar agreements with certain Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, the Partnership Agreement. |
| **UBTI; ECI** | The Fund may make investments that would cause a U.S. tax-exempt Partner to have "unrelated business taxable income" ("UBTI") within the meaning of Section 512 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), or cause a non-U.S. Partner to have income "effectively connected with the conduct of a trade or business within the United States," as defined in the Code. |
| **ERISA** | The Fund will use its reasonable best efforts to conduct the affairs and operations of the Fund so as to avoid being a plan assets vehicle under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"). |
| **Transfers and Withdrawals** | Generally, a Limited Partner may not resign from the Fund or sell, assign, or transfer any interest in the Fund without the prior written consent of the General Partner, which generally may be withheld in the General Partner's sole discretion.  In addition, generally, a Limited Partner may not withdraw any amounts from the Fund during its term. |
| **Indemnification and Exculpation** | The Fund will indemnify and hold harmless the General Partner; the Principals; and the General Partner's and its general partner's partners, members, managers, employees, agents, advisors, affiliates, and personnel against all claims, liabilities, costs, and expenses, including legal fees, judgments, and amounts paid in defense and settlement, as |

incurred by them, by reason of their activities on behalf of the Fund or the Partners, other than for bad faith, gross negligence, willful malfeasance or such other limitations as set forth in the Partnership Agreement.

| | |
|---|---|
| **Risks and Certain Potential Conflicts of Interest** | An investment in the Fund involves significant risks and there can be no assurance that the Fund's investment objectives will be achieved.  There may occur potential or actual conflicts of interest involving the General Partner, its affiliates and the Fund.  For further discussion of risks and certain potential conflicts of interest, see Section III—"Risk Factors." |
| **Investment Considerations** | Each prospective investor should consult its own advisers as to legal, business, tax, accounting, ERISA and other related matters concerning an investment in the Fund. |
| | Each prospective non-U.S. investor should consult its own tax and other advisers in determining the possible tax, exchange control, or other consequences to such investor under the laws of the jurisdictions of which it is a citizen, resident, or domiciliary; in which it conducts business; or in which it otherwise may be subject to tax, of the purchase and ownership of limited partner interests in the Fund. |
| | For further discussion of certain investment considerations, see Section IV—"Legal and Tax Matters." |
| **Placement Agent** | The Fund has engaged Ausdal, and may in the future engage other selling agents, to offer and sell interests in the Fund.  Such selling agents may be paid a sales commission: (i) by the Fund; (ii) out of the General Partner's Management Fee; (iii) out of the General Partner's carried interest; and/or (iv) an assets-based "distribution fee" charged to the Partners introduced by such selling agents.  Accordingly, depending on the type of sales commissions paid, such commissions may increase the aggregate expenses of any person investing in the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund. |
| **Legal Counsel to the General Partner** | Vedder Price P.C. serves as legal counsel to the General Partner.  Vedder Price does not represent the Limited Partners.  No independent counsel has been retained to represent the Limited Partners.  See Section IV– "Legal and Tax Matters – Legal Counsel." |
| **Fund Auditors** | Grant Thornton LLP |
| **Administrator** | Woodfield Fund Administration, LLC |

# III.  Risk Factors

Investing in the Fund involves various risks.  Prospective investors should consider carefully the following risk factors and the other information in this memorandum before deciding to invest.  The risks described below are those that the General Partner currently believes are the material risks the Fund will face, but are not the only risks associated with an investment in the Fund.  If any of the events contemplated by the following risks or other risks that have not been identified or that are currently considered immaterial or unlikely should occur, the Fund's results and the performance of an investment in the Fund could be adversely affected.

CHICAGO/#2574756.8

## Investment Risks

*General Investment Risks.* The business of the Fund is to invest primarily in short-term debt and equity investments in commercial real estate properties within the United States, which may include properties and projects that are undervalued, distressed or require unconventional financing to become viable, as well as in loans that may be non-performing. Such investments involve a high degree of business and financial risk that can result in substantial losses. Investors in the Fund should not subscribe to or invest in the Fund unless they can readily bear the consequences of losses on their investment.

*General Real Estate Investment Risks.* Because the Fund will concentrate its assets in the real-estate industry, the Fund's performance will be closely linked to and will be directly affected by changes in and the performance of the local and regional real estate markets in which the Fund invests. Real estate markets in the United States generally have been subject to substantial and often unpredictable fluctuations and declines on a local, regional and national basis over the past several years and such trends may continue in the future. Borrowers in projects in which the Fund may invest or to whom the Fund may extend loans may fail to pay their loans, in a timely manner or at all, and/or the value of the properties underlying, securing or associated with the Fund's Investments may decline. A number of factors may contribute to a borrower failing to pay a loan or a decline in the value of a property, including, among other things, over-supply or lack of demand, defaults by borrowers or tenants, increases in vacancy rates, declines in rental income, property taxes, changes in zoning laws, increased operating expenses or capital expenditures and the availability and pricing of financing. Real estate risks also arise where borrowers fail to carry adequate insurance, or become liable for costs related to compliance with environmental laws. Lastly, in certain cases, there may be no collateral to protect an Investment after it has been made, or the collateral or portion thereof available to the Fund may have a value that is significantly less than amount of the associated Investment, particularly after taking into account the rights to the collateral held by more senior lien holders.

*Junior and Mezzanine Loan Risks.* Loans or debt interests in which the Fund may invest may be among the most junior in a company's or project's capital structure and, thus, subject to the greatest risk of loss. Due to their lower place in a borrower or project's capital structure and possible unsecured status, junior loans and interests involve a higher degree of overall risk than senior loans of the same borrower or project. Junior loans that are bridge loans generally carry the expectation that the borrower will be able to obtain permanent financing in the near future. Any delay in obtaining permanent financing subjects the bridge loan investor to increased risk. In cases where the Fund extends bridge loans to a borrower, the Fund will bear the risk that the borrower may be unable to locate permanent financing to replace the bridge loan, in a timely manner or at all, which could adversely affect the Fund's associated Investment.

The Fund may make Investments in mezzanine loans. Unlike conventional mortgage loans, many mezzanine loans are not secured by a mortgage on the underlying real property but rather by a pledge of equity interests (such as a partnership or limited liability company membership) in the property owner or another company in the ownership structure that has control over the property. Generally, mezzanine loans may be more highly leveraged than other types of loans and subordinate in the capital structure of the borrower. While foreclosure of a mezzanine loan generally takes substantially less time than foreclosure of a traditional mortgage, the holders of a mezzanine loan have different remedies available versus the holder of a first lien mortgage loan. In addition, a sale of the underlying real property would not be unencumbered, and thus would be subject to encumbrances by more senior mortgages and liens of other creditors. Upon foreclosure of a mezzanine loan, the holder of the mezzanine loan typically acquires an equity interest in the borrower or other obligor. However, because of the subordinate nature of a mezzanine loan, the real property continues to be subject to the lien of the mortgage and other liens encumbering the real estate. In the event the holder of a mezzanine loan forecloses on its equity collateral, the holder may need to cure the borrower or other obligor's existing mortgage defaults or, to the extent permissible, sell the property to pay off other creditors. To the extent that the amount of mortgages and senior indebtedness and liens exceed the value of the real estate, the collateral underlying the mezzanine loan may have little or no value.

CHICAGO/#2574756.8

*Foreclosure Risk*.  There may be additional costs associated with enforcing a Fund's remedies under a loan including additional legal costs and payment of real property transfer taxes upon foreclosure in certain jurisdictions.  As a result of these additional costs, the Fund may determine that pursuing foreclosure on the loan collateral is not worth the associated costs.  In addition, if the Fund incurs costs and the collateral loses value or is not recovered by the Fund in foreclosure, the Fund could lose more than its original investment in the loan.  Foreclosure risk is heightened for junior loans, including certain mezzanine loans.

*Past Performance Not Indicative of Future Results*.  The performance of the Principals' prior investments is not necessarily indicative of the Fund's future results.  While the General Partner intends for the Fund to make investments that have estimated returns commensurate with the risks undertaken, there can be no assurances that the targeted internal rate of return will be achieved.  On any given investment, loss of principal is possible.

*Concentration of Investments*.  The Fund will participate in a limited number of investments that will be primarily focused in the commercial real-estate industry.  As a result, the Fund's investment portfolio is likely to be highly concentrated, and the performance of a few holdings may substantially affect its aggregate return.  Furthermore, to the extent that the capital raised is less than the targeted amount, the Fund may invest in an smaller number of projects, properties and loans than it otherwise could have and thus will be comparatively less diversified.

*Borrowing Risk*.  The use of borrowings may result in greater losses to the Fund than would be the case if borrowings were not used.  To the extent the Fund realizes an Investment with borrowings outstanding with respect to that investment, the Fund will be required to repay the borrowings prior to making distributions to investors.

*Lack of Sufficient Investment Opportunities*.  It is possible that the Fund will never be fully invested if enough sufficiently attractive investments are not identified.  The business of identifying, structuring and diligencing suitable investments in commercial real-estate is highly competitive, time consuming and involves a high degree of uncertainty.

*Restricted Nature of Investment Positions*.  Generally, there will be no readily available market for the Fund's Investments, and hence, most of the Fund's Investments will be difficult to value.  Dispositions of or exiting from such Investments may require a lengthy time period or may result in distributions in kind to the Partners.

*Enhanced Scrutiny and Potential for Increased Industry Regulation*.  There has been significant discussion recently regarding enhanced governmental scrutiny and/or increased regulation of the private investment fund industry.  There can be no assurance that any such scrutiny or regulation will not have an adverse impact on the Fund's activities, including the ability of the Fund to implement operating improvements or otherwise execute its investment strategy or achieve its investment objectives.

*Need for Follow-On Investments*.  Following an initial investment in a given loan, property or project, the Fund may determine that additional funds are necessary or the Fund may be provided with an opportunity to increase its initial investment.  There is no assurance that the Fund will make follow-on investments or that the Fund will have sufficient funds to make all or any of such investments.  Any decision by the Fund not to make follow-on investments or its inability to make such investments may have a substantial negative effect on a property or project in need of such an investment.  Additionally, failing to make such investments may result in a lost opportunity for the Fund to increase its participation in a successful property or project or the dilution of the Fund's ownership in a company affiliated with the property or project if a third party invests in such company instead of the Fund.

*Leveraged Investments*.  If the Fund borrows funds to make investments, the Fund would be exposed to the risk of leverage, which magnifies the potential for gain and loss on amounts invested.

CHICAGO/#2574756.8

*Co-Investment Risk*  The Fund will face risks relating to joint ventures or partnerships that are not present with other methods of investing.  The Fund may enter into joint ventures or partnerships with unaffiliated third parties for the acquisition, financing, development and construction of real estate projects. Such Investments may involve risks not otherwise present with other methods of investment, including, for example, the possibility that:

•    the co-venturer or project sponsor in an Investment might become bankrupt, in which case the Fund's Investment might become subject to the rights of the co-venturer or project sponsor's creditors, and the Fund may be forced to liquidate its Investment before it otherwise would choose to do so;

•    such co-venturer or project sponsor may at any time have economic or business interests or goals that are or that become inconsistent with the Fund's business interests or goals, which may cause the Fund to disagree with its co-venturer or project sponsor as to the best course of action with respect to the Investment and which disagreement may not be resolved to the Fund's satisfaction; however, the written agreements with such co-venturer or project sponsor may grant to the Fund certain approval rights with respect to major decisions related to the Investment;

•    such co-venturer or project sponsor may be in a position to take action contrary to the Fund's instructions or requests or contrary to the Fund's policies or objectives, which may cause the Fund not to realize the return anticipated from its Investment; or

•    it may be difficult for the Fund to sell its Investment in any such joint venture or partnership.

*Geographic Risk*  The Fund intends to invest in real estate projects throughout the United States. It is possible that a higher percentage of its Investments will relate to property located in one or more states. If the real estate markets or general economic conditions in the geographic areas in which the Fund invests unexpectedly decline to an extent greater than the Fund forecasts, or recover to a lesser extent than the Fund forecasts, the value of the real properties in which the Fund invests and that are underlying its Investments in these areas could decline. Any of these events could materially adversely affect the Fund's business, financial condition or results of operations.

*Compliance with Environmental and/or Human Health Laws and Regulations*  All real property and the operations conducted in connection with real property are subject to federal, state and local laws, ordinances and regulations relating to environmental protection and human health and safety. These laws and regulations generally govern wastewater discharges, air emissions, the operation and removal of underground and above-ground storage tanks, the use, storage, treatment, transportation and disposal of solid and hazardous materials and the remediation of contamination associated with disposals. Under limited circumstances, a secured lender, in addition to the owner of real property, may be liable for clean-up costs or have the obligation to take remedial actions under environmental laws, including, but not limited to, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or CERCLA. Some of these laws and regulations may impose joint and several liability for the costs of investigation or remediation of contaminated properties, regardless of fault or the legality of the original disposal. In addition, the presence of these substances, or the failure to properly remediate these substances, may adversely affect the Fund's ability to sell such property or to use the property as collateral for future borrowing.

The Fund may become subject to environmental liabilities associated with an Investment if it participates in the management of the related real estate. Environmental laws may impose restrictions on the manner in which property may be used or businesses may be operated, and these restrictions may require substantial expenditures. It is possible that property in which the Fund holds an interest may contain hazardous substances, wastes, contaminants or pollutants that the Fund may be required to remove or remediate. The Fund may also incur liability to tenants or other users of property in which the Fund holds an interest or neighboring properties. The Fund cannot guarantee that it will not incur full recourse liability for the entire cost of removal and cleanup, that the cost of such removal and cleanup will

16

not exceed the value of the property or that it will recover any of these costs from any other party. It may be difficult or impossible to sell a property following discovery of hazardous substances or wastes on the property.  The cost of defending against claims of liability, of compliance with environmental regulatory requirements, of remediating any contaminated property or of paying personal injury claims could materially adversely affect the Fund's business, financial condition and results of operations and, consequently, amounts available for distribution to the Limited Partners.

*Borrowings by Sponsors of Investments*  The sponsor of any Investment may incur indebtedness at the project level.  The Fund's ability to achieve its investment and leverage objective depends on the ability of its project sponsors to borrow money in sufficient amounts and on favorable terms. If lenders do not allow these borrowings to be renewed or if the sponsor cannot replace maturing borrowings on favorable terms or at all, the sponsor might have to sell its Investment assets under adverse market conditions, which would harm the Fund's results of operations and may result in permanent losses.

*Limited Number of Tenants*  An Investment's results of operations may rely on only one or a few tenants and therefore the insolvency, bankruptcy or receivership of any of these limited number of tenants could adversely affect the results of the Investment.  There is a significant creditworthiness risk where only a single or a few tenants lease all or a significant portion of a property underlying the Fund's Investment.

*Possibility of Fraud and Other Misconduct*  When the Fund invests in an Investment, the Fund may not have custody of the Investment's assets.  Therefore, there is the risk that the Investment sponsor could divert or abscond with those assets, provide false reports of operations or engage in other misconduct.

## Structural Risks

*Reliance on the General Partner.*  The Fund has no operating history and will be entirely dependent on the General Partner.  Control over the operation of the Fund will be vested entirely with the General Partner, and the Fund's future profitability will depend largely upon the business and investment acumen of the Principals.  The loss of service of one or more of the Principals could have an adverse effect on the Fund's ability to realize its investment objectives.  Limited Partners generally have no right or power to take part in the management of the Fund, and as a result, the investment performance of the Fund will depend entirely on the actions of the General Partner.

*Significant Adverse Consequences for Default.*  The Partnership Agreement provides for significant adverse consequences in the event a Limited Partner defaults on its Commitment or other payment obligations.  In addition to losing its right to potential distributions from the Fund, a defaulting Limited Partner will be forced to forfeit half of its interest in the Fund.  If a Limited Partner defaults, it may be difficult for the Fund to make up the shortfall and could have a negative impact on the Fund's returns.

*Dilution.*  Limited Partners admitted to the Fund at subsequent closings will participate in then-existing investments of the Fund, thereby diluting the interest of existing Limited Partners in such investments.  Although any such new Limited Partner will be required to contribute its pro rata share of previously made capital contributions, there can be no assurance that this contribution will reflect the fair value of the Fund's existing investments at the time of such contributions.  Similarly, to the extent a Parallel Fund invests in a then-existing investment of the Fund, such investment will dilute the interest of the Fund in such investment.

*General Partner's Carried Interest.*  The fact that the General Partner's carried interest is based on a percentage of net profits may create an incentive for the General Partner to cause the Fund to make riskier or more-speculative investments than otherwise would be the case, which may increase Limited Partners' risks for significant losses on their investment in the Fund.

*Transfer by General Partner*.  To the extent the General Partner, its partners, the Principals and/or their respective affiliates commit to make an investment in the Fund, a material participation in or a portion of such investment may thereafter be transferred to others, subject to any express limitations thereon in the Partnership Agreement.

*Adverse Market Conditions*.  Any material adverse change in the economic environment, such as adverse changes in interest rates or consumer confidence, or continued economic uncertainty or anemic economic growth could have a negative impact on the performance and/or valuation of the Fund's Investments.  The Fund's performance can be affected by deterioration in the real estate markets and by market events, such as the onset of the credit crisis in the summer of 2007.

*Side Letters*  The General Partner or the Fund may enter into a side letter or other written agreement with one or more investors.  Such Side Letter may entitle an investor to make an investment in the Fund on terms other than those described in the Partnership Agreement or the Subscription Agreement.  Any such terms may be more favorable than those offered to other investors.

*Use of Valuations*  The Fund may obtain independent third-party valuations or appraisals for the purpose of valuing the underlying real estate collateral to determine the size of each Investment; however, the Fund may use its own internal real estate valuations from time to time.  Unlike publicly traded securities, real estate assets generally cannot be marked to an established trading value.  An appraisal or valuation is only an estimate of value and is not a precise measure of realizable value.  Real estate valuations are subject to numerous assumptions and limitations.  However, ultimate realization of the market value of a real estate asset depends to a great extent on economic and other conditions beyond the control of the General Partner and the Fund.  Further, appraised or otherwise determined values do not necessarily represent the price at which a real estate investment would sell, since market prices of real estate Investments can only be determined by negotiation between a willing buyer and seller.  As a result, if the Fund were to liquidate a particular Investment, the realized value of the underlying real estate collateral may be more or less than the appraised value or valuation of such asset.

## Conflicts of Interest

*Conflicts of Interest with Principals/General Partner*.  During the Investment Period, the Principals will pursue all appropriate investment opportunities through the Fund, subject to certain limited exceptions.  However, the Principals currently manage other investment funds, including the Flagship Fund, that have a similar investment strategy as the Fund, and other investments similar to those in which the Fund will be investing.  The Principals also currently manage prior vintages of this Fund.  The investment period for each prior vintage has ended.  The Principals also manage T2 Strategic Real Estate Fund, LP ("SREI"), an open-end fund that invests the majority of its assets in debt related real estate investment.  The Fund may invest in investments with SREI.

Accordingly, the General Partner may direct certain relevant investment opportunities to those investment funds and investments, and the General Partner will continue to manage and monitor such investment funds and investments.  The significant expected investment of the Principals in the Fund, as well as the Principals' interest in the carried interest, operate to align, to some extent, the interest of the Principals with the interest of the Limited Partners, although the Principals have economic interests in such other investment funds and investments as well and receive management fees and carried interests relating to these interests, which may differ from the Management Fee and Carried Interest applicable to the Fund.  Such other investment funds, including Parallel Funds, and investments that the Principals may control may compete with the Fund with respect to opportunities in which by the Fund may invest. With the exception of Parallel Funds, the allocation of investment opportunities may not be pro rata among clients and allocations may differ for a variety of reasons, including cash flow and investment restrictions.  The restrictions on managing other investment funds set forth in this Memorandum serve to alleviate conflicts with the respect to the allocation of investment opportunities, but to the extent investment funds managed by the General Partner have unallocated capital the potential for conflict exists.  Following the Investment Period, the Principals may and likely will focus their investment activities on other opportunities and areas unrelated to the Fund's investments.

CHICAGO/#2574756.8

*Co-Investments by General Partner Affiliates or Limited Partners*.  Under certain circumstances, the Fund may be offered an opportunity to make an investment in connection with a transaction in which a Principal or another affiliate of the General Partner ("General Partner Affiliate") is expected to participate or in an investment in which the General Partner Affiliate already has made, or concurrently will make, an investment.  In connection with such investments, the Fund and the General Partner Affiliate may have conflicting interests and investment objectives.  Generally, the terms of any such co-investment applicable to the Fund will be no less favorable than the investment terms applicable to the General Partner Affiliate.

Similarly, to the extent the Fund offers a co-investment opportunity to a Limited Partner, such Limited Partner may participate in an investment of the Fund.  In connection with such an investment, the Fund and the Limited Partner may have conflicting interests and investment objectives.  Generally, the terms of any such co-investment applicable to the Fund will be no less favorable than the terms applicable to the Limited Partner; however, the Fund cannot guarantee the parties' investment will be structured in the same manner, and the Limited Partner may take a junior or senior creditor position to the Fund in relation to such co-investment.

*Conflicting Investor Interests*.  Limited Partners may have conflicting investment, tax, and other interests with respect to their investments in the Fund, including conflicts relating to the structuring of investment acquisitions and dispositions.  Conflicts may arise in connection with decisions made by the General Partner regarding an investment that may be more beneficial to one Limited Partner than another, especially with respect to tax matters.  In structuring, acquiring and disposing of investments, the General Partner generally will consider the investment and tax objectives of the Fund and its Partners as a whole, not the investment, tax, or other objectives of any Limited Partner individually.

## Liquidity Risks

*Illiquidity; Lack of Current Distributions*.  An investment in the Fund should be viewed as illiquid and suitable only for long-term investors.  It is uncertain as to when profits, if any, will be realized.  Losses on unsuccessful investments may be realized before gains on successful investments are realized.  While an investment may be sold at any time, the Fund may be unable to easily convert or exit an investment on a timely basis, or at all, without realizing a substantial loss.  Before such time, there may be no current return on the investment.  Furthermore, the expenses of operating the Fund (including the annual Management Fee payable to the General Partner) may exceed its income, thereby requiring that the difference be paid from the Fund's capital.

*Limited Transferability of Fund Interests*.  There will be no public market for the Fund interests, and none is expected to develop.  There are substantial restrictions upon the transferability of Fund interests under the Partnership Agreement and applicable securities laws.  In general, withdrawals of Fund interests are not permitted.  In addition, Fund interests are not redeemable.

## Tax Risks

*Taxable Income May Exceed Cash Distributions*.  The federal tax liability of a taxable Investor resulting from the disposition by the Fund of investments, the disposition of interests in the Fund or the ongoing operations of the Fund may substantially exceed the cash, if any, received by the Investor as a result of such disposition or operations.  Thus, a Limited Partner may have to make an out-of-pocket expenditure to cover its tax liability.

*Tax-Exempt Investors*.  A tax-exempt investor that invests in the Fund may realize unrelated business taxable income ("UBTI").  Prospective investors that are tax-exempt entities should consult with their own advisors prior to making an investment in the Fund as to the potential UBTI and other tax consequences that may apply to their particular situations.

*Non-U.S. Investors*.  Prospective non-U.S. investors in the Fund should be aware that an investment in the Fund may give rise to effectively connected income ("ECI").  In such case, a non-U.S. investor may have an obligation to pay tax to and file returns with the Service.  In addition, a non-U.S. investor's share of certain types of income from the Fund may be subject to a 30% withholding tax under FATCA, unless an exception applies.  Prospective investors that are non-U.S. persons are strongly urged to consult their advisors prior to making an investment in the Fund.  *See Certain U.S. Federal Income Tax Matters – Taxation of Non-U.S. Limited Partners.*

*Delayed Schedule K-1s*.  The Fund may not be able to provide final Schedule K-1s to Limited Partners for any given fiscal year until after April 15 of the following year.  Thus, Limited Partners may be required to obtain extensions of the filing dates for their U.S. federal, state, and local income tax returns.  Each prospective investor should consult with its own adviser as to the advisability and tax consequences of an investment in the Fund.

## Regulatory Risks

*No Registration Under the Investment Company Act or Federal or State Securities Laws*.  The Fund will not be registered with the SEC as an investment company under the Investment Company Act in reliance upon an exemption from the Investment Company Act.  Accordingly, the provisions of the Investment Company Act that are applicable to registered investment companies (e.g., mutual funds) will not be applicable.  The interests of the Fund will not be registered with the SEC under the Securities Act in reliance on the exemptive provisions of Section 4(2) and/or Regulation D thereunder.  The Fund shall be exempt from registration under Section 3(c)(5) of the Investment Company Act.  Similar reliance has been placed on apparently available exemptions from securities registration and qualification requirements under applicable state securities laws.  No assurance can be given that the offering currently qualifies or will continue to qualify under one or more of such exemptive provisions due to, among other things, the manner of distribution, reliance on investor representations or retroactive changes in securities law, regulations or interpretations thereof.

THE FOREGOING IS A SUMMARY OF CERTAIN SIGNIFICANT RISKS RELATING TO AN INVESTMENT IN THE FUND.   THIS SUMMARY SHOULD NOT BE INTERPRETED AS A REPRESENTATION THAT THE RISKS IDENTIFIED AND DISCUSSED IN THIS SECTION ARE THE ONLY RISKS ASSOCIATED WITH AN INVESTMENT IN THE FUND, OR THAT THE MAGNITUDE OF SUCH RISKS IS NECESSARILY EQUAL.

# IV.   Legal and Tax Matters

## Employee Benefit Plan Considerations

The following is a summary of certain factors arising under the Employee Retirement Income Security Act of 1974, as amended, including the regulations thereunder ("ERISA") and the Code that should be considered before a "fiduciary" (as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code) of an "employee benefit plan" (as defined in Section 3(3) of ERISA) or a "plan" (as defined in Section 4975(e)(1) of the Code) (a "Plan") commits to an investment in the Fund.  The following summary is as of the date hereof and is not intended to be complete, but it addresses certain questions under ERISA and the Code which should be considered by a Plan fiduciary and its counsel.  Any Plan fiduciary should consult with its counsel regarding the consequences under ERISA, the Code or other similar statutes of an investment in the Fund.

In considering an investment in the Fund, a Plan fiduciary should consider, among other things: (i) whether the investment is in accordance with the documents governing the Plan; (ii) whether the investment satisfies the diversification requirements of Section 404(a)(1)(C) of ERISA; and (iii) the nature of an investment in, and the compensation structure of, the Fund (e.g., that certain of the Fund's activities may generate UBTI).

Section 406 ERISA and Section 4975 of the Code prohibit certain transactions (a "Prohibited Transaction") involving the assets of a Plan and persons or entities who have certain specified relationships to the Plan ("parties in interest" within the meaning of ERISA or "disqualified persons" within the meaning of the Code) unless a statutory or administrative exemption applies to the transaction. If the General Partner or any of its affiliates is or may be a party in interest or a disqualified person with respect to a Plan considering an investment in the Fund, the Plan fiduciary must determine that its investment will not directly or indirectly give rise to a non-exempt Prohibited Transaction.

Section 3(42) of ERISA and U.S. Department of Labor regulations (see 29 CFR § 2510.3-101) (the "Plan Asset Regulations") provide, generally, that, when a "benefit plan investor" (currently defined to include employee benefit plans subject to Part 4 of Title I of ERISA, any plan to which Section 4975 of the Code applies, and any entity whose underlying assets include plan assets by reason of a plan's investment in such entity, that are deemed to hold plan assets under ERISA) invests in an entity such as the Fund, such investor's assets include the limited partner interest and an undivided interest in each of the underlying assets of the Fund, unless (i) the equity participation in the Fund by benefit plan investors is not "significant" (currently defined as 25% of any class of the Fund's equity interests, excluding such interests held by the General Partner or its affiliates), (ii) the Fund complies with the "venture capital operating company" ("VCOC") exception, (iii) the Fund complies with the "real estate operating company" ("REOC") exception, or (iv) the Fund qualifies for another exception under the Plan Asset Regulations. If the underlying assets of the Fund were to be considered plan assets of such benefit plan investor, the General Partner of the Fund would be a fiduciary under ERISA, subject to burdensome ERISA requirements with which the General Partner could not presently comply, and the Fund would be subject to prohibited transaction rules of ERISA and Section 4975 of the Code that could adversely impact the General Partner's ability to invest the assets of the Fund.

The Fund does not intend at this time to limit investment by benefit plan investors, and therefore it is possible that investment by benefit plan investors will be significant. If the General Partner determines that equity participation by benefit plan investors is significant, the General Partner will use its reasonable best efforts to cause the Fund to comply with the VCOC or REOC exception. If the General Partner determines that equity participation by benefit plan investors is not significant and the General Partner determines that the Fund may be able to operate more effectively if it is not required to comply with conditions necessary for qualification as a VCOC or REOC, the General Partner may elect, in lieu of VCOC or REOC compliance, to use its reasonable best efforts to limit transfers and take other actions permitted under the Partnership Agreement designed to assure that participation by benefit plan investors does not become significant. If the Fund qualifies for the VCOC or REOC exception or if equity participation by benefit plan investors is not significant, the General Partner will not be considered a fiduciary under ERISA, and the underlying assets of the Fund will not be deemed "plan assets" of any benefit plan investor.

The Fund will qualify as a VCOC if (i) it has direct contractual rights to substantially participate in or substantially influence the management of operating companies constituting at least 50% of its portfolio (measured at cost) and (ii) in the ordinary course of its business, actively exercises such management rights with respect to at least one of the operating companies in which it invests. An "operating company" is an entity engaged in the production or sale of a product or service, as distinguished from a reinvesting entity. Determination as to whether the Fund qualifies as a VCOC is made at the time the Fund makes its first long-term investment and thereafter during a ninety-day annual valuation period each year, the first day of which shall begin no later than the anniversary of the Fund's first long-term investment. In order to qualify as a VCOC, the Fund must meet the requirements for a VCOC on at least one day of each such ninety-day annual valuation period. Special rules apply to any wind-up of the Fund when it enters into its "distribution period," as defined in the Plan Asset Regulations.

The Fund will qualify as a REOC if (i) on its initial valuation date (and annually thereafter) at least 50% of its assets (valued at cost) are invested in real estate that is managed or developed and with respect to which such entity has the right to substantially participate directly in the management or development activities, and (ii) in the ordinary course of its business, the entity is engaged directly in real estate management or development activities. The Fund must actively exercise such management rights

21

on an ongoing basis in the ordinary course of business.  The 50% test must be met at the time of the Fund's first long-term investment and annually thereafter.

Plan fiduciaries should consult with their counsel and other advisors as to the provisions of ERISA applicable to an investment in the Fund.  In particular, the fiduciary of a Plan should consider whether an investment in the Fund meets the prudence and diversification requirements of ERISA and is consistent with the terms of the Plan's underlying documents.

## Legal Counsel

Vedder Price P.C. represents the General Partner solely with respect to the specific matters as to which it has been retained and consulted by the General Partner, including certain matters with respect to the Fund.  Other matters may exist that could have a bearing on the Fund, its Investments, the General Partner and/or its respective affiliates as to which Vedder Price has been neither retained nor consulted. Vedder Price does not undertake to monitor compliance by the General Partner and its affiliates with respect to the Fund's Investments and investment guidelines and procedures set forth in this Memorandum and the Partnership Agreement, nor does Vedder Price monitor compliance by the Fund, the General Partner and/or their affiliates with applicable laws, unless in each case Vedder Price has been specifically retained to do so.  Vedder Price does not investigate or verify the accuracy and completeness of information set forth in this Memorandum concerning the Fund, the General Partner or any of their respective affiliates, personnel or investments.  Furthermore, Vedder Price is not providing any advice, representation, warranty or other assurance of any kind as to any matter to any Limited Partner of the Fund, and Limited Partners will be required to authorize and agree in the subscription materials as to the Vedder Price's representation.

## Certain U.S. Federal Income Tax Matters

*General*

The following description is a summary of certain U.S. federal income tax considerations of an investment in the Fund.  It does not address every potential tax consequence, and except as noted below does not discuss particular considerations that may be applicable to investors subject to special rules, including tax-exempt investors, real estate investment trusts, dealers in securities, and foreign investors. The statements in this summary are based upon various provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and existing and currently proposed Treasury Regulations under the Code, legislative history of the Code, existing administrative rulings and practices of the Internal Revenue Service ("Service"), and judicial decisions as of the date of this Memorandum.   No assurance can be given that future legislative, regulatory or administrative changes or court decisions will not significantly modify the statements made herein.  Any such changes or decisions may be retroactive and thereby be applied to transactions entered into prior to the date of their enactment or release.  No assurance can be given that the Service will not challenge any of the positions taken by the Fund and that such challenge, if any, will not be successful.

Prospective investors that are exempt from U.S. federal income taxation, non-U.S. investors and other types of investors should consult with their own tax advisors regarding other U.S. federal, state and local tax effects of investing in the Fund.  In particular, this Memorandum does not address any alternative minimum tax effects of investing in the Fund or the limitations imposed by the Code on the ability of Limited Partners to deduct net losses, if any, incurred by the Fund.  Because the specific Investments that may be made by the Fund have not yet been determined, no representation is made as to any tax benefits, including deductions or credits, being available as a result of an investment in the Fund. It is not expected that an investment in the Fund will reduce the cumulative tax liability of an investor with respect to any year.  The Fund's primary objective is to generate income through debt and equity investments in real estate, not to reduce the tax liabilities of the Limited Partners.

For purposes of the discussion that follows, Limited Partners that are U.S. Persons and are generally exempt from U.S. federal income taxation are referred to as "U.S. Tax-Exempt Limited

Partners." Limited Partners that are U.S. Persons and are not generally exempt from U.S. federal income taxation are referred to as "Taxable U.S. Investors." "U.S. Persons" include: (a) citizens and residents of the United States; (b) corporations and partnerships created or organized in the United States or under the laws of the United States or of any state thereof or the District of Columbia; (c) estates whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; and (d) trusts if a United States court is able to exercise primary supervision over the administration of such trust, and one or more United States fiduciaries have the authority to control all substantial decisions of such trust. Finally, Limited Partners that are not U.S. Persons are referred to as "Non-U.S. Limited Partners."

THIS DISCUSSION IS NOT INTENDED OR WRITTEN BY THE FUND, THE GENERAL PARTNER/OR THE GENERAL PARTNER'S COUNSEL TO BE USED BY ANY PERSON FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER U.S. TAX LAWS. THIS DISCUSSION IS PROVIDED TO SUPPORT THE PROMOTION AND MARKETING BY THE FUND OF THE FUND INTERESTS. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR CONCERNING THE POTENTIAL TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

*Partnership Status of the Fund*

Pursuant to the "check-the-box" regulations, an entity such as the Fund will generally be classified as a partnership for U.S. federal income tax purposes unless it makes an election to be classified as an association taxable as a corporation. The General Partner does not intend to make such an election for the Fund. Therefore, the Fund is expected to be classified as a partnership for U.S. federal income tax purposes. However, the Fund has not sought a ruling from the Service that it will be treated for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation.

Section 7704 of the Code provides that a "publicly traded partnership" will generally be treated as a corporation for U.S. federal income tax purposes. Section 7704 defines a "publicly traded partnership" as any partnership if interests in such partnership are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof. Given the limited circumstances in which a Limited Partner may transfer its Fund interest, the General Partner believes that interests in the Fund should not be considered traded on a secondary market or the substantial equivalent thereof. However, there can be no assurance the Service will accept this conclusion.

An entity, or portion of an entity, may be classified as a "TMP" under Section 7701(i) of the Code if (i) substantially all of its assets consist of debt obligations or interests in debt obligations; (ii) more than 50% of those debt obligations are real estate mortgages or interests in real estate mortgages as of specified testing dates; (iii) the entity has issued debt obligations (liabilities) that have two or more maturities; and (iv) the payments required to be made by the entity on its debt obligations "bear a relationship" to the payments to be received by the entity on the debt obligations that it holds as assets. Under Treasury regulations, if less than 80% of the assets of an entity (or a portion of an entity) consists of debt obligations, these debt obligations are considered not to comprise "substantially all" of its assets, and therefore the entity would not be treated as a TMP. Where an entity, or portion of an entity, is classified as a TMP, it is generally treated as a taxable corporation for U.S. federal income tax purposes.

If the Fund were classified as an association (or a publicly traded partnership or TMP) taxable as a corporation, the Fund would pay U.S. federal income tax at corporate rates on its net income, and distributions to the Limited Partners in general would be dividends to the extent of the earnings and profits of the Fund, with distributions in excess thereof being treated first as a return of capital and thereafter as capital gain. Such tax would result in a reduction in the amount of cash available for distribution to the Limited Partners.

The remainder of this discussion assumes that the Fund will be treated as a partnership for U.S. federal income tax purposes.

*Taxation of Limited Partners on Income of the Fund*

23

*Limited Partners, rather than Fund, subject to Tax.*  As a partnership, the Fund generally will not be subject to federal income tax.  Instead, the income, gain, loss and deductions resulting from the Fund's operations (and the Fund's share of such items from each flow-through entity in which the Fund invests) will be allocated to its Limited Partners.  Each Limited Partner must report on its income tax return its share of ordinary income or loss, net long-term capital gain or loss, and net short-term capital gain or loss that it is allocated by the Fund.  Each Limited Partner must pay taxes on its allocated share whether or not it has received a distribution from the Fund.

The tax information returns filed by the Fund may be audited by the Service.  Adjustments, if any, resulting from such an audit or from other Service determinations may require each Limited Partner to file an amended tax return and may possibly result in an audit of such return.  Any audit of a Limited Partner's return could result in adjustments of non-Fund as well as Fund items.

*Tax Allocations of Profits and Losses.*  Under Code Section 704(b), the Fund's allocations of taxable income or loss to the Limited Partners generally will be respected for U.S. federal income tax purposes if they have "substantial economic effect" or they are in accordance with the partners' interests in the partnership.  If the Fund's allocations do not comply with Code Section 704(b), the Service may reallocate partnership tax items in accordance with the interests of the Limited Partners in the Fund.  In such case, a Limited Partner may be required to file an amended return and pay any additional tax liability (together with interest and potentially penalties) resulting from such adjustment.

It is possible that a Limited Partner's U.S. federal income tax liability with respect to its allocable share of the Fund's earnings in a particular taxable year could exceed the cash distributions to such Limited Partner for such year.  For example, the Fund may recognize (directly or through a flow-through entity in which the Fund invests) taxable income in advance of the receipt of corresponding cash as a result of investments that generate "original issue discount" or "market discount," as discussed below, or with respect to an investment that generates cash flow that is applied to debt service.  Moreover, the Fund may recognize taxable income from an Investment organized as a flow-through entity without the receipt of cash distributions corresponding to such income.

*Investment in Flow-Through Entities.*  The Fund may invest a portion of its assets in one or more Investments or special purpose vehicles organized as a flow-through entity for U.S. federal income tax purposes.  In such case, the tax treatment of the flow-through entity's investment(s) will flow through to the Fund (and then to the investors in the Fund).  The discussion below addresses the tax treatment of certain investments in the hands of the Fund and any flow-through entity in which the Fund may invest.

*Original Issue Discount.*  The Fund (directly or through a flow-through entity owned by the Fund) may originate or acquire loans, including loans with appreciation interests, that are deemed to have original issue discount for U.S. federal income tax purposes.  Original issue discount is generally equal to the difference between an obligation's issue price and its stated redemption price at maturity.  The Fund must recognize as income in each year the portion of the original issue discount that accrues during that year, even though it does not receive cash in that year in the amount of the original issue discount.  As a result, a Limited Partner will be required to include in its taxable income its allocable share of the amount of such original issue discount accrued with respect to such a debt obligation, regardless of whether it receives cash from the Fund in such amount.

*Market Discount.*  The Fund (directly or through a flow-through entity owned by the Fund) may also hold or purchase debt instruments that are subject to the "market discount" provisions contained in Sections 1276-1278 of the Code.  These rules generally provide that if a holder acquires a debt instrument at a discount from, in general, its stated redemption price at maturity, which discount equals or exceeds one-fourth of one percent (0.25%) of the principal amount times the number of remaining complete years to maturity, or weighted average maturity in some cases, and thereafter disposes of such an instrument, the lesser of (a) the gain realized or (b) the portion of the market discount that accrued while the debt instrument was held by such holder will be treated as ordinary income at the time of the disposition.  Any accrued market discount will also be recognized in the event that principal payments are made on the debt instrument.  The market discount rules also provide that the net direct interest expense with respect to

any market discount bond is allowed as a deduction for the taxable year only to the extent that such expense exceeds the portion of the market discount allocable to the days during the taxable year on which such bond was held by the taxpayer (as determined under the rules of Section 1276(b) of the Code).

*Sale of Investments*.   The Fund expects to generate ordinary income from certain of its investment activities, including rental income, interest income and OID (discussed above).   In certain cases, the Fund's (direct or indirect) sale or disposition of an investment may result in capital gains or losses.   If such investment was held longer than twelve months, the capital gain or loss will be "long-term."   "Long-term capital gains" realized by non-corporate taxpayers are taxed at rates lower than the rates for ordinary income and capital gains on assets held for twelve months or less.   Currently, the maximum federal long-term capital gain rate for non-corporate taxpayers is 20%.   Capital losses of individuals and other non-corporate taxpayers are deductible only to the extent of the taxpayer's capital gains for the taxable year plus up to $3,000 of the taxpayer's ordinary income for such year.   Individuals and non-corporate taxpayers are permitted to carry unused capital losses forward to succeeding taxable years indefinitely until such losses are utilized.   Capital gains of corporate taxpayers are subject to the regular corporate tax rates, and corporations are permitted to apply capital losses only against capital gains and have a limited period to which such losses can be carried back or forward.

Notwithstanding the above, the Fund's sale or disposition of certain investments (or the sale of investments by a flow-through entity in which the Fund invests) could result in ordinary income in whole or in part, including (a) as a result of the "market discount" rules discussed above, (b) the sale of so-called "dealer" property (e.g., real estate considered to be held for sale to customers in the ordinary course of a trade or business), (c) the sale of loans that are not considered capital assets under Section 1221 of the Code, and (d) the sale of property that has depreciation recapture under Section 1245 or Section 1250 of the Code.   In addition, in the case of non-corporate taxpayers, gain attributable to the recapture of certain real estate depreciation deductions is subject to a 25% rate in lieu of the general 20% rate applicable to long term capital gains.

*Tax on Net Investment Income*.   In addition, individuals are required to pay a 3.8% Medicare surtax on the lesser of (i) their "net investment income" including interest, dividends, gains from the sale of securities, and other passive income, or (ii) the excess of their modified adjusted gross income for such taxable year over $200,000 ($250,000 in the case of joint filers).   A similar tax applies to estates and trusts, with certain modifications.   Prospective investors should consult their tax advisers regarding the effect, if any, of this tax on their ownership and disposition of interests in the Fund.

*REIT Subsidiary*.   The General Partner is permitted, but not required, to cause the Fund to establish a subsidiary taxable as a real estate investment trust ("REIT") for United States federal income tax purposes.

To qualify for taxation as a REIT, the REIT Subsidiary (as defined above) would have to satisfy certain requirements, including requirements relating to ownership of shares in the REIT Subsidiary, gross income tests, and asset ownership tests.   Under the share ownership test, the REIT Subsidiary must have at least 100 shareholders, and five or fewer individuals cannot own more than 50% by value of the REIT Subsidiary's stock (applying constructive ownership rules).   Under the gross income test, at least 75% of the REIT's gross income each year must be derived from enumerated real estate sources (including qualifying rents from real property, interest on debt secured by real property, and gains from the sale of interests in non-dealer real property).   Moreover, at least 95% of the REIT's gross income must be from specified passive sources, including from sources satisfying the 75% test.   Under the asset test, at least 75% of the REIT's assets (measured quarterly) must be interests in real property, mortgages on real property, and certain other qualified investments.   A REIT is also subject to concentration limits on certain investments that are not real estate assets.

If the REIT Subsidiary qualifies as a REIT, then the REIT Subsidiary would be entitled to a deduction for dividends paid to its shareholders.   This substantially eliminates the "double taxation" that generally results from the use of corporations.   However, the REIT Subsidiary would nonetheless be subject to a 100% excise tax if it sells "dealer property," which is property held primarily for sale to

customers in the ordinary course of a trade or business.  There can be no assurance that the REIT Subsidiary would not be subject to this tax.

As long as the REIT Subsidiary qualifies as a REIT, distributions to the Fund out of the current and accumulated earnings and profits of the REIT Subsidiary, and not designated as capital gains dividends, would be taken into account by Taxable U.S. Investors as ordinary dividends, and corporate Taxable U.S. Investors would not be entitled to a dividends received deduction on such amounts. Distributions and undistributed amounts designated as capital gain dividends would be taxed as long-term capital gains up to the REIT Subsidiary's net capital gain for the year.  Distributions in excess of earnings and profits would first be applied to reduce the Fund's tax basis in its REIT shares (but not below zero), and then would be treated as capital gain.

If the REIT Subsidiary fails to qualify as a REIT and certain relief provisions do not apply, the REIT Subsidiary would be subject to tax on its taxable income at regular corporate rates, which could substantially reduce the anticipated returns to investors.

The taxation of a REIT is complex and the above is only a general summary of certain of the applicable rules and requirements.  Investors should consult their tax advisors.

*Passive Loss and At-Risk Limitations*.  Under the "passive activity loss" rules set forth in the Code, non-corporate taxpayers and certain corporations are generally able to claim losses from passive activities only (i) to the extent of any current income generated by passive activities, or (ii) when certain dispositions of the investment generating the passive loss occur.  It is possible the Fund will generate passive activity losses.  Accordingly, a taxpayer subject to the passive loss rules could not use such losses to offset such taxpayer's active business income, compensation income, and portfolio income (e.g., interest, dividends, and royalties not derived in the ordinary course of a trade or business, and capital gains from portfolio investments).  Income and gain of the Fund not treated as passive activity income generally will be treated as portfolio income, and a Limited Partner generally will not be able to use passive activity losses to offset such portfolio income from the Fund.

Under the "at-risk" rules set forth in the Code, losses from business and income-producing activities are generally limited to the amount a non-corporate taxpayer or closely held, corporate taxpayer has at-risk in such investment.  Generally, the amount at-risk is a Limited Partner's allocable share of capital invested in such investment and such Limited Partner's share of recourse debt for which the Limited Partner is liable.  Amounts representing nonrecourse financing of an investment are generally not considered to be at-risk, with an exception for certain nonrecourse financing borrowed to hold real estate. Losses that cannot be claimed under the "at-risk" rules are generally deferred and carried forward by a taxpayer until such taxpayer has income from the investment that generated such loss.

*Expense Limitations*.  In the case of Limited Partners that are individuals, the ability to utilize certain specific items of deduction attributable to the investment activities of the Fund (as opposed to its activities that represent a trade or business for U.S. federal income tax purposes) may be limited, among other things, under the investment interest limitation in Code Section 163(d) and the 2% floor on miscellaneous itemized deductions (including investment expenses) in Code Section 67.  Moreover, an individual whose adjusted gross income exceeds a threshold amount is required to reduce the amount allowable for itemized deductions by 3% of the excess over the threshold (but not to exceed 80% of the amount of the itemized deductions).

The extent to which any of the foregoing provisions of the Code will be applicable will depend upon the nature of the Fund's future operations and the tax situations of each of the taxable Limited Partners.

*Organization and Syndication Expenses*.  Expenses paid in connection with the organization and syndication of a partnership must be capitalized.  Up to $5,000 of the expenses of organizing (but not syndicating) a partnership may be deducted in the year in which the partnership begins business (except to the extent that the total organization expenses exceed $50,000) and any remaining organization

expenses may be amortized for tax purposes over a period of 180 months (beginning with the month in which the partnership begins business). If the Service were successful in challenging the Fund's treatment of any expenditures as organization expenditures or in reclassifying expenditures as syndication expenditures, any amortization or other deductions with respect to such expenditures would be disallowed and the taxable income of the Fund would be increased.

*Sale or Transfer of Fund Interests*

Upon a sale of a Limited Partner's interest in the Fund, a Limited Partner will recognize gain or loss equal to the difference between (a) the proceeds of such sale plus such Limited Partner's share of the Fund's non-recourse liabilities and (b) such Limited Partner's tax basis in its Fund interest. Such gain or loss recognized on a sale of Fund interests by a Limited Partner who does not hold such interests as a "dealer" and who has held such interests for more than 12 months, will generally be long-term capital gain or loss, as the case may be, except that the portion of the selling Limited Partner's gain allocable to (or amount realized, in excess of basis, attributable to) "inventory items" and "unrealized receivables" of the Fund as defined in Code Section 751 will be treated as ordinary income. A Limited Partner will begin a new holding period in a portion of its interest in the Fund on each date a cash capital contribution is made.

*Liquidation of the Fund*

Upon liquidation of the Fund, its property will be distributed in kind or sold and any gain or loss on any such sales will be allocated in accordance with the Partnership Agreement.

In the event of the liquidation of the Fund, each taxable Limited Partner will recognize gain to the extent that the cash and marketable securities received in the liquidation exceed his adjusted basis for Fund interest. See "*Sale or Transfer of Fund Interests*" above.

Upon liquidation, a loss would be recognized only in the event that the Limited Partner receives only cash, "unrealized receivables" or "inventory items" and then only if (and to the extent that) the Limited Partner's adjusted basis for his Fund interest exceeds the sum of money distributed and his share of the adjusted basis for unrealized receivables and inventory items. During the year of liquidation, each Limited Partner may be allocated income from the operations of the Fund.

*Taxation of U.S. Tax-Exempt Limited Partners*

*Unrelated Business Taxable Income.* Under Code Section 501(a), U.S. tax-exempt entities are generally exempt from U.S. federal income tax. U.S. tax-exempt entities otherwise exempt from U.S. federal income taxation may, however, be subject to tax on UBTI if income is derived from either (a) an "unrelated trade or business" carried on by the Fund (directly or through a flow-through entity in which the Fund invests) or (b) "debt-financed" property owned by the Fund or a flow-through entity in which the Fund invests. For each tax-exempt investor, the unrelated business income tax generally only applies to UBTI in excess of $1,000 for any taxable year.

*Unrelated Trade or Business.* The first category of UBTI is income derived from an unrelated trade or business. To constitute an unrelated trade or business, an activity must be regularly carried on by a tax-exempt organization (or by a partnership, such as the Fund, or limited liability company in which the tax-exempt investor is a partner or member) and not substantially related to the organization's tax-exempt purposes. UBTI can arise from incidental business activities such as the receipt of fee income or the sale of property held typically for sale. However, income may qualify for one of several exclusions from UBTI so long as it is not attributable to debt-financed property.

Income excludable from UBTI includes: (a) dividends and interest, (b) amounts received as consideration for entering into agreements to make loans, (c) qualified rents from real property, (d) qualified rents from personal property leased in connection with real property (provided that the amount of rent attributable to the personal property does not exceed 10% of the total rent received under

27

the lease) and (e) gains or losses from the sale, exchange or other disposition of property (except for property that is determined to be inventory or property held primarily for sale to customers in the ordinary course of the trade or business). The exclusion from UBTI for rents from real property is not applicable if (a) more than 10% of the total rents received or accrued under the lease of space in the property is attributable to personal property, (b) the determination of the amount of rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage of receipts or sales) or (c) services are rendered to the occupant primarily for its convenience or are in addition to those customarily rendered in connection with the rental of space for occupancy only.

If the Fund (or a flow-through entity in which the Fund invests) is at any time determined to be holding one or more of its assets primarily for sale to customers in the ordinary course of business ("dealer property") or if one or more of its assets constituted property of a kind which would properly be includible in inventory if on hand at the end of the year ("inventory property"), any gain or loss realized upon the sale or exchange of those assets would generally be treated as UBTI to the U.S. Tax-Exempt Limited Partners of the Fund. Moreover, the Fund may generate UBTI if it receives (directly or indirectly) business income or certain fee income that does not fall within one of the exclusions set forth above.

*Debt-Financed Property*. Notwithstanding the foregoing exclusions, UBTI generally includes income derived from property to the extent that there is "acquisition indebtedness" with respect to the property. Acquisition indebtedness is the unpaid amount of any indebtedness incurred directly or indirectly to acquire or improve the property, including (a) indebtedness incurred in acquiring or improving property, (b) indebtedness incurred before the acquisition or improvement of property if such indebtedness would not have been incurred but for the acquisition or improvement of the property and (c) indebtedness incurred after the acquisition or improvement of property if such indebtedness would not have been incurred but for such acquisition or improvement and such indebtedness was reasonably foreseeable at the time of the acquisition or improvement. During the period that acquisition indebtedness is outstanding, a pro rata share of the tax-exempt entity's income from the property will generally give rise to UBTI based on the ratio of the average outstanding principal balance of such debt to the average basis of the property during the applicable taxable year. If debt-financed property is sold or otherwise disposed of, there shall be included in computing UBTI an amount with respect to gain which is the same percentage of the total gain derived from such sale or other disposition as: (i) the highest acquisition indebtedness with respect to such property during the 12-month period preceding the date of disposition, is of (ii) the average of the adjusted basis of the property as of the first day during the taxable year that the property was held and the adjusted basis of the property as of the last day during the taxable year that the property was held.

In addition, if a U.S. Tax-Exempt Limited Partner incurs acquisition indebtedness in connection with its investment in the Fund, an investment in the Fund may give rise to UBTI.

The Fund (directly or through a flow-through entity in which the Fund invests) may incur "acquisition indebtedness" to finance its investments. In addition, the Fund may recognize other income includable as UBTI discussed above. Therefore, U.S. Tax-Exempt Limited Partners may realize UBTI as a result of their investment in the Fund.

*REIT Subsidiary*. As discussed above, the General Partner is permitted, but not required, to cause the Fund to form a REIT Subsidiary. In such case, amounts distributed by the REIT Subsidiary to the Fund generally would not constitute UBTI, assuming the shares in the REIT Subsidiary are not debt-financed. If the REIT Subsidiary is considered "pension held," however, then a portion of the dividends paid to a qualified pension trust may constitute UBTI if the pension trust owns (directly or indirectly) more than 10% of the interests in the REIT. A REIT is "pension held" if the closely held prohibition is avoided due to certain provisions relating to pension ownership, and if at least one qualified trust owns (directly or indirectly) more than 25% of the interests in the REIT, or if more than 50% of the interests in the REIT are owned (directly or indirectly) by such trusts who each own more than 10%.

CHICAGO/#2574756.8

**TAX-EXEMPT LIMITED PARTNERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF OWNING INTERESTS IN THE FUND.**

*Tax Information Reporting*

The Fund will furnish annually to each Limited Partner a report containing an IRS Form 1065, Schedule K-1 that indicates such Limited Partner's distributive share for such year of the Fund's taxable income or loss, and other tax items for use in the preparation of the Limited Partner's income tax return. The preparation and filing of the Limited Partner's income tax return, however, will be the responsibility of each Limited Partner and not of the Fund. Each Limited Partner will be required to treat Fund items on his, her or its tax return consistently with the treatment on the Fund's tax return. It is expected that annual tax information regarding the Investments will not be received in sufficient time to permit the Fund to incorporate such information into its annual tax information and distribute such information to Limited Partners prior to April 15 of each year. As a result, Limited Partners will likely be required to obtain extensions for filing federal, state and local income tax returns each year.

*Tax Shelter Registration*

Certain tax shelter reporting requirements apply to "reportable transactions," which include transactions having a potential for tax avoidance or evasion as determined under Treasury Regulations, including transactions specifically identified by the IRS as "listed transactions."

Although the Fund does not anticipate participating in any reportable transactions, it may directly or indirectly through an investment in a flow-through entity engage in a transaction which is a reportable transaction. If this occurs, the Fund (or anyone that is considered a "material advisor") may have to disclose the reportable transaction to the Internal Revenue Service and maintain a list of investors that participated in the reportable transaction. In addition, those Limited Partners that participated in the reportable transaction by reason of their investment in the Fund may have an obligation to disclose their participation in such a transaction by attaching a completed copy of Treasury Form 8886 to their federal income tax return and possibly filing such form with the IRS Office of Tax Shelter Analysis. Failure to properly disclose such information could result in the imposition of significant penalties. If the Fund is aware that it has engaged in a reportable transaction, the General Partner will provide notice to the investors. INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS WITH RESPECT TO THE ABOVE TAX SHELTER REPORTING REQUIREMENTS.

*Taxation of Non-U.S. Limited Partners*

The following is a discussion of selected U.S. federal income tax consequences of the ownership and disposition a Fund interest applicable to Non-U.S. Limited Partners in the Fund. The discussion is based on current law, and is for general information only. It addresses only selected, and not all, aspects of U.S. federal income taxation. A Non-U.S. Limited Partner should consult its tax adviser with respect to U.S. federal income tax consequences of a sale of its interests in the Fund.

As stated above, because the Fund will be classified as a partnership for U.S. federal income tax purposes, each of the Non-U.S. Limited Partner will be treated as though they directly earned their share of the income earned by the Fund.

*Taxation of ECI.* The U.S. federal income tax treatment of Non-U.S. Limited Partners of the Fund depends upon the activities of the Fund. If the Fund (directly or through a flow-through entity in which the Fund invests) is engaged in a U.S. trade or business, the Fund would be required to withhold and pay over to the U.S. tax authorities a percentage equal to the highest applicable U.S. tax rate of each Non-U.S. Limited Partner's share of the Fund's effectively connected income ("ECI"), and each Non-U.S. Limited Partner would be required to file U.S. tax returns and pay U.S. tax on its share of the Fund's ECI. In such a case, all or a portion of the gain on the disposition by a Non-U.S. Limited Partner of its Fund interest may be taxed as ECI to the extent such gain is attributable to assets of the Fund that generate ECI. In

addition, a Non-U.S. Limited Partner that is a non-U.S. corporation may also be subject to an additional branch profits tax of 30% on its share of the Fund's effectively connected earnings and profits, adjusted as provided by law (subject to possible reduction by an applicable tax treaty).

If the Fund (directly or through a flow-through entity in which the Fund invests) was regarded as engaged in a U.S. trade or business, Non-U.S. Limited Partners would be viewed as being engaged in a trade or business in the United States and as maintaining an office or other fixed place of business in the United States. Certain other income of a Non-U.S. Limited Partner that is unrelated to the Fund could thus be treated as ECI as a result of such Non-U.S. Limited Partner's investment in the Fund. Non-U.S. Limited Partners may in certain circumstances be deemed to have established a taxable presence or to be engaged in a trade or business in the states and localities in which the Fund's activities are conducted, thus becoming subject to tax return filing and tax payment obligations in such jurisdictions.

The amount of ECI that will be realized by Non-U.S. Limited Partners will depend on the nature of the Fund's operation and investments. ECI earned by the Fund is subject to withholding under Code Section 1446. Any amounts properly withheld under Code Section 1446 generally can be applied as a credit against the U.S. federal income tax liability of a Non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment. Under Code Section 1446, the Fund is required to make periodic installment payments to the IRS of withholding tax based on the amount of its Non-U.S. Limited Partners' allocable share of ECI. The applicable rate for calculating such withholding tax is the highest corporate or individual rate, whichever is applicable. A Non-U.S. Limited Partner will be required to file U.S. federal income tax returns with respect to its ECI, even if the Fund withholds taxes under Section 1446. In addition to filing an annual income tax return, Non-U.S. Limited Partners may be required to comply with certain reporting requirements under applicable Regulations.

Based on the contemplated investment activities described herein, it is likely that the Fund (or a flow-through entity in which the Fund invests) will be considered to be engaged in a "U.S. trade or business" for these purposes or to have received ECI from such a trade or business. **Prospective Non-U.S. Limited Partners should consult their tax advisors**.

*Taxation of Non-ECI*. If the Fund earns (directly or through a flow-through entity in which the Fund invests) certain types of periodic income from U.S. sources that is not ECI (such as dividends or interest to the extent such income is not ECI), each Non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income. This 30% tax is sometimes reduced or eliminated by income tax treaty, or, in the case of interest, under the portfolio interest exception, provided that proper certification is supplied when necessary and other requirements are met. This tax is collected through withholding by the Fund. With respect to income of the Fund that is not ECI, Non-U.S. Limited Partners who are not themselves engaged in a U.S. trade or business will not be subject to any U.S. tax with respect to gains from the sale of portfolio securities held for investment (except, as noted below, in cases where FIRPTA applies and subject to FATCA). However, a Non-U.S. Limited Partner who is an individual present in the United States for 183 or more days in the taxable year of the sale would be taxed by the United States on any such gain if either (a) such individual's tax home for U.S. federal income tax purposes is in the United States, or (b) the gain is attributable to an office or other fixed place of business maintained in the United States by such individual.

*FIRPTA*. The Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA"), imposes a tax on gain realized on disposition by a non-U.S. person of a USRPI by treating such gain as ECI, generally giving rise to the tax consequences described above. A USRPI held by a partnership is deemed to be owned proportionately by its partners. A partnership interest in certain circumstances can itself be deemed a USRPI for purposes of computing the withholding of proceeds from a sale of such interest. Subject to certain exceptions, if the Fund (or a flow-through entity in which the Fund invests) disposes of a USRPI, the Fund will be required to treat the gain recognized as ECI and withhold under Section 1446 (discussed above) with respect to Non-U.S. Limited Partners. Where a Non-U.S. Limited Partner's interest in the Fund itself is deemed to be a USRPI, and the Non-U.S. Limited Partner disposes of such interest, by sale or otherwise, the transferee of such interest would be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition. Any amounts so withheld

can be applied as a credit against the U.S. federal income tax liability of the Non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment. Non-U.S. Limited Partners may be required to comply with certain reporting requirements to the extent provided in Treasury regulations.

*Other Considerations.* Non-U.S. Limited Partners may also be required to file returns with and pay taxes to state or local taxing jurisdictions in the United States in connection with the holding or disposition of interest in the Fund. Each Non-U.S. Limited Partner is advised to consult its tax advisor regarding the tax effects of an investment in the Fund, including information return and reporting requirements, the possible applicability of tax treaties, potential tax liability that may be imposed by the country or other jurisdiction of which such investor is a citizen or in which such person resides or is otherwise located, and other U.S. and non-U.S. tax matters.

*FATCA*

In addition to the rules described above regarding the potential imposition of U.S. withholding taxes on payments to Non-U.S. Limited Partners, U.S. withholding taxes could also be imposed under Section 1471 through Section 1474 of the Code (referred to as "FATCA").

Under FATCA, a withholding tax of 30% applies to "withholdable payments" made to a "foreign financial institution" (an "FFI") unless the FFI enters into an agreement with the IRS (an "FFI Agreement"), complies with an applicable intergovernmental agreement, or an exception applies. Under an FFI agreement, a foreign financial institution is generally required, among other things, to gather information regarding its U.S. account holders, report information regarding such holders to the IRS, and withhold a 30% tax from certain payments to "recalcitrant" account holders or to FFIs that have not entered into an FFI Agreement with the IRS and are not otherwise exempt.

The term "withholdable payment" generally includes any payment (or allocation from a partnership, if no corresponding payment is made) of (i) U.S. source interest, dividends, royalties, and other fixed or determinable annual or periodical gains, profits, and income (FDAP income), and (ii) the gross proceeds from the disposition of stock, debt, or other property that can produce U.S.-source dividends or interest.

A FFI generally means any non-U.S. entity that (a) accepts deposits in the ordinary course of a banking or similar business, (b) holds financial assets for the benefit of one or more persons as a substantial portion of its business, or (c) is an investment entity, which includes an entity engaged primarily in the business of investing or trading in securities or partnership interests, or an entity that functions or holds itself out as a collective investment vehicle, a private equity fund, a hedge fund, a venture capital fund, a leveraged buyout fund, or a similar entity. The 30% withholding tax also generally applies to withholdable payments to a non-U.S. entity that is not an FFI, unless the entity provides certification as to the substantial U.S. owners of the entity.

FATCA withholding began on July 1, 2014 with respect to FDAP income (described above), and will begin on January 1, 2017 (for payments of gross proceeds described above). As a result, and subject to the foregoing effective dates, the Fund generally will be required to withhold 30% of withholdable payments received by the Fund that are distributable to an investor that is an FFI or other non-U.S. entity unless such investor complies with the applicable requirements under FATCA, an applicable IGA, or an exception applies.

Whether a non-U.S. entity is an FFI, and the requirements and conditions imposed on an entity that is an FFI under FATCA, may depend on or be modified by an IGA between the United States and the home country of such non-U.S. entity. Prospective investors should consult their tax advisors.

*Possible Legislative or Other Actions Affecting Tax Consequences*

Prospective Limited Partners should recognize that the present U.S. federal income tax treatment of an investment in the Fund may be modified by legislative, judicial or administrative action at any time

and that any such action may affect investments and commitments previously made.  The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the Service and the Treasury, resulting in revisions of regulations and revised interpretations of established concepts as well as statutory changes.  Revisions in U.S. federal tax laws and interpretations of these laws could adversely affect the tax consequences of an investment in the Fund.

## State and Local Tax Consequences

Prospective investors should consider the state and local tax consequences of an investment in the Fund.  The Fund and/or the Limited Partners (including U.S. Tax-Exempt Limited Partners) may be subject to state and local taxes or filing requirements (including, potentially, withholding and estimated tax payment obligations) in various jurisdictions, including not only the states in which they are deemed to reside, but also the states in which the Fund may be deemed to be doing business.  Such taxes may include (but are not limited to) real property and income taxes.  Any tax paid to a particular state or local jurisdiction by the Fund on behalf of a Limited Partner as a result of a state or local withholding or estimated tax payment obligation will be treated as a distribution to such Limited Partner from the Fund.

## Investment Company and Investment Advisers Regulation

The Fund does not intend to register as an investment company under the U.S. Investment Company Act of 1940, as amended, and the General Partner does not intend to register as an investment adviser under the Advisers Act, unless it is required to do so.  The General Partner is currently an exempt reporting adviser with the SEC.  The General Partner's Form ADV is available at www.adviserinfo.sec.gov.

## Private Placement Status

The limited partner interests described herein are not registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or U.S. state securities laws and are being offered and sold in reliance upon the exemptions for transactions not involving a public offering.  As a purchaser of limited partner interests in a private placement not registered under the Securities Act, each investor will be required to make certain representations to the Fund, including that it is acquiring such interests for investment, and not with a view to resale or distribution, and that it is an accredited investor, as defined in Regulation D under the Securities Act.  Further, each investor must be prepared to bear the economic risk of the investment for an indefinite period, since these interests cannot be sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  It is extremely unlikely that the limited partner interests will ever be registered under the Securities Act or any state securities act.

During the course of the offering and before sale, each prospective investor of limited partner interests and its investor representatives, if any, are invited to ask questions of the General Partner concerning the terms and conditions of the offering and to obtain any additional information necessary to verify the accuracy of the information furnished in this Memorandum, to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense.  See "Additional Information."

## Restrictions on Transfer

Generally, limited partner interests will not be assignable or transferable without the prior written consent of the General Partner.  One of the requisites to such consent may be an opinion of the Fund's counsel that such a transfer would not subject the Fund or the General Partner to any regulatory or tax requirements or result in the violation of any applicable law or governmental regulation, the cost of which the transferor and transferee may be required to bear.

# *V.   Additional Information*

Before the consummation of the offering, the Fund or the General Partner will provide to each prospective investor and such investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this offering and to obtain any additional information that the Fund or General Partner may possess or can obtain without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished in this Memorandum.  No person other than the Fund and the General Partner has been authorized to give information or to make any representations concerning the Fund or this offering outside of this Memorandum, and if given or made, such other information or representations must not be relied upon as having been authorized by the Fund.

This Memorandum is intended to present a general outline of the policies and structure of the Fund and the General Partner.   Each prospective Limited Partner should thoroughly review the Partnership Agreement, which specifies the rights and obligations of the Partners, and the subscription agreement, which contains various representations each prospective investor must make, and details certain conditions to a prospective investor's participation in the offering.  The Summary of Principal Terms of certain provisions of the Partnership Agreement contained herein is necessarily incomplete and is qualified in its entirety by reference to the Partnership Agreement.   Copies of the Partnership Agreement and the subscription agreement are attached hereto as Appendix A and  Appendix B, respectively, and copies also are available upon request to the General Partner.

CHICAGO/#2574756.8

**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**T2 ASSET OPPORTUNITY FUND IV, LP**

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS .................................................................................... 1

     1.1      Definitions ................................................................................... 1

ARTICLE II      ORGANIZATION ............................................................................... 9

     2.1      Continuation ................................................................................ 9

     2.2      Name .......................................................................................... 9

     2.3      Purpose ...................................................................................... 9

     2.4      Place of Business ....................................................................... 9

ARTICLE III      CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ................................ 10

     3.1      Capital Commitment ................................................................. 10

     3.2      Capital Accounts; Allocations ................................................. 10

     3.3      Distributions in Kind ............................................................... 11

     3.4      Determinations ......................................................................... 12

     3.5      Reinvestment Rights ................................................................ 12

     3.6      Alternative Investment Vehicles ............................................. 13

ARTICLE IV      DISTRIBUTIONS .............................................................................. 14

     4.1      Distribution Policy ................................................................... 14

     4.2      Distribution of Short-Term Investment Income ...................... 15

     4.3      Distributions of Investment Proceeds ..................................... 15

     4.4      Distributions to the General Partner For Anticipated Taxes .... 15

     4.5      Distributions in Excess of Basis .............................................. 16

     4.6      Return of Distributions ............................................................ 16

ARTICLE V      MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES .................... 17

     5.1      Management Fee ....................................................................... 17

     5.2      Organizational Expenses ......................................................... 17

ARTICLE VI      GENERAL PARTNER ........................................................................ 18

     6.1      Authority .................................................................................. 18

     6.2      Indebtedness ............................................................................ 18

     6.3      Investment Period ..................................................................... 18

     6.4      Limitation on Investments ....................................................... 19

     6.5      UBTI; ECI ................................................................................ 19

     6.6      Plan Asset Regulations ............................................................ 19

     6.7      Ordinary Operating Expenses .................................................. 19

**TABLE OF CONTENTS**

(continued)

Page

| | | |
|---|---|---|
| 6.8 | Conflicts of Interest | 19 |
| 6.9 | No Transfer of General Partnership Interest; No Withdrawal or Loans | 19 |
| 6.10 | No Liability to Partnership or Partners | 20 |
| 6.11 | Indemnification of General Partner | 20 |
| 6.12 | Formation of New Fund | 21 |
| 6.13 | [Reserved] | 21 |
| 6.14 | Other Interests | 21 |
| 6.15 | Co-Investment | 22 |
| ARTICLE VII | LIMITED PARTNERS | 22 |
| 7.1 | Limited Liability | 22 |
| 7.2 | Transfer of Limited Partnership Interests | 22 |
| 7.3 | No Withdrawal or Loans | 24 |
| 7.4 | No Termination | 24 |
| 7.5 | Additional Limited Partners | 24 |
| 7.6 | Government Regulation | 25 |
| 7.7 | Reimbursement for Payments on Behalf of a Partner | 29 |
| 7.8 | §754 Election | 30 |
| 7.9 | Written Consent | 30 |
| 7.10 | Bank Holding Company Act of 1956 | 30 |
| 7.11 | Confidential Information | 31 |
| ARTICLE VIII | DURATION AND DISSOLUTION | 32 |
| 8.1 | Duration | 32 |
| 8.2 | Early Termination | 32 |
| 8.3 | Removal of the General Partner | 33 |
| 8.4 | Liquidation of the Partnership | 34 |
| 8.5 | General Partner Give Back | 35 |
| ARTICLE IX | VALUATION OF PARTNERSHIP ASSETS | 36 |
| 9.1 | Normal Valuation | 36 |
| 9.2 | Restrictions on Transfer or Blockage | 36 |
| 9.3 | Write-down to Value | 36 |
| 9.4 | Adjustments Required by GAAP Accounting | 36 |
| ARTICLE X | BOOKS OF ACCOUNTS; MEETINGS | 36 |

**TABLE OF CONTENTS**

(continued)

<strong>Page</strong>

| | | | |
|---|---|---|---|
| 10.1 | Books | | 36 |
| 10.2 | Fiscal Year | | 36 |
| 10.3 | Reports | | 37 |
| 10.4 | Allocations | | 38 |
| 10.5 | Custody of Securities | | 38 |
| 10.6 | [Reserved] | | 38 |
| 10.7 | Tax Matters Partner | | 38 |
| 10.8 | Code §83 Safe Harbor Election | | 38 |
| ARTICLE XI | CERTIFICATE OF LIMITED PARTNERSHIP; POWER OF ATTORNEY | | 39 |
| 11.1 | Certificate of Partnership | | 39 |
| 11.2 | Power of Attorney | | 39 |
| ARTICLE XII | MISCELLANEOUS | | 40 |
| 12.1 | Amendments | | 40 |
| 12.2 | Limited Partners Default on Capital Commitment | | 42 |
| 12.3 | Successors | | 46 |
| 12.4 | Governing Law; Severability | | 46 |
| 12.5 | Notices | | 46 |
| 12.6 | Legal Counsel | | 46 |
| 12.7 | Miscellaneous | | 47 |
| 12.8 | Parallel Funds | | 48 |
| 12.9 | Insurance | | 48 |
| 12.10 | Side Letters | | 48 |
| 12.11 | No Third Party Beneficiaries | | 48 |

Schedule I      Schedule of Commitments (maintained by the General Partner with the books and records of the Partnership)

CHICAGO/#2577231.7

**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**T2 ASSET OPPORTUNITY FUND IV, LP**

This **AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP** dated as of December 1, 2014, is among T2 Asset Opportunity Fund IV GP, LLC, a Delaware limited liability company (the "General Partner"), and the Limited Partners (as defined herein).  The General Partner and the Limited Partners are collectively referred to herein as the "Partners."

**WHEREAS**, T2 Asset Opportunity Fund IV, LP (the "Partnership") was formed as a limited partnership under the Delaware Act (a) pursuant to a Certificate of Limited Partnership filed in the office of the Secretary of State of Delaware on October 15, 2014 and (b) by the Limited Partnership Agreement dated as of October 15, 2014 (the "Initial Agreement"), entered into by and between the General Partner, as general partner, and Jeff D. Brown, as the sole limited partner (the "Initial Limited Partner");

**WHEREAS**, the General Partner and the Initial Limited Partner desire to enter into this Amended and Restated Agreement of Limited Partnership (the "Agreement") in anticipation of the admission of additional limited partners and to amend and restate the Initial Agreement in its entirety as hereinafter set forth;

**WHEREAS**, the parties hereto desire to provide for the governance of the Partnership and to set forth in detail their respective rights and duties to the Partnership; and

**WHEREAS**, the Initial Limited Partner desires to withdraw as a limited partner of the Partnership upon the admission of one or more additional limited partners.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements made herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby wish to amend and restate the Initial Agreement and enter into this Agreement as follows:

**ARTICLE I**

**DEFINITIONS**

1.1    Definitions.   For purposes of this Agreement, the following terms shall have the meanings set forth below.  Additional defined terms are set forth in the subsequent sections of this Agreement.

"Active Partner" means a direct or indirect owner of the General Partner who is an active employee of the General Partner or its affiliates with respect to Partnership activities at the time of the event which requires that such Person's status as an Active Partner be determined.

"Additional Limited Partners" has the meaning set forth in Section 7.5.

"Additional Payment" has the meaning set forth in Section 7.5.

"Affiliate" of any Person means any other Person (excluding with respect to the General Partner and its affiliates, (i) any Investment and (ii) any investment of any fund or General Partner affiliate existing as of the Initial Closing Date and of any fund the formation of which is not prohibited by Section 6.12) controlling, controlled by or under common control with such Person.

"Agreement" means this Amended and Restated Agreement of Limited Partnership of T2 Asset Opportunity Fund IV, LP, as amended, supplemented, waived or otherwise modified from time to time in accordance with its terms.

"Allocable Share" means the fraction, but in no event greater than one, obtained by dividing (i) the Partnership's aggregate Investment Contributions invested in all Realized Investments by (ii) the Partnership's aggregate Investment Contributions invested in investments in all of the Partnership's existing and former Investments.

"Alternative Investment Vehicle" means any alternative investment vehicle used for making investments outside of the Partnership on a parallel basis with or in lieu of the Partnership.

"Applicable Law" has the meaning set forth in Section 7.6(a).

"Applicable Rate" means, at any time, a variable rate per annum equal to the rate of interest published, from time to time, in the Midwest Edition of The Wall Street Journal as the "prime rate" at large United States money center banks.

"Approved Executive Officer" shall mean each of Jeff D. Brown and John W. Southard (so long as each such Person is active in the Partnership's affairs), and any person recommended by the General Partner in writing and approved as an Approved Executive Officer by at least two-thirds of the Required Interests (so long as such Person is active in the Partnership's affairs).

"BHCA" means the U.S. Bank Holding Company Act of 1956, as amended (including any modifications made pursuant to the U.S. Gramm-Leach-Bliley Act), and other similar banking legislation, and the rules and regulations promulgated thereunder.

"BHCA Interest" means, as of the date of any determination, that portion of the Capital Commitment or Capital Contributions of a BHCA Limited Partner that exceeds 4.99% (or if modified by the BHCA without regard to Section 4(k) of the BHCA, such modified percentage) of total Capital Commitments or Capital Contributions, respectively, of the Limited Partners (other than BHCA Interests and any other Limited Partner interests, if any, that are non-voting interests) that are not Defaulting Partners.  Each BHCA Limited Partner and any affiliate of such BHCA Limited Partner that itself is a BHCA Limited Partner shall be considered a single BHCA Limited Partner for purposes of determining "BHCA Interest."

"BHCA Limited Partner" means, as of the date of any determination, (i) each Limited Partner that (A) is subject to the BHCA and (B) has notified the General Partner in writing of such status at any time prior to such determination (other than a Limited Partner that is investing under Section 4(k) thereof and has delivered a written notice to the General Partner so stating prior to or at the time of its investment) and (ii) any transferee of such Limited Partner but, with respect to such transferee, only to the extent that the portion of its Capital Commitment or Capital Contribution acquired from such Limited Partner was a BHCA Interest at the time of such acquisition.

"Benefit Plan Investor" means (i) an employee benefit plan subject to the provisions of Part 4 of Subtitle B of Title I of ERISA, (ii) an individual retirement account, annuity or other "plan" subject to Code §4975 or (iii) an entity the assets of which are deemed to be plan assets of an employee benefit plan or an individual retirement account or annuity under the Plan Asset Regulations, in each case which has notified the General Partner in writing of such status at any time prior to any determination hereunder.

2

"Business Day" means any day on which commercial banks are open for business in Chicago, Illinois.

"Capital Account" has the meaning set forth in Section 3.2(a).

"Capital Account Value" means, with respect to each Partner, the amount that would be distributed to such Partner by the Partnership if, on the date as of which such determination is being made, each investment owned by the Partnership had been sold at its "value" (determined in accordance with Article X) and the Partnership had been liquidated in accordance with Section 8.4.

"Capital Call Notice" has the meaning set forth in Section 3.1(a).

"Capital Commitment" with respect to any Partner, means the aggregate amount of cash that such Partner has agreed to contribute to the Partnership (excluding any Additional Payments paid pursuant to Section 7.5) as set forth in Schedule I hereto as the same may be modified from time to time under the terms of this Agreement.

"Capital Contribution" with respect to any Partner, means, subject to Sections 3.1(c) and 3.1(d), the amount of cash received by the Partnership from such Partner pursuant to its Capital Commitment (excluding any Additional Payments paid pursuant to Section 7.5).

"Carried Interest" means (i) the General Partner's right to receive distributions pursuant to Sections 4.3(d), 4.3(e)(ii) and advances with respect thereto pursuant to Section 4.4 and obligation to return such distributions and (ii) allocations of items of Partnership income, gain, loss or deduction related thereto.

"Cause Event" has the meaning set forth in Section 8.2(d).

"Certificate" has the meaning set forth in Section 11.1.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Confidential Information" means (i) all information, materials and data relating to any Partnership Entity or any Partner that are not generally known to or available for use by the public (including this Agreement, information and materials relating to products or services, pricing structures (including historical or projected pricing, cost, sales and profitability of each product or service offered), accounting and business methods, financial data (including historical performance data, investment returns, valuations, financial statements or other information concerning historical or projected financial condition, results of operations or cash flows), inventions, devices, new developments, methods and processes, prospective investments, customers, clients and investors, customer, client and investor lists, copyrightable works and all technology, trade secrets and other proprietary information), (ii) all information, materials and data the disclosure of which the General Partner in good faith believes is not in the best interests of any Partnership Entity or any Partner and (iii) all other information, materials and data, if any, which any Partnership Entity or any Partner is required by law or agreement to keep confidential.

"Confidential Memorandum" means that certain Confidential Private Placement Memorandum for the Private Placement of Limited Partnership Interests of T2 Asset Opportunity Fund IV, LP, dated March 2015, and as thereafter amended or supplemented.

"Continuing Investment Approval" has the meaning set forth in Section 8.2(a).

"Conversion" has the meaning set forth in Section 8.3(b).

"Cost Contributions" mean (i) Capital Contributions (other than Investment Contributions) that are used to pay an expense of the Partnership (including Organizational Expenses and Partnership Expenses); provided that upon the liquidation of the Partnership, any Capital Contribution that is not an Investment Contribution shall be a Cost Contribution.  To the extent a Partner made a Cost Contribution to fund Management Fees which were subsequently reimbursed to such Partner under Section 5.1(b), such Partner's Cost Contribution shall be deemed reduced by the amount of such reimbursement.

"Current Income" means all interest, dividend, fee and similar income received by the Partnership from investments held by the Partnership (other than Short-Term Investment Income).

"Defaulted Amounts" has the meaning set forth in Section 12.2(a).

"Defaulting Partner" has the meaning set forth in Section 12.2(a).

"Delaware Act" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

"Designated Account" means an account designated by a Lender into which all Capital Contributions, when called, are to be directly deposited by the Partners.

"Disclosure Recipient" means, with respect to any Limited Partner, such Person's Affiliates, directors, officers, employees, representatives, agents, investors or attorneys.

"ECI" means (i) income which is "effectively connected with the conduct of a trade or business within the United States" for purposes of Code §§871(b)(1), 875 and 882(a)(1), and (ii) gains that are treated as income described in clause (i) of this definition under §897 of the Code.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, the related provisions of the Code, and the respective rules and regulations promulgated thereunder, in each case as amended from time to time, and judicial rulings and interpretations thereof.

"Excluded Limited Partner" means any Management Person that is also a Limited Partner.

"Extension Notice" has the meaning set forth in Section 8.1.

"Final Closing Date" means the date which is the 12 month anniversary of the Initial Closing Date, subject to the General Partner's ability to close earlier in its sole discretion.  The General Partner in its sole discretion may extend the Final Closing Date by up to three months.

"Flagship Fund" means T2 Opportunity Fund IV, LP, a Delaware limited partnership managed by T2 Capital Management IV, LLC, which is an affiliate of the General Partner.  The Partnership is a Parallel Fund (as defined below) to the Flagship Fund.

"Frozen Carried Interest" has the meaning set forth in Section 8.3(b).

"GAAP" means U.S. generally accepted accounting principles, consistently applied.

"General Partner Affiliates" has the meaning set forth in Section 7.6(a)(ii).

"GP Indemnitees" has the meaning set forth in Section 8.3(d).

"GP Removal Date" has the meaning set forth in Section 8.3(b).

"GP Removal Notice" has the meaning set forth in Section 8.3(a).

"Initial Agreement" has the meaning set forth in the preamble.

"Initial Closing Date" means the date on which investors are first admitted to the Partnership as Limited Partners pursuant to this Agreement, which is anticipated to occur in first quarter of 2015.

"Initial Limited Partner" has the meaning set forth in the preamble.

"Investment" means any investment made by the Partnership (including, without limitation, follow-on investments), but excluding Short-Term Investments.  For the avoidance of doubt, Investments may include but are not limited to: senior debt (secured by first mortgages on the related property), mezzanine debt (secured by junior mortgages on a property or properties or equity interests in the entities owning a property or properties), preferred equity investments or hybrid investments in entities that own the related property.

"Investment Advisers Act" means the U.S. Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Investment Company Act" means the U.S. Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Investment Contributions" means all Subscription Facility Contributions and any other Capital Contributions that are used to make an Investment or, as determined by the General Partner, to pay expenses incurred in direct connection with the making, maintaining or disposing of such Investment. Subscription Facility Contributions shall be considered to be made in connection with the Investment that was funded by the associated Subscription Facility, as determined by the General Partner in its sole discretion.

"Investment Period" has the meaning set forth in Section 6.3.

"Investment Proceeds" means all cash, securities and other property received by the Partnership in respect of any Investment or portion thereof, and any proceeds thereof (excluding any portion thereof that constitute the Investment except to the extent that they are distributed to the Partners in kind), net of any expenses or taxes imposed on the Partnership in connection with such receipt, including Current Income and but not including Short-Term Investment proceeds.

"IRS Notice" has the meaning set forth in Section 10.8(a).

"Lender" means the administrative agent, servicer and each lender under a Subscription Facility, together with their respective participants, successors and assigns.

"Liability" has the meaning set forth in Section 4.6(b).

"Limited Partner Interests" has the meaning set forth in Section 3.4.

"Limited Partner Regulatory Problem" has the meaning set forth in Section 7.6(b).

"Limited Partners" means the Persons listed on Schedule I hereto in their capacity as limited partners of the Partnership (including each Person admitted to the Partnership in accordance with

5

<u>Section 7.5</u>) and each Person who is admitted to the Partnership as a substitute limited partner pursuant to <u>Section 7.2</u> or <u>7.6</u>, so long as each such Person continues to be a limited partner of the Partnership hereunder.

"<u>Management Fee</u>" has the meaning set forth in <u>Section 5.1(a)</u>.

"<u>Management Persons</u>" means the General Partner, its Affiliates and each of their respective managers, officers and employees, and direct and indirect partners, members, shareholders, in their capacity as such.

"<u>Net Benefit</u>" means, as of any date of determination, the amount, if any, by which (i) the aggregate amount or value of all distributions made to the Partners pursuant to <u>Section 4.3</u> on or prior to such date and not returned pursuant to <u>Section 4.6</u> <u>exceeds</u> (ii) the aggregate amount of all Capital Contributions made by the Partners on or prior to such date.

"<u>Non-Marketable Securities</u>" means securities that are neither listed on a recognized securities exchange nor actively traded in the over-the-counter market or, if so listed or traded, are either held subject to a restriction or agreement adversely affecting their marketability or transferability or where the size of the Partnership's holdings compared to the trading volume would adversely affect their marketability.

"<u>Non-U.S. Partner</u>" means, with respect to any determination hereunder, any Limited Partner that is not (or any Limited Partner that is a flow-through entity for U.S. federal income tax purposes that has a partner or member that is not) a United States Person.

"<u>Opinion of Limited Partner's Counsel</u>" means a written opinion of any counsel selected by a Limited Partner, which counsel and form and substance of opinion is reasonably acceptable to the General Partner.

"<u>Opinion of the Partnership's Counsel</u>" means an opinion of Vedder Price P.C. or other counsel selected by the General Partner, which other counsel and form and substance of opinion is reasonably acceptable to the Limited Partner (or Limited Partners holding a majority of the Required Interests) directly affected by such opinion.

"<u>Organizational Expenses</u>" means all expenses (including, without limitation, travel, printing, legal and accounting fees and expenses) incurred in connection with or, as determined by the General Partner in good faith, reasonably allocable to the organization and funding of the Partnership, a Parallel Fund, an Alternative Investment Vehicle, the General Partner and its general partner.

"<u>Parallel Funds</u>" has the meaning set forth in <u>Section 12.8</u>.

"<u>Partner Interest</u>" means any determination to be made under this Agreement based on a specified proportion of the "Partner Interest" shall be based upon the Partners' respective Capital Contributions.

"<u>Partnership</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Partnership Entities</u>" means, collectively, the Partnership, the General Partner and each of their respective affiliates, each general partner, manager or other control Person of any of the foregoing Persons and each existing or prospective Investment.

"Partnership Expenses" means all costs, expenses, liabilities and obligations relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by an Investment), including (i) all costs and expenses attributable to acquiring, holding, monitoring and disposing of the Partnership's investments (including interest on money borrowed by the Partnership, registration expenses and brokerage, finders', custodial and other fees), (ii) legal, accounting, auditing, consulting and other fees and expenses (including expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and Schedule K-1s), (iii) extraordinary expenses of the Partnership (including litigation costs and expenses and indemnification costs and expenses permitted by the terms of this Agreement, judgments and settlements), (iv) all out-of-pocket fees and expenses incurred by the Partnership or any Management Person relating to investment and disposition opportunities for the Partnership not consummated (including legal, accounting, consulting and other fees and expenses, financing commitment fees, real estate title and appraisal costs, environmental audits, and printing), and (v) the Management Fee, but not including Organizational Expenses.

"Partnership Group" means (i) the Partnership and (ii) any Alternative Investment Vehicle.

"Payment Default" has the meaning set forth in Section 12.2(a).

"Pending Investments" has the meaning set forth in Section 8.2(a).

"Person" means any individual, partnership, corporation, joint venture, trust, association or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Plan Asset Regulations" means U.S. Department of Labor rules and regulations, including 29 C.F.R. §2510.3-101 *et seq*, as amended by Section 3(42) of ERISA, that address the applicability of ERISA to entities in which employee benefit plans directly or indirectly invest.

"Preferred Return" means, with respect to each Partner, *the excess*, if any, of (i) the aggregate amount of distributions required to cause the internal rate of return from the Initial Closing Date through the date of determination on the aggregate Capital Contributions made to fund Realized Investments on or prior to the date of determination, and taking into account all prior distributions on Realized Investments, to equal 8.0% per annum, over (ii) the aggregate Capital Contributions made on or prior to the date of determination to fund Realized Investments. For purposes of calculations of Preferred Return pursuant to this paragraph, (x) each Capital Contribution shall be treated as having been made on the date such Capital Contribution was required to be paid to the Partnership (as set forth in the applicable Capital Call Notice) and (y) distributions made shall be given effect as of the date made.

"Realized Investments" means the portion of each Investment that has been disposed of or completely written off for federal income tax purposes by the Partnership.

"Regulated Partner" has the meaning set forth in Section 7.6(b).

"Regulatory Sale" has the meaning set forth in Section 7.6(f).

"Regulatory Solution" has the meaning set forth in Section 7.6(e).

"Reimbursing Partner" has the meaning set forth in Section 7.7.

"Required Interests" has the meaning set forth in Section 3.4.

"Reusable Amounts" has the meaning set forth in Section 3.5.

"Short-Term Investment Income" means  income earned on Short-Term Investments, including any gains and net of any losses from dispositions of Short-Term Investments, and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means (i) evidences of indebtedness issued or unconditionally guaranteed by the United States, or issued by any agency or instrumentality, thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition by the Partnership, (ii) certificates of deposit or acceptances, with a maturity of one year or less from the date of acquisition by the Partnership, of any financial institution that is a member of the Federal Reserve System and has combined capital and surplus and undivided profits of not less than $250,000,000, (iii) commercial paper, with a maturity of 1 year or less from the date of acquisition by the Partnership, issued by a corporation organized under the laws of any state of the United States or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Services and at least P-1 by Moody's Investors Service, Inc., (iv) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency or instrumentality thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition by the Partnership, and (v) money market funds and mutual funds, the assets of which are solely invested in items described in clauses (i) through (iv) of this definition.

"Special Limited Partner" has the meaning set forth in Section 8.3(b).

"Subscription Facility" means a credit facility under which the Partnership is an obligor and that is secured by, among other things, the unfunded or unutilized Capital Commitments of the Partners.

"Subscription Facility Contribution" means any Capital Contribution made for the purpose of paying principal, interest or other amounts payable to a Lender under a Subscription Facility.

"Tax Amount" means, with respect to a fiscal year and with respect to the General Partner, an amount equal to the anticipated taxes with respect to the Partnership income allocated to such Partner in respect of its Carried Interest for such fiscal year.  All calculations of anticipated taxes pursuant to this definition shall assume that (i) such Partner is subject to the highest applicable marginal U.S. federal, state and local tax rates to which any of the General Partner's individual (i.e., human being) partners or former partners is subject, taking into account the deductibility of U.S. state and local taxes, subject to any applicable limitations on deductibility, and the character of any income, gains, deductions, losses or credits, (ii) for purposes of determining the tax benefit of a deduction, loss or credit, the General Partner's only income, gains, losses, deductions and credits for such fiscal year and each prior fiscal year are income, gains, deductions, losses and credits attributable to its ownership interest in the Partnership with respect to its Carried Interest, (iii) with respect to any distribution of investments in kind received by such Partner, such investments are sold in a taxable transaction immediately after their receipt by such Partner for an amount equal to their value determined for purposes of Section 3.3(a), and (iv) any Partnership losses allocated to such Partner in prior periods but not previously utilized as an offset against income or gains pursuant to this paragraph are available for offset against income and gains (to the extent permitted by applicable tax law) with respect to such fiscal year.

"Tax Exempt Partner" means, with respect to any determination hereunder, any Limited Partner that is (or any Limited Partner that is a flow-through entity for U.S. federal income tax purposes that has a partner or member that is) exempt from U.S. federal income taxation under Code §501(a).

8

"Transfer" has the meaning set forth in Section 7.2(a).

"UBTI" means Partnership income that is treated as unrelated business taxable income as defined in §512 and §514 of the Code.

"United States" or "U.S." means the United States of America, its territories and possessions, any State of the United States of America and the District of Columbia.

"United States Person" means a "United States person" as defined in Code §7701(a)(30).

"Unpaid Preferred Return" means, with respect to each Partner, as the date of any determination, the excess, if any, of (i) such Partner's Preferred Return, over (ii) the aggregate amount of all distributions made to such Partner pursuant to Sections 4.3(c), 4.3(d)(i), and 4.3(e)(i).

"Unrealized Loss" means, as of any date of determination, the excess, if any, of (i) the aggregate amount of Investment Contributions used to fund all investments held by the Partnership that are not Realized Investments over (ii) the aggregate value of such investments as determined under Section 9.1.

## ARTICLE II

## ORGANIZATION

2.1    Continuation.

(a)    The Initial Limited Partner and the General Partner hereby amend and restate the Initial Agreement by deleting the Initial Agreement in its entirety and replacing it with this Agreement. The Partners hereby agree to continue the limited partnership (the "Partnership") pursuant to and in accordance with the Delaware Act.  The term of the Partnership commenced upon the filing of the Certificate with the Secretary of State of Delaware (the date of such filing is referred to herein as the date of "formation" of the Partnership) and shall continue until dissolution of the Partnership in accordance with the provisions of Article VIII hereof.

(b)    Upon the admission of the first additional Limited Partner to the Partnership, (i) the Initial Limited Partner hereby simultaneously withdraws as a limited partner of the Partnership, and none of the Partners shall have any claim against the Initial Limited Partner as such, and (ii) the Initial Limited Partner shall receive a return of any capital contributions made by it to the Partnership and have no further right, interest or obligation of any kind whatsoever as a Partner of the Partnership.

2.2    Name.  The name of the Partnership will be "T2 Asset Opportunity Fund IV, LP" or such other name or names as the General Partner may from time to time designate upon written notice to the Limited Partners.

2.3    Purpose.   The Partnership is organized for the object and purpose of investing in securities or other assets of the kind or nature described in the Confidential Memorandum as thereafter amended or supplemented prior to the date hereof, managing, supervising and disposing such investments, and engaging in such activities incidental or ancillary thereto as the General Partner deems necessary or advisable.

2.4    Place of Business.  The General Partner will maintain its principal office in Wheaton, Illinois, or at such other place or places as the General Partner may from time to time designate.

# ARTICLE III

## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1     <u>Capital Commitment</u>.

(a)     Subject to <u>Sections 3.1(c)</u>, <u>7.6</u> and <u>12.2</u>, each Partner shall make contributions to the capital of the Partnership pro rata, based upon the Partners' respective Capital Commitments, in an aggregate amount not greater than its Capital Commitment by contributing installments in cash when and as called by the General Partner upon at least 10 days' prior written notice (a "<u>Capital Call Notice</u>"). Each cash Capital Contribution to the Partnership shall be made by wire transfer of immediately available funds to a bank account designated by the General Partner, or during the duration of a Subscription Facility, to a Designated Account.

(b)     Notwithstanding the provisions of <u>Section 3.1(a)</u> above, each Partner's obligation to fund its Capital Commitment will expire at the end of the Investment Period; <u>provided</u> that the Partners shall remain obligated to make Capital Contributions throughout the duration of the Partnership (or longer as set forth in <u>Section 4.6</u>) pursuant to their respective Capital Commitments to the extent necessary to (i) fund follow-on Investments, (ii) fund Subscription Facility Contributions, (iii) fulfill commitments to invest in companies evidenced in writing as of such date, (iv) to complete investments in transactions that were in process as of such date that are funded within 6 months following such date and (v) pay Partnership Expenses and other obligations of the Partnership, including obligations pursuant to <u>Section 4.6</u>.  Notwithstanding anything in this Agreement to the contrary, a Partner's obligation to make Subscription Facility Contributions shall be without defense, counterclaim or setoff of any kind.

(c)     The General Partner may cause the Partnership to return to the Partners all or any portion of any Capital Contribution to the Partnership which is not invested in an Investment or used to pay Partnership Expenses or Organizational Expenses.  Each such return of Capital Contributions shall be returned to all Partners in proportion to the cash Capital Contribution made by each such Partner and such returned Capital Contributions may be called again by the General Partner according to the provisions of this <u>Section 3.1</u> as if such returned Capital Contribution had not been previously called and funded.

(d)     Distributions to a Partner (regardless of the source or character thereof other than distributions to the General Partner with respect to its Carried Interest) pursuant to <u>Section 4.2</u> or <u>Section 4.3</u> may, at the General Partner's sole discretion, be treated for purposes of this <u>Section 3.1</u> as Capital Contributions returned to such Partner pursuant to the provisions of <u>Section 3.1(c)</u> to the extent such Partner has made Cost Contributions, and any such amounts so treated as returned may be called again by the General Partner according to the provisions of this <u>Section 3.1</u> as if such amounts had not been previously called and funded.

3.2     <u>Capital Accounts; Allocations</u>.

(a)     The Partnership shall maintain a separate capital account for each Partner (each, a "<u>Capital Account</u>") according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv).  For this purpose, the Partnership may, upon the occurrence of any of the events specified in U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)(g) to reflect a revaluation of Partnership property.

(b)     Items of Partnership income, gain, loss, expense or deduction (determined according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv) for any fiscal period shall

be allocated among the Partners in such manner that, as of the end of such fiscal period and to the greatest extent possible, the Capital Account of each Partner shall be equal to the respective net amount, positive or negative, that would be distributed to such Partner from the Partnership or for which such Partner would be liable to the Partnership under this Agreement, determined as if, on the last day of such fiscal period, the Partnership were to (a) liquidate the assets of the Partnership for an amount equal to their book value (determined according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)) and (b) distribute the proceeds in liquidation in accordance with Section 8.4; provided, that the Management Fee shall be allocated among the Limited Partners in accordance with the amount calculated for each Limited Partner under Section 5.1.  Notwithstanding the foregoing and prior to making allocations under the preceding sentence, the provisions of the U.S. Department of Treasury Regulations promulgated under Code §704(b) relating to qualified income offset, minimum gain chargeback, minimum gain chargeback with respect to partner nonrecourse debt, allocations of nonrecourse deductions, allocations with respect to partner nonrecourse debt, and limitations on allocations of losses relating to a partner's adjusted capital account deficit are hereby incorporated by reference and shall be applied in such manner determined by the General Partner to the allocation of income, gain, loss and deduction in the manner provided in such regulations.

      3.3    <u>Distributions in Kind</u>.

      (a)    If any securities are to be distributed in kind to the Partners as provided in Article IV, (i) such securities will first be written up or down to their value (as determined, pursuant to Article IX, as of the date of such distribution), (ii) any investment gain or investment loss resulting from the application of clause (i) shall be allocated to the Partners' respective Capital Accounts in accordance with Section 3.2(b), (iii) such security shall be deemed to have been sold at the value determined pursuant to clause (i) and the proceeds of such sale distributed pursuant to Article IV and (iv) the value of any distributed securities (as determined pursuant to clause (i)) shall be debited against the Partners' respective Capital Accounts upon a distribution of such securities.

      (b)    In connection with any distribution of securities in kind, the General Partner may, in its sole discretion, offer to all Partners the right to receive at their election all or any portion of such distribution in the form of the net proceeds actually received by the Partnership, on behalf of such Partners, from a disposition of such securities that otherwise would have been distributed to such Partners in kind; provided that in the event the Partnership disposes of securities on behalf of a Partner, neither the Partnership nor the General Partner, notwithstanding anything contained herein to the contrary, shall have any liability whatsoever to such Partner or the Partnership with respect to such disposition (including without limitation with respect to the timing of such disposition) other than for willful malfeasance; and provided further that the distribution to any or all of the Limited Partners of the net proceeds of Investments or other securities that otherwise could have been distributed to such Partners in kind, whether at the election of such Limited Partners or otherwise, shall not affect the right of the General Partner or any other Partner to receive its portion of such distribution in kind.  Notwithstanding any provision contained in this Agreement to the contrary, any (i) expenses (including commissions and underwriting costs) of such disposition and (ii) gain or loss recognized by the Partnership upon the disposition of such securities (including any increase or decrease in the value of such securities from the value of such securities (as determined in accordance with Article IX and Section 3.3(a)) had no election to receive proceeds of a disposition of such securities been made and such securities been distributed to all Partners in accordance with Section 3.3(a)) shall be allocated equitably only among those Partners receiving proceeds instead of securities in kind, and any gain or loss created under Section 3.3(a) with respect to securities distributed in kind shall be allocated equitably only among those Partners receiving such securities in kind.  Upon receipt from a Limited Partner of an opinion of counsel (which opinion and counsel shall be reasonably acceptable to the General Partner) to the effect that there is a material likelihood that a distribution of particular securities to such Limited Partner would cause such Limited

Partner to be in violation of an applicable law, including ERISA, the General Partner shall not distribute such securities to such Limited Partner and shall use reasonable efforts to dispose of such securities and distribute the net proceeds to such Limited Partner in accordance with the other provisions of this Section 3.3(b).  The General Partner will provide each Benefit Plan Investor 10 days' prior written notice before the Partnership makes an in-kind distribution to the Partners.

(c)     Except as set forth in Section 3.3(b), to the extent feasible, each distribution of securities (other than pursuant to Section 7.6) shall be apportioned among the Partners in proportion to their respective interests in the proposed distribution, except to the extent a disproportionate distribution of such securities is necessary to avoid distributing fractional shares.

(d)     Each Limited Partner covenants and agrees that, without the prior written consent of the General Partner, it will not use any information it obtains with respect to a distribution or proposed distribution by the Partnership of securities in kind to effect, at any time prior to the actual date and time of such distribution, purchases or sales of or other transactions involving, or contracts for the purchase or sale of or other transactions involving, securities of the same class or series as those distributed, securities convertible into or exchangeable for such securities, or derivatives of any of the foregoing securities.

(e)     The Partnership will retain sole dominion and control over all securities of Investments thereof (including any securities sold in accordance with Section 3.3(b)) owned by the Partnership until such time as such investments are sold or distributed by or at the direction of the Partnership, with sole discretion over voting and disposition, including determining when to sell such securities.  For all purposes under this Agreement (including calculations of distributions and Capital Accounts, but not including allocations of taxable income) other than this Section 3.3, any Limited Partner electing to receive proceeds pursuant to Section 3.3(b) nonetheless shall be treated as if such Partner had received a distribution of securities in kind in accordance with Section 3.3(a) contemporaneously with the other Partners.

3.4     Determinations.

(a)     Any determination to be made under this Agreement or the Delaware Act based upon a majority or other specified proportion or percentage of the "Capital Commitments" and any other vote hereunder or under the Delaware Act involving the Limited Partners shall disregard any consent, approval or vote with respect to (i) except as set forth in Section 12.1, any Limited Partner Interest held by a Defaulting Partner, (ii) any interest held by a Management Person and (iii) any other interests that are not entitled to vote on a particular matter pursuant to the terms of this Agreement, including pursuant to Section 7.10.  Such proportion or percentage shall be expressed as a fraction, based on Capital Commitments and shall be calculated by excluding from both the numerator and the denominator the aggregate of all interests described in clauses (i) through (iii) above.  Any determination to be made based upon a specified proportion of the "Limited Partner Interests" shall be based upon the applicable Person's Capital Commitments.  "Required Interests" means the Limited Partner Interests, excluding the interests described in clauses (i) through (iii) above.  Except for the consent rights of specified groups of Limited Partners specifically set forth herein, the Limited Partners shall be deemed to constitute a single class or group for purposes of all voting and consent rights provided for herein or under the Delaware Act.

(b)     The Preferred Return for each Partner shall be determined whenever allocations to the Partners' Capital Accounts are made pursuant to Section 3.2(b) or distributions are made pursuant to Section 4.3 or more frequently as deemed appropriate by the General Partner in its sole discretion.

3.5     Reinvestment Rights.

12

The Partnership may in the sole discretion of the General Partner and subject to Section 6.3, make an Investment using Investment Proceeds received by the Partnership during the Investment Period from the liquidation, sale or debt refinancing of, or otherwise with respect to, all or a portion of any Investment to the extent such proceeds represent a return of Capital Contributions (as opposed to profit, as determined by the General Partner in its sole discretion) ("Reusable Amounts").  Reusable Amounts may instead be reinvested by any Alternative Investment Vehicle in accordance with the terms of the governing documents of any such entity, and amounts available for reinvestment by any Alternative Investment Vehicle may instead be reinvested by the Partnership in accordance with the terms hereof. Any Reusable Amounts so retained under this Section 3.5 shall be deemed to have been distributed to the Partners and subsequently re-contributed by the Partners for the purposes for which they were retained, but shall not be treated as increasing or reducing a Limited Partner's Capital Commitment (or funded portion thereof) to the Partnership.

      3.6    Alternative Investment Vehicles.

If the General Partner determines in good faith that, for legal, tax or regulatory reasons, some or all of the Partners should participate in a potential Investment through an alternative investment structure, the General Partner shall be permitted to structure the making of all or any portion of such Investment outside of the Partnership by requiring any such Partner or Partners, as determined by the General Partner in good faith, to make such Investment indirectly through an Alternative Investment Vehicle.  The General Partner shall use its reasonable best efforts to ensure that the Alternative Investment Vehicle's assets will not constitute "plan assets" under ERISA.  The Partners required to join such an Alternative Investment Vehicle shall be required to make Capital Contributions directly to each such Alternative Investment Vehicle, to the same extent, for the same purposes and on the same terms and conditions as Partners are required to make Capital Contributions to the Partnership, and such Capital Contributions shall reduce the Capital Commitment of the Partners required to join such an Alternative Investment Vehicle to the same extent as if Capital Contributions were made to the Partnership with respect thereto. The General Partner may execute organizational documents of any such Alternative Investment Vehicle on behalf of the Partners so required as contemplated pursuant to the power of attorney contained in Section 11.1 of this Agreement.  Each Partner shall have the same economic interest (on a pre-tax basis) in all material respects in Investments made pursuant to this Section 3.6 as such Partner would have if such Investment had been made solely by the Partnership, and the other terms of any such Alternative Investment Vehicle shall be substantially identical in all material respects to those of the Partnership, except for differences required for legal, tax, regulatory or liquidation reasons.   Such Alternative Investment Vehicle (or the entity in which such Alternative Investment Vehicle invests) shall provide for the limited liability of the Limited Partners that is no less favorable than that provided for under Delaware law as a matter of the organizational documents of such Alternative Investment Vehicle (or the entity in which such Alternative Investment Vehicle invests) and as a matter of local law.  The General Partner or an Affiliate thereof will serve as the general partner (or equivalent thereof) with respect to such Alternative Investment Vehicle.   Subject to applicable legal, tax and regulatory considerations, any Alternative Investment Vehicle shall terminate upon the termination of the Partnership.    The determination of the allocations and distributions pursuant to Articles III and IV and the General Partner Give Back under Section 8.5 shall be calculated by treating investments made by any Alternative Investment Vehicles as having been made by the Partnership.  During the duration of a Subscription Facility, and notwithstanding the fact that an Alternative Investment Vehicle may not be an obligor thereunder, all Capital Contributions made to an Alternative Investment Vehicle pursuant to this Section 3.6 shall be made to a Designated Account.

CHICAGO/#2577231.7

# ARTICLE IV

## DISTRIBUTIONS

4.1     <u>Distribution Policy</u>.

(a)     The General Partner shall make distributions of cash, property and securities from time to time as described in this <u>Section 4.1</u> and in the manner described in <u>Sections 4.2</u> and <u>4.3</u>. Subject to the provisions of this <u>Section 4.1</u>, the General Partner shall distribute cash received by the Partnership constituting Current Income and Short-Term Investment Income at least quarterly, and shall distribute the net cash proceeds from disposition of Investments (including, if applicable, the portion which represents the original cost of such Investment) as promptly as reasonably practicable following receipt thereof.  Notwithstanding the foregoing, the General Partner shall use its reasonable best efforts to distribute net cash proceeds from disposition of Investments within 30 days following receipt of such funds by the Partnership.  Notwithstanding the foregoing and anything else to the contrary contained herein, all distributions of Partnership assets (including Current Income, Short-Term Investment Income and net cash proceeds from disposition of Investments) will be subject to the availability of cash after setting aside appropriate reserves for anticipated or contingent obligations, liabilities and commitments of the Partnership as reasonably determined by the General Partner, including, without limitation, any such obligations, liabilities or commitments arising in connection with a Subscription Facility.  Except as set forth in <u>Section 3.1(d)</u> and <u>Section 3.5</u>, net cash proceeds from the sale of Investments shall not be reinvested by the Partnership in Investments.  Notwithstanding anything in this Agreement to the contrary, the General Partner may deem, at its sole election, all or any portion of net cash proceeds, Short-Term Investment Income or Current Income as having been distributed to the Partners and simultaneously returned pursuant to <u>Section 3.1</u> to the Partnership as Capital Contributions pursuant to the Partners' Capital Commitment, but only to the extent that the General Partner could have made capital calls for such Capital Contributions pursuant to <u>Section 3.1</u>.  In addition, for purposes of <u>Section 4.3</u>, the General Partner may elect to distribute Current Income from an Investment that is not a Realized Investment in the same manner as if such Investment were a Realized Investment.

(b)     Prior to the winding-up and liquidation of the Partnership, and except as otherwise permitted under <u>Section 7.6</u>, in-kind distributions will include only (A) securities which are listed or quoted on a United States national securities exchange or quoted on a United States national automated inter-dealer quotation system and which the General Partner reasonably believes are (x) not subject to any "hold-back" or "lock-up" agreement, (y) eligible for sale by the distributee under Rule 144 of the Securities Act of 1933, as amended, (in making such determination, the General Partner may assume, whether or not true, that the distributee is not an affiliate of the issuer of such securities and that there are no facts or circumstances particular to the distributee that are not applicable to the distributees generally that otherwise impose a legal restriction on such distributee resulting in such securities being ineligible for immediate sale) and (z) eligible for sale by the Partnership under Rule 144(k) of the Securities Act of 1933, as amended, (assuming the Partnership is not an affiliate of the issuer of such securities) and (B) Non-Marketable Securities which the General Partner, in its sole discretion, believes will promptly be converted into, exchanged for or otherwise become cash or marketable securities.

(c)     Notwithstanding anything in this Agreement to the contrary, the General Partner may at any time elect to defer distribution of all or any portion of any cash distribution that otherwise would be made to it on account of its Carried Interest.  Any amount that is not distributed to the General Partner due to the preceding sentence, in the General Partner's sole discretion, either shall be retained by the Partnership on the General Partner's behalf or distributed to the Partners (other than to the General Partner with respect to its Carried Interest) pursuant to <u>Section 4.3</u>.  If an amount is not distributed to the General Partner pursuant to this <u>Section 4.1(c)</u>, then the General Partner in its sole discretion may elect to

receive all or any portion of any subsequent cash distributions (or if the General Partner elects in its sole discretion, solely those made out of profits) until the General Partner has received the same aggregate amount of cash distributions it would have received had it not elected to defer such distributions pursuant to the first sentence of this Section 4.1(c).

(d)     Notwithstanding anything to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, shall not be required to make a distribution to any Partner on account of its interest in the Partnership to the extent such distribution would violate the Delaware Act or other applicable law or the terms of any Subscription Facility.

4.2     Distribution of Short-Term Investment Income.  Short-Term Investment Income shall be distributed among the Partners (other than Defaulting Partners) ratably in proportion to their respective interests in the assets generating such Short-Term Investment Income, as determined by the General Partner.

4.3     Distributions of Investment Proceeds.  Subject to prior repayment of any Subscription Facility or other indebtedness of the Partnership, and subject to Sections 3.5, 7.7, and 12.2, Investment Proceeds from any Investment shall be initially apportioned among the Partners participating in such Investment pro rata in accordance with their Investment Contributions made to fund such Investment. Amounts so apportioned to the General Partner shall be distributed to the General Partner, and amounts so apportioned to each Limited Partner shall be distributed to such Limited Partner (other than a Defaulting Partner) and the General Partner as follows:

(a)     First, 100% to such Limited Partner until such Partner has received distributions pursuant to this Section 4.3(a) equal to the sum of (i) such Partner's aggregate Investment Contributions made with respect to Realized Investments and (ii) such Partner's pro rata share (based on the Partners' respective Capital Commitments) of the Unrealized Loss;

(b)     Second, thereafter, 100% to such Limited Partner until such Partner has received distributions pursuant to this Section 4.3(b) equal to the aggregate amount of Allocable Share of such Partner's Cost Contributions;

(c)     Third, thereafter, 100% to such Limited Partner until the Unpaid Preferred Return of such Limited Partner is reduced to zero;

(d)     Fourth, 100% to the General Partner, until the General Partner has received cumulative distributions under this Section 4.3(d)(ii) with respect to such Limited Partner equal to 40% of all distributions made to such Limited Partner pursuant to Section 4.3(c) and made or being made to such Limited Partner and the General Partner pursuant to Section 4.3(d)(i) and (ii); and

(e)     Fifth, (i) 60% to such Limited Partner and (ii) 40% to the General Partner.

4.4     Distributions to the General Partner For Anticipated Taxes.  Notwithstanding the priorities set forth in Section 4.3, the General Partner shall have the authority to cause the Partnership to make distributions pursuant to this Section 4.4 to the General Partner (subject to Section 7.7) based on the excess, for such Partner, of such Partner's anticipated Tax Amount in respect of its Carried Interest for such fiscal year, over the amount of distributions previously made to such Partner pursuant to Article IV with respect to such fiscal year.  Such distributions shall be treated for all purposes hereof, other than this Section 4.4, as advances of distributions pursuant to Section 4.2 or the appropriate paragraph of Section 4.3 (as reasonably determined by the General Partner), and thus shall reduce dollar for dollar the amount of future distributions to such Partner pursuant to Section 4.2 or the appropriate paragraph of

Section 4.3.  For purposes of applying this Section 4.4, the General Partner's Carried Interest and its interest attributable to its Capital Commitment shall be treated as interests held by different Partners.

4.5     Distributions in Excess of Basis.  In the event that the General Partner otherwise would receive a cash distribution hereunder pursuant to Section 4.3 or otherwise (other than in connection with the liquidation and winding up of the Partnership) in excess of its U.S. federal income tax basis in its interest in the Partnership, if elected by the General Partner, the amount of such distribution shall not be distributed to the General Partner until such time, if any, as such distribution would not be in excess of the General Partner's tax basis in its interest in the Partnership.

4.6     Return of Distributions.

(a)     If the Partnership incurs any Liability, the General Partner may in its sole discretion call previously uncalled Capital Commitments pursuant to Section 3.1 (notwithstanding anything to the contrary in Section 3.1(b)) (in such case, which uncalled amounts shall be funded by the Partners within 10 days after the date of any notice in the form of a Capital Call Notice or other written request by the General Partner), but in no event shall any Partner be required to contribute amounts pursuant to this Section 4.6 after the date 18 months after the Partnership's termination except to fund a Liability or Liabilities of which the General Partner has delivered to the Partners on or prior to such date written notice of such Liability or Liabilities.

(b)     For purposes of this Section 4.6, "Liability" means any liability or obligation that the Partnership would be required by this Agreement or otherwise to pay if it had adequate funds, including (i) the expenses of investigating, defending or handling any pending or threatened litigation or claim arising out of the Partnership's activities, investments or business, (ii) the amount of any judgment or settlement arising out of such litigation or claim, and (iii) the Partnership's obligation to indemnify any Partner or other Person pursuant to Section 6.11 or otherwise.

(c)     Any amounts contributed by a Partner pursuant to Section 4.6(a)(ii) shall be credited to such Partner's Capital Account but shall not constitute a Capital Contribution hereunder.  For purposes of Sections 4.3 and 8.5, without duplication, such contributions by a Partner shall be treated as reductions of the applicable distribution amounts received by such Partner.  Any debit pursuant to Section 3.2(a) on account of a Liability shall be allocated to the Partners' Capital Accounts after crediting the contributions required by this Section 4.6 to the Partners' Capital Accounts.

(d)     A Partner's obligation to make contributions to the Partnership under this Section 4.6 shall survive the dissolution, liquidation, winding up and termination of the Partnership, subject to any limitations on survival expressed elsewhere in this Section 4.6, and for purposes of this Section 4.6, the Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 4.6, including instituting a lawsuit to collect any contribution with interest from the date such contribution was required to be paid under Section 4.6(a) calculated at a rate equal to the Applicable Rate plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

(e)     The rights and remedies contained in this Section 4.6 shall be exercisable only by the General Partner for the benefit of the Partnership and the General Partner, and nothing in this Section 4.6 is intended to or shall provide any Person that is not a party hereto with any rights or remedies with respect to or under this Agreement.

16

# ARTICLE V

## MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES

5.1     <u>Management Fee</u>.

(a)     <u>General</u>.  As compensation for managing the affairs of the Partnership, the Partnership shall pay the General Partner a fee (the "<u>Management Fee</u>") in the amounts set forth below, payable in arrears on a monthly basis during the period commencing on the Initial Closing Date and ending on Partnership's last day of the monthly period after the <u>earliest to occur</u> of (x) the dissolution of the Partnership pursuant to Article VIII and (y) unless the General Partner receives Continuing Investment Approval, the date 6 months after a Cause Event.  If the first day that the Management Fee is payable is not for a full calendar month, the Management Fee shall be prorated on a daily basis according to the actual number of days in such period.

(b)     During the Investment Period, the monthly Management Fee shall equal 1/12 of 1.5% of the aggregate Capital Commitments.  To the extent the Partnership does not fully call the Partners' Capital Commitments on or prior to the expiration of the Investment Period, the General Partner shall return to the Partnership, without interest, the portion of the Management Fees assessed against such uncalled Capital Commitments.  Thereafter, the Partnership shall refund such amounts to the Limited Partners pro rata in proportion to which such Management Fees were assessed against such Partners.

(c)     From and after the expiration of the Investment Period, the monthly Management Fee shall equal 1/12 of 1.5% of the Partnership's aggregate Investment Contributions, excluding any Investment Contributions made to fund Realized Investments.

(d)     Notwithstanding <u>Section 5.1(b)</u> and <u>Section 5.1(c)</u> above, the Management Fee otherwise assessed against a Limited Partner shall be reduced: (i) by 25 basis points per annum, if such Limited Partner makes a Capital Commitment in an amount at least equal to $3 million (regardless of when such Capital Commitment is made), and (ii) by 25 basis points per annum, if such Limited Partner makes its Capital Commitment during the first 3 months following the Initial Closing Date (regardless of the amount of such Capital Commitment).  For the avoidance of doubt, a Limited Partner that makes the minimum Capital Commitment described in clause (i) and also makes such commitment within the time period set forth in clause (ii) shall be entitled to a reduction of 50 basis points per annum.  In addition, the General Partner in its sole discretion may otherwise reduce or waive its Management Fee for Management Persons or for other Limited Partners at the discretion of the General Partner.

(e)     100% of any amount treated for U.S. federal income tax purposes as an item of expense in respect of the Management Fee shall be allocated to the Limited Partners ratably in accordance with their respective Capital Commitments, as adjusted for a Partner to the extent the Management Fee is reduced (including by operation of <u>Section 5.1(d)</u>) or waived for such Partner.  Notwithstanding anything to the contrary in this Agreement, the benefit of any such reduction or waiver shall be specially allocated to such Partner(s) for all purposes of this Agreement, including <u>Section 4.3</u>.

5.2     <u>Organizational Expenses</u>.  The Partnership will reimburse the General Partner for up to $500,000 of Organizational Expenses.

CHICAGO/#2577231.7

# ARTICLE VI

# GENERAL PARTNER

6.1     <u>Authority</u>.

(a)     The management of the Partnership will be vested exclusively in the General Partner (acting directly or through its duly appointed agents), and the General Partner will have full control over the business, assets, conduct and affairs of the Partnership.  Subject to the terms of this Agreement, the General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objectives and purposes of the Partnership, and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, it deems necessary or advisable or incidental thereto, including the power to acquire and dispose of any investment (including marketable securities).

(b)     All matters concerning the following shall be reasonably determined in good faith by the General Partner, whose determination shall be final and conclusive as to all Partners absent manifest error:  (i) except to the extent otherwise expressly provided in this Agreement, the allocation and distribution of net profits, net losses, Investment Proceeds, Short-Term Investment Income, and the return of capital among the Partners, including taxes thereon, and valuations, and (ii) accounting procedures and determinations, estimates of the amount of Management Fees payable by any Defaulting Partner or Regulated Partner, tax determinations and elections, determinations as to on whose behalf expenses were incurred and the attribution of fees and expenses to Investments, and other determinations not specifically and expressly provided for by the terms of this Agreement.

(c)     Third parties dealing with the Partnership may rely conclusively upon the General Partner's certification that it is acting on behalf of the Partnership and that its acts are authorized.  The General Partner's execution of any agreement or document on behalf of the Partnership is sufficient to bind the Partnership for all purposes.

6.2     <u>Indebtedness</u>.  The General Partner may incur indebtedness on behalf of the Partnership and in connection therewith may pledge Partnership assets and the unfunded or uncalled Capital Commitments of the Partners as collateral for such indebtedness.  Partnership indebtedness may be secured by the Partnership's assets and the Partnership's right to call and receive, and the General Partner's right to call, each Partner's Capital Contributions.  The General Partner anticipates that the aggregate amount of indebtedness incurred by the Partnership and outstanding from time to time shall not exceed 50% of the Fund's net asset value (disregarding any outstanding amounts under a Subscription Facility) at the time of borrowing as determined by the General Partner in its sole discretion.  For purposes of the preceding sentence, "indebtedness incurred by the Partnership" shall not include indebtedness of entities in which an Investment is an equity interest.   Notwithstanding anything in this <u>Section 6.2</u> to the contrary, there is no limitation on indebtedness that the Partnership may incur in connection with repurchasing any Partnership interest from a Regulated Partner or a Defaulting Partner and any such indebtedness shall not be applied to the limitations on the amount of indebtedness set forth in this <u>Section 6.2</u>.

6.3     <u>Investment Period</u>.  The Partnership's investment period will commence on the Initial Closing Date and end on the date that is 18 months after the Final Closing Date or on such earlier date as determined by the General Partner ("<u>Investment Period</u>").  Following the end of the Investment Period, the Partnership will not make new Investments (other than Short-Term Investments) except to fund Pending Investments, then-existing commitments and follow-on Investments.

6.4     Limitation on Investments.

(a)     From and after the date the Partnership has received aggregate Capital Commitments in excess of $50,000,000, the Partnership shall not invest an amount that would exceed 15% of the aggregate Capital Commitments of the Partners (measured as of the date any such Investment is to be made) in any single Investment.  For the purposes of this <u>Section 6.4</u>, each loan in any portfolio of Investments not originated by the Partnership or a wholly-owned subsidiary of the Partnership shall be treated as a separate Investment.  For the avoidance of doubt, an investment in a wholly-owned subsidiary of the Partnership, or an entity jointly owned by the Partnership and one or more parallel investors, will not itself be considered an Investment subject to the restrictions in this <u>Section 6.4(a)</u>.

(b)     The Partnership will not make any Investments which, at the time of the Investment, are outside of the United States.

6.5     <u>UBTI; ECI</u>.  The Partnership may engage in transactions that will cause Tax Exempt Partners and Non-U.S. Partners to recognize UBTI or ECI, respectively, as a result of their investment in the Partnership.

6.6     <u>Plan Asset Regulations</u>.  The General Partner will use its reasonable best efforts to ensure that the Partnership's assets will not constitute "plan assets" under ERISA.

6.7     <u>Ordinary Operating Expenses</u>.  The General Partner shall pay (a) all ordinary overhead and administrative expenses of the Partnership incurred by the General Partner in connection with maintaining and operating their offices (including salaries, rent, travel, entertainment and equipment expenses), but excluding any Partnership Expenses and any Organizational Expenses reimbursable under <u>Section 5.2</u> and (b) Organizational Expenses to the extent not reimbursed under <u>Section 5.2</u>.

6.8     <u>Conflicts of Interest</u>.

(a)     Each Management Person of the General Partner shall devote so much of its time to the affairs of the Partnership as in its reasonable judgment the conduct of the Partnership's business shall reasonably require and each Management Person shall not be obligated to do or perform any act or thing in connection with the Partnership's business not expressly set forth herein.  Subject to the foregoing, but notwithstanding any other provisions to the contrary in this Agreement, each Management Person will be permitted to perform similar duties for any other entity.

(b)     Nothing herein contained shall be deemed to preclude a Management Person from engaging directly or indirectly in any other business or from directly or indirectly purchasing, selling or holding securities, options, separate accounts, investment contracts, currency, currency units or any other asset and any interests therein for their own accounts or for the account of any other Person, whether as investment adviser, dealer, broker or otherwise.  No Partner shall, by reason of being a Partner, have any right to participate in any manner in any profits or income earned or derived by or accruing to a Management Person from the conduct of any business other than the Partnership's business or from the conduct of any activities for any account other than that of the Partnership.

6.9     <u>No Transfer of General Partnership Interest; No Withdrawal or Loans</u>.  The General Partner will not sell, assign, pledge, mortgage or otherwise dispose of its general partner interest in the Partnership, will not withdraw from the Partnership prior to the dissolution of the Partnership and will not borrow or withdraw any amount from the Partnership, except as expressly permitted by this Agreement. Any such sale, assignment, pledge, mortgage or disposition in contravention of this <u>Section 6.9</u> shall be void.  The General Partner shall not permit an Approved Executive Officer (in each case, only for so long

19

as such person continues to be an Active Partner) to voluntarily transfer (other than to such Person's immediate family) more than 50% of such person's initial interest in the Carried Interest, and any such voluntary transfers may only be made (a) to the partners of the General Partner as of the date hereof, (b) to employees of the General Partner or any Affiliate thereof, (c) for charitable purposes, or (d) for estate planning or to Persons related to such transferor (including, without limitation, through marriage and/or adoption); provided that any Approved Executive Officer may transfer up to 75% of his interest in the Carried Interest to a trust, partnership, limited liability company or similar vehicle for the benefit of such Person or his immediate family (so long as such trust, partnership, limited liability company or similar vehicle continues to be for the benefit of such Person or such Person's immediate family). Notwithstanding any provision of this Agreement, including this Section 6.9, if the General Partner is regulated as a registered investment adviser under the Investment Advisers Act, the General Partner shall not engage in any "assignment" (within the meaning of the Investment Advisers Act) of its interest in the Partnership without the requisite consent required under the Investment Advisers Act; provided that the rights of the Limited Partners with respect to any breach of this sentence shall be limited to those set forth in the Investment Advisers Act.

6.10    No Liability to Partnership or Partners.    To the extent permitted by applicable law, neither the General Partner nor any of its direct or indirect owners, managers, members, partners, shareholders, directors, officers, employees (including any Approved Executive Officer), agents, advisors, representatives or contractors, nor any of their respective affiliates shall be liable to any Limited Partner or the Partnership for (i) any action taken or failure to act as General Partner, or on behalf of the General Partner, except to the extent of the General Partner's or such other person's gross negligence, willful malfeasance or willful breach of a material provision of this Agreement, (ii) any action or inaction arising from reliance upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants selected and retained by any of them in good faith or (iii) any action or inaction of any agent, contractor or consultant selected and retained by any of them in good faith.  This Section 6.10 shall not be deemed to limit the liability, if any, of an Approved Executive Officer for gross negligence or willful malfeasance by such Person in the course of the performance of his duties to the Partnership and the General Partner.

6.11    Indemnification of General Partner.    To the extent permitted by applicable law, the Partnership will indemnify the General Partner and, unless otherwise determined by the General Partner in its sole discretion, each of the General Partner's respective direct and indirect members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates (and their respective members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates) (each of the foregoing, an "Indemnified Party") against any claims, losses, liabilities, damages, costs or expenses (including attorney fees, judgments and expenses in connection therewith and amounts paid in defense and settlement thereof) to which any of such Persons may directly or indirectly become subject in connection with the Partnership, the General Partner or in connection with any involvement with an Investment (including serving as an officer, director, consultant or employee for any Investment) directly or indirectly on behalf of the Partnership, but only to the extent that such Person acted in good faith and (1) acted in a manner reasonably believed to be in the best interests of the Partnership or an Investment, (2) was neither grossly negligent nor engaged in willful malfeasance, (3) did not willfully breach a material provision of this Agreement and such breach was the direct proximate cause of the loss for which indemnification is being sought and (4) with respect to any criminal action, did not have reasonable cause at the time of such action to believe that his, her or its conduct was unlawful.  For purposes of Section 6.10 and this Section 6.11, no Indemnified Party shall, under any circumstances, be deemed grossly negligent for good-faith errors of judgment where such Person was acting in a manner which a reasonably prudent private equity fund manager would have reasonably believed to be in the best interest of the Partnership.  The Partnership may, in case of any Person indemnifiable under this Section 6.11, in the sole judgment of the General

20

Partner, pay the expenses of such Person in advance of the final disposition of any proceeding, so long as (i) with respect to any derivative action brought by any Limited Partner, the Person receiving the advance is not the subject of such derivative action, (ii) with respect to any direct action brought by Limited Partners holding at least a majority of the Required Interests, the Person receiving the advance is not the subject of such direct action, (iii) the General Partner has a good-faith belief such expenses are indemnifiable, and (iv) the General Partner receives a written undertaking by such Person to repay the full amount advanced if there is a final determination that such Person did not satisfy the standards set forth in clauses (1)-(4) immediately above or that such Person is not otherwise entitled to indemnification as provided herein. Each Indemnified Party shall use its reasonable efforts to seek indemnification from any available insurance obtained by the Partnership or any Investment for purposes of reducing the indemnification obligations of the Partnership under this Section 6.11; provided that if an Indemnified Party is entitled to indemnification hereunder and is also entitled to recovery under any such insurance policy with respect to such claim, the Indemnified Party shall not be required to incur costs and expenses prior to receipt of insurance proceeds but shall be entitled to indemnification hereunder and shall reimburse the Partnership to the extent it subsequently receives insurance proceeds in respect of the matter giving rise to such indemnification claim. Notwithstanding anything to the contrary in this Agreement, the Partnership may in the sole judgment of the General Partner pay any obligations or liabilities arising out of this Section 6.11 as a secondary indemnitor at any time prior to any primary indemnitor making any payments any such primary indemnitor owes, it being understood that any such payment by the Partnership shall not constitute a waiver of any right of contribution or subrogation to which the Partnership is entitled (including against any primary indemnitor) or relieve any other indemnitor from any indemnity obligations. Notwithstanding anything to the contrary in this Section 6.11, the Partnership shall not indemnify the General Partner or any of their respective partners or members against the costs of defending any litigation, including settlement costs with respect thereto, in connection with an internal dispute solely among such Persons.

6.12    Formation of New Fund. Each Partner's interest in the business endeavors of the other Partners is limited to his or its interest in the Partnership and no Partner's future business activities are restricted, except that the General Partner may not undertake any activity other than as permitted in the following sentences. Notwithstanding the foregoing, neither the General Partner nor any Approved Executive Officer (nor any of their respective Affiliates) will form or manage any pooled investment vehicle (other than the Partnership) with an investment objective substantially similar to that of the Partnership as set forth in Memorandum until the earlier of (i) the expiration of the Investment Period; or (ii) the date on which at least seventy-five percent (75%) of the aggregate Capital Commitments of the Partners have been invested or committed for investment in Investments, as determined by General Partner in its reasonable discretion. The sole remedy available to the Limited Partners for any violation of this Section 6.12 shall be to obtain injunctive relief and in no event shall any damages (monetary or otherwise) or other such relief be available. Notwithstanding the foregoing, the General Partner may establish Parallel Funds to invest substantially all of their assets in the Partnership or proportionately alongside the Partnership and on effectively the same terms as the Partnership. In addition, the General Partner may establish Alternative Investment Vehicles as described in Section 3.6.

6.13    [Reserved].

6.14    Other Interests. If a Limited Partner requests the General Partner to assist it in finding a purchaser for all or any portion of its interest in the Partnership, the General Partner and/or its designees, in the General Partner's sole discretion and without in any way limiting the provisions of Section 7.2, may elect to (a) purchase all or a portion of such interest, provided that such interest is not greater than $2 million, and/or (b) offer and sell all or a portion of such interest on behalf of the selling Limited Partner to one or more of the Limited Partners (but not necessarily all Limited Partners) and/or to one or more third parties who are not Limited Partners. To the extent that the General Partner acquires the

interest of a Defaulting Partner, a Regulated Partner or any other Limited Partner, the General Partner will (subject to Section 3.4) be deemed to be a Limited Partner with respect to such interest for all purposes of this Agreement; provided that the General Partner may elect in its sole discretion at any time to convert all or any portion of such interest into a general partner interest in the Partnership. No consent of any Limited Partner shall be required as a condition precedent to any such Transfer or any conversion from a limited partner interest to a general partner interest contemplated by this Section 6.15.

6.15    Co-Investment.  The General Partner may (but shall not be obligated to) permit one or more Limited Partners and their Affiliates and/or other Persons to make investments ("Co-Investments") in one or more Investment, without making such investment opportunities available to other Limited Partners.  The General Partner, in its sole discretion, shall allocate the available investment among the Partnership and the Persons, if any, who are co-investing.

## ARTICLE VII

## LIMITED PARTNERS

7.1    Limited Liability.  The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation to make contributions to the Partnership in excess of their respective Capital Commitments specified in Schedule I, except to the extent set forth in this Section 7.1 and Sections 3.1(d), 3.5, 4.6, 7.2(c), 7.5, 7.6, 7.7, 10.3(e), 10.8 and 12.2 hereof and the Delaware Act; provided that a Limited Partner shall be required to return any distribution made to it in error.  The Limited Partners (in their capacity as such) will take no part in the control, management, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

7.2    Transfer of Limited Partnership Interests.

(a)    Except as otherwise explicitly contemplated herein, a Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of (a "Transfer") all or any of its interest in the Partnership (including any transfer or assignment of all or a part of its interest to a Person who becomes an assignee of a beneficial interest in the Partnership even though not becoming a substitute Limited Partner) unless the General Partner has consented to such Transfer or assignment in writing, which consent shall not be unreasonably withheld with regard to an assignment by a Limited Partner of its entire beneficial interest to any one Person if all of the following conditions are satisfied as reasonably determined by the General Partner:  (1) such assignee constitutes only one beneficial owner of the Partnership's securities for purposes of the Investment Company Act and only one partner of the Partnership within the meaning of U.S. Department of Treasury Reg. §1.7704-1(h), (2) such assignee is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act and a "qualified client" within the meaning of the rules and regulations promulgated under the Investment Advisers Act, (3) such assignment does not cause the General Partner, any of its affiliates, the Partnership or any of the Limited Partners to be subjected to (or materially increase its obligation with respect to) any regulations or reporting requirements that the General Partner reasonably believes to be significant or burdensome or to any tax obligation, (4) the assignee in the General Partner's judgment has the financial ability to hold the Limited Partner interest and perform in a timely manner all of its obligations as a Limited Partner under this Agreement, and (5) as reasonably determined by the General Partner, none of such assignee, its Affiliates, agents or advisors or any Person associated with such assignee is a competitor of the Partnership, the General Partner, any Investment or any of their respective Affiliates, except that a Limited Partner which is a trust under an employee benefit plan may, upon prior written notice to the General Partner, (i) assign a beneficial interest in all or a portion of its interest in the Partnership to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor or a sponsor which was formerly the affiliate of the sponsor (in which case the

22

transferor shall remain liable for all liabilities and obligations relating to the transferred beneficial interest) or (ii) change a trustee or fiduciary of a Limited Partner, underlined provided any such replacement trustee or fiduciary is also a fiduciary as defined under applicable state law.  No consent of any other Limited Partner shall be required as a condition precedent to any Transfer.  The voting rights of any Limited Partner Interest shall automatically terminate upon any Transfer of such interest to a trust, heir, beneficiary, guardian or conservator or upon any other Transfer if the transferor no longer retains control over such voting rights and the General Partner has not consented pursuant to Section 7.2(b) to such transferee becoming a substitute Limited Partner.  As a condition to any Transfer of a Limited Partner Interest (including a Transfer not requiring the consent of the General Partner), (1) the transferor and the transferee shall provide such legal opinions, certificates and other documentation and information (including information necessary to comply with the requirements of Code §743, if applicable) as the General Partner shall reasonably request, and (2) if required under a Subscription Facility, either the transferor (as a condition precedent to such transfer) or the transferee (as a condition precedent to its admission as a Partner) shall make a pro rate Subscription Facility Contribution for any amounts advanced under the Subscription Facility Contribution on account of the transferor's Capital Commitment.

(b)     Notwithstanding anything to the contrary contained in this Section 7.2, Section 7.6 or 12.2, a transferee or assignee of a Limited Partner Interest shall not become a substitute Limited Partner without the prior written consent of the General Partner in its sole discretion and without executing a copy of this Agreement or an amendment hereto in form and substance satisfactory to the General Partner in its sole discretion, provided, however, that, except for Transfers which would permit the General Partner to withhold its consent pursuant to Section 7.2(f) below, the consent of the General Partner shall not be required for the admission of a transferee or assignee as a substitute Limited Partner if such transferee or assignee is a trust, fiduciary, or employee benefit plan receiving its interest in a transaction or under the circumstances described in Section 7.2(a)(i) or (ii) above.  Any substitute Limited Partner admitted to the Partnership with the consent of the General Partner shall succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the interest to which such Limited Partner was substituted.

(c)     Unless the General Partner otherwise determines in its sole discretion, the transferor and transferee of any Limited Partner Interest shall be jointly and severally obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses and any immediate or ongoing accounting costs attributable to the Partnership's compliance with the requirements of Code §743(b) or (e) with respect to the transferred interest) of any Transfer or proposed Transfer of a Limited Partner Interest, whether or not consummated.

(d)     The transferee of any Limited Partner Interest shall be treated as having made all of the Capital Contributions made by, and received all of the allocations and distributions received by, the transferor of such interest in respect of such interest.

(e)     Notwithstanding any other provision of this Agreement, no Transfer (including any Transfer of an interest in Partnership profits, losses or distributions) shall be permitted if such Transfer would (i) unless the General Partner otherwise consents in its sole discretion, cause (A) the Partnership to have more than 100 partners, as determined for purposes of U.S. Department of Treasury Reg. §1.7704-1(h) or (B) the aggregate Transfer of Limited Partner Interests for a given Partnership taxable year to exceed 2% of total Limited Partner Interests (excluding for this purpose, any Transfer by a Limited Partner described in U.S. Department of Treasury Reg. § 1.7704-1(e), (f) or (g)), (ii) unless the General Partner otherwise consents in its sole discretion, cause the Partnership to lose its ability to rely on any exemption from registration under the Investment Company Act upon which the Partnership is entitled to rely at such time, (iii) cause the Partnership to be treated as a publicly traded partnership within

23

the meaning of Code §7704 and U.S. Department of Treasury Reg. § 1.7704-1, (iv) cause all or any portion of the assets of the Partnership to constitute "plan assets" under ERISA, (v) result in a material default under any Subscription Facility, or (vi) create a significant risk of causing the results contemplated by any of underlined clauses (i) through (v), as determined by the General Partner in its sole discretion.

(f)       The General Partner may withhold its consent to the Transfer of any Partnership Interest (and no such Transfer shall be made) if the proposed Transfer would create a material risk of a violation of applicable law by the General Partner, the Partnership or any General Partner Affiliate or a material risk that the Partnership or the General Partner would be subject to any governmental regulation requiring any registration or filing requirement which the General Partner believes to be significant (including any registration under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Investment Advisers Act or the Investment Company Act) or that the Partnership or any Partner (other than the assignor Partner and assignee) would be subject to any tax liability or increase in tax liability.

(g)       Any Transfer that violates this Section 7.2 shall be void and the purported buyer, assignee, transferee, pledgee, mortgagee, or other recipient shall have no interest in or rights to Partnership assets, profits, losses or distributions and neither the General Partner nor the Partnership shall be required to recognize any such interest or rights.

7.3    No Withdrawal or Loans.  Subject to the provisions of Sections 7.2, 7.6 and 12.2, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.  Notwithstanding the foregoing, the General Partner may on behalf of the Partnership, without the consent of any Limited Partner, enter into any agreement that permits a Limited Partner to withdraw from the Partnership in accordance with provisions substantially similar to those set forth in Section 7.6 or any side letter or similar agreement of the Partnership (e.g., in the event such Limited Partner would be in violation of applicable law or policy of such Limited Partner or subjected to a materially burdensome tax, law or regulation if such Limited Partner were to continue as a limited partner of the Partnership).

7.4    No Termination.  The substitution, death, incompetency, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

7.5    Additional Limited Partners.  The General Partner may accept additional Limited Partners ("Additional Limited Partners") and/or accept additional Capital Commitments from existing Limited Partners, until the Final Closing Date.  Any Additional Limited Partner will be treated as having been a party to this Agreement as of the Initial Closing Date (or any such additional Capital Commitment will be treated as having been made as of the Initial Closing Date) for all purposes, and will be required to bear a portion of the Partnership Expenses (including the Management Fee) and Organizational Expenses equivalent to that which would have been borne by such Limited Partner had such Limited Partner been a Limited Partner (or had such increased Capital Commitment been made) on the Initial Closing Date, and will be required to contribute its portion of all Capital Contributions made from the Initial Closing Date. On the date of its admission to the Partnership (in the case of Additional Limited Partners), or the date of acceptance of a Partner's subscription to increase its Capital Commitment, each such Partner entering into such arrangement shall (i) make a Capital Contribution to the Partnership in an amount (a "Subsequent Contribution") equal to its portion of all Capital Contributions made by the other Partners to the Partnership prior to such admission date (or date of such increased Capital Commitment) and (ii) pay to the Partnership an additional amount, as determined by the General Partner, on such Subsequent Contribution calculated at the greater of (a) the Applicable Rate plus 3.5% per annum or (b) 8.0%  per

annum from the date or dates that such Subsequent Contribution or portions thereof would have been required to be contributed to the Partnership if such Partner had been admitted to the Partnership (in the case of Additional Limited Partners) or subscribed for such increased Capital Commitment (in the case of additional subscriptions by existing Limited Partners) as of the Initial Closing Date (an "Additional Payment"); provided that the General Partner may make any equitable adjustments to such required contributions that it believes would be fair or equitable, including to reflect prior distributions made to the Partners (including distributions in respect of Investments no longer held by the Partnership). Notwithstanding the foregoing, no Additional Payment shall be required with respect to Additional Limited Partners admitted (or increased Capital Commitments accepted) during the first 3 months following the Initial Closing Date.  Proceeds therefrom representing additional Management Fees and any Additional Payment related thereto shall be paid to the General Partner.  The other proceeds therefrom shall be distributed to the Partners that participated in the earlier Capital Contribution based upon their relative shares of each earlier Capital Contribution and any such distribution (other than distributions with respect to Additional Payments) may be recalled by the General Partner pursuant to Section 3.1(a) as if such returned Capital Contribution had not been previously called.  Upon the admittance of an additional Limited Partner or the increase in a Partner's Capital Commitment, the General Partner shall modify Schedule I to reflect such admittance or increase.  For purposes of this Section 7.5, a Limited Partner that increases its Capital Commitment shall be treated as an Additional Limited Partner with respect to the amount by which its Capital Commitment increased.

      7.6    Government Regulation.

      (a)    (i)    The General Partner shall use reasonable best efforts to ensure that it and the Partnership are in substantial compliance with those material provisions of Applicable Law (as defined below) with which they are obligated by such statutes to comply (if any).  Each Limited Partner shall reasonably cooperate with the General Partner and the Partnership in complying with such material provisions of Applicable Law, shall provide the Partnership any information reasonably requested by the General Partner in complying with any such law or inquiry from any governmental, quasi-governmental, judicial or regulatory authority, agency or entity and the General Partner shall reasonably cooperate with the Limited Partners in complying with the material provisions of Applicable Law.  "Applicable Law" means ERISA or any comparable material United States federal or state law applicable to or affecting governmental plans or any regulations relating to any of the foregoing.

      (ii)    Each Limited Partner shall use reasonable efforts not to take any affirmative action which would, to its knowledge, create a material risk of subjecting the Partnership or the General Partner, or its partners, (or any of their respective officers, directors, partners, members or employees (collectively, "General Partner Affiliates")) to any governmental law, rule or regulation (or any violation thereof) or any material filing or regulatory requirement (including requiring registration with any governmental agency) or any material tax or increase in tax to which such Person would not otherwise be subject, in each case which would be material and adverse to the Partnership or the General Partner (or any General Partner Affiliate).

      (b)    If either a Limited Partner or the General Partner obtains an Opinion of Limited Partner's Counsel or an Opinion of Partnership's Counsel, respectively, that:

      (i)    there is a material risk that a Limited Partner (or any employee benefit plan which is a constituent of the Limited Partner) would be in material violation of Applicable Law if such Limited Partner were to continue as a Limited Partner of the Partnership, the violation of which would have a material and adverse effect on such Limited Partner, the Partnership or the General Partner (or any General Partner Affiliate), or

CHICAGO/#2577231.7

(ii)    a Limited Partner's status as a Partner creates a material risk of subjecting the Partnership or the General Partner (or any General Partner Affiliate) to any governmental law, rule or regulation (or any violation thereof) or any material filing or regulatory requirement (including requiring registration with any governmental agency) or any material tax or increase in tax to which such Person would not otherwise be subject, in each case which would be material and adverse to the Partnership or the General Partner (or any General Partner Affiliate), or

(iii)    with respect to Benefit Plan Investors, there is a material risk that any assets owned by the Partnership could be deemed to be "plan assets" under ERISA of the Limited Partner (or any employee benefit plan which is a constituent of the Limited Partner), or

(iv)    there is a material risk that a Limited Partner (or any employee benefit plan which is a constituent of the Limited Partner) would jeopardize the ability of the Partnership to consummate an investment or to have a material and adverse effect on an investment, the General Partner (or any General Partner Affiliate) or the Partnership,

then the provisions of Sections 7.6(c) through 7.6(1) shall apply.  The events described in clauses (i) through (iv) of this Section 7.6(b) are each referred to herein as a "Limited Partner Regulatory Problem." The Limited Partners described above in this Section 7.6(b) are each referred to herein as a "Regulated Partner."  Each Limited Partner shall promptly notify the General Partner in writing of any change in Applicable Law or other event coming to its attention which it believes may be cause for withdrawal by such Limited Partner under the provisions of this Section 7.6.  If the Partnership's initial Investment (other than a Short-Term Investment) does not cause the Partnership to be in compliance with an exception to the Plan Asset Regulations, then the General Partner shall promptly notify the Limited Partners of such event.  After the Partnership initially satisfies the requirements of an exception to the Plan Asset Regulations, the General Partner shall, in the event the General Partner reasonably believes that the Partnership will not remain in compliance with an exception to the Plan Asset Regulations, promptly notify the Limited Partners of such belief.

(c)    In the event of a Limited Partner Regulatory Problem, the Regulated Partner shall use reasonable efforts (including during the Remedy Period defined below) to eliminate or minimize the Limited Partner Regulatory Problem (including a sale to a third party on terms reasonably acceptable to the Regulated Partner).

(d)    Subject to the provisions of Sections 7.6(b) and 7.6(c) and this Section 7.6(d), each Regulated Partner may elect to withdraw from the Partnership, or upon demand by the General Partner will withdraw from the Partnership, at the time and in the manner provided under Section 7.6(g). In the event of a Limited Partner Regulatory Problem, the General Partner shall have a period of 180 days following receipt of a counsel opinion described in Section 7.6(b) (or such lesser period reasonably recommended in such counsel's opinion delivered pursuant to Section 7.6(b), but in no event less than 90 days) (the "Remedy Period") to use its reasonable efforts to eliminate or minimize the Limited Partner Regulatory Problem whether by correction of the condition giving rise to the risk or problem, by amendment of this Agreement pursuant to Section 12.1, a Regulatory Sale, a Regulatory Solution, or by requiring the Regulated Partner to withdraw in accordance with the procedures set forth in Section 7.6(g) (without regard to the 20-day time period set forth therein); provided that the General Partner shall not be required to forego any investment opportunity on behalf of the Partnership to solve a Limited Partner Regulatory Problem.  Each such Regulated Partner shall reimburse the Partnership for all costs incurred by the Partnership in connection with the withdrawal of such Regulated Partner under this Section 7.6 or any Regulatory Sale or Regulatory Solution with respect to such Regulated Partner's Limited Partner

Interest; provided that no such reimbursement shall be required if such withdrawal is necessitated solely by the failure of the General Partner to comply with the efforts required by Section 6.6.

(e)     If requested to do so by the General Partner, the Regulated Partner shall use reasonable efforts to cooperate with the General Partner during the Remedy Period in arranging another method to minimize or eliminate a Limited Partner Regulatory Problem (a "Regulatory Solution"), including but not limited to the formation of a separate entity (on terms not substantially less advantageous to the Regulated Partner than the terms of this Partnership) to hold the Regulated Partner's share (or the share of any employee benefit plan which is a constituent of the Regulated Partner) of the Partnership's securities and other assets or negotiating an in-kind redemption of the Regulated Partner's interests in the Partnership on terms reasonably acceptable to the Limited Partner.

(f)     The General Partner may elect (in its sole discretion) to offer the Regulated Partner's entire Partnership Interest to the Partners and/or a third party who is not a "party in interest" (as defined under ERISA) for a price, payable in cash, equal to the Regulated Partner's Capital Account Value (a "Regulatory Sale"). Subject to the immediately following sentence, the General Partner shall specify and implement the procedures for making offers and shall set the time limits for acceptance thereof consistent with the other time limits set forth in this Section 7.6. In the case of a Regulatory Sale, the procedures set forth in Section 12.2(a)(vi) shall be applicable, except that the term "Regulated Partner" shall be substituted for the term "Defaulting Partner," the price shall be payable in cash at closing and shall equal the Regulated Partner's Capital Account Value (or such other amount and/or such other terms as may be agreed to by such Regulated Partner). As a condition to the consummation of any sale, the acquiring Person (or Persons) shall agree to become a party to this Agreement and assume the Regulated Partner's obligation to make future Capital Contributions in an amount equal to the balance of such offeree's Capital Commitment (which shall be equal to the balance of the Regulated Partner's Capital Commitment). Upon the consummation of a Regulatory Sale, such Regulated Partner shall cease to be a Partner of the Partnership for all purposes of this Agreement and the transferee shall be a substitute Limited Partner for all purposes of this Agreement.

(g)     If the General Partner does not sell the Regulated Partner's entire Partnership Interest pursuant to a Regulatory Sale, provide for a Regulatory Solution (reasonably acceptable to such Regulated Partner) or deliver to such Regulated Partner an Opinion of Partnership's Counsel that the condition giving rise to the Limited Partner Regulatory Problem has been corrected within the Remedy Period, then, at any time during the 20-day period immediately following the expiration of the Remedy Period, such Regulated Partner may elect to withdraw or the General Partner (if it has not already required such Regulated Partner to withdraw during the Remedy Period) may require such Regulated Partner to withdraw in whole or in part from the Partnership on the earlier to occur of (i) the last day of the calendar quarter during which the election and demand for withdrawal is made or (ii) such date for withdrawal as may be recommended in the counsel opinion described in Section 7.6(b). Upon any withdrawal, there shall be distributed (x) to such Regulated Partner, in full payment and satisfaction of its interest in the Partnership, an amount, subject to reduction pursuant to Section 7.6(i) below, equal to the balance of the withdrawing Partner's Capital Account Value as of the effective date of withdrawal, payable in cash, cash equivalents or equities (as valued in accordance with Article IX hereof as of the date of distribution to the Regulated Partner) as the General Partner in its sole discretion selects and (y) to the General Partner, an amount equal to the unpaid Carried Interest (if any) attributable to the withdrawing Regulated Partner's interest; provided that (A) to the extent that securities are to be distributed, the General Partner shall select securities in an equitable manner so that the withdrawing Partner receives approximately a pro rata portion of the securities held by the Partnership (adjusted to eliminate odd lots and taking into account any limitations on the Partnership's ability to divide a particular security for distribution), (B) to the extent securities are to be distributed, such securities shall not include any securities that may not be distributed to such withdrawing Regulated Partner because it (or any employee benefit plan constituent of

27

such Regulated Partner) would be in material violation of Applicable Law as a result of holding such securities or the Partnership is prohibited by any material law, contract, or agreement from distributing such securities, and (C) any distributions in cash or cash equivalents may be made at such time and in such manner so as not to disrupt the Partnership's operations, business or activities or impair the value of any of the Partnership's securities.  All Capital Contributions by, and all distributions with respect to, a Person who has withdrawn from the Partnership pursuant to this Section 7.6(g) shall be disregarded for purposes of Sections 4.3, 8.5 and 8.4(f) and the definition of "Net Benefit."

(h)     Effective upon the date of withdrawal of any Regulated Partner or the Regulatory Sale of any Regulated Partner's entire Partnership Interest, (i) such Regulated Partner's Capital Commitment shall be reduced to zero and, in the case of a withdrawing Regulated Partner, the aggregate Capital Commitments of the Partnership shall be commensurately reduced, (ii) such Regulated Partner shall cease to be a Partner of the Partnership for all purposes, and (iii) except for such Regulated Partner's right to receive payment for his, her or its Partnership Interest as provided above, such Regulated Partner shall no longer be entitled to the rights of a Partner under this Agreement, including, without limitation, the right to receive allocations, the right to receive distributions during the term of the Partnership and upon liquidation of the Partnership and the right to vote on Partnership matters as provided in this Agreement.

(i)     The amount payable to a Regulated Partner pursuant to Section 7.6(g) above shall be reduced by an amount equal to the product of (A) the estimated amount of Partnership Expense for the Management Fee for the six-month period immediately following such Regulated Partner's withdrawal, multiplied by (B) a fraction, the numerator of which is such Regulated Partner's Capital Commitment immediately prior to such Person's withdrawal and the denominator of which is the Partnership's aggregate Capital Commitments (which amount of reduction shall not exceed such Regulated Partner's Capital Account Value as of the effective date of withdrawal); provided that if upon the date of a Regulated Partner's withdrawal from the Partnership pursuant to this Section 7.6 the amount calculated immediately above (without giving effect to the second parenthetical) exceeds such Regulated Partner's Capital Account Value as of the effective date of withdrawal, the withdrawing Regulated Partner shall pay to the Partnership in cash an amount equal to such excess, unless in the opinion of counsel for such Regulated Partner (which counsel and opinion shall be acceptable to the General Partner in its reasonable discretion), it is materially likely that the Regulated Partner would be in material violation of Applicable Law as a result of making such payment; and provided further however that no such reduction shall be made pursuant to the first sentence of this Section 7.6(i) if such Regulated Partner's withdrawal is necessitated solely by the failure of the General Partner to comply with the efforts required by Section 6.6.  The Partnership shall pay to the General Partner an amount equal to the sum of (i) any reduction pursuant to this Section 7.6(i) in the amount payable to a Regulated Partner pursuant to Section 7.6(g) and (ii) any cash payment by such Regulated Partner pursuant to this Section 7.6(i).

(j)     Prior to the time of any Regulatory Sale, Regulatory Solution or withdrawal, a Regulated Partner shall continue to fund its Capital Commitment and shall continue to be a Limited Partner for all purposes of this Agreement; provided that if, (x) as set forth in an Opinion of Limited Partner's Counsel for such Regulated Partner, it is materially likely that such Regulated Partner would be in material violation of Applicable Law (the violation of which (although not covered by such opinion) would have a material adverse effect on such Regulated Partner) if it fulfilled its Capital Commitment or (y) in the Opinion of Limited Partner's Counsel or Opinion of the Partnership's Counsel, the assets of the Partnership are, or there is a material risk that the assets of the Partnership would be, deemed "plan assets" under the Plan Asset Regulations for purposes of ERISA, then for all purposes of this Agreement other than Section 4.6 (including but not limited to Articles III and IV other than Section 4.6) such Regulated Partner's Capital Commitment shall be reduced to the amount of Capital Contributions (net of distributions pursuant to Section 3.1(d)) made by such Regulated Partner prior thereto and the aggregate

Capital Commitments of the Partnership shall be commensurately reduced.  Nevertheless, for a period of 6 months thereafter, the Management Fee will continue to be calculated as if there had been no reduction in such Regulated Partner's Capital Commitment and the Partnership Expense for such Management Fee will continue to be allocated among the Partners as if there had been no reduction in such Regulated Partner's Capital Commitment and such Regulated Partner shall pay to the Partnership in cash an amount equal to its share of such Partnership Expense, determined as described in Section 7.6(i), to the extent not paid by any Person (or Persons) that have acquired all or any portion of such Regulated Partner's interest pursuant to a Regulatory Sale or a Regulatory Solution; provided that such reduction in the Regulated Partner's Capital Commitment will be taken into account in calculating such Management Fee if such reduction in the Regulated Partner's Capital Commitment is required because the General Partner failed to comply with the efforts required by Section 6.6.  In the event the General Partner objects to the form and substance and/or the conclusion of the opinion of counsel delivered by a Regulated Partner pursuant to this Section 7.6(j) and/or to the Regulated Partner's assertion that the violation of Applicable Law described in such opinion would have a material adverse effect on such Regulated Partner, and such disagreement has not been finally resolved and if the necessity for reducing such Regulated Partner's Capital Commitment has not been eliminated before the date a proposed Capital Contribution is required to be made, then such Regulated Partner's Capital Commitment shall be reduced in accordance with the first sentence of this Section 7.6(j); provided that (i) if such disagreement is ultimately resolved (by negotiation, mediation, arbitration, a court proceeding or otherwise) in favor of the General Partner, then (A) such Regulated Partner's Capital Commitment shall be immediately restored to the amount of such Regulated Partner's Capital Commitment immediately prior to application of this Section 7.6(j) and (B) within 10 days after such Regulated Partner's receipt of written notice of such final determination, such Regulated Partner shall be required to make a Capital Contribution to the Partnership equal to the aggregate amount of Capital Contributions such Regulated Partner previously would have made to the Partnership but did not make because such Person's Capital Commitment was temporarily reduced pursuant to this Section 7.6 and (ii) a Regulated Partner shall not be deemed a Defaulting Partner for not making any Capital Contributions during the period such Person's Capital Commitment is reduced pursuant to this Section 7.6(j).  If such Limited Partner does not make such Capital Contribution within such 10-day period, then such Limited Partner shall be deemed a Defaulting Partner and the Partnership shall be entitled to invoke the remedies provided under Section 13.2.

(k)     Except as specifically provided in this Section 7.6, no consent of any Limited Partner shall be required as a condition precedent to any Regulatory Solution or any Regulatory Sale pursuant to this Section 7.6.

(l)     Notwithstanding anything in this Section 7.6 to the contrary, no Regulated Partner's interest will be transferred or subdivided, and no Person shall become a substitute Limited Partner, in contravention of Section 7.2(e) and 7.2(f).

(m)     Each Limited Partner represents that it is an "accredited investor" within the meaning of Regulation D of the Securities Act and a "qualified client" within the meaning of the Investment Advisers Act.

7.7     Reimbursement for Payments on Behalf of a Partner.

(a)     If the Partnership is obligated to pay any amount to a governmental agency or body or to any other Person (or otherwise makes a payment) because of a Partner's status or otherwise specifically attributable to a Partner (including U.S. federal withholding taxes with respect to non-U.S. partners, U.S. state withholding taxes and U.S. state unincorporated business taxes), then such Partner (the "Reimbursing Partner") shall reimburse the Partnership in full for the entire amount paid (including any interest, penalties and expenses associated with such payment); provided that if neither the

Partnership nor such Reimbursing Partner would be obligated to pay such amount but for the General Partner's gross negligence or willful malfeasance, such Reimbursing Partner shall not be obligated to reimburse the Partnership for any interest and penalties resulting from such gross negligence or willful malfeasance.  At the option of the General Partner, the amount to be reimbursed may be charged against the Capital Account of the Reimbursing Partner, and, at the option of the General Partner, but without duplication:

        (i)     promptly upon notification of an obligation to reimburse the Partnership, the Reimbursing Partner shall make a cash payment to the Partnership equal to the full amount to be reimbursed (and the amount paid shall be added to the Reimbursing Partner's Capital Account but shall not be deemed to be a Capital Contribution hereunder), and/or

        (ii)    the Partnership shall make distributions to the Reimbursing Partner net of the governmental payment or reduce subsequent distributions which would otherwise be made to the Reimbursing Partner until the Partnership has recovered the amount to be reimbursed (provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Reimbursing Partner's Capital Account).

    (b)    A Reimbursing Partner's obligation to make reimbursements to the Partnership under this Section 7.7 shall survive the dissolution, liquidation, winding up and termination of the Partnership and, for purposes of this Section 7.7, the Partnership shall be treated as continuing in existence.  The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 7.7, including instituting a lawsuit to collect such contribution with interest calculated at an annual compounded rate equal to the Applicable Rate plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

    7.8    §754 Election.  The General Partner may, but shall not be obligated to, cause the Partnership to make the election provided for in §754 of the Code.

    7.9    Written Consent.  Subject to Section 3.4, whenever action is required by this Agreement to be taken by the Limited Partners holding a certain percentage of the interests of the Limited Partners, such action shall be deemed to be valid if taken upon written vote or written consent by such required percentage of Limited Partners.

    7.10    Bank Holding Company Act of 1956.  Notwithstanding any other provision in this Agreement to the contrary, any determination, approval, consent and any other vote under this Agreement or the Delaware Act shall disregard any consent, approval or vote with respect to any BHCA Interest; provided that the foregoing exclusion of BHCA Interests shall not apply to BHCA Interests of any BHCA Limited Partner with respect to any consent, approval or vote (a) concerning the issuance of additional amounts or classes of senior interests in the Partnership, the modification of the terms of the Limited Partner interests or the dissolution of the Partnership (in each case, unless such BHCA Limited Partner has provided prior written notice to the General Partner that the regulations promulgated under the BHCA no longer classify limited partnership interests permitted to vote on such matters as "nonvoting securities") or (b) with respect to which such BHCA Limited Partner has delivered to the General Partner written notice and an Opinion of Limited Partner's Counsel (which may be provided by in-house counsel of such BHCA Limited Partner if such counsel has expertise in the area in which such counsel is providing the opinion) to the effect that the exercise of such voting rights will not cause limited partnership interests to be treated as "voting securities" under 12 C.F.R. Section 225.2(q) or any successor regulation as in effect from time to time.

7.11    Confidential Information.

(a)    Notwithstanding anything contained herein to the contrary (other than as expressly required by Section 10.3), the General Partner has the right (in its sole and absolute discretion) not to disclose any Confidential Information to any Limited Partner or to the Limited Partner's Disclosure Recipients if the General Partner determines that such disclosure is not in the best interests of the Partnership, any Partner and/or any Investment.  Each Limited Partner shall keep confidential and shall not disclose, or permit any of its Disclosure Recipients to disclose, any information or materials regarding the Partnership Entities or the other Partners (whether or not such information or materials have been designated by the General Partner as Confidential Information), except to the extent, and only to the extent, that (i) the disclosure of such information or materials is expressly required by applicable law, (ii) the information or materials were previously known to such Limited Partner other than as disclosed by any Partnership Entity, (iii) the information or materials become publicly known other than through the actions or inactions of such Limited Partner or its Disclosure Recipients or (iv) the disclosure of such information and materials by such Limited Partner is to its Disclosure Recipients (provided that, in each case, such Persons agree in writing to keep such information and materials confidential to the same extent as if they were Limited Partners of the Partnership or are otherwise required under applicable law to keep such information confidential and such Limited Partner shall be responsible for the failure of any such Person to so comply).  Without limiting the foregoing, in the event that any Limited Partner or any of its Disclosure Recipients is required by any applicable law, statute, governmental rule or regulation or judicial or governmental order, judgment or decree to disclose any Confidential Information, prior to such disclosure such Person shall promptly notify the General Partner in writing of such anticipated disclosure, which notification shall include the nature of the legal requirement and the extent of the required disclosure; and such Person shall cooperate with the General Partner to preserve the confidentiality of such information consistent with applicable law (including, without limitation, in any case in which there has been no judicial or governmental order, judgment or decree, withholding disclosure of such Confidential Information until such time as it has been finally determined that such disclosure is required under applicable law).  No Limited Partner may use, and each Limited Partner shall cause any Disclosure Recipient to which it directly or indirectly discloses any Confidential Information to hold such information confidential to the same extent as would be required if such Person were a Limited Partner and not to use, any Confidential Information it receives for any purpose other than monitoring and evaluating such Limited Partner's investment in the Partnership.  Any information provided to a Person at a Limited Partner's direction shall be treated instead as having been provided to such Person by such Limited Partner, and such disclosure by the Limited Partner shall be subject to the requirements of this Section 7.11.

(b)    Without limiting the foregoing, each Limited Partner agrees that the following items are included within Confidential Information of, and are of independent, proprietary, economic value to, the General Partner, the Partnership and, with respect to information obtained from an Investment, the disclosure of which would cause substantial, irreparable harm to the General Partner, the Partnership and/or the applicable Investment:  (i) all information regarding the historical or projected pricing, cost, sales and profitability of each product or service offered by any Investment; (ii) all information pertaining to the valuation ascribed to an Investment, any subsidiary thereof or to any interests in any of the foregoing by such Investment's management, the Partnership, the General Partner, or any other Person; and (iii) all financial statements or other information concerning the historical or projected financial condition, results of operations or cash flows of any Investment.

(c)    The General Partner may agree (i) to limit the applicability of any portion of this Section 7.11 to a particular Limited Partner and/or (ii) to limit disclosure of the name of, or any other information regarding, a particular Limited Partner and, in each such case, any such agreement shall not be a side letter or similar agreement for purposes of Section 12.10.

31

(d)     Notwithstanding anything else contained in this Agreement (including the other provisions of this Section 7.11), each Limited Partner may disclose, without limitation, the tax treatment and tax structure (as such terms are used in Code §6011 and the Treasury Regulations promulgated thereunder) of its investment in the Partnership and of any transactions entered into by the Partnership; provided that this authorization to disclose such tax treatment and tax structure is not intended to permit disclosure of any other information.

## ARTICLE VIII

## DURATION AND DISSOLUTION

8.1     Duration.  The Partnership will be dissolved on the third anniversary of the Final Closing Date, except that the General Partner may, in its sole discretion and upon at least 60 days' prior written notice to the Limited Partners (the "Extension Notice"), extend the term of the Partnership for 2 additional one-year periods without the consent of the Limited Partners. Any subsequent extensions will require the approval of the General Partner and the Limited Partners holding 80% of Required Interests. Notwithstanding any other provision of this Agreement, in the event that the General Partner determines that there has been an "assignment" of this Agreement within the meaning of the Investment Advisers Act and the requisite consent of the Partnership has not been obtained, then the General Partner may (but is not obligated to) dissolve the Partnership by delivering written notice to such effect to the Limited Partners.

8.2     Early Termination.

(a)     Limited Partners holding at least two-thirds of the Required Interests may deliver to the General Partner not less than 30 days after the occurrence of a Cause Event a written notice of their desire to limit new Investments as described in this Section 8.2(a).  Thereafter, the Partnership shall not deliver a Capital Call Notice to fund any Investments, except for follow-on Investments, Investments pursuant to then-existing commitments and Investments funded entirely, or in part, with the proceeds of a Subscription Facility, to the extent such proceeds have not been repaid to the Lender thereunder (collectively, "Pending Investments"); provided that the Partnership may again deliver Capital Call Notices to fund any investments in accordance with the other provisions of this Agreement with the approval of the General Partner and the Limited Partners holding two-thirds of the Required Interests on or prior to the date 3-months after such Cause Event (such approval, "Continuing Investment Approval").

(b)     The Partnership shall be dissolved upon the written decision of the General Partner and all the Partners.

(c)     The Partnership shall be dissolved upon the decision of the General Partner, in its sole discretion, to dissolve the Partnership because it has determined based on the advice of counsel selected by the General Partner that (i) changes in any applicable law or regulation would have a material adverse effect on the continuation of the Partnership or (ii) such action is necessary or advisable in order for the Partnership not to be in material violation of any material law or regulation (including ERISA).

(d)     If the General Partner has (i) been convicted of or criminally indicted for fraud, embezzlement or a similar felony involving misappropriation of funds in connection with the business of the Partnership or any Investment, or (ii) willfully breached any of its material obligations under this Agreement in a manner that adversely affects the Limited Partners and such breach is not substantially cured within 60 days (or if in the process of being cured within 60 days, is substantially cured within 120 days) after receipt by the General Partner of written notice with respect thereto from Limited Partners holding at least 80% of the Required Interests (each a "Cause Event"), Limited Partners holding at least

80% of the Required Interests may elect to dissolve the Partnership by delivering a written notice to the General Partner to such effect.

(e)     The foregoing sections 8.2(a)-(d) notwithstanding, the Partnership shall not be dissolved and the Partners' obligations to make Subscription Facility Contributions shall not be terminated until such time as all obligations of the Partnership under said Subscription Facility have been paid in full and Lender's commitment to fund additional advances thereunder has been terminated.

8.3     Removal of the General Partner.

(a)     Limited Partners holding at least 80% of the Required Interests may remove the General Partner as general partner of the Partnership by delivering a written notice to the General Partner (the "GP Removal Notice") to such effect not later than 30 days after the occurrence of a Cause Event.

(b)     On the date of the General Partner's removal pursuant to this Section 8.3 (the "GP Removal Date"), (i) the interest of such removed General Partner in the Partnership shall be converted (the "Conversion") into a Limited Partner interest and after such Conversion such removed General Partner shall be a "Special Limited Partner," and (ii) neither the Special Limited Partner nor any Limited Partner that is, or that is owned by, controlled by or established primarily for the benefit of, one or more direct or indirect owners of the removed General Partner or any of such owner's respective family members shall be required to make any additional Capital Contributions or other payments to the Partnership or to participate in any Investments after the GP Removal Date unless such Person affirmatively elects not later than 30 days after the GP Removal Date to continue funding its Capital Commitment for all purposes of this Agreement.  If any such Person does not make such election to continue funding its Capital Commitment, it shall no longer be allocated any additional Partnership Expenses and shall no longer participate in the profits, losses or otherwise with respect to any Investments (including follow-on Investments) the Partnership makes after the GP Removal Date.  Notwithstanding anything contained in this Agreement, the Special Limited Partner shall assume the rights and responsibilities of a Limited Partner under this Agreement, except that the Special Limited Partner shall maintain its right to receive distributions pursuant to this Agreement as if it were still the General Partner (subject to the adjustments made pursuant to this Section 8.3(b)).  Following the GP Removal Date, (x) the portion of each distribution that would have been distributed pursuant Section 4.3(d)(ii) or 4.3(e)(ii) in the absence of a removal of the General Partner pursuant to this Section 8.3 instead shall be distributed to the Special Limited Partner in respect of the Frozen Carried Interest until the Special Limited Partner has received aggregate distributions pursuant to this sentence equal to the Frozen Carried Interest, and (y) the remaining portion of each distribution shall be distributed pursuant to the provisions of Section 4.3 (other than Section 4.3(d)(ii) or 4.3(e)(ii)).  For purposes of this Section 8.3(b), the "Frozen Carried Interest" means an amount equal to the portion of the removed General Partner's Capital Account Value as of the date the removed General Partner received the GP Removal Notice, and determined without regard to this Section 8.3(b), that is attributable to the removed General Partner's right to receive distributions pursuant to Sections 4.3(d)(ii) and 4.3(e)(ii), plus interest at the Applicable Rate plus 2 percentage points per annum, compounded annually, on such amount calculated from the date the removed General Partner received the GP Removal Notice through the GP Removal Date.

(c)     The valuation of the removed General Partner's Capital Account Value shall be its value as set forth in the Partnership's annual audited financial statements for the Partnership's fiscal year most recently ended on or prior to the GP Removal Date, as equitably adjusted by the removed General Partner to reflect any distributions to the removed General Partner subsequent to such fiscal year end; provided that the removed General Partner's interest in any Investments subsequent to such fiscal year end shall be included in such valuation at cost.

CHICAGO/#2577231.7

(d)     Effective upon the GP Removal Date, such removed General Partner (i) shall remain liable only for obligations with respect to any liability, loss, costs or expense (mature or unmatured, contingent or otherwise) solely arising out of, relating to, incidental to, or by virtue of any act, transaction or event in connection with the operation of the Partnership's business prior to the GP Removal Date and (ii) shall not be liable with respect to any liability, loss, costs or expense (mature or unmatured, contingent or otherwise) arising out of, relating to, incidental to, or by virtue of any act, transaction or event in connection with the operation of the Partnership's business on or after the GP Removal Date.   The removed General Partner and its members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates (and their respective members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates) (collectively, "GP Indemnitees") shall continue to be entitled to exculpation in accordance with Section 6.10 and indemnification in accordance with Section 6.11 (as if such removed General Partner had not been removed as General Partner) to the extent that such exculpation or indemnification relates in any way to actions taken by such Persons on or prior to the GP Removal Date. Notwithstanding anything contrary in this Agreement, the GP Indemnitees shall be deemed third-party beneficiaries of this Section 8.3 and Sections 4.3, 6.10 and 6.11 and no amendment that would alter this Section 8.3 or Section 4.3, 6.10 or 6.11 shall be made without the prior written consent of the removed General Partner if such amendment adversely affects the removed General Partner or any of the other GP Indemnitees.

(e)     No removal of the General Partner under Section 8.3(a) shall be effective unless each of the following conditions is satisfied within 120 days after the date the GP Removal Notice is delivered to the removed General Partner:  (i) a new general partner of the Partnership (which may be an individual or an entity) shall have been selected by the Limited Partners, and such new general partner shall have assumed all obligations of the removed General Partner under this Agreement arising on or after the date on which such new general partner is admitted to the Partnership; (ii) an amendment to the Certificate shall have been filed with the Secretary of State of Delaware that reflects:  (A) the admission of the new general partner as the general partner of the Partnership and (B) the removal of the withdrawing General Partner as the general partner of the Partnership; and (iii) the admission of the new general partner shall not have caused the Partnership to cease to be taxable as a partnership for United States federal or state income tax purposes.

(f)     The Partners hereby agree to make such amendments to this Agreement as are necessary or advisable to implement the admission of a new general partner, the removal of the withdrawing General Partner and the changes in the economic relationships among the Partners that are described in this Section 8.3 in a fair and equitable manner consistent with the principles set forth in this Section 8.3, and in all events to interpret and apply this Agreement (whether or not formal amendments are executed) in a manner consistent with such principles.  No amendment to this Agreement that would adversely affect the Special Limited Partner's rights or obligations under this Section 8.3 or any amendment to this Section 8.3 shall be made without the prior written consent of the Special Limited Partner or, prior to the Conversion, the General Partner.

8.4     Liquidation of the Partnership.

(a)     Liquidation.  Upon dissolution, the Partnership will be liquidated in an orderly manner in accordance with the provisions of this Agreement and the Delaware Act.  The General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement, unless, in the case of an early termination of the Partnership pursuant to Section 8.2(d), a different liquidator is appointed by Limited Partners holding two-thirds of the Required Interests.  If the General Partner acts as the liquidator for the Partnership, the Partnership shall promptly pay the General Partner and its Affiliates

34

for reasonable fees and expenses in connection with the General Partner's activities as liquidator of the Partnership.

(b)    Final Allocation and Distribution.   Following dissolution of the Partnership (whether or not an early dissolution) and upon the liquidation and winding up of the Partnership, the General Partner or a liquidator appointed pursuant to Section 8.4(a) will make a final allocation of all items of income, gain, loss and expense in accordance with Article III hereof, and the Partnership's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Partners.   After payment or provision for payment of all liabilities and obligations of the Partnership, the remaining assets, if any, will be distributed among the Partners pursuant to Article IV.

8.5    General Partner Give Back.   After the final distribution of the assets of the Partnership among the Partners as provided in this Section 8.4 and Article VIII, with respect to each Limited Partner other than a Defaulting Partner, the General Partner shall contribute to the Partnership, and the Partnership shall, promptly following receipt, distribute to such Limited Partner, an amount equal to the greater of the amounts described in the following clauses (i) and (ii):

(i)    in the event that the Partners (other than Defaulting Partners) did not receive distributions (excluding payments to the General Partner with respect to its Carried Interest, and distributions returned to the Partnership pursuant to Section 4.6) in the aggregate equal to their aggregate Capital Contributions plus their aggregate Preferred Return, the amount, if any, of such deficit (and such amount will be distributed to the Partners (including the General Partner) in proportion to their respective deficits); and

(ii)    the amount (if positive) by which the aggregate distributions that the General Partner received and did not previously return to the Partnership or the Partners pursuant to this Agreement in respect of the Carried Interest exceeds 40% of the Net Benefit (other than with respect to Defaulting Partners) of the Partnership over the life of the Partnership, which amount shall be distributed to the Partners (other than Defaulting Partners, but including the General Partner) in proportion to their respective Capital Commitments;

provided that the General Partner shall not be obligated to make capital contributions pursuant to this Section 8.5 in excess of 100% of the net amount of the Carried Interest distributions, minus aggregate Tax Amounts attributable to the Carried Interest, made to the General Partner during the life of the Partnership and not previously returned by the General Partner (or its partners) to the Partnership or the Partners pursuant to this Agreement.   The General Partner shall be obligated to restore its negative Capital Account, if any, only to the extent set forth in this Section 8.5.   The calculation of the amount that the General Partner shall contribute to the Partnership pursuant to this Section 8.5 shall be made after giving effect to any return of distributions made by the Partners to the Partnership pursuant to Section 4.6(a).   The determination of the General Partner Give Back shall be calculated by treating investments made by any Alternative Investment Vehicle as having been made by the Partnership.

(b)    Cancellation.   Following completion of the winding up of Partnership affairs as contemplated by this Article VIII, the Partnership shall terminate upon the filing of a Certificate of Cancellation of the Certificate in accordance with the applicable provisions of the Delaware Act.

35

# ARTICLE IX

# VALUATION OF PARTNERSHIP ASSETS

9.1     <u>Normal Valuation</u>.  For purposes of this Agreement, the value of any investment as of any date (or in the event such date is a holiday or other day that is not a business day, as of the next preceding business day) will be determined as follows:

(a)     an investment that is (i) listed or quoted on a recognized securities exchange or quoted on any national automated inter-dealer quotation system or (ii) traded over-the-counter, shall be valued at the average of its last "trade" price on each trading day during the 10-day trading period ending immediately prior to the time of determination, or if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such day; and

(b)     all other investments will be valued on such date by the General Partner at fair market value in such manner as it may reasonably determine.

9.2     <u>Restrictions on Transfer or Blockage</u>.  Any investment that is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Partnership's holdings compared to the trading volume would adversely affect its marketability, will be valued at such discount from the value determined under <u>Section 9.1</u> above as the General Partner deems necessary to reflect properly the marketability of such investment.

9.3     <u>Write-down to Value</u>.  Any investments that have permanently declined in value as determined by the General Partner will be written-down to their value pursuant to the provisions of this <u>Article IX</u> as of the date of such determination.

9.4     <u>Adjustments Required by GAAP Accounting</u>.  With respect to reports furnished to Limited Partners pursuant to <u>Section 10.3</u> that are prepared, in whole or in part, in accordance with GAAP, the valuation rules set forth in this <u>Article IX</u> shall be adjusted to the extent necessary to comply with GAAP, including the Financial Accounting Standards Board Accounting Standards Codification Topic 820:  Fair Value Measurements and Disclosures, effective as of September 15, 2009 (as such codification topic may be amended or modified thereafter), as promulgated by the Financial Accounting Standards Board.

# ARTICLE X

# BOOKS OF ACCOUNTS; MEETINGS

10.1     <u>Books</u>.  The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the General Partner's principal office, which books will be open to inspection by any Partner (or its authorized representative) for any purpose reasonably related to such Limited Partner's interest in the Partnership at any time during ordinary business hours upon at least 10 business days' prior notice, subject in each case to any portion of the books which may otherwise be kept confidential with respect to any Limited Partner as provided in this Agreement.

10.2     <u>Fiscal Year</u>.  The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

10.3   <u>Reports</u>.  The General Partner will furnish to each Limited Partner:

(a)   within 120 days after the end of each fiscal year commencing with the year ended December 31, 2015, (i) audited financial statements for the Partnership for such year (including a balance sheet, statement of income and loss and statement of changes in Partner's Capital Accounts), prepared in accordance with GAAP, but without consolidating Investment financial information with the Partnership, and certified by a firm of independent certified public accountants of recognized national standing selected by the General Partner, and (ii) a list of the Partnership's investments as of the end of such year, valued at fair market value in accordance with <u>Article X</u>;

(b)   within 120 days after the end of each fiscal year, such Limited Partner's Schedule K-1 for such fiscal year;

(c)   at a Limited Partner's reasonable request, reasonable monthly or quarterly information as to Partnership income and expenses, quarterly information as to Partnership balance sheet items and any reasonable information such Limited Partner may require in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners, including information required by a Limited Partner or any partner thereof in order to comply with any reporting or withholding requirements applicable to such Limited Partner or any partner thereof pursuant to §897 or 1445 of the Code; and

(d)   at the request of any Limited Partner and subject to appropriate confidentiality restrictions, such other financial information regarding the Partnership and its investments as such Limited Partner may from time to time reasonably request; <u>provided</u> that the requesting Limited Partner will pay any extraordinary expenses arising out of providing such requested information.

The financial reports, information and schedules described in this <u>Section 10.3</u> are dependent upon information to be provided to the General Partner by the Investments.  Therefore, notwithstanding the foregoing time periods, the General Partner may furnish such reports and schedules to the Limited Partners after the expiration of such time periods, but as soon as reasonably practical, following receipt of all financial and other information from each of the Investments necessary or desirable to prepare such documents.  Notwithstanding any provision in this <u>Section 10.3</u> to the contrary, and subject to <u>Section 7.11</u>, the information and materials described in this paragraph and the reports (other than quarterly and annual balance sheets and income statements for the Partnership, statements of the applicable Partner's Capital Account and the applicable Partner's Schedule K-1), summaries and valuations of the Investments described in this <u>Section 10.3</u> and any Investment financial, business or valuation information contained in information required to be provided pursuant to this Agreement shall be required to be furnished only to Limited Partners who have provided such representations, warranties and assurances, as the General Partner may request in its sole discretion, that such documents (and any contents thereof) are not required by any law to be disclosed to any other Person and that such Limited Partner (and its Disclosure Recipients) will not use such documents (or any contents thereof) for a purpose other than monitoring and evaluating such Limited Partner's investment in the Partnership or disclose such documents (or any contents thereof) to any other Person who may be required by law to disclose such documents (or any contents thereof), in each case other than disclosure permitted by <u>Section 7.11(a)(ii)</u> or <u>7.11(a)(iii)</u> or to a Person to whom such disclosure is permitted by <u>Section 7.11(a)(iv)</u> and such Person will not be required by law to disclose such documents (or any contents thereof).

The General Partner shall, except to the extent that the General Partner is required by law or agreement to keep confidential, notify Limited Partners in connection with the quarterly and annual reporting to the Limited Partners of the commencement of any lawsuit or legal proceeding of which the

37

General Partner is aware in which the Partnership, the General Partner or any Approved Executive Officer is a named party and which, if adversely determined, the General Partner believes would be reasonably likely to result in an adverse effect on the ability of any such Person to perform such Person's obligations under this Agreement.

The General Partner may, in its sole discretion, choose to furnish certain or all of such financial reports, statements, schedules, summaries and other information described in this <u>Section 10.3</u> to the Limited Partners electronically via email, the Internet and/or another electronic reporting medium in lieu of providing the Limited Partners with paper copies of such documents; <u>provided</u> that the General Partner may agree in writing (which agreement shall not be a side letter or similar agreement for purposes of <u>Section 10.10</u>) in its sole discretion and at the request of any Limited Partner to limit the applicability of any portion of this sentence to such Limited Partner.

10.4    <u>Allocations</u>.

(a)    Except as required by Code § 704(c) and the Treasury Regulations thereunder, all income, gains, losses and deductions of the Partnership shall be allocated, for U.S. federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses and deductions among the Partners under <u>Section 3.2(b)</u> for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses and deductions shall be allocated among the Partners for tax purposes so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.  For the avoidance of doubt, items of expense or deduction in respect of Management Fees shall be allocated pursuant to <u>Section 5.1(e)</u>.

(b)    If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of its Partnership interest (whether under Code §83 or any similar provisions of any law, rule or regulation or any other applicable law, rule, regulation or doctrine) and the Partnership is entitled to any offsetting deduction, in the General Partner's discretion the Partnership's deduction may be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner.

10.5    <u>Custody of Securities</u>.  The Partnership's securities, to the extent practicable, will be held at a financial institution.  For the avoidance of doubt, uncertificated private placements will not be held with a financial institution.

10.6    <u>[Reserved]</u>.

10.7    <u>Tax Matters Partner</u>.  The General Partner is designated the "Tax Matters Partner" (as defined in Code §6231).

10.8    <u>Code §83 Safe Harbor Election</u>.

(a)    By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "<u>IRS Notice</u>") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS

Notice.  The Partnership and each Partner hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including the requirement that each Partner shall prepare and file any U.S. federal income tax returns that such Partner is required to file reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Partnership in a manner consistent with the requirements of the IRS Notice.  A Partner's obligations to comply with the requirements of this Section 10.8 shall survive such Partner's ceasing to be a Partner of the Partnership and/or the dissolution, liquidation, winding up and termination of the Partnership, and, for purposes of this Section 10.8, the Partnership shall be treated as continuing in existence.

(b)     Each Partner authorizes the General Partner to amend this Section 10.8 to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent Internal Revenue Service guidance); provided that such amendment is not materially adverse to such Partner (as compared with the after-tax consequences that would result if the provisions of the IRS Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

## ARTICLE XI

## CERTIFICATE OF LIMITED PARTNERSHIP; POWER OF ATTORNEY

11.1     Certificate of Partnership.  A certificate of Limited Partnership within the meaning of the Delaware Act (the "Certificate") was prepared prior to the execution and delivery of this Agreement.  The General Partner has caused the Certificate to be filed and recorded in the office of the Secretary of State of the State of Delaware, and, to the extent required by applicable law, the General Partner will cause the Certificate to be filed in the appropriate place in each state in which the Partnership may hereafter establish a place of business, but the Partnership shall not be obligated to provide the Limited Partners with a copy of any amendment to or restatement of the Certificate.  The General Partner will also cause to be filed, recorded and published, such statements, notices, certificates or other instruments required by any provision of any applicable law that governs the formation of the Partnership or the conduct of its business from time to time.

11.2     Power of Attorney.

(a)     Each of the undersigned, to the fullest extent permitted by applicable law, does hereby constitute, appoints and grants the General Partner with full power to act without the others, as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute or sign, acknowledge and deliver or file (i) the Certificate, (ii) any amendment to, modification to, restatement of or cancellation of the Certificate, (iii) all instruments, deeds, agreements, documents and certificates that may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (iv) all instruments, deeds, agreements, documents and certificates that may be required to effectuate the dissolution, liquidation, winding-up and termination of the Partnership or admit any additional partners or members thereto, except where such action requires the express approval of the Limited Partners hereunder, (v) any duly enacted amendment to this Agreement, including, without limitation, such amendments as are enacted pursuant to the provisions of the terms of this Agreement, and all instruments and documents that may be necessary or desirable to effectuate an amendment so approved, (vi) in the case of a Regulated Partner (including a Partner treated as a Regulated Partner hereunder) or Defaulting Partner, any bills of sale or other appropriate transfer documents necessary or advisable to effectuate Transfers of such Person's interest pursuant to Section 7.6 or Section 12.2, and (vii) such other documents, deeds, agreements or instruments as may be required

39

under the laws of any state, the United States or any other jurisdiction; provided, however, that the power of attorney granted to a person hereunder shall expire automatically upon the first to occur of any of the following events:  such person is convicted of a felony which brings the Partnership into material disrepute; such person files a voluntary petition in a bankruptcy or similar insolvency proceedings; or an involuntary petition in a bankruptcy or similar insolvency proceeding is filed with respect to such person which remains undismissed for 60 days.  The powers of attorney granted herein will be deemed to be coupled with an interest, will be irrevocable and will survive the death, incompetency, disability or dissolution of a Limited Partner.  The power of attorney granted pursuant to this Section 11.2 shall not be deemed to expand any right or duty of the General Partner otherwise granted or imposed hereunder.  Without limiting the foregoing, the powers of attorney granted herein will not be deemed to constitute a written consent of any Limited Partner for purposes of Section 12.1.

(b)      The appointment of attorney-in-fact provided in this Section 11.2 shall not revoke, in whole or in part, any powers of attorney previously or contemporaneously executed by the undersigned (including any power of attorney executed in connection with investing in the Partnership).  To the extent permitted by applicable law, this appointment shall not be revoked by any subsequent or contemporaneous power of attorney (including any power of attorney executed in connection with investing in the Partnership) that the undersigned may execute, unless the General Partner agrees and (i) such subsequent power of attorney specifically provides that it revokes the power of attorney provided by this Section 11.2 by referring to the power of attorney provided by this Section 11.2 and the name of the agent(s) appointed hereby as attorney(s)-in-fact and (ii) a copy of such subsequent power of attorney is provided to the agent(s) appointed hereby.

(c)      Each Limited Partner agrees to execute such other documents as the General Partner may reasonably request in order to effect the intention and purposes of the power of attorney contemplated by this Section 11.2.

## ARTICLE XII

## MISCELLANEOUS

12.1      Amendments.

(a)      This Agreement may be amended only by the written consent of the General Partner and, except as otherwise provided in this Agreement, the Limited Partners (other than Defaulting Partners) representing at least a majority of the Required Interests.

(b)      Notwithstanding anything in Section 12.1(a) to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) that alters this Section 12.1(b) or which increases or decreases such Limited Partner's Capital Commitment without the written consent of such Limited Partner.

(c)      Notwithstanding anything in Section 12.1(a) to the contrary, no amendment will be valid as to any Limited Partner which alters the provisions of Section 2.3, 3.2, 4.2, 4.3, 5.1, 8.4, 8.5, or this Section 12.1(c) (including any amendment which would alter a definition in such a manner as to alter any such provision) without the consent of Limited Partners representing at least three-quarters of the Required Interests.

(d)      Notwithstanding anything in Section 12.1(a) to the contrary, no amendment that would alter the provisions of this Section 12.1(d), or that would alter the definition of "Benefit Plan Investor" or would alter the provisions of Sections 3.1(b), 3.3(b), 6.6, 7.6 or 10.3(f) or the provision in the

first sentence of <u>Section 7.7</u> and would materially and adversely affect any Benefit Plan Investor's interest, shall be valid without the consent of Benefit Plan Investors representing at least three-quarters of the Required Interests held by Benefit Plan Investors.

(e)     Notwithstanding anything in <u>Section 12.1(a)</u> to the contrary, so long as a Subscription Facility exists, no amendment of this Agreement will be valid as to any Lender that would materially adversely affect such Lender.

(f)     [Reserved].

(g)     Notwithstanding anything in <u>Section 12.1(a)</u> to the contrary, no amendment that would alter the definitions of "BHCA," "BHCA Interest," "BHCA Limited Partner" or that would alter the provisions of this <u>Section 12.1(g)</u>, or would alter the provisions of <u>Section 7.10</u> and would materially and adversely affect any BHCA Limited Partner's interest in a manner that does not similarly materially and adversely affect the other Limited Partners generally, shall be valid without the consent of BHCA Limited Partners representing a majority of the Capital Commitments held by BHCA Limited Partners.

Notwithstanding anything in this Agreement to the contrary, this Agreement may be amended by the General Partner without the consent of any Limited Partner (i) in order to cure any ambiguity or error, make an inconsequential revision, provide clarity or to correct or supplement any provision herein that may be defective or inconsistent with any other provisions herein, <u>provided</u> that such amendment does not have a materially adverse effect on the Limited Partners, (ii) to add any obligation, representation or warranty of the General Partner or surrender any right or power granted to the General Partner, (iii) for such other purpose or purposes as the General Partner may deem to be necessary, appropriate, advisable, incidental or convenient to the management and conduct of the business and affairs of the Partnership, <u>provided</u> that, in the General Partner's judgment, no such amendment pursuant to this clause (iii) has or could be reasonably expected to have a materially adverse effect on the Partnership or any Limited Partner or (iv) following any change in U.S. federal income tax law that would have the effect of characterizing as ordinary income to the General Partner returns that under the law in effect as of the Initial Closing Date would be characterized as capital gain or qualified dividend income, in such manner as is determined by the General Partner in good faith, <u>provided</u> that, with respect to any amendment made pursuant to this <u>clause (iv)</u>, if the General Partner reasonably believes that such amendment would have a materially adverse effect on the interests of any Limited Partner, such amendment will not be effective with respect to such adversely affected Limited Partner unless such Person consents to such amendment. The General Partner shall provide a copy of any amendment to this Agreement to each Limited Partner at least 5 business days in advance of the General Partner giving its consent to such amendment.  The General Partner may, in its sole discretion, choose to deliver any proposed or effective amendment described in this <u>Section 12.1</u> via email and/or another electronic reporting medium in lieu of providing the Limited Partners with paper copies of such amendment; <u>provided</u> that the General Partner may agree in writing in its sole discretion and at the request of any Limited Partner to limit the applicability of any portion of this sentence to such Limited Partner.

Upon obtaining such required approvals or consents, if any, of the Limited Partners holding the requisite percentage of Required Interests and without any further action or execution by any other Person, including any Limited Partner (x) any amendment, restatement, modification or waiver of this Agreement may be implemented and reflected in a writing executed solely by the General Partner, (y) where the General Partner determines such action to be necessary notwithstanding <u>clause (x)</u> above, the General Partner shall be authorized and empowered by each Limited Partner, with full power of substitution, to execute, acknowledge, make, swear to, verify, deliver, record, file and/or publish all instruments and documents that may be necessary or desirable to effectuate any amendment to, restatement of, modification to or waiver of, this Agreement and (z) each Limited Partner and any other

party to this Agreement shall be deemed a party to and bound by such writing executed by the General Partner, in the case of clause (x), or such writing executed or action taken by the General Partner, in the case of clause (y), reflecting such amendment to, restatement of, modification to or waiver of, this Agreement.

12.2    Limited Partners Default on Capital Commitment.

(a)    If any Limited Partner (a "Defaulting Partner") fails to make full payment when due (a "Payment Default") of any portion of its Capital Commitment or any other payment required under this Agreement or such Limited Partner's subscription agreement for its interest in the Partnership (the amount of such defaulted payments in the aggregate, including all accrued and unpaid interest thereon, and together with any other unpaid amounts that are due and owing by such Limited Partner thereunder, the "Defaulted Amounts") and such Payment Default is not cured within 10 business days after written notice to such Defaulting Partner from the General Partner with respect to such Payment Default, other than a Regulated Partner whose Capital Commitment has been reduced in accordance with Section 7.6(j), the General Partner in its sole discretion, on its own behalf or on behalf of the Partnership, may (but shall not be obligated to) pursue and enforce any and all rights and remedies the Partnership and/or the General Partner may have against such Defaulting Partner at law, in equity or pursuant to any other provision of this Agreement or otherwise with respect thereto, including taking any one or more of the following actions in any order of priority:

(i)    In addition to all Defaulted Amounts owed by the Defaulting Partner, the Partnership may (A) accrue and collect interest computed on all Defaulted Amounts and any amount due to the Partnership or the General Partner pursuant to this Section 12.2 at an annual compounded rate not to exceed the Applicable Rate plus 6 percentage points per annum (but not in excess of the highest rate per annum permitted by law) as such rate shall be determined by the General Partner in its sole discretion with respect to each failure to make such payments, and/or (B) require reimbursement from the Defaulting Partner for all out-of-pocket expenses (including for attorneys' fees) incurred by the Partnership and the General Partner in connection with the collection and other efforts in respect of the Defaulted Amounts (which payment of such interest and expense reimbursement shall not be treated as a Capital Contribution by the Defaulting Partner).    The General Partner may require the payment of such interest and expense reimbursement whether or not it exercises any rights or remedies.

(ii)    So long as any Defaulted Amounts remain unpaid, the Partnership may withhold all distributions (or portions thereof) that would otherwise be made to the Defaulting Partner pursuant to this Agreement and apply such withheld distributions to offset any Defaulted Amounts owing by the Defaulting Partner to the Partnership or the General Partner under this Agreement or any other agreement.

(iii)    The General Partner may assist the Defaulting Partner in finding a buyer for all or any part of the Defaulting Partner's interest in the Partnership; provided that the General Partner shall not have any obligation to contact any particular Limited Partner or other Person with regard to such sale and shall have no liability to any Partner, including the Defaulting Partner, if no such buyer is found.

(iv)    The Partnership and the General Partner may pursue a lawsuit to collect the Defaulted Amounts due to the Partnership and the General Partner including amounts owed pursuant to Section 12.2(a)(i) and/or 12.2(a)(ix).    The General Partner may require the payment of such interest and expense reimbursement whether or not it exercises any rights or remedies.

(v)　　Subject to Section 12.2(a)(vii), the General Partner may cause the Defaulting Partner to forfeit up to 50% of its interest in the Partnership without payment or other consideration therefor, and the General Partner shall offer such forfeited portion of the Defaulting Partner's interest in the Partnership to the Partners (other than any Defaulting Partners and Persons not able to acquire such interests pursuant to Section 7.2(e) and 7.2(f)) pro rata according to their respective Capital Commitments.  The General Partner shall provide a notice to each Partner (other than Defaulting Partners) setting forth the amount of the forfeited portion of the Defaulting Partner's interest offered to such Partner.  In the event that any Partner does not elect to accept its pro rata share of the forfeited portion of a Defaulting Partner's interest in the Partnership, such forfeited portion not accepted will be offered again by the General Partner according to the provisions of this Section 12.2(a)(v) as if such forfeited portion had not previously been offered until either all of such interest is acquired or no Partner wishes to accept any further portion.  Subject to Section 12.2(a)(vii), to the extent a Defaulting Partner's interest forfeited pursuant to this Section 12.2(a)(v) is not reallocated to the Partners, the General Partner may in its sole discretion offer such interest to a third party or parties, each of which shall, as a condition of purchasing such interest, become a party to this Agreement.  The sole consideration to the Defaulting Partner for each portion of such Defaulting Partner's interest reallocated to another Partner or purchased by a third party pursuant to this Section 12.2(a)(v) shall be the assumption by such Partner or third party, as applicable, of the Defaulting Partner's obligation to make both defaulted and future Capital Contributions (together, in the General Partner's sole discretion, with interest) pursuant to its Capital Commitment that are commensurate with the portion of the Defaulting Partner's interest being reallocated to such Partner or purchased by such third party.  The Defaulting Partner acknowledges that it shall not receive any payment for any interest reallocated to Partners or purchased by a third party or parties pursuant to this Section 12.2(a)(v), including for any funded portion of its Capital Commitment related thereto, even though the purchased interest may actually have significant positive value at the time of such reallocation or purchase.

(vi)　　Subject to Section 12.2(a)(vii), to the extent a Defaulting Partner's interest is not forfeited and reallocated pursuant to Section 12.2(a)(v) (including the remaining portion of such Defaulting Partner's interest not subject to forfeiture), the General Partner may offer to the Partners (other than any Defaulting Partners and Persons not able to acquire such interests pursuant to Section 7.2(e) and 7.2(f)) the portion of the Defaulting Partner's interest in the Partnership that is not forfeited and reallocated or sold pursuant to Section 12.2(a)(v) at an aggregate price equal to the balance of such Defaulting Partner's Capital Account on the effective date such Defaulting Partner's interest is sold (adjusted, as necessary, to exclude any unrealized appreciation with respect to any Investment and to include all unrealized depreciation with respect to each Investment, as determined by the General Partner in its sole discretion) corresponding to the interest so offered.  At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall, as payment in full for the Defaulting Partner's interest being purchased by such Partner, deliver, as determined by the General Partner in its sole discretion, (x) cash and/or (y) a non-interest bearing, non-recourse three-year promissory note (in a form approved by the General Partner), secured only by the Defaulting Partner's interest being purchased, payable to the Defaulting Partner, in an aggregate amount equal to the purchase price for the interest being acquired by such Partner.  If the remaining portion of the Defaulting Partner's interest is not purchased in the manner set forth herein, the General Partner in its sole discretion may offer the remaining interest to a third party or parties on terms not more favorable than originally offered to the Partners, in which case such third party or parties shall, as a condition of purchasing such interest, become a party to this Agreement.

CHICAGO/#2577231.7

(vii)     Any Partner or third party acquiring a portion of the Defaulting Partner's interest shall assume the portion of the Defaulting Partner's obligation to make both defaulted and future Capital Contributions pursuant to its Capital Commitment (plus accrued and unpaid interest, if any, owing by the Defaulting Partner pursuant to Section 12.2(a)(i) unless waived by the General Partner in its sole discretion) that is commensurate with the portion of the Defaulting Partner's interest being acquired by such Person; provided that the General Partner shall have the right, in its sole discretion, to reduce the Capital Commitment pertaining to the portion of the Defaulting Partner's interest acquired by a Person to the amount of Capital Contributions made by the Defaulting Partner with respect to such portion of the Defaulting Partner's Partnership interest (which amount of Capital Contributions shall be equal to the pro rata portion of the aggregate Capital Contributions made by the Defaulting Partner with respect to its entire interest) on or prior to the date of the Payment Default, and the aggregate Capital Commitments of the Partnership shall be commensurately reduced; and provided further that, in the General Partner's sole discretion, such Defaulting Partner's Capital Commitment (and corresponding uncalled Capital Commitment) shall not be deemed reduced for purposes of Section 4.6.

(viii)    The General Partner may reduce (and such reduction shall be deemed to be effective as of the actual date of the Payment Default, without giving effect to any applicable cure period, or as of such later date as is determined by the General Partner) any portion of such Defaulting Partner's Capital Commitment (which has not been assumed by another Partner or third party) to the amount of the Capital Contributions (which have not been acquired by another Partner or third party) made by such Defaulting Partner (net of distributions pursuant to Section 3.1(d)), and the aggregate Capital Commitments of the Partnership shall be commensurately reduced; provided that, in the General Partner's sole discretion, such Defaulting Partner's Capital Commitment (and corresponding uncalled Capital Commitment) shall not be deemed reduced for purposes of Section 4.6; and further provided that no such reduction in a Defaulting Partner's Capital Contribution shall be effective as against a Lender that has advanced funds to the Partnership on account of such Capital Commitment.

(ix)     Notwithstanding anything contained herein to the contrary, from and after the date on which a Limited Partner has become a Defaulting Partner (or such later date as is determined by the General Partner), the General Partner in its sole discretion may make effective one or more of the following provisions:  (A) such Defaulting Partner will have no right to receive any distributions, except for distributions made upon the Partnership's liquidation, (B) upon the Partnership's liquidation the aggregate distributions that such Defaulting Partner shall be entitled to receive from the Partnership shall not exceed an amount equal to the excess, if any, of (1) the balance of such Defaulting Partner's Capital Account on the date on which the Defaulting Partner became a Defaulting Partner (adjusted to the extent determined by the General Partner in its sole discretion, as necessary, to exclude any unrealized appreciation with respect to any Investment and to include all unrealized depreciation with respect to each Investment, as determined by the General Partner in its sole discretion) (which balance has not been acquired by another Partner or third party) over (2) such Defaulting Partner's share of Partnership Expenses (including the Management Fee, determined, for this purpose, in accordance with Section 7.6(i)), Organizational Expenses and other items of Partnership loss and expense for all periods after the date on which the Defaulting Partner became a Defaulting Partner, determined as if there had been no reduction in such Defaulting Partner's Capital Commitment pursuant to Section 12.2(a)(viii), and such Defaulting Partner's Capital Account shall continue to be debited for (and, to the extent the Defaulting Partner does not return distributions pursuant to Section 4.6, the foregoing amount shall be reduced by) any Liability under Section 4.6 as if there had been no reduction in such Defaulting Partner's Capital Commitment, (C) until the amount described in clause (B) is reduced to zero, the Management Fee payable by the Partnership shall be calculated

and allocated among the Partners as if there had been no reduction in such Defaulting Partner's Capital Commitment hereunder, and (D) once the amount described in clause (B) is reduced to zero, (1) such Defaulting Partner's Capital Commitment shall be reduced to zero for all purposes of this Agreement (provided that, in the General Partner's sole discretion, such Defaulting Partner's Capital Commitment (and corresponding uncalled Capital Commitment) shall be deemed not reduced for purposes of Section 4.6), including the calculation of the Partnership's aggregate Capital Commitments and determination of the Management Fee and (2) such Defaulting Partner shall be liable each period to the General Partner for an amount equal to its portion of the Management Fee, determined, for this purpose, in accordance with Section 7.6(i), as if there had been no reduction in such Defaulting Partner's Capital Commitment hereunder.

(b)     No consent of any Limited Partner shall be required as a condition precedent to any Transfer of a Defaulting Partner's interest, or the admission of a transferee as a substitute Limited Partner with respect to such interest, pursuant to this Section 12.2.  Notwithstanding the foregoing, no Defaulting Partner's interest shall be transferred, and no Person shall become a substitute Limited Partner, in contravention of Section 7.2.

(c)     The General Partner shall handle the procedures of making the offers set forth in this Section 12.2 and shall in its discretion set time limits for acceptance.  In connection with any purchase of a Partnership interest pursuant to this Section 12.2, upon the General Partner's request, the Defaulting Partner shall make customary representations and warranties to each purchaser and will execute a customary transfer agreement.

(d)     The failure of any Limited Partner to fulfill an obligation hereunder shall not relieve any other Limited Partner of any of its obligations under this Agreement.

(e)     Notwithstanding the notice requirements of Section 3.1(a), additional Capital Contributions may be called by the General Partner on 5 business days' notice following a Limited Partner failing to fund any amount due pursuant to a Capital Call Notice.  In addition, the General Partner is authorized to apply amounts that would otherwise be distributed to a Partner to satisfy such Partner's obligation to make a Capital Contribution pursuant to Section 3.1(a) or any other payment required under this Agreement.  Such amounts applied shall be deemed distributed to such Partner by the Partnership and then contributed by such Partner to the Partnership as Capital Contributions or paid by such Partner to the Partnership, as applicable.

(f)     Notwithstanding anything in this Agreement to the contrary and unless otherwise determined by the General Partner in its sole discretion, during any period of time that a Limited Partner is a Defaulting Partner, such Defaulting Partner shall not be entitled to receive any of the reports, or information contained therein, provided for in Section 10.3 or any other information regarding the Partnership or any Investment, other than (i) a statement of such Defaulting Partner's closing Capital Account balance as and when provided by the General Partner to the other Limited Partners in accordance with Section 10.3, (ii) the Defaulting Partner's Schedule K-1s, as and when provided by the General Partner to the other Limited Partners in accordance with Section 10.3(b), and (iii) any additional reports and information that are required by applicable law.

(g)     Each Partner hereby acknowledges that certain provisions of this Agreement (including this Section 12.2) provide for specific consequences in the event of a breach of this Agreement by a Partner.  Each Partner hereby agrees that the default provisions of this Agreement are fair and reasonable and, in light of the difficulty of determining actual damages, represent a prior agreement among the Partners as to appropriate liquidated damages.  Without limiting the general effect of the preceding sentence, the Partners hereby specifically acknowledge and agree that the enforceability of this

45

Section 12.2 is essential to the stability of the Partnership as an organization and to the ability of the Partnership to effectively serve its purpose and conduct its business operations.

(h)     Each Limited Partner hereby specifically agrees that, in the event such Limited Partner becomes a Defaulting Partner, regardless of the reason therefor, such Limited Partner shall not be entitled to claim that the Partnership or any of the other Partners are precluded, on the basis of any fiduciary or other duty arising in respect of such Limited Partner's status as such or other equitable claim or theory, from seeking any of the penalties or other remedies permitted under this Agreement or applicable law.

12.3    Successors.  Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and permitted assigns.

12.4    Governing Law; Severability.  This Agreement will be construed in accordance with the laws of the State of Delaware, without regard to the conflict of law rules thereof, and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Act.  If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only in such jurisdiction and only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

12.5    Notices.  All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given on the date when personally delivered, 2 business days after being mailed by first class mail (postage prepaid and return receipt requested), when sent by facsimile or transmitted by email (if sent before 5 p.m. local time on a business day in the time zone to which it is sent (and otherwise on the next business day)), or on the date after being sent by reputable overnight courier service (charges prepaid), in each case to the recipient at the address, facsimile number or email address set forth in Schedule I or to such other address, facsimile number or email address or to the attention of such other Person as has been indicated to the General Partner in accordance with the provisions of this Section 12.5.  The General Partner may agree to limit or condition the use of any particular manner of notice described herein as it relates to one or more Limited Partners at such Person's request.

12.6    Legal Counsel.  Each Partner hereby agrees and acknowledges that:

(a)     The General Partner has retained legal counsel in connection with the formation of the Partnership and expects to retain legal counsel (collectively, "Law Firms") in connection with the operation of the Partnership, including making, holding and disposing of investments.  Except as otherwise agreed to by the General Partner in writing in its sole discretion, the Law Firms are not representing and will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner Interests, the management and operation of the Partnership, or any dispute that may arise between the Limited Partners on the one hand and the General Partner and/or the Partnership on the other (the "Partnership Legal Matters").

(b)     Except as otherwise agreed to by the General Partner in writing in its sole discretion, each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and will pay all fees and expenses of such independent counsel.

46

12.7    <u>Miscellaneous</u>.

(a)    <u>Entire Agreement</u>.  This Agreement, together with each Limited Partner's subscription agreement subscribing for an interest in the Partnership, contains the entire agreement among the respective parties and supersedes all prior arrangements or understanding with respect thereto; except that the Partnership and the General Partner may enter into, and this Agreement is deemed to include, side letters and similar written agreements with any Limited Partner(s) entered into by or on behalf of the Partnership or the General Partner on or after the date hereof; <u>provided</u>, <u>however</u>, that the parties agree that notwithstanding <u>Section 12.1</u> or <u>12.10</u> of this Agreement, each such agreement may be amended, modified, waived or terminated by the General Partner and the Limited Partner(s) who are parties thereto without the consent of any other Limited Partner (so long as such amendment or modification does not adversely affect their respective interests hereunder), and no Limited Partner not a party to any particular agreement is intended to be a third-party beneficiary of such agreement.

(b)    <u>Counterparts; Delivery of Original Forms</u>.  This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together shall constitute one agreement.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each party hereto or thereto will reexecute original forms thereof and deliver them to the requesting party.  No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(c)    <u>Descriptive Headings</u>.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(d)    <u>Construction</u>.  Unless the context otherwise requires:  (i) a term has the meaning assigned to it; (ii) "or" is not exclusive; (iii) words in the singular include the plural, and words in the plural include the singular; (iv) provisions apply to successive events and transactions; (v) the words "herein," "hereof" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) all references herein to Articles, Sections, Exhibits, paragraphs, subparagraphs and clauses shall be deemed to be references to Articles, Sections, paragraphs, subparagraphs and clauses of, and Exhibits to, this Agreement unless the context shall otherwise require; (vii) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (viii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (ix) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (x) references to "$" or "dollars" shall mean United States dollars; (xi) unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement, instrument or statute that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (A) in the case of agreements or instruments, by waiver or consent, and (B) in the case of statutes, by succession of comparable successor statutes, and references to all attachments thereto and instruments incorporated therein; and (xii) all references to any Partner shall mean and include such Partner and any Person duly admitted as a partner in the Partnership in substitution therefor in accordance with this Agreement, unless the context otherwise requires.  Whenever from the

context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and terms stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.  Each Limited Partner acknowledges that it participated in, or had the meaningful opportunity to participate in, the negotiations and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed to be the product of meaningful individualized negotiations between the General Partner and each Limited Partner and no presumption or burden of proof shall arise favoring or disfavoring any Partner by virtue of the authorship of any of the provisions of this Agreement.

(e)     Further Assurances.  Each Limited Partner hereby covenants and agrees on behalf of itself and its successors and assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish and deliver such other information, instruments, documents, tax forms and statements (including any information requested by the General Partner in relation to Code §§1471-1474) and to take such other actions as may be necessary or appropriate for the General Partner to effectively carry out the purposes of the Partnership and this Agreement.

12.8    Parallel Funds.  To facilitate investment by non-United States citizens and certain other Persons, the General Partner may form one or more parallel investment entities ("Parallel Funds") which will invest substantially all of their assets in the Partnership or invest in Investments on a pro rata basis with the Partnership.  Investments made by Parallel Funds in Investments and dispositions of such Investments will be made on substantially the same terms and conditions as the Partnership, subject to any tax, regulatory or legal restrictions that may limit the type or amount of such Investments or dispositions by the Partnership or the Parallel Funds.  The Partnership is a Parallel Fund to the Flagship Fund.

12.9    Insurance.  The General Partner, on behalf of the Partnership, may cause the Partnership to purchase and maintain insurance with such coverage as the General Partner reasonably deems appropriate for the protection of any Management Person against any liability incurred by such Persons in any such capacity.

12.10   Side Letters.  Notwithstanding any other provision of this Agreement, including Section 12.1, or of any subscription agreement, it is hereby acknowledged and agreed that the General Partner on its own behalf or on behalf of the Partnership without the approval of any Limited Partner or any other Person may enter into a side letter or similar agreement (a "side letter") to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any subscription agreement. The parties hereto agree that any terms contained in a side letter to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any subscription agreement.

12.11   No Third Party Beneficiaries.  Subject to Section 8.3(d), no Person (other than a Lender to the extent such rights have been assigned under a Subscription Facility) that is not a party hereto shall have any rights or obligations pursuant to this Agreement.  The provisions of this Agreement are intended to benefit the Partners and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Partnership.  To the fullest extent permitted by law, neither the Limited Partners nor the General Partner shall have any duty or obligation to any creditor of the Partnership to make any contribution to the Partnership or issue any Capital Call Notice or recall any distribution, except as specifically provided in this Agreement.  In no event shall any provision of this Agreement be enforceable for the benefit of any Person other than the Limited Partners, the General Partner and their respective successors and assigns (which may include, without limitation, a Lender under a Subscription Facility).

\*\*\*

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered by the General Partner and the Initial Limited Partner effective as of the date first above written and by each other party hereto effective as of the date that such party first acquired a Commitment.

**GENERAL PARTNER**:

**T2 ASSET OPPORTUNITY FUND IV, LP**

By: T2 Asset Opportunity Fund IV GP, LLC
Its:  General Partner

By:_____
Name:_____
Title:_____

**LIMITED PARTNER**:

_____
(Print or Type Name)

By:_____
Name:_____
Title:_____

50

# EXHIBIT 3C

**AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
T2 ASSET OPPORTUNITY FUND IV, LP**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................... 1
   1.1 Definitions ............................................................................................. 1
ARTICLE II ORGANIZATION ............................................................................... 9
   2.1 Continuation ........................................................................................... 9
   2.2 Name ....................................................................................................... 9
   2.3 Purpose ................................................................................................... 9
   2.4 Place of Business ................................................................................... 9
ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ................ 10
   3.1 Capital Commitment ............................................................................ 10
   3.2 Capital Accounts; Allocations ............................................................. 10
   3.3 Distributions in Kind ........................................................................... 11
   3.4 Determinations ..................................................................................... 12
   3.5 Reinvestment Rights ............................................................................ 12
   3.6 Alternative Investment Vehicles ......................................................... 13
ARTICLE IV DISTRIBUTIONS ............................................................................. 14
   4.1 Distribution Policy ............................................................................... 14
   4.2 Distribution of Short-Term Investment Income .................................. 15
   4.3 Distributions of Investment Proceeds .................................................. 15
   4.4 Distributions to the General Partner For Anticipated Taxes ............... 15
   4.5 Distributions in Excess of Basis .......................................................... 16
   4.6 Return of Distributions ........................................................................ 16
ARTICLE V MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES ..... 17
   5.1 Management Fee ................................................................................... 17
   5.2 Organizational Expenses ...................................................................... 17
ARTICLE VI GENERAL PARTNER ...................................................................... 18
   6.1 Authority .............................................................................................. 18
   6.2 Indebtedness ......................................................................................... 18
   6.3 Investment Period ................................................................................ 18
   6.4 Limitation on Investments ................................................................... 19
   6.5 UBTI; ECI ............................................................................................ 19
   6.6 Plan Asset Regulations ........................................................................ 19
   6.7 Ordinary Operating Expenses .............................................................. 19

**TABLE OF CONTENTS**

(continued)

Page

| | | |
|---|---|---|
| 6.8 | Conflicts of Interest | 19 |
| 6.9 | No Transfer of General Partnership Interest; No Withdrawal or Loans | 19 |
| 6.10 | No Liability to Partnership or Partners | 20 |
| 6.11 | Indemnification of General Partner | 20 |
| 6.12 | Formation of New Fund | 21 |
| 6.13 | [Reserved] | 21 |
| 6.14 | Other Interests | 21 |
| 6.15 | Co-Investment | 22 |
| ARTICLE VII | LIMITED PARTNERS | 22 |
| 7.1 | Limited Liability | 22 |
| 7.2 | Transfer of Limited Partnership Interests | 22 |
| 7.3 | No Withdrawal or Loans | 24 |
| 7.4 | No Termination | 24 |
| 7.5 | Additional Limited Partners | 24 |
| 7.6 | Government Regulation | 25 |
| 7.7 | Reimbursement for Payments on Behalf of a Partner | 29 |
| 7.8 | §754 Election | 30 |
| 7.9 | Written Consent | 30 |
| 7.10 | Bank Holding Company Act of 1956 | 30 |
| 7.11 | Confidential Information | 31 |
| ARTICLE VIII | DURATION AND DISSOLUTION | 32 |
| 8.1 | Duration | 32 |
| 8.2 | Early Termination | 32 |
| 8.3 | Removal of the General Partner | 33 |
| 8.4 | Liquidation of the Partnership | 34 |
| 8.5 | General Partner Give Back | 35 |
| ARTICLE IX | VALUATION OF PARTNERSHIP ASSETS | 36 |
| 9.1 | Normal Valuation | 36 |
| 9.2 | Restrictions on Transfer or Blockage | 36 |
| 9.3 | Write-down to Value | 36 |
| 9.4 | Adjustments Required by GAAP Accounting | 36 |
| ARTICLE X | BOOKS OF ACCOUNTS; MEETINGS | 36 |

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| | 10.1 | Books | 36 |
| | 10.2 | Fiscal Year | 36 |
| | 10.3 | Reports | 37 |
| | 10.4 | Allocations | 38 |
| | 10.5 | Custody of Securities | 38 |
| | 10.6 | [Reserved] | 38 |
| | 10.7 | Tax Matters Partner | 38 |
| | 10.8 | Code §83 Safe Harbor Election | 38 |
| ARTICLE XI | | CERTIFICATE OF LIMITED PARTNERSHIP; POWER OF ATTORNEY | 39 |
| | 11.1 | Certificate of Partnership | 39 |
| | 11.2 | Power of Attorney | 39 |
| ARTICLE XII | | MISCELLANEOUS | 40 |
| | 12.1 | Amendments | 40 |
| | 12.2 | Limited Partners Default on Capital Commitment | 42 |
| | 12.3 | Successors | 46 |
| | 12.4 | Governing Law; Severability | 46 |
| | 12.5 | Notices | 46 |
| | 12.6 | Legal Counsel | 46 |
| | 12.7 | Miscellaneous | 47 |
| | 12.8 | Parallel Funds | 48 |
| | 12.9 | Insurance | 48 |
| | 12.10 | Side Letters | 48 |
| | 12.11 | No Third Party Beneficiaries | 48 |

Schedule I    Schedule of Commitments (maintained by the General Partner with the books and records of the Partnership)

**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**T2 ASSET OPPORTUNITY FUND IV, LP**

This **AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP** dated as of December 1, 2014, is among T2 Asset Opportunity Fund IV GP, LLC, a Delaware limited liability company (the "General Partner"), and the Limited Partners (as defined herein).  The General Partner and the Limited Partners are collectively referred to herein as the "Partners."

WHEREAS, T2 Asset Opportunity Fund IV, LP (the "Partnership") was formed as a limited partnership under the Delaware Act (a) pursuant to a Certificate of Limited Partnership filed in the office of the Secretary of State of Delaware on October 15, 2014 and (b) by the Limited Partnership Agreement dated as of October 15, 2014 (the "Initial Agreement"), entered into by and between the General Partner, as general partner, and Jeff D. Brown, as the sole initial partner (the "Initial Limited Partner");

WHEREAS, the General Partner and the Initial Limited Partner desire to enter into this Amended and Restated Agreement of Limited Partnership (the "Agreement") in anticipation of the admission of additional limited partners and to amend and restate the Initial Agreement in its entirety as hereinafter set forth;

WHEREAS, the parties hereto desire to provide for the governance of the Partnership and to set forth in detail their respective rights and duties to the Partnership; and

WHEREAS, the Initial Limited Partner desires to withdraw as a limited partner of the Partnership upon the admission of one or more additional limited partners.

NOW, THEREFORE, in consideration of the mutual promises and agreements made herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby wish to amend and restate the Initial Agreement and enter into this Agreement as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions.   For purposes of this Agreement, the following terms shall have the meanings set forth below.  Additional defined terms are set forth in the subsequent sections of this Agreement.

"Active Partner" means a direct or indirect owner of the General Partner who is an active employee of the General Partner or its affiliates with respect to Partnership activities at the time of the event which requires that such Person's status as an Active Partner be determined.

"Additional Limited Partners" has the meaning set forth in Section 7.5.

"Additional Payment" has the meaning set forth in Section 7.5.

"Affiliate" of any Person means any other Person (excluding with respect to the General Partner and its affiliates, (i) any Investment and (ii) any investment of any fund or General Partner affiliate existing as of the Initial Closing Date and of any fund the formation of which is not prohibited by Section 6.12) controlling, controlled by or under common control with such Person.

"Agreement" means this Amended and Restated Agreement of Limited Partnership of T2 Asset Opportunity Fund IV, LP, as amended, supplemented, waived or otherwise modified from time to time in accordance with its terms.

"Allocable Share" means the fraction, but in no event greater than one, obtained by dividing (i) the Partnership's aggregate Investment Contributions invested in all Realized Investments by (ii) the Partnership's aggregate Investment Contributions invested in investments in all of the Partnership's existing and former Investments.

"Alternative Investment Vehicle" means any alternative investment vehicle used for making investments outside of the Partnership on a parallel basis with or in lieu of the Partnership.

"Applicable Law" has the meaning set forth in Section 7.6(a).

"Applicable Rate" means, at any time, a variable rate per annum equal to the rate of interest published, from time to time, in the Midwest Edition of The Wall Street Journal as the "prime rate" at large United States money center banks.

"Approved Executive Officer" shall mean each of Jeff D. Brown and John W. Southard (so long as each such Person is active in the Partnership's affairs), and any person recommended by the General Partner in writing and approved as an Approved Executive Officer by at least two-thirds of the Required Interests (so long as such Person is active in the Partnership's affairs).

"BHCA" means the U.S. Bank Holding Company Act of 1956, as amended (including any modifications made pursuant to the U.S. Gramm-Leach-Bliley Act), and other similar banking legislation, and the rules and regulations promulgated thereunder.

"BHCA Interest" means, as of the date of any determination, that portion of the Capital Commitment or Capital Contributions of a BHCA Limited Partner that exceeds 4.99% (or if modified by the BHCA without regard to Section 4(k) of the BHCA, such modified percentage) of total Capital Commitments or Capital Contributions, respectively, of the Limited Partners (other than BHCA Interests and any other Limited Partner interests, if any, that are non-voting interests) that are not Defaulting Partners.  Each BHCA Limited Partner and any affiliate of such BHCA Limited Partner that itself is a BHCA Limited Partner shall be considered a single BHCA Limited Partner for purposes of determining "BHCA Interest."

"BHCA Limited Partner" means, as of the date of any determination, (i) each Limited Partner that (A) is subject to the BHCA and (B) has notified the General Partner in writing of such status at any time prior to such determination (other than a Limited Partner that is investing under Section 4(k) thereof and has delivered a written notice to the General Partner so stating prior to or at the time of its investment) and (ii) any transferee of such Limited Partner but, with respect to such transferee, only to the extent that the portion of its Capital Commitment or Capital Contribution acquired from such Limited Partner was a BHCA Interest at the time of such acquisition.

"Benefit Plan Investor" means (i) an employee benefit plan subject to the provisions of Part 4 of Subtitle B of Title I of ERISA, (ii) an individual retirement account, annuity or other "plan" subject to Code §4975 or (iii) an entity the assets of which are deemed to be plan assets of an employee benefit plan or an individual retirement account or annuity under the Plan Asset Regulations, in each case which has notified the General Partner in writing of such status at any time prior to any determination hereunder.

CHICAGO/#2577231.6

"Business Day" means any day on which commercial banks are open for business in Chicago, Illinois.

"Capital Account" has the meaning set forth in Section 3.2(a).

"Capital Account Value" means, with respect to each Partner, the amount that would be distributed to such Partner by the Partnership if, on the date as of which such determination is being made, each investment owned by the Partnership had been sold at its "value" (determined in accordance with Article X) and the Partnership had been liquidated in accordance with Section 8.4.

"Capital Call Notice" has the meaning set forth in Section 3.1(a).

"Capital Commitment" with respect to any Partner, means the aggregate amount of cash that such Partner has agreed to contribute to the Partnership (excluding any Additional Payments paid pursuant to Section 7.5) as set forth in Schedule I hereto as the same may be modified from time to time under the terms of this Agreement.

"Capital Contribution" with respect to any Partner, means, subject to Sections 3.1(c) and 3.1(d), the amount of cash received by the Partnership from such Partner pursuant to its Capital Commitment (excluding any Additional Payments paid pursuant to Section 7.5).

"Carried Interest" means (i) the General Partner's right to receive distributions pursuant to Sections 4.3(d), 4.3(e)(ii) and advances with respect thereto pursuant to Section 4.4 and obligation to return such distributions and (ii) allocations of items of Partnership income, gain, loss or deduction related thereto.

"Cause Event" has the meaning set forth in Section 8.2(d).

"Certificate" has the meaning set forth in Section 11.1.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Confidential Information" means (i) all information, materials and data relating to any Partnership Entity or any Partner that are not generally known to or available for use by the public (including this Agreement, information and materials relating to products or services, pricing structures (including historical or projected pricing, cost, sales and profitability of each product or service offered), accounting and business methods, financial data (including historical performance data, investment returns, valuations, financial statements or other information concerning historical or projected financial condition, results of operations or cash flows), inventions, devices, new developments, methods and processes, prospective investments, customers, clients and investors, customer, client and investor lists, copyrightable works and all technology, trade secrets and other proprietary information), (ii) all information, materials and data the disclosure of which the General Partner in good faith believes is not in the best interests of any Partnership Entity or any Partner and (iii) all other information, materials and data, if any, which any Partnership Entity or any Partner is required by law or agreement to keep confidential.

"Confidential Memorandum" means that certain Confidential Private Placement Memorandum for the Private Placement of Limited Partnership Interests of T2 Asset Opportunity Fund IV, LP, dated December 1, 2014, and as thereafter amended or supplemented.

"Continuing Investment Approval" has the meaning set forth in Section 8.2(a).

3

"Conversion" has the meaning set forth in Section 8.3(b).

"Cost Contributions" mean (i) Capital Contributions (other than Investment Contributions) that are used to pay an expense of the Partnership (including Organizational Expenses and Partnership Expenses); provided that upon the liquidation of the Partnership, any Capital Contribution that is not an Investment Contribution shall be a Cost Contribution.  To the extent a Partner made a Cost Contribution to fund Management Fees which were subsequently reimbursed to such Partner under Section 5.1(b), such Partner's Cost Contribution shall be deemed reduced by the amount of such reimbursement.

"Current Income" means all interest, dividend, fee and similar income received by the Partnership from investments held by the Partnership (other than Short-Term Investment Income).

"Defaulted Amounts" has the meaning set forth in Section 12.2(a).

"Defaulting Partner" has the meaning set forth in Section 12.2(a).

"Delaware Act" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

"Designated Account" means an account designated by a Lender into which all Capital Contributions, when called, are to be directly deposited by the Partners.

"Disclosure Recipient" means, with respect to any Limited Partner, such Person's Affiliates, directors, officers, employees, representatives, agents, investors or attorneys.

"ECI" means (i) income which is "effectively connected with the conduct of a trade or business within the United States" for purposes of Code §§871(b)(1), 875 and 882(a)(1), and (ii) gains that are treated as income described in clause (i) of this definition under §897 of the Code.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, the related provisions of the Code, and the respective rules and regulations promulgated thereunder, in each case as amended from time to time, and judicial rulings and interpretations thereof.

"Excluded Limited Partner" means any Management Person that is also a Limited Partner.

"Extension Notice" has the meaning set forth in Section 8.1.

"Final Closing Date" means the date which is the 12 month anniversary of the Initial Closing Date, subject to the General Partner's ability to close earlier in its sole discretion.  The General Partner in its sole discretion may extend the Final Closing Date by up to three months.

"Flagship Fund" means T2 Opportunity Fund IV, LP, a Delaware limited partnership managed by T2 Capital Management IV, LLC, which is an affiliate of the General Partner.  The Partnership is a Parallel Fund (as defined below) to the Flagship Fund.

"Frozen Carried Interest" has the meaning set forth in Section 8.3(b).

"GAAP" means U.S. generally accepted accounting principles, consistently applied.

"General Partner Affiliates" has the meaning set forth in Section 7.6(a)(ii).

"GP Indemnitees" has the meaning set forth in Section 8.3(d).

CHICAGO/#2577231.6

"GP Removal Date" has the meaning set forth in Section 8.3(b).

"GP Removal Notice" has the meaning set forth in Section 8.3(a).

"Initial Agreement" has the meaning set forth in the preamble.

"Initial Closing Date" means the date on which investors are first admitted to the Partnership as Limited Partners pursuant to this Agreement, which is anticipated to occur in first quarter of 2015.

"Initial Limited Partner" has the meaning set forth in the preamble.

"Investment" means any investment made by the Partnership (including, without limitation, follow-on investments), but excluding Short-Term Investments. For the avoidance of doubt, Investments may include but are not limited to: senior debt (secured by first mortgages on the related property), mezzanine debt (secured by junior mortgages on a property or properties or equity interests in the entities owning a property or properties), preferred equity investments or hybrid investments in entities that own the related property.

"Investment Advisers Act" means the U.S. Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Investment Company Act" means the U.S. Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Investment Contributions" means all Subscription Facility Contributions and any other Capital Contributions that are used to make an Investment or, as determined by the General Partner, to pay expenses incurred in direct connection with the making, maintaining or disposing of such Investment. Subscription Facility Contributions shall be considered to be made in connection with the Investment that was funded by the associated Subscription Facility, as determined by the General Partner in its sole discretion.

"Investment Period" has the meaning set forth in Section 6.3.

"Investment Proceeds" means all cash, securities and other property received by the Partnership in respect of any Investment or portion thereof, and any proceeds thereof (excluding any portion thereof that constitute the Investment except to the extent that they are distributed to the Partners in kind), net of any expenses or taxes imposed on the Partnership in connection with such receipt, including Current Income and but not including Short-Term Investment proceeds.

"IRS Notice" has the meaning set forth in Section 10.8(a).

"Lender" means the administrative agent, servicer and each lender under a Subscription Facility, together with their respective participants, successors and assigns.

"Liability" has the meaning set forth in Section 4.6(b).

"Limited Partner Interests" has the meaning set forth in Section 3.4.

"Limited Partner Regulatory Problem" has the meaning set forth in Section 7.6(b).

"Limited Partners" means the Persons listed on Schedule I hereto in their capacity as limited partners of the Partnership (including each Person admitted to the Partnership in accordance with

Section 7.5) and each Person who is admitted to the Partnership as a substitute limited partner pursuant to Section 7.2 or 7.6, so long as each such Person continues to be a limited partner of the Partnership hereunder.

"Management Fee" has the meaning set forth in Section 5.1(a).

"Management Persons" means the General Partner, its Affiliates and each of their respective managers, officers and employees, and direct and indirect partners, members, shareholders, in their capacity as such.

"Net Benefit" means, as of any date of determination, the amount, if any, by which (i) the aggregate amount or value of all distributions made to the Partners pursuant to Section 4.3 on or prior to such date and not returned pursuant to Section 4.6 exceeds (ii) the aggregate amount of all Capital Contributions made by the Partners on or prior to such date.

"Non-Marketable Securities" means securities that are neither listed on a recognized securities exchange nor actively traded in the over-the-counter market or, if so listed or traded, are either held subject to a restriction or agreement adversely affecting their marketability or transferability or where the size of the Partnership's holdings compared to the trading volume would adversely affect their marketability.

"Non-U.S. Partner" means, with respect to any determination hereunder, any Limited Partner that is not (or any Limited Partner that is a flow-through entity for U.S. federal income tax purposes that has a partner or member that is not) a United States Person.

"Opinion of Limited Partner's Counsel" means a written opinion of any counsel selected by a Limited Partner, which counsel and form and substance of opinion is reasonably acceptable to the General Partner.

"Opinion of the Partnership's Counsel" means an opinion of Vedder Price P.C. or other counsel selected by the General Partner, which other counsel and form and substance of opinion is reasonably acceptable to the Limited Partner (or Limited Partners holding a majority of the Required Interests) directly affected by such opinion.

"Organizational Expenses" means all expenses (including, without limitation, travel, printing, legal and accounting fees and expenses) incurred in connection with or, as determined by the General Partner in good faith, reasonably allocable to the organization and funding of the Partnership, a Parallel Fund, an Alternative Investment Vehicle, the General Partner and its general partner.

"Parallel Funds" has the meaning set forth in Section 12.8.

"Partner Interest" means any determination to be made under this Agreement based on a specified proportion of the "Partner Interest" shall be based upon the Partners' respective Capital Contributions.

"Partnership" has the meaning set forth in Section 2.1.

"Partnership Entities" means, collectively, the Partnership, the General Partner and each of their respective affiliates, each general partner, manager or other control Person of any of the foregoing Persons and each existing or prospective Investment.

"Partnership Expenses" means all costs, expenses, liabilities and obligations relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by an Investment), including (i) all costs and expenses attributable to acquiring, holding, monitoring and disposing of the Partnership's investments (including interest on money borrowed by the Partnership, registration expenses and brokerage, finders', custodial and other fees), (ii) legal, accounting, auditing, consulting and other fees and expenses (including expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and Schedule K-1s), (iii) extraordinary expenses of the Partnership (including litigation costs and expenses and indemnification costs and expenses permitted by the terms of this Agreement, judgments and settlements), (iv) all out-of-pocket fees and expenses incurred by the Partnership or any Management Person relating to investment and disposition opportunities for the Partnership not consummated (including legal, accounting, consulting and other fees and expenses, financing commitment fees, real estate title and appraisal costs, environmental audits, and printing), and (v) the Management Fee, but not including Organizational Expenses.

"Partnership Group" means (i) the Partnership and (ii) any Alternative Investment Vehicle.

"Payment Default" has the meaning set forth in Section 12.2(a).

"Pending Investments" has the meaning set forth in Section 8.2(a).

"Person" means any individual, partnership, corporation, joint venture, trust, association or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Plan Asset Regulations" means U.S. Department of Labor rules and regulations, including 29 C.F.R. §2510.3-101 *et seq*, as amended by Section 3(42) of ERISA, that address the applicability of ERISA to entities in which employee benefit plans directly or indirectly invest.

"Preferred Return" means, with respect to each Partner, *the excess*, if any, of (i) the aggregate amount of distributions required to cause the internal rate of return from the Initial Closing Date through the date of determination on the aggregate Capital Contributions made to fund Realized Investments on or prior to the date of determination, and taking into account all prior distributions on Realized Investments, to equal 8.0% per annum, over (ii) the aggregate Capital Contributions made on or prior to the date of determination to fund Realized Investments.  For purposes of calculations of Preferred Return pursuant to this paragraph, (x) each Capital Contribution shall be treated as having been made on the date such Capital Contribution was required to be paid to the Partnership (as set forth in the applicable Capital Call Notice) and (y) distributions made shall be given effect as of the date made.

"Realized Investments" means the portion of each Investment that has been disposed of or completely written off for federal income tax purposes by the Partnership.

"Regulated Partner" has the meaning set forth in Section 7.6(b).

"Regulatory Sale" has the meaning set forth in Section 7.6(f).

"Regulatory Solution" has the meaning set forth in Section 7.6(e).

"Reimbursing Partner" has the meaning set forth in Section 7.7.

"Required Interests" has the meaning set forth in Section 3.4.

7

"Reusable Amounts" has the meaning set forth in Section 3.5.

"Short-Term Investment Income" means  income earned on Short-Term Investments, including any gains and net of any losses from dispositions of Short-Term Investments, and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means (i) evidences of indebtedness issued or unconditionally guaranteed by the United States, or issued by any agency or instrumentality, thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition by the Partnership, (ii) certificates of deposit or acceptances, with a maturity of one year or less from the date of acquisition by the Partnership, of any financial institution that is a member of the Federal Reserve System and has combined capital and surplus and undivided profits of not less than $250,000,000, (iii) commercial paper, with a maturity of 1 year or less from the date of acquisition by the Partnership, issued by a corporation organized under the laws of any state of the United States or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Services and at least P-1 by Moody's Investors Service, Inc., (iv) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency or instrumentality thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition by the Partnership, and (v) money market funds and mutual funds, the assets of which are solely invested in items described in clauses (i) through (iv) of this definition.

"Special Limited Partner" has the meaning set forth in Section 8.3(b).

"Subscription Facility" means a credit facility under which the Partnership is an obligor and that is secured by, among other things, the unfunded or unutilized Capital Commitments of the Partners.

"Subscription Facility Contribution" means any Capital Contribution made for the purpose of paying principal, interest or other amounts payable to a Lender under a Subscription Facility.

"Tax Amount" means, with respect to a fiscal year and with respect to the General Partner, an amount equal to the anticipated taxes with respect to the Partnership income allocated to such Partner in respect of its Carried Interest for such fiscal year.  All calculations of anticipated taxes pursuant to this definition shall assume that (i) such Partner is subject to the highest applicable marginal U.S. federal, state and local tax rates to which any of the General Partner's individual (i.e., human being) partners or former partners is subject, taking into account the deductibility of U.S. state and local taxes, subject to any applicable limitations on deductibility, and the character of any income, gains, deductions, losses or credits, (ii) for purposes of determining the tax benefit of a deduction, loss or credit, the General Partner's only income, gains, losses, deductions and credits for such fiscal year and each prior fiscal year are income, gains, deductions, losses and credits attributable to its ownership interest in the Partnership with respect to its Carried Interest, (iii) with respect to any distribution of investments in kind received by such Partner, such investments are sold in a taxable transaction immediately after their receipt by such Partner for an amount equal to their value determined for purposes of Section 3.3(a), and (iv) any Partnership losses allocated to such Partner in prior periods but not previously utilized as an offset against income or gains pursuant to this paragraph are available for offset against income and gains (to the extent permitted by applicable tax law) with respect to such fiscal year.

"Tax Exempt Partner" means, with respect to any determination hereunder, any Limited Partner that is (or any Limited Partner that is a flow-through entity for U.S. federal income tax purposes that has a partner or member that is) exempt from U.S. federal income taxation under Code §501(a).

8

"Transfer" has the meaning set forth in Section 7.2(a).

"UBTI" means Partnership income that is treated as unrelated business taxable income as defined in §512 and §514 of the Code.

"United States" or "U.S." means the United States of America, its territories and possessions, any State of the United States of America and the District of Columbia.

"United States Person" means a "United States person" as defined in Code §7701(a)(30).

"Unpaid Preferred Return" means, with respect to each Partner, as the date of any determination, the excess, if any, of (i) such Partner's Preferred Return, over (ii) the aggregate amount of all distributions made to such Partner pursuant to Sections 4.3(c), 4.3(d)(i), and 4.3(e)(i).

"Unrealized Loss" means, as of any date of determination, the excess, if any, of (i) the aggregate amount of Investment Contributions used to fund all investments held by the Partnership that are not Realized Investments over (ii) the aggregate value of such investments as determined under Section 9.1.

## ARTICLE II

## ORGANIZATION

2.1     Continuation.

(a)     The Initial Limited Partner and the General Partner hereby amend and restate the Initial Agreement by deleting the Initial Agreement in its entirety and replacing it with this Agreement. The Partners hereby agree to continue the limited partnership (the "Partnership") pursuant to and in accordance with the Delaware Act.  The term of the Partnership commenced upon the filing of the Certificate with the Secretary of State of Delaware (the date of such filing is referred to herein as the date of "formation" of the Partnership) and shall continue until dissolution of the Partnership in accordance with the provisions of Article VIII hereof.

(b)     Upon the admission of the first additional Limited Partner to the Partnership, (i) the Initial Limited Partner hereby simultaneously withdraws as a limited partner of the Partnership, and none of the Partners shall have any claim against the Initial Limited Partner as such, and (ii) the Initial Limited Partner shall receive a return of any capital contributions made by it to the Partnership and have no further right, interest or obligation of any kind whatsoever as a Partner of the Partnership.

2.2     Name.  The name of the Partnership will be "T2 Asset Opportunity Fund IV, LP" or such other name or names as the General Partner may from time to time designate upon written notice to the Limited Partners.

2.3     Purpose.   The Partnership is organized for the object and purpose of investing in securities or other assets of the kind or nature described in the Confidential Memorandum as thereafter amended or supplemented prior to the date hereof, managing, supervising and disposing such investments, and engaging in such activities incidental or ancillary thereto as the General Partner deems necessary or advisable.

2.4     Place of Business.  The General Partner will maintain its principal office in Wheaton, Illinois, or at such other place or places as the General Partner may from time to time designate.

## ARTICLE III

## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1     Capital Commitment.

(a)     Subject to Sections 3.1(c), 7.6 and 12.2, each Partner shall make contributions to the capital of the Partnership pro rata, based upon the Partners' respective Capital Commitments, in an aggregate amount not greater than its Capital Commitment by contributing installments in cash when and as called by the General Partner upon at least 10 days' prior written notice (a "Capital Call Notice"). Each cash Capital Contribution to the Partnership shall be made by wire transfer of immediately available funds to a bank account designated by the General Partner, or during the duration of a Subscription Facility, to a Designated Account.

(b)     Notwithstanding the provisions of Section 3.1(a) above, each Partner's obligation to fund its Capital Commitment will expire at the end of the Investment Period; provided that the Partners shall remain obligated to make Capital Contributions throughout the duration of the Partnership (or longer as set forth in Section 4.6) pursuant to their respective Capital Commitments to the extent necessary to (i) fund follow-on Investments, (ii) fund Subscription Facility Contributions, (iii) fulfill commitments to invest in companies evidenced in writing as of such date, (iv) to complete investments in transactions that were in process as of such date that are funded within 6 months following such date and (v) pay Partnership Expenses and other obligations of the Partnership, including obligations pursuant to Section 4.6.  Notwithstanding anything in this Agreement to the contrary, a Partner's obligation to make Subscription Facility Contributions shall be without defense, counterclaim or setoff of any kind.

(c)     The General Partner may cause the Partnership to return to the Partners all or any portion of any Capital Contribution to the Partnership which is not invested in an Investment or used to pay Partnership Expenses or Organizational Expenses.  Each such return of Capital Contributions shall be returned to all Partners in proportion to the cash Capital Contribution made by each such Partner and such returned Capital Contributions may be called again by the General Partner according to the provisions of this Section 3.1 as if such returned Capital Contribution had not been previously called and funded.

(d)     Distributions to a Partner (regardless of the source or character thereof other than distributions to the General Partner with respect to its Carried Interest) pursuant to Section 4.2 or Section 4.3 may, at the General Partner's sole discretion, be treated for purposes of this Section 3.1 as Capital Contributions returned to such Partner pursuant to the provisions of Section 3.1(c) to the extent such Partner has made Cost Contributions, and any such amounts so treated as returned may be called again by the General Partner according to the provisions of this Section 3.1 as if such amounts had not been previously called and funded.

3.2     Capital Accounts; Allocations.

(a)     The Partnership shall maintain a separate capital account for each Partner (each, a "Capital Account") according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv).  For this purpose, the Partnership may, upon the occurrence of any of the events specified in U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)(g) to reflect a revaluation of Partnership property.

(b)     Items of Partnership income, gain, loss, expense or deduction (determined according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv) for any fiscal period shall

CHICAGO/#2577231.6

be allocated among the Partners in such manner that, as of the end of such fiscal period and to the greatest extent possible, the Capital Account of each Partner shall be equal to the respective net amount, positive or negative, that would be distributed to such Partner from the Partnership or for which such Partner would be liable to the Partnership under this Agreement, determined as if, on the last day of such fiscal period, the Partnership were to (a) liquidate the assets of the Partnership for an amount equal to their book value (determined according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)) and (b) distribute the proceeds in liquidation in accordance with Section 8.4; provided, that the Management Fee shall be allocated among the Limited Partners in accordance with the amount calculated for each Limited Partner under Section 5.1.  Notwithstanding the foregoing and prior to making allocations under the preceding sentence, the provisions of the U.S. Department of Treasury Regulations promulgated under Code §704(b) relating to qualified income offset, minimum gain chargeback, minimum gain chargeback with respect to partner nonrecourse debt, allocations of nonrecourse deductions, allocations with respect to partner nonrecourse debt, and limitations on allocations of losses relating to a partner's adjusted capital account deficit are hereby incorporated by reference and shall be applied in such manner determined by the General Partner to the allocation of income, gain, loss and deduction in the manner provided in such regulations.

3.3     Distributions in Kind.

(a)     If any securities are to be distributed in kind to the Partners as provided in Article IV, (i) such securities will first be written up or down to their value (as determined, pursuant to Article IX, as of the date of such distribution), (ii) any investment gain or investment loss resulting from the application of clause (i) shall be allocated to the Partners' respective Capital Accounts in accordance with Section 3.2(b), (iii) such security shall be deemed to have been sold at the value determined pursuant to clause (i) and the proceeds of such sale distributed pursuant to Article IV and (iv) the value of any distributed securities (as determined pursuant to clause (i)) shall be debited against the Partners' respective Capital Accounts upon a distribution of such securities.

(b)     In connection with any distribution of securities in kind, the General Partner may, in its sole discretion, offer to all Partners the right to receive at their election all or any portion of such distribution in the form of the net proceeds actually received by the Partnership, on behalf of such Partners, from a disposition of such securities that otherwise would have been distributed to such Partners in kind; provided that in the event the Partnership disposes of securities on behalf of a Partner, neither the Partnership nor the General Partner, notwithstanding anything contained herein to the contrary, shall have any liability whatsoever to such Partner or the Partnership with respect to such disposition (including without limitation with respect to the timing of such disposition) other than for willful malfeasance; and provided further that the distribution to any or all of the Limited Partners of the net proceeds of Investments or other securities that otherwise could have been distributed to such Partners in kind, whether at the election of such Limited Partners or otherwise, shall not affect the right of the General Partner or any other Partner to receive its portion of such distribution in kind.  Notwithstanding any provision contained in this Agreement to the contrary, any (i) expenses (including commissions and underwriting costs) of such disposition and (ii) gain or loss recognized by the Partnership upon the disposition of such securities (including any increase or decrease in the value of such securities from the value of such securities (as determined in accordance with Article IX and Section 3.3(a)) had no election to receive proceeds of a disposition of such securities been made and such securities been distributed to all Partners in accordance with Section 3.3(a)) shall be allocated equitably only among those Partners receiving proceeds instead of securities in kind, and any gain or loss created under Section 3.3(a) with respect to securities distributed in kind shall be allocated equitably only among those Partners receiving such securities in kind.  Upon receipt from a Limited Partner of an opinion of counsel (which opinion and counsel shall be reasonably acceptable to the General Partner) to the effect that there is a material likelihood that a distribution of particular securities to such Limited Partner would cause such Limited

11

Partner to be in violation of an applicable law, including ERISA, the General Partner shall not distribute such securities to such Limited Partner and shall use reasonable efforts to dispose of such securities and distribute the net proceeds to such Limited Partner in accordance with the other provisions of this Section 3.3(b). The General Partner will provide each Benefit Plan Investor 10 days' prior written notice before the Partnership makes an in-kind distribution to the Partners.

(c)    Except as set forth in Section 3.3(b), to the extent feasible, each distribution of securities (other than pursuant to Section 7.6) shall be apportioned among the Partners in proportion to their respective interests in the proposed distribution, except to the extent a disproportionate distribution of such securities is necessary to avoid distributing fractional shares.

(d)    Each Limited Partner covenants and agrees that, without the prior written consent of the General Partner, it will not use any information it obtains with respect to a distribution or proposed distribution by the Partnership of securities in kind to effect, at any time prior to the actual date and time of such distribution, purchases or sales of or other transactions involving, or contracts for the purchase or sale of or other transactions involving, securities of the same class or series as those distributed, securities convertible into or exchangeable for such securities, or derivatives of any of the foregoing securities.

(e)    The Partnership will retain sole dominion and control over all securities of Investments thereof (including any securities sold in accordance with Section 3.3(b)) owned by the Partnership until such time as such investments are sold or distributed by or at the direction of the Partnership, with sole discretion over voting and disposition, including determining when to sell such securities. For all purposes under this Agreement (including calculations of distributions and Capital Accounts, but not including allocations of taxable income) other than this Section 3.3, any Limited Partner electing to receive proceeds pursuant to Section 3.3(b) nonetheless shall be treated as if such Partner had received a distribution of securities in kind in accordance with Section 3.3(a) contemporaneously with the other Partners.

3.4    Determinations.

(a)    Any determination to be made under this Agreement or the Delaware Act based upon a majority or other specified proportion or percentage of the "Capital Commitments" and any other vote hereunder or under the Delaware Act involving the Limited Partners shall disregard any consent, approval or vote with respect to (i) except as set forth in Section 12.1, any Limited Partner Interest held by a Defaulting Partner, (ii) any interest held by a Management Person and (iii) any other interests that are not entitled to vote on a particular matter pursuant to the terms of this Agreement, including pursuant to Section 7.10. Such proportion or percentage shall be expressed as a fraction, based on Capital Commitments and shall be calculated by excluding from both the numerator and the denominator the aggregate of all interests described in clauses (i) through (iii) above. Any determination to be made based upon a specified proportion of the "Limited Partner Interests" shall be based upon the applicable Person's Capital Commitments. "Required Interests" means the Limited Partner Interests, excluding the interests described in clauses (i) through (iii) above. Except for the consent rights of specified groups of Limited Partners specifically set forth herein, the Limited Partners shall be deemed to constitute a single class or group for purposes of all voting and consent rights provided for herein or under the Delaware Act.

(b)    The Preferred Return for each Partner shall be determined whenever allocations to the Partners' Capital Accounts are made pursuant to Section 3.2(b) or distributions are made pursuant to Section 4.3 or more frequently as deemed appropriate by the General Partner in its sole discretion.

3.5    Reinvestment Rights.

The Partnership may in the sole discretion of the General Partner and subject to <u>Section 6.3</u>, make an Investment using Investment Proceeds received by the Partnership during the Investment Period from the liquidation, sale or debt refinancing of, or otherwise with respect to, all or a portion of any Investment to the extent such proceeds represent a return of Capital Contributions (as opposed to profit, as determined by the General Partner in its sole discretion) ("<u>Reusable Amounts</u>").  Reusable Amounts may instead be reinvested by any Alternative Investment Vehicle in accordance with the terms of the governing documents of any such entity, and amounts available for reinvestment by any Alternative Investment Vehicle may instead be reinvested by the Partnership in accordance with the terms hereof. Any Reusable Amounts so retained under this <u>Section 3.5</u> shall be deemed to have been distributed to the Partners and subsequently re-contributed by the Partners for the purposes for which they were retained, but shall not be treated as increasing or reducing a Limited Partner's Capital Commitment (or funded portion thereof) to the Partnership.

      3.6     <u>Alternative Investment Vehicles</u>.

If the General Partner determines in good faith that, for legal, tax or regulatory reasons, some or all of the Partners should participate in a potential Investment through an alternative investment structure, the General Partner shall be permitted to structure the making of all or any portion of such Investment outside of the Partnership by requiring any such Partner or Partners, as determined by the General Partner in good faith, to make such Investment indirectly through an Alternative Investment Vehicle.   The General Partner shall use its reasonable best efforts to ensure that the Alternative Investment Vehicle's assets will not constitute "plan assets" under ERISA.   The Partners required to join such an Alternative Investment Vehicle shall be required to make Capital Contributions directly to each such Alternative Investment Vehicle, to the same extent, for the same purposes and on the same terms and conditions as Partners are required to make Capital Contributions to the Partnership, and such Capital Contributions shall reduce the Capital Commitment of the Partners required to join such an Alternative Investment Vehicle to the same extent as if Capital Contributions were made to the Partnership with respect thereto. The General Partner may execute organizational documents of any such Alternative Investment Vehicle on behalf of the Partners so required as contemplated pursuant to the power of attorney contained in Section 11.1 of this Agreement.  Each Partner shall have the same economic interest (on a pre-tax basis) in all material respects in Investments made pursuant to this <u>Section 3.6</u> as such Partner would have if such Investment had been made solely by the Partnership, and the other terms of any such Alternative Investment Vehicle shall be substantially identical in all material respects to those of the Partnership, except for differences required for legal, tax, regulatory or liquidation reasons.   Such Alternative Investment Vehicle (or the entity in which such Alternative Investment Vehicle invests) shall provide for the limited liability of the Limited Partners that is no less favorable than that provided for under Delaware law as a matter of the organizational documents of such Alternative Investment Vehicle (or the entity in which such Alternative Investment Vehicle invests) and as a matter of local law.  The General Partner or an Affiliate thereof will serve as the general partner (or equivalent thereof) with respect to such Alternative Investment Vehicle.   Subject to applicable legal, tax and regulatory considerations, any Alternative Investment Vehicle shall terminate upon the termination of the Partnership.   The determination of the allocations and distributions pursuant to Articles III and IV and the General Partner Give Back under Section 8.5 shall be calculated by treating investments made by any Alternative Investment Vehicles as having been made by the Partnership.  During the duration of a Subscription Facility, and notwithstanding the fact that an Alternative Investment Vehicle may not be an obligor thereunder, all Capital Contributions made to an Alternative Investment Vehicle pursuant to this Section 3.6 shall be made to a Designated Account.

## ARTICLE IV

## DISTRIBUTIONS

4.1     <u>Distribution Policy</u>.

(a)     The General Partner shall make distributions of cash, property and securities from time to time as described in this <u>Section 4.1</u> and in the manner described in <u>Sections 4.2</u> and <u>4.3</u>. Subject to the provisions of this <u>Section 4.1</u>, the General Partner shall distribute cash received by the Partnership constituting Current Income and Short-Term Investment Income at least quarterly, and shall distribute the net cash proceeds from disposition of Investments (including, if applicable, the portion which represents the original cost of such Investment) as promptly as reasonably practicable following receipt thereof.  Notwithstanding the foregoing, the General Partner shall use its reasonable best efforts to distribute net cash proceeds from disposition of Investments within 30 days following receipt of such funds by the Partnership.  Notwithstanding the foregoing and anything else to the contrary contained herein, all distributions of Partnership assets (including Current Income, Short-Term Investment Income and net cash proceeds from disposition of Investments) will be subject to the availability of cash after setting aside appropriate reserves for anticipated or contingent obligations, liabilities and commitments of the Partnership as reasonably determined by the General Partner, including, without limitation, any such obligations, liabilities or commitments arising in connection with a Subscription Facility.  Except as set forth in <u>Section 3.1(d)</u> and <u>Section 3.5</u>, net cash proceeds from the sale of Investments shall not be reinvested by the Partnership in Investments.  Notwithstanding anything in this Agreement to the contrary, the General Partner may deem, at its sole election, all or any portion of net cash proceeds, Short-Term Investment Income or Current Income as having been distributed to the Partners and simultaneously returned pursuant to <u>Section 3.1</u> to the Partnership as Capital Contributions pursuant to the Partners' Capital Commitment, but only to the extent that the General Partner could have made capital calls for such Capital Contributions pursuant to <u>Section 3.1</u>.  In addition, for purposes of <u>Section 4.3</u>, the General Partner may elect to distribute Current Income from an Investment that is not a Realized Investment in the same manner as if such Investment were a Realized Investment.

(b)     Prior to the winding-up and liquidation of the Partnership, and except as otherwise permitted under <u>Section 7.6</u>, in-kind distributions will include only (A) securities which are listed or quoted on a United States national securities exchange or quoted on a United States national automated inter-dealer quotation system and which the General Partner reasonably believes are (x) not subject to any "hold-back" or "lock-up" agreement, (y) eligible for sale by the distributee under Rule 144 of the Securities Act of 1933, as amended, (in making such determination, the General Partner may assume, whether or not true, that the distributee is not an affiliate of the issuer of such securities and that there are no facts or circumstances particular to the distributee that are not applicable to the distributees generally that otherwise impose a legal restriction on such distributee resulting in such securities being ineligible for immediate sale) and (z) eligible for sale by the Partnership under Rule 144(k) of the Securities Act of 1933, as amended, (assuming the Partnership is not an affiliate of the issuer of such securities) and (B) Non-Marketable Securities which the General Partner, in its sole discretion, believes will promptly be converted into, exchanged for or otherwise become cash or marketable securities.

(c)     Notwithstanding anything in this Agreement to the contrary, the General Partner may at any time elect to defer distribution of all or any portion of any cash distribution that otherwise would be made to it on account of its Carried Interest.  Any amount that is not distributed to the General Partner due to the preceding sentence, in the General Partner's sole discretion, either shall be retained by the Partnership on the General Partner's behalf or distributed to the Partners (other than to the General Partner with respect to its Carried Interest) pursuant to <u>Section 4.3</u>.  If an amount is not distributed to the General Partner pursuant to this <u>Section 4.1(c)</u>, then the General Partner in its sole discretion may elect to

14

receive all or any portion of any subsequent cash distributions (or if the General Partner elects in its sole discretion, solely those made out of profits) until the General Partner has received the same aggregate amount of cash distributions it would have received had it not elected to defer such distributions pursuant to the first sentence of this Section 4.1(c).

(d)     Notwithstanding anything to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, shall not be required to make a distribution to any Partner on account of its interest in the Partnership to the extent such distribution would violate the Delaware Act or other applicable law or the terms of any Subscription Facility.

4.2     Distribution of Short-Term Investment Income.  Short-Term Investment Income shall be distributed among the Partners (other than Defaulting Partners) ratably in proportion to their respective interests in the assets generating such Short-Term Investment Income, as determined by the General Partner.

4.3     Distributions of Investment Proceeds.  Subject to prior repayment of any Subscription Facility or other indebtedness of the Partnership, and subject to Sections 3.5, 7.7, and 12.2, Investment Proceeds from any Investment shall be initially apportioned among the Partners participating in such Investment pro rata in accordance with their Investment Contributions made to fund such Investment. Amounts so apportioned to the General Partner shall be distributed to the General Partner, and amounts so apportioned to each Limited Partner shall be distributed to such Limited Partner (other than a Defaulting Partner) and the General Partner as follows:

(a)     First, 100% to such Limited Partner until such Partner has received distributions pursuant to this Section 4.3(a) equal to the sum of (i) such Partner's aggregate Investment Contributions made with respect to Realized Investments and (ii) such Partner's pro rata share (based on the Partners' respective Capital Commitments) of the Unrealized Loss;

(b)     Second, thereafter, 100% to such Limited Partner until such Partner has received distributions pursuant to this Section 4.3(b) equal to the aggregate amount of Allocable Share of such Partner's Cost Contributions;

(c)     Third, thereafter, 100% to such Limited Partner until the Unpaid Preferred Return of such Limited Partner is reduced to zero;

(d)     Fourth, 100% to the General Partner, until the General Partner has received cumulative distributions under this Section 4.3(d)(ii) with respect to such Limited Partner equal to 40% of all distributions made to such Limited Partner pursuant to Section 4.3(c) and made or being made to such Limited Partner and the General Partner pursuant to Section 4.3(d)(i) and (ii); and

(e)     Fifth, (i) 60% to such Limited Partner and (ii) 40% to the General Partner.

4.4     Distributions to the General Partner For Anticipated Taxes.  Notwithstanding the priorities set forth in Section 4.3, the General Partner shall have the authority to cause the Partnership to make distributions pursuant to this Section 4.4 to the General Partner (subject to Section 7.7) based on the excess, for such Partner, of such Partner's anticipated Tax Amount in respect of its Carried Interest for such fiscal year, over the amount of distributions previously made to such Partner pursuant to Article IV with respect to such fiscal year. Such distributions shall be treated for all purposes hereof, other than this Section 4.4, as advances of distributions pursuant to Section 4.2 or the appropriate paragraph of Section 4.3 (as reasonably determined by the General Partner), and thus shall reduce dollar for dollar the amount of future distributions to such Partner pursuant to Section 4.2 or the appropriate paragraph of

15

Section 4.3.  For purposes of applying this Section 4.4, the General Partner's Carried Interest and its interest attributable to its Capital Commitment shall be treated as interests held by different Partners.

4.5    Distributions in Excess of Basis.  In the event that the General Partner otherwise would receive a cash distribution hereunder pursuant to Section 4.3 or otherwise (other than in connection with the liquidation and winding up of the Partnership) in excess of its U.S. federal income tax basis in its interest in the Partnership, if elected by the General Partner, the amount of such distribution shall not be distributed to the General Partner until such time, if any, as such distribution would not be in excess of the General Partner's tax basis in its interest in the Partnership.

4.6    Return of Distributions.

(a)    If the Partnership incurs any Liability, the General Partner may in its sole discretion call previously uncalled Capital Commitments pursuant to Section 3.1 (notwithstanding anything to the contrary in Section 3.1(b)) (in such case, which uncalled amounts shall be funded by the Partners within 10 days after the date of any notice in the form of a Capital Call Notice or other written request by the General Partner), but in no event shall any Partner be required to contribute amounts pursuant to this Section 4.6 after the date 18 months after the Partnership's termination except to fund a Liability or Liabilities of which the General Partner has delivered to the Partners on or prior to such date written notice of such Liability or Liabilities.

(b)    For purposes of this Section 4.6, "Liability" means any liability or obligation that the Partnership would be required by this Agreement or otherwise to pay if it had adequate funds, including (i) the expenses of investigating, defending or handling any pending or threatened litigation or claim arising out of the Partnership's activities, investments or business, (ii) the amount of any judgment or settlement arising out of such litigation or claim, and (iii) the Partnership's obligation to indemnify any Partner or other Person pursuant to Section 6.11 or otherwise.

(c)    Any amounts contributed by a Partner pursuant to Section 4.6(a)(ii) shall be credited to such Partner's Capital Account but shall not constitute a Capital Contribution hereunder.  For purposes of Sections 4.3 and 8.5, without duplication, such contributions by a Partner shall be treated as reductions of the applicable distribution amounts received by such Partner.  Any debit pursuant to Section 3.2(a) on account of a Liability shall be allocated to the Partners' Capital Accounts after crediting the contributions required by this Section 4.6 to the Partners' Capital Accounts.

(d)    A Partner's obligation to make contributions to the Partnership under this Section 4.6 shall survive the dissolution, liquidation, winding up and termination of the Partnership, subject to any limitations on survival expressed elsewhere in this Section 4.6, and for purposes of this Section 4.6, the Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 4.6, including instituting a lawsuit to collect any contribution with interest from the date such contribution was required to be paid under Section 4.6(a) calculated at a rate equal to the Applicable Rate plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

(e)    The rights and remedies contained in this Section 4.6 shall be exercisable only by the General Partner for the benefit of the Partnership and the General Partner, and nothing in this Section 4.6 is intended to or shall provide any Person that is not a party hereto with any rights or remedies with respect to or under this Agreement.

## ARTICLE V

## MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES

5.1     <u>Management Fee</u>.

(a)     <u>General</u>.  As compensation for managing the affairs of the Partnership, the Partnership shall pay the General Partner a fee (the "<u>Management Fee</u>") in the amounts set forth below, payable in arrears on a monthly basis during the period commencing on the Initial Closing Date and ending on Partnership's last day of the monthly period after the <u>earliest to occur</u> of (x) the dissolution of the Partnership pursuant to Article VIII and (y) unless the General Partner receives Continuing Investment Approval, the date 6 months after a Cause Event.  If the first day that the Management Fee is payable is not for a full calendar month, the Management Fee shall be prorated on a daily basis according to the actual number of days in such period.

(b)     During the Investment Period, the monthly Management Fee shall equal 1/12 of 1.5% of the aggregate Capital Commitments.  To the extent the Partnership does not fully call the Partners' Capital Commitments on or prior to the expiration of the Investment Period, the General Partner shall return to the Partnership, without interest, the portion of the Management Fees assessed against such uncalled Capital Commitments.  Thereafter, the Partnership shall refund such amounts to the Limited Partners pro rata in proportion to which such Management Fees were assessed against such Partners.

(c)     From and after the expiration of the Investment Period, the monthly Management Fee shall equal 1/12 of 1.5% of the Partnership's aggregate Investment Contributions, excluding any Investment Contributions made to fund Realized Investments.

(d)     Notwithstanding <u>Section 5.1(b)</u> and <u>Section 5.1(c)</u> above, the Management Fee otherwise assessed against a Limited Partner shall be reduced: (i) by 25 basis points per annum, if such Limited Partner makes a Capital Commitment in an amount at least equal to $3 million (regardless of when such Capital Commitment is made), and (ii) by 25 basis points per annum, if such Limited Partner makes its Capital Commitment during the first 3 months following the Initial Closing Date (regardless of the amount of such Capital Commitment).  For the avoidance of doubt, a Limited Partner that makes the minimum Capital Commitment described in clause (i) and also makes such commitment within the time period set forth in clause (ii) shall be entitled to a reduction of 50 basis points per annum.  In addition, the General Partner in its sole discretion may otherwise reduce or waive its Management Fee for Management Persons or for other Limited Partners at the discretion of the General Partner.

(e)     100% of any amount treated for U.S. federal income tax purposes as an item of expense in respect of the Management Fee shall be allocated to the Limited Partners ratably in accordance with their respective Capital Commitments, as adjusted for a Partner to the extent the Management Fee is reduced (including by operation of <u>Section 5.1(d)</u>) or waived for such Partner.  Notwithstanding anything to the contrary in this Agreement, the benefit of any such reduction or waiver shall be specially allocated to such Partner(s) for all purposes of this Agreement, including <u>Section 4.3</u>.

5.2     <u>Organizational Expenses</u>.  The Partnership will reimburse the General Partner for up to $500,000 of Organizational Expenses.

17

## ARTICLE VI

## GENERAL PARTNER

6.1     <u>Authority</u>.

(a)     The management of the Partnership will be vested exclusively in the General Partner (acting directly or through its duly appointed agents), and the General Partner will have full control over the business, assets, conduct and affairs of the Partnership.  Subject to the terms of this Agreement, the General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objectives and purposes of the Partnership, and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, it deems necessary or advisable or incidental thereto, including the power to acquire and dispose of any investment (including marketable securities).

(b)     All matters concerning the following shall be reasonably determined in good faith by the General Partner, whose determination shall be final and conclusive as to all Partners absent manifest error:  (i) except to the extent otherwise expressly provided in this Agreement, the allocation and distribution of net profits, net losses, Investment Proceeds, Short-Term Investment Income, and the return of capital among the Partners, including taxes thereon, and valuations, and (ii) accounting procedures and determinations, estimates of the amount of Management Fees payable by any Defaulting Partner or Regulated Partner, tax determinations and elections, determinations as to on whose behalf expenses were incurred and the attribution of fees and expenses to Investments, and other determinations not specifically and expressly provided for by the terms of this Agreement.

(c)     Third parties dealing with the Partnership may rely conclusively upon the General Partner's certification that it is acting on behalf of the Partnership and that its acts are authorized. The General Partner's execution of any agreement or document on behalf of the Partnership is sufficient to bind the Partnership for all purposes.

6.2     <u>Indebtedness</u>.  The General Partner may incur indebtedness on behalf of the Partnership and in connection therewith may pledge Partnership assets and the unfunded or uncalled Capital Commitments of the Partners as collateral for such indebtedness.  Partnership indebtedness may be secured by the Partnership's assets and the Partnership's right to call and receive, and the General Partner's right to call, each Partner's Capital Contributions.  The General Partner anticipates that the aggregate amount of indebtedness incurred by the Partnership and outstanding from time to time shall not exceed 50% of the Fund's net asset value (disregarding any outstanding amounts under a Subscription Facility) at the time of borrowing as determined by the General Partner in its sole discretion.  For purposes of the preceding sentence, "indebtedness incurred by the Partnership" shall not include indebtedness of entities in which an Investment is an equity interest.   Notwithstanding anything in this <u>Section 6.2</u> to the contrary, there is no limitation on indebtedness that the Partnership may incur in connection with repurchasing any Partnership interest from a Regulated Partner or a Defaulting Partner and any such indebtedness shall not be applied to the limitations on the amount of indebtedness set forth in this <u>Section 6.2</u>.

6.3     <u>Investment Period</u>.  The Partnership's investment period will commence on the Initial Closing Date and end on the date that is 18 months after the Final Closing Date or on such earlier date as determined by the General Partner ("<u>Investment Period</u>").  Following the end of the Investment Period, the Partnership will not make new Investments (other than Short-Term Investments) except to fund Pending Investments, then-existing commitments and follow-on Investments.

18

6.4     Limitation on Investments.

(a)     From and after the date the Partnership has received aggregate Capital Commitments in excess of $50,000,000, the Partnership shall not invest an amount that would exceed 15% of the aggregate Capital Commitments of the Partners (measured as of the date any such Investment is to be made) in any single Investment.  For the purposes of this Section 6.4, each loan in any portfolio of Investments not originated by the Partnership or a wholly-owned subsidiary of the Partnership shall be treated as a separate Investment.  For the avoidance of doubt, an investment in a wholly-owned subsidiary of the Partnership, or an entity jointly owned by the Partnership and one or more parallel investors, will not itself be considered an Investment subject to the restrictions in this Section 6.4(a).

(b)     The Partnership will not make any Investments which, at the time of the Investment, are outside of the United States.

6.5     UBTI; ECI.  The Partnership may engage in transactions that will cause Tax Exempt Partners and Non-U.S. Partners to recognize UBTI or ECI, respectively, as a result of their investment in the Partnership.

6.6     Plan Asset Regulations.  The General Partner will use its reasonable best efforts to ensure that the Partnership's assets will not constitute "plan assets" under ERISA.

6.7     Ordinary Operating Expenses.  The General Partner shall pay (a) all ordinary overhead and administrative expenses of the Partnership incurred by the General Partner in connection with maintaining and operating their offices (including salaries, rent, travel, entertainment and equipment expenses), but excluding any Partnership Expenses and any Organizational Expenses reimbursable under Section 5.2 and (b) Organizational Expenses to the extent not reimbursed under Section 5.2.

6.8     Conflicts of Interest.

(a)     Each Management Person of the General Partner shall devote so much of its time to the affairs of the Partnership as in its reasonable judgment the conduct of the Partnership's business shall reasonably require and each Management Person shall not be obligated to do or perform any act or thing in connection with the Partnership's business not expressly set forth herein.  Subject to the foregoing, but notwithstanding any other provisions to the contrary in this Agreement, each Management Person will be permitted to perform similar duties for any other entity.

(b)     Nothing herein contained shall be deemed to preclude a Management Person from engaging directly or indirectly in any other business or from directly or indirectly purchasing, selling or holding securities, options, separate accounts, investment contracts, currency, currency units or any other asset and any interests therein for their own accounts or for the account of any other Person, whether as investment adviser, dealer, broker or otherwise.  No Partner shall, by reason of being a Partner, have any right to participate in any manner in any profits or income earned or derived by or accruing to a Management Person from the conduct of any business other than the Partnership's business or from the conduct of any activities for any account other than that of the Partnership.

6.9     No Transfer of General Partnership Interest; No Withdrawal or Loans.  The General Partner will not sell, assign, pledge, mortgage or otherwise dispose of its general partner interest in the Partnership, will not withdraw from the Partnership prior to the dissolution of the Partnership and will not borrow or withdraw any amount from the Partnership, except as expressly permitted by this Agreement.  Any such sale, assignment, pledge, mortgage or disposition in contravention of this Section 6.9 shall be void.  The General Partner shall not permit an Approved Executive Officer (in each case, only for so long

19

as such person continues to be an Active Partner) to voluntarily transfer (other than to such Person's immediate family) more than 50% of such person's initial interest in the Carried Interest, and any such voluntary transfers may only be made (a) to the partners of the General Partner as of the date hereof, (b) to employees of the General Partner or any Affiliate thereof, (c) for charitable purposes, or (d) for estate planning or to Persons related to such transferor (including, without limitation, through marriage and/or adoption); underlined provided that any Approved Executive Officer may transfer up to 75% of his interest in the Carried Interest to a trust, partnership, limited liability company or similar vehicle for the benefit of such Person or his immediate family (so long as such trust, partnership, limited liability company or similar vehicle continues to be for the benefit of such Person or such Person's immediate family). Notwithstanding any provision of this Agreement, including this Section 6.9, if the General Partner is regulated as a registered investment adviser under the Investment Advisers Act, the General Partner shall not engage in any "assignment" (within the meaning of the Investment Advisers Act) of its interest in the Partnership without the requisite consent required under the Investment Advisers Act; provided that the rights of the Limited Partners with respect to any breach of this sentence shall be limited to those set forth in the Investment Advisers Act.

6.10   No Liability to Partnership or Partners.   To the extent permitted by applicable law, neither the General Partner nor any of its direct or indirect owners, managers, members, partners, shareholders, directors, officers, employees (including any Approved Executive Officer), agents, advisors, representatives or contractors, nor any of their respective affiliates shall be liable to any Limited Partner or the Partnership for (i) any action taken or failure to act as General Partner, or on behalf of the General Partner, except to the extent of the General Partner's or such other person's gross negligence, willful malfeasance or willful breach of a material provision of this Agreement, (ii) any action or inaction arising from reliance upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants selected and retained by any of them in good faith or (iii) any action or inaction of any agent, contractor or consultant selected and retained by any of them in good faith.  This Section 6.10 shall not be deemed to limit the liability, if any, of an Approved Executive Officer for gross negligence or willful malfeasance by such Person in the course of the performance of his duties to the Partnership and the General Partner.

6.11   Indemnification of General Partner.   To the extent permitted by applicable law, the Partnership will indemnify the General Partner and, unless otherwise determined by the General Partner in its sole discretion, each of the General Partner's respective direct and indirect members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates (and their respective members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates) (each of the foregoing, an "Indemnified Party") against any claims, losses, liabilities, damages, costs or expenses (including attorney fees, judgments and expenses in connection therewith and amounts paid in defense and settlement thereof) to which any of such Persons may directly or indirectly become subject in connection with the Partnership, the General Partner or in connection with any involvement with an Investment (including serving as an officer, director, consultant or employee for any Investment) directly or indirectly on behalf of the Partnership, but only to the extent that such Person acted in good faith and (1) acted in a manner reasonably believed to be in the best interests of the Partnership or an Investment, (2) was neither grossly negligent nor engaged in willful malfeasance, (3) did not willfully breach a material provision of this Agreement and such breach was the direct proximate cause of the loss for which indemnification is being sought and (4) with respect to any criminal action, did not have reasonable cause at the time of such action to believe that his, her or its conduct was unlawful.  For purposes of Section 6.10 and this Section 6.11, no Indemnified Party shall, under any circumstances, be deemed grossly negligent for good-faith errors of judgment where such Person was acting in a manner which a reasonably prudent private equity fund manager would have reasonably believed to be in the best interest of the Partnership.  The Partnership may, in case of any Person indemnifiable under this Section 6.11, in the sole judgment of the General

20

Partner, pay the expenses of such Person in advance of the final disposition of any proceeding, so long as (i) with respect to any derivative action brought by any Limited Partner, the Person receiving the advance is not the subject of such derivative action, (ii) with respect to any direct action brought by Limited Partners holding at least a majority of the Required Interests, the Person receiving the advance is not the subject of such direct action, (iii) the General Partner has a good-faith belief such expenses are indemnifiable, and (iv) the General Partner receives a written undertaking by such Person to repay the full amount advanced if there is a final determination that such Person did not satisfy the standards set forth in clauses (1)-(4) immediately above or that such Person is not otherwise entitled to indemnification as provided herein.  Each Indemnified Party shall use its reasonable efforts to seek indemnification from any available insurance obtained by the Partnership or any Investment for purposes of reducing the indemnification obligations of the Partnership under this Section 6.11; provided that if an Indemnified Party is entitled to indemnification hereunder and is also entitled to recovery under any such insurance policy with respect to such claim, the Indemnified Party shall not be required to incur costs and expenses prior to receipt of insurance proceeds but shall be entitled to indemnification hereunder and shall reimburse the Partnership to the extent it subsequently receives insurance proceeds in respect of the matter giving rise to such indemnification claim.  Notwithstanding anything to the contrary in this Agreement, the Partnership may in the sole judgment of the General Partner pay any obligations or liabilities arising out of this Section 6.11 as a secondary indemnitor at any time prior to any primary indemnitor making any payments any such primary indemnitor owes, it being understood that any such payment by the Partnership shall not constitute a waiver of any right of contribution or subrogation to which the Partnership is entitled (including against any primary indemnitor) or relieve any other indemnitor from any indemnity obligations.   Notwithstanding anything to the contrary in this Section 6.11, the Partnership shall not indemnify the General Partner or any of their respective partners or members against the costs of defending any litigation, including settlement costs with respect thereto, in connection with an internal dispute solely among such Persons.

6.12    Formation of New Fund.  Each Partner's interest in the business endeavors of the other Partners is limited to his or its interest in the Partnership and no Partner's future business activities are restricted, except that the General Partner may not undertake any activity other than as permitted in the following sentences.  Notwithstanding the foregoing, neither the General Partner nor any Approved Executive Officer (nor any of their respective Affiliates) will form or manage any pooled investment vehicle (other than the Partnership) with an investment objective substantially similar to that of the Partnership as set forth in Memorandum until the earlier of (i) the expiration of the Investment Period; or (ii) the date on which at least seventy-five percent (75%) of the aggregate Capital Commitments of the Partners have been invested or committed for investment in Investments, as determined by General Partner in its reasonable discretion.  The sole remedy available to the Limited Partners for any violation of this Section 6.12 shall be to obtain injunctive relief and in no event shall any damages (monetary or otherwise) or other such relief be available.  Notwithstanding the foregoing, the General Partner may establish Parallel Funds to invest substantially all of their assets in the Partnership or proportionately alongside the Partnership and on effectively the same terms as the Partnership.  In addition, the General Partner may establish Alternative Investment Vehicles as described in Section 3.6.

6.13    [Reserved].

6.14    Other Interests.  If a Limited Partner requests the General Partner to assist it in finding a purchaser for all or any portion of its interest in the Partnership, the General Partner and/or its designees, in the General Partner's sole discretion and without in any way limiting the provisions of Section 7.2, may elect to (a) purchase all or a portion of such interest, provided that such interest is not greater than $2 million, and/or (b) offer and sell all or a portion of such interest on behalf of the selling Limited Partner to one or more of the Limited Partners (but not necessarily all Limited Partners) and/or to one or more third parties who are not Limited Partners.  To the extent that the General Partner acquires the

interest of a Defaulting Partner, a Regulated Partner or any other Limited Partner, the General Partner will (subject to Section 3.4) be deemed to be a Limited Partner with respect to such interest for all purposes of this Agreement; provided that the General Partner may elect in its sole discretion at any time to convert all or any portion of such interest into a general partner interest in the Partnership.  No consent of any Limited Partner shall be required as a condition precedent to any such Transfer or any conversion from a limited partner interest to a general partner interest contemplated by this Section 6.15.

6.15    Co-Investment.  The General Partner may (but shall not be obligated to) permit one or more Limited Partners and their Affiliates and/or other Persons to make investments ("Co-Investments") in one or more Investment, without making such investment opportunities available to other Limited Partners.  The General Partner, in its sole discretion, shall allocate the available investment among the Partnership and the Persons, if any, who are co-investing.

## ARTICLE VII

## LIMITED PARTNERS

7.1    Limited Liability.  The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation to make contributions to the Partnership in excess of their respective Capital Commitments specified in Schedule I, except to the extent set forth in this Section 7.1 and Sections 3.1(d), 3.5, 4.6, 7.2(c), 7.5, 7.6, 7.7, 10.3(e), 10.8 and 12.2 hereof and the Delaware Act; provided that a Limited Partner shall be required to return any distribution made to it in error.  The Limited Partners (in their capacity as such) will take no part in the control, management, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

7.2    Transfer of Limited Partnership Interests.

(a)    Except as otherwise explicitly contemplated herein, a Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of (a "Transfer") all or any of its interest in the Partnership (including any transfer or assignment of all or a part of its interest to a Person who becomes an assignee of a beneficial interest in the Partnership even though not becoming a substitute Limited Partner) unless the General Partner has consented to such Transfer or assignment in writing, which consent shall not be unreasonably withheld with regard to an assignment by a Limited Partner of its entire beneficial interest to any one Person if all of the following conditions are satisfied as reasonably determined by the General Partner:  (1) such assignee constitutes only one beneficial owner of the Partnership's securities for purposes of the Investment Company Act and only one partner of the Partnership within the meaning of U.S. Department of Treasury Reg. §1.7704-1(h), (2) such assignee is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act and a "qualified client" within the meaning of the rules and regulations promulgated under the Investment Advisers Act, (3) such assignment does not cause the General Partner, any of its affiliates, the Partnership or any of the Limited Partners to be subjected to (or materially increase its obligation with respect to) any regulations or reporting requirements that the General Partner reasonably believes to be significant or burdensome or to any tax obligation, (4) the assignee in the General Partner's judgment has the financial ability to hold the Limited Partner interest and perform in a timely manner all of its obligations as a Limited Partner under this Agreement, and (5) as reasonably determined by the General Partner, none of such assignee, its Affiliates, agents or advisors or any Person associated with such assignee is a competitor of the Partnership, the General Partner, any Investment or any of their respective Affiliates, except that a Limited Partner which is a trust under an employee benefit plan may, upon prior written notice to the General Partner, (i) assign a beneficial interest in all or a portion of its interest in the Partnership to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor or a sponsor which was formerly the affiliate of the sponsor (in which case the

transferor shall remain liable for all liabilities and obligations relating to the transferred beneficial interest) or (ii) change a trustee or fiduciary of a Limited Partner, provided any such replacement trustee or fiduciary is also a fiduciary as defined under applicable state law.  No consent of any other Limited Partner shall be required as a condition precedent to any Transfer.  The voting rights of any Limited Partner Interest shall automatically terminate upon any Transfer of such interest to a trust, heir, beneficiary, guardian or conservator or upon any other Transfer if the transferor no longer retains control over such voting rights and the General Partner has not consented pursuant to Section 7.2(b) to such transferee becoming a substitute Limited Partner.  As a condition to any Transfer of a Limited Partner Interest (including a Transfer not requiring the consent of the General Partner), (1) the transferor and the transferee shall provide such legal opinions, certificates and other documentation and information (including information necessary to comply with the requirements of Code §743, if applicable) as the General Partner shall reasonably request, and (2) if required under a Subscription Facility, either the transferor (as a condition precedent to such transfer) or the transferee (as a condition precedent to its admission as a Partner) shall make a pro rate Subscription Facility Contribution for any amounts advanced under the Subscription Facility Contribution on account of the transferor's Capital Commitment.

(b)    Notwithstanding anything to the contrary contained in this Section 7.2, Section 7.6 or 12.2, a transferee or assignee of a Limited Partner Interest shall not become a substitute Limited Partner without the prior written consent of the General Partner in its sole discretion and without executing a copy of this Agreement or an amendment hereto in form and substance satisfactory to the General Partner in its sole discretion, provided, however, that, except for Transfers which would permit the General Partner to withhold its consent pursuant to Section 7.2(f) below, the consent of the General Partner shall not be required for the admission of a transferee or assignee as a substitute Limited Partner if such transferee or assignee is a trust, fiduciary, or employee benefit plan receiving its interest in a transaction or under the circumstances described in Section 7.2(a)(i) or (ii) above. Any substitute Limited Partner admitted to the Partnership with the consent of the General Partner shall succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the interest to which such Limited Partner was substituted.

(c)    Unless the General Partner otherwise determines in its sole discretion, the transferor and transferee of any Limited Partner Interest shall be jointly and severally obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses and any immediate or ongoing accounting costs attributable to the Partnership's compliance with the requirements of Code §743(b) or (e) with respect to the transferred interest) of any Transfer or proposed Transfer of a Limited Partner Interest, whether or not consummated.

(d)    The transferee of any Limited Partner Interest shall be treated as having made all of the Capital Contributions made by, and received all of the allocations and distributions received by, the transferor of such interest in respect of such interest.

(e)    Notwithstanding any other provision of this Agreement, no Transfer (including any Transfer of an interest in Partnership profits, losses or distributions) shall be permitted if such Transfer would (i) unless the General Partner otherwise consents in its sole discretion, cause (A) the Partnership to have more than 100 partners, as determined for purposes of U.S. Department of Treasury Reg. §1.7704-1(h) or (B) the aggregate Transfer of Limited Partner Interests for a given Partnership taxable year to exceed 2% of total Limited Partner Interests (excluding for this purpose, any Transfer by a Limited Partner described in U.S. Department of Treasury Reg. § 1.7704-1(e), (f) or (g)), (ii) unless the General Partner otherwise consents in its sole discretion, cause the Partnership to lose its ability to rely on any exemption from registration under the Investment Company Act upon which the Partnership is entitled to rely at such time, (iii) cause the Partnership to be treated as a publicly traded partnership within

23

the meaning of Code §7704 and U.S. Department of Treasury Reg. § 1.7704-1, (iv) cause all or any portion of the assets of the Partnership to constitute "plan assets" under ERISA, (v) result in a material default under any Subscription Facility, or (vi) create a significant risk of causing the results contemplated by any of <u>clauses (i)</u> through <u>(v)</u>, as determined by the General Partner in its sole discretion.

(f)     The General Partner may withhold its consent to the Transfer of any Partnership Interest (and no such Transfer shall be made) if the proposed Transfer would create a material risk of a violation of applicable law by the General Partner, the Partnership or any General Partner Affiliate or a material risk that the Partnership or the General Partner would be subject to any governmental regulation requiring any registration or filing requirement which the General Partner believes to be significant (including any registration under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Investment Advisers Act or the Investment Company Act) or that the Partnership or any Partner (other than the assignor Partner and assignee) would be subject to any tax liability or increase in tax liability.

(g)     Any Transfer that violates this <u>Section 7.2</u> shall be void and the purported buyer, assignee, transferee, pledgee, mortgagee, or other recipient shall have no interest in or rights to Partnership assets, profits, losses or distributions and neither the General Partner nor the Partnership shall be required to recognize any such interest or rights.

7.3     <u>No Withdrawal or Loans</u>.   Subject to the provisions of <u>Sections 7.2</u>, <u>7.6</u> and <u>12.2</u>, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.   Notwithstanding the foregoing, the General Partner may on behalf of the Partnership, without the consent of any Limited Partner, enter into any agreement that permits a Limited Partner to withdraw from the Partnership in accordance with provisions substantially similar to those set forth in <u>Section 7.6</u> or any side letter or similar agreement of the Partnership (e.g., in the event such Limited Partner would be in violation of applicable law or policy of such Limited Partner or subjected to a materially burdensome tax, law or regulation if such Limited Partner were to continue as a limited partner of the Partnership).

7.4     <u>No Termination</u>.   The substitution, death, incompetency, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

7.5     <u>Additional Limited Partners</u>.   The General Partner may accept additional Limited Partners ("<u>Additional Limited Partners</u>") and/or accept additional Capital Commitments from existing Limited Partners, until the Final Closing Date.   Any Additional Limited Partner will be treated as having been a party to this Agreement as of the Initial Closing Date (or any such additional Capital Commitment will be treated as having been made as of the Initial Closing Date) for all purposes, and will be required to bear a portion of the Partnership Expenses (including the Management Fee) and Organizational Expenses equivalent to that which would have been borne by such Limited Partner had such Limited Partner been a Limited Partner (or had such increased Capital Commitment been made) on the Initial Closing Date, and will be required to contribute its portion of all Capital Contributions made from the Initial Closing Date. On the date of its admission to the Partnership (in the case of Additional Limited Partners), or the date of acceptance of a Partner's subscription to increase its Capital Commitment, each such Partner entering into such arrangement shall (i) make a Capital Contribution to the Partnership in an amount (a "<u>Subsequent Contribution</u>") equal to its portion of all Capital Contributions made by the other Partners to the Partnership prior to such admission date (or date of such increased Capital Commitment) and (ii) pay to the Partnership an additional amount, as determined by the General Partner, on such Subsequent Contribution calculated at the greater of (a) the Applicable Rate plus 3.5% per annum or (b) 8.0%  per

24

annum from the date or dates that such Subsequent Contribution or portions thereof would have been required to be contributed to the Partnership if such Partner had been admitted to the Partnership (in the case of Additional Limited Partners) or subscribed for such increased Capital Commitment (in the case of additional subscriptions by existing Limited Partners) as of the Initial Closing Date (an "Additional Payment"); provided that the General Partner may make any equitable adjustments to such required contributions that it believes would be fair or equitable, including to reflect prior distributions made to the Partners (including distributions in respect of Investments no longer held by the Partnership). Notwithstanding the foregoing, no Additional Payment shall be required with respect to Additional Limited Partners admitted (or increased Capital Commitments accepted) during the first 3 months following the Initial Closing Date.  Proceeds therefrom representing additional Management Fees and any Additional Payment related thereto shall be paid to the General Partner.  The other proceeds therefrom shall be distributed to the Partners that participated in the earlier Capital Contribution based upon their relative shares of each earlier Capital Contribution and any such distribution (other than distributions with respect to Additional Payments) may be recalled by the General Partner pursuant to Section 3.1(a) as if such returned Capital Contribution had not been previously called.  Upon the admittance of an additional Limited Partner or the increase in a Partner's Capital Commitment, the General Partner shall modify Schedule I to reflect such admittance or increase.  For purposes of this Section 7.5, a Limited Partner that increases its Capital Commitment shall be treated as an Additional Limited Partner with respect to the amount by which its Capital Commitment increased.

       7.6     Government Regulation.

       (a)     (i)     The General Partner shall use reasonable best efforts to ensure that it and the Partnership are in substantial compliance with those material provisions of Applicable Law (as defined below) with which they are obligated by such statutes to comply (if any).  Each Limited Partner shall reasonably cooperate with the General Partner and the Partnership in complying with such material provisions of Applicable Law, shall provide the Partnership any information reasonably requested by the General Partner in complying with any such law or inquiry from any governmental, quasi-governmental, judicial or regulatory authority, agency or entity and the General Partner shall reasonably cooperate with the Limited Partners in complying with the material provisions of Applicable Law.  "Applicable Law" means ERISA or any comparable material United States federal or state law applicable to or affecting governmental plans or any regulations relating to any of the foregoing.

       (ii)     Each Limited Partner shall use reasonable efforts not to take any affirmative action which would, to its knowledge, create a material risk of subjecting the Partnership or the General Partner, or its partners, (or any of their respective officers, directors, partners, members or employees (collectively, "General Partner Affiliates")) to any governmental law, rule or regulation (or any violation thereof) or any material filing or regulatory requirement (including requiring registration with any governmental agency) or any material tax or increase in tax to which such Person would not otherwise be subject, in each case which would be material and adverse to the Partnership or the General Partner (or any General Partner Affiliate).

       (b)     If either a Limited Partner or the General Partner obtains an Opinion of Limited Partner's Counsel or an Opinion of Partnership's Counsel, respectively, that:

       (i)     there is a material risk that a Limited Partner (or any employee benefit plan which is a constituent of the Limited Partner) would be in material violation of Applicable Law if such Limited Partner were to continue as a Limited Partner of the Partnership, the violation of which would have a material and adverse effect on such Limited Partner, the Partnership or the General Partner (or any General Partner Affiliate), or

(ii)     a Limited Partner's status as a Partner creates a material risk of subjecting the Partnership or the General Partner (or any General Partner Affiliate) to any governmental law, rule or regulation (or any violation thereof) or any material filing or regulatory requirement (including requiring registration with any governmental agency) or any material tax or increase in tax to which such Person would not otherwise be subject, in each case which would be material and adverse to the Partnership or the General Partner (or any General Partner Affiliate), or

(iii)    with respect to Benefit Plan Investors, there is a material risk that any assets owned by the Partnership could be deemed to be "plan assets" under ERISA of the Limited Partner (or any employee benefit plan which is a constituent of the Limited Partner), or

(iv)    there is a material risk that a Limited Partner (or any employee benefit plan which is a constituent of the Limited Partner) would jeopardize the ability of the Partnership to consummate an investment or to have a material and adverse effect on an investment, the General Partner (or any General Partner Affiliate) or the Partnership,

then the provisions of Sections 7.6(c) through 7.6(l) shall apply.  The events described in clauses (i) through (iv) of this Section 7.6(b) are each referred to herein as a "Limited Partner Regulatory Problem." The Limited Partners described above in this Section 7.6(b) are each referred to herein as a "Regulated Partner."  Each Limited Partner shall promptly notify the General Partner in writing of any change in Applicable Law or other event coming to its attention which it believes may be cause for withdrawal by such Limited Partner under the provisions of this Section 7.6.  If the Partnership's initial Investment (other than a Short-Term Investment) does not cause the Partnership to be in compliance with an exception to the Plan Asset Regulations, then the General Partner shall promptly notify the Limited Partners of such event.  After the Partnership initially satisfies the requirements of an exception to the Plan Asset Regulations, the General Partner shall, in the event the General Partner reasonably believes that the Partnership will not remain in compliance with an exception to the Plan Asset Regulations, promptly notify the Limited Partners of such belief.

(c)     In the event of a Limited Partner Regulatory Problem, the Regulated Partner shall use reasonable efforts (including during the Remedy Period defined below) to eliminate or minimize the Limited Partner Regulatory Problem (including a sale to a third party on terms reasonably acceptable to the Regulated Partner).

(d)     Subject to the provisions of Sections 7.6(b) and 7.6(c) and this Section 7.6(d), each Regulated Partner may elect to withdraw from the Partnership, or upon demand by the General Partner will withdraw from the Partnership, at the time and in the manner provided under Section 7.6(g). In the event of a Limited Partner Regulatory Problem, the General Partner shall have a period of 180 days following receipt of a counsel opinion described in Section 7.6(b) (or such lesser period reasonably recommended in such counsel's opinion delivered pursuant to Section 7.6(b), but in no event less than 90 days) (the "Remedy Period") to use its reasonable efforts to eliminate or minimize the Limited Partner Regulatory Problem whether by correction of the condition giving rise to the risk or problem, by amendment of this Agreement pursuant to Section 12.1, a Regulatory Sale, a Regulatory Solution, or by requiring the Regulated Partner to withdraw in accordance with the procedures set forth in Section 7.6(g) (without regard to the 20-day time period set forth therein); provided that the General Partner shall not be required to forego any investment opportunity on behalf of the Partnership to solve a Limited Partner Regulatory Problem.  Each such Regulated Partner shall reimburse the Partnership for all costs incurred by the Partnership in connection with the withdrawal of such Regulated Partner under this Section 7.6 or any Regulatory Sale or Regulatory Solution with respect to such Regulated Partner's Limited Partner

26

Interest; provided that no such reimbursement shall be required if such withdrawal is necessitated solely by the failure of the General Partner to comply with the efforts required by Section 6.6.

(e)      If requested to do so by the General Partner, the Regulated Partner shall use reasonable efforts to cooperate with the General Partner during the Remedy Period in arranging another method to minimize or eliminate a Limited Partner Regulatory Problem (a "Regulatory Solution"), including but not limited to the formation of a separate entity (on terms not substantially less advantageous to the Regulated Partner than the terms of this Partnership) to hold the Regulated Partner's share (or the share of any employee benefit plan which is a constituent of the Regulated Partner) of the Partnership's securities and other assets or negotiating an in-kind redemption of the Regulated Partner's interests in the Partnership on terms reasonably acceptable to the Limited Partner.

(f)      The General Partner may elect (in its sole discretion) to offer the Regulated Partner's entire Partnership Interest to the Partners and/or a third party who is not a "party in interest" (as defined under ERISA) for a price, payable in cash, equal to the Regulated Partner's Capital Account Value (a "Regulatory Sale").  Subject to the immediately following sentence, the General Partner shall specify and implement the procedures for making offers and shall set the time limits for acceptance thereof consistent with the other time limits set forth in this Section 7.6.  In the case of a Regulatory Sale, the procedures set forth in Section 12.2(a)(vi) shall be applicable, except that the term "Regulated Partner" shall be substituted for the term "Defaulting Partner," the price shall be payable in cash at closing and shall equal the Regulated Partner's Capital Account Value (or such other amount and/or such other terms as may be agreed to by such Regulated Partner).  As a condition to the consummation of any sale, the acquiring Person (or Persons) shall agree to become a party to this Agreement and assume the Regulated Partner's obligation to make future Capital Contributions in an amount equal to the balance of such offeree's Capital Commitment (which shall be equal to the balance of the Regulated Partner's Capital Commitment).  Upon the consummation of a Regulatory Sale, such Regulated Partner shall cease to be a Partner of the Partnership for all purposes of this Agreement and the transferee shall be a substitute Limited Partner for all purposes of this Agreement.

(g)      If the General Partner does not sell the Regulated Partner's entire Partnership Interest pursuant to a Regulatory Sale, provide for a Regulatory Solution (reasonably acceptable to such Regulated Partner) or deliver to such Regulated Partner an Opinion of Partnership's Counsel that the condition giving rise to the Limited Partner Regulatory Problem has been corrected within the Remedy Period, then, at any time during the 20-day period immediately following the expiration of the Remedy Period, such Regulated Partner may elect to withdraw or the General Partner (if it has not already required such Regulated Partner to withdraw during the Remedy Period) may require such Regulated Partner to withdraw in whole or in part from the Partnership on the earlier to occur of (i) the last day of the calendar quarter during which the election or demand for withdrawal is made or (ii) such date for withdrawal as may be recommended in the counsel opinion described in Section 7.6(b).  Upon any withdrawal, there shall be distributed (x) to such Regulated Partner, in full payment and satisfaction of its interest in the Partnership, an amount, subject to reduction pursuant to Section 7.6(i) below, equal to the balance of the withdrawing Partner's Capital Account Value as of the effective date of withdrawal, payable in cash, cash equivalents or equities (as valued in accordance with Article IX hereof as of the date of distribution to the Regulated Partner) as the General Partner in its sole discretion selects and (y) to the General Partner, an amount equal to the unpaid Carried Interest (if any) attributable to the withdrawing Regulated Partner's interest; provided that (A) to the extent that securities are to be distributed, the General Partner shall select securities in an equitable manner so that the withdrawing Partner receives approximately a pro rata portion of the securities held by the Partnership (adjusted to eliminate odd lots and taking into account any limitations on the Partnership's ability to divide a particular security for distribution), (B) to the extent securities are to be distributed, such securities shall not include any securities that may not be distributed to such withdrawing Regulated Partner because it (or any employee benefit plan constituent of

27

such Regulated Partner) would be in material violation of Applicable Law as a result of holding such securities or the Partnership is prohibited by any material law, contract, or agreement from distributing such securities, and (C) any distributions in cash or cash equivalents may be made at such time and in such manner so as not to disrupt the Partnership's operations, business or activities or impair the value of any of the Partnership's securities.  All Capital Contributions by, and all distributions with respect to, a Person who has withdrawn from the Partnership pursuant to this Section 7.6(g) shall be disregarded for purposes of Sections 4.3, 8.5 and 8.4(f) and the definition of "Net Benefit."

(h)     Effective upon the date of withdrawal of any Regulated Partner or the Regulatory Sale of any Regulated Partner's entire Partnership Interest, (i) such Regulated Partner's Capital Commitment shall be reduced to zero and, in the case of a withdrawing Regulated Partner, the aggregate Capital Commitments of the Partnership shall be commensurately reduced, (ii) such Regulated Partner shall cease to be a Partner of the Partnership for all purposes, and (iii) except for such Regulated Partner's right to receive payment for his, her or its Partnership Interest as provided above, such Regulated Partner shall no longer be entitled to the rights of a Partner under this Agreement, including, without limitation, the right to receive allocations, the right to receive distributions during the term of the Partnership and upon liquidation of the Partnership and the right to vote on Partnership matters as provided in this Agreement.

(i)     The amount payable to a Regulated Partner pursuant to Section 7.6(g) above shall be reduced by an amount equal to the product of (A) the estimated amount of Partnership Expense for the Management Fee for the six-month period immediately following such Regulated Partner's withdrawal, multiplied by (B) a fraction, the numerator of which is such Regulated Partner's Capital Commitment immediately prior to such Person's withdrawal and the denominator of which is the Partnership's aggregate Capital Commitments (which amount of reduction shall not exceed such Regulated Partner's Capital Account Value as of the effective date of withdrawal); provided that if upon the date of a Regulated Partner's withdrawal from the Partnership pursuant to this Section 7.6 the amount calculated immediately above (without giving effect to the second parenthetical) exceeds such Regulated Partner's Capital Account Value as of the effective date of withdrawal, the withdrawing Regulated Partner shall pay to the Partnership in cash an amount equal to such excess, unless in the opinion of counsel for such Regulated Partner (which counsel and opinion shall be acceptable to the General Partner in its reasonable discretion), it is materially likely that the Regulated Partner would be in material violation of Applicable Law as a result of making such payment; and provided further however that no such reduction shall be made pursuant to the first sentence of this Section 7.6(i) if such Regulated Partner's withdrawal is necessitated solely by the failure of the General Partner to comply with the efforts required by Section 6.6.  The Partnership shall pay to the General Partner an amount equal to the sum of (i) any reduction pursuant to this Section 7.6(i) in the amount payable to a Regulated Partner pursuant to Section 7.6(g) and (ii) any cash payment by such Regulated Partner pursuant to this Section 7.6(i).

(j)     Prior to the time of any Regulatory Sale, Regulatory Solution or withdrawal, a Regulated Partner shall continue to fund its Capital Commitment and shall continue to be a Limited Partner for all purposes of this Agreement; provided that if, (x) as set forth in an Opinion of Limited Partner's Counsel for such Regulated Partner, it is materially likely that such Regulated Partner would be in material violation of Applicable Law (the violation of which (although not covered by such opinion) would have a material adverse effect on such Regulated Partner) if it fulfilled its Capital Commitment or (y) in the Opinion of Limited Partner's Counsel or Opinion of the Partnership's Counsel, the assets of the Partnership are, or there is a material risk that the assets of the Partnership would be, deemed "plan assets" under the Plan Asset Regulations for purposes of ERISA, then for all purposes of this Agreement other than Section 4.6 (including but not limited to Articles III and IV other than Section 4.6) such Regulated Partner's Capital Commitment shall be reduced to the amount of Capital Contributions (net of distributions pursuant to Section 3.1(d)) made by such Regulated Partner prior thereto and the aggregate

CHICAGO/#2577231.6

Capital Commitments of the Partnership shall be commensurately reduced.  Nevertheless, for a period of 6 months thereafter, the Management Fee will continue to be calculated as if there had been no reduction in such Regulated Partner's Capital Commitment and the Partnership Expense for such Management Fee will continue to be allocated among the Partners as if there had been no reduction in such Regulated Partner's Capital Commitment and such Regulated Partner shall pay to the Partnership in cash an amount equal to its share of such Partnership Expense, determined as described in Section 7.6(i), to the extent not paid by any Person (or Persons) that have acquired all or any portion of such Regulated Partner's interest pursuant to a Regulatory Sale or a Regulatory Solution; provided that such reduction in the Regulated Partner's Capital Commitment will be taken into account in calculating such Management Fee if such reduction in the Regulated Partner's Capital Commitment is required because the General Partner failed to comply with the efforts required by Section 6.6.  In the event the General Partner objects to the form and substance and/or the conclusion of the opinion of counsel delivered by a Regulated Partner pursuant to this Section 7.6(j) and/or to the Regulated Partner's assertion that the violation of Applicable Law described in such opinion would have a material adverse effect on such Regulated Partner, and such disagreement has not been finally resolved and if the necessity for reducing such Regulated Partner's Capital Commitment has not been eliminated before the date a proposed Capital Contribution is required to be made, then such Regulated Partner's Capital Commitment shall be reduced in accordance with the first sentence of this Section 7.6(j); provided that (i) if such disagreement is ultimately resolved (by negotiation, mediation, arbitration, a court proceeding or otherwise) in favor of the General Partner, then (A) such Regulated Partner's Capital Commitment shall be immediately restored to the amount of such Regulated Partner's Capital Commitment immediately prior to application of this Section 7.6(j) and (B) within 10 days after such Regulated Partner's receipt of written notice of such final determination, such Regulated Partner shall be required to make a Capital Contribution to the Partnership equal to the aggregate amount of Capital Contributions such Regulated Partner previously would have made to the Partnership but did not make because such Person's Capital Commitment was temporarily reduced pursuant to this Section 7.6 and (ii) a Regulated Partner shall not be deemed a Defaulting Partner for not making any Capital Contributions during the period such Person's Capital Commitment is reduced pursuant to this Section 7.6(j).  If such Limited Partner does not make such Capital Contribution within such 10-day period, then such Limited Partner shall be deemed a Defaulting Partner and the Partnership shall be entitled to invoke the remedies provided under Section 13.2.

(k)     Except as specifically provided in this Section 7.6, no consent of any Limited Partner shall be required as a condition precedent to any Regulatory Solution or any Regulatory Sale pursuant to this Section 7.6.

(l)     Notwithstanding anything in this Section 7.6 to the contrary, no Regulated Partner's interest will be transferred or subdivided, and no Person shall become a substitute Limited Partner, in contravention of Section 7.2(e) and 7.2(f).

(m)     Each Limited Partner represents that it is an "accredited investor" within the meaning of Regulation D of the Securities Act and a "qualified client" within the meaning of the Investment Advisers Act.

7.7     Reimbursement for Payments on Behalf of a Partner.

(a)     If the Partnership is obligated to pay any amount to a governmental agency or body or to any other Person (or otherwise makes a payment) because of a Partner's status or otherwise specifically attributable to a Partner (including U.S. federal withholding taxes with respect to non-U.S. partners, U.S. state withholding taxes and U.S. state unincorporated business taxes), then such Partner (the "Reimbursing Partner") shall reimburse the Partnership in full for the entire amount paid (including any interest, penalties and expenses associated with such payment); provided that if neither the

Partnership nor such Reimbursing Partner would be obligated to pay such amount but for the General Partner's gross negligence or willful malfeasance, such Reimbursing Partner shall not be obligated to reimburse the Partnership for any interest and penalties resulting from such gross negligence or willful malfeasance.  At the option of the General Partner, the amount to be reimbursed may be charged against the Capital Account of the Reimbursing Partner, and, at the option of the General Partner, but without duplication:

      (i)    promptly upon notification of an obligation to reimburse the Partnership, the Reimbursing Partner shall make a cash payment to the Partnership equal to the full amount to be reimbursed (and the amount paid shall be added to the Reimbursing Partner's Capital Account but shall not be deemed to be a Capital Contribution hereunder), and/or

      (ii)    the Partnership shall make distributions to the Reimbursing Partner net of the governmental payment or reduce subsequent distributions which would otherwise be made to the Reimbursing Partner until the Partnership has recovered the amount to be reimbursed (provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Reimbursing Partner's Capital Account).

(b)    A Reimbursing Partner's obligation to make reimbursements to the Partnership under this Section 7.7 shall survive the dissolution, liquidation, winding up and termination of the Partnership and, for purposes of this Section 7.7, the Partnership shall be treated as continuing in existence.  The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 7.7, including instituting a lawsuit to collect such contribution with interest calculated at an annual compounded rate equal to the Applicable Rate plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

7.8    §754 Election.  The General Partner may, but shall not be obligated to, cause the Partnership to make the election provided for in §754 of the Code.

7.9    Written Consent.  Subject to Section 3.4, whenever action is required by this Agreement to be taken by the Limited Partners holding a certain percentage of the interests of the Limited Partners, such action shall be deemed to be valid if taken upon written vote or written consent by such required percentage of Limited Partners.

7.10    Bank Holding Company Act of 1956.  Notwithstanding any other provision in this Agreement to the contrary, any determination, approval, consent and any other vote under this Agreement or the Delaware Act shall disregard any consent, approval or vote with respect to any BHCA Interest; provided that the foregoing exclusion of BHCA Interests shall not apply to BHCA Interests of any BHCA Limited Partner with respect to any consent, approval or vote (a) concerning the issuance of additional amounts or classes of senior interests in the Partnership, the modification of the terms of the Limited Partner interests or the dissolution of the Partnership (in each case, unless such BHCA Limited Partner has provided prior written notice to the General Partner that the regulations promulgated under the BHCA no longer classify limited partnership interests permitted to vote on such matters as "nonvoting securities") or (b) with respect to which such BHCA Limited Partner has delivered to the General Partner written notice and an Opinion of Limited Partner's Counsel (which may be provided by in-house counsel of such BHCA Limited Partner if such counsel has expertise in the area in which such counsel is providing the opinion) to the effect that the exercise of such voting rights will not cause limited partnership interests to be treated as "voting securities" under 12 C.F.R. Section 225.2(q) or any successor regulation as in effect from time to time.

7.11    Confidential Information.

(a)    Notwithstanding anything contained herein to the contrary (other than as expressly required by Section 10.3), the General Partner has the right (in its sole and absolute discretion) not to disclose any Confidential Information to any Limited Partner or to the Limited Partner's Disclosure Recipients if the General Partner determines that such disclosure is not in the best interests of the Partnership, any Partner and/or any Investment.  Each Limited Partner shall keep confidential and shall not disclose, or permit any of its Disclosure Recipients to disclose, any information or materials regarding the Partnership Entities or the other Partners (whether or not such information or materials have been designated by the General Partner as Confidential Information), except to the extent, and only to the extent, that (i) the disclosure of such information or materials is expressly required by applicable law, (ii) the information or materials were previously known to such Limited Partner other than as disclosed by any Partnership Entity, (iii) the information or materials become publicly known other than through the actions or inactions of such Limited Partner or its Disclosure Recipients or (iv) the disclosure of such information and materials by such Limited Partner is to its Disclosure Recipients (provided that, in each case, such Persons agree in writing to keep such information and materials confidential to the same extent as if they were Limited Partners of the Partnership or are otherwise required under applicable law to keep such information confidential and such Limited Partner shall be responsible for the failure of any such Person to so comply).  Without limiting the foregoing, in the event that any Limited Partner or any of its Disclosure Recipients is required by any applicable law, statute, governmental rule or regulation or judicial or governmental order, judgment or decree to disclose any Confidential Information, prior to such disclosure such Person shall promptly notify the General Partner in writing of such anticipated disclosure, which notification shall include the nature of the legal requirement and the extent of the required disclosure; and such Person shall cooperate with the General Partner to preserve the confidentiality of such information consistent with applicable law (including, without limitation, in any case in which there has been no judicial or governmental order, judgment or decree, withholding disclosure of such Confidential Information until such time as it has been finally determined that such disclosure is required under applicable law).  No Limited Partner may use, and each Limited Partner shall cause any Disclosure Recipient to which it directly or indirectly discloses any Confidential Information to hold such information confidential to the same extent as would be required if such Person were a Limited Partner and not to use, any Confidential Information it receives for any purpose other than monitoring and evaluating such Limited Partner's investment in the Partnership.  Any information provided to a Person at a Limited Partner's direction shall be treated instead as having been provided to such Person by such Limited Partner, and such disclosure by the Limited Partner shall be subject to the requirements of this Section 7.11.

(b)    Without limiting the foregoing, each Limited Partner agrees that the following items are included within Confidential Information of, and are of independent, proprietary, economic value to, the General Partner, the Partnership and, with respect to information obtained from an Investment, the disclosure of which would cause substantial, irreparable harm to the General Partner, the Partnership and/or the applicable Investment:  (i) all information regarding the historical or projected pricing, cost, sales and profitability of each product or service offered by any Investment; (ii) all information pertaining to the valuation ascribed to an Investment, any subsidiary thereof or to any interests in any of the foregoing by such Investment's management, the Partnership, the General Partner, or any other Person; and (iii) all financial statements or other information concerning the historical or projected financial condition, results of operations or cash flows of any Investment.

(c)    The General Partner may agree (i) to limit the applicability of any portion of this Section 7.11 to a particular Limited Partner and/or (ii) to limit disclosure of the name of, or any other information regarding, a particular Limited Partner and, in each such case, any such agreement shall not be a side letter or similar agreement for purposes of Section 12.10.

31

(d)     Notwithstanding anything else contained in this Agreement (including the other provisions of this Section 7.11), each Limited Partner may disclose, without limitation, the tax treatment and tax structure (as such terms are used in Code §6011 and the Treasury Regulations promulgated thereunder) of its investment in the Partnership and of any transactions entered into by the Partnership; provided that this authorization to disclose such tax treatment and tax structure is not intended to permit disclosure of any other information.

## ARTICLE VIII

## DURATION AND DISSOLUTION

8.1     Duration.  The Partnership will be dissolved on the third anniversary of the Final Closing Date, except that the General Partner may, in its sole discretion and upon at least 60 days' prior written notice to the Limited Partners (the "Extension Notice"), extend the term of the Partnership for 2 additional one-year periods without the consent of the Limited Partners. Any subsequent extensions will require the approval of the General Partner and the Limited Partners holding 80% of Required Interests. Notwithstanding any other provision of this Agreement, in the event that the General Partner determines that there has been an "assignment" of this Agreement within the meaning of the Investment Advisers Act and the requisite consent of the Partnership has not been obtained, then the General Partner may (but is not obligated to) dissolve the Partnership by delivering written notice to such effect to the Limited Partners.

8.2     Early Termination.

(a)     Limited Partners holding at least two-thirds of the Required Interests may deliver to the General Partner not less than 30 days after the occurrence of a Cause Event a written notice of their desire to limit new Investments as described in this Section 8.2(a).  Thereafter, the Partnership shall not deliver a Capital Call Notice to fund any Investments, except for follow-on Investments, Investments pursuant to then-existing commitments and Investments funded entirely, or in part, with the proceeds of a Subscription Facility, to the extent such proceeds have not been repaid to the Lender thereunder (collectively, "Pending Investments"); provided that the Partnership may again deliver Capital Call Notices to fund any investments in accordance with the other provisions of this Agreement with the approval of the General Partner and the Limited Partners holding two-thirds of the Required Interests on or prior to the date 3-months after such Cause Event (such approval, "Continuing Investment Approval").

(b)     The Partnership shall be dissolved upon the written decision of the General Partner and all the Partners.

(c)     The Partnership shall be dissolved upon the decision of the General Partner, in its sole discretion, to dissolve the Partnership because it has determined based on the advice of counsel selected by the General Partner that (i) changes in any applicable law or regulation would have a material adverse effect on the continuation of the Partnership or (ii) such action is necessary or advisable in order for the Partnership not to be in material violation of any material law or regulation (including ERISA).

(d)     If the General Partner has (i) been convicted of or criminally indicted for fraud, embezzlement or a similar felony involving misappropriation of funds in connection with the business of the Partnership or any Investment, or (ii) willfully breached any of its material obligations under this Agreement in a manner that adversely affects the Limited Partners and such breach is not substantially cured within 60 days (or if in the process of being cured within 60 days, is substantially cured within 120 days) after receipt by the General Partner of written notice with respect thereto from Limited Partners holding at least 80% of the Required Interests (each a "Cause Event"), Limited Partners holding at least

80% of the Required Interests may elect to dissolve the Partnership by delivering a written notice to the General Partner to such effect.

      (e)     The foregoing sections 8.2(a)-(d) notwithstanding, the Partnership shall not be dissolved and the Partners' obligations to make Subscription Facility Contributions shall not be terminated until such time as all obligations of the Partnership under said Subscription Facility have been paid in full and Lender's commitment to fund additional advances thereunder has been terminated.

      8.3     Removal of the General Partner.

      (a)     Limited Partners holding at least 80% of the Required Interests may remove the General Partner as general partner of the Partnership by delivering a written notice to the General Partner (the "GP Removal Notice") to such effect not later than 30 days after the occurrence of a Cause Event.

      (b)     On the date of the General Partner's removal pursuant to this Section 8.3 (the "GP Removal Date"), (i) the interest of such removed General Partner in the Partnership shall be converted (the "Conversion") into a Limited Partner interest and after such Conversion such removed General Partner shall be a "Special Limited Partner," and (ii) neither the Special Limited Partner nor any Limited Partner that is, or that is owned by, controlled by or established primarily for the benefit of, one or more direct or indirect owners of the removed General Partner or any of such owner's respective family members shall be required to make any additional Capital Contributions or other payments to the Partnership or to participate in any Investments after the GP Removal Date unless such Person affirmatively elects not later than 30 days after the GP Removal Date to continue funding its Capital Commitment for all purposes of this Agreement.  If any such Person does not make such election to continue funding its Capital Commitment, it shall no longer be allocated any additional Partnership Expenses and shall no longer participate in the profits, losses or otherwise with respect to any Investments (including follow-on Investments) the Partnership makes after the GP Removal Date.  Notwithstanding anything contained in this Agreement, the Special Limited Partner shall assume the rights and responsibilities of a Limited Partner under this Agreement, except that the Special Limited Partner shall maintain its right to receive distributions pursuant to this Agreement as if it were still the General Partner (subject to the adjustments made pursuant to this Section 8.3(b)).  Following the GP Removal Date, (x) the portion of each distribution that would have been distributed pursuant Section 4.3(d)(ii) or 4.3(e)(ii) in the absence of a removal of the General Partner pursuant to this Section 8.3 instead shall be distributed to the Special Limited Partner in respect of the Frozen Carried Interest until the Special Limited Partner has received aggregate distributions pursuant to this sentence equal to the Frozen Carried Interest, and (y) the remaining portion of each distribution shall be distributed pursuant to the provisions of Section 4.3 (other than Section 4.3(d)(ii) or 4.3(e)(ii)).  For purposes of this Section 8.3(b), the "Frozen Carried Interest" means an amount equal to the portion of the removed General Partner's Capital Account Value as of the date the removed General Partner received the GP Removal Notice, and determined without regard to this Section 8.3(b), that is attributable to the removed General Partner's right to receive distributions pursuant to Sections 4.3(d)(ii) and 4.3(e)(ii), plus interest at the Applicable Rate plus 2 percentage points per annum, compounded annually, on such amount calculated from the date the removed General Partner received the GP Removal Notice through the GP Removal Date.

      (c)     The valuation of the removed General Partner's Capital Account Value shall be its value as set forth in the Partnership's annual audited financial statements for the Partnership's fiscal year most recently ended on or prior to the GP Removal Date, as equitably adjusted by the removed General Partner to reflect any distributions to the removed General Partner subsequent to such fiscal year end; provided that the removed General Partner's interest in any Investments subsequent to such fiscal year end shall be included in such valuation at cost.

(d)     Effective upon the GP Removal Date, such removed General Partner (i) shall remain liable only for obligations with respect to any liability, loss, costs or expense (mature or unmatured, contingent or otherwise) solely arising out of, relating to, incidental to, or by virtue of any act, transaction or event in connection with the operation of the Partnership's business prior to the GP Removal Date and (ii) shall not be liable with respect to any liability, loss, costs or expense (mature or unmatured, contingent or otherwise) arising out of, relating to, incidental to, or by virtue of any act, transaction or event in connection with the operation of the Partnership's business on or after the GP Removal Date.   The removed General Partner and its members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates (and their respective members, managers, shareholders, partners, directors, officers, employees, agents, advisors, assigns, representatives and affiliates) (collectively, "GP Indemnitees") shall continue to be entitled to exculpation in accordance with Section 6.10 and indemnification in accordance with Section 6.11 (as if such removed General Partner had not been removed as General Partner) to the extent that such exculpation or indemnification relates in any way to actions taken by such Persons on or prior to the GP Removal Date. Notwithstanding anything contrary in this Agreement, the GP Indemnitees shall be deemed third-party beneficiaries of this Section 8.3 and Sections 4.3, 6.10 and 6.11 and no amendment that would alter this Section 8.3 or Section 4.3, 6.10 or 6.11 shall be made without the prior written consent of the removed General Partner if such amendment adversely affects the removed General Partner or any of the other GP Indemnitees.

(e)     No removal of the General Partner under Section 8.3(a) shall be effective unless each of the following conditions is satisfied within 120 days after the date the GP Removal Notice is delivered to the removed General Partner:  (i) a new general partner of the Partnership (which may be an individual or an entity) shall have been selected by the Limited Partners, and such new general partner shall have assumed all obligations of the removed General Partner under this Agreement arising on or after the date on which such new general partner is admitted to the Partnership; (ii) an amendment to the Certificate shall have been filed with the Secretary of State of Delaware that reflects:  (A) the admission of the new general partner as the general partner of the Partnership and (B) the removal of the withdrawing General Partner as the general partner of the Partnership; and (iii) the admission of the new general partner shall not have caused the Partnership to cease to be taxable as a partnership for United States federal or state income tax purposes.

(f)     The Partners hereby agree to make such amendments to this Agreement as are necessary or advisable to implement the admission of a new general partner, the removal of the withdrawing General Partner and the changes in the economic relationships among the Partners that are described in this Section 8.3 in a fair and equitable manner consistent with the principles set forth in this Section 8.3, and in all events to interpret and apply this Agreement (whether or not formal amendments are executed) in a manner consistent with such principles.  No amendment to this Agreement that would adversely affect the Special Limited Partner's rights or obligations under this Section 8.3 or any amendment to this Section 8.3 shall be made without the prior written consent of the Special Limited Partner or, prior to the Conversion, the General Partner.

8.4     Liquidation of the Partnership.

(a)     Liquidation.  Upon dissolution, the Partnership will be liquidated in an orderly manner in accordance with the provisions of this Agreement and the Delaware Act.  The General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement, unless, in the case of an early termination of the Partnership pursuant to Section 8.2(d), a different liquidator is appointed by Limited Partners holding two-thirds of the Required Interests.  If the General Partner acts as the liquidator for the Partnership, the Partnership shall promptly pay the General Partner and its Affiliates

34

for reasonable fees and expenses in connection with the General Partner's activities as liquidator of the Partnership.

        (b)    <u>Final Allocation and Distribution</u>.  Following dissolution of the Partnership (whether or not an early dissolution) and upon the liquidation and winding up of the Partnership, the General Partner or a liquidator appointed pursuant to <u>Section 8.4(a)</u> will make a final allocation of all items of income, gain, loss and expense in accordance with <u>Article III</u> hereof, and the Partnership's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Partners.  After payment or provision for payment of all liabilities and obligations of the Partnership, the remaining assets, if any, will be distributed among the Partners pursuant to <u>Article IV</u>.

        8.5    <u>General Partner Give Back</u>.  After the final distribution of the assets of the Partnership among the Partners as provided in this <u>Section 8.4</u> and <u>Article VIII</u>, with respect to each Limited Partner other than a Defaulting Partner, the General Partner shall contribute to the Partnership, and the Partnership shall, promptly following receipt, distribute to such Limited Partner, an amount equal to the greater of the amounts described in the following <u>clauses (i)</u> and <u>(ii)</u>:

        (i)    in the event that the Partners (other than Defaulting Partners) did not receive distributions (excluding payments to the General Partner with respect to its Carried Interest, and distributions returned to the Partnership pursuant to <u>Section 4.6</u>) in the aggregate equal to their aggregate Capital Contributions plus their aggregate Preferred Return, the amount, if any, of such deficit (and such amount will be distributed to the Partners (including the General Partner) in proportion to their respective deficits); and

        (ii)    the amount (if positive) by which the aggregate distributions that the General Partner received and did not previously return to the Partnership or the Partners pursuant to this Agreement in respect of the Carried Interest exceeds 40% of the Net Benefit (other than with respect to Defaulting Partners) of the Partnership over the life of the Partnership, which amount shall be distributed to the Partners (other than Defaulting Partners, but including the General Partner) in proportion to their respective Capital Commitments;

<u>provided</u> that the General Partner shall not be obligated to make capital contributions pursuant to this <u>Section 8.5</u> in excess of 100% of the net amount of the Carried Interest distributions, <u>minus</u> aggregate Tax Amounts attributable to the Carried Interest, made to the General Partner during the life of the Partnership and not previously returned by the General Partner (or its partners) to the Partnership or the Partners pursuant to this Agreement.  The General Partner shall be obligated to restore its negative Capital Account, if any, only to the extent set forth in this <u>Section 8.5</u>.  The calculation of the amount that the General Partner shall contribute to the Partnership pursuant to this <u>Section 8.5</u> shall be made after giving effect to any return of distributions made by the Partners to the Partnership pursuant to <u>Section 4.6(a)</u>.  The determination of the General Partner Give Back shall be calculated by treating investments made by any Alternative Investment Vehicle as having been made by the Partnership.

        (b)    <u>Cancellation</u>.  Following completion of the winding up of Partnership affairs as contemplated by this <u>Article VIII</u>, the Partnership shall terminate upon the filing of a Certificate of Cancellation of the Certificate in accordance with the applicable provisions of the Delaware Act.

CHICAGO/#2577231.6

Case 2:20-cv-01402-SPG-JEM   Document 130-1   Filed 03/29/23   Page 157 of 225   Page ID
#:7805

## ARTICLE IX

## VALUATION OF PARTNERSHIP ASSETS

9.1     Normal Valuation.  For purposes of this Agreement, the value of any investment as of any date (or in the event such date is a holiday or other day that is not a business day, as of the next preceding business day) will be determined as follows:

(a)     an investment that is (i) listed or quoted on a recognized securities exchange or quoted on any national automated inter-dealer quotation system or (ii) traded over-the-counter, shall be valued at the average of its last "trade" price on each trading day during the 10-day trading period ending immediately prior to the time of determination, or if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such day; and

(b)     all other investments will be valued on such date by the General Partner at fair market value in such manner as it may reasonably determine.

9.2     Restrictions on Transfer or Blockage.  Any investment that is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Partnership's holdings compared to the trading volume would adversely affect its marketability, will be valued at such discount from the value determined under Section 9.1 above as the General Partner deems necessary to reflect properly the marketability of such investment.

9.3     Write-down to Value.  Any investments that have permanently declined in value as determined by the General Partner will be written-down to their value pursuant to the provisions of this Article IX as of the date of such determination.

9.4     Adjustments Required by GAAP Accounting.  With respect to reports furnished to Limited Partners pursuant to Section 10.3 that are prepared, in whole or in part, in accordance with GAAP, the valuation rules set forth in this Article IX shall be adjusted to the extent necessary to comply with GAAP, including the Financial Accounting Standards Board Accounting Standards Codification Topic 820:  Fair Value Measurements and Disclosures, effective as of September 15, 2009 (as such codification topic may be amended or modified thereafter), as promulgated by the Financial Accounting Standards Board.

## ARTICLE X

## BOOKS OF ACCOUNTS; MEETINGS

10.1    Books.  The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the General Partner's principal office, which books will be open to inspection by any Partner (or its authorized representative) for any purpose reasonably related to such Limited Partner's interest in the Partnership at any time during ordinary business hours upon at least 10 business days' prior notice, subject in each case to any portion of the books which may otherwise be kept confidential with respect to any Limited Partner as provided in this Agreement.

10.2    Fiscal Year.  The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

10.3    Reports.  The General Partner will furnish to each Limited Partner:

(a)    within 120 days after the end of each fiscal year commencing with the year ended December 31, 2015, (i) audited financial statements for the Partnership for such year (including a balance sheet, statement of income and loss and statement of changes in Partner's Capital Accounts), prepared in accordance with GAAP, but without consolidating Investment financial information with the Partnership, and certified by a firm of independent certified public accountants of recognized national standing selected by the General Partner, and (ii) a list of the Partnership's investments as of the end of such year, valued at fair market value in accordance with Article X;

(b)    within 120 days after the end of each fiscal year, such Limited Partner's Schedule K-1 for such fiscal year;

(c)    at a Limited Partner's reasonable request, reasonable monthly or quarterly information as to Partnership income and expenses, quarterly information as to Partnership balance sheet items and any reasonable information such Limited Partner may require in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners, including information required by a Limited Partner or any partner thereof in order to comply with any reporting or withholding requirements applicable to such Limited Partner or any partner thereof pursuant to §897 or 1445 of the Code; and

(d)    at the request of any Limited Partner and subject to appropriate confidentiality restrictions, such other financial information regarding the Partnership and its investments as such Limited Partner may from time to time reasonably request; provided that the requesting Limited Partner will pay any extraordinary expenses arising out of providing such requested information.

The financial reports, information and schedules described in this Section 10.3 are dependent upon information to be provided to the General Partner by the Investments.  Therefore, notwithstanding the foregoing time periods, the General Partner may furnish such reports and schedules to the Limited Partners after the expiration of such time periods, but as soon as reasonably practical, following receipt of all financial and other information from each of the Investments necessary or desirable to prepare such documents.   Notwithstanding any provision in this Section 10.3 to the contrary, and subject to Section 7.11, the information and materials described in this paragraph and the reports (other than quarterly and annual balance sheets and income statements for the Partnership, statements of the applicable Partner's Capital Account and the applicable Partner's Schedule K-1), summaries and valuations of the Investments described in this Section 10.3 and any Investment financial, business or valuation information contained in information required to be provided pursuant to this Agreement shall be required to be furnished only to Limited Partners who have provided such representations, warranties and assurances, as the General Partner may request in its sole discretion, that such documents (and any contents thereof) are not required by any law to be disclosed to any other Person and that such Limited Partner (and its Disclosure Recipients) will not use such documents (or any contents thereof) for a purpose other than monitoring and evaluating such Limited Partner's investment in the Partnership or disclose such documents (or any contents thereof) to any other Person who may be required by law to disclose such documents (or any contents thereof), in each case other than disclosure permitted by Section 7.11(a)(ii)   or   7.11(a)(iii)   or to a Person to whom such disclosure is permitted by Section 7.11(a)(iv) and such Person will not be required by law to disclose such documents (or any contents thereof).

The General Partner shall, except to the extent that the General Partner is required by law or agreement to keep confidential, notify Limited Partners in connection with the quarterly and annual reporting to the Limited Partners of the commencement of any lawsuit or legal proceeding of which the

General Partner is aware in which the Partnership, the General Partner or any Approved Executive Officer is a named party and which, if adversely determined, the General Partner believes would be reasonably likely to result in an adverse effect on the ability of any such Person to perform such Person's obligations under this Agreement.

The General Partner may, in its sole discretion, choose to furnish certain or all of such financial reports, statements, schedules, summaries and other information described in this <u>Section 10.3</u> to the Limited Partners electronically via email, the Internet and/or another electronic reporting medium in lieu of providing the Limited Partners with paper copies of such documents; <u>provided</u> that the General Partner may agree in writing (which agreement shall not be a side letter or similar agreement for purposes of <u>Section 10.10</u>) in its sole discretion and at the request of any Limited Partner to limit the applicability of any portion of this sentence to such Limited Partner.

10.4   <u>Allocations</u>.

(a)   Except as required by Code § 704(c) and the Treasury Regulations thereunder, all income, gains, losses and deductions of the Partnership shall be allocated, for U.S. federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses and deductions among the Partners under <u>Section 3.2(b)</u> for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses and deductions shall be allocated among the Partners for tax purposes so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.   For the avoidance of doubt, items of expense or deduction in respect of Management Fees shall be allocated pursuant to <u>Section 5.1(e)</u>.

(b)   If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of its Partnership interest (whether under Code §83 or any similar provisions of any law, rule or regulation or any other applicable law, rule, regulation or doctrine) and the Partnership is entitled to any offsetting deduction, in the General Partner's discretion the Partnership's deduction may be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner.

10.5   <u>Custody of Securities</u>.   The Partnership's securities, to the extent practicable, will be held at a financial institution.   For the avoidance of doubt, uncertificated private placements will not be held with a financial institution.

10.6   <u>[Reserved]</u>.

10.7   <u>Tax Matters Partner</u>.   The General Partner is designated the "Tax Matters Partner" (as defined in Code §6231).

10.8   <u>Code §83 Safe Harbor Election</u>.

(a)   By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "<u>IRS Notice</u>") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.   For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS

Notice.  The Partnership and each Partner hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including the requirement that each Partner shall prepare and file any U.S. federal income tax returns that such Partner is required to file reporting the income tax effects of each "Safe Harbor Partnership Interest" issued by the Partnership in a manner consistent with the requirements of the IRS Notice.  A Partner's obligations to comply with the requirements of this Section 10.8 shall survive such Partner's ceasing to be a Partner of the Partnership and/or the dissolution, liquidation, winding up and termination of the Partnership, and, for purposes of this Section 10.8, the Partnership shall be treated as continuing in existence.

(b)     Each Partner authorizes the General Partner to amend this Section 10.8 to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent Internal Revenue Service guidance); provided that such amendment is not materially adverse to such Partner (as compared with the after-tax consequences that would result if the provisions of the IRS Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

## ARTICLE XI

## CERTIFICATE OF LIMITED PARTNERSHIP; POWER OF ATTORNEY

11.1     Certificate of Partnership.  A certificate of Limited Partnership within the meaning of the Delaware Act (the "Certificate") was prepared prior to the execution and delivery of this Agreement.  The General Partner has caused the Certificate to be filed and recorded in the office of the Secretary of State of the State of Delaware, and, to the extent required by applicable law, the General Partner will cause the Certificate to be filed in the appropriate place in each state in which the Partnership may hereafter establish a place of business, but the Partnership shall not be obligated to provide the Limited Partners with a copy of any amendment to or restatement of the Certificate.  The General Partner will also cause to be filed, recorded and published, such statements, notices, certificates or other instruments required by any provision of any applicable law that governs the formation of the Partnership or the conduct of its business from time to time.

11.2     Power of Attorney.

(a)     Each of the undersigned, to the fullest extent permitted by applicable law, does hereby constitute, appoints and grants the General Partner with full power to act without the others, as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute or sign, acknowledge and deliver or file (i) the Certificate, (ii) any amendment to, modification to, restatement of or cancellation of the Certificate, (iii) all instruments, deeds, agreements, documents and certificates that may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (iv) all instruments, deeds, agreements, documents and certificates that may be required to effectuate the dissolution, liquidation, winding-up and termination of the Partnership or admit any additional partners or members thereto, except where such action requires the express approval of the Limited Partners hereunder, (v) any duly enacted amendment to this Agreement, including, without limitation, such amendments as are enacted pursuant to the provisions of the terms of this Agreement, and all instruments and documents that may be necessary or desirable to effectuate an amendment so approved, (vi) in the case of a Regulated Partner (including a Partner treated as a Regulated Partner hereunder) or Defaulting Partner, any bills of sale or other appropriate transfer documents necessary or advisable to effectuate Transfers of such Person's interest pursuant to Section 7.6 or Section 12.2, and (vii) such other documents, deeds, agreements or instruments as may be required

under the laws of any state, the United States or any other jurisdiction; provided, however, that the power of attorney granted to a person hereunder shall expire automatically upon the first to occur of any of the following events:  such person is convicted of a felony which brings the Partnership into material disrepute; such person files a voluntary petition in a bankruptcy or similar insolvency proceedings; or an involuntary petition in a bankruptcy or similar insolvency proceeding is filed with respect to such person which remains undismissed for 60 days.  The powers of attorney granted herein will be deemed to be coupled with an interest, will be irrevocable and will survive the death, incompetency, disability or dissolution of a Limited Partner.  The power of attorney granted pursuant to this Section 11.2 shall not be deemed to expand any right or duty of the General Partner otherwise granted or imposed hereunder. Without limiting the foregoing, the powers of attorney granted herein will not be deemed to constitute a written consent of any Limited Partner for purposes of Section 12.1.

(b)     The appointment of attorney-in-fact provided in this Section 11.2 shall not revoke, in whole or in part, any powers of attorney previously or contemporaneously executed by the undersigned (including any power of attorney executed in connection with investing in the Partnership). To the extent permitted by applicable law, this appointment shall not be revoked by any subsequent or contemporaneous power of attorney (including any power of attorney executed in connection with investing in the Partnership) that the undersigned may execute, unless the General Partner agrees and (i) such subsequent power of attorney specifically provides that it revokes the power of attorney provided by this Section 11.2 by referring to the power of attorney provided by this Section 11.2 and the name of the agent(s) appointed hereby as attorney(s)-in-fact and (ii) a copy of such subsequent power of attorney is provided to the agent(s) appointed hereby.

(c)     Each Limited Partner agrees to execute such other documents as the General Partner may reasonably request in order to effect the intention and purposes of the power of attorney contemplated by this Section 11.2.

## ARTICLE XII

## MISCELLANEOUS

12.1     Amendments.

(a)     This Agreement may be amended only by the written consent of the General Partner and, except as otherwise provided in this Agreement, the Limited Partners (other than Defaulting Partners) representing at least a majority of the Required Interests.

(b)     Notwithstanding anything in Section 12.1(a) to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) that alters this Section 12.1(b) or which increases or decreases such Limited Partner's Capital Commitment without the written consent of such Limited Partner.

(c)     Notwithstanding anything in Section 12.1(a) to the contrary, no amendment will be valid as to any Limited Partner which alters the provisions of Section 2.3, 3.2, 4.2, 4.3, 5.1, 8.4, 8.5, or this Section 12.1(c) (including any amendment which would alter a definition in such a manner as to alter any such provision) without the consent of Limited Partners representing at least three-quarters of the Required Interests.

(d)     Notwithstanding anything in Section 12.1(a) to the contrary, no amendment that would alter the provisions of this Section 12.1(d), or that would alter the definition of "Benefit Plan Investor" or would alter the provisions of Sections 3.1(b), 3.3(b), 6.6, 7.6 or 10.3(f) or the provision in the

first sentence of <u>Section 7.7</u> and would materially and adversely affect any Benefit Plan Investor's interest, shall be valid without the consent of Benefit Plan Investors representing at least three-quarters of the Required Interests held by Benefit Plan Investors.

(e)        Notwithstanding anything in <u>Section 12.1(a)</u> to the contrary, so long as a Subscription Facility exists, no amendment of this Agreement will be valid as to any Lender that would materially adversely affect such Lender.

(f)        [Reserved].

(g)        Notwithstanding anything in <u>Section 12.1(a)</u> to the contrary, no amendment that would alter the definitions of "BHCA," "BHCA Interest," "BHCA Limited Partner" or that would alter the provisions of this <u>Section 12.1(g)</u>, or would alter the provisions of <u>Section 7.10</u> and would materially and adversely affect any BHCA Limited Partner's interest in a manner that does not similarly materially and adversely affect the other Limited Partners generally, shall be valid without the consent of BHCA Limited Partners representing a majority of the Capital Commitments held by BHCA Limited Partners.

Notwithstanding anything in this Agreement to the contrary, this Agreement may be amended by the General Partner without the consent of any Limited Partner (i) in order to cure any ambiguity or error, make an inconsequential revision, provide clarity or to correct or supplement any provision herein that may be defective or inconsistent with any other provisions herein, <u>provided</u> that such amendment does not have a materially adverse effect on the Limited Partners, (ii) to add any obligation, representation or warranty of the General Partner or surrender any right or power granted to the General Partner, (iii) for such other purpose or purposes as the General Partner may deem to be necessary, appropriate, advisable, incidental or convenient to the management and conduct of the business and affairs of the Partnership, <u>provided</u> that, in the General Partner's judgment, no such amendment pursuant to this clause (iii) has or could be reasonably expected to have a materially adverse effect on the Partnership or any Limited Partner or (iv) following any change in U.S. federal income tax law that would have the effect of characterizing as ordinary income to the General Partner returns that under the law in effect as of the Initial Closing Date would be characterized as capital gain or qualified dividend income, in such manner as is determined by the General Partner in good faith, <u>provided</u> that, with respect to any amendment made pursuant to this <u>clause (iv)</u>, if the General Partner reasonably believes that such amendment would have a materially adverse effect on the interests of any Limited Partner, such amendment will not be effective with respect to such adversely affected Limited Partner unless such Person consents to such amendment. The General Partner shall provide a copy of any amendment to this Agreement to each Limited Partner at least 5 business days in advance of the General Partner giving its consent to such amendment.   The General Partner may, in its sole discretion, choose to deliver any proposed or effective amendment described in this <u>Section 12.1</u> via email and/or another electronic reporting medium in lieu of providing the Limited Partners with paper copies of such amendment; <u>provided</u> that the General Partner may agree in writing in its sole discretion and at the request of any Limited Partner to limit the applicability of any portion of this sentence to such Limited Partner.

Upon obtaining such required approvals or consents, if any, of the Limited Partners holding the requisite percentage of Required Interests and without any further action or execution by any other Person, including any Limited Partner (x) any amendment, restatement, modification or waiver of this Agreement may be implemented and reflected in a writing executed solely by the General Partner, (y) where the General Partner determines such action to be necessary notwithstanding <u>clause (x)</u> above, the General Partner shall be authorized and empowered by each Limited Partner, with full power of substitution, to execute, acknowledge, make, swear to, verify, deliver, record, file and/or publish all instruments and documents that may be necessary or desirable to effectuate any amendment to, restatement of, modification to or waiver of, this Agreement and (z) each Limited Partner and any other

party to this Agreement shall be deemed a party to and bound by such writing executed by the General Partner, in the case of clause (x), or such writing executed or action taken by the General Partner, in the case of clause (y), reflecting such amendment to, restatement of, modification to or waiver of, this Agreement.

  12.2 Limited Partners Default on Capital Commitment.

    (a) If any Limited Partner (a "Defaulting Partner") fails to make full payment when due (a "Payment Default") of any portion of its Capital Commitment or any other payment required under this Agreement or such Limited Partner's subscription agreement for its interest in the Partnership (the amount of such defaulted payments in the aggregate, including all accrued and unpaid interest thereon, and together with any other unpaid amounts that are due and owing by such Limited Partner thereunder, the "Defaulted Amounts") and such Payment Default is not cured within 10 business days after written notice to such Defaulting Partner from the General Partner with respect to such Payment Default, other than a Regulated Partner whose Capital Commitment has been reduced in accordance with Section 7.6(j), the General Partner in its sole discretion, on its own behalf or on behalf of the Partnership, may (but shall not be obligated to) pursue and enforce any and all rights and remedies the Partnership and/or the General Partner may have against such Defaulting Partner at law, in equity or pursuant to any other provision of this Agreement or otherwise with respect thereto, including taking any one or more of the following actions in any order of priority:

      (i) In addition to all Defaulted Amounts owed by the Defaulting Partner, the Partnership may (A) accrue and collect interest computed on all Defaulted Amounts and any amount due to the Partnership or the General Partner pursuant to this Section 12.2 at an annual compounded rate not to exceed the Applicable Rate plus 6 percentage points per annum (but not in excess of the highest rate per annum permitted by law) as such rate shall be determined by the General Partner in its sole discretion with respect to each failure to make such payments, and/or (B) require reimbursement from the Defaulting Partner for all out-of-pocket expenses (including for attorneys' fees) incurred by the Partnership and the General Partner in connection with the collection and other efforts in respect of the Defaulted Amounts (which payment of such interest and expense reimbursement shall not be treated as a Capital Contribution by the Defaulting Partner). The General Partner may require the payment of such interest and expense reimbursement whether or not it exercises any rights or remedies.

      (ii) So long as any Defaulted Amounts remain unpaid, the Partnership may withhold all distributions (or portions thereof) that would otherwise be made to the Defaulting Partner pursuant to this Agreement and apply such withheld distributions to offset any Defaulted Amounts owing by the Defaulting Partner to the Partnership or the General Partner under this Agreement or any other agreement.

      (iii) The General Partner may assist the Defaulting Partner in finding a buyer for all or any part of the Defaulting Partner's interest in the Partnership; provided that the General Partner shall not have any obligation to contact any particular Limited Partner or other Person with regard to such sale and shall have no liability to any Partner, including the Defaulting Partner, if no such buyer is found.

      (iv) The Partnership and the General Partner may pursue a lawsuit to collect the Defaulted Amounts due to the Partnership and the General Partner including amounts owed pursuant to Section 12.2(a)(i) and/or 12.2(a)(ix). The General Partner may require the payment of such interest and expense reimbursement whether or not it exercises any rights or remedies.

CHICAGO/#2577231.6

(v)     Subject to Section 12.2(a)(vii), the General Partner may cause the Defaulting Partner to forfeit up to 50% of its interest in the Partnership without payment or other consideration therefor, and the General Partner shall offer such forfeited portion of the Defaulting Partner's interest in the Partnership to the Partners (other than any Defaulting Partners and Persons not able to acquire such interests pursuant to Section 7.2(e) and 7.2(f)) pro rata according to their respective Capital Commitments.  The General Partner shall provide a notice to each Partner (other than Defaulting Partners) setting forth the amount of the forfeited portion of the Defaulting Partner's interest offered to such Partner.  In the event that any Partner does not elect to accept its pro rata share of the forfeited portion of a Defaulting Partner's interest in the Partnership, such forfeited portion not accepted will be offered again by the General Partner according to the provisions of this Section 12.2(a)(v) as if such forfeited portion had not previously been offered until either all of such interest is acquired or no Partner wishes to accept any further portion.  Subject to Section 12.2(a)(vii), to the extent a Defaulting Partner's interest forfeited pursuant to this Section 12.2(a)(v) is not reallocated to the Partners, the General Partner may in its sole discretion offer such interest to a third party or parties, each of which shall, as a condition of purchasing such interest, become a party to this Agreement.  The sole consideration to the Defaulting Partner for each portion of such Defaulting Partner's interest reallocated to another Partner or purchased by a third party pursuant to this Section 12.2(a)(v) shall be the assumption by such Partner or third party, as applicable, of the Defaulting Partner's obligation to make both defaulted and future Capital Contributions (together, in the General Partner's sole discretion, with interest) pursuant to its Capital Commitment that are commensurate with the portion of the Defaulting Partner's interest being reallocated to such Partner or purchased by such third party.  The Defaulting Partner acknowledges that it shall not receive any payment for any interest reallocated to Partners or purchased by a third party or parties pursuant to this Section 12.2(a)(v), including for any funded portion of its Capital Commitment related thereto, even though the purchased interest may actually have significant positive value at the time of such reallocation or purchase.

(vi)    Subject to Section 12.2(a)(vii), to the extent a Defaulting Partner's interest is not forfeited and reallocated pursuant to Section 12.2(a)(v) (including the remaining portion of such Defaulting Partner's interest not subject to forfeiture), the General Partner may offer to the Partners (other than any Defaulting Partners and Persons not able to acquire such interests pursuant to Section 7.2(e) and 7.2(f)) the portion of the Defaulting Partner's interest in the Partnership that is not forfeited and reallocated or sold pursuant to Section 12.2(a)(v) at an aggregate price equal to the balance of such Defaulting Partner's Capital Account on the effective date such Defaulting Partner's interest is sold (adjusted, as necessary, to exclude any unrealized appreciation with respect to any Investment and to include all unrealized depreciation with respect to each Investment, as determined by the General Partner in its sole discretion) corresponding to the interest so offered.  At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall, as payment in full for the Defaulting Partner's interest being purchased by such Partner, deliver, as determined by the General Partner in its sole discretion, (x) cash and/or (y) a non-interest bearing, non-recourse three-year promissory note (in a form approved by the General Partner), secured only by the Defaulting Partner's interest being purchased, payable to the Defaulting Partner, in an aggregate amount equal to the purchase price for the interest being acquired by such Partner.  If the remaining portion of the Defaulting Partner's interest is not purchased in the manner set forth herein, the General Partner in its sole discretion may offer the remaining interest to a third party or parties on terms not more favorable than originally offered to the Partners, in which case such third party or parties shall, as a condition of purchasing such interest, become a party to this Agreement.

43

(vii)     Any Partner or third party acquiring a portion of the Defaulting Partner's interest shall assume the portion of the Defaulting Partner's obligation to make both defaulted and future Capital Contributions pursuant to its Capital Commitment (plus accrued and unpaid interest, if any, owing by the Defaulting Partner pursuant to Section 12.2(a)(i) unless waived by the General Partner in its sole discretion) that is commensurate with the portion of the Defaulting Partner's interest being acquired by such Person; provided that the General Partner shall have the right, in its sole discretion, to reduce the Capital Commitment pertaining to the portion of the Defaulting Partner's interest acquired by a Person to the amount of Capital Contributions made by the Defaulting Partner with respect to such portion of the Defaulting Partner's Partnership interest (which amount of Capital Contributions shall be equal to the pro rata portion of the aggregate Capital Contributions made by the Defaulting Partner with respect to its entire interest) on or prior to the date of the Payment Default, and the aggregate Capital Commitments of the Partnership shall be commensurately reduced; and provided further that, in the General Partner's sole discretion, such Defaulting Partner's Capital Commitment (and corresponding uncalled Capital Commitment) shall not be deemed reduced for purposes of Section 4.6.

(viii)     The General Partner may reduce (and such reduction shall be deemed to be effective as of the actual date of the Payment Default, without giving effect to any applicable cure period, or as of such later date as is determined by the General Partner) any portion of such Defaulting Partner's Capital Commitment (which has not been assumed by another Partner or third party) to the amount of the Capital Contributions (which have not been acquired by another Partner or third party) made by such Defaulting Partner (net of distributions pursuant to Section 3.1(d)), and the aggregate Capital Commitments of the Partnership shall be commensurately reduced; provided that, in the General Partner's sole discretion, such Defaulting Partner's Capital Commitment (and corresponding uncalled Capital Commitment) shall not be deemed reduced for purposes of Section 4.6; and further provided that no such reduction in a Defaulting Partner's Capital Contribution shall be effective as against a Lender that has advanced funds to the Partnership on account of such Capital Commitment.

(ix)     Notwithstanding anything contained herein to the contrary, from and after the date on which a Limited Partner has become a Defaulting Partner (or such later date as is determined by the General Partner), the General Partner in its sole discretion may make effective one or more of the following provisions:  (A) such Defaulting Partner will have no right to receive any distributions, except for distributions made upon the Partnership's liquidation, (B) upon the Partnership's liquidation the aggregate distributions that such Defaulting Partner shall be entitled to receive from the Partnership shall not exceed an amount equal to the excess, if any, of (1) the balance of such Defaulting Partner's Capital Account on the date on which the Defaulting Partner became a Defaulting Partner (adjusted to the extent determined by the General Partner in its sole discretion, as necessary, to exclude any unrealized appreciation with respect to any Investment and to include all unrealized depreciation with respect to each Investment, as determined by the General Partner in its sole discretion) (which balance has not been acquired by another Partner or third party) over (2) such Defaulting Partner's share of Partnership Expenses (including the Management Fee, determined, for this purpose, in accordance with Section 7.6(i)), Organizational Expenses and other items of Partnership loss and expense for all periods after the date on which the Defaulting Partner became a Defaulting Partner, determined as if there had been no reduction in such Defaulting Partner's Capital Commitment pursuant to Section 12.2(a)(viii), and such Defaulting Partner's Capital Account shall continue to be debited for (and, to the extent the Defaulting Partner does not return distributions pursuant to Section 4.6, the foregoing amount shall be reduced by) any Liability under Section 4.6 as if there had been no reduction in such Defaulting Partner's Capital Commitment, (C) until the amount described in clause (B) is reduced to zero, the Management Fee payable by the Partnership shall be calculated

44

and allocated among the Partners as if there had been no reduction in such Defaulting Partner's Capital Commitment hereunder, and (D) once the amount described in clause (B) is reduced to zero, (1) such Defaulting Partner's Capital Commitment shall be reduced to zero for all purposes of this Agreement (provided that, in the General Partner's sole discretion, such Defaulting Partner's Capital Commitment (and corresponding uncalled Capital Commitment) shall be deemed not reduced for purposes of Section 4.6), including the calculation of the Partnership's aggregate Capital Commitments and determination of the Management Fee and (2) such Defaulting Partner shall be liable each period to the General Partner for an amount equal to its portion of the Management Fee, determined, for this purpose, in accordance with Section 7.6(i), as if there had been no reduction in such Defaulting Partner's Capital Commitment hereunder.

(b)     No consent of any Limited Partner shall be required as a condition precedent to any Transfer of a Defaulting Partner's interest, or the admission of a transferee as a substitute Limited Partner with respect to such interest, pursuant to this Section 12.2.  Notwithstanding the foregoing, no Defaulting Partner's interest shall be transferred, and no Person shall become a substitute Limited Partner, in contravention of Section 7.2.

(c)     The General Partner shall handle the procedures of making the offers set forth in this Section 12.2 and shall in its discretion set time limits for acceptance.  In connection with any purchase of a Partnership interest pursuant to this Section 12.2, upon the General Partner's request, the Defaulting Partner shall make customary representations and warranties to each purchaser and will execute a customary transfer agreement.

(d)     The failure of any Limited Partner to fulfill an obligation hereunder shall not relieve any other Limited Partner of any of its obligations under this Agreement.

(e)     Notwithstanding the notice requirements of Section 3.1(a), additional Capital Contributions may be called by the General Partner on 5 business days' notice following a Limited Partner failing to fund any amount due pursuant to a Capital Call Notice.  In addition, the General Partner is authorized to apply amounts that would otherwise be distributed to a Partner to satisfy such Partner's obligation to make a Capital Contribution pursuant to Section 3.1(a) or any other payment required under this Agreement.  Such amounts applied shall be deemed distributed to such Partner by the Partnership and then contributed by such Partner to the Partnership as Capital Contributions or paid by such Partner to the Partnership, as applicable.

(f)     Notwithstanding anything in this Agreement to the contrary and unless otherwise determined by the General Partner in its sole discretion, during any period of time that a Limited Partner is a Defaulting Partner, such Defaulting Partner shall not be entitled to receive any of the reports, or information contained therein, provided for in Section 10.3 or any other information regarding the Partnership or any Investment, other than (i) a statement of such Defaulting Partner's closing Capital Account balance as and when provided by the General Partner to the other Limited Partners in accordance with Section 10.3, (ii) the Defaulting Partner's Schedule K-1s, as and when provided by the General Partner to the other Limited Partners in accordance with Section 10.3(b), and (iii) any additional reports and information that are required by applicable law.

(g)     Each Partner hereby acknowledges that certain provisions of this Agreement (including this Section 12.2) provide for specific consequences in the event of a breach of this Agreement by a Partner.  Each Partner hereby agrees that the default provisions of this Agreement are fair and reasonable and, in light of the difficulty of determining actual damages, represent a prior agreement among the Partners as to appropriate liquidated damages.  Without limiting the general effect of the preceding sentence, the Partners hereby specifically acknowledge and agree that the enforceability of this

45

Section 12.2 is essential to the stability of the Partnership as an organization and to the ability of the Partnership to effectively serve its purpose and conduct its business operations.

      (h)    Each Limited Partner hereby specifically agrees that, in the event such Limited Partner becomes a Defaulting Partner, regardless of the reason therefor, such Limited Partner shall not be entitled to claim that the Partnership or any of the other Partners are precluded, on the basis of any fiduciary or other duty arising in respect of such Limited Partner's status as such or other equitable claim or theory, from seeking any of the penalties or other remedies permitted under this Agreement or applicable law.

12.3    Successors.  Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and permitted assigns.

12.4    Governing Law; Severability.  This Agreement will be construed in accordance with the laws of the State of Delaware, without regard to the conflict of law rules thereof, and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Act.  If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only in such jurisdiction and only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

12.5    Notices.  All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given on the date when personally delivered, 2 business days after being mailed by first class mail (postage prepaid and return receipt requested), when sent by facsimile or transmitted by email (if sent before 5 p.m. local time on a business day in the time zone to which it is sent (and otherwise on the next business day)), or on the date after being sent by reputable overnight courier service (charges prepaid), in each case to the recipient at the address, facsimile number or email address set forth in Schedule I or to such other address, facsimile number or email address or to the attention of such other Person as has been indicated to the General Partner in accordance with the provisions of this Section 12.5.  The General Partner may agree to limit or condition the use of any particular manner of notice described herein as it relates to one or more Limited Partners at such Person's request.

12.6    Legal Counsel.  Each Partner hereby agrees and acknowledges that:

      (a)    The General Partner has retained legal counsel in connection with the formation of the Partnership and expects to retain legal counsel (collectively, "Law Firms") in connection with the operation of the Partnership, including making, holding and disposing of investments.  Except as otherwise agreed to by the General Partner in writing in its sole discretion, the Law Firms are not representing and will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner Interests, the management and operation of the Partnership, or any dispute that may arise between the Limited Partners on the one hand and the General Partner and/or the Partnership on the other (the "Partnership Legal Matters").

      (b)    Except as otherwise agreed to by the General Partner in writing in its sole discretion, each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and will pay all fees and expenses of such independent counsel.

CHICAGO/#2577231.6

12.7    Miscellaneous.

(a)    Entire Agreement.  This Agreement, together with each Limited Partner's subscription agreement subscribing for an interest in the Partnership, contains the entire agreement among the respective parties and supersedes all prior arrangements or understanding with respect thereto; except that the Partnership and the General Partner may enter into, and this Agreement is deemed to include, side letters and similar written agreements with any Limited Partner(s) entered into by or on behalf of the Partnership or the General Partner on or after the date hereof; provided, however, that the parties agree that notwithstanding Section 12.1 or 12.10 of this Agreement, each such agreement may be amended, modified, waived or terminated by the General Partner and the Limited Partner(s) who are parties thereto without the consent of any other Limited Partner (so long as such amendment or modification does not adversely affect their respective interests hereunder), and no Limited Partner not a party to any particular agreement is intended to be a third-party beneficiary of such agreement.

(b)    Counterparts; Delivery of Original Forms.  This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together shall constitute one agreement.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each party hereto or thereto will reexecute original forms thereof and deliver them to the requesting party.  No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(c)    Descriptive Headings.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(d)    Construction.  Unless the context otherwise requires:  (i) a term has the meaning assigned to it; (ii) "or" is not exclusive; (iii) words in the singular include the plural, and words in the plural include the singular; (iv) provisions apply to successive events and transactions; (v) the words "herein," "hereof" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) all references herein to Articles, Sections, Exhibits, paragraphs, subparagraphs and clauses shall be deemed to be references to Articles, Sections, paragraphs, subparagraphs and clauses of, and Exhibits to, this Agreement unless the context shall otherwise require; (vii) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (viii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (ix) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (x) references to "$" or "dollars" shall mean United States dollars; (xi) unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement, instrument or statute that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (A) in the case of agreements or instruments, by waiver or consent, and (B) in the case of statutes, by succession of comparable successor statutes, and references to all attachments thereto and instruments incorporated therein; and (xii) all references to any Partner shall mean and include such Partner and any Person duly admitted as a partner in the Partnership in substitution therefor in accordance with this Agreement, unless the context otherwise requires.  Whenever from the

47

context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and terms stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.  Each Limited Partner acknowledges that it participated in, or had the meaningful opportunity to participate in, the negotiations and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed to be the product of meaningful individualized negotiations between the General Partner and each Limited Partner and no presumption or burden of proof shall arise favoring or disfavoring any Partner by virtue of the authorship of any of the provisions of this Agreement.

(e)     Further Assurances.  Each Limited Partner hereby covenants and agrees on behalf of itself and its successors and assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish and deliver such other information, instruments, documents, tax forms and statements (including any information requested by the General Partner in relation to Code §§1471-1474) and to take such other actions as may be necessary or appropriate for the General Partner to effectively carry out the purposes of the Partnership and this Agreement.

12.8   Parallel Funds.  To facilitate investment by non-United States citizens and certain other Persons, the General Partner may form one or more parallel investment entities ("Parallel Funds") which will invest substantially all of their assets in the Partnership or invest in Investments on a pro rata basis with the Partnership.  Investments made by Parallel Funds in Investments and dispositions of such Investments will be made on substantially the same terms and conditions as the Partnership, subject to any tax, regulatory or legal restrictions that may limit the type or amount of such Investments or dispositions by the Partnership or the Parallel Funds.  The Partnership is a Parallel Fund to the Flagship Fund.

12.9   Insurance.  The General Partner, on behalf of the Partnership, may cause the Partnership to purchase and maintain insurance with such coverage as the General Partner reasonably deems appropriate for the protection of any Management Person against any liability incurred by such Persons in any such capacity.

12.10   Side Letters.  Notwithstanding any other provision of this Agreement, including Section 12.1, or of any subscription agreement, it is hereby acknowledged and agreed that the General Partner on its own behalf or on behalf of the Partnership without the approval of any Limited Partner or any other Person may enter into a side letter or similar agreement (a "side letter") to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any subscription agreement. The parties hereto agree that any terms contained in a side letter to or with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any subscription agreement.

12.11   No Third Party Beneficiaries.  Subject to Section 8.3(d), no Person (other than a Lender to the extent such rights have been assigned under a Subscription Facility) that is not a party hereto shall have any rights or obligations pursuant to this Agreement.  The provisions of this Agreement are intended to benefit the Partners and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Partnership.  To the fullest extent permitted by law, neither the Limited Partners nor the General Partner shall have any duty or obligation to any creditor of the Partnership to make any contribution to the Partnership or issue any Capital Call Notice or recall any distribution, except as specifically provided in this Agreement.  In no event shall any provision of this Agreement be enforceable for the benefit of any Person other than the Limited Partners, the General Partner and their respective successors and assigns (which may include, without limitation, a Lender under a Subscription Facility).

\*\*\*

CHICAGO/#2577231.6

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered by the General Partner and the Initial Limited Partner effective as of the date first above written and by each other party hereto effective as of the date that such party first acquired a Commitment.

**GENERAL PARTNER**:

**T2 ASSET OPPORTUNITY FUND IV, LP**

By: T2 Asset Opportunity Fund IV GP, LLC
Its:  General Partner

By:_____
Name:_____
Title:_____

**LIMITED PARTNER**:

_____
(Print or Type Name)

By:_____
Name:_____
Title:_____

50

# EXHIBIT 4

**To:**　　　Robert Gravette[robert@criterionwealth.com]
**From:**　　Patrick Denard
**Sent:**　　2015-02-13T11:47:34-05:00
**Importance:**　　Normal
**Subject:**　Re: T2 Opp Fund 4
**Received:**　　　　2015-02-13T11:47:34-05:00

Perfect

On Friday, February 13, 2015, Robert Gravette <robert@criterionwealth.com> wrote:

> No.  This opportunity is too good to pass up.
>
> We can start building outside RE in the future.

> **From:** Patrick Denard [mailto:pjdenard@gmail.com]
> **Sent:** Friday, February 13, 2015 8:45 AM
> **To:** Robert Gravette
> **Subject:** Re: T2 Opp Fund 4

One more thought...We currently own three properties in addition to our own home and the ortho building. We will single-family home in Portland, a townhome locally, and a six unit apartment building locally. This fund is obviously in real estate. Do you think I should avoid in order to maintain diversity?

On Thursday, February 12, 2015, Robert Gravette <robert@criterionwealth.com> wrote:

> OK.  I'll let you know when we are ready to open.  Should be in a few weeks.
>
> Bob

> **From:** Patrick Denard [mailto:pjdenard@gmail.com]
> **Sent:** Wednesday, February 11, 2015 1:50 PM
> **To:** Robert Gravette
> **Subject:** Re: T2 Opp Fund 4

Looks interesting to me. If you think it is good and that they will take the 100k go for it.

Thx

Patrick

On Wednesday, February 11, 2015, Robert Gravette <robert@criterionwealth.com> wrote:

> Waterfall is revenue sharing with investor and sponsor after preferred rate is paid.
>
> We can probably get around the 250k

> **From:** Patrick Denard [mailto:pjdenard@gmail.com]
> **Sent:** Wednesday, February 11, 2015 11:48 AM
> **To:** Robert Gravette
> **Subject:** Re: T2 Opp Fund 4

What is waterfall? Also it says minimum investment is 250k?

On Wednesday, February 11, 2015, Robert Gravette <robert@criterionwealth.com> wrote:

> Take a look at this.
>
> Bob

> Robert Gravette
>
> President

> **Criterion Wealth Management**
>
> **T** 661 254 2543 **TF** 800 550 1095
>
> 26650 The Old Road,  Ste. 212
>
> Valencia, CA  91381
>
> **criterionwealth.com**

Criterion Insurance Services, Inc. DBA: Criterion Wealth Management does not accept buy, sell or cancel orders by e-mail, or any instructions by e-mail that would require your signature. Securities and advisory services are offered through Ausdal Financial Partners, Inc., Member FINRA/SIPC 5187 Utica Ridge Road, Davenport, IA  52807 (563) 326-2064. Investment Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners, Inc. and any subsidiaries or affiliates. CA Insurance License # 0786906. Information contained in this communication is not considered an official record of your account and does not supersede normal trade confirmations or statements.  Any information provided has been prepared from sources believed to be reliable but is not guaranteed, does not represent all available data necessary for making investment decisions and is for informational purposes only.

This e-mail may be privileged and/or confidential, and the sender does not waive any related rights and obligations.  Any distribution, use or copying of this e-mail or the information it contains by other than an intended recipient is unauthorized.  If you receive this e-mail in error, please advise me (by return e-mail or otherwise) immediately. Information received by or sent from this system is subject to review by supervisory personnel, is retained and may be produced to regulatory authorities or others with a legal right to the information.

E-mail messages are not encrypted

# EXHIBIT 5



**CRITERION**

## TD Checklist:

## Patrick J. Denard
## (TD Account #934046100)

**Re:**      **T2 Asset Opportunity Fund IV, LP**
             **$100,000 (100,000 units @$1 per unit)**

- ❏ Letter of Authorization for Non-Publicly Traded Investment
- ❏ TD Ameritrade Clearing, Inc. Agreement Regarding Non-Publicly Traded Investments
- ❏ Letter of Direction
- ❏ Subscription Package

If you have any questions, please do not hesitate to contact Yumiko Odama at (661) 254-2543.

Securities and advisory services are offered through Ausdal Financial Partners, Inc. Member FINRA/SIPC 5187 Utica Ridge Road, Davenport, IA 52807 (563) 326-2064. Investment Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners, Inc. and any subsidiaries or affiliates. CA insurance License # 0786900

Reset Form



# LETTER OF AUTHORIZATION (LOA)

## FOR NON-PUBLICLY TRADED INVESTMENT

Account # 934046100

Advisor # I8S

| Advisor:<br>Mark A. MacArthur and/or Robert A. Gravette | Date: |
|---|---|

| Rep Code:<br>I8S | Re: TD Ameritrade Account #:<br>934046100 |
|---|---|

By my signature below, I hereby confirm that I understand and agree to the following:

I hereby authorize and direct TD Ameritrade, Inc. to transfer $ 100,000 to purchase 100,000 shares/units at a price of $ 1.00 per share/unit from my identified TD Ameritrade account into T2 Asset Oppt Fund IV, LP (limited partnership or other non-publicly traded investment) and to open a new account in the name of my account with the identified L.P. (or other non-publicly traded investment) designated above to which a transfer is to be made. Please note that the L.P. General Partner (or other applicable principal) or the Advisor is not affiliated with TD Ameritrade, Inc., and TD Ameritrade is not responsible for the actions or investments of the L.P. (or other non-publicly traded investment), the General Partner (or other applicable principal), the Advisor or their affiliates. I understand that I will no longer have access to or control over the funds invested in the L.P. (or other non-publicly traded investment) held at TD Ameritrade.

I agree that TD Ameritrade may rely on the valuations of the L.P. (or other non-publicly traded investment) provided by the General Partner (or other applicable principal), the Advisor, the L.P. (or other non-publicly traded investment) or their other service providers for purposes of pricing transactions in the L.P. (or other non-publicly traded investment), reporting, or other purposes without any duty or obligation to inquire into whether such valuations are current or correct. TD Ameritrade is not responsible for monitoring the investments of the L.P. (or other non-publicly traded investment). I made the decision to invest in the identified L.P. (or other non-publicly traded investment) designated above without any advice or recommendation from TD Ameritrade. I hold TD Ameritrade and its affiliates harmless from any claims arising out of its reliance on this transfer request and for any claims that I may have against the L.P. (or other non-publicly traded investment), the General Partner (or applicable principal), the Advisor, or their affiliates.

Sincerely *(please print),*

| Name *(First, Middle Initial, Last)*:<br>Patrick J. Denard |
|---|

| Home Street Address *(no PO boxes)*:<br>420 G. Street |
|---|

| City:<br>Jacksonville | State:<br>OR | ZIP Code:<br>97530 |
|---|---|---|

| Email Address:<br>pjdenard@gmail.com | Phone:<br>(503) 320-8557 |
|---|---|

Signature: _____ Date: 3/23/15

### Non-Publicly Traded Investment Contact Information and Payment Instructions

| Company Name:<br>Woodfield Fund Administration, LLC |
|---|

| Address *(no PO boxes)*:<br>1 N. Waker Drive, Ste. 2150 |
|---|

| City:<br>Chicago | State:<br>IL | ZIP Code:<br>60606 |
|---|---|---|

| Contact Name:<br>same as above |
|---|

| Contact Address *(no PO boxes)*: |
|---|

| City: | State: | ZIP Code: |
|---|---|---|

| Send Check To:<br>See Below: Wire |
|---|

| Wire Instructions: MB Financial Bank, N.A., 6111 N. River Road, Rosemont, IL 60018 (847) 653-1024 |
|---|
| ABA: 071 001 737 Account: 184 000 6920 Acct. Name: T2 Asset Opportunity Fund IV, LP |
| For Further Credit: Patrick J. Denard (TD Acct. 934046100) |

Mailing Address:
**TD Ameritrade Institutional**
PO BOX 919094
San Diego, CA 92191-9094

Overnight Address:
**TD Ameritrade Institutional**
5010 Wateridge Vista Drive
San Diego, CA 92121-5775

TDAI 4507 REV. 07/14

Investment Products: Not FDIC Insured * No Bank Guarantee * May Lose Value

TD Ameritrade Institutional, Division of TD Ameritrade, Inc., member FINRA/SIPC/NFA. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2014 TD Ameritrade IP Company, Inc. All rights reserved. Used with permission.





 **Ameritrade**

Institutional

# TD AMERITRADE ALTERNATIVE INVESTMENT AGREEMENT

Account # 934046100

Advisor # I8S

WHEREAS, the individual (the "Client") named at the end of this Agreement has or desires to maintain an account as identified below ("Account") of which TD Ameritrade Clearing, Inc. ("TDAC"), the clearing firm for TD Ameritrade, Inc. ("TD Ameritrade"), will be the custodian; and

WHEREAS, the Client has or wants to acquire and/or hold in the Account an investment which is not publicly traded, which investment is specified at the end of this Agreement (the "Investment"); and

WHEREAS, TD Ameritrade will allow the Investment to be held in the Account, but only on the terms and subject to the conditions set forth below.

NOW, THEREFORE, the parties hereto agree as follows:

1. **Valuation of the Investment:**

   (a) The Client represents and warrants that the value of the investment as specified below and in any notice pursuant to paragraph (b) below represents the current fair market value of the Investment on the date hereof.

   (b) The Client agrees to advise TD Ameritrade in writing no later than the 10th day of each January of any change in the fair market value of the Investment from the amount specified below or as of the preceding December 31st, as the case may be, and within 20 days of any other written request as to the fair market value of the Investment as of the date specified in such request. TD Ameritrade shall have no obligation to investigate or determine whether there has been any change in that fair market value, and the fair market value of the Investment as last reported to TD Ameritrade shall be used by TD Ameritrade for all purposes of administration of the Account, without regard to any actual or constructive knowledge that TD Ameritrade may have as to the fair market value of the Investment.

2. **Obligations of TD Ameritrade:**

   (a) TD Ameritrade's obligations with respect to the Investment are solely to hold the Investment in custody. TD Ameritrade's obligation to hold the Investment in custody does not include any obligation to notify the Client (or any other party) of the receipt or failure to receive any amount, to forward to the Client any notices with respect to the Investment, to monitor or report to the Client as to the performance or nonperformance of any person with respect to the Investment (or the performance or nonperformance by any person of any obligation or term contained in, or imposed by, the Investment) or to take enforcement or other action with respect thereto, regardless of whether TD Ameritrade has any actual or constructive knowledge which might make such action or inaction advisable.

   (b) The obligations of TD Ameritrade with respect to the Investment are those herein specifically provided and no other.

   (c) If the Investment, or the terms of the acquisition or disposition thereof, requires or make advisable the taking (or the refraining from taking) of any action, then the Client and not TD Ameritrade shall have the sole obligation to take (or refrain from taking), or instruct TD Ameritrade to take (if such action can only be taken by TD Ameritrade) such action, including by way of illustration and not by way of limitation, retaining sufficient other assets in the Account to meet any capital calls or to pay any expenses for, or relating to, the administration or maintenance of the Investment, retain in the Account property required to be sold pursuant to the terms of any option, and filing such documents as may be necessary or advisable to preserve, protect, or defend the title to the Investment.

3. **Representations:** The Client represents to TD Ameritrade that:

   (a) TD Ameritrade has not solicited the Client to acquire or hold the Investment nor made any recommendation as to the acquisition, retention, or disposition of the Investment in the Account.

   (b) The Client has such arrangements as the Client deems appropriate to monitor the Investment and to take such action with respect to the Investment as the Client deems is adequate and appropriate.

4. **Indemnification:** The Client agrees to indemnify and hold harmless TD Ameritrade and its affiliates from and against any and all liabilities, penalties, losses, damages, claims, costs, expenses, and disbursements (including legal fees and expenses) which may be imposed upon, incurred by, or asserted against TD Ameritrade in any way:

   (a) relating to or arising out of a failure by the Client to timely and properly file any tax returns, or a failure to timely pay any tax required as a result of, or attributable to, the Investment;

   (b) as a result of the use for any purpose by TD Ameritrade of the valuation of the Investment in accordance with this Agreement;

   (c) arising out of, or in connection with, the acquisition, holding, or disposition of the Investment or TD Ameritrade's agreement to act as custodian of the Investment pursuant to this Agreement; or

   (d) as a result of the Client's failure for any reason whatsoever to timely provide TD Ameritrade with the information as to any changes in the fair market value of the Investment.



TDAI 7283 REV. 02/14

5. **TD Ameritrade Right to Terminate Agreement:**

   (a) TD Ameritrade reserves the absolute right to terminate its agreement to hold the Investment in the account at any time and for any reason whatsoever, and TD Ameritrade shall have no liability or responsibility to the Client for any loss, loss of value, damage, or expense suffered or incurred by the Client by reason of the termination of its agreement. The Client, upon receipt of notice from TD Ameritrade of the termination of TD Ameritrade's agreement to continue to hold the Investment shall instruct TD Ameritrade as to the disposition thereof, and if the Client fails to provide TD Ameritrade with any such instructions within thirty (30) days of the date of TD Ameritrade's notice, the Client agrees that the Client shall be deemed to have instructed TD Ameritrade to distribute the Investment in-kind to the Client.

   (b) Nothing contained herein constitutes any agreement to hold any investment into which the Investment may be converted, whether pursuant to the terms of the Investment, by reason of any option or conversion privilege contained therein or upon any enforcement of rights or remedies with respect to the Investment and to seek TD Ameritrade's agreement to hold any investment into which the Investment may be converted.

6. **Miscellaneous:**

   (a) Other Agreements: TD Ameritrade is a party to other agreements, including the TD Ameritrade Client Agreement, with the Client with respect to the Account, and nothing contained herein shall be construed to diminish, reduce, or eliminate any rights which TD Ameritrade may have under any such other agreements, including rights of TD Ameritrade to indemnification, nor shall anything in this agreement be construed to diminish, reduce or eliminate any obligations of the Client under any such agreement.

   (b) Survival of Indemnification: The Client's obligations hereunder shall continue in effect as long as TD Ameritrade acts as custodian of the Client's Account; provided, however, the indemnification provisions herein shall survive the termination of this Agreement, the transfer or liquidation of the Account, or the resignation, or removal of TD Ameritrade as custodian.

   (c) Amendments: TD Ameritrade shall not be bound by any amendment of this Agreement unless in writing and signed by an officer of TD Ameritrade.

   (d) Notices: All notices to the Client shall be deemed given if mailed by first class mail, postage prepaid, addressed to the Client at the address appearing in the records of TD Ameritrade; and any notice or other communication to TD Ameritrade shall be deemed given when received by TD Ameritrade at the following address:

   TD Ameritrade Institutional
   Attn: Corporate Actions
   5010 Wateridge Vista Drive
   San Diego, CA 92121-5775

   (e) Governing Laws: this Agreement shall be construed and enforced in accordance with the laws of the State of New York applicable to agreements to be wholly performed therein.

   (f) Benefits: This Agreement shall be binding upon the Client and his or her beneficiaries, executors, administrators, legal representatives, and successors.

   (g) Fees and Expenses: Promptly upon demand, the Client shall pay or reimburse TD Ameritrade for all out-of-pocket fees and expenses (including legal fees and expenses) incurred by, or imposed upon, TD Ameritrade as a result of holding the Investment in the Account.

### TD AMERITRADE, INC.
### ADDITIONAL DISCLOSURE FOR ALTERNATIVE INVESTMENTS

The acquisition and/or holding of an investment which is not publicly traded in TD Ameritrade Accounts imposes additional burdens upon TD Ameritrade. Nevertheless, TD Ameritrade will allow certain clients to acquire and hold in their TD Ameritrade Account a non-publicly traded investment where the client has provided to TD Ameritrade certain representations and acknowledgments and agrees to assume certain responsibilities.

As a condition to allowing alternative investments to be held in your TD Ameritrade Account, you must sign the attached Agreement Regarding Alternative Investments. The information that follows is a description of some, but not all of the representations, acknowledgments, and agreements required of the client.

THE AGREEMENT REGARDING ALTERNATIVE INVESTMENTS IS A LEGAL DOCUMENT THAT WILL IMPOSE CERTAIN DUTIES AND RESPONSIBILITIES ON YOU AND WHICH MAY AFFECT YOUR LEGAL RIGHTS. BEFORE SIGNING THIS AGREEMENT, YOU ARE URGED TO CONSULT WITH YOUR LEGAL ADVISOR.

1. **Limitations on Transfers of Investments:**
A custodian is not required to hold all investments made by a client, and many institutions which act as custodians will not allow a client to hold an alternative investment in the client's account. As a result, a client who acquires an alternative investment in his or her account may thereafter be unable to transfer his or her investment to an account maintained by another custodian. Therefore, a client may be required to continue to utilize TD Ameritrade as a custodian of his or her account, at least with respect to the alternative investment, so long as that alternative investment is held in his or her account. Furthermore, in the event that TD Ameritrade should resign as custodian of a client's account or TD Ameritrade should revoke its consent to hold the alternative investment (as TD Ameritrade is allowed) in the account, the client may be forced to sell his or her alternative investment if the client cannot find another custodian who will agree to allow the client to hold the alternative investment in the client's account.

   TDAI 7283 REV. 02/14

**2.   Valuation of Assets:**

TD Ameritrade may be required to file various governmental reports disclosing the value of the assets in all accounts for which it is the custodian. Therefore, so long as the value of the investment is not readily available to TD Ameritrade within its recordkeeping systems (as generally is not the case with an alternative investment), the client must furnish to TD Ameritrade at specified times and when requested by TD Ameritrade information as to the fair market value of each investment and any change in that fair market value.

**3.   Tax ID Numbers:**

If the investment may generate "unrelated business taxable income," a tax return (Form 990-T) may be required to be filed for the account, and the IRS also requires that an employer identification number be obtained for the account. The account owner is responsible for obtaining that number from the IRS (IRS Form SS-4 is used for this purpose) and for furnishing that number to the sponsor of the investment.

**4.   Subscription Agreements:**

Some investments require that the investor sign a subscription agreement and/or investor questionnaire acknowledging certain matters, representing, among other things, that the investor is an "accredited investor" and indemnifying the sponsor of the investment for various matters. The client, and not TD Ameritrade, is responsible for making all of the representations, warranties, and/or agreements required as a condition to the purchase of the investment. However, the client should clearly indicate in any subscription agreement that the investment is being acquired through his or her account and that the investment should be registered as "TD Ameritrade, Inc.," not in its individual capacity but solely as Custodian of the Account of [name of client]."

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of _____, 20

TD AMERITRADE, INC.:

By: _____     Title: _____

CLIENT:

Name:  Patrick J. Denard _____   Signature: _____   Date: 3/33/15

Address:  420 G. Street, Jacksonville, OR 97530 _____

Investment:  T2 Asset Opportunity Fund IV, LP _____

Account Number:  934046100 _____   Fair Market Value:$ 1.00 per unit _____

- I will be responsible to see that this certificate is registered in the proper name of TD Ameritrade, Inc.

Mailing Address:
**TD Ameritrade Institutional**
PO BOX 919094
San Diego, CA 92191-9094

Overnight Address:
**TD Ameritrade Institutional**
5010 Wateridge Vista Drive
San Diego, CA 92121-5775

TDAI 7283 REV. 02/14

Investment Products: Not FDIC Insured  *  No Bank Guarantee  *  May Lose Value

TD Ameritrade Institutional, Division of TD Ameritrade, Inc., member FINRA/SIPC/NFA and TD Ameritrade Clearing, Inc., member FINRA/SIPC.
TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank.
© 2014 TD Ameritrade IP Company, Inc. All rights reserved. Used with permission.

Date:   3/23/15

Woodfield Fund Administration, LLC
Attention: Investor Services Department
1 N. Wacker Drive, Ste. 2150
Chicago, IL 60606

Re:     T2 Asset Opportunity Fund IV, LP
        Patrick J. Denard

To Whom It May Concern:

I, Patrick J. Denard, authorize T2 Asset Opportunity Fund IV, LP to register my
interests/units at TD Ameritrade, Inc. as **TD Ameritrade Clearing Inc., FBO: Patrick J.
Denard (Acct. #934046100) (Tax ID: 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)**.

Please accept this letter as my authorization to T2 Asset Opportunity Fund IV, LP to send
all future distributions/payments of income, dividends and/or principal earned from this
asset as follows:

**Overnight mailing instructions:**
        TD Ameritrade Institutional
        Attention: Limited Partnerships
        200 S. 108th Avenue, Omaha, NE 68103-2207
        **OR**
        Submit per TD Ameritrade, Inc.'s Non-Standard Assets Team's Instructions
        Check Payable: TD Ameritrade, Inc.
                FBO: **Patrick J. Denard**
                Account: **934046100**

This should be effective immediately upon receipt of this direction. Should you have any
questions, please contact my financial advisor, Criterion Wealth Management at (661) 254-
2543.

Sincerely,

Patrick J. Denard
Investor
SSN: xxx-xx-7181

cc:     Criterion Wealth Management
        Ausdal Financial Partners

Re: Letter of Direction regarding new purchase in joint account of $100,000 (100,000 units @$1 per unit) of
T2 Asset Opportunity Fund IV, LP.

PPM #102

INVESTMENTS
WORTH
BUILDING

T2 | CAPITAL
MANAGEMENT™

*T2 Asset Opportunity Fund IV, LP*

**Subscription Documents for
Limited Partnership Interests**

**T2 Asset Opportunity Fund IV, LP**
**Instructions for Completion of the Subscription Documents**

To purchase limited partnership interests in T2 Asset Opportunity Fund IV, LP (the "Fund"), please review and complete all of the Subscription Documents contained in this package. By signing the attached Subscription Agreement, the Investor also agrees to become a party to, and be bound and governed by, the Fund's Amended and Restated Agreement of Limited Partnership dated as of December 1, 2014 (the "Partnership Agreement").

A.   Completing the Subscription Documents: *If you have any questions regarding the completion of the Subscription Documents, please call Jeff Baxter at* (630) 590-9511.

    1.   On the first page, fill in the legal name of the individual or entity making the investment (the "Investor") and the total amount of the investment (the "Commitment"). The Commitment is the maximum investment that the Investor agrees to make over the life of the Fund.

    2.   On page 13, following your careful review of the Subscription Agreement, fill in the date and the amount of the Investor's Commitment. *If the Investor is an individual*: The Investor must sign and print the Investor's name. *If the Investor is an entity*: An authorized party of the Investor must print the entity's legal name, sign and print the authorized party's name and title or capacity in which such party is signing on behalf of the investing entity.

    3.   On pages 15 through 17, please complete the investor identification, distribution, contact information, and private fund reporting information as requested. *This information must be completed in full.*

    4.   On Exhibit A, complete the Benefit Plan Investor representations (pages A-1 to A-2).

    5.   On Exhibit B:

        ·   If the Investor is an individual (including IRAs and revocable trusts), please (a) complete the *Eligibility Questionnaire for Individuals* (two pages) AND (b) sign the *Eligibility Questionnaire Signature Page for Individuals* (immediately following the Eligibility Questionnaire for Individuals).

        ·   If the Investor is an entity (excluding IRAs and revocable trusts), please (a) complete the *Eligibility Questionnaire for Entities*, including the supplemental data questions (four pages total) AND (b) sign the *Eligibility Questionnaire Signature Page for Entities* (immediately following the Eligibility Questionnaire for Entities).

    6.   On Exhibit C, please review and complete all requested information. This optional election permits the Fund to deliver your Schedules K-1 electronically.

    7.   Review Annex B, the Privacy Statement of T2 Asset Opportunity Fund IV GP, LLC, the Fund's general partner.

    8.   If the Investor is a United States individual or entity, please complete Form W-9.

    9.   If the Investor is a non-United States individual, non-United States corporation, non-United States partnership or other non-United States entity, please complete Form W-8BEN, W-8BEN-E, W-8ECI, W-8IMY or W-8EXP, as applicable. Each of these forms can be found on the Internal Revenue Service's website at www.irs.gov or by contacting T2 Asset Opportunity Fund IV GP, LLC at (630) 590-9511.

i

B. <u>Delivery of the Subscription Documents</u>:  Please mail the original, completed Subscription Documents to:

**T2 Asset Opportunity Fund IV, LP**
**c/o Woodfield Fund Administration, LLC**
**1 N. Wacker Drive, Suite 2150**
**Chicago, IL 60606**
**Attn:  Investor Services Department**

Scanned copies of the completed Subscription Documents can be e-mailed to T2admin@woodfieldllc.com.

C. <u>Capital Contributions to the Fund</u>:  A capital call notice will be provided at least ten (10) days prior to the due date for the initial capital call. The capital call notice will include wire instructions.

D. <u>Additional Required Documents</u>.  The Fund reserves the right to request any additional documentation reasonably necessary to verify the identity of a prospective limited partner.  Please be aware that your failure to provide such documentation may delay the acceptance of your subscription or cause your subscription request to be rejected entirely.  The Fund shall be held harmless by any such prospective limited partner against loss arising as a result of a failure to provide requested documentation.  If the subscription is rejected, the Fund will refund (without interest) to the subscriber any subscription payments received by the Fund.

**T2 Asset Opportunity Fund IV, LP**
**SUBSCRIPTION AGREEMENT**

| |
|---|
| Patrick J. Denard |
| Legal Name of Investor |
| $ $100,000 |
| Amount of Commitment |

To:    T2 Asset Opportunity Fund IV, LP
       c/o T2 Asset Opportunity Fund IV GP, LLC
       111 W. Wesley Street, Suite 5
       Wheaton, IL 60187

Ladies and Gentlemen:

The undersigned subscribing investor (the "Investor") acknowledges receipt of the Confidential Private Placement Memorandum dated as of March 2015, as updated from time to time (the "Memorandum") of T2 Asset Opportunity Fund IV, LP, a Delaware limited partnership (the "Fund"), with respect to the offering of limited partnership interests (the "Interests") in the Fund.   The Investor hereby agrees as follows:

1.    **Subscription for Limited Partnership Interests**.  Subject to the terms and conditions set forth in this Subscription Agreement and in the Amended and Restated Agreement of Limited Partnership dated as of December 1, 2014 of the Fund (the "Partnership Agreement"), the Investor agrees to (a) subscribe for and irrevocably purchase from the Fund limited partnership interests (the "Interests") in the Fund in the aggregate amount of its Commitment (as set forth above), payable in the manner and at the times provided in the Partnership Agreement, (b) become a party to and be governed and bound by the terms and conditions of the Partnership Agreement, and (c) become a Limited Partner of the Fund. Capitalized terms used but not defined herein shall have the respective meanings given to them in the Partnership Agreement.  The Memorandum, the Partnership Agreement, this Subscription Agreement and the other written materials furnished to the Investor by the Fund are sometimes referred to herein collectively as the "Offering Materials."

2.    **Representations, Covenants and Warranties of the Investor**.  The Investor hereby represents, covenants and warrants to the Fund and to T2 Asset Opportunity Fund IV GP, LLC (the "General Partner") and to each other person or entity who acquires an interest in the Fund as follows:

(a)    **Suitability.  THE INVESTOR HAS READ CAREFULLY AND UNDERSTANDS THE OFFERING MATERIALS AND HAS CONSULTED ITS OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR THE INVESTOR.  ANY SPECIFIC ACKNOWLEDGMENT SET FORTH BELOW WITH RESPECT TO ANY STATEMENT CONTAINED IN THE OFFERING MATERIALS SHALL NOT BE DEEMED TO LIMIT THE GENERALITY OF THESE REPRESENTATIONS AND WARRANTIES.  THE INVESTOR IS PURCHASING INTERESTS IN THE FUND RELYING SOLELY ON THE INFORMATION CONTAINED IN THE OFFERING MATERIALS, AND NOT ON ANY OTHER STATEMENT (WHETHER ORAL OR WRITTEN) WITH RESPECT TO THE OFFERING OF INTERESTS MADE BY THE FUND, THE GENERAL PARTNER OR ANY OFFICER, DIRECTOR, EMPLOYEE, STOCKHOLDER, MEMBER, PARTNER OR AFFILIATE OF EITHER OF THEM. NEITHER THE GENERAL PARTNER NOR ANY OTHER PERSON ACTING ON THE FUND'S BEHALF OFFERED TO SELL THE INVESTOR INTERESTS IN THE FUND BY MEANS OF**

1

ANY FORM OF GENERAL SOLICITATION OR ADVERTISING, SUCH AS MEDIA
ADVERTISING OR PUBLIC SEMINARS.

**(b)      Opportunity to Verify Information**.  The Investor acknowledges that representatives
of the Fund have made available to the Investor, during the course of this transaction and prior to the
purchase of the Interests, the opportunity to ask questions of and receive answers from them concerning
the terms and conditions of the offering described in the Offering Materials and to obtain any additional
information necessary to verify the information contained in the Offering Materials or otherwise relative
to the proposed activities of the Fund.  The Investor acknowledges having received satisfactory answers to
all of its questions from representatives of the Fund and having obtained all additional information
requested by it of the Fund and its representatives.

**(c)      Fee Arrangements**.  The Investor acknowledges and understands the fee arrangements
discussed in the Memorandum and the Partnership Agreement.

**(d)      Purchase for Investment; Transferability**.

(i)      The Investor understands that the Investor must bear the economic risk
of its investment until the termination of the Fund, and that the Interests have not been
registered under the Securities Act of 1933, as amended (the "Securities Act") in reliance on the
exemption contained in Section 4(2) thereof and the provisions of Rule 506 of Regulation D
promulgated thereunder, and, therefore, cannot be resold or otherwise disposed of unless they are
subsequently registered under the Securities Act or unless an exemption from such registration is
available.  The Investor also acknowledges and understands that (1) the offering and sale of the
Interests has not been registered under the securities laws of any state or any other jurisdiction
and that the Offering Materials have not been subject to review or comment by the United States
Securities and Exchange Commission ("SEC") or any state securities commission or any similar
body or agency of any other jurisdiction; (2) the Fund is not being registered as an "investment
company" as the term is defined in Section 3(a) of the Investment Company Act of 1940, as
amended (the "Investment Company Act"); and (3) the Investor is purchasing the Interests for its
own account and without a view towards resale or distribution thereof.  The Investor agrees not to
resell or otherwise dispose of all or any part of the Interests purchased by the Investor, except as
permitted by law, including, without limitation, any regulations under the Securities Act, and any
and all applicable provisions of the Partnership Agreement.

(ii)      The Investor understands that the Fund does not have any obligation or
intention to register the Interests for sale under the Securities Act or any state securities laws or of
supplying the information which may be necessary to enable the Investor to sell its Interests; and
that the Investor has no right to require the registration of the Interests under the Securities Act,
any state securities laws or other applicable securities regulations.  The Investor also understands
that sales or transfers of Interests are further restricted by the provisions of the Partnership
Agreement.  There is no public or other market for the Interests, and none is expected to develop.
For the foregoing reasons, the Investor will be required to retain ownership of the Interests and
bear the economic risk of this investment for an indefinite period.

(iii)      The Investor represents and warrants further that it has no contract,
understanding, agreement or arrangement with any person to sell, transfer or pledge to such
person or anyone else any of the Interests for which the Investor hereby subscribes (in whole or in
part); and the Investor represents and warrants that it has no present plans to enter into any such
contract, undertaking, agreement or arrangement.

(iv)      The Investor understands that the Interests cannot be sold or transferred
without the prior written consent of the General Partner, which consent may be withheld in its
sole and absolute discretion and which consent will be withheld if any such transfer could cause
the Fund to become subject to regulation under federal law as an investment company or would
subject the Fund to adverse tax consequences.

2

(v)      By executing this Subscription Agreement, the Subscriber affirmatively consents to the description of the Fund set forth in the Offering Materials, the actual and potential risks and conflicts of interest involved with an investment in the Fund, and the costs and charges involved in an investment in the Fund.

**(e)      Full Contribution**.  The Investor understands that, except as otherwise provided in the Partnership Agreement, the Investor is not permitted to make less than the full amount of any required capital contribution, and that the Partnership Agreement contains default provisions with respect thereto pursuant to which the Investor may lose a material portion of its investment in the Fund.

**(f)      Eligible Purchaser Status**.  The Investor is an "accredited investor" within the meaning of Regulation D under the Securities Act and is a "qualified client" as defined in Rule 203-5 of the Investment Advisers Act of 1940, as amended ("Advisers Act").  The Investor has completed and signed, or had its authorized representative complete and sign, the applicable Eligibility Questionnaire attached hereto as Exhibit B and all statements, answers and information therein are correct.

**(g)      No Need for Liquidity**.  The Investor has no need for liquidity in connection with its purchase of the Interests, can bear the substantial economic risks of its investment in the Fund for an indefinite period of time and can afford to suffer the complete loss thereof.

**(h)      Investment Objectives**.  The purchase of the Interests by the Investor is consistent with the general long-term investment objectives of the Investor.

**(i)      Investment Company Act**.   Unless otherwise permitted under the Investment Company Act, if the Investor is a corporation, trust, partnership, limited liability company or other organization or entity, (i) it has not been formed, organized, reorganized, capitalized or recapitalized for the purpose of acquiring or holding the Interests, or the Investor's Commitment is less than 40% of its total assets and committed capital; (ii) its stockholders, partners, members or other beneficial owners do not have and will not have individual discretion as to their participation in particular investments made by the Investor; and (iii) it is not an investment company registered or required to register under the Investment Company Act; provided, that if the Investor is unable to make any of the representations set forth in this paragraph (i), it shall have so notified the General Partner in writing and shall have provided to the General Partner such additional information as the General Partner may reasonably request.

**(j)      Knowledge and Experience**.  The Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of any offer regarding the Fund, such knowledge and experience in tax, financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund and, in making a decision to proceed with this investment (unless the Investor has a purchaser representative), the Investor has not relied upon any representations, warranties or agreements other than those set forth in this Subscription Agreement and the other Offering Materials, if any.

**(k)      Investment Risks**.  The Investor is aware that an investment in the Fund involves substantial risks, including the risks summarized in the Memorandum under "Risk Factors," and has determined that the purchase of the Interests is a suitable investment for it.  The Investor is aware that (i) the Fund has no financial or operating history, (ii) any historical or projected investment returns set forth in the Offering Materials or any supplemental materials are not necessarily comparable to or indicative of returns, if any, that may be achieved on investments made by the Fund, and (iii) the General Partner or a person or entity selected by the General Partner (which may be a manager, member or affiliate thereof) will receive substantial compensation in connection with the management of the Fund.  The Investor has sufficient financial resources to bear the loss of its entire investment in the Fund.

**(l)      Purchaser Representative**.  If the Investor has utilized a purchaser representative for the purpose of evaluating an investment in the Fund, the Investor has previously given the Fund written notice of such fact, specifying that such representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

3

(m)     **Special Purpose Entities**.  The Investor is not an entity that has been organized, reorganized, capitalized, recapitalized for the principal or specific purpose (or as one of the principal or specific purposes) of investing in the Fund, or a substantial portion of its assets consist (or will consist) of an interest in the Fund (a "Special Purpose Entity"); provided that if the Investor is a Special Purpose Entity, the Investor shall (i) so indicate in its Eligibility Questionnaire and (ii) provide the General Partner with such information (including such representations and warranties) relating to such entity and its ultimate beneficial owners as may be reasonably requested in order to assure compliance with all applicable laws, rules and regulations (including those under the Securities Act, the Investment Company Act, the "publicly traded partnership" provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), and the United States Treasury Regulations promulgated thereunder). Restrictions (substantially similar to the restrictions contained in the Partnership Agreement on the assignment or transfer of Interests in the Fund) shall be imposed on the ability of the direct or indirect beneficial or record owners of such special purpose entity (or entities) to transfer directly or indirectly their interests in such entity (or entities).

(n)     **Certain Flow-Through Entities**.  If the Investor is (or will be at any time during the period which the Investor holds any interest in the Fund) a partnership, limited liability company, grantor trust or S corporation for United States federal income tax purposes (a "flow-through entity"), then either (i) less than seventy percent (70%) of the value of the Investor (as well as the value of any flow-through entity that is a direct or indirect beneficial owner of the Investor) is attributable to the Investor's interest in the Fund or (ii) the Investor was not formed, availed of or reorganized for the principal purpose to permit the Fund to satisfy (or have as one of its principal purposes the satisfaction of) the 100 partner limitation of United States Treasury Regulation Section 1.7704-1(h)(ii).

(o)     **Covenant to Provide Tax Information**.  The Investor covenants that it (1) will provide any form, certification or other information reasonably requested by and acceptable to the General Partner that is necessary for the Fund (x) to prevent or qualify for a reduced rate of withholding or backup withholding in any jurisdiction from or through which the Fund receives payments, (y) to determine the proper rate of, or applicability of an exemption from, withholding with respect to any distribution, payment, or allocation to the Investor, or (z) to satisfy reporting or other obligations under the Code and the Treasury Regulations, (2) will update or replace such form, certification or other information in accordance with its terms or subsequent amendments, and (3) will otherwise comply with any reporting obligations imposed by the U.S. or any other jurisdiction with respect to Investor's investment in the Fund, including reporting obligations that may be imposed by future legislation.

(p)     **No View to Tax Benefits**.  The Investor is not acquiring the Interests with a view to realizing any benefits under U.S. federal income tax laws, and no representations have been made to the Investor that any such benefits will be available as a result of the Investor's acquisition, ownership or disposition of the Interests.

(q)     **No Borrowings**.  The Investor has not borrowed and will not borrow any portion of its contribution to the Fund, either directly or indirectly, from the Fund, the General Partner or any affiliate of the foregoing.

(r)     **No Independent Counsel to Represent Investors**.  The Investor understands that Vedder Price P.C. ("Vedder Price") has been engaged as legal counsel by the General Partner to represent it and the Fund and their affiliates in connection with the organization of the Fund and the offering of Interests.  The Investors also understands that no separate counsel has been engaged to independently represent the Limited Partners in connection with the formation of the Fund the offering of Interests.  The Investor understands that other counsel may also be retained where the General Partner on its own behalf or on behalf of the Fund determines that to be appropriate.

The Investor understands that, in advising the Fund and the General Partner with respect to the preparation of the Memorandum, Vedder Price has relied upon information that has been furnished to it by the Fund, the General Partner and their affiliates, and has not independently investigated or verified the accuracy or completeness of the information set forth in the Memorandum.  In addition, the Investor

4

understands that Vedder Price does not monitor the compliance of the Fund or the General Partner with the investment guidelines set forth in the Memorandum, or the Fund's terms or applicable laws.

The Investor acknowledges that there may be situations in which there is a "conflict" between the interests of the General Partner and those of the Fund. The Investor understands that, in these situations, the General Partner and the Fund will determine the appropriate resolution thereof, and may seek advice from Vedder Price in connection with such determinations. The General Partner and the Fund have consented to Vedder Price's concurrent representation of such parties in such circumstances.

**(s)** **Final Form of Agreements**. The Investor understands and acknowledges that its investment in the Fund shall be subject to the terms and conditions of this Subscription Agreement and the Partnership Agreement in such final forms as shall be executed by the parties thereto, and as the same may be amended from time to time in accordance with their respective terms.

**(t)** **Certain Tax Matters**. The Investor acknowledges and understands that the Fund is being organized and managed so as to avoid being classified as a "publicly traded partnership" taxable as a corporation under Section 7704 of the Code, the effect of which shall be to restrict the transferability of the Investor's Interests.

**(u)** **Authorization**. If the Investor is an individual, the Investor has the legal capacity and authority to execute, deliver and perform the Investor's obligations under this Subscription Agreement. If the Investor is a corporation, partnership, limited liability company, trust or other entity, (i) the person executing this Subscription Agreement has the full power and authority to execute and deliver this Subscription Agreement on behalf of the subscribing entity; (ii) such entity is duly formed and organized, validly existing, and in good standing under the laws of its jurisdiction of formation; (iii) such entity is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement and to become a Limited Partner in the Fund; and (iv) the Investor shall deliver to the Fund such evidence of such authority as the Fund may reasonably require.

**(v)** **Electronic Delivery of Reports**. The Investor consents to receiving the periodic financial reports and tax information described in the Partnership Agreement by e-mail or by means of having access to a database or other forum hosted on a website designated by the General Partner (the "Reporting Site"), with such parameters regarding access and availability of information for review as the General Partner deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein. If at any time the Investor cannot or does not want to access such reports and information by email or via the Reporting Site, the Investor will notify the General Partner, in which case the General Partner will provide the Investor paper copies of such reports.

**(w)** **Indemnification and Exculpation.** The Investor specifically agrees to and acknowledges the exculpation and indemnification provisions set forth in the Partnership Agreement and that such provisions shall survive the undersigned's withdrawal as a Limited Partner and the Fund's dissolution. The undersigned hereby waives any personal liability on the part of the General Partner or its officers, employees and agents, in connection with the Fund's management, provided that the acts or omissions of the person in question did not constitute fraud, gross negligence or willful misconduct.

**(x)** **"Bad Actor" Disqualification.** The Investor has not engaged in a "disqualifying event" as defined within Rule 506 of Regulation D under the Securities Act, including:

(i)     being convicted of a felony or misdemeanor within the last ten (10) years that was in connection with the purchase or sale of a security, involving the making of a false filing with the SEC or arose out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of securities;

(ii)     being subject to an order, judgment or decree of any court of competent jurisdiction, entered within the last five (5) years, that restrains or enjoins the Investor from

5

engaging or continuing to engage in any conduct or practice (whether or not appealable or subject to a pending appeal) in connection with the purchase or sale of a security, involving the making of a false filing with the SEC or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of securities;

(iii)     being subject to a final order of a state securities commission (or any agency or officer of a state performing similar functions), a state authority that supervises or examines banks, savings associations or credit unions, a state insurance commission (or any agency or officer of a state performing similar functions), an appropriate federal banking agency, the CFTC or the National Credit Union Administration that bars the Investor from association with an entity regulated by such commission, authority, agency or officer, or is barred from engaging in the business of securities, insurance or banking or engaging in savings association or credit union activities or whereby such final order is based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct and was issued within ten years of the date of this Subscription Agreement;

(iv)     being subject to an SEC order entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or Section 203(e) or (f) of the Advisers Act that suspends or revokes the Investor's registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations in connection with such activities, or bars the Investor from being associated with any entity or from participating in the offering of any penny stock;

(v)     being subject to any order of the SEC entered within the last five (5) years that, as of the date of this Subscription Agreement, orders the Investor to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including without limitation Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and 17 CFR 240.10b-5, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act, or any other rule or regulation thereunder or Section 5 of the Securities Act;

(vi)     is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)     has filed (as a registrant or issuer), or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five (5) years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii)     is subject to a United States Postal Service false representation order entered within five (5) years of the date of this Subscription Agreement, or is, as of the date of this Subscription Agreement, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

If the Investor engaged in one of the "disqualifying events" described above or as otherwise set forth in Rule 506 of Regulation D, it must inform the General Partner and provide information regarding the disqualifying event including the date of such event.   If in the future, the Investor can no longer make this representation, it must promptly notify the General Partner and provide information regarding the disqualifying event including the date of any such event.   The Investor specifically consents to the disclosure of any such disqualifying event to any other Limited Partner and third-parties as the General Partner may deem necessary to ensure the Fund can continue to claim the Rule 506 safe harbor.

6

3.      **ERISA Representations**.  If the Investor is a Benefit Plan Investor (as defined below), the Investor represents and warrants that the Investor's purchase of the Interests and the subsequent holding of the Interests do not and will not constitute a "non-exempt prohibited transaction" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Code.  The term "Benefit Plan Investor" refers to (i) any "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of ERISA, (ii) any "plan" as defined in and subject to Section 4975 of the Code and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already-described Benefit Plan Investors.  If the Investor is a Benefit Plan Investor and if the Fund is or becomes a Plan Assets Entity, the investment by such Benefit Plan Investor in the Fund constitutes the appointment by the Named Fiduciary as described below, in accordance with the written requirements governing the underlying plan(s), of the General Partner as an "investment manager" as defined in Section 3(38) of ERISA, with the authority to manage the Fund's assets and the authority to appoint other "investment managers" with respect to any Fund assets which are deemed to be plan assets of the Benefit Plan Investor.  The General Partner hereby acknowledges to each Benefit Plan Investor subject to Title I of ERISA or Section 4975 of the Code its status, for any period during which the Fund is a Plan Assets Entity, as a "fiduciary" as defined by Section 3(21) of ERISA with respect to such Plan Assets.

Furthermore, by executing this Subscription Agreement, any Investor that is a Benefit Plan Investor represents and warrants to the Fund and the General Partner that:

        **(a)**      The person(s) or entities responsible for the investment decision (the "Named Fiduciary") has determined that, in view of such considerations, the purchase of an Interest in the Fund is consistent with the Named Fiduciary's responsibility under ERISA, Section 4975 of the Code or similar law and has considered the following with respect to the Benefit Plan Investor's investment in the Fund:  (i) the role such investment or investment course of action plays in that portion of the Benefit Plan Investor's portfolio that the Named Fiduciary manages; (ii) whether the investment or investment course of action is reasonably designed as part of that portion of the Benefit Plan Investor's portfolio managed by the Named Fiduciary to further the purposes of the Benefit Plan Investor, taking into account both the risk of loss and the opportunity for gain that could result therefrom; (iii) the composition of that portion of the portfolio that the Named Fiduciary manages with regard to diversification; (iv) the liquidity and current rate of return of that portion of the Benefit Plan Investor's portfolio managed by the Named Fiduciary relative to its anticipated cash flow requirements; (v) the projected return of that portion of the portfolio managed by the Named Fiduciary relative to the Benefit Plan Investor's funding objectives; (vi) the risks associated with an investment in the Fund, including the limited right to withdraw from the Fund; (vii) whether the risk, structure and operation of the fee arrangements have been adequately disclosed and whether such arrangements further the interests of the Benefit Plan Investor; (viii) that the investment in the Fund and the investment program employed by the General Partner as described in the Memorandum are not prohibited by ERISA, Code Section 4975 or similar law; and (ix) whether the investment is permitted under the Benefit Plan Investor's governing documents.

        **(b)**      The Named Fiduciary (i) is authorized to make, and is responsible for, the decision to invest in the Fund; (ii) is independent of the Fund, the General Partner, any sales agent and each of their affiliates; (iii) is qualified to make such investment decision and has, to the extent it deems necessary, consulted its own investment advisors and legal counsel regarding the investment in the Fund; (iv) in making its decision to invest in the Fund has not relied on any advice or recommendation of the Fund, the General Partner, any sales agent or any of their affiliates; and (v) if the Named Fiduciary is subject to Title I of ERISA, the Named Fiduciary is a named fiduciary as defined in Section 402(a)(2) of ERISA authorized by the underlying plan documents to appoint the General Partner as a fiduciary and investment manager to the plan.

        **(c)**      The Named Fiduciary agrees to deliver to the General Partner all of the information that it may request in order to avoid violations of any provisions of ERISA or any other laws applicable to the Investor, and promptly will notify the General Partner, in writing, of any change in the information so furnished; and

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

(d)      If the Named Fiduciary is subject to Title I of ERISA, the Named Fiduciary understands and represents that (i) its copy of this Subscription Agreement is the Investor's indicia of ownership of the Interests in the Fund for purposes of Section 403(a) of ERISA and (ii) a copy of this Subscription Agreement will be held in trust by the Benefit Plan Investor's trustee.

**4.      Closing; Capital Contributions and Fees.**

(a)      **Closing**.  The closing of the sale and purchase of the Investor's Interests (the "Closing") shall take place at such date and time as the General Partner may determine but in any event not later than 12 months following the first closing date (unless extended in accordance with the Partnership Agreement), which is expected to occur in the first quarter of 2015, and at such place as shall be selected by the General Partner.  As soon as practicable following the Closing, the General Partner will deliver to the Investor a copy of the Partnership Agreement and a counterpart of this Subscription Agreement, which shall be executed by the Investor, the General Partner and the Fund.

(b)      **Capital Contributions and Fees**.  The initial capital contribution for the purchase of the Investor's Interests, each subsequent capital contribution and the payment of fees to the Fund and the General Partner, as the case may be, shall take place at such times and in the manner specified in the Offering Materials.

**5.      Agreements with Other Limited Partners**.  The General Partner and the Fund represent that each other Limited Partner has executed and delivered or will execute and deliver a subscription agreement substantially identical to this Subscription Agreement (except as to the amount of the Interests to be purchased), in which each such other Limited Partner agrees to subscribe for and purchase Interests from the Fund and makes substantially identical representations and warranties as are made by the Investor in Section 2.  The purchases of the Interests by the Investor and the other Limited Partners are to be separate purchases from the Fund and the sales of the Interests to the Investor and the other Limited Partners are to be separate sales by the Fund.

**6.      Survival of Agreements and Representations and Warranties**.  All agreements, representations and warranties of the parties contained herein, or made in writing by or on behalf of the General Partner or the Fund in connection with the transactions contemplated by this Subscription Agreement, shall survive the execution and delivery of this Subscription Agreement, any investigation at any time made by the Investor or on its behalf, and the sale and purchase of the Investor's Interests in the Fund and payment therefor.

**7.      Further Assurances**.

(a)      The Investor acknowledges that, unless it notifies the Fund and the General Partner in writing to the contrary prior to such time as it acquires the Interests, all of its representations and warranties contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire) will be deemed to have been repeated as of the date it purchases the Interests.  If at any time during the term of the Fund, the Investor is no longer in compliance with any of its representations, warranties and acknowledgments contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire), the Investor shall so advise the General Partner promptly in writing.

(b)      The Investor represents and warrants that the following statements are true, correct and complete: that unless an Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8IMY, or W-8EXP, as applicable, has been completed, (i) the Investor is not a foreign person for purposes of U.S. income taxation (i.e., the Investor is not a nonresident alien, a foreign corporation, a foreign partnership, or a foreign trust or foreign estate); (ii) that the following information contained elsewhere in the subscription documents is true, correct and complete:  the U.S. taxpayer identification number (i.e., social security number or employer identification number), the home address (in the case of an individual) or office address (in the case of an entity) and the place of incorporation (in the case of a corporation); and (iii) that the Investor agrees to inform the General Partner promptly if the Investor becomes a

8

nonresident alien (in the case of an individual) or other foreign person (in the case of an entity) following the date hereof.

(c)     The Investor will provide the General Partner with such information as it may reasonably request from time to time with respect to its citizenship, residency, ownership or control so as to permit the General Partner to evaluate and comply with any legal, regulatory and tax requirements applicable to the Fund, the Investor's investment in the Fund or any of the investments (or proposed investments) to be made by the Fund.

(d)     The attached Investor Information page and Eligibility Questionnaire (collectively, the "Investor Questionnaire") that the Investor has completed is incorporated herein by reference in its entirety and made a part hereof, and all of the statements, answers and information in the Investor Questionnaire are true and correct as of the date hereof, and will be true and correct as the date of acceptance of this subscription, and do not omit to state any material fact necessary in order to make the statements contained therein not misleading.

**8.     Indemnification**.  The Investor (i) acknowledges that the Fund and the General Partner (as well as their officers, directors, managers, employees, stockholders, partners, members, counsel and affiliates) are relying on the representations, warranties and acknowledgments of the Investor contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire), and (ii) agrees to indemnify each of them and their agents, representatives, officers, directors, managers, employees, stockholders, partners, members and affiliates against any and all claims, demands, losses, damages, costs and expenses whatsoever arising as a result of, or in connection with, any breach by the Investor of any such representations, warranties or acknowledgments.

**9.     Compliance with Anti-Money Laundering Regulations, etc**.  The Investor acknowledges that due to anti-money laundering regulations within their respective jurisdictions, the Fund, its General Partner, and/or any administrator acting on behalf of the Fund may require further documentation verifying the Investor's identity and the source of funds used to purchase the Interests before this Subscription Agreement can be processed or accepted.  To comply with applicable U.S. anti-money laundering legislation and regulations, the Investor agrees that all payments by the Investor to the Fund and all distributions to the Investor from the Fund will only be made in the Investor's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the United States Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended (the "Bank Secrecy Act"), and the regulations promulgated thereunder by the United States Department of the Treasury, as such regulations may be amended from time to time.  The Investor further agrees to provide the General Partner at any time during the term of the Fund with such information as the General Partner determines to be necessary and appropriate to verify compliance with the anti-money laundering regulations of any applicable jurisdiction or to respond to requests for information concerning the identity of Limited Partners from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, and to update such information as necessary.

The Investor represents that the amounts to be contributed by the Investor to the Fund will not be directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.[1]   The Investor represents and

---

[1] Federal regulations and executive orders administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.  These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs, including the List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time, or any executive order administered by OFAC.  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at www.treasury.gov/resource-center/sanctions.  In addition, certain programs

9

warrants that none of:  (i) the Investor; (ii) any Person controlling or controlled by the Investor; (iii) if the Investor is a privately held entity, any Person having a beneficial interest in the Investor; (iv) any Person for whom the Investor is acting as agent or nominee in connection with the purchase of the Interests is (1) a country, territory, individual or entity named on a list maintained by OFAC, (2) a Person prohibited under the OFAC Programs, (3) a senior foreign political figure[2], or any immediate family member or close associate[3] of a senior foreign political figure as such terms are defined in the footnotes below, (4) a "foreign shell bank" within the meaning of the Bank Secrecy Act and the regulations promulgated thereunder by the United States Department of the Treasury, (5) a person or entity subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder:  the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriations Act, or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified or reviewed from time to time or (6) a person or entity resident in or whose subscription funds are transferred through a jurisdiction identified as non-cooperative[4] by the Financial Action Task Force. Such Persons in (1) through (6) are collectively referred to as "Prohibited Persons."

In addition, if the Investor is a "financial institution" as such term is defined in the Bank Secrecy Act and the regulations promulgated thereunder by the United States Department of the Treasury, as such regulations may be amended from time to time, the Investor represents and warrants that the Investor has anti-money laundering policies and procedures in place reasonably designed to collect information with respect to and verify the identity of the Investor's investors or customers.  In this regard, the Investor hereby represents and warrants that it is not a Prohibited Person.  The representations and warranties set forth in this Section 9 shall be deemed repeated and reaffirmed by the Investor as of each date that the Investor is required to make a contribution of capital to the Fund, and if at any time during the term of the Fund the representations and warranties set forth in this Section 9 shall cease to be true, the Investor shall promptly so notify the General Partner of the Fund in writing.

To the extent the Investor has beneficial owners or is an intermediary subscribing for an Interest on behalf of one or more investors or beneficial owners (collectively, "Owners"): (i) the Investor has carried out due diligence as required by applicable law to establish the identities of all such Owners; (ii) based on such due diligence, the Investor reasonably believes that no such Owners are Prohibited Persons; (iii) the Investor has conducted enhanced due diligence on any Owner who is a senior foreign political figure; (iv) based on such enhanced due diligence, the Investor has no reason to believe that the funds invested by each such senior foreign political figure involve the proceeds of official corruption; (v) the Investor has no reason to believe that the funds invested or to be invested by Owners were derived

---

administered by OFAC (the "OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the lists maintained by OFAC.
[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.  In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.
[3] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.
[4] Non-cooperative jurisdictions are non-U.S. countries that have been designated as high-risk or non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering ("FATF"), of which the U.S. is a member and with which designation the U.S. representative to the group or organization continues to concur.  The FATF list of non-cooperative jurisdictions is found at http://www.fatf-gafi.org.

from activities that may contravene any U.S. or non-U.S. anti-money laundering laws or regulations; (vi) the Investor holds the evidence of such identities and status and will maintain all such evidence for at least 5 years from the date of the Investor's complete withdrawal from the Fund; and (vii) the Investor will make available such information and any additional information requested by the Fund or the General Partner that is required under applicable regulations, to the extent permitted by applicable law.

The Investor understands and agrees that the Fund may not accept any amounts from a prospective Limited Partner if such Limited Partner cannot make the representations set forth in this Section 9. If an existing Limited Partner cannot make these representations at any time after the admission of such Limited Partner to the Fund, the General Partner may require the withdrawal of such Limited Partner's Interests. The Investor further understands and agrees that, by law, the Fund may be obligated to "freeze" the Investor's account, by prohibiting additional contributions from the Investor, declining any withdrawal requests and/or segregating the assets in the account in compliance with governmental regulations and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the General Partner may, by written notice to the undersigned, suspend the Investor's withdrawal rights if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, its General Partner or any of the Fund's other service providers.

10.    **Non-Disclosure**. The Investor acknowledges that the Fund is furnishing or have furnished to the Investor certain proprietary information ("Confidential Information") relating to the business affairs and current and proposed operations of the Fund for study and evaluation by the Investor for possibly investing in the Interests. The Investor acknowledges that the information provided by the Fund is confidential; therefore, the Investor agrees not to disclose it and not to disclose that any discussions or contracts with the Fund have occurred or are intended, other than as provided for in the following paragraph.

The Investor acknowledges that the information furnished is in all respects confidential in nature, other than information which is in the public domain through other means and that any disclosure or use of same by the Investor, except as provided in this Subscription Agreement, may cause serious harm or damage to the Fund, the General Partner and the Limited Partners. Therefore, the Investor agrees that the Investor will not use the information furnished for any purpose other than as otherwise permitted herein, and agrees that the Investor will not either directly or indirectly including through any agent, employee, or representative, disclose this information, either in whole or in part, to any third party; provided, however that (a) information furnished may be disclosed to those directors, officers and employees of the Investor and to the Investor's advisors who need such information for the purpose of evaluating the investment in the Interests (it being understood that those directors, officers, employees and advisors shall be informed by the Investor of the confidential nature of such information and shall be directed by the Investor to treat such information confidentially), and (b) any disclosure of information may be made to which the Fund consents in writing.

11.    **Expenses**. Each party hereto will pay its own expenses relating to this Subscription Agreement and the purchase of the Investor's Interests in the Fund hereunder.

12.    **Amendments**. Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of the Investor and the General Partner.

13.    **Rejection of Subscription**. The Investor acknowledges that the subscription for the Interests contained herein may be rejected by the General Partner in its sole discretion at any time prior to the Closing.

14.    **Acceptance of Subscription**. The General Partner may accept in its sole discretion all or any portion of the amount of the Commitment set forth on the signature page hereto by delivery to the Fund of a counterpart signature page hereto setting forth the portion of the Investor's Commitment accepted by the General Partner. Prompt notice of such acceptance also will be given to the Investor either by delivery of this Subscription Agreement countersigned by the General Partner or by notice of such execution.

11

**15.**   **Counterparts**.  This Subscription Agreement may be executed in any number of counterparts, each of which shall be an original but all of which taken together shall constitute one Subscription Agreement.

**16.**   **General**.  This Subscription Agreement (i) shall be irrevocable by the Investor and binding upon the Investor and the legal representatives, successors and assigns of the Investor, (ii) shall survive the admission of the Investor as a Limited Partner of the Fund, and (iii) shall, if the Investor consists of more than one person, be the joint and several obligation of all such persons.  This Subscription Agreement shall be governed by the internal laws of the State of Delaware, except insofar as affected by the "Blue Sky" laws of the jurisdiction in which the offering described herein has been made to the Investor or applicable federal securities law as set forth herein.

**17.**   **Jurisdiction**.  To the fullest extent permitted by applicable law, any action or proceeding brought by the Investor against the General Partner (or its respective direct or indirect owners, officers, directors, managers, employees or consultants in their capacity as such, or in any related capacity) or the Fund, or relating in any way to this Subscription Agreement or the Offering Materials, shall be brought and enforced in the courts of the State of Illinois located in DuPage County, or (to the fullest extent subject matter jurisdiction exists therefore) the United States District Court for the Northern District of Illinois and, to the extent permitted by applicable law, the Investor irrevocably submits to the non-exclusive jurisdiction of both courts in respect of any action or proceedings between it and the General Partner (or their respective direct or indirect owners, officers, directors, managers, employees or consultants in their capacity as such, or in any related capacity) or the Fund, or relating in any way to this Subscription Agreement or the Offering Materials.  The Investor irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Illinois located in DuPage County or the United States District Court for the Northern District of Illinois and any claim and any such action or proceeding brought in either court has been brought in an inconvenient forum.  THE INVESTOR AND THE GENERAL PARTNER, ON BEHALF OF ITSELF AND THE FUND, IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY ACTION OR PROCEEDING BY OR AGAINST THE GENERAL PARTNER (OR ITS RESPECTIVE DIRECT OR INDIRECT OWNERS, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES OR CONSULTANTS IN THEIR CAPACITY AS SUCH, OR IN ANY RELATED CAPACITY) OR THE FUND, OR IN ANY WAY RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE OFFERING MATERIALS.

**18.**   **Severability**.  Each provision of this Subscription Agreement, including each representation made in the Investor Questionnaire incorporated herein, shall be considered severable.  If it is determined by a court of competent jurisdiction that any provision of this Subscription Agreement is invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Subscription Agreement.

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

## SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement for the purchase of limited partnership interests in T2 Asset Opportunity Fund IV, LP (the "Fund") and represents that the execution of this signature page constitutes the execution of the signature page of each of (i) the Subscription Agreement for the purchase of the Interests in the Fund in the aggregate amount set forth below, and (ii) the Amended and Restated Agreement of Limited Partnership of the Fund dated as of December 1, 2014 and as may be amended from time to time (the "Partnership Agreement") in which the undersigned agrees to become a Limited Partner of the Fund and be bound and governed by the Partnership Agreement as if the undersigned were an original signatory thereto.  Upon acceptance below by the General Partner on behalf of the Fund, the undersigned shall be admitted as a Limited Partner of the Fund and hereby authorizes the signature page to be attached to a counterpart of the Partnership Agreement executed by the General Partner.

The foregoing Subscription Agreement is hereby accepted by and agreed to by the undersigned as of the date first above written:


Date: __3/23/15__                                    Commitment Amount: $100,000

If Investor is an individual:                          *Joint Signature, if applicable:*

Sign: _____                 Sign: _____

Print Name: __Patrick J. Denard__               Print Name: _____

If Investor is an entity (fund, partnership, corporation, LLC, etc.):

Print legal name of investing entity:   _____

Signature of authorized person:   _____

Print name and title:   _____

*Additional signature, if applicable:*

Signature:   _____

Print name and title:   _____

13

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

**T2 ASSET OPPORTUNITY FUND IV, LP**

**SUBSCRIPTION AGREEMENT**
**GENERAL PARTNER ACCEPTANCE PAGE**
**(To be completed by the General Partner)**

   T2 Asset Opportunity Fund IV GP, LLC, the general partner of T2 Asset Opportunity Fund IV, LP, hereby accepts the foregoing subscription on behalf of T2 Asset Opportunity Fund IV, LP either (a) for the Capital Commitment amount set forth below or (b) if the Capital Commitment amount below is left blank, then the Investor's requested Capital Commitment amount set forth above the Investor's signature on its signature page to the Subscription Agreement.

       Capital Commitment Amount:  $_____

Closing: _____

      **T2 ASSET OPPORTUNITY FUND IV, LP**

      By: T2 Asset Opportunity Fund IV GP, LLC,
        its General Partner

      By:_____
        Name:
        Title:

      **T2 ASSET OPPORTUNITY FUND IV GP, LLC**

      By:_____
        Name:
        Title:

14

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

## I.     Distribution Information

**A.     Investor ACH Instructions:** *Please indicate below where you would like to receive distributions from the Fund.*

***NOTE: TD Ameritrade, Inc. will provide instructions. Interim please review the attached Letter of Direction.

Bank Name:_____   Swift Code**:_____
Bank City/State/Country:_____   For Further Credit to:_____
Bank ABA#:_____   Account Name:_____
Account Name:_____   Account #:_____
Account #:_____   **Required for U.S. dollar ACH transfer to non-U.S. banks.  Please contact your bank for more information.

☐     Check this box if you require a wire transfer instead of an ACH transfer and instead list your wire instructions above.

## II.     Investor Contact Information

**A.     Investor's Domicile (*for tax purposes*)**

Name: Dr. Patrick J. Denard                            Telephone: (503) 320-8557
Address: 420 G. Street                                     Fax:_____
_____                E-mail: pjdenard@gmail.com
City: Jacksonville     State: OR   Zip: 97530   ☐ Check this box if you do not have an e-mail address.
                                                                      (A substantial amount of correspondence and
SSN/Tax ID: 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                             reporting related to this investment will be
                                                                      provided electronically.  If you cannot access such
                                                                      electronic communications, please check this box
                                                                      to receive paper copies.)

**B.     Investor's Adviser (if any)**

If applicable, please provide the name of the investment adviser firm, wealth manager or consultant that is working with you in connection with this investment: Criterion Wealth Management_____.

If you would like the above-named entity or person to be copied on all correspondence related to this investment, please provide this entity's or person's full contact information below:

Company: Criterion Wealth Management        Telephone: (661) 254-2543
Attention: Jason Stauffer                               Fax:_____
Address: 26650 The Old Road, Ste. 212          E-mail: jason@criterionwealth.com
_____                ☐ Check this box if you do not have an e-mail address.
City: Valencia          State: CA                      (A substantial amount of correspondence and
Zip: 91381                                                      reporting related to this investment will be
                                                                      provided electronically. If you cannot access such
                                                                      electronic communications, please check this box to
                                                                      receive paper copies.)

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

C.    **Additional Correspondence Contacts (if any)**

Name: Yumiko Odama

Address: 26650 The Old Road, Ste. 212

City: Valencia        State: CA    Zip: 91381

Telephone: (661) 254-2543

Fax:

E-mail: yumiko@criterionwealth.com

☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically.  If you cannot access such electronic communications, please check this box to receive paper copies.)

Name:

Address:

City:                State:      Zip:

Telephone:

Fax:

E-mail:

☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically.  If you cannot access such electronic communications, please check this box to receive paper copies.)

16

## III.    Private Fund Reporting Information

**PRIVATE FUND REPORTING INFORMATION**

*To enable the General Partner to complete Form PF (if applicable), please indicate which one of the following categories best describes Subscriber* **[initial only one blank]:**

      _?▷_        Individual that is a United States person[5] (including their trust)

      _____      Individual that is not a United States person (including their trust)

      _____      Broker-dealer

      _____      Insurance company

      _____      Investment company registered with the SEC

      _____      Private fund[6]

      _____      Non-profit

      _____      Pension plan (excluding government pension plans)

      _____      Banking or thrift institution (proprietary)

      _____      State or municipal government entity[7] (excluding government pension plans)

      _____      State or municipal government pension plan

      _____      Sovereign wealth fund or foreign official institution

      _____      Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries

      _____      Other

If Subscriber indicated "Other," please describe the nature of Subscriber: _____

_____

---

[5] A "United States Person" for this purpose means (a) any natural person resident in the United States; (b) any partnership or corporation organized or incorporated under the laws of the United States; (c) any estate of which any executor or administrator is a U.S. person; (d) any trust of which any trustee is a U.S. person; (e) any agency or branch of a foreign entity located in the United States; (f) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (h) any partnership or corporation if: (i) organized or incorporated under the laws of any foreign jurisdiction; and (ii) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act of 1933, unless it is organized or incorporated, and owned, by accredited investors who are not natural persons, estates or trusts. Any discretionary account or similar account that is held for the benefit of a United States person by a dealer or other professional fiduciary is a United States person if the dealer or professional fiduciary is a related person of the General Partner and is not organized, incorporated, or (if an individual) resident in the United States.

[6] A "private fund" means any issuer that would be an investment company as defined in the Investment Company Act, section 3 but for the Investment Company Act, section 3(c)(1) or 3(c)(7).

[7] A "government entity" means any state or political subdivision of a state, including (a) any agency, authority, or instrumentality of the state or political subdivision; (b) a plan or pool of assets controlled by the state or political subdivision or any agency, authority, or instrumentality thereof; and (c) any officer, agent, or employee of the state or political subdivision or any agency, authority, or instrumentality thereof, acting in their official capacity.

17

**EXHIBIT A**

## BENEFIT PLAN INVESTOR STATUS

The Memorandum states that the General Partner will use commercially reasonable efforts to operate the Fund as a "real estate operating company" or "venture capital operating company" under the "plan asset" regulations of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Alternatively, the General Partner may decide to limit Interests held by Partners subject to ERISA to less than 25% of aggregate commitments (not including any investments by the General Partner and certain other persons and their respective affiliates).

The term "Benefit Plan Investor" refers to (i) any "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of, ERISA, (ii) any "plan" as defined in and subject to Section 4975 of the Code and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already-described benefit plan investors. Benefit Plan Investors include, but are not limited to, corporate pension and profit sharing plans, "simplified employee pension plans," Keogh plans for self-employed individuals (including partners), individual retirement accounts ("IRAs"), medical benefit plans, life insurance plans, church plans that have elected to be subject to ERISA, bank commingled trust funds, insurance company separate accounts for such plans and accounts and, under certain circumstances, all or a portion of the general account of an insurance company.

The Investor represents that it is (please check all applicable boxes):

       (i)      ☑      <u>not</u> a Benefit Plan Investor; or

       (ii)     ☐      a Benefit Plan Investor that is:

            (1)   ☐     an employee benefit plan or trust that is subject to the fiduciary responsibility provisions of ERISA – this includes U.S. pension plans and U.S. profit-sharing and 401(k) plans, "Multiemployer Plans" and "Taft-Hartley Plans" but does not include U.S. governmental plans, church plans that have not made the election under Section 410(d) of the Code and non-U.S. employee pension and welfare benefit plans;

            (2)   ☐     an IRA, Keogh Plan and/or other plan subject to Section 4975 of the Code, but not subject to the fiduciary responsibility provisions of ERISA; or

            (3)   ☐     a Plan Assets Entity (as defined above) (including an entity in which 25% or more of the total value of any class of equity interests in the entity is held by other Benefit Plan Investors).

If the Investor is a Plan Assets Entity, the percentage of such entity's assets that constitutes "plan assets" within the meaning of Section 3(42) of ERISA is not more than the amount indicated below (please check an applicable box). To ease the administrative burden related to monitoring and updating this percentage, the Fund recommends that the Investor build in some cushion so that the Investor will not have to notify the General Partner if the percentage changes slightly.

| | | | | |
|---|---|---|---|---|
| ☐ 10% ** | ☐ 20% ** | ☐ 30% | ☐ 40% | ☐ 50% |
| ☐ 60% | ☐ 70% | ☐ 80% | ☐ 90% | ☐ 100% |

A-1

\*\*Applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors.

The Investor agrees to promptly notify the General Partner in writing if there is any change to the foregoing representations, including in the percentages as set forth above and at such time or times as the General Partner may request.

**EXHIBIT B**

## ELIGIBILITY QUESTIONNAIRE FOR INDIVIDUALS

Name of Investor:  Patrick J. Denard _____

**INDIVIDUALS (including IRA and Revocable Trust Investors)**:  *Please complete Parts I through III of this Questionnaire*

**I.**     **Verification of Status as "Accredited Investor" under Regulation D**

*The Investor represents and warrants that he/she is an "accredited investor" within the meaning of Regulation D under the Securities Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1.     ☑     The Investor is a natural person whose net worth, taken together with the net worth of such person's spouse, exceeds $1,000,000.  For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value (excluding the value of the Investor's primary residence) over total liabilities.  Total liabilities may exclude the amount of indebtedness secured by the Investor's primary residence up to its fair market value, but must include any indebtedness in excess of the primary residence's fair market value.[1]

2.     ☐     The Investor is a natural person who had an individual income in excess of $200,000 in each of the two previous years, or joint income with such person's spouse in excess of $300,000 in each of those years, and who reasonably expects to reach the same income level in the current year.

3.     ☐     The Investor is a revocable trust and the settler(s) or grantor(s) of the trust meet the criteria set forth in either 1 or 2 above.

*Note*:  To qualify as an "accredited investor," at least one of the first three statements must be checked.

Disclosure of Foreign Citizenship.

1.     ☐     The Investor is a citizen of a country other than the United States.

2.            If you checked the box next to the preceding question, specify the country of which the Investor is a citizen._____

**II.**     **Verification of Status as a "Qualified Client"**

*The Investor represents and warrants that he/she is a "qualified client" as defined in Rule 203-5 under the Advisers Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1.     ☐     The Investor is a natural person who immediately after investing in the Fund has or will

---

[1] Any increase in the amount of debt secured by the primary residence in the 60 days prior to the date of the Subscription Agreement associated with this Questionnaire that was incurred other than in connection with the purchase of your primary residence should be included as a liability, even if the value of the primary residence exceeds the amount of debt secured by such primary residence.

B-1 (Individuals)

have at least $1,000,000 of assets under the management of the General Partner.

2. ☐ The Investor is a natural person who immediately after investing in the Fund has or will have a net worth (together with assets held jointly with a spouse) of more than $2,000,000 (excluding the value of the Investor's primary residence).  (See I.1. above for a definition of "net worth.")

3. ☐ The Investor is a "qualified purchaser" under the Investment Company Act of 1940.  The Fund may request information on the basis for which the representation is made.

Question 4 to be answered ONLY by "insiders" of the Fund or the General Partner.

4. ☐ With respect to Fund or the General Partner, the Investor is:

    (a) a director, trustee, general partner, managing member or advisory board member;

    (b) an executive officer; OR

    (c) an employee who regularly participates in the investment activities of the General Partner and/or its affiliates (or affiliated funds) and has performed such role for at least 12 months.

### III.   Status as a "Qualified Purchaser"

*For informational purposes only.  If the Investor is a "Qualified Purchaser" within the meaning of the Investment Company Act, please check the applicable statement or statements below pursuant to which the Investor so qualifies.*  **Please read Annex A attached hereto for information regarding what is includable in "investments" and for information regarding the valuation of such "investments."** *(Please check all that apply.)*

### For Individual and Revocable Trust Investors Only

1. ☐ The Investor owns not less than $5,000,000 in investments[2], including any investments held jointly, in community property or other similarly shared ownership interest with his/her spouse, including the amount of his/her investment held in an individual retirement account or similar account and the investments of which are

---

[2] The term "investments" for purposes of this item (1) shall mean any or all (1) securities (as defined in Securities Act), except for securities of issuers controlled by the Investor ("Control Securities") unless (A) the issuer of the Control Securities is itself a registered or private investment company or is excepted from the definition of investment company by Rule 3a 6 or Rule 3a 7 under the Investment Company Act, (B) the Control Securities represent securities of an issuer that files reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, (C) the issuer of the Control Securities has a class of securities listed on a designated offshore securities market under Regulation S under the Securities Act or (D) the issuer of the Control Securities is a private company with shareholders' equity not less than $50 million determined in accordance with generally accepted accounting principles, as reflected in the company's most recent financial statements (provided such financial statements were issued within 16 months of the date of the Investor's purchase of Interests); (2) futures contracts or options thereon held for investment purposes, (3) physical commodities held for investment purposes; (4) swaps and other similar financial contracts entered into for investment purposes; (5) real estate held for investment purposes; and (6) cash and cash equivalents held for investment purposes.

B-2 (Individuals)

directed by and held for his/her benefit.[3]

2. ☐ The Investor is a revocable trust and each grantor of the trust meets the criteria set forth in Item 1 above.

3. ☐ The Investor is an individual who is a "knowledgeable employee" as defined in Rule 3c-5 under the Investment Company Act including, but not limited to, (i) a director, executive officer[4], trustee, general partner, advisory board member, or (ii) an employee of the Fund and the General Partner (other than an employee performing solely clerical, secretarial or administrative functions) who has participated in investment activities of the Fund or a similar entity for at least twelve (12) months.

### For IRA or Self-Directed Pension Plan

4. ☐ The Investor is an IRA or a self-directed pension plan and the individual who established the IRA or self-directed pension plan and the individual responsible for directing the investment of assets in the Fund is an individual who owns not less than $5,000,000 in investments.

### Question 5 to be answered ONLY by "insiders" of the Fund and the General Partner.

5. ☐ With respect to the Fund or the General Partner (e.g., its general partner, manager, investment adviser, etc...), the Investor is a natural person who immediately prior to entering into the Agreement is:

(i)     an executive officer, director, trustee, general partner, managing member or person serving in a similar capacity of The General Partner; or

(ii)    an employee who regularly participates in the investment activities of the General Partner (other than an employee performing solely clerical, secretarial or administrative functions) and/or its affiliates (or affiliated funds) and has performed such role for at least 12 months.

---

[3] In determining whether spouses who are, making a joint investment are qualified purchasers, there may be included in the amount of each spouse's investments any investments owned by the other spouse (whether or not such investments are held jointly).
[4] Includes any (a) president, (b) vice president in charge of a business unit, division or function, or (c) any other person who performs a policy-making function.

B-3 (Individuals)

## ELIGIBILITY QUESTIONNAIRE SIGNATURE PAGE FOR INDIVIDUALS

The Investor understands that the foregoing information will be relied upon by the Fund and the General Partner for the purpose of determining the eligibility of the Investor to purchase and own Interests in the Fund. The Investor agrees to notify the General Partner immediately if any representation or warranty contained in this Subscription Agreement, including this Eligibility Questionnaire, becomes untrue at any time. The Investor agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Investor's status as an accredited investor or to otherwise determine the eligibility of the Investor to purchase Interests in the Fund. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Fund, the General Partner and each Limited Partner thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signature:_____

Print Name: Patrick J. Denard_____

Joint signature, if applicable:_____

Print Name:_____

B-4 (Individuals)

## ELIGIBILITY QUESTIONNAIRE FOR ENTITIES

Name of Investor: _____

***ENTITIES (non-individuals, other than IRA and Revocable Living Trust Investors):
Please complete Parts I through IV of this Questionnaire***

### I.      Verification of Status as "Accredited Investor" under Regulation D

*The Investor represents and warrants that it is an "accredited investor" within the meaning of
Regulation D under the Securities Act and has checked the applicable statement or statements below,
pursuant to which the Investor so qualifies.  (Please check all that apply.)*

1.      ☐      The Investor has total assets in excess of $5 million AND was not formed for the
specific purpose of acquiring the Interests, AND is any of the following:
- a corporation;·
- a partnership;·
- a limited liability company;
- a Massachusetts or similar business trust; or
- an organization described in Section 501(c)(3) of the Code.

2.      ☐      The Investor is any of the following:
- a bank, or any savings and loan association or other institution acting in its
individual or fiduciary capacity;
- a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act
of 1934;
- an insurance company;
- an investment company registered under the Investment Company Act;·
- a business development company as defined under the Investment Company Act;
- a Small Business Investment Company licensed by the U.S. Small Business
Administration;
- an employee benefit plan (within the meaning of ERISA) whose investment
decision is being made by a plan fiduciary, which is either a bank, savings and loan
association, insurance company or registered investment adviser, or an employee
benefit plan whose total assets are in excess of $5 million or a self-directed
employee benefit plan whose investment decisions are made solely by persons that
are accredited investors; or
- a plan established and maintained by a state, its political subdivisions, or any
agency or instrumentality of a state or its political subdivisions, for the benefit of
its employees, if such plan has total assets in excess of $5 million.

3.      ☐      The Investor is a trust, not formed for the specific purpose of acquiring the Interests,
with total assets in excess of $5 million and whose purchase is directed by a
sophisticated person (i.e., a person who has such knowledge and experience in
financial and business matters that he or she is capable of evaluating the merits and
risks of investing in the Interests).

4.      ☐      The Investor is an entity as to which all the equity owners (for example, in a limited
partnership, all of the limited partners) are accredited investors.  *If only statement (4)
has been checked, please have each equity owner fill out the Eligibility Questionnaire
for Individuals or this Eligibility Questionnaire for Entities, as applicable.  Please feel
free to make copies of these pages for each equity owner.*

B-1 (Entities)

## II.     Verification of Status as a "Qualified Client"

The Investor represents and warrants that it is a "qualified client" as defined in Rule 203-5 under the Advisers Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies.  (Please check all that apply.)

1.    ☐     The Investor is an entity that immediately after investing in the Fund has or will have at least $1,000,000 of assets under the management of the General Partner.

2.    ☐     The Investor is an entity that immediately after investing in the Fund has or will have a net worth of more than $2,000,000.

3.    ☐     The Investor is a "qualified purchaser" under the Investment Company Act of 1940.  The Fund may request information on the basis for which the representation is made.

## III.     Status as a "Qualified Purchaser"

For informational purposes only.  If the Investor is a "Qualified Purchaser" within the meaning of the Investment Company Act, please check the applicable statement or statements below pursuant to which the Investor so qualifies.  **Please read Annex A attached hereto for information regarding what is includable in "investments" and for information regarding the valuation of such "investments."** (Please check all that apply.)

1.    ☐     The Investor is an entity which:
- was not formed for the specific purpose of attempting to qualify as a Qualified Purchaser for investing in the Fund[1];
- is acting for its own account or the accounts of other Qualified Purchasers[2], AND
- in the aggregate owns and invests on a discretionary basis not less than $25,000,000 in "investments."

2.    ☐     Each beneficial owner of the Investor's securities is a Qualified Purchaser (or in the case of a trust, the trustee or other person directing such trust and each settlor or other person who has contributed assets to the trust are Qualified Purchasers).  *If only statement (2) has been checked, please have each equity owner fill out the Eligibility Questionnaire for Individuals or this Eligibility Questionnaire for Entities, as applicable.  Please feel free to make copies of these pages for each equity owner.*

3.    ☐     The Investor is an entity which:
- was not formed for the specific purpose of attempting to qualify as a Qualified Purchaser for investing in the Fund;
- owns not less than $5,000,000 in "investments"; AND

---

[1] An Investor may be deemed to be "formed for the specific purpose of investing in the Fund" if either (i) the amount of the Investor's subscription for Interests in the Fund exceeds 40% of the total assets (on a consolidated basis with its subsidiaries) of the Investor, or (ii) interest holders in the Investor are able to decide individually whether to participate, or the extent of their participation, in the Investor's investment in the Fund (i.e., holders of interests in the Investor can determine whether their capital will form part of the capital invested by the Investor in the Fund).

[2] "Qualified Purchasers" include any individual referred to in Part III of the Eligibility Questionnaire for Individuals or any entity referred to in this Part III for Entities.

B-2 (Entities)

- is directly or indirectly owned entirely by or for a "Family Company."[3]

4. ☐ The Investor is a "qualified institutional buyer"[4] acting for its own account or for other qualified institutional buyers, provided that:
- a dealer described in paragraph (a)(1)(ii) of Rule 144A must own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer; AND
- a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will only be deemed to be acting for its own account to the extent that investment decisions are made by the fiduciary, trustee or sponsor of such plan (i.e., there must be at least $100,000,000 of nonself-directed assets in the plan) and then only with respect to the assets as to which investment decisions are made by the fiduciary, trustee or sponsor.

## IV.   Supplemental Data

1.   Legal form of entity (corporation, partnership, trust, etc.):_____

Jurisdiction of organization:_____

2.   Is the Investor a registered investment company or a private investment fund which is not registered under the Investment Company Act in reliance on Section 3(c)(1) or 3(c)(7) thereof? Note:  If the answer is "Yes," the Fund may be required to limit your investment such that your investment in the Fund constitutes less than 10% of the Fund.

_____ Yes        _____ No

3.   If the Investor is a Section 3(c)(1) or Section 3(c)(7) fund and was formed prior to June 19, 1996, has it obtained all requisite consents from its equity holders to be treated as a Qualified Purchaser?

_____ Yes        _____ No

4.   The fiscal year-end of the Investor is _____
                                             (Month/Day)

5.   The taxable year-end of the Investor, for purposes of reporting any income tax or filing tax information returns, is _____
                                  (Month/Day)

---

[3] A "Family Company" is a company which is entirely owned directly or indirectly by or for two or more natural persons who are related as siblings, or are spouses (or former spouses), or are direct lineal descendants (whether by birth or adoption) of such persons, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

[4] As defined in paragraph (a) of Rule 144A under the Securities Act.

B-3 (Entities)

**ELIGIBILITY QUESTIONNAIRE SIGNATURE PAGE FOR ENTITIES**

      The Investor understands that the foregoing information will be relied upon by the Fund and the General Partner for the purpose of determining the eligibility of the Investor to purchase and own Interests in the Fund.  The Investor agrees to notify the General Partner immediately if any representation or warranty contained in this Subscription Agreement, including this Eligibility Questionnaire, becomes untrue at any time.  The Investor agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Investor's status as an accredited investor or to otherwise determine the eligibility of the Investor to purchase Interests in the Fund.  To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Fund, the General Partner and each Limited Partner thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

      Name of Entity:_____

      By (signature):_____

      Print Name:_____

      Print Title:_____

      Additional signature, if applicable:_____

      Print Name:_____

      Print Title:_____

**EXHIBIT C**

**ELECTRONIC DELIVERY OF SCHEDULES K-1 CONSENT AND DISCLOSURE STATEMENT**

Pursuant to IRS Revenue Procedure 2012-17, intended recipients of Schedules K-1 who wish to receive their Schedules K-1 solely through electronic transmission are required to provide affirmative consent.

In order to receive your Schedules K-1 from the T2 Asset Opportunity Fund IV, LP (the "Fund") through electronic transmission you must affirmatively consent in writing by properly reviewing, completing, executing and delivering this Consent and Disclosure Statement by email to Woodfield Fund Administration, LLC (the "Administrator") at the address noted below.

***Paper Statement***.  If you do not consent to receive your Schedules K-1 electronically, they will be furnished to you on paper instead.

***Scope and Duration of Consent & Notice of Termination***.  If you do consent to the electronic delivery of your Schedules K-1, all Schedules K-1 will only be furnished by such method for the Fund until the earliest of: (A) your withdrawal of consent (in the manner described below); (B) the full redemption of your interest in the Fund; (C) the dissolution and winding up of the Fund; or (D) any other date effective as of which we notify you that we will no longer provide such Schedules K-1 electronically (which effective date is generally expected to be no earlier than the date we send out such notice).

***Post-Consent Request for a Paper Statement***.  If you consent to electronic delivery of Schedules K-1 and you wish to obtain a paper copy, please contact the Administrator at the address noted below.  A request for a paper copy (or copies) of Schedules K-1 will not be considered to be a withdrawal of consent to receive Schedules K-1 electronically.

***Withdrawal of Consent***.  You may withdraw your consent to receive Schedules K-1 electronically by writing (electronically or on paper) to the Administrator at the address noted below.  The withdrawal of your consent will take effect on the date your correspondence is received by us.  We will confirm your withdrawal of consent and the date on which it takes effect in writing (either electronically or on paper).  Please note that a withdrawal of consent will not apply to a statement that is furnished electronically in the manner described above before the effective date of such withdrawal of consent.

***Notice of Termination***.  We will cease to provide Schedules K-1 electronically to you (and, except as required by law, cease to provide Schedules K-1 in any other form) upon your withdrawal from the Fund.

***Updating Information***.  In the event that your contact information changes, please furnish your updated information in writing (either electronically or on paper) to the Administrator at the address noted below.  We will inform you of any change to this contact information.

***Hardware & Software Requirements***.  After you consent to receive your Schedules K-1 electronically, you will need a computer, access to email, a printer and available memory on your computer hard drive in order to access, print and retain your electronic Schedule K-1.  Your Schedule K-1 will be attached to that email.

***Please note that, notwithstanding electronic delivery, a Schedule K-1 may be required to be printed and attached to a Federal, State or local income tax return.***

Please fill in the name of the Investor below and check the following and return a copy of this consent by email to T2admin@woodfieldllc.com.

Investor Name:  Patrick J. Denard (pjdenard@gmail.com)

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

☑        consents to electronic delivery of Schedules K-1 and other communications on such terms and conditions as described in this Consent and Disclosure Statement.

If you have any questions or concerns, please do not hesitate to contact the Fund's Administrator at the following address, phone and email:

Woodfield Fund Administration, LLC
1 N. Wacker Drive, Suite 2150
Chicago, IL 60606
Attn:  Investor Services Department
T2admin@woodfieldllc.com
Facsimile:  (847) 255-3566
Phone: (847) 255-3500

C-2

ANNEX A

## INVESTMENTS

For determining whether the Investor is a "Qualified Purchaser," the term "investments" includes:

(1)    Securities, other than securities of an issuer that controls, is controlled by, or is under common control with, the Investor that owns such securities, unless the issuer of such securities is a "public company," an "investment vehicle" or has not less than $50 million in equity, as reflected on such company's financial statements which present such equity information as of a date within 16 months preceding the date on which the Investor acquires Interests. The term "public company" includes all companies that file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 or have a class of securities that are listed on a Designated Offshore Securities Market, as defined by Regulation S under the Securities Act. The term "investment vehicle" includes a commodity pool or an "investment company" (whether U.S. or offshore) or a company that would be an investment company but for the exclusions provided by Sections 3(c)(1) through 3(c)(9) of the Investment Company Act or the exemptions provided by Rule 3a-6 or 3a-7;

(2)    Real estate held for investment purposes so long as it is not used by the Investor or a close relative (generally, a sibling, spouse, former spouse, direct ancestor or descendant or a spouse of such an ancestor or descendant) for personal or business purposes. However, real estate owned by an Investor who is primarily in the real estate business is includable as an "investment" even if it is held by the owner;

(3)    "Commodity interests" or "physical commodities" held for investment purposes by the Investor. "Commodity interests" includes commodity futures contracts, options on commodity futures contracts, and options on physical commodities traded on or subject to the rules of (i) any contract market designated for trading such transactions under the Commodity Exchange Act and the rules thereunder or (ii) any board of trade or exchange outside the United States, as contemplated in Part 30 of the rules under the Commodity Exchange Act. "Physical commodities" includes any physical commodity with respect to which a "commodity interest" is traded on a market specified in the definition of commodity interests above;

(4)    To the extent not securities, "financial contracts" entered into for investment purposes. "Financial contracts" includes any arrangement that (i) takes the form of an individually negotiated contract, agreement, or option to buy, sell, lend, swap, or repurchase, or other similar individually negotiated transaction commonly entered into by participants in the financial markets; (ii) is in respect of securities, commodities, currencies, interest or other rates, other measures of value, or any other financial or economic interest similar in purpose or function to any of the foregoing; and (iii) is entered into in response to a request from a counter party for a quotation, or is otherwise entered into and structured to accommodate the objectives of the counter party to such arrangement;

(5)    In the case of an Investor that is a commodity pool or a company that would be an investment company but for the exclusion provided by Section 3(c)(1) or 3(c)(7) of the Investment Company Act, any amounts payable to such Investor pursuant to a firm agreement or similar binding commitment pursuant to which a person has agreed to acquire an interest in, or make capital contributions to, the Investor upon the demand of the Investor; and

(6)    Cash and cash equivalents held for investment purposes, such as bank deposits, foreign currencies, certificates of deposits, bankers acceptances and similar bank instruments and the net cash surrender value of an insurance policy.

*"Investments" do not include other assets which do not reflect experience in the financial markets, such as jewelry, art work, antiques and other collectibles.*

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

For purposes of determining the amount of "investments" owned by a company, "investments" of a parent company and its majority-owned subsidiaries may be aggregated to meet the minimum "investment" amount requirements, regardless of which company is the Investor.

For purposes of determining the amount of "investments" owned by a natural person, there may be included any "investment" held jointly or as community property with such person's spouse.  In determining whether spouses who are making a joint investment in the Fund are Qualified Purchasers, there may be included in the amount of each spouse's "investments" any "investments" owned by the other spouse (whether or not such "investments" are held jointly).

In determining whether a natural person is a Qualified Purchaser, there may be included in the amount of such person's "investments" any "investments" in an individual retirement account or similar account the investments of which are directed by and held for the benefit of such person.

## VALUATION OF INVESTMENTS

In determining the value of "investments" in order to ascertain Qualified Purchaser status, the aggregate amount of "investments" owned and invested on a discretionary basis by such person can be either their fair market value on the most recent practicable date or the cost of such "investments," provided that the same method must be used for all "investments." However,

(1)      In the case of "commodity interests," the amount of "investments" is the value of the initial margin or option premium deposited in connection with such "commodity interests" and

(2)      In each case, there must be deducted from the amount of such "investments" the following amounts:

(a)      The amount of any outstanding indebtedness incurred by the Investor to acquire such "investments" and

(b)      In the case of a Family Company (as defined in Part II, footnote 3, of the Eligibility Questionnaire for Entities), in addition to the amounts specified in paragraph (2)(a) above, any outstanding indebtedness incurred by an owner of the Family Company to acquire the Family Company's "investments."

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

**ANNEX B**



### PRIVACY STATEMENT

The following privacy statement is issued by T2 Capital Management, LLC ("T2 Capital") and each of the funds (collectively, the "Funds") managed or advised by T2 Capital or its affiliates.

T2 Capital considers privacy a fundamental right of the Fund's limited partners and takes seriously the obligation to safeguard limited partner information. Accordingly, we do not share any non-public personal information of any current or former limited partner with any unaffiliated third parties, except as permitted by law or as authorized by our limited partners.

In the course of providing investment products and services to you, we collect non-public personal information about you from sources such as subscription agreements and related documents as well as from transactions related to your account. In the normal course of serving our limited partners, information we collect may be shared with companies that perform various services such as custodians, accountants, attorneys, broker-dealers and financial institutions for the Fund. Specifically, we may disclose to these service providers all non-public information we collect, including:

- Information we receive on subscription agreements or other forms, such as a limited partner's name, address, social security or tax identification number, amount of investment(s), and bank account information; and

- Information about transactions with us, such as a limited partner's capital account balance and other account data.

Finally, as required or permitted by the Funds' respective partnership agreements, we may distribute to the limited partners in a Fund certain personal financial information of the limited partners, such as commitment amounts, which may be recorded in schedules attached to such Fund's partnership agreement.

Any service provider or organization receiving your personal information will be authorized to use such information only to perform the services required and as permitted by applicable law. Access to limited partners' non-public personal information is restricted to those employees and managers of T2 Capital who require access to provide services to the Funds and their limited partners. A limited partner's right to privacy extends to all forms of contact with T2 Capital, including telephone, written correspondence and electronic media, such as the Internet.

For questions concerning this policy, please contact Jeff Baxter at (630) 590-9511 or via email at jbaxter@t2investments.com.

Annex B-1

T2 Asset Opportunity Fund IV, LP
Subscription Documents
CHICAGO/#2649425.4

T2 | CAPITAL
MANAGEMENT™

March 6, 2015

RE:  T2 Asset Opportunity Fund IV, LP
     Wiring Instructions

Dear Investor,

Thank you for your investment in the T2 Asset Opportunity Fund IV.  Below are the wiring instructions related to your investment:

| Wiring Instructions |
|---|
| MB Financial Bank, N. A. |
| 6111 N. River Road |
| Rosemont, IL  60018 |
| Routing #:  071 001 737 |
| Account #:  184 000 6920 |
| Account name:  T2 Asset Opportunity Fund IV, LP |
| Reference: (Please state investor name) |

Thank you for your partnership.  Please feel free to call me with any questions at 630-590-9511 ext. 103.

Sincerely,

Jeff Baxter
Vice President, Investor Relations

T2 Asset Opportunity Fund IV, LP
PPM #102
Patrick J. Denard
TD Acct. 934046100



| Form **W-9** | **Request for Taxpayer** | **Give Form to the** |
|---|---|---|
| (Rev. December 2014) | **Identification Number and Certification** | **requester. Do not** |
| Department of the Treasury<br>Internal Revenue Service | | **send to the IRS.** |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**Patrick J. Denard**

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☑ Individual/sole proprietor or single-member LLC
☐ C Corporation
☐ S Corporation
☐ Partnership
☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

**5** Address (number, street, and apt. or suite no.)

**420 G. Street**

**6** City, state, and ZIP code

**Jacksonville, OR 97530**

Requester's name and address (optional)

**7** List account number(s) here (optional)

**TD Acct. 934046100: T2 Asset Opportunity Fund IV, LP**

*Print or type*
*See Specific Instructions on page 2.*

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

5 4 2 – 1 9 – 7 1 8 1

**or**

Employer identification number

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**    Signature of U.S. person ▶    Date ▶ 3/23/15

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X    Form **W-9** (Rev. 12-2014)

Form W-9 (Rev. 12-2014)

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* above.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account, list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9.

**a. Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

**b. Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

**c. Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

**d. Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

**e. Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

Form W-9 (Rev. 12-2014)

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box in line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box in line 3.

**Limited Liability Company (LLC).** If the name on line 1 is an LLC treated as a partnership for U.S. federal tax purposes, check the "Limited Liability Company" box and enter "P" in the space provided. If the LLC has filed Form 8832 or 2553 to be taxed as a corporation, check the "Limited Liability Company" box and in the space provided enter "C" for C corporation or "S" for S corporation. If it is a single-member LLC that is a disregarded entity, do not check the "Limited Liability Company" box; instead check the first box in line 3 "Individual/sole proprietor or single-member LLC."

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space in line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note.** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

### Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns.

### Line 6

Enter your city, state, and ZIP code.

### Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on this page), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.*

Form W-9 (Rev. 12-2014)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i) (A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity[4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i) (B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 2.

*Note.* Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or contact them at *www.ftc.gov/idtheft* or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

# EXHIBIT 6



### Confirmation of Purchase

Registration:        TD Ameritrade Clearing Inc FBO PATRICK J DENARD INDIVIDUAL

Client Name:         PATRICK J DENARD
Account #:           934046100
Cusip:               87499N104
Security Name:       T2 ASSET OPPORTUNITY FUND IV LP
Valuation Unique ID: 87499N104-PATR6100
Tax ID:              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
Units/Shares/Capital: Capital
Funding Type:        Wire                Amount: $100,000.00

Dear Sponsor/Transfer Agent:

TD Ameritrade recently delivered documents to transact a purchase for the above mentioned client and security. We are regulatory bound (SEC 15C3-3) to receive confirmation of purchases within 30 days of the funds being sent. Please complete this confirmation and return it to us by 5/15/2015 to avoid possible adverse tax consequence for the client. **If certificated need original cert in lieu of this confirmation.**

**Effective Purchase Date:** _____

| Upon receipt of the above purchase, please select one of the following: |
| :--- |
| Confirm number of units/shares: _____ at $ _____ per unit/shares |
| or |
| Confirm $ _____ Capital Investment  (Only if pricing is not on a per-unit basis) |

| Total Investment $_____ (amount of total commitment if capital based) |
| :--- |
| or |
| Total Investment _____ (amount of total units) |

**Printed Name and Title of Authorized Party:**_____
**Authorized Signature:**_____

_____
**Date**
We ask that you confirm the purchase by signing, dating, and returning your response by fax to 866-468-6268 or by email to nsa@tdameritrade.com. If this is a capital based security please also send a copy of this confirmation to valuations@rastanger.com

If you have any questions, please contact TD Ameritrade's Alternative Investment Department at 800-632-9095. Thank you for your time and cooperation in this matter.

Sincerely,

TD Ameritrade Clearing Inc
Alternative Investment Department
200 South 108th Ave / Omaha, NE 68154-2631

FOIA CONFIDENTIAL TREATMENT REQUESTED BY T2 CAPITAL MANAGEMENT    T2CAPITAL_SEC_00002401