## SECRETARY'S CERTIFICATE OF CORPORATE RESOLUTIONS OF TD AMERITRADE CLEARING, INC.

I, Janis Companella, hereby certify that I am the duly elected, qualified and acting Secretary of TD Ameritrade Clearing, Inc., a corporation validly existing and in good standing under the laws of the State of Nebraska (the "Corporation").

I further certify that the following individuals (together, the "Directors") comprise all of the members of the Board of Directors of the Corporation:

William J. Gerber
Judith K. Ricketts

I further certify that the signatures of the Directors on the Unanimous Written Consent of the Corporation's Board of Directors dated February 2, 2015, (the "Resolutions") attached hereto as Exhibit A were adopted and ever since have been and now are in full force and effect.

I further certify the passage of said Unanimous Written Consent was in all respects regular and in accordance with the By-Laws of said Corporation and remains in full force and effect.

**IN WITNESS WHEREOF,** I have hereunto set my hand this 4th day of February, 2015.

Janis Companella, Secretary

### EXHIBIT A

### UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF TD AMERITRADE CLEARING, INC.

The undersigned, being all of the members of the Board of Directors (the "Board") of TD Ameritrade Clearing, Inc., a Nebraska corporation (the "Corporation"), in accordance with the authority contained in Section 21-2090 of the Nebraska Business Corporation Act, without formality of convening a meeting, do hereby consent to the following actions and waive any notice required to be given in connection therewith:

<u>Removals, Resignation and Elections</u>

**NOW, THEREFORE, BE IT RESOLVED,** that Caroline F. Langer be, and hereby is, removed as Director, Brokerage Operations of the Corporation, effective May 20, 2012.

**NOW, THEREFORE, BE IT RESOLVED,** that Joseph R. Stockton be, and hereby is, elected to be Senior Manager, Brokerage Operations of the Corporation, effective December 24, 2012, to hold such office until his respective successor is elected and qualified or until his earlier death, resignation or removal.

**NOW, THEREFORE, BE IT RESOLVED,** that Lance W. Deal be, and hereby is, removed as Director, Brokerage Operations of the Corporation, effective March 16, 2013.

**NOW, THEREFORE, BE IT RESOLVED,** that David Raftesath be, and hereby is, elected to be Director, Brokerage Operations of the Corporation, effective April 1, 2013, to hold such office until his respective successor is elected and qualified or until his earlier death, resignation or removal.

**NOW, THEREFORE, BE IT RESOLVED,** that MonaLisa T. Como be, and hereby is, removed as Managing Director, Brokerage Operations of the Corporation, effective September 7, 2013.

**NOW, THEREFORE, BE IT RESOLVED,** that Ovidio Montemayor be, and hereby is, elected to be Director, Brokerage Operations of the Corporation, effective May 10, 2014, to hold such office until his respective successor is elected and qualified or until his earlier death, resignation or removal.

**NOW, THEREFORE, BE IT RESOLVED,** that Romeo L. Pineda be, and hereby is, removed as Director, Brokerage Operations of the Corporation, effective June 16, 2014.

**NOW, THEREFORE, BE IT RESOLVED,** that Joseph A. Iraci be, and hereby is, removed as Managing Director, Brokerage Operations of the Corporation, effective July 5, 2014.

**NOW, THEREFORE, BE IT RESOLVED,** that V. Valerie Simpson be, and hereby is, elected to be Director, Brokerage Operations of the Corporation, effective July 5, 2014, to hold such office until her respective successor is elected and qualified or until her earlier death, resignation or removal.

**NOW, THEREFORE, BE IT RESOLVED,** that Charles E. Church be, and hereby is, elected to be Senior Manager, Brokerage Operations of the Corporation, effective November 29, 2014, to hold such office until his respective successor is elected and qualified or until his earlier death, resignation or removal.

**NOW, THEREFORE, BE IT RESOLVED,** that Staci J. Sullivan be, and hereby is, elected to be Managing Director, Brokerage Operations of the Corporation, effective December 21, 2014, to hold such office until her respective successor is elected and qualified or until her earlier death, resignation or removal.

**WHEREAS,** it is in the best interest of the Corporation to accept the resignation of Felix B. Davidson as President of the Corporation, effective January 31, 2015.

**NOW, THEREFORE, BE IT RESOLVED,** the resignation of Felix B. Davidson is accepted, effective January 31, 2015.

**WHEREAS,** it is in the best interests of the Corporation to elect Judith K. Ricketts to be President of the Corporation.

**NOW, THEREFORE, BE IT RESOLVED,** that Judith K. Ricketts be, and hereby is, elected to be President of the Corporation, effective January 31, 2015, to hold such office until her respective successor is elected and qualified or until her earlier death, resignation or removal.

<u>Authorized Individuals</u>

**WHEREAS,** it is in the best interests of the Corporation to grant authority to certain officers, managers and employees to take action on behalf of the Corporation.

**NOW, THEREFORE, BE IT RESOLVED,** that each of the following officers, managers, and employees be, and each hereby is, fully authorized and empowered to transfer, endorse, buy, sell, assign, set over and deliver any and all shares of stock, bonds, debentures, notes, evidences of indebtedness, mutual funds or other securities, including alternative investments, now or hereafter standing in the name of or owned by the Corporation, and to make, execute, and deliver, under the corporate seal of the Corporation, any and all written instruments and take any other action necessary or proper to effectuate the authority hereby conferred:

| | |
|---|---|
| Judith K. Ricketts | President |
| William J. Gerber | Chief Financial Officer |
| James A. Powell | Treasurer |
| William T. Yates | Vice President and Managing Director, Brokerage Operations Finance |
| Donald E. Roberts | Managing Director, Brokerage Operations |
| Renee S. Capelle | Managing Director, Brokerage Operations |
| Ovidio Montemayor | Managing Director, Brokerage Operations |
| Staci J. Sullivan | Managing Director, Brokerage Operations |
| Carrie Brandale | Managing Director, Retail Brokerage Services |
| Charles L. Upchurch | Director, Brokerage Operations |
| David W. Raftesath | Director, Brokerage Operations |
| V. Valiere Simpson | Director, Brokerage Operations |
| Christopher A. Frank | Senior Manager, Brokerage Operations |

**FURTHER RESOLVED,** that each of the following Managers, Senior Managers, and Directors be, and each hereby is, fully authorized and empowered to transfer, endorse, assign, set over and deliver any and all shares of stock, bonds, debentures, notes, evidences of indebtedness, mutual funds or other securities, excluding alternative investments, now or hereafter standing in the name of or owned by the Corporation, and to make, execute, and deliver, under the corporate seal of the Corporation, any and all written instruments and take any other action necessary or proper to effectuate the authority hereby conferred, except that any such action by a Manager must be pre-approved or countersigned, as appropriate, by one other Manager:

| | |
|---|---|
| James R. Watts | Managing Director, Institutional Brokerage Services |
| Margaret J. Hoops | Director, Retail Brokerage Services |
| Charles E. Church | Senior Manager, Brokerage Operations |
| Randall A. Mercado | Senior Manager, Retail Brokerage Services |
| Jason Marabeas | Senior Manager, Institutional Brokerage Services |
| Dusty A. Sargent | Senior Manager, Institutional Brokerage Services |
| Wissam Chamunas | Senior Manager, Institutional Brokerage Services |
| Diana C. Rivas Blackwell | Manager, Institutional Brokerage Services |
| Saul D. Borland | Manager, Institutional Brokerage Services |
| Michael A. Bacher | Manager, Institutional Brokerage Services |
| Annie W. Hong | Manager, Institutional Brokerage Services |
| Jessica L. Zulkosky | Manager, Brokerage Operations |
| Jessica M. Hall | Manager, Retail Brokerage Services |
| Clark Taylor | Manager, Retail Brokerage Services |
| Megan D. Miller | Manager, Retail Brokerage Services |

SIGNATURE GUARANTEED

**FURTHER RESOLVED,** that the following individuals be, and be hereby is, fully authorized and empowered to transfer, endorse, buy, sell, assign, set over and deliver any and all alternative investments, now or hereafter standing in the name of or owned by the Corporation, and to make, execute, and deliver, under the corporate seal of the Corporation, any and all written instruments and take any other action necessary or proper to effectuate the authority hereby conferred:

| | |
|---|---|
| Joseph R. Stockton | Senior Manager, Brokerage Operations |
| Lance S. Shafer | Manager, Brokerage Operations |
| Carrie J. Sybert | Manager, Brokerage Operations |

**FURTHER RESOLVED,** that the following individuals be, and be hereby is, fully authorized and empowered to execute and deliver on behalf of the Corporation any and all mutual fund selling agreements and all letters of intent or other documents required to consummate such mutual fund selling agreements, and to take any other action necessary or proper to effectuate the authority hereby conferred:

| | |
|---|---|
| Joseph R. Stockton | Senior Manager, Brokerage Operations |
| Derek S. Johnson | Manager, Brokerage Operations |

**FURTHER RESOLVED,** that the following individuals be, and be hereby is, fully authorized and empowered to execute and deliver on behalf of the Corporation any and all letters of transmittal and appraisal rights or dissenters' rights instruction letters, and all letters of intent or other documents required to consummate such letters of transmittal and appraisal rights or dissenters' rights instruction letters, and to take any other action necessary or proper to effectuate the authority hereby conferred:

| | |
|---|---|
| Chad R. Johnsen | Senior Manager, Brokerage Operations |
| Mandi R. Foster | Manager, Brokerage Operations |
| Pauline Remhof | Manager, Brokerage Operations |

**FURTHER RESOLVED,** that each of the following individuals and be, and each hereby is, fully authorized and empowered to transfer, endorse, assign, set over and deliver any and all shares of stock, bonds, debentures, notes, evidences of indebtedness, or other securities, excluding alternative investments, now or hereafter standing in the name of or owned by the Corporation, and to make, execute, and deliver, under the corporate seal of the Corporation, any and all written instruments and take any other action necessary or proper to effectuate the authority hereby conferred:

| | |
|---|---|
| Anthony M. Karhoff | Manager, Brokerage Operations |
| Nicole S. Murphy | Manager, Brokerage Operations |
| Myra E. Lich | Manager, Brokerage Operations |

**FURTHER RESOLVED,** that each of the following individuals be, and each hereby is, fully authorized and empowered to execute and deliver on behalf of the Corporation any and all collateral loan agreements and other documents necessary to consummate such collateral loan agreements, and to take any other action necessary or proper to effectuate the authority hereby conferred:

| | |
|---|---|
| Benjamin F. Rouch | Managing Director, Investor Services |
| Margaret J. Hoops | Director, Retail Brokerage Services |
| Andrea Leonardi Dawson | Senior Manager, Retail Brokerage Services |
| Dusty A. Sargent | Senior Manager, Institutional Brokerage Services |
| Matthew R. Portney | Manager, Retail Brokerage Services |
| Skyla L. Wolcott | Manager, Retail Brokerage Services |
| Saul D. Burland | Manager, Institutional Brokerage Services |
| Curtis R. Divona | Manager, Institutional Brokerage Services |

| | |
|---|---|
| Sam F. Badal | Manager, Institutional Brokerage Services |

Transfer Agent

**WHEREAS**, the Corporation is a party to an agreement with TD Asset Management, Inc. ("TDAM") under which the Corporation acts as the transfer agent (the "Transfer Agent Activities") for certain mutual funds (the "Mutual Funds") managed by TDAM, and

**WHEREAS**, The Bank of New York ("BONY") acts as the custodian for the Mutual Funds, and

**WHEREAS**, it is in the best interests of the Corporation to grant authority to certain individuals to take action on behalf of the Corporation with regard to the Transfer Agent Activities.

**NOW, THEREFORE, BE IT RESOLVED**, that each of the following individuals be, and each hereby is, authorized to give oral or written instructions to TDAM and BONY related to the Transfer Agent Activities:

| | |
|---|---|
| Judith K. Ricketts | President |
| William J. Gerber | Chief Financial Officer |
| James A. Powell | Treasurer |
| William T. Yates | Vice President and Managing Director, Brokerage Operations Finance |
| Charles L. Upchurch | Director, Brokerage Operations |
| Joseph R. Stockton | Senior Manager, Brokerage Operations |
| Mansourou Gakou | Manager, Brokerage Operations |
| William A. Miller | Manager, Brokerage Operations |

**FURTHER RESOLVED**, that each of the following individuals be, and each hereby is, authorized to give oral or written instructions only to BONY related to the Transfer Agent Activities:

| | |
|---|---|
| Staci J. Sullivan | Director, Brokerage Operations |
| Michael Asmus | Treasury Senior Manager, TD Ameritrade Services Company, Inc. |
| Timothy D. Tefft | Treasury Analyst, TD Ameritrade Services Company, Inc. |

FDIC Sweep Product Account

**WHEREAS**, the Corporation has an account with TD Bank USA, NA ("TD Bank") that is used to deposit funds from the FDIC sweep product (the "Account"); and

**WHEREAS**, it is in the best interests of the Corporation to grant authority to certain individuals so that they may take action on behalf of the Corporation with regard to the Account.

**NOW, THEREFORE, BE IT RESOLVED**, that the following officers of the Corporation (collectively, the "Authorized Officers") be and hereby are authorized to take any and all action necessary to manage, maintain or close the Account:

| | |
|---|---|
| Judith K. Ricketts | President |
| William J. Gerber | Chief Financial Officer |
| James A. Powell | Treasurer |
| William T. Yates | Vice President and Managing Director, Brokerage Operations Finance |

**FURTHER RESOLVED**, that the Authorized Officers and the following individuals (collectively with the Authorized Officers, the "Authorized Signatories") be and hereby authorized to execute any and all documents necessary to deposit funds to or transfer or withdraw funds from the Account, and to give written or oral instructions to TD Bank relating to such deposits, transfers and withdrawals:

| | |
|---|---|
| Charles L. Upchurch | Director, Brokerage Operations |
| Joseph R. Stockton | Senior Manager, Brokerage Operations |
| Mansourou Gakou | Manager, Brokerage Operations |
| William A. Miller | Manager, Brokerage Operations |
| Michael Asmus | Treasury Senior Manager, TD Ameritrade Services Company, Inc. |
| Timothy D. Tefft | Treasury Analyst, TD Ameritrade Services Company, Inc. |

DTC Authorized Persons

**WHEREAS**, the Corporation is a member of the Deposit Trust Company ("DTC"); and

**WHEREAS**, the Corporation transacts certain business with DTC, including clearing and settlement of trades (collectively, the "DTC Activities"); and

**WHEREAS**, it is in the best interest of the Corporation to grant authority to certain individuals to deal with DTC on behalf of the Corporation with regard to the DTC Activities.

**NOW, THEREFORE, BE IT RESOLVED**, that each of the following individuals (collectively, the "Authorized Persons," and each, an "Authorized Person") be, and hereby is, authorized and empowered to communicate with and give instructions to DTC with regard to any and all DTC Activities, and to take, from time to time, any other action related to the DTC Activities that is necessary or proper, as determined in the sole discretion of the Authorized Person, including executing and delivering any and all documents or instruments related to the DTC Activities:

| | |
|---|---|
| Judith K. Ricketts | President |
| William T. Yates | Vice President and Managing Director, Brokerage Operations Finance |
| Ovidio Montemayor | Managing Director, Brokerage Operations |
| Staci J. Sullivan | Managing Director, Brokerage Operations |
| Charles L. Upchurch | Director, Brokerage Operations |
| David Rafteseth | Director, Brokerage Operations |
| V. Valiere Simpson | Director, Brokerage Operations |
| Thomas J. Textor | Chief Compliance Officer |

**FURTHER RESOLVED**, that the authority granted in the foregoing resolution shall remain in full force and effect until amended or revoked by action of the Board.

**FURTHER RESOLVED**, that the foregoing list of Authorized Persons shall replace and supersede any and all previous lists of persons authorized to act on behalf of the Corporation with regard to the DTC Activities.

**FURTHER RESOLVED**, that any and all actions heretofore taken by any of the Authorized Persons in connection with the matters contemplated by these resolutions, or by any officer of the Corporation in connection with the Corporation's DTC membership, is hereby approved, ratified and confirmed in all respects as fully as if such actions had been presented to the Board for its approval prior to such action being taken.

NSCC Authorized Persons

**WHEREAS**, the Corporation is a member of the National Securities Clearing Corporation ("NSCC"); and

**WHEREAS**, the Corporation transacts certain business with NSCC, including clearing and settlement of trades (collectively, the "NSCC Activities"); and

**WHEREAS**, it is in the best interest of the Corporation to grant authority to certain individuals to deal with NSCC on behalf of the Corporation with regard to the NSCC Activities.

**NOW, THEREFORE, BE IT RESOLVED**, that each of the following individuals (collectively, the "Authorized Persons," and each, an "Authorized Person") be, and hereby is, authorized and empowered to communicate with and give instructions to NSCC with regard to any and all NSCC Activities, and to take, from time to time, any other action related to the NSCC Activities that is necessary or proper, as determined in the sole discretion of the Authorized Person, including executing and delivering any and all documents or instruments related to the NSCC Activities:

| | |
|---|---|
| Judith K. Ricketts | President |
| William T. Yates | Vice President and Managing Director, Brokerage Operations Finance |
| Ovidio Montemayor | Managing Director, Brokerage Operations |
| Staci J. Sullivan | Managing Director, Brokerage Operations |
| Charles L. Upchurch | Director, Brokerage Operations |
| David Rafteseth | Director, Brokerage Operations |
| V. Valiere Simpson | Director, Brokerage Operations |
| Thomas J. Textor | Chief Compliance Officer |

**FURTHER RESOLVED**, that the authority granted in the foregoing resolution shall remain in full force and effect until amended or revoked by action of the Board.

