## FORWARD LOOKING STATEMENTS

Before purchasing any of the Units described in this Memorandum, you should read the section entitled "Risk Factors" in this Memorandum carefully. You should be prepared to accept any and all risks associated with purchasing the Units, including a complete loss of your investment.

Information contained in this Memorandum contains "forward-looking statements." Forward-looking statements reflect the Fund's current expectations or forecasts of future events. Forward-looking statements can be identified by words such as "will," "believes," "expects," "may," "should," or "anticipates" or the negative thereof or other variations thereon or comparable terminology, or by discussions of strategy. The matters identified in the "Risk Factors" section constitute cautionary statements identifying important factors with respect to forward-looking statements, including certain risks and uncertainties. Other factors could also cause actual results to vary materially from the future results covered in the forward-looking statements contained herein.

Any projections, estimates or other forecasts contained in this Memorandum are forward-looking statements that have been prepared by the Fund and are based on assumptions that the Fund believes are reasonable. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Accordingly, the projections are only an estimate. Actual results may vary from the projections, and the variations may be material.

The information presented in this Memorandum is current as of the date of this Memorandum. The Fund has no obligation to update potential investors with respect to developments after the date of this Memorandum.

*[Remainder of page intentionally left blank.]*



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572444

# RISK FACTORS

Investment in the Units offered hereby involves significant risk, including the risk of a complete loss of the investment and the general economic failure of the Fund. In addition to the other information in this Memorandum, the following factors should be considered carefully in evaluating an investment in the Units offered hereby. The risks and uncertainties described below are not the only ones relevant to the Fund. The investment described herein is highly speculative, involves a high degree of risk and represents an illiquid investment. An investor should be able to bear the loss of the investor's entire investment.

## General Risks

### Projections, Assumptions and Models

The information contained in this Memorandum has been obtained or derived from sources believed by the MGP to be reliable, but the MGP does not represent that it is accurate or complete. The analyses contained herein are based on numerous assumptions. Different assumptions could result in materially different results. Past performance is not indicative of future results. Before making any investment, prospective investors should examine this Memorandum carefully and conduct appropriate due diligence.

### Sophisticated Investment

The investment objectives of the Fund involve a variety of risks and a wide range of assumptions. Investors should not invest in the Units if they do not fully comprehend the nature of these risks and assumptions.

### General Economic and Market Conditions

The success of the activities of the Fund may be affected by general economic and market conditions, such as interest rates, commodity prices, availability of credit, inflation rates, economic uncertainty, changes in laws as well as domestic and global political circumstances. These factors may affect the level and volatility of prices for mineral leases and the ability to develop and sell the undeveloped mineral leases and hydrocarbon production. Volatility or illiquidity could impair profitability or result in losses.

## Risks Related to the Fund

### No Operating History or Revenues

The Fund was formed recently for the initial purpose of raising capital to acquire mineral leases and Working Interests and to drill oil and gas wells on select leasehold acreage in the Bakken and Three Forks production zones in North Dakota, the Williams Fork and Mancos production zones in Colorado and other primarily unconventional oil producing basins in North America. The Fund has no historical operations for potential investors to evaluate.

### Product Pricing and Transportation Capacity

Crude oil prices at any production location are impacted by the cost to transport the physical barrel to either a refining center or a trading center where different crude types are fungible and where pricing (especially of high volume or marker grades) is transparent. Lack of transport capacity or high cost alternatives to pipeline transport can result in significant locational discounts or differentials relative to

marker prices. Differentials can move negatively for producers when production increases or transportation capacity disruptions create a shortage of the least expensive transportation alternative (generally a pipeline). These differential moves can be of variable duration based on the remedies employed to reduce cost or increase capacity.

North Dakota and Montana have limited refinery capacity. As production increased significantly over the last decade, transportation infrastructure struggled to keep pace and as a result, price differentials have moved against producers. As a result of the limited transportation infrastructure and refining capacity, the Fund's production may be interrupted, or shut in, from time to time for numerous reasons, including weather conditions, accidents, loss of pipeline or gathering system access, field labor issues or strikes, or voluntary production curtailment in response to market conditions.

In Colorado's Piceance Basin, utilization rates for pipelines vary by season, although total year-round out-take capacity in the area exceeds current deliverability of approximately 2.7 BCF/D of by almost forty percent (40%). Thus, it is not unusual to see substantially lower utilization rates relative to total capacity due to varying demand for gas over the course of the year.

In October 2007, 102 drilling rigs were operating in the Piceance Basin in search of natural gas and significant investments were made in pipeline and processing capacity to support the anticipated production. The infrastructure was over-built, as the number of active rigs declined to sixty-four (64) in 2008 and further declined to twelve (12) rigs at year-end 2013.

Natural gas prices in the first half of 2014 are trading at a twenty percent (20%) premium to 2013 (and eighty percent (80%) above 2012 averages) in response to the unprecedented supply draw-down during the 2014 winter. Current "replacement demand" from gas storage companies to replenish supplies in preparation for 2015 are well above historic averages.

The relatively high value of natural gas liquids (NGL) has led producers to target wet gas. NGL prices have traditionally been linked to crude oil, resulting in a significant price premium over pipeline-quality dry natural gas. More recently, the natural gas plant liquids composite spot price (which approximates a value of NGL produced at natural gas processing plants) has hovered roughly halfway between West Texas Intermediate (WTI) crude oil and natural gas spot prices. While NGL demand is supporting steady prices, ethane, which is currently priced below natural gas, is being left in the dry gas stream. The costs of separating and transporting ethane volumes exceed the value of the ethane itself; so it is more economical to retain it in the natural gas sales stream, a phenomenon known as ethane rejection.

**Depletion**

Oil and gas wells by their nature are depleting assets; production could last anywhere from a few months to more than thirty (30) years. As a result, annual production will naturally decline over the life of a well, and so too will returns to investors.

A substantial reduction in production could materially affect the Fund's cash flow.

**Hedging**

To the extent that the Fund engages in commodity-price-risk management (or hedging) activities to protect the Fund's cash flows from commodity price declines, the Fund may be prevented from realizing the full benefits of price increases above the levels of the derivative instruments used to manage price risk. Additionally, the Fund's hedging activities may expose it to the risk of financial loss in certain circumstances, including instances in which: (i) the Fund's production is less than the hedged volumes; (ii) there is a widening of price basis differentials between delivery points for the



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572446

Fund's production and the delivery point assumed in the hedge arrangement; (iii) the counterparties to the Fund's hedging or other price-risk management contracts fail to perform under those arrangements; or (iv) a sudden unexpected event materially impacts oil and natural-gas prices.

**Derivative Regulations**

The United States Congress in 2010 adopted comprehensive financial reform legislation that establishes federal oversight and regulation of the over-the-counter derivatives market and entities that participate in that market. The legislation, known as the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), was signed into law by the President on July 21, 2010, and requires the Commodity Futures Trading Commission (the "CFTC"), the SEC and other regulators to promulgate rules and regulations implementing the new legislation. In its rulemaking under the Dodd-Frank Act, the CFTC has issued final regulations to set position limits for certain futures and option contracts in the major energy markets and for swaps that are their economic equivalents. Certain bona fide hedging transactions would be exempt from these position limits. The position limits rule was vacated by the United States District Court for the District of Columbia on September 28, 2012, with the exception of the rules amendment to 17 C.F.R., section 150.2. The CFTC also has finalized other regulations, including critical rulemakings on the definition of "swap," "security-based swap," "swap dealer," and "major swap participant". The Dodd-Frank Act and CFTC Rules also will require us in connection with certain derivatives activities to comply with clearing and trade-execution requirements (or take steps to qualify for an exemption to such requirements). In addition, new regulations may require us to comply with margin requirements although these regulations are not finalized and their application to the Fund is uncertain at this time. Other regulations also remain to be finalized, and the CFTC recently has delayed the compliance dates for various regulations already finalized. As a result it is not possible at this time to predict with certainty the full effects of the Dodd-Frank Act and CFTC rules on the Fund and the timing of such effects. The Dodd-Frank Act may also require the counterparties to the Fund's derivative instruments to spin off some of their derivatives activities into a separate entity, which may not be as creditworthy as the current counterparty. The Dodd-Frank Act and any implementing regulations could significantly increase the cost of derivative contracts (including from swap recordkeeping and reporting requirements and through requirements to post collateral which could adversely affect the Fund's available liquidity), materially alter the terms of derivative contracts, reduce the availability of derivatives to protect against risks the Fund encounters, reduce its ability to monetize or restructure its existing derivative contracts, and increase its exposure to less creditworthy counterparties. If the Fund reduces its use of derivatives as a result of the legislation and regulations, its results of operations may become more volatile and its cash flows may be less predictable, which could adversely affect the Fund's ability to plan for and fund capital expenditures or to make distributions. Finally, the legislation was intended, in part, to reduce the volatility of oil and natural gas prices, which some legislators attributed to speculative trading in derivatives and commodity instruments related to oil and natural gas. The Fund's revenues could therefore be adversely affected if a consequence of the legislation and regulations is to lower commodity prices. Any of these consequences could have a material adverse effect on the Fund, its financial condition and its results of operations.

**Dependence on Key Individuals**

The Fund will rely heavily on the skills, talents, abilities, and activities of each of the MGP, Investment Manager and particularly their respective principals. The loss of the services of any of such principals could have a significant impact on the investment performance of the Fund. Moreover, Unitholders have no right or power to take part in the management of the Fund. Accordingly, each Unitholder should critically assess the information herein concerning the principals of each of the Investment Manager and MGP and should not purchase Units unless such Unitholder is willing to entrust all aspects of (a) the Fund's investment management to the Investment Manager and (b) management to the MGP.

### Insufficient Insurance

It is possible that some or all of the insurance coverage which the Fund has available may become unavailable or prohibitively expensive. In that case, the MGP may elect to change the insurance coverage. Consequently, Investor General Partners could be exposed to additional financial risk due to the reduced insurance coverage and due to the fact that Investor General Partners would continue to be individually liable for their pro-rata share of the Fund's pro-rata obligations and liabilities. Unitholders could be subject to greater risk of loss of their investment since less insurance would be available to protect the Fund from casualty losses.

### Dependence on Operators and Certain Operating Risks Which May or May Not be Attributed to the Fund

The Fund will not be an operator of all of the wells in which it owns an interest and therefore will depend on well third party operators to provide cost estimates and manage the physical drilling, completion and production operations. The Fund anticipates using multiple operators but cannot assure that each or all of the operators will not incur operational hazards or financial difficulties.

The MGP also intends to contract with Coachman Energy Operating Company LLC (the "Coachman Operator" or "CEOC"), a wholly-owned subsidiary of the Investment Manager, to be the operator of certain wells in the Piceance Basin and potentially other locations in North America. As a result, certain risks associated with the operation of those wells may be attributed to the Fund. These risks include the risk of fire, explosions, blow outs, pipe failure, abnormally pressured formations and environmental hazards such as oil spills, gas leaks, ruptures or discharges of toxic gases. Any of these occurrences could result in substantial losses to the Fund due to injury or loss of life, severe damage to or destruction of property, natural resources and equipment, environmental damage, clean-up responsibilities, regulatory investigation and penalties and suspension of operations.

Drilling activities are subject to many risks, including the risk that no commercially productive reservoirs will be encountered. There can be no assurance that new wells drilled by third party operators or the Coachman Operator will be productive or that the Fund will recover all or any portion of the Fund's investment. Drilling for oil and gas may involve unprofitable efforts, not only from dry wells, but from wells that are productive but do not produce sufficient net revenues to return a profit after drilling, operating or other costs. The cost of drilling, completing and operating wells is often uncertain. The Fund's drilling operations may be curtailed, delayed or canceled as a result of numerous factors, many of which are beyond the Fund's control, including title problems, weather conditions, mechanical problems, compliance with governmental requirements and shortages and delays in the delivery of equipment and services. The Fund's future drilling activities may not be successful and, if unsuccessful, such failure may have a material adverse effect on its future results of operations and financial condition.

### Environmental Regulations

Drilling operations upon which the Fund is dependent are subject to extensive energy, environmental and other laws and regulations of federal, state and local authorities. These laws and regulations may require the acquisition of a permit before drilling commences or prohibit these activities on certain lands lying within wilderness and other protected areas. In the course of complying with these requirements, an operator may incur significant additional costs. If it fails to comply with these requirements, it could be subject to civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws and regulations may be adopted or become applicable to such companies or their facilities, and future changes in laws and regulations may have a detrimental effect on their business. In acquiring some of the acreage or

drilling rights, companies upon which the Fund is dependent may have assumed on-site liabilities associated with the environmental condition of the acreage, regardless of when such liabilities arose and whether known or unknown, and in some cases agreed to indemnify the former owners of those facilities for on-site environmental liabilities. Steps required to bring facilities into compliance, if necessary, could be expensive, and thus could adversely affect a company's financial condition. Furthermore, with the continuing trend toward stricter standards, greater regulation, and more extensive permitting requirements, most natural resource companies expect their environmental expenditures to be substantial in the future. Tougher new environmental laws might be imposed on the industry that could result in higher costs and greater risk exposure for the Fund's investments and the Investor General Partners.

### Financial Difficulties of Customers and Partners

If the companies with which the Fund maintains customer relationships or participates in joint ventures experience financial difficulties, the Fund may be subject to increased exposure to credit risk. Any inability of these companies to continue their relationships with the Fund, participate in the joint ventures or meet their financial or performance obligations to the Fund could have a material adverse effect on the Fund's financial condition, results of operations, and cash flows.

### Uncertain Production

Properties that the Fund acquires may not produce oil or natural gas as projected; consequently, the Fund may be unable to determine reserve potential, identify liabilities associated with the properties or obtain protection from sellers against such liabilities, all of which could cause the Fund to incur losses. One of the Fund's growth strategies is to pursue selective acquisitions of undeveloped leasehold oil and natural gas reserves. When the Investment Manager chooses to pursue an acquisition, it will perform an informal review of the target properties that the Investment Manager believes is consistent with industry practices. However, these informal reviews are inherently incomplete. Even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit the Fund to become sufficiently familiar with the properties to assess fully their deficiencies and potential. The Fund may not perform an inspection on every potential acquisition.

### Determination of Offering Price

The offering price for the Units was arbitrarily determined by the MGP and bears no relationship to the Fund's assets, equity or any other recognized criteria of value.

### Long-Term Nature of Investment; Restrictions on Marketability

Currently, there is no market for the Units and no market is expected to develop after the Offering. Consequently, an investment in the Units offered hereby must be considered to be highly illiquid. An investment in the Units offered hereby is suitable and appropriate only for those investors who have no need for liquidity in the investment and who can afford to make an investment that may have to be held for a long period of time and that cannot be readily sold, transferred or assigned. The Units will not be registered under the Securities Act or the securities laws of any state and may be resold only in transactions exempt from registration under the Securities Act and applicable state and non-U.S. securities laws. Significant restrictions on resale are also imposed in the Partnership Agreement.

**Exemption under the Securities Act**

This Offering may not comply with private placement exemptions available under securities laws. The sale of the Units has not been registered under the Securities Act or any state securities laws in reliance upon exemptions from both federal and state registration obligations. The exemptions from the registration requirements are very technical, subjective in their application, and fact specific, requiring compliance with and cooperation by all Unitholders, the Fund and any other persons participating in the Offering. As a result, although the Fund has made every effort to comply with both federal and state securities laws, there can be no assurance that all technical requirements of these exemptions will be met. Failure to satisfy these requirements could result in a rescission claim for damages against the Fund.

**Regulation under the 1940 Act**

The Fund has not registered with the SEC as an investment company pursuant to the 1940 Act in reliance on an exemption from such registration and with respect to which the Fund believes it is qualified. Neither a legal opinion nor a no-action position has been requested of the SEC staff on this issue. In addition, in order to comply with the terms of the exemption(s) upon which the Fund is relying, the Fund may not be able to make certain investments or engage in certain activities that it otherwise may pursue, but which are prohibited under the subject exemption. If the SEC or a court of competent jurisdiction were to find that the Fund is required to register as an investment company, there could be significant negative consequences including, without limitation, fines, penalties, or costs associated with having to register as an investment company or defend against lawsuits or other proceedings. Should the Fund be subjected to any or all of the foregoing, the Fund would be affected materially and adversely.

**Limited Voting Powers and Voice in Management**

Except for certain decisions set forth in statute and in the Partnership Agreement, the Unitholders will have no voting rights with respect to the operation, management and conduct of the Fund.

**Unlimited Liability of Investor General Partners**

Under Delaware law, general partners of a limited partnership have unlimited liability for their pro-rata share of the Fund's pro-rata obligations and liabilities of that partnership. If a Unitholder purchases Units as an Investor General Partner, such Investor General Partner will be liable for all obligations and liabilities arising from the Fund's operations if these liabilities exceed both the assets and insurance of the Fund. Even if an Investor General Partner converts his general partner interest into a limited partner interest, such investor will continue to be liable as a general partner for matters that occurred while such Unitholder owned a general partner interest. A Unitholder's liability as an Investor General Partner may exceed the amount of his capital contributions.

