*Bakken Income Fund LLC ("Bakken Income Fund")*

Bakken Income Fund acquires working interests in proven producing wells to generate cash flow for its investors. Highlights include:

- $25,000,000 income fund launched June 2012
- First wells acquired July 2012
- First investor cash distributions were made for November 2012
- $20.6MM capital raised as of December 2014
- 94 gross producing wells as of December 2014

**Bakken Income Fund Well Performance**




Well histories illustrate actual well production compared to an average type curve of a typical Bakken well over a 40-year production life.

On July 13, 2012, Bakken Income Fund purchased interests in its first five wells, which are located in Williams County, North Dakota in the Tarpon II prospect. Tarpon II is considered premium Bakken acreage with a thick, highly pressurized production horizon and high organic content (oil-in-place). Wells in the Bakken exhibit a steep decline within the first twelve months before settling into stable, low-decline production that is estimated to exceed 40 years. With individual production timeframes

ranging from approximately three months to under four years (at time of purchase), Bakken Income Fund enjoys steady anchor production while also benefitting from higher rates of flush production from younger wells.

As of year-end 2014, Bakken Income Fund averaged approximately 279 BOE (barrels of oil equivalent) per day from ninety-four (94) producing wells. Fourth Quarter 2014 gross production totaled approximately 1,034,730 BO (Barrels of Oil) with approximately 35,180 BO net to fund. Total daily production throughout 2014 was affected by widespread pad drilling in the Bakken, which has become more commonplace over the past two years. While offering cost savings, pad drilling often results in production delays as PDP wells are shut-in to accommodate nearby Frac jobs. Over the course of the year, BIF averaged approximately ten shut-in wells at any given time.

In mid-2014, Coachman formed CA III, a special purpose vehicle created to pool capital available from older funds (like BIF) and Coachman's new funds in capital-intensive developmental assets. Combining resources has allowed for expansion of each fund's asset base, which may help in value creation. In addition to the assets listed above, BIF currently owns approximately 11% of CA III, which in turn owns certain interests in the following:

- Kokopelli Prospect, Piceance Basin - Acquired July 2014 4 PDP wells and 8 drilling/completing with an additional Salt Water Disposal well

- Cholla Prospect, Central Kansas Uplift - Acquired December 2014

**PAST PERFORMANCE OF THE AFFILIATE FUNDS IS NOT INDICATIVE OF FUTURE RESULTS AND NO GUARANTEE OF FUTURE PERFORMANCE BY THE FUND.**

*Coachman Energy Land II LLC ("CELII")*

CELII is a growth fund with no planned interim investor distributions. CELII was formed in June 2011 to acquire developed and undeveloped net mineral acreage (NMA) targeting North Dakota's Bakken Shale production horizon, primarily in Williams, McKenzie, and Dunn Counties, North Dakota. The Fund utilizes financial partnerships such as joint ventures and farm in/farm out arrangements to develop and prove out its undeveloped acreage positions, participate in in-fill drilling programs, or it will buy and hold mineral leases, selling only after development occurs in the vicinity of its holdings thus proving-up the prospect.

To date CELII has raised $17.7MM of equity and debt capital used to acquire 14,297 NMA, including the purchase of a Working Interest in 49 producing wells have since been divested setting the stage for a shift in strategy for the Fund. The new strategy of the Fund will evaluate different opportunities that reduce risk in high quality projects. Participation in the most promising projects will allow CELII to maximize the limited amount of capital resources available as well as the possibility to secure low cost debt in the future. Through its investment in CA III, larger acquisitions can be made on behalf of multiple funds which allow CELII the ability to participate in additional projects.

**PAST PERFORMANCE OF THE AFFILIATE FUNDS IS NOT INDICATIVE OF FUTURE RESULTS AND NO GUARANTEE OF FUTURE PERFORMANCE BY THE FUND.**



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572502

*Bakken Drilling Fund IV LP ("BDF IV")*

BDF IV provides its investors the opportunity to enjoy cash flow and certain tax advantages generated by participating in the drilling and completion of oil and gas wells. As of December 31, 2014, the Fund includes thirty-four (34) producing wells. Operating partners in the Bakken include Zavanna, Statoil, Continental, Oasis and Whiting. **See "Williston Basin Operating Partners" beginning on page 72.** Highlights include:

| BAKKEN DRILLING FUND IV | AS OF 12/31/14 |
|---|---|
| Fund Type | Developmental Drilling |
| Fund Equity Target | $50,000,000 |
| Actual Equity Raised[17] | $54,500,000 |
| Launched | May 2013 |
| First Drilling Projects Acquired | July 2013 |
| Proved Developed Producing Wells | 31 |
| Wells Drilling or Waiting on Completion | 26 |
| Currently Generating Revenues | Yes |

**Bakken Drilling Fund IV Well Performance**




*Table: The different colored and shaped points represent monthly production data for the wells in BDF IV*

On July 1, 2013, Bakken Drilling Fund IV purchased interests in its first five (5) wells and acreage, which are located in Williams and McKenzie Counties, North Dakota in the Tarpon II prospect. Tarpon

[17] Actual equity raised through June 30, 2014.

II is considered premium Bakken acreage with a thick, highly pressurized production horizon and high organic content (oil-in-place). Wells in the Bakken exhibit a steep decline within the first twelve months before settling into stable, low-decline production that is estimated to exceed forty (40) years. With individual production timeframes ranging from approximately three (3) months to under four (4) years (at time of purchase).

In addition to current drilling projects and producing wells, BDF IV provides access to upside potential. BDF IV closed in 2014 with ownership interests in thirty-one wells producing approximately 255 BOEPD net, up from just approximately 10 BOEPD one year ago.

BDF IV also owns approximately two and five-tenths percent (2.5%) average Working Interests in additional 43 PUD drilling locations. Today, each Bakken drilling spacing unit (DSU) typically has one producing well, with the opportunity to drill up to three additional Bakken wells, and as many as ten Three Forks wells, to fully produce all of the reserves in the unit. On average throughout the Basin, the Investment Manager assumes four Three Forks wells per DSU. With the advent of the Eco-Pad® (large drill sites with multiple wells), operators are now aggressively pursuing in-fill drilling on a per DSU-basis. Eco-Pad® drilling allows operators to access more reserves at reduced costs, which dramatically impacts overall economics. BDF IV owns its percentage share of all reserves contained within each spacing unit, which translates to potential added cash flow from new wells. As increased drilling on the spacing unit reduces the risk associated with future drilling there, the “undrilled” reserve values will increase as well leading to an increase in overall asset value increases above and beyond that associated with the newly drilled well.

In mid-2014, Coachman formed CA III, a special purpose vehicle created to pool capital available from closed funds (like BDF IV) to invest alongside other Coachman funds in capital-intensive developmental assets. Combining resources has allowed for expansion of each fund’s asset base, which may help create value. In addition to the assets listed above, BDF IV currently owns approximately 24% of CA III, which in turn owns certain interests in the following:

- Kokopelli Prospect, Piceance Basin - Acquired July 2014 4 PDP wells and 8 drilling/completing with an additional Salt Water Disposal well
- Cholla Prospect, Central Kansas Uplift - Acquired December 2014

**PAST PERFORMANCE OF THE AFFILIATE FUNDS IS NOT INDICATIVE OF FUTURE RESULTS AND NO GUARANTEE OF FUTURE PERFORMANCE BY THE FUND.**

**Definition of Reserves Categories**

Proved Reserves = Reserves, which by analysis of geosciences and engineering data can be estimated with reasonable certainty (i.e., a high degree of confidence meaning at least a ninety percent (90%) probability) to be commercially recoverable from the relevant date forward from known reservoirs and under defined economic conditions, operating methods and government regulations, in an area delineated by drilling and defined by fluid contacts, if any, and adjacent undrilled portion of the reservoir that can reasonably be judged as continuous with such reservoir and commercially productive on the basis of available geosciences and engineering data.

PDP = Proved Developed Producing Reserves. Proved Reserves to be recovered from existing wells and facilities, after necessary equipment has been installed, from completion intervals that are open and producing at the relevant time, including improved recovery reserves but only after the relevant improved recovery project is in operation.

PDNP = Proved Developed Not Producing. Proved Reserves to be recovered from existing wells and facilities, after necessary equipment has been installed, from (i) completion intervals that are open but which have not yet started producing at the relevant time, (ii) wells which were shut-in for market conditions or pipeline conditions, (iii) wells not capable of production for mechanical reasons and (iv) reserves expected to be recovered from zones in existing wells that will require additional completion work or future re-completion work to start production, in each case where production can be initiated or restored with relatively low expenditure compared to the cost of drilling a new well.

PUD = Proved Undeveloped Production. Proved Reserves expected to be recovered through future investments (i) from new wells on un-drilled acreage in known accumulations, (ii) from deepening existing wells to a different (but known) reservoir, (iii) from in-fill wells that will increase recovery or (iv) where a relatively large expenditure (e.g., when compared to the cost of drilling a new well) is required to (a) re-complete an existing well or (b) install production or transportation facilities for primary or improved recovery projects.

When combined together, PDP, PDNP and PUD Reserves are referred to as Proved or Total Proved or TP or P1 or 1P Reserves.

PROB = Probable Reserves. Reserves that analysis of geosciences and engineering data indicate are less likely to be recovered than Proved Reserves but more certain to be commercially recovered than Possible Reserves and it must be either (i) equally likely that the actual remaining quantities recovered will be greater than or less than the sum of the estimated Proved Reserves plus Probable Reserves or (ii) at least a fifty percent (50%) probability that the actual quantities recovered will equal or exceed the sum of the estimated Proved Reserves plus Probable Reserves.

P1 Reserves combined with PROB Reserves are referred to as P2 or 2P Reserves.

Possible Reserves = Reserves that analysis of geosciences and engineering data indicate are less likely to be recovered than Probable Reserves, where the total quantities ultimately and commercially recovered have either (i) a low probability to exceed the sum of Proved Reserves, Probable Reserves plus Possible Reserves or (ii) at least a ten percent (10%) probability that the actual quantities recovered will equal or exceed the sum of the estimated sum of Proved Reserves, Probable Reserves plus Possible Reserves.

P2 Reserves when combined with Possible Reserves are referred to as P3 or 3P Reserves.

Probable and Possible Reserves are NOT Proved Reserves.

**Williston Basin Operating Partners**

Continental Resources (NYSE: CLR)

Rank Among Bakken Producers: #1
Net Mineral Acres: 1.2 million
Production: 74.3 MBOPD

Whiting Petroleum (NYSE: WLL)

Rank Among Bakken Producers: #2
Net Mineral Acres: 715,000
Production: 110 MBOPD

<u>XTO Energy (NYSE: XOM)</u>
Division of ExxonMobil

Rank Among Bakken Producers: #5
Net Mineral Acres: 531,000
Production: 48.1 MBOPD

<u>Statoil (NYSE: STO)</u>

Rank Among Bakken Producers: #7
Net Mineral Acres: 330,000
Production: 43.7 MBOPD

<u>Oasis Petroleum (NYSE: OAS)</u>

Rank Among Bakken Producers: #8
Net Mineral Acres: 507,000
Production: 37.9 MBOPD

<u>Zavanna LLC (Privately Held)</u>

Rank Among Bakken Producers: #24
Net Mineral Acres: 531,000
Production: 6.8 MBOPD

*[Remainder of page intentionally left blank.]*



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572506

## INVESTMENT MANAGER AND MGP

CE Managing General Partners LLC, the Fund's MGP, is a Delaware limited liability company. The MGP has overall responsibility for the management of the Fund's activities. The MGP has retained Coachman Energy Partners LLC, a Delaware limited liability company, to act as the Investment Manager and has delegated investment management authority to the Investment Manager. The Principals of the Investment Manager and the MGP are the same. The Principals are Randall Kenworthy, Don Scott, Caroline Gash, and Stephen Mut.



## Investment Management Agreement

Pursuant to the Investment Management Agreement between the MGP and the Investment Manager, on behalf of the Fund, the Investment Manager has full discretion over the management of the trading and investment activities of the Fund, subject to the overall authority of the MGP. The Investment Management Agreement provides that the Investment Manager shall not be liable to the Fund or its Unitholders for honest mistakes in judgment or for losses due to such mistakes or negligence, whether by omission or commission, of any broker or other agent of the Fund or the Investment Manager. The Investment Manager is also not liable to the Fund in connection with any investment policy or the purchase, sale or retention of any security, except for such losses attributable to malfeasance by the Investment Manager. The Investment Management Agreement contains provisions for the indemnification by the Fund of the Investment Manager and its principals, members, service providers and employees against liabilities or losses arising in connection with the performance of its services to the Fund, so long as such indemnified person determines, in good faith, that such action was in the best interest of the Fund and such liability or loss was not the result of gross negligence or willful misconduct. Notwithstanding the foregoing, nothing herein shall be deemed to waive any rights under federal or state securities laws.

Without prior consultation with the MGP, but subject to the terms and conditions of the Investment Management Agreement and Section 6.1 of the LLC Agreement, the Investment Manager shall have the exclusive authority and responsibility to acquire, manage and dispose of the Fund's assets (the "Assets") from time to time in its sole discretion, including the authority to purchase, sell, or otherwise acquire, deal in or with, or dispose of mineral leases and Working Interests in oil and gas wells. The foregoing notwithstanding and at all times during the term of the Investment Management Agreement, the Investment Manager shall be subject to the ultimate oversight by, and supervision of, the MGP.

## Investment Manager Activities and Insurance

The Fund may purchase and maintain, at the expense of the Fund, insurance, in amounts that are customary to its business, on behalf of the MGP and the Investment Manager and their respective members, equity holders, directors, officers and employees or any agent appointed by the Investment Manager, which will insure such parties against liability asserted against all or any of them in any such capacity arising out of their status as such.

The Investment Manager and its affiliates may carry on investment activities for their own accounts, for family members and other who do not invest in the Fund. The Investment Manager may be engaged in activities, including investment activities, apart from the Fund, including managing other accounts or Affiliate Funds with similar strategies as the Fund.

## Principals

*Randall Kenworthy*. Mr. Kenworthy serves as the sole Manager and Chief Executive Officer of the Investment Manager and the Chief Executive Officer of the MGP. In 2007 and 2008, Mr. Kenworthy co-founded two prior Affiliate Funds, Coachman Energy I LLC ("CEI") and Coachman Energy II LLC ("CEII"), which focused on acquiring ownership positions in mineral acres in the Bakken Shale. CEI and CEII participated in the acquisition of 66,000 Net Mineral Acres in Williams and McKenzie Counties, North Dakota, and participated in the drilling of some of the state's first Bakken wells drilled west of the Nesson Anticline. Ultimately CEI and CEII participated in 105 Bakken and Three Forks wells, increasing the asset value of the combined funds sixty-five percent (65%) in 180 days (per the 2011 Cawley Gillespie and Associates reserve report) from $65MM in January 2011, to $111 million in January 2012. Mr. Kenworthy led the effort to sell the CEI and CEII assets to a Fortune 100 company in 2012, generating substantial investor returns. In 2011, Mr. Kenworthy

formed Coachman Energy Holdings and launched Bakken Drilling Fund Coachman Energy III LP with an equity capital target of $25 million. Over his thirty year career, Mr. Kenworthy has closed over $1 billion in transactions. Mr. Kenworthy maintains a strong personal commitment to mentoring young entrepreneurs and business professionals. For the past 18 years, Mr. Kenworthy has been an annual speaker for the Southern Methodist University Cox School of Business Executive MBA and Caruth Institute for Entrepreneurship programs. He has authored two custom training programs used by 7,000 sales personnel on three continents, and continues to be a sought after speaker and expert in the areas of sales, marketing, business development, private investment and financing. He has been married for twenty-six years and has a grown daughter.

*Caroline Gash*. Ms. Gash is the Secretary of the Investment Manager and the Chief Analytics & Performance Officer of the MGP. Ms. Gash is the prior Chief Financial Officer of the Investment Manager and Manager. Prior to joining Coachman Energy Partners, Ms. Gash served as an Associate Analyst for the Energy, International Entertainment, and Real Estate sectors of Caddis Capital, LLC, an Affiliate Fund. As an Associate Analyst, Ms. Gash was responsible for evaluating investment opportunities, monitoring the operations of investments and providing strategic advice to principals of the MGP and its affiliates, which manage other investments. Prior to joining Caddis Capital, she spent two years as an Investment Analyst in the private wealth management field. Ms. Gash holds a Bachelors of Science from the University of Notre Dame, a Masters of Finance degree from the University of Denver, and a Masters of Business Administration from the University of Denver.

*Don Scott*. Mr. Scott serves as the Chief Financial Officer and Chief Operating Officer of the Investment Manager and Manager. From 1980 to 1998, Mr. Scott served as a tax consultant and later as a tax partner with Arthur Andersen. While at Andersen, Mr. Scott worked extensively in the oil and gas industry, providing tax and consulting services to independent exploration and production companies, and drilling companies, both domestic and international, independent and integrated, public and private. His major clients included Kerr McGee and Petroleum Investments, the second MLP ever created in the world. In 1998, Mr. Scott opened an office for what became Atlantic Trust Company in Denver. From 2007 to 2012, Mr. Scott established and managed OmniWealth, a family office investment adviser focusing exclusively on high-net-worth clients. OmniWealth grew to approximately $225 million in assets under Mr. Scott's management. The investment results from Mr. Scott's approach included relatively small losses in the most devastating stock market crash since the great depression (2008 into March 2009), and impressive positive returns over the five-year period of 2008 – 2012. Prior to his departure, OmniWealth had grown to a dozen employees serving approximately 20 high-net-worth families. After having been a key investor in several Affiliate Funds, Mr. Scott left OmniWealth to become Coachman's COO in July of 2012. Mr. Scott earned his Bachelors of Business Administration from the University of Central Arkansas. He has been a frequent speaker and has over 50 published articles and quotes, including The Journal of Partnership Taxation, The Oil & Gas Tax Journal, Taxes, a variety of trade publications, numerous newspapers, and various others.

