11. The Subscriber has evaluated the merits and risks of investing in the Fund, and the Subscriber's overall commitment to investments that are not readily marketable is not disproportionate to its individual net worth, and investment in the Units will not cause such overall commitment to become excessive. The Subscriber has adequate means of providing for its financial requirements, both current and anticipated, and has no need for liquidity in this investment. The Subscriber can bear and is willing to accept the economic risk of losing its entire investment in the Units.

12. The Subscriber hereby acknowledges receipt of the Memorandum and the Escrow Agreement between the Fund and Colorado State Bank and Trust, as escrow agent, dated October 17, 2014, as amended, and attached as Appendix III to the Memorandum, each of which has been provided by the Fund.

13. The Subscriber hereby acknowledges that the sale of the Units has not been accompanied by the publication of any advertisement, any general solicitation or as the direct result of an investment seminar sponsored by the Fund or any of its affiliates.

14. All information that the Subscriber has provided to the Fund herein concerning its suitability to invest in the Units is complete, accurate and correct as of the date of its signature on the last page of this Subscription Agreement. The Subscriber hereby agrees to notify the Fund immediately of any material change in any such information occurring prior to the acceptance of this Subscription Agreement, including any information about changes concerning its net worth and financial position.

15. The Subscriber has had the opportunity to ask questions of, and receive answers from each of the Fund, the General Partner and their respective directors, managers, officers, and employees concerning the Fund, the creation or operation of the Fund and terms and conditions of the offering of the Units. The Subscriber has been provided with all materials and information requested by either the Subscriber or others representing the Subscriber, including any information requested to verify any information furnished to the Subscriber.

16. The Subscriber is purchasing the Units for such Subscriber's own account and for investment purposes only and has no present intention, understanding or arrangement for the distribution, transfer, assignment, resale or subdivision of the Units. The Subscriber understands that, due to the restrictions referred to in Paragraph 17 below, and the lack of any market existing or to exist for the Units, the investment in the Fund will be highly illiquid and may have to be held indefinitely.

17. The Subscriber understand that legends will be placed on any certificates evidencing the Units with respect to restrictions on distribution, transfer, resale, assignment or subdivision of the Units imposed by applicable federal and state securities laws. The Subscriber is fully aware that the Units subscribed for hereunder have not been registered with the Securities and Exchange Commission in reliance on an exemption specified in Regulation D of the Securities Act, which reliance is based in part upon the Subscriber's representations set forth herein. The Subscriber understands that the Units subscribed for herein have not been registered under applicable state securities laws and are being offered and sold pursuant to the exemptions specified in said laws, and unless they are registered, they may not be re-offered for sale or resold except in a transaction or as a security exempt under those laws.

18. The Subscriber hereby acknowledges receipt of the LP Agreement, and hereby adopts the LP Agreement as a Limited Partner and/or Investor General Partner, as applicable, of the Fund.

19. The Subscriber understands that fees of up to thirteen and seventy-five hundredths percent (13.75%) will be paid from the Capital Contributed (as defined in the LP Agreement), to the extent such fees apply, which includes following fees: (i) seven percent (7%) of the Capital Contributed, payable in connection with broker dealer commissions; provided, however, that in the event that an Investor contributes $5,000,000 or more to the Fund, then such Participating Broker-Dealer's selling commission shall be reduced from seven percent (7%) to two percent (2%) (the "Commission Reduction"); (ii) a three and three quarter percent (3.75%) fee to the managing-broker-dealer for managing the sales and marketing efforts of the Fund and complying with FINRA and federal and state securities laws; and (iii) three percent (3%) of the aggregate Capital Contributions will be deducted as an Organizational Fee, provided solely as a reimbursement of expenses incurred by the General Partner for the organization of the Fund and syndication of the Units; provided, however, the Fund may, but is not obligated to pay the organizational and syndications fees out of funds received from the Investing Company (as defined in the LP Agreement). The Commission Reduction will reduce the purchase price of the Unit to $95,000. Any Investor eligible for the Commission Reduction will still be entitled to the Major Investor Incentive.

20. The Subscriber understands that the Fund will pay: (i) an annual management fee to the General Partner, or Coachman Energy Administrator LLC, a Delaware limited liability company (the "Administrator"), on the General Partner's behalf, in an amount equal to two and one-half percent (2.5%) of the aggregate Capital Contributions; and (ii) an annual reimbursement equal to a maximum (per year) of one and one-half percent (1.5%) of the aggregate Capital Contributions to the Administrator for management expenses incurred in providing administrative services to the Fund, including overhead expenses.

21. The Subscriber understands that in the event the Fund incurs indebtedness, the Investment Manager will be entitled to a one percent (1%) origination fee and a one percent (1%) fee on any drawdown on such indebtedness for efforts in assisting to arrange such debt for the Fund, and subsequently managing assets purchased or acquired from the indebtedness.

22. The Subscriber understands that in the event the Fund incurs indebtedness and the MGP or its Affiliates is required to guarantee any such indebtedness or extensions of credit, the MGP or its Affiliates may charge the Fund a one-time guaranty fee equal to two percent (2%) of the amount guaranteed by the MGP or its Affiliates.

23. The Subscriber has no knowledge that amounts paid or contributed to the Fund by the Subscriber were directly or indirectly derived from, or related to, any activity that is deemed criminal under the laws of the United States, including, without limitation, anti-money laundering laws.

24. This Subscription Agreement shall be construed in accordance with and governed by the laws of the State of Delaware without regard to its choice of law provisions, except as to the type of registration of ownership of Units, which shall be construed in accordance with the state of principal residence of the subscribing investor.

25. THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS, THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE UNITS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

26. The Subscriber hereby covenants and agrees that any dispute, controversy or other claim arising under, out of or relating to this Subscription Agreement or any of the transactions contemplated hereby, or any amendment thereof, or the breach or interpretation hereof or thereof, shall be determined and settled in binding arbitration in the County of Denver, State of Colorado, in accordance with the rules and procedures of the American Arbitration Association. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, reasonable attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction.

**27. The Subscriber hereby agrees to indemnify, defend and hold harmless the Fund, the General Partner, and all of their officers, directors, affiliates, employees and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of its failure to fulfill all of the terms and conditions of this Subscription Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Subscriber has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by the Fund, the General Partner, or any of their officers, directors, affiliates, employees or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Subscriber has furnished in connection with this transaction.**

28. The Subscriber hereby acknowledges and agrees that: (a) it may not transfer or assign this Subscription Agreement, or any interest herein, and any purported transfer shall be void; (b) it is not entitled to cancel, terminate or revoke this Subscription Agreement and that this Subscription Agreement will be binding on its heirs, successors and personal representatives; provided, however, that if the General Partner rejects this Subscription Agreement, this Subscription Agreement shall be automatically canceled, terminated and revoked; (c) this Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the sale of the Units and may be amended, modified or terminated only by a writing executed by all parties (except as provided herein with respect to rejection of this Subscription Agreement by the General Partner); (d) within five days after receipt of a written request from the Fund, the undersigned agrees to provide such information and to execute and deliver such documents as may be necessary to comply with any and all laws and regulations to which the Fund is subject; and (e) the representations and warranties of the undersigned set forth herein shall survive the sale of the Units pursuant to this Subscription Agreement.

29. Power of Attorney ("POA"). The undersigned Limited Partner and/or Investor General Partner, as applicable, of the Fund hereby constitutes and appoints the General Partner, any Liquidator (as defined in the LP Agreement), and authorized officers and

attorneys-in-fact of the Fund, and each of those acting singly, in each case with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to:

a. execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (A) all certificates, documents and other instruments (including, without limitation, the LP Agreement, the Certificate, and all amendments or restatements thereof) that the General Partner or the Liquidator deems appropriate or necessary to form, qualify, or continue the existence or qualification of the Fund as a limited partnership (or a partnership in which the Limited Partners have limited liability) in the State of Delaware and in all other jurisdictions in which the Fund may or plans to conduct business or own property; (B) all instruments that the General Partner deems appropriate or necessary to reflect any amendment, change, modification, or restatement of the LP Agreement in accordance with its terms; (C) all conveyances and other instruments or documents that the General Partner or the Liquidator deems appropriate or necessary to reflect the dissolution and liquidation of the Fund pursuant to the terms of the LP Agreement, including, without limitation, a certificate of cancellation; (D) all instruments relating to the admission, withdrawal, removal, or substitution of any Unitholder pursuant to, or other events described in Articles 11, 12 or 13 of the LP Agreement or the Capital Contribution of any Unitholder; and (E) all certificates, documents and other instruments relating to the determination of the rights, preferences, and privileges of the Units; and

b. execute, swear to, seal, acknowledge and file all ballots, consents, approvals, waivers, certificates, and other instruments appropriate or necessary, in the sole and absolute discretion of the General Partner or any Liquidator, to make, evidence, give, confirm, or ratify any vote, consent, approval, agreement, or other action which is made or given by the Unitholders hereunder or is consistent with the terms of the LP Agreement or appropriate or necessary, in the sole discretion of the General Partner or any Liquidator, to effectuate the terms or intent of the LP Agreement.

Nothing contained in this Paragraph 28 (the "POA") shall be construed as authorizing the General Partner or any Liquidator to amend the LP Agreement except in accordance with Article 14 of the LP Agreement or as may be otherwise expressly provided for in the LP Agreement. This POA is hereby declared to be irrevocable and a power coupled with an interest, in recognition of the fact that each of the Unitholders will be relying upon the power of the General Partner and any Liquidator to act as contemplated by the LP Agreement in any filing or other action by it on behalf of the Fund, and it shall survive and not be affected by the subsequent Incapacity of the undersigned Unitholder or the transfer of all or any portion of Units held by the undersigned Unitholder and shall extend to such undersigned Unitholder's heirs, successors, assigns and personal representatives. The undersigned Unitholder hereby agrees to be bound by any representation made by the General Partner or any Liquidator, acting in good faith pursuant to this POA, and the undersigned Unitholder and/or Investor General Partner, as applicable, hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the General Partner or any Liquidator, taken in good faith under such power of attorney. Each Unitholder and/or Investor General Partner, as applicable, shall execute and deliver to the General Partner or the Liquidator, within fifteen (15) days after receipt of the General Partner's or Liquidator's request therefor, such further designation, powers of attorney and other instruments as the General Partner or the Liquidator, as the case may be, deems necessary to effectuate the LP Agreement and the purposes of the Fund.

All terms which are used herein but not defined shall have the meaning set forth in the LP Agreement. Investors must list their principal place of residence rather than their office or other address on the signature page so that the Fund can confirm compliance with appropriate securities laws. If you wish correspondence sent to some address other than your principal residence, please provide a mailing address in the blank provided below.

30. Please identify the Broker/Dealer Registered Representative or RIA who sold you the Units in the Company.

Name: ________________________________________

**If** there was no Broker/Dealer or RIA involved in this transaction, **please initial both spaces below.**

______ The undersigned acknowledges that there was no Broker/Dealer or RIA involved in this transaction and these Units were purchased directly from the Fund without the involvement of a FINRA Broker/Dealer, a FINRA registered representative, or a Registered Investment Advisor, and that Select Capital Corporation is not the Broker/Dealer of record for this transaction.

______ The undersigned acknowledges they have a pre-existing business relationship with the Company, the Manager, or its Affiliates, and have not made this investment as a result of any general solicitation.

COACHMAN energy

**TRANSFER ON DEATH DESIGNATION.** By signing below, I (we) request that my (our) investment (if accepted by the General Partner) be registered in "transfer on death" form, and designate the following beneficiary(ies) as the individual(s) to whom the investment shall pass after I am (we are) deceased.

Print Name_______________________________ Date of Birth__________________ Number of Units__________

Print Name_______________________________ Date of Birth__________________ Number of Units__________

Print Name_______________________________ Date of Birth__________________ Number of Units__________

Print Name_______________________________ Date of Birth__________________ Number of Units__________

**By signing below, I (we) make the following warranties, representations and agreements:**

a) The Fund is not required to re-register the investment in the name of the beneficiary(ies) unless the Fund has received such documents as required to establish that I am (we both are) deceased.

b) The Fund is not responsible for determining the tax consequences of the decision to register this investment to requested beneficiary(ies).

c) I (we) agree to hold harmless, indemnify and defend the Fund and its agents for any claim, loss or liability resulting from i) breach of any warranty or representation in this Subscription Agreement and/or ii) any action the Fund takes in connection with the registration, any re-registration in the name of the beneficiary, and from any distribution thereafter to the beneficiary, made as requested or authorized under this Subscription Agreement.

d) If this Subscription Agreement is established under joint tenants with rights of survivorship account status, upon death of one of the owners, ownership shall pass to the surviving joint owner, and the Fund may follow the instructions of the survivor with regard to the investment, including without limitation, instructions to i) terminate transfer on death registration or ii) change owner to beneficiary.

e) If I am married and established this account individually, or jointly and the joint applicant is not my spouse, my spouse's waiver has been executed by signing below.

f) The Fund has not provided any legal advice to me (us), and I (we) agree to obtain the advice of an attorney with regard to the enforceability of this form of registration in my state, and its effect on my estate and tax planning.

