the MGP's determination in its sole and absolute discretion that such revocation is in the best interests of the Unitholders.

Section 10.3 Tax Matters Partner.

(a) The MGP shall be the "tax matters partner" of the Fund for federal income tax purposes. Pursuant to Section 6230(e) of the Code, upon receipt of notice from the IRS of the beginning of an administrative proceeding with respect to the Fund, the tax matters partner shall furnish the IRS with the name, address, taxpayer identification number, and profit interest of each of the Unitholders and the Assignees; *provided, however,* that such information is provided to the Fund by the Unitholders and the Assignees.

(b) The tax matters partner is authorized, but not required:

(1) to enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Fund items required to be taken into account by a Unitholder for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the tax matters partner may expressly state that such agreement shall bind all Unitholders, except that such settlement agreement shall not bind any Unitholder (i) who (within the time prescribed pursuant to the Code and Regulations) files a statement with the IRS providing that the tax matters partner shall not have the authority to enter into a settlement agreement on behalf of such Unitholder or (ii) who is a "notice partner" (as defined in Section 6231(a)(8) of the Code) or a member of a "notice group" (as defined in Section 6223(b)(2) of the Code);

(2) in the event that a notice of a final administrative adjustment at the Fund level of any item required to be taken into account by a Unitholder for tax purposes (a "final adjustment") is mailed to the tax matters partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the filing of a complaint for refund with the United States Claims Court or the District Court of the United States for the district in which the Fund's principal place of business is located;

(3) to intervene in any action brought by any other Unitholder for judicial review of a final adjustment;

(4) to file a request for an administrative adjustment with the IRS and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request;

(5) to enter into an agreement with the IRS to extend the period for assessing any tax which is attributable to any item required to be taken account by a Unitholder for tax purposes, or an item affected by such item; and

(6) to take any other action on behalf of the Unitholders of the Fund in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(c) The taking of any action and the incurring of any expense by the tax matters partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the tax matters partner and the provisions relating to indemnification of the MGP set forth in Section 7.8 of this Agreement shall be fully applicable to the tax matters partner in its capacity as such.

(d) The tax matters partner shall receive no compensation for its services. All third party costs and expenses incurred by the tax matters partner in performing its duties as such (including legal and accounting fees and expenses) shall be borne by the Fund. Nothing herein shall be construed to restrict the Fund from engaging an accounting firm to assist the tax matters partner in discharging its duties hereunder, so long as the compensation paid by the Fund for such services is reasonable.

Section 10.4 Organizational Fee. The MGP shall have the discretion to determine whether the Fund will capitalize or elect to deduct and amortize the Organizational Fee.

Section 10.5 Withholding. Each Unitholder hereby authorizes the Fund to withhold from or pay on behalf of or with respect to such Unitholder any amount of federal, state, local, or foreign taxes that the MGP determines that the Fund is required to withhold or pay with respect to any amount distributable or allocable to such Unitholder pursuant to this Agreement, including, without limitation, any taxes required to be withheld or paid by the Fund pursuant to Sections 1441, 1442, 1445, or 1446 of the Code. Any amount paid on behalf of or with respect to a Unitholder shall constitute a loan by the Fund to such Unitholder, which loan shall be repaid by such Unitholder within fifteen (15) days after notice from the MGP that such payment must be made unless (i) the Fund withholds such payment from a distribution which would otherwise be made to the Unitholder or (ii) the MGP determines, in its sole and absolute discretion, that such payment may be satisfied out of the available moneys of the Fund which would, but for such payment, be distributed to the Unitholder. Any amounts withheld pursuant to the foregoing clauses (i) or (ii) shall be treated as having been distributed to such Unitholder. Each Unitholder hereby unconditionally and irrevocably grants to the Fund a security interest in such Unitholder's Percentage Interest to secure such Unitholder's obligation to pay to the Fund any amounts required to be paid pursuant to this Section 10.5. In the event that a Unitholder fails to pay any amounts owed to the Fund pursuant to this Section 10.5 when due, the MGP may, in its sole and absolute discretion, elect to make the payment to the Fund on behalf of such defaulting Unitholder, and in such event shall be deemed to have loaned such amount to such defaulting Unitholder and shall succeed to all rights and remedies of the Fund as against such defaulting Unitholder. Without limitation, in such event the MGP shall have the right to receive distributions that would otherwise be distributable to such defaulting Unitholder until such time as such loan, together with all interest thereon, has been paid

in full, and any such distributions so received by the MGP shall be treated as having been distributed to the defaulting Unitholder and immediately paid by the defaulting Unitholder to the MGP in repayment of such loan. Any amounts payable by a Unitholder hereunder shall bear interest at the lesser of (A) the base rate on corporate loans at large United States money center commercial banks, as published from time to time in the Wall Street Journal, plus four (4) percentage points, or (B) the maximum lawful rate of interest on such obligation, such interest to accrue from the date such amount is due (i.e., fifteen (15) days after demand) until such amount is paid in full. Each Unitholder shall take such actions as the Fund or the MGP shall request in order to perfect or enforce the security interest created hereunder.

## ARTICLE 11
## TRANSFERS AND WITHDRAWALS

Section 11.1 Transfer. No Unit shall be transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Article 11. Any Transfer or purported Transfer of a Unit not made in accordance with this Article 11 shall be null and void.

Section 11.2 Transfer of Units of MGP Interest. The MGP may not transfer any of its MGP Interest or withdraw as MGP except as provided in Section 11.2. The MGP may transfer all or any part of its MGP Interest (i) at any time to any Person who is the MGP's Affiliate, (ii) at any time involuntarily by operation of law, or (iii) to any Person who is approved by the MGP and a Majority. Notwithstanding the foregoing, the MGP may sell its Carried Interest at any time, without the Consent of the Unitholders.

Section 11.3 Transfer of Units.

(a) A Unitholder may Transfer some or all of his Units only if the Transfer:

(1) is to the Fund;

(2) is to an Affiliate of the Unitholder;

(3) is to an existing Unitholder;

(4) is a gift made by a Unitholder to a member of such transferor Unitholder's Immediate Family, including a trust for the benefit of such member of the Unitholder's Immediate Family, whether such Transfer is made prior to the death of the Unitholder or upon the death of the Unitholder and whether made pursuant to the explicit written direction of the Unitholder or according to the operation of laws of descent; or

(5) receives the approval of the MGP.

Notwithstanding a Transfer made in reliance upon (1) – (4) above, the Units in the hands of the Assignee must remain subject to the same restrictions on Transfer as they



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572611

were when held by the transferor. These Transfer restrictions will also apply to (i) any Units transferred by Unitholders to subsequent holders; (ii) any Units subsequently issued by the Fund; and (iii) any Units issued pursuant to any options, warrants or convertible securities.

(b) Transfers made in accordance with this Section 11.3 shall not be effective until such date as specified in a notice delivered to the MGP, which date must be at least ten (10) days subsequent to the date of the delivery of such notice.

Section 11.4 Permitted Transfers. A Unitholder may Transfer all or any portion of his Units, subject to the following conditions precedent (any Transfer of such Units satisfying either Section 11.3 or the conditions precedent set forth in this Section 11.4 (a "Permitted Transfer"), and such conditions precedent may be waived by the MGP, in its sole and absolute discretion:

(a) Subject to Section 11.3, no Unitholder shall Transfer any or all of his Units (solely for purposes of this Section, the "Selling Holder") to any person, trust, association, company, firm, partnership, corporation or other entity without first giving written notice of such intended Transfer to the MGP of the number and type of Units he proposes to dispose of (for purposes of this Section 11.4(a), the "Offered Units") and the nature and terms of the proposed Transfer. Such notice shall be given in the manner provided in Section 16.1 hereof. The notice shall be deemed to constitute an offer to sell the Offered Units to the MGP on the terms set forth in the notice. The MGP shall have fifteen (15) days from the date the offer is deemed to have been given by the Selling Holder to indicate in writing to the Selling Holder its decision as to whether it will purchase all or any of the Offered Units. In the event that the Selling Holder's offer made pursuant to this Section 11.4(a) is accepted by the MGP, the closing of the purchase of the Offered Units, or any portion thereof by the MGP shall occur within ten (10) days after the notice of acceptance of such offer is given by the MGP in accordance with Section 11.4(a) hereof. The MGP shall make payment of the purchase price of the Offered Units in the manner specified in the notice of sale.

(b) If the MGP does not purchase all of the Offered Units pursuant to this Section 11.4, the Selling Holder shall be free to Transfer the Offered Units, or any portion thereof not purchased by the MGP; *provided, however,* that:

(1) the Transfer by the Selling Holder pursuant hereto shall be made in strict accordance with the terms of the proposed sale described in the offer made to the MGP, and such Transfer shall be consummated within ten (10) days from the expiration of the time in which the MGP could have accepted the Selling Holder's offer to purchase pursuant to Section 11.4(a) hereof. After the expiration of such ten (10) day period, all of the Selling Holder's Units shall again be subject to the provisions of this Agreement as though the offer under Section 11.4(a) hereof had not been made. Any Unit which is transferred pursuant to Section 11.4(a) shall remain subject to the provisions of this Agreement as if the Selling Holder remained the holder of such Unit;



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572612

(2) no such Transfer shall be made which, in the opinion of counsel to the Fund, would result in the Fund being considered to have been terminated for purposes of Section 708 of the Code or would result in material adverse federal income tax consequences to the Fund or its Unitholders;

(3) the Fund shall not be required to recognize any such Transfer until the instrument conveying such interest has been delivered to the MGP for recordation on the books of the Fund; and

(4) unless an Assignee becomes a Substituted Unitholder in accordance with the provisions set forth in Section 11.6, he shall not be entitled to any of the rights granted to a Unitholder hereunder, other than the right to receive all or part of the share of the Profits, Losses, income, gain, cash distributions or returns of capital to which his Selling Holder would otherwise be entitled.

(c) The Selling Holder shall furnish to the Fund an opinion of counsel, which counsel and opinion shall be satisfactory to the Fund, that the Transfer will not cause the Fund to terminate for federal income tax purposes and that such Transfer will not cause the application of the rules of Code Sections 168(g)(1)and 168(h) (generally referred to as the "tax-exempt entity leasing rules") or similar rules to apply to Fund, property of the Fund, or the Unitholders.

(d) The Selling Holder and Assignee shall furnish the Fund with the Assignee's taxpayer identification number and sufficient information to determine the Assignee's initial tax basis in the Units transferred.

(e) Either (A) such Units shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (B) the Selling Holder shall provide an opinion of counsel, which opinion and counsel shall be satisfactory to the MGP, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the transfer of securities.

(f) The transferor shall have obtained the MGP's written consent to such Transfer.

Section 11.5 Rights of Assignees. An Assignee shall be entitled only to allocations and distributions with respect to such Units in accordance with this Agreement, but shall have no right to any information or accounting of the affairs of the Fund, shall not be entitled to inspect the books or records of the Fund, and shall not have any of the rights of a MGP or a Unitholder under the Act or the Agreement.

Section 11.6 Admission of Assignees as Unitholders. Subject to the other provisions of Article 11, an Assignee may be admitted to the Fund as a Substituted Unitholder only upon satisfaction of the conditions set forth below in this Section 11.6:

(a) The MGP consents to such admission;

(b) The Units with respect to which the Assignee is being admitted were acquired by means of a Permitted Transfer;

(c) The Assignee becomes a party to this Agreement as a Unitholder and executes such documents and instruments as the MGP may reasonably request (including, without limitation, amendments to the Certificate) as may be necessary or appropriate to confirm such Assignee as a Unitholder in the Fund and such Assignee's agreement to be bound by the terms and conditions hereof;

(d) The Assignee pays or reimburses the Fund for all reasonable legal, filing, certification costs that the Fund incurs in connection with the admission of the Assignee as a Substituted Unitholder with respect to the Offered Units; and

(e) If the Assignee is not an individual of legal majority, the Assignee provides the Fund with evidence satisfactory to counsel for the Fund of the authority of the Assignee to become a Unitholder and to be bound by the terms and conditions of this Agreement.

Section 11.7 Conversion of Investor General Partners into Limited Partners.

(a) As provided in this Section 11.7, at their sole discretion, each Investor General Partner may elect to convert, transfer and exchange its Investor General Partner Interest into and for a Limited Partner Interest. An Investor General Partner may exercise such election by sending written notice thereof to the MGP.

(b) Upon the determination of the MGP, in its sole discretion, the Investor General Partners shall convert, transfer and exchange all of the Investor General Partners Interests into and for Limited Partners Interests.

(c) The MGP shall cause the conversion, transfer and exchange to be effected as promptly as possible as prudent business judgment dictates by taking such actions to effect such conversion, transfer and exchange as the MGP determines to be required by this Agreement and applicable law. Conversion of an Investor General Partner to a Limited Partner shall be conditioned upon a finding by the MGP that such conversion will not have an adverse effect, tax or otherwise, on the Investor General Partners or the Fund. Upon such conversion, transfer and exchange, such Investor General Partners shall be Limited Partners; however, they will remain liable to the Fund for any additional Capital Contribution(s) required for their proportionate share of any Fund obligation or liability arising prior to the conversion.

(d) A Limited Partner may not convert, transfer or exchange its Limited Partner Interest for an Investor General Partner Interest.

(e) The MGP shall notify all Investor General Partners at least thirty (30) days prior to any material change in the amount of the Fund's insurance coverage.

Section 11.8 Representations. Each Unitholder hereby covenants and represents to the Fund for the benefit of the Fund and all Unitholders, that (i) he is not

currently making a market in Units, and (ii) he will not Transfer or attempt to Transfer any Unit on an established securities market or a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (any regulation, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published thereunder). Each Unitholder further agrees that he will not Transfer any Unit to any Person unless such Person agrees to be bound by this Section 11.8 and to Transfer such Units only to Persons who agree to be similarly bound.

Section 11.9 General Provisions.

(a) No Unitholder may withdraw from the Fund other than as a result of a Permitted Transfer of all of such Unitholder's Units in accordance with this Article 11.

(b) Any Unitholder who Transfers all of its Units in a Permitted Transfer pursuant to this Article 11 shall cease to be a Unitholder upon the admission of all Assignees as Substituted Unitholders.

(c) Transfers pursuant to this Article 11 may only be made on the first day of a month, unless the MGP otherwise agrees; *provided, however*, that a Transfer of Units pursuant to exercise of rights by a secured party in connection with a pledge of such Units may occur at any time.

## ARTICLE 12
## ADMISSION OF PARTNERS

Section 12.1 Admission of Successor MGP. A successor to all of the MGP Interest pursuant to Section 11.2 hereof who is proposed to be admitted as a successor MGP shall be admitted to the Fund as the MGP, effective upon such transfer. Any such successor MGP shall carry on the business of the Fund without dissolution. In each case, the admission shall be subject to the successor MGP executing and delivering to the Fund an acceptance of all of the terms and conditions of this Agreement and such other documents or instruments as may be required to effect the admission.

Section 12.2 Admission of Additional Unitholders.

(a) A Person who makes a Capital Contribution to the Fund in accordance with this Agreement shall be admitted to the Fund as an Additional Unitholder only upon furnishing to the MGP: (i) evidence of acceptance, in form satisfactory to the MGP, of all of the terms and conditions of this Agreement, including, without limitation, the power of attorney granted in Section 2.4 hereof; and (ii) such other documents or instruments as may be required in the discretion of the MGP in order to effect such Person's admission as an Additional Unitholder.

(b) Notwithstanding anything to the contrary in this Section 12.2, no Person shall be admitted as an Additional Unitholder without the consent of the MGP, which consent may be given or withheld in the MGP's sole and absolute discretion. The



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572615

admission of any Person as an Additional Unitholder shall become effective on the date upon which the name of such Person is recorded on the books and records of the Fund, following the Consent of the MGP to such admission.

