CHARLES CANTER (Cal. Bar No. 263197)
Email: canterc@sec.gov
DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katherine Zoladz, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CRITERION WEALTH MANAGEMENT INSURANCE SERVICES, INC.; ROBERT ALLEN GRAVETTE; and MARK ANDREW MACARTHUR<br><br>Defendants. | Case No. 2:20-cv-01402-SPG-JEM<br><br>**DECLARATION OF LARRY NAKAMURA**<br><br>Pre-Trial Conf. Date: April 26, 2023<br>Trial Date: May 16, 2023<br><br>Judge: Hon. Sherilyn Peace Garnett |

# DECLARATION OF LARRY NAKAMURA

I, Larry Nakamura, declare, pursuant to U.S.C. § 1746, as follows:

1. I am an individual over 18 years of age and have personal knowledge of the matters set forth below, and if called as a witness, I could and would competently testify to the facts stated therein.

2. I made this declaration at the request of the staff of the Securities and Exchange Commission ("SEC").

3. I am a Vice President and Chief Compliance Officer of CI Private Wealth, LLC, and Head of US Compliance ("CI Private Wealth"), a wholly owned subsidiary of CI Financial Corp., a Canadian corporation. I have 30 years of experience in the financial services industry. I have been a compliance professional for the last 20 years providing compliance consulting services, solutions for regulated entities, and served in the position of Chief Compliance Officer ("CCO") in the securities and financial services space.

4. From December 2010 until approximately December 2019, I was an Executive Consultant at National Regulatory Services, Inc. ("NRS"), a compliance consulting firm with clients in the financial services industry.

5. While I was at NRS, I provided compliance consulting services to Criterion Wealth Management and Insurance Services, Inc. ("Criterion"), a registered investment adviser that was one of NRS' clients.

6. My primary contact at Criterion was Robert Gravette, President and CCO of Criterion. I also occasionally communicated with other Criterion personnel, including Gravette's partner Mark MacArthur and Jason Stauffer, a back-office employee who assumed the responsibilities of CCO for a time.

7. As a compliance consultant at NRS assigned to the Criterion account, I assisted Criterion with a series a projects, including revising their Form ADV to address regulatory requirements in 2010 and responding to requests from the SEC's Office of Compliance, Inspections, and Examinations ("OCIE") in 2016-2017. Because

Criterion was a relatively small adviser with no dedicated compliance staff, they consulted me frequently on compliance matters.

8. In 2014, Criterion engaged NRS to perform a review of its compliance program and make recommendations on ways to improve that program. To formalize that engagement, the parties signed an agreement dated March 6, 2014. A true and correct copy of that agreement is attached hereto as Exhibit 55.

9. The purpose of a compliance review is to evaluate a registrant's compliance program and identify gaps in that program. Because a compliance review is by definition a high-level, holistic evaluation of a registrant's compliance program, NRS relied on the registrant to provide the bulk of the information on which any recommendations would be based. Moreover, as a compliance consultant, my focus was necessarily limited to compliance issues. I referred questions regarding the language of client agreements to the registrant's legal counsel and any matters of securities valuation to the registrant's auditor.

10. I understand that Advisers Act Rule 206(4)-7 ("Compliance Rule") requires a registrant to adopt policies and procedures specifically tailored to the risks of their business. Therefore, it was my practice to recommend that registrant's written policies and procedures reflected their particular products and operations. Furthermore, where a registrant's client base consists primarily of retail investors, it was my custom and practice to recommend that the language of their disclosures could be understood by such investors.

11. It was my practice in conducting compliance reviews of investment advisory firms in three stages: an off-site review, an on-site review, and a report summarizing my findings and outlining my recommendations. During the off-site review, it was my practice to obtain and review documents such as the firm's Form ADV, its compliance manual, its code of ethics, and its client agreements to develop an understanding of the firm's business. During the on-site review, usually conducted over a one-day period, it was my practice to evaluate the firm's policies and

procedures, review its books and records, and interview key staff responsible for compliance, trading, marketing and portfolio management, among other areas. After the off-site and on-site reviews, it was my practice to generate a report with written recommendations. I followed the first two steps of this three-step process in my 2014 review of Criterion's compliance program.

12. In connection with the first stage of the 2014 Criterion compliance review, I reviewed Criterion's Form ADV, their Code of Ethics, their Policies and Procedures Manual, and their client agreements. I did not receive many of the other documents I had requested from Criterion, including a listing of affiliated and non-affiliated broker-dealer(s), custodian(s), and subadvisers/model portfolio managers and related agreements, and private placement memoranda for affiliated private offerings; therefore, my off-site review was limited to the material provided. In the second stage of the compliance review, I conducted a site visit to their offices on May 28, 2014, during which I examined their books and records, observed their supervisory systems, and interviewed key personnel.

13. I discovered gaps in Criterion's compliance program during my off-site review and May 2014 site visit. For example, there was no formal investment process that I could observe, and due to lack of adequate documentation, there were some processes I was unable to test. For these reasons, I was unable to proceed to the third stage of my typical review process and prepare a formal report. However, I prepared a draft report that reflected some of my findings. A true and correct copy of that draft report is attached hereto as Exhibit 56.

14. I also presented my findings to the client orally during my site visit and delivered model documents to help Criterion enhance its disclosures and strengthen its policies and procedures. I did this during an in-person meeting with Gravette and Stauffer. I described to them the gaps I had identified in their compliance program, my recommendations on how to fill those gaps, and the consequences of not doing so. MacArthur was present for parts of that meeting.

15. During the 2014 Criterion compliance review, I noticed that Criterion was using a compliance manual dated 2008. That compliance manual appeared to be a generic document that contained boilerplate language that failed to address the unique risks of their business or comply with current regulatory requirements. A true and correct copy of the 2008 Criterion compliance manual I reviewed as part of NRS' 2014 engagement is attached hereto as Exhibit 7.

16. I conveyed my recommendation that Criterion should revise and update its compliance manual orally at the May 2014 on-site meeting with Gravette, MacArthur and Stauffer and in followup email correspondence. At that May 2014 meeting and various times thereafter, I delivered model documents to facilitate implementation of the changes I proposed to Criterion's compliance manual. Following that meeting, I also delivered to Criterion a one-page document describing seven sections that I believed should be added to compliance manual to address the gaps I had identified. A true and correct copy of the one-page document with the recommended new compliance manual sections is attached hereto as Exhibit 57.

17. Two sections I recommended adding to the Criterion compliance manual were policies and procedures surrounding Criterion's recommendation of private placements and policies and procedures relating to due diligence of such investments. Private placements are inherently riskier than publicly traded securities for several reasons. First, they are not subject to the same reporting and audit requirements as publicly traded securities and are thus less transparent. Second, they often involve illiquid and hard-to-value assets such as real estate or mining rights. Therefore, it was my practice to recommend that a registrant adopt policies and procedures specifically concerning such products where they constitute a substantial portion of the registrant's business.

18. After reviewing the documents Criterion provided and interviewing Criterion staff, I learned that private placements were a substantial part of Criterion's business. Based on my knowledge and familiarity with the regulatory landscape, I was aware

that the SEC had been increasing its scrutiny of private offerings. As a result, I offered suggestions on ways Criterion could address the risks posed by these securities. For example, I recommended that Criterion strengthen its policies and procedures concerning their due diligence of private placements. While my review indicated that Criterion staff may conduct some due diligence of private offerings recommended to Criterion clients, there was little documentation of actual steps taken or potential issues disclosed through that process. For instance, there was no evidence that they took any steps to verify that the private placement issuers were in compliance with state and federal law.

19. During the 2014 compliance review, I learned that Criterion derived income from a referral arrangement it had with TD Ameritrade. It was my practice to ensure that a registrant disclose any source of material compensation in addition to advisory fees, because such compensation may present a conflict of interest for the registrant. For that reason, I recommended that Criterion disclose the TD Ameritrade compensation arrangement in Item 14 of its Form ADV and revise any conflicting disclosures. *See* Ex. 56 at 9 & 14.

20. Item 14 of the Form ADV Pt. 2 requires a registrant to disclose any sort of compensation that might incentivize the registrant or its representative to sell a product. As part of my work in connection with the off-site phase of the 2014 Criterion compliance review, I examined Criterion's then-current Form ADV Pt. 2 brochure. A true and correct copy of that brochure is attached hereto as Exhibit 103. At the time, Criterion disclosed in Item 14 of its Form ADV Pt. 2 that it did not pay any referral fees or any compensation in conjunction with advisory services provided to its clients. Given the referral arrangement between Criterion and TD Ameritrade, this disclosure appeared inaccurate.

21. As a compliance consultant, I have provided advice to more than 150 dually registered investment advisers. In my experience as a compliance consultant in the securities industry, I can only recall a handful of instances where a dually registered

investment adviser charged advisory fees on products for which they are also receiving broker-dealer commissions. In each instance where such a practice was disclosed to me, I paid special attention to ensure that the conflicts of interest presented by these arrangements were fully disclosed to investors.

22. During the 2014 compliance review, Criterion did not disclose to me that Gravette and MacArthur were earning commissions from a third-party fund manager in the form of trailing referral fees. In my experience, broker-dealer commissions typically take the form of a one-time payment based on a percentage of the transaction. However, I have occasionally encountered trailing commissions in the context of dually registered investment advisers. Because trailing commissions are paid over time, I understand that such commissions create an incentive for the investment adviser to recommend continued investment even where it is no longer in the client's best interest. For that reason, it was my practice to recommend that any compensation arrangements involving trailing commissions be disclosed in a clear and concise manner. Accordingly, had I known that Criterion was earning trailing referral fees, I would have requested additional information about how these fees were disclosed to Criterion's clients. Further, I would have recommended that Criterion correct its Form ADV Pt. 2 disclosures to reflect this arrangement, as I did when I became aware of the TD Ameritrade compensation arrangement.

23. During the 2014 compliance review, Criterion did not disclose to me that it was earning ongoing commissions from a second fund manager in the form of a portion of that fund manager's performance allocation and/or carried interest. Like trailing referral fees, I understand that this type of compensation presents additional conflicts of interest, because the registrant could earn double compensation by collecting both commissions and advisory fees and the registrant would have an incentive to recommend continued investment even where it would not be in the client's best interest. For the same reasons set forth above, it was my practice to recommend clear disclosure of this type of compensation arrangement and to advise prompt and clear

disclosure if the client was not already providing it. I would expect this information to be disclosed in the registrant's Form ADV Pt. 2 and in offering documents such as a private placement memorandum.

24. In the months following the on-site portion of my 2014 compliance review, I scheduled regular calls with Gravette and Stauffer to address, on a section-by-section basis, the updates and revisions to their compliance manual and other improvements to their compliance program. I tried to schedule those calls approximately once a month.

25. Despite these calls, Criterion did not implement many of the recommendations I had made in my 2014 review. For example, I had been working with Criterion to revise their compliance manual to include the sections outlined in Exhibit 57 since 2014; however, despite my best efforts, that project languished and remained incomplete through at least the first quarter of 2017.

26. In 2017, I learned that the OCIE had conducted an examination of Criterion and identified certain deficiencies. Criterion enlisted my help in addressing the points raised in OCIE's deficiency letter. At Criterion's request, I reviewed a copy of the OCIE deficiency letter dated April 20, 2017. A true and correct copy of that April 20, 2017 deficiency letter is attached hereto as Exhibit 19.

27. I was not surprised that OCIE had found deficiencies in Criterion's compliance program because I observed many of the same gaps during NRS' compliance review in 2014 and I was aware that Criterion had not implemented many of the recommendations I had made during that review. One of the deficiencies identified by OCIE was that Criterion appeared to have violated the Compliance Rule by using a 2008 compliance manual that did not appear tailored to their particular business operations.

28. At no point did I ever advise Criterion to delay adoption of a new compliance manual. To the contrary, I urged Criterion to devote additional resources to their compliance program generally and prioritize updating their compliance manual

specifically.

29. The April 2017 OCIE deficiency letter also observed that Criterion lacked policies and procedures concerning their due diligence of private placements, which constituted a substantial portion of their business. I had made the same observation years earlier in 2014 and recommended that Criterion formalize their due diligence procedures and documentation for private offerings.

30. While I provided advice to help Criterion understand the issues raised in the April 2017 OCIE deficiency letter, I played no role in drafting or reviewing Criterion's written response.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of March, 2023, at Miami, Florida.

Respectfully submitted,

LARRY NAKAMURA

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On March 29, 2023, I caused to be served the document entitled **DECLARATION OF LARRY NAKAMURA** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 29, 2023

*/s/ Charles E. Canter*
Charles E. Canter

***SEC v. Criterion Wealth Management Insurance Services, Inc., et al.***
**United States District Court for the Central District of California**
**Case No. 2:20-cv-01402-SPG-JEM**

**SERVICE LIST**

Kenneth E. Yeadon, Esq.
Hinshaw & Culbertson LLP
151 N. Franklin Blvd., Ste. 2500
Chicago, IL 60606
Email: kyeadon@hinshawlaw.com
***Attorney for Defendants Criterion Wealth Management Insurance Services, Inc., and Robert Allen Gravette***

Jeffrey R. Thomas, Esq.
Thomas Law LLC
3801 E. Florida Ave.,
Suite 107
Denver, CO 80210
Email: jthomas@thomaslawllc.com
***Attorney for Defendant Mark Andrew MacArthur***