# EXHIBIT 7

# IA Policies and Procedures Manual

## Revision as of 4/5/2008

Criterion Insurance Services, Inc.

,

GOVERNMENT EXHIBIT 7

Blumberg No. 5122

# Table of Contents

1 REGISTRATION, LICENSING, AND SUPERVISORY STRUCTURE....1/32
1.1 Registration, Licensing....2/32
1.2 IARD Maintenance....2/32
1.3 Supervisory Structure....3/32
1.4 Procedures for Compliance with Registration and Licensing....4/32

2 BOOKS AND RECORDS REQUIREMENTS....5/32
2.1 Required Records....5/32
2.1.1 Advertising File....5/32
2.1.2 Annual Offer of Form ADV Part II (Disclosure Brochure)....5/32
2.1.3 Annual Review....5/32
2.1.4 Associated Persons Personal Transactions Records....6/32
2.1.5 Financial Records....6/32
2.1.6 Order Tickets....6/32
2.1.7 Organizational Documents....7/32
2.1.8 Policies and Procedures....7/32
2.1.9 Solicitor Disclosure Document....7/32
2.1.10 Transaction Records....9/32
2.1.11 Written Agreements....9/32
2.1.12 Written Communications....9/32
2.2 Custodial Advisers Records....9/32
2.3 Additional Records....10/32
2.3.1 Allocation Procedures, Trading Practices....10/32
2.3.2 Best Execution File....10/32
2.3.3 Complaint File....11/32
2.3.4 Disaster Recovery....11/32
2.3.5 Organizational Chart....13/32
2.3.6 Privacy Policy....13/32
2.3.7 Regulatory Inspections....15/32
2.4 Books and Records Retention....15/32
2.4.1 Electronic Maintenance of Records....16/32
2.5 Procedures for Compliance with Record-Keeping Policies....17/32

3 CODE OF ETHICS AND CONDUCT....18/32
3.1 General....18/32
3.1.1 Basic Principles....18/32
3.1.2 Chief Compliance Officer....18/32
3.1.3 Security....18/32
3.1.4 Covered Accounts....19/32
3.1.5 Beneficial Ownership....19/32
3.1.6 Personal Account Trading and Investment Policy....19/32
3.1.7 Service as a Director....20/32
3.1.8 Gifts....20/32
3.1.9 Duties of Confidentiality....20/32
3.1.10 General Ethical Conduct:....20/32
3.1.11 Misappropriation of Customer Funds....21/32
3.2 Insider Trading....22/32
3.2.1 Policy Statement on Insider Trading....22/32



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00606928

# Table of Contents

**3 CODE OF ETHICS AND CONDUCT**
3.2.2 Who Is An Insider? ....22/32
3.2.3 What Is Material Information? ....22/32
3.2.4 What Is Nonpublic Information? ....23/32
3.2.5 Types of Liability ....23/32
3.3 Penalties for Insider Trading ....23/32
3.4 Procedures for Compliance with Code of Ethics ....24/32

**4 TRADING** ....28/32
4.1 Best Execution ....29/32
4.2 Trade Errors ....32/32

# 1 REGISTRATION, LICENSING, AND SUPERVISORY STRUCTURE

The Investment Advisers Act of 1940 ("the Advisers Act") defines an "investment adviser" in Section 202(1)(11) generally to include any person (including a natural person or an entity) who meets the "prongs" listed below:

(1) for compensation

(2) is engaged in the business

(3) of providing advice to others or issuing reports or analyses regarding securities

Detail regarding these elements of the investment adviser definition are addressed by the SEC in Investment Advisers Act Release No 1092 ("Release 1092"). Release 1092 was developed jointly by the SEC and the North American Securities Administrators Association ("NASAA"). NASAA is an organization of state securities regulators. Release 1092 addresses the applicability of the Advisers Act to investment advisers commonly known as "financial planners." Release 1092 also clarifies numerous aspects of the definition of investment adviser as applies generally to all advisers.

Section 203A of the Advisers Act provides a mandatory exemption from registration under the Advisers Act for any investment adviser that is regulated or required to be regulated in the state in which it maintains its principal office and place of business and which has assets under management of less that $25 million. The exemption does not apply to an investment adviser that serves as investment adviser to a registered investment company. Because the exemption is mandatory, an investment adviser that qualifies is prohibited from registration under the Advisers Act. Section 203A-1 effectively provides for a $5 million 'window' such that an investment adviser otherwise qualifying for the exemption may elect to register with the SEC under the Advisers Act when its assets reach $25 million but is not required to register with the SEC until its assets reach $30 million. In determining the level of assets under management, an investment adviser should consider portfolios for which it provides continuous and regular supervisory or management services among other factors such as discretionary authority or ongoing management responsibilities.

Certain investment advisers with less than $25 million under management are permitted to register with the SEC under the Advisers Act. These include Advisers to registered investment companies, Advisers with their principal office in a state that does not have an Investment Adviser statute, foreign Advisers doing business in the US, nationally recognized statistical rating organizations, pension consultants to plans with at least $50 million in assets, Advisers in a control or affiliation with another SEC registered investment adviser, Advisers offering investment advice exclusively through the internet, newly registering Advisers that have a reasonable expectation that their assets will reach $25 million within a 120-day period following the effective date of their registration, and Advisers that would be otherwise required to register in 30 or more states.

Starting on February 1, 2006, hedge fund managers that have at least 15 "clients," as defined under Investment Advisers Act Rule 203(b)(3)-2, must file a Form ADV thereby becoming a federally-covered SEC registered investment adviser. In accordance with these rules and guidance, the Adviser has achieved effective registration.



FOIA Confidential Treatment Requested by Criterion Wealth Management CRITERION_SEC_00606930

## 1.1 Registration, Licensing

To affect its registration, the Criterion Insurance Services, Inc.,dba: Criterion Wealth Management has filed an application (FORM ADV Part 1) through the Investment Advisers Registration Depository ("IARD"). The information submitted in Part 1 includes information about the investment adviser's education, business, the persons who own the Adviser and disclosure regarding any sanctions for violating securities or other laws. The Criterion Insurance Services, Inc.,dba: Criterion Wealth Management has also completed Form ADV Part II and all relevant schedules. The information in Part II is geared primarily toward the Criterion Insurance Services, Inc.,dba: Criterion Wealth Management clients/investors, and provides the basis for the disclosures made to clients/investors under Rule 204-3 of the Advisers Act. Part II contains information relating to the business practices, fees, investment strategies and conflicts of interest the Criterion Insurance Services, Inc.,dba: Criterion Wealth Management may have with its clients/investors. Part II is not submitted to the SEC but is deemed to be filed so long as a copy is maintained in the Criterion Insurance Services, Inc.,dba: Criterion Wealth Management's files. This record is subject to review by the SEC. Part II is required to be updated annually, within 90 days of the Criterion Insurance Services, Inc.,dba: Criterion Wealth Management's fiscal year end, and whenever it becomes materially inaccurate. Some states may require the form to be provided to the state.

## 1.2 IARD Maintenance

Any Adviser registered with the SEC or state(s) is required to maintain current registration data through entitlement on the Registration Depository ("IARD"). Entitlement to the system is obtained through specific documentation submitted to the NASD as administrator of the system. Such documentation is found at https://www.iard.com or by contacting the IARD help desk at 240-386-4848.

Under state and SEC regulations, the Adviser is required to file an Annual Updating Amendment through IARD within 90 days following the end of the Adviser's fiscal year.

The Adviser is required to keep the information in its Form ADV current. Failure to maintain an updated Form ADV may result in disciplinary, administrative, injunctive or even criminal action against the Adviser by the SEC and/or by the state(s). Making a misleading claim in Form ADV could be the basis for a client or investor claim of fraud under state law.

The Adviser must file an amendment to its Form ADV Part 1 electronically through the IARD according to the following requirements:

- Promptly for any changes to Items 1, 3, 9 or 11 of Part 1A
- Promptly for any change to Items 1, 2 (A through F), or 2I of Part 1B
- Promptly for any materials changes to Items 4, 8 or 10 of Part 1A
- Within 90 days of the end of the Adviser's fiscal year end (Annual Updating Amendment)
- If the Adviser is required to provide an audited balance sheet with Schedule G, within 90 days of the close of the Adviser's fiscal year (some states may have additional or differing requirements)

Amendments to the wrap fee brochure (Schedule H) may be made by "stickering" provided any supplemental information is dated and affixed to the brochure in a manner that can be readily understood by a client/investor or potential client/investor.

The Part II and associated schedules form a written disclosure statement that provides information about business practices, fees, and conflicts of interest the Adviser may have with its clients/investors. Until an electronic facility is provided by the SEC through IARD, the Adviser must maintain its Form ADV Part II in paper format and provide a copy to all of its clients/investors.

Record of providing Form ADV Part II shall include a record of the date(s) that the form was provided to any client/investor or prospective client/investor who subsequently becomes a client/investor of the Adviser. Rule 204-3 imposes requirements for the delivery of Form ADV Part II and relevant schedules (1) at least 48 hours prior to entering into the advisory relationship, or (2) at the time of entering into a contract with the Adviser, provided the client/investor can terminate the contract without penalty within 5 business days after entering the contract.

At least once annually, Rule 204-3 requires that the Adviser must advise each of its clients/investors that a current Form ADV Part II and applicable Schedules are available for review. The firm shall maintain a record of the clients/investors to whom the form is offered, the date and form of the offer (by representative sample copy), and of those accepting the offer. For those clients/investors requesting a copy of the offered Form ADV Part II, the Adviser shall also maintain evidence that such copy was provided.

## 1.3 Supervisory Structure

In accordance with Rule 206(4)-7 of the Investment Advisers Act of 1940 (hereinafter "Advisers Act"), other SEC regulations, and applicable state regulations requiring supervision of specific firm activities, the Adviser has established a supervisory structure that includes the designation of personnel in key positions and a description of those positions. In a table at the end of this chapter, or in a separate file maintained by the Adviser, it has identified and maintains current a list of key personnel, their duties and supervisory obligations, as applicable.

In accordance with Rule 206(4)-7 of the Advisers Act, the Adviser must designate one employed individual to act as its Chief Compliance Officer, whose duty it shall be to administer the Adviser's compliance policies and procedures. The Chief Compliance Officer shall have full responsibility and authority to develop and enforce all appropriate compliance related policies and procedures for the Adviser. The Adviser identifies its Chief Compliance Officer ("CCO") in its organizational chart or other table of supervisory structure, and through the IARD system as required.

The Adviser's officers include but are not limited to principals such as the Founder, Managing Member, or others and a Chief Compliance Officer. These individuals are ultimately responsible for the Adviser's supervisory system, including its implementation, maintenance and ongoing appraisals as more fully described in the Procedures section below. The Adviser's principal officers may or may not supervise other officers and/or managers as well as other employees of the Adviser. The Adviser's Chief Compliance Officer is responsible for development and enforcement of the Adviser's compliance program, unless specifically exempted in the Procedures section below.

The Adviser is cautioned that the approach to licensing of its individual associated persons (including those in supervisory roles) differs from state to state. Many states impose requirements for the Adviser's associated persons to meet certain licensing requirements depending upon the nature and/or scope of services they offer. Section 203A(b)(1) of the Advisers Act prohibits a state from applying its registration and licensing laws to a federally-covered investment adviser and its supervised or associated persons. Nonetheless, a state can impose registration, licensing or other qualification requirements on an associated person (sometimes

known as an 'investment adviser representative') if the individual has a place of business in the state. These requirements may include filing a Form U-4, taking and passing Series 65 or 66 or achieving other proficiency exams. When they apply, compliance with these requirements may generally be reported through disclosures on the IARD system.

Rule 203A-3(a) of the Advisers Act defines an "investment adviser representative" as a supervised person of the investment adviser who has more than five clients/investors who are natural persons and more than ten percent of whose clients/investors are natural persons. Notwithstanding this, a supervised person is not an investment adviser representative if the supervised person does not on a regular basis solicit, meet with, or otherwise communicate with clients/investors of the investment adviser or provides only impersonal investment advice.

## 1.4 Procedures for Compliance with Registration and Licensing

The Adviser has established procedures that require review of its registration status no less frequently than quarterly. This review shall include, but is not limited to, a review of the IARD Form ADV Part 1 filed with the SEC and Part II and Schedules, review of the underlying criteria and supporting information for the Form, and confirmation of all material responses. A record of the review shall be retained among the Adviser's central records.

The Adviser requires that each individual providing investment advice be required to maintain all applicable licenses.

Because the Adviser does not generally require individual licensure, no individual may conduct advisory services with the investing public without prior approval by the Adviser.

To ensure that its supervisory structure is adequately formed and adhered to, the Adviser maintains an updated record of its supervisory chain of command among its central files and records. The record is periodically distributed to individuals named as supervisors, to ensure that they will remain at all times informed of the supervisory requirements attributed to them.

Unless otherwise specifically enumerated, the CCO is responsible for implementation and ongoing oversight of these procedures, including the oversight of individuals to whom certain procedures may be delegated.

No less than annually, the CCO will oversee the renewal of the Adviser's registration. No less than annually (within 90 days of the fiscal year end of the Adviser), the CCO will file an annual amendment, updating all forms and records as necessary.

The CCO or an individual he/she designates with responsibility for licensing will conduct periodic reviews of its regulatory filings, including at minimum an annual amendment, and amendments upon any material change in its business practices. If other than the CCO, such delegation will be reported on the Adviser's organizational chart.

Amendments to the Adviser's regulatory filings will be documented by electronic tracking on IARD or by retention of all dated materials among the central compliance records of the Adviser.

# 2 BOOKS AND RECORDS REQUIREMENTS

Rule 204-2 of the Advisers Act imposes the requirement for the Adviser to maintain certain books and records for certain specified periods of time.

## 2.1 Required Records

Pursuant to the Advisers Act at Rule 204-2, the following records are required to be maintained and preserved in an easily accessible place for a period of not less than 5 years from the end of the fiscal year during which the last entry was made on the document. For the first 2 years, the record must be maintained on the premises of the Adviser. This retention requirement applies to the records noted below EXCEPT that organizational records must be retained for at least three years following the date on which the Adviser terminates its registration.

### 2.1.1 Advertising File

The Adviser must retain a copy of each notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication that an investment adviser circulates or distributes, directly or indirectly, to 10 or more persons (other than persons connected with the Adviser). If such notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication recommends the purchase or sale of a specific security and does not state the reasons for such recommendation, a memorandum by the Adviser including information to support the recommendation must be included in the file.

### 2.1.2 Annual Offer of Form ADV Part II (Disclosure Brochure)

The Adviser must offer a current form of its disclosure brochure no less than annually to all clients/investors of the Adviser. The Adviser must document and maintain a record of the offer. The Adviser must also retain a sample version of the Form ADV Part II as evidence of timely amendment and distribution. The file shall include the following:

- List of each individual or other party to whom the offer or an updated Form ADV Part II was provided
- Copy of the form of the offer (letter or other means of distribution)
- Form ADV Part II in effect at the time of the offer
- Any individual or other party that responds to the request
- List of evidence that any individual or other party who responded to the offer was provided with the current form, as requested

### 2.1.3 Annual Review

The Adviser is required by Rule 204-2(a)17(ii) to maintain any record(s) that document the review of its written policies and procedures performed in connection with Rule 206(4)-7(a).

## 2.1.4 Associated Persons Personal Transactions Records

Rule 204-2(a)(12)(i) requires that the Adviser retain a record of every transaction in a securities in which the Adviser or any associated person (or investment advisory representative) has or acquires any direct or indirect beneficial ownership, unless the transaction is not subject to the Adviser's or the associated person's control, or if the transaction is in securities that are direct obligations of the Government of the US, bankers' acceptances, CDs, commercial paper and high quality short term debt instruments including repurchase agreements, or shares issued by registered open-end investment companies. For purposes of this rule, the term "associated person" shall mean any partner, officer or director of the investment adviser; any employee who makes any recommendation, who participates in the determination of which recommendation shall be made, or whose functions or duties relate to the determination of which recommendation shall be made; any employee who, in connection with his duties, obtains any information concerning which securities are being recommended prior to the effective dissemination of such recommendations or of the information concerning such recommendations; and any of the following persons who obtain information concerning securities recommendations being made by such investment adviser prior to the effective dissemination of such recommendations or of the information concerning such recommendations: (1) any person in a control relationship to the investment adviser, (2) any affiliated person of such controlling person and (3) any affiliated person of such affiliated person.

In addition to those associated persons included in the definition above, the Adviser may at its sole discretion require that other employees, consultants, or others provide evidence of their personal trading to ensure that appropriate controls are in place at all times.

## 2.1.5 Financial Records

Records of the Adviser's financial condition, and evidence of current and accurate accountings, are required by Rule 204-2. Included in this requirement are the following:

- Journal, or journals, that lists all cash receipts and disbursement records, and any other records of original entry used to create the journal entries
- General and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts
- All check books, bank statements, canceled checks and evidence of current reconciliations
- All bills or statements relating to the business of the Adviser, and evidence of payment, which might include copies of checks received or other statements demonstrating payment of invoices
- Current financial statements, including trial balances and net capital computations, balance sheets, income and expense statements and internal audit working papers relating to the business of the Adviser

## 2.1.6 Order Tickets

A ticket or memorandum of each order placed by the Adviser for the purchase or sale of a security, or any instruction received by the Adviser from the client/investor concerning the purchase, sale, receipt or delivery of a particular security, and of any modification or cancellation of any such order or instruction, must be retained and must include the following information:

- Terms and conditions of the order, instruction, modification or cancellation
- Person connected with the Adviser who recommended the transaction
- Person who placed the order
- Account for which the order was entered
- Date
- Bank, broker or dealer by or through whom the order was executed
- Whether or not the order was discretionary

## 2.1.7 Organizational Documents

The Adviser must maintain current and complete Articles of Incorporation, charters, minute books, partnership records, stock certificate books and other reports as evidence of its viability as an entity, as required by state or other jurisdictions. *As mentioned in the introduction, different from other records noted in this section, these records must be preserved for at least three years after the cessation of the Adviser's operations.*

## 2.1.8 Policies and Procedures

Rule 204-2 requires that the Adviser retain a copy of the Adviser's policies and procedures formulated pursuant to Rule 206(4)-7 that are currently in effect or which were in effect within the most recent 5 year period.

## 2.1.9 Solicitor Disclosure Document

**Policy**

Criterion Insurance Services, Inc. dba Criterion Wealth Management, as a matter of policy, complies with relevant regulatory requirements and maintains our Disclosure Document on a current and accurate basis. Our firm's Disclosure Document provides information about the firm's advisory services, business practices, professionals, policies and any actual and potential conflicts of interest, among other things.

**Background**

As a registered investment adviser, Criterion Insurance Services, Inc. dba Criterion Wealth Management has a duty to comply with the disclosure document delivery requirements of Rule 204-3(a) under the Advisers Act, or similar state regulations. An adviser's Disclosure Document may be Form ADV Part II or another document containing all of the information required by Form ADV Part II.

**Responsibility**

Robert A. Gravette has the responsibility for maintaining Criterion Insurance Services, Inc. dba Criterion Wealth Management's Disclosure Document on a current and accurate basis, making appropriate amendments and filings, ensuring initial delivery of the Disclosure Document to new clients, sending the annual client offer of the Disclosure Document and maintaining all appropriate files.

**Procedure**

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted various procedures to implement the firm's policy and reviews to monitor and insure the firm's disclosure document policy is observed, implemented properly and amended or updated, as appropriate, which may be summarized as follows:

1. Initial Discovery

A representative of Criterion Insurance Services, Inc. dba Criterion Wealth Management will provide a copy of the firm's current Disclosure Document to each prospective client either: at the time of entering into an advisory agreement with a client; or, not less than 48 hours prior to entering into an advisory agreement with a client.

Criterion Insurance Services, Inc. dba Criterion Wealth Management will maintain a document or acknowledgment evidencing delivery of the Disclosure Document to each client.

The Compliance Officer will maintain dated copies of all Criterion Insurance Services, Inc. dba Criterion Wealth Management's complete Disclosure Documents so as to be able to identify which Disclosure Document was in use at any time.

2. Annual Offer / Delivery

Criterion Insurance Services, Inc. dba Criterion Wealth Management will send a notice (Annual Offer) to all current advisory clients once each year, offering a current copy of the firm's Disclosure Document. Annual Offers will inform clients that Criterion Insurance Services, Inc. dba Criterion Wealth Management will deliver its current disclosure to clients, upon client request.

Criterion Insurance Services, Inc. dba Criterion Wealth Management will maintain an "Annual Offer File" for each calendar year which will include:

- a sample copy of the Annual Offer,
- a copy of the Disclosure Document offered to clients for the particular year,
- a list of the names and addresses of the clients to whom Criterion Insurance Services, Inc. dba Criterion Wealth Management sent an Annual Offer,
- a list / copies of client requests for Criterion Insurance Services, Inc. dba Criterion Wealth Management's Disclosure Document, and
- copies of Criterion Insurance Services, Inc. dba Criterion Wealth Management's letters to clients sending the Disclosure Document, which will be sent within seven days of the receipt of any client request.

3. Review and Amendment

The designated officer will review the firm's complete Disclosure Document on a periodic basis to maintain the Disclosure Document on a current and accurate basis and to properly reflect and be consistent with the firm's current services, business practices, fees, investment professionals, affiliations and conflicts of interest, among other things.

When changes or updates to the Disclosure Document are necessary or appropriate, the designated officer will make any and all disclosure document amendments timely and promptly and maintain records of the filings and amendments.

### 2.1.10 Transaction Records

If the Adviser provides any investment supervisory or management service to any client/investor, it must retain a record showing separately for each client/investor the securities purchased and sold, and the date, amount and price of each such transaction; as well as by-security information for each client/investor such that the Adviser can promptly furnish the name of each client/investor with an interest in the security and the amount of that interest.

### 2.1.11 Written Agreements

Copies of any and all written agreements (advisory agreements, subscription agreements, etc) in use with clients/investors must be maintained, including all powers of attorney. Side letters may be deemed to be part of this requirement, as are any written agreement entered into by the Adviser with any client/investor or otherwise relating to its business. Accordingly all side letters and other written agreements shall be retained among the Adviser's central records.

It is advisable that the Adviser maintains a representative sample of each such agreement, and a list of the clients/investors of the firm subject to each type of agreement. The executed agreements may be retained in separate client/investor files.

### 2.1.12 Written Communications

Originals of all written communications received and copies of all written communications sent by the Adviser relating to its advisory business must be retained by the Adviser. Note that the rule has been deemed to include electronic communications, including email and instant messages, and also includes internal communications (those sent among associated personnel of the Adviser). Unsolicited market letters and other similar communications of general public distribution not prepared by or for the Adviser are not required under this category.

## 2.2 Custodial Advisers Records

Advisers with custody or possession of securities must retain the following:

- Journal or other record showing all purchases, sales, receipts and deliveries of securities (including certificate numbers) for custodial accounts
- Record of all debits and credits for custodial accounts
- Separate ledger account for each custodial client/investor showing all purchases, sales receipts and deliveries of securities, the date and price of each purchase and sale, and all debits and credits
- Copies of confirmations of all transactions made in custodial accounts
- By-security record including the name of the client/investor/fund with an interest in such security, the amount or interest of each client/investor/fund and the location of each such security

## 2.3 Additional Records

Although not enumerated in specific regulations, certain files and records may be requested by a regulatory examiner at the time of an audit. While not an exhaustive or all-inclusive list, the Adviser may elect to maintain any or all of these additional types of records.

### 2.3.1 Allocation Procedures, Trading Practices

Advisers shall maintain a file that contains allocation procedures and other trading practices, relevant representative order forms, and related documentation as evidence of its consistency in making pre-trade allocations of client/investor orders.

### 2.3.2 Best Execution File

**Policy**

As an investment advisory firm, Criterion Insurance Services, Inc. dba Criterion Wealth Management has a fiduciary and fundamental duty to seek best execution for client/investor transactions. A central file is recommended and includes evidence of periodic review of transactions.

**Background**

Best execution has been defined by the SCE as the "execution of securities transactions for clients in such a manner that the clients' total cost or proceeds in each transaction is the most favorable under the circumstances." The best execution responsibility applies to the circumstances of each particular transaction and an adviser must consider the full range and quality of a broker-dealer's services, including execution capability, commission rates, the value of any research, financial responsibility and responsiveness, among other things.

All procedures for compliance files can be found in Criterion Insurance Services, Inc. dba Criterion Wealth Management Office Manual.

**Responsibility**

Robert Gravette has the responsibility for the implementation and monitoring of our best execution policy, practices, disclosures and recordkeeping.

**Procedure**

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted procedures to implement the firm's policy and reviews to monitor and insure the firm's policy is observed, implemented properly and amended or updated, as appropriate, which may be summarized as follows:

- As part of Criterion Insurance Services, Inc. dba Criterion Wealth Management's brokerage and best execution practices, Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted and implemented written best execution practices and established a Brokerage Committee (or designated an individual or officer).

- The Brokerage Committee (or designated officer) which has responsibility for monitoring our firm's trading practices, gathering relevant information, periodically reviewing and evaluating the services provided by broker-dealers, the quality of executions, research, commission rates, and overall brokerage relationships, among other things.

## 2.3.3 Complaint File

Criterion Insurance Services, Inc. dba Criterion Wealth Management should maintain a central record of any and all written or verbal client/investor complaints, including the method or status of resolution, any settlement or litigation related to the complaint, and current disposition of the matter. All complaint procedures can be found in Criterion Insurance Services, Inc. dba Criterion Wealth Management Office Manual.

## 2.3.4 Disaster Recovery

**Policy**

Records of Criterion Insurance Services, Inc. dba Criterion Wealth Management's efforts to monitor and maintain systems in a manner that would enable its continuous operation in the event of an unforeseen disaster or other interruption in business shall be maintained and available for review. The file should include evidence of distribution of Criterion Insurance Services, Inc. dba Criterion Wealth Management's policies to appropriate parties, including RAs and clients/investors. At minimum, the plan should include means for recovery of Criterion Insurance Services, Inc. dba Criterion Wealth Management's critical systems; restoration or recovery of any permanent record of the firm, such as its organizational documents, employee files and financial records; primary contact information; location and status of back-ups; alternative venue for employees and other systems; and procedures or access codes that might enable Criterion Insurance Services, Inc. dba Criterion Wealth Management and its clients/investors to regain effective operations.

**Background**

Since the terrorist activities of 9/11/2001, all advisory firms need to establish written disaster recovery and business continuity plans for the firm's business. This will allow advisers to meet their responsibilities to clients as a fiduciary in managing client assets, among other things. It also allows a firm to meet its regulatory requirements in the event of any kind of disaster, such as bombing, fire, flood, earthquake, power failure or any other event that may disable the firm or prevent access to our office.

**Responsiblity**

Robert A. Gravette is responsible for maintaining and implementing Criterion Insurance Services, Inc. dba Criterion Wealth Management's Disaster Recovery and Business Continuity Plan.

**Procedure**

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted various procedures to implement the firm's policy and reviews to monitor and insure the firm's policy is observed, implemented properly and amended or updated, as appropriate, which may be summarized as follows:

The following individuals have the primary responsibility for implementation and monitoring of our Disaster Recovery Policy:

- Robert A. Gravette is responsible for documenting computer back-up procedures, i.e. frequency, procedure, person(s) responsible, etc.
- Robert A. Gravette is responsible for designating back-up storage location(s) and persons responsible to maintain back-up data in separate locations.
- Robert A. Gravette is responsible for identifying and listing key or mission critical people in the event of an emergency or disaster, obtaining their names, addresses, e-mail, fax, cell phone and other information and distributing this information to all personnel.
- Robert A. Gravette is responsible for designating and arranging for "hot", "warm", or home site recovery location(s) for mission critical persons to meet to continue business, and for obtaining and or arranging for adequate systems equipment for these locations.
- Robert A. Gravette is responsible for establishing back-up telephone/communication system for clients, personnel and others to contact the firm and for the firm to contact clients.
- Robert A. Gravette is responsible for determining and assessing back-up systems for key vendors and mission critical service providers.
- Robert A. Gravette is responsible for conducting periodic and actual testing and training for mission critical and all personnel.

Criterion Insurance Services, Inc. dba Criterion Wealth Management's disaster recovery systems will be tested periodically.

Criterion Insurance Services, Inc. dba Criterion Wealth Management's Disaster Recovery Plan will be reviewed periodically, and at least on an annual basis, by the Disaster Recovery Team.

All procedures and other information for Data Backup and Recovery Procedures can be found in Criterion Insurance Services, Inc. dba Criterion Wealth Management's Office Manual.

<u>Security Overview</u>

Threats to Network: All workstations are running Eset Nod32 with active definition update and daily scans.Server is running Eset Nod 32, with active definition updates 2 times a day scans. Firewall blocking common ports used by most viruses and spyware.

Availability: The networks is designed to run at a 24/7 availability.

Disaster Recovery: (Backup) The main back up of electronic data is a hard drive cartridge, with daily rotation of media. (Offsite storage) A cartridge from server will be kept offsite for data redundancy if worst case scenario were to happen data would be no more than 1 week old. The backup disk is held offsite by Carolina Arriaga, Director of Operations, at 23418 Riversbridge Way, Valencia, CA 91354. (Recovery) If a catastrophic failure of the main server does occur, first response will to be restoring data from the hard driver cartridge.

Firewall Security: (Stateful Packet Inspection) SPI is enabled, and updated when new firmware are released and updated. (Network Address Translation) N/A (Hacker Attack Prevention) Firewall is enabled at all times. Intrusion filter on firewall is enabled. Antivirus running a continuous scan and is updated on a daily basis. (Alerts) Log files and Alert messages are emailed to network administrator. (Content Filtering) Currently not enabled, but is possible.

Internet Services Security: (Web Service) N/A - Website currently hosted offsite through advisor sites. (Email Communications) Select Users do have email access. (FTP Services) N/A - FTP services are currently not needed. (Remote Network Administration) Network Administrator has remote management of servers, firewalls, and web managed switches. Remote administration is done either through direct communication with the hardware or using Remote Desktop.

### 2.3.5 Organizational Chart

Criterion Insurance Services, Inc. dba Criterion Wealth Management's organizational chart, or supervisory chain of command is available in Criterion Insurance Services, Inc. dba Criterion Wealth Management's Office Manual.

**Partner, Chief Compliance Officer**

*Currently held by Robert A. Gravette*

**Partner, Chief Investment Officer**

*Currently held by Mark A. MacArthur*

**Director of Operations**

*Currently held by Carolina Arriaga*

**Research Associate / Analyst**

*Currently held by Andrew G. Dexter*

**Executive Assistant**

*Currently held by Stephanie M. Bell (part-time) and Laura Pask (full-time)*

### 2.3.6 Privacy Policy

**Privacy Policy**

Regulation S-P and the Federal Trade Commission Privacy of Consumer Financial Information; Final Rule requires that Criterion Insurance Services, Inc. dba Criterion Wealth Management maintain a privacy policy to ensure that nonpublic client/investor data be subject to adequate controls and security. In connection with this Regulation, Criterion Insurance Services, Inc. Criterion Wealth Management is required to distribute a privacy statement at the time of initial investment, and no less than annually thereafter to clients/investors. Details regarding Criterion Insurance Services, Inc. dba Criterion Wealth Management's privacy policy are provided in the Employee Handbook. The Privacy Policy file should contain evidence of the statement's annual distribution to clients/investors.

As a registered investment adviser, Criterion Insurance Services, Inc. dba Criterion Wealth Management must comply with SEC Regulation S-P (or other applicable regulations), which requires registered advisers to adopt policies and procedures to protect the "nonpublic personal information" of natural person

consumers and customers and to disclose to such persons policies and procedures for protecting customers and to disclose to such persons policies and procedures for protecting that information. Nonpublic personal information includes nonpublic "personally identifiable financial information" plus any list, description or grouping of customers that is derived from nonpublic personally identifiable financial information. Such information may include personal financial and account information, information relating to services performed for or transactions entered into on behalf of clients, advice provided by Criterion Insurance Services, Inc. dba Criterion Wealth Management to the clients, and data or analyses derived from such nonpublic personal information.

The purpose of these privacy policies and procedures is to provide administrative, technical and physical safeguards which assist employees in maintaining the confidentiality of nonpublic personal information collected from the consumers and customers of an investment adviser. All nonpublic information, whether relating to an adviser's current or former clients, is subject to privacy policies and procedures. Any doubts about the confidentiality of client information must be resolved in favor of confidentiality.

Robert A. Gravette is responsible for reviewing, maintaining and enforcing these policies and procedures to ensure meeting Criterion Insurance Services, Inc. dba Criterion Wealth Management's client privacy goals and objectives while at a minimum ensuring compliance with applicable federal and state laws and regulations. Robert A. Gravette may recommend any disciplanry or other action as appropriate. Robert A. Gravette is also responsible for distributing these policies and procedures to employees and conducting appropriate employee training to ensures employee adherence to these policies and procedures.

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted various procedures to implement the firm's policy and reviews to monitor and insure the firm's policy is observed, implemented properly and amended or updated, as appropriate, which may be summarized as follows:

*Non-Disclosure of Client Information*

Criterion Insurance Services, Inc. dba Criterion Wealth Management maintains safeguards to comply with federal and state standards to guard each client's nonpublic personal information. Criterion Insurance Services, Inc. dba Criterion Wealth Management does not share any nonpublic personal information with any nonaffiliated third parties, except in the following circumstances:

- As necessary to provide the service that the client has requested or authorized, or to maintain and services the client's account;
- As required by regulatory authorities or law enforcement officials who have jurisdiction over Criterion Insurance Services, Inc. dba Criterion Wealth Management, or as otherwise required by any applicable law; and
- To the extent reasonably necessary to prevent fraud and unauthorized transactions.

Employees are prohibited, either during or after termination of their employment, from disclosing nonpublic personal information to any person or entity outside Criterion Insurance Services, Inc. dba Criterion Wealth Management, including family members, except under the circumstances described above. An employee is permitted to disclose nonpublic personal information only to such other employees who need to have access to such information to deliver our services to the client.

*Security of Client Information*

Criterion Insurance Services, Inc. dba Criterion Wealth Management restricts access to nonpublic information to those employees who need to know such information to provide services to our clients.

Any employee who is authorized to have access to nonpublic personal information is required to keep such information in a secure compartment or receptacle on a daily basis as of the close of business each day. All electronic or computer files containing such information shall be password secured and firewall protected from access by unauthorized persons. Any conversations involving nonpublic personal information, if appropriate at all, must be conducted by employees in private, and care must be taken to avoid any unauthorized persons overhearing or intercepting such conversations.

*Privacy Notices*

Criterion Insurance Services, Inc. dba Criterion Wealth Management will provide each client with initial notice of the firm's current policy when the client relationship is established. Criterion Insurance Services, Inc. dba Criterion Wealth Management shall also provide each such client with a new notice of the firm's current privacy policies at least annually. If, at any time, Criterion Insurance Services, Inc. dba Criterion Wealth Management adopts material changes to its privacy policies, the firm shall provide each such client with a revised notice reflecting the new privacy policies. Robert A. Gravette is responsible for ensuring that required notices are distributed to Criterion Insurance Services, Inc. dba Criterion Wealth Management's consumers and customers.

### 2.3.7 Regulatory Inspections

Documentation related to any regulatory inspection, including documentation of steps taken to remedy findings, shall be maintained.

## 2.4 Books and Records Retention

All records of the Adviser (except as noted below) must be retained for 5 years in an easily accessible place. The records must remain on the Adviser's premises for at least 2 years. Additionally, the following must be retained for 3 years beyond the life of the entity:

- Copies of the original documents filed with the SEC or state securities commission(s)
- Registration letters received from all regulatory agencies
- Organizational Records
- Annual filings (Schedule I)
- Withdrawal notification (Form ADV-W)

**Policy**

As a registered investment adviser, Criterion Insurance Services, Inc. dba Criterion Wealth Management is required, and as a matter of policy, maintains various books and records on a current and accurate basis which are subject to periodic regulatory examination. Our firm's policy is to maintain firm and client files and records in an appropriate, current, accurate and well-organized manner in various areas of the firm depending on the nature of the records.

Criterion Insurance Services, Inc. dba Criterion Wealth Management's policy is to maintain required firm and client records and files in an appropriate office of Criterion Insurance Services, Inc. dba Criterion

Wealth Management for the first two years and in a readily accessible facility and location for an additional three years for a total of not less than five years from the end of the applicable fiscal year. Certain records for the firm's performance, advertising and corporate existence are kept for longer periods. (Certain states may require longer record retention.)

**Background**

Registered investment advisers, as regulated entities, are required to maintain specified books and records. There are generally two groups of books and records to be maintained. The first group is financial records for an adviser as an on-going business such as financial journals, balance sheets, bills, etc. The second general group of records are client related files as a fiduciary to the firm's advisory clients and these include agreements, statements, correspondence and advertising, trade records, among many others.

**Responsibility**

Robert A. Gravette has the overall responsibility for the implementation and monitoring of our books and records policy, practices, disclosures and recordkeeping for the firm.

**Procedure**

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted procedures to implement the firm's policy and reviews to monitor and insure the firm's policy is observed, implemented properly and amended or updated, as appropriate, which may be summarized as follows:

Criterion Insurance Services, Inc. dba Criterion Wealth Management's designated officer, individual, or department manager(s), as may be appropriate, has the responsibility for the firm's filing systems for the books, records and files required to be maintained by Criterion Insurance Services, Inc. dba Criterion Wealth Management. Criterion Insurance Services, Inc. dba Criterion Wealth Management's filing systems for records, whether stored in files or electronic media, are designed to meet the firm's policy, business needs and regulatory requirements as follows:

- Arranging for easy location, access and retrieval;
- Having available the means to provide legible true and complete copies;
- For reecords stored on electronic media, back-up files are made and such records stored separately;
- Reasonably safeguarding all files, including electronic media, from loss, alteration or destruction;
- Limiting access by authorized persons to Criterion Insurance Services, Inc. dba Criterion Wealth Management's records and;
- Ensuring that any non-electronic records that are electronically reproduced and stored are accurate reproductions.
- Periodic reviews may be conducted by the designated officer, individual or department managers to monitor Criterion Insurance Services, Inc. dba Criterion Wealth Management's recordkeeping systems, controls, and firm and client files.

## 2.4.1 Electronic Maintenance of Records

Rule 204-2(g) establishes special requirements of Advisers using electronic media for retention of records. SEC Release IA 1945, for May, 2001, provides further guidance for such retention methods.

In general, the following requirements apply when electronic media is used for retention:

- The Adviser is required to maintain an index of the records in a way that permits easy location, access and retrieval of any particular record.
- The Adviser shall promptly provide a legible, true, and complete copy of the record in the medium and format in which it is stored, as well as the means to view such record. For instance, if stored on CD ROM, the record must be protected from alteration, and any software required to produce a copy of, or to read the record, must be available on the disk. Additionally, the Adviser must ensure that electronic records are subject to an appropriate degree of security, including provisions to prevent viewing or access of unauthorized parties. The Adviser must ensure that the SEC or other regulatory examiner is granted access to view the records.

## 2.5 Procedures for Compliance with Record-Keeping Policies

The CCO is responsible for assuring that the Adviser has established policies to ensure that its records are maintained in a secure central location in a manner that is consistent with applicable SEC and/or State requirements.

Periodically, but no less than annually, the Adviser conducts an internal review to ensure that records are maintained in a manner that is compliant with SEC and/or State regulations, and that ensures documents are retained for an appropriate period of time.

# 3 CODE OF ETHICS AND CONDUCT

As an investment adviser, Criterion Insurance Services, Inc. dba Criterion Wealth Management is a fiduciary. It owes its clients/investors the highest duty of loyalty and relies on each employee to avoid conduct that is or may be inconsistent with that duty. It is also important for employees to avoid actions that, while they may not actually involve a conflict of interest or an abuse of a client/investor's trust, may have the appearance of impropriety. Because Criterion Insurance Services, Inc. dba Criterion Wealth Management may serve as general partner, investment manager and/or investment adviser to a number of investment partnerships, investment funds and other types of separate accounts (collectively throughout "clients/investors") Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted a code of ethics setting forth policies and procedures, including the imposition of restrictions on itself and employees, to the extent reasonably necessary to prevent certain violations of applicable law. This Code of Ethics and Conduct (the "Code") is intended to set forth those policies and procedures and to state Criterion Insurance Services, Inc. dba Criterion Wealth Management's broader policies regarding its duty of loyalty to clients/investors.

## 3.1 General

Rule 204A-1 requires Advisers to establish, maintain and enforce a written code of ethics.

### 3.1.1 Basic Principles

This Code is based on a few basic principles that should pervade all investment related activities of all employees, personal as well as professional: (1) the interests of the Adviser's clients/investors come before the Adviser's or any employee's interests; (2) each employee's professional activities and personal investment activities must be consistent with this Code and avoid any actual or potential conflict between the interests of clients/investors and those of the Adviser or the employee; and (3) those activities must be conducted in a way that avoids any abuse of an employee's position of trust with and responsibility to the Adviser and its clients/investors, including taking inappropriate advantage of that position.

The Employee understands and agrees that any and all activities of the Employee during the term of this Agreement shall in all respects comply with applicable federal and state securities laws, and other laws, rules and regulations, any applicable laws of foreign jurisdictions, and the firm policies and procedures that have been adopted (or that may in the future be adopted) by the Employer (the "Firm Policies"), as each may be amended from time to time, including without limitation those prohibiting insider trading and front running of client/investor accounts.

### 3.1.2 Chief Compliance Officer

Many of the specific procedures, standards, and restrictions described in this Code involve consultation with the Chief Compliance Officer ("CCO"). The CCO will be designated by a senior principal of the Adviser.

### 3.1.3 Security

For purposes of this Code, the term "security" includes not only stocks, but also options, rights, warrants, futures contracts, convertible securities or other securities that are related to securities in which the Adviser's clients/investors may invest or as to which the Adviser may make recommendations (sometimes also

referred to as "related securities").

### 3.1.4 Covered Accounts

Many of the procedures, standards and restrictions in this Code govern activities in "Covered Accounts." Covered Accounts consist of:

1. Securities accounts of which the Adviser is a beneficial owner, provided that (except where the CCO otherwise specifies) investment partnerships or other funds of which the Adviser or any affiliated entity is the general partner, investment adviser or investment manager or from which the Adviser or such affiliated entity receives fees based on capital gains are generally not considered Covered Accounts, despite the fact that the Adviser or employees may be considered to have an indirect beneficial ownership interest in them
2. Each securities account registered in an employee's name and each account or transaction in which an employee has any direct or indirect "beneficial ownership interest" (other than accounts of investment limited partnerships or other investment funds not specifically identified by the CCO as "Covered Accounts")

### 3.1.5 Beneficial Ownership

The concept of "beneficial ownership" of securities is broad. It includes not only securities a person owns directly, and not only securities owned by others specifically for his or her benefit, but also (i) securities held by his or her spouse, minor children and relatives who live full time in his or her home, and (ii) securities held by another person if by reason of any contract, understanding, relationship, agreement or other arrangement the employee obtains benefits substantially equivalent to ownership.

**Note:** This broad definition of "beneficial ownership" does not necessarily apply for purposes of other securities laws or for purposes of estate or income tax reporting or liability. An employee may declare that the reporting or recording of any securities transaction should not be construed as an admission that he or she has any direct or indirect beneficial ownership in the security for other purposes.

### 3.1.6 Personal Account Trading and Investment Policy

It is the Adviser's policy to impose specific requirements related to each covered person's personal trading and investment activity. The Adviser has Quarterly Securities Disclosure forms for each employee to disclose any trades placed in that quarter.

The Adviser's policy is to consider the effects of various types of trading, including short term trading and trading in new issues as a potential conflict of interest. Similarly, the Adviser may impose specific requirements related to investments in private placements.

Approval may be refused for any proposed trade by an employee that:

1. Involves a security that is being or has been purchased or sold by the Adviser on behalf of any client/investor account or is being considered for purchase or sale

2. Is otherwise prohibited under any internal policies of the Adviser (such as the Adviser's Policy and Procedures to Detect and Prevent Insider Trading)
3. Breaches the employee's fiduciary duty to any client/investor
4. Is otherwise inconsistent with applicable law, including the Advisers Act and the Employee Retirement Income Security Act of 1974, as amended
5. Creates an appearance of impropriety

The Procedures section shall address the Adviser's specific procedures for these types of investments and trading.

### 3.1.7 Service as a Director

No employee may serve as a director of a publicly-held company without prior approval by the CCO (or a senior principal, if the CCO is the proposed board member) based upon a determination that service as a director would not be adverse to the interests of any client/investor. In the limited instances in which such service is authorized, employees serving as directors will be isolated from other employees who are involved in making decisions as to the securities of that company through procedures determined by the CCO to be appropriate in the circumstances. These practices may also constitute illegal "insider trading." Some of the specific trading rules described below are also intended, in part, to prevent front running and scalping. If an account is managed by an investment adviser, other than the Adviser, to which full investment discretion has been granted, these rules will not apply for so long as the employee(s) who has (have) a beneficial ownership interest in the account do not have or exercise any discretion. Such accounts will remain subject to the reporting requirements set forth in the next section of this Code.

### 3.1.8 Gifts

The receipt or giving of any gift of more than nominal value ($100/year) from any person or entity that does business with or on behalf of any client/investor is prohibited, except as otherwise permitted by the CCO.

### 3.1.9 Duties of Confidentiality

All information relating to clients/investors' portfolios and activities and to proposed recommendations is strictly confidential. Consideration of a particular purchase or sale for a client/investor account may not be disclosed, except to authorized persons.

### 3.1.10 General Ethical Conduct:

The following are potentially compromising situations that must be avoided:

- Causing the Adviser, acting as principal for its own account or for any account in which the Adviser or any person associated with the Adviser (within the meaning of the Investment Advisers Act) to sell any security to or purchase any security from a client/investor in violation of any applicable law, rule or regulation of a governmental agency
- Communicating any information regarding the Adviser, the Adviser's investment products or any client/investor to prospective clients/investors, journalists, or regulatory authorities that is not accurate, untrue or omitting to state a material fact necessary in order to make the statements the Adviser has made to such person

- Engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative, particularly with respect to a client/investor or prospective client/investor
- Engaging in any conduct that is not in the best interest of the Adviser or might appear to be improper
- Engaging in any financial transaction with any of the Adviser's vendors, clients/investors or employees, including but not limited to: providing any rebate, directly or indirectly, to any person or entity that has received compensation from the Adviser; accepting, directly or indirectly, from any person or entity, other than the Adviser, compensation of any nature such as a bonus, commission, fee, gratuity or other consideration in connection with any transaction on behalf of the Adviser; beneficially owning any security of, or have, directly or indirectly, any financial interest in, any other organization engaged in securities, financial or related business, except for beneficial ownership of not more than one percent (1%) of the outstanding securities of any business that is publicly owned
- Engaging in any form of harassment
- Improperly using or authorizing the use of any inventions, programs, technology or knowledge that are the proprietary information of the Adviser
- Investing or holding outside interest or directorship in clients/investors, vendors, customers or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Adviser. In the limited instances in which service as a director is authorized by the Adviser, employees serving as directors will be isolated from other employees who are involved in making decisions as to the securities of that company through procedures determined by the Adviser to be appropriate according to the circumstances
- Making any unlawful agreement with vendors, existing or potential investment targets or other organizations.
- Making any untrue statement of a material fact or omitting to state to any person a material fact necessary in order to make the statements the Adviser has made to such person materially complete
- Participation in civic or professional organizations that might involve divulging confidential information of the company.
- Unlawfully discussing trading practices, pricing, clients/investors, research, strategies, processes or markets with competing companies or their employees
- Using any device, scheme or artifice to defraud, or engaging in any act, practice, or course of conduct that operates or would operate as a fraud or deceit upon, any client/investor or prospective client/investor or any party to any securities transaction in which the Adviser or any of its clients/investors is a participant

### 3.1.11 Misappropriation of Customer Funds

Misappropriation, stealing, or conversion of customer funds is prohibited and constitutes serious fraudulent and criminal acts. Examples of such acts include (1) unauthorized wire or other transfers in and out of customer accounts; (2) borrowing customer funds; (3) converting customer checks that are intended to be added or debited to existing accounts; and (4) taking liquidation values of securities belonging to customers.

## 3.2 Insider Trading

The Adviser has adopted the following policies and procedures to detect and prevent the misuse of material, nonpublic information by employees of the Adviser.

### 3.2.1 Policy Statement on Insider Trading

The Adviser forbids any officer, director or employee from trading, either personally or on behalf of others, on material nonpublic information or communicating material nonpublic information to others in violation of the law. This conduct is frequently referred to as "insider trading." The Adviser's policy applies to every officer, director and employee and extends to activities within and outside their duties at the Adviser. Each officer, director and employee must read this policy statement and acknowledge his or her understanding of it. Any questions regarding the Adviser's policy and procedures should be referred to the CCO.

The term "insider trading" is not defined in the federal securities laws, but generally is used to refer to the use of material nonpublic information to trade in securities (whether or not one is an "insider") or to communications of material nonpublic information to others.

While the law concerning insider trading is not static, it is generally understood that the law prohibits the following:

- Trading by an insider while in possession of material nonpublic information
- Trading by a non-insider, while in possession of material nonpublic information, where the information either was disclosed to the non-insider in violation of an insider's duty to keep it confidential or was misappropriated
- Communicating material nonpublic information to others in violation of one's duty to keep such information confidential

### 3.2.2 Who Is An Insider?

The concept of an "insider" is broad. It includes officers, directors and employees of a company. In addition, a person can be a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a company's affairs and as a result is given access to information solely for the company's purposes. A temporary insider can include certain "outsiders" such as, among others, a company's attorneys, accountants, consultants, bank lending officers, and the employees of such organizations. According to the United States Supreme Court, before such an "outsider" may be considered a "temporary insider", the company's relationship with the outsider must be such that the company reasonably expects him or her to keep the disclosed nonpublic information confidential.

### 3.2.3 What Is Material Information?

While covered persons are prohibited from trading on inside information, trading on inside information is not a basis for liability unless the information is "material." Information generally is material if there is a substantial likelihood that a reasonable client/investor would consider it important in making his or her investment decisions, or if public dissemination of the information is reasonably certain to have a substantial effect on the price of a company's securities. Information that should be presumed to be material includes,

but is not limited to: dividend changes; earnings estimates; changes in previously released earnings estimates; significant merger or acquisition proposals or agreements; commencement of or developments in major litigation; liquidation problems; and extraordinary management developments.

Questions one might ask in determining whether information is material include:

- Is this information that a client/investor would consider important in making his or her investment decisions? Is this information that would substantially affect the market price of the securities if generally disclosed?
- Is the information nonpublic? To whom has this information been provided? Has the information been effectively communicated to the marketplace by being published in a recognized national distribution agency or publication such as Reuters, The Wall Street Journal or other such widely circulated publications?

Caution must be exercised however, because material information does not necessarily have to relate to a company's business. The Supreme Court of the United States has broadly interpreted materiality in some cases, and has asserted criminal liability associated with inappropriate disclosures.

### 3.2.4 What Is Nonpublic Information?

Information is nonpublic until it has been effectively communicated to the market place. One must be able to point to some fact to show that the information is generally public. For example, information found in a report filed with the Securities and Exchange Commission, or appearing in Dow Jones, Reuters Economic Services, The Wall Street Journal or other publications of general circulation would be considered public.

### 3.2.5 Types of Liability

Actions by the US courts, including the Supreme Court have resulted in findings that assert liability to fiduciaries in the context of trading on material nonpublic information. In some cases it has been found that a non-insider can enter into a confidential relationship with the company through which they gain information or they can acquire a fiduciary duty to the company's shareholders as "tippees" if they are aware or should have been aware that they have been given confidential information by an insider who has violated his fiduciary duty to the company's shareholders. This is a circumstance into which an associate of the Adviser may fall.

In the "tippee" situation, a breach of duty occurs only if the insider personally benefits, directly or indirectly, from the disclosure. It is important to note that the benefit does not have to be monetary; it can be a gift, and can even be a 'reputational' benefit that will translate into future earnings. Another basis for insider trading liability is the "misappropriation" theory, where trading occurs on material nonpublic information that was stolen or misappropriated from any other person. This theory can be used to apply liability to individuals not previously thought to be encompassed under the fiduciary duty theory.

## 3.3 Penalties for Insider Trading

Penalties for trading on or communicating material nonpublic information are severe, both for individuals involved in the trading (or tipping) and their employers. A person can be subject to some or all of the penalties below even if he or she does not personally benefit from the violation. Penalties include:

- Civil injunctions
- Damages in a civil suit as much as three times the amount of actual damages suffered by other buyers or sellers
- Disgorgement of profits
- Jail sentences
- Fines for the person who committed the violation of up to three times the profit gained or loss avoided, whether or not the person actually benefited, and
- Fines for the employer or other controlling person of up to the greater of $1,000,000 or three times the amount of the profit gained or loss avoided
- Prohibition from employment in the securities industry

In addition, any violation of this policy statement can be expected to result in serious disciplinary measures by the Adviser, including dismissal of the persons involved.

## 3.4 Procedures for Compliance with Code of Ethics

The CCO shall determine which employees are covered by the Adviser's Code of Ethics.

The CCO has determined that all employees are covered by the Adviser's Code of Ethics. In the following procedures all such persons shall be referred to as "covered persons."

The CCO shall assume responsibility for maintaining, in an accessible place, the following materials:

1. Copy of this Code of Ethics
2. Record of any violation of these procedures for the most recent five years, and a detailed synopsis of the actions taken in response
3. Copy of each transaction report submitted by each officer, director and employee of the Adviser for the most recent five years
4. List of all persons who are or have been required to file transaction reports.

In an effort to prevent insider trading, through his/her own efforts or as delegated to qualified covered persons under his/her supervision, the CCO will do the following:

1. Answer questions and document responses regarding the Adviser's policy and procedures
2. Provide, on a regular basis (no less than annually), an educational program to familiarize covered persons with the Adviser's policy and procedures
3. Require each employee to acknowledge his or her receipt and compliance with this policy and procedures regarding insider trading on an annual basis, and retain acknowledgements among the Adviser's central compliance records
4. Resolve issues of whether information received by an employee of the Adviser is material and nonpublic and document findings
5. Review on a regular basis and update as necessary the Adviser's policy and procedures and document any resulting amendments or revisions
6. When it is determined that an employee of the Adviser has material nonpublic information, implement measures to prevent dissemination of such information and if necessary, restrict covered

persons from trading in the securities

In an effort to detect insider trading, through his/her own efforts or as delegated to qualified covered persons under his/her supervision, the CCO will perform the following actions:

1. Review the trading activity reports filed by each officer, director, and employee of the Adviser, documenting findings by initialing and dating the forms or reports reviewed
2. Review the duplicate confirmations and statements and related documentation of personal and related accounts maintained by officers, directors and covered persons versus the activity in the fund(s) advised by the Adviser
3. Require officers, directors and covered persons to submit periodic reports of personal trading activity, and to attest to the completeness of each individual's disclosure of outside accounts at the time of hiring and at least annually thereafter

To determine whether the Adviser's covered persons have complied with the rules described above (and to detect possible insider trading), the CCO will have access to and will review transactions effected in Covered Accounts within 30 days after the end of each month, and will review duplicate trade confirmations provided pursuant to those rules within 10 days after their receipt. The CCO will compare transactions in Covered Accounts with transactions in client accounts for transactions or trading patterns that suggest violations of this Policy or potential front running, scalping, or other practices that constitute or could appear to involve abuses of covered persons' positions. Annually each covered person must certify that he or she has read and understands this Code, that he or she recognizes that this Code applies to him or her, and that he or she has complied with all of the rules and requirements of this Code that apply to him or her. The CCO is charged with responsibility for collection, review, and retention of the certifications submitted by covered persons.

Although covered persons are not prohibited under this policy from trading securities for their own accounts at the same time that they are involved in trading on behalf of the Adviser, they must do so only in full compliance with this Policy and their fiduciary obligations. At all times, the interests of the Adviser's clients will prevail over the covered person's interest. No trades or trading strategies used by a covered person may conflict with the Adviser's strategies or the markets in which the Adviser is trading. The Adviser's covered persons may not use the Adviser's proprietary trading strategies to develop or implement new strategies that may otherwise disadvantage the Adviser or its clients. Personal account trading must be done on the covered person's own without placing undue burden on the Adviser's time. No transactions should be undertaken that are beyond the financial resources of the covered person.

No Covered person may purchase or sell any non-exempt security for any Covered Account without first obtaining prior approval from the CCO (in the case of the CCO's own personal request to purchase or sell a non-exempt security, [PRINCIPAL] shall render prior approval). For purposes of this Policy, the term "exempt securities" means securities that are direct obligations of the Government of the United States, money market instruments (bankers' acceptances, bank certificates of deposit, commercial paper, repurchase agreements and other high quality short-term debt instruments), money market funds, mutual funds (unless the adviser or a control affiliate acts as the investment adviser or principal underwriter for the fund), unit investment trusts invested exclusively in open-ended mutual funds (unless the adviser or a control affiliate

acts as the investment adviser or principal underwriter for any of the funds), and securities traded in accounts over which an employee does not exercise any investment discretion. It is the covered person's obligation to ensure that pre-clearance requests are provided to the CCO. The CCO may take any and all steps it deems appropriate in rendering or denying approval for the proposed trade. In the event that the CCO is not accessible, all pre-clearance requests will be forwarded directly to the [PRINCIPAL]. NO action may be taken until approval is attained. Pre-clearance authorization for a transaction is only valid for the day on which the approval is granted. If the transaction is not completed that day, the covered person must have the proposed transaction approved again. This requirement applies to transactions involving open market orders and limit or other types of orders.

No employee may purchase and subsequently sell a security within any thirty (30) day period, unless such transaction is approved in writing by the CCO. Each determination will be made on a case by case basis. The CCO shall have the sole authority to grant or withhold permission to execute the trade.

No employee may purchase new publicly offered issues of any securities ("New Issue Securities") for any Covered Account in the public offering of those securities without the prior written consent of the CCO.

Each covered person must, at the onset of employment and immediately following subsequent events involving the acquisition of securities (marriage, inheritance, etc.), disclose to the CCO the identities, amounts, and locations of all securities he/she owns. On an annual basis, each employee will be required to confirm the location of all Covered Accounts. In all cases, duplicate statements and trade confirmations must be sent directly to the CCO from the custodian. All statements of holdings, duplicate trade confirmations, duplicate account statements, and monthly and quarterly reports will generally be held in confidence by the CCO. However, the CCO may provide access to any of those materials to other members of the Adviser's management in order to resolve questions regarding compliance with this Policy and regarding potential purchases or sales for client accounts, and the Adviser may provide regulatory authorities with access to those materials where required to do so under applicable laws, regulations, or orders of such authorities.

To prevent the misappropriation, stealing or conversion of customer funds, the Adviser will implement one or more of the following procedures:

•

Verify changes of address with the customer by requesting such changes in writing from the customer or by verifying the change through a telephone call or email to the customer.

- Require supervisory review of changes of address or customer account information to ensure that employees do not independently change customers' addresses and account information.
- Ensure associated persons do not have the ability to alter account statements on-line.
- Closely analyze customers' use of any address other than their home address. Use of P.O. boxes, "in care of" addresses, and other than home addresses are prohibited, or verified by telephone and in writing directly with the customer by a supervisor or firm compliance employee. Duplicate confirmations and account statements are sent to the customer's home address, whenever possible.
- All transfers, withdrawals, or wires from the customer's account require the customer's written authorization and must receive supervisory approval.
- Periodically and systematically review (through the use of exception reports or other means) for indications of problems, such as: (1) number of customers with non-home mailing addresses; (2) any customer account that shows the same address as an associated person; (3) multiple changes of address by a customer or among customers of an associated person; (4) use of the same address for multiple

customers; and (5) correspondence returned as undeliverable by the post office. The CCO or designee will contact the associated person and/or the customer directly to follow up on and investigate unusual activity.

- If possible, provide customers with access to their account statements on a secure firm website so that customers can easily verify activity in their accounts.
- The use of personal electronic devices (personal computers, blackberries) to conduct firm business is prohibited unless the use of personal electronic devices is pre-approved and the devices can be linked with the firm's system to allow for supervisory review.
- Require each associated person who has knowledge of misappropriation, stealing or conversion of customer funds to promptly report the situation to the CCO.

# 4 TRADING

**Policy**

As an adviser and a fiduciary to our clients, our clients' interests must always be placed first and foremost, and our trading practices and procedures prohibit unfair trading practices and seek to disclose and avoid any actual or potential conflicts of interests or resolve such conflicts in the client's favor.

Our firm has adopted the following policies and practices to meet the firm's fiduciary responsibilities and to insure our trading practices are fair to all clients and that no client or account is advantaged or disadvantaged over any other.

Also, Criterion Insurance Services, Inc. dba Criterion Wealth Management's trading practices are generally disclosed in our Disclosure Document provided to prospective clients and annually offered to clients.

**Background**

As a fiduciary, many conflicts of interest may arise in the trading activities on behalf of our clients, our firm and our employees, and must be disclosed and resolved in the interests of the clients. In addition, securities laws, insider trading prohibitions and the Advisers Act, and rules thereunder, prohibit certain types of trading activities.

***Allocation***

As a matter of policy, an adviser's allocation procedures must be fair and equitable to all clients with no particular group or client(s) being favored or disfavored over any other clients.

Criterion Insurance Services, Inc. dba Criterion Wealth Management's policy prohibits any allocation of trades in a manner that Criterion Insurance Services, Inc. dba Criterion Wealth Management's propriety accounts, affiliated accounts, or any particular client(s) or group of clients receive more favorable treatment than other client accounts.

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted a clear written policy for the fair and equitable allocation of transactions, (e.g. prorata allocation, rotational allocation, and other means) which is disclosed in Criterion Insurance Services, Inc. dba Criterion Wealth Management's Disclosure Document.

**Responsibility**

Robert A. Gravette has the responsibility for the implementation and monitoring of our trading policies and practices, disclosures and recordkeeping for the firm.

**Procedure**

Criterion Insurance Services, Inc. dba Criterion Wealth Management has adopted various procedures to implement the firm's policy and reviews to monitor and insure the firm's trading policies are observed, implemented properly and amended or updated, which may be summarized as follows:

- Periodic supervisory reviews of the firm's trading practices.
- Periodic reviews of the firm's Disclosure Document, advisory agreements, and other materials for appropriate disclosures of the firm's trading practices and any conflicts of interests.

## 4.1 Best Execution

Criterion Insurance Services, Inc.,dba: Criterion Wealth Management has an obligation to seek best execution of clients/investors' transactions under the circumstances of the particular transaction. Accordingly, Criterion Insurance Services, Inc.,dba: Criterion Wealth Management must execute securities transactions for clients/investors in such a manner that the clients/investors' total cost or proceeds in each transaction is the most favorable under the circumstances.

The Advisers/ Partners of Criterion Insurance Services, Inc.,dba: Criterion Wealth Management do an annual review as to the appropriateness and cost effectiveness of our primary custodian, Charles Schwab Institutional (Aka: Schwab). Schwab has provided our clients/investors' their best execution policies upon the clients/investor' opening their accounts. Below are Schwab's best execution procedures.

**Schwab order routing and execution services dated March 26, 2007:**

The following describes the main aspects of Schwab's execution services for customer orders. In Section I, Schwab's Order Routing Policies are described. In Section II, Schwab's continuous, formal process to assure best execution for Schwab's customer orders is described in detail.

**Section I: Order Routing Policies of Charles Schwab & Co., Inc.**

Charles Schwab & Co., Inc. is committed to providing best execution for your trades. In arranging for the execution of equities and listed options orders, Schwab seeks out industry leading execution services and access to the best performing markets.

On October 29, 2004, Schwab completed the sale of its capital markets affiliate, Schwab Capital Markets L.P., to UBS Americas, Inc. As part of the sale, Schwab entered into eight-year equity and options order routing and execution services agreements (Services Agreements) with UBS Capital Markets L.P. (formerly Schwab Capital Markets L.P.) and UBS Securities LLC (together referred to as UBS) providing Schwab with continued access to the state-of-the-art order handling technology and services deployed in our former capital markets operations. Under the agreements, UBS manages the execution of most types of orders for which customers have not provided specific instructions (non-directed orders), including through the use of intelligent order routing technology for identifying the best available market. UBS also provides execution services for most types of directed orders.

UBS routing and execution services are subject to Schwab's execution quality standards for achieving best execution. In certain circumstances, Schwab itself may route orders directly to a market for execution. Schwab considers a number of factors in evaluating execution quality, including execution price and opportunities for price improvement, market depth and order size, the trading characteristics of the security, speed and accuracy of the execution, the availability of efficient and reliable order handling systems, service levels, and the cost of executing orders at a particular market or firm. "Price improvement" occurs when an order is executed at a price more favorable than the displayed national best bid or offer, and may be available for listed stocks traded on the exchanges, for listed and over-the-counter (OTC) stocks traded in dealer markets, and for listed options. Schwab regularly monitors the execution quality provided by UBS

and the various markets to which UBS and Schwab may route orders, to ensure orders are routed to markets that have provided high-quality executions over time.

Part of the consideration Schwab received for the sale of its capital markets business related to the Services Agreements with UBS and Schwab's commitments to route most types of equity and listed options orders through UBS for eight years. However, Schwab does not receive rebates or other additional consideration from UBS or third-parties for equity and options orders routed through UBS.

Schwab routes certain multi-leg options orders (such as spreads, straddles, collars and buy-writes) to the CBOE through iSpreads, a sophisticated order management and trading application used by customers that was developed and is operated by First Traders Analytical Solutions LLC and licensed exclusively to the CBOE. Schwab receives use of iSpreads software and analytics for the benefit of its customers in exchange for routing to the CBOE all multi-leg options orders entered through iSpreads.

Customer orders entered during the Extended Hours Trading session for equities are routed to the NYSE Arca, in which Schwab holds an equity interest. Schwab orders are also executed through facilities of the Nasdaq Stock Market, in which Schwab holds an equity interest.

Quarterly information regarding the routing of orders by Schwab in listed equities, OTC equities and listed options is available on our website at www.schwabinstitutional.com or will be provided to you in written form upon request.

**Section II: Quality Assurance Procedures**

*Execution Quality Criteria and Methodology* Schwab has designated ultimate responsibility for monitoring execution quality to an internal committee comprised of members of senior management.

In order for Schwab customers receive best execution; Schwab evaluates an extensive list of factors affecting the quality of an execution. The elements of execution quality are reviewed using multiple measures. Some measures are easily quantifiable, while some are more qualitative in nature. Currently, Schwab relies on the SEC Rule 11Ac1-5 data that the various market centers provide, and an independent auditing group for the quantitative and qualitative information used to monitor execution quality. In addition, Schwab has developed the information and tools necessary to internally monitor all quantifiable elements of execution quality.

The following sections provide, by execution element, the quantitative and qualitative factors that may be taken into consideration by the committee when determining whether an execution venue can be reasonably expected to satisfy best execution for Schwab customer orders.

1. Execution Price

* Percentage of Shares Price Improved

* Percentage of Shares Executed outside of the NBBO Spread

* Percentage of Shares Executed within the NBBO Spread

* Effective Spread - The difference between the midpoint of the bid-ask spread and the execution price.

* Effective/Quoted (%) - The ratio of the effective spread to the quoted spread at the time of order receipt by

the market center.

* Execution of pre-open marketable orders

2. <u>Size of Execution</u>

* Percentage of Liquidity Provided (Liquidity Enhancement)

* Avoidance of Partial Fills

* Automatic Execution Guarantees

* Enhanced Limit Order Print Protection

3. <u>Execution Speed</u>

* Turn-Around Time of Market and Marketable Limit Orders

* Immediate or Non-Immediate Display of Non-Marketable Orders At-The-Quote or Better-Than-The-Quote

* Speed of Execution for Non-Marketable Orders At-The-Quote or Better-Than-The-Quote

4. <u>Cost of Execution</u>

* Transaction Fees

* Commissions

5. <u>Customer Service</u>

There are many elements to the service an execution venue provides. The list below includes services that are of particular interest to Schwab customers:

* *Number of stocks traded* - the ability and/or willingness of a market venue to trade a wide range of stocks.

* *Limitations on Order Flow* - the ability and/or willingness for a market venue to accept different order sizes, types and conditions.

* *Adjustments* - willingness of the market maker to change the price of an execution in question.

* *Execution Quality Reporting* - availability and timely production of regular data analysis reports and/or raw data; types of data supplied; frequency of reporting.

* *Equal treatment of order types* (market vs. marketable limit)

* *Equal treatment of order sizes* (block vs. retail; large retail vs. small retail)

* *Automatic Execution Guarantees* - systemic limits and rules vary among market venues.

* *Order flow shut down process* - how order flow in a stock or group of stocks may be turned off and rate and reason for occurrence.

* *Systems Reliability* - how often does system go down; duration of down times; ability to communicate and resolve problems.

* *Systems Capacity* - limitations on number of orders, stocks, quotes, message traffic; system queues.

* *Trading Capacity* - willingness and/or ability to trade volatile issues.

## 4.2 Trade Errors

As a fiduciary, Criterion Insurance Services, Inc. dba Criterion Wealth Management has the responsibility to effect orders correctly, promptly and in the best interests of our clients. In the event any error occurs in the handling of any client transactions, due to Criterion Insurance Services, Inc. dba Criterion Wealth Management's actions, or inaction, or actions of others, Criterion Insurance Services, Inc. dba Criterion Wealth Management's policy is to seek to identify and correct any errors as promptly as possible without disadvantaging the client or benefiting Criterion Insurance Services, Inc. dba Criterion Wealth Management in any way.

If the error is the responsibility of Criterion Insurance Services, Inc. dba Criterion Wealth Management, any client transaction will be corrected and Criterion Insurance Services, Inc. dba Criterion Wealth Management will be responsible for any client loss resulting from an inaccurate or erroneous order.

Criterion Insurance Services, Inc. dba Criterion Wealth Management's policy and practice is to monitor and reconcile all trading activity, identify and resolve any trade errors promptly, document each trade error with appropriate supervisory approval and maintain a trade error file.

The Adviser has access to Schwab's error alerts system. This system will only recognize trading limitations and order issues. Schwab's Alerts/Trade Errors reports are printed from the Schwab website and given to the Adviser. The Adviser acknowledges the Alerts/Trade Errors reports by reviewing and initialing. If insufficient funds alert requires further trades to be done, these trades will be logged into Criterion Insurance Services, Inc dba Criterion Wealth Management's compliance logs. Alerts/Trade Errors are filed into Charles Schwab Institutional Alerts/Trade Errors Binder and an additional copy is filed into clients/investor's file.