**FURTHER RESOLVED**, that the foregoing list of Authorized Persons shall replace and supersede any and all previous lists of persons authorized to act on behalf of the Corporation with regard to the NSCC Activities.

**FURTHER RESOLVED**, that any and all actions heretofore taken by any of the Authorized Persons in connection with the matters contemplated by these resolutions, or by any officer of the Corporation in connection with the Corporation's NSCC membership, is hereby approved, ratified and confirmed in all respects as fully as if such actions had been presented to the Board for its approval prior to such action being taken.

OCC Authorized Persons

**WHEREAS**, the Corporation is a member of The Options Clearing Corporation ("OCC"); and

**WHEREAS**, it is in the best interest of the Corporation to grant authority to certain individuals to take certain action on behalf of the Corporation with OCC.

**NOW, THEREFORE, BE IT RESOLVED**, that each of the following individuals (collectively, the "Authorized Persons," and each, an "Authorized Person") be, and hereby is, authorized and empowered (i) to act on behalf of the Corporation in signing certificates, checks, agreements, receipts, orders, drafts, pledges and such other paper as may from time to time be necessary for the transaction of business between the Corporation and OCC, including, without limitation, exercise notices and margin withdrawal requests, and (ii) in general to give such instructions and take such actions as such Authorized Person may from time to time deem necessary or appropriate in connection with the transaction of such business:

| | |
|---|---|
| Judith K. Ricketts | President |
| William J. Gerber | Chief Financial Officer |
| William T. Yates | Vice President and Managing Director, Brokerage Operations Finance |
| Ovidio Montemayor | Managing Director, Brokerage Operations |
| Lizabeth Miller | Senior Manager |

**FURTHER RESOLVED**, that the President, Chief Financial Officer, Treasurer and any Vice President of the Corporation be, and each hereby is, authorized and empowered to authorize, by written appointment, any officers, employees or agents in addition to or in substitutions for the Authorized Persons named in the foregoing resolution, to act on behalf of the Corporation in transacting business with OCC, and each such officer, employee or agent so authorized shall have the same authority in dealing with OCC as the Authorized Persons named in the foregoing resolution.

**FURTHER RESOLVED**, that the Secretary or any Assistant Secretary of the Corporation be, and hereby is, authorized to certify to OCC a copy of these resolutions and the names and signatures of the Authorized Persons, and OCC is authorized to rely upon any such certificate until formally advised by a like certificate of any changes therein, and is authorized to rely upon any such superseding certificates.

Omnibus Resolution

**RESOLVED**, that any and all actions heretofore taken by any of the individuals named in the above resolutions in connection with the matters contemplated by these resolutions is hereby approved, ratified and confirmed in all respects as fully as if such actions had been presented to the Board for its approval prior to such action being taken.

Date: February 2, 20[illegible]

[signature]
William J. Gerber

[signature]
Judith K. Ricketts

Being all the members of the Board of Directors of TD Ameritrade Clearing, Inc.

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 2.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only **one** of the following seven boxes:
☐ Individual/sole proprietor or single-member LLC ☑ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate
☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶
**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.
☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any) 12
Exemption from FATCA reporting code (if any) N/A
(Applies to accounts maintained outside the U.S.)

5 Address (number, street, and apt. or suite no.)
PO Box 2207

Requester's name and address (optional)

6 City, state, and ZIP code
Omaha, NE 68103-2207

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number
[ ][ ][ ] – [ ][ ] – [ ][ ][ ][ ]

or

Employer identification number
4 7 – 0 5 3 3 6 2 9

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** Signature of U.S. person ▶ [signature] Date ▶ April 15, 2015

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and
4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.



SIGNATURE GUARANTEED
MEDALLION GUARANTEED

TD Ameritrade

## Alternative Investment Department Payment Instructions

### Payment by Wire

| | |
|---|---|
| Bank Name: | First National Bank of Omaha |
| Bank Address: | 16th & Dodge Street, Omaha, NE 68102 |
| ABA#: | 104-000-016 |
| Account Name: | TD Ameritrade Clearing Inc. |
| Account #: | 164-24-641 |
| FFC A/C Name: | NSA Transaction Account |
| FFC A/C#: | 980021265-1 |
| *REF: | (Purpose of Wire & Security Name)<br>*Example: Redemptions for XYZ Fund* |

After sending the wire, please notify the Alternative Investment Department with written correspondence via **fax to 866-468-6268** or e-mail to nsa@tdameritrade.com and include the following:

- The amount of the wire and the date it was sent
- **Purpose** of the wire and a **breakdown of how the funds should be credited**. Be sure to include, the **client name(s)**, and if possible the TD **Ameritrade Account #** in which the funds should be credited to. If the capital balance or shares are affected please provide the remaining balance or the number of shares being redeemed.

### Payment by Check

Checks should be made payable to: *TD Ameritrade Clearing Inc.*

Please include the **purpose** of the payment and a **breakdown of how the funds should be credited**. Be sure to include, the **client name(s)**, and if possible the TD **Ameritrade Account #** in which the funds should be credited to. If the capital balance or shares are affected please provide the remaining balance or the number of shares being redeemed.

Checks can be mailed to one of the following addresses:

**Regular Mailing Address:**
TD Ameritrade Clearing Inc.
Attn: Alternative Investment Dept.
PO Box 2207
Omaha, NE 68103-2207

**Overnight Mailing Address:**
TD Ameritrade Clearing Inc.
Attn: Alternative Investment Dept.
200 South 108th Ave
Omaha, NE 68154-2631

Should there be any questions regarding these instructions please contact the Alternative Investment Department, we are available Monday-Friday 8:00A.M. – 4:30P.M central standard time.

Thanks for your assistance!

**Alternative Investment Department**
**TD Ameritrade Clearing Inc.**
Fax: 866-468-6268
Phone: 800-632-9095
E-mail: nsa@tdameritrade.com

PPM #102

INVESTMENTS
WORTH
BUILDING

T2 CAPITAL MANAGEMENT™

# *T2 Asset Opportunity Fund IV, LP*

***Subscription Documents for Limited Partnership Interests***

**T2 Asset Opportunity Fund IV, LP**
**Instructions for Completion of the Subscription Documents**

To purchase limited partnership interests in T2 Asset Opportunity Fund IV, LP (the "Fund"), please review and complete all of the Subscription Documents contained in this package. By signing the attached Subscription Agreement, the Investor also agrees to become a party to, and be bound and governed by, the Fund's Amended and Restated Agreement of Limited Partnership dated as of December 1, 2014 (the "Partnership Agreement").

A. Completing the Subscription Documents: *If you have any questions regarding the completion of the Subscription Documents, please call Jeff Baxter at* (630) 590-9511.

1. On the first page, fill in the legal name of the individual or entity making the investment (the "Investor") and the total amount of the investment (the "Commitment"). The Commitment is the maximum investment that the Investor agrees to make over the life of the Fund.

2. On page 13, following your careful review of the Subscription Agreement, fill in the date and the amount of the Investor's Commitment. *If the Investor is an individual*: The Investor must sign and print the Investor's name. *If the Investor is an entity*: An authorized party of the Investor must print the entity's legal name, sign and print the authorized party's name and title or capacity in which such party is signing on behalf of the investing entity.

3. On pages 15 through 17, please complete the investor identification, distribution, contact information, and private fund reporting information as requested. *This information must be completed in full.*

4. On Exhibit A, complete the Benefit Plan Investor representations (pages A-1 to A-2).

5. On Exhibit B:

   - If the Investor is an individual (including IRAs and revocable trusts), please (a) complete the *Eligibility Questionnaire for Individuals* (two pages) AND (b) sign the *Eligibility Questionnaire Signature Page for Individuals* (immediately following the Eligibility Questionnaire for Individuals).

   - If the Investor is an entity (excluding IRAs and revocable trusts), please (a) complete the *Eligibility Questionnaire for Entities*, including the supplemental data questions (four pages total) AND (b) sign the *Eligibility Questionnaire Signature Page for Entities* (immediately following the Eligibility Questionnaire for Entities).

6. On Exhibit C, please review and complete all requested information. This optional election permits the Fund to deliver your Schedules K-1 electronically.

7. Review Annex B, the Privacy Statement of T2 Asset Opportunity Fund IV GP, LLC, the Fund's general partner.

8. If the Investor is a United States individual or entity, please complete Form W-9.

9. If the Investor is a non-United States individual, non-United States corporation, non-United States partnership or other non-United States entity, please complete Form W-8BEN, W-8BEN-E, W-8ECI, W-8IMY or W-8EXP, as applicable. Each of these forms can be found on the Internal Revenue Service's website at www.irs.gov or by contacting T2 Asset Opportunity Fund IV GP, LLC at (630) 590-9511.

B. Delivery of the Subscription Documents: Please mail the original, completed Subscription Documents to:

**T2 Asset Opportunity Fund IV, LP**
**c/o Woodfield Fund Administration, LLC**
**1 N. Wacker Drive, Suite 2150**
**Chicago, IL 60606**
**Attn: Investor Services Department**

Scanned copies of the completed Subscription Documents can be e-mailed to T2admin@woodfieldllc.com.

C. Capital Contributions to the Fund: A capital call notice will be provided at least ten (10) days prior to the due date for the initial capital call. The capital call notice will include wire instructions.

D. Additional Required Documents. The Fund reserves the right to request any additional documentation reasonably necessary to verify the identity of a prospective limited partner. Please be aware that your failure to provide such documentation may delay the acceptance of your subscription or cause your subscription request to be rejected entirely. The Fund shall be held harmless by any such prospective limited partner against loss arising as a result of a failure to provide requested documentation. If the subscription is rejected, the Fund will refund (without interest) to the subscriber any subscription payments received by the Fund.

**T2 Asset Opportunity Fund IV, LP**
**SUBSCRIPTION AGREEMENT**

| |
|---|
| Patrick J. Denard |
| Legal Name of Investor |
| $ $100,000 |
| Amount of Commitment |

To: T2 Asset Opportunity Fund IV, LP
c/o T2 Asset Opportunity Fund IV GP, LLC
111 W. Wesley Street, Suite 5
Wheaton, IL 60187

Ladies and Gentlemen:

The undersigned subscribing investor (the "Investor") acknowledges receipt of the Confidential Private Placement Memorandum dated as of March 2015, as updated from time to time (the "Memorandum") of T2 Asset Opportunity Fund IV, LP, a Delaware limited partnership (the "Fund"), with respect to the offering of limited partnership interests (the "Interests") in the Fund. The Investor hereby agrees as follows:

1. **Subscription for Limited Partnership Interests**. Subject to the terms and conditions set forth in this Subscription Agreement and in the Amended and Restated Agreement of Limited Partnership dated as of December 1, 2014 of the Fund (the "Partnership Agreement"), the Investor agrees to (a) subscribe for and irrevocably purchase from the Fund limited partnership interests (the "Interests") in the Fund in the aggregate amount of its Commitment (as set forth above), payable in the manner and at the times provided in the Partnership Agreement, (b) become a party to and be governed and bound by the terms and conditions of the Partnership Agreement, and (c) become a Limited Partner of the Fund. Capitalized terms used but not defined herein shall have the respective meanings given to them in the Partnership Agreement. The Memorandum, the Partnership Agreement, this Subscription Agreement and the other written materials furnished to the Investor by the Fund are sometimes referred to herein collectively as the "Offering Materials."

2. **Representations, Covenants and Warranties of the Investor**. The Investor hereby represents, covenants and warrants to the Fund and to T2 Asset Opportunity Fund IV GP, LLC (the "General Partner") and to each other person or entity who acquires an interest in the Fund as follows:

(a) **Suitability**. **THE INVESTOR HAS READ CAREFULLY AND UNDERSTANDS THE OFFERING MATERIALS AND HAS CONSULTED ITS OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR THE INVESTOR. ANY SPECIFIC ACKNOWLEDGMENT SET FORTH BELOW WITH RESPECT TO ANY STATEMENT CONTAINED IN THE OFFERING MATERIALS SHALL NOT BE DEEMED TO LIMIT THE GENERALITY OF THESE REPRESENTATIONS AND WARRANTIES. THE INVESTOR IS PURCHASING INTERESTS IN THE FUND RELYING SOLELY ON THE INFORMATION CONTAINED IN THE OFFERING MATERIALS, AND NOT ON ANY OTHER STATEMENT (WHETHER ORAL OR WRITTEN) WITH RESPECT TO THE OFFERING OF INTERESTS MADE BY THE FUND, THE GENERAL PARTNER OR ANY OFFICER, DIRECTOR, EMPLOYEE, STOCKHOLDER, MEMBER, PARTNER OR AFFILIATE OF EITHER OF THEM. NEITHER THE GENERAL PARTNER NOR ANY OTHER PERSON ACTING ON THE FUND'S BEHALF OFFERED TO SELL THE INVESTOR INTERESTS IN THE FUND BY MEANS OF**

**ANY FORM OF GENERAL SOLICITATION OR ADVERTISING, SUCH AS MEDIA ADVERTISING OR PUBLIC SEMINARS.**

(b) Opportunity to Verify Information. The Investor acknowledges that representatives of the Fund have made available to the Investor, during the course of this transaction and prior to the purchase of the Interests, the opportunity to ask questions of and receive answers from them concerning the terms and conditions of the offering described in the Offering Materials and to obtain any additional information necessary to verify the information contained in the Offering Materials or otherwise relative to the proposed activities of the Fund. The Investor acknowledges having received satisfactory answers to all of its questions from representatives of the Fund and having obtained all additional information requested by it of the Fund and its representatives.

(c) Fee Arrangements. The Investor acknowledges and understands the fee arrangements discussed in the Memorandum and the Partnership Agreement.

(d) Purchase for Investment; Transferability.

(i) The Investor understands that the Investor must bear the economic risk of its investment until the termination of the Fund, and that the Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act") in reliance on the exemption contained in Section 4(2) thereof and the provisions of Rule 506 of Regulation D promulgated thereunder, and, therefore, cannot be resold or otherwise disposed of unless they are subsequently registered under the Securities Act or unless an exemption from such registration is available. The Investor also acknowledges and understands that (1) the offering and sale of the Interests has not been registered under the securities laws of any state or any other jurisdiction and that the Offering Materials have not been subject to review or comment by the United States Securities and Exchange Commission ("SEC") or any state securities commission or any similar body or agency of any other jurisdiction; (2) the Fund is not being registered as an "investment company" as the term is defined in Section 3(a) of the Investment Company Act of 1940, as amended (the "Investment Company Act"); and (3) the Investor is purchasing the Interests for its own account and without a view towards resale or distribution thereof. The Investor agrees not to resell or otherwise dispose of all or any part of the Interests purchased by the Investor, except as permitted by law, including, without limitation, any regulations under the Securities Act, and any and all applicable provisions of the Partnership Agreement.

(ii) The Investor understands that the Fund does not have any obligation or intention to register the Interests for sale under the Securities Act or any state securities laws or of supplying the information which may be necessary to enable the Investor to sell its Interests; and that the Investor has no right to require the registration of the Interests under the Securities Act, any state securities laws or other applicable securities regulations. The Investor also understands that sales or transfers of Interests are further restricted by the provisions of the Partnership Agreement. There is no public or other market for the Interests, and none is expected to develop. For the foregoing reasons, the Investor will be required to retain ownership of the Interests and bear the economic risk of this investment for an indefinite period.

(iii) The Investor represents and warrants further that it has no contract, understanding, agreement or arrangement with any person to sell, transfer or pledge to such person or anyone else any of the Interests for which the Investor hereby subscribes (in whole or in part); and the Investor represents and warrants that it has no present plans to enter into any such contract, undertaking, agreement or arrangement.

(iv) The Investor understands that the Interests cannot be sold or transferred without the prior written consent of the General Partner, which consent may be withheld in its sole and absolute discretion and which consent will be withheld if any such transfer could cause the Fund to become subject to regulation under federal law as an investment company or would subject the Fund to adverse tax consequences.

(v) By executing this Subscription Agreement, the Subscriber affirmatively consents to the description of the Fund set forth in the Offering Materials, the actual and potential risks and conflicts of interest involved with an investment in the Fund, and the costs and charges involved in an investment in the Fund.

(e) **Full Contribution**. The Investor understands that, except as otherwise provided in the Partnership Agreement, the Investor is not permitted to make less than the full amount of any required capital contribution, and that the Partnership Agreement contains default provisions with respect thereto pursuant to which the Investor may lose a material portion of its investment in the Fund.

(f) **Eligible Purchaser Status**. The Investor is an "accredited investor" within the meaning of Regulation D under the Securities Act and is a "qualified client" as defined in Rule 203-5 of the Investment Advisers Act of 1940, as amended ("Advisers Act"). The Investor has completed and signed, or had its authorized representative complete and sign, the applicable Eligibility Questionnaire attached hereto as Exhibit B and all statements, answers and information therein are correct.

(g) **No Need for Liquidity**. The Investor has no need for liquidity in connection with its purchase of the Interests, can bear the substantial economic risks of its investment in the Fund for an indefinite period of time and can afford to suffer the complete loss thereof.

(h) **Investment Objectives**. The purchase of the Interests by the Investor is consistent with the general long-term investment objectives of the Investor.

(i) **Investment Company Act**. Unless otherwise permitted under the Investment Company Act, if the Investor is a corporation, trust, partnership, limited liability company or other organization or entity, (i) it has not been formed, organized, reorganized, capitalized or recapitalized for the purpose of acquiring or holding the Interests, or the Investor's Commitment is less than 40% of its total assets and committed capital; (ii) its stockholders, partners, members or other beneficial owners do not have and will not have individual discretion as to their participation in particular investments made by the Investor; and (iii) it is not an investment company registered or required to register under the Investment Company Act; provided, that if the Investor is unable to make any of the representations set forth in this paragraph (i), it shall have so notified the General Partner in writing and shall have provided to the General Partner such additional information as the General Partner may reasonably request.

(j) **Knowledge and Experience**. The Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of any offer regarding the Fund, such knowledge and experience in tax, financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund and, in making a decision to proceed with this investment (unless the Investor has a purchaser representative), the Investor has not relied upon any representations, warranties or agreements other than those set forth in this Subscription Agreement and the other Offering Materials, if any.

(k) **Investment Risks**. The Investor is aware that an investment in the Fund involves substantial risks, including the risks summarized in the Memorandum under "Risk Factors," and has determined that the purchase of the Interests is a suitable investment for it. The Investor is aware that (i) the Fund has no financial or operating history, (ii) any historical or projected investment returns set forth in the Offering Materials or any supplemental materials are not necessarily comparable to or indicative of returns, if any, that may be achieved on investments made by the Fund, and (iii) the General Partner or a person or entity selected by the General Partner (which may be a manager, member or affiliate thereof) will receive substantial compensation in connection with the management of the Fund. The Investor has sufficient financial resources to bear the loss of its entire investment in the Fund.

(l) **Purchaser Representative**. If the Investor has utilized a purchaser representative for the purpose of evaluating an investment in the Fund, the Investor has previously given the Fund written notice of such fact, specifying that such representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

(m) Special Purpose Entities. The Investor is not an entity that has been organized, reorganized, capitalized, recapitalized for the principal or specific purpose (or as one of the principal or specific purposes) of investing in the Fund, or a substantial portion of its assets consist (or will consist) of an interest in the Fund (a "Special Purpose Entity"); provided that if the Investor is a Special Purpose Entity, the Investor shall (i) so indicate in its Eligibility Questionnaire and (ii) provide the General Partner with such information (including such representations and warranties) relating to such entity and its ultimate beneficial owners as may be reasonably requested in order to assure compliance with all applicable laws, rules and regulations (including those under the Securities Act, the Investment Company Act, the "publicly traded partnership" provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), and the United States Treasury Regulations promulgated thereunder). Restrictions (substantially similar to the restrictions contained in the Partnership Agreement on the assignment or transfer of Interests in the Fund) shall be imposed on the ability of the direct or indirect beneficial or record owners of such special purpose entity (or entities) to transfer directly or indirectly their interests in such entity (or entities).

(n) Certain Flow-Through Entities. If the Investor is (or will be at any time during the period which the Investor holds any interest in the Fund) a partnership, limited liability company, grantor trust or S corporation for United States federal income tax purposes (a "flow-through entity"), then either (i) less than seventy percent (70%) of the value of the Investor (as well as the value of any flow-through entity that is a direct or indirect beneficial owner of the Investor) is attributable to the Investor's interest in the Fund or (ii) the Investor was not formed, availed of or reorganized for the principal purpose to permit the Fund to satisfy (or have as one of its principal purposes the satisfaction of) the 100 partner limitation of United States Treasury Regulation Section 1.7704-1(h)(ii).

(o) Covenant to Provide Tax Information. The Investor covenants that it (1) will provide any form, certification or other information reasonably requested by and acceptable to the General Partner that is necessary for the Fund (x) to prevent or qualify for a reduced rate of withholding or backup withholding in any jurisdiction from or through which the Fund receives payments, (y) to determine the proper rate of, or applicability of an exemption from, withholding with respect to any distribution, payment, or allocation to the Investor, or (z) to satisfy reporting or other obligations under the Code and the Treasury Regulations, (2) will update or replace such form, certification or other information in accordance with its terms or subsequent amendments, and (3) will otherwise comply with any reporting obligations imposed by the U.S. or any other jurisdiction with respect to Investor's investment in the Fund, including reporting obligations that may be imposed by future legislation.

(p) No View to Tax Benefits. The Investor is not acquiring the Interests with a view to realizing any benefits under U.S. federal income tax laws, and no representations have been made to the Investor that any such benefits will be available as a result of the Investor's acquisition, ownership or disposition of the Interests.

(q) No Borrowings. The Investor has not borrowed and will not borrow any portion of its contribution to the Fund, either directly or indirectly, from the Fund, the General Partner or any affiliate of the foregoing.

(r) No Independent Counsel to Represent Investors. The Investor understands that Vedder Price P.C. ("Vedder Price") has been engaged as legal counsel by the General Partner to represent it and the Fund and their affiliates in connection with the organization of the Fund and the offering of Interests. The Investors also understands that no separate counsel has been engaged to independently represent the Limited Partners in connection with the formation of the Fund the offering of Interests. The Investor understands that other counsel may also be retained where the General Partner on its own behalf or on behalf of the Fund determines that to be appropriate.

The Investor understands that, in advising the Fund and the General Partner with respect to the preparation of the Memorandum, Vedder Price has relied upon information that has been furnished to it by the Fund, the General Partner and their affiliates, and has not independently investigated or verified the accuracy or completeness of the information set forth in the Memorandum. In addition, the Investor

understands that Vedder Price does not monitor the compliance of the Fund or the General Partner with the investment guidelines set forth in the Memorandum, or the Fund's terms or applicable laws.

The Investor acknowledges that there may be situations in which there is a "conflict" between the interests of the General Partner and those of the Fund. The Investor understands that, in these situations, the General Partner and the Fund will determine the appropriate resolution thereof, and may seek advice from Vedder Price in connection with such determinations. The General Partner and the Fund have consented to Vedder Price's concurrent representation of such parties in such circumstances.

(s) **Final Form of Agreements**. The Investor understands and acknowledges that its investment in the Fund shall be subject to the terms and conditions of this Subscription Agreement and the Partnership Agreement in such final forms as shall be executed by the parties thereto, and as the same may be amended from time to time in accordance with their respective terms.

(t) **Certain Tax Matters**. The Investor acknowledges and understands that the Fund is being organized and managed so as to avoid being classified as a "publicly traded partnership" taxable as a corporation under Section 7704 of the Code, the effect of which shall be to restrict the transferability of the Investor's Interests.

(u) **Authorization**. If the Investor is an individual, the Investor has the legal capacity and authority to execute, deliver and perform the Investor's obligations under this Subscription Agreement. If the Investor is a corporation, partnership, limited liability company, trust or other entity, (i) the person executing this Subscription Agreement has the full power and authority to execute and deliver this Subscription Agreement on behalf of the subscribing entity; (ii) such entity is duly formed and organized, validly existing, and in good standing under the laws of its jurisdiction of formation; (iii) such entity is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement and to become a Limited Partner in the Fund; and (iv) the Investor shall deliver to the Fund such evidence of such authority as the Fund may reasonably require.

(v) **Electronic Delivery of Reports**. The Investor consents to receiving the periodic financial reports and tax information described in the Partnership Agreement by e-mail or by means of having access to a database or other forum hosted on a website designated by the General Partner (the "Reporting Site"), with such parameters regarding access and availability of information for review as the General Partner deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein. If at any time the Investor cannot or does not want to access such reports and information by email or via the Reporting Site, the Investor will notify the General Partner, in which case the General Partner will provide the Investor paper copies of such reports.

(w) **Indemnification and Exculpation**. The Investor specifically agrees to and acknowledges the exculpation and indemnification provisions set forth in the Partnership Agreement and that such provisions shall survive the undersigned's withdrawal as a Limited Partner and the Fund's dissolution. The undersigned hereby waives any personal liability on the part of the General Partner or its officers, employees and agents, in connection with the Fund's management, provided that the acts or omissions of the person in question did not constitute fraud, gross negligence or willful misconduct.

(x) **"Bad Actor" Disqualification**. The Investor has not engaged in a "disqualifying event" as defined within Rule 506 of Regulation D under the Securities Act, including:

(i) being convicted of a felony or misdemeanor within the last ten (10) years that was in connection with the purchase or sale of a security, involving the making of a false filing with the SEC or arose out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of securities;

(ii) being subject to an order, judgment or decree of any court of competent jurisdiction, entered within the last five (5) years, that restrains or enjoins the Investor from

engaging or continuing to engage in any conduct or practice (whether or not appealable or subject to a pending appeal) in connection with the purchase or sale of a security, involving the making of a false filing with the SEC or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of securities;

(iii) being subject to a final order of a state securities commission (or any agency or officer of a state performing similar functions), a state authority that supervises or examines banks, savings associations or credit unions, a state insurance commission (or any agency or officer of a state performing similar functions), an appropriate federal banking agency, the CFTC or the National Credit Union Administration that bars the Investor from association with an entity regulated by such commission, authority, agency or officer, or is barred from engaging in the business of securities, insurance or banking or engaging in savings association or credit union activities or whereby such final order is based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct and was issued within ten years of the date of this Subscription Agreement;

(iv) being subject to an SEC order entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or Section 203(e) or (f) of the Advisers Act that suspends or revokes the Investor's registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations in connection with such activities, or bars the Investor from being associated with any entity or from participating in the offering of any penny stock;

(v) being subject to any order of the SEC entered within the last five (5) years that, as of the date of this Subscription Agreement, orders the Investor to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including without limitation Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and 17 CFR 240.10b-5, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act, or any other rule or regulation thereunder or Section 5 of the Securities Act;

(vi) is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) has filed (as a registrant or issuer), or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five (5) years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) is subject to a United States Postal Service false representation order entered within five (5) years of the date of this Subscription Agreement, or is, as of the date of this Subscription Agreement, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

If the Investor engaged in one of the "disqualifying events" described above or as otherwise set forth in Rule 506 of Regulation D, it must inform the General Partner and provide information regarding the disqualifying event including the date of such event. If in the future, the Investor can no longer make this representation, it must promptly notify the General Partner and provide information regarding the disqualifying event including the date of any such event. The Investor specifically consents to the disclosure of any such disqualifying event to any other Limited Partner and third-parties as the General Partner may deem necessary to ensure the Fund can continue to claim the Rule 506 safe harbor.

3. **ERISA Representations**. If the Investor is a Benefit Plan Investor (as defined below), the Investor represents and warrants that the Investor's purchase of the Interests and the subsequent holding of the Interests do not and will not constitute a "non-exempt prohibited transaction" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Code. The term "Benefit Plan Investor" refers to (i) any "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of ERISA, (ii) any "plan" as defined in and subject to Section 4975 of the Code and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already-described Benefit Plan Investors. If the Investor is a Benefit Plan Investor and if the Fund is or becomes a Plan Assets Entity, the investment by such Benefit Plan Investor in the Fund constitutes the appointment by the Named Fiduciary as described below, in accordance with the written requirements governing the underlying plan(s), of the General Partner as an "investment manager" as defined in Section 3(38) of ERISA, with the authority to manage the Fund's assets and the authority to appoint other "investment managers" with respect to any Fund assets which are deemed to be plan assets of the Benefit Plan Investor. The General Partner hereby acknowledges to each Benefit Plan Investor subject to Title I of ERISA or Section 4975 of the Code its status, for any period during which the Fund is a Plan Assets Entity, as a "fiduciary" as defined by Section 3(21) of ERISA with respect to such Plan Assets.

Furthermore, by executing this Subscription Agreement, any Investor that is a Benefit Plan Investor represents and warrants to the Fund and the General Partner that:

**(a)** The person(s) or entities responsible for the investment decision (the "Named Fiduciary") has determined that, in view of such considerations, the purchase of an Interest in the Fund is consistent with the Named Fiduciary's responsibility under ERISA, Section 4975 of the Code or similar law and has considered the following with respect to the Benefit Plan Investor's investment in the Fund: (i) the role such investment or investment course of action plays in that portion of the Benefit Plan Investor's portfolio that the Named Fiduciary manages; (ii) whether the investment or investment course of action is reasonably designed as part of that portion of the Benefit Plan Investor's portfolio managed by the Named Fiduciary to further the purposes of the Benefit Plan Investor, taking into account both the risk of loss and the opportunity for gain that could result therefrom; (iii) the composition of that portion of the portfolio that the Named Fiduciary manages with regard to diversification; (iv) the liquidity and current rate of return of that portion of the Benefit Plan Investor's portfolio managed by the Named Fiduciary relative to its anticipated cash flow requirements; (v) the projected return of that portion of the portfolio managed by the Named Fiduciary relative to the Benefit Plan Investor's funding objectives; (vi) the risks associated with an investment in the Fund, including the limited right to withdraw from the Fund; (vii) whether the risk, structure and operation of the fee arrangements have been adequately disclosed and whether such arrangements further the interests of the Benefit Plan Investor; (viii) that the investment in the Fund and the investment program employed by the General Partner as described in the Memorandum are not prohibited by ERISA, Code Section 4975 or similar law; and (ix) whether the investment is permitted under the Benefit Plan Investor's governing documents.

**(b)** The Named Fiduciary (i) is authorized to make, and is responsible for, the decision to invest in the Fund; (ii) is independent of the Fund, the General Partner, any sales agent and each of their affiliates; (iii) is qualified to make such investment decision and has, to the extent it deems necessary, consulted its own investment advisors and legal counsel regarding the investment in the Fund; (iv) in making its decision to invest in the Fund has not relied on any advice or recommendation of the Fund, the General Partner, any sales agent or any of their affiliates; and (v) if the Named Fiduciary is subject to Title I of ERISA, the Named Fiduciary is a named fiduciary as defined in Section 402(a)(2) of ERISA authorized by the underlying plan documents to appoint the General Partner as a fiduciary and investment manager to the plan.

**(c)** The Named Fiduciary agrees to deliver to the General Partner all of the information that it may request in order to avoid violations of any provisions of ERISA or any other laws applicable to the Investor, and promptly will notify the General Partner, in writing, of any change in the information so furnished; and

(d) If the Named Fiduciary is subject to Title I of ERISA, the Named Fiduciary understands and represents that (i) its copy of this Subscription Agreement is the Investor's indicia of ownership of the Interests in the Fund for purposes of Section 403(a) of ERISA and (ii) a copy of this Subscription Agreement will be held in trust by the Benefit Plan Investor's trustee.

4. **Closing; Capital Contributions and Fees.**

(a) **Closing**. The closing of the sale and purchase of the Investor's Interests (the "Closing") shall take place at such date and time as the General Partner may determine but in any event not later than 12 months following the first closing date (unless extended in accordance with the Partnership Agreement), which is expected to occur in the first quarter of 2015, and at such place as shall be selected by the General Partner. As soon as practicable following the Closing, the General Partner will deliver to the Investor a copy of the Partnership Agreement and a counterpart of this Subscription Agreement, which shall be executed by the Investor, the General Partner and the Fund.

(b) **Capital Contributions and Fees**. The initial capital contribution for the purchase of the Investor's Interests, each subsequent capital contribution and the payment of fees to the Fund and the General Partner, as the case may be, shall take place at such times and in the manner specified in the Offering Materials.

5. **Agreements with Other Limited Partners**. The General Partner and the Fund represent that each other Limited Partner has executed and delivered or will execute and deliver a subscription agreement substantially identical to this Subscription Agreement (except as to the amount of the Interests to be purchased), in which each such other Limited Partner agrees to subscribe for and purchase Interests from the Fund and makes substantially identical representations and warranties as are made by the Investor in Section 2. The purchases of the Interests by the Investor and the other Limited Partners are to be separate purchases from the Fund and the sales of the Interests to the Investor and the other Limited Partners are to be separate sales by the Fund.

6. **Survival of Agreements and Representations and Warranties**. All agreements, representations and warranties of the parties contained herein, or made in writing by or on behalf of the General Partner or the Fund in connection with the transactions contemplated by this Subscription Agreement, shall survive the execution and delivery of this Subscription Agreement, any investigation at any time made by the Investor or on its behalf, and the sale and purchase of the Investor's Interests in the Fund and payment therefor.

7. **Further Assurances**.

(a) The Investor acknowledges that, unless it notifies the Fund and the General Partner in writing to the contrary prior to such time as it acquires the Interests, all of its representations and warranties contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire) will be deemed to have been repeated as of the date it purchases the Interests. If at any time during the term of the Fund, the Investor is no longer in compliance with any of its representations, warranties and acknowledgments contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire), the Investor shall so advise the General Partner promptly in writing.

(b) The Investor represents and warrants that the following statements are true, correct and complete: that unless an Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8IMY, or W-8EXP, as applicable, has been completed, (i) the Investor is not a foreign person for purposes of U.S. income taxation (i.e., the Investor is not a nonresident alien, a foreign corporation, a foreign partnership, or a foreign trust or foreign estate); (ii) that the following information contained elsewhere in the subscription documents is true, correct and complete: the U.S. taxpayer identification number (i.e., social security number or employer identification number), the home address (in the case of an individual) or office address (in the case of an entity) and the place of incorporation (in the case of a corporation); and (iii) that the Investor agrees to inform the General Partner promptly if the Investor becomes a

nonresident alien (in the case of an individual) or other foreign person (in the case of an entity) following the date hereof.

(c) The Investor will provide the General Partner with such information as it may reasonably request from time to time with respect to its citizenship, residency, ownership or control so as to permit the General Partner to evaluate and comply with any legal, regulatory and tax requirements applicable to the Fund, the Investor's investment in the Fund or any of the investments (or proposed investments) to be made by the Fund.

(d) The attached Investor Information page and Eligibility Questionnaire (collectively, the "Investor Questionnaire") that the Investor has completed is incorporated herein by reference in its entirety and made a part hereof, and all of the statements, answers and information in the Investor Questionnaire are true and correct as of the date hereof, and will be true and correct as the date of acceptance of this subscription, and do not omit to state any material fact necessary in order to make the statements contained therein not misleading.

8. **Indemnification**. The Investor (i) acknowledges that the Fund and the General Partner (as well as their officers, directors, managers, employees, stockholders, partners, members, counsel and affiliates) are relying on the representations, warranties and acknowledgments of the Investor contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire), and (ii) agrees to indemnify each of them and their agents, representatives, officers, directors, managers, employees, stockholders, partners, members and affiliates against any and all claims, demands, losses, damages, costs and expenses whatsoever arising as a result of, or in connection with, any breach by the Investor of any such representations, warranties or acknowledgments.

9. **Compliance with Anti-Money Laundering Regulations, etc**. The Investor acknowledges that due to anti-money laundering regulations within their respective jurisdictions, the Fund, its General Partner, and/or any administrator acting on behalf of the Fund may require further documentation verifying the Investor's identity and the source of funds used to purchase the Interests before this Subscription Agreement can be processed or accepted. To comply with applicable U.S. anti-money laundering legislation and regulations, the Investor agrees that all payments by the Investor to the Fund and all distributions to the Investor from the Fund will only be made in the Investor's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the United States Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended (the "Bank Secrecy Act"), and the regulations promulgated thereunder by the United States Department of the Treasury, as such regulations may be amended from time to time. The Investor further agrees to provide the General Partner at any time during the term of the Fund with such information as the General Partner determines to be necessary and appropriate to verify compliance with the anti-money laundering regulations of any applicable jurisdiction or to respond to requests for information concerning the identity of Limited Partners from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, and to update such information as necessary.

The Investor represents that the amounts to be contributed by the Investor to the Fund will not be directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.[1] The Investor represents and

---

[1] Federal regulations and executive orders administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs, including the List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time, or any executive order administered by OFAC. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at www.treasury.gov/resource-center/sanctions. In addition, certain programs

warrants that none of: (i) the Investor; (ii) any Person controlling or controlled by the Investor; (iii) if the Investor is a privately held entity, any Person having a beneficial interest in the Investor; (iv) any Person for whom the Investor is acting as agent or nominee in connection with the purchase of the Interests is (1) a country, territory, individual or entity named on a list maintained by OFAC, (2) a Person prohibited under the OFAC Programs, (3) a senior foreign political figure[2], or any immediate family member or close associate[3] of a senior foreign political figure as such terms are defined in the footnotes below, (4) a "foreign shell bank" within the meaning of the Bank Secrecy Act and the regulations promulgated thereunder by the United States Department of the Treasury, (5) a person or entity subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriations Act, or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified or reviewed from time to time or (6) a person or entity resident in or whose subscription funds are transferred through a jurisdiction identified as non-cooperative[4] by the Financial Action Task Force. Such Persons in (1) through (6) are collectively referred to as "Prohibited Persons."

In addition, if the Investor is a "financial institution" as such term is defined in the Bank Secrecy Act and the regulations promulgated thereunder by the United States Department of the Treasury, as such regulations may be amended from time to time, the Investor represents and warrants that the Investor has anti-money laundering policies and procedures in place reasonably designed to collect information with respect to and verify the identity of the Investor's investors or customers. In this regard, the Investor hereby represents and warrants that it is not a Prohibited Person. The representations and warranties set forth in this Section 9 shall be deemed repeated and reaffirmed by the Investor as of each date that the Investor is required to make a contribution of capital to the Fund, and if at any time during the term of the Fund the representations and warranties set forth in this Section 9 shall cease to be true, the Investor shall promptly so notify the General Partner of the Fund in writing.

To the extent the Investor has beneficial owners or is an intermediary subscribing for an Interest on behalf of one or more investors or beneficial owners (collectively, "Owners"): (i) the Investor has carried out due diligence as required by applicable law to establish the identities of all such Owners; (ii) based on such due diligence, the Investor reasonably believes that no such Owners are Prohibited Persons; (iii) the Investor has conducted enhanced due diligence on any Owner who is a senior foreign political figure; (iv) based on such enhanced due diligence, the Investor has no reason to believe that the funds invested by each such senior foreign political figure involve the proceeds of official corruption; (v) the Investor has no reason to believe that the funds invested or to be invested by Owners were derived

---

administered by OFAC (the "OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the lists maintained by OFAC.

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[4] Non-cooperative jurisdictions are non-U.S. countries that have been designated as high-risk or non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering ("FATF"), of which the U.S. is a member and with which designation the U.S. representative to the group or organization continues to concur. The FATF list of non-cooperative jurisdictions is found at http://www.fatf-gafi.org.

from activities that may contravene any U.S. or non-U.S. anti-money laundering laws or regulations; (vi) the Investor holds the evidence of such identities and status and will maintain all such evidence for at least 5 years from the date of the Investor's complete withdrawal from the Fund; and (vii) the Investor will make available such information and any additional information requested by the Fund or the General Partner that is required under applicable regulations, to the extent permitted by applicable law.

The Investor understands and agrees that the Fund may not accept any amounts from a prospective Limited Partner if such Limited Partner cannot make the representations set forth in this Section 9. If an existing Limited Partner cannot make these representations at any time after the admission of such Limited Partner to the Fund, the General Partner may require the withdrawal of such Limited Partner's Interests. The Investor further understands and agrees that, by law, the Fund may be obligated to "freeze" the Investor's account, by prohibiting additional contributions from the Investor, declining any withdrawal requests and/or segregating the assets in the account in compliance with governmental regulations and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the General Partner may, by written notice to the undersigned, suspend the Investor's withdrawal rights if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, its General Partner or any of the Fund's other service providers.

10. **Non-Disclosure**. The Investor acknowledges that the Fund is furnishing or have furnished to the Investor certain proprietary information ("Confidential Information") relating to the business affairs and current and proposed operations of the Fund for study and evaluation by the Investor for possibly investing in the Interests. The Investor acknowledges that the information provided by the Fund is confidential; therefore, the Investor agrees not to disclose it and not to disclose that any discussions or contracts with the Fund have occurred or are intended, other than as provided for in the following paragraph.

The Investor acknowledges that the information furnished is in all respects confidential in nature, other than information which is in the public domain through other means and that any disclosure or use of same by the Investor, except as provided in this Subscription Agreement, may cause serious harm or damage to the Fund, the General Partner and the Limited Partners. Therefore, the Investor agrees that the Investor will not use the information furnished for any purpose other than as otherwise permitted herein, and agrees that the Investor will not either directly or indirectly including through any agent, employee, or representative, disclose this information, either in whole or in part, to any third party; provided, however that (a) information furnished may be disclosed to those directors, officers and employees of the Investor and to the Investor's advisors who need such information for the purpose of evaluating the investment in the Interests (it being understood that those directors, officers, employees and advisors shall be informed by the Investor of the confidential nature of such information and shall be directed by the Investor to treat such information confidentially), and (b) any disclosure of information may be made to which the Fund consents in writing.

11. **Expenses**. Each party hereto will pay its own expenses relating to this Subscription Agreement and the purchase of the Investor's Interests in the Fund hereunder.

12. **Amendments**. Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of the Investor and the General Partner.

13. **Rejection of Subscription**. The Investor acknowledges that the subscription for the Interests contained herein may be rejected by the General Partner in its sole discretion at any time prior to the Closing.

14. **Acceptance of Subscription**. The General Partner may accept in its sole discretion all or any portion of the amount of the Commitment set forth on the signature page hereto by delivery to the Fund of a counterpart signature page hereto setting forth the portion of the Investor's Commitment accepted by the General Partner. Prompt notice of such acceptance also will be given to the Investor either by delivery of this Subscription Agreement countersigned by the General Partner or by notice of such execution.

15. **Counterparts**. This Subscription Agreement may be executed in any number of counterparts, each of which shall be an original but all of which taken together shall constitute one Subscription Agreement.

16. **General**. This Subscription Agreement (i) shall be irrevocable by the Investor and binding upon the Investor and the legal representatives, successors and assigns of the Investor, (ii) shall survive the admission of the Investor as a Limited Partner of the Fund, and (iii) shall, if the Investor consists of more than one person, be the joint and several obligation of all such persons. This Subscription Agreement shall be governed by the internal laws of the State of Delaware, except insofar as affected by the "Blue Sky" laws of the jurisdiction in which the offering described herein has been made to the Investor or applicable federal securities law as set forth herein.

17. **Jurisdiction**. To the fullest extent permitted by applicable law, any action or proceeding brought by the Investor against the General Partner (or its respective direct or indirect owners, officers, directors, managers, employees or consultants in their capacity as such, or in any related capacity) or the Fund, or relating in any way to this Subscription Agreement or the Offering Materials, shall be brought and enforced in the courts of the State of Illinois located in DuPage County, or (to the fullest extent subject matter jurisdiction exists therefore) the United States District Court for the Northern District of Illinois and, to the extent permitted by applicable law, the Investor irrevocably submits to the non-exclusive jurisdiction of both courts in respect of any action or proceedings between it and the General Partner (or their respective direct or indirect owners, officers, directors, managers, employees or consultants in their capacity as such, or in any related capacity) or the Fund, or relating in any way to this Subscription Agreement or the Offering Materials. The Investor irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Illinois located in DuPage County or the United States District Court for the Northern District of Illinois and any claim and any such action or proceeding brought in either court has been brought in an inconvenient forum. THE INVESTOR AND THE GENERAL PARTNER, ON BEHALF OF ITSELF AND THE FUND, IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY ACTION OR PROCEEDING BY OR AGAINST THE GENERAL PARTNER (OR ITS RESPECTIVE DIRECT OR INDIRECT OWNERS, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES OR CONSULTANTS IN THEIR CAPACITY AS SUCH, OR IN ANY RELATED CAPACITY) OR THE FUND, OR IN ANY WAY RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE OFFERING MATERIALS.

18. **Severability**. Each provision of this Subscription Agreement, including each representation made in the Investor Questionnaire incorporated herein, shall be considered severable. If it is determined by a court of competent jurisdiction that any provision of this Subscription Agreement is invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Subscription Agreement.

## SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement for the purchase of limited partnership interests in T2 Asset Opportunity Fund IV, LP (the "Fund") and represents that the execution of this signature page constitutes the execution of the signature page of each of (i) the Subscription Agreement for the purchase of the Interests in the Fund in the aggregate amount set forth below, and (ii) the Amended and Restated Agreement of Limited Partnership of the Fund dated as of December 1, 2014 and as may be amended from time to time (the "Partnership Agreement") in which the undersigned agrees to become a Limited Partner of the Fund and be bound and governed by the Partnership Agreement as if the undersigned were an original signatory thereto. Upon acceptance below by the General Partner on behalf of the Fund, the undersigned shall be admitted as a Limited Partner of the Fund and hereby authorizes the signature page to be attached to a counterpart of the Partnership Agreement executed by the General Partner.

The foregoing Subscription Agreement is hereby accepted by and agreed to by the undersigned as of the date first above written:

Date: 3/23/15

Commitment Amount: $100,000

If Investor is an individual:

Sign: [signature]

Print Name: Patrick J. Denard

*Joint Signature, if applicable*:

Sign: ______________________

Print Name: ______________________

If Investor is an entity (fund, partnership, corporation, LLC, etc.):

Print legal name of investing entity: ______________________

Signature of authorized person: ______________________

Print name and title: ______________________

*Additional signature, if applicable*:

Signature: ______________________

Print name and title: ______________________

**T2 ASSET OPPORTUNITY FUND IV, LP**

**SUBSCRIPTION AGREEMENT**
**GENERAL PARTNER ACCEPTANCE PAGE**
**(To be completed by the General Partner)**

T2 Asset Opportunity Fund IV GP, LLC, the general partner of T2 Asset Opportunity Fund IV, LP, hereby accepts the foregoing subscription on behalf of T2 Asset Opportunity Fund IV, LP either (a) for the Capital Commitment amount set forth below or (b) if the Capital Commitment amount below is left blank, then the Investor's requested Capital Commitment amount set forth above the Investor's signature on its signature page to the Subscription Agreement.

Capital Commitment Amount: $_______________

Closing: _________

**T2 ASSET OPPORTUNITY FUND IV, LP**

By: T2 Asset Opportunity Fund IV GP, LLC,
its General Partner

By:_________________________________
Name:
Title:

**T2 ASSET OPPORTUNITY FUND IV GP, LLC**

By:_________________________________
Name:
Title:

## I. Distribution Information

**A. Investor ACH Instructions:** *Please indicate below where you would like to receive distributions from the Fund.*

***NOTE: TD Ameritrade, Inc. will provide instructions. Interim please review the attached Letter of Direction.

Bank Name:__________

Bank City/State/Country:__________

Bank ABA#:__________

Account Name:__________

Account #:__________

Swift Code**:__________

For Further Credit to:__________

Account Name:__________

Account #:__________

**Required for U.S. dollar ACH transfer to non-U.S. banks. Please contact your bank for more information.

☐ Check this box if you require a wire transfer instead of an ACH transfer and instead list your wire instructions above.

## II. Investor Contact Information

**A. Investor's Domicile (*for tax purposes*)**

Name: Dr. Patrick J. Denard

Address: 420 G. Street

City: Jacksonville State: OR Zip: 97530

SSN/Tax ID: 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

Telephone: (503) 320-8557

Fax:__________

E-mail: pjdenard@gmail.com

☐ Check this box if you do not have an e-mail address.

(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

**B. Investor's Adviser (if any)**

If applicable, please provide the name of the investment adviser firm, wealth manager or consultant that is working with you in connection with this investment: Criterion Wealth Management.

If you would like the above-named entity or person to be copied on all correspondence related to this investment, please provide this entity's or person's full contact information below:

Company: Criterion Wealth Management

Attention: Jason Stauffer

Address: 26650 The Old Road, Ste. 212

City: Valencia State: CA

Zip: 91381

Telephone: (661) 254-2543

Fax:__________

E-mail: jason@criterionwealth.com

☐ Check this box if you do not have an e-mail address.

(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

C. **Additional Correspondence Contacts (if any)**

Name: Yumiko Odama
Address: 26650 The Old Road, Ste. 212

City: Valencia State: CA Zip: 91381

Telephone: (661) 254-2543
Fax:
E-mail: yumiko@criterionwealth.com
☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

Name:
Address:

City: State: Zip:

Telephone:
Fax:
E-mail:
☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

## III. Private Fund Reporting Information

**PRIVATE FUND REPORTING INFORMATION**

*To enable the General Partner to complete Form PF (if applicable), please indicate which one of the following categories best describes Subscriber* **[initial only one blank]:**

RD Individual that is a United States person[5] (including their trust)
_____ Individual that is not a United States person (including their trust)
_____ Broker-dealer
_____ Insurance company
_____ Investment company registered with the SEC
_____ Private fund[6]
_____ Non-profit
_____ Pension plan (excluding government pension plans)
_____ Banking or thrift institution (proprietary)
_____ State or municipal government entity[7] (excluding government pension plans)
_____ State or municipal government pension plan
_____ Sovereign wealth fund or foreign official institution
_____ Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries
_____ Other

If Subscriber indicated "Other," please describe the nature of Subscriber: ____________________

______________________________________________________________

[5] A "United States Person" for this purpose means (a) any natural person resident in the United States; (b) any partnership or corporation organized or incorporated under the laws of the United States; (c) any estate of which any executor or administrator is a U.S. person; (d) any trust of which any trustee is a U.S. person; (e) any agency or branch of a foreign entity located in the United States; (f) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (h) any partnership or corporation if: (i) organized or incorporated under the laws of any foreign jurisdiction; and (ii) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act of 1933, unless it is organized or incorporated, and owned, by accredited investors who are not natural persons, estates or trusts. Any discretionary account or similar account that is held for the benefit of a United States person by a dealer or other professional fiduciary is a United States person if the dealer or professional fiduciary is a related person of the General Partner and is not organized, incorporated, or (if an individual) resident in the United States.

[6] A "private fund" means any issuer that would be an investment company as defined in the Investment Company Act, section 3 but for the Investment Company Act, section 3(c)(1) or 3(c)(7).

[7] A "government entity" means any state or political subdivision of a state, including (a) any agency, authority, or instrumentality of the state or political subdivision; (b) a plan or pool of assets controlled by the state or political subdivision or any agency, authority, or instrumentality thereof; and (c) any officer, agent, or employee of the state or political subdivision or any agency, authority, or instrumentality thereof, acting in their official capacity.

**EXHIBIT A**

**BENEFIT PLAN INVESTOR STATUS**

The Memorandum states that the General Partner will use commercially reasonable efforts to operate the Fund as a "real estate operating company" or "venture capital operating company" under the "plan asset" regulations of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Alternatively, the General Partner may decide to limit Interests held by Partners subject to ERISA to less than 25% of aggregate commitments (not including any investments by the General Partner and certain other persons and their respective affiliates).

The term "Benefit Plan Investor" refers to (i) any "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of, ERISA, (ii) any "plan" as defined in and subject to Section 4975 of the Code and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already-described benefit plan investors. Benefit Plan Investors include, but are not limited to, corporate pension and profit sharing plans, "simplified employee pension plans," Keogh plans for self-employed individuals (including partners), individual retirement accounts ("IRAs"), medical benefit plans, life insurance plans, church plans that have elected to be subject to ERISA, bank commingled trust funds, insurance company separate accounts for such plans and accounts and, under certain circumstances, all or a portion of the general account of an insurance company.

The Investor represents that it is (please check all applicable boxes):

(i) ☑ <u>not</u> a Benefit Plan Investor; or

(ii) ☐ a Benefit Plan Investor that is:

(1) ☐ an employee benefit plan or trust that is subject to the fiduciary responsibility provisions of ERISA – this includes U.S. pension plans and U.S. profit-sharing and 401(k) plans, "Multiemployer Plans" and "Taft-Hartley Plans" but does not include U.S. governmental plans, church plans that have not made the election under Section 410(d) of the Code and non-U.S. employee pension and welfare benefit plans;

(2) ☐ an IRA, Keogh Plan and/or other plan subject to Section 4975 of the Code, but not subject to the fiduciary responsibility provisions of ERISA; or

(3) ☐ a Plan Assets Entity (as defined above) (including an entity in which 25% or more of the total value of any class of equity interests in the entity is held by other Benefit Plan Investors).

If the Investor is a Plan Assets Entity, the percentage of such entity's assets that constitutes "plan assets" within the meaning of Section 3(42) of ERISA is not more than the amount indicated below (please check an applicable box). To ease the administrative burden related to monitoring and updating this percentage, the Fund recommends that the Investor build in some cushion so that the Investor will not have to notify the General Partner if the percentage changes slightly.

| | | | | |
|---|---|---|---|---|
| ☐ 10% ** | ☐ 20% ** | ☐ 30% | ☐ 40% | ☐ 50% |
| ☐ 60% | ☐ 70% | ☐ 80% | ☐ 90% | ☐ 100% |

**Applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors.

The Investor agrees to promptly notify the General Partner in writing if there is any change to the foregoing representations, including in the percentages as set forth above and at such time or times as the General Partner may request.

EXHIBIT B

## ELIGIBILITY QUESTIONNAIRE FOR INDIVIDUALS

Name of Investor: Patrick J. Denard

INDIVIDUALS (including IRA and Revocable Trust Investors): ***Please complete Parts I through III of this Questionnaire***

### I. Verification of Status as "Accredited Investor" under Regulation D

*The Investor represents and warrants that he/she is an "accredited investor" within the meaning of Regulation D under the Securities Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☑ The Investor is a natural person whose net worth, taken together with the net worth of such person's spouse, exceeds $1,000,000. For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value (excluding the value of the Investor's primary residence) over total liabilities. Total liabilities may exclude the amount of indebtedness secured by the Investor's primary residence up to its fair market value, but must include any indebtedness in excess of the primary residence's fair market value.[1]

2. ☐ The Investor is a natural person who had an individual income in excess of $200,000 in each of the two previous years, or joint income with such person's spouse in excess of $300,000 in each of those years, and who reasonably expects to reach the same income level in the current year.

3. ☐ The Investor is a revocable trust and the settler(s) or grantor(s) of the trust meet the criteria set forth in either 1 or 2 above.

Note: To qualify as an "accredited investor," at least one of the first three statements must be checked.

Disclosure of Foreign Citizenship.

1. ☐ The Investor is a citizen of a country other than the United States.

2. If you checked the box next to the preceding question, specify the country of which the Investor is a citizen.____________________

### II. Verification of Status as a "Qualified Client"

*The Investor represents and warrants that he/she is a "qualified client" as defined in Rule 203-5 under the Advisers Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor is a natural person who immediately after investing in the Fund has or will

[1] Any increase in the amount of debt secured by the primary residence in the 60 days prior to the date of the Subscription Agreement associated with this Questionnaire that was incurred other than in connection with the purchase of your primary residence should be included as a liability, even if the value of the primary residence exceeds the amount of debt secured by such primary residence.

have at least $1,000,000 of assets under the management of the General Partner.

2. ☐ The Investor is a natural person who immediately after investing in the Fund has or will have a net worth (together with assets held jointly with a spouse) of more than $2,000,000 (excluding the value of the Investor's primary residence). (See I.1. above for a definition of "net worth.")

3. ☐ The Investor is a "qualified purchaser" under the Investment Company Act of 1940. The Fund may request information on the basis for which the representation is made.

Question 4 to be answered ONLY by "insiders" of the Fund or the General Partner.

4. ☐ With respect to Fund or the General Partner, the Investor is:

(a) a director, trustee, general partner, managing member or advisory board member;

(b) an executive officer; OR

(c) an employee who regularly participates in the investment activities of the General Partner and/or its affiliates (or affiliated funds) and has performed such role for at least 12 months.

## III. Status as a "Qualified Purchaser"

*For informational purposes only. If the Investor is a "Qualified Purchaser" within the meaning of the Investment Company Act, please check the applicable statement or statements below pursuant to which the Investor so qualifies.* ***Please read Annex A attached hereto for information regarding what is includable in "investments" and for information regarding the valuation of such "investments."*** *(Please check all that apply.)*

***For Individual and Revocable Trust Investors Only***

1. ☐ The Investor owns not less than $5,000,000 in investments[2], including any investments held jointly, in community property or other similarly shared ownership interest with his/her spouse, including the amount of his/her investment held in an individual retirement account or similar account and the investments of which are

[2] The term "investments" for purposes of this item (1) shall mean any or all (1) securities (as defined in Securities Act), except for securities of issuers controlled by the Investor ("Control Securities") unless (A) the issuer of the Control Securities is itself a registered or private investment company or is excepted from the definition of investment company by Rule 3a 6 or Rule 3a 7 under the Investment Company Act, (B) the Control Securities represent securities of an issuer that files reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, (C) the issuer of the Control Securities has a class of securities listed on a designated offshore securities market under Regulation S under the Securities Act or (D) the issuer of the Control Securities is a private company with shareholders' equity not less than $50 million determined in accordance with generally accepted accounting principles, as reflected in the company's most recent financial statements (provided such financial statements were issued within 16 months of the date of the Investor's purchase of Interests); (2) futures contracts or options thereon held for investment purposes, (3) physical commodities held for investment purposes; (4) swaps and other similar financial contracts entered into for investment purposes; (5) real estate held for investment purposes; and (6) cash and cash equivalents held for investment purposes.

directed by and held for his/her benefit.[3]

2. ☐ The Investor is a revocable trust and each grantor of the trust meets the criteria set forth in Item 1 above.

3. ☐ The Investor is an individual who is a "knowledgeable employee" as defined in Rule 3c-5 under the Investment Company Act including, but not limited to, (i) a director, executive officer[4], trustee, general partner, advisory board member, or (ii) an employee of the Fund and the General Partner (other than an employee performing solely clerical, secretarial or administrative functions) who has participated in investment activities of the Fund or a similar entity for at least twelve (12) months.

***For IRA or Self-Directed Pension Plan***

4. ☐ The Investor is an IRA or a self-directed pension plan and the individual who established the IRA or self-directed pension plan and the individual responsible for directing the investment of assets in the Fund is an individual who owns not less than $5,000,000 in investments.

***Question 5 to be answered ONLY by "insiders" of the Fund and the General Partner.***

5. ☐ With respect to the Fund or the General Partner (e.g., its general partner, manager, investment adviser, etc...), the Investor is a natural person who immediately prior to entering into the Agreement is:

(i) an executive officer, director, trustee, general partner, managing member or person serving in a similar capacity of The General Partner; or

(ii) an employee who regularly participates in the investment activities of the General Partner (other than an employee performing solely clerical, secretarial or administrative functions) and/or its affiliates (or affiliated funds) and has performed such role for at least 12 months.

---

[3] In determining whether spouses who are, making a joint investment are qualified purchasers, there may be included in the amount of each spouse's investments any investments owned by the other spouse (whether or not such investments are held jointly).

[4] Includes any (a) president, (b) vice president in charge of a business unit, division or function, or (c) any other person who performs a policy-making function.

## ELIGIBILITY QUESTIONNAIRE SIGNATURE PAGE FOR INDIVIDUALS

The Investor understands that the foregoing information will be relied upon by the Fund and the General Partner for the purpose of determining the eligibility of the Investor to purchase and own Interests in the Fund. The Investor agrees to notify the General Partner immediately if any representation or warranty contained in this Subscription Agreement, including this Eligibility Questionnaire, becomes untrue at any time. The Investor agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Investor's status as an accredited investor or to otherwise determine the eligibility of the Investor to purchase Interests in the Fund. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Fund, the General Partner and each Limited Partner thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signature:____________________

Print Name: Patrick J. Denard

Joint signature, if applicable:____________________

Print Name:____________________

TD AMERITRADE CLEARING INC FBO

SIGNATURE GUARANTEED

## ELIGIBILITY QUESTIONNAIRE FOR ENTITIES

Name of Investor: ______________________________

***ENTITIES (non-individuals, other than IRA and Revocable Living Trust Investors): Please complete Parts I through IV of this Questionnaire***

### I. Verification of Status as "Accredited Investor" under Regulation D

*The Investor represents and warrants that it is an "accredited investor" within the meaning of Regulation D under the Securities Act and has checked the applicable statement or statements below, pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor has total assets in excess of $5 million AND was not formed for the specific purpose of acquiring the Interests, AND is any of the following:
   - a corporation;·
   - a partnership;·
   - a limited liability company;
   - a Massachusetts or similar business trust; or
   - an organization described in Section 501(c)(3) of the Code.

2. ☐ The Investor is any of the following:
   - a bank, or any savings and loan association or other institution acting in its individual or fiduciary capacity;
   - a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;
   - an insurance company;
   - an investment company registered under the Investment Company Act;·
   - a business development company as defined under the Investment Company Act;
   - a Small Business Investment Company licensed by the U.S. Small Business Administration;
   - an employee benefit plan (within the meaning of ERISA) whose investment decision is being made by a plan fiduciary, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan whose total assets are in excess of $5 million or a self-directed employee benefit plan whose investment decisions are made solely by persons that are accredited investors; or
   - a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5 million.

3. ☐ The Investor is a trust, not formed for the specific purpose of acquiring the Interests, with total assets in excess of $5 million and whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of investing in the Interests).

4. ☐ The Investor is an entity as to which all the equity owners (for example, in a limited partnership, all of the limited partners) are accredited investors. *If only statement (4) has been checked, please have each equity owner fill out the Eligibility Questionnaire for Individuals or this Eligibility Questionnaire for Entities, as applicable. Please feel free to make copies of these pages for each equity owner.*

## II. Verification of Status as a "Qualified Client"

*The Investor represents and warrants that it is a "qualified client" as defined in Rule 203-5 under the Advisers Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor is an entity that immediately after investing in the Fund has or will have at least $1,000,000 of assets under the management of the General Partner.

2. ☐ The Investor is an entity that immediately after investing in the Fund has or will have a net worth of more than $2,000,000.

3. ☐ The Investor is a "qualified purchaser" under the Investment Company Act of 1940. The Fund may request information on the basis for which the representation is made.

## III. Status as a "Qualified Purchaser"

*For informational purposes only. If the Investor is a "Qualified Purchaser" within the meaning of the Investment Company Act, please check the applicable statement or statements below pursuant to which the Investor so qualifies.* ***Please read Annex A attached hereto for information regarding what is includable in "investments" and for information regarding the valuation of such "investments."*** *(Please check all that apply.)*

1. ☐ The Investor is an entity which:
   - was not formed for the specific purpose of attempting to qualify as a Qualified Purchaser for investing in the Fund[1];
   - is acting for its own account or the accounts of other Qualified Purchasers[2], AND
   - in the aggregate owns and invests on a discretionary basis not less than $25,000,000 in "investments."

2. ☐ Each beneficial owner of the Investor's securities is a Qualified Purchaser (or in the case of a trust, the trustee or other person directing such trust and each settlor or other person who has contributed assets to the trust are Qualified Purchasers). *If only statement (2) has been checked, please have each equity owner fill out the Eligibility Questionnaire for Individuals or this Eligibility Questionnaire for Entities, as applicable. Please feel free to make copies of these pages for each equity owner.*

3. ☐ The Investor is an entity which:
   - was not formed for the specific purpose of attempting to qualify as a Qualified Purchaser for investing in the Fund;
   - owns not less than $5,000,000 in "investments"; AND

---

[1] An Investor may be deemed to be "formed for the specific purpose of investing in the Fund" if either (i) the amount of the Investor's subscription for Interests in the Fund exceeds 40% of the total assets (on a consolidated basis with its subsidiaries) of the Investor, or (ii) interest holders in the Investor are able to decide individually whether to participate, or the extent of their participation, in the Investor's investment in the Fund (i.e., holders of interests in the Investor can determine whether their capital will form part of the capital invested by the Investor in the Fund).

[2] "Qualified Purchasers" include any individual referred to in Part III of the Eligibility Questionnaire for Individuals or any entity referred to in this Part III for Entities.

- is directly or indirectly owned entirely by or for a "Family Company."[3]

4. ☐ The Investor is a "qualified institutional buyer"[4] acting for its own account or for other qualified institutional buyers, provided that:
   - a dealer described in paragraph (a)(1)(ii) of Rule 144A must own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer; AND
   - a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will only be deemed to be acting for its own account to the extent that investment decisions are made by the fiduciary, trustee or sponsor of such plan (i.e., there must be at least $100,000,000 of nonself-directed assets in the plan) and then only with respect to the assets as to which investment decisions are made by the fiduciary, trustee or sponsor.

## IV. Supplemental Data

1. Legal form of entity (corporation, partnership, trust, etc.):______________________________

   Jurisdiction of organization:______________________________________________

2. Is the Investor a registered investment company or a private investment fund which is not registered under the Investment Company Act in reliance on Section 3(c)(1) or 3(c)(7) thereof? Note: If the answer is "Yes," the Fund may be required to limit your investment such that your investment in the Fund constitutes less than 10% of the Fund.

   ______ Yes      ______ No

3. If the Investor is a Section 3(c)(1) or Section 3(c)(7) fund and was formed prior to June 19, 1996, has it obtained all requisite consents from its equity holders to be treated as a Qualified Purchaser?

   ______ Yes      ______ No

4. The fiscal year-end of the Investor is ______________
   (Month/Day)

5. The taxable year-end of the Investor, for purposes of reporting any income tax or filing tax information returns, is ______________
   (Month/Day)

---

[3] A "Family Company" is a company which is entirely owned directly or indirectly by or for two or more natural persons who are related as siblings, or are spouses (or former spouses), or are direct lineal descendants (whether by birth or adoption) of such persons, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

[4] As defined in paragraph (a) of Rule 144A under the Securities Act.

## ELIGIBILITY QUESTIONNAIRE SIGNATURE PAGE FOR ENTITIES

The Investor understands that the foregoing information will be relied upon by the Fund and the General Partner for the purpose of determining the eligibility of the Investor to purchase and own Interests in the Fund. The Investor agrees to notify the General Partner immediately if any representation or warranty contained in this Subscription Agreement, including this Eligibility Questionnaire, becomes untrue at any time. The Investor agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Investor's status as an accredited investor or to otherwise determine the eligibility of the Investor to purchase Interests in the Fund. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Fund, the General Partner and each Limited Partner thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Name of Entity:______________________________

By (signature):______________________________

Print Name:______________________________

Print Title:______________________________

Additional signature, if applicable:__________________

Print Name:______________________________

Print Title:______________________________

**EXHIBIT C**

## ELECTRONIC DELIVERY OF SCHEDULES K-1 CONSENT AND DISCLOSURE STATEMENT

Pursuant to IRS Revenue Procedure 2012-17, intended recipients of Schedules K-1 who wish to receive their Schedules K-1 solely through electronic transmission are required to provide affirmative consent.

In order to receive your Schedules K-1 from the T2 Asset Opportunity Fund IV, LP (the "Fund") through electronic transmission you must affirmatively consent in writing by properly reviewing, completing, executing and delivering this Consent and Disclosure Statement by email to Woodfield Fund Administration, LLC (the "Administrator") at the address noted below.

***Paper Statement.*** If you do not consent to receive your Schedules K-1 electronically, they will be furnished to you on paper instead.

***Scope and Duration of Consent & Notice of Termination.*** If you do consent to the electronic delivery of your Schedules K-1, all Schedules K-1 will only be furnished by such method for the Fund until the earliest of: (A) your withdrawal of consent (in the manner described below); (B) the full redemption of your interest in the Fund; (C) the dissolution and winding up of the Fund; or (D) any other date effective as of which we notify you that we will no longer provide such Schedules K-1 electronically (which effective date is generally expected to be no earlier than the date we send out such notice).

***Post-Consent Request for a Paper Statement.*** If you consent to electronic delivery of Schedules K-1 and you wish to obtain a paper copy, please contact the Administrator at the address noted below. A request for a paper copy (or copies) of Schedules K-1 will not be considered to be a withdrawal of consent to receive Schedules K-1 electronically.

***Withdrawal of Consent.*** You may withdraw your consent to receive Schedules K-1 electronically by writing (electronically or on paper) to the Administrator at the address noted below. The withdrawal of your consent will take effect on the date your correspondence is received by us. We will confirm your withdrawal of consent and the date on which it takes effect in writing (either electronically or on paper). Please note that a withdrawal of consent will not apply to a statement that is furnished electronically in the manner described above before the effective date of such withdrawal of consent.

***Notice of Termination.*** We will cease to provide Schedules K-1 electronically to you (and, except as required by law, cease to provide Schedules K-1 in any other form) upon your withdrawal from the Fund.

***Updating Information.*** In the event that your contact information changes, please furnish your updated information in writing (either electronically or on paper) to the Administrator at the address noted below. We will inform you of any change to this contact information.

***Hardware & Software Requirements.*** After you consent to receive your Schedules K-1 electronically, you will need a computer, access to email, a printer and available memory on your computer hard drive in order to access, print and retain your electronic Schedule K-1. Your Schedule K-1 will be attached to that email.

***Please note that, notwithstanding electronic delivery, a Schedule K-1 may be required to be printed and attached to a Federal, State or local income tax return.***

Please fill in the name of the Investor below and check the following and return a copy of this consent by email to T2admin@woodfieldllc.com.

Investor Name: Patrick J. Denard (pjdenard@gmail.com)

☑ consents to electronic delivery of Schedules K-1 and other communications on such terms and conditions as described in this Consent and Disclosure Statement.

If you have any questions or concerns, please do not hesitate to contact the Fund's Administrator at the following address, phone and email:

Woodfield Fund Administration, LLC
1 N. Wacker Drive, Suite 2150
Chicago, IL 60606
Attn: Investor Services Department
T2admin@woodfieldllc.com
Facsimile: (847) 255-3566
Phone: (847) 255-3500

**ANNEX A**

**INVESTMENTS**

For determining whether the Investor is a "Qualified Purchaser," the term "investments" includes:

(1) Securities, other than securities of an issuer that controls, is controlled by, or is under common control with, the Investor that owns such securities, unless the issuer of such securities is a "public company," an "investment vehicle" or has not less than $50 million in equity, as reflected on such company's financial statements which present such equity information as of a date within 16 months preceding the date on which the Investor acquires Interests. The term "public company" includes all companies that file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 or have a class of securities that are listed on a Designated Offshore Securities Market, as defined by Regulation S under the Securities Act. The term "investment vehicle" includes a commodity pool or an "investment company" (whether U.S. or offshore) or a company that would be an investment company but for the exclusions provided by Sections 3(c)(1) through 3(c)(9) of the Investment Company Act or the exemptions provided by Rule 3a-6 or 3a-7;

(2) Real estate held for investment purposes so long as it is not used by the Investor or a close relative (generally, a sibling, spouse, former spouse, direct ancestor or descendant or a spouse of such an ancestor or descendant) for personal or business purposes. However, real estate owned by an Investor who is primarily in the real estate business is includable as an "investment" even if it is held by the owner;

(3) "Commodity interests" or "physical commodities" held for investment purposes by the Investor. "Commodity interests" includes commodity futures contracts, options on commodity futures contracts, and options on physical commodities traded on or subject to the rules of (i) any contract market designated for trading such transactions under the Commodity Exchange Act and the rules thereunder or (ii) any board of trade or exchange outside the United States, as contemplated in Part 30 of the rules under the Commodity Exchange Act. "Physical commodities" includes any physical commodity with respect to which a "commodity interest" is traded on a market specified in the definition of commodity interests above;

(4) To the extent not securities, "financial contracts" entered into for investment purposes. "Financial contracts" includes any arrangement that (i) takes the form of an individually negotiated contract, agreement, or option to buy, sell, lend, swap, or repurchase, or other similar individually negotiated transaction commonly entered into by participants in the financial markets; (ii) is in respect of securities, commodities, currencies, interest or other rates, other measures of value, or any other financial or economic interest similar in purpose or function to any of the foregoing; and (iii) is entered into in response to a request from a counter party for a quotation, or is otherwise entered into and structured to accommodate the objectives of the counter party to such arrangement;

(5) In the case of an Investor that is a commodity pool or a company that would be an investment company but for the exclusion provided by Section 3(c)(1) or 3(c)(7) of the Investment Company Act, any amounts payable to such Investor pursuant to a firm agreement or similar binding commitment pursuant to which a person has agreed to acquire an interest in, or make capital contributions to, the Investor upon the demand of the Investor; and

(6) Cash and cash equivalents held for investment purposes, such as bank deposits, foreign currencies, certificates of deposits, bankers acceptances and similar bank instruments and the net cash surrender value of an insurance policy.

*"Investments" do not include other assets which do not reflect experience in the financial markets, such as jewelry, art work, antiques and other collectibles.*

For purposes of determining the amount of "investments" owned by a company, "investments" of a parent company and its majority-owned subsidiaries may be aggregated to meet the minimum "investment" amount requirements, regardless of which company is the Investor.

For purposes of determining the amount of "investments" owned by a natural person, there may be included any "investment" held jointly or as community property with such person's spouse. In determining whether spouses who are making a joint investment in the Fund are Qualified Purchasers, there may be included in the amount of each spouse's "investments" any "investments" owned by the other spouse (whether or not such "investments" are held jointly).

In determining whether a natural person is a Qualified Purchaser, there may be included in the amount of such person's "investments" any "investments" in an individual retirement account or similar account the investments of which are directed by and held for the benefit of such person.

**VALUATION OF INVESTMENTS**

In determining the value of "investments" in order to ascertain Qualified Purchaser status, the aggregate amount of "investments" owned and invested on a discretionary basis by such person can be either their fair market value on the most recent practicable date or the cost of such "investments," provided that the same method must be used for all "investments." However,

(1) In the case of "commodity interests," the amount of "investments" is the value of the initial margin or option premium deposited in connection with such "commodity interests" and

(2) In each case, there must be deducted from the amount of such "investments" the following amounts:

(a) The amount of any outstanding indebtedness incurred by the Investor to acquire such "investments" and

(b) In the case of a Family Company (as defined in Part II, footnote 3, of the Eligibility Questionnaire for Entities), in addition to the amounts specified in paragraph (2)(a) above, any outstanding indebtedness incurred by an owner of the Family Company to acquire the Family Company's "investments."

ANNEX B

T2 | CAPITAL MANAGEMENT™

## PRIVACY STATEMENT

The following privacy statement is issued by T2 Capital Management, LLC ("T2 Capital") and each of the funds (collectively, the "Funds") managed or advised by T2 Capital or its affiliates.

T2 Capital considers privacy a fundamental right of the Fund's limited partners and takes seriously the obligation to safeguard limited partner information. Accordingly, we do not share any non-public personal information of any current or former limited partner with any unaffiliated third parties, except as permitted by law or as authorized by our limited partners.

In the course of providing investment products and services to you, we collect non-public personal information about you from sources such as subscription agreements and related documents as well as from transactions related to your account. In the normal course of serving our limited partners, information we collect may be shared with companies that perform various services such as custodians, accountants, attorneys, broker-dealers and financial institutions for the Fund. Specifically, we may disclose to these service providers all non-public information we collect, including:

- Information we receive on subscription agreements or other forms, such as a limited partner's name, address, social security or tax identification number, amount of investment(s), and bank account information; and

- Information about transactions with us, such as a limited partner's capital account balance and other account data.

Finally, as required or permitted by the Funds' respective partnership agreements, we may distribute to the limited partners in a Fund certain personal financial information of the limited partners, such as commitment amounts, which may be recorded in schedules attached to such Fund's partnership agreement.

Any service provider or organization receiving your personal information will be authorized to use such information only to perform the services required and as permitted by applicable law. Access to limited partners' non-public personal information is restricted to those employees and managers of T2 Capital who require access to provide services to the Funds and their limited partners. A limited partner's right to privacy extends to all forms of contact with T2 Capital, including telephone, written correspondence and electronic media, such as the Internet.

For questions concerning this policy, please contact Jeff Baxter at (630) 590-9511 or via email at jbaxter@t2investments.com.

T2 | CAPITAL MANAGEMENT

March 6, 2015

RE: T2 Asset Opportunity Fund IV, LP
Wiring Instructions

Dear Investor,

Thank you for your investment in the T2 Asset Opportunity Fund IV. Below are the wiring instructions related to your investment:

| Wiring instructions |
| --- |
| MB Financial Bank, N. A.<br>6111 N. River Road<br>Rosemont, IL 60018 |
| Routing #: 071 001 737<br>Account #: 184 000 6920 |
| Account name: T2 Asset Opportunity Fund IV, LP |
| Reference: (Please state investor name) |

Thank you for your partnership. Please feel free to call me with any questions at 630-590-9511 ext. 103.

Sincerely,

Jeff Baxter
Vice President, Investor Relations

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 2.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
Patrick J. Denard

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only one of the following seven boxes:
☑ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate
☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ____
**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.
☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any) ____
Exemption from FATCA reporting code (if any) ____
*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.)
420 G. Street

Requester's name and address (optional)

6 City, state, and ZIP code
Jacksonville, OR 97530

7 List account number(s) here (optional)
TD Acct. 934046100: T2 Asset Opportunity Fund IV, LP

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

**Social security number**
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

**or**

**Employer identification number**
__ __ – __ __ __ __ __ __ __

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** Signature of U.S. person ▶ Date ▶ 3/23/15

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and
4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien;
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;
- An estate (other than a foreign estate); or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

- In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;
- In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and
- In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* above.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account, list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor* |
| **For this type of account:** | **Give name and EIN of:** |
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity[4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 2.

***Note.** Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or contact them at *www.ftc.gov/idtheft* or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

# EXHIBIT 7

Name: Patrick J. Denard No.: E2005R

# COACHMAN ENERGY VI LP

## AMENDED AND RESTATED
## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

MANAGING GENERAL PARTNER:

COACHMAN ENERGY MANAGING GENERAL PARTNERS LLC

*[Page intentionally left blank.]*

**AMENDED AND RESTATED**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**COACHMAN ENERGY VI LP (THE "FUND")**
**A DELAWARE LIMITED PARTNERSHIP**

**Private Placement of**
**Investor General Partner Interests and Limited Partner Interests in**
**Coachman Energy VI LP**

**THE INFORMATION CONTAINED IN THIS AMENDED AND RESTATED CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") IS CONFIDENTIAL AND PROPRIETARY TO THE FUND. IT IS BEING SUBMITTED TO PROSPECTIVE INVESTORS SOLELY FOR SUCH INVESTORS' CONFIDENTIAL USE, WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT PRIOR PERMISSION IN WRITING FROM THE MANAGING GENERAL PARTNER ("MGP"), THE INVESTOR WILL NOT COPY THIS DOCUMENT OR ANY PORTION OF IT OR USE ANY INFORMATION CONTAINED HEREIN FOR ANY PURPOSE OTHER THAN EVALUATING A POTENTIAL INVESTMENT IN THE UNITS BEING OFFERED HEREBY.**

**THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY BY ANYONE IN ANY STATE IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION, OR TO ANY PERSON OTHER THAN THE OFFEREE TO WHOM THIS MEMORANDUM HAS BEEN DELIVERED.**

**ISSUANCE OF THE UNITS (AS DEFINED HEREIN) WILL BE MADE BY THE MGP ONLY TO SUBSCRIBERS MEETING CERTAIN SUITABILITY STANDARDS. THE UNITS ARE BEING OFFERED SUBJECT TO PRIOR SALE, WITHDRAWAL, CANCELLATION OR MODIFICATION OF THE OFFER AND TO FURTHER CONDITIONS SET FORTH HEREIN. ONLY THOSE UNITS DESCRIBED HEREIN WILL BE SOLD. THE MGP RESERVES THE RIGHT, IN ITS ABSOLUTE DISCRETION, TO DECIDE WHICH SUBSCRIPTIONS WILL BE ACCEPTED AND WHICH WILL BE REJECTED, AND TO ALLOT TO ANY SUBSCRIBER FEWER THAN THE NUMBER OF UNITS SUBSCRIBED FOR BY SUCH SUBSCRIBER.**

**OTHER THAN THE MGP, INVESTMENT MANAGER, MANAGING BROKER DEALER, OR ANY ANOTHER PERSON AUTHORIZED BY THE MGP AND THOSE BROKER DEALERS WHO HAVE SIGNED SELLING AGREEMENTS WITH THE FUND, NO DEALER, SALESPERSON OR OTHER PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MAY NOT BE RELIED UPON. PROSPECTIVE INVESTORS ARE ADVISED TO CONDUCT THEIR OWN THOROUGH INVESTIGATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, BEFORE MAKING AN INVESTMENT IN THE SECURITIES. PRIOR TO THE SALE OF THE SECURITIES, THE FUND WILL PROVIDE PROSPECTIVE INVESTORS THE OPPORTUNITY TO ASK QUESTIONS AND TO OBTAIN ANY ADDITIONAL INFORMATION CONCERNING THE FUND AND THE TERMS AND CONDITIONS OF THE OFFERING THAT THEY WISH TO OBTAIN.**

**THE SECURITIES OFFERED HEREBY ARE BEING OFFERED AND WILL BE SOLD IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED IN SECTION 4(A)(2) TO A LIMITED NUMBER OF INVESTORS THAT ARE "ACCREDITED INVESTORS" WITHIN THE MEANING OF RULE 501 OF REGULATION D UNDER THE SECURITIES ACT AS AMENDED (THE "SECURITIES ACT") AND THAT HAVE SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO BE CAPABLE OF EVALUATING THE MERITS AND RISKS OF INVESTING IN THE SECURITIES.**

**THIS INVESTMENT IS SUITABLE ONLY FOR SUBSCRIBERS OF SUBSTANTIAL NET WORTH THAT ARE WILLING AND HAVE THE FINANCIAL CAPABILITY TO BEAR THE ECONOMIC RISK OF AN INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THERE IS NO PUBLIC TRADING MARKET FOR THE SECURITIES NOR IS IT CONTEMPLATED THAT ONE WILL DEVELOP IN THE FORESEEABLE FUTURE. ANY TRANSFER OR RESALE OF THE UNITS OR ANY INTEREST OR PARTICIPATION THEREIN WILL BE SUBJECT TO RESTRICTIONS UNDER THE SECURITIES ACT AND AS DESCRIBED UNDER "SUMMARY OF THE PARTNERSHIP AGREEMENT—LIMITED TRANSFERABILITY OF UNITS."**

**PURCHASERS OF THE UNITS WILL BE REQUIRED TO MAKE (PURSUANT TO A SUBSCRIPTION DOCUMENT AND INVESTOR QUESTIONNAIRE DELIVERED TO THE FUND) CERTAIN ACKNOWLEDGMENTS, REPRESENTATIONS AND AGREEMENTS UPON INITIAL ISSUANCE, INCLUDING REPRESENTATIONS WITH RESPECT TO THEIR NET WORTH OR INCOME AND THEIR AUTHORITY TO MAKE SUCH INVESTMENT, AS WELL AS REPRESENTATIONS THAT THEY ARE FAMILIAR WITH AND UNDERSTAND THE TERMS, CONDITIONS AND RISKS OF THIS OFFERING.**

**CERTAIN OF THE TERMS OF THE SUBSCRIPTION DOCUMENT AND OTHER DOCUMENTS ARE DESCRIBED HEREIN. THESE DESCRIPTIONS DO NOT PURPORT TO BE COMPLETE AND EACH SUMMARY DESCRIPTION IS SUBJECT TO, AND QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, THE ACTUAL TEXT OF THE RELEVANT DOCUMENT. THE TERMS OF THE PURCHASE OF THE UNITS OFFERED HEREIN WILL BE SET FORTH IN A SUBSCRIPTION DOCUMENT AND A PARTNERSHIP AGREEMENT. ANY PURCHASE OF UNITS SHOULD BE MADE ONLY AFTER A COMPLETE AND THOROUGH REVIEW OF THE PROVISIONS OF SUCH AGREEMENTS. IN THE EVENT THAT ANY OF THE TERMS, CONDITIONS OR OTHER PROVISIONS OF THE AGREEMENTS IS INCONSISTENT WITH OR CONTRARY TO THE DESCRIPTION OF TERMS IN THIS MEMORANDUM, SUCH AGREEMENTS WILL GOVERN.**

**THIS OFFERING INVOLVES A HIGH DEGREE OF RISK AND POTENTIALLY SUBSTANTIAL FEES TO THE MGP AND/OR ITS AFFILIATES. SEE "RISK FACTORS" BEGINNING ON PAGE 12. AN INDEPENDENT INVESTIGATION SHOULD BE UNDERTAKEN BY EACH SUBSCRIBER REGARDING THE SUITABILITY OF HIS, HER OR ITS INVESTMENT IN THE UNITS. OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY INFORMATION MADE AVAILABLE AS DESCRIBED BELOW AS LEGAL OR TAX ADVICE. EACH SUBSCRIBER SHOULD CONSULT HIS, HER OR ITS OWN COUNSEL, ACCOUNTANT OR BUSINESS ADVISOR AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING THE PURCHASE OF THE UNITS.**

**THE MARKET, FINANCIAL AND OTHER FORWARD-LOOKING INFORMATION PRESENTED IN THIS MEMORANDUM REPRESENT THE SUBJECTIVE VIEWS OF THE MGP OF THE FUND, AND ARE BASED ON ASSUMPTIONS THE MGP BELIEVES ARE REASONABLE BUT THAT MAY OR MAY NOT PROVE TO BE CORRECT. THERE CAN BE NO ASSURANCE THAT THE MGP'S VIEWS ARE ACCURATE OR THAT THE MGP'S**

**ESTIMATES WILL BE REALIZED, AND NOTHING CONTAINED HEREIN IS OR SHOULD BE RELIED ON AS A PROMISE AS TO THE FUTURE PERFORMANCE OR CONDITION OF THE FUND. INDUSTRY EXPERTS MAY DISAGREE WITH THESE ASSUMPTIONS AND WITH THE MGP'S VIEW OF THE MARKET AND THE PROSPECTS FOR THE FUND.**

**INVESTORS USING ASSETS SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA") OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE") SHOULD NOT ACQUIRE OR HOLD THE UNITS UNLESS SUCH ACQUISITION OR HOLDING IS EXEMPTED FROM THE PROHIBITED TRANSACTION RESTRICTIONS OF ERISA AND THE CODE.**

**INVESTORS WHOSE AUTHORITY IS SUBJECT TO LEGAL INVESTMENT RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER, AND IF SO, TO WHAT EXTENT, THE UNITS WILL CONSTITUTE LEGAL INVESTMENTS FOR THEM.**

**THIS MEMORANDUM HAS NOT BEEN REVIEWED BY, AND THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY. THE FOREGOING AUTHORITIES HAVE NOT PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THIS MEMORANDUM PRESENTS INFORMATION WITH RESPECT TO THE FUND AS OF THE DATE HEREOF. THE DELIVERY OF THIS MEMORANDUM AT A TIME AFTER THE DATE ON THE COVER DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THAT DATE. THIS MEMORANDUM MAY BE UPDATED FROM TIME TO TIME VIA A SUPPLEMENT OR SUPPLEMENTS AS MATERIAL INFORMATION CHANGES.**

**YOU AGREE TO THE FOREGOING BY ACCEPTING DELIVERY OF THIS MEMORANDUM.**

**The date of this Memorandum is March 19, 2015.**

## Conditions to Receiving this Memorandum

By accepting delivery of this Memorandum, you understand and agree to comply with the following:

- the information contained herein is confidential;
- you will not make any photocopy or electronic reproduction of this Memorandum or any related documents;
- you will not distribute this Memorandum or disclose any of its contents to any persons other than to those persons, if any, that you retain to advise you with respect to its contents;
- you will review this Memorandum, including statistical, financial, and other numerical data, with your legal, regulatory, tax, accounting, investment, or other advisors. Neither the Fund nor the MGP intend in this Memorandum to furnish legal, regulatory, tax, accounting, investment, or other advice;
- the MGP may reject any offer to purchase Units, in whole or in part, for any reason; and
- if you do not purchase Units or if the Offering is terminated, on request of the Fund or the MGP, you will return this Memorandum and all attached documents to the address set forth below.

Notwithstanding the foregoing or any other express or implied agreement or understanding to the contrary, you and your employees, representatives, and other agents are authorized by the Fund and the MGP, each of their respective affiliates, and each person acting on behalf of the Fund or the MGP, to disclose the tax aspects and structure (insofar as the structure may be relevant to the tax aspects) of this transaction to any and all persons, without limitation of any kind. You may disclose all materials of any kind (including opinions or other tax analyses) to the extent (but only to the extent) that they relate to the tax aspects and structure (insofar as the structure may be relevant to the tax aspects) of this transaction. This authorization is not intended to permit disclosure of any other information including (without limitation): (i) any portion of any materials to the extent not related to the tax aspects or the structure of the transaction; (ii) the identities of participants or potential participants in the transaction; (iii) the existence or status of any negotiations; (iv) any financial information relating to the Fund, the MGP or their respective affiliates; or (v) any other term or detail not related to the tax aspects or the structure of the transaction.

This Memorandum has been prepared for use by a limited group of accredited investors to consider the purchase of Units in the Fund. The Fund reserves the right to modify this Offering via a supplement or supplements or terminate the Offering at any time with regard to future investment decisions by investors as outlined herein.

The Fund has engaged Select Capital Corporation as its Managing Broker Dealer. Prospective investors may contact the MGP or Select Capital at the following addresses:

**MGP**:
Coachman Energy Managing General Partners LLC
Attention: Investor Relations
5251 DTC Parkway, Suite 200
Greenwood Village, CO 80111
Phone: (855) 899-8576
Fax: (303) 534-0220
Email: investorrelations@coachmanenergy.com

**Managing Broker Dealer**:
Select Capital Corporation
Burke Dambly, President
31351 Rancho Viejo Road, Suite #205
San Juan Capistrano, CA 92675
Phone: (714) 656-2127
Fax: (949) 429-5393
Email: Burke@SelectCapitalCorporation.com

**Important Notice about Information in this Memorandum**

The Fund hereby extends to each offeree (and to his purchaser representative, if any) the opportunity, prior to the consummation of a sale of any Units to such offeree, to ask questions of, and to receive answers from, the MGP concerning this offering and to obtain any additional information to the extent the MGP possesses the same or can acquire it without unreasonable effort or expense in order to verify the accuracy of the information set forth herein.

This Memorandum contains summaries of certain documents believed to be accurate, but reference is hereby made to the actual documents for complete information concerning the rights and obligations of the parties thereto. Copies of such documents not otherwise provided in this Memorandum are available at the office of the MGP and all such summaries are qualified in their entirety by reference to these documents. Supplements, if any, to the material contained in this Memorandum will be attached hereto. Prospective investors should review the material contained in this Memorandum and the information contained in any such supplements.

This Memorandum has been prepared by the Fund solely for use in connection with the initial offer and sale of the Units as described herein. It constitutes an offer only to the prospective purchaser to whom delivered by the Fund, its Managing Broker Dealer, its broker dealers, or the MGP and not to the public generally. No person has authorized the use of or assumed any liability for this Memorandum in connection with any offer or sale of the Units other than the offer and sale by the Fund to an initial purchaser of the Units.

## TABLE OF CONTENTS

SUMMARY OF THE OFFERING ..... 1
FORWARD LOOKING STATEMENTS ..... 11
RISK FACTORS ..... 12
General Risks ..... 12
Risks Related to the Fund ..... 12
Risks Related to the Oil and Gas Industry ..... 18
Risks Related to Tax Matters Generally ..... 21
POTENTIAL CONFLICTS OF INTEREST ..... 27
MGP May Buy Unsubscribed Units of the Offering ..... 27
No Separate Representation ..... 27
Investment Manager ..... 27
Competition by the Fund with Affiliates ..... 28
Investment Manager Policies ..... 28
Affiliate Transaction Policy ..... 29
Allocation Policy ..... 29
Valuation Policy ..... 29
Operations Management Policy ..... 30
Management of the Fund ..... 31
Advisory Committee ..... 31
USE OF PROCEEDS ..... 32
THE OFFERING ..... 34
Offering Amount ..... 34
Coachman Energy VIB LLC ..... 34
Closing ..... 34
Subscription Amount ..... 34
Offering Period ..... 35
Cash Distributions ..... 35
Escrow of Funds ..... 36
Fees and Expenses ..... 36
Indebtedness Fee ..... 38
Hedging ..... 38
Investor Suitability Requirements ..... 38
Transfer Restrictions ..... 38
Subscription Procedure ..... 39
Offering Subject to Modification ..... 39
Citi Feeder Fund and Coachman Investment Obligations ..... 40
THE FUND ..... 41
Fund Highlights ..... 41
Fund Investment Objectives and Business Plan ..... 43
Investment Strategy ..... 44
Acquisition Process ..... 52
Insurance ..... 58
Exit Strategy ..... 58
Typical Agreements ..... 59
Transportation Infrastructure ..... 60
Definition of Reserves Categories ..... 71



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572432

INVESTMENT MANAGER AND MGP .... 74

Investment Management Agreement .... 75
Investment Manager Activities and Insurance .... 75
Principals .... 75
Technical Team .... 78

SUMMARY OF THE PARTNERSHIP AGREEMENT .... 80

Type of Interests .... 80
Nature of the Fund .... 81
Control of Operations of the Fund .... 81
Capital Contributions .... 81
Investment Period .... 82
Debt/Leverage .... 82
Loans or Advances from the Fund .... 82
Withdrawal of Contributions .... 82
Distributions .... 82
General Allocations .... 83
Special Allocations and Economic Effect to Unitholder .... 84
Percentage Interest .... 84
Limited Transferability of Units .... 84
Dissolution and Liquidation .... 85
Exculpation and Indemnification .... 86
Conflicts of Interest .... 87
Meetings and Consent .... 87
Removal of MGP .... 87
Reports .... 88
Amendment of Partnership Agreement .... 88
Governance of the Fund .... 88

SUMMARY OF THE FUND'S DISTRIBUTION REINVESTMENT PLAN .... 89

General .... 89
Investment of Distributions .... 89
Fees .... 89
Administration .... 89
Voting .... 90
Election to Participate or Terminate Participation .... 90
Federal Income Tax Considerations .... 90
Amendments and Termination .... 90

TAX CONSIDERATIONS .... 91

Partnership Taxation .... 91
Special Features of Oil and Gas Taxation .... 96
General Tax Provisions .... 106
Certain ERISA Considerations .... 109
Plan Asset Consequences .... 110

SUPPLEMENTAL SALES LITERATURE .... 111

ADDITIONAL INFORMATION .... 111

APPENDIX I SUBSCRIPTION DOCUMENTS .... I-1
APPENDIX II PARTNERSHIP AGREEMENT .... II-1
APPENDIX III ESCROW AGREEMENT .... III-1
APPENDIX IV DISTRIBUTION REINVESTMENT PLAN .... IV-1

## SUMMARY OF THE OFFERING

*In this summary, selected information is highlighted regarding the Units and the Offering. The summary does not contain all the information you need to consider in making your investment decision. To understand the terms of the Units, read the Partnership Agreement and this Memorandum, and review copies of the documents attached as Appendices or referenced herein. Capitalized terms not otherwise defined have the definitions ascribed in the Partnership Agreement.*

| | |
|---|---|
| ***The Fund*** | Coachman Energy VI LP (the "Fund") is a Delaware limited partnership. It is governed by the Amended and Restated Partnership Agreement attached hereto as Appendix II (the "Partnership Agreement"). Its principal place of business is 5251 DTC Parkway, Suite 200, Greenwood Village, Colorado 80111 and its phone number is 855-899-8576. **See "The Fund" beginning on page 41**. |
| ***Business Plan; Investments*** | The Fund is a newly formed entity and has not yet engaged in business operations. The Fund was created for the purpose of acquiring and drilling oil and gas wells on select leasehold acreage in the Williston Basin (North Dakota), Piceance Basin (Colorado), Central Kansas Uplift (Kansas) and other primarily unconventional oil shale basins in North America. The principal objectives of the Fund are to: (1) acquire mineral leases and/or producing oil and gas wells; (2) participate in drilling gross horizontal and occasionally vertical oil and gas wells thereby increasing the inherent and market value of underlying acreage; and (3) produce and sell hydrocarbons. The oil and gas wells will target the Bakken and Three Forks production zones in North Dakota, the Williams Fork and Mancos production zones in Colorado, as well as other generally unconventional production zones in other select prospects in North America. Due to the significant drop in crude oil prices over the last several months, the MGP anticipates significant acquisition opportunities in the Williston, Permian, Eagle Ford and Denver-Julesburg Basins along with other basins that fit the Fund's risk/return profile and development needs. |
| ***Parallel Funds*** | The Fund is required to invest side by side in certain oil and gas projects on identical terms with certain Affiliate Funds (as hereinafter defined). **See "Parallel Funds" beginning on page 39.** |
| ***Managing General Partner and Investment Manager*** | Coachman Energy Managing General Partners LLC (the "MGP"), is a Delaware limited liability company and is the sole managing general partner of the Fund. The MGP, on behalf of the Fund, has retained Coachman Energy Partners LLC, a Delaware limited liability company, to act as investment manager (the "Investment Manager"). The principals of the Investment Manager and the MGP (the "Principals") are the same. The Principals are Randall Kenworthy, Don Scott, Caroline Gash, and Stephen Mut. The Investment Manager will, through an agreement with the MGP, manage the investment activities of the Fund. The Investment Manager is responsible for the day-to-day management of the Fund's investment assets, subject to the overall authority of the MGP. The Investment Manager currently is registered with the Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Advisers Act of 1940, as |

amended (the "Advisers Act"). **See "Investment Manager and MGP" beginning on page 74.**

***Investor General Partners***

In addition to the MGP, investors may subscribe for general partner interests in the Fund ("Investor General Partners"). Prospective investors accepted as Investor General Partners will have no control or voice in the management and operations of the Fund, other than matters described in the Partnership Agreement. **See "Summary of the Partnership Agreement" beginning on page 80.** Investor General Partners will have unlimited liability regarding Fund operations, subject to liability insurance carried by the Fund. **See "Conversion of Investor General Partners to Limited Partners" below.**

***Coachman Energy VIB LLC***

The MGP and Investment Manager have created the Investing Company solely as a special purpose entity to invest substantially all of its capital into the Fund and to provide Investing Company investors certain tax benefits. The combined equity invested in the Fund (A) by either directly or indirectly through the Investing Company and (B) by employee benefit plans subject to ERISA or certain provisions of the Code may not exceed twenty-five percent (25%) of the value of any class of equity of the Fund and shall be subject to adjustment to the extent necessary to comply with such requirement.

***Limited Partners***

There will initially be one (1) class of limited partners. All prospective investors subscribing for and accepted as limited partners of the Fund will be parties to the Partnership Agreement of the Fund. Limited Partners will have no control or voice in the management and operations of the Fund, other than matters described in the Partnership Agreement.

***Limited Transferability of Units***

The Units are subject to significant restrictions on transferability under the Partnership Agreement and applicable securities laws. The Units offered hereby will not be registered under the Securities Act of 1933, as amended (the "Securities Act"). **See "Summary of the Partnership Agreement – Limited Transferability of Units" beginning on page 84.**

***Unitholders***

Limited Partners and Investor General Partners (but specifically excluding the MGP) are referred to herein, collectively, as "Unitholders" and Limited Partner interests and Investor General Partner interests are referred to herein, collectively, as "Units."

***Conversion of Investor General Partners to Limited Partners***

At any time, at the sole discretion of the MGP, all Investor General Partners will convert and become Limited Partners. After becoming a Limited Partner, a former Investor General Partner will not have limited liability regarding the Fund's operations prior to such conversion, but will have limited liability (to the same extent as other Limited Partners) regarding the Fund's operations thereafter.

***Distributions of Cash***

The MGP, in its sole discretion, will cause the Fund to establish such reserves as may be reasonably necessary for payment of all expenses

of the Fund or as the MGP, in good faith, determines as otherwise necessary or appropriate.

Prior to the second (2nd) anniversary of the Final Closing Date (as hereafter defined), no distributions of cash will be made. Available cash generated during the initial two (2)-year period may be reinvested into additional drilling and/or used to acquire additional oil and gas properties. Thereafter, Distributions (the "Distributions") may be made at any time as determined by the MGP.

All Distributions of cash will be made as follows:

- First, ninety percent (90%) to the Unitholders pro rata based on their relative Percentage Interests, until such Unitholders receive one hundred percent (100%) of their relative initial Capital Contribution (as that term is defined in the Partnership Agreement, attached hereto as Appendix II) and the Preferred Return, which is defined as, with respect to a Unitholder, a sum equal to twenty-five percent (25%) of the Capital Contribution of such Unitholder, and ten percent (10%) to the MGP.
- Thereafter, seventy percent (70%) to Unitholders pro rata based on their relative Percentage Interests and thirty percent (30%) to the MGP.

The Fund's ability to make Distributions is dependent upon proceeds from the sale of hydrocarbons. The MGP intends to make Distributions only when there is Cash Available for Distribution and then only in accordance with the Partnership Agreement and applicable law. To the extent there is Cash Available for Distribution, the MGP may cause the Fund to make Distributions within thirty (30) days of the end of each month; provided, however, that the MGP may elect to, in its sole discretion, cause the Fund to make Distributions within thirty (30) days of the end of each quarter. **See "The Offering – Cash Distributions" beginning on page 35.**

***Offering Period***

The Fund is offering (the "Offering") up to 2,500 Units (as such number may be increased for the overallotment option). The initial term of the Offering ("Initial Offering Period") will be until the earlier of June 30, 2016, or the date on which this Offering is fully subscribed. The MGP reserves the right, in its sole discretion, to extend the Initial Offering Period one (1) time for a period of up to an additional twelve (12) months ("Extended Offering Period"). The Extended Offering Period will be initiated through a supplement to this Memorandum and such supplement will become part of this Memorandum. The last day of the Initial Offering Period, or in the event of an extension, the Extended Offering Period, is the "Offering Termination Date." The "Final Closing Date" will be the earlier of (i) the date the Maximum Offering Amount has been issued or (ii) the Offering Termination Date. **See "The Offering" beginning on page 34.**



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572436

***Maximum/Minimum Offering Amounts***

The minimum amount of Units being offered pursuant to the Offering is $1,000,000 ("Minimum Offering Amount") and the maximum amount of Units being offered is $250,000,000 (the "Maximum Offering Amount"), together with an option for an overallotment of an additional $50,000,000 of Units (the "Overallotment"). In calculating the Minimum Offering Amount, subscriptions proceeds from the MGP or its affiliates will be included. Invested funds will be held in an escrow account (as described below) until receipt of the Minimum Offering Amount.

Upon receipt of the Minimum Offering Amount, the MGP may purchase any unsubscribed Units. **See "Potential Conflicts of Interest – MGP May Buy Unsubscribed Units of the Offering" beginning on page 27.**

***Minimum Subscription; Incentives***

Minimum Subscription. Subject to the Early Investor Incentives and the Major Investor Incentive (collectively, the "Incentives"), each purchaser of Units (each, a "Purchaser" and collectively, "Purchasers") will contribute $100,000 per Unit; provided, however, that any investments made by the Investing Company will receive a credit for any commissions or fees previously incurred at the Investing Company level (the "Investing Company Credit"). The minimum investment by a Purchaser is one (1) Unit; provided, however, that the MGP may offer and sell less than one (1) Unit to any investor in its sole discretion; and provided, further, that in no event will the MGP accept any subscription for less than one-half (1/2) Unit.

The management team of the MGP and its employees will also contribute one percent (1%) of the total investment in the Fund in cash.

***Investor Incentives***

Stage 1 Early Investor Incentive. Purchasers who buy Units from broker dealers and Registered Investment Advisors ("RIAs") as described below under "--Early Investor Incentive Availability to Broker Dealers" and who fully pay for Units prior to the acceptance by the Fund and/ or the Investing Company (collectively, the "Companies") of subscriptions for a total of 500 Units (the "Stage 1 Units") in the Companies ("Stage 1"), excluding any units (1) in the Companies subject to the Major Investor Incentive and/or (2) subscribed for in the Fund by the Investing Company (each a "Stage 1 Investor"), will receive a twelve percent (12%) gross up on the number of Units purchased, resulting in the issuance to such Stage 1 Investor of 1.136 Units per $100,000 contribution (the "Stage 1 Early Investor Incentive"). The MGP may reduce or increase the number of Stage 1 Units available for issuance in connection with the Stage 1 Early Investor Incentive in its sole discretion, at any time, upon seven (7) days' prior notice to the existing investors.

Stage 2 Early Investor Incentive. Following the termination of Stage 1, Purchasers who buy Units from broker dealers and RIAs as described below under "--Early Investor Incentive Availability to Broker Dealers" and who fully pay for Units prior to the acceptance by the Companies of subscriptions for a total of 500 additional units (the "Stage 2 Units") in the Companies ("Stage 2"), excluding any units (1) in the Companies subject to the Major Investor Incentive and/or (2) subscribed for in the Fund by the Investing Company (each a "Stage 2 Investor"), will

receive a six percent (6%) gross up on the number of Units purchased, resulting in the issuance to such Stage 2 Investor of 1.064 Units per $100,000 contribution (the "Stage 2 Early Investor Incentive" and, together with the Stage 1 Early Investor Incentive, the "Early Investor Incentives"). The MGP may reduce or increase the number of Stage 2 Units available for issuance in connection with the Stage 2 Early Investor Incentive in its sole discretion, at any time, upon seven (7) days' prior notice to the existing investors.

Early Investor Incentives Availability to Registered Investment Advisors and Broker Dealers.

Broker dealers and RIAs who have either (i) entered into selling agreements with the Fund, or (ii) commenced due diligence on the Offering as of the date of this Memorandum will have 115 days from the date of this Memorandum to sell the Stage 1 Units and, following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Broker dealers and RIAs who have neither (i) entered into selling agreements with the Fund, nor (ii) commenced due diligence on the Offering as of the date of this Memorandum will have 135 days from the first date subsequent to the date of this Memorandum on which such broker dealer or RIA is contacted by the Fund or a wholesale representative of the Fund to sell the Stage 1 Units, and following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Once both Stage 1 and Stage 2 have lapsed, however, such broker dealers and RIAs shall no longer be eligible to offer any Stage 1 Units or Stage 2 Units (collectively, "Early Incentive Units") to their clients even if all of the Early Incentive Units have not been sold by the Fund.

Major Investor Incentive. Any single investor (or group of affiliated investors, a "Group") purchasing a minimum of twenty (20) Units in a single transaction or, in the discretion of the MGP, in an aggregate of transactions, will receive a ten percent (10%) gross up on the amount of Units received, resulting in receipt of 1.111 Units per $100,000 contribution. The Major Investor Incentive may not be combined with the Early Investor Incentives. The Investing Company shall qualify for the Major Investor Incentive only to the extent that an individual or Group within the Investing Company qualifies individually or as a Group.

The Early Investor Incentives and the Major Investor Incentive shall at all times be subject to the requirement that less than twenty-five percent (25%) of the value of any class of equity of the Fund be held by a Plan (as defined herein), and shall be subject to adjustment to the extent necessary to comply with such requirement. **See "The Offering – Offering Amount" beginning on page 34.**

***Escrow Account***

All subscriptions, including subscriptions from the MGP or its affiliates, will initially be deposited into an escrow account (the "Escrow Account") with Colorado State Bank and Trust, 1600 Broadway, 4th Floor, Denver, Colorado 80202, acting as escrow agent (the "Escrow



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572438

Agent"). Select Capital Corporation (the "Managing Broker Dealer") and the MGP will each be a party to the escrow agreement, attached hereto as Appendix III ("Escrow Agreement"). Upon receipt of the Minimum Offering Amount and pursuant to the escrow agreement, the Fund may withdraw funds from the Escrow Account. If the Minimum Offering Amount is not raised, the Escrow Agent will refund all funds in the Escrow Account directly to the subscribers. **See "The Offering – Escrow of Funds" beginning on page 36**.

After the funds are transferred to the MGP but before their investment in Projects, they may be temporarily invested in income producing short-term, highly liquid investments, in which there is appropriate safety of principal, such as U.S. Treasury Bills. If the MGP determines that the Fund may be deemed an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), then the investment activity will cease.

***Partnership Agreement*** The Fund will be governed by the Partnership Agreement. **See "Summary of the Partnership Agreement" beginning on page 80**.

***Use of Proceeds*** The net proceeds available to be invested by the Fund (after the payment of certain commissions, fees and expenses relating to the Offering) for the Minimum Offering Amount and Maximum Offering Amount are expected to be $862,500 and $215,625,000, respectively. **See "Use of Proceeds" beginning on page 32**.

***Subscription Procedure*** All persons or entities desiring to purchase Units must complete, execute and deliver to the Managing Broker Dealer, a subscription agreement and investor questionnaire (collectively, the "Subscription Document(s)") along with a deposit via wire transfer, personal or certified check for the entire Capital Contribution. The applicable closing(s) will be scheduled to occur on either the first (1st) or sixteenth (16th) day of each month as will be set forth in each Subscription Document. The Managing Broker Dealer will review each Subscription Document for completeness; the MGP will then accept or reject each Subscription Document, in its sole discretion, within ten (10) business days of receipt. If the MGP rejects a Subscription Document, the accompanying subscription payment will be returned to the subscriber within ten (10) business days. Each investor must deliver all the completed documents described in Appendix I under "Subscription Documents." **See "The Offering – Subscription Procedure" beginning on page 39**.

***Affiliate Transactions*** Periodically, the Fund may acquire or sell oil and gas related assets to or from another fund (a) operated by the MGP; (b) operated by an affiliate of the MGP or (c) advised by the Investment Manager (collectively, "Affiliate Funds"). By executing the Partnership Agreement, investors agree that the MGP and the Fund may engage in such related party transactions on the terms described herein on page 29 and will be deemed to have satisfied its fiduciary obligations to each Unitholder in connection with such related party transactions. **See**

| | |
|---|---|
| | **"Potential Conflicts of Interest – Affiliate Transaction Policy" beginning on page 29**. |
| ***Fees and Expenses – Management Expenses*** | The MGP, on behalf of the Fund, has engaged Coachman Energy Administrator LLC, a Delaware limited liability company ("CEA"), to oversee the administrative functions of the Fund as well as Affiliate Funds, including the collection of all fees and payment of expenses. CEA is an affiliate of each of the MGP and the Investment Manager. CEA will receive an annual reimbursement equal to a maximum (per year) of one and one-half percent (1.5%) of the aggregate Capital Contributions for expenses incurred in providing administrative services to the Fund, including overhead expenses. The actual costs for services such as accounting, tax preparation, financial audits, legal, allocable compensation, petroleum engineering, geology, and third party engineering reserve reports are borne by the Fund for which these services are performed. **See "The Offering – Fees and Expenses" beginning on page 36**. |
| ***Fees and Expenses - Organizational Fee*** | Upon receipt of the Minimum Offering Amount and each subsequent closing, the Fund will pay to MGP, or CEA on MGP's behalf, an Organizational Fee equal to three percent (3%) of the aggregate Capital Contributions; *provided, however,* the Fund may, but is not obligated to pay the Organizational Fee out of funds received from the Investing Company. The Organizational Fee is a reimbursement to the MGP for organizational and syndication expenses incurred relating to the Fund. At the Minimum Offering Amount and the Maximum Offering Amount, the Organizational Fee would be $30,000 and $7,500,000 respectively. **See "The Offering – Fees and Expenses" beginning on page 36**. |
| ***Fees and Expenses – Annual Management Fee*** | The Fund will pay an annual management fee ("Annual Management Fee") to MGP, or CEA on MGP's behalf, in an amount equal to two and one-half percent (2.5%) of the aggregate Capital Contributions. At the Minimum Offering Amount and the Maximum Offering Amount, the Annual Management Fee would be $25,000 and $6,250,000 respectively, whether or not the Unitholders receive the return of their entire Capital Contribution. The Annual Management Fee shall be reduced to one percent (1%) of the aggregate Capital Contributions at the earlier of such time as the carried interest of the MGP is equal to thirty percent (30%), or five (5) years from the Final Closing Date. **See "The Offering – Fees and Expenses" beginning on page 36**. |
| ***Fees and Expenses - Indebtedness and Guaranty Fees*** | In the event that the Fund incurs indebtedness, the Investment Manager will be entitled to a one-time one percent (1%) origination fee and a one-time one percent (1%) fee on any drawdown on such indebtedness. The indebtedness fees are for the Investment Manager's efforts in assisting to arrange such debt for the Fund, and subsequently managing assets purchased or acquired from the indebtedness. In the event the MGP or its Affiliates is required to guarantee any such indebtedness or extensions of credit, the MGP or its Affiliates may charge the Fund a one-time guaranty fee equal to two percent (2%) of |

the amount guaranteed by the MGP or its Affiliates, if applicable ("Guaranty Fee").

The Fund has elected to solicit capital through broker dealers and RIAs and will pay commissions to participating broker dealers that execute valid selling agreements with the Fund through its Managing Broker Dealer; *provided, however,* that the Fund may also accept capital without broker dealers or RIAs where the MGP or its affiliates have pre-existing business relationships. **See "Use of Proceeds" beginning on page 32**.

***Commissions and Fees To Broker Dealers***

***Selling Commissions:***

Commissions will equal up to seven percent (7%) of the gross offering proceeds raised by Participating Broker-Dealers (the "Capital Contributed"); *provided, however*, that in the event that an Investor contributes $5,000,000 or more to the Fund, then such Participating Broker-Dealer's selling commission shall be reduced from seven percent (7%) to two percent (2%). The reduction in commission will reduce the purchase price of the Unit to $95,000 for eligible investors. Any investor eligible for the reduction in commission will still be entitled to the Major Investor Incentive.

***Managing Broker Dealer Fee:***

The Fund will employ Select Capital Corporation as the Managing Broker Dealer and will pay a fee equal to three and three quarter percent (3.75%) of the Capital Contributed, some of which will be reallocated to Participating Dealers. An affiliate of the Managing Broker Dealer will also receive one and one-half percent (1.5%) of the ongoing Distributions once the MGP or its successor becomes entitled to receive thirty percent (30%) of the Cash Available for Distribution, which will be allocated from the Distributions owed to the MGP and not Unitholders.

All commissions and fees described above will be paid from Capital Contributed to the extent such commissions or fees apply.

***Term of the Fund***

The Fund will exist for an initial term of up to five (5) years from the Final Closing Date and the MGP may extend the term of the Fund for up to two (2) additional one year periods thereafter, without approval of the Unitholders ("Term").

***Investment Period***

Under the terms of the Partnership Agreement, the Investment Period (the period during which the Fund may deploy capital) will commence on the receipt of the Minimum Offering Amount and terminate four (4) years from the Final Closing Date, *provided* that the MGP, in its sole discretion, may extend such period for one (1) additional year, and *provided further*, that with respect to existing Projects, the MGP may continue to conduct expansion drilling, buy additional mineral acreage and acquire existing working interests until the termination of the Fund.

The MGP may terminate the Investment Period at any time if it determines that changes in any applicable law or regulation make it necessary for the Fund to do so. After the Investment Period, the MGP



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572441

is limited to how it may deploy capital. Once the Investment Period ends, the Fund may only hold funds in checking, savings, money market accounts or invested in income producing short-term, highly liquid investments, in which there is appropriate safety of principal, such as U.S. Treasury Bills, or make follow-on investments in (A) any investment in which the Fund holds a pre-existing interest as of the date of the proposed follow-on investment or (B) within 180 days of the end of the Investment Period, to complete transactions (including drilling, completion and work-over costs) where the Fund was a party to a signed letter of intent or term sheet or was otherwise obligated to complete such transactions before the end of the Investment Period.

***Borrowings/Indebtedness*** The MGP may cause the Fund to incur indebtedness. The Fund's assets may be used as collateral to secure debt, and any debt assumed must be non-recourse to the Limited Partners. The MGP may receive a fee in connection with the Fund's indebtedness. **See "The Offering – Indebtedness and Guaranty Fees" on page 38**.

***Regulatory Matters*** The Fund is not registered as an investment company under the 1940 Act in reliance upon an exemption from such registration provided for under the 1940 Act. In order to comply with the terms of the exemption upon which the Fund is relying, the Fund may not be able to make certain investments or engage in certain activities that it otherwise may pursue, but which are prohibited under the subject exemption.

The Investment Manager currently is registered with the SEC as an investment adviser under the Advisers Act. **See "Investment Manager and MGP" beginning on page 74**.

***Insurance*** The MGP anticipates that the Fund will be covered under each of the operators' loss of well control insurance policies and commercial general liability insurance. In addition to the coverage anticipated to be provided by operators, the Fund is covered by general insurance coverage pursuant to its status as an Affiliate of the MPG and Investment Manager. Such insurance will include general liability, umbrella, errors and omissions, directors and officers insurance; pollution control; excess care, custody and control; and operators extra expense coverage. **See "The Fund – Insurance" beginning on page 58**.

***Advisory Committee*** The MGP may form one or more Advisory Committees to assist the MGP in making decisions related to the Fund. A minimum of three (3) Advisory Committee members may be appointed by the MGP to: (1) advise the MGP on such matters related to the Fund, as the MGP may request; or (2) review and recommend or not recommend the resolution of any conflict related to the Fund presented to the Advisory Committee; *provided, however,* that any investment decisions made on behalf of the Fund by the Investment Manager will not be subject to review by any such Advisory Committee. The Advisory Committee may be designated as either a binding or non-binding authority. Unitholders shall receive notice of such Advisory Committees upon formation, as applicable.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572442

| | |
|---|---|
| ***Investor Suitability*** | The Fund is offering Units only to institutional or other investors that are "accredited investors" (as defined under Rule 501(a) of Regulation D under the Securities Act). **See "The Offering – Investor Suitability Requirements" beginning on page 38**. |
| ***Tax Matters*** | The Fund will be treated as a partnership for federal income tax purposes. Prospective investors should consult their own tax advisors with specific reference to their own situation as it relates to an investment in the Fund. **See "Tax Considerations" beginning on page 91**. |
| ***Distribution Reinvestment Plan*** | Under the Fund's Distribution Reinvestment Plan (the "Distribution Reinvestment Plan"), Unitholders may reinvest the distributions they receive in additional Units. The purchase price per Unit under the Distribution Reinvestment Plan will be $90,000. No sales commissions or dealer manager fees will be paid on Units sold under the Distribution Reinvestment Plan. If Unitholder participates in the Distribution Reinvestment Plan, such Unitholder will not receive the cash from their Distributions, other than special distributions that are designated by the MGP. As a result, Unitholder may have a tax liability with respect to their share of the Fund's taxable income, but they will not receive cash Distributions to pay such liability. MGP may terminate the Distribution Reinvestment Plan at its sole discretion at any time upon ten (10) days' prior written notice to Unitholder. **See "Summary of the Fund's Distribution Reinvestment Plan" beginning on page 89.** |
| ***Sales Literature*** | No sales literature, other than this Memorandum and marketing materials provided by the MGP, will be used in connection with the Offering. |
| ***Risk Factors*** | Investment in the Units is speculative, involves a high degree of risk, and should be considered only by accredited investors who can bear the economic risks of their investment for an indefinite period of time and who can afford to sustain a total loss of their investment. Prospective investors should consider carefully all of the information provided. In making an investment decision, investors must rely on their own examination of the Fund and the terms of the Offering, including the merits and risks involved. **See "Risk Factors" beginning on page 12**. |