**Exculpation and Indemnification**

Under the Partnership Agreement, neither the MGP nor any of its affiliates or any of their respective officers, employees, managers, directors, members, agents, or assigns is liable to the Fund or its Unitholders for any act or omission based upon errors of judgment or other fault in connection with the business or affairs of the Fund as long as the relevant person acted without fraud, deceit, gross negligence, or willful misconduct and without engaging in a wrongful taking. These provisions alter the fiduciary duties of the MGP such that no act or omission by the MGP, including actions involving conflicts of interest, as described in this Memorandum and otherwise, breaches any duty to the Fund or its Unitholders if the relevant person acted without fraud, deceit, gross negligence, or willful



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572450

misconduct and without engaging in a wrongful taking. In addition, the MGP and its affiliates and their respective officers, employees, managers, directors, members, agents and assigns have broad indemnification rights for any act or omission where they acted in good faith and with the belief that such indemnified person was acting in the Fund's interest and without fraud, deceit, gross negligence, or willful misconduct and without engaging in a wrongful taking. Under some securities and corporate laws, in some circumstances, liability may be imposed even when a person acts in good faith, and the exculpation and indemnification of the Fund may not be effective to limit the liability of such person.

**Non-Indemnification of Investor General Partners**

The Fund will not indemnify any of the Investor General Partners for obligations related to casualty and business losses, which exceed, or are otherwise not covered by, available insurance coverage and the Fund's assets. As a result, the value of an investment interest in the Fund could be reduced in the case of a claim that exceeds the available insurance coverage to the Fund. In the event of a successful claim, an Investor General Partner could lose his entire investment in the Fund.

**Funding Obligations**

Affiliate private banks of Citibank, N.A. have sponsored one or more special purpose feeder funds (the "Citi Feeder") to invest substantially all of its capital in Coachman VII LLC ("Coachman VII"), which will then co-invest substantially all of its capital in certain oil and gas projects in which the Fund may also be investing (the "Projects") on the same terms and conditions in which the Fund will also be investing. Unless otherwise agreed to in writing by the Citi Feeder and Coachman VII, the Fund, together with the Affiliate Funds, is required to invest one-half (1/2) of all amounts invested by Coachman VII in any Projects in which Coachman VII invests. In the event the Fund and/or the Affiliate Funds are unable to invest at least one-half of the amounts invested by Coachman VII in various Projects, the Citi Feeder may terminate its offering.

**Risks Related to the Oil and Gas Industry**

**Oil and Gas Price Uncertainty**

Our results of operations as well as the carrying value of our oil and gas properties are substantially dependent upon the prices of oil and natural gas, which have recently declined. In the event such decline continues for a prolonged period of time our results of operations could be adversely affected, and our ability to continue our planned development and acquisition activities could be substantially curtailed.

Our revenue, cash flows, profitability, growth, production and present value of our estimated reserves depend substantially upon prevailing prices for oil and natural gas. Currently, our costs to maintain our unproved properties include non-producing leasehold, geological and geophysical costs associated with leasehold or drilling interests and in process exploration drilling costs. In the future, our results of operations and the ceiling on the carrying value of our oil and gas properties will be dependent on the estimated present value of proved reserves, which depends on the prevailing prices for oil and gas. During the past five years, the posted price for West Texas intermediate light sweet crude oil, which we refer to as WTI, has ranged from a low of $34.03 per barrel, or Bbl, in February 2009 to a high of $113.39 per Bbl in April 2011. The Henry Hub spot market price of natural gas has ranged from a low of $1.82 per million British thermal units, or MMBtu, in April 2012 to a high of $7.51 per MMBtu in January 2010. During 2014, WTI prices ranged from $53.27 to $106.91 per Bbl and the Henry Hub spot market price of natural gas ranged from $2.89 to $6.15 per MMBtu. On January 20, 2015, the WTI posted price for crude oil was $48.96 per Bbl and the Henry Hub spot market price of natural gas was $3.13 per MMBtu, representing decreases of 54% and 49%, respectively, from the high of $106.91 per Bbl of oil and $6.15 per MMBtu for natural gas during 2014.

Various factors beyond our control affect prices of oil and natural gas, including political and economic conditions; worldwide and domestic supplies of and demand for oil and gas; weather conditions; the ability of the members of the Organization of Petroleum Exporting Countries ("OPEC") to agree on and maintain price and production controls; political instability or armed conflict in oil-producing regions; the price of foreign imports; the level of consumer demand; the price and availability of alternative fuels; and changes in existing federal and state regulations. In the event the recent substantial decline in oil and gas prices continues for a prolonged period of time, our operations and financial condition could be materially and adversely affected, and the level of development and exploration expenditures could be substantially curtailed. These conditions could ultimately impact the ability of the Fund to realize on its investment program as described in this Memorandum.

**Industry and Economic Risks**

The oil and gas business is fundamentally a commodity business. The operations and earnings of the Fund may be affected significantly by changes in oil, gas, and petrochemical prices and by changes in margins on gasoline and other refined products. Such prices and margins depend on local, regional and global events or conditions that affect supply and demand for the relevant commodity. These events or conditions generally are not predictable and include, among other things:

- general economic growth rates and the occurrence of economic recessions;
- the development of new supply sources;
- adherence by countries to OPEC quotas;
- weather, including seasonal patterns that affect regional energy demand (such as the demand for heating oil or gas in winter) as well as severe weather events (such as hurricanes) that can disrupt supplies or interrupt the operation of the wells;
- technological advances, including advances in exploration, production, refining and petrochemical manufacturing technology and advances in technology relating to energy usage;
- changes in demographics, including population growth rates and consumer preferences;
- the proximity and availability of transportation facilities; and
- the competitiveness of alternative hydrocarbon or other energy sources.

**Regulation Relating to Hydraulic Fracturing**

Hydraulic fracturing is a common practice that is used to stimulate production of hydrocarbons from tight formations, such as the Bakken/Three Forks and Niobrara/Mancos/Williams Fork Horizons. The process involves the injection of water, sand and chemicals under pressure into rock formations to fracture the surrounding rock and stimulate production. There has been increasing public controversy regarding hydraulic fracturing with regard to use of fracturing fluids, impacts on drinking water supplies, use of waters, and the potential for impacts to surface water, groundwater, air quality and

the environment generally. A number of lawsuits and enforcement actions have been initiated implicating hydraulic fracturing practices.

On July 24, 2014, a Boulder County District Court judge struck down Longmont's hydraulic fracturing ban. Judge Dolores Mallard issued the summary judgment. In the ruling, she said Longmont's charter amendment clearly conflicted with the state's regulations and its interest in the efficient development of oil and gas deposits. "While the court appreciates the Longmont citizens' sincerely held beliefs about risks to their health and safety, the court does not find this is sufficient to completely devalue the state's interest," Mallard wrote. The ban can remain in place while the appeal process plays out.

On August 3, 2014, Governor John Hickenlooper and Congressman Jared Polis agreed to compromise on oil and gas control within Colorado. The agreement includes the formation of a task force of eighteen (18) members to craft regulations to minimize conflicts over the siting of oil and gas facilities in Colorado. Governor Hickenlooper also agreed to drop the state's lawsuit against Longmont, challenging the city's voter-approved ban on hydraulic fracturing. Congressman Polis agreed to withdraw two initiatives (88 and 89) aimed at tightening control over the industry, as well as, two (2) pro-industry initiatives (121 and 137).

**Competitive Factors**

The oil and gas industry is highly competitive. The Fund will compete with other firms in the sale or purchase of needed goods and services for its production and will employ methods of competition that are lawful and appropriate for such purposes. The success of such competitors may affect the success of the Fund.

The MGP may form additional entities in the future to engage in activities similar to those of the Fund, and may be engaged in sponsoring one or more such additional entities at approximately the same time as the Fund's investments are being made. Due to competition among such funds for availability of equipment, contractors and personnel, it may make the completion of drilling activities by the Fund more difficult.

**Political Risks**

The Fund may be affected from time to time in varying degree by political factors including:

- political developments and laws and regulations (such as expropriation or forced divestiture of assets and unilateral cancellation or modification of contract terms, as well as de-regulation of certain energy markets);
- environmental regulations;
- restrictions on exploration, production, imports and exports;
- restrictions on the Fund's ability to engage in certain areas of business within a local or national jurisdiction;
- price controls;
- tax or royalty increases (including retroactive claims);
- war or other international conflicts;

- currency exchange; and
- civil unrest.

Both the likelihood of these occurrences and their overall effect upon the Fund are not accurately predictable.

**Project Risks**

The Fund's success depends upon its ability to acquire, drill, and complete oil wells at an economic price and its results will therefore be affected by events or conditions that impact the advancement, operation, cost or results of such projects, including:

- the outcome of negotiations with mineral owners, joint ventures, governments, suppliers, customers or others;
- reservoir performance and natural field decline;
- changes in operating conditions and costs, including costs of third party equipment or services such as drilling rigs and shipping;
- security concerns or acts of terrorism that threaten or disrupt the safe operation of company facilities; and
- the occurrence of unforeseen technical difficulties (including technical problems that may delay start-up or interrupt production or that may lead to unexpected downtime of refineries or petrochemical plants).

**Risks Related to Tax Matters Generally**

The following discussion summarizes certain general tax risks associated with an investment in the Units. Unless otherwise indicated, all statutory references in this Memorandum are to the Code. IN ADDITION TO THIS SECTION, EACH PROSPECTIVE INVESTOR SHOULD ALSO READ THE "TAX CONSIDERATIONS" BELOW CAREFULLY. EACH PROSPECTIVE INVESTOR SHOULD ALSO OBTAIN THE ADVICE OF HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE MATTERS DISCUSSED HEREIN AND THE EFFECT OF AN INVESTMENT IN THE UNITS ON HIS, HER OR ITS TAX SITUATION.

**Uncertain Tax Consequences**

Investment in the Units will have certain tax aspects unique to each individual Unitholder, and the Internal Revenue Service ("IRS") or the courts might disagree with the positions taken by the Fund and/or its tax partners as to those tax aspects. In addition, the tax aspects of an investment in the Units could be changed significantly by reason of further changes in the tax laws or the interpretations thereof. A change in tax law could materially and adversely affect the value of the investments.

**Tax Reform**

No assurance can be given that the present federal income tax treatment of an investment in the Fund will not be affected adversely by future legislative, judicial or administrative action, possibly applicable on a retroactive basis. As of the date of this Memorandum, several recently enacted provisions of the Code have not yet been the subjects of administrative or judicial clarification and

interpretation. Recently, members of the U.S. Congress considered substantive changes to the existing U.S. federal income tax laws that would have affected the tax treatment of certain partnerships and the tax treatment of oil and gas businesses. Each prospective Unitholder and his, her or its tax advisor should be aware that any further modification of the Code or the regulations promulgated thereunder, or any administrative ruling or judicial decision could be applied to an investment in the Fund, possibly on a retroactive basis.

### No IRS Rulings

The Fund will not seek a ruling from the IRS as to any of the Federal income tax consequences of an investment in the Units. Thus, positions taken by the Fund as to tax aspects could differ from positions taken ultimately by the IRS in auditing tax returns, and issuing rulings or otherwise, that could result in unexpected and material modifications to the tax returns and tax liabilities of the Fund and the Unitholders.

### Partnership Status

The flow-through to investors of the income tax items of the Fund depends upon classification of the Fund as a "partnership" (rather than as an association taxable as a corporation) for federal income tax purposes. A partnership is not taxed as an entity; rather, items of revenue and expense flow through to the partners on a *pro rata* basis, or in accordance with the formula set forth in the Partnership Agreement, and each partner is responsible for payment of income taxes on the portion allocated to such partner. Limited partnerships, such as the Fund, that have ninety (90%) or more of their gross income for every taxable year consisting of "qualifying income," as defined in Section 7704 of the Code, or that are not traded on an established securities market and that are not tradable on a secondary market or the substantial equivalent thereof, are treated in the same manner as partnerships for tax purposes. The classification of the Fund as a partnership for tax purposes is dependent on the present law and regulations, which are subject to change. The U.S. Congress and several states are evaluating ways to subject partnerships to entity-level taxation. Entity-level taxation would reduce the Fund's distributions to the Units, which distributions might themselves be taxable.

### Tax Liability in Excess of Fund Distributions

Because the holders of the Units are treated as partners for income tax purposes to whom the Fund allocates taxable income which could be different in amount than the cash distributed by the Fund, the holders of the Units are required to pay any U.S. federal income taxes and, in some cases, state and local income taxes on their share of the Fund's taxable income even if the holders of Units do not receive any cash distributions from the Fund. Unitholders may not receive cash distributions from the Fund equal to their share of the Fund's taxable income allocated to them (including income specially allocated to Unitholders entitled to the Early Investor Incentives or Major Investor Incentive). Cash distribution may not even equal to the actual tax liability that results from that income.

### Recognition of Allocations

The Partnership Agreement contains provisions that allocate federal income tax consequences of the Fund's business. These provisions may not technically comply with the "substantial economic effect" safe harbor provided in the tax regulations. If such allocation provisions were not recognized for federal income tax purposes, a portion of the federal income tax deductions allocated to and claimed by a Unitholder, including deductions for intangible drilling costs and leasehold acquisition costs, could be reallocated to the MGP or to other Unitholders or a portion of the taxable income allocated to the MGP or other Unitholders could be taxed to a particular Unitholder.



FOIA Confidential Treatment Requested by Criterion Wealth Management 

### Reasonableness of Deductions

To be deductible as a business expense, each item of expense must be ordinary and necessary and reasonable in amount. Given that certain expenses that the Fund expects to incur will be paid to affiliated persons or entities, the IRS may assert that the amount of such expenses was not determined at "arm's length" and, consequently, disallow the deduction of a portion of the expenses as not being ordinary and necessary or reasonable in amount. Certain fees may also be re-characterized by the IRS as nondeductible costs or "partnership" distributions, further reducing the tax benefits available to the Unitholders from an investment in the Fund.

### Timing of Deductions

The MGP will use reasonable efforts to expend or contract for the expenditure of the capital contributions of the Fund in the year such contributions are received. However, some of the expenses may be incurred prior to the actual drilling of the wells. The MGP cannot assure that any deductible intangible drilling costs incurred in a year prior to the year of the actual drilling of the wells will be deductible in the year incurred. Among other things, the Fund might not expend or contract for the expenditure of a substantial portion of its capital contributions in the year in which Unitholders are admitted to the Fund, in which event no substantial tax deductions would be available in that year from the Fund. Further, the IRS may disallow deductions attributable to the period prior to a Unitholder's admission or investment in the Fund.

### Required Capitalization

Certain expenditures by the Fund will be required to be capitalized and will only be deductible, if at all, over time. Specifically, only that portion of the intangible drilling costs attributable to the Fund's smallest working interest in each well that is not a partnership for federal income tax purposes through the first day of the month after the gross income attributable to the operating mineral interest in the initial wells to be drilled, after deducting applicable royalties, overriding royalties, production payments, shut-in payments, rentals, and other similar burdens, and taxes, except income taxes, equals the sum of: (i) all leasehold acquisition costs; (ii) one hundred percent (100%) of the cost and expenses incurred in drilling, testing, completing, equipping and operating (inclusive of workover or recompletion costs) such well; and (iii) other expenses directly attributable to such well (or, perhaps, multiple wells within a particular property) ("Return of Invested Capital") may be deducted. Intangible drilling costs, along with tangible equipment costs, allocable to working interests held by others in such wells must be capitalized as the cost of acquiring the working interest.

### Loss Limitations

Under Section 469 of the Code, "passive" losses and credits are not allowed as a deduction against other income, including salary, active business income and portfolio income (e.g., dividends or interest), but may only be used to offset "passive" income and gains, until the complete disposition of the interest in the activity giving rise to such "passive" losses or credits. A Limited Partner's interest in the Fund will be treated as a "passive activity," and any tax losses derived by a Limited Partner from the Fund will generally be allowable only to the extent of such Limited Partner's "passive" income. A taxpayer's interest in an oil or gas well drilled or operated under a working interest does not constitute a passive activity so long as the taxpayer owns the working interest directly or through an entity that does not limit the taxpayer's liability with respect to such drilling or operation. Consequently, each Investor General Partner should be entitled to deduct his share of deductible intangible drilling and development costs and other deductible expenses allocable to the drilling or operation of wells under working interests without regard to the passive activity loss limitations to the extent that the Investor General Partner interest is directly or indirectly owned by an individual whose liability from such

Investor General Partner interest is not limited. However, an Investor General Partner's ability to take deductions will be subject to basis and "at risk" limitations. The exception for working interests would not be applicable to any operations of the Fund other than the drilling and operation of wells under working interests. Therefore, if the Fund acquires an interest or participates in other activities, such activities will be treated as passive activities to the Investor General Partners and any losses derived by them with respect to such activities will generally be passive losses allowable only to the extent of their passive income. In addition, the exception for working interests will not apply from and after a conversion of an Investor General Partner interest to a Limited Partner interest. The treatment of the Fund as a "publicly traded partnership" for purposes of applying the passive activity loss limitations would even more severely restrict or eliminate a Unitholder's ability to use any losses from the Fund to offset income from other sources.

### Tax Effect of Conversion of Investor General Partners into Limited Partners

The Partnership Agreement provides for conversion of individual Investor General Partner interests into Limited Partner interests at the option of each Investor General Partner, or conversion of all Investor General Partner interests into Limited Partner Interests upon determination of the MGP, in its sole discretion, as more particularly described in the Partnership Agreement. The tax consequences of such a conversion will depend upon the law in existence at the time of conversion and upon the results of that Partnership's operations prior to that time. Such consequences may be adverse if the conversion is deemed a "constructive termination" of the Fund for federal income tax purposes or may be adverse under the passive loss rules as a result of a Unitholder's particular circumstances. If the MGP determines that the conversion of the Investor General Partner interests to Limited Partner interests will have an adverse effect, tax or otherwise, on the Investor General Partners or the Fund, the MGP may not convert those interests. Accordingly, the MGP and the Fund cannot assure that any Investor General Partner interests will be converted to Limited Partner interests or when any such conversion will occur.

### Eligibility to Claim Percentage Depletion

Percentage depletion deductions are tax deductions calculated based upon a percentage of gross income from the property, but are limited to one hundred percent (100%) of the total taxable income of the Unitholder from the property for each taxable year, may not exceed sixty-five percent (65%) of the taxpayer's overall taxable income (with certain adjustments) for the year, and, in general, are severely limited or not available to Unitholders that do not qualify as independent producers. Because depletion deductions must be computed separately by each Unitholder and not at the partnership level, the availability of percentage depletion will depend in part upon a Unitholder's individual circumstances. Therefore, each individual Unitholder may not be eligible to claim percentage depletion deductions.

### Potential Tax Risks as to Farmouts and Back-In Working Interests

If the Fund acquires working interests in oil and gas leases under the terms of a farmout agreement, a portion of the value of such working interests may have to be reported as taxable income. In addition, the ability of a Unitholder to deduct all intangible drilling costs paid by the Fund with respect to oil and gas leases burdened by a back-in working interest may be limited. A back-in working interest is a right held by another party to become a WI Owner in the oil and gas lease on Return of Invested Capital on the oil and gas lease.

### Tax Gain or Loss on Disposition of Units and Cash Received on Liquidation Could be More or Less Than Expected

If a Unitholder sells its Units, the Unitholder will recognize a gain or loss equal to the difference between the amount realized and that Unitholder's adjusted tax basis in those Units. Because distributions in excess of a Unitholder's allocable share of the Fund's net taxable income and allocable share of the Fund's net taxable losses decrease that Unitholder's tax basis in its Units, the amount, if any, of such prior excess distributions or losses with respect to the Units sold will, in effect, become a taxable income allocated to that Unitholder if the Unitholder sells such Units at a price greater than that Unitholder's tax basis in those Units, even if the price received is less than the original cost. Furthermore, a substantial portion of the amount realized, whether or not representing gain, may be taxed as ordinary income due to potential recapture items, including depreciation and depletion recapture. In addition, because the amount realized may include a Unitholder's share of the Fund's nonrecourse liabilities, if a Unitholder sells its Units, such Unitholder may incur a tax liability in excess of the amount of cash received from the sale.

Similarly, upon a sale of assets and liquidation of the Fund, Unitholders who have been specially allocated certain deductions, such as for intangible drilling costs, will have capital accounts which may be less per Unit than Unitholders who had not been allocated such deductions and therefore be entitled to less liquidating distributions per Unit than other Unitholders.

### Possible Audit of the Fund's Tax Return

The IRS may audit the tax returns of the Fund. If the IRS were to audit the tax information returns of the Fund, adjustment (if any) resulting from any such audit may result in audits of the Unitholders' own tax returns. Such audits of the Unitholders' tax returns could result in adjustments of items that are unrelated to the Fund, as well as related items.

### Penalties and Interest

If the IRS were to challenge successfully the Fund's tax treatment of one or more items, the Unitholders could be liable for penalties and interest as well as additional tax. For example, a "substantial understatement penalty" equal to twenty percent (20%) of a substantial understatement of income tax could be imposed in certain circumstances. Interest on deficiencies is determined periodically by applying an average adjusted prime rate charged by commercial banks and is compounded daily.

### State and Local Taxes

In addition to U.S. federal income taxes, Unitholders will likely be subject to other taxes, including foreign, state and local taxes, unincorporated business taxes and estate inheritance or intangible taxes that are imposed by the various jurisdictions in which the Fund conducts business or own property now or in the future, even if they do not live in any of those jurisdictions. A discussion of these taxes is beyond the scope of this Memorandum. Unitholders will likely be required to file foreign, state and local income tax returns and pay foreign, state and local income taxes in some or all of these various jurisdictions. Unitholders may be subject to penalties for failure to comply with those requirements. The Fund intends to own assets and conduct business in North Dakota, Colorado and other states. It is the responsibility of each Unitholder to file all required U.S. federal, foreign, state and local tax returns. In addition to income and franchise taxes, Delaware, Colorado, North Dakota, Montana or their political subdivisions may also levy property taxes, sales and use taxes, and occupational license taxes. A discussion of these taxes is beyond the scope of this Memorandum. However, because of the possibility that such taxes may have an impact on the

economic value of the Fund and on the value of the Unitholders' interests therein, the Unitholders should consult with their own tax advisors to determine the effect of such taxes.

**Tax-Exempt and Non-U.S. Persons**

Investment in Units by tax-exempt entities, such as employee benefit plans and individual retirement accounts (known as IRAs), and non-U.S. persons raises issues unique to them. For example, virtually all of the Fund's income allocated to organizations exempt from U.S. federal income tax, including IRAs and other retirement plans, will be unrelated business taxable income and will be taxable to them. These tax exempt organizations will also be allocated their proportionate share of operating expenses of the Fund, including intangible drilling costs. Distributions to non-U.S. persons will be reduced by withholding taxes imposed at the highest applicable effective tax rate and non-U.S. persons will be required to file U.S. federal income tax returns and pay tax on their allocable share of the Fund's taxable income. A discussion of these issues is beyond the scope of this Memorandum. Any tax-exempt entity or non-U.S. person should consult its tax advisor before investing in Units.

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THE FUND.

*[Remainder of page intentionally left blank.]*

## POTENTIAL CONFLICTS OF INTEREST

The Fund is subject to various conflicts of interest arising out of its relationship with the MGP, the Investment Manager, CEA, and their respective principals and affiliates. None of the agreements and arrangements between the MGP, the Investment Manager, and CEA are the result of arm's-length negotiations. These conflicts include, but are not limited to, the following:

### MGP May Buy Unsubscribed Units of the Offering

The MGP is authorized to purchase any unsubscribed Units of the Offering. The MGP may also sell its carried interest in the Fund without the consent of the Unitholders.

### No Separate Representation

The MGP is represented by legal counsel in connection with the Offering. The MGP's legal counsel has not acted on behalf of the Fund or any Unitholder. Each of the Fund, Investment Manager, MGP, CEA (collectively, the "Management Parties") and each of their respective principals have not been represented by separate counsel in connection with the formation of each of Management Parties or the drafting of this Memorandum and the Partnership Agreement, any other of the various agreements and other documents or entities relevant to this Offering. The attorneys, accountants and other experts who perform services for each of the Management Parties may perform similar services for the principals of Management Parties and their affiliates and it is contemplated that such multiple representations will continue in the future. However, should the Management Parties become involved in disputes, the MGP will cause the disputing parties to retain separate counsel for such matters.

### Investment Manager

The Investment Manager has adopted policies and procedures designed to address conflicts of interest, including procedures regarding the allocation and aggregation of investment opportunities among clients and a Code of Ethics, which includes a standard of business conduct and establishes policies and procedures with regard to personal securities transactions of the Investment Manager's personnel. **See "Potential Conflicts of Interest – Investment Manager Policies" on page 28.**

Principals of the MGP and Investment Manager are the same Principals of the general partner, manager and the investment manager of the Affiliate Funds and the Parallel Funds. They may also conduct investment activities for their own accounts. In addition, the Investment Manager may, from time to time, sponsor new funds and manage Affiliate Funds. The Affiliate Funds may have investment objectives or may implement investment strategies similar to, or different from, those of the Fund. In that regard, the MGP and Investment Manager may give advice or take action with respect to Affiliate Funds that differs from the advice given with respect to the Fund. To the extent that a particular investment is suitable for both the Fund and Parallel Funds and the timing for the purchase or sale of such security is the same for all such clients, such an investment will be offered to the Fund and Parallel Funds *pro rata*.

The MGP and the Investment Manager will use their best efforts in connection with the purposes and objectives of the Fund and will devote so much of their business time and effort to the affairs of the Fund as may, in their judgment, be necessary to accomplish the purposes of the Fund. Each of the Partnership Agreement and Investment Management Agreement specifically provide that each of the MGP and Investment Manager may conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Fund.

Without limiting the generality of the foregoing, but subject to the requirements of the Advisers Act and other applicable law, members of the MGP and Investment Manager may act as the investment adviser or investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their own name or through other entities, and may serve as officers, directors, consultants, partners or stockholders of one or more investment funds, partnerships, securities firms or advisory firms. It may not always be possible or consistent with the investment objectives of the various persons or entities described above and of the Fund for the same investment positions to be taken or liquidated at the same time or at the same price.

Competition by the Fund with Affiliates

Each of the MGP and Investment Manager, and their respective principals, employees, agents, members, and affiliates may form additional entities in the future to engage in activities similar to those of the Fund, and may be engaged in sponsoring one or more such additional entities at approximately the same time as the Fund's investments are being made. These activities may involve conflicts of interest and/or direct competition. Such person's pursuit of competing activities will not be construed as a breach of such person's duties to each of the Fund or any Unitholder. The Fund may enter into transactions with Affiliate Funds and there is no guarantee that such transactions will be negotiated on arms-length terms.

In the event of material conflicts relating to proposed transactions among the Fund, MGP or Investment Manager and their respective affiliates, the MGP may, but is not required to, elect to form an Advisory Committee to review the fairness of such transactions. The general structure of such an Advisory Committee is described under **"Advisory Committee" on page 31** herein.

Investment Manager Policies

The Investment Manager has adopted an Investment Selection Policy applicable to all of the funds that it manages, including the Fund. The policy applies to any potential investment that presents itself to the Investment Manager and that is expected to require more than $1,000,000 of capital, including drilling and development.

Under the policy, an acquisition team comprised of the Director of Acquisitions & Divestitures, President of Oil & Gas Operations, Chief Engineer, Geologist, and Chief Analytics & Performance Officer of the Investment Manager is responsible for evaluating the various investment opportunities that present themselves to the Investment Manager.

All incoming opportunities are referred first to Frank Canepa, the Director of Acquisitions & Divestitures to identify the opportunity and make an initial determination of whether it fits with the investment strategy of any funds managed by the Investment Manager such that the devotion of further resources is warranted.

If the opportunity passes the initial stages of review by Mr. Canepa, the other members of the acquisition team become more actively involved in evaluating the opportunity and further due diligence is conducted to enable the Investment Manager to have a clear understanding of the investment, including risk/return expectations, capital needs, timeline, and fit.

If the acquisition team determines to proceed with the opportunity after this due diligence is conducted, the acquisition team formulates its offer and acquisition strategy and recommends the opportunity to the Principals for approval. Unanimous approval by the Principals is required in order to proceed with the offer. If the offer is approved, it is further developed and delivered to the target and the acquisition team and others work to complete and document the transaction.



FOIA Confidential Treatment Requested by Criterion Wealth Management 

## Affiliate Transaction Policy

Periodically, the Fund may acquire or sell oil and gas related assets from or to an Affiliate Fund. By executing the Partnership Agreement, Unitholders agree that the MGP may cause the Fund to engage in such related party transactions on the terms described below and will be deemed to have satisfied its fiduciary obligations to each Unitholder in connection with such related party transactions. In order to satisfy its fiduciary obligations for any transaction with an Affiliate Fund, the MGP has adopted the following policies:

- Neither the MGP nor any Affiliate Fund shall sell, transfer or convey any property to or from the Fund, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Unitholders.

- If the asset(s) being acquired or sold has a fair market value ("FMV") of greater than $250,000, as determined by the MGP, in its sole discretion, the MGP must either (i) obtain an appraisal by an independent third-party ("Appraisal"), (ii) obtain a valuation from an independent engineering firm ("Reserve Report"), or (iii) compile comparable asset valuations relying in good faith on any other third-party support ("Third Party Compilation"), to determine the FMV of the asset.

- If a basket of assets ("Basket") is acquired in a single transaction by an Affiliate Fund or the Fund, as applicable, the MGP, in its sole discretion, may unbundle the Basket and sell the individual assets to an Affiliate Fund or the Fund, as applicable, by establishing the asset values, by (i) Appraisal, (ii) Reserve Report, or (iii) Third-Party Compilation.

- If the asset(s) being acquired or sold has a FMV of less than $250,000, as determined by the MGP, in good faith, the MGP may determine FMV using any reasonable method.

## Allocation Policy

The Investment Manager has adopted an Allocation Policy applicable to all of the funds that it manages, including the Fund, the Parallel Funds and each Affiliate Fund. The policy sets forth the procedures for determining which funds managed by the Investment Manager should be considered appropriate investor candidates for each investment opportunity presented to the Investment Manager.

In making this determination, the Investment Manager considers the risk/return and cash flow, lifecycle, capital requirements, and diversification and compatibility with existing fund assets of the various funds it manages to determine the pool of investor funds for which a particular investment opportunity might be appropriate. The Investment Manager then allocates that opportunity among those investor funds using the following rules: (i) with certain limited exceptions described in the policy, all joint investments must be made on substantially identical terms; and (ii) the Investment Manager must allocate investments among the investor funds based on their available capital relative to the size of the investment.

## Valuation Policy

The Investment Manager has adopted a valuation policy applicable to all of the funds that it manages, including the Fund, the Parallel Funds and each Affiliate Fund (the "Valuation Policy"). The policy sets forth the procedures for ensuring appropriate, accurate, and consistent internal rate of return (IRR) calculations for all funds managed by the Investment Manager.

IRRs are calculated twice each year, as of June 30 and December 31. Such calculations reflect all actual cash flows, plus or minus changes in the fair value of each fund's net assets. A fund's fair value will typically reflect the book value of all non-oil and gas assets. The fair value of oil and gas assets is determined by a reserve engineering report prepared in compliance with SEC rules by third-party engineering firms engaged by the Investment Manager. The Investment Manager determines the value of undeveloped acreage at acreage prices based on industry knowledge, any appropriate and available recent comparables, significant current and ongoing market deal evaluation activities, and recent appraisals to the extent available.

Once the value for the various fund assets is determined in accordance with the policy, the Investment Manager may apply discounts if the Investment Manager has reason to believe the collective values assembled exceed the amount that could be realized upon a sale. Any final discount will typically be between zero percent (0%) and fifteen percent (15%) of the valuation. After applying this discount, if any, all fees will be estimated as if an actual sale and liquidation at such fair market value took place. All such fees will then be subtracted, yielding a final net fair value to be used for the IRR calculations.

Consistent with the Valuation Policy, the Investment Manager may elect to value all assets at cost for up to one full calendar year following the Final Closing Date.

## Operations Management Policy

The Investment Manager has adopted an Operations Management Policy applicable to all of the funds that it manages, including the Fund. The policy sets forth the procedures to ensure optimization of costs and results associated with well operations, and to manage conflicts of interest.

CEOC is a wholly-owned subsidiary of the Investment Manager, and is the operator of record for certain oil and gas projects. CEOC has contracted with Cynosure Energy, LLC ("Cynosure"), of which Coachman Energy Partners, LLC owns 51% of the membership interest as of January 1, 2015, to perform operations on its behalf for those oil and gas projects. CEOC has substantial and continuous involvement with the Cynosure team. Neyeska Mut is the managing director of Cynosure Energy LLC. She is the spouse of Stephen Mut, who serves as the President of Oil & Gas Operations for the MGP.

Cynosure prepares each Authorization for Expenditure (AFE) for all wells to be drilled, in consultation with Frank Canepa, the Director of Acquisitions & Divestitures of Investment Manager and the President of CEOC. All AFEs must be approved by the CEOC approval committee, which consists of Frank Canepa, Randall Kenworthy, Caroline Gash, and Don Scott (the "Approval Committee"). Mr. Canepa is also responsible for reviewing actual cost results against the AFE and to discuss any overruns exceeding ten percent (10%) in total with the Approval Committee.

Cynosure has responsibility for vendor selection, in consultation with Mr. Canepa. Any vendor that is reasonably expected to receive amounts in excess of the lesser of (i) $2,000,000; or (ii) five percent (5%) of the total cost of a particular project must be approved by the Approval Committee.

Mr. Canepa and Cynosure, as well as outside consultants, are heavily involved in the process of obtaining necessary permits and complying with the various regulatory requirements applicable to the projects. Mr. Canepa is required to keep the Approval Committee informed and involve the Approval Committee in decision-making as he deems appropriate.

## Management of the Fund

The Principals of Coachman Energy Partners LLC are also the Principals of the managers or general partners of the following entities: Coachman Energy Administrator LLC, Bakken Income Fund LLC, Coachman Energy Land II LLC, Bakken Drilling Fund III LP, Bakken Drilling Fund IV LP, Bakken Drilling Fund IVB LLC, Coachman Acquisition III LLC, Coachman Energy VII LLC, Coachman Energy Operating Company LLC, Coachman Energy VIII LLC are substantially the same as the MGP. The management of these funds involves conflicts of interest and/or direct competition between the managers and the related funds.

## Advisory Committee

The MGP may form one or more Advisory Committees to assist the MGP in making decisions related to the Fund. A minimum of three (3) Advisory Committee members may be appointed by the MGP to: (1) advise the MGP on such matters related to the Fund, as the MGP may request; or (2) review and recommend or not recommend the resolution of any conflict related to the Fund presented to the Advisory Committee; *provided, however,* that any investment decisions made on behalf of the Fund by the Investment Manager will not be subject to review by any such Advisory Committee. The Advisory Committee may be designated as either a binding or non-binding authority. Unitholders shall receive notice of such Advisory Committees upon formation, as applicable.

## Indebtedness and Guaranty Fees

The MGP may cause the Fund to incur indebtedness. In the event that the Fund incurs indebtedness, the Investment Manager will be entitled to a one-time one percent (1%) origination fee and a one-time one percent (1%) fee on any drawdown on such indebtedness. The indebtedness fees are for the Investment Manager's efforts in assisting to arrange such debt for the Fund and subsequently managing assets purchased or acquired from the indebtedness. In the event the MGP or its affiliates is required to guarantee any such indebtedness or extensions of credit, the MGP or its affiliates may charge the Fund a one-time two percent (2%) Guaranty Fee payable to the MGP or such affiliate.

*[Remainder of page intentionally left blank.]*



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572464

## USE OF PROCEEDS

The net proceeds available to the Fund (after commissions, fees and expenses are paid) should the Maximum Offering Amount be raised are expected to be approximately $215,625,000. The following table sets forth the estimated use of the proceeds of the Offering, assuming (A) the sale of the Maximum Offering Amount; and (B) the Offering is not extended to $300,000,000, per the Overallotment.

*[Continues on next page.*]

| | Minimum Offering Amount | % of Total | Maximum Offering Amount | % of Total |
|---|---|---|---|---|
| **SOURCE OF FUNDS** | | | | |
| Gross Offering Proceeds | $1,000,000 | 100.00% | $250,000,000 | 100.00% |
| Less: | | | | |
| Selling Commissions[1] | $70,000 | 7.00% | $17,500,000 | 7.00% |
| Managing Broker Dealer Fee[2] | $37,500 | 3.75% | $9,375,000 | 3.75% |
| Organizational Fee[3] | $30,000 | 3.00% | $7,500,000[4] | 3.00% |
| **Net Proceeds to Invest** | **$862,500** | **86.25%** | **$215,625,000** | **86.25%** |
| **USE OF FUNDS[5]** | | | | |
| Acquisitions | $414,800 | 48.09% | $103,700,000 | 48.09% |
| Drilling and Completing | $447,700 | 51.91% | $111,925,000 | 51.91% |
| **Net Proceeds to Invest** | **$862,500** | **100.00%** | **$215,625,000** | **100.00%** |

---

1 Selling commissions are paid to licensed FINRA member broker dealer firms as compensation for selling Units through their registered representatives. Such commissions will equal up to seven percent (7%) of the Capital Contributed; *provided*, *however*, that in the event that an Investor contributes $5,000,000 or more to the Fund, then such Participating Broker-Dealer's selling commission shall be reduced from seven percent (7%) to two percent (2%).

2 The Managing Broker-Dealer will receive a non-accountable Managing Broker-Dealer Fee in the amount of 3.75% of the Capital Contributed. The Managing Broker-Dealer will not be required to account for the spending of amounts comprising this fee. The Managing Broker-Dealer may re-allocate and pay any portion of the Managing Broker-Dealer Fee to the Participating Dealers. The Managing Broker Dealer Fee is solely related to this Offering. An Affiliate of the Managing Broker Dealer will also receive one and one-half percent (1.5%) of the ongoing Distributions once the MGP becomes entitled to receive thirty percent (30%) of the Cash Available for Distribution, which will be allocated from the Distributions owed to the MGP and not the Unitholders. Effective March 18, 2011, certain affiliates of the Fund entered into a consulting services agreement with Managing Broker Dealer for a monthly retainer. Such retainer adjusts on a monthly basis and may be terminated by either party with sixty (60) days' notice. The Fund has no direct or indirect payment obligation with respect to the monthly retainer fee. The Fund's affiliates are solely responsible for payment of the monthly retainer and such retainer shall not be paid form the proceeds of the Offering.

3 The Organizational Fee is equal to three percent (3%) of the aggregate Capital Contributions and is provided solely as a reimbursement of expenses incurred by the MGP for the organization of the Fund and syndication of the Units. These expenses include, but are not limited to, legal fees, industry advisory fees, printing costs, marketing costs, administrative expenses and due diligence costs as well as the time and efforts of the MGP. The Organizational Fee shall be paid out of aggregate Capital Contributions; *provided, however*, the Fund may, but is not obligated to pay the Organizational Fee out of funds received from the Investing Company.

4 Notwithstanding the amounts set forth in the table above, anticipated proceeds from the Offering will be used to pay the Fund's operating expenses until sufficient revenues are available to the Fund to cover such expenses.

5 The drilling and completing amount indicates both direct and indirect expenses. The indirect expenses include, among other things, operating expenses and compensation to the Manager. Such compensation is described under **"The Offering – Fees and Expenses" beginning on page 36**. Other general operating expenses of the Fund may also be paid out of Offering proceeds.

# THE OFFERING

## Offering Amount

The Fund is offering up to two thousand five hundred (2,500) Units (as such number may be increased for the Overallotment) at a price of $100,000 per Unit payable in cash, subject to the Incentives and Investing Company Credit. Purchasers of the Units offered for sale hereby will be admitted to the Fund as limited partners or general partners, as specified in their Subscription Documents, and will have the rights as set forth in the Partnership Agreement and applicable law. The Maximum Offering Amount will be $250,000,000. The Minimum Offering Amount will be $1,000,000. In calculating the Minimum Offering Amount, subscriptions proceeds from the MGP or its affiliates will be included. The MGP may elect, in its sole discretion, at any time during the Initial Offering Period or the Extended Offering Period to increase the amount of capital raised by the Fund by up to an additional $50,000,000. If the Fund does not raise the Minimum Offering Amount by the Offering Termination Date, it will return all funds received without interest and discontinue the Offering.

## Coachman Energy VIB LLC

The MGP and Investment Manager have created the Investing Company solely as a special purpose entity to invest substantially all of its capital into the Fund and to provide Investing Company investors certain tax benefits. The combined equity invested in the Fund (A) by either directly or indirectly through the Investing Company and (B) by employee benefit plans subject to ERISA or certain provisions of the Code may not exceed twenty-five percent (25%) of the value of any class of equity of the Fund and shall be subject to adjustment to the extent necessary to comply with such requirement.

## Closing

The Fund will execute periodic closings during the Offering. These closings will be on either the first (1st) or sixteenth (16th) day of each month as determined by the MGP and governed by the terms of the Partnership Agreement. The MGP will accept or reject each Subscription Document in its sole discretion within ten (10) days of receipt. All funds received from prospective investors will initially be deposited into the Escrow Account.

## Subscription Amount

Subject to the Incentives described below, each Purchaser of Units will contribute $100,000 per Unit; *provided, however,* that any investments made by the Investing Company will receive the Investing Company Credit. The minimum investment by a Purchaser is one (1) Unit; provided, however, the MGP may offer and sell less than one (1) Unit to any investor in its sole discretion; and provided, further, that in no event will the MGP accept any subscription for less than one-half (1/2) Unit.

The management team of the MGP and its employees will also contribute one percent (1%) of the total investment in the Fund in cash.

Stage 1 Investors will receive a twelve percent (12%) gross up on the number of Units purchased, resulting in the issuance to such Stage 1 Investor of 1.136 Units per $100,000 contribution. The MGP may reduce or increase the number of Stage 1 Units available for issuance in connection with the Stage 1 Early Investor Incentive in its sole discretion, at any time, upon seven (7) days' prior notice to the existing investors.

Following the termination of Stage 1, Stage 2 Investors will receive a six percent (6%) gross up on the number of Units purchased, resulting in the issuance to such Stage 2 Investor of 1.064 Units per $100,000 contribution. The MGP may reduce or increase the number of Stage 2 Units available for issuance in connection with the Stage 2 Early Investor Incentive in its sole discretion, at any time, upon seven (7) days' prior notice to the existing investors.

Broker dealers and RIAs who have either (i) entered into selling agreements with the Fund, or (ii) commenced due diligence on the Offering as of the date of this Memorandum will have 115 days from the date of this Memorandum to sell the Stage 1 Units and, following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Broker dealers and RIAs who have neither (i) entered into selling agreements with the Fund, nor (ii) commenced due diligence on the Offering as of the date of this Memorandum will have 135 days from the first date subsequent to the date of this Memorandum on which such broker dealer or RIA is contacted by the Fund or a wholesale representative of the Fund to sell the Stage 1 Units, and following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Once both Stage 1 and Stage 2 have lapsed, however, such broker dealers and RIAs shall no longer be eligible to offer any Stage 1 Units or Stage 2 Units (collectively, "Early Incentive Units") to their clients even if all of the Early Incentive Units have not been sold by the Fund.

Additionally, any single investor or Group purchasing a minimum of twenty (20) Units in a single transaction will receive a ten percent (10%) gross up on the number of Units received, resulting in receipt of 1.111 Units per $100,000 contribution. The Major Investor Incentive may not be combined with the Early Investor Incentives. The Investing Company shall qualify for the Major Investor Incentive only to the extent that an individual or Group within the Investing Company qualifies individually or as a Group.

The Incentives shall at all times be subject to the requirement that less than twenty-five percent (25%) of the value of any class of equity of the Fund be held by a Plan and shall be subject to adjustment to the extent necessary to comply with such requirement.

## Offering Period

The Initial Offering Period will be until the earlier of June 30, 2016, or the date on which this Offering is fully subscribed. The MGP reserves the right, in its sole discretion, to extend the Initial Offering Period one (1) time for a period of up to an additional twelve (12) months ("Extended Offering Period"). The Extended Offering Period will be initiated through a supplement to this Memorandum and such supplement will become part of this Memorandum. The last day of the Initial Offering Period, or in the event of an extension, the Extended Offering Period, is the "Offering Termination Date." The "Final Closing Date" will be the earlier of (i) the date the Maximum Offering Amount has been issued or (ii) the Offering Termination Date.

## Cash Distributions

Distributions may be made at any time as determined by the MGP. The MGP, in its sole discretion, will cause the Fund to establish such reserves in such amounts as reasonably necessary for payment of all expenses of the Fund or as the MGP, in good faith, determines as necessary or appropriate.

Prior to the second (2nd) anniversary of the Final Closing Date (as defined herein), no distributions of cash will be made. Available cash generated during the initial two (2)-year period may be reinvested into additional drilling and/or used to acquire additional oil and gas properties Thereafter, Distributions may be made at any time as determined by the MGP.

The Fund's ability to make Distributions is dependent upon proceeds from the sale of hydrocarbons. The MGP intends to make Distributions only when there is Cash Available for Distribution and then only in accordance with the Partnership Agreement and applicable law. The MGP, in its sole discretion, will make such determination on a monthly basis. To the extent there is Cash Available for Distribution, the MGP may cause the Fund to make Distributions within thirty (30) days of the end of each month; *provided, however,* that the MGP may elect to, in its sole discretion, cause the Fund to make Distributions within thirty (30) days of the end of each quarter. Cash Available for Distribution will be distributed in the following manner:

- First, ninety percent (90%) to the Unitholders *pro rata* based on their relative Percentage Interests, until such Unitholders receive one hundred percent (100%) of their relative initial Capital Contribution and the Preferred Return, and ten percent (10%) to the MGP.

- Thereafter, seventy percent (70%) to Unitholders *pro rata* based on their relative Percentage Interests and thirty percent (30%) to the MGP.

Notwithstanding the foregoing, the MGP may cause the Fund to make cash distributions out of the Capital Contributions in an amount intended to equal the tax liability of either the MGP or any Unitholder with respect to allocations of income or gain from the Fund as to its carried interest.

<u>Escrow of Funds</u>

The Fund will establish an Escrow Account with Colorado State Bank and Trust, 1600 Broadway, 4th Floor, Denver, Colorado 80202 as Escrow Agent pursuant to an Escrow Agreement. The funds accepted by the Managing Broker Dealer and MGP will be deposited in the Escrow Account until receipt of the Minimum Offering Amount. Upon receipt of Minimum Offering Amount, the Fund will be permitted to withdraw funds and deposit in the Fund's bank account to be deployed as indicated in "**Use of Proceeds" beginning page 32**. Before the funds are invested in Projects, such funds may be temporarily invested in income producing short-term, highly liquid investments, in which there is appropriate safety of principal, such as U.S. Treasury Bills. If the MGP determines that the Fund may be deemed an investment company under the 1940 Act, then the investment activity will cease.

<u>Fees and Expenses</u>

| | **Minimum Offering Amount** | **Maximum Offering Amount** | **% of Total** |
|---|---|---|---|
| **Gross Proceeds** | $1,000,000 | $250,000,000 | 100.0% |
| | | | |
| ***Organizational Fee*** | | | |
| Reimbursement for Organizational Expenses | $20,000 | $5,000,000 | 2.0% |
| Reimbursement for Syndication Expenses | $10,000 | $2,500,000 | 1.0% |
| | | | |
| ***Annual Management Fee*** | | | |
| Prior to Investor Preference | $25,000 | $6,250,000 | 2.5% |
| Post Investor Preference | $10,000 | $2,500,000 | 1.0% |

Upon receipt of the Minimum Offering Amount and each subsequent closing, the Fund will pay to the MGP, or CEA on the MGP's behalf, an Organizational Fee equal to three percent (3%) of the aggregate Capital Contributions; *provided, however,* the Fund may, but is not obligated to pay the

Organizational Fee out of funds received from the Investing Company. The Organizational Fee is provided solely as a reimbursement of expenses incurred by the MGP related to the organization of the Fund and syndication of the Units. These expenses include, but are not limited to, legal fees, industry advisory fees, printing costs, marketing costs, administrative expenses and due diligence costs as well as the time and efforts of the MGP.

Additionally, the Fund will pay to MGP, or CEA on MGP's behalf, an Annual Management Fee in an amount equal to two and one-half percent (2.5%) of the aggregate Capital Contributions for expenses relating to the provision of investment management services. The Annual Management Fee may not exceed either (i) $6,250,000, in the event the MGP elects not to offer the Overallotment; or (ii) $7,500,000, in the event the MGP elects to offer the Overallotment. The Annual Management Fee shall be reduced to one percent (1%) of aggregate Capital Contributions at the earlier of such time as the carried interest of the MGP is equal to thirty percent (30%), or five (5) years from the date the Fund closes.

CEA will receive an annual reimbursement equal to a maximum (per year) of one and one-half percent (1.5%) of the aggregate Capital Contributions for expenses incurred in providing administrative services to the Fund as well as Affiliate Funds (the "Management Expenses"), including overhead expenses. The actual costs for services such as accounting, tax preparation, financial audits, legal, allocable compensation, petroleum engineering, geology, and third party engineering reserve reports are borne by the fund for which these services are performed.

The Annual Management Fee and Management Expenses will be paid monthly on the last day of each month, and shall be based on the Capital Contributions received by the Fund as of the end of each month. The amount to be paid on the last day of each month shall be equal to the cumulative amounts owed to date, less all previous amounts paid.

In exchange for the Annual Management Fee, the Investment Manager will provide investment services, including, without limitation:

- finding, evaluating, and conducting diligence on oil and gas production acquisition and mineral acreage investment opportunities in the Bakken and Three Forks production zones in North Dakota, the Williams Fork and Mancos production zones in Colorado, Montana and other generally unconventional production zones in other select prospects in North America;

- negotiating terms of investment in various properties and working interests, including the joint operating agreements, participation agreements and related governing documents on behalf of the Fund;

- on the Fund's behalf, engage and contract third party professionals such as geologists, geophysicist, and petroleum engineers to evaluate potential plays, evaluating proposals from operators, and providing production and reserving valuation opinions;

- on the Fund's behalf, conduct diligence on oil and gas production acquisition and mineral acreage investment opportunities in the Bakken and Three Forks production zones in North Dakota, the Williams Fork and Mancos production zones in Colorado, Montana and other generally unconventional production zones in other select prospects in North America;

- managing any reporting and compliance with the IRS, SEC and other federal laws and regulations including any required state or local law compliance on behalf of the Fund;

- negotiating and entering into hedging facilities on behalf of the Fund; and
- providing the pre-closing and post-closing accounting platforms to support the investment and preparing the requisite financial statements and reports on an ongoing basis on behalf of the Fund.

Indebtedness and Guaranty Fees

In the event that the Fund incurs indebtedness, the Investment Manager will be entitled to a one-time one percent (1%) origination fee and a one-time one percent (1%) fee on any drawdown on such indebtedness. The indebtedness fees are for the Investment Manager's efforts in assisting to arrange such debt for the Fund and subsequently managing assets purchased or acquired from the indebtedness. In the event the MGP or its affiliates is required to guarantee any such indebtedness or extensions of credit, the MGP or its affiliates may charge the Fund a one-time two percent (2%) Guaranty Fee payable to the MGP or such affiliate.

Hedging

In order to mitigate the risk of commodity price volatility, the Investment Manager may employ such techniques as it considers appropriate, including hedging transactions, for the Fund in light of the conditions and trends in commodity prices and securities markets at the time. The Commodities Exchange Act and CFTC Rules have been amended in certain respects as a result of the adoption of the Dodd-Frank Act. As a result of these amendments, the Investment Manager will be required to comply with clearing and trade-execution requirements (or take steps to qualify for an exemption to such requirements) in connection with hedging activities. New regulations may also require the Investment Manager to comply with margin requirements although these regulations are not finalized and their application to the Fund is uncertain at this time. **See "Risk Factors – Derivative Regulations" beginning on page 14**. There can be no assurance that the Investment Manager's objectives will be satisfied or that Unitholders will not lose money. The Investment Manager will determine whether the Fund will use hedging for the Fund's estimated production.

Investor Suitability Requirements

Each subscriber will be required to make certain representations concerning the appropriateness of this investment in each of the Subscription Documents and Partnership Agreement. The MGP may also require independent verification of the representations provided by subscribers, in order to assure compliance with applicable federal and state securities laws. Further, the MGP and the Managing Broker Dealer will have sole discretion regarding acceptance of any subscription.

The investor standards in the Subscription Documents represent minimum requirements for subscribers, and the satisfaction of such standards does not necessarily mean that the Units are an appropriate investment for a subscriber. Comparable standards, as well as various other restrictions, will be imposed in connection with any resale of the Units.

Transfer Restrictions

As set forth more particularly in Article 11 of the Partnership Agreement, the transfer of Units shall be restricted. Unitholders may transfer some or all of such Unitholder's Units to permitted persons (e.g., the Fund, affiliates of the Fund, existing Unitholders, by gift, trust, or death of the Unitholder, or upon the approval of the MGP). In all other circumstances, Unitholders must first make an offer to sell such Unitholder's Units to the MGP, among other conditions, including obtaining the MGP's written

consent, an opinion of counsel, and providing such information to the MGP to effect the transfer as shall be required under Article 11 of the Partnership Agreement.

## Subscription Procedure

All persons or entities desiring to subscribe for and purchase Units must complete, execute and deliver to the Managing Broker Dealer, the Subscription Document along with a deposit via wire transfer, personal or certified check for their entire Capital Contribution in the Fund. The applicable closing(s) will be scheduled to occur on either the first (1st) or sixteenth (16th) day of each month as will be set forth in each Subscription Document. The Managing Broker Dealer will review each subscription for completeness; the MGP will accept or reject each Subscription Document, in its sole discretion, within ten (10) business days of receipt. If the MGP or the Managing Broker Dealer rejects a Subscription Document, the accompanying subscription payment will be returned to the subscriber within ten (10) business days. Each investor must deliver all the completed documents described in Appendix I under "Subscription Documents."

## Parallel Funds

The MGP or its affiliates may organize, and offer and sell securities of, one or more collective investment vehicles, special purpose vehicles, or other contractual arrangements, created to give any individual or entity the opportunity to invest in Projects alongside the Fund, including but not limited to Coachman VII (collectively, the "Parallel Funds"). Each Parallel Fund shall (i) make and dispose of each investment in a Project at the same time and on the same terms as the Fund makes and disposes of its corresponding investment in such Project and (ii) make an investment in each Project, and bear expenses related to any investment or prospective investment in a Project, in the same proportion of its aggregate capital commitments available for investment as the portion of the Fund's aggregate capital commitments available for investment that is invested in (or proposed to be invested in) each such Project.

From time to time prior to ninety (90) days after the Final Closing Date (and subject to any applicable legal, tax, accounting or regulatory considerations), each Parallel Fund shall purchase from or sell to the Fund or any other Parallel Fund, as applicable, at fair value (calculated pursuant to the Valuation Policy applicable to the Fund and the Parallel Funds), as if the Unitholders and the participants in such Parallel Fund were partners of a single pooled investment vehicle, a portion of any investment in a Project to the extent necessary for the Fund and each Parallel Fund to each own the portion of each investment in a Project that it would own if all investments had been made as of the date of such transfer; provided that the MGP may make any equitable adjustments to such valuation that it believes would be fair or equitable, including to reflect accrued but unpaid interest or dividends, prior distributions made to the Unitholders or participants in a Parallel Fund with respect thereto, and/or the excuse or exclusion of any Unitholder or participant in a Parallel Fund from one or more investments in Projects.

## Offering Subject to Modification

This Offering is subject to modification from time to time by the MGP through the issuance of a supplement(s) that would describe any material changes from the terms and conditions of the original Offering. Any supplement(s) will become part of the Memorandum and no investment decision should be made by a potential investor without consideration of the material changes outlined in the supplement(s).

<u>Citi Feeder Fund and Coachman Investment Obligations</u>

Affiliate private banks of Citibank have sponsored the Citi Feeder to invest substantially all of its capital in Coachman VII, which will then co-invest substantially all of its capital in certain Projects on the same terms and conditions in which the Fund will also be investing. Unless otherwise agreed to in writing by the Citi Feeder and Coachman VII, the Fund, together with the Affiliate Funds, is required to invest one-half (1/2) of all amounts invested by Coachman VII in any Projects in which Coachman VII invests. In the event the Fund and/or the Affiliate Funds are unable to invest at least one-half of the amounts invested by Coachman VII in various Projects, the Citi Feeder may terminate its offering.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

# THE FUND

## Fund Highlights

- DIRECT INVESTMENT:
  - The Fund plans to invest in oil/natural gas at the wellhead, not an equity interest.
- PROVEN PERFORMER:
  - Coachman is a proven manager whose previous full cycle funds generated substantial investor returns: 2.0X ROI, 18% IRR — Coachman Energy I; 1.5X ROI, 26% IRR — Coachman Energy II.[6]
- SPONSOR CO-INVESTMENT:
  - The management team of Coachman and its employees will also contribute one percent (1%) of the total investment in the Fund in cash.
- FUND INCENTIVES:
  - Choice between general partner and limited partner interests.
  - Twenty-five percent (25%) gross Preferred Return to Unitholders.
  - Early Investor Incentives: Stage 1 Investors will receive a twelve percent (12%) gross up on the number of Units subscribed for by such Stage 1 Investor, resulting in the issuance to such Stage 1 Investor of 1.136 Units per $100,000 contribution. Stage 2 Investors will receive a six percent (6%) gross up on the number of Units subscribed for by such Stage 2 Investor, resulting in the issuance to such Stage 2 Investor of 1.064 Units per $100,000 contribution.
  - Early Investor Incentive Availability to Broker Dealers:

    Broker dealers and RIAs who have either (i) entered into selling agreements with the Fund, or (ii) commenced due diligence on the Offering as of the date of this Memorandum will have 115 days from the date of this Memorandum to sell the Stage 1 Units and, following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

    Broker dealers and RIAs who have neither (i) entered into selling agreements with the Fund, nor (ii) commenced due diligence on the Offering as of the date of this Memorandum will have 135 days from the first date subsequent to the date of this Memorandum on which such broker dealer or RIA is contacted by the Fund or a wholesale representative of the Fund to sell the Stage 1 Units, and following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

    Once both Stage 1 and Stage 2 have lapsed, however, such broker dealers and RIAs shall no longer be eligible to offer any Early Incentive Units to their clients even if all of the Early Incentive Units have not been sold by the Fund.

---

[6] Net of fees. Reviewed by KPMG LLP through an agreed upon procedure.

- Major Investor Incentive: Any single investor or Group purchasing a minimum of twenty (20) Units in a single transaction will receive a ten percent (10%) gross up on the amount of Units received, resulting in receipt of 1.111 Units per $100,000 contribution.
- Option to reinvest any distributions (there is no guarantee any distributions will be made) for the purchase of Units at $90,000 per Unit in connection with a Dividend Reinvestment Program.

❖ EXPERIENCED TECHNICAL TEAM:

- The Fund's technical team has over one hundred (100) years combined experience managing multi-billion dollar unconventional oil and gas projects around the globe with companies like Shell and Arco.

❖ UNCONVENTIONAL LIQUIDS FOCUS:

- The Fund is oil centric; Coachman will drill primarily oil wells, which may or may not also produce natural gas and/or natural gas liquids

- The primary focus is expected to be on the Bakken and Three Forks formations in the Williston Basin within North Dakota and Montana. The Williston Basin is believed to be the largest, most prolific new oil discovery in the lower 48 United States according to a U.S. Geological Survey (USGS) assessment in April 2013; the USGS estimates 7.4 billion barrels of recoverable oil production and an estimated 6.7 trillion cubic feet of undiscovered, technically recoverable natural gas.

- The Fund plans to participate in drilling numerous wells in the Williams Fork and potentially the Mancos and Mancos B horizons in the Piceance Basin located in Southwestern Colorado. The Piceance Basin contains approximately 1.3 billion barrels of oil per acre on average, making it the richest deposit of oil shale in the U.S.

- Additionally, the Fund is considering investment opportunities in northern Colorado's Denver-Julesberg (DJ) Basin, the Central Kansas Uplift in central Kansas and Oklahoma, and the Permian Basin in western Texas. As the Fund matures it may consider investment opportunities presently not recognized.

- Due to the significant drop in crude oil prices over the last several months, the MGP anticipates significant acquisition opportunities in the Williston, Permian, Eagle Ford and Denver-Julesburg Basins along with other basins that fit the Fund's risk/return profile and development needs.

❖ FOCUS ON GROWTH

- The expected efficiencies associated with more aggressive pad drilling effectively enable the transformation of an "oil field operation" into a "manufacturing play". These efficiencies result in significantly lower costs per barrel of reserves developed and higher value creation per unit of input for those owners who are properly financed.

- The Investment Manager seeks to move assets up the reserve value chain through active development as described later in this document. Projects with large development schedules, multiple production horizons, and/or adjacent acquisitions allow the Fund to leverage its growth potential to the point that can "move the investment needle."

❖ CAPITAL ALLOCATION and DIVERSIFICATION:

- The Investment Manager expects to invest the majority of the Fund's capital in proved, development projects drilling PUDs (Proved Undeveloped) and participating in in-fill drilling with leading operators and Coachman operated prospects. A smaller allocation of capital is reserved for projects that are less developed with known geology and significant oil-in-place with superior investment return potential.

- The Fund expects to be broadly diversified, drilling approximately 350 estimated wells in two or more of North America's leading unconventional shale oil and gas basins located within multiple states.

❖ DRILL WITH THE BIGGEST AND MOST EXPERIENCED OPERATORS IN THE WILLISTON BASIN:

- In the Williston Basin's Bakken and Three Forks horizons, the Fund will participate in wells drilled and operated by some of the world's leading exploration and production companies such as Whiting, Continental, Statoil, XTO, and Oasis. **See "Williston Basin Operating Partners" beginning on page 72**. The Investment Manager will also operate wells in Colorado's Piceance Basin and possibly other like basins. By operating a percentage of the portfolio, the Investment Manager will be able to initiate/expedite drilling and completion projects as needed to enhance production cash flow and reserve value creation to complement non-operated projects.

❖ EXIT 5 years:

- The MGP intends to sell all of the Fund's assets and liquidate the Fund within five (5) years of the Final Closing Date, creating a liquidity event for the Unitholders. The MGP may extend the term of the Fund for up to two (2) additional one (1)-year periods thereafter without limited partner approval.

<u>Fund Investment Objectives and Business Plan</u>

Over the past eighteen (18) months, operators in the Williston Basin have realized an exponential rise in upfront capital expenditures, which has been driven by a radical acceleration in the drilling of Bakken and Three Forks wells. The industry has realized that the Three Forks is not only oily, but also that economic wells can be produced in at least three of four existing benches. As little as eighteen (18) months ago, the Investment Manager anticipated a maximum of six (6) Bakken and Three Forks wells per 1,280-acre spacing unit. Today, the Investment Manager believes as many as sixteen (16) to twenty (20) Bakken and Three Forks wells could be drilled per spacing unit. The industry solution to the increased drilling requirement, and the subsequent 3X increase in drilling and completion costs per spacing unit, is pad drilling. Drilling from a pad, operators can reduce individual well cost by as much as twenty percent (20%). To do so, operators must drill multiple wells (six (6) or more) from a single pad to realize the extraordinary cost savings.

The increase in Three Forks opportunity and the enormous increase in upfront capital expenditure have enabled a significant investment and acquisition opportunity for both large operators and smaller operators/non-operators like Coachman. Large operators have invested hundreds of billions of dollars in producing assets and mineral acreage through corporate mergers, acquisitions, and large-scale buyouts of major holdings. Faced with trillions of dollars of future drilling commitments, large operators are selling off non-operated positions in prime prospects. Smaller non-operated WI Owners are finding that the accelerated drilling schedules require investments in excess of their ability to fund and are prime acquisition targets.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572476

In the Williston Basin, the Investment Manager will pursue proved, non-operated Working Interests in development drilling projects from both major operators and smaller WI Owners within targeted prospects with the objective of owning twenty percent (20%) or more Working Interest. Targeted acquisitions will likely contain current oil and gas production as well as the opportunity to drill in-fill wells/PUDs. Revenues from producing wells can be used to fund drilling opportunities and increase the value of the prospect through cash flow and asset appreciation. The value of future production from producing wells may be used as collateral for low-cost debt, which provides an additional capital source to bring known reserves to producing status. In the process, undrilled “Probable” and “Possible” reserves may ascend the value chain to “Proved” status—immediately increasing the overall value of the asset.

The Investment Manager will also pursue opportunities in Colorado’s Piceance Basin. Comparable to the Williston Basin, the Piceance Basin is unconventional in nature with a contiguous production horizon, meaning it is not a matter of if hydrocarbons will be found, but rather how much can be extracted with current and future technologies. In June 2014, the Investment Manager acquired from a distressed seller a substantial position in the Piceance Basin, which will require an estimated two hundred million ($200) million (or more depending on test results in additional production zones) to completely drill the prospect. Like the smaller WI Owners in the Williston Basin, the seller could not afford to develop the acreage. Also similar to the Williston Basin, the Piceance Basin provides acquisition opportunities where a significant percentage of the acreage has been proved through drilling on or near targeted projects.

In addition to the Williston and Piceance Basins, the Investment Manager will evaluate other unconventional and occasionally conventional resource plays in other areas such as, but not limited to, the Central Kansas Uplift in Kansas and Oklahoma, the Denver-Julesburg Basins in Colorado, and the Permian Basin in Texas.

<u>Investment Strategy</u>

While the key components of the Investment Manager’s strategy are detailed in the Memorandum, a summary of the “Key Investment Criteria” is as follows:

- **Economic Performance** — Identify and invest in assets with the potential to deliver twenty percent (20%) IRR or greater with significant upside opportunity.

- **Focus on Growth**

  - **Development Phase Projects** — Invest the majority of the Fund’s capital in proved, development phase projects that participate in in-fill drilling of PUDs. In addition, place capital in projects that are less developed with known geology and significant hydrocarbons in place with superior investment return potential. This blended portfolio approach reduces risk through diversification and enhances the Fund’s ability to achieve investment return objectives.

  - **Large Scale and Manufacture Style Replication** — Participate in projects with large opportunity for growth through multi-year drilling inventories and/or adjacent expansion opportunities. Large projects with multi-year drilling inventories adapt well to manufacturing-style drilling, which allows standardization of well configurations that can be replicated over a large number of wells. This standardization provides substantial cost savings in drilling and completing operations, logistics, and supply chain management. Rapid scalability accelerates value creation and enhances cash flows through the ability to generate better prices and terms when marketing produced hydrocarbons as well as increases access to low cost debt capital.

- ➢ Due to the significant drop in crude oil prices over the last several months, the MGP anticipates significant acquisition opportunities in the Williston, Permian, Eagle Ford and Denver-Julesburg Basins along with other basins that fit the Fund's risk/return profile and development needs.

- ❖ **Unconventional Liquid-Centric Plays** — Focus on unconventional liquid (oil, condensate, and wet gas) centric prospects in North America.

- ❖ **Operators** — Presence of select high-quality major operator(s) with which the Investment Manager typically partners, or the ability for the Investment Manager to operate select prospects such as the Piceance Basin assets described herein.

- ❖ **Access to Upside** — Acquire prospects with stacked pay opportunities (the Bakken and four Three Forks benches in North Dakota; the Williams Fork and the Mancos and Mancos B in Colorado) where the primary target zone to be developed has the potential for substantial investment returns and the additional zone(s) provide future drilling opportunities and/or substantial accretive proved reserves. In addition, both active positioning and passive participation in the targeted basins may result in substantial value increases associated with commodity price moves, technology and infrastructure improvements, and an expansion of the reserve volumes that can be economically exploited.

- ❖ **Multiple Exit Opportunities** – Higher Working Interest ownership positions in assets with large inventories of wells to be drilled that possess significant production volumes and substantial proved reserves will command a premium price on exit and will be attractive to several different types of larger buyers with extremely low costs of capital.

<u>Targeted Areas:</u>

Over millions of years and by virtue of heat and pressure from overlying rocks, hydrocarbons were generated from organic material. Oil and gas were "expelled" from the original source rock when they became sufficiently mature. "Conventional oil" pools may be found in reservoirs long distances from their petroleum source bed and higher in the earth's strata where the oil is trapped by an overlying seal or impermeable rock. Most of the conventional oil generated over geologic time has naturally found its way to the earth's surface via migration along faults and fissures and seeped into ocean beds, tar pits, or into the atmosphere via evaporation. "Unconventional oil" is usually found within or very near its source "kitchen" either because it is immature (comprised of very large immobile molecules) or because the strata surrounding the source is largely impermeable, offering no pathway for migration. In this setting, source rocks are continually heated and expelled petroleum can create very high pressures, which provides a natural assistant to production activities.

*Williston Basin (Bakken) – North Dakota*



Source: USGS

The Williston Basin is a large structural basin in eastern Montana, western North Dakota, northwestern South Dakota, southeastern Saskatchewan, and southwestern Manitoba. Paleozoic age (550 to 250 million years old) rocks are oil and natural gas reservoirs. The oval-shaped basin extends approximately 475 miles (764 km) north-south and 300 miles (480 km) east-west.

In 2013 alone, Williston Basin production was over 310,000,000 barrels of oil.[7] Today, production averages about 1,000,000 barrels of oil per day in North Dakota and 75,000 barrels of oil per day in eastern Montana.[8] From 2010 to 2013, North Dakota saw an increase in production of 177%.[9] North Dakota is now the second most productive state in the U.S. (behind Texas) having surpassed Alaska in 2012.

Following successful horizontal completions in the Middle Bakken, the underlying Three Forks Formation has garnered additional attention. The Three Forks reservoirs are part of the Bakken petroleum system and were sourced with oil from the overlying Lower Bakken Shale. Where this shale is thermally mature, the underlying upper Three Forks is oil-saturated and anticipated to be economically viable with proper stimulation. Regional mapping indicates that these three dolomite intervals are continuous over a large extent of the Williston Basin.

In April 2013, the U.S. Geological Survey (USGS) updated its assessment of oil resources in the Williston Basin. The USGS estimated mean undiscovered volumes of 7.4 billion barrels of oil, 6.7 trillion cubic feet of associated/dissolved natural gas, and 0.53 billion barrels of natural gas liquids in the Bakken and Three Forks Formations in the Williston Basin Province of Montana, North Dakota, and South Dakota.[10] Recent updates from Continental Resources and Kodiak Oil estimate recoverable reserves in the Three Forks benches of 350,000 – 450,000 barrels of oil per well. This potentially doubles the recoverable reserves within each 1,280-acre spacing unit when combined with the Bakken.

In North Dakota, the Investment Manager will continue to acquire mineral leases and Working Interest positions, which include existing production and in-fill drilling opportunities, in its core area of operations in Williams, McKenzie, and Mountrail counties. In addition, the Investment Manager's experienced technical team actively monitors rapidly evolving drilling and frac'ing technologies, which may transform areas of marginal economic well performance into attractive acquisition targets. Should well production and overall reserves increase due to enhanced completion techniques, the Investment Manager would expand its focus into newly developing economic areas, which may include Dunn and Divide counties.

The Investment Manager is evaluating acquisition targets in selected areas of the Williston Basin. The target parameters are cost effective operators in the play, combining the geologic sweet spots with good operators including but not limited to Whiting, Continental, Statoil, XTO, Zavanna, and Oasis. **See "Williston Basin Operating Partners" beginning on page 72**.

*Piceance Basin – Colorado*

As a part of the Green River Formation (a group of oil and gas basins located in Utah, Wyoming, and Colorado), the Piceance Basin is a relatively small, asymmetrical basin located in northwestern Colorado. Eocene age (55 to 35 million years old) rocks are the oil and natural gas reservoirs. The basin extends approximately 100 miles (161 km) north-south and 60 miles (97 km) east-west.

---

[7] Source: https://www.dmr.nd.gov/oilgas/stats/annualprod.pdf

[8] Source: http://northdakotapipelines.com/us-williston-basin-oil-production/

[9] Source: http://dailycaller.com/2014/08/04/north-dakota-oil-production-surpassed-1-million-barrels-per-day/

[10] Source: http://pubs.usgs.gov/fs/2013/3013/




The Piceance is essentially a mix between a mature play (near Rifle, CO), and a growth play in the gas producing areas of the Williams Fork and Mancos—not including the potential in the Niobrara. Well spacing varies by formation, with Williams Fork on ten (10)-acre spacing and Mancos wells on a forecast twenty (20)-acre spacing. Due to the terrain, often referred to as the "Piceance Highlands," high-intensity pad drilling is employed with an anticipated thirty (30) wells, and up to as many as sixty (60) wells, per pad. Two (2) to three (3) pads can be built per square mile. Wells are directionally drilled in an S-shaped wellbore configuration. Horizontal drilling is being tested for selected zones in the Mancos with positive preliminary results.

The Piceance Basin contains significant oil and gas reserves across the 7,200 square miles that it encompasses. The Williams Fork has long been of interest to oil and gas companies because of its large natural gas deposits. The U.S. Department of Energy estimates that eighty percent (80%) of the recoverable oil shale in the Green River Formation is located in a roughly thirty-five (35)-mile by thirty-five (35)-mile area (784,000-acres) in Colorado's Piceance Basin. Most projections confirm that approximately 600 to 800 billion barrels of oil are recoverable from the shale. Therefore, these 784,000 acres potentially contain up to 640 billion barrels of oil—twice the oil of Saudi Arabia.[11]

The typical BTU content of Piceance natural gas is 1150-1175 BTU's per thousand cubic feet per gas—often referred to as "wet gas" (approximately 84% methane). The produced natural gas includes a variety of high-value hydrocarbons, including propane, butane, iso-propane, natural gasoline, and ethane. The wells may also produce light oil, ranging between three and seven barrels of oil per 1.0 million cubic feet of gas.

In the Piceance, the Investment Manager will continue to acquire mineral leases and Working Interest positions, which include existing production and in-fill drilling opportunities, in its core areas of operations in Garfield and Rio Blanco counties.




*Central Kansas Uplift – Kansas and Oklahoma*

The Arbuckle and Mississippi Lime production zones have been developed in selected areas using vertical drilling over the past fifty (50) years. Today, the Arbuckle and Mississippi Lime are providing new prospects in previously under-developed areas while also expanding into previously *undeveloped* areas. It is estimated the total play encompasses over 17 million acres and may involve drilling as many as four wells per square mile. The wells are relatively shallow (3,000 – 6,000 feet) and are considered "low tech" with short laterals and small multi-stage fracture stimulations.[12]

[11] Source: http://www.eccos.us/oil-shale-in-co-ut-wy

The Investment Manager is evaluating several acquisition targets in this core area and nearby extensions.

*Permian Basin –West Texas and New Mexico*




The Greater Permian Basin (comprised of the Midland Basin, Delaware Basin, and Marfa Basin) covers over 80,000 square miles in western Texas. In the early 1980's, oil production in the Permian was booming. However, with the drop of oil prices, production slowed drastically. In recent years, advances in horizontal drilling and fracturing techniques have led to a production renaissance in the area. In the past five years, horizontal drilling has exploded with the number of rigs increasing fivefold. Since 2011 alone, companies have drilled over 9,300 new wells. The federal Energy Information Administration expects Permian oil production to surge to over 1.3 million barrels per day in 2014, up from just 800,000 barrels in 2007. The basin is now the country's largest oil producer.[13]

The Investment Manager is evaluating several acquisition targets in this core area and nearby extensions.

*Niobrara (Denver-Julesburg Basin) – Colorado*




The Niobrara formation has historically been developed with conventional vertical wells. Weld County, Colorado alone boasts over 18,000 oil and gas wells. Using improved hydraulic fracturing techniques the Niobrara is undergoing a resurgence of development, both with low-cost vertical wells in down-spacing situations and horizontal wells in certain select fault blocks. Some analysts have assessed the play at approximately two (2) billion barrels of recoverable oil reserves. [14]

The Investment Manager is evaluating several acquisition targets in the core Wattenburg field and nearby extensions. The target parameters are cost effective operators in the liquid region of the Niobrara play, combining the geologic sweet spots with good operators.

---

[12] Source: *IHS Herold Mississippian Oil Play Regional Play Assessment*

[13] Source: http://clineshalecentral.com/permian-basin-americas-newest-fracking-boom-theres-much-water

[14] Source: http://www.coga.org/pdfs_facts/Niobrara_fastfacts.pdf

## Focus on Growth

*Development Phase Prospects*

The Investment Manager seeks to purchase superior assets with high quality geology and the opportunity to apply leading engineering technologies to create attractive well economics. High quality assets many times are primarily developmental in nature and, therefore, contain modest amounts of proved reserves either from current or neighboring production. The Investment Manager utilizes its world-class technical team, which collectively has managed multi-billion dollar projects around the globe, to identify potential projects. The above-mentioned basins contain assets that have been pre-identified by the technical team as targeted areas containing high quality assets.

Any asset is only as good as its operator, therefore, the Investment Manager is very mindful of whom it will partner with in the operations of a project. Not only does the Investment Manager look for good geology where current engineering technology allows the Fund to capitalize on such geology, but it also targets assets where quality teams are operating. The Investment Manager partners with an existing operator or may acquire the current operator and take over operations.

Development plays are, by nature, highly capital intensive. As the industry has moved to multi-well pad drilling to improve economics, the cash requirements at any one time have increased. Additionally, the time between cash outflow to pay for the drilling and completing of a well and first cash inflow from the sale of hydrocarbons has also increased. While this evolution to pad drilling has created better economics due to cost and time efficiencies, it has increased the importance to diversify and control a portion of the Fund's portfolio through operations. Therefore, the Investment Manager will continue to participate as a non-operated Working Interest owner in basins such as the Bakken and Permian, but will operate its investments in the less complicated basins of the Piceance and Central Kansas Uplift.

The Investment Manager will manage a portfolio of both non-operated Working Interest and operated Working Interest in multiple basins. A combination of basins and non-operated versus operated Working Interest ownership is important to maximize value in the portfolio during development and divestiture. By operating a percentage of the portfolio, the Investment Manager will be able to infuse investments and/or cash flow when either or both are lacking in operated projects. Additionally, the market places higher valuations on companies that have high Working Interest in multiple basins, which makes it imperative the Investment Manager participate in at least two (and possibly more) basins.

*Scale and Manufacture Style Replication*

Over the past five years, most drilling in U.S. unconventional shale basins has been aimed not only at developing a profitable revenue stream from the drilled wellbore but also at meeting contractual hurdles to allow future drilling to proceed without stringent time constraints on each DSU. As the vast majority of prime acreage is now "held by production" (HBP), operators' tactics have changed from holding acreage to optimizing economic and volumetric returns. The most obvious results of this change are a more aggressive drilling schedule in prime areas and the use of learning curves to reduce unit costs and increase unit value creation.

For decades, oil and gas asset valuations have roughly followed guidelines designed by the SEC that seek to divide reserves into categories that generally reflect their ultimate realized value on a discounted and risk-weighted basis. Barrels that have been sold at the wellhead carry a transparent value based on the then current market. Barrels in the ground that will or could be produced in the future are segmented into categories and are approximately valued as follows:

*Reserve Value Chain*

| | |
|---|---|
| | |
| Produced and in Transport | $100,000 (sales value) |
| Produced and in Tankage | $60,000 (net of costs, production tax & royalties) |
| PDP (Proved-Developed-Producing) | $30,000 (sub-surface assets) |
| PUD (Proved Undeveloped) | $10,000 |
| Probable | $2,000 |
| Possible | $0 |

By drilling additional wells, the inherent value and the market value of the DSU increase:

- ❖ Any successfully drilled wells should convert a PUD (proved undeveloped) to a PDP (proven developed producing) and net value should be created relative to the difference between capital expended and the increase in assessed value of the newly producing well.

- ❖ With each successful well drilled in a horizon, reserves in other undrilled potential reserves begin to move up the value chain from Possible to Probable, and from Probable to PUD status.

- ❖ As the DSU becomes more mature and its value more transparent in the marketplace, the value will most likely increase.

- ❖ PDP and PUD reserves are generally viewed by commercial banks as acceptable collateral for low cost debt. Further drilling entirely financed with debt may be an equally attractive value accretion option depending upon the then current market.

The efficiencies associated with more aggressive pad drilling effectively enable the transformation of an "oil field operation" into a "manufacturing play". These efficiencies result in significantly lower costs per barrel of reserves developed and higher value creation per unit of input for those owners who are properly financed. As an example, the "ECO-pad" concept developed by Continental in the Bakken allows for two, and as many as four, contiguous DSUs to be developed from a single drilling location. Multiple production horizons can be developed within each of these DSUs, with current projections ranging from eight to as many as twenty or more wells to be drilled and completed within a single 1,280-acre spacing unit.

The Investment Manager seeks not only to move assets up the reserve value chain as described above but also to do so on a large scale to maximize returns. In success cases, having the ability to scale through large development schedules, multiple production horizons, and/or adjacent acquisitions allows the Fund to leverage those economic successes to the point that can "move the investment needle."

**Access to Upside**

Unconventional oil plays, and the types of conventional opportunities attractive to The Investment Manager, offer exposure to upside potential. **Subject to all of the Risk Factors set forth in this**

**Memorandum**, the Fund's strategic plan is designed with sufficient flexibility to take advantage where it is prudent to do so. While almost none of the upside elements are specifically included in the Fund's plans, the Investment Manager is confident that results may be enhanced beyond projections due to exposure to the following upside elements.

- *Commodity Price Upside* – Geopolitical events and supply/demand imbalances that result in upward price movement are likely to occur over the life of the Fund resulting in increased revenues and enhanced exit options.

- *Commodity Price Volatility* – While it is equally likely that, over the life of the Fund, lower prices may prevail for some period of time, impacts on unconventional oil will be buffered to an extent by a floor price produced by higher cost production on the margin. During periods of low price, high quality assets are often made available at lower cost.

- *Learning Curve Impact* – The large number of wells that will be drilled by The Investment Manager and industry partners over the next two decades may provide a vast statistical set of "repetitions" which may resemble a manufacturing operation. This may induce a "learning curve" that results in lower unit costs and higher unit value creation. The timing and specific nature of any contributor to a learning curve improvement is not predictable.

- *Technology Improvements* – Learning curves are a key component of all manufacturing processes. The unconventional oil exploitation industry is still in its infancy and is therefore subject to step function improvements associated with technological breakthroughs, which may deliver steep improvements in the slope of the learning curve. Improvements in drilling and completion techniques have already positively influenced economics in U.S. shale basins over the past several years and should continue to do so.

- *Infrastructure* – Increasing basin maturity will lead to increased sharing of infrastructure. This should result in lower unit costs and increased production of natural gas and gas liquids, which are often wasted or not optimally utilized in frontier areas.

- *Volumetric Upside* – While infrastructure and technological improvements can result in increased realized volumes from a targeted horizon, increased knowledge of local geology can vastly increase the size of the target and have a much larger impact on upside.

- *Multiple Pay Zones* – Multiple and/or missed pay opportunities can dramatically increase reserves by increasing the volumetric upside from one to several production horizons.

**Multiple Exit Opportunities**

The Investment Manager's end goal is to build a significant asset base through continual asset acquisition, aggregation, and aggressive development while taking advantage of upside potential when presented. The combination of asset maturity, size and scope, the ability to select time of exit, and the Investment Manager's experience in financial markets and transactions offers a distinct advantage at the time of monetization when compared with many smaller existing owners. These attributes may present the Fund and its Unitholders the option to pursue one (or more) liquidity mechanisms including:

- Sale to a major oil and gas operating company (low cost of capital and low discount rate);

- Sale to major fuel consumer as a hedge against crude prices (buyer perceives high prices);

- Merger or "pooling of interests" with follow on sale (increased scale);

- ❖ An IPO or Alternative Public Offering (arbitrage asset base vs. corporate vehicle); and
- ❖ A Master Limited Partnership (competes with low yield fixed income alternatives).

The Investment Manager has been and will be opportunistic in approaching divestment with no predefined agenda other than return to the investor. As such, it is likely that the Investment Manager will evaluate multiple liquidity events and the avenue pursued will vary based on the opportunity presented at the time.

## Acquisition Process

### Fund Management & Acquisitions

Mineral ownership in oil and gas wells is generally divided into "Working Interests", which specifies percentage ownership in a mineral lease and/or particular well. Working Interest owners ("WI Owners") receive a recordable instrument (title) with their purchase along with a title opinion from the operator.

Each WI Owner is expected to fund its *pro rata* share of the (A) initial start-up and drilling costs and (B) the on-going operating expenses for both the well and the mineral lease. Distributions from oil and gas sales are determined after netting Working Interest expenses including operating, transport, and hedging costs and other fees and expenses that may be reasonably assessed by the operator pursuant to a Joint Operating Agreement (as defined herein) against Working Interest revenues. **See "Typical Agreements - Operating Agreements" beginning on page 59**. Distributions are then paid to WI Owners on a Net Revenue Interest (NRI) basis. NRI is a share of production after all lease royalty burdens, including royalty and overriding royalty interests, have been subtracted from the Working Interest. It is the percentage of total production that each Working Interest and royalty interest party actually receives. The ratio of NRI to Working Interest varies by basin and state. Typically, the Williston Basin has an NRI to Working Interest ratio between seventy-five percent (75%) and seventy-eight percent (78%), while the Piceance Basin is closer to eighty percent (80%). Some basins, like the Central Kansas Uplift, have NRI to Working Interest ratios as high as eighty-seven percent (87%). The table below provides an example of the interplay between Working Interest and Net Revenue Interest.

| Party | WI% | NRI% | NRI/WI | (1-NRI/WI) |
|---|---|---|---|---|
| Company A | 60% | 46% | 77% | 23% |
| Company B | 30% | 23% | 77% | 23% |
| Company C | 10% | 8% | 77% | 23% |
| Land Owner | | 3% | | |
| Farm-in Override | | 20% | | |
| Total Interest | 100% | 100% | | |

During the past five (5) years, the Fund's principals have acquired over 30,000 net mineral acres and participated in the drilling of over 250 gross wells in the Fund's targeted areas. As a result, the Fund's principals have amassed significant knowledge related to:

- ❖ Identifying, analyzing, and securing high quality prospects throughout North America;



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572485

- Successfully participating in drilling and completing deep, over pressured, horizontal wells in North Dakota and Montana;
- Successfully participating in drilling and completing shallow, vertical conventional wells in Colorado;
- Identifying and working with top operators; and
- Managing the technical aspects of well operations and completions.

The Fund will seek to participate in the drilling of oil and gas wells within the targeted areas through a variety of means, which may include:

- Acquiring Working Interests in prospective mineral leases and supplying capital to drill the Fund's net Working Interest percentage of each well;
- Participating in Farm Out/In arrangements with third parties or Affiliate Funds, in which the third party or Affiliate Fund would supply the mineral leases and the Fund would supply one hundred percent (100%) of the capital to drill a well(s). The Fund would receive the major portion of the hydrocarbon production and net revenue, typically seventy percent (70%) to ninety percent (90%) (based upon a number of variables and consideration), for funding the drilling costs in a Farm Out/In arrangement;
- Paying a drilling bonus to a third party or Affiliate Fund for the rights to drill a well or wells on their mineral leases. In addition to the drilling bonus, the Fund would pay one hundred percent (100%) of the drilling costs of the net Working Interest acquired for the drilling bonus. The Fund would then receive one hundred percent (100%) of the production, and own one hundred percent (100%) of the Working Interest in the well for which the Fund paid a bonus and drilling costs. The third party or Affiliate Fund would typically receive an Override of one percent (1%) to five percent (5%) of the gross revenues from each drilled well in addition to the drilling bonus; or
- Numerous variations upon these themes.

The Fund will not be constrained to the above-referenced means of drilling oil and gas wells in the targeted areas. The Fund may participate in the drilling through joint ventures, drilling partnerships, drill to own (where a party earns a Working Interest by providing drilling and completion capital in lieu of *pro rata* mineral lease purchases) programs, etc.

**Value-Based Acquisitions**

*Consolidation Approach*

The acquisition of minority Working Interests in oil and gas properties is a tedious process involving significant costs and time to research and clear title. For large operators, small acquisitions cannot "move the performance needle" in and of themselves. These operators see the return on investment for aggregating small positions as relatively low when compared to pursuing alternative opportunities. With the Investment Manager's low fixed cost model, it may be able to efficiently—and profitably—aggregate these interests into a composite size that may be of interest to a larger player. The Investment Manager may be able to do this for two major reasons. First, there is little or no overhead associated with corporate functions or field operations maintained by major and mid-major operating companies. Second and more importantly, having participated in these prime areas in the past, the Investment Manager has a significant information and relationship advantage, which allows it to much more readily target individual owners who may wish to exit.

The opportunity to acquire proved assets with large development opportunities delivers exceptional benefits to Fund investors, including:

- ❖ The discount to market that both some large and small sellers may currently accept appears to be twenty percent (20%) to thirty percent (30%);
- ❖ Revenues from existing producing wells can offset further development drilling costs within the DSU;
- ❖ Production can be hedged to protect cash flow and cover any debt payments;
- ❖ Purchase of probable and possible reserves may be made at extremely low values; and
- ❖ Future development investments are then made with a strong potential for future gain versus investment input slope.

The Investment Manager has invested significant resources in automating leaseholder records in both the Fund's past and current Affiliate Fund assets. This allows the Investment Manager to proactively pursue minority owners who may be seeking an exit.

*Distressed Seller*

Many of the early entrants in the U.S. shale basins are looking to exit today for a variety of reasons including:

- ❖ Operators are publishing budgets that call for substantially more aggressive development drilling schedules, which leads to cash calls that exceed the capacity of some smaller owners to fund.
- ❖ Less sophisticated WI Owners who entered with only a vague idea as to an exit strategy lack the ability or financial skills to access capital markets.
- ❖ Early drilling was conducted on the first section of the "learning curve". Though results were positive, inexperienced owners not familiar with improvements over time will have lower expectations of future results.
- ❖ Costs for first generation wells were high on a unit basis because of inadequate infrastructure, lack of supply versus demand for drilling and completion services, and the fact that drilling to hold acreage one DSU at a time is inherently less efficient than multiple wells drilled from a single pad. Some inexperienced WI Owners have doubts that operators will be able to reduce drilling costs as much as they are projecting.

While all of these factors contribute to the existence of a market of "semi-distressed sellers", the inability to meet future cash calls and the resultant loss of value is the main driving force influencing sellers today. As the major operators pursue more efficient and aggressive development, smaller WI Owners are exposed to ever-increasing capital calls associated with concurrent drilling and completion programs. This effectively enables a "squeeze play" where the minority WI Owners are deluged with multiple cash call each month.

***Affiliate Fund's Recent Acquisition from Distressed Seller Delivers Immediate Value – Transaction 1***

One recent $17.5 Million acquisition secured 300 BOEPD net production, 1,900 net mineral acres, and Proved reserves of 1.8 million BOEPD in the Williston Basin. A post-purchase engineering review

and valuation by Cawley, Gillespie & Associates showed an NPV10 value of $29 million—a sixty percent (60%) lift over the purchase price. The development forecast for this asset increases production to 500 BOEPD through the drilling and completion of an additional four (4) to five (5) net wells.

***Affiliate Fund's Recent Acquisition from Distressed Seller Delivers Immediate Value – Transaction 2***

A second and more recent $4.0 Million acquisition secured 1,430 net mineral acres, and Proved reserves of 28.7 million BOE in the Piceance Basin. A pre-purchase engineering review and valuation by Gustavson Associates showed an NPV10 value of $99 million. The development forecast for this asset may drive significant increases in production and reserve value through the development of upwards of 90 additional wells.

By targeting distressed sellers, the Investment Manager seeks to acquire PUD reserves at relatively low prices—generally some twenty percent (20%) to thirty percent (30%) below market—while also securing all-important probable and possible reserves. This sets the stage for potentially rapid growth in net present value (NPV) once in-fill drilling begins.

## Prospect Evaluation

The following section contains a description of the investment opportunities that the Investment Manager believes will be appropriate for the Fund. The narrative contains numerous assumptions the Investment Manager has made based upon both long term and recent experience. These assumptions are embedded within the narrative and are not generally referred to as such.

The Investment Manager continually evaluates opportunities to acquire high-quality assets in areas where the Fund can achieve the scale required for a successful exit opportunity either through aggregating smaller Working Interests from several transactions into sizeable holdings or purchasing larger Working Interests in a single transaction. The Fund targets areas with substantial development opportunities. While the Investment Manager anticipates the focus of the Fund will be in the core areas of the Williston Basin and Piceance Basins where Affiliate Funds have previously invested, it will regularly assess other opportunities within those basins as well as in other analogous basins that have characteristics and probable results that are convergent with the objectives of the Fund.

The Investment Manager has developed an internal evaluation process to qualify each prospect, with the objectives of:

- ❖ Leveraging internal expertise,
- ❖ Objectively and rigorously assessing the risks and projected revenue streams, and
- ❖ Assessing the potential for asset appreciation.

The Investment Manager utilizes specific criteria to appraise assets available including but not limited to:

- ❖ The availability of reliable drilling, completion, production, and reserve information to qualify and quantify the risks and upside in the targeted horizon, as well as other potential horizons;
- ❖ Projected returns with a minimum twenty percent (20%) IRR to the Fund based on the projected net cash flows, *provided, however*, that the ultimate success of the Fund in its ability to achieve



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572488

such objectives is not guaranteed to occur as the Fund's ultimate performance is subject to several risk factors as described herein;

- ❖ Aligned with the Fund's strategy of acquiring proved acreage, which many times includes current production, with additional 3P reserves for development;
- ❖ Proven operators with a track-record of success in the area; and/or
- ❖ Use of an affiliate of the Investment Manager energy to operate majority owned projects.

**Deal Sourcing**

Coachman's technical team of Stephen Mut, Michael Hendricks, and Steven Crane have been working in the oil and gas industry for a combined 100+ years, which allows them to leverage their extensive networks of professionals including geologists, reservoir engineers, local landmen, and oil and gas E&P business professionals. In addition, Randall Kenworthy has developed relationships with many of the leading oil and gas companies' executives operating in North Dakota, Colorado, Kansas, Oklahoma, and Texas and has had substantial interactions with leading oil and gas bankers, sell/buy side investment banking firms, oil and gas attorneys, and accounting professionals. Coachman uses this network to source opportunities primarily in regions of proven reserves in contiguous shale plays. Coachman reviews approximately 150-200 deals per year, which are largely brought directly to the team by their networks. These networks, however, are also tapped for new deals as needed.

**Selection Process**

Coachman's prospect selection process is comprised of four broad phases:

1. *Initial Screening*: One (1) out of approximately every twenty-five (25) prospect opportunities Coachman generates makes it out of the Initial Screening phase. Prospects are initially reviewed by the Director of Acquisitions & Divestitures who evaluates whether each opportunity fits the strategy and objectives of the Fund. In addition, he confirms select high-level economic metrics. If the overview information signals to Coachman the prospect will fit within the strategic objectives of the Fund and the desired economic characteristics are confirmed, the prospect is elevated to Coachman's Technical Team for a more detailed technical and prospect evaluation.

2. *Technical and Prospect Evaluation*: Well control data is gathered and evaluated, and production models and a standard decline curve(s) for the prospect(s) target horizons are developed. Well age is taken into careful consideration as past fracture stimulation techniques cannot accurately predict new well performance in many of North Dakota's prospects. Coachman's land personnel map the prospect by operators to gain insight into which dominant operators are in the target prospect area. Coachman's land personnel also gather all spacing requests and well permits providing insight into the pace of future drilling activity within a prospect.

3. *Financial Modeling*: If the Technical Team approves of the deal it then goes to Coachman's analytics department for full financial modeling. Coachman's analytics team builds a complete pro forma for the prospect, evaluates how the prospect may or may not affect overall Fund performance with regards to Fund returns, cash flow, and capital expenditure requirements, and provides valuation guidance. The Analytics Team also runs various sensitivity and scenario analysis to better understand underlying assumptions and risk measures.

4. *Investment Recommendation*: Once the financial models are built, verified, and analyzed, an investment recommendation is made to the Senior Management Team. After the Senior

Management Team has had time to review the data, it makes a decision to pursue or not pursue the opportunity based on its alignment with the objectives of the Fund.

**Deal Negotiation**

Once Coachman has made the decision to pursue a project, consensus is generated regarding price range, terms and conditions and capital structure required to maximize the return on investment not only for the new prospect, but also for the overall Fund.

**Preliminary Review/Technical Evaluation**

During the initial review of an investment opportunity, the Investment Manager's technical personnel and financial analysts will gather financial, engineering, and geological data required to determine if a project is appropriate for the Fund's objectives. The Investment Manager will use both non-material private and public data but tends to rely heavily on its own in-house technical and production information. The Investment Manager will consider a number of criteria while evaluating a potential acquisition and/or drilling target, including:

- Projected economic performance;
- Opportunity to acquire additional acreage in the target area to establish additional DSU and drilling opportunities;
- The operator, their completion techniques, success rates, access to rigs, experience levels of the rig crews and availability of supplies;
- Risk: technical, geological, production, economic and environmental; and
- Exit potential (strategic proximity of potential acquirers or production or reserves).

**Pre-Close**

The Fund's primary acquisition target is acreage that has been assembled into a DSU for the purpose of drilling one or more wells. Prior to closing the acquisition of a Working Interest, the Investment Manager will evaluate available engineering and geologic studies relating to the acreage and title opinion for each leasehold being acquired. The Investment Manager will also examine the prospect for possible liens, environmental infractions, and required infrastructure.

**Asset Management**

Upon closing the acquisition of a Working Interest, the Investment Manager will review all assignments and filings to determine what has been recorded at state and local levels to provide the Fund with clear asset ownership. Due to the nature of the industry, including the backlog of filings at the counties, certain assignments and other related ownership documents (e.g., title opinions) may not be current at the time of acquisition. However, the acquisition agreements typically provide a mechanism to "true-up" Working Interest upon finalization of all ownership documents.

Once an acquisition has been made and assembled into a DSU, the Investment Manager will work with an established operator to drill horizontal (and occasionally vertical) oil and gas well(s) on the acquired acreage. The Fund's technical team may provide the Fund's operators with well completion advice and the execution of the multi-stage hydraulic fracturing ("Frac") jobs, if required. The Fund's

technical team may also assist operators with technical design of the Frac, log evaluation, and actual on-location execution, if required.

<u>Insurance</u>

The Investment Manager anticipates that the Fund will be covered under each of the operators' loss of well control insurance policies and commercial general liability insurance. The Investment Manager will review the Fund's insurance coverage prior to commencing drilling operations and periodically evaluate the sufficiency of insurance. The Investment Manager may, in its sole discretion, increase or decrease the policy limits and types of insurance from time to time as it deems appropriate under the circumstances, which may vary materially.

<u>Exit Strategy</u>

The Investment Manger intends to adopt an exit strategy to facilitate the liquidation of the Fund's portfolio assets within a timeframe of approximately five (5) years, plus two one-year extensions in the sole discretion of the Investment Manager. Investors are cautioned, however, that the Fund's ability to implement its plan of liquidation will be highly dependent upon market conditions occurring in the future, which are impossible to accurately predict. Strategies that may be employed include, but are not limited to:

- Acquisition of the Fund's assets by one of the major oil and gas companies drilling in and around the target area;
- Merge the Fund with a large publicly traded oil and gas company for stock;
- Combine all Affiliate Funds, and fund assets, operated by the Investment Manager and its affiliates into a single entity (New Co) and sell to a large operator, merge for stock with a large public oil and gas company, or execute an Initial Public Offering of New Co; and
- Merge the Fund into a Public LP or MLP.

The Investment Manager continues to see major exploration and production companies reposition and increase their leasehold and production positions through divestiture or acquisition over the past 18 months. The Fund will attempt to position itself for a similar acquisition by a strategic acquiring company in the future.

**Recent Exit Strategy Transactions**

***Example 1: Whiting Petroleum Acquires Kodiak Oil & Gas – July 2014***

Whiting Petroleum signed a definitive agreement to acquire Kodiak Oil & Gas for $6.0 billion. Kodiak adds roughly 171,000 net acres and about 40,000 barrels of oil equivalent per day primarily in Williams, McKenzie, Dunn, and Divide Counties in North Dakota making Whiting the largest operator in the Williston Basin.

***Example 2: Kodiak Oil & Gas Divests Assets – February 2014***

Kodiak Oil & Gas divested 20,900 net acres in the southwest Williston Basin area to an undisclosed party for roughly $70 million. The deal included 12 wells (gross) with production of about 300 barrels of oil equivalent per day.

***Example 3: Oasis Petroleum Acquires Zenergy Assets – September 2013***

Oasis Petroleum bought approximately 136,000 net acres in the West Williston project area from Zenergy for a total transaction value of $1.45 billion. The acquired assets produce approximately 9,000 barrels of oil equivalent per day.

***Example 4: Whiting Petroleum Corporation Acquires Assets – September 2013***

Whiting Petroleum Corporation acquired 17,300 net acres primarily in Williams and McKenzie Counties, North Dakota, from undisclosed private parties for a total price of $260 million. The deal included 121 producing wells (gross) with average oil and gas production of 2,420 barrels of oil equivalent per day and proved reserves of 17.1 million barrels of oil equivalent.

***Example 5: Kodiak Oil & Gas Acquires Liberty Resources Assets – July 2013***

Kodiak Oil & Gas acquired 42,000 net acres in Williams and McKenzie Counties, North Dakota for $730 million from Liberty Resources. The assets have production of approximately 5,500 barrels of oil equivalent per day and proved reserves of 23.2 million barrels of oil equivalent.

**Typical Agreements**

*Participation Agreements and Other Acquisition Documents*. The Fund may enter into participation agreements regarding the acquired acreage. Each participation agreement (A) sets forth the terms of the Working Interest acquisitions, (B) lists the Working Interest acquired by each party and (C) describes the total amount of overriding royalty interest ("ORRI") burden on the Working Interest acquired. Copies of these participation agreements will be available for review by potential investors upon request.

*Operating Agreements.* The Fund may enter into a standard operating agreement ("Joint Operating Agreement" or "JOA") with the well operators. A JOA is a contract between the operator and one or more WI Owners that governs rights and responsibilities with respect to: (A) drilling operating wells and (B) payment of costs and accounting relating to such operations. The JOA is based on a standard form promulgated by the American Association of Petroleum Landmen.

Each JOA designates the operators and grants it the right to conduct operations on behalf of the WI Owners and, if the operator does not use its own tools and equipment to drill wells in the contract area, to hire drilling contractors to do so. The JOA also specifies the manner in which operations for the drilling, development, operation and abandonment of wells may be proposed, approved, and conducted.

The Fund or any other WI Owner has the right to propose wells. When a well is proposed, the operator sends each WI Owner an Authorization for Expenditure ("AFE"), which describes the estimated drilling cost of the proposed well. Each WI Owner then elects whether to participate in the proposed well. If a WI Owner elects to participate, it is obligated to pay to the operator its proportionate share of drilling and completion costs, even if those costs exceed the estimate contained in the AFE. The operator can require WI Owners to pay their share of the estimated costs prior to drilling. If a WI Owner elects not to participate, the participating WI Owners may pay the non-participating WI Owner's share of drilling costs and receive the non-participating WI Owner's share of production until drilling costs plus specified penalty amounts have been recouped. Operators generally will not commence drilling on a proposed well until the participating WI Owners agree to pay one hundred percent (100%) of the drilling costs.

JOAs generally provide the parties are severally, but not jointly liable, and each WI Owner is liable only for its proportional share of costs. Each WI Owner grants to the operator a lien upon the WI Owner's oil and gas rights in the contract area to secure payment of its share of expenses. The operator is required to conduct operations in a good and workmanlike manner, but is liable to the WI Owners only for its gross negligence or willful misconduct. Upon request, potential investors may review each of the JOAs entered into by the Fund.

*Oil Sales Contracts and Division Orders*. Pursuant to the JOA, when a well is completed and producing oil and gas, each WI Owner may take in kind or separately dispose of its share of production. If the WI Owner elects to dispose of its share, the WI Owner will enter into an oil sales contract with a purchaser and execute the purchaser's division order (which specifies the WI Owner's net share of production proceeds or "net revenue interest," after deducting landowner's royalties, ORRI and other burdens on production). The purchaser then pays the WI Owner its share of production proceeds directly under the terms of the oil sales contract.

If a WI Owner elects not to separately dispose of its share of production, the operator may sell production for the account of a WI Owner who has not made its own sales arrangements. The operator often markets one hundred percent (100%) of the well's production to a third-party purchaser under an oil sales contract between the operator and the purchaser, and the purchaser pays one hundred percent (100%) of the production proceeds from the well to the operator. The operator then distributes to the WI Owner its proportionate share of the proceeds pursuant to the operator's division order signed by the WI Owner. Production taxes are deducted from the amount paid to the WI Owner, and production proceeds are paid monthly, regardless of whether the WI Owner receives proceeds directly from a third party purchaser or from the operator. If the operator distributes proceeds, the operator may deduct from proceeds the WI Owner's *pro rata* operating expense owed to the operator.

## Transportation Infrastructure

### Crude Oil Transportation and Marketing in the Williston Basin

Crude oil prices at any location are generally determined by the cost incurred in transporting a physical barrel from the wellhead to a refining center or trading center where pricing is transparent. In the U.S., prices have generally been based upon the cost of crude oil delivered to refineries along the Gulf Coast. **See "Risk Factors" beginning on page 12**.

The oil contained in the Bakken and Three Forks region is commonly referred to as "light, sweet crude", which means it contains a lower amount of sulfur and is lighter than most U.S. domestic onshore crude oil production. Therefore, Bakken/Three Forks crude requires less refining than other crude oils with higher sulfur content and produces more gasoline and diesel product than most competing crude oils. The end result is a higher demand for this grade of crude within the refining industry. Refiners value the intrinsic product yield from this lighter crude, and from the fact that a significant input of light crude allows them to purchase higher volumes of lower priced heavy crude which can then utilize otherwise vacant cracking and sulfur removal capacity within the refinery.

As a result of horizontal drilling in the Bakken formation, North Dakota's annual crude oil production has more than tripled over a four-year period — from 80 million barrels in total in 2009, to over 300 million barrels in 2013. This growth continues, with the North Dakota Pipeline Authority (NDPA) reporting that production surpassed more than 1 million barrels per day in April 2014 with several industry projections projecting 1.3+ million barrels per day of production by the end of 2015. This rapid rise in production has created a transportation supply-demand imbalance that gave rise to significant ($15 per barrel) negative differentials in 2010 despite the high refining value of the crude. Railroads, trucking and pipeline companies responded to this "opportunity" with a significant amount of capital investment allowing producers multiple transport options and moved Bakken crude away



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572493

from "stranded" status. This change was responsible for the differential change to par with WTI crude. According to the NDPA, in April 2014, sixty-three percent (63%) of Williston Basin crude was transported via rail, thirty percent (30%) by pipeline, with the balance sent to a local refinery or trucked out.

Bakken crude has been transported long distances to refineries in Washington's Puget Sound, Philadelphia and eastern Canada. Bakken crude competes with waterborne crudes of similar quality, which are priced $10 or more above WTI. Bakken crude is sold at the refinery gate at a similar price. However, when netted back to North Dakota, the field price for Bakken crude is closer to WTI pricing because of the high cost transport that is used. This higher cost per unit transport system is of great benefit to North Dakota producers since it alleviated the logistic logjam that previously resulted in curtailed production. However, when more pipeline capacity is installed and commissioned, the field price for Bakken crude will likely increase as transportation costs are further reduced. The timing of this development, however, is uncertain due to project and regulatory uncertainty.

Transportation related projects continue to sprout up as Bakken production increases. Some examples include:

**Rail**

Burlington Northern (BNSF) announced approximately $400 million in capital projects for 2014 in North Dakota alone, nearly doubling 2013's $220 million investments. Plans are to expand rail capacity, replace and maintain the network infrastructure, and continue the implementation of Positive Train Control technology.

Dakota Plains is nearing completion of its Pioneer Rail Terminal expansion. This roughly $50 million project should nearly double its rail capacity to 48,000 barrels of oil per day as well as significantly increase storage capacity and rail loading speed.

Numerous companies continue to expand rail fleets to access Bakken crude. Highlights include Statoil leasing 1,000 tanker cars, Phillips66 purchasing 2,000 tanker cars, and additional rail commitments from Tesoro and Marathon Oil.

**Pipeline**

Enbridge's recently approved $2.6 billion Sandpiper Pipeline Project is designed to move 225,000 BOPD from a terminal near Tioga, North Dakota, to Clearbrook, Minnesota, and 375,000 BOPD from Clearbrook to Superior, Wisconsin. Once completed (projected in 2016), the crude oil can be shipped on Enbridge and other third-party pipelines to Midwest and other North American refineries.

WBI Energy is in the initial planning stages of a $650 million, 375-mile natural gas pipeline. Plans call for it to move 400 million cubic feet per day of natural gas starting from Spring Creek in western North Dakota, connection to several natural gas procession facilities across the state, and ultimately linking up to the Great Lakes and Viking pipelines in Emerson, Minnesota.

Enterprise Products announced plans in June 2014 to build a 1,200-mile crude pipeline from North Dakota to Cushing, Oklahoma, with capacity of 340,000 barrels of oil per day.

TransCanada's Keystone XL and related proposed pipeline projects could open additional Williston Basin crude takeaway capacity through connections in Baker, Montana. If approved, this $5+ billion pipeline project would add capacity of 830,000 barrels of oil per day from Canada through Cushing, Oklahoma, down to the Gulf Coast and all its refineries.

Alliance Pipeline recently completed the $170 million Tioga lateral pipeline designed to bring over 125 million cubic feet per day of natural gas and gas liquids into the Chicago market. Much of this gas has been flared in the field due to lack of transport/storage capacity.

The map below provides a glimpse at the geography being targeted for these expansions. While the value that these projects will create for North Dakota producers is difficult to quantify at this point, completion of these projects is anticipated to be beneficial to them.




**Natural Gas and Liquids Transportation and Marketing in the Piceance Basin**

The Piceance Basin is serviced by a myriad of companies who gather, transport, and process natural gas and NGL's. The major interstate pipeline companies are then chartered to deliver the finished product, either dry gas or NGL's to their customers for consumption or further processing. Piceance basin gas finds its way to consumers on both the West Coast and the Midwest; while the NGL's are transported to the large petrochemical facilities on the Gulf Coast via Mont Belvieu, TX.

Williams Energy has a capacity of 1.0 BCF/D over 3,500 miles of pipeline in service and 4,000 connection points. Summit Midstream Grand River System (see graphic below) services our core operating area as well, with over 1,700 miles of pipeline in service and a rated capacity of 665 million cubic feet per day.

**Pipeline Outtake**

Utilization rates for pipelines will vary by season, although total year-round outtake capacity in the area exceeds deliverability of current operators by almost 40%. Thus, it is not unusual to see substantially lower utilization rates relative to total capacity due to varying demand for gas over the course of the year.

In Colorado, the Rocky Mountain Natural Gas Company provides interconnections between natural gas producers in the western part of the state and the TransColorado Gas Transmission Company, which travels southward into New Mexico en route to the California market, through the Transwestern Gas Company and Kinder Morgan pipeline systems.

In addition, in 2006, the TransColorado Gas Transmission Company installed a capability to reverse flow on its system, providing natural gas producers operating in the developing Unita/Piceance Basins of eastern Utah and western Colorado the opportunity to also transport their product eastward to the

Cheyenne Hub in eastern Colorado via other regional natural gas pipelines to access transportation services to Midwest markets. TransColorado Transmission also further expanded its northern flow capacity out of the San Juan Basin in southern Colorado in 2008 to give producers in that area greater access to these Midwest markets, in addition to their traditional Western regional market.




Also providing transportation service out of the Unita and Piceance basins is the western portion of the Rockies Express Pipeline system. Completed in February 2007, the 328-mile Rockies Express-Entrega system has the capability to transport 1.5 billion cubic feet per day of natural gas supplies from northwestern Colorado and southwestern Wyoming to the Cheyenne Hub located in northeastern Colorado.

The Public Service Company of Colorado is the major distributor of gas in Colorado, with more end-use customers in a single State than any other company in the region.

**Prior Funds**

*Coachman Energy I & Coachman Energy II*

Two (2) prior Affiliate Funds, Coachman Energy I and Coachman Energy II (collectively, the "Coachman Funds"), capitalized on an environment that featured vast amounts of undeveloped acreage throughout the Bakken Shale:

| COACHMAN ENERGY I/II | AS OF DIVESTITURE |
|---|---|
| Fund Type | Land and Drilling |
| Actual Capital (Equity and Debt) | $115,000,000 |
| Launched | 2007 and 2008 |
| Proved Developed and Producing Wells | 105 |
| BOPD | 800 |
| Approx. Net Mineral Acreage Acquired | 10,000 |
| CE I ROI / IRR[15] | 2.0X / 18% IRR |
| CE II ROI / IRR[16] | 1.5X / 26% IRR |
| Sold 100% of the CEI assets and 65% of CEII assets to F100 company in 2012 | |

15 Net of fees.

16 Net of fees. Coachman Energy II's returns are 65% realized. IRR reflects the estimated value of unsold acreage at the time of Coachman's separation from Caddis Capital (May 30, 2012).

From 2007 through 2010, the managing general partners of the Coachman Funds (the "Widgeon Investment Manager") pursued minority ownership positions in relatively undeveloped acreage. Using a combination of investor equity, leverage, and cash flow from existing wells, the Widgeon Investment Manager partnered with major operators to prove up the acreage and monetize reserves. As drilling activities accelerated, additional minority positions were purchased from small players unable to keep up with growing capital requirements. Following this strategy, the Widgeon Investment Manager amassed ownership in over 10,000 net mineral acres for the Coachman Funds, participated in drilling 105 wells ultimately producing 800 barrels of oil to net to funds, and increased net present value (NPV) significantly in a short period of time. According to a June 2011 reserves analysis (see chart below), the discounted cash flow value of the assets increased 65% in the first 180 days of 2011 ($67.4MM in January 2011 to $111MM in July 2011) as acreage was drilled, doubling daily production, and substantially increasing the value of the majority of the lightly drilled leaseholds held for future in-fill drilling. **See "Definition of Reserves Categories" on page 71.**




Coachman Funds NPV 10 Valuation

65% NPV 10 increase in the first 180 days of 2011
$67.4MM in January 2011 to $111MM in July 2011

In January 2012, a majority of the assets of Coachman Energy I & II were sold to the energy investment advisory division of a publicly traded Fortune 100 company. The packaged portfolio included approximately 7,000 net mineral acres and Working Interest in 105 gross wells located primarily in Williams and McKenzie Counties, North Dakota. The sale of approximately sixty (60%) of the leaseholds and approximately ninety-five (95%) of the associated production in Coachman Funds resulted in the return of roughly 170% of Invested Capital, gross-of-fees, to date. Net-of-fees Coachman Energy resulted in the return of 200% of Invested Capital, while Coachman Energy II resulted in the return of roughly 150% of Invested Capital, to date.

**PAST PERFORMANCE OF THE AFFILIATE FUNDS IS NOT INDICATIVE OF FUTURE RESULTS AND NO GUARANTEE OF FUTURE PERFORMANCE BY THE FUND.**

*Bakken Drilling Fund III LP ("BDF III")*

BDF III provides its investors the opportunity to enjoy cash flow and certain tax advantages generated by participating in the drilling and completion of oil and gas wells. As of December 31, 2014, the Fund includes forty-four (44) producing wells in the Williston Basin, North Dakota. Operating partners in the Bakken include Zavanna, Statoil, Continental, Whiting and Oasis. **See "Williston Basin Operating Partners" beginning on page 72**. Highlights include:

| BAKKEN DRILLING FUND III | AS OF 12/31/14 |
|---|---|
| Fund Type | Developmental Drilling |
| Fund Equity Target | $25,000,000 |
| Actual Equity Raised | $33,600,000 |
| Launched | November 15, 2011 |
| First Drilling Projects Acquired | January 2, 2012 |
| Proved Developed Producing Wells | 44 |
| Wells Drilling or Waiting on Completion | 19 |
| Currently Making Distributions | Yes |

**BDF III Well Performance**

The well histories provided below illustrate actual well production compared to the average type curve of a typical Bakken well over a forty (40)-year production life. Each point shows the daily average of monthly production. On average the Bakken Drilling Fund III's wells have consistently met or exceeded typical type curve performance.




*Table: The different colored and shaped points represent monthly production data for the wells in BDF III*

In addition to current drilling projects and producing wells, BDF III provides access to upside potential. BDF III owns Working Interests averaging approximately one and eight-tenths (1.8%) in thirty-six (36) Proved Undeveloped (PUD) drill sites. The PUD wellbores directly offset existing program wells and are anticipated to be drilled throughout the term of the Fund.

BDF III closed in 2014 with ownership interests in forty-four PDP wells producing approximately 70 BOEPD net. When looking at production today, it is important to note BDF III sold seventeen PDP wells to Bakken Income Fund representing approximately 250 BOEPD net. Total daily production throughout 2014 was affected by widespread pad drilling in the Bakken, which has become more commonplace over the past two years. While offering cost savings, pad drilling often results in production delays as PDP wells are shut-in to accommodate nearby Frac jobs. In addition, projections have been impacted by extended drilling and completion timelines on pad-drilled wells. For example, four Sylvester wells were spud in late 2013; drilling and completion was finally completed early 4Q14. The addition of the four wells added 43 BOEPD net to fund (per 90-day trailing average).

In mid-2014, Coachman formed Coachman Acquisition III (CA III), a special purpose vehicle created to pool available capital from Coachman's closed funds (like BDF III) and Coachman's newer funds in capital-intensive developmental assets. Combining resources of certain of Coachman's funds has allowed for expansion of each fund's asset base, which may help in value creation. In addition to the assets above, BDF III currently owns approximately 6% of CA III, which in turn owns certain interests in the following:

- Kokopelli Prospect, Piceance Basin - Acquired July 2014 4 PDP wells and 8 drilling/completing with an additional Salt Water Disposal well

- Cholla Prospect, Central Kansas Uplift - Acquired December 2014

**PAST PERFORMANCE OF THE AFFILIATE FUNDS IS NOT INDICATIVE OF FUTURE RESULTS AND NO GUARANTEE OF FUTURE PERFORMANCE BY THE FUND.**



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572499