*Stephen Mut.* Mr. Mut serves as the President of Oil & Gas Operations for the MGP. Mr. Mut offers over 40 years of oil and gas experience, including tenure as President of ARCO Latin America and CEO of SURE (Shell Unconventional Resource Energy). Upon graduation with a Bachelors and Master's Degree in Environmental Engineering from Rice University, Mr. Mut worked in a refinery along the Houston ship channel. While at Atlantic Richfield Company (ARCO), Mr. Mut moved through management roles in engineering, economics and planning, and crude oil trading in the Refining and Marketing side. Mr. Mut eventually transitioned to the Exploration and Production side as an executive, overseeing activity in South Louisiana, the North Sea, and eventually all ARCO production outside of North America. In 1997, Mr. Mut was named President of ARCO Global Energy Ventures. As President, Mr. Mut was responsible for the development of a start-up downstream business development company whose mission was to expand ARCO's growth avenues in proximity

to its exploration and production core. Utilizing a $35MM expense budget, the unit developed four business line precursors, which eventually spun off two businesses – ARCO Integrated Power and a small Asian LPG business. Mr. Mut later served as President of ARCO Latin America, during which time he was responsible for the execution of $3.5B of capital commitments in oil and gas developments over a five-year period in Venezuela and Ecuador until ARCO was merged with British Petroleum in 1999. From 2000 to 2005, Mr. Mut returned to big oil as Vice President of Shell Exploration and Production – Unconventional Resources (SURE). While at SURE, Mr. Mut led a team to develop vast oil shale deposits in western Colorado and throughout the rest of the world with a new environmentally sensitive technology. In 2009, Mr. Mut retired as CEO of SURE. Mr. Mut has served in various positions for the Society of Petroleum Engineers, American Institute of Chemical Engineers, National Mining Association, Western Regional Council and United Kingdom Offshore Operators Association.

*Frank Canepa, Director of Acquisitions & Divestitures.* As Director of Business Development, Mr. Canepa assists the investment team with identifying and vetting acquisition opportunities for the Coachman Energy family of funds. He also serves as the President of Coachman Energy Operating Company, providing oversight and operational guidance for the Coachman-operated drilling, development, and production activities executed by our various contractors. Mr. Canepa's initial introduction to the oil and gas industry was with Chinook Pipeline Construction Services followed by six years with the Western Company of North America delivering cementing and pressure pumping (stimulation) services to operators throughout the Rocky Mountain Region. He later joined Core Data Products, a division of Core Labs and Western Geophysical, where he provided specialized data services merging reservoir engineering, geophysical, wire line and core sample data for field production analysis and secondary/tertiary recovery programs. His background includes royalty interest management, and digital data capture systems for field operations and production management, including Environmental, Health & Safety (EH&S) programs for the oil and gas and mining industries. Mr. Canepa is a graduate of Santa Clara University where he received a BA in Business Administration. He later completed his MBA at Southern Oregon State University.

*Michael Mastrodonato, General Counsel.* Mr. Mastrodonato brings over 25 years of experience as corporate legal counsel and general counsel to a number of companies in both the for-profit and nonprofit arena to his position as Coachman's general counsel. He advises executives within the company and works alongside employees in Strategic Business Units, Marketing, Brand Communication, Sales, Human Resources, Corporate Alliances and the International Divisions. Michael also provides assistance with global joint ventures, strategic partnership deals, mergers and acquisitions. Immediately prior to joining Coachman, Michael served as Chief Administrative Officer and General Counsel for Humanitarian International Services Group (HISG). HISG is a nonprofit effort serving orphans and widows around the globe, specializing in disaster response and disaster response training, along with business development creation. He is one of the founders of HISG and has worked with the group since September 2001. Michael was also Executive Vice President of a number of for-profit companies, helping sustain the nonprofit work of HISG. Prior to his nonprofit work, Michael was a partner with the Law Firm of Kaman, Berlove, Marafioti, Jacobstein & Goldman, LLP. He joined the firm in 1988 and his primary areas of practice included general corporate law, real estate, estate planning, trusts and estates. A 1981 graduate of St. John Fisher College in Rochester, New York, Michael received his Juris Doctor Degree from the Santa Clara University School of Law in Santa Clara, California in 1988. He attended Georgetown University International Affairs Program prior to going into the United States Naval Reserve where he reached the rank of Lieutenant, Naval intelligence. Michael served in the Naval Reserve from 1988 through 1995. Michael's Bar Membership includes New York State, Fourth Judicial Department and United States District Court, Western District of New York. Michael has been married for thirty years and has two grown sons.

*Michelle Malloy, Vice-President of Finance / Controller.* Ms. Malloy is responsible for leading the financial and accounting operations at Coachman. This includes oversight of Coachman's

management companies and its multiple drilling funds, including its oil and gas operational accounting and fund accounting. She is also charged with developing and enforcing GAAP compliance and internal controls over financial reporting. Michelle brings over twenty years of accounting and finance experience to Coachman including internal and external financial reporting, operational accounting, tax and compliance, treasury management, developing and managing internal controls, accounting systems administration and financial modeling / analysis. Prior to joining Coachman, Michelle was the corporate controller for Inflection Energy LLC, a start-up natural gas exploration and production company. She was responsible for managing all aspects of the company's accounting department including financial reporting, operational accounting, and maintenance of the Bolo system, including general ledger and subledgers. Her background also includes serving as Director of General Accounting with MarkWest Energy Partners LLC, a $1 Billion publicly traded, mid-stream gas company. At MarkWest, she directly supervised a team of six accounting managers and indirectly supervised an additional 20+ staff members. She was responsible for the preparation of monthly consolidated financial packages, and separate financial packages for three joint ventures, including gathering information from multiple reporting segments. Michelle graduated cum laude from the University of Colorado, Denver, with a Bachelor of Science degree in Business Administration with an emphasis in Accounting. She is a Certified Public Accountant and a Certified Treasury Professional. Additional professional affiliations include Association of Financial Professionals, American Institute of Certified Public Accounts, and Council of Petroleum Accountants Societies (COPAS).

## Technical Team

The Fund's Technical Team is comprised of a unique combination of talented experts with significant oil and gas industry experience. The Fund retains consultants who possess deep expertise in the areas of oil and gas exploration, production operations, reservoir engineering, geology, executive management, finance, fund management, and corporate governance. The following persons have been retained under independent consulting agreements, the cost of which will be paid by the Fund.

*Steven Crane*. Mr. Crane serves as a Petroleum Engineer to the Fund. Mr. Crane brings over 35 years of oil and gas experience, including an 18 year tenure at Atlantic Richfield Company (ARCO) and 8 years at Shell, in roles of increasing responsibility, both technical and managerial. During his early career at ARCO, Mr. Crane held various petroleum engineering roles in West Texas and Prudhoe Bay, Alaska and conducted research & development in EOR and Production Enhancement, working with other major international oil companies such as BP, RD Shell, Exxon, AGIP, and Statoil. From 1994 to 1999, Mr. Crane served as Manager/Senior Manager of Business Development in which he developed new business opportunities and projects for ARCO with a primary focus on integrated unconventional oil and EOR projects. Mr. Crane also developed partnering strategies, initiated relationships, and developed joint ventures with international governments and energy companies. In 1999, Mr. Crane joined Muse Stancil & Co. as a Senior Consultant where he advised operating companies and investment banks across the energy value chain and provided inclusive service from project development to technical and economic evaluation to contract negotiation. From 2000 to 2001, as a Business Development Advisor for Pioneer Natural Resource Co., Mr. Crane expanded non-U.S. business developments and identified and captured 1.5 million acres of exploration/production concessions in a competitive North African play. In 2001, Mr. Crane served as Vice President of Business Development of Heavy Oil for Shell, acting as head of resource and business evaluation for the Shell Group's emerging Unconventional Oil business. In 2006, Mr. Crane became President of SURE Northern Energy Ltd. (Royal Dutch Shell subsidiary) with responsibilities for developing the Grosmont Venture, which is potentially the largest unconventional oil asset for Royal Dutch Shell (publically announced over 30 billion barrels). After retiring from Shell in 2009, Mr. Crane established an advisory service for the energy sector, focusing on unconventional resources. Mr. Crane is widely noted as an expert in unconventional oil and gas projects, integrating both upstream and downstream and is the author of numerous published works and conference papers and holds nine US and international patents. Mr. Crane is a Registered Professional Engineer

in the State of Texas and is a member of the Society of Petroleum Engineers (SPE) and the Association of International Petroleum Negotiators (AIPN). Mr. Crane holds a Bachelors of Science in Petroleum Engineering from New Mexico Institute of Mining and Technology as well as a Master's in Business Administration from Southern Methodist University.

*Mike Hendricks*. Mr. Hendricks serves as a geologist to the Fund. Mr. Hendricks has over 40 years of experience in the oil and gas industry. In 1981, Mr. Hendricks began serving as Vice President and Secretary of West Point Exploration where he was responsible for corporate participation in petroleum plays in the Rocky Mountain region with emphasis on the Williston Basin carbonate plays. In 1983, Mr. Hendricks was appointed President and Treasurer of West Point Exploration and managed all facets of exploration and production. Since 1985, Mr. Hendricks has served as President at Hendricks and Associates with responsibilities including: providing broad-based consulting services to the petroleum industry; offering seminars and courses for industry participants in core analysis, petrography, and reservoir characterization; serving as an expert witness for oil and gas companies before the Wyoming Oil and Gas Conservation Committee; prospecting in the Rocky Mountain region. Mr. Hendricks has invested over 20 years of his career in the Williston Basin analyzing and working the Basin's unconventional formations. Mr. Hendricks has performed work for Exxon, Texaco, Conoco Phillips, ARCO, Devon, Bill Barrett Corp, EOG, Whiting, Continental and Brigham among others. Mr. Hendricks is credited with finding the Cow Creek Field, Flaxton Field, Baden Field, and Ft. Berthold Reservation, all in North Dakota. Mr. Hendricks is a member of the American Association of Petroleum Geologists (AAPG), the Rocky Mountain Association of Geologists (RMAG), the Society of Economic Paleontologists and Mineralogists (SEPM), and the Wyoming Geological Association (WGA). Mr. Hendricks holds a BA in English Literature from the University of Colorado, a MS in Geology from the Colorado School of Mines, and a PhD in Geology from the Colorado School of Mines.

*[Remainder of page intentionally left blank.]*



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572512

## SUMMARY OF THE PARTNERSHIP AGREEMENT

*A prospective subscriber should read and familiarize himself with the Partnership Agreement that appears in Appendix II to this Memorandum. The following statements summarize certain provisions of the Partnership Agreement as currently in effect but do not purport to provide a complete description; the Fund qualifies them in their entirety by express reference to the Partnership Agreement. For definitions of certain capitalized terms used in this section, see the Partnership Agreement.*

### Type of Interests

*A Purchaser of Units May Choose to be a Limited Partner and/or an Investor General Partner.* Each purchase of Units must choose whether to subscribe as a Limited Partner or as an Investor General Partner. There are material differences in the federal income tax effects and the liability associated with these different types of Unitholders and the economic consequences of those tax effects. Any income, gain, loss, or deduction attributable to Fund activities will generally be allocable to the Unitholders who bear the economic risk of loss with respect to the activities. Investor General Partners generally will be permitted to offset Fund losses and deductions against income from any source. Limited Partners generally will be allowed to offset Fund losses and deductions only against passive income.

A Unitholder must indicate whether it is subscribing as a Limited Partner or as an Investor General Partner by filling in the appropriate line of the Subscription Document and by signing in the appropriate places. If a subscriber fails to indicate on the Subscription Document a choice between investing as a Limited Partner or as an Investor General Partner, the MGP will not accept the subscription and will return the Subscription Document and the tendered subscription payment to the subscriber.

*Limited Partners.* The liability of each Limited Partner will generally be limited to the amount of such Limited Partner's investment in the Fund, together with any undistributed profit credited to such Limited Partner's Capital Account and certain distributions made to such Limited Partner by the Fund. **See "Nature of the Fund" beginning on page 81**.

*General Partners.* The General Partners of the Fund will consist of the MGP and each Investor General Partner. Each Investor General Partner will be fully liable for the debts, obligations and liabilities of the Fund individually and as a group with all other General Partners as provided by the Delaware Revised Uniform Limited Partnership Act to the extent liabilities are not satisfied from the proceeds of insurance or from the sale of Fund assets. **See "Risk Factors" beginning on page 12**. While the activities of the Fund will be covered by insurance policies (**see "The Fund – Insurance" beginning on page 58** and **"Summary of the Partnership Agreement – Exculpation and Indemnification" beginning on page 86**), the Investor General Partners may incur personal liability as a result of the Fund's activities which are not covered by insurance or Fund assets.

*Conversion of Units by Investor General Partners.* Upon written notice to the MGP, and except as provided below and in the Partnership Agreement, each Investor General Partner has the right to convert his general partner interests into Limited Partner interests. In addition, the MGP may automatically convert all Investor General Partner interests into Limited Partner interests upon the MGP's determination, in its sole discretion. Upon conversion, an Investor General Partner of the Fund will become a Limited Partner. After becoming a Limited Partner, a former Investor General Partner will not have limited liability regarding the Fund's operations prior to such conversion, but will have limited liability (to the same extent as other Limited Partners) regarding the Fund's operations thereafter.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572513

Except with respect to purchased Units, the MGP is not entitled to convert its interests into Limited Partner interests. Likewise, Limited Partners do not have any right to convert into Investor General Partners.

## Nature of the Fund

The Fund is a Delaware limited partnership. The liability of each Limited Partner will generally be limited to the amount of such Limited Partner's investment in the Fund, together with any undistributed profit credited to such Limited Partner's Capital Account. However, Limited Partners may be also liable to the Fund for certain distributions that the Limited Partner has received in certain circumstances including if the: (i) Limited Partner received a distribution and, after giving effect to such distribution, the Fund's liabilities exceeded the fair market value of its assets or (ii) Fund recalls distributions previously made under the indemnification provisions of the Partnership Agreement (described below).

The Limited Partners will not have any personal liability to third parties, to the Fund or to the other Limited Partners, except as required by applicable law.

Each Investor General Partner will have unlimited liability for Fund obligations. The Investor General Partners will be jointly and severally liable, with the other Investor General Partners and the MGP, for all obligations and liabilities to creditors and claimants, whether arising out of contract or tort, in the conduct of Fund operations.

## Control of Operations of the Fund

The MGP's powers under the Partnership Agreement are quite broad. Generally, the MGP has full, exclusive and complete responsibility and discretion in the management and control of the Fund, and the Unitholders have no authority to transact business for, or participate in the regular management activities and decisions of, the Fund.

## Capital Contributions

*Minimum Investment.* Except as set forth below, a Unitholder will each contribute $100,000 per Unit, subject to the Incentives and Investing Company Credit. The minimum investment by a Unitholder is one (1) Unit; provided, however, the MGP may accept less than the minimum investment from any investor, in its sole discretion; provided further, that in no event will the MGP accept any subscription for less than one-half (1/2) Unit.

*Stage 1 Early Investor Incentive.* Stage 1 Investors will receive a twelve percent (12%) gross up on the number of Units subscribed for by such Stage 1 Investor, resulting in the issuance to such Stage 1 Investor of 1.136 Units per $100,000 contribution. The MGP may reduce or increase the number of Early Incentive Units available for issuance in its sole discretion, at any time, upon seven (7) days' prior notice to the existing investors.

*Stage 2 Early Investor Incentive.* Following the termination of Stage 1, Stage 2 Investors will receive a six percent (6%) gross up on the number of Units purchased, resulting in the issuance to such Stage 2 Investor of 1.064 Units per $100,000 contribution. The MGP may reduce or increase the number of Stage 2 Units available for issuance in connection with the Stage 2 Early Investor Incentive in its sole discretion, at any time, upon seven (7) days' prior notice to the existing investors.

*Major Investor Incentive.* Any single investor or Group purchasing a minimum of twenty (20) Units in a single transaction will receive a ten percent (10%) gross up on the amount of Units received, resulting in receipt of 1.111 Units per $100,000 contribution. The Investing Company shall qualify for

the Major Investor Incentive only to the extent that an individual or Group within the Investing Company qualifies individually or as a Group.

Early Incentive Investors and Major Investors will be specially allocated Net Profits (or, if necessary, in a year in which a liquidation occurs, items of income or gain) in order to increase their capital accounts by an amount equal the capital contribution that would have been associated with their additional Units received.

The Incentives shall at all times be subject to the requirement that less than twenty-five percent (25%) of the value of any class of equity of the Fund be held by a Plan (as defined herein), and shall be subject to adjustment to the extent necessary to comply with such requirement.

## Investment Period

Under the Partnership Agreement, the Investment Period (the period during which the Fund may deploy capital) will commence upon receipt of the Minimum Offering Amount and terminate four (4) years from the Final Closing Date, provided that the MGP may extend such period for one (1) additional year, and provided further, that with respect to existing Projects, the MGP may continue to conduct expansion drilling, buy additional mineral acreage and acquire existing working interests until the termination of the Fund. The MGP may terminate the Investment Period at any time if it determines that changes in any applicable law or regulation make it necessary for the Fund to do so.

After the Investment Period, the MGP is limited to how it may deploy capital. Upon termination of the Investment Period, the Fund may only (i) hold funds in a checking, savings or money market account and (ii) make follow-on investments in any currently-held investment. Additionally, within 180 days of the end of the Investment Period, the Fund may only complete transactions (including drilling, completion and work-over costs) if the Fund was obligated to complete such transactions before the end of the Investment Period.

## Debt/Leverage

The MGP may cause the Fund to incur indebtedness. The Fund's assets may or may not be used as collateral to secure debt, and any debt must be non-recourse to the Fund and its partners, including General Partners. The MGP may receive a fee in connection with the Fund's indebtedness. **See "The Offering – Indebtedness and Guaranty Fees" on page 38**.

## Loans or Advances from the Fund

The Fund is expressly prohibited from making any loans or advances out of the Fund's moneys to any person or entity affiliated with the MGP or its Principals. The MGP or its principals may loan or advance money to the Fund so long as the terms are consistent with similar lending arrangements typically negotiated by outside parties in an arm's length transaction.

## Withdrawal of Contributions

Prior to the dissolution and liquidation of the Fund, no Unitholder will be entitled to withdraw any of the Unitholder's Capital Contributions except as provided in the Partnership Agreement.

## Distributions

Distributions may be made at any time as determined by the MGP. The MGP, in its sole discretion, may cause the Fund to establish such reserves in such amounts as reasonably necessary for



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572515

payment of all expenses of the Fund or as the MGP, in good faith, determines as necessary or appropriate.

Prior to the second (2nd) anniversary of the Final Closing Date, no distributions of cash will be made. Available cash generated during the initial two (2)-year period may be reinvested into additional drilling and/or used to acquire additional oil and gas properties. Thereafter, distributions may be made at any time as determined by the MGP.

The Fund's ability to make Distributions is dependent upon proceeds from the sale of hydrocarbons. The MGP intends to make Distributions only when there is Cash Available for Distribution and then only in accordance with the Partnership Agreement and applicable law. The MGP, in its sole discretion, will make such determination on a monthly basis. To the extent there is Cash Available for Distribution, the MGP may cause the Fund to make Distributions within thirty (30) days of the end of each month; *provided, however,* that the MGP may elect to, in its sole discretion, cause the Fund to make Distributions within thirty (30) days of the end of each quarter. Cash Available for Distribution will be distributed in the following manner:

- First, ninety percent (90%) to the Unitholders *pro rata* based on their relative Percentage Interests, until such Unitholders receive 100% of their relative initial Capital Contribution and the Preferred Return, and ten percent (10%) to the MGP.

- Thereafter, seventy percent (70%) to Unitholders *pro rata* based on their relative Percentage Interests and thirty percent (30%) to the MGP.

Once the MGP or its successor becomes entitled to receive thirty percent (30%) of the Cash Available for Distribution an Affiliate of the Managing Broker Dealer will also receive one and one-half percent (1.5%) of the ongoing Distributions, which will be allocated from the Distributions owed to the MGP and not the Unitholders.

Notwithstanding the foregoing, the MGP may cause the Fund to make cash distributions out of the Capital Contributions in an amount intended to equal the tax liability of either the MGP or any Unitholder with respect to allocations of income or gain from the Fund as to its carried interest.

<u>General Allocations</u>

Subject to certain special allocations and regulatory limitations further described in the Partnership Agreement, Fund income will be allocated as follows:

- First, Net Profits (and, if necessary, items of income and gain) one hundred percent (100%) to MGP to the extent it receives a distribution for such year;

- Second, Net Profits shall be allocated (and, if necessary, in a year in which a liquidation occurs, items of income and gain) one hundred percent (100%) among the Unitholders entitled to Stage 1 Early Investor Incentives, *pro rata* based on their relative Percentage Interests, until such Unitholders have been allocated an amount equal to the excess, if any, of (i) fourteen percent (14%) of each Unitholder's Capital Contributions resulting in a right to the Stage 1 Early Investor Incentive for such person, over (ii) the cumulative Net Profits allocated to such person pursuant to this allocation tier for all prior years;

- Third, Net Profits shall be allocated (and, if necessary, in a year in which a liquidation occurs, items of income and gain) one hundred percent (100%) among the Unitholders entitled to Stage 2 Early Investor Incentives, *pro rata* based on their relative Percentage Interests, until such Unitholders have been allocated an amount equal to the excess, if any, of (i) six percent



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572516

(6%) of each Unitholder's Capital Contributions resulting in a right to the Stage 2 Early Investor Incentive for such person, over (ii) the cumulative Net Profits allocated to such person pursuant to this allocation tier for all prior years;

- Fourth, Net Profits shall be allocated (and, if necessary, in a year in which a liquidation occurs, items of income and gain) one hundred percent (100%) among Major Incentive Investors, *pro rata* based on their relative Percentage Interests, until such Unitholders have been allocated an amount equal to the excess if any, of (i) eleven percent (11%) of each Unitholder's Capital Contributions resulting in a right to the Major Investor Incentive for such person, over (ii) the cumulative Net Profits allocated to such person pursuant to this allocation tier for all prior years; and

- Fifth, to the Unitholders, *pro rata* based on their relative Percentage Interests.

Net Losses will be allocated to the Unitholders *pro rata* in accordance with their Percentage Interests; *provided, that* no Net Losses will be allocated to a Unitholder if the Unitholder's Capital Account if doing so would create a deficit balance in the Capital Account.

<u>Special Allocations and Economic Effect to Unitholder</u>

Certain Fund tax items are specially allocated to certain investors. The Fund's intangible drilling costs will be specially allocated to Unitholders other than the Investing Company. The Fund's leasehold acquisition costs will be specially allocated to Investing Company. Further, certain regulatory allocations related to oil and gas investments, such as simulated basis, simulated gains and simulated losses will be specially allocated among the Unitholders as described in Article 6 of the Partnership Agreement. These allocations have significant economic effect and generally cause the Unitholder receiving the special allocation to bear the economic burden associated with the cost generating the special allocation. For example, cash distributed in liquidation to a Unitholder who has received special allocations of deductions, such as intangible drilling costs, may be less cash per Unit than the amount received by other Unitholders. The Partnership Agreement should be carefully reviewed with respect to these items.

<u>Percentage Interest</u>

A Unitholder's Percentage Interest will be equal to a fraction, the numerator of which equals the number of Units owned by such Unitholder and the denominator equals the number of total outstanding Units, expressed as a percentage.

<u>Limited Transferability of Units</u>

The Units are subject to significant restrictions on transferability. The Units may not be sold, transferred or assigned, in whole or in part, unless such sale, transfer or assignment is approved by the MGP (in its sole discretion) or otherwise permitted under the terms of the Partnership Agreement. Any transfer may also be subject to the right of first refusal granted to the MGP. If a transfer would cause the Fund to be taxable as a corporation under the publicly-traded-partnership rules, the transfer will not be recognized by the Fund in any regard and will be null and void. If the transfer is recognized, the assignee of the Unit will only be admitted as a Substituted Unitholder upon the conditions set forth in the Partnership Agreement. Until a transferee becomes a Substituted Unitholder, such transferee is entitled to receive his share of allocations and distributions, but he has no right, under Delaware law or the Partnership Agreement, to require delivery of any information regarding the transactions or to vote in the Fund.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572517

Dissolution and Liquidation

The Fund will be dissolved upon the first to occur of the following:

- the consent of the MGP, subject to Section 13.1(c) of the Partnership Agreement;
- the sale, exchange, transfer or otherwise dispose of all or substantially all of the Fund's assets in a single transaction or a series of related transactions (including by way of merger, consolidation or other combination with any other Person), subject to Section 7.4(d) of the Partnership Agreement;
- a Majority Consent; *provided, however*, that such Majority Consent is required only until the third (3rd) anniversary of the Final Closing Date;
- if the Fund has a limited duration, then upon the expiration of the Term and thereafter, the MGP may dissolve the Fund without Consent of the Unitholders;
- any event under applicable law requiring dissolution; or
- an event of withdrawal (including by resignation, removal, Bankruptcy or dissolution or its equivalent) of the MGP, unless, within ninety (90) days after such event of withdrawal a Majority agrees in writing to continue the business of the Fund and to the appointment, effective as of the date of withdrawal, of a successor MGP.

Upon dissolution of the Fund, the assets of the Fund will be liquidated and the proceeds thereof will be paid, to the extent permitted by applicable law, in the following order of priority:

- First, to the payment and discharge of all of the Fund's debts and liabilities to creditors other than the Unitholders;
- Second, to the payment and discharge of all of the Fund's debts and liabilities to the MGP;
- Third, to the payment and discharge of all of the Fund's debts and liabilities to the other Unitholders;
- Fourth, to the Unitholders based on their relative Percentage Interests until each Unitholder has received an amount equal to the excess, if any, of (i) the cumulative Preferred Return for such Unitholder to the date such distribution is made, over (ii) the sum of all prior distributions to the Unitholders pursuant to Sections 5.1(a) and 13.2(a)(4) of the Partnership Agreement; *provided, however*, that no distribution will be made pursuant to Section 13.2(a)(4) of the Partnership Agreement that creates or increases a Capital Account deficit for any Unitholder that exceeds such Unitholder's obligation to restore such deficit, determined as follows: distributions shall first be determined tentatively pursuant to Section 13.2(a)(4) of the Partnership Agreement without regard to the Unitholders' Capital Accounts, and then the allocation provisions of Article 6 of the Partnership Agreement shall be applied tentatively as if such tentative distributions had been made; if any Unitholder shall thereby have a Capital Account that exceeds the Unitholder's obligation to restore such deficit, the actual distribution to such Unitholder pursuant to Section 13.2(a)(4) of the Partnership Agreement shall be equal to the tentative distribution to such Unitholder less the amount of the excess to such Unitholder; and



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572518

- The balance, if any, to the MGP and Unitholders in accordance with their relative Capital Account balances, after giving effect to all contributions, distributions, adjustments, and allocations for all periods.

Exculpation and Indemnification

The Fund shall indemnify each Indemnitee from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including, without limitation, attorneys' fees and other legal fees and expenses), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the operations of the Fund as set forth in the Partnership Agreement in which such Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, unless it is established that: (i) the act or omission of the Indemnitee was material to the matter giving rise to the proceeding and was either (a) committed in bad faith or (b) the result of active and deliberate dishonesty; (ii) the Indemnitee actually received an improper personal benefit in money, property or services; or (iii) in the case of any criminal proceeding, the Indemnitee had reasonable cause to believe that the act or omission was unlawful.

The termination of any proceeding by judgment, order or settlement does not create a presumption that the Indemnitee did not meet the requisite standard of conduct set forth in this section with respect to the subject matter of such proceeding. The termination of any proceeding by conviction of an Indemnitee or upon a plea of nolo contendere or its equivalent by an Indemnitee, or an entry of an order of probation against an Indemnitee prior to judgment, creates a rebuttable presumption that such Indemnitee acted in a manner contrary to that specified in this section. Any indemnification pursuant to this section shall be made only out of the assets of the Fund, and neither the MGP nor any Limited Partner shall have any obligation to contribute to the capital of the Fund or otherwise provide funds, to enable the Fund to fund its obligations under this section.

Reasonable expenses incurred by an Indemnitee who is a party to a proceeding may be paid or reimbursed by the Fund in advance of the final disposition of the proceeding upon receipt by the Fund of a written (i) affirmation by the Indemnitee of the Indemnitee's good faith belief that the standard of conduct necessary for indemnification by the Fund as authorized in this section has been met, and (ii) undertaking by or on behalf of the Indemnitee to repay the amount if it shall ultimately be determined that the standard of conduct has not been met.

The indemnification provided by the Partnership Agreement shall be in addition to any other rights to which an Indemnitee or any other Person may be entitled under any agreement, pursuant to any vote of the Unitholders, as a matter of law or otherwise, and shall continue as to an Indemnitee who has ceased to serve in such capacity unless otherwise provided in a written agreement pursuant to which such Indemnities is indemnified.

The Fund may, but shall not be obligated to, purchase and maintain insurance, on behalf of the Indemnitees and such other Persons as the MGP shall determine, against any liability that may be asserted against or expenses that may be incurred by such Person in connection with the Fund's activities, regardless of whether the Fund would have the power to indemnify such Person against such liability under the provisions of the Partnership Agreement.

In no event may an Indemnitee subject any of the Unitholders to personal liability by reason of the indemnification provisions set forth in the Partnership Agreement. An Indemnitee shall not be denied indemnification in whole or in part under this section because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of the Partnership Agreement.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572519

## Conflicts of Interest

Each Unitholder acknowledges that there might be situations in which the interest of the Fund may conflict with the interests of the MGP, Investment Manager or their respective affiliates (the "Management Parties"). In the event of a conflict of interest between the Management Parties, on one hand, and the Fund or any Unitholder, on the other hand, the MGP may choose to resolve such conflict by either (i) obtaining a Majority Consent, (ii) the approval of an Advisory Committee, or (iii) obtaining an independent third party's determination that the resolution is no less favorable to the Fund than those generally being provided to or available from third parties or is fair and reasonable to the Fund, taking into account the totality of the relationships between the parties involved. Furthermore, each Unitholder agrees that the activities of the Management Parties specifically authorized by or described in the Partnership Agreement, or any Ancillary Agreements, may be engaged in by the Management Parties and will not, in any case or in the aggregate, be deemed a breach of the Partnership Agreement or any duty owed by the Management Parties to the Fund or Unitholder.

## Meetings and Consent

Meetings of the Unitholders may be called by the MGP and shall be called upon the receipt by the MGP of a written request by a Majority. The MGP will provide Unitholders with a notice of such meeting and each Unitholder may consent in person or by proxy at such meeting. The MGP does not contemplate holding regular meetings.

## Removal of MGP

The Unitholders may remove the MGP only for "cause" upon approval by the Unitholders holding a Supermajority (not including the Units held by the MGP or its affiliates, if any). For the purposes of this section, "cause" shall exist upon the occurrence of the following:

- the MGP shall have materially breached the Partnership Agreement or shall have committed an act of gross negligence, willful malfeasance, intentional misconduct, a breach of a fiduciary duty or fraud against the Fund (each a "Wrongful Act"), *provided, however*, that the MGP's compliance with Section 7.6(a) of the Partnership Agreement, if applicable, shall preclude the MGP's action with regard to such transaction from being deemed a Wrongful Act;

- the Wrongful Act shall have had a material adverse effect on the business or property of the Fund taken as a whole;

- the Unitholders shall have provided the MGP with notice of such Wrongful Act and the Unitholders' intention to remove the MGP pursuant to Section 8.5 of the Partnership Agreement; and

- the MGP shall have failed to cure such Wrongful Act within ninety (90) days of receipt of the notice from the Unitholders.

A resigning MGP need not transfer its carried interest. A removed MGP will be entitled to be distributed the amount that the removed MGP would have been entitled to receive if the Fund had sold its assets for their fair market value and repaid its liabilities, including normal and customary transaction costs, immediately prior to the removal. The fair market value of the Fund's assets will be initially determined by the appraisal of an independent third party selected by the removed MGP and such determination will be binding unless the Unitholders object to such determination by a

Supermajority vote. If a sufficient number of Unitholders object to the removed MGP's determination, the fair market value of the assets will be determined as the average of the initial appraisal and an appraisal by an independent appraiser selected by the replacement MGP. The removed MGP will receive this distribution upon the effective date of his removal.

## Reports

The MGP will cause to be prepared and furnished to each Unitholder, at the Fund's expense, within sixty (60) days of the end of each calendar quarter each of: (A) an unaudited quarterly financial statement and (B) drilling, completion, and production reports. As soon as practicable after the end of the Fiscal Year, the MGP will provide the Unitholders with financial statements, all tax information relating to the Fund, including Schedule K-1s, and any other information that the MGP finds to be materially relevant to the Unitholders.

## Amendment of Partnership Agreement

Notwithstanding Sections 14.1(a) and 14.1(b) of the Partnership Agreement, the Partnership Agreement shall not be amended without the consent of each Unitholder adversely affected if such amendment would (i) convert a Limited Partner's interest in the Fund into a General Partner interest, (ii) modify the limited liability of a Limited Partner in a manner adverse to such Limited Partner, (iii) alter rights of the Unitholder to receive distributions or allocations or (iv) amend Section 14.1(c) of the Partnership Agreement. Further, no amendment may alter (A) the restrictions on the MGP's authority set forth in Section 7.4 of the Partnership Agreement without the consent specified in the particular Subsection proposed to be amended; or (B) Sections 7.9 or 7.10 of the Partnership Agreement without a Supermajority Consent.

Without the consent of the Unitholders, the MGP may amend the Partnership Agreement to (1) add to the obligations of the MGP or surrender any right or power granted to the MGP or any affiliate of the MGP for the benefit of the Unitholders; (2) reflect the admission, substitution, termination, or withdrawal of Unitholders in accordance with the Partnership Agreement; (3) reflect a change that is of an inconsequential nature and does not adversely affect the Unitholders in any material respect, or to cure any ambiguity, correct or supplement any provision in the Partnership Agreement not inconsistent with law or with other provisions, or make other changes with respect to matters arising under the Partnership Agreement that will not be inconsistent with law or with the provisions of the Partnership Agreement; (4) satisfy any requirements, conditions, or guidelines contained in any order, directive, opinion, ruling or regulation of a federal or state agency or contained in federal or state law; (5) accommodate investments in the Fund by employee benefit plans through group trusts or other investment vehicles; (6) accommodate the creation of investment entities and alternative investment vehicles; and (7) increase the likelihood that the Fund will not be treated as a publicly traded partnership.

## Governance of the Fund

The Fund is a Delaware limited partnership and subject to the Delaware Revised Uniform Limited Partnership Act. In addition, the governance provisions of the Fund are set forth in the Partnership Agreement and Certificate of Limited Partnership, which are attached hereto. The Partnership Agreement and Certificate of Limited Partnership of the Fund are incorporated herein by reference.

*[Remainder of page intentionally left blank.]*

## SUMMARY OF THE FUND'S DISTRIBUTION REINVESTMENT PLAN

A copy of the Fund's Distribution Reinvestment Plan (the "Distribution Reinvestment Plan") is attached to this Memorandum as Appendix IV. Unitholders should review the entire Distribution Reinvestment Plan with their own independent legal counsel before electing to participate in and purchase Units through the Distribution Reinvestment Plan. The following is merely a summary of some of the significant provisions of the Distribution Reinvestment Plan and is qualified in its entirety by the full text thereof.

### General

Unitholders who have received a copy of this Memorandum and participate in this Offering can elect to participate in and purchase Units through the Distribution Reinvestment Plan at any time and will not need to receive a separate memorandum relating solely to the Distribution Reinvestment Plan. A person who becomes a Unitholder other than by participating in this Offering may purchase Units through the Distribution Reinvestment Plan only after receipt of a separate memorandum relating solely to the Distribution Reinvestment Plan.

### Investment of Distributions

Units will be purchased under the Distribution Reinvestment Plan on the Fund's distribution payment dates. The purchase of fractional Units is a permissible and likely result of the reinvestment of distributions under the Distribution Reinvestment Plan.

The purchase price per Unit will be $90,000. The Fund will not charge a Unitholder any other fees in connection with the purchase of Units under the Distribution Reinvestment Plan. The price for Units purchased under the Distribution Reinvestment Plan bears little relationship to, what a Unitholder might receive for their Units if such Unitholder tried to sell the Units or if the Fund liquidated its portfolio.

### Fees

The Fund will not pay a commission in connection with a Unitholder's purchase of Units in the Distribution Reinvestment Plan. No selling commissions or dealer manager fees will be paid on Units sold under the Distribution Reinvestment Plan. The Fund will not receive a fee for selling Units under the Distribution Reinvestment Plan.

### Administration

As of the date of this Memorandum, the Distribution Reinvestment Plan will be administered by the Fund or one of the Fund's affiliates (the "DRIP Administrator"), but a different entity may act as DRIP Administrator in the future. The DRIP Administrator will keep all records of participants' account and send statements of such accounts to participants. Within ninety (90) days after the end of each calendar year, the Fund will provide investors with an individualized report on an investment, including the purchase dates, purchase price, number of Units owned, and the amount of distributions made in the prior year. The Fund will send to all participants in the Distribution Reinvestment Plan, without charge, all supplements to and updated versions of this Memorandum which the Fund is required to provide under applicable securities laws. Units purchased under the Distribution Reinvestment Plan will be registered in the name of each participating Unitholder.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572522

**Voting**

Unitholders may vote all Units acquired through the Distribution Reinvestment Plan.

**Election to Participate or Terminate Participation**

Assuming a Unitholder is eligible, such Unitholder may elect to participate in the Distribution Reinvestment Plan by making a written election to participate in the Subscription Documents at the time such Unitholder subscribes for Units. Any other Unitholder who receives a copy of this Memorandum and who has not previously elected to participate in the Distribution Reinvestment Plan may so elect at any time by completing the enrollment form attached to the Subscription Documents, the form of which is attached to this Memorandum, or by completing any other appropriate authorization form as may be available from the Fund or the MGP. Participation in the Distribution Reinvestment Plan will commence with the next distribution made after receipt of the Unitholder's notice. Once enrolled, such Unitholder may continue to purchase Units under the Distribution Reinvestment Plan until the Fund has sold all of the Units registered in this offering, has terminated this offering, or has terminated the Fund's Distribution Reinvestment Plan.

A Unitholder can choose to have all or a portion of his distributions reinvested through the Distribution Reinvestment Plan. A Unitholder may also change the percentage of such Unitholder's distributions that will be reinvested at any time if such Unitholder completes a new enrollment form or other form provided for that purpose.

Each Unitholder that has elected to participate in the Distribution Reinvestment Plan will be provided an individualized report on his or her investment within 90 days after the end of the Fund's fiscal year, including the purchase date(s), purchase price and number of Units owned, as well as the dates of Distribution payments and amounts of Distributions paid during the prior fiscal year. A Unitholder may terminate his participation in the Distribution Reinvestment Plan at any time by providing the Fund with written notice. Any transfer of a Unitholder's Units will effect a termination of the participation of those Units in the Distribution Reinvestment Plan.

**Federal Income Tax Considerations**

Unitholders subject to federal income taxation who elect to participate in the Distribution Reinvestment Plan will incur tax liability with respect to their share of the Fund's taxable income even though they will not receive cash Distributions, other than special distributions that are designated by the MGP. The Fund may withhold a percentage of the amount of distributions paid if a Unitholder fails to furnish a valid taxpayer identification number, fail to properly report interest or dividends or fail to certify that you are not subject to withholding. **See "Tax Considerations" beginning on page 91.**

**Amendments and Termination**

The Fund reserves the right to amend any aspect of the Distribution Reinvestment Plan or terminate the Distribution Reinvestment Plan without the consent of Unitholders, *provided* that notice of any material amendment is sent to participants at least ten (10) days' prior to the effective date of that amendment or termination; *provided, however*, no such amendment shall add compensation to the plan or remove the opportunity for a Unitholder to terminate such Unitholder's participation in the plan, as specified above.

*[Remainder of page intentionally left blank.]*



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572523

# TAX CONSIDERATIONS

**The following discussion was written to support the promotion or marketing of an investment in the Units and does not constitute tax advice. Each investor should seek advice based on the investor's particular circumstances from an independent tax advisor.**

The following discussion is a general summary only of the United States federal income and various other tax considerations of the Fund and the tax effects on the Unitholders. It is impractical to comment on all of the tax consequences of an investment in the Fund or of the contemplated operations of the Fund and its projects. Such consequences may vary depending on an investor's particular circumstances. The discussion is directed primarily to individuals who are citizens or residents of the United States. Persons who are not individual U.S. residents or citizens, such as non-U.S. residents, partnerships, corporations, tax-exempt entities, individual retirement accounts (IRAs), trusts, or estates may have federal income tax consequences substantially different from those discussed below. A particular investor may be subject to various facts and circumstances that are applicable only to him and that may give rise to additional considerations. The following discussion generally does not address any of those additional considerations. In addition, an investment in Units may have foreign, state and local (including Native American tribal) tax consequences to a particular investor that are not discussed below. Accordingly, each potential investor is urged to consult his tax advisor prior to purchasing Units, with specific reference to the effect of his particular facts and circumstances on the matters discussed in this Memorandum. **See "—General Tax Provisions" on page 106** and **"The Offering – Investor Suitability Requirements" beginning on page 38.**

The tax considerations discussed herein are based on existing provisions of the Code, existing Treasury Regulations (final, temporary, and proposed), published interpretations of the Code and such regulations by the IRS, and existing court decisions, any of which could be changed or become inapplicable at any time. Any new legislation, judicial decisions, regulations, or other pronouncements may apply retroactively to transactions prior to the date of such changes and could significantly modify the statements made and tax considerations discussed in this Memorandum.

A portion of the following discussion focuses on the characterization of income or losses under various rules as ordinary income or loss or capital gain or loss. At the present time, the marginal rate of federal income tax applicable to long-term capital gains may be significantly more favorable for an individual taxpayer, depending upon income level, than the rate on ordinary income. Corporations, on the other hand, are taxable at the same rate on ordinary income and capital gains.

No rulings will be requested from the IRS with respect to the tax consequences of ownership of interests in the Fund. Additionally, no opinion of counsel will be requested with respect to such tax consequences.

EACH PROSPECTIVE INVESTOR IS ADVISED TO CONSULT HIS TAX ADVISOR WITH RESPECT TO THE UNITED STATES FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF PARTICIPATION IN THE FUND. EXCEPT AS EXPRESSLY PROVIDED OTHERWISE, THE FOLLOWING DISCUSSION RELATES TO THE FUND AND OPERATIONS ON THE PROJECTS.

## Partnership Taxation

*General.* The Fund intends and expects to be classified and treated as a partnership for U.S. federal income tax purposes. A partnership is not a taxable entity under federal income tax laws. Instead, each partner reports on his federal income tax return for the taxable year in which the partnership's taxable year ends his distributive share of the income, gains, losses, deductions, and credits of the

partnership, irrespective of any actual cash distributions made to such partner during his taxable year. For example, a partner will be required to report his share of partnership income as determined under the partnership's method of accounting, notwithstanding that the revenues resulting in such income are retained in whole or in part by the Fund for payment of any partnership expenses, debt service, working capital, or otherwise. A Unitholder's share of any partnership losses in a taxable year may be applied against his income from other sources only to the extent of the tax basis of his interest in the Fund and to the extent permitted under the "passive activity" and "at risk" limitations. **See "—Special Features of Oil and Gas Taxation — Passive Activity Loss Limitations" beginning on page 99** and **"— Special Features of Oil and Gas Taxation — Basis and At Risk Limitations" beginning on page 102.**

*Partnership Classification*. Expected tax consequences resulting from an investment in Units are dependent upon the classification of the Fund as a partnership for federal income tax purposes. If the Fund is classified as a partnership for federal income tax purposes, the expenditures made and income received by the Fund will flow to the Unitholders in amounts equal to their respective distributive shares of income, gain, loss, deduction and credit. In order for the anticipated tax consequences of an investment in Units to materialize, however, the Fund must be classified as a partnership for federal income tax purposes and not as an association or "publicly traded partnership" taxable as a corporation. Any references in the following discussion to partnerships relate only to organizations treated as partnerships for federal income tax purposes.

Under a default rule in the Treasury Regulations, a partnership with at least two partners (that are not themselves disregarded), such as the Fund, is treated as a partnership for federal tax purposes, unless such entity affirmatively elects to be treated as an association taxable as a corporation. The Fund will not elect to be treated as an association taxable as a corporation for federal tax purposes. Certain unincorporated organizations may elect to opt out of partnership treatment for federal income tax purposes. The members of such an electing organization are treated as individually owning their portion of the property and, in the case of an oil and gas working interest, must capitalize intangible drilling costs allocable to working interests held by others and may only deduct intangible drilling costs attributable to the smallest working interest held through Return of Invested Capital. The classification of any Project in which the Fund invests in the future as a partnership for federal tax purposes cannot be determined at this time because such classification depends upon agreements and actions to be entered into in the future.

The classification of the Fund as an association taxable as a corporation for federal tax purposes would have a material adverse effect on the Unitholders. If the Fund were determined to be taxable as a corporation, its income, deductions, and credits would be reported by the Fund and not by its partners, the Fund would be taxed directly on any net income, and distributions to its partners would be treated as taxable dividends to the extent of current and accumulated earnings and profits of the Fund. Thus, any tax benefits anticipated from investment in the Fund would be adversely affected or eliminated if the Fund was treated as a corporation.

Section 7704 of the Code treats certain "publicly traded partnerships" as corporations for federal income tax purposes. Section 7704 defines a publicly traded partnership as a partnership in which the Fund's interests are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent of a secondary market. If all interests in a partnership were issued in transactions that were not required to be registered under the Securities Act and if the partnership does not have more than 100 partners at any time, the interests in such partnership will be treated as not readily tradable on a secondary market or the substantial equivalent of a secondary market. Additionally, the rule taxing publicly traded partnerships as corporations is specifically inapplicable to a partnership for any year if at least ninety (90%) of the partnership gross income for such year and all preceding years consists of, among other things, interest or income from the exploration, development, production, processing, refining, transportation, or marketing of oil and gas

and gains from the sale of assets used to generate that income. The Fund intends to not be taxable as a corporation under the "publicly traded partnership" rules of Section 7704 of the Code.

THE FOLLOWING DISCUSSION IS PREDICATED ON THE ASSUMPTION THAT THE FUND WILL BE CLASSIFIED AS A PARTNERSHIP FOR FEDERAL TAX PURPOSES AND WILL NOT BE CLASSIFIED AS A "PUBLICLY TRADED PARTNERSHIP" OR OTHERWISE TREATED AS AN ASSOCIATION TAXABLE AS A CORPORATION.

*Taxation of Partners*. For each taxable year, each Unitholder will be required to report on his individual federal income tax return his share of partnership income, gain, loss, deduction, and credit for such taxable year. Each Unitholder is required to take his share into account in computing his federal income tax liability regardless of whether he has received or will receive any cash distributions from the Fund. Therefore, he may be required to report and pay tax on income that the Fund has earned but that has not been distributed to him. This may occur, for example, when the Fund uses revenues to repay partnership borrowings or to pay nondeductible expenditures.

A distribution of cash to a Unitholder generally is not taxable to such Unitholder unless the amount of the distribution exceeds the Unitholder's basis in his Units. Any such excess generally should be taxable as capital gain, assuming those Units are held as a capital asset. If, however, any portion of the distribution is considered to be in exchange for the Unitholder's interest in ordinary income items, including potential recapture of intangible drilling cost, depletion, and depreciation deductions, that portion will be taxed as ordinary income even if the amount of the distribution did not exceed the Unitholder's tax basis in his Units. In addition, a Unitholder could recognize income if cash distributions made to him cause his at-risk amount to be reduced below zero. **See "— Special Features of Oil & Gas Taxation — Basis and At Risk Limitations" beginning on page 102.**

The Fund will use the calendar year and the accrual method of accounting for federal income tax purposes. The IRS, however, could require the Fund to treat particular items of income, gain, loss, or deduction under a different method of accounting if it determines that the use of the accrual method with respect to that item does not clearly reflect income. A change in the method of accounting could defer deductions or accelerate income.

*Allocations*. Under the Partnership Agreement, certain items of income, gain, loss, deduction and credit are specially allocated to certain partners, and other items of partnership income, gain, loss, deduction, and credit are generally allocated among the partners pro rata based on their relative Percentage Interests. The specific items specially allocated among the partners are described in the summary of the partnership agreement in this Memorandum. **See "Summary of Partnership Agreement — Special Allocations and Economic Effect to Unitholder" beginning on page 84.**

The special allocations of certain items of income, gain, loss, deduction and credit will have an economic effect on a Unitholder's investment return. For example, as leasehold acquisition costs are allocated to the Investing Company, those costs will reduce the capital account of the Investing Company and effectively result in the Investing Company's contributed capital being used to pay such costs. If the Fund were unable to generate revenue sufficient to exceed those costs, all or a portion of the Investing Company's investment would be lost and thus the subscriber's for units of the Investing Company could lose all or a part of their investment. Similarly, intangible drilling costs will be allocated to the Investor General Partners and there is a risk that the Fund will not generate sufficient revenues to recover those costs.

Fund allocations of income, gain, loss, deduction, and credit among Unitholders are governed generally by Section 704(b) of the Code. Section 704(b) provides that partnership allocations will be recognized for federal income tax purposes if such allocations either have, or are deemed to have, "substantial economic effect" or are made, or deemed made, in accordance with the partners'

interests in the partnership, determined by taking into account all relevant facts and circumstances. If an allocation of an item does not have substantial economic effect, such item will be reallocated among the Unitholders and the MGP in accordance with their interests in the Fund.

Treasury Regulations Section 1.704-1(b) indicates that allocations will have economic effect if, throughout the term of the partnership: (a) they are reflected in the partners' capital accounts, (b) such capital accounts are respected upon liquidation of the partnership, and (c) a partner with a deficit in his capital account following the distribution of liquidation proceeds is required to restore the amount of such deficit to the partnership. If requirements (a) and (b) are satisfied, but requirement (c) is not, an allocation may nevertheless be considered to have economic effect if the allocation does not cause or increase a deficit in the recipient partner's capital account balance, determined after taking into account certain reasonably anticipated deductions and distributions, and the partnership agreement contains a "qualified income offset" which provides that a partner who unexpectedly receives an adjustment, allocation or distribution which causes or increases a deficit balance will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible.

If allocations do not have "economic effect" under the Treasury Regulations, they may still be respected by the IRS if they are deemed to have "economic effect" or if they are made, or deemed made, in accordance with the partners' interests in the partnership. Under the "economic effect equivalence" test, if a liquidation of the partnership at the end of each year or at the end of any future year would produce the same economic results to the partners as would occur if the "economic effect" test (described above) were satisfied, regardless of the economic performance of the partnership, the allocations will be deemed to have economic effect. If an allocation is deemed to have economic effect, that economic effect must be substantial.

The economic effect of an allocation will be "substantial" if there is a reasonable possibility that the allocation will substantially affect the dollar amounts to be received by the Unitholders from the Fund, independent of tax consequences. The determination of whether economic effect is "substantial" is a question of fact which may depend in part on the timing of income and deductions and on consideration of the non-partnership tax attributes of the Unitholders and their affiliates.

If an allocation does not have economic effect or if that economic effect is not substantial, it must be made in accordance with the partners' interests in the partnership. The "partners' interests in the partnership" signify the manner in which the partners have agreed to share the economic benefit or burden, if any, corresponding to the income, gain, loss, deduction or credit that is allocated and is determined taking into account all facts and circumstances relating to the economic arrangement of the partners.

The Fund will maintain a capital account for each Unitholder which will be credited (increased) by his or its contributions to the Fund and all items of income and gain allocated to such Unitholder. Such capital account will be debited (reduced) by all distributions and all deductions and losses allocated to such Unitholder. Unitholders other than Investor General Partners are not obligated to restore deficit capital account balances following the liquidation of their respective interests in the Fund. As discussed under **"Summary of Partnership Agreement — General Allocations" beginning on page 83**, the Partnership Agreement provides for modifications in the allocations described above if necessary to prevent or eliminate any deficit capital account balance for any Unitholder, taking into account reasonably expected deductions and distributions in subsequent years.

The capital accounts will be maintained in an effort to cause the allocations to have substantial economic effect, meet the "economic effect equivalence" test under the Treasury Regulations or be made in accordance with the "partners' interests in the partnership". However, the allocations may not meet the requirements of Treasury Regulation Section 1.704-1(b). Thus, it is possible that the



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572527

IRS will seek to reallocate the Fund's income, gain, loss and deduction in accordance with the IRS's determination of each Unitholder's interest in the Fund.

*Elections and Returns*. The Fund will be subject to the partnership provisions of the Code and to similar provisions of any applicable state income tax laws. The Fund will adopt the accrual method of accounting and calendar year as its taxable year for income tax purposes. As soon as is practicable after the end of each fiscal year, each Unitholder will receive a report containing such information as may be deemed to enable each Unitholder to prepare and file his federal income tax return and any required state income tax return.

While no federal income tax is required to be paid by an organization classified as a partnership for federal income tax purposes, the Fund must file a federal income tax information return which is subject to audit by the IRS. Any such audit may lead to adjustments, in which event the Unitholders may be required to file amended personal federal income tax returns. Any such audit also may lead to an audit of a Unitholder's individual tax return and adjustments to items unrelated to an investment in Units.

*Determinations of Partnership Items at Fund Level*. For purposes of reporting, audit, and assessment of additional federal income tax, the tax treatment of "partnership items" is determined at the partnership level. Each partner must report such items on his individual tax return in a manner consistent with the partnership determination, unless special filings are made with the IRS and in accordance with the Partnership Agreement. The IRS generally cannot initiate deficiency proceedings against an individual partner with respect to partnership items without first conducting an administrative proceeding at the partnership level as to the correctness of the partnership's treatment of the item. An individual partner may not file suit for a credit or a refund arising out of a partnership item without first filing a request for an administrative proceeding by the IRS at the partnership level. Individual partners are entitled to notice of such administrative proceedings and decisions made at such proceedings, except in the case of partners with less than a one percent (1.0%) profits interest in a partnership having more than one hundred (100) partners. If a group of partners having an aggregate profits interest of five percent (5.0%) or more in such a partnership so requests, however, the IRS also must mail notices to a partner appointed by that group to receive notice. All Unitholders, whether or not entitled to notice, are entitled to participate in the administrative proceedings at the partnership level. All Unitholders in the Fund, including those not entitled to notice, may be bound by a settlement reached by the Fund's "tax matters partner," which will be the MGP. If a proposed tax deficiency is contested in any court by any Unitholder or by the MGP, all partners of the Fund may be deemed parties to such litigation and bound by the result reached therein.

*Administrative Costs*. The MGP intends generally to take the position that administrative costs reimbursed to the MGP and the management fee are deductible in the year of payment. To the extent that administrative costs are determined to constitute an organization or syndication cost or some other nondeductible cost, such amount will not give rise to any deduction in the year of payment but, rather, will be deductible (if at all) only over some period of time. This will be the case with respect to the syndication expenses and the Fund formation fees. The determination of the portion (if any) of the administrative cost that is deductible and the timing of any such deduction are factual issues.

*Constructive Termination*. A partnership will constructively terminate for federal income tax purposes if fifty percent (50%) or more of the interests in profits and capital of the partnership are sold or exchanged in any consecutive twelve (12)-month period. If a constructive termination of the Fund occurred, the Fund would be treated as transferring all of its assets and liabilities to a new partnership in exchange for an interest in the new partnership and, immediately thereafter, the Fund would be treated as distributing its interest in the new partnership to the Unitholders in liquidation of the Fund. Such a constructive termination could have adverse federal income tax consequences, such as the

bunching of taxable income within one taxable period with respect to any Unitholder whose taxable year differs from the Fund's, the recognition of taxable income by any Unitholder who is deemed to receive a constructive distribution of cash in excess of his basis in Units or his "at risk" amount at the time of the constructive termination, or the loss of elections made by the Fund. For additional discussion of the tax consequences of the conversion, **see "— Special Features of Oil and Gas Taxation — Passive Activity Loss Limitations" beginning on page 99.**

*Conversion of Investor General Partner Interests*. As provided for in the Partnership Agreement, the Investor General Partner interests in the Fund may be converted to Limited Partner interests. Such conversion will not constitute a sale or exchange. Accordingly, a Unitholder will not recognize any gain or loss as a result of a conversion of an Investor General Partner interest into a Limited Partner interest, unless the converting Investor General Partner's relative share of any Fund liabilities is reduced as a result of such conversion. Such a reduction would be treated as a constructive distribution of cash to that Investor General Partner, which would reduce the basis of his interests and would be taxable to the extent it exceeds his basis or at risk amount. **See "Tax Considerations – Special Features of Oil and Gas Taxation – Basis and At Risk Limitations" beginning on page 102.** The IRS has ruled that a conversion of a general partner interest to a limited partner interest in the same partnership does not result in a deemed sale or exchange of the converted interests and therefore is not taken into account in determining whether a constructive termination has occurred. Assuming this ruling is not revoked or modified, constructive termination of the Fund is unlikely to occur by reason of the conversion of the interests held by Investor General Partners to Limited Partner interests.

## Special Features of Oil and Gas Taxation

The Fund will acquire existing hydrocarbon production and invest in the Projects. The following discussion is a summary of some of the principal features of United States federal income taxation of oil and gas operations that may apply to the Fund and the operations of the Projects.

Lease Acquisition Costs. The cost of acquiring oil and gas leasehold or similar property interests is a capital expenditure that must be recovered through depletion deductions if the lease is productive. **See "—Special Features of Oil and Gas Taxation — Depletion" beginning on page 98**. If a lease is proved worthless and abandoned, the cost of acquisition less any depletion claimed may be deducted as an ordinary loss in the year the lease becomes worthless. **See "—Special Features of Oil and Gas Taxation — Depreciation" beginning on page 97.**

Geophysical Costs. The cost of geophysical exploration will be capitalized and amortized ratably over twenty-four (24) months in accordance with Section 167(h) of the Code.

Operating and Administrative Costs. Amounts paid for operating a producing well are generally deductible as ordinary business expenses. Administrative costs, saltwater disposal fees and other specific expenditures should be deductible to the extent they constitute ordinary and necessary business expenses that are reasonable in amount and to the extent they do not produce significant benefits that extend beyond the year incurred.

Intangible Drilling Costs. Except as provided below, WI Owners in oil and gas properties may elect to deduct intangible drilling costs that they incur, such as expenditures for drilling, labor, wages, hauling, fuel, supplies, and other costs incident to and necessary for the drilling and preparation of wells for production. The Fund intends to elect to deduct all intangible drilling costs. Assuming proper elections, each Unitholder will be entitled to deduct his distributive share of the intangible drilling costs incurred by or allocable to the Fund, subject to the basis, at risk and passive activity loss limitations discussed below. **See "—Special Features of Oil and Gas Taxation — Basis and At Risk Limitations" beginning on page 102** and **"—Special Features of Oil and Gas Taxation —**

**Passive Activity Loss Limitations" beginning on page 99**. Any intangible drilling costs allocable to the Fund that are incurred prior to the formation of the Fund are not deductible by the Unitholders even if paid by the Fund. Such costs must be capitalized as lease acquisition costs. **See "—Special Features of Oil and Gas Taxation — Lease Acquisition Costs" beginning on page 96.**

Only that portion of the intangible drilling costs attributable to the Fund's smallest working interest in each well on the Projects through "payout" may be deducted. "Payout" generally occurs when a carrying party recoups its costs out of income from the property as to which the carry occurred. Intangible drilling costs, along with tangible equipment costs, allocable to working interests held by others in such wells must be capitalized as the cost of acquiring the working interest. As an example, if the Fund owns a ten percent (10%) working interest in one of the wells on the Projects, the Fund may deduct only ten percent (10%) of the total costs incurred by all WI Owners for that well. Any costs of that well paid by the Fund above that threshold must be capitalized.

Some capital contributions to the Fund may be expended in one year for services to be performed in the following year. The Fund may deduct such expenses in the year incurred only if "economic performance" with respect to the Fund occurs in the year of payment or, subject to limitations, within ninety (90) days after the close of such year, and all other requirements for deductions by accrual basis taxpayers are met. In the case of the drilling of an oil and gas well by an entity such as the Fund, "economic performance" is generally deemed to occur when the well is spudded (i.e., boring is commenced). Even if all of these requirements are met, Unitholders will be entitled to deduct their share of any such prepayments only to the extent of the "cash basis" of their interests, determined without regard to any liability of the Fund and any amount borrowed by a Unitholder with respect to the Fund. If any of these requirements are not satisfied in the year the expense is incurred, any deductions attributable to such expense would be deferred to the subsequent year in which the contract to which such expense relates is performed and subject to tax law in effect at such time. The deductibility of any intangible drilling costs by the Fund in the year incurred is an inherently factual determination predicated largely on future events. If Unitholders are admitted to the Fund late in a calendar year and the Fund expends a substantial portion of its capital or contracts for required prepayments in such year which do not meet the requirements discussed above, a significant portion of any material tax benefits associated with an investment in the Fund that would otherwise be realized in the year of admission would be deferred to a subsequent year or years and subject to the tax law in effect at such time. In addition, the allocation of intangible drilling costs to a Unitholder that is admitted to the Fund late in the calendar year will only be allocated such costs in accordance with conventions allowable under applicable law.

Subject to the limitations discussed above, a Unitholder that is not an integrated oil company within the meaning of Section 291(b)(1)(A) of the Code will be entitled to deduct his full share of domestic intangible drilling costs for federal income tax purposes. **See "—Special Features of Oil and Gas Taxation — Depletion" beginning on page 98.** A Unitholder that is an integrated oil company may currently deduct seventy percent (70%) of the intangible drilling costs and may amortize the remaining thirty percent (30%) of such costs over a period of sixty (60) months, except that all costs of dry holes may be deducted in the year the drilling is completed.

Previously deducted intangible drilling costs will be recaptured as ordinary income upon the disposition by the Fund of property to which such deductions relate (to the extent of the gain recognized) or upon the disposition by a Unitholder of his interests. **See "—Special Features of Oil and Gas Taxation — Sale of Property"** and **"— Special Features of Oil and Gas Taxation — Sale of Interests" beginning on pages 103 and 104 respectively.**

<u>Depreciation</u>. The cost of equipment — such as casing, tubing, tanks, pumping units, and other similar property — may not be deducted currently. Such costs must be capitalized and recovered through depreciation. The depreciation deduction for most equipment used in domestic oil and gas



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572530

exploration and production is calculated using an accelerated recovery method and a seven-year recovery period. Each Unitholder will be entitled to his distributive share of the Fund's depreciation deductions, subject to the general restrictions discussed in this Memorandum.

Depletion. The owner of an economic interest in an oil and gas property is entitled to the greater of percentage depletion or cost depletion with respect to oil and gas properties that qualify for such depletion methods. In the case of partnerships, the depletion allowance must be computed separately by each partner and not by the partnership. Notwithstanding this requirement, however, the Fund will compute a "simulated depletion allowance" solely for the purposes of maintaining capital accounts.

Cost depletion for any year is determined by multiplying the number of units (e.g., barrels of oil) sold during the year by a fraction, the numerator of which is the adjusted basis of the mineral interest and the denominator of which is the estimated recoverable units of reserve. In no event can the cost depletion exceed the adjusted basis of the property to which it relates.

Except as discussed below, a Unitholder may deduct for percentage depletion with respect to each oil and gas property of the Fund. Unitholders must compute their own depletion allowance and maintain records of the adjusted basis of property for depletion and other purposes. While the Fund will furnish the Unitholders with information relating to this computation, these requirements may impose an administrative burden on a Unitholder.

Percentage depletion is calculated by the owner of an economic interest in an oil or gas property, or a partner in a partnership (such as the Fund) which holds such an economic interest, as an amount equal to fifteen percent (15%) (and in the case of marginal production an additional one percent (1%), subject to a maximum increase of ten percent (10%), for each whole dollar by which $20 exceeds the average domestic wellhead price for crude oil for the immediately preceding fiscal year) of his gross income from the depletable property for the taxable year.

The percentage depletion deduction in respect of any property is limited, however, to the lesser of (i) one hundred percent (100%) of the taxable income of the owner, or partner, from the property for each taxable year, computed without the depletion allowance, or (ii) sixty-five percent (65%) of said owner or partner's taxable income from all sources, figured without the depletion allowance, the deduction for domestic production activities, any net operating loss carryback, and any capital loss carryback. **See "—General Tax Provisions — Alternative Minimum Tax" beginning on page 106.**

Percentage depletion is generally available only with respect to domestic oil and gas production of certain "independent producers," which, in general, are persons not directly or indirectly involved in the retail sale of oil, natural gas, or derivative products or the operation of a major refinery (i.e., for tax years ending after August 8, 2005, the average daily refinery runs (as defined in the Code) of a Unitholder and any related party does not exceed 75,000 barrels of oil per day). An independent producer may deduct percentage depletion only to the extent his average daily production of domestic crude oil, or the natural gas equivalent, does not exceed 1,000 barrels. This depletable amount may be allocated between crude oil and natural gas production, with 6,000 cubic feet of domestic natural gas production regarded as equivalent to one barrel of crude oil. The 1,000 barrel limitation must be allocated among the independent producer and controlled or related persons and family members in proportion to the respective production by such persons during the period in question.

In addition to the foregoing limitation, the percentage depletion deduction otherwise available is limited to sixty-five percent (65%) of the taxpayer's total taxable income for the year. Any percentage depletion deduction disallowed because of the sixty-five percent (65%) limitation may be deducted in the following taxable year if the percentage depletion deduction for such year plus the deduction

carryover does not exceed sixty-five percent (65%) of the taxpayer's total taxable income for that year. The carryover period resulting from the sixty-five percent (65%) net income limitation is indefinite.

Depletion deductions reduce the Unitholder's adjusted basis in the property. However, unlike cost depletion, deductions under percentage depletion are not limited to the adjusted basis of the property or the Unitholder's basis in his Fund interest; the percentage depletion amount continues to be allowable as a deduction after the adjusted basis has been reduced to zero.

All or a portion of any gain recognized on the disposition of a depletable property or of Units may be taxed as ordinary income to the extent of recapture of depletion deductions, except for percentage depletion deductions in excess of the basis of the property. **See "—Special Features of Oil and Gas Taxation — Sale of Property"** and **"—Special Features of Oil and Gas Taxation — Sale of Interests" beginning on pages 103 and 104 respectively.**

Because depletion will be computed separately by each Unitholder and not at the partnership level, no assurance can be given as to the availability or extent of percentage depletion deductions to the Unitholder. Each Unitholder should consult his personal tax advisor to determine whether percentage depletion would be available to him.

Qualified Domestic Production Deduction. A partner in a partnership may take a deduction with respect to "qualified production activities income" of the partnership. This deduction is equal to a percentage of the lesser of the qualified production activities income of the partner or the partner's taxable income. The applicable percentage is currently six percent (6%). The deduction is limited to fifty percent (50%) of W-2 wages. For purposes of calculating a partner's W-2 wages, the partner includes his allocable share of the partnership's W-2 wages and the partner's W-2 wages from other sources allocated or attributable to its other qualified production activities.

Qualified production activities income equals the excess, if any, of the taxpayer's domestic production gross receipts over the deductions, expenses or losses (including cost of goods sold) allocable to such receipts and a ratable portion of the deductions, expenses and losses not allocable to such receipts or another class of income. Domestic production gross receipts includes receipts derived from any sale, exchange or other disposition of tangible personal property which was extracted by the taxpayer in whole or in significant part within the United States. If the Fund extracts oil and gas within the Projects, the receipts from the sale of that oil and gas should constitute domestic production gross receipts. Each Unitholder will be allocated a portion of these domestic production gross receipts and all allocable and non-allocable deductions, expenses and losses and may be entitled to utilize this deduction.

Because the qualified domestic production deduction will be computed separately by each Unitholder and not at the partnership level, no assurance can be given as to the availability or extent of such deductions to the Unitholder. Each Unitholder should consult his personal tax advisor to determine whether the qualified domestic production deduction would be available to him.

Passive Activity Loss Limitations. Generally, a taxpayer can deduct losses from "passive activities" only against income from passive activities and can utilize passive activity tax credits only to offset the tax attributable to passive activity income. The taxpayer cannot use passive activity losses to offset personal earnings, active business income, or investment or portfolio income, such as interest, dividends, royalties, or gains from the sale of assets that generate investment or portfolio income, and cannot reduce his tax liability attributable to those items with passive activity credits.

A passive activity is generally defined as any activity that involves the conduct of a trade or business in which the taxpayer does not materially participate. Under the Code, a Limited Partner cannot be

considered to materially participate. Thus, Limited Partners will be subject to the passive activity loss limitations with respect to their share of losses and deductions from the Fund. Consequently, an Limited Partner's share of losses and deductions from the Fund may be deducted only to the extent of his share of income from the Fund and any income from other passive activities. Passive activity losses that may not be utilized because of the passive activity loss limitations may be carried forward to offset passive activity income in subsequent years.

Interest income, including interest from any production payments treated as loans for federal income tax purposes and interest from the investment of the Fund's working capital or other partnerships, and royalty income are treated as portfolio income under the passive activity rules and are not considered to be income from a passive activity. The Treasury Department also has the authority to prescribe regulations "requiring net income or gain from a limited partnership or other passive activity to be treated as not from a passive activity." No such regulations have been issued to date, and no assurance can be given that subsequent regulations will not retroactively characterize various items of partnership income as non-passive.

When a limited partnership disposes of an activity, the limited partners can deduct their suspended passive activity losses attributable to that activity. Although unclear, each oil or gas property may constitute a separate activity for purposes of the passive activity rules. Assuming that each oil or gas property is a separate activity, whenever the Fund sells its entire interest in an oil or gas property to an unrelated party or abandons it, each Unitholder in the Fund will then be able to deduct any suspended passive activity losses attributable to that property. If the Fund disposes of only part of its interest in a property, however, Unitholders will be able to offset only their suspended passive activity losses attributable to that property against the gain on the disposition. Any remaining suspended passive activity losses will remain suspended. Notwithstanding whether an oil and gas property is a separate activity, when a Unitholder sells all his Units, and has no further interest in the Fund, he will be able to deduct all his suspended passive activity losses attributable to the Fund.

A taxpayer's interest in an oil or gas well drilled or operated under a working interest does not constitute a passive activity so long as the taxpayer owns the working interest directly or through an entity that does not limit the taxpayer's liability with respect to such drilling or operation. In general, an entity will be considered to limit the liability of the taxpayer with respect to the drilling or operation of a well only if, under applicable state law, the taxpayer's potential liability is limited to a determinable fixed amount. Indemnification agreements, insurance, stop loss arrangements, or other similar arrangements are not taken into account in determining whether a taxpayer holds a working interest through an entity that limits the taxpayer's liability. Thus, prior to any conversion of their Investor General Partner interests to Limited Partner interests and to the extent that the Fund drills or operates wells under working interests, the passive activity loss limitations should not apply to Investor General Partners. Consequently, each Investor General Partner should be entitled to deduct currently his share of deductible intangible drilling costs and other deductible expenses allocable to the drilling or operation of wells pursuant to working interests without regard to the passive activity loss limitations, but subject to the basis and at risk limitations discussed below. An Investor General Partner's share of Fund income will be non-passive income, however, that may not be offset by losses from any passive activities. As discussed below, this rule continues to apply to income attributable to an Investor General Partner's interests that have been converted to Limited Partner interests. The exception for working interests would not be applicable to any operations of the Fund other than the drilling and operation of wells pursuant to working interests. Therefore, if the Fund acquires an interest or participates in other activities, such activities will be treated as passive activities to the Investor General Partners and any losses derived by those Investor General Partners with respect to such activities will be passive activity losses allowable only to the extent discussed above.

It should be noted that if an Investor General Partner is an S corporation, a limited partnership, or a trust, the working interest exception will not apply to the shareholders, limited partners, or

beneficiaries thereof because that form of ownership limits the liability of the ultimate owners. The same rule would apply to the general partners, limited partners and members of a limited liability partnership, a limited liability limited partnership, or a limited liability company.

As discussed under **"Summary of the Offering – Conversion of Investor General Partners to Limited Partners" on page 2** and **"Summary of the Partnership Agreement – Type of Interests – Conversion of Units by Investor General Partners" beginning on page 80**, the Investor General Partner interests in the Fund may be converted to Limited Partner interests. So long as such conversion does not occur until that time, the interests of the Investor General Partners will not be treated as a passive activity. If, however, an Investor General Partner claims any loss that is treated as an active loss under the working interest exception, any net income in succeeding taxable years attributable to the working interest, and any other properties the value of which is enhanced by drilling, logging, seismic testing, or other activities any part of the costs of which were borne by the taxpayer as a result of owning such working interest, will be treated as active income. Thus, if the Fund incurs net losses during its initial taxable years, any subsequent net income from the Fund will generally be treated as active income to a Unitholder who acquires Investor General Partner interests even after those interests have been converted to Limited Partner interests.

If the Investor General Partners of the Fund deduct losses under the working interest exception and their interests are then converted to Limited Partner interests during a taxable year, deductions with respect to net loss wells that are incurred in the year of conversion but after the date of the conversion are considered passive activity deductions, even if the converted partners have net income for the taxable year. If the Investor General Partner interests in the Fund are converted to Limited Partner interests during a taxable year, this rule may increase both the active income and the passive loss allocable for such year to the Investors holding those interests. If the conversion occurs at the beginning of a taxable year, any net losses of the converted partners for such year will be passive.

The passive activity rules do not apply to corporations, other than S corporations, personal service corporations, and closely held C corporations. A closely held C corporation is a corporation in which not more than five individuals own, directly or indirectly, more than fifty percent (50%) of the value of the outstanding stock during the last half of the year. An additional exception from the passive activity rules applies to closely held C corporations that are not personal service corporations. Such closely held C corporations may deduct passive activity losses against all of their income except portfolio income.

A special provision of the passive activity rules applies to publicly traded partnerships. If this special provision were to apply to the Fund, additional limitations would apply, the most significant of which is that a Unitholder could only deduct his share of losses and deductions from the Fund against his share of passive activity income from the Fund. The definition of "publicly traded partnership" for purposes of this special provision is the same as the definition of "publicly traded partnership" in Section 7704 of the Code, except that this special provision does not include the 90% gross income exception. The Fund does not intend to be treated as a "publicly traded partnership" for purposes of the application of the passive activity loss limitations. **See "—Partnership Taxation — Partnership Classification" beginning on page 92.**

Limitations on Interest Deductions. Generally, a taxpayer may deduct "investment interest" only to the extent of his "net investment income." The taxpayer may carry forward any unused investment interest to later years when he has additional net investment income. Investment interest is interest paid on debt incurred or continued to acquire or carry property held for investment. Net investment income includes gross income and gains from property held for investment reduced by any expenses directly connected with the production of such income and gains. To the extent that interest is

attributable to a passive activity, it is treated as a passive activity deduction and is subject to limitation under the passive activity rules and not under the investment interest limitation rules.

Consequently, if a Unitholder borrows money to purchase interests, the investment interest limitation may apply to the interest on the debt. In addition, an Investor General Partner's share of partnership income and losses will be considered investment income and losses for purposes of the investment interest limitation, and his share of partnership losses will therefore reduce his net investment income and may affect the deductibility of his other investment interest, whether or not he borrows to purchase interests.

Interest expense on debt used by a taxpayer to purchase or carry an interest in a passive activity will be taken into account in computing the taxpayer's income or loss from the passive activity. There are detailed tracing and allocation rules with respect to the allocation of interest expense to specific expenditures. As a result, the deductibility of interest expense by a Limited Partner will depend upon such Limited Partner's personal tax situation. Potential investors who contemplate using borrowed funds to purchase Limited Partner interests or Investor General Partner interests that may convert to Limited Partner interests are urged to consult with their tax advisors with respect to the application and interaction of the investment interest and passive activity limitations.

Interest on indebtedness incurred or continued to purchase or carry tax-exempt securities is not deductible. Unitholders who currently own or anticipate acquiring tax-exempt securities and contemplate purchasing interests with borrowed funds are urged to consult their tax advisors.

For Profit Limitation. In addition to the passive activity limitations discussed above, an individual who engages in an activity without the intent to make an economic profit therefrom aside from federal income tax benefits may not take deductions attributable to such activity in excess of the gross income he derives from the activity, except for deductions allowable without regard to profit motive. Thus, in any taxable year in which the deductions of the Fund exceed its gross income, any Unitholder who invested in the Fund without the requisite economic profit motive may be unable to deduct substantially his entire distributive share of such excess.

Basis and At Risk Limitations. Except as described above, a partner may not deduct in any year any amount attributable to his share of partnership losses, if any, which is in excess of his adjusted tax basis in his interest in the partnership at the end of the partnership tax year. **See "—Special Features of Oil and Gas Taxation — Depletion" beginning on page 98.** A Unitholder's initial adjusted tax basis in his Units of the Fund will equal his cash contributions to the Fund. It will be increased by any additional cash contributions when made, by the Unitholder's distributive share of income and gain of the Fund and by his share of certain borrowings of the Fund. It will be decreased, but not below zero (0), by distributions from the Fund, the Unitholder's distributive share of losses of the Fund, depletion deductions on his share of oil and gas income of the Fund and any decrease in his share of borrowings of the Fund. Decreases in a Unitholder's share of liabilities that have given rise to a basis increase will be treated as distributions of cash and, thus, will reduce basis and may result in taxable income to the Unitholder if such decrease exceeds the Unitholder's basis.

In addition to the limitation of losses to a Unitholder's adjusted tax basis, losses allocable to such Unitholder in excess of allocable income during a taxable year may be deducted only to the extent of the amount with respect to which such Unitholder is "at risk" at the close of the taxable year. A Unitholder will be at risk as to the amount of money contributed, assuming such Unitholder uses his personal funds to make such contribution or borrows the funds on a recourse basis from a lender unrelated to the Fund, and amounts borrowed for use in the Fund for which the Unitholder is personally liable. The at risk amount will be increased by such Unitholder's share of partnership income and gains and the amount by which such Unitholder's percentage depletion deductions with respect to partnership property exceed such Unitholder's share of the basis of such property. A

Unitholder will not be at risk with respect to amounts protected against loss through nonrecourse financings, guarantees, stop loss agreements, or "other similar arrangements" or with respect to amounts borrowed from other parties having an interest in the Fund, family members or other related parties. The at risk amount is reduced by the amount of the allowable losses for the taxable year, the amount of distributions made to the Unitholder and such Unitholder's depletion deductions, and the reduced amount determines the extent to which losses sustained in future years will be deductible. Any loss disallowed as a result of the application of the at- risk provisions may be deducted in future years to the extent the taxpayer increases his amount at risk. Losses deducted in a year are subject to recapture in a later year at ordinary income rates in the event, and to the extent, a taxpayer's adjusted amount at risk falls below zero.

The at-risk limitation applies on an activity-by-activity basis, and in the case of oil and gas properties, each property is treated as a separate activity. Thus, a Unitholder's interest in each oil or gas property is treated separately so that a loss from any one property is limited to the at risk amount for that property and not the at risk amount for all the Unitholder's oil and gas properties. It is uncertain how this rule is implemented in the case of multiple oil and gas properties owned by a single partnership. However, for taxable years ending on or before the date on which further guidance is published, the IRS will permit aggregation of properties owned by a partnership in computing a partner's at risk limitation with respect to such partnership. If a Unitholder must compute his at risk amount separately with respect to each property owned by the Fund, he may not be allowed to utilize his share of losses or deductions attributable to a particular property even though he has a positive at risk amount with respect to the Fund as a whole.

Sale of Property. When the Fund sells property, it will recognize gain to the extent that the amount realized on the sale exceeds its basis in the property and will recognize loss to the extent that its basis exceeds the amount realized. In the case of a sale of an oil or gas property, each Unitholder will compute his gain or loss individually based on his share of the amount realized, as allocated to him under the Partnership Agreement, and his share of the basis in such property. The amount realized will include the amount of money received and the fair market value of any other property received. If the purchaser assumes a liability in connection with the sale or takes the property subject to a liability, the amount realized will include the amount of such liability.

If gain is recognized on such sale, the portion of the gain that is treated as recapture of intangible drilling cost, depletion, or depreciation deductions will be treated as ordinary income and the remainder generally will constitute "Section 1231 gain." If loss is recognized on such sale, such loss generally will constitute "Section 1231 loss."

Each Unitholder will be required to report his share of the portion of the gain that constitutes recapture as ordinary income and must also take into account his share of the Section 1231 gains and losses along with his Section 1231 gains and losses from other sources. The characterization of the Unitholder's share of the Section 1231 gains and Section 1231 losses attributable to partnership properties as either ordinary or capital will depend on the total amount of the Unitholder's Section 1231 gains and the total amount of his Section 1231 losses from all sources for the year. Generally, if the total amount of the gains exceeds the total amount of the losses, all such gains and losses will be treated as capital gains and losses, and if the total amount of the losses exceeds the total amount of the gains, all such gains and losses will be treated as ordinary income and losses. A Unitholder's net Section 1231 gains, however, will be treated as ordinary income to the extent of the Unitholder's net Section 1231 losses during the immediately preceding five years, reduced by the Section 1231 losses previously recaptured under this rule.

Termination of the Fund. When the Fund is terminated, each Unitholder will be taxable, in the taxable year in which the termination occurs, on his share of income, gain, loss, and deduction arising prior to

the date of termination from the Fund. Unitholders must also take into account their shares of gains or losses resulting from the sale or other disposition of partnership assets in liquidation of the Fund.

Upon the termination of the Fund, each Unitholder will be required to recognize gain to the extent that the amount of money distributed to him exceeds the basis of his interests or his amount at risk with respect to the Fund. **See "—Special Features of Oil & Gas Taxation — Basis and At Risk Limitations" beginning on page 102.** A Unitholder will recognize no loss unless he receives only money, unrealized receivables, and inventory. In such a case, the Unitholder could recognize loss to the extent that the basis of his Units exceeds the aggregate of the money and the partnership basis of the property received. If, however, a Unitholder receives more or less than his share of ordinary income items, including potential recapture of intangible drilling cost, depletion, and depreciation deductions, the Unitholder will be required to recognize ordinary income or loss to that extent.

A Unitholder's basis in any distributed property will be equal to the basis of his Units, reduced by any money received. The Unitholder's basis will first be allocated to ordinary income assets in an amount equal to the Fund's basis in such assets, which generally will be zero (0). Any remaining basis will be allocated, in general, to other properties to the extent of the Fund's basis in those properties subject to reallocation among properties designed to reduce basis – value disparities to the extent possible.

Thus, basis increases are allocated to properties with unrealized appreciation and basis decreases are allocated to properties with unrealized depreciation. Any basis adjustment remaining after the Fund's basis has been fully carried over and reallocated is first allocated among those properties with unrealized appreciation to the full extent of each property's unrealized appreciation. To the extent that the increase is not fully allocated at this point, it is allocated in proportion to the properties' respective fair market values.

Sale of Interests. When a Unitholder sells an interest, the Unitholder will recognize gain or loss measured by the difference between the amount realized on the sale and his basis in the Units sold. The Unitholder's amount realized will be the selling price plus his share of any liabilities that increased his basis in such Units. For a discussion of the computation of the tax basis in Units, **see "—Special Features of Oil & Gas Taxation – Basis and At Risk Limitations" beginning on page 102.**

To the extent that the portion of the amount realized attributable to ordinary income items (including potential recapture of intangible drilling cost, depletion, and depreciation deductions) exceeds the portion of the basis allocable to such items, which generally will be zero, the gain will be ordinary income. Therefore, a substantial portion of any gain realized upon the sale of Units may constitute ordinary income. So long as the Unitholder holds his Units as a capital asset—generally, an asset held as an investment—the remainder of the gain will be capital gain and any loss will be capital loss. The Unitholder will be required to recognize the full amount of the ordinary income portion even if it exceeds the overall gain on the sale (in which event the Unitholder will also recognize capital loss to the extent the ordinary income exceeds the overall gain) or there is an overall loss on the sale (in which event the Unitholder will recognize an offsetting capital loss equal to the ordinary income portion and an additional capital loss equal to the overall loss on the sale). Gain or loss realized by an Investor General Partner upon the sale of interests will generally constitute active income or loss, while gain or loss realized by a Limited Partner upon such a sale will constitute passive income or loss, which passive loss may be used to offset active income only upon a complete disposition of Units, except in circumstances where a Limited Partner has received his interest in a conversion. **See "—Special Features of Oil & Gas Taxation – Passive Activity Loss Limitations" beginning on page 99.**

Net capital gains of individual taxpayers currently are taxed at a minimum statutory rate (generally a maximum of twenty percent (20%) for 2014 for capital assets held for more than twelve (12) months), which is less than the maximum statutory rate applicable to other income recognized in 2014 (39.6%).

Net capital gains mean the excess of net long-term capital gains over net short-term capital losses. These rates are subject to change by new legislation at any time.

Upon the sale of interests in the Fund, the Fund's basis in its assets is adjusted for the benefit of the purchaser to reflect the gain or loss realized by the selling partner upon the sale of Units of the Fund if the Fund has made an election under Section 754 of the Code or if the Fund's adjusted basis in the partnership property exceeds the fair market value of such property by more than $250,000. As a result of the tax accounting complexities inherent in, and the substantial expense attendant to, the election to adjust the tax basis of partnership property upon sales of Units, the MGP does not currently intend to make this election on behalf of the Fund. Under the Partnership Agreement, such election may be made only by the MGP in its role as tax matter partner. The absence of any such election and of the power to compel the making of such an election may reduce the value of interests to a potential transferee and may be an additional impediment to the transferability of interests. In addition, the Fund may be required to bear the tax accounting complexities and expenses attendant to adjusting the tax basis of the Fund's property upon the sale of Units of the Fund if the fair market value of the Fund's property declines below the Fund's adjusted basis in that property.

A Unitholder who sells Units must notify the Fund of the transaction in accordance with the Partnership Agreement and the Code and regulations thereunder. Such notice must be given in writing within 30 days of the sale or, if earlier, by January 15 of the year following the year in which the sale occurs, and must include the names and addresses of the buyer and seller, the taxpayer identification numbers of the buyer and seller, if known, and the date of the sale. A Unitholder who fails to furnish the relevant information to the Fund may be penalized for each such failure, unless it is shown that such failure was due to reasonable cause and not willful neglect. In addition, the Fund will be required to notify the IRS of any sale of Units of which it has notice or knowledge and to report the names, addresses, and taxpayer identification numbers of the buyer and seller, along with other required information. The Fund is also required to provide copies of the information it provides to the IRS to the buyer and seller. A Unitholder should consult their own tax advisor, however, regarding their particular reporting requirements.

Section 1060 of the Code may also require both the buyer and seller of Units to file statements with their federal income tax returns stating their agreement, if any, concerning the allocation of the purchase price among assets.

Farm outs and Back-in Interests. One of the various ways in which the Fund may acquire existing hydrocarbon production and/or oil and gas leases is through a farm out. Some farm outs may be characterized for tax purposes as partnerships entered into by the Fund and the other party to the farm out. The manner in which the parties to these farm outs agree to allocate income, gain, loss, deduction, and credit, or any item of income, gain, loss, deduction and for credit, may be disallowed under Section 704 of the Code. **See "—Partnership Taxation — Allocations" beginning on page 93.** If the farm out does not create a partnership but rather creates a co-ownership arrangement, the Fund may be required to capitalize a portion of the intangible drilling costs paid in excess of its fractional share of the working interest acquired under the agreement. **See "—Partnership Taxation — Partnership Classification" beginning on page 92.** One type of farm out in which the Fund might be involved is a transaction in which, in exchange for the drilling of a well on a particular drill site, the drilling party becomes entitled to an assignment of one hundred percent (100%) of the leasehold interest in the drill site acreage, until such time as his or its drilling, completion and production costs are recovered out of production therefrom, with a lesser percentage thereafter, and a lesser fractional interest in the portion of the tract exclusive of the drill site acreage. The IRS has ruled, in Revenue Ruling 77-176, 1977-1 COB. 77, that any transfer of rights in property other than the drill site acreage in this type of transaction would be deemed a sale of such other property by the party transferring the property on which gain or loss is realized. The IRS further ruled that, while the party receiving the acreage and incurring the cost of drilling the well on the drill site may elect to

deduct such costs as intangible drilling and development costs, such party would realize ordinary income equal to the value of the acreage earned exclusive of the drill site acreage.

The MGP will attempt to structure any farm out or similar transaction in a way which either eliminates or minimizes to the fullest extent possible the tax consequences set forth in this ruling and the other adverse tax consequences described above. Nonetheless, the ruling may have adverse tax implications for the Fund if and when the Fund enters into such farm outs, since the Fund may recognize gain or loss upon the transfer or receipt of an interest in the property.

## General Tax Provisions

Following is a brief summary of some additional federal income tax laws which may impact upon a Unitholder.

Net Investment Income Tax. The Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, imposes a three and eight-tenths percent (3.8%) Medicare tax on certain net investment income from a variety of sources earned by individuals for taxable years beginning after December 31, 2012. For this purpose, net investment income generally includes a Unitholder's allocable share of the Fund's income and gain. The tax will be imposed on the lesser of (i) the Unitholder's net income from all investments, and (ii) the amount by which the Unitholder's adjusted gross income exceeds $250,000 (if the Unitholder is married and filing jointly) or $200,000 (if the Unitholder is unmarried).

Alternative Minimum Tax. The individual alternative minimum tax is imposed on income other than net capital gain at graduated rates of twenty-six percent (26%) and twenty-eight percent (28%) on "alternative minimum taxable income" in excess of exemption amounts. The tax thus computed is reduced by the taxpayer's regular tax liability.

Alternative minimum taxable income is computed by increasing regular taxable income by tax preference items and re-computing certain items. For an individual taxpayer, adjustments include such items as the difference between accelerated depreciation deductions and depreciation deductions under the alternative system of Section 168(g) of the Code using the 150% declining balance method with respect to tangible personal property and the straight-line method with respect to real property.

An adjustment is also made for the difference between the intangible drilling costs deducted for the year and the amount that would have been deducted if those costs had been recovered over 120 months, to the extent that difference is greater than sixty-five percent (65%) of the amount of net income from oil and gas properties. An "independent producer" will only include this adjustment to the extent the amount of the adjustment exceeds forty percent (40%) of the alternative minimum taxable income, computed with the full adjustment but without the alternative tax net operating loss deduction.

The passive activity limitations also apply for purposes of computing alternative minimum taxable income, although tax preference items taken into account for purposes of the passive activity rules are not taken into account in computing alternative minimum taxable income.

Corporations are subject to an alternative minimum tax of twenty percent (20%) of alternative minimum taxable income to the extent that such amount exceeds the greater of (a) the corporation's federal income tax liability or (b) certain exemption amounts. Corporate items of tax preference include items similar to those described above for individuals, and a number of additional items.

Because a Unitholder's liability for the alternative minimum tax is computed by taking into account his regular income tax liability, the extent to which any tax preference items directly or indirectly resulting from an investment in interests would be subject to the alternative minimum tax will depend on the facts of his particular situation. For a taxpayer with substantial tax preference items, the alternative minimum tax could reduce the after-tax economic benefit of his investment in interests. Each potential investor should consult his tax advisor concerning the impact of the alternative minimum tax on his investment in interests.

Unrelated Business Income Tax. Certain entities, including trusts formed as part of pension or profit sharing plans that are qualified under Sections 401(a) and 501(a) of the Code, individual retirement accounts and certain charitable and other organizations described in Section 501(c) of the Code generally are exempt from federal income tax. However, such entities are subject to tax on their UBTI at the regular trust federal income tax rates. UBTI means the gross income derived by any organization from any unrelated trade or business (as defined in Section 513 of the Code) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business. Dividends, interest and royalties are generally excluded from UBTI. If an entity subject to these rules has substantial UBTI, it may cease to be qualified as an except entity. The Fund anticipates that all or a portion of the Fund's income attributable to Unitholders that are entities described above, including individual retirement accounts, will constitute UBTI to that entity. Tax-exempt entities, including individual retirement accounts, should consult their own tax advisors regarding the UBTI ramifications and other tax aspects of an investment in the Fund.

Reportable Transactions. A material advisor with respect to a reportable transaction must file a return and maintain lists of investors, which list must be made available to the Secretary of the Treasury upon request. A "reportable transaction" is one of five types of transactions defined in Treasury Regulations. They include (1) listed transactions, (2) transactions of interest, (3) loss transactions, (4) confidential transactions and (5) transactions with contractual protection.

A party to a transaction who received any tax benefits from that transaction and whose disclosure of the tax aspects of the transaction is limited by a person that gave advice as to the tax consequences of that transaction has participated in a confidential-transaction type of reportable transaction. A participant in a reportable transaction is required to file IRS Form 8886 with its annual tax returns and with the IRS Office of Tax Shelter Analysis.

Each Unitholder should determine whether its disclosure of the tax treatment or the tax structure of investing in Units has been limited in any way for any length of time through an express or implied agreement with an advisor, including the MGP. It is the MGP's position that no agreement which limits a Unitholder's disclosure beyond that extent exists and the MGP has authorized Unitholders to disclose the tax treatment and tax structure of an investment in the Fund from the outset of discussions with all potential investors. If the Unitholder's disclosure has been limited by anyone who has made a statement (or by anyone on whose behalf a statement has been made) to them about the tax treatment or tax structure of an investment in Units and who received fees in excess of $50,000 with respect to such Investment, the Unitholder may be a participant in a reportable transaction and may be required to make certain disclosures.

Changes in Federal Income Tax Laws. Significant and fundamental changes in the nation's federal income tax laws have been made in recent years and additional changes are likely. Any such change may affect the Fund and the Unitholders. Moreover, judicial decisions, regulations or administrative pronouncements could unfavorably affect the tax consequences of an investment in the Fund. **See "Risk Factors – Risks Related to Tax Matters Generally" beginning on page 21.**



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572540

Compliance Provisions. Taxpayers are subject to several penalties and other provisions which encourage compliance with the federal income tax laws, including an addition to tax of twenty percent (20%) of a "substantial understatement" of federal income tax (which may be increased to forty percent (40%) in the case of a non-disclosed transaction that lacks economic substance) and a separate addition to tax of twenty percent (20%) of a "reportable transaction understatement" of federal income tax, which is increased to thirty percent (30%) if the transaction was not adequately disclosed (as described above). The addition for substantial understatements is imposed if an understatement of tax exceeds the greater of (a) ten percent (10%) of the tax required to be shown on the return or (b) $5,000 (or the lesser of ten percent (10%) of the tax required to be shown on the return (or, if greater, $10,000) or $10,000,000 for a corporation other than an S corporation or a personal holding company). The addition for reportable transaction understatements is imposed if a significant purpose of the transaction is the avoidance or evasion of Federal income tax.

Except in the case of understatements attributable to "tax shelter" items or reportable transaction understatements, an item of understatement will not give rise to the penalty if (a) there is or was "substantial authority" for the taxpayer's treatment of the item or (b) all facts relevant to the tax treatment of the item are disclosed on the return or on a statement attached to the return and there was a reasonable basis for such tax treatment. In the case of partnerships, the disclosure is to be made on the return of the partnership. However, an individual partner may make adequate disclosure with respect to partnership items if specific conditions are met.

In the case of understatements attributable to "tax shelter" items, the penalty may be avoided only if the taxpayer establishes that there was reasonable cause for the underpayment and that the taxpayer had good faith with respect to the underpayment. A "tax shelter" item is one that arises from a partnership, or other form of investment, a significant purpose of which is the avoidance or evasion of federal income tax. The MGP does not believe that utilizing percentage depletion allowances or intangible drilling cost deductions should be considered tax avoidance and does not anticipate that these provisions would apply to any understatement attributable to the disallowance of an item allocated from the Fund. Unitholders are cautioned, however, to consult their tax advisors with respect to the possible application of the substantial understatement penalty.

With respect to reportable transaction understatements, a taxpayer must establish that there was reasonable cause for the underpayment and that the taxpayer had good faith with respect to the underpayment to avoid the penalty. A taxpayer will be unable to establish reasonable cause and good faith unless the transaction was adequately disclosed (as described above), there was substantial authority for the taxpayer's treatment of the item and the taxpayer reasonably believed that treatment was more likely than not the proper treatment. As stated above, it is the MGP's position that an investment in Units should not be a reportable transaction and that the Fund will not engage in any reportable transactions. In the case of understatements attributable to non-disclosed transactions that lack economic substance, there is no defense if the penalty is imposed. The MGP does not believe the Fund will engage in any transaction that lacks economic substance. However, due to the potentially severe consequences for failing to adequately disclose a reportable transaction or a transaction that lacks economic substance, Unitholders are cautioned to consult their tax advisors with respect to the characterization of the Fund's activities and an investment in Units under the "reportable transaction" rules and the "economic substance" rules.

Consistency Requirements. Unitholders must generally treat partnership items on their federal income tax returns consistently with the treatment of such items on the information return of the Fund, unless a Unitholder files a statement with the IRS identifying the inconsistency or otherwise satisfies the requirements for waiver of the consistency requirement. Failure to satisfy this requirement will result in an adjustment to conform the Unitholder's treatment of the item with the treatment of the item on the partnership return. Intentional or negligent disregard of the consistency requirement may subject a Unitholder to substantial penalties.

Social Security Benefits; Self-Employment Tax. An Investor General Partner's share of any income or loss attributable to the Units may constitute "net earnings from self-employment" for both social security and self-employment tax purposes, while a Limited Partner's share of such items will not constitute net earnings from self-employment. No quarters of coverage or increased benefits under the Social Security Act will be earned by Limited Partners and may not be earned by Investor General Partners. If an Investor General Partner is receiving Social Security benefits and if such Unitholders share of such items are net earnings from self-employment, his taxable income attributable to his investment in interests may be taken into account in determining any reduction in benefits because of "excess earnings."

State Law Tax Aspects. The Fund will operate in states and localities that impose taxes on the Fund's assets, transactions or income or on each Unitholder based upon his share of any income derived from partnership activities in such jurisdictions. The Unitholder may be required to file state tax returns and to pay the taxes described in the preceding sentence and may be subject to penalties for failure to comply with these requirements. Depending upon the location of the Fund's properties and applicable state and local laws, deductions or credits available to a Unitholder for federal income tax purposes may not be available for state or local income tax purposes. Pursuant to the income tax withholding rules of Colorado, North Dakota, and Montana, the MGP may elect to withhold a percentage of income from amounts to be distributed to Unitholders if such Unitholders are not residents of such states.

In certain jurisdictions, estate or inheritance taxes may be payable therein upon the death of a Unitholder due to the operations of the Fund in those jurisdictions. Therefore, a Unitholder may be subject to income taxes, estate or inheritance taxes or both in states or localities in which the Fund does business as well as in his own state or domicile.

**Certain ERISA Considerations**

Although the MGP and the Fund do not anticipate becoming subject to the Plan Asset Regulations (as defined below), an investment of employee benefit plan assets in the Fund may raise additional issues under ERISA and the Code. Certain of these issues are described below.

Plan Assets. ERISA and the Code do not define "plan assets." However, regulations promulgated under ERISA by the U.S. Department of Labor (the "Plan Asset Regulations") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the 1940 Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company," in each case as defined in the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" if they hold, in the aggregate, less than twenty-five percent (25%) of the value of any class of such entity's equity, excluding equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliate of any such person. For purposes of this twenty-five percent (25%) test (the "Benefit Plan Investor Test"), "benefit plan investors" generally include employee benefit plans subject to ERISA or the Code, including "Keogh" plans and individual retirement accounts, as well as any entity whose underlying assets are deemed to include Plan assets under the Plan Asset Regulations and Section 3(42) of ERISA (e.g., an entity of which twenty-five percent (25%) or more of the value of any class of equity interests is held by employee benefit plans or other benefit plan investors and which does not satisfy another exception under the Plan Asset Regulations), unless all of the benefit plan investors are individual retirement accounts. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if twenty-

five percent (25%) or more of the value of any class of Units in the Fund were held by benefit plan investors, an undivided interest in each of the underlying assets of the Fund would be deemed to be plan assets of any Plan subject to Title I of ERISA or Section 4975 of the Code.

The Units will not constitute "publicly offered" securities or securities issued by an investment company registered under the 1940 Act and it is not expected that the Fund will qualify as an "operating company" under the Plan Asset Regulations. Consequently, the Fund intends to use reasonable efforts to provide that investment by a Plan in the Fund will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by the Plan in the Fund to less than twenty-five percent (25%) of the value of any class of Units in the Fund as described above. In this regard, there may be circumstances in which transfers of interests may be restricted. However, each Plan fiduciary should be aware that even if the Benefit Plan Investor Test were met at the time a Plan acquires Units, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals, and that Units held by benefit plan investors may be subject to mandatory redemption in such event in order to continue to meet the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Fund, the Fund will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Fund will otherwise satisfy the Plan Asset Regulations or that the assets of the Fund will not otherwise be deemed to be ERISA plan assets.

Plan Asset Consequences

If the assets of the Fund were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Fund and (ii) certain transactions in which the Fund might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the MGP, the Fund and any other fiduciary that has engaged in the prohibited transaction could be required (i) to restore to the Plan any profit realized on the transaction and (ii) to reimburse the Plan for any losses suffered by the Plan as a result of the investment. In addition, each party in interest involved could be subject to an excise tax equal to fifteen percent (15%) of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries that decide to invest in the Fund could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Fund or as co-fiduciaries for actions taken by or on behalf of the Fund. With respect to an IRA that invests in the Fund, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Each plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Fund.

**INDIVIDUAL TAX ADVICE SHOULD BE SOUGHT**

**THE TAX CONSIDERATIONS ATTENDANT TO AN INVESTMENT IN THE PARTNERSHIP ARE COMPLEX AND VARY WITH INDIVIDUAL CIRCUMSTANCES. EACH PROSPECTIVE UNITHOLDER SHOULD REVIEW SUCH TAX CONSEQUENCES WITH HIS TAX ADVISOR.**

*[Remainder of page intentionally left blank.]*



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572543

## SUPPLEMENTAL SALES LITERATURE

In addition to this Memorandum, additional information may be provided to prospective investors in connection with the offering of the Units, although only when accompanied or preceded by the delivery of this Memorandum. The Offering is made only by means of this Memorandum and the Partnership Agreement; prospective investors should not rely on any other information provided when making a decision to invest in the Units. Although the MGP does not believe that the information contained in any such additional materials conflicts with any of the information contained in this Memorandum or the Partnership Agreement, in the event of such conflict, the information contained in the Memorandum and the Partnership Agreement will be deemed to govern.

## ADDITIONAL INFORMATION

Certain additional documentation relating to each of the Fund, MGP, Investment Manager and their respective principals is available for inspection at the MGP's offices by prior written request. Members of the management of the MGP and the Investment Manager are also available to meet with potential investors to provide supplemental information to assist investors, or their representatives, in evaluating a potential investment in the Units.

## RULE 506(D) AND RULE 506(E) DISCLOSURE

On September 2013, the United States Securities and Exchange Commission (the "SEC") issued new rules under its private placement regulations requiring companies to verify that certain of its investors are not "bad actors," which may include Investor General Partners of the Fund. An offering that includes a bad actor may not be eligible to proceed under the SEC's private placement exemption, and may be subject to the general securities registration requirements of potentially multiple states under the various state securities laws. The potential applicability of multiple, and potentially conflicting, state requirements could substantially, and adversely, impact the business or economic outlook of the Fund.

In order to help us satisfy these new requirements, please take a moment to review these new rules, which we've enclosed with this mailing.

We are taking instruction from the SEC to exercise reasonable care in identifying disqualified persons under Rules 506(d) and 506(e), which requires us to update our inquiries for continuous or "long-lived" securities offerings. To that end, ***if you are an Investor General Partner***, please notify the company immediately if you believe you have or may have participated in a disqualifying event. Those are described in the enclosed rules on Appendix V, and generally include the following:

- Certain criminal convictions in connection with (i) the purchase and sale of a security, (ii) filings made with the SEC, or (iii) activities related to the business of an underwriter, broker, dealer or investment adviser
- Certain court injunctions and restraining orders issued in connection with (i) the purchase and sale of a security, (ii) filings made with the SEC, or (iii) activities related to the business of an underwriter, broker, dealer or investment adviser
- Final orders of certain state and federal regulators with respect to engaging in the business of securities, banking or insurance
- Certain SEC disciplinary orders
- Certain SEC cease-and-desist orders

- SEC stop orders
- Suspension or expulsion from membership in a self-regulatory organization (SRO), such as FINRA, or from association with an SRO member
- U.S. Postal Service false representation orders

*[Remainder of page intentionally left blank.]*

# APPENDIX I

## SUBSCRIPTION DOCUMENTS

*[Page intentionally left blank.]*

Purchaser Questionnaire & Subscription Agreement

# Units of Limited Partner Interests and Investor General Partner Interests in Coachman Energy VI LP

COACHMAN energy

EACH PROSPECTIVE INVESTOR IN COACHMAN ENERGY VI LP, A DELAWARE LIMITED PARTNERSHIP (THE "FUND"), SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THE CONTEXT OF SUCH PROSPECTIVE INVESTOR'S OWN NEEDS, INVESTMENT OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE SUCH PROSPECTIVE INVESTOR'S OWN INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE INVESTOR IS ENCOURAGED TO CONSULT WITH SUCH PROSPECTIVE INVESTOR'S ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT, OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED INVESTMENT.

**Please read carefully the Amended and Restated Confidential Private Placement Memorandum (the "Memorandum") for the sale of units of limited partner interests and investor general partner interests (the "Units") in the Fund and all exhibits thereto, before deciding to invest.**

This offering is limited to investors who certify that they meet all of the suitability requirements set forth in the Memorandum for the purchase of the Units.

If you meet these qualifications and desire to purchase Units, please complete, sign and deliver this Subscription Agreement along with your check, payable to: (i) Colorado Bank and Trust, as Escrow Agent for Coachman Energy VI LP, until we reach the Minimum Offering Amount, then to (ii) Coachman Energy VI LP after we reach the Minimum Offering Amount. Unless otherwise directed by the Fund, the documents should be mailed or delivered to:

**Select Capital Corporation**
**Attention: Burke Dambly, President**
**31351 Rancho Viejo Road, Suite #205**
**San Juan Capistrano, CA 92675**
**Fax: 949-429-5393**
**Email: Burke@Selectcapitalcorporation.com**

**Upon (1) receipt of the signed Subscription Agreement and ACH Banking Information; (2) verification of your investment qualifications; (3) receipt of a completed Form W-9 and copy of a form of identification (for subscribers investing in the Fund prior to the Minimum Offering Amount); and (4) acceptance of your subscription by the General Partner (as defined herein), acting on behalf of the Fund (the General Partner reserves the right, in its sole discretion, to accept or reject a subscription for any reason whatsoever), the Fund will notify you of receipt and acceptance of your subscription.**

**Important Notes:**

a. The person or entity actually making the decision to invest in Units should complete and execute the Subscription Agreement.

b. Broker/Dealers and their Registered Representatives must complete Schedule II.

1 **INITIAL INVESTMENT**

COACHMAN energy

Subscriber: ______________________________________
(as Registered – please print)

The offering by the Fund of limited partner interests and investor general partner interests (collectively, "Units") is limited to investors who certify that they qualify as "accredited investors" (as such term is defined under Regulation D promulgated under the Securities Act of 1933, as amended), unless waived in the sole discretion of Coachman Energy Managing General Partners LLC, the Managing General Partner of the Fund (the "General Partner"). The General Partner reserves the right, in its sole discretion, to accept or reject this Subscription Agreement for any reason whatsoever.

**This is the offer and agreement ("Subscription Agreement") of the undersigned (the "Subscriber") to purchase:**

__________ units of **limited partner ("LP")** interest (the "LP Interest") to be issued by the Fund for a purchase price of $100,000 per Unit, subject to the Incentives (as described below), and subject to the terms, conditions, acknowledgments, representations, and warranties stated herein; **and, or**

__________ units of investor **general partner ("GP")** interest (together with the LP Interest, the "Units") to be issued by the Fund, for a purchase price of $100,000 per Unit, subject to the Incentives, and subject to the terms, conditions, acknowledgments, representations, and warranties stated herein **(Subscribers investing as GPs must also complete the questionnaire attached as Schedule III);**

**In exchange for:**

$____________________ total purchase price, representing the aggregate contribution for the Units the Subscriber is purchasing, subject to the Incentives (as defined herein); to become a Limited Partner and/or Investor General Partner, as applicable, in the Fund, as more fully described in the Amended and Restated Confidential Private Placement Memorandum dated March 19, 2015 (the "Memorandum"); and to enter into the Fund's Amended and Restated Limited Partnership Agreement, dated March 19, 2015 (the "LP Agreement"), the form of which is attached as Appendix I to the Memorandum.

**Please indicate the method of transmitting funds by checking one of the following:**

☐ **By Mail:** Attach a check made payable to "Colorado Bank and Trust, as Escrow Agent for Coachman Energy VI LP" until we reach the Minimum Offering Amount, then to "Coachman Energy VI LP" after we reach the Minimum Offering Amount.

☐ **By Wire:**

**Until we reach the Minimum Offering Amount:**
Colorado State Bank and Trust
1600 Broadway, 4th Floor
Denver, CO 80202
ABA #: 103 900 036
Account: 600024642
Ref: BOKF Corporate Trust Funds
Attn: George Kubin
Further Credit: *Coachman Energy Subscription Escrow Acct # 82-9840-01-6*

**After we reach the Minimum Offering Amount:**
Colorado State Bank and Trust
1600 Broadway, 4th Floor
Denver, CO 80202
ABA #: 102 000 607
Account: 8094702599
Account Name: Coachman Energy VI LP
Memo: *Please Reference Your Name and Fund Name*

☐ **Waiver of Commission:** Please check this box if you are eligible for a waiver of commission. Waivers of commissions are available for purchases:

(1) through an affiliated investment advisor, or
(2) participating Broker-Dealer or its retirement plan, or
(3) for a representative of a participating Broker-Dealer or his or her retirement plan or family member(s)

☐ **Registered Investment Advisor (RIA):** If this box is checked, commission will be waived. All sales of securities must be made through a Broker-Dealer and include a Certification of Client Suitability signed by the RIA. If an RIA has introduced the sale, the sale must be conducted through:

(1) the RIA in his or her capacity as a Registered Representative of a Broker-Dealer, if applicable;
(2) a Registered Representative of a Broker-Dealer which is affiliated with the RIA, if applicable; or
(3) if neither (1) nor (2) is applicable, an unaffiliated Broker-Dealer.

COACHMAN energy

**Distribution Reinvestment Plan (DRP)**
The Fund has adopted a distribution reinvestment plan (the "DRP") for investors who purchase Units pursuant to the Memorandum. The Fund will apply all distributions declared and paid in respect of the Units held by each participating Unitholder, including distributions paid with respect to any full or fractional Units acquired under the DRP, to the purchase of the Units for such participating Unitholders.

Under the DRP, the purchase price per Unit will be $90,000. The Fund will not charge a Unitholder any other fees in connection with the purchase of Units under the DRP. A detailed summary of the DRP may be found in the Memorandum, and a copy of the DRP is attached as Appendix IV thereto.

Should you wish to have your cash distributions reinvested in the form of more Units, a copy of the DRP election form is attached hereto as Schedule IV.

Additional Instructions for Investors Subscribing Before the Minimum Offering Amount is Reached

Subscribers investing in the Fund before the Minimum Offering Amount is reached and who will have their funds held in escrow are required to (i) complete a Form W-9 and (ii) provide a copy of a form of identification. A copy of Form W-9 and additional instructions are attached hereto as Schedule V.

**Notice of Early Investor Incentives**
There are two (2) Early Investor Incentives available to Subscribers. Subscribers (each a "Stage 1 Investor") who buy Units from broker dealers or registered investment advisors ("RIAs") as described below under "Early Investor Incentive Availability to Broker Dealers and Registered Investment Advisors" and who fully pay for Units prior to the acceptance by the Fund and/or Coachman Energy VIB LLC, a Delaware limited liability company (the "Investing Company," and collectively, the "Companies") of subscriptions for a total of 500 Units ("Stage 1 Units") in the Companies ("Stage 1"), excluding any Units (i) in the Companies subject to the Major Investor Incentive and/or (ii) subscribed for in the Fund by the Investing Company, shall receive a twelve percent (12%) gross up on the number of Units subscribed for by such Stage 1 Investor, resulting in the issuance to such Stage 1 Investor of 1.136 Units per $100,000 contribution (the "Stage 1 Early Investor Incentive").

Following the termination of Stage 1, Subscribers (each a "Stage 2 Investor") who buy Units from broker dealers or RIAs as described below under "Early Investor Incentive Availability to Broker Dealers and Registered Investment Advisors" and who fully pay for Units prior to the acceptance by the Companies of subscriptions for a total of 500 additional Units ("Stage 2 Units") in the Companies ("Stage 2"), excluding any Units (i) in the Companies subject to the Major Investor Incentive and/or (ii) subscribed for in the Fund by the Investing Company, but including those Units subscribed for by Stage 1 Investors, shall receive a six percent (6%) gross up on the number of Units subscribed for by such Stage 2 Investor, resulting in the issuance to such Stage 2 Investor of 1.064 Units per $100,000 contribution (the "Stage 2 Early Investor Incentive" and together with the Stage 1 Early Investor Incentive, the "Early Investor Incentives").

**Early Investor Incentives Availability to Broker Dealers and Registered Investment Advisors**
Broker dealers and Registered Investment Advisors ("RIAs") who have either (i) entered into selling agreements with the Fund, or (ii) commenced due diligence on the Offering as of the date of the Memorandum will have 115 days from the date of the Memorandum to sell the Stage 1 Units and, following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Broker dealers and RIAs who have neither (i) entered into selling agreements with the Fund, nor (ii) commenced due diligence on the Offering as of the date of the Memorandum will have 135 days from the first date subsequent to the date of the Memorandum on which such broker dealer or RIA is contacted by the Fund or a wholesale representative of the Fund to sell the Stage 1 Units, and following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Once both Stage 1 and Stage 2 have lapsed, however, such broker dealers and RIAs shall no longer be eligible to offer any Stage 1 Units or Stage 2 Units (collectively, "Early Incentive Units") to their clients even if all of the Early Incentive Units have not been sold by the Fund.

**Notice of Major Investor Incentive**
Any single or Affiliated (as such term is defined in the LP Agreement) group of investor(s) purchasing a minimum of twenty (20) Units in a single transaction will receive a ten percent (10%) gross up on the amount of Units subscribed for, resulting in receipt of 1.111 Units per $100,000 contribution (the "Major Investor Incentive," and collectively with the Early Investor Incentives, the "Incentive(s)").

The Major Investor Incentive may not be combined with the Early Investor Incentives.

The combined equity invested in the Fund by (A) the Company, plus (B) any Plan (as defined in the Memorandum), may not exceed twenty-five percent (25%) of the value of any class of equity of the Investment Fund, and the Early Investment Incentives shall be subject to adjustment to the extent necessary to comply with such requirement.

COACHMAN energy

## 2 SUBSCRIBER ACKNOWLEDGMENTS, REPRESENTATIONS AND WARRANTIES

In order to induce the General Partner, on behalf of the Fund, to accept this Subscription Agreement and as further consideration for such acceptance, the Subscriber hereby makes the following acknowledgments, representations and warranties with the full knowledge that the General Partner will expressly rely thereon in making a decision to accept or reject this Subscription Agreement:

1. The Subscriber has received the Memorandum and the LP Agreement and is familiar with their terms, has read and fully understands the risk factors enumerated in the Memorandum and has read and reviewed the LP Agreement and fully understands its terms.

2. The Subscriber hereby adopts, confirms, and agrees to all of the covenants, representations, and warranties contained in this Subscription Agreement.

3. The Subscriber represents that it is an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and as indicated below qualifies as an accredited investor:

**(check each as appropriate)**

**As of the date of this Subscription Agreement, the Subscriber is:**

☐ an individual who had an income in excess of $200,000 in each of the two most recent years (or joint income with his or her spouse in excess of $300,000 in each of those years) and has a reasonable expectation of reaching the same income level in the coming year;

☐ an individual who has a net worth (or joint net worth with his or her spouse) in excess of $1,000,000, exclusive of the value of the primary residence, but inclusive of home furnishings and personal automobiles;

☐ an Individual Retirement Account ("IRA") or revocable trust and the individual who established the IRA or each grantor of the trust is an accredited investor on the basis of (a) or (b) above;

☐ a self-directed pension plan and the participant who directed that the assets of his or her account be invested in the Fund is an accredited investor on the basis of (a) or (b) above and such participant is the only participant whose account is being invested in the Fund;

☐ a pension plan which is not a self-directed plan and which has total assets in excess of $5,000,000;

☐ an irrevocable trust which consists of a single trust (1) with total assets in excess of $5,000,000, (2) which was not formed for the specific purpose of investing in the Fund and (3) whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable or evaluating the merits and risks of the prospective investment;

☐ a corporation, a limited liability company, a partnership or a Massachusetts or similar business trust, that was not formed for the specific purpose of acquiring interest in the Fund, with total assets in excess of $5,000,000;

☐ an entity in which all of the equity owners are accredited investors; or

☐ none of the above apply (further information may be required to determine accredited investor status).

[1] When determining net worth, the value of the investor's primary residence must be excluded, and the related amount of indebtedness secured by the primary residence up to its fair market value may also be excluded. However, indebtedness secured by the residence in excess of the value of the home should be considered a liability and deducted from the investor's net worth. (SEC Compliance and Disclosure Interpretation, Question 179.01, July 23, 2010) Further, any additional indebtedness secured by an individual's primary residence which is obtained within 60 days prior to the issuance of the Units will be treated as a liability, unless such indebtedness is the result of the acquisition of the primary residence. (SEC Final Rule Release No. 33-9287, December 21, 2011

COACHMAN energy

**4. Under penalties of perjury, the Subscriber certifies that:**

☐ the number shown on this Subscription Agreement is its correct taxpayer identification number; and (initial one):
__________ the Subscriber is not subject to backup withholding, because it has not been notified that it is subject to backup withholding as a result of a failure to report all interest or dividends; or the Internal Revenue Service has notified the Subscriber that it is no longer subject to backup withholding; **or**

__________ the Subscriber is subject to backup withholding (if it has been notified that it is subject to backup withholding due to notified payee under-reporting) and it has not received a notice from the Internal Revenue Service advising it that backup withholding has terminated.

5. The Subscriber further represents and warrants that it has the capacity to evaluate the merits and risks of the prospective investment in Units and that such investment is not disproportionate to its income or available liquid funds and that it further has the capacity to protect its interests in connection with the purchase of the Units.

**The following is a description of its experience in financial and business matters:**

______________________________________________________________________________

______________________________________________________________________________

6. **The Subscriber (we) wishes to own its (our) Units as follows (check one):**

☐ **Separate or individual property.** (In community property states, if the purchaser is married, his (her) spouse must provide written consent if community funds will be used to purchase the Units.)

Spousal Consent Signature: ______________________________

Print Name: ______________________________

☐ **Husband and Wife as community property.** (Community property states only. Husband and Wife should both sign all required documents unless advised by their attorney that one signature is sufficient.)

☐ **Joint Tenants with right of survivorship.** (Both parties must sign all required documents unless advised by their attorneys that one signature is sufficient.)

☐ **Tenants in Common.** (Both parties must sign all required documents.)

☐ **Trust.** (Attach copy of trust instrument and include name of trust, name of trustee and date trust was formed.)

☐ **Fund (General or Limited) or Limited Liability Company.** (Attach copy of partnership or operating agreement and include evidence of authority for person who executes required documents.)

☐ **Other** (indicate):______________________________________________________________

______________________________________________________________________________

7. The Subscriber understands that in the event this Subscription Agreement is not accepted then the funds transmitted herewith shall be returned to the undersigned and this Subscription Agreement shall be terminated and will be of no further effect.

8. The Subscriber understands that upon acceptance by the General Partner on behalf of the Fund, this Subscription Agreement is irrevocable and binding.

9. The Subscriber has substantial experience in investment decisions of this type or is relying on such Subscriber's attorney, accountant or other adviser or purchaser representative in making such Subscriber's investment decision.

10. No representations or warranties have been made to the Subscriber by the Fund, the General Partner, or any officers, directors, employees, agents, or affiliates of the General Partner.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572552