TRANSFER ON DEATH SPOUSAL WAIVER:

Spouse's Waiver: ___________________________________

Date: ______________________, 20__________

[Remainder of page intentionally left blank.]



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572556

COACHMAN energy

## 3 EXECUTION

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this _____ day of __________________, 20______.

**A. REGISTRATION INFORMATION**

Please print the exact name (registration) Subscriber desires on account:

_______________________________________________

Principal Mailing Address: _______________________________________________

_______________________________________________

Email Address: _______________________________________________

If an **individual**:

Primary State of Residence: ______________________

Individual's Birth Date: ___________________________

If an **entity**:

Date/State of Formation: ______________________________

Authorized Person: ___________________________________

Title: ________________________________________________

Social Security or Federal Tax ID Number:__________________________________________

**B. INVESTOR INFORMATION**

Please send all correspondence to the following:

Name: _______________________________________________

Please check your preferred method of communication.

☐ Address: _______________________________________________

_______________________________________________

☐ Email Address: _______________________________________________

Phone: Business (______) _________________ Home (______) _______________

**C. SIGNATURES**

THE UNDERSIGNED HAS THE AUHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED IN A. ABOVE.

Executed this _______ day of ________________________, 20_______

_______________________________________________

Signature (Subscriber, or authorized signatory)

_______________________________________________

Signature (Subscriber, or authorized signatory)

Accepted by the Fund as of this _______day of _________________________, 20________.

**Coachman Energy VI LP**

**By:** **Coachman Energy Managing General Partners LLC**
**Its:** **Managing General Partner**

By: ___________________________________________________

Name: ___________________________________________________

Title: ___________________________________________________

COACHMAN energy

SCHEDULE I

## ACH BANKING INFORMATION REQUEST FORM

### REGISTRATION INFORMATION

Beneficiary Name (Please Print)

Street Address | Apt.

City | State | Zip Code

Phone Number | Email Address

### FINANCIAL ORGANIZATION INFORMATION

Bank Name

Bank Address | Suite #

City | State | Zip Code

Account Number | ABA/Routing Number

Type of Account ☐ Checking ☐ Savings

Signature of Beneficiary | Date

COACHMAN energy

**SCHEDULE II**

## BROKER/DEALER REPRESENTATIONS AND WARRANTIES

Standards of suitability have been established by the Company in accordance with the definition of "accredited investor," as promulgated under Regulation D of the Securities Act and fully disclosed in this Subscription Agreement. Prior to recommending purchase of the Units, we have reasonable grounds to believe, on the basis of information supplied by the Subscriber concerning his or her investment objectives, other investments, financial situation and needs, and other pertinent information that: (i) the Subscriber meets the standards established by the Company; (ii) the Subscriber has a net worth and income sufficient to sustain the risks inherent in the Units, including loss of the entire investment and lack of liquidity; and (iii) the Units are otherwise a suitable investment for the Subscriber. We will maintain in our files documents disclosing the basis upon which the suitability of this Subscriber was determined.

We verify that the above subscription either does not involve a discretionary account or, if so, that the Subscriber's prior written approval was obtained relating to the liquidity and marketability of the Units during the term of the investment.

**BROKER/DEALER FIRM NAME:** ______________________________

Broker/Dealer CRD Number: ______________________________

Main Office Address: ______________________________

______________________________

Phone: (________) ________ – ____________ Fax: (________) ________ – ____________

**REGISTERED REPRESENTATIVE:** ______________________ CRD Number: ____________

(Please Print)

Address: ______________________________

______________________________

Phone: (________) ________ – ____________ Fax: (________) ________ – ____________

Email Address: ______________________________

I hereby certify that I am registered in ______________________, the state of sale.

______________________ Signature of Registered Representative

______________________ Signature of Registered Principal

______________________ Date

______________________ Printed Name

______________________ Date

**SUBSCRIPTION WILL NOT BE ACCEPTED WITHOUT THE SIGNATURE OF A REGISTERED PRINCIPAL OF THE BROKER/DEALER FIRM.**

COACHMAN energy

SCHEDULE III

# FOR GP SUBSCRIBERS ONLY

**Each Subscriber should complete for joint accounts.**

**CONFIDENTIAL**
**RULE 506 DISQUALIFICATION EVENT QUESTIONNAIRE**
**COACHMAN ENERGY PARTNERS**
**COACHMAN ENERGY VI LP**

This Questionnaire is being furnished to you to obtain information in connection with an offering (the "Offering") of securities by Coachman Energy VI LP, a Delaware limited partnership (the "Issuer"), to be made pursuant to Rule 506 under the Securities Act of 1933, as amended (the "Securities Act"). As used in this Questionnaire, "you" also refers to any entity on whose behalf you are responding.

**Important Note: Please answer every question. If your answer to a question is "Yes," please provide details in the explanation, and attach additional pages to supplement your answers if necessary.** Unless otherwise stated, your answers should be given as of the date you sign the Questionnaire. Please note that certain questions are necessarily broad in scope, so if you have doubts regarding whether something should be included in your response please err on the side of over-inclusion. The Issuer may have additional follow-up questions for you in connection with the Offering.

Once you have completed the Questionnaire, please sign it to indicate: (i) your consent for the Issuer to rely upon the information provided in this Questionnaire; (ii) your acknowledgement that the Securities and Exchange Commission (the "SEC") may require the Issuer to publicly disclose the information provided in this Questionnaire, and your consent to such public disclosure; (iii) your agreement to promptly notify the Issuer of any changes in information provided in the Questionnaire occurring after the date you sign the Questionnaire; and (iv) your confirmation that the information contained in the Questionnaire is true and correct, to the best of your knowledge and belief after a reasonable investigation, as of the date you sign the Questionnaire.

Please complete the Questionnaire and return it with your completed subscription documents. If you have any questions with respect to these matters, please call Colin Miller at (720) 279-0010.

**ISSUER WILL USE REASONABLE, GOOD FAITH EFFORTS TO ENSURE THE EXISTENCE AND CONTENTS OF THIS QUESTIONNAIRE, AS WELL AS YOUR ANSWERS AND ALL NOTES AND DRAFTS PREPARED BY YOU, ARE KEPT CONFIDENTIAL.**

COACHMAN energy

1. Name, Address, Telephone Number and Email

Your Full Name: ________________________________________

Please provide all previous, assumed or fictitious names or aliases: ____________________________________________

**BUSINESS ADDRESS** | **HOME ADDRESS**

_____________________________________________ _____________________________________________

_____________________________________________ _____________________________________________

_____________________________________________ _____________________________________________

Business Telephone (_____) ____________________ HomeTelephone (_____) _______________________

Email Address: ______________________________________________

2. Have you been convicted, within the last ten (10) years (or five (5) years, in the case of the Issuer, its predecessors and affiliated issuers), of any felony or misdemeanor:

- in connection with the purchase or sale of any security;
- involving the making of any false filing with the SEC; or
- arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities?

☐ No. ☐ Yes. If yes, please provide the date of such conviction, a copy of any applicable order, and explain:

_______________________________________________________________________________________________

3. Are you subject to any order, judgment, or decree, entered within the last five (5) years that restrains or enjoins you from engaging or continuing to engage in any conduct or practice:

- in connection with the purchase or sale of any security;
- involving the making of any false filing with the SEC; or
- arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order, judgment or decree, and explain:

_______________________________________________________________________________________________

4. Are you subject to a final order of a state securities commission (or an agency of officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the Commodity Futures Trading Commission; or the National Credit Union Administration that:

- on the date hereof, bars you from:
- association with an entity regulated by such commission, authority, agency or officer;
- engaging in the business of securities, insurance or banking; or
- engaging in savings association or credit union activities; or

- constitutes a final order, entered within the last ten (10) years, that is based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct?

A "final order" is a final, written directive or declaratory statement issued by any of the regulators listed in this Question 4 under applicable statutory authority that provides for notice and an opportunity for a hearing.

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

________________________________________________________________________

5. Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the "Advisers Act"), that, on the date hereof:

- suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser;
- places on you limitations on the activities, functions or operations of, or imposes civil money penalties; or
- bars you from being associated with any entity or from participating in the offering of any penny stock?

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

________________________________________________________________________

6. Are you subject to any order of the SEC, entered within the last five (5) years that orders you to cease and desist from committing or causing a violation of or a future violation of:

- any scienter-based anti-fraud provision of the federal securities laws, including, but not limited to, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, or Section 206(1) of the Advisers Act or any other rule or regulation thereunder; or
- Section 5 of the Securities Act.

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

________________________________________________________________________

7. Have you been suspended or expelled from membership in, or from association with a member of, a securities self-regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

________________________________________________________________________

8. Have you filed (as a registrant or issuer), or were you named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five (5) years, was the subject of a refusal order, stop order, or exemption suspension, or are you, on the date hereof, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

________________________________________________________________________



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572562

9. Have you been subject to a United States Postal Service false representation order entered within the last five (5) years, or are you subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

☐ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

**If any information furnished by me in this Questionnaire becomes inaccurate, incomplete or otherwise changes, I will promptly advise the Issuer and/or the Managing General Partner to that effect and furnish any supplementary information that may be appropriate as a result of any developments, including the passage of time and any new relationships that may develop in the future.**

**The foregoing answers are correctly and fully stated to the best of my knowledge, information, and belief after a reasonable investigation.**

Signature: ______________________________

Print Name: ______________________________

Date: ______________________________

COACHMAN energy

**SCHEDULE IV**

## COACHMAN ENERGY VI LP
## DISTRIBUTION REINVESTMENT PLAN ELECTION FORM

**REGISTERED NAME(S):** ______________________________

**REGISTERED ADDRESS:** ______________________________

______________________________

**A. Distribution Reinvestment Plan (DRP)**

Complete this section if you wish to have your cash distributions reinvested in the form of more Company Units of Limited Partner Interest or Investor General Partner Interest ("Units").

- If you wish to reinvest all of your cash distributions in the DRP, please cross the box marked "All."
- If you wish to reinvest a portion of your cash distributions in the DRP and if you own at least one (1) Unit, please cross the box marked "Part" and designate the number of Units.
- If you wish to terminate participation in the Company's DRP, please cross the box marked "Terminate."

Please note that an election to participate fully in the Company's DRP will override any other agreements or instructions in the Company's records regarding direct payment of your cash distributions into a specified account.

| | | |
|---|---|---|
| ☐ | **All** | **Please mark this box with an "X" if you wish all of your Units to be reinvested in the Company's DRP.** |
| ☐ | **Part** | **Please mark this box with an "X" and show the number of Units you wish to participate in the Company's DRP in the space provided below:**<br>______________________ |
| ☐ | **Terminate** | **Please mark this box with an "X" if you wish to terminate participation in the Company's DRP.** |

COACHMAN energy

**B. Signature(s) - This section must be signed for your instructions to be executed.**

If you have chosen to have your cash distributions fully or partially reinvested into Units and you have completed Section A, you must sign this form as follows in the space provided:

- **Individual:** Sign in the space provided in the first column below.
- **Joint Holding:** Where the holding is in more than one name, all of the unitholders must sign.
- **Power of Attorney:** To sign under Power of Attorney, you must have already filed this document with the Company. If you have not previously filed this document, please attached a certified photocopy of the Power of Attorney to this form when you return it.

I authorize you to act in accordance with my instructions set forth above. I acknowledge that these instructions supersede and have priority over all previous instructions with respect to my/our securities. Where I have indicated participation in the DRP, I hereby agree to be bound by the terms and conditions of the DRP.

| Individual or Unitholder 1 | Unitholder 2 (if applicable) | Unitholder 3 (if applicable) |
|---|---|---|
| ______________________ | ______________________ | ______________________ |
| Date: ________________ | Date: ________________ | Date: ________________ |

Note: When signed under Power of Attorney, the attorney states that they have not received any notice of revocation.

COACHMAN energy

SCHEDULE V

## For Subscribers Investing in the Fund Prior to the Minimum Offering Amount

## FORM W-9 AND INSTRUCTIONS

Please complete the attached Form W-9 and review the instructions attached thereto. Return the completed Form W-9 to the Fund and not to the Internal Revenue Service. Subscribers are also required to submit to the Fund a copy of a form of identification.

[*Form W-9 attached.*]



FOIA Confidential Treatment Requested by Criterion Wealth Management 

*[Page intentionally left blank.]*

Form **W-9**
(Rev. August 2013)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

See **Specific Instructions** on page 2.
Print or type

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☐ Individual/sole proprietor ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ________

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) ________

Exemption from FATCA reporting code (if any) ________

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Social security number**
☐☐☐ – ☐☐ – ☐☐☐☐

**Employer identification number**
☐☐ – ☐☐☐☐☐☐☐

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below), and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** **Signature of U.S. person ▶** **Date ▶**

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity,

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust, and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

***Example.*** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS a percentage of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

### Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* on page 1.

**What is FATCA reporting?** The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name/disregarded entity name" line.

**Partnership, C Corporation, or S Corporation.** Enter the entity's name on the "Name" line and any business, trade, or "doing business as (DBA) name" on the "Business name/disregarded entity name" line.

**Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulation section 301.7701-2(c)(2)(iii). Enter the owner's name on the "Name" line. The name of the entity entered on the "Name" line should never be a disregarded entity. The name on the "Name" line must be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on the "Name" line. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on the "Business name/disregarded entity name" line. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

**Note.** Check the appropriate box for the U.S. federal tax classification of the person whose name is entered on the "Name" line (Individual/sole proprietor, Partnership, C Corporation, S Corporation, Trust/estate).

**Limited Liability Company (LLC).** If the person identified on the "Name" line is an LLC, check the "Limited liability company" box only and enter the appropriate code for the U.S. federal tax classification in the space provided. If you are an LLC that is treated as a partnership for U.S. federal tax purposes, enter "P" for partnership. If you are an LLC that has filed a Form 8832 or a Form 2553 to be taxed as a corporation, enter "C" for C corporation or "S" for S corporation, as appropriate. If you are an LLC that is disregarded as an entity separate from its owner under Regulation section 301.7701-3 (except for employment and excise tax), do not check the LLC box unless the owner of the LLC (required to be identified on the "Name" line) is another LLC that is not disregarded for U.S. federal tax purposes. If the LLC is disregarded as an entity separate from its owner, enter the appropriate tax classification of the owner identified on the "Name" line.

**Other entities.** Enter your business name as shown on required U.S. federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/disregarded entity name" line.

## Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the *Exemptions* box, any code(s) that may apply to you. See *Exempt payee code* and *Exemption from FATCA reporting code* on page 3.

**Exempt payee code.** Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following codes identify payees that are exempt from backup withholding:

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulation section 1.671-4(b)(2)(i)(A)) | The grantor* |
| **For this type of account:** | **Give name and EIN of:** |
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity [4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulation section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 1.

***Note.** Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, social security number (SSN), or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or contact them at *www.ftc.gov/idtheft* or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

# APPENDIX II

## PARTNERSHIP AGREEMENT

*[Page intentionally left blank.]*

**AMENDED AND RESTATED**
**LIMITED PARTNERSHIP AGREEMENT**
**of**
**COACHMAN ENERGY VI LP**

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF COACHMAN ENERGY VI LP (the "Agreement"), dated as of March 19, 2015, amends, restates and replaces that certain Limited Partnership Agreement of Coachman Energy VI LP dated October 17, 2014, in its entirety. This Agreement is entered into by and among Coachman Energy Managing General Partners LLC, a Delaware limited liability company, as the Managing General Partner (the "MGP"), and the Persons whose names are set forth on Exhibit A as attached hereto who are admitted as Unitholders (as defined herein) in accordance with the provisions herein and pursuant to the provisions of the Act (as defined herein).

**ARTICLE 1**
**DEFINED TERMS**

The following definitions shall be for all purposes, unless otherwise clearly indicated to the contrary, applied to the terms used in this Agreement.

"Act" means the Delaware Revised Uniform Limited Partnership Act, as it may be amended from time to time, and any successor to such statute.

"Additional Unitholder" means a Person admitted to the Fund as a Unitholder pursuant to Section 12.2 hereof and who is shown as such on the books and records of the Fund.

"Affiliate" or "Affiliated" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any Person that owns or controls ten percent (10%) or more of the voting interests of such Person, or (iv) any officer, director, key employee, general partner or trustee of such Person or of any Person referred to in clauses (i), (ii), and (iii) above.

"Affiliate Fund" means another fund that is either: (a) operated by the MGP; (b) an Affiliate of the MGP; or (c) advised by the Investment Manager.

"Agreement" means this Amended and Restated Limited Partnership Agreement, as it may be amended, supplemented or restated from time to time.

"Alternative Investment Vehicle" means a Parallel Fund, an Investment Entity, a Financing Vehicle or a Subsidiary Corporation.

"Ancillary Agreements" means, collectively, (1) Investment Management Agreement between the MGP and the Investment Manager and (2) Administrative Services Agreement between the MGP and CEA.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572574

"Assignee" means a Person to whom one or more Units have been transferred in a manner permitted under this Agreement, but who has not become a Substituted Unitholder, and who has the rights set forth in Section 11.5.

"Basket" shall have the meaning set forth in Section 7.6(a).

"Capital Account" means, with respect to any Unitholder or Assignee of the Fund, the Capital Account maintained for such Unitholder or Allocatee in accordance with the following provisions:

(i) To each Unitholder's or Assignee's Capital Account there shall be credited (A) such Person's Capital Contributions, (B) such Person's distributive share of Net Profits and any items in the nature of income or gain which are specially allocated to such Person pursuant to Section 6.3 or Section 6.4, (C) such Person's distributive share of Simulated Gain, and (D) the amount of any Fund's liabilities assumed by such Person or that are secured by any Property distributed to such Person;

(ii) To each Unitholder's or Assignee's Capital Account there shall be debited (A) the amount of money and the Gross Asset Value of any Property distributed to such Person pursuant to any provision of this Agreement, (B) such Person's distributive share of Net Losses and any items in the nature of expenses or losses which are specially allocated to such Person pursuant to Section 6.3 or Section 6.4, (C) such Person's distribution share of Simulated Depletion Deductions and Simulated Loss, (D) the amount of any liabilities of such Person assumed by the Fund or that are secured by any Property contributed by such Unitholder or Allocatee to the Fund, and (E) brokerage, syndication, organizational or similar fees paid by the Fund that are directly attributable to the Unitholder's or Assignee's subscription of Units of the Fund (any such fees charged with respect to a given subscription will be charged to such subscriber's capital account);

(iii) In the event a Unit is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit;

(iv) In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations; and

(v) For purposes of computing the Unitholders' and Assignees' Capital Accounts, the Simulated Basis of each oil and gas property of the Fund will be allocated first to Investing Company to the extent of Leasehold Acquisition Costs, and then among the Unitholders and Assignees *pro rata* based on their Percentage Interests. Leasehold Acquisition Costs will be allocated one hundred percent (100%) to Investing Company.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with

such Regulations. In the event the MGP shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are computed in order to comply with such Regulations, the MGP may make such modification. The MGP also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Unitholders and Assignees the amount of capital reflected on the Fund's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b). The MGP shall provide the Unitholders and Assignees with written notice of any such adjustments or modifications.

"Capital Contributed" means the gross amount of Capital Contributions raised by a broker dealer.

"Capital Contribution" means, in respect of any Unitholder or Assignee, the sum of all cash contributions and all the fair market value of property, tangible or intangible, contributed by such Unitholder to the capital of the Fund pursuant to Article 4, prior to deductions of any fees, commissions or discounts, including, but not limited to the fees set forth in Section 7.5.

"Carried Interest" means that portion of the MGP's Percentage Interest that relates to its right to receive Carried Interest Distributions and allocations attributable thereto pursuant to this Agreement or, as to any other Investment Entity, that portion of the interest in such Investment Entity held by the Managing General Partner or its Affiliate that has similar economic characteristics as the Carried Interest Distributions.

"Carried Interest Distributions" means the amount distributed to the MGP pursuant to Section 5.1 in its capacity as the MGP.

"Cash Available for Distribution" means all cash, whether revenues or other funds received by the Fund, but excluding cash received upon any issuance of Units ("Offering Cash"), less the sum of the following to the extent paid or set aside by the Fund: (a) all principal and interest payments on Indebtedness and all other sums paid to lenders, to the extent such sums are not paid from Offering Cash, as determined by the MGP, in good faith; (b) all cash expenditures incurred incident to the normal operation of the Fund's business (including the Management Expenses, the Annual Management Fee, and the Fund Expenses); and (c) Reserves. Any moneys released from a Reserve will be considered a cash receipt by the Fund for purposes of this definition.

"CEA" means Coachman Energy Administrator LLC, a Delaware limited liability company, with which the Fund has an administrator services agreement.

"Certificate" means the Certificate of Limited Partnership relating to the Fund filed in the Office of the Secretary of State for the State of Delaware, as amended from time to time in accordance with the terms hereof and the Act.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572576

"Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time, as interpreted by the applicable regulations thereunder. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

"Consent" means the consent or approval of a proposed action by a Unitholder or the MGP, as applicable.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction (including depletion) allowable with respect to an asset for such Fiscal Year for federal income tax purposes, except that with respect to any asset whose Gross Asset Value differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for such Fiscal Year bears to such beginning adjusted tax basis; *provided, however*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero (0), Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the MGP.

"Early Investor Incentives" means, collectively, the Stage 1 Early Investor Incentive and the Stage 2 Early Investor Incentive. The number of Units available for issuance pursuant to the Early Investor Incentives may be reduced or increased by the MGP, in its sole discretion, at any time, upon seven (7) days' prior notice to the Limited Partners.

"Extended Offering Period" means the extension of the Initial Offering Period one time for a period of up to an additional twelve (12) months.

"Final Closing Date" means the earlier of (i) the date the Maximum Offering Amount has been issued or (ii) the Offering Termination Date.

"Fund" means Coachman Energy VI LP, a limited partnership formed under the Act and subject to the terms and conditions of this Agreement, and any successor thereto.

"Fund Expenses" means, except as otherwise specifically provided in this Agreement, all costs and expenses of maintaining the operations of the Fund, entities in which the Fund has a direct or indirect interest (pro rata where applicable to reflect such interest) and its properties of whatever kind or nature, including taxes, fees and other governmental charges levied against the Fund, legal and accounting expenses (including those for tax planning and the preparation of reports and projections), mailing expenses, consulting fees, insurance (including directors and officers insurance, professional liability insurance and well drilling liability insurance), administrative fees, broker-dealer commissions, fees for outside services, audit costs, custodial fees, other customary fees, costs and expenses (including travel expenses of employees of the

Management Parties) incurred in connection with the acquisition (whether or not consummated), ownership, financing, development, redevelopment, management, leasing and disposition of properties, including insurance and litigation expenses, but specifically excluding the Annual Management Fee, the Management Expenses, and the Organizational Fee.

"Fiscal Year" means the fiscal year of the Fund, which shall be the calendar year.

"Gross Asset Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Unitholder to the Fund shall be the gross fair market value of such asset as agreed to by such contributor and the MGP;

(ii) The Gross Asset Values of all items of Fund property shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account) as of the following times: (A) the acquisition of an additional Interest in the Fund by any new or existing Unitholder in exchange for more than a de minimis Capital Contribution, (B) the distribution by the Fund to a Unitholder or Assignee of more than a de minimis amount of Fund property as consideration for Units in the Fund, and (C) the liquidation of the Fund within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) (other than pursuant to Code Section 708(b)(1)(B)); *provided* that an adjustment described in clause (A) of this paragraph shall be made only if the MGP reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Unitholders and Assignees in the Fund;

(iii) The Gross Asset Value of any item of Fund property distributed to any Unitholder or Assignee (other than as consideration for an Interest in the Fund as described in clause (B) of subparagraph (ii) above) shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such item on the date of distribution; and

(iv) The Gross Asset Values of each item of Fund property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Simulated Depletion Deductions or Depreciation taken into account with respect to such asset, for purposes of computing Net Profits and Net Losses.

"Guaranty Fee" has the meaning set forth in <u>Section 7.5(g)</u>.

"IDCs" means "intangible drilling and development costs" described in Code Section 263(c).

"Immediate Family" means, with respect to any natural Person, such natural Person's spouse and such natural Person's natural or adoptive parents, descendants, nephews, nieces, brothers, and sisters.

"Incapacity" or "Incapacitated" means, (i) as to any individual Unitholder, death, total physical disability or entry by a court of competent jurisdiction adjudicating him incompetent to manage his Person or his estate; (ii) as to any corporation which is a Unitholder, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; (iii) as to any partnership which is a Unitholder, the dissolution and commencement of winding up of the partnership; (iv) as to any estate which is a Unitholder, the distribution by the fiduciary of the estate's entire interest in the Fund; (v) as to any trustee of a trust which is a Unitholder, the termination of the trust (but not the substitution of a new trustee); or (vi) as to any Unitholder, the bankruptcy of such Unitholder. For purposes of this definition, bankruptcy of a Unitholder shall be deemed to have occurred when (a) the Unitholder commences a voluntary proceeding seeking liquidation, reorganization or other relief under any bankruptcy, insolvency or other similar law now or hereafter in effect, (b) the Unitholder is adjudged as bankrupt or insolvent, or a final and nonappealable order for relief under any bankruptcy, insolvency or similar law now or hereafter in effect has been entered against the Unitholder, (c) the Unitholder executes and delivers a general assignment for the benefit of the Unitholder's creditors, (d) the Unitholder files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Unitholder in any proceeding of the nature described in clause (b) above, (e) the Unitholder seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator for the Unitholder or for all or any substantial part of the Unitholder's properties, (f) any proceeding seeking liquidation, reorganization or other relief of or against such Unitholder under any bankruptcy, insolvency or other similar law now or hereafter in effect has not been dismissed within one hundred twenty (120) days after the commencement thereof, (g) the appointment without the Unitholder's consent or acquiescence of a trustee, receiver or liquidator has not been vacated or stayed within ninety (90) days of such appointment, or (h) an appointment referred to in clause (g) which has been stayed is not vacated within ninety (90) days after the expiration of any such stay.

"Incentives" means the Major Investor Incentive and the Early Investor Incentives, collectively.

"Indebtedness" shall mean the aggregate of, without duplication, (a) any obligations under any indebtedness for borrowed money, (b) any indebtedness evidenced by any note, bond, debenture or other debt security, (c) all outstanding obligations of the Fund to pay the deferred purchase price of property or services, (d) any commitment or obligation by which the Fund directly or indirectly assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (e) any indebtedness or contingent payment obligation pursuant to a direct or

indirect guarantee, (f) any obligations under capitalized leases, and (g) any accrued interest, prepayment premiums, termination, acceleration, contingent or similar fees or penalties of any kind or nature arising or accruing out of items (a) – (g) above.

"Indebtedness Fee" has the meaning set forth in Section 7.5(f).

"Indemnitee" means (i) any Person made a party to a proceeding by reason of his status as (A) the MGP, (B) a director or officer of the Fund, MGP or Investment Manager, or (C) a guarantor, pursuant to a loan guarantee or any other guarantee given to a third party in connection with any partnership property or loan, including, without limitation, environmental indemnities, reimbursements agreements or guaranties to credit enhancers under bond issues, undertakings or indemnities to title companies, or otherwise, for any Indebtedness of the Fund (including, without limitation, any Indebtedness which the Fund has assumed or taken assets subject to); and (ii) such other Persons (including Affiliates of the MGP or the Fund) as the MGP may designate from time to time (whether before or after the event giving rise to potential liability), in its sole and absolute discretion.

"Initial Offering Period" will be until the earlier of June 30, 2016, or the date on which this Offering is fully subscribed.

"Investing Company" means Coachman Energy VIB LLC, a Delaware limited liability company.

"Investment Entity" means an investment entity through which the Fund invests directly or indirectly in parallel with a Parallel Fund, including any entity so formed to own one or more Investment Entities.

"Investment Manager" means Coachman Energy Partners LLC, a Delaware limited liability company, with which the MGP has an investment management agreement, on behalf of the Fund.

"Investment Period" means the period commencing upon receipt of the Minimum Offering Amount and terminating four (4) years from the Final Closing Date; *provided, that* the MGP, in its sole discretion, may extend such period for one (1) additional year without Unitholder Consent; *provided further* that with respect to existing oil and gas projects, the MGP may continue to conduct expansion drilling, buy additional mineral acreage and acquire existing working interests until the termination of the Fund. The MGP may terminate the Investment Period at any time if it determines that changes in any applicable law or regulation make it necessary for the Fund to do so.

"Investor General Partners" means any Unitholder that is admitted as an Investor General Partner upon execution hereof or is admitted as a Substituted Unitholder of the Fund pursuant to the provisions of this Agreement, having acquired Units from an Investor General Partner, in such Person's capacity as an Investor General Partner of the Fund. "Investor General Partner" shall not include, after a conversion, such Investor General Partner who converts to a Limited Partner pursuant to Section 11.7.

"Investor General Partner Interest" means a Percentage Interest held by an Investor General Partner, in its capacity as an Investor General Partner. An Investor General Partner Interest may be expressed as a number of Units.

"IRS" means the Internal Revenue Service, which administers the internal revenue laws of the United States.

"Leasehold Acquisition Costs" means the cost and expenses associated with acquiring the Fund's interests in oil and gas leasehold interests, as reasonably determined and calculated by the Fund, including lease bonuses.

"Limited Partner" means any Unitholder named as a Limited Partner in Exhibit A attached hereto, as amended from time to time, or any Substituted Unitholder holding a limited partner interest.

"Limited Partner Interest" means a Percentage Interest held by a Limited Partner, in its capacity as a Limited Partner. A Limited Partner Interest may be expressed as a number of Units.

"Liquidator" has the meaning set forth in Section 13.2.

"Major Investor Incentive" means the incentive for any single investor (or group of Affiliated investors, a "Group") purchasing a minimum of twenty (20) Units in a single transaction to receive a ten percent (10%) gross up on the amount of Units received, resulting in receipt of 1.111 Units per $100,000 contribution. The Major Investor Incentive may not be combined with the Early Investor Incentives.

"Majority" means the Unitholders and the MGP, collectively, holding more than fifty percent (50%) of the total Units issued and outstanding.

"Managing Broker Dealer" means Select Capital Corporation in its capacity as the lead broker-dealer of the Fund, or its successors as Managing Broker Dealer of the Fund.

"Managing General Partner" or "MGP" means Coachman Energy Managing General Partners LLC, a Delaware limited liability company, in its capacity as the MGP of the Fund, or its successors as MGP of the Fund.

"Maximum Offering Amount" means $250,000,000 of Units, together with an option for an overallotment of an additional $50,000,000 of Units.

"MGP Interest" means the general partner interest held by the MGP or its successor.

"Minimum Offering Amount" means $1,000,000 of Units. Invested funds will be held in an escrow account until receipt of the Minimum Offering Amount.

"Net Profits" and "Net Losses" (and any items of income, gain, expense, or loss referred to in this Agreement) shall be determined in accordance with federal income tax accounting principles, as modified by Regulations Section 1.704-1(b)(2)(iv), except that Net Profits and Net Losses shall not include items of income, gain and expense that are specially allocated pursuant to Section 6.3. All allocations of income, Net Profits, gain, Net Losses and expense (and all items contained therein) for federal income tax purposes shall be identical to all allocations of such items set forth in Article 6, except as otherwise required by Section 704(c) of the Code and Regulations promulgated thereunder.

"Offering Termination Date" means the last day of the Initial Offering Period, or in the event of an extension, the Extended Offering Period.

"Organizational Fee" means the reimbursement of expenses incurred by the MGP related to the organization of the Fund and syndication of the Units, including, but not limited to, expenses for printing, engraving, mailing, registrars, trustees, escrow holders, depositaries, engineers and other experts, expenses of qualification of the sale of securities under federal and state law, including taxes, accountants and attorneys' fees, industry advisory fees, marketing costs, administrative expenses and due diligence costs as well as the time and efforts of the MGP. The Organizational Fee shall include any Syndication Expenses, but specifically exclude total brokerage discounts and commissions, wholesaling fees and due diligence reimbursements paid to soliciting dealers. The Fund may, but is not obligated to pay the Organizational Fee out of funds received from the Investing Company.

"Overallotment" means the election by the MGP as part of the initial offering of Units of the Fund and the Investing Company to allow subscriptions in excess of $50,000,000.

"Parallel Fund" means a separate investment vehicle, special purpose vehicle, limited partnership, limited liability company, corporation, or other contractual arrangement which has been created to give any individual or entity the opportunity to invest its capital in certain oil and gas projects alongside the Fund (the "Projects").

"Partner Minimum Gain" has the meaning set forth in Regulations Section 1.704-2(i) for partner minimum gain. A Unitholder's share of Partner Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(i)(5).

"Percentage Interest" means an ownership interest in the Fund by either a Unitholder or the MGP and includes any and all benefits to which the holder of such a Percentage Interest may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement. A Percentage Interest may be expressed as a percentage, which will be determined by dividing the aggregate number of Units owned by the Unitholder by the total number of Units then issued and outstanding.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572582

"Partnership Minimum Gain" has the meaning set forth in Regulations Section 1.704-2(d) for partnership minimum gain. In accordance with Regulations Section 1.704-2(d), the amount of Partnership Minimum Gain is determined by first computing for each Partnership nonrecourse liability any gain the Fund would realize if it disposed of the property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. A Unitholder's share of Partnership Minimum Gain shall be determined in accordance with Regulations Section 1.704-2(g)(1).

"PDP" means Proved Reserves to be recovered from existing wells and facilities, after necessary equipment has been installed, from completion intervals that are open and producing at the relevant time, including improved recovery reserves but only after the relevant improved recovery project is in operation.

"PDNP" means Proved Reserves to be recovered from existing wells and facilities, after necessary equipment has been installed, from (i) completion intervals that are open but which have not yet started producing at the relevant time, (ii) wells which were shut-in for market conditions or pipeline conditions, (iii) wells not capable of production for mechanical reasons and (iv) reserves expected to be recovered from zones in existing wells that will require additional completion work or future re-completion work to start production, in each case where production can be initiated or restored with relatively low expenditure compared to the cost of drilling a new well.

"Person" means an individual or a corporation, partnership, trust, unincorporated organization, association or other entity.

"Preferred Return" means, with respect to a Unitholder, a sum equal to twenty-five percent (25%) of the Capital Contribution of such Unitholder, commencing on the date the Unitholder's initial Capital Contribution is accepted by the Fund.

"PUD" means Proved Reserves expected to be recovered through future investments (i) from new wells on un-drilled acreage in known accumulations, (ii) from deepening existing wells to a different (but known) reservoir, (iii) from infill wells that will increase recovery or (iv) where a relatively large expenditure (e.g., when compared to the cost of drilling a new well) is required to (a) re-complete an existing well or (b) install production or transportation facilities for primary or improved recovery projects.

"Regulations" means the permanent, temporary, proposed, or proposed and temporary regulations issued by the Department of the Treasury that are promulgated under the Code as amended.

"Reserves" means with respect to any month or other fiscal period, funds set aside or amounts allocated during such period to reserves which are maintained in amounts deemed sufficient by the MGP for working capital and for payment of taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Fund's business (including the Management Expenses, Annual

Management Fee, and Fund Expenses, whether for drilling, completion or work-over costs).

"Simulated Basis" means the Gross Asset Value of any oil and gas property (as defined in Code Section 614).

"Simulated Depletion Deductions" means the simulated depletion allowance computed by the Fund with respect to its oil and gas properties pursuant to Regulations Section 1.704-1(b)(2)(iv)(k)(2). For purposes of computing Simulated Depletion Deductions, the Fund will apply the simulated cost depletion method under Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"Simulated Gain" or "Simulated Loss" means the simulated gain or simulated loss computed by the Fund with respect to its oil and gas properties pursuant to Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"Stage 1 Early Investor Incentive" means a twelve percent (12%) gross up on the number of Units received, resulting in 1.136 Units received per $100,000 contribution, which will be available to investors who purchase Units from broker dealers or registered investment advisors (subject to certain limitations) and fully pay for such Units prior to the acceptance by the Fund and/or the Investing Company (collectively, the "Companies") of subscriptions for a total of 500 units (the "Stage 1 Units") in the Companies ("Stage 1"), collectively, excluding any units (1) in the Companies subject to the Major Investor Incentive and/or (2) subscribed for in the Fund by the Investing Company.

"Stage 2 Early Investor Incentive" means a six percent (6%) gross up on the number of Units received, resulting in 1.064 Units received per $100,000 contribution, which will be available to investors who purchase Units from broker dealers or registered investment advisors (subject to certain limitations) and fully pay for such Units following the termination of Stage 1, but prior to the acceptance by the Companies of subscriptions for a total of an additional 500 units (the "Stage 2 Units") in the Companies ("Stage 2"), collectively, excluding any units (1) in the Companies subject to the Major Investor Incentive and/or (2) subscribed for in the Fund by the Investing Company, but including those Units subscribed for by Stage 1 Investors (as defined below).

"Stage 1 Investor(s)" means an investor who qualifies for the Stage 1 Early Investor Incentive.

"Stage 2 Investor(s)" means an investor who qualifies for the Stage 2 Early Investor Incentive, but not for the Stage 1 Early Investor Incentive.

"Subsidiary Corporation" means any corporation, group trust, limited liability company or partnership wholly owned either directly or indirectly by the Fund, or any Parallel Fund established in order to invest in any Property.

"Substituted Unitholder" means a Person who is admitted as either a Limited Partner or Investor General Partner to the Fund pursuant to Section 11.6.

"Supermajority" means the Unitholders and the MGP, collectively, holding more than sixty-seven percent (67%) of the total Units issued and outstanding.

"Syndication Expenses" means all expenditures classified as syndication expenses pursuant to Section 1.709-2(b) of the Regulations. Syndication Expenses shall be taken into account under this Agreement at the time they would be taken into account under the Fund's method of accounting if they were deductible expenses.

"Term" means the Fund's initial period of existence of up to five (5) years from the Final Closing Date, plus two (2) additional one (1) year periods of existence thereafter, as such additional periods may be implemented by the MGP, in its sole discretion.

"Transfer" means a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, exchange or any other disposition by law or otherwise.

"Valuation Policy" means the valuation policy adopted by the Investment Manager, from time to time, applicable to all of the funds that it manages, including without limitation the Fund and the Parallel Funds.

"Unit" means a fractional undivided share of Percentage Interests.

"Unitholder" means a Person who holds Units in the Fund, but specifically excluding the MGP.

## ARTICLE 2
## THE FUND

Section 2.1 Initial Organization. The Fund is a limited partnership organized on August 27, 2014, pursuant to the provisions of the Act. The Unitholders hereby agree to conduct the operations of the Fund as a limited partnership pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

Section 2.2 Name. The name of the Fund shall be Coachman Energy VI LP. The Fund's business may be conducted under any other name or names deemed advisable by the MGP, including the name of the MGP or any Affiliate thereof. The words "Limited Partnership," "L.P.," "Ltd." or similar words or letters shall be included in the Fund's name where necessary for the purposes of complying with the laws of any jurisdiction that so requires. The MGP in its sole and absolute discretion may change the name of the Fund at any time and from time to time and shall notify the Unitholders of such change in the next regular communication to the Unitholders.

Section 2.3 Registered Office and Agent; Principal Office. The address of the registered office of the Fund in the State of Delaware shall be located at 160 Greentree Drive, Suite 101, Dover, Delaware, 19904, and the registered agent for service of



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572585

process on the Fund in the State of Delaware at such registered office shall be National Registered Agents, Inc. The principal office of the Fund shall be at 5251 DTC Parkway, Suite 200, Greenwood Village, CO 80111, or such other place as the MGP may from time to time designate by notice to the Limited Partners. The Fund may maintain offices at such other place or places within or outside the States of Delaware and Colorado as the MGP deems advisable.

Section 2.4 Power of Attorney.

(a) Each Unitholder and each Assignee hereby constitutes and appoints the MGP, the Liquidator, and authorized officers and attorneys-in-fact of each, and each of those acting singly, in each case with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to:

(1) execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) all certificates, documents and other instruments (including, without limitation, this Agreement and the Certificate and all amendments or restatements thereof) that the MGP or the Liquidator deem appropriate or necessary to form, qualify or continue the existence or qualification of the Fund as a limited partnership (or a partnership in which the Limited Partners have limited liability) in the State of Delaware and in all other jurisdictions in which the Fund may or plans to conduct business or own property; (b) all instruments that the MGP or the Liquidator deem appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (c) all conveyances and other instruments or documents that the MGP or the Liquidator deem appropriate or necessary to reflect the dissolution and liquidation of the Fund pursuant to the terms of this Agreement, including, without limitation, a certificate of cancellation; (d) all instruments relating to the admission, withdrawal, removal or substitution of any Unitholder pursuant to, or other events described in, Article 11, 12 or 13 hereof or the Capital Contribution of any Unitholder; and (e) all certificates, documents and other instruments relating to the determination of the rights, preferences and privileges of Percentage Interests; and

(2) execute, swear to, seal, acknowledge and file all ballots, consents, approvals, waivers, certificates and other instruments appropriate or necessary, in the sole and absolute discretion of the MGP or the Liquidator, to make, evidence, give, confirm or ratify any vote, consent, approval, agreement or other action which is made or given by the Unitholders hereunder or is consistent with the terms of this Agreement or appropriate or necessary, in the sole discretion of the MGP or the Liquidator, to effectuate the terms or intent of this Agreement.

Nothing contained herein shall be construed as authorizing the MGP or the Liquidator to amend this Agreement except in accordance with Article 14 hereof or as may be otherwise expressly provided for in this Agreement.

(b) The foregoing power of attorney is hereby declared to be irrevocable and a power coupled with an interest, in recognition of the fact that each of the Unitholders will be relying upon the power of the MGP and the Liquidator to act as contemplated by this Agreement in any filing or other action by it on behalf of the Fund, and it shall survive and not be affected by the subsequent Incapacity of any Unitholder or Assignee and the transfer of all or any portion of such Unitholder's or Assignee's Units and shall extend to such Unitholder's or Assignee's heirs, successors, assigns and personal representatives. Each such Unitholder or Assignee hereby agrees to be bound by any representation made by the MGP or the Liquidator, acting in good faith pursuant to such power of attorney, and each such Unitholder or Assignee hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the MGP or the Liquidator, taken in good faith under such power of attorney. Each Unitholder or Assignee shall execute and deliver to the MGP or the Liquidator, within fifteen (15) days after receipt of the MGP's or Liquidator's request therefor, such further designation, powers of attorney and other instruments as the MGP or the Liquidator, as the case may be, deems necessary to effectuate this Agreement and the purposes of the Fund.

Section 2.5 Term. The term of the Fund commenced on August 27, 2014, and shall continue until the Fund is dissolved pursuant to the provisions of Article 13 herein or as otherwise provided in this Agreement or by law.

Section 2.6 Independent Activities. The MGP and each Unitholder may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Fund or otherwise, without having or incurring any obligation to offer any interest in such activities to the Fund or any Unitholder. Neither this Agreement nor any activity undertaken pursuant hereto shall prevent the MGP from engaging in such activities, or require the MGP to permit the Fund or any Unitholder to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by the MGP and the admission of each Unitholder, each Unitholder hereby waives, relinquishes and renounces any such right or claim of participation.

Section 2.7 MGP. The name and address of the MGP is as follows:

Coachman Energy Managing General Partners LLC
5251 DTC Parkway, Suite 200
Greenwood Village, CO 80111

Section 2.8 Unitholders. The name, address, type of interest (Investor General Partner or Limited Partner) and number of Units of each Unitholder shall be set forth in Exhibit A attached hereto, which Exhibit A may be amended by the MGP from time to time.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572587

## ARTICLE 3
## PURPOSE

Section 3.1 Purpose and Business. The purpose and nature of the business to be conducted by the Fund is to (i) acquire mineral leases and/or producing oil and gas wells; (ii) participate in drilling gross horizontal and occasionally vertical oil and gas wells thereby increasing the inherent and market value of underlying acreage; (iii) produce and sell hydrocarbons; and (iv) do anything necessary or incidental to the foregoing.

Section 3.2 Powers. The Fund is empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of the purposes and business described herein and for the protection and benefit of the Fund, *provided* that the Fund shall not take any action which, in the judgment of the MGP, in its sole and absolute discretion, could (i) subject the MGP to any additional taxes under Section 857 or Section 4981 of the Code, or (ii) violate any law or regulation of any governmental body or agency having jurisdiction over the MGP or its securities, unless such action shall have been specifically consented to by the MGP in writing.

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

Section 4.1 Capital Contributions.

(a) Subject to the Incentives, as applicable, each Unitholder shall make a Capital Contribution of cash in the amount of $100,000 per Unit and the minimum investment by a Unitholder is one (1) Unit. The MGP, in its sole discretion, may accept less than the minimum investment but will not accept any subscription for less than one-half (1/2) Unit. Any investments made by the Investing Company will receive a credit for any commissions or fees previously incurred at the Investing Company level. The amount of Capital Contributions, number of Units acquired by each investor who becomes a Unitholder, and whether the Unitholder is purchasing a Limited Partner Interest or Investor General Partner Interest, is set forth opposite his name and address on Exhibit A attached hereto.

(b) If the Fund has not accepted subscriptions for the Minimum Offering Amount on or before the Offering Termination Date, the Offering shall be canceled and all subscriptions received shall be refunded to the subscribers within ten (10) business days after the Offering Termination Date.

(c) Upon receipt of the Minimum Offering Amount and before the Final Closing Date, the MGP may purchase Units as a Limited Partner or as an Investor General Partner under the same terms as any other Person may under the Offering. The MGP is hereby issued the Carried Interest pursuant to this Agreement.

(d) In the event the Fund receives the Minimum Offering Amount and commences business, no interest (other than interest attributable to sums held in the

escrow account) shall accrue on any Capital Contributions, and no Unitholder shall have the right to withdraw or to be repaid any capital contributed by him except as otherwise specifically provided in this Agreement.

Section 4.2 Sale or Exchange of Units. In the event of a Transfer of some or all of a Unitholder's Units, the Capital Account of the transferring Unitholder shall become the Capital Account of the Assignee acquiring such Units, to the extent it relates to the portion of the Units transferred.

Section 4.3 Compliance with Section 704(b) of the Code. The provisions of this Agreement as they relate to the maintenance of Capital Accounts and the allocation of Net Profits and Net Losses are intended, and shall be construed, and, if necessary, modified, to cause the allocations of Profits, Losses, income, gain and credit pursuant to Article 6 to have substantial economic effect under the Regulations, in light of the distributions made pursuant to Articles 5 and 13 and the Capital Contributions made pursuant to this Article 4.

Section 4.4 Liability. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Limited Partner to make a Capital Contribution in excess of the Capital Contribution made by that Limited Partner. No Limited Partner shall be liable for the debts, liabilities, contracts or any other obligations of the Fund. Except as otherwise provided by applicable state law, a Limited Partner shall be liable only to make his Capital Contributions and shall not be required to lend any moneys to the Fund, or, after his Capital Contributions have been paid, to make any additional capital contributions to the Fund. The MGP shall have no personal liability for the repayment of any Capital Contributions of any Limited Partner.

## ARTICLE 5
## DISTRIBUTIONS

Section 5.1 Distributions of Cash Available for Distribution. Distributions may be made at any time as determined by the MGP. The MGP, in its sole discretion, may cause the Fund to establish such reserves in such amounts as reasonably necessary for payment of all expenses of the Fund or as the MGP, in good faith, determines as necessary or appropriate. Prior to the second (2nd) anniversary of the Final Closing Date, no distributions of cash will be made. Available cash generated during the initial two (2)-year period may be reinvested into additional drilling and/or used to acquire additional oil and gas properties. Thereafter, distributions may be made at any time as determined by the MGP. To the extent there is Cash Available for Distribution, the MGP may cause the Fund to make distributions in the following manner:

(a) First, ninety percent (90%) to the Unitholders *pro rata* based on their relative Percentage Interests, until such Unitholders receive one hundred percent (100%) of their initial Capital Contribution and the Preferred Return, and ten percent (10%) to the MGP; and

(b) Thereafter, seventy percent (70%) to Unitholders *pro rata* based on their relative Percentage Interests and thirty percent (30%) to the MGP.

Distributions, if any, made under this Section 5.1 may be made in monthly installments within thirty (30) days after the end of each month; *provided, however*, that the MGP may, in its sole and absolute discretion, cause the Fund to make distributions within thirty (30) days after the end of each quarter. If a distribution is in connection with the liquidation of the Fund, such distribution shall be made in accordance with Article 13.

Section 5.2 Distribution to Pay Certain Tax Liabilities. Before the expiration of thirty (30) days after the Fund files its federal income tax return, for any taxable period, the MGP shall have the discretion to cause the Fund to make a distribution of cash, including Offering Cash, to the Investing Company or the MGP of an amount equal to (a) that portion of the Fund's income attributed to such Unitholder during such taxable period multiplied by (b) the sum of the maximum federal and state income tax rates in effect for such taxable period (taking into account the deductibility of such state taxes for federal income tax purposes) for such Unitholder.

Section 5.3 Limitations on Distributions. No distributions may be paid if, after giving effect thereto, either (a) the Fund would not be able to pay its debts as they become due in the ordinary course of business; or (b) the Fund's total assets would be less than its total liabilities (including any amounts needed in connection with the winding-up of the Fund to satisfy preferential rights superior to the rights of Unitholders to such distribution). Notwithstanding the foregoing, upon a determination to distribute funds in any manner expressly provided in this Article 5, made in good faith, the MGP shall not incur any liability on account of such distribution, even though such distribution may have resulted in the Fund retaining insufficient funds for the operation of its business which insufficiency resulted in loss to the Fund or necessitated the borrowing of funds by the Fund.

Section 5.4 Record Date for Distributions. The record date for determining the identity of the Unitholders entitled to receive payment of any distribution shall be the last day of the relevant calendar month, or if applicable, the last day of the last calendar month of the relevant calendar quarter.

## ARTICLE 6
## ALLOCATIONS

Section 6.1 Net Profits. After giving effect to the special allocations set forth in Sections 6.3 and 6.4, Net Profits for any Fiscal Year shall be allocated to the MGP, Unitholders as follows:

(a) First, Net Profits, and if necessary in any Fiscal Year, items of gross income and gain, one hundred percent (100%) to MGP to the extent it receives a distribution for such Fiscal Year;

(b) Second, Net Profits (and if necessary in a Fiscal Year in which a liquidation occurs, items of gross income or gain) shall be allocated one hundred



FOIA Confidential Treatment Requested by Criterion Wealth Management 

percent (100%) among the Stage 1 Investors entitled to the Stage 1 Early Investor Incentives, *pro rata* based on their relative holdings of Units entitled to the Stage 1 Early Investor Incentive, until such Unitholders have been allocated an amount equal to the excess, if any, of (i) fourteen percent (14%) of each Unitholder's and Assignee's Capital Contributions resulting in a right to the Early Investor Incentive for such Unitholders, over (ii) the cumulative Net Profits allocated to such Person pursuant to this Section 6.1(b) for all prior Fiscal Years;

(c) Third, Net Profits (and if necessary in a Fiscal Year in which a liquidation occurs, items of gross income or gain) one hundred (100%) among the Stage 2 Investors entitled to the Stage 2 Early Investor Incentives, *pro rata* based on their relative holdings of Units entitled to the Stage 2 Early Investor Incentive, until such Unitholders have been allocated an amount equal to the excess of (i) six percent (6%) of each Unitholder's Capital Contribution resulting in a right to the Stage 2 Early Investor Incentive for each such Unitholder, over (ii) the cumulative Net Profits allocated to such Unitholder pursuant to this Section 6.1(c) for all prior Fiscal Years;

(d) Fourth, Net Profits shall be allocated (and, if necessary, in a Fiscal Year in which a liquidation occurs, items of gross income or gain) one hundred percent (100%) among Major Incentive Investors, *pro rata* based on their relative Percentage Interests, until such Unitholders have been allocated an amount equal to the excess if any, of (i) eleven percent (11%) of each Unitholder's Capital Contributions resulting in a right to the Major Investor Incentive for such person, over (ii) the cumulative Net Profits allocated to such person pursuant to this Section 6.1(d) for all prior Fiscal Years; and

(e) Fifth, to the Unitholders, *pro rata* based on their relative Percentage Interests.

Section 6.2 Net Losses. After giving effect to the special allocations set forth in Sections 6.3 and 6.4, Net Losses for any Fiscal Year shall be allocated to the Unitholders *pro rata* in accordance with their Percentage Interests; *provided, that* no Net Losses will be allocated to a Unitholder if the Unitholder's Capital Account if doing so would create a deficit balance in the Capital Account.

Section 6.3 Special Allocations. The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Article 6, if there is a net decrease in Fund Minimum Gain during any Fiscal Year, each Unitholder or Assignee shall be specially allocated items of Fund income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Unitholder or Assignee's share of the net decrease in Fund Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unitholder or Assignee pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).

This Section 6.3(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Partner Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article 6, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Unitholder or Assignee who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Fund income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Unitholder's or Assignee's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Unitholder or Assignee pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.3(b) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) Qualified Income Offset. If a Partner receives in any taxable year an adjustment, allocation, or distribution described in subparagraphs (4), (5), or (6) of Regulations Section 1.704-1(b)(2)(ii)(d) that causes or increases a negative balance in such Unitholder's Capital Account that exceeds the sum of such Unitholder's shares of Partnership Minimum Gain and Partner Minimum Gain, as determined in accordance with Regulations Sections 1.704-2(g) and 1.704-2(i), such Unitholder shall be allocated specially for such taxable year (and, if necessary, later taxable years) items of income and gain in an amount and manner sufficient to eliminate such negative capital account balance as quickly as possible as provided in Regulations Section 1.704-1(b)(2)(ii)(d). After the occurrence of an allocation of income or gain to a Unitholder in accordance with this Section, to the extent permitted by Regulations Section 1.704-1(b), items of expense or loss shall be allocated to such Unitholder in an amount necessary to offset the income or gain previously allocated to such Unitholder under this Section.

(d) Gross Income Allocation. In the event that any Unitholder or Assignee has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Unitholder or Assignee is obligated to restore pursuant to any provision of the Agreement and (ii) the amount such Unitholder or Assignee is deemed to be obligated to restore pursuant to the penultimate sentences of Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Unitholder or Assignee shall be allocated items of Fund income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 6.3(d) shall be made only if and to the extent that such Unitholder or Assignee would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 6 have been tentatively made as if Section 6.3(c) and this Section 6.3(d) were not in this Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be allocated among the Unitholders and Assignees *pro rata* based on their relative Percentage Interests.

(f) Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Unitholder or Assignee who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(g) Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Fund asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Unitholder or Assignee in complete liquidation of such Partner's interest in the Fund, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Unitholders or Assignees in accordance with their interests in the Fund in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Unitholder or Assignee to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(h) Capital Account Deficits. Loss shall not be allocated to a Unitholder or Assignee to the extent that such allocation would cause a deficit in such Unitholder's or Assignee's Capital Account (after reduction to reflect the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6)) to exceed the sum of such Unitholder's shares of Partnership Minimum Gain and Partner Minimum Gain. Any Loss in excess of that limitation shall be allocated to the other Unitholders. After the occurrence of an allocation of Loss to any other Unitholder in accordance with this Section, to the extent permitted by Regulations Section 1.704-1(b), Profit shall be allocated to such other Unitholders in an amount necessary to offset the Loss previously allocated to such other Unitholders under this Section.

(i) Simulated Depletion, Simulated Loss, IDCs and Leasehold Acquisition Costs. IDCs will be allocated among the Unitholders other than Investing Company *pro rata* based on their Percentage Interests. Simulated Basis will be allocated one hundred percent (100%) to Investing Company to the extent of Leasehold Acquisition Costs, and any remaining Simulated Basis will be allocated among the Unitholders *pro rata* based on their Percentage Interests. Simulated Depletion Deductions and Simulated Loss with respect to each oil and gas property of the Fund will be allocated in proportion to the manner in which the Simulated Basis of such property is allocated among the Unitholders and Allocatees pursuant to subparagraph (v) of the definition of "Capital Account."

(j) Simulated Gains. Simulated Gain with respect to any Fund oil and gas property will be allocated among the Unitholders based on the gain the Unitholder

would recognize if the Fund's amount realized on the disposition that are allocable to the oil and gas property disposed of were allocated as follows: (i) first, among the Unitholders (A) to the extent of their Simulated Basis, after adding back any Simulated Depletion Deductions for such Unitholders with respect to the property triggering the Simulated Gains as of the date of the disposition, and (B) to the extent of their the IDCs previously allocated to them with respect to the property triggering the Simulated Gains (if the amount realized is not sufficient to equal the amounts in items (A) and (B) above, the amount realized will be allocated among the groups in (A) and (B) based on the ratio that each bears to the total of items (A) and (B), such that if item (A) is forty percent (40%) of the total of those items, the parties in item (A) will be allocated in the aggregate forty percent (40%) of the total amount realized), and (ii) second, among the Unitholders *pro rata* based on their Percentage Interests.

(k) Amount Realized. For purposes of Regulations Sections 1.704-1(b)(2)(iv)(k)(2) and 1.704-1(b)(4)(iii), the amount realized on the disposition of any oil and gas property of the Fund shall be allocated (i) first to the Unitholders in an amount equal to the remaining Simulated Basis of such property in the same proportions as the Simulated Basis of such property was allocated to the Unitholders pursuant to subparagraph (v) of the definition of "Capital Account," and (ii) any remaining amount realized shall be allocated to the Unitholders in the same ratio as Simulated Gain is allocated pursuant to Section 6.3(j).

Section 6.4 Treasury Regulation Allocation. When the book value of an asset of the Fund differs from its basis for Federal or other income tax purposes, solely for purposes of the relevant tax and not for purposes of computing Capital Account balances, income, gain, loss, deduction and credit shall be allocated among the Unitholders under the allocation method chosen by the MGP and authorized under the Regulations.

Section 6.5 Allocations Between Transferor and Assignee. If a Unitholder transfers any part or all of its Units or if an Additional Unitholder is admitted pursuant to the terms of this Agreement, the distributive shares of Net Profit and Net Loss, or items thereof, allocable among the Unitholders during such taxable year of the Fund shall be allocated either (a) as if the Fund's taxable year had ended on the date of the transfer or admission, or (b) based on the number of days of such taxable year before and after the transfer or admission without regard to the results of Fund activities in the respective portions of such taxable year. The MGP, in its sole and absolute discretion, shall determine which method shall be used to allocate the distributive shares of the various items of Profits and Losses among the Unitholders and any Assignees.

## ARTICLE 7
## MANAGEMENT AND OPERATIONS OF BUSINESS

Section 7.1 Management. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Fund are and shall be exclusively vested in the MGP, and no Unitholder shall have any right to participate in or exercise control or management power over the business and affairs of

the Fund. For purposes of this Agreement, any action or election of, or designation, decision, consent or determination (or matters of like import) by, the MGP referred to in this Agreement shall be in the sole and absolute discretion of the MGP, unless otherwise stated in this Agreement. Any mathematical computation made by the MGP shall be deemed conclusive, absent manifest error. The MGP shall have the discretion and authority to correct any prior administrative errors or omissions made in the administration and management of the Fund, including corrections to reflect valid elections made by Unitholders. In addition to the powers now or hereafter granted a general partner of a limited partnership under applicable law or which are granted to the MGP under any other provision of this Agreement, the MGP, subject to Section 7.4 hereof, shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Fund, including, without limitation:

(a) bind the Fund, by execution of documents or otherwise, to any obligation not inconsistent with the provisions of this Agreement;

(b) rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(c) consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reasonable reliance upon the written advice of such Persons as to matters within such Persons' professional or expert competence shall be presumed to have been done or omitted in good faith and not to constitute "cause" as defined in Section 8.5;

(d) serve as manager, managing general partner, general partner or managing member of any Parallel Fund, any Investment Entity, any Alternative Investment Vehicle, any other investment fund, and any related entity of such other investment fund;

(e) terminate of the Investment Period at any time if it determines, in its discretion, that changes in any applicable law or regulation make it necessary for the Fund to do so;

(f) cause the Fund to purchase additional incremental liability insurance and shall maintain such insurance for the remaining term of the Fund, in such an amount as the MGP deems necessary or appropriate;

(g) subject to Section 7.4, make any expenditures, the lending or borrowing of money (including, without limitation, making prepayments on loans and borrowing money to permit the Fund to make distributions to its Unitholders in such amounts as will permit the MGP to avoid the payment of any federal income tax (including, for this purpose, any excise tax pursuant to Section 4981 of the Code)), the assumption or guarantee of, or other contracting for, Indebtedness and other liabilities,

the issuance of evidences of Indebtedness (including the securing of same by deed to secure debt, mortgage, deed of trust or other lien or encumbrance on the Fund's assets) and the incurring of any obligations it deems necessary for the conduct of the activities of the Fund;

(h) make any tax, regulatory and other filings, or render periodic or other reports to governmental or other agencies having jurisdiction over the business or assets of the Fund;

(i) acquire, dispose, mortgage, pledge, encumber, hypothecate or exchange any assets of the Fund (including the exercise or grant of any conversion, option, privilege, or subscription right or other right available in connection with any assets at any time held by the Fund) or the merger or other combination of the Fund with or into another entity (all of the foregoing subject to any prior approval only to the extent required by Section 7.4 hereof);

(j) negotiate, execute, and perform any contracts, conveyances or other instruments that the MGP considers useful or necessary to the conduct of the Fund's operations or the implementation of the MGP's powers under this Agreement, including contracting with contractors, developers, consultants, accountants, legal counsel, other professional advisors and other agents and the payment of their expenses and compensation out of the Fund's assets;

(k) distribute any Cash Available for Distribution or other Fund assets in accordance with this Agreement;

(l) cause the Fund to hold, manage, invest and reinvest any amounts not included in Cash Available for Distribution (whether due to Reserves or otherwise) and other assets during the Investment Period;

(m) collect and receive revenues and income of the Fund;

(n) the formation of, or acquisition of an interest in, and the contribution of property to, any further limited or general partnerships or other relationships that it deems desirable (including, without limitation, the acquisition of interests in, and the contributions of property to any Person in which it has an equity investment from time to time);

(o) control any matters affecting the rights and obligations of the Fund, including the settlement, compromise, submission to arbitration or any other form of dispute resolution, or abandonment of, any claim, cause of action, liability, debt or damages, due or owing to or from the Fund, the commencement or defense of suits, legal proceedings, administrative proceedings, arbitration or other forms of dispute, resolution, and the representation of the Fund in all suits or legal proceedings, administrative proceedings, arbitrations or other forms of dispute resolution, the incurring of legal expense, and the indemnification of any Person against liabilities and contingencies to the extent permitted by law;

(p) subject to Section 7.6(a), determine the fair market value of any Fund property using such reasonable method of valuation as it may adopt;

(q) exercise, directly or indirectly, through any attorney-in-fact acting under a general or limited power of attorney, any right, including the right to vote, appurtenant to any asset or investment held by the Fund;

(r) exercise any of the powers of the MGP enumerated in this Agreement on behalf of any Person in which the Fund does not have an interest pursuant to contractual or other arrangements with such Person;

(s) make, execute or deliver any and all deeds, leases, notes, deeds to secure debt, mortgages, deeds of trust, security agreements, conveyances, contracts, guarantees, warranties, indemnities, waivers, releases or legal instruments or agreements in writing necessary or appropriate in the judgment of the MGP for the accomplishment of any of the powers of the MGP enumerated in this Agreement;

(t) adjust the application of the Incentives in order to comply with the requirement that less than twenty-five percent (25%) of the value of any class of equity of the Fund be held by (A) the Investing Company, plus (B) any Employee Benefit Plan subject to the fiduciary and prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, or the Code; and

(u) cause the Fund to borrow money from any Person, including the MGP or its Affiliates, or to guarantee loans or other extensions of credit; *provided, however,* that the MGP or its Affiliates may charge the Fund a guaranty fee equal to two percent (2%) of the amount guaranteed by the MGP or its Affiliates, if applicable.

Section 7.2 Authorization. Each of the Unitholders agrees that the MGP is authorized to execute, deliver and perform the above-mentioned agreements and transactions on behalf of the Fund without any further act, approval or vote of the Unitholders, notwithstanding any other provision of this Agreement (except as provided in Section 7.4), the Act or any applicable law, rule or regulation, to the fullest extent permitted under the Act or other applicable law. The execution, delivery or performance by the MGP or the Fund of any agreement authorized or permitted under this Agreement shall not constitute a breach by the MGP of any duty that the MGP may owe the Fund or the Unitholders or any other Persons under this Agreement or of any duty stated or implied by law or equity.

Section 7.3 Certificate of Limited Partnership. The MGP has previously filed the Certificate with the Secretary of State of Delaware as required by the Act. The MGP shall use all reasonable efforts to cause to be filed such other certificates or documents as may be reasonable and necessary or appropriate for the formation, continuation, qualification and operation of a limited partnership (or a partnership in which the limited partners have limited liability) in the State of Delaware and any other state, or the District of Columbia, in which the Fund may elect to do business or own property. To the extent that such action is determined by the MGP to be reasonable and necessary

or appropriate, the MGP shall file amendments to and restatements of the Certificate and do all the things to maintain the Fund as a limited partnership (or a partnership in which the limited partners have limited liability) under the laws of the State of Delaware and each other state or the District of Columbia in which the Fund may elect to do business or own property.

Section 7.4 Restrictions on MGP's Authority.

(a) The MGP may not take any action that would amend Section 3.1 of this Agreement without a Majority Consent.

(b) The MGP may not take any action in contravention of an express prohibition or limitation of this Agreement without Majority Consent.

(c) The MGP may not sell, exchange, transfer or otherwise dispose of all or substantially all of the Fund's assets in a single transaction or a series of related transactions (including by way of merger, consolidation or other combination with any other Person) without a Majority Consent; *provided, however*, that such Majority Consent is required only until the third anniversary of the Final Closing Date.

(d) The MGP may not make any loans out of the Fund's moneys to any person or entity affiliated with the MGP or its principals.

(e) The MGP may not, upon termination of the Investment Period, hold Fund moneys outside of a checking, savings or money market account; *provided, however*, that the MGP may cause the Fund to make follow-on investments in any currently-held investment, as of the termination of the Investment Period; *provided, further*, that, within 180 days of the end of the Investment Period, the MGP may cause the Fund to complete transactions (including drilling, completion and work-over costs) only if the Fund was obligated to complete such transactions prior to the termination of the Investment Period.

Section 7.5 Fees and Expenses.

(a) Upon receipt of the Minimum Offering Amount and each subsequent closing, the Fund shall pay CEA (all of which will be paid as a reimbursement to the MGP) an organizational fee equal to three percent (3%) of the aggregate Capital Contributions (the "Organizational Fee"). The Organizational Fee is provided solely as a reimbursement of expenses incurred by the MGP related to the organization of the Fund and syndication of the Units. These expenses include, but are not limited to, legal fees, industry advisory fees, printing costs, marketing costs, administrative expenses and due diligence costs as well as the time and efforts of the MGP. Notwithstanding the foregoing, the Fund may, but is not obligated to pay the Organizational Fee out of funds received from the Investing Company.

(b) The Fund shall pay to the MGP, or CEA on the MGP's behalf, an annual management fee (the "Annual Management Fee") in an amount equal to two and one half percent (2.5%) of the aggregate Capital Contributions for expenses relating to

the provision of investment management services, but not to exceed annually (i) $1,250,000 in the event the MGP elects not to offer the Overallotment, or (ii) $2,500,000 in the event the MGP elects to offer the Overallotment. The Annual Management Fee shall be reduced to one percent (1.0%) of aggregate Capital Contributions upon the earlier of (i) the Carried Interest equaling to thirty percent (30%), or (ii) five (5) years from the Final Closing Date.

(c) The Fund shall pay CEA an annual reimbursement equal to a maximum (per year) of one and one half percent (1.5%) of the aggregate Capital Contributions for expenses incurred in providing management services to the Fund, including overhead expenses (the "Management Expenses").

(d) The Annual Management Fee and Management Expenses will be paid in monthly installments on the last day of each month. The amount of each monthly installment will be equal to the cumulative amounts owed to date, less amounts previously paid for the Annual Management Fee and Management Expenses.

(e) The Fund shall bear and be charged with all other costs and expenses of the Fund's activities and operations, including all Fund Expenses. To the extent any out-of-pocket Fund Expenses are paid by the MGP on behalf of the Fund, the Fund shall reimburse such Fund Expenses. The amount of Fund Expenses to be borne by the Fund is not subject to any maximum amount.

(f) In the event that the Fund incurs Indebtedness, the Investment Manager will be entitled to a one-time one percent (1%) origination fee and a one-time one percent (1%) fee on any drawdown on such Indebtedness (the "Indebtedness Fee"). The Investment Manager shall not be entitled to any Indebtedness Fees for any Indebtedness repaid and thereafter drawn-down again.

(g) In the event the MGP or its Affiliates is required to guarantee any Indebtedness, the MGP or its Affiliates may charge the Fund a one-time guaranty fee equal to two percent (2%) of the amount guaranteed by the MGP or its Affiliates ("Guaranty Fee").

(h) The Fund shall pay the following: (i) commissions to one or more broker-dealers in connection with the sale of the Units in an amount up to seven percent (7%) of the Capital Contributed; *provided, however*, that in the event that an investor contributes $5,000,000 or more to the Fund, then such participating broker-dealer's selling commission shall be reduced from seven percent (7%) to two percent (2%) (the "Commission Reduction"); and (ii) a fee equal to three and three quarters percent (3.75%) of the Capital Contributed paid to the Managing Broker Dealer, some of which will be reallocated to participating broker-dealers. The Commission Reduction will reduce the purchase price of the Unit to $95,000. Any investor eligible for the Commission Reduction will still be entitled to the Major Investor Incentive. An affiliate of the Managing Broker Dealer will also receive one and one-half percent (1.5%) of the ongoing Distributions once the MGP or its successor becomes entitled to receive thirty percent (30%) of the cash available for distribution, which will be allocated from the

Distributions owed to the MGP and not the Unitholders. Unless otherwise indicated, all commissions or fees described in this Section 7.5(h) shall be paid from Capital Contributed to the extent such commissions or fees apply.

(i) Any payments made by the Fund under this Section 7.5 shall be treated as and shall be an expense of the Fund rather than a distribution to a Unitholder.

Section 7.6 Contracts with Affiliate Funds.

(a) Except as expressly permitted by this Agreement, the Fund may acquire or sell oil and gas related assets from or to an Affiliate Fund. The MGP may cause the Fund to engage in such related party transactions on the terms described below and will be deemed to have satisfied its fiduciary obligations to each Unitholder in connection with such related party transactions. In order to satisfy its fiduciary obligations for any transaction with an Affiliate Fund, the MGP has adopted the following policies:

(1) Neither the MGP nor any Affiliate Fund shall sell, transfer or convey any property to or from the Fund, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Unitholders.

(2) If the asset(s) being acquired or sold has a fair market value ("FMV") of greater than $250,000, as determined by the MGP, in its sole discretion, the MGP must either (i) obtain an appraisal by an independent third-party ("Appraisal"), (ii) obtain a valuation from an independent engineering firm ("Reserve Report"), or (iii) compile comparable asset valuations relying in good faith on any other third-party support ("Third Party Compilation"), to determine the FMV of the asset.

(3) If a basket of assets ("Basket") is acquired in a single transaction by an Affiliate Fund or the Fund, as applicable, the MGP, in its sole discretion, may unbundle the Basket and sell the individual assets to an Affiliate Fund or the Fund, as applicable, by establishing the asset values, by (i) Appraisal, (ii) Reserve Report, or (iii) Third-Party Compilation.

(4) If the asset(s) being acquired or sold has a FMV of less than $250,000, as determined by the MGP, in good faith, the MGP may determine FMV using any reasonable method.

(b) The MGP is expressly authorized to enter into, in the name and on behalf of the Fund, a right of first opportunity arrangement and other conflict avoidance agreements with various (1) Affiliate Funds, and (2) Affiliates of each of the (i) MGP; (ii) Fund; or (iii) Investment Manager, on such terms as the MGP, in its sole and absolute discretion, believes are advisable.

(c) The MGP may cause the Fund, without approval of the Unitholders, to issue a preferred class of limited partner interest to Bakken Income Fund LLC, Coachman Energy Land Fund II LP, Bakken Drilling Fund III LP, or Bakken Drilling

Fund IV LP (collectively the "Exchange Funds"), in exchange for the assets of either of the Exchange Funds, as applicable, which include real estate holdings in the Bakken region.

Section 7.7 Other Activities of the MGP and Affiliates of the MGP.

(a) Ability to engage in other activities. Each Unitholder expressly agrees that the MGP, the Investment Manager and their respective Affiliates may engage independently or with others, for its or their own accounts and for the accounts of others, in other business ventures and activities of every nature and description whether such ventures are competitive with the Fund or otherwise. Neither the Fund nor any Unitholder shall have any rights or obligations by virtue of this Agreement in and to such independent ventures and activities or the income and profits derived therefrom.

(b) No obligation to disclose opportunities. The MGP shall not be obligated to disclose to the Fund any particular investment opportunity, whether or not any such opportunity is of a character which could be taken by the Fund.

(c) Parallel Funds. The MGP or its Affiliates may organize, and offer and sell securities of, one or more Parallel Funds. Each Parallel Fund shall (i) make and dispose of each investment in a Project at the same time and on the same terms as the Fund makes and disposes of its corresponding investment in such Project and (ii) make an investment in each Project, and bear expenses related to any investment or prospective investment in a Project, in the same proportion of its aggregate capital commitments available for investment as the portion of the Fund's aggregate capital commitments available for investment that is invested in (or proposed to be invested in) each such Project. From time to time prior to ninety (90) days after the Final Closing Date (and subject to any applicable legal, tax, accounting or regulatory considerations), each Parallel Fund shall purchase from or sell to the Fund or any other Parallel Fund, as applicable, at fair value (calculated pursuant to the Valuation Policy applicable to the Fund and the Parallel Funds), as if the Unitholders and the participants in such Parallel Fund were partners of a single pooled investment vehicle, a portion of any investment in a Project to the extent necessary for the Fund and each Parallel Fund to each own the portion of each investment in a Project that it would own if all investments had been made as of the date of such transfer; provided that the MGP may make any equitable adjustments to such valuation that it believes would be fair or equitable, including to reflect accrued but unpaid interest or dividends, prior distributions made to the Unitholders or participants in a Parallel Fund with respect thereto, and/or the excuse or exclusion of any Unitholder or participant in a Parallel Fund from one or more investments in Projects.

(d) Conflicts of Interest. Each Unitholder acknowledges that there might be situations in which the interest of the Fund may conflict with the interests of the MGP, Investment Manager or their respective Affiliates (the "Management Parties"). In the event of a conflict of interest between the Management Parties, on one hand, and the Fund or any Unitholder, on the other hand, the MGP may choose to resolve such conflict by either (i) obtaining a Majority Consent, (ii) the approval of an Advisory

Committee, or (iii) by an independent third party's determination that the resolution is no less favorable to the Fund than those generally being provided to or available from third parties or is fair and reasonable to the Fund, taking into account the totality of the relationships between the parties involved. Furthermore, each Unitholder agrees that the activities of the Management Parties specifically authorized by or described in this Agreement, or any Ancillary Agreements, may be engaged in by the Management Parties and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty owed by the Management Parties to the Fund or Unitholder.

Section 7.8 Indemnification.

(a) The Fund shall indemnify each Indemnitee from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including, without limitation, attorneys' fees and other legal fees and expenses), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the operations of the Fund as set forth in this Agreement in which such Indemnitee may be involved, or is threatened to be involved, as a party or otherwise, unless it is established that: (i) the act or omission of the Indemnitee was material to the matter giving rise to the proceeding and either was committed in bad faith or was the result of active and deliberate dishonesty; (ii) the Indemnitee actually received an improper personal benefit in money, property or services; or (iii) in the case of any criminal proceeding, the Indemnitee had reasonable cause to believe that the act or omission was unlawful. Without limitation, the foregoing indemnity shall extend to any liability of any Indemnitee, pursuant to a loan guaranty or otherwise, for any Indebtedness of the Fund (including without limitation, any Indebtedness which the Fund has assumed or taken subject to), and the MGP is hereby authorized and empowered, on behalf of the Fund, to enter into one or more indemnity agreements consistent with the provisions of this Section 7.8 in favor of any Indemnitee having or potentially having liability for any such Indebtedness. The termination of any proceeding by judgment, order or settlement does not create a presumption that the Indemnitee did not meet the requisite standard of conduct set forth in this Section 7.8(a) with respect to the subject matter of such proceeding. The termination of any proceeding by conviction of an Indemnitee or upon a plea of nolo contendere or its equivalent by an Indemnitee, or an entry of an order of probation against an Indemnitee prior to judgment, creates a rebuttable presumption that such Indemnitee acted in a manner contrary to that specified in this Section 7.8(a). Any indemnification pursuant to this Section 7.8 shall be made only out of the assets of the Fund, and neither the MGP nor any Unitholder shall have any obligation to contribute to the capital of the Fund or otherwise provide funds, to enable the Fund to fund its obligations under this Section 7.8.

(b) Reasonable expenses incurred by an Indemnitee who is a party to a proceeding may be paid or reimbursed by the Fund in advance of the final disposition of the proceeding upon receipt by the Fund of (i) a written affirmation by the Indemnitee of the Indemnitee's good faith belief that the standard of conduct necessary for indemnification by the Fund as authorized in Section 7.8(a) has been met, and (ii) a

written undertaking by or on behalf of the Indemnitee to repay the amount if it shall ultimately be determined that the standard of conduct has not been met.

(c) The indemnification provided by this Section 7.8 shall be in addition to any other rights to which an Indemnitee or any other Person may be entitled under any agreement, pursuant to any vote of the Unitholders, as a matter of law or otherwise, and shall continue as to an Indemnitee who has ceased to serve in such capacity unless otherwise provided in a written agreement pursuant to which such Indemnitee is indemnified.

(d) The Fund may, but shall not be obligated to, purchase and maintain insurance, on behalf of the Indemnitees and such other Persons as the MGP shall determine, against any liability that may be asserted against or expenses that may be incurred by such Person in connection with the Fund's activities, regardless of whether the Fund would have the power to indemnify such Person against such liability under the provisions of this Agreement.

(e) For purposes of this Section 7.8, the Fund shall be deemed to have requested an Indemnitee to serve as fiduciary of an employee benefit plan whenever the performance by it of its duties to the Fund also imposes duties on, or otherwise involves services by, it to the plan or participants or beneficiaries of the plan; excise taxes assessed on an Indemnitee with respect to an employee benefit plan pursuant to applicable law shall constitute fines within the meaning of Section 7.8; and actions taken or omitted by the Indemnitee with respect to an employee benefit plan in the performance of its duties for a purpose reasonably believed by it to be in the interest of the participants and beneficiaries of the plan shall be deemed to be for a purpose which is not opposed to the best interests of the Fund.

(f) In no event may an Indemnitee subject any of the Unitholders to personal liability by reason of the indemnification provisions set forth in this Agreement.

(g) An Indemnitee shall not be denied indemnification in whole or in part under this Section because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

(h) The provisions of this Section 7.8 are for the benefit of the Indemnitees, their heirs, successors, assigns and administrators and shall not be deemed to create any rights for the benefit of any other Persons. Any amendment, modification or repeal of this Section 7.8 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the Fund's liability to any Indemnitee under this Section 7.8 as in effect immediately prior to such amendment, modification, or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

Section 7.9 Liability of the MGP.

(a) Notwithstanding anything to the contrary set forth in this Agreement, the MGP shall not be liable for monetary damages to the Fund, any Unitholders or any Assignees for losses sustained or liabilities incurred as a result of errors in judgment or of any act or omission if the MGP acted in good faith.

(b) The Unitholders expressly acknowledge that the MGP is acting on behalf of the Fund, and that the MGP is under no obligation to consider the separate interests of the Unitholders (including, without limitation, the tax consequences to Unitholders or Assignees) in deciding whether to cause the Fund to take (or decline to take) any actions, and that the MGP shall not be liable for monetary damages for losses sustained, liabilities incurred, or benefits not derived by Unitholders in connection with such decisions; *provided, that* the MGP has acted in good faith.

(c) Subject to its obligations and duties as MGP set forth in Section 7.1(a) hereof, the MGP may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, including, but not limited to, the Investment Manager and CEA. The MGP shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the MGP in good faith.

(d) Any amendment, modification or repeal of this Section 7.9 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the MGP's liability to the Fund and the Unitholders under this Section 7.9 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

Section 7.10 Other Matters Concerning the MGP.

(a) The MGP may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.

(b) The MGP may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, architects, engineers, environmental consultants and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion of such Persons as to matters which such MGP reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

(c) The MGP shall have the right, in respect of any of its powers or obligations hereunder, to act through any of its duly authorized officers and a duly appointed attorney or attorneys-in-fact. Each such attorney shall, to the extent provided

by the MGP in the power of attorney, have full power and authority to do and perform all and every act and duty which is permitted or required to be done by the MGP hereunder.

Section 7.11 Title to Fund Assets. Title to Fund assets, whether real, personal or mixed and whether tangible or intangible, shall be deemed to be owned by the Fund as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such Fund assets or any portion thereof. Title to any or all of the Fund assets may be held in the name of the Fund, the MGP or one or more nominees, as the MGP may determine, including Affiliates of the MGP. The MGP hereby declares and warrants that any Fund assets for which legal title is held in the name of the MGP or any nominee or Affiliate of the MGP shall be held by the MGP for the use and benefit of the Fund in accordance with the provisions of this Agreement; *provided, however,* that the MGP shall use its best efforts to cause beneficial and record title to such assets to be vested in the Fund as soon as reasonably practicable. All Fund assets shall be recorded as the property of the Fund in its books and records, irrespective of the name in which legal title to such Fund assets is held.

Section 7.12 Reliance by Third Parties. Notwithstanding anything to the contrary in this Agreement, any Person dealing with the Fund shall be entitled to assume that the MGP has full power and authority, without consent or approval of any other Unitholder or Person to encumber, sell or otherwise use in any manner any and all assets of the Fund and to enter into any contracts on behalf of the Fund, and take any and all actions on behalf of the Fund and such Person shall be entitled to deal with the MGP as if the MGP were the Fund's sole party in interest, both legally and beneficially. Each Unitholder hereby waives any and all defenses or other remedies which may be available against such Person to contest, negate or disaffirm any action of the MGP in connection with any such dealing. In no event shall any Person dealing with the MGP or its representatives be obligated to ascertain that the terms of this Agreement have been complied with or to inquire into the necessity or expedience of any act or action of the MGP or its representatives. Each and every certificate, document or other instrument executed on behalf of the Fund by the MGP or its representatives shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i) at the time of the execution and delivery of such certificate, document or instrument, this Agreement was in full force and effect, (ii) the Person executing and delivering such certificate, document or instrument was duly authorized and empowered to do so for and on behalf of the Fund and (iii) such certificate, document or instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon the Fund.

## ARTICLE 8
## RIGHTS AND OBLIGATIONS OF UNITHOLDERS

Section 8.1 Liability of Limited Partners. The Limited Partners shall have no liability in addition to their Capital Contributions except as expressly provided in this Agreement or under the Act.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572605

Section 8.2 Liability of Investor General Partners. Investor General Partners are jointly and severally liable, in addition to their Capital Contributions and together with the MGP, for Fund obligations and liabilities represented by their ownership of interests as general partners, in accordance with the Act, which may include liability for any wrongful acts or omissions of the MGP or the misapplication of money or property of a third party or of the Fund by the MGP acting within the scope of its apparent authority to the extent such acts or omissions are chargeable to the Fund.

Section 8.3 Management of Business. No Unitholder or Assignee (other than the MGP, any of its Affiliates or any officer, director, employee, partner, agent or trustee of the MGP, the Fund or any of their respective Affiliates, in their capacity as such) shall take part in the operation, management or control (within the meaning of the Act) of the Fund's business, transact any business in the Fund's name or have the power to sign documents for or otherwise bind the Fund. The transaction of any such business by the MGP, any of its Affiliates or any officer, director, employee, partner, agent or trustee of the MGP, the Fund or any of their respective Affiliates, in their capacity as such, shall not affect, impair or eliminate the limitations on the liability of the Unitholders or Assignees under this Agreement.

Section 8.4 Return of Capital. No Unitholder shall be entitled to the withdrawal or return of its Capital Contribution, except to the extent of distributions made pursuant to this Agreement or upon termination of the Fund as provided herein. No Unitholder or Assignee shall have priority over any other Unitholder or Assignee either as to the return of Capital Contributions or as to Profits, Losses or Distributions.

Section 8.5 Removal of MGP. The Unitholders may remove the MGP only for "cause" upon approval by a Supermajority (not including the Units held by the MGP or its Affiliates, if any). For the purposes of this section, "cause" shall exist upon the occurrence of the following:

(a) the MGP shall have materially breached this Agreement or shall have committed an act of willful malfeasance, intentional misconduct, a breach of a fiduciary duty or fraud against the Fund (each a "Wrongful Act"); *provided, however,* that the MGP's compliance with Section 7.6(a), if applicable, shall preclude the MGP's action with regard to such transaction from being deemed a Wrongful Act;

(b) the Wrongful Act shall have had a material adverse effect on the business or property of the Fund taken as a whole;

(c) the Unitholders shall have provided the MGP with notice of such Wrongful Act and the Unitholders' intention to remove the MGP pursuant to this section; and

(d) the MGP shall have failed to cure such Wrongful Act within ninety (90) days of receipt of the notice from the Unitholders.

A resigning MGP need not transfer its Carried Interest. A removed MGP will be entitled to be distributed the amount that the removed MGP would have been entitled to receive

if the Fund had sold its assets for their fair market value and repaid its liabilities, including normal and customary transaction costs, immediately prior to the removal. The fair market value of the Fund's assets will be initially determined by the appraisal of an independent third party selected by the removed MGP and such determination will be binding unless the Unitholders object to such determination by a Supermajority Consent. If a sufficient number of Unitholders object to the removed MGP's determination, the fair market value of the assets will be determined as the average of the initial appraisal and an appraisal by an independent appraiser selected by the replacement MGP. The removed MGP will receive this distribution upon the effective date of his removal.

Section 8.6 Rights of Unitholders Relating to the Fund.

(a) In addition to other rights provided by this Agreement or by the Act, each Unitholder, or its designated representative, shall have the right, for a purpose reasonably related to such Unitholder's interest in the Fund, as such purpose is evaluated by the MGP in good faith, upon written demand with a statement of the purpose of such demand and at such Unitholder's own expense (including such copying and administrative charges as the MGP may establish from time to time) to obtain:

(1) a copy of the most recent financial reports of the Fund;

(2) a copy of the Fund's federal, state and local income tax returns for each Fiscal Year;

(3) the current list of the name and last known business, residence or mailing address of each Unitholder (the "Unitholder List"); *provided, however,* that the Unitholder List will only be released to the requesting Unitholder (A) for a purpose related to a demonstrating a Wrongful Act; and (B) upon a showing of evidence reasonably likely to establish that a Wrongful Act has been committed, as each of the foregoing is evaluated by the MGP in good faith;

(4) a copy of this Agreement and the Certificate and all amendments thereto, together with executed copies of all powers of attorney pursuant to which this Agreement, the Certificate and all amendments thereto have been executed; and

(5) true and full information regarding the amount of cash contributed by each Unitholder and which each Unitholder has agreed to contribute in the future, and the date on which each became a Unitholder.

(b) Notwithstanding any other provision of this Section 8.6, the MGP may keep confidential from the Unitholders, for such period of time as the MGP determines in its sole and absolute discretion to be reasonable, any information that (i) the MGP reasonably believes to be in the nature of trade secrets or other information the disclosure of which the MGP in good faith believes is not in the best interests of the Fund or could damage the Fund or its business or (ii) the Fund is required by law or by agreements with an unaffiliated third party to keep confidential.

## ARTICLE 9
## BOOKS, RECORDS, ACCOUNTING AND REPORTS

Section 9.1 Records and Accounting. The MGP shall keep or cause to be kept at the principal office of the Fund those records and documents required to be maintained by the Act and other books and records deemed by the MGP to be appropriate with respect to the Fund's business, including, without limitation, all books and records necessary to provide to the Unitholders any information, lists and copies of documents required to be provided pursuant to Section 9.3 hereof. Any records maintained by or on behalf of the Fund in the regular course of its business may be kept on, or be in the form of, punch cards, magnetic tape, photographs, micrographics or any other information storage device; *provided*, *that* the records so maintained are convertible into clearly legible written form within a reasonable period of time. The books of the Fund shall be maintained, for financial and tax reporting purposes, on an accrual basis in accordance with generally accepted accounting principles, or such other basis as the MGP determines to be necessary or appropriate.

Section 9.2 Fiscal Year. The fiscal year of the Fund shall be the calendar year.

Section 9.3 Reports.

(a) The accounts of the Fund will be audited (at the expense of the Fund) as of the close of each fiscal year, beginning with an audit for the fiscal year ending 2015, by an independent nationally or regionally recognized public accounting firm selected by the MGP in its sole and absolute discretion.

(b) The MGP will cause to be prepared and furnished to each Unitholder, at the Fund's expense, within sixty (60) days of the end of each calendar quarter each of: (A) an unaudited quarterly financial statement and (B) drilling, completion, and production reports. As soon as practicable after the end of the Fiscal Year, the MGP will provide the Unitholders with financial statements, all tax information relating to the Fund, including Schedule K-1s, and any other information that the MGP finds to be materially relevant to the Unitholders.

## ARTICLE 10
## TAX MATTERS

Section 10.1 Preparation of Tax Returns. The MGP shall arrange for the preparation and timely filing of all returns of Fund income, gains, deductions, losses and other items required of the Fund for federal and state income tax purposes and shall use all reasonable efforts to furnish, within ninety (90) days of the close of each taxable year, the tax information reasonably required by Unitholders for federal and state income tax reporting purposes.

Section 10.2 Tax Elections. Except as otherwise provided herein, the MGP shall, in its sole and absolute discretion, determine whether to make any available election pursuant to the Code. The MGP shall have the right to seek to revoke any such election (including, without limitation, the election under Section 754 of the Code) upon