Section 12.3 Amendment of Agreement and Certificate of Limited Partnership. For the admission to the Fund of any Unitholder, the MGP shall take all steps necessary and appropriate under the Act to amend the records of the Fund and, if necessary, to prepare as soon as practical an amendment of this Agreement (including an amendment of Exhibit A) and, if required by law, shall prepare and file an amendment to the Certificate and may for this purpose exercise the power of attorney granted pursuant to Section 2.4 hereof.

## ARTICLE 13
## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 13.1 Dissolution. The Fund shall not be dissolved by the admission of Substituted Unitholders or Additional Unitholders or by the admission of a successor MGP in accordance with the terms of this Agreement. Upon the withdrawal of the MGP, any successor MGP shall continue the business of the Fund. The Fund shall dissolve, and its affairs shall be wound up, upon the first to occur of any of the following ("Liquidating Events"):

(a) a Majority Consent; *provided, however*, that such Majority Consent is required only until the third (3rd) anniversary of the Final Closing Date;

(b) the sale, exchange, transfer or otherwise dispose of all or substantially all of the Fund's assets in a single transaction or a series of related transactions (including by way of merger, consolidation or other combination with any other Person), subject to Section 7.4(c);

(c) the Consent of the MGP;

(d) if the Fund has a limited duration, then upon the expiration of the term of the Fund, and thereafter the MGP may dissolve the Fund without Consent of the Unitholders;

(e) any event under applicable law requiring dissolution; or

(f) an event of withdrawal (including by resignation, removal, Bankruptcy or dissolution or its equivalent) of the MGP, unless, within ninety (90) days after such event of withdrawal a Majority agrees in writing to continue the business of the Fund and to the appointment, effective as of the date of withdrawal, of a successor MGP.

Section 13.2 Winding Up.

(a) Upon the occurrence of a Liquidating Event, the Fund shall continue solely for the purposes of winding up its affairs in an orderly manner,

liquidating its assets, and satisfying the claims of its creditors and Unitholders. No Unitholder shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Fund's business and affairs. The MGP, or, in the event there is no remaining MGP, any Person elected by a Majority vote (the MGP or such other Person being referred to herein as the "Liquidator"), shall be responsible for overseeing the winding up and dissolution of the Fund and shall take full account of the Fund's liabilities and property and the Fund property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom shall be applied and distributed in the following order:

(1) First, to the payment and discharge of all of the Fund's debts and liabilities to creditors other than the Unitholders;

(2) Second, to the payment and discharge of all of the Fund's debts and liabilities to the MGP;

(3) Third, to the payment and discharge of all of the Fund's debts and liabilities to the other Unitholders; and

(4) Fourth, to the Unitholders based on their relative Percentage Interests until each Unitholder has received an amount equal to the excess, if any, of (i) the cumulative Preferred Return for such Unitholder to the date such distribution is made, over (ii) the sum of all prior distributions to the Unitholders pursuant to Section 5.1(a) and this Section 13.2(a)(4); *provided, however,* that no distribution will be made pursuant to this Section 13.2(a)(4) that creates or increases a Capital Account deficit for any Unitholder that exceeds such Unitholder's obligation to restore such deficit, determined as follows: distributions shall first be determined tentatively pursuant to this Section 13.2(a)(4) without regard to the Unitholders' Capital Accounts, and then the allocation provisions of Article 6 shall be applied tentatively as if such tentative distributions had been made; if any Unitholder shall thereby have a Capital Account that exceeds the Unitholder's obligation to restore such deficit, the actual distribution to such Unitholder pursuant to this Section 13.2(a)(4) shall be equal to the tentative distribution to such Unitholder less the amount of the excess to such Unitholder; and

(5) The balance, if any, to the MGP and Unitholders in accordance with their relative Capital Account balances, after giving effect to all contributions, distributions, adjustments, and allocations for all periods.

Prior to the foregoing distributions, the MGP shall have made adjustments to Capital Accounts of the Partners to reflect the fair market value of the Fund assets as of the date of the Fund's liquidation in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(f).

The MGP shall not receive any additional compensation for any services performed pursuant to this Article 13.

(b) Notwithstanding the provisions of Section 13.2(a) hereof, which require liquidation of the assets of the Fund, if prior to or upon dissolution of the Fund,

the Liquidator determines that an immediate sale of part or all of the Fund's assets would be impractical or would cause undue loss to the Unitholders, the Liquidator may, in its sole and absolute discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Fund (including to those Unitholders as creditors) and/or distribute to the Unitholders, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.2(a) hereof, undivided interests in such Fund assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be made only if, in the good faith judgment of the Liquidator, such distributions in kind are in the best interest of the Unitholders, and shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operation of such properties at such time. The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

(c) In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the MGP and Unitholders pursuant to this Article 13 may be:

(1) distributed to a trust established for the benefit of the MGP and Unitholders for the purposes of liquidating Fund assets, collecting amounts owed to the Fund, and paying any contingent or unforeseen liabilities or obligations of the Fund or of the MGP arising out of or in connection with the Fund. The assets of any such trust shall be distributed to the MGP and Unitholders from time to time, in the reasonable discretion of Liquidator, in the same proportions as the amount distributed to such trust by the Fund would otherwise have been distributed to the MGP and Unitholders pursuant to this Agreement; or

(2) withheld or escrowed to provide a reasonable reserve for Fund liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Fund; *provided, that* such withheld or escrowed amounts shall be distributed to the MGP and Unitholders in the manner and order of priority set forth in Section 13.2(a) as soon as practicable.

Section 13.3 Compliance with Timing Requirements of Regulations. In the event the Fund is "liquidated" within the meaning of Regulations Section 1.704-l(b)(2)(ii)(g), distributions shall be made pursuant to this Article 13 to the MGP and Unitholders who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Unitholder has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Unitholder shall have no obligation to make any capital contribution to the Fund with respect to such deficit, and such deficit shall not be considered a debt owed to the Fund or to any other Person for any purpose whatsoever.

Section 13.4 Deemed Contribution and Distribution. Notwithstanding any other provision of this Article 13, in the event the Fund is considered "liquidated" within the

meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but no Liquidating Event has occurred, the Fund's property shall not be liquidated, the Fund's liabilities shall not be paid or discharged, and the Fund's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Fund shall be deemed to have contributed all Fund property and liabilities to a new partnership in exchange for an interest in such new partnership and, immediately thereafter, the Fund will be deemed to liquidate by distributing such interests to the new partnership to the Unitholders in accordance with their Percentage Interests pursuant to Article 6.

Section 13.5 Rights of Unitholders. Except as otherwise provided in this Agreement, each Unitholder shall look solely to the assets of the Fund for the return of its Capital Contributions and shall have no right or power to demand or receive property other than cash from the Fund.

Section 13.6 Notice of Dissolution. In the event a Liquidating Event occurs or an event occurs that would result in a dissolution of the Fund, the MGP shall, within thirty (30) days thereafter, provide written notice thereof to each of the Unitholders.

Section 13.7 Termination of Fund and Cancellation of Certificate of Limited Partnership. Upon the completion of the liquidation of the Fund cash and property as provided in Section 13.2 hereof, the Fund shall be terminated, a certificate of cancellation shall be filed, and all qualifications of the Fund as a foreign limited partnership in jurisdictions other than the State of Delaware shall be canceled and such other actions as may be necessary to terminate the Fund shall be taken.

Section 13.8 Reasonable Time for Winding-Up. A reasonable time shall be allowed for the orderly winding-up of the business and affairs of the Fund and the liquidation of its assets pursuant to Section 13.2 hereof, in order to minimize any losses otherwise attendant upon such winding-up, and the provisions of this Agreement shall remain in effect between the Unitholders during the period of liquidation.

Section 13.9 Waiver of Partition. Each Unitholder hereby waives any right to partition of the Fund property.

## ARTICLE 14
## AMENDMENT OF PARTNERSHIP AGREEMENT; MEETINGS

Section 14.1 Amendments.

(a) Amendments to this Agreement may be proposed by the MGP or by a Majority. Following such proposal, the MGP shall submit any proposed amendment to the Unitholders. The MGP shall seek the written vote of the Unitholders on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. For purposes of obtaining a written vote, the MGP may require a response within a reasonable specified time, but not less than fifteen (15) days, and failure to respond in such time period shall constitute a vote which is consistent with the MGP's recommendation with respect to the proposal. Except as

provided in Section 14.1(b), 14.1(c) or 14.1(d), a proposed amendment shall be adopted and be effective as an amendment hereto if it is approved by the MGP and a Majority.

(b) Notwithstanding Section 14.1(a), the MGP shall have the power, without the consent of the Unitholders, to amend this Agreement as may be required to facilitate or implement any of the following purposes:

(1) to add to the obligations of the MGP or surrender any right or power granted to the MGP or any Affiliate of the MGP for the benefit of the Unitholders;

(2) to reflect the admission, substitution, termination, or withdrawal of Unitholders in accordance with this Agreement;

(3) to reflect a change that is of an inconsequential nature and does not adversely affect the Unitholders in any material respect, or to cure any ambiguity, correct or supplement any provision in this Agreement not inconsistent with law or with other provisions, or make other changes with respect to matters arising under this Agreement that will not be inconsistent with law or with the provisions of this Agreement;

(4) to satisfy any requirements, conditions, or guidelines contained in any order, directive, opinion, ruling or regulation of a federal or state agency or contained in federal or state law;

(5) accommodate investments in the Fund by employee benefit plans through group trusts or other investment vehicles;

(6) accommodate the creation of investment entities and alternative investment vehicles; and

(7) increase the likelihood that the Fund will not be treated as a publicly traded partnership.

The MGP shall provide notice to the Unitholders when any action under this Section 14.1(b) is taken.

(c) Notwithstanding Section 14.1(a) and 14.1(b) hereof, this Agreement shall not be amended without the Consent of each Unitholder adversely affected if such amendment would (i) convert a Limited Partner's interest in the Fund into a general partner interest, (ii) modify the limited liability of a Limited Partner in a manner adverse to such Limited Partner, (iii) alter rights of the Unitholder to receive distributions pursuant to Article 5, or the allocations specified in Article 6, (iv) cause the termination of the Fund prior to the time set forth in Section 13, or (v) amend this Section 14.1(c). Further, no amendment may alter (A) the restrictions on the MGP's authority set forth in Section 7.4 without the Consent specified in the particular Subsection proposed to be amended; or (B) Sections 7.9 or 7.10 without a Supermajority Consent.

(d) Notwithstanding Section 14.1(a) or Section 14.1(b) hereof, the MGP shall not amend Sections 7.7, 11.2 or 14.2 without a Majority Consent.

Section 14.2 Meetings of the Unitholders.

(a) Meetings of the Unitholders may be called by the MGP and shall be called upon the receipt by the MGP of a written request by a Majority. The call shall state the nature of the business to be transacted. Notice of any such meeting shall be given to all Unitholders not less than five (5) days nor more than thirty (30) days prior to the date of such meeting. Unitholders may vote in person or by proxy at such meeting. Whenever the vote or Consent of the Unitholders is permitted or required under this Agreement, such vote or Consent may be given at a meeting of the Unitholders or may be given in accordance with the procedure prescribed in Section 14.1(a) hereof. Except as otherwise expressly provided in this Agreement, a Majority Consent shall control.

(b) Any action required or permitted to be taken at a meeting of the Unitholders may be taken without a meeting if a written Consent setting forth the action so taken is signed by a Majority (or such other percentage expressly required by this Agreement). Such Consent may be in one instrument or in several instruments, and shall have the same force and effect as a vote of a Majority (or such other percentage expressly required by this Agreement). Such Consent shall be filed with the MGP. An action so taken shall be deemed to have been taken at a meeting held on the effective date so certified.

(c) Each Unitholder may authorize any Person or Persons to act for him by proxy on all matters in which a Unitholder is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Unitholder or his attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Unitholder executing it, such revocation to be effective upon the Fund's receipt of or written notice such revocation from the Unitholder executing such proxy.

(d) Each meeting of Unitholders shall be conducted by the MGP or such other Person as the MGP may appoint pursuant to such rules for the conduct of the meeting as the MGP or such other Person deems appropriate.

## ARTICLE 15

## ADVISORY COMMITTEE

Section 15.1 Establishment. The Fund may have a committee or committees (each, an "Advisory Committee") appointed by the MGP to (i) advise the MGP on such matters related to the Fund as the MGP may request such advice and (ii) review and recommend or not recommend the resolution of any conflict of interest related to the Fund that may be presented to the Advisory Committee; *provided, however*, that any investment decisions made on behalf of the Fund by the Investment Manager, will not be subject to review by any such Advisory Committee. The Advisory Committee may

be designated as either a binding or non-binding authority. If the advice and decisions of an Advisory Committee are non-binding, the failure to follow such advice or decisions shall not be evidence of fraud, deceit, gross negligence, willful misconduct or wrongful taking or violation of any duty (fiduciary or otherwise) of the MGP. Notwithstanding the foregoing or anything contained herein to the contrary, in the event the Advisory Committee fails to render a decision to recommend or not recommend any item presented under clause (ii) of the first sentence of this Section 15.1 within thirty (30) days after notice with respect thereto from the MGP, the Advisory Committee shall be deemed to have recommended the applicable item for purposes of this Agreement. Upon the formation of any Advisory Committee, the MGP shall provide notice of such formation to the Unitholders.

Section 15.2 Composition. Any Advisory Committee shall consist of at least three (3) representatives selected by the MGP, in its sole and absolute discretion. Such representatives need not be Unitholders. The MGP shall seek to appoint representatives that have relevant knowledge and experience in matters which affect the Fund. Neither the MGP nor any principal of the MGP will be a member of the Advisory Committee, and no more than one (1) Advisory Committee member shall be an Affiliate of the MGP. An Advisory Committee shall act by the majority in number of its members. Any member of the Advisory Committee may resign by giving the MGP thirty (30) days' prior notice. In the event a vacancy in the Advisory Committee results in the Advisory Committee consisting of less than three (3) representatives, the MGP shall promptly appoint a new representative to the Advisory Committee, taking into account the foregoing provisions of this Section 15.2.

Section 15.3 Meetings; Compensation. Meetings of the Advisory Committee shall be held as necessary upon the written request of the MGP (which request may be sent by e-mail) or as reasonably proposed in writing by any member of the Advisory Committee and may be attended by use of equipment that allows all individuals participating in the meeting to hear and speak to each other. No compensation shall be paid by the Fund to members of the Advisory Committee who are Unitholders or Affiliates of the MGP. Members of the Advisory Committee who are not Unitholders or Affiliates of the MGP may receive compensation as determined by the MGP. Additionally, reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee will be reimbursed by the Fund. The MGP or its designated representative may attend any meeting of the Advisory Committee. Notice of any meeting of the Advisory Committee shall be given to each representative of the Advisory Committee and the MGP no later than five (5) days prior to the date of such meeting but advance notice may be waived by the Person entitled thereto.

## ARTICLE 16
## GENERAL PROVISIONS

Section 16.1 Addresses and Notice. Any notice, demand, request or report required or permitted to be given or made to a Unitholder or Assignee under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class United States mail or by other means of written

communication to the Unitholder or Assignee at the address set forth in Exhibit A or such other address of which the Unitholder shall notify the MGP in writing.

Section 16.2 Titles and Captions. All article or section titles or captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

Section 16.3 Pronouns and Plurals. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 16.4 Further Action. The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 16.5 Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

Section 16.6 Creditors. Other than as expressly set forth herein with respect to the Indemnitees, none of the provisions of this Agreement shall be for the benefit of, or shall be enforceable by, any creditor of the Fund.

Section 16.7 Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

Section 16.8 Counterparts. This Agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing its signature hereto.

Section 16.9 Applicable Law. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

Section 16.10 Invalidity of Provisions. If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

Section 16.11 Arbitration. The Unitholders, the Fund and MGP (collectively, the "Parties" or individually, a "Party") covenant and agree that in the event of any dispute, controversy or other claim between them arising out of, relating to or in

connection with this Agreement or the Fund or its organization, formation, business or management (a "Dispute"), the Parties shall use their best efforts to resolve such Dispute by good-faith negotiation and mutual agreement. However, in the event that the Parties are unable to resolve any Dispute as set forth above, the Parties agree that such Dispute shall be determined and settled in binding arbitration in the County of Denver, State of Colorado, in accordance with the Commercial Arbitration Rules and Procedures of the American Arbitration Association (the "AAA"). In no event shall the results of any mediation proceeding be admissible in any arbitration or judicial proceeding.

In the event that a Party does not reasonably believe that a Dispute may be resolved by good-faith negotiation and mutual agreement in a timely manner, such aggrieved Party shall provide a written "Notice of Intent to Arbitrate" to the other Parties. The Notice of Intent to Arbitrate shall include a description of the nature of the Dispute to be resolved. The Parties shall use reasonable efforts to choose a mutually agreeable arbitrator (the "Arbitrator") within five (5) working days after receipt of the Notice of Intent to Arbitrate. If the Parties are unable or otherwise do not choose a mutually acceptable Arbitrator within such five (5) working day period after receipt of the Notice of Intent to Arbitrate, then the Parties shall request AAA to select the Arbitrator promptly.

The Arbitrator so chosen shall commence deliberations no later than ten (10) calendar days following selection. Each of the Parties is required to disclose all information relevant to the disputed facts that are alleged, which disclosure is intended to accelerate the exchange of basic information concerning the Dispute and eliminate and/or at least reduce the need for further discovery. The Parties are required to disclose information about witnesses, documents, damages and insurance policies which relate to the Dispute. Upon request, the Arbitrator or arbitration panel may allow depositions; *provided, that* they can be scheduled and completed within a twenty (20) calendar day period of time. Copies of all pertinent written documents prepared by each Party shall be forwarded to the Arbitrator and to the other Parties. The Arbitrator may request other written documents from either Party. Any new document prepared by any Party at the request of the Arbitrator shall be furnished to all Parties. There shall be no other discovery. The Arbitrator shall issue its decision in writing within five (5) working days following the commencement of deliberations, or such longer time as is reasonably necessary.

The prevailing Party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, reasonable attorneys' fees, in addition to any other available remedies. If the Arbitrator's decision provides for a monetary award, it shall be paid within ten (10) calendar days of the decision. If the Arbitrator's decision provides for a non-monetary award, it shall be complied with immediately. Any award rendered therein shall be final and binding on each and all of the Parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. The decision of the Arbitrator may be vacated, confirmed or appealed only pursuant to the provisions of the U.S. Uniform Arbitration Act. The Arbitrator shall have authority to enter awards of money damages, as well as awards of

equitable remedies, such as costs, pre-award interest, specific performance, injunctive relief, post-award interest and attorneys' fees, as the Arbitrator deems equitable. The Arbitrator may award any form of interlocutory and permanent relief that could be awarded by a court.

Section 16.12 Entire Agreement. This Agreement contains the entire understanding and agreement among the Unitholders with respect to the subject matter hereof and supersedes any other prior written or oral understandings or agreements among them with respect thereto.

[*Signatures contained on following page.*]



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572625

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**Managing General Partner:**

COACHMAN ENERGY MANAGING GENERAL PARTNERS LLC, a Delaware limited liability company

By: ______________________________
Name: Randy Kenworthy
Title: Chief Executive Officer

**Unitholders:**

______________________________
By: ______________________________
Title: ______________________________

______________________________
By: ______________________________
Title: ______________________________

______________________________
By: ______________________________
Title: ______________________________

______________________________
By: ______________________________
Title: ______________________________

**EXHIBIT A**
**Unitholders**

| Name/Address | Units | Capital Contribution | Type of Interest |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# APPENDIX III

## ESCROW AGREEMENT



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00572628

*[Page intentionally left blank.]*

# SUBSCRIPTION ESCROW AGREEMENT

**THIS SUBSCRIPTION ESCROW AGREEMENT** (this "Escrow Agreement"), dated as of October 23, 2014, is entered into by and among Coachman Energy VI LP, a Delaware limited partnership ("Fund VI") and Coachman Energy VI LLC, a Delaware limited liability company ("Fund VIB") (Fund VI and Fund VIB are collectively referred to herein as the "Companies"), Select Capital Corporation, a California corporation and the managing broker-dealer for the Companies (the "Managing Broker-Dealer") and BOKF, N.A., d/b/a Colorado State Bank and Trust, as escrow agent (the "Escrow Agent").

**WHEREAS,** the Companies have entered into a Managing Broker Dealer Agreement, dated October 23 2014, with the Managing Broker-Dealer pursuant to which the Managing Broker-Dealer is authorized to solicit and collect subscription funds on behalf of the Companies;

**WHEREAS**, pursuant to the terms and conditions of the Confidential Private Placement Memorandum of Fund VI and the Confidential Private Placement Memorandum of Fund VIB, each dated as of October 17, 2014 (collectively, the "Memoranda"), attached hereto as Exhibit A, subscribers desire to purchase units of limited partner interest and/or general partner interest in Fund VI and membership interests in Fund VIB (the "Investor Units") at a price of $50,000 per Investor Unit (the "Offering"), subject to certain investor incentives, as further described in the Memoranda;

**WHEREAS**, in order to facilitate the closing of the offering of the Investor Units, until such time as at least $1,000,000 (the "Minimum Offering Amount") has been raised collectively by the Companies, as provided in the Memoranda, the Companies desire to establish an escrow account into which funds received from subscribers in the Offering will be deposited, to be held for the benefit of the purchasers of Investor Units (the "Investors") and the Companies until such time as subscriptions for the Minimum Offering Amount have been deposited into escrow in accordance with the terms of this Escrow Agreement; and

**WHEREAS,** the Escrow Agent is willing to accept appointment as escrow agent upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises set forth above and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

**1. Escrow of Investor Funds.**

(a) On or before the commencement of the Offering, the Companies shall establish an escrow account with the Escrow Agent (the "Escrow Account"). All funds received from Investors in payment for the Investor Units ("Investor Funds") will be delivered to the Escrow Agent within one (1) business day following the day upon which such Investor Funds are received by the Companies or the Managing Broker-Dealer, and shall, upon receipt of good and collected funds by the Escrow Agent, be retained in the Escrow Account by the Escrow Agent and invested as stated below. During the term of this Escrow Agreement, the Companies and the Managing Broker-Dealer shall cause all checks received by and made payable to each of them in payment for the Investor Units to be endorsed in favor of the Escrow Agent and delivered to the Escrow Agent for deposit in the Escrow Account. Investor Funds also may be wired directly to the Escrow Account using wire instructions provided by the Escrow Agent.

(b) Escrow Agent shall have no duty to make any disbursement, investment or other use of Investor Funds until and unless it has good and collected funds. In the event that any checks deposited in

the Escrow Account are returned or prove uncollectible after the funds represented thereby have been released by the Escrow Agent, then the Companies shall promptly reimburse the Escrow Agent for any and all costs incurred for such, upon request, and the Escrow Agent shall deliver the returned checks to the Companies. The Escrow Agent shall be under no duty or responsibility to enforce collection of any check delivered to it hereunder. The Escrow Agent reserves the right to deny, suspend or terminate participation by an Investor to the extent the Escrow Agent deems it advisable or necessary to comply with applicable laws or to eliminate practices that are not consistent with the purposes of the Offering.

**2. Identity of Investors.** Copies of the Memoranda are attached as **Exhibit A** to this Escrow Agreement. The Companies or the Managing Broker-Dealer shall furnish to the Escrow Agent with each delivery of Investor Funds, a list of the Investors who have paid for the Investor Units showing the name, address, tax identification number, amount of Investor Units subscribed for and the amount paid and deposited with the Escrow Agent. This information comprising the identity of Investors shall be provided to the Escrow Agent in the format set forth on **Exhibit B-1** to this Escrow Agreement (the "List of Investors"). All Investor Funds so deposited shall not be subject to any liens or charges by the Companies, the Managing Broker-Dealer or the Escrow Agent, or judgments or creditors' claims against the Companies, until released to the Companies as hereinafter provided. The Companies understand and agree that the Companies shall not be entitled to any Investor Funds on deposit in the Escrow Account and no such funds shall become the property of the Companies except when released to the Companies pursuant to Section 3 of this Escrow Agreement. The Companies, the Managing Broker-Dealer and the Escrow Agent will treat all Investor information as confidential. The Escrow Agent shall not be required to accept any Investor Funds which are not accompanied by the information on the List of Investors.

**3. Disbursement of Funds.**

(a) In the event the Escrow Agent receives written notice from Fund VI, Fund VIB, or the Managing Broker-Dealer that Fund VI, Fund VIB or the Managing Broker-Dealer has rejected an Investor's subscription, the Escrow Agent shall pay to the applicable Investor, within ten (10) business days after receiving notice of the rejection, by first class United States Mail at the address appearing on the List of Investors, or at such other address or fed wire instructions as are furnished to the Escrow Agent by the Investor in writing, all collected sums paid by the Investor for Investor Units and received by the Escrow Agent, together with the interest earned on such Investor Funds.

(b) Once the Escrow Agent is in receipt of good and collected Investor Funds totaling at least the Minimum Offering Amount, the Escrow Agent shall notify the Companies and Managing Broker-Dealer of the same in writing. If the Minimum Offering Amount or more is received into the Escrow Account at any time before the Termination Date (as defined in Section 4 of this Escrow Agreement), then the Escrow Agent shall pay out the Investor Funds and all earnings thereon when and as directed by joint written instruction of the Companies and the Managing Broker-Dealer in the format set forth on **Exhibit B-2**.

(c) If the Minimum Offering Amount has not been received by the Escrow Agent before the Termination Date, the Escrow Agent shall, within ten (10) business days after the Termination Date, refund to each Investor by first class United States Mail at the address appearing on the List of Investors, or at such other address or fed wire instructions as are furnished to the Escrow Agent by the Investor in writing, all sums paid by the Investor for Investor Units and received by the Escrow Agent, together with the interest earned on such funds in the Escrow Account, and shall then notify the Companies and Managing Broker-Dealer in writing of such refunds. As set forth in Section 4 hereof, the Companies may extend the Offering and the Termination Date by twelve (12) months in its sole discretion.

**4. Term of Escrow.** The "Termination Date" shall be December 31, 2015, provided that the Termination Date may be extended by twelve (12) months upon written notice to the Escrow Agent (which written notice shall include a statement that such extension is not in contravention of the terms of the Offering). Notwithstanding the foregoing, in all events this Escrow Agreement shall terminate (i) on the date the Escrow Agent receives written notice from either of the Companies or the Managing Broker-Dealer that the Companies are abandoning the sale of the Investor Units; (ii) the date the Escrow Agent receives notice from the Securities and Exchange Commission or any other federal or state regulatory authority that a stop or similar order has been issued with respect to the Offering, (iii) the date the Escrow Agent institutes an interpleader or similar action, or (iv) a date which is not later than thirty (30) days following written notice from the Companies appointing a successor escrow agent and terminating the services of the Escrow Agent hereunder. After the Termination Date or other termination described above, the Companies and the Managing Broker-Dealer shall not deposit, and the Escrow Agent shall not accept, any additional amounts representing payments by prospective Investors.

**5. Duty and Limitation on Liability of the Escrow Agent.**

(a) The Escrow Agent's rights and responsibilities shall be governed solely by this Escrow Agreement. Neither the Memoranda, nor any other agreement or document shall govern the Escrow Agent even if such other agreement or document is referred to herein, is deposited with, or is otherwise known to, the Escrow Agent.

(b) The Escrow Agent shall be under no duty to determine whether the Companies or the Managing Broker-Dealer are complying with the requirements of the Offering or applicable securities or other laws in tendering the Investor Funds to the Escrow Agent. The Escrow Agent shall not be responsible for, or be required to enforce, any of the terms or conditions of any Offering document or other agreement between the Companies or the Managing Broker-Dealer and any other party.

(c) The Escrow Agent may conclusively rely upon and shall be fully protected in acting upon any statement, certificate, notice, request, consent, order or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall have no duty or liability to verify any such statement, certificate, notice, request, consent, order or other document. Upon or before the execution of this Escrow Agreement, the Companies and the Managing Broker-Dealer shall deliver to the Escrow Agent authorized signers' lists in the form of **Exhibit C-1** and **Exhibit C-2** to this Escrow Agreement.

(d) The Escrow Agent shall be under no obligation to institute and/or defend any action, suit or proceeding in connection with this Escrow Agreement unless first indemnified to its satisfaction.

(e) The Escrow Agent may consult counsel of its own choice with respect to any question arising under this Escrow Agreement and the Escrow Agent shall not be liable for any action taken or omitted in good faith upon the advice of such counsel.

(f) The Escrow Agent shall not be liable for any action taken or omitted by it except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of loss.

(g) The Escrow Agent is acting solely as escrow agent hereunder and owes no duties, covenants or obligations, fiduciary or otherwise, to any person by reason of this Escrow Agreement, except as otherwise explicitly set forth in this Escrow Agreement, and no implied duties, covenants or obligations, fiduciary or otherwise, shall be read into this Escrow Agreement against the Escrow Agent.

(h) In the event of any disagreement between any of the parties to this Escrow Agreement, or between any of them and any other person, including any Investor, resulting in adverse or conflicting claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue so to refrain from acting until (i) the rights of all interested parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjudged and all doubt resolved by agreement among all of the interested persons, and the Escrow Agent shall have been notified thereof in writing signed by all such persons. Notwithstanding the foregoing, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court, whether with or without jurisdiction and the Escrow Agent is hereby authorized in its sole discretion to comply with and obey any such orders, judgments, decrees or levies.

(i) In the event that any controversy should arise with respect to this Escrow Agreement, the Escrow Agent shall have the right, at its option, to institute an interpleader action in any court of competent jurisdiction to determine the rights of the parties.

(j) IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

(k) The parties agree that the Escrow Agent had no role in the preparation of the Offering documents, has not reviewed any such documents, and makes no representations or warranties with respect to the information contained therein or omitted therefrom.

(l) The Escrow Agent shall have no obligation, duty or liability with respect to compliance with any federal or state securities, disclosure or tax laws concerning the Offering documents or the issuance, offering or sale of the Investor Units.

(m) The Escrow Agent shall have no duty or obligation to monitor the application and use of the Investor Funds once transferred to the Companies, that being the sole obligation and responsibility of the Companies.

(n) The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

**6. Escrow Agent's Fee.** The Escrow Agent shall be entitled to compensation for its services in the amount of $3,000, which compensation shall be paid $1,500 by Fund VI and $1,500 by Fund VIB. The

fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any material service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation relating to this Escrow Agreement, or the subject matter hereof, then the Escrow Agent shall be reasonably compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorney's fees and expenses, occasioned by any delay, controversy, litigation or event, and the same shall be paid by the Companies. The obligations of the Companies under this Section 6 shall survive the resignation or removal of the Escrow Agent and the assignment or termination of this Escrow Agreement. In addition, a $25.00 per check fee will be charged if the escrow account has to be refunded due to a failure to meet the Minimum Offering Amount. All of these fees are payable upon the release of the Investor Funds, and the Escrow Agent is hereby authorized to deduct such fees from the Investor Funds prior to any release thereof pursuant to Section 3 hereof.

**7. Investment of Investor Funds; Income Allocation and Reporting.**

(a) The Escrow Agent shall invest the Investor Funds, including any and all interest and investment income, in accordance with the written instructions in the form of **Exhibit D** provided to the Escrow Agent and signed by the Companies. The Companies may only specify investments in (1) bank accounts, (2) bank money-market accounts, (3) short time certificates of deposit issued by a bank, or (4) short-term securities issued or guaranteed by the U S Government. Any interest received by the Escrow Agent with respect to the Investor Funds, including reinvested interest shall become part of the Investor Funds, and shall be disbursed pursuant to Section 3 of this Escrow Agreement. The Companies agree that, for tax reporting purposes, all interest or other taxable income earned on the Investor Funds in any tax year shall be taxable to the Companies.

(b) The Escrow Agent shall be entitled to sell or redeem any such investments as the Escrow Agent deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement. The parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

(c) Upon or before the execution of this Escrow Agreement, the Companies shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate IRS forms W-9 or W-8 and other forms and documents that the Escrow Agent may reasonably request. The Companies understand that if such tax reporting documentation is not so certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any interest or other income earned on the Investor Funds pursuant to this Escrow Agreement. The Companies shall also provide tax reporting documentation for the Investors as the Escrow Agent may reasonably request.

(d) The Companies agree to indemnify and hold the Escrow Agent harmless from and against any and all taxes, additions for late payment, interest, penalties and other expenses that may be assessed against the Escrow Agent on or with respect to the Investor Funds unless any such tax, addition for late payment, interest, penalties and other expenses shall be determined by a court of competent jurisdiction to have been primarily caused by the Escrow Agent's gross negligence or willful misconduct. The terms of this paragraph shall survive the assignment or termination of this Escrow Agreement and the resignation or removal of the Escrow Agent.

**8. Notices.** All notices, requests, demands, and other communications under this Escrow Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given, (b) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service, or (c) on the third day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed, return receipt requested, to the party as follows:

If to Fund VI:

Coachman Energy VI LP
Attention: Don Scott
5251 DTC Parkway, Suite 200
Greenwood Village, Colorado 80111

With a copy to:

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Attention: Tonya Mitchem Grindon, Esq.
211 Commerce Street, Suite 800
Nashville, Tennessee 37201

If to Fund VIB:

Coachman Energy VIB LLC
Attention: Don Scott
5251 DTC Parkway, Suite 200
Greenwood Village, Colorado 80111

With a copy to:

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
Attention: Tonya Mitchem Grindon, Esq.
211 Commerce Street, Suite 800
Nashville, Tennessee 37201

If to Managing Broker-Dealer:

Select Capital Corporation
Attention: Burke Dambly, President
31351 Rancho Viejo Rd., Suite 205
San Juan Capistrano, CA 92675

If to Escrow Agent:

Colorado State Bank and Trust
Attention: George Kubin
1600 Broadway, 3rd Floor

Denver, Colorado 80202

Any party may change its address for purposes of this section by giving the other party written notice of the new address in the manner set forth above.

9. **Indemnification of Escrow Agent.** The Companies and the Managing Broker-Dealer hereby jointly and severally indemnify, defend and hold harmless the Escrow Agent from and against, any and all loss, liability, cost, damage and expense, including, without limitation, reasonable counsel fees and expenses, which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates unless such loss, liability, cost, damage or expense is finally determined by a court of competent jurisdiction to have been primarily caused by the gross negligence or willful misconduct of the Escrow Agent. The terms of this Section 9 shall survive the assignment or termination of this Escrow Agreement and the resignation or removal of the Escrow Agent.

10. **Resignation.** The Escrow Agent may resign upon thirty (30) days' advance written notice to the Companies and the Managing Broker-Dealer. If a successor escrow agent is not appointed within the thirty (30) day period following such notice, the Escrow Agent may petition any court of competent jurisdiction to name a successor escrow agent or interplead the Investor Funds with such court, whereupon the Escrow Agent's duties hereunder shall terminate.

11. **Successors and Assigns.** Except as otherwise provided in this Escrow Agreement, no party hereto shall assign this Escrow Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect. This Escrow Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto. Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets in whole or in part, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance any further act.

12. **Governing Law; Jurisdiction.** This Escrow Agreement shall be construed, performed, and enforced in accordance with, and governed by, the internal laws of the State of Delaware, without giving effect to the principles of conflicts of laws thereof.

13. **Severability.** In the event that any part of this Escrow Agreement is declared by any court or other judicial or administrative body to be null, void, or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Escrow Agreement shall remain in full force and effect.

14. **Amendments; Waivers.** This Escrow Agreement may be amended or modified, and any of the terms, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of

any other provision, term, covenant, representation, or warranty of this Escrow Agreement. The Companies and the Managing Broker-Dealer agree that any requested waiver, modification or amendment of this Escrow Agreement shall be consistent with the terms of the Offering.

**15. Entire Agreement.** This Escrow Agreement contains the entire understanding among the parties hereto with respect to the escrow contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such escrow.

**16. References to Escrow Agent.** No printed or other matter in any language (including, without limitation, the Memoranda, any supplement or amendment relating thereto, notices, reports and promotional material) which mentions the Escrow Agent's name or the rights, powers, or duties of the Escrow Agent shall be issued by the Companies or the Managing Broker-Dealer, or on the behalf of the Companies or Managing Broker-Dealer unless the Escrow Agent shall first have given its specific written consent thereto.

**17. Section Headings.** The section headings in this Escrow Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Escrow Agreement.

**18. Counterparts.** This Escrow Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Escrow Agreement to be executed the day and year first set forth above.

Coachman Energy VI LP

By:________________________
Its: COO/CFO
Date: 10-17-14

Coachman Energy VIB LLC

By:________________________
Its: COO/CFO
Date: 10-17-14

Select Capital Corporation

By: James M Walsh
Its: CEO
Date: 10/23/14

Colorado State Bank and Trust, as Escrow Agent

By:________________________
Its: SVP
Date: 10-22-14

EXHIBIT A

COPIES OF MEMORANDA

EXHIBIT B-1
**List of Investors**

Pursuant to the Escrow Agreement dated October __, 2014, by and among Coachman Energy VI LP, a Delaware limited partnership ("Fund VI") and Coachman Energy VI LLC, a Delaware limited liability company ("Fund VIB") (Fund VI and Fund VIB are collectively referred to herein as the "Companies"), Select Capital Corporation, a California corporation and the managing broker-dealer for the Companies (the "Managing Broker-Dealer") and BOKF, N.A., d/b/a Colorado State Bank and Trust, as escrow agent (the "Escrow Agent"), the Companies and the Managing Broker-Dealer hereby certify that the following Investors have paid money for the purchase of ____________ (the "Investor Units"), and the money has been deposited with the Escrow Agent:

Name of Subscriber ________________________________

Address of Subscriber ________________________________
________________________________
________________________________

Number of Units: ________________________________

Subscription Amount
Submitted herewith: ________________________________

Taxpayer ID number/
Social Security number ________________________________

Fund Name ________________________________

Coachman Energy VI LP:

By: ________________________
Its: ________________________
Date: ______________________

Coachman Energy VIB LLC:

By: ________________________
Its: ________________________
Date: ______________________

Select Capital Corporation:

By: ________________________
Its: ________________________
Date: ______________________

EXHIBIT B-2

COLORADO STATE BANK AND TRUST

[Insert Date]

Coachman Energy VI LP
Attention: Don Scott
5251 DTC Parkway, Suite 200
Greenwood Village, Colorado 80111

Coachman Energy VIB LLC
Attention: Don Scott
5251 DTC Parkway, Suite 200
Greenwood Village, Colorado 80111

Select Capital Corporation
Attention: Burke Dambly, President
31351 Rancho Viejo Rd., Suite 205
San Juan Capistrano, CA 92675

Re: ***MINIMUM COMPLETION NOTICE***

Ladies and Gentlemen;

Pursuant to Section 3(b) of that certain Escrow Agreement dated as of October __, 2014 ("Escrow Agreement"), by and among Coachman Energy VI LP, a Delaware limited partnership ("Fund VI") and Coachman Energy VI LLC, a Delaware limited liability company ("Fund VIB") (Fund VI and Fund VIB are collectively referred to herein as the "Companies"), Select Capital Corporation, a California corporation and the managing broker-dealer for the Companies (the "Managing Broker-Dealer") and BOKF, N.A., d/b/a Colorado State Bank and Trust, as escrow agent (the "Escrow Agent"), Escrow Agent hereby notifies the Companies and Managing Broker-Dealer that Investor Funds in the aggregate amount of at least the Minimum Offering Amount have been deposited, in collected funds, into the Escrow Account prior to the Termination Date. Capitalized terms used and not otherwise defined herein have the respective meanings set forth in the Escrow Agreement.

Accompanying this Minimum Completion Notice hereto is a copy of the current Subscriber List as provided in Exhibit B-1 to Escrow Agent corresponding to the respective Investor Funds. As set forth in Section 3(b) of the Escrow Agreement, the confirmation of Companies below as to the accuracy of this Minimum Completion Notice shall constitute written instruction and authorization for Escrow Agent to disburse such Investor Funds as provided in such Section 3(b).

Sincerely,

COLORADO STATE BANK AND TRUST

By: ______________________________

Name: ____________________________

Title: _____________________________

The undersigned hereby confirms to Escrow Agent that, to the best of its knowledge, (1) subscriptions for the Minimum Offering Amount have been received and not rescinded prior and (2) the information set forth herein and on Exhibit B-1 hereto is accurate in all material respects:

"Companies"

Coachman Energy VI LP

By: ______________________________
Name: ____________________________
Title: _____________________________

Coachman Energy VIB LLC

By: ______________________________
Name: ____________________________
Title: _____________________________

"Managing Broker-Dealer"

Select Capital Corporation

By: ______________________________
Name: ____________________________
Title: _____________________________

# EXHIBIT C-1

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Coachman Energy VI LP and Coachman Energy VIB LLC and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit C-1 is attached, on behalf of either Coachman Energy VI LP or Coachman Energy VIB LLC.

| **Name / Title** | ***Specimen Signature*** |
| --- | --- |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |

# EXHIBIT C-2

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Select Capital Corporation and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit C-2 is attached, on behalf of Select Capital Corporation.

| **Name / Title** | ***Specimen Signature*** |
|---|---|
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |
| ______________________ Name | ______________________ Signature |
| ______________________ Title | |

EXHIBIT D

**Agency and Custody Account Direction**
**For Cash Balances**
**Colorado State Bank and Trust Deposit Accounts**

Direction to use the following Colorado State Bank and Trust Money Accounts for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Exhibit D is attached.

You are hereby directed to deposit, as indicated below, or as I shall direct further in writing from time to time, all cash in the Account in the following deposit account of Colorado State Bank and Trust:

________________________________ ("Deposit Account")

I understand that amounts on deposit in the Deposit Account are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $250,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $250,000.

I acknowledge that I have full power to direct investments of the Account.

I understand that I may change this direction at any time and that it shall continue in effect until revoked or modified by me by written notice to you.

________________________________________
Authorized Representative
Coachman Energy VI LP and Coachman Energy VIB LLC

__________________________
Date

# AMENDMENT NO. 1
# TO SUBSCRIPTION ESCROW AGREEMENT

This **AMENDMENT NO. 1 TO SUBSCRIPTION ESCROW AGREEMENT** (this "Amendment"), is entered into and effective as of March 17, 2015 (the "Effective Date"), by and among Coachman Energy VI LP, a Delaware limited partnership ("Fund VI"), Coachman Energy VIB LLC, a Delaware limited liability company ("Fund VIB") (Fund VI and Fund VIB are collectively referred to herein as the "Companies"), BOKF, NA, d/b/a Colorado State Bank and Trust (the "Escrow Agent"), and Select Capital Corporation, a California corporation and the Company's managing broker-dealer (the "Dealer Manager," and collectively with the Companies and the Escrow Agent, the "Parties" or individually, a "Party") and amends that certain Subscription Escrow Agreement by and between the Parties, dated October 23, 2014 (the "Subscription Escrow Agreement"). Terms not defined herein shall be defined in accordance with the Subscription Escrow Agreement.

A. The Companies have increased the price per Investor Unit pursuant to an Amended and Restated Confidential Private Placement Memorandum of Fund VI and an Amended and Restated Confidential Private Placement Memorandum of Fund VIB, each dated as of March 19, 2015, and decreased the number of Investor Units being offered thereunder.

B. The Parties desire to amend the Subscription Escrow Agreement to reflect the revised terms and new price per Investor Unit of $100,000.

The Parties to the Escrow Agreement hereby agree to amend the Subscription Escrow Agreement as follows:

1. **Amendment No. 1**. All references to "the Confidential Private Placement Memorandum of Fund VI and the Confidential Private Placement Memorandum of Fund VIB, each dated as of October 17, 2014" are hereby deleted in their entirety and replaced with "the Amended and Restated Confidential Private Placement Memorandum of Fund VI and the Amended and Restated Confidential Private Placement Memorandum of Fund VIB, each dated as of March 19, 2015."

2. **Amendment No. 2**. The price per Investor Unit has been increased from $50,000 to $100,000, and all references to the price per Investor Unit are hereby amended to reflect that the price per Investor Unit is equal to $100,000.

3. **Governing Law.** This Amendment will be governed by and construed under the laws of the State of Delaware without regard to any conflicts of laws principles that would require the application of any other law.

[signatures on following page]

N TRE 1482253 v2
2925641-000010 03/16/2015

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the day first set forth above.

**COMPANY:**

**Coachman Energy VI LP**

By: Coachman Energy Managing General Partners LLC
Its: General Partner

By: ______________________________
Name: Randall Kenworthy
Title: Chief Executive Officer

**Coachman Energy VIB LLC**

By: Coachman Energy Managing General Partners LLC
Its: General Partner

By: ______________________________
Name: Randall Kenworthy
Title: Chief Executive Officer

**ESCROW AGENT:**

**BOKF, NA, d/b/a Colorado State Bank and Trust**

By: ______________________________
Name: George F. Kubin
Title: SVP and Regional Manager

**DEALER MANAGER:**

**Select Capital Corporation**

By: ______________________________
Name: James M. Walsh
Title: Chief Executive Officer

N TRE 1482253 v2
2925641-000010 03/16/2015

# APPENDIX IV

## DISTRIBUTION REINVESTMENT PLAN

*[Page intentionally left blank.]*

**COACHMAN ENERGY VI LP**
**DISTRIBUTION REINVESTMENT PLAN**
**Effective as of March 19, 2015**

Coachman Energy VI LP, a Delaware limited partnership (the "Company"), has adopted a distribution reinvestment plan (the "DRP"), as of March 19, 2015 (the "Effective Date"), the terms and conditions of which are set forth below. Capitalized terms shall have the same meaning as set forth in the Limited Partnership Agreement of the Company (the "LPA"), unless otherwise defined herein.

1. *Distribution Reinvestment.* As agent for the limited partners and investor general partners of the Company ("Partners") who (A) purchase units of limited partner interest or units of investor general partner interest of the Company (the "Units") pursuant to the Amended and Restated Confidential Private Placement Memorandum dated March 19, 2015 (the "Current Offering"), or (B) purchase Units pursuant to any future offering of the Company (a "Future Offering") and to the extent they elect to participate in the DRP (the "Participants"), the Company will apply all distributions declared and paid in respect of the Units held by each participating Partner (the "Distributions"), including Distributions paid with respect to any full or fractional Units acquired under the DRP, to the purchase of the Units for such participating Partners. The purchase price per Unit shall be $90,000.

2. *Effective Date.* The DRP will become effective on the Effective Date. Any amendment to the DRP shall be effective as provided in Section 11.

3. *Eligibility and Procedure for Participation.* Any Partner who purchases Units pursuant to the Current Offering or any Future Offering, may elect to become a Participant at any time by completing and executing the enrollment form attached to any subscription documents completed at the time such Partner subscribes for Units, or by completing and executing any other appropriate authorization form as may be available from the Company or the MGP (as defined below). The Company may elect to deny a Partner participation in the DRP if the Partner resides in a jurisdiction or foreign country where, in the Company's judgment, the burden or expense of compliance with applicable securities laws makes the Partner's participation impracticable or inadvisable. Participation in the DRP will begin with the next Distribution payable after receipt of a Participant's accepted Subscription Agreement and enrollment form or other appropriate authorization.

A Participant can choose to have all or a portion of Distributions reinvested through the DRP. A Participant may also change the percentage of Distributions that will be reinvested at any time by completing a new enrollment form or other form provided for that purpose. Units will be purchased under the DRP on the date that Distributions are paid by the Company.

Each Participant agrees that if, at any time prior to the listing of the Units on a national stock exchange or inclusion of the Units for quotation on a national market system, he or she fails to meet the suitability requirements for making an investment in the Company or cannot make the other representations or warranties set forth in the Subscription Agreement, he or she will promptly so notify the Company in writing.

4. *No Commissions or Other Charges.* No dealer manager fee and no sales commissions will be paid with respect to the DRP Units.

5. *Exclusion of Certain Distributions.* Coachman Energy Managing General Partners LLC, the managing general partner of the Company (the "MGP"), reserves the right to designate that certain cash or other distributions will be excluded from Distributions that may be reinvested in Units under the DRP.

6. *Taxation.* The reinvestment of Distributions in the DRP does not relieve Participants of any taxes which may be payable as a result of any such Participant's share of the Company's taxable income.

7. *Certificates.* The ownership of the Units purchased through the DRP will be in book-entry form unless and until the Company issues certificates for its Units.

8. *Voting.* A Participant may vote all Units acquired through the DRP to the same extent as it may vote other Units, as described in the LPA.

9. *Reports.* Within 90 days after the end of the Company's fiscal year, the Company shall provide each Partner with an individualized report on his or her investment, including the purchase date(s), purchase price and number of Units owned, as well as the dates of Distribution payments and amounts of Distributions paid during the prior fiscal year.

10. *Termination by Participant.* A Participant may terminate participation in the DRP at any time, without penalty by delivering to the Company a written notice. Such termination shall be effective within forty-five (45) days following the Company's receipt of the Participant's written notice. Prior to listing of the Units on a national stock exchange or quotation on a national market system, any transfer of Units by a Participant to a non-Participant will terminate participation in the DRP with respect to the transferred Units. Upon termination of DRP participation for any reason, Distributions paid subsequent to termination will be distributed to the Partner in cash, unless otherwise determined by the MGP.

11. *Amendment or Termination of DRP by the Company.* The MGP, in its sole and absolute discretion, may amend, modify, suspend or terminate the DRP for any reason upon 10 days' prior written notice to the Participants; *provided, however,* no such amendment shall add compensation to the plan or remove the opportunity for a Unitholder to terminate such Unitholder's participation in the plan as specified in Section 10 above.

12. *Liability of the Company.* The Company shall not be liable for any act done in good faith, or for any good faith omission to act, including, without limitation, any claims or liability (a) arising out of failure to terminate a Participant's account upon such Participant's death prior to receipt of notice in writing of such death, or (b) with respect to the time and the prices at which Units are purchased or sold for a Participant's account. To the extent that indemnification may apply to liabilities arising under the Securities Act of 1933, as amended, or the securities laws of a particular state, the Company has been advised that, in the opinion of the SEC and certain state securities commissioners, such indemnification is contrary to public policy and, therefore, unenforceable.

## APPENDIX V

## RULE 506(D) AND RULE 506(E) DISCLOSURE

### SEC "Bad Actor" Rules 506(d) and 506(e)

(d) "*Bad Actor" disqualification.* (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(*1*) Association with an entity regulated by such commission, authority, agency, or officer;

(*2*) Engaging in the business of securities, insurance or banking; or

(*3*) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale; 144

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(b) or 78*o*-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

(2) Paragraph (d)(1) of this section shall not apply:

(i) With respect to any conviction, order, judgment, decree, suspension, expulsion or bar that occurred or was issued before September 23, 2013;

(ii) Upon a showing of good cause and without prejudice to any other action by the Commission, if the Commission determines that it is not necessary under the circumstances that an exemption be denied;

(iii) If, before the relevant sale, the court or regulatory authority that entered the relevant order, judgment or decree advises in writing (whether contained in the relevant judgment, order or decree or separately to the Commission or its staff) that disqualification under paragraph (d)(1) of this section should not arise as a consequence of such order, judgment or decree; or

(iv) If the issuer establishes that it did not know and, in the exercise of reasonable care, could not have known that a disqualification existed under paragraph (d)(1) of this section.

*Instruction to paragraph (d)(2)(iv).* An issuer will not be able to establish that it has exercised reasonable care unless it has made, in light of the circumstances, factual inquiry into whether any disqualifications exist. The nature and scope of the factual inquiry will vary based on the facts and circumstances concerning, among other things, the issuer and the other offering participants.

(3) For purposes of paragraph (d)(1) of this section, events relating to any affiliated issuer that occurred before the affiliation arose will be not considered disqualifying if the affiliated entity is not:

(i) In control of the issuer; or

(ii) Under common control with the issuer by a third party that was in control of the affiliated entity at the time of such events.

* * *

(e) *Disclosure of prior "bad actor" events.* The issuer shall furnish to each purchaser, a reasonable time prior to sale, a description in writing of any matters that would have triggered disqualification under paragraph (d)(1) of this section but occurred before September 23, 2013. The failure to furnish such information timely shall not prevent an issuer from relying on this section if the issuer establishes

that it did not know and, in the exercise of reasonable care, could not have known of the existence of the undisclosed matter or matters.

*Instruction to paragraph (e).* An issuer will not be able to establish that it has exercised reasonable care unless it has made, in light of the circumstances, factual inquiry into whether any disqualifications exist. The nature and scope of the factual inquiry will vary based on the facts and circumstances concerning, among other things, the issuer and the other offering participants.

*[Page intentionally left blank.]*

# EXHIBIT 8

CRITERION
WEALTH MANAGEMENT

# Scan and Double Check Coversheet

Client: Patrick J. Denard

File Path: S:\Client Folders\Current Clients\Denard, Patrick J\Accounts\934046100 Individual\100 Executed Docs\Transactions\AI\Coachman

Brief description of document(s): Coachman Purchase

Number of page(s): 33

Date submitted for double-check: 06/09/2015

Scanned by – **Initial and date:** [signature] 6/9/2015

Double-checked and shredded by – **Initial and date:** CSL 6/22/15

***Upon completion, please place attached document(s) in the shredding bin.***

T 661 254 2543 TF 800 550 1095
26650 The Old Road • Suite 212 • Valencia • CA • 91381
*CriterionWealth.com*

Securities and advisory services are offered through Ausdal Financial Partners, Inc., Member FINRA/SIPC 5187 Utica Ridge Road, Davenport, IA 52807 (563) 326-2064. Investment Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners, Inc. and any subsidiaries or affiliates. CA Insurance License # 0786906

CRITERION
WEALTH MANAGEMENT

# TD Checklist:

**Patrick J. Denard**
**(TD Account #934046100)**

**Re:** **Coachman Energy VI, LP**
**$150,000 (1.5 units @$100k per unit)**

- ❑ Letter of Authorization for Non-Publicly Traded Investment
- ❑ TD Ameritrade Clearing, Inc. Agreement Regarding Non-Publicly Traded Investments
- ❑ Letter of Direction
- ❑ Subscription Package

If you have any questions, please do not hesitate to contact Yumiko Odama at (661) 254-2543.

T 661 254 2543 TF 800 550 1095
26650 The Old Rd • Ste 212 • Valencia • CA • 91381
*CriterionWealth.com*

Securities and advisory services are offered through Ausdal Financial Partners Inc Member FINRA/SIPC 5187 Utica Ridge Road Davenport IA 52807 (563) 326-2064 Investment Advisory services offered through Criterion Wealth Management are independent of Ausdal Financial Partners Inc and any subsidiaries or affiliates CA Insurance License # 0786906

TD Ameritrade Institutional

Reset Form

# LETTER OF AUTHORIZATION (LOA)

## FOR NON-PUBLICLY TRADED INVESTMENT

E-MAILED 5/14/2015

Completed 5/20/15 ©

Account # 934046100

Advisor # I8S

Advisor: Mark A. MacArthur and/or Robert A. Gravette

Date:

Rep Code: I8S

Re: TD Ameritrade Account #: 934046100

By my signature below, I hereby confirm that I understand and agree to the following:

I hereby authorize and direct TD Ameritrade, Inc. to transfer $ 150,000 to purchase 1.5 shares/units at a price of $ 100,000 per share/unit from my identified TD Ameritrade account into Coachman Energy VI LP (limited partnership or other non-publicly traded investment) and to open a new account in the name of my account with the identified L.P. (or other non-publicly traded investment) designated above to which a transfer is to be made. Please note that the L.P. General Partner (or other applicable principal) or the Advisor is not affiliated with TD Ameritrade, Inc., and TD Ameritrade is not responsible for the actions or investments of the L.P. (or other non-publicly traded investment), the General Partner (or other applicable principal), the Advisor or their affiliates. I understand that I will no longer have access to or control over the funds invested in the L.P. (or other non-publicly traded investment) held at TD Ameritrade.

I agree that TD Ameritrade may rely on the valuations of the L.P. (or other non-publicly traded investment) provided by the General Partner (or other applicable principal), the Advisor, the L.P. (or other non-publicly traded investment) or their other service providers for purposes of pricing transactions in the L.P. (or other non-publicly traded investment), reporting, or other purposes without any duty or obligation to inquire into whether such valuations are current or correct. TD Ameritrade is not responsible for monitoring the investments of the L.P. (or other non-publicly traded investment). I made the decision to invest in the identified L.P. (or other non-publicly traded investment) designated above without any advice or recommendation from TD Ameritrade. I hold TD Ameritrade and its affiliates harmless from any claims arising out of its reliance on this transfer request and for any claims that I may have against the L.P. (or other non-publicly traded investment), the General Partner (or applicable principal), the Advisor, or their affiliates.

Sincerely *(please print)*,

Name *(First, Middle Initial, Last)*: Patrick J. Denard

Home Street Address *(no PO boxes)*: 420 G. Street

City: Jacksonville | State: OR | ZIP Code: 97530

Email Address: pjdenard@gmail.com | Phone: (503) 320-8557

Signature: [signature] Date: 4/19/15

**Non-Publicly Traded Investment Contact Information and Payment Instructions**

Company Name: Select Capital Corporation

Address *(no PO boxes)*: 31351 Rancho Viejo Road, Suite #205

City: San Juan Capistrano | State: CA | ZIP Code: 92675

Contact Name: Burke Damply, President

Contact Address *(no PO boxes)*: Same as Above

City: | State: | ZIP Code:

Send Check To: See Below: Wire

Wire Instructions: Colorado State Bank and Trust, 1600 Broadway, 4th Floor, Denver, CO 80202 Attn: George Kubin
ABA: 103 900 036 Account: 600024642 Ref: BOKF Corporate Trust Funds
For Further Credit: Coachman Energy Subscription Escrow Acct. #82-9840-01-6

Mailing Address:
**TD Ameritrade Institutional**
PO BOX 919094
San Diego, CA 92191-9094

Overnight Address:
**TD Ameritrade Institutional**
5010 Wateridge Vista Drive
San Diego, CA 92121-5775

TDAI 4507 REV. 07/14

Investment Products: Not FDIC Insured * No Bank Guarantee * May Lose Value

TD Ameritrade Institutional, Division of TD Ameritrade, Inc., member FINRA/SIPC/NFA. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2014 TD Ameritrade IP Company, Inc. All rights reserved. Used with permission.

Reset Form

TD Ameritrade Institutional

# TD AMERITRADE ALTERNATIVE INVESTMENT AGREEMENT

Account # 934046100

Advisor # I8S

WHEREAS, the individual (the "Client") named at the end of this Agreement has or desires to maintain an account as identified below ("Account") of which TD Ameritrade Clearing, Inc. ("TDAC"), the clearing firm for TD Ameritrade, Inc. ("TD Ameritrade"), will be the custodian; and

WHEREAS, the Client has or wants to acquire and/or hold in the Account an investment which is not publicly traded, which investment is specified at the end of this Agreement (the "Investment"); and

WHEREAS, TD Ameritrade will allow the Investment to be held in the Account, but only on the terms and subject to the conditions set forth below.

NOW, THEREFORE, the parties hereto agree as follows:

1. **Valuation of the Investment:**

   (a) The Client represents and warrants that the value of the investment as specified below and in any notice pursuant to paragraph (b) below represents the current fair market value of the Investment on the date hereof.

   (b) The Client agrees to advise TD Ameritrade in writing no later than the 10th day of each January of any change in the fair market value of the Investment from the amount specified below or as of the preceding December 31st, as the case may be, and within 20 days of any other written request as to the fair market value of the Investment as of the date specified in such request. TD Ameritrade shall have no obligation to investigate or determine whether there has been any change in that fair market value, and the fair market value of the Investment as last reported to TD Ameritrade shall be used by TD Ameritrade for all purposes of administration of the Account, without regard to any actual or constructive knowledge that TD Ameritrade may have as to the fair market value of the Investment.

2. **Obligations of TD Ameritrade:**

   (a) TD Ameritrade's obligations with respect to the Investment are solely to hold the Investment in custody. TD Ameritrade's obligation to hold the Investment in custody does not include any obligation to notify the Client (or any other party) of the receipt or failure to receive any amount, to forward to the Client any notices with respect to the Investment, to monitor or report to the Client as to the performance or nonperformance of any person with respect to the Investment (or the performance or nonperformance by any person of any obligation or term contained in, or imposed by, the Investment) or to take enforcement or other action with respect thereto, regardless of whether TD Ameritrade has any actual or constructive knowledge which might make such action or inaction advisable.

   (b) The obligations of TD Ameritrade with respect to the Investment are those herein specifically provided and no other.

   (c) If the Investment, or the terms of the acquisition or disposition thereof, requires or make advisable the taking (or the refraining from taking) of any action, then the Client and not TD Ameritrade shall have the sole obligation to take (or refrain from taking), or instruct TD Ameritrade to take (if such action can only be taken by TD Ameritrade) such action, including by way of illustration and not by way of limitation, retaining sufficient other assets in the Account to meet any capital calls or to pay any expenses for, or relating to, the administration or maintenance of the Investment, retain in the Account property required to be sold pursuant to the terms of any option, and filing such documents as may be necessary or advisable to preserve, protect, or defend the title to the Investment.

3. **Representations:** The Client represents to TD Ameritrade that:

   (a) TD Ameritrade has not solicited the Client to acquire or hold the Investment nor made any recommendation as to the acquisition, retention, or disposition of the Investment in the Account.

   (b) The Client has such arrangements as the Client deems appropriate to monitor the Investment and to take such action with respect to the Investment as the Client deems is adequate and appropriate.

4. **Indemnification:** The Client agrees to indemnify and hold harmless TD Ameritrade and its affiliates from and against any and all liabilities, penalties, losses, damages, claims, costs, expenses, and disbursements (including legal fees and expenses) which may be imposed upon, incurred by, or asserted against TD Ameritrade in any way:

   (a) relating to or arising out of a failure by the Client to timely and properly file any tax returns, or a failure to timely pay any tax required as a result of, or attributable to, the Investment;

   (b) as a result of the use for any purpose by TD Ameritrade of the valuation of the Investment in accordance with this Agreement;

   (c) arising out of, or in connection with, the acquisition, holding, or disposition of the Investment or TD Ameritrade's agreement to act as custodian of the Investment pursuant to this Agreement; or

   (d) as a result of the Client's failure for any reason whatsoever to timely provide TD Ameritrade with the information as to any changes in the fair market value of the Investment.

**5. TD Ameritrade Right to Terminate Agreement:**

(a) TD Ameritrade reserves the absolute right to terminate its agreement to hold the Investment in the account at any time and for any reason whatsoever, and TD Ameritrade shall have no liability or responsibility to the Client for any loss, loss of value, damage, or expense suffered or incurred by the Client by reason of the termination of its agreement. The Client, upon receipt of notice from TD Ameritrade of the termination of TD Ameritrade's agreement to continue to hold the Investment shall instruct TD Ameritrade as to the disposition thereof, and if the Client fails to provide TD Ameritrade with any such instructions within thirty (30) days of the date of TD Ameritrade's notice, the Client agrees that the Client shall be deemed to have instructed TD Ameritrade to distribute the Investment in-kind to the Client.

(b) Nothing contained herein constitutes any agreement to hold any investment into which the Investment may be converted, whether pursuant to the terms of the Investment, by reason of any option or conversion privilege contained therein or upon any enforcement of rights or remedies with respect to the Investment and to seek TD Ameritrade's agreement to hold any investment into which the Investment may be converted.

**6. Miscellaneous:**

(a) Other Agreements: TD Ameritrade is a party to other agreements, including the TD Ameritrade Client Agreement, with the Client with respect to the Account, and nothing contained herein shall be construed to diminish, reduce, or eliminate any rights which TD Ameritrade may have under any such other agreements, including rights of TD Ameritrade to indemnification, nor shall anything in this agreement be construed to diminish, reduce or eliminate any obligations of the Client under any such agreement.

(b) Survival of Indemnification: The Client's obligations hereunder shall continue in effect as long as TD Ameritrade acts as custodian of the Client's Account; provided, however, the indemnification provisions herein shall survive the termination of this Agreement, the transfer or liquidation of the Account, or the resignation, or removal of TD Ameritrade as custodian.

(c) Amendments: TD Ameritrade shall not be bound by any amendment of this Agreement unless in writing and signed by an officer of TD Ameritrade.

(d) Notices: All notices to the Client shall be deemed given if mailed by first class mail, postage prepaid, addressed to the Client at the address appearing in the records of TD Ameritrade; and any notice or other communication to TD Ameritrade shall be deemed given when received by TD Ameritrade at the following address:

TD Ameritrade Institutional
Attn: Corporate Actions
5010 Wateridge Vista Drive
San Diego, CA 92121-5775

(e) Governing Laws: this Agreement shall be construed and enforced in accordance with the laws of the State of New York applicable to agreements to be wholly performed therein.

(f) Benefits: This Agreement shall be binding upon the Client and his or her beneficiaries, executors, administrators, legal representatives, and successors.

(g) Fees and Expenses: Promptly upon demand, the Client shall pay or reimburse TD Ameritrade for all out-of-pocket fees and expenses (including legal fees and expenses) incurred by, or imposed upon, TD Ameritrade as a result of holding the Investment in the Account.

## TD AMERITRADE, INC.
## ADDITIONAL DISCLOSURE FOR ALTERNATIVE INVESTMENTS

The acquisition and/or holding of an investment which is not publicly traded in TD Ameritrade Accounts imposes additional burdens upon TD Ameritrade. Nevertheless, TD Ameritrade will allow certain clients to acquire and hold in their TD Ameritrade Account a non-publicly traded investment where the client has provided to TD Ameritrade certain representations and acknowledgments and agrees to assume certain responsibilities.

As a condition to allowing alternative investments to be held in your TD Ameritrade Account, you must sign the attached Agreement Regarding Alternative Investments. The information that follows is a description of some, but not all of the representations, acknowledgments, and agreements required of the client.

THE AGREEMENT REGARDING ALTERNATIVE INVESTMENTS IS A LEGAL DOCUMENT THAT WILL IMPOSE CERTAIN DUTIES AND RESPONSIBILITIES ON YOU AND WHICH MAY AFFECT YOUR LEGAL RIGHTS. BEFORE SIGNING THIS AGREEMENT, YOU ARE URGED TO CONSULT WITH YOUR LEGAL ADVISOR.

**1. Limitations on Transfers of Investments:**
A custodian is not required to hold all investments made by a client, and many institutions which act as custodians will not allow a client to hold an alternative investment in the client's account. As a result, a client who acquires an alternative investment in his or her account may thereafter be unable to transfer his or her investment to an account maintained by another custodian. Therefore, a client may be required to continue to utilize TD Ameritrade as a custodian of his or her account, at least with respect to the alternative investment, so long as that alternative investment is held in his or her account. Furthermore, in the event that TD Ameritrade should resign as custodian of a client's account or TD Ameritrade should revoke its consent to hold the alternative investment (as TD Ameritrade is allowed) in the account, the client may be forced to sell his or her alternative investment if the client cannot find another custodian who will agree to allow the client to hold the alternative investment in the client's account.

**2. Valuation of Assets:**
TD Ameritrade may be required to file various governmental reports disclosing the value of the assets in all accounts for which it is the custodian. Therefore, so long as the value of the investment is not readily available to TD Ameritrade within its recordkeeping systems (as generally is not the case with an alternative investment), the client must furnish to TD Ameritrade at specified times and when requested by TD Ameritrade information as to the fair market value of each investment and any change in that fair market value.

**3. Tax ID Numbers:**
If the investment may generate "unrelated business taxable income," a tax return (Form 990-T) may be required to be filed for the account, and the IRS also requires that an employer identification number be obtained for the account. The account owner is responsible for obtaining that number from the IRS (IRS Form SS-4 is used for this purpose) and for furnishing that number to the sponsor of the investment.

**4. Subscription Agreements:**
Some investments require that the investor sign a subscription agreement and/or investor questionnaire acknowledging certain matters, representing, among other things, that the investor is an "accredited investor" and indemnifying the sponsor of the investment for various matters. The client, and not TD Ameritrade, is responsible for making all of the representations, warranties, and/or agreements required as a condition to the purchase of the investment. However, the client should clearly indicate in any subscription agreement that the investment is being acquired through his or her account and that the investment should be registered as "TD Ameritrade, Inc.," not in its individual capacity but solely as Custodian of the Account of [name of client]."

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of ____________________, 20

TD AMERITRADE, INC.:

By: ______________________________ Title: ______________

CLIENT:

Name: Patrick J. Denard Signature: [signature] Date: 4/19/15

Address: 420 G. Street, Jacksonville, OR 97530

Investment: Coachman Energy VI,LP

Account Number: 934046100 Fair Market Value:$ 100,000 per unit

- I will be responsible to see that this certificate is registered in the proper name of TD Ameritrade, Inc.

Mailing Address:
**TD Ameritrade Institutional**
PO BOX 919094
San Diego, CA 92191-9094

Overnight Address:
**TD Ameritrade Institutional**
5010 Wateridge Vista Drive
San Diego, CA 92121-5775

TDAI 7283 REV. 02/14

Investment Products: Not FDIC Insured * No Bank Guarantee * May Lose Value

TD Ameritrade Institutional, Division of TD Ameritrade, Inc., member FINRA/SIPC/NFA and TD Ameritrade Clearing, Inc., member FINRA/SIPC.
TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank.
© 2014 TD Ameritrade IP Company, Inc. All rights reserved. Used with permission.

Date: 4/19/2015

Select Capital Corporation
Attention: Burke Dambly, President
31351 Rancho Viejo Road, Suite #205
San Juan Capistrano, CA 92675

Re: Coachman Energy VI, LP
Patrick J. Denard

To Whom It May Concern:

I, Patrick J. Denard, authorize Coachman Energy VI, LP to register my interests/units at TD Ameritrade, Inc. as **TD Ameritrade Clearing Inc., FBO: Patrick J. Denard Acct. #934046100 (SSN: 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)**.

Please accept this letter as my authorization to Coachman Energy VI, LP to send all future distributions/payments of income, dividends and/or principal earned from this asset as follows:

**Overnight mailing instructions:**
TD Ameritrade Institutional
Attention: Limited Partnerships
200 S. 108th Avenue, Omaha, NE 68103-2207
**OR**
Submit per TD Ameritrade, Inc.'s Non-Standard Assets Team's Instructions
Check Payable: TD Ameritrade, Inc.
FBO: **Patrick J. Denard**
Account: **934046100**

This should be effective immediately upon receipt of this direction. Should you have any questions, please contact my financial advisor, Criterion Wealth Management at (661) 254-2543.

Sincerely,

Patrick J. Denard
Investor
SSN: xxx-xx-7181

cc: Criterion Wealth Management
Ausdal Financial Partners

Re: Letter of Direction regarding new purchase in Individual Account of $150,000 (1.5 units @$100,000 per unit) of Coachman Energy VI, LP.

ORIGINAL

# Units of Limited Partner Interests and Investor General Partner Interests in Coachman Energy VI LP

COACHMAN energy

EACH PROSPECTIVE INVESTOR IN COACHMAN ENERGY VI LP, A DELAWARE LIMITED PARTNERSHIP (THE "FUND"), SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THE CONTEXT OF SUCH PROSPECTIVE INVESTOR'S OWN NEEDS, INVESTMENT OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE SUCH PROSPECTIVE INVESTOR'S OWN INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH PROSPECTIVE INVESTOR IS ENCOURAGED TO CONSULT WITH SUCH PROSPECTIVE INVESTOR'S ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT, OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED INVESTMENT.

**Please read carefully the Amended and Restated Confidential Private Placement Memorandum (the "Memorandum") for the sale of units of limited partner interests and investor general partner interests (the "Units") in the Fund and all exhibits thereto, before deciding to invest.**

This offering is limited to investors who certify that they meet all of the suitability requirements set forth in the Memorandum for the purchase of the Units.

If you meet these qualifications and desire to purchase Units, please complete, sign and deliver this Subscription Agreement along with your check, payable to: (i) Colorado Bank and Trust, as Escrow Agent for Coachman Energy VI LP, until we reach the Minimum Offering Amount, then to (ii) Coachman Energy VI LP after we reach the Minimum Offering Amount. Unless otherwise directed by the Fund, the documents should be mailed or delivered to:

**Select Capital Corporation**
**Attention: Burke Dambly, President**
**31351 Rancho Viejo Road, Suite #205**
**San Juan Capistrano, CA 92675**
**Fax: 949-429-5393**
**Email: Burke@Selectcapitalcorporation.com**

**Upon (1) receipt of the signed Subscription Agreement and ACH Banking Information; (2) verification of your investment qualifications; (3) receipt of a completed Form W-9 and copy of a form of identification (for subscribers investing in the Fund prior to the Minimum Offering Amount); and (4) acceptance of your subscription by the General Partner (as defined herein), acting on behalf of the Fund (the General Partner reserves the right, in its sole discretion, to accept or reject a subscription for any reason whatsoever), the Fund will notify you of receipt and acceptance of your subscription.**

**Important Notes:**

a. The person or entity actually making the decision to invest in Units should complete and execute the Subscription Agreement.

b. Broker/Dealers and their Registered Representatives must complete Schedule II.

**1 INITIAL INVESTMENT**

COACHMAN energy

Subscriber: Patrick J. Denard
(as Registered – please print)

The offering by the Fund of limited partner interests and investor general partner interests (collectively, "Units") is limited to investors who certify that they qualify as "accredited investors" (as such term is defined under Regulation D promulgated under the Securities Act of 1933, as amended), unless waived in the sole discretion of Coachman Energy Managing General Partners LLC, the Managing General Partner of the Fund (the "General Partner"). The General Partner reserves the right, in its sole discretion, to accept or reject this Subscription Agreement for any reason whatsoever.

**This is the offer and agreement ("Subscription Agreement") of the undersigned (the "Subscriber") to purchase:**

__________ units of **limited partner ("LP")** interest (the "LP Interest") to be issued by the Fund for a purchase price of $100,000 per Unit, subject to the Incentives (as described below), and subject to the terms, conditions, acknowledgments, representations, and warranties stated herein; **and, or**

1.5 units of investor **general partner ("GP")** interest (together with the LP Interest, the "Units") to be issued by the Fund, for a purchase price of $100,000 per Unit, subject to the Incentives, and subject to the terms, conditions, acknowledgments, representations, and warranties stated herein **(Subscribers investing as GPs must also complete the questionnaire attached as Schedule III);**

**In exchange for:**

$150,000 total purchase price, representing the aggregate contribution for the Units the Subscriber is purchasing, subject to the Incentives (as defined herein); to become a Limited Partner and/or Investor General Partner, as applicable, in the Fund, as more fully described in the Amended and Restated Confidential Private Placement Memorandum dated March 19, 2015 (the "Memorandum"); and to enter into the Fund's Amended and Restated Limited Partnership Agreement, dated March 19, 2015 (the "LP Agreement"), the form of which is attached as Appendix I to the Memorandum.

**Please indicate the method of transmitting funds by checking one of the following:**

☐ **By Mail:** Attach a check made payable to "Colorado Bank and Trust, as Escrow Agent for Coachman Energy VI LP" until we reach the Minimum Offering Amount, then to "Coachman Energy VI LP" after we reach the Minimum Offering Amount.

☒ **By Wire:**

**Until we reach the Minimum Offering Amount:**
Colorado State Bank and Trust
1600 Broadway, 4th Floor
Denver, CO 80202
ABA #: 103 900 036
Account: 600024642
Ref: BOKF Corporate Trust Funds
Attn: George Kubin
Further Credit: *Coachman Energy Subscription Escrow Acct # 82-9840-01-6*

**After we reach the Minimum Offering Amount:**
Colorado State Bank and Trust
1600 Broadway, 4th Floor
Denver, CO 80202
ABA #: 102 000 607
Account: 8094702599
Account Name: Coachman Energy VI LP
Memo: *Please Reference Your Name and Fund Name*

☐ **Waiver of Commission:** Please check this box if you are eligible for a waiver of commission. Waivers of commissions are available for purchases:
(1) through an affiliated investment advisor, or
(2) participating Broker-Dealer or its retirement plan, or
(3) for a representative of a participating Broker-Dealer or his or her retirement plan or family member(s)

☐ **Registered Investment Advisor (RIA):** If this box is checked, commission will be waived. All sales of securities must be made through a Broker-Dealer and include a Certification of Client Suitability signed by the RIA. If an RIA has introduced the sale, the sale must be conducted through:
(1) the RIA in his or her capacity as a Registered Representative of a Broker-Dealer, if applicable;
(2) a Registered Representative of a Broker-Dealer which is affiliated with the RIA, if applicable; or
(3) if neither (1) nor (2) is applicable, an unaffiliated Broker-Dealer.

COACHMAN energy

**Distribution Reinvestment Plan (DRP)**
The Fund has adopted a distribution reinvestment plan (the "DRP") for investors who purchase Units pursuant to the Memorandum. The Fund will apply all distributions declared and paid in respect of the Units held by each participating Unitholder, including distributions paid with respect to any full or fractional Units acquired under the DRP, to the purchase of the Units for such participating Unitholders.

Under the DRP, the purchase price per Unit will be $90,000. The Fund will not charge a Unitholder any other fees in connection with the purchase of Units under the DRP. A detailed summary of the DRP may be found in the Memorandum, and a copy of the DRP is attached as Appendix IV thereto.

Should you wish to have your cash distributions reinvested in the form of more Units, a copy of the DRP election form is attached hereto as Schedule IV.

Additional Instructions for Investors Subscribing Before the Minimum Offering Amount is Reached

Subscribers investing in the Fund before the Minimum Offering Amount is reached and who will have their funds held in escrow are required to (i) complete a Form W-9 and (ii) provide a copy of a form of identification. A copy of Form W-9 and additional instructions are attached hereto as Schedule V.

**Notice of Early Investor Incentives**
There are two (2) Early Investor Incentives available to Subscribers. Subscribers (each a "Stage 1 Investor") who buy Units from broker dealers or registered investment advisors ("RIAs") as described below under "Early Investor Incentive Availability to Broker Dealers and Registered Investment Advisors" and who fully pay for Units prior to the acceptance by the Fund and/or Coachman Energy VIB LLC, a Delaware limited liability company (the "Investing Company," and collectively, the "Companies") of subscriptions for a total of 500 Units ("Stage 1 Units") in the Companies ("Stage 1"), excluding any Units (i) in the Companies subject to the Major Investor Incentive and/or (ii) subscribed for in the Fund by the Investing Company, shall receive a twelve percent (12%) gross up on the number of Units subscribed for by such Stage 1 Investor, resulting in the issuance to such Stage 1 Investor of 1.136 Units per $100,000 contribution (the "Stage 1 Early Investor Incentive").

Following the termination of Stage 1, Subscribers (each a "Stage 2 Investor") who buy Units from broker dealers or RIAs as described below under "Early Investor Incentive Availability to Broker Dealers and Registered Investment Advisors" and who fully pay for Units prior to the acceptance by the Companies of subscriptions for a total of 500 additional Units ("Stage 2 Units") in the Companies ("Stage 2"), excluding any Units (i) in the Companies subject to the Major Investor Incentive and/or (ii) subscribed for in the Fund by the Investing Company, but including those Units subscribed for by Stage 1 Investors, shall receive a six percent (6%) gross up on the number of Units subscribed for by such Stage 2 Investor, resulting in the issuance to such Stage 2 Investor of 1.064 Units per $100,000 contribution (the "Stage 2 Early Investor Incentive" and together with the Stage 1 Early Investor Incentive, the "Early Investor Incentives").

**Early Investor Incentives Availability to Broker Dealers and Registered Investment Advisors**
Broker dealers and Registered Investment Advisors ("RIAs") who have either (i) entered into selling agreements with the Fund, or (ii) commenced due diligence on the Offering as of the date of the Memorandum will have 115 days from the date of the Memorandum to sell the Stage 1 Units and, following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Broker dealers and RIAs who have neither (i) entered into selling agreements with the Fund, nor (ii) commenced due diligence on the Offering as of the date of the Memorandum will have 135 days from the first date subsequent to the date of the Memorandum on which such broker dealer or RIA is contacted by the Fund or a wholesale representative of the Fund to sell the Stage 1 Units, and following the termination of Stage 1, will thereafter have 60 days to sell the Stage 2 Units.

Once both Stage 1 and Stage 2 have lapsed, however, such broker dealers and RIAs shall no longer be eligible to offer any Stage 1 Units or Stage 2 Units (collectively, "Early Incentive Units") to their clients even if all of the Early Incentive Units have not been sold by the Fund.

**Notice of Major Investor Incentive**
Any single or Affiliated (as such term is defined in the LP Agreement) group of investor(s) purchasing a minimum of twenty (20) Units in a single transaction will receive a ten percent (10%) gross up on the amount of Units subscribed for, resulting in receipt of 1.111 Units per $100,000 contribution (the "Major Investor Incentive," and collectively with the Early Investor Incentives, the "Incentive(s)").

The Major Investor Incentive may not be combined with the Early Investor Incentives.

The combined equity invested in the Fund by (A) the Company, plus (B) any Plan (as defined in the Memorandum), may not exceed twenty-five percent (25%) of the value of any class of equity of the Investment Fund, and the Early Investment Incentives shall be subject to adjustment to the extent necessary to comply with such requirement.

COACHMAN energy

## 2 SUBSCRIBER ACKNOWLEDGMENTS, REPRESENTATIONS AND WARRANTIES

In order to induce the General Partner, on behalf of the Fund, to accept this Subscription Agreement and as further consideration for such acceptance, the Subscriber hereby makes the following acknowledgments, representations and warranties with the full knowledge that the General Partner will expressly rely thereon in making a decision to accept or reject this Subscription Agreement:

1. The Subscriber has received the Memorandum and the LP Agreement and is familiar with their terms, has read and fully understands the risk factors enumerated in the Memorandum and has read and reviewed the LP Agreement and fully understands its terms.

2. The Subscriber hereby adopts, confirms, and agrees to all of the covenants, representations, and warranties contained in this Subscription Agreement.

3. The Subscriber represents that it is an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and as indicated below qualifies as an accredited investor:

**(check each as appropriate)**

**As of the date of this Subscription Agreement, the Subscriber is:**

☐ an individual who had an income in excess of $200,000 in each of the two most recent years (or joint income with his or her spouse in excess of $300,000 in each of those years) and has a reasonable expectation of reaching the same income level in the coming year;

☒ an individual who has a net worth (or joint net worth with his or her spouse) in excess of $1,000,000, exclusive of the value of the primary residence, but inclusive of home furnishings and personal automobiles;

☐ an Individual Retirement Account ("IRA") or revocable trust and the individual who established the IRA or each grantor of the trust is an accredited investor on the basis of (a) or (b) above;

☐ a self-directed pension plan and the participant who directed that the assets of his or her account be invested in the Fund is an accredited investor on the basis of (a) or (b) above and such participant is the only participant whose account is being invested in the Fund;

☐ a pension plan which is not a self-directed plan and which has total assets in excess of $5,000,000;

☐ an irrevocable trust which consists of a single trust (1) with total assets in excess of $5,000,000, (2) which was not formed for the specific purpose of investing in the Fund and (3) whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable or evaluating the merits and risks of the prospective investment;

☐ a corporation, a limited liability company, a partnership or a Massachusetts or similar business trust, that was not formed for the specific purpose of acquiring interest in the Fund, with total assets in excess of $5,000,000;

☐ an entity in which all of the equity owners are accredited investors; or

☐ none of the above apply (further information may be required to determine accredited investor status).

[1] When determining net worth, the value of the investor's primary residence must be excluded, and the related amount of indebtedness secured by the primary residence up to its fair market value may also be excluded. However, indebtedness secured by the residence in excess of the value of the home should be considered a liability and deducted from the investor's net worth. (SEC Compliance and Disclosure Interpretation, Question 179.01, July 23, 2010) Further, any additional indebtedness secured by an individual's primary residence which is obtained within 60 days prior to the issuance of the Units will be treated as a liability, unless such indebtedness is the result of the acquisition of the primary residence. (SEC Final Rule Release No. 33-9287, December 21, 2011

COACHMAN energy

**4. Under penalties of perjury, the Subscriber certifies that:**

■ the number shown on this Subscription Agreement is its correct taxpayer identification number; and (initial one):

__PD__ the Subscriber is not subject to backup withholding, because it has not been notified that it is subject to backup withholding as a result of a failure to report all interest or dividends; or the Internal Revenue Service has notified the Subscriber that it is no longer subject to backup withholding; **or**

__________ the Subscriber is subject to backup withholding (if it has been notified that it is subject to backup withholding due to notified payee under-reporting) and it has not received a notice from the Internal Revenue Service advising it that backup withholding has terminated.

5. The Subscriber further represents and warrants that it has the capacity to evaluate the merits and risks of the prospective investment in Units and that such investment is not disproportionate to its income or available liquid funds and that it further has the capacity to protect its interests in connection with the purchase of the Units.

**The following is a description of its experience in financial and business matters:**

______________________________________________

______________________________________________

6. **The Subscriber (we) wishes to own its (our) Units as follows (check one):**

■ **Separate or individual property.** (In community property states, if the purchaser is married, his (her) spouse must provide written consent if community funds will be used to purchase the Units.)

Spousal Consent Signature: ______________________

Print Name: ______________________

☐ **Husband and Wife as community property.** (Community property states only. Husband and Wife should both sign all required documents unless advised by their attorney that one signature is sufficient.)

☐ **Joint Tenants with right of survivorship.** (Both parties must sign all required documents unless advised by their attorneys that one signature is sufficient.)

☐ **Tenants in Common.** (Both parties must sign all required documents.)

☐ **Trust.** (Attach copy of trust instrument and include name of trust, name of trustee and date trust was formed.)

☐ **Fund (General or Limited) or Limited Liability Company.** (Attach copy of partnership or operating agreement and include evidence of authority for person who executes required documents.)

☐ **Other** (indicate):______________________________________________

______________________________________________

7. The Subscriber understands that in the event this Subscription Agreement is not accepted then the funds transmitted herewith shall be returned to the undersigned and this Subscription Agreement shall be terminated and will be of no further effect.

8. The Subscriber understands that upon acceptance by the General Partner on behalf of the Fund, this Subscription Agreement is irrevocable and binding.

9. The Subscriber has substantial experience in investment decisions of this type or is relying on such Subscriber's attorney, accountant or other adviser or purchaser representative in making such Subscriber's investment decision.

10. No representations or warranties have been made to the Subscriber by the Fund, the General Partner, or any officers, directors, employees, agents, or affiliates of the General Partner.

COACHMAN energy

11. The Subscriber has evaluated the merits and risks of investing in the Fund, and the Subscriber's overall commitment to investments that are not readily marketable is not disproportionate to its individual net worth, and investment in the Units will not cause such overall commitment to become excessive. The Subscriber has adequate means of providing for its financial requirements, both current and anticipated, and has no need for liquidity in this investment. The Subscriber can bear and is willing to accept the economic risk of losing its entire investment in the Units.

12. The Subscriber hereby acknowledges receipt of the Memorandum and the Escrow Agreement between the Fund and Colorado State Bank and Trust, as escrow agent, dated October 17, 2014, as amended, and attached as Appendix III to the Memorandum, each of which has been provided by the Fund.

13. The Subscriber hereby acknowledges that the sale of the Units has not been accompanied by the publication of any advertisement, any general solicitation or as the direct result of an investment seminar sponsored by the Fund or any of its affiliates.

14. All information that the Subscriber has provided to the Fund herein concerning its suitability to invest in the Units is complete, accurate and correct as of the date of its signature on the last page of this Subscription Agreement. The Subscriber hereby agrees to notify the Fund immediately of any material change in any such information occurring prior to the acceptance of this Subscription Agreement, including any information about changes concerning its net worth and financial position.

15. The Subscriber has had the opportunity to ask questions of, and receive answers from each of the Fund, the General Partner and their respective directors, managers, officers, and employees concerning the Fund, the creation or operation of the Fund and terms and conditions of the offering of the Units. The Subscriber has been provided with all materials and information requested by either the Subscriber or others representing the Subscriber, including any information requested to verify any information furnished to the Subscriber.

16. The Subscriber is purchasing the Units for such Subscriber's own account and for investment purposes only and has no present intention, understanding or arrangement for the distribution, transfer, assignment, resale or subdivision of the Units. The Subscriber understands that, due to the restrictions referred to in Paragraph 17 below, and the lack of any market existing or to exist for the Units, the investment in the Fund will be highly illiquid and may have to be held indefinitely.

17. The Subscriber understand that legends will be placed on any certificates evidencing the Units with respect to restrictions on distribution, transfer, resale, assignment or subdivision of the Units imposed by applicable federal and state securities laws. The Subscriber is fully aware that the Units subscribed for hereunder have not been registered with the Securities and Exchange Commission in reliance on an exemption specified in Regulation D of the Securities Act, which reliance is based in part upon the Subscriber's representations set forth herein. The Subscriber understands that the Units subscribed for herein have not been registered under applicable state securities laws and are being offered and sold pursuant to the exemptions specified in said laws, and unless they are registered, they may not be re-offered for sale or resold except in a transaction or as a security exempt under those laws.

18. The Subscriber hereby acknowledges receipt of the LP Agreement, and hereby adopts the LP Agreement as a Limited Partner and/or Investor General Partner, as applicable, of the Fund.

19. The Subscriber understands that fees of up to thirteen and seventy-five hundredths percent (13.75%) will be paid from the Capital Contributed (as defined in the LP Agreement), to the extent such fees apply, which includes following fees: (i) seven percent (7%) of the Capital Contributed, payable in connection with broker dealer commissions; provided, however, that in the event that an Investor contributes $5,000,000 or more to the Fund, then such Participating Broker-Dealer's selling commission shall be reduced from seven percent (7%) to two percent (2%) (the "Commission Reduction"); (ii) a three and three quarter percent (3.75%) fee to the managing-broker-dealer for managing the sales and marketing efforts of the Fund and complying with FINRA and federal and state securities laws; and (iii) three percent (3%) of the aggregate Capital Contributions will be deducted as an Organizational Fee, provided solely as a reimbursement of expenses incurred by the General Partner for the organization of the Fund and syndication of the Units; provided, however, the Fund may, but is not obligated to pay the organizational and syndications fees out of funds received from the Investing Company (as defined in the LP Agreement). The Commission Reduction will reduce the purchase price of the Unit to $95,000. Any Investor eligible for the Commission Reduction will still be entitled to the Major Investor Incentive.

20. The Subscriber understands that the Fund will pay: (i) an annual management fee to the General Partner, or Coachman Energy Administrator LLC, a Delaware limited liability company (the "Administrator"), on the General Partner's behalf, in an amount equal to two and one-half percent (2.5%) of the aggregate Capital Contributions; and (ii) an annual reimbursement equal to a maximum (per year) of one and one-half percent (1.5%) of the aggregate Capital Contributions to the Administrator for management expenses incurred in providing administrative services to the Fund, including overhead expenses.

COACHMAN energy

21. The Subscriber understands that in the event the Fund incurs indebtedness, the Investment Manager will be entitled to a one percent (1%) origination fee and a one percent (1%) fee on any drawdown on such indebtedness for efforts in assisting to arrange such debt for the Fund, and subsequently managing assets purchased or acquired from the indebtedness.

22. The Subscriber understands that in the event the Fund incurs indebtedness and the MGP or its Affiliates is required to guarantee any such indebtedness or extensions of credit, the MGP or its Affiliates may charge the Fund a one-time guaranty fee equal to two percent (2%) of the amount guaranteed by the MGP or its Affiliates.

23. The Subscriber has no knowledge that amounts paid or contributed to the Fund by the Subscriber were directly or indirectly derived from, or related to, any activity that is deemed criminal under the laws of the United States, including, without limitation, anti-money laundering laws.

24. This Subscription Agreement shall be construed in accordance with and governed by the laws of the State of Delaware without regard to its choice of law provisions, except as to the type of registration of ownership of Units, which shall be construed in accordance with the state of principal residence of the subscribing investor.

25. THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS, THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE UNITS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

26. The Subscriber hereby covenants and agrees that any dispute, controversy or other claim arising under, out of or relating to this Subscription Agreement or any of the transactions contemplated hereby, or any amendment thereof, or the breach or interpretation hereof or thereof, shall be determined and settled in binding arbitration in the County of Denver, State of Colorado, in accordance with the rules and procedures of the American Arbitration Association. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, reasonable attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction.

**27. The Subscriber hereby agrees to indemnify, defend and hold harmless the Fund, the General Partner, and all of their officers, directors, affiliates, employees and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of its failure to fulfill all of the terms and conditions of this Subscription Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Subscriber has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by the Fund, the General Partner, or any of their officers, directors, affiliates, employees or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Subscriber has furnished in connection with this transaction.**

28. The Subscriber hereby acknowledges and agrees that: (a) it may not transfer or assign this Subscription Agreement, or any interest herein, and any purported transfer shall be void; (b) it is not entitled to cancel, terminate or revoke this Subscription Agreement and that this Subscription Agreement will be binding on its heirs, successors and personal representatives; provided, however, that if the General Partner rejects this Subscription Agreement, this Subscription Agreement shall be automatically canceled, terminated and revoked; (c) this Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the sale of the Units and may be amended, modified or terminated only by a writing executed by all parties (except as provided herein with respect to rejection of this Subscription Agreement by the General Partner); (d) within five days after receipt of a written request from the Fund, the undersigned agrees to provide such information and to execute and deliver such documents as may be necessary to comply with any and all laws and regulations to which the Fund is subject; and (e) the representations and warranties of the undersigned set forth herein shall survive the sale of the Units pursuant to this Subscription Agreement.

29. Power of Attorney ("POA"). The undersigned Limited Partner and/or Investor General Partner, as applicable, of the Fund hereby constitutes and appoints the General Partner, any Liquidator (as defined in the LP Agreement), and authorized officers and

COACHMAN energy

attorneys-in-fact of the Fund, and each of those acting singly, in each case with full power of substitution, as its true and lawful agent and attorney-in-fact, with full power and authority in its name, place and stead to:

a. execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (A) all certificates, documents and other instruments (including, without limitation, the LP Agreement, the Certificate, and all amendments or restatements thereof) that the General Partner or the Liquidator deems appropriate or necessary to form, qualify, or continue the existence or qualification of the Fund as a limited partnership (or a partnership in which the Limited Partners have limited liability) in the State of Delaware and in all other jurisdictions in which the Fund may or plans to conduct business or own property; (B) all instruments that the General Partner deems appropriate or necessary to reflect any amendment, change, modification, or restatement of the LP Agreement in accordance with its terms; (C) all conveyances and other instruments or documents that the General Partner or the Liquidator deems appropriate or necessary to reflect the dissolution and liquidation of the Fund pursuant to the terms of the LP Agreement, including, without limitation, a certificate of cancellation; (D) all instruments relating to the admission, withdrawal, removal, or substitution of any Unitholder pursuant to, or other events described in Articles 11, 12 or 13 of the LP Agreement or the Capital Contribution of any Unitholder; and (E) all certificates, documents and other instruments relating to the determination of the rights, preferences, and privileges of the Units; and

b. execute, swear to, seal, acknowledge and file all ballots, consents, approvals, waivers, certificates, and other instruments appropriate or necessary, in the sole and absolute discretion of the General Partner or any Liquidator, to make, evidence, give, confirm, or ratify any vote, consent, approval, agreement, or other action which is made or given by the Unitholders hereunder or is consistent with the terms of the LP Agreement or appropriate or necessary, in the sole discretion of the General Partner or any Liquidator, to effectuate the terms or intent of the LP Agreement.

Nothing contained in this Paragraph 28 (the "POA") shall be construed as authorizing the General Partner or any Liquidator to amend the LP Agreement except in accordance with Article 14 of the LP Agreement or as may be otherwise expressly provided for in the LP Agreement. This POA is hereby declared to be irrevocable and a power coupled with an interest, in recognition of the fact that each of the Unitholders will be relying upon the power of the General Partner and any Liquidator to act as contemplated by the LP Agreement in any filing or other action by it on behalf of the Fund, and it shall survive and not be affected by the subsequent Incapacity of the undersigned Unitholder or the transfer of all or any portion of Units held by the undersigned Unitholder and shall extend to such undersigned Unitholder's heirs, successors, assigns and personal representatives. The undersigned Unitholder hereby agrees to be bound by any representation made by the General Partner or any Liquidator, acting in good faith pursuant to this POA, and the undersigned Unitholder and/or Investor General Partner, as applicable, hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the General Partner or any Liquidator, taken in good faith under such power of attorney. Each Unitholder and/or Investor General Partner, as applicable, shall execute and deliver to the General Partner or the Liquidator, within fifteen (15) days after receipt of the General Partner's or Liquidator's request therefor, such further designation, powers of attorney and other instruments as the General Partner or the Liquidator, as the case may be, deems necessary to effectuate the LP Agreement and the purposes of the Fund.

All terms which are used herein but not defined shall have the meaning set forth in the LP Agreement. Investors must list their principal place of residence rather than their office or other address on the signature page so that the Fund can confirm compliance with appropriate securities laws. If you wish correspondence sent to some address other than your principal residence, please provide a mailing address in the blank provided below.

30. Please identify the Broker/Dealer Registered Representative or RIA who sold you the Units in the Company.

Name: Ausdal Financial Partners, Inc.

**If** there was no Broker/Dealer or RIA involved in this transaction, **please initial both spaces below.**

______ The undersigned acknowledges that there was no Broker/Dealer or RIA involved in this transaction and these Units were purchased directly from the Fund without the involvement of a FINRA Broker/Dealer, a FINRA registered representative, or a Registered Investment Advisor, and that Select Capital Corporation is not the Broker/Dealer of record for this transaction.

______ The undersigned acknowledges they have a pre-existing business relationship with the Company, the Manager, or its Affiliates, and have not made this investment as a result of any general solicitation.

COACHMAN energy

**TRANSFER ON DEATH DESIGNATION.** By signing below, I (we) request that my (our) investment (if accepted by the General Partner) be registered in "transfer on death" form, and designate the following beneficiary(ies) as the individual(s) to whom the investment shall pass after I am (we are) deceased.

Print Name________________________ Date of Birth______________ Number of Units________

Print Name________________________ Date of Birth______________ Number of Units________

Print Name________________________ Date of Birth______________ Number of Units________

Print Name________________________ Date of Birth______________ Number of Units________

**By signing below, I (we) make the following warranties, representations and agreements:**

a) The Fund is not required to re-register the investment in the name of the beneficiary(ies) unless the Fund has received such documents as required to establish that I am (we both are) deceased.

b) The Fund is not responsible for determining the tax consequences of the decision to register this investment to requested beneficiary(ies).

c) I (we) agree to hold harmless, indemnify and defend the Fund and its agents for any claim, loss or liability resulting from i) breach of any warranty or representation in this Subscription Agreement and/or ii) any action the Fund takes in connection with the registration, any re-registration in the name of the beneficiary, and from any distribution thereafter to the beneficiary, made as requested or authorized under this Subscription Agreement.

d) If this Subscription Agreement is established under joint tenants with rights of survivorship account status, upon death of one of the owners, ownership shall pass to the surviving joint owner, and the Fund may follow the instructions of the survivor with regard to the investment, including without limitation, instructions to i) terminate transfer on death registration or ii) change owner to beneficiary.

e) If I am married and established this account individually, or jointly and the joint applicant is not my spouse, my spouse's waiver has been executed by signing below.

f) The Fund has not provided any legal advice to me (us), and I (we) agree to obtain the advice of an attorney with regard to the enforceability of this form of registration in my state, and its effect on my estate and tax planning.

TRANSFER ON DEATH SPOUSAL WAIVER:

Spouse's Waiver: ______________________________

Date: ____________________, 20__________

[Remainder of page intentionally left blank.]

COACHMAN energy

**3 EXECUTION**

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this 19 day of April, 2015.

**A. REGISTRATION INFORMATION**

Please print the exact name (registration) Subscriber desires on account: Patrick J. Denard

Principal Mailing Address: 420 G. Street
Jacksonville, OR 97530

Email Address: pjdenard@gmail.com

If an **individual**:

Primary State of Residence: Oregon

Individual's Birth Date: 10/10/1979

If an **entity**:

Date/State of Formation: ____________

Authorized Person: ____________

Title: ____________

Social Security or Federal Tax ID Number: 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

**B. INVESTOR INFORMATION**

Please send all correspondence to the following:

Name: Dr. Patrick J. Denard

Please check your preferred method of communication.

☑ Address: 420 G. Street
Jacksonville, OR 97530

☐ Email Address: ____________

Phone: Business (____) ____________ Home ( 503 ) 320-8557

**C. SIGNATURES**

THE UNDERSIGNED HAS THE AUHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED IN A. ABOVE.

Executed this 19th day of April, 2015

[signature]

Signature (Subscriber, or authorized signatory)

____________

Signature (Subscriber, or authorized signatory)

Accepted by the Fund as of this ______day of ____________, 20______.

**Coachman Energy VI LP**

**By:** **Coachman Energy Managing General Partners LLC**
**Its:** **Managing General Partner**

By: ____________

Name: ____________

Title: ____________

COACHMAN energy

SCHEDULE I

## ACH BANKING INFORMATION REQUEST FORM

### REGISTRATION INFORMATION

Beneficiary Name (Please Print)

Street Address Apt.

City State Zip Code

Phone Number Email Address

**Note: For further instructions, please review the attached Letter of Direction regarding registration and payments.**

### FINANCIAL ORGANIZATION INFORMATION

Bank Name

Bank Address Suite #

City State Zip Code

Account Number ABA/Routing Number

Type of Account ☐ Checking ☐ Savings

Signature of Beneficiary Date



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00074028

COACHMAN energy

**SCHEDULE II**

## BROKER/DEALER REPRESENTATIONS AND WARRANTIES

Standards of suitability have been established by the Company in accordance with the definition of "accredited investor," as promulgated under Regulation D of the Securities Act and fully disclosed in this Subscription Agreement. Prior to recommending purchase of the Units, we have reasonable grounds to believe, on the basis of information supplied by the Subscriber concerning his or her investment objectives, other investments, financial situation and needs, and other pertinent information that: (i) the Subscriber meets the standards established by the Company; (ii) the Subscriber has a net worth and income sufficient to sustain the risks inherent in the Units, including loss of the entire investment and lack of liquidity; and (iii) the Units are otherwise a suitable investment for the Subscriber. We will maintain in our files documents disclosing the basis upon which the suitability of this Subscriber was determined.

We verify that the above subscription either does not involve a discretionary account or, if so, that the Subscriber's prior written approval was obtained relating to the liquidity and marketability of the Units during the term of the investment.

**BROKER/DEALER FIRM NAME:** Ausdal Financial Partners, Inc.

Broker/Dealer CRD Number: 7795

Main Office Address: 5187 Utica Ridge Road

Davenport, IA 52807

Phone: (563) 326 – 2064 Fax: (___) ___ – ___

**REGISTERED REPRESENTATIVE:** Robert A. Gravette CRD Number: 1938019

(Please Print)

Address: 26650 The Old Road, Ste. 212

Valencia, CA 91381

Phone: (661) 254 – 2543 Fax: (___) ___ – ___

Email Address: robert@criterionwealth.com

I hereby certify that I am registered in Oregon, the state of sale.

[signature]

Signature of Registered Representative

4/21/2015

Date

[signature]

Signature of Registered Principal

WARREN W. WILSON

Printed Name

5/8/2015

Date

**SUBSCRIPTION WILL NOT BE ACCEPTED WITHOUT THE SIGNATURE OF A REGISTERED PRINCIPAL OF THE BROKER/DEALER FIRM.**

COACHMAN energy

**SCHEDULE III**

# FOR GP SUBSCRIBERS ONLY

**Each Subscriber should complete for joint accounts.**

**CONFIDENTIAL**
**RULE 506 DISQUALIFICATION EVENT QUESTIONNAIRE**
**COACHMAN ENERGY PARTNERS**
**COACHMAN ENERGY VI LP**

This Questionnaire is being furnished to you to obtain information in connection with an offering (the "Offering") of securities by Coachman Energy VI LP, a Delaware limited partnership (the "Issuer"), to be made pursuant to Rule 506 under the Securities Act of 1933, as amended (the "Securities Act"). As used in this Questionnaire, "you" also refers to any entity on whose behalf you are responding.

**Important Note: Please answer every question. If your answer to a question is "Yes," please provide details in the explanation, and attach additional pages to supplement your answers if necessary.** Unless otherwise stated, your answers should be given as of the date you sign the Questionnaire. Please note that certain questions are necessarily broad in scope, so if you have doubts regarding whether something should be included in your response please err on the side of over-inclusion. The Issuer may have additional follow-up questions for you in connection with the Offering.

Once you have completed the Questionnaire, please sign it to indicate: (i) your consent for the Issuer to rely upon the information provided in this Questionnaire; (ii) your acknowledgement that the Securities and Exchange Commission (the "SEC") may require the Issuer to publicly disclose the information provided in this Questionnaire, and your consent to such public disclosure; (iii) your agreement to promptly notify the Issuer of any changes in information provided in the Questionnaire occurring after the date you sign the Questionnaire; and (iv) your confirmation that the information contained in the Questionnaire is true and correct, to the best of your knowledge and belief after a reasonable investigation, as of the date you sign the Questionnaire.

Please complete the Questionnaire and return it with your completed subscription documents. If you have any questions with respect to these matters, please call Colin Miller at (720) 279-0010.

**ISSUER WILL USE REASONABLE, GOOD FAITH EFFORTS TO ENSURE THE EXISTENCE AND CONTENTS OF THIS QUESTIONNAIRE, AS WELL AS YOUR ANSWERS AND ALL NOTES AND DRAFTS PREPARED BY YOU, ARE KEPT CONFIDENTIAL.**

COACHMAN energy

1. Name, Address, Telephone Number and Email

Your Full Name: Patrick J. Denard

Please provide all previous, assumed or fictitious names or aliases: ______

**BUSINESS ADDRESS**

______

______

______

Business Telephone (____) ______

**HOME ADDRESS**

420 G. Street

Jacksonville, OR 97530

______

HomeTelephone ( 503 ) 320-8557

Email Address: pjdenard@gmail.com

2. Have you been convicted, within the last ten (10) years (or five (5) years, in the case of the Issuer, its predecessors and affiliated issuers), of any felony or misdemeanor:

- in connection with the purchase or sale of any security;
- involving the making of any false filing with the SEC; or
- arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities?

☒ No. ☐ Yes. If yes, please provide the date of such conviction, a copy of any applicable order, and explain:

______

3. Are you subject to any order, judgment, or decree, entered within the last five (5) years that restrains or enjoins you from engaging or continuing to engage in any conduct or practice:

- in connection with the purchase or sale of any security;
- involving the making of any false filing with the SEC; or
- arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities?

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order, judgment or decree, and explain:

______

4. Are you subject to a final order of a state securities commission (or an agency of officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the Commodity Futures Trading Commission; or the National Credit Union Administration that:

- on the date hereof, bars you from:
- association with an entity regulated by such commission, authority, agency or officer;
- engaging in the business of securities, insurance or banking; or
- engaging in savings association or credit union activities; or

COACHMAN energy

- constitutes a final order, entered within the last ten (10) years, that is based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct?

A "final order" is a final, written directive or declaratory statement issued by any of the regulators listed in this Question 4 under applicable statutory authority that provides for notice and an opportunity for a hearing.

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

---

5. Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the "Advisers Act"), that, on the date hereof:

- suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser;
- places on you limitations on the activities, functions or operations of, or imposes civil money penalties; or
- bars you from being associated with any entity or from participating in the offering of any penny stock?

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

---

6. Are you subject to any order of the SEC, entered within the last five (5) years that orders you to cease and desist from committing or causing a violation of or a future violation of:

- any scienter-based anti-fraud provision of the federal securities laws, including, but not limited to, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, or Section 206(1) of the Advisers Act or any other rule or regulation thereunder; or
- Section 5 of the Securities Act.

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

---

7. Have you been suspended or expelled from membership in, or from association with a member of, a securities self-regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

---

8. Have you filed (as a registrant or issuer), or were you named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five (5) years, was the subject of a refusal order, stop order, or exemption suspension, or are you, on the date hereof, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued?

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

---

COACHMAN energy

9. Have you been subject to a United States Postal Service false representation order entered within the last five (5) years, or are you subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations?

☒ No. ☐ Yes. If yes, please provide the date and a copy of such order and explain:

**If any information furnished by me in this Questionnaire becomes inaccurate, incomplete or otherwise changes, I will promptly advise the Issuer and/or the Managing General Partner to that effect and furnish any supplementary information that may be appropriate as a result of any developments, including the passage of time and any new relationships that may develop in the future.**

**The foregoing answers are correctly and fully stated to the best of my knowledge, information, and belief after a reasonable investigation.**

Signature: [signature]

Print Name: Patrick J. Denard

Date: 4/19/2015

COACHMAN energy

SCHEDULE IV

## COACHMAN ENERGY VI LP
## DISTRIBUTION REINVESTMENT PLAN ELECTION FORM

**REGISTERED NAME(S):** ______________________________

**REGISTERED ADDRESS:** ______________________________

______________________________

### A. Distribution Reinvestment Plan (DRP)

Complete this section if you wish to have your cash distributions reinvested in the form of more Company Units of Limited Partner Interest or Investor General Partner Interest ("Units").

- If you wish to reinvest all of your cash distributions in the DRP, please cross the box marked "All."
- If you wish to reinvest a portion of your cash distributions in the DRP and if you own at least one (1) Unit, please cross the box marked "Part" and designate the number of Units.
- If you wish to terminate participation in the Company's DRP, please cross the box marked "Terminate."

Please note that an election to participate fully in the Company's DRP will override any other agreements or instructions in the Company's records regarding direct payment of your cash distributions into a specified account.

| | | |
|---|---|---|
| ☐ | **All** | **Please mark this box with an "X" if you wish all of your Units to be reinvested in the Company's DRP.** |
| ☐ | **Part** | **Please mark this box with an "X" and show the number of Units you wish to participate in the Company's DRP in the space provided below:**<br><br>______________________ |
| ☐ | **Terminate** | **Please mark this box with an "X" if you wish to terminate participation in the Company's DRP.** |