# EXHIBIT 19

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
LOS ANGELES REGIONAL OFFICE
444 SOUTH FLOWER STREET, SUITE 900
LOS ANGELES, CALIFORNIA 90071

April 20, 2017

DELIVERY VIA SECURE EMAIL

Mr. Robert A. Gravette, President
Mr. Jason Stauffer, Director of Operations and Chief Compliance Officer
Criterion Wealth Management Insurance Services, Inc.
26650 The Old Road, Suite 110
Valencia, CA 91381

Re: Examination of Criterion Wealth Management Insurance Services, Inc. ("Registrant")
(SEC File No. 801-67247)

Dear Mr. Gravette:

The Staff conducted an examination of Registrant, which evaluated compliance with certain provisions of the federal securities laws or other applicable rules and regulations (together, "federal securities laws"). The examination identified the deficiencies and weaknesses in controls (together, "findings") that are described in Exhibit A, and which the Staff discussed with you during an exit interview on April 20, 2017.

The Staff is bringing these findings to your attention for immediate corrective action, without regard to any other action(s) that may result from the examination. The findings are based on the Staff's examination and are not findings or conclusions of, or binding on, the Commission or any of its divisions or offices. You should not conclude that any of the firm's activities not discussed in Exhibit A are in full compliance with the federal securities laws. Nor should you conclude that Exhibit A sets forth an exhaustive list of the ways in which the firm's activities do not comply with the federal securities laws. Neither the Staff's findings or its communications during the course of the examination nor any remedial actions undertaken in response to such findings or communications foreclose the Commission from taking any other action, including but not limited to an enforcement action, with respect to the firm.

The descriptions of the federal securities laws and related interpretations in Exhibit A may be paraphrased or abbreviated. Please visit our website at http://www.sec.gov/divisions.shtml for complete information related to these regulatory requirements.

Please respond in writing to each of the matters described in Exhibit A by May 20, 2017, describing any steps you have taken or intend to take with respect to each deficiency identified.

Blumberg No. 5122
GOVERNMENT EXHIBIT
19

You should respond directly to this office as follows:

Kent Woo, Examination Manager
U.S. Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, California 90071

Thank you for your cooperation. If you have any questions, please contact Kent Woo at (323) 965-3208 or Kelly Kibbie at (323) 965-3270.

Sincerely,

Lee, Sang W.

Digitally signed by Lee, Sang W.
DN: dc=GOV, dc=SEC, dc=AD, ou=Common, ou=Regions, ou=Pacific, ou=Los Angeles, ou=Employee, cn=Lee, Sang W., email=LeeSa@sec.gov
Date: 2017.04.20 15:33:23 -07'00'

Sang W. Lee
Assistant Director

Attachment: Exhibit A

Exhibit A
Criterion Wealth Management Insurance Services, Inc.
(SEC File No. 801-67247)

**The Staff identified the following deficiencies during the examination:**

## I. Inadequate Compliance Program - Rule 206(4)-7

Rule 206(4)-7 of the Investment Advisers Act of 1940 ("Advisers Act") requires all registered investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act. Each adviser should first identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks. The Commission expects that an adviser's policies and procedures, at a minimum, should address a standard set of operations to the extent that they are relevant to the adviser. *See* Compliance Programs of Investment Companies and Investment Advisers Release Nos. IA-2204; IC-26299 (Feb. 5, 2004).

### A. 2008 IA Policies and Procedures Manual

In response to the Staff's request for Registrant's policies and procedures, Registrant produced two documents: (i) an "IA Policies and Procedures Manual - Revision as of 4/5/2008" for "Criterion Insurance Services, Inc." (a business name that Registrant has not used in recent years) and (ii) a PDF file labeled "IA Policies and Procedures Manual - 062015 - WORKING DRAFT.pfd" (the "2015 Draft"). From the state of these documents, it is evident that Registrant has not revised its written policies and procedures in over seven years, despite significant changes to its business and applicable regulatory requirements.[1] Registrant's failure to have enacted policies and procedures reasonably designed to prevent violations of the Advisers Act constitute a violation of Rule 206(4)-7.

In its response to this letter, Registrant should identify the steps that it intends to take to address this deficiency. Please provide documentation to support any corrective action taken.

### B. Due Diligence of Private Placements

Despite the fact that Registrant has recommended a large number of private placement investments to its clients and received (along with its supervised persons) large amounts of commissions and other non-advisory fees, Registrant has no written policies and procedures about conducting due diligence on private placements or providing information to clients and prospective clients regarding its due diligence. Investments in private placements present a

[1] Registrant's 2015 Draft is obviously still in draft form, with bracketed statements such as the following: (i) "[Consider including the following if accurate and applicable…]"; (ii) "[Include the following sub-section if your firm's business activities make it subject to the Foreign Corrupt Practices Act…]"; (iii) "(NOTE: In the event an adviser retains the research, voting and/or recordkeeping services of an outside proxy firm, the adviser must tailor its proxy policy and procedures…)"; (iv) "[Include if applicable:]"; and (v) "IMPORTANT NOTE: … Advisers should carefully read and customize these procedures to ensure they accurately reflect the firm's practices."

unique set of risks because of their exemption from registration and the inapplicability of some of the laws and regulations that are designed to protect investors.

The examination revealed that Registrant failed to perform adequate due diligence and ongoing monitoring of private placement investments that it recommended to clients. Although Registrant conducted some due diligence on certain private placement investments (such as conducting site visits and reviewing materials provided by issuers and/or Ausdal Financial Partners, Inc. ["Ausdal"]), Registrant confirmed during field interviews that, as a matter of course, it generally conducted no other independent due diligence.[2]

The Staff's review of several private placement investments revealed that Registrant failed to (i) perform adequate due diligence on the underlying assets of the private placements; (ii) evaluate the accuracy of the issuers' disclosure and financial projections; and (iii) adequately monitor the ongoing operations of the private placements and their underlying investments.

**1. Aequitas Promissory Notes**

Between 2008 and 2014, Registrant invested 45 client accounts in private placements of the Aequitas Hybrid Fund, LLC ("Hybrid Fund"; $900,000) and in subordinated promissory notes issued by Aequitas Commercial Finance ("Aequitas"; $7,935,000 in initial promissory note investments and "roll-over" investments [*i.e.*, amounts reinvested when the initial notes matured]). Many clients did not receive their principal back when Aequitas defaulted on principal payment obligations in January 2016. Thereafter, on March 10, 2016, the SEC filed a complaint against Aequitas and its affiliated entities alleging a Ponzi-like scheme to defraud and misuse client assets. *See* SEC Litigation Release No. 23485 (March 11, 2016).

Registrant advised the Staff during field interviews that, although it visited Aequitas and its healthcare receivables facility (CarePayment), it did not do any other independent due diligence regarding (i) the assets underlying the Aequitas notes; (ii) the accuracy of Aequitas' disclosure and financial projections; or (iii) information that indicated potential problems with the Aequitas investments. The examination revealed that information was available to Registrant after the 2008 initial investments that could have possibly alerted Registrant to potential red flags with respect to the Aequitas promissory note investments. For example, a client's December 2012 inquiry regarding then-current litigation against Aequitas and uncertainty about the assets underlying the promissory notes failed to prompt Registrant to do any follow-up investigation. *See* Email from Mark MacArthur to Jim Peterson (dated December 12, 2012).

Examples of information available to Registrant reflecting potential problems with the Aequitas notes include the following:

- The Hybrid Fund announced its plan to liquidate in late 2009; however, Registrant's clients were not redeemed from the fund until December 2015. Registrant advised the

[2] During the Examination Period (from November 1, 2014 through June 30, 2016), Registrant's principals Messrs. Robert Gravette and Mark MacArthur operated a branch office of Ausdal, a broker-dealer with representatives across the country and offices in Downers Grove, Illinois and Davenport, Iowa. The examination revealed that Ausdal had material conflicts of interest in numerous private placements due to its relationships with, and receipt of compensation from, such issuers.

Staff that it "began experiencing delays in communications" from the fund in mid-2012, which continued until clients were finally redeemed. *See* Response to Request No. 57. A February 2015 email from a former client (who received a "hardship" early redemption from the fund in April 2015, shortly after she threatened to contact the SEC) summarized her experience as follows:

> *We have been told for two years that the fund was being liquidated and promised our liquidation distribution on numerous occasion [sic] and also that ... [Aequitas] is performing audits on the liquidation several times. We are so frustrated and very unsure if we will ever receive any proceeds. I do believe that there is something very wrong going on and that they should be investigated.*

Email from Carol Harris to Yumiko Odama (Feb. 25, 2015).

- Aequitas' private placement memoranda contained numerous disclosures about the significant risks involved with the promissory note investments, including that they were "highly speculative" and "lack[ed] liquidity." *See, e.g.*, Confidential Private Placement Memorandum, dated November 30, 2012, at p.22. Additionally, the memoranda also disclosed that Aequitas could use proceeds of the sale of secured notes to repay the principal and interest of previously issued secured notes. *Id.* at p. 2. However, Registrant advised the Staff that it conducted no follow-up inquiries regarding these issues.

- The audit opinion by Deloitte & Touche of Aequitas' financial statements for 2013 contained two paragraphs that emphasized matters related to fair value and related-party transactions. The "emphasis of matters" paragraphs were a deviation from a standard unqualified opinion, indicating potential red flags. Registrant advised the Staff that it conducted no follow-up inquiries regarding these issues.

Registrant advised the Staff that, due to red flags that it perceived with respect to Aequitas, in late 2012 and early 2013, it "encouraged clients to allow maturing notes ... to be paid out rather than re-invested." Responses to Request Nos. 33, 57. Despite this perception, the Staff found no indication that Registrant redoubled its due diligence effort or stopped investing in Aequitas at this time - in fact, Registrant made 19 additional investments on behalf of clients (both initial investments and "roll-over" investments) between April 2013 and January 2015.

**2. Private Placement Funds**

As of December 31, 2015, private placement investments (other than the Aequitas investments discussed above) comprised roughly 36.1% of Registrant's AUM, with an aggregate initial investment amount of $72,677,279. With respect to private placement investments (other than the Aequitas investments) held by clients during the Examination Period, Registrant and/or its principals, Messrs. Robert Gravette and Mark MacArthur,[3] received approximately $4,055,170

[3] Mr. MacArthur ceased being an owner and officer of Registrant as of July 1, 2016. Registrant advised the Staff during field interviews that its ownership change was initiated in September 2015, along with a business model

in commissions and other non-advisory payments (received before, during and after the Examination Period); as set forth below, these commissions and other payments were in addition to Registrant's "Alternative Investment Fee" that it charged to its advisory clients. The examination revealed that Registrant failed to conduct adequate due diligence on its private placement investments for the reasons set forth below.

**a. Disclosures, Financial Projections and Underlying Assets**

As stated above, Registrant advised the Staff during field interviews that, other than its site visits with respect to certain investments, it generally conducted no independent due diligence regarding the disclosures, financial projections and underlying assets of the private placement investments that it recommended to clients, but rather relied on information supplied by the issuers and/or Ausdal. The Staff's review of eleven due diligence files confirmed these representations.

Registrant's lack of formal policies and procedures regarding due diligence of disclosures, financial projections and underlying assets of private placement issuers is inconsistent with Registrant's obligations under Rule 206(4)-7.

**b. Material Conflicts of Interest**

Many of the private placements reviewed by the Staff disclosed significant material conflicts of interest; however, Registrant advised the Staff that it did not perform any independent due diligence regarding such conflicts. The following are some examples.

- Ausdal-Related Funds. Many of the private placement investments that Registrant recommends to its clients are sourced by Ausdal. In addition to the commissions that Ausdal and Registrant's supervised persons receive for selling such investments, Ausdal and its affiliates often receive other forms of compensation from the issuers. Although these relationships and payments often create significant conflicts of interest, Registrant generally undertakes no independent due diligence efforts to ensure that clients are not disadvantaged in any way. For example, in the Macon County Healthcare Investors LLC ("Macon County") and Flint River Healthcare Investments, LLC ("Flint River") private placements, the private placement memoranda reflect that Ausdal and/or its supervised persons received sales commissions, portions of the funds' managing member operations and capital transactions distributions, and a percentage of a "property acquisition fee."

  As another example, members of Macon County's manager and the manager of its wholly-owned subsidiary, Premier Healthcare Investments, LLC ("Premier") were also investors in Flint River and members of Flint River's managing member. *See* Macon County Private Placement Memorandum, at p. 35. Although Macon County's private

---

change shortly thereafter in which Registrant began to conduct business under two separate names and models: (i) Criterion Wealth Management ("CWM"), which is run by Messrs. Gravette and Zachary Herbert (Registrant's Chief Investment Officer), and (ii) Criterion Capital Investments ("CCI"), which is run by Mr. MacArthur (as an independent contractor) to service his pre-existing clients.

placement memorandum states that Premier's only assets would be a hospital and a rural health clinic, the Staff located a reference to a loan made by Premier to another private placement (SC Healthcare Investments LLC; "SC Healthcare") whose principals were also principals of Premier, Flint River and Macon County. *See* SC Healthcare September 2014 Financials, dated October 29, 2014, at p. 2. The examination revealed that no due diligence was conducted on this loan.

- Solidian Fund, LP ("Solidian"). The private placement memorandum for Solidian discloses that the fund's general partner, principals and affiliates may enter into trades "opposite to or entered ahead of trades entered into by ...[the fund]." *See* Solidian Private Placement Memorandum, dated October 16, 2006, at p. 7. The memorandum further states: "Because of their confidential nature, Limited Partners will not be permitted to inspect records of such trading." *Id.* Registrant advised the Staff that it conducted no due diligence regarding this disclosure.

- Pacific West Home Mortgage II, LLC ("Pacific West II"). The Staff reviewed certain documents relating to Pacific West II. This fund's private placement memoranda discloses significant material conflicts of interest, including the following:

> Although you will know that the Company is going to make Loans only to Bird Rock Home Mortgage and its affiliates, and you will know the general type of investments Bird Rock Home Mortgage intends to make, at the commencement of the Offering, *you will not know which, if any, of the affiliates of Bird Rock Home Mortgage to whom any Loans will be made or what is the business of such affiliate(s).*

  *See* Pacific West II Private Placement Memorandum, at p. 8 *(emphasis supplied).* The memorandum further states that "*the Company may make Loans to affiliates... whose businesses are completely different from Bird Rock Home Mortgage.*" *Id.* at p. 9 *(emphasis supplied).* The examination revealed that Registrant failed to conduct adequate due diligence regarding these material conflicts of interest.

Registrant's failure to enact and effect policies and procedures regarding initial and ongoing due diligence pertaining to conflicts of interest is inconsistent with the requirements of Rule 206(4)-7.

### c. Compliance with State and Federal Legal Requirements

Registrant has no policies and procedures to ensure that private placement issuers are in compliance with applicable state and federal legal requirements. As discussed below, the examination revealed findings by two state authorities documenting violations by two different private placement issuers:

- The California Department of Business Oversight fined the manager (and affiliates) of four of the funds in which Registrant's clients invested (Pacific West Home Mortgage, LLC ["Pacific West I"]; Pacific West II; Southland Home Mortgage, LLC ["Southland

I"]; and Southland Home Mortgage II, LLC ["Southland II"][collectively, the "Pacific West and Southland Funds"]) $45,000 for "engaging in investment adviser activities without having first applied for and secured from the Commissioner a certificate… authorizing them to act in such capacity…" *In re Bird Rock Management LLC*, CA Dept. of Bus. Oversight (Stipulation, April 27, 2016), *available at* http://www.dbo.ca.gov/ENF/pdf/2016/Bird%20Rock%20Management%20LLC-Stipulation.pdf.

- On July 27, 2016, the Georgia Department of Community Health issued a Cease and Desist Order (the "2016 Cease and Desist Order") requiring Flint River Hospital, Inc. to cease operating 18 hospital beds that it had been unlawfully operating since 2014. *See* Response to SR 63(n). Registrant advised the Staff that Macon County is in the process of appealing the order.

In addition, the Staff discovered several lawsuits against private placement issuers that Registrant recommended to its clients (and from which its supervised persons received commissions). For example, SC Healthcare recently settled a class action lawsuit (*Folk v. SC Healthcare Investments, LLC, et al.*, Case No. 1:16-cv-643-JMC [D.S.C.]) alleging violations of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. §2101, *et seq.*, pertaining to alleged unlawful actions by the issuer in connection with its closing of a hospital and termination of employees. *See* Response to 63(a). Although the Staff notes that initial and ongoing due diligence efforts may not ensure discovery of all instances of noncompliance with applicable laws by issuers, Rule 206(4)-7 requires Registrant to enact policies and procedures to address this significant risk to its clients.

### d. Unrelated Business Taxable Income ("UBTI")

Although Registrant's Form ADV Part 2A disclosures ("Brochures") advise clients that "[a]ccount supervision is guided by the client's stated objectives … *as well as tax considerations*," Registrant has no policies and procedures regarding due diligence efforts to determine whether investments that could generate UBTI are suitable for tax-exempt clients. *See, e.g.*, March 10, 2014 Brochure, at p. 3; March 17, 2015 Brochure, at p. 3; and March 29, 2016 CCI Brochure, at p. 5 *(emphasis supplied)*. Registrant failed to provide any evidence to the Staff showing that it conducted any due diligence regarding how UBTI expected to be generated by certain private placements would affect investments by ERISA plans, IRAs, §501(c)(3) organizations, and charitable remainder trusts. The Staff's review noted that the following private placement memoranda warned that UBTI would be or might be generated, which would in turn cause tax-exempt organizations to incur taxable income: (i) Pacific West I; (ii) Pacific West II; (iii) Hurst Medical Office Building, LLC ("Hurst"); (iv) Southland I; (v) Southland II; (vi) Solidian; (vii) T2 Strategic Real Estate Income Fund LLC ("T2 Strategic"); (viii) T2 Asset Opportunity Fund II, LP ("T2 II"); (ix) Macon County; (x) SC Healthcare; and (xi) Flint River. Initial investments (from 2007 through 2016) by Registrant's clients that are ERISA plans, IRAs, §501(c)(3) organizations and charitable remainder trusts in these private placement totaled approximately $27,937,719.

Because Registrant advises clients that its account supervision process is guided, in part, by tax considerations, its failure to enact and effect policies and procedures to assess the effect of UBTI with respect to its tax-exempt clients is inconsistent with Rule 206(4)-7.

For the reasons stated above, Registrant's lack of policies and procedures regarding initial and ongoing due diligence with respect to the private placement investments that it recommends to clients is inconsistent with its obligations under Rule 206(4)-7. In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

### C. Private Placement Valuations

Registrant charges investment advisory fees based on a percentage of assets under management. With respect to its private placement investments, Registrant does not perform any independent valuations and instead relies upon issuers to provide market values; when an issuer does not provide a market value, Registrant bills clients based on the investment's cost basis. *See* Responses to Request Nos. 20 – 24.

Registrant has **no active** policies and procedures to mitigate the risk of over-billing clients on an investment when its cost basis exceeds its current market value.[4] *(Emphasis added.)* As discussed in Section II.G. below, the Staff's review noted several instances in which clients may have been overbilled for poorly performing investments. The lack of adequate controls in this area, including the lack of formal policies and procedures reasonably designed to prevent violations of the Advisers Act, is inconsistent with Registrant's obligations under Rule 206(4)-7.

In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

### D. Client Fee Billing

Registrant has **no active** policies and procedures to ensure accurate client billing.[5] *(Emphasis added.)* The Staff's review noted significant discrepancies among certain private placement values reported by (i) Registrant's custodian (TD Ameritrade); (ii) Registrant; and (iii) private placement issuers. In numerous instances, Registrant billed clients based on values from TD Ameritrade that were from the previous quarter and were significantly more than the current values reported by issuers. For example, the value reflected by TD Ameritrade on December 31,

---

[4] The Staff notes that Registrant's 2015 Draft has a section on valuing securities and states that "Robert A. Gravette will arrange for monthly reviews of valuation information from whatever source to promptly identify any incorrect, stale or mispriced securities…." Further, the draft provides that "whenever valuation information for specific illiquid, foreign, derivative, private or other investments is not available through pricing services or custodians, Criterion Wealth Management's designated officer, trader(s) or portfolio manager(s) will obtain and document price information from at least one independent source…." 2015 Draft, "Valuation of Securities."

[5] The Staff notes that Registrant's 2015 Draft has a section captioned "Directly Deducting Advisory Fees," which is obviously still in draft form and states in pertinent part: "*Consider the following as recommended procedures*: …conduct quarterly testing of a sample of client fee calculations to verify accuracy … [and] conduct overall testing of the reasonableness of fees in comparison to aggregate assets under management…." *(Emphasis added.)*

2015, for the investment of The Southern Baptist Theological Seminary Endowment account (-3902)("SBTS Endowment") in Solidian was $4,222,779.17; however, this value was actually from the third quarter of 2015 and was $73,538 more than the issuer's reported value of $4,149,241.17 on December 31, 2015. *See* Response to SR 47.

The Staff requests that Registrant conduct a comprehensive review of its files for the last five years to identify instances in which clients were billed based on stale values from TD Ameritrade that were larger than the current values reported by issuers. In response to this letter, Registrant should identify the steps that the firm intends to take to address this deficiency, including whether it intends to refund any overbilled amounts to affected clients. Please provide documentation to support any corrective action taken.

### E. ERISA and IRA Clients

Registrant has no policies and procedures to ensure that its advisory services to its ERISA and IRA clients comply with applicable laws. Significantly, Registrant has no policies and procedures to ensure that it does not engage in any transactions constituting "prohibited transactions" under ERISA and the Internal Revenue Code.[6] Registrant advised the Staff that its ERISA clients invested $7,015,000 in private placements for which Registrant or its supervised persons received compensation other than advisory fees, resulting in at least $316,555 in such non-advisory compensation to Registrant and/or its supervised persons (in addition to Alternative Investment Fees received by Registrant). Additionally, Registrant's IRA and SEP IRA clients invested at least $5,984,996 in private placements (held during the Examination Period) for which Registrant or its supervised persons received at least $514,223 in commissions and other non-advisory compensation.

Additionally, as further discussed in Section I.F. below, the Staff discovered cross transactions during the Examination Period involving (i) ERISA plan clients totaling approximately $149,577; (ii) IRA clients totaling approximately $14,284; and (iii) charitable remainder trust clients totaling approximately $32,318.

Registrant's failure to enact and effect policies and procedures regarding its ERISA and IRA clients is inconsistent with the requirements of Rule 206(4)-7. In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

### F. Cross Trades

The examination revealed that Registrant effected 18 cross trades totaling approximately $416,894 during the Examination Period. As noted above, these cross transactions involved ERISA clients, §501(c)(3) clients, IRA clients and charitable remainder trust clients. When questioned during field interviews about these cross trades, Registrant advised that, with respect to each trade, a client had

[6] However, Registrant's Brochures state that Registrant is "deemed to be a fiduciary to advisory clients that are employee benefit plans or individual retirement accounts (IRAs) pursuant to … ERISA and regulations under the Internal Revenue Code of 1986, respectively." *See, e.g.*, March 10, 2014 Brochure, at p. 9. The disclosure further states: "To avoid engaging in prohibited transactions, … [Registrant] may only charge fees for investment advice about products for which our firm and/or our related persons do not receive any commissions or 12b-1 fees, or … when such fees are used to offset … [Registrant's] advisory fees." *Id.*

contacted Registrant and advised that it wanted to sell a position. Registrant then chose a different client to serve as the buyer and effected the trade without prior disclosure to the buying client. With respect to each trade, Registrant relied on TD Ameritrade to price the transaction and did not do any independent investigation regarding fair pricing. Further, Registrant failed to maintain accurate records documenting each trade.

Registrant failed to adopt policies and procedures to ensure that it fulfills its fiduciary duties to both buying and selling clients when effecting such cross trades, including disclosing all material facts to each client and making certain that no clients are disadvantaged in such transactions. Registrant's actions are inconsistent with the requirements of Rule 206(4)-7.

In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

**G. <u>Leveraged ETFs</u>**

Registrant's December 31, 2014 holdings list includes at least $10,707,112 in leveraged ETF positions. The Staff reviewed a sample of client statements reflecting that some positions were held for over three years and resulted in large losses. For example, the Staff noted the following unrealized losses in the December 31, 2014 TD Ameritrade statements:

- The SBTS Endowment account (-3902) reflects unrealized losses in four leveraged ETF positions totaling $507,058, with two positions being held since October of 2011.
- The SBTS Deferred Compensation Plan account ("SBTS Deferred Compensation")(-4536) reflects unrealized losses in two leveraged ETF positions totaling $18,945; one of these positions had been held over five years, since December of 2009.
- The accounts for George Wade (-9467, -8583, and -5232) reflect unrealized losses in five leveraged ETF positions totaling $113,672; one position, held since December 2012, reflects unrealized losses of $88,347.93.

As noted in an Investor Alert issued by the SEC Staff and FINRA, most leveraged ETFs "reset" daily and are not intended to be held for longer periods of time. *See* "Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors," *available at* <u>https://www.sec.gov/investor/pubs/leveragedetfs-alert.htm</u>. "Their performance over longer periods of time - over weeks or months or years - can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time.... [and] [t]his effect can be magnified in volatile markets." *Id.* The Investor Alert cites an example of an ETF seeking to triple the daily return of a reference index; the ETF decreased 53% between December 1, 2008 and April 30, 2009, while the reference index actually increased by approximately 8% during that same period.

Despite Registrant's large investments of client assets in leveraged ETFs during the Examination Period, Registrant has no policies and procedures regarding such investments. Registrant's failure to enact and effect policies and procedures regarding its use of leveraged ETFs is inconsistent with the requirements of Rule 206(4)-7.

In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

**H. Proxy Voting**

Although Registrant has no policies and procedures in place governing proxy voting,[7] Section 5 of its Investment Management Agreements with clients states:

> "It is the policy of the CWM *[sic]* to vote proxies on behalf of clients. Custodians are directed to forward all shareholder related materials to CWM."

The Staff's review of selected client files confirms that clients completed TD Ameritrade proxy authorization forms. *See, e.g.*TD Ameritrade Institutional "Authorization to Mail Proxies to Financial Advisor (Agent)" forms for (i) SBTS Deferred Compensation (-4536), dated November 13, 2009; and (ii) Vicky W. Chow IRA Rollover (-3889), dated December 17, 2012. Pursuant to Rule 206(4)-6, Registrant is prohibited from exercising voting authority for any client securities unless it (a) adopts and implements policies and procedures required by the rule; (b) provides disclosure to clients regarding how they may obtain information regarding Registrant's voting with respect to such securities; (c) provides disclosure to clients regarding its policies and procedures; and (d) upon request, furnishes a copy of its policies and procedures to each requesting client.

The Staff notes that its review of Registrant's March 10, 2014 Brochure, which was in effect at the beginning of the Examination Period, states that it does "not vote proxies on behalf of clients." March 10, 2014 Brochure, Item 17.

Registrant's conflicting disclosures regarding its proxy voting policies, and its failure to have relevant policies and procedures in place, are inconsistent with the requirements of Rule 206(4)-7. In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

**I. Annual Compliance Review**

Rule 206(4)-7(b) requires advisers to conduct an annual review of compliance procedures and practices, which Registrant failed to do. In response to the Staff's requests for written interim and annual compliance reviews, internal control analyses, current risk inventories, internal audit schedules and completed audits, Registrant produced only one document captioned "Advisers Act Compliance Program Development/Risk Assessment Review - 2014" (the "2014 Assessment"). Each page of the 2014 Assessment contains the header "NRS- DRAFT FOR

---

[7] The Staff notes that, although the 2008 Policies make no reference to proxy voting policies and procedures, the 2015 Draft contains a section on the topic that is obviously still in draft form. The draft gives Mr. Gravette "the responsibility for the implementation and monitoring of … [Registrant's] proxy voting policy, practices, disclosures and record keeping, including outlining … [Registrant's] voting guidelines…." The draft further states that Registrant "has the responsibility for voting proxies for portfolio securities consistent with the best economic interests of the clients…[and] maintains written policies and procedures as to the handling, research, voting and reporting of proxy voting and makes appropriate disclosures about … [Registrant's] proxy policies and procedures."

DISCUSSION PURPOSES," with numerous notations identifying follow-up actions without corresponding indications that such actions were ever completed.

Further, in response to the Staff's requests for documents evidencing employee compliance training and written compliance guidance provided to employees, Registrant merely produced Code of Ethics acknowledgment forms that were signed by employees after the Staff delivered its initial document requests to Registrant. Registrant advised the staff during field interviews that none of its supervised persons had received any Advisers Act training. [8]

In response to this letter, Registrant should advise the Staff of the steps that it plans to take to address this deficiency. Please provide documentation to support any corrective action taken.

### J. <u>Chief Compliance Officer</u>

Rule 206(4)-7 requires advisers to designate a chief compliance officer ("CCO") to be responsible for administering its compliance policies and procedures. The CCO should be competent and knowledgeable regarding the Advisers Act and the rules thereunder.

As detailed above, the examination disclosed numerous significant deficiencies concerning Registrant's policies and procedures and annual compliance reviews. The Staff noted that Registrant's CCO before and during the Examination Period, Mr. Gravette, did not appear to be knowledgeable about Registrant's obligations under the Advisers Act, including its fiduciary obligations to clients (regarding disclosure of conflicts of interest, disclosure of compensation, and duties regarding fee billing); its due diligence obligations with respect to the private placement investments that it recommended to clients; and its ongoing compliance-related obligations. Mr. Gravette advised the Staff during field interviews that he had no training in the Advisers Act, other than his broker's license training, and that he had never attended any seminars regarding Advisers Act compliance.

## II. Breaches of Fiduciary Duty – Section 206

Sections 206(1) and 206(2) of the Advisers Act prohibit an investment adviser from (1) employing any device, scheme, or artifice to defraud any client or prospective client; or (2) engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. These sections impose a federal fiduciary duty on an investment adviser with respect to its clients. *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 189-92 (1963). As a fiduciary, an investment adviser is held to the highest standards of conduct and has an affirmative duty of utmost good faith to act solely in the best interests of its clients. Further, an adviser has a fiduciary obligation to provide full and fair disclosure of all material facts and to fully disclose any conflicts of interest that may affect the adviser's ability to provide clients with unbiased advice.

Additionally, as a fiduciary, an investment adviser has an obligation to ensure that it (i) obtains adequate information about a security prior to recommending it or purchasing it for an advisory client and (ii) has a reasonable basis for its recommendation. *See, e.g., In re Alfred C. Rizzo*,

[8] As an update, Registrant advised on March 23, 2017, that Mr. Jason Stauffer is currently "taking the required coursework to obtain the IACCP designation…." *See* Response to SR 69.

Advisers Act Release No. 897 (January 11, 1984). Advisers Act Release No. 1406, dated March 16, 1994 ("Release 1406"), states that an investment adviser owes its clients the duty to provide only suitable investment advice, which includes knowing the investment product being recommended as well as the clients receiving the recommendation.

### A. Failure to Disclose Material Conflicts of Interest and Receipt of Non-Advisory Compensation by Registrant and its Supervised Persons

Registrant failed to cause Form ADV Part 2B disclosures for Messrs. Gravette and MacArthur to be delivered to any clients or prospective clients. This failure to provide supplemental brochures for Messrs. Gravette and MacArthur is significant, as Item 4 of Part 2B would have required the disclosure of all non-advisory compensation that they each received with respect to the sales of private placement investments, as well as disclosure regarding material conflicts of interest.

Further, Registrant's Brochures also failed to provide adequate disclosures regarding compensation and conflicts of interest. Registrant's Brochures during the Examination Period disclose that Registrant's representatives "may" recommend Alternative Asset investments for which they "may receive separate and typical compensation…." *See* Item 5 of Brochures effective during the Examination Period. Additionally, Item 10 of Registrant's Brochures provides that Registrant's associated persons "may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal…." However, this disclosure is not sufficient to advise clients that Registrant and its supervised persons do in fact receive a large amount of such compensation, including (i) ongoing "finder's fees" paid directly to Registrant in private placements not involving Ausdal; (ii) large percentages of carried interest payments in certain private placements; and (iii) with respect to private placements involving Ausdal, 95% of all sales compensation received by Ausdal. *See In re The Robare Group, Ltd.*, Advisers Act Rel. No. 4566 (Nov. 7, 2016).

The Staff also notes that Registrant's Brochures include the following inaccurate statements regarding conflicts of interest: (i) "we disclose to clients the existence of all material conflicts of interest…."; (ii) "we disclose to the client in a separate disclosure document the compensation we receive in exchange for the client's referral to the selected investment adviser"; and (iii) "we educate our employees regarding the responsibilities of a fiduciary…." *See* Item 10 of Brochures effective during the Examination Period.

#### 1. Undisclosed Carried Interest and "Finder's Fee" Payments

- Undisclosed portions of the carried interest fees received by private placement issuers' general partners: For each of the following private placements, Registrant's supervised persons received undisclosed payments as described below.

  - T2 II - The private placement memorandum (dated June 1, 2012) contains no reference to Registrant or Ausdal. Regarding sales compensation, the memorandum merely provides that "[a] third party may refer potential Limited Partners to the Fund" and that the "General Partner may pay a portion of its fees to such third parties as a referral fee." However, after repeated questions by the Staff regarding the nature of Registrant's compensation, Registrant finally

advised that its supervised persons and T2's General Partner each receive 50% of the profits above the preferred rate paid to investors (until 25% of the cumulative returns paid to investors are matched), and, thereafter, each receives 25%. As of the date of production on January 20, 2017, Registrant's supervised persons received approximately $235,992. *See* SR 3(i) Detail. (The Staff notes that the Buy-out Agreement produced in response to SR 23 contemplates Messrs. Gravette and/or MacArthur receiving at least $860,000 from T2 II and T2 Asset Opportunity Fund III, LP ["T2 III"].)

- T2 III - The private placement memorandum (dated August 2013) contains no reference to Registrant or Ausdal and no reference to the payment of sales compensation. Registrant advised the Staff that its supervised persons and T2 III's General Partner each receive 50% of the profits above the preferred rate paid to investors (until 50% of the cumulative returns paid to investors are matched), and, thereafter, each receives 25%. As of the date of production on January 20, 2017, Registrant's supervised persons have received approximately $142,302 from T2 III. *See* SR 3(i) Detail.

- T2 Asset Opportunity Fund IV LP ("T2 IV") - The private placement memorandum (dated February 2015) states that (a) half of the General Partner's carried interest will be paid to Ausdal, and (b) Ausdal and other selling agents "may be paid a commission: (i) by the Fund; (ii) out of the General Partner's Management Fee; (iii) out of the General Partner's carried interest; and/or (iv) an assets-based 'distribution fee' charged to the Partners introduced by such selling agents." Memorandum, at pp. 7 and 12. Registrant advised the Staff that its supervised persons and T2 IV's General Partner each receive 50% of the profits above the preferred rate paid to investors (until 40% of the cumulative returns paid to investors are matched), and, thereafter, each receives 20%. It appears that it would be unreasonable for investors to assume, based on the disclosure provided to them, that Registrant's supervised persons would be receiving a profits interest in T2 IV for merely acting as a selling agent; therefore, the disclosure appears to be inadequate. As of the date of production on January 20, 2017, Registrant advised the Staff that no compensation had been received from T2 IV. *See* SR 3(i) Detail.

- T2 Strategic - The private placement memorandum (dated May 2015) states that T2 Strategic has engaged Ausdal (and may engage other selling agents), who "may be paid a sales commission out of the Manager's Management Fee or Performance Allocation or an assets-based 'distribution fee' charged to the Members introduced by such selling agents, in addition to a portion of the Management Fee and/or Performance Allocation." Memorandum, at p. 19. Registrant advised the Staff that its supervised persons receive a back-end 2% commission above the preferred rate, and thereafter, 20% of the profits of T2 Strategic. It appears that it would be unreasonable for investors to assume, based on the disclosure provided to them, that Registrant's supervised persons would be receiving a profits interest in T2 Strategic for merely acting as a selling agent; therefore, the disclosure is inadequate. As of the date of production on January

20, 2017, Registrant advised the Staff that payments from T2 Strategic total approximately $172,163. *See* SR 3(i) Detail.

- Undisclosed back-end "finder's fees": For each of the following private placements, Registrant directly received an undisclosed annual back-end 2% performance-based fee once the preferred rate had been paid to investors (which Registrant also characterized during field interviews as a "finder's fee"). *See* Response to SR 3(i). As further discussed below in Section IV, it appears that Registrant was acting as an unregistered broker-dealer by accepting such compensation directly in exchange for its recommendations that its advisory clients invest in these private placements.

    - Pacific West I - The private placement memorandum (dated November 10, 2008) makes no disclosure regarding any sales compensation except the following:

        > The Units are being offered and sold by the Manager. No broker-dealers or other professional money raisers will be used. Any finder's fee will be paid by the Manager and not from the proceeds of this Offering.

        Memorandum, at p. ii. However, Registrant advised the Staff that it has been paid an annual back-end 2% performance fee (after the preferred rate has been paid to investors) from the issuer since 2009. The total amount received by Registrant as of the date of Registrant's document production on January 20, 2017, was approximately $641,468.

    - Southland I - The private placement memorandum (dated June 25, 2008) makes no disclosure regarding any sales compensation except the following:

        > The Units are being offered and sold by the Manager. No broker-dealers or other professional money raisers will be used. Any finder's fee will be paid by the Manager and not from the proceeds of this Offering.

        PPM, p. ii. However, Registrant advised the Staff that it has been paid an annual back-end 2% performance fee (after the preferred rate has been paid to investors) from the issuer since 2009. The total amount received by Registrant as of the date of Registrant's document production on January 20, 2017, was approximately $716,055.

The Staff requests that Registrant conduct a comprehensive review of its files for the last five years to identify instances in which it or its supervised persons received "finder's fees," portions of carried interest payments, or other non-advisory compensation. In response to this letter, Registrant should identify the steps that the firm intends to take to address this deficiency, including whether it intends to reimburse clients invested in such private placements. Please provide documentation to support any corrective action taken.

### 2. Undisclosed Portion of Ausdal Compensation

Messrs. Gravette and MacArthur advised the Staff during field interviews that they generally received 95% of the sales compensation paid to Ausdal for private placement investments recommended to Registrant's clients. As discussed above, because Registrant failed to provide investors with the Form ADV Part 2B disclosures for Messrs. Gravette and MacArthur, and because Registrant's Brochures fail to adequately disclose the fact of such compensation and the resulting conflicts of interest, Registrant's disclosure is inadequate. Even if clients were advised in the relevant private placement memoranda that Ausdal was receiving sales compensation, clients were not provided any concrete information regarding whether Messrs. Gravette and MacArthur were receiving any such compensation. The large amounts received by Messrs. Gravette and MacArthur created significant conflicts of interest that were not disclosed to clients, leaving them unable to assess Registrant's motivation in recommending each private placement investment and the risks involved.

Registrant advised the Staff that Messrs. Gravette and/or MacArthur received the following commissions as Ausdal representatives with respect to private placement investments held by Registrant's clients:

- Bakken Drilling Fund – 7%
- Bakken Income Fund – 7%
- Brazil Teak Investors LLC – 6%
- Brightwater Holdings LLC – 6.5%
- Brightwater R&B Mezzanine Partners, LLC – 6%
- Coachman Energy VI – 7%
- Coastal California Blueberry Farm LLC – 5.20%
- Elite Dairy Genomics LLC – 6%
- Flint River Healthcare Investments LLC – 6%
- Hurst Medical Office Building LLC – 6%
- Macon County Healthcare Investors LLC – 6%
- Pacific West II – 2% ongoing annual payment
- Paraiso Teak Plantation, LLC – 7%
- SC Healthcare Investments LLC – 6%
- Southland II – 2% ongoing annual payment
- Staples Medical Tower LLC – 5%
- Wabash Crossings LLC – 6%

*See* Registrant's Response to SR 3(i) and SR 22.[9] In response to this letter, Registrant should identify the steps that the firm intends to take to address this deficiency, including whether it intends to provide remedial disclosure to clients and former clients. Please provide documentation to support any corrective action taken.

---

[9] The Staff notes that this is not an exhaustive list of all private placements sold to Registrant's clients for which Messrs. Gravette and/or MacArthur received commissions as Ausdal representatives.

## B. <u>Failure to Provide Clients with Available Discounts on Private Placement Investments</u>

An investment adviser has a fiduciary duty to "seek best execution for client transactions – i.e., to seek the most favorable terms reasonably available under the circumstances." *In Re Marin Investment Counsel, Ltd.*, Inv. Advisers Act Rel. No. 3686 (Oct. 2, 2013)(holding that an adviser breached its fiduciary duty when it caused a client to purchase a more expensive mutual fund share class when a less expensive class was available)*(internal quotations omitted)*. Recent enforcement actions by FINRA against firms that failed to provide applicable volume discounts and sales charge waivers "resulted in millions of dollars in fines and restitution to customers." FINRA 2016 Regulatory and Examination Priorities Letter (Jan. 5, 2016), *avail. at* *<u>https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf</u>*.

The examination revealed that Registrant's clients were invested in several private placements that offered discounts to investors that invested through fee-based advisory/brokerage accounts; however, Registrant failed to provide its clients with such discounts, which totaled approximately $634,105. It appears that Messrs. Gravette and/or MacArthur retained sales compensation for themselves that could have been provided to investors in the form of discounts. Registrant's stated reason for failing to provide such discounts was that the investments were excluded from Registrant's Investment Management Fee (a graduated fee capped at 1.5% annually). However, Registrant collected its Alternative Investment Fee on such investments (ranging from .25% to .50% annually). The Staff notes that Registrant's breach of fiduciary duty to seek the best terms for its clients is not cured by its waiver of its Investment Management Fee.

The Staff's review of selected private placement offerings recommended by Registrant to its clients disclosed the following discounts, none of which Registrant offered to its clients:

- <u>Elite Dairy Genomics, LLC</u> – The private placement memorandum (dated June 23, 2011) states that Ausdal is authorized to reduce its fee by 6% for investors purchasing units through a fee-based brokerage account or registered representatives purchasing for their own account. The initial investment amounts of Registrant's clients (from September 2011 through November 2013) totaled approximately $7,366,150, and Messrs. Gravette and/or MacArthur received approximately $421,698 in commissions. A discount of 6% on the initial investments would have saved clients approximately $441,969.

- <u>Flint River</u> - The private placement memorandum (dated August 2, 2011) states that the fund "may discount Units up to 6% to Investors investing through fee based advisory accounts" and that "[s]uch discounts will come from commissions due to Ausdal…." The initial investment amounts of Registrant's clients totaled approximately $1,500,075, and Messrs. Gravette and/or MacArthur received approximately $85,400. A discount of 6% on the initial investments would have saved Registrant's clients approximately $90,005.

- <u>Hurst</u> – The private placement memorandum (dated March 29, 2010) states that the fund "may discount Units up to 6% to Investors investing through fee-based advisory accounts" and that "[s]uch discounts will come from commissions due

to Ausdal...." The initial investment amounts of Criterion clients totaled approximately $1,050,200, and Messrs. Gravette and/or MacArthur received approximately $68,400. A discount of 6% on the initial investments would have saved Registrant's clients approximately $63,012.

- Costal California Blueberry Farm LLC – The private placement memorandum (dated December 13, 2007) states that Ausdal "is authorized to return half of its placement fee to ... [investors investing through a fee-based brokerage account] or registered representatives that chose to purchase units for their own account...." The initial investment amounts of Registrant's clients totaled approximately $2,049,504, and Messrs. Gravette and/or MacArthur received approximately $114,950. A discount of 3% on the initial investments would have saved Registrant's clients approximately $61,485.

- Staples Medical Tower LLC – The private placement memorandum (dated June 22, 2007) states that Ausdal may give a 3% discount to investors purchasing units through a fee-based brokerage account. The initial investment amounts of Registrant's clients totaled approximately $1,144,800, and Messrs. Gravette and/or MacArthur received approximately $70,300. A discount of 3% on the initial investments would have saved Registrant's clients approximately $34,344.

In response to this letter, Registrant should conduct a comprehensive review of all private placement offerings for which it or its supervised persons received commissions (and/or other non-advisory compensation) that offered discounts to investors and should detail the steps that it plans to take address this violation, including whether Registrant and/or its supervised persons plan to remit any monies to affected clients and former clients. Please provide documentation to support any corrective action taken.

### C. Failure to Disclose Material Conflicts of Interest Regarding the Pacific West and Southland Funds

Registrant failed to disclose to investors in the Pacific West and Southland Funds that it made FINRA filings reflecting that the principals of the funds' manager, Daniel Deans Niednagel and Stephen Paul Niednagel, were registered with Registrant from October 27, 2008 through June 30, 2009. Registrant advised the Staff that the purpose of these filings was to enable Messrs. Niednagel "to complete their Series 63 exams and be licensed." Response to SR 38. The relationship between Registrant and Messrs. Niednagel was a material conflict of interest that should have been disclosed to investors.

In response to this letter, Registrant should detail the steps that it plans to take with respect to this violation, including whether it plans to provide remedial disclosures to clients. Please provide documentation supporting any corrective action taken.

## D. Misleading Statement Regarding Private Placements

### 1. SC Healthcare

The examination revealed that months after SC Healthcare abruptly closed its hospital, Registrant attempted to convince certain investors holding Class A shares to agree to a plan to convert such shares to Class C shares. The Class A shares were entitled to a 14% simple annual preferred return on unreturned capital (which according to the May 2, 2013 private placement memorandum, was personally guaranteed by James Simpson, an Ausdal principal [the "Simpson Guarantee"]), while the proposed Class C shares were to receive a 10% non-compounding annual return and, thereafter, a pro rata participation with the Class B shares in any gains.[10] The Staff's review notes that Registrant appears to have made misleading statements in its efforts to persuade its clients to agree to the conversion (which was never effected).

In an email from Mr. MacArthur to advisory client Dennis Galanter, dated May 18, 2016, the Staff noted that the following statements may have been misleading:

- "The plan from the beginning was to transition to Behavioral Health as the primary business model." The Staff notes that SC Healthcare's private placement memoranda, dated May 2, 2013, contains no disclosures regarding such a plan.

- "As a result of some staff movement and primary referring physician issues, it became obvious the hospital wasn't in good standing." The Staff notes that the hospital was purchased in connection with a bankruptcy proceeding, and a local article stated that "[f]or decades the hospital struggled financially…." *See* McKenzie, Laura J., "Southern Palmetto Hospital Closes," (January 29, 2016) *The People Sentinel, avail. at http://www.thepeoplesentinel.com/news/2016-01-28/southern-palmetto-hospital-closes#.WOL_F0YrJEY*. As such Mr. MacArthur's statement may have been misleading.

- "Should the hospital perform as planned, which is similar to the Macon County success, investors will likely do as well and possibly better." There is no basis to conclude that Macon County is successful. Contrary to its intention at the outset, Macon County has not made any distributions to investors since its inception in 2013. A March 2014 Macon County investor update noted that the hospital had "experienced simultaneous unexpected setbacks [in] late 2013 and into 2014 negatively impacting … [its] revenue to a point of negative cash flow," which resulted in rent concessions to the hospital. Further, the hospital was served with the 2016 Cease and Desist Order requiring it to cease its illegal operation of eighteen hospital beds. (The Staff notes that the complaint notice upon which the Cease and Desist Order was based was dated eight days before Mr. MacArthur's email on May 10, 2016.)

---

[10] The Staff notes that, according to the proposed conversion, 1.25 Class C shares were to be given for each Class A share.

- "John Hopfensberger[11] and his team have a runway of success to follow." Given the serious problems with SC Healthcare, which resulted in its hospital's closure; the Macon County issues noted above; and Mr. Hopfensberger's personal Chapter 7 bankruptcy in 2010 (which was disclosed in the private placement memoranda), Mr. MacArthur's statement appears to be misleading.

In addition, the examination revealed that Registrant made no efforts to enforce the Simpson Guarantee before its recommendation to clients to agree to the Class A conversion. *See* SC Healthcare memorandum, at p. 10. Registrant advised the Staff that no payments have been made by Mr. Simpson with respect to his guarantee and the "the guarantee had been removed early on in the investment." Response to SR 63(c).

### 2. Aequitas

Call notes by Mr. MacArthur on November 18, 2015, regarding a conversation with advisory client Kathy Schreiber state: "I called Kathy to update her on Aequitas & Millennium. She asked about Hybrid payout and expressed concern that there may not be any money at Aequitas. *I responded that Aequitas, based on all our due diligence is financial [sic] solid.*" *(Emphasis added.)* However, Mr. MacArthur advised the Staff during field interviews that Registrant did no independent due diligence with respect to Aequitas, and that the sole basis for his statement was assurances by Aequitas that it was financially sound. Shortly thereafter, as discussed above in Section I.B.1., Aequitas defaulted on its notes and the SEC complaint was filed. This misleading statement was inconsistent with Registrant's fiduciary duty of good faith and fair dealing under Section 206.

## E. Misleading Disclosure Regarding Advisory Fees

The examination revealed that Registrant's disclosure regarding its advisory fees is misleading for the reasons set forth below. As such, Registrant's disclosure is inconsistent with the requirements of Section 206.

### 1. Disclosures Regarding Registrant's Former Fee Structure

The Staff noted that Registrant's disclosure regarding the advisory fees that it charged clients before its 2016 organizational change was misleading and contradictory. Specifically, Item 5 of Registrant's Brochures before March 2016 state that Registrant "has two fee schedules to determine the annualized fee for advisory services" and that "[t]he applicability of each fee schedule is determined by the nature and scope of the advisory services to be provided in addition to the type of securities managed in the client's portfolio." The Brochures provide in pertinent part:

1) Investment Management
[Registrant]… shall utilize this fee schedule for advisory services encompassing the following:

---

[11] Mr. Hopfensberger held the following positions with respect to SC Healthcare: (i) member of SC Healthcare Investments Manager, LLC, the fund's manager; (ii) principal of CMK Properties, LLC, the fund's asset manager; and (iii) member of BCH Acquisitions Group, LLC, which owns 38.1% of SC Healthcare's Class B Units. *See* SC Healthcare's Private Placement Memorandum, dated May 2, 2013; and Response to SR 63..

- Stocks, bonds, cash management
- Asset allocation, diversification strategies
- Strategic and tactical management using multiple asset categories and securities
- Investment selection and monitoring
- Account reporting ....

2) Alternative Investment Fee...
[Registrant] ... shall utilize this fee schedule for advisory services encompassing the following:

- Hedge Fund investments
- Private Placement Investments
- Private Equity Investments....

When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to ... clients in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal.... If a ... client chooses to invest in these securities and an associated person of ... Registrant receives separate commission compensation from the sale of an Alternative Asset Investment, the Asset will be excluded from the ... fee calculation as described above.[12]

Based on the foregoing, clients would most likely understand that (i) they would only be charged an Alternative Investment Fee (and not the Investment Management Fee) for their investments in private placements; and (ii) they would not be charged any advisory fees for investments for which Registrant's associated persons received commissions. However, Registrant's investment management agreements ("IMAs") contained the following contradictory language: "In the event that ... [Registrant] is compensated directly by the fund manager or broker dealer per SEC regulation D requirements, this asset is not subject to the investment management fee... [and] [o]nly the alternative fee will apply." The IMAs were silent as to compensation received by Registrant's supervised persons.

In practice, Registrant charged clients (i) both its Investment Management Fee and its Alternative Investment Fee for certain Aequitas investments and Solidian investments; and (ii) its Alternative Investment Fee for all other private placement investments (even though it and/or its supervised persons received commissions and other non-advisory compensation). Registrant's fee billing practices were inconsistent with the requirements of Section 206.

In response to this letter, Registrant should describe the steps that it plans to take to address this deficiency, including whether it intends to provide remedial disclosure to clients and former clients

[12] Registrant's March 2016 CCI Brochure contains similar disclosure. but adds a section captioned "Performance Based Fee."

that accurately describes the fees charged. Please provide supporting documentation regarding all corrective measures.

### 2. Disclosures Regarding CWM's Current Fee Structure

Registrant's March 30, 2016 CWM Brochure, which omits the Alternative Investment Fee, discloses two fee schedules: (i) a "Standard Asset Based Management Fee" and (ii) a "Performance Based Management Fee." Following both fee schedule descriptions, a section captioned "Alternative Asset Compensation" contains disclosure that investments in alternative investments for which associated persons of CWM receive commissions "will be excluded from the CWM fee calculation as described above." The CWM IMA (updated March 2016) does not mention the Alternative Investment Fee or offsets of commissions. In response to this letter, for any periods after March 30, 2016, Registrant should conduct a comprehensive review of the type and amounts of advisory fees charged to clients for private placement investments for which Registrant and/or its supervised persons receive commissions or other non-advisory fees and ensure that it is consistent with its updated disclosures. Please provide documentation supporting all corrective measures taken.

### 3. Disclosures Regarding Tiered Fee Schedule

Registrant's Investment Management fees are based on a tiered fee schedule. For example, the March 10, 2014 Brochure provides the following schedule:

| Assets under Management | Annual Fee (%) |
|---|---|
| Up to $499,999 | 1.50% |
| $500,000 - $999,999 | 1.25% |
| $1,000,000 - $1,999,999 | 1.00% |
| $2,000,000 - $4,999,999 | 0.65% |
| $5,000,000 - $10,000,000 | 0.50% |
| Above $10,000,000 | 0.40% |

Based on this disclosure, it would be reasonable for a client to understand that the fee charged equals the percentage corresponding to such client's total assets under management (*i.e.*, a client with $4,000,000 of assets would be charged the corresponding annual fee of 0.65%). However, correspondence discovered by the Staff during the examination indicates that this was not the case and that Registrant interpreted the schedule "similar to a tax rate schedule." *See* Email from Robert Gravette to Wayne Milligan (SBTS), dated February 22, 2010. This correspondence reflected that SBTS had interpreted the fee schedule as noted by the Staff above; Registrant responded:

> I believe we identified the perceived discrepancy by Wayne. The primary one is that a Fee rate of 1.25% is used, rather than the ADV tiered schedule. This is a common mistake. The tiered schedule is best understood to act similar to a tax rate schedule. The last dollars are at the marginal rate, but not inclusive of all dollars. This breakdown is consistent regardless of the total AUM amount.

Registrant's fee disclosure is potentially misleading and inconsistent with the requirements of Section 206. In response to this letter, Registrant should describe the steps that it plans to take to address this deficiency, including whether it intends to provide remedial disclosure to clients and former clients that accurately describes the fees charged. Please provide supporting documentation regarding all corrective measures.

### F. Compliance with Client Investment Mandates

The Staff's review notes that Registrant appears to have deviated from the investment mandates of the following clients:

(i) SBTS Endowment (-3902): SBTS is a tax-exempt organization under §501(c)(3) of the Internal Revenue Code. Registrant managed the entire portfolio of SBTS. SBTS' Investment Plan, dated September 13, 2011, which was prepared based on The Southern Baptist Theological Seminary Investment Policy Statement, dated September 7, 2010, (the "Policy Statement") provides that "[t]he primary objective … is to earn a total return, net of all fees incurred, sufficient to: (i) Support the Spending Rule (currently stated as *4.5%*) [and] (ii) *Protect* and, *where prudent*, increase the purchasing power of Fund assets." *(Emphasis added.)*

Private Placement Investments. The December 31, 2014 holdings list reflects fourteen private placement investments in SBTS Endowment totaling $27,268,213, which constituted approximately 35.6% of the total account value of approximately $76,621,537 (per the client list).[13]

Each private placement memorandum reviewed by the Staff contains the following disclosure (or disclosure substantively similar thereto):

> **AN INVESTMENT IN THE UNITS IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. INVESTORS MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD AND BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT.**

SC Healthcare Memorandum (May 2, 2013)*(Emphasis in original.)*

The Staff notes that time has demonstrated the high risk nature of these investments. For example, SC Healthcare's financial projections, attached as Exhibit D to its May 2, 2013 private placement memorandum, estimated that the sale of its hospital in year 5 of the investment would result in average returns of 14% to Class A shareholders and 44% to Class B shareholders. However, SC

[13] The total account value reflected on the December 31, 2014 TD Ameritrade statement is approximately $77,850,817 (including an FDIC-insured deposit account of $711,128.27), a difference of approximately $1,229,280 from the value reflected on the client list. *See* discussion in Section I.D., above.

Healthcare abruptly closed the hospital in January 2016, and it remained closed through the date of Registrant's production on March 17, 2017. Although Registrant advised the Staff that SC Healthcare recently received a purchase offer of $3.9 million for the hospital, it appears that investors have little hope of monetary recovery, as SC Healthcare's December 31, 2016 balance sheet lists total liabilities of approximately $6.12 million and total assets of approximately $1.43 million. *See* Response to SR 63.

Given the speculative nature of the private placements, the lack of adequate due diligence performed, and SBTS Endowment's conservative investment mandates, Registrant did not have a reasonable basis for recommending that the client invest in private placements in such a concentrated manner.

<u>Solidian.</u> The Staff notes that one private placement investment, Solidian, appears to have violated the spirit, if not the letter, of Section 7 of SBTS' Policy Statement prohibiting the use of over-the-counter derivatives and the use of derivatives to create leverage. Solidian's private placement memorandum, dated October 6, 2006, states that all of its assets were invested in over-the-counter options that were priced based on the value of underlying hedge funds. Per the memorandum, the fund employed leverage on a 3:1 ratio relative to its net asset value. Registrant advised the Staff that SBTS' Financial Board had approved the investment, but Registrant produced only an unsigned draft of meeting minutes that stated that "the Financial Board approved an exception to the Investment Policy Statement to permit investment in the Solidian Fund under management of the Royal Bank of Canada." This draft seems to reflect that SBTS did not understand the investment, as the fund was not managed by the Royal Bank of Canada. Further, the draft made no reference to the fact that the fund's only investments were over-the-counter options or that the fund employed leverage. In any event, SBTS' approval of the investment does not relieve Registrant of its fiduciary obligation to recommend only suitable investments.

<u>Leveraged ETFs</u>. The examination also revealed that Registrant purchased large positions in leveraged ETFs for SBTS Endowment, resulting in large unrealized losses for the period sampled. The December 31, 2014 statement for SBTS Endowment reflects unrealized losses of $507,058 in four leveraged ETF positions, with one of those positions being held since October of 2011 (the total cost basis for these four positions was $2,445,443.62). In addition, the December 31, 2014 TD Ameritrade statement for the SBTS "cash account" (-0608) reflects a $3,137,270.58 position (cost basis of $3,146,703.68) in a leveraged ETF, which constituted approximately 75% of the total value of $4,183,464.88, amounting to an unrealized loss of $9,433.10.

Registrant represented to the Staff that "[a]t no point was the levered ETF representing even a 1% allocation for assets managed." However, the Staff notes that, according to the December 31, 2014 custodial statements, the market value of the leveraged ETFs in SBTS Endowment, SBTS Deferred Compensation and SBTS -0608 totaled $6,302,883.65, which was approximately 7.6% of the aggregate account value of $82,945,781.50. Given the large unrealized losses reflected above,

and the dangers of holding such investments for longer than one day, Registrant has not demonstrated that its use of leveraged ETFs was suitable.[14]

(ii) SBTS Deferred Compensation (-4536): SBTS Deferred Compensation's Investment Plan, dated December 9, 2009 (the "Plan"), states, in part: (i) "No single investment will be made with the assumption that complete loss of capital is a real possibility"; (ii) "Recognition of capital preservation as priority to growth will go into all portfolio management decisions and acceptance of reduce *[sic]* upside returns in certain conditions is expected"; (iii) "The Plan return expectation is ≥5% ...[and] [t]he Plan will take a mid-term investment outlook in order to minimize volatility"; and (iv) "In the event of the death of Mr. Mohler, total portfolio liquidity will be available within 90 days." Registrant stated that, for various reasons, the Plan parameters were determined to be too narrow, and it was decided to view this account "as part of the general assets of the endowment ... [t]o be managed according to the policy objectives dictated by the ... [SBTS Endowment Investment Policy Statement]."

Private Placement Investments. The December 31, 2014 holdings list reflects that SBTS Deferred Compensation held six private placement investments totaling approximately 72.2% of the account value reflected on the client list of $931,881.[15] For the reasons discussed above, the private placement investments appear to be unsuitable. The Staff notes that SBTS Deferred Compensation's 90-day liquidity restriction, standing alone, should have precluded these investments, which were all illiquid in nature and contained varying lock-up lengths.

Leveraged ETFs. As of December 31, 2014, SBTS Deferred Compensation also held three positions in leveraged ETFs totaling $54,119.03 (cost basis of $72,574.32), which constituted approximately 5.9% of the total account value (per the TD Ameritrade statement) of $991,499.75, reflecting an unrealized loss of $18,455.29. One of these positions had been held over five years, since December of 2009.

(iii) Baptist Gardens: Baptist Gardens is a tax-exempt organization under §501(c)(3) of the Internal Revenue Code. Registrant advised the Staff that it managed 20-25% of the client's total portfolio. Per Registrant, the client's first account with Registrant (-9810) was established in September 2013 "to gain non-stock market exposure and

---

[14] In addition, the leveraged ETF positions may have violated the spirit, if not the letter, of Section 7 of the Policy Statement, which provides: "This policy is not intended to grant Managers the authority to use derivatives to create leverage. Derivative strategies designed to increase a separate account's effective risk exposure above the level obtainable using permissible cash market instruments require approval by the Financial Board." Registrant explained that the positions "were limited to hedging tools" and that "[i]n no instance was the position taken as a speculative 'open' investment." However, the extended length of time that these positions were held seems to suggest that the positions were closer to speculative open positions than to traditional hedging positions.

[15] The Staff notes that the December 31, 2014 TD Ameritrade statement reflects the total account value as approximately $991,500 (including an FDIC-insured deposit account of $7,216.64), a difference of approximately $59,619 from the amount reflected in the client list. *See* discussion in Section I.D., above.

diversify into medical related and/or real estate type investments"; Registrant listed the risk tolerance level for this account as "moderately aggressive" in the client list that it provided to the Staff. The second account (-3068), a cash management account opened in the first quarter of 2014, "was initiated with a conservative cash/short duration goal to generate incremental benefit with interest relative to the savings rate of .01%." Client meeting notes dated October 13, 2015 state: "Goals remain the same: conservative growth." Registrant explained, "Putting the two account values together in conversation, created *[sic]* an overall goal that resulted in a conservative growth strategy, using a 'sleeve' type allocation."

Aequitas Investments. The December 31, 2014 holdings list reflects that Aequitas notes ($500,000) comprised approximately 23.4% of the total account value ($2,096,278 per the client list)[16] of account -9810: (i) a $335,000 note with a 36-month term was purchased on November 4, 2013, and (ii) a $165,000 note with a 12-month term was purchased on the same date. As set forth above in Section I.B.1., these notes were purchased after Registrant perceived red flags with Aequitas communication and delayed financials and "encouraged clients to allow maturing notes… to be paid out rather than re-invested." Aequitas defaulted on the $335,000 note, which is now part of the receivership process. It appears that the notes were unsuitable, given their speculative nature, Registrant's stated concerns regarding Aequitas at the time of the note purchases, the inadequate due diligence conducted by Registrant to have a reasonable basis for the recommendation, and the client's apparent "conservative growth" investment objective.

Other Private Placement Investments. In addition to the Aequitas notes, the holdings list reflects that account -9810 held two other private placement investments as of December 31, 2014, totaling approximately $947,274. These two investments comprised approximately 45.2% of the total value reflected on the client list. For the reasons discussed above, these investments do not appear to have been suitable investment recommendations.

Loan to SC Healthcare. The Staff's review also noted that a $500,000 loan by the client to SC Healthcare was not included on Registrant's holdings list or its list of all private placement investments (Response to SR 3). This loan was originated in December 2015, a month before the hospital owned by SC Healthcare closed its doors with only two days' notice to patients and hospital employees in January 2016.

Although Registrant advised the Staff that this loan was an "outside holding" for which it "did not charge any management fees….," the Staff's review reflects that Registrant charged its Alternative Investment Fee on this loan. *See* Alternative Investment Fee Confirmation, dated June 30, 2016. Further, Registrant advised the Staff that this loan was "a direct transaction between Baptist Gardens and SC

[16] The Staff notes that the total account value reflected on the December 31, 2014 TD Ameritrade statement for account -9810 is approximately $2,290,209 (including an FDIC-insured deposit account of $84,727.90), a difference of $193,931 from the value indicated in the client list. *See* discussion in Section I.D., above.

Healthcare"; however, a December 9, 2015 email from John Hopfensberger to Mr. MacArthur thanks him "for his teams *[sic]* hard work on this." Response to SR 63(i).

The Staff notes that, at the time that Baptist Gardens made this loan, there were serious red flags with respect to the fund. For example, the September 2014 financials disclosed:

> Cash and accounts receivable balances in the financials have not been reconciled to the bank statements or detail patient ledgers at the time of this report. The reconciliation is in process, however, conversion of software systems and change in bank accounts from RMC Barnwell to SC Healthcare Investments *have caused chaos in accounting for these transactions and the fact that none of the accounts have been reconciled since March 2014, and some, never reconciled.*

*(Emphasis supplied.)* These financials also noted that a line of credit had been obtained, with part of the proceeds "used to pay off the loan from Premier Healthcare." September 2014 Financials, at p. 2. This loan raises concerns, as the principals of Premier Healthcare, Macon County's subsidiary, are also principals of SC Healthcare. In response to the Staff's request for detailed information regarding all "loans, bridge loans, lines of credit, notes payable, or other similar instruments obtained by SC and/or the Hospital," Registrant failed to provide any information regarding this loan from Premier Healthcare. *See* Response to SR 63(h).

Other significant red flags were noted with respect to SC Healthcare before the loan by Baptist Gardens, including the firing of the hospital operator; significant operating losses; and a large amount of outstanding debt. Registrant had a fiduciary obligation, as Baptist Garden's investment adviser, to provide all relevant information regarding the apparent precarious state of SC Healthcare and to advise that the loan did not appear to be a suitable investment.

Leveraged ETFs. Both Baptist Gardens accounts held large positions in leveraged ETFs. The December 31, 2014 TD Ameritrade statement for account -9810 reflects $277,122.60 in leveraged ETFs, which comprised 12.1% of the total account value of $2,290,208.90 per the statement; this account showed a year-to-date loss of $72,565.96, and although Registrant stated that it was not able to produce a statement reflecting unrealized gains and losses by investment, it is probable that a portion of such losses were due to the large leveraged ETF positions, given the performance of other accounts holding similar positions at the same time.[17] Further, the TD Ameritrade statement for account -3068 shows a $239,880 position in a

[17] Notably, the December 31, 2015 statement for account -9810 reflected a year-to-date loss of $683,904. Again, Registrant advised that a TD Ameritrade statement reflecting unrealized gains and losses by investment was not available.

leveraged ETF, which was 61.3% of the total account value of $391,612.44 per the statement; the position, held since December 10, 2014, sustained a $668.99 loss as of December 31, 2014.

For the reasons discussed above in Section I.G., the large positions in leveraged ETFs held for extended lengths of time were inappropriate and unsuitable for the accounts.

(iv) <u>David and Vicky Chow:</u> As of December 31, 2014, Registrant managed the following accounts, which totaled approximately 20-25% of the clients' portfolio: (i) David C. Chow Rollover IRA (-3885); (ii) Vicky W. Chow Rollover IRA (-3889); and (iii) a Joint Tenant Account (-4341). Per the client list that Registrant provided to the Staff, each account has a "moderate" investment strategy. Registrant further advised that the client "was concerned about the stock market and the large exposure he would have when his work at Amgen and his wife's work at another biotechnology company were included… [and] he stated a desire to eliminate the ups and downs of the stock markets." Registrant stated that the clients' "intention, from the beginning, was to work with alternatives."

<u>Aequitas.</u> Three Aequitas notes were purchased by the client household: (i) a $100,000 24-month term note on May 13, 2013 (valued at $104,051 on December 31, 2014, which constituted approximately 16.1% of the $648,114 client list value[18] of account -3889); (ii) a $75,000 36-month note on December 17, 2013 (valued at $78,422 as of December 31, 2014, which constituted approximately 9.9% of the $789,691 client list value[19] of account -3885); and (iii) a $100,000 36-month note on June 24, 2014 (valued at $102,546 as of December 31, 2014, which constituted approximately 12% of the $852,508 client list value[20] of account -4341); Aequitas defaulted on the last two notes, which were purchased after the client expressed his concern about the poor performance of his portfolio, as discussed below.

Registrant's call notes for October 1, 2013 state that the client was concerned about the poor performance of the accounts "and not meeting his retirement goals" and that "[h]is wife's work situation … [was] deteriorating and he wants to be sure that … [they could] get where they need to be." Thereafter, Registrant's call notes state: "We decided to closely monitor the VXX position, put a small

---

[18] The total account value reflected on the December 31, 2014 TD Ameritrade statement for account -3889 is approximately $646,032 (including an FDIC-insured deposit account of $17,239.57), a difference of $2,082 from the client list amount. *See* discussion in Section I.D., above.

[19] The total account value reflected on the December 31, 2014 TD Ameritrade statement for account -3885 is approximately $788,972 (including an FDIC-insured deposit account of $74,248), a difference of approximately $719 from the client list amount. *See* discussion in Section I.D., above.

[20] The total account value reflected on the December 31, 2014 TD Ameritrade statement for account -4341 is approximately $851,515 (including an FDIC-insured deposit account of $85,865), a difference of approximately $993 from the client list. *See* discussion in Section I.D., above.

amount of cash to work in the market and invest in Aequitas with an amount that will carry a large impact. He wants to get on track so he can make some retirement decisions." Thereafter, the last two Aequitas were purchased.

Although Registrant stated that the client "was comfortable" with the Aequitas allocation because he wanted to avoid the stock market and because of the lack of opportunity in the bond market," given the speculative nature of the notes, Registrant's stated concerns regarding Aequitas at the time of the purchases, and the clients' "moderate" investment strategy, the Aequitas investments appear to have been unsuitable.

Other Private Placement Investments. In addition to the Aequitas notes, the household account held four private placement investments valued at $808,821 as of December 31, 2014, which comprised 35.3% of the total household value (per the client list). For the reasons discussed above, as well as the clients' "moderate" investment strategy, the private placement investments appear to be unsuitable.

Leveraged ETFs. The client household held the following leveraged ETF positions as of December 31, 2014: (i) account -3885: three positions with a total market value of $97,029.95, constituting 12.3% of the total statement value of $788,972.33 (two positions reflected unrealized losses of $4,058.88 [purchased on January 15, 2013] and $3,215.82 [purchased on January 13, 2014], respectively); (ii) account -3889: two positions with a total market value of $35,815, constituting 5.5% of the total statement value of $646,031.56 (one position reflecting an unrealized loss of $6,541.82 [purchased on March 27, 2013]); and (iii) account -3431: two positions with a total market value of $32,178.32, constituting 3.8% of the total statement value of $851,514.93 (reflecting unrealized losses of $4,281.01 [purchased on January 13, 2014] and $1,852.80 [purchased on February 6, 2013], respectively).

For the reasons stated above, these leveraged ETF positions were inappropriate and unsuitable for the accounts.

(v) DLW 401(k) Plan and Trust ("DLW"). As of December 31, 2014, Registrant managed the following accounts, which comprised approximately 75% of DLW's investible assets: (i) DLW Orthopedics 401(k) Plan & Trust (-1234) and (ii) DLW Orthopedics Defined Benefit Plan & Trust (-0317). The client's goal, per its April 8, 2010 Investment Plan, was "to obtain retirement income goal without taking undue risk." Registrant stated that the client "viewed investing in alternatives as much more conservative than investing in the stock market" and "consistently resisted ... [an] exposure [to stocks] and maintained his demand for alternatives."

Aequitas. The client made two investments in Aequitas notes totaling $325,000. Aequitas defaulted on the latter note purchase of $200,000 made in November 2014. Given the note's speculative nature and the lack of adequate due diligence performed even after Registrant perceived red flags (*See* Section I.B.1 above), it appears that the November 2014 investment, which constituted 10.8% of the total

account (-0317) value of approximately $1,847,633 as of December 31, 2014 (per the client list), was unsuitable.

Other Private Placement Investments. In addition to the Aequitas notes, Registrant placed DLW in eight private placements that were valued at $1,181,304 as of December 31, 2014, which constituted approximately 55.7% of the client's accounts. Given the speculative nature of the private placements and the lack of adequate due diligence performed, Registrant did not have a reasonable basis for recommending that the client invest in private placements in such a concentrated manner.

Leveraged ETFs. As of December 31, 2014, DLW's accounts held six leveraged ETF positions totaling approximately $34,344. TD Ameritrade statements reflected unrealized losses of approximately $12,790 in these positions, four of which were held since 2013. For the reasons stated above, these investments appear to have been unsuitable.

The Staff notes that its review of the following additional sampled client files revealed suitability concerns similar to those noted above: (i) George Wade Family Trust (with a risk tolerance level of "Medium/Low" and large positions in private placements, as well as long-held leveraged ETF positions and Aequitas investments); (ii) James G. Peterson and Barbara Silton (with a "moderate" risk tolerance level and large investments in private placements, as well as long-held leveraged ETF positions and an Aequitas note); (iii) James Kehrli (a "moderately conservative" IRA account with a private placement and Aequitas investment, as well as long-held leveraged ETF positions); (iv) Standard Aero Parts Inc. (a "Moderately Conservative" profit sharing plan with long-held leveraged ETF positions); and (v) Peter Seeger (a retiree looking for "income and long term appreciation to maintain his lifestyle needs" with large investments in private placements, as well as long-held leveraged ETF positions and Aequitas investments).

It appears that Registrant failed to have a reasonable basis for making the investment recommendations summarized above, which is inconsistent with an adviser's fiduciary duty to its clients. The firm should take corrective action(s) that it considers appropriate to address this deficiency and provide documentation of such corrective action(s) to the Staff.

### G. Fees Based on Cost Basis of Assets

Registrant's use of a private placement's cost basis when market value is unavailable for purposes of calculating advisory fees is inconsistent with Section 206 if the cost basis exceeds market value. During the examination, Registrant provided the staff with documents and communications suggesting that several investments may have had a cost basis exceeding market value, including, for example, the following:

- SC Healthcare – As noted above, this fund's underlying asset, a hospital, was closed in January 2016 and, as of the close of the Examination Period, had not made any distributions since May 2014; nonetheless, Registrant continues to value the investment at its June 2013 initial cost.

- Macon County - This private placement has never paid any distributions and, as noted above, its underlying asset, a hospital, was served with the 2016 Cease and Desist Order requiring it to cease its illegal operation of eighteen hospital beds. Nonetheless, Registrant still values the investment at its initial cost from October 2013.

- Hurst Medical Office Building, LLC - Registrant advised the Staff that this fund's underlying "[p]roperty has yet to become cash flow positive." Response to SR 35. Nonetheless, Registrant continues to value this investment at the original investment amount from June 2010.

As Registrant's Alternative Investment Fee is based on a percentage of each asset's value, it appears that Registrant has overbilled its clients with respect to assets not carried at their current market values. In response to this letter, Registrant should (i) conduct a comprehensive review of all private placement valuations for the last five years, (ii) determine the amount overbilled to clients, and (iii) advise the Staff of any plans to make affected clients whole. Please provide documentation supporting all corrective actions.

## III. **Books and Records - Rule 204-2**

Rule 204-2 requires an investment adviser to make and keep true, accurate and current certain books and records relating to its investment advisory business. The books and records must be maintained and preserved in an easily accessible place for a period of not less than five years.

During the course of the examination, Registrant provided the Staff with a misleading document indicating that it had "confirmed with John Hopfensberger that no complaints or lawsuits have ever been filed against SC Healthcare Investments LLC." Response to SR 40. However, the WARN Act class action lawsuit discussed above in Section I.B.2.c. was mentioned repeatedly in SC Healthcare Investor Updates (which Registrant produced in response to SR 45); as such, it appears that Registrant knew, or should have known, of the litigation at the time that it advised the Staff otherwise. This action by Registrant is inconsistent with the requirements of Rule 204-2.

Additionally, the examination revealed that Registrant failed to keep required records with respect to its cross trades, discussed above in Section I.F.

In response to this letter, Registrant should advise the Staff of the steps that it intends to take to ensure compliance with Rule 204-2.

## IV. **Acting as an Unregistered Broker Dealer – Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act")**

Section 15(a)(1) of the Exchange Act makes it unlawful for any broker or dealer to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or induce or attempt to induce the purchase or sale of, any security unless such broker or dealer is

registered with the Commission. Scienter is not required in order to prove a violation of Section 15(a)(1).[21]

Section 3(a)(4) of the Exchange Act broadly defines a "broker" as "any person engaged in the business of effecting transactions in securities for the accounts of others." The phrase "engaged in the business" connotes a certain regularity of participation in securities transactions at key points in the chain of distribution.[22] Effecting securities transactions need not be the principal business or principal source of income for the person. In determining whether a person is acting as a broker, courts consider whether the person:

> (1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3) is selling, or previously sold, the securities of other issuers; (4) is involved in negotiations between the issuer and the investor; (5) makes valuations as to the merits of the investment or gives advice; and (6) is an active rather than passive finder of investors.[23]

The Commission has stated that the receipt of securities commissions or other transaction-based compensation is a key factor in determining whether a person or an entity is acting as a broker-dealer. Absent an exemption, a person that receives commissions or other transaction-based compensation generally is required to register as a broker-dealer.[24]

Registrant appears to have acted as an unregistered broker-dealer by actively soliciting clients for two private placement funds, Pacific West and Southland. It appears that Registrant acted as an unregistered broker-dealer because it: (1) solicited clients who then invested in the Pacific West and Southland Funds; (2) was not an employee of the issuers; (3) received transaction-based compensation (an ongoing, annual back-end 2% performance-based fee once the preferred rate had been paid to investors, which Registrant also characterized as a "finder's fee" during field interviews); (4) maintained contact with investors after they invested in the private placements; and (5) facilitated communication between investors and the private placement funds.

In its response, Registrant should identify what steps it intends to take with respect to this finding.

## V. <u>Advertising and Marketing – Section 206; Rule 206(4)-1</u>

During the course of the examination, the Staff noted the following instances of misleading advertising and marketing by Registrant. The following is not intended to be a comprehensive list

---

[21] *See SEC v. Interlink Data Network*, 1993 U.S. Dist. LEXIS 20163, at *46 (C.D. Cal. Nov. 15, 1993).

[22] *See SEC v. Nat'l Executive Planners, Ltd.*, 503 F. Supp. 1066, 1073 (M.D.N.C. 1980); *Mass. Fin Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass.), <u>aff'd</u>. 545 F.2d 754 (1st Cir. 1976).

[23] *See SEC v. Hansen*, 1984 U.S. Dist. LEXIS 17835, at *26 (S.D.N.Y. Apr. 6, 1984).

[24] *See In re Wolff Juall Invs., LLC*, SEC No-Action Letter (May 17, 2005); *In re Herbruck, Alder & Co.*, SEC No-Action Letter (June 4, 2002); *In re 1st Global, Inc.*, SEC No-Action Letter (May 7, 2001); and *In re Bryan Claggett*, SEC No-Action Letter (Sept. 22, 1998).

of deficiencies with respect to Registrant's advertising and marketing. Rather, we request that Registrant conduct a comprehensive review of its advertising and marketing materials, including Registrant's website, and, in response to this letter, identify the steps that it intends to take to address these deficiencies.

### A. Misleading Advertising Regarding Fees

The Staff noted several examples of misleading advertising regarding Registrant's fees, including the following:

- "WHAT ARE THE COSTS INVOLVED? ...We are not a broker, therefore we do not typically profit from trading securities. Transaction costs are generally passed to the client and negotiated by Criterion to ensure our clients receive the lowest institutional cost available. Certain products used to balance portfolios may incur a commission." Registrant's current website at http://www.criterionwealth.com/faq-1/ (site last visited on March 30, 2017)

- "Our fee structure is clear, transparent and straightforward." File captioned "Q3-2015.10 Blog Posts (10.2015-Current)," produced in response to Request No. 38; and Registrant's current website at http://www.criterionwealth.com/non-profit-services/ (site last visited on March 30, 2017).

- "Most advisors aren't interested in your financial life. They're interested mainly in the parts of your financial life they can profit from—by selling you investments and insurance for a sales commission, for example. ...Our boutique structure allows us to understand your needs and desires thoroughly. And our relationship-fee structure allows us to implement the solutions that work best for you—not for us. Registrant's current website at http://www.criterionwealth.com/why-were-different (site last visited on March 30, 2017).

- "OUR FEES ...A fee-based approach puts us and our clients 'on the same side of the table.' ... Unlike many advisors, our model does not depend on continually earning fresh sales commissions by pushing products. However, it is also important to us to make available to our clients those products that can only be bought with a sales commission. In such cases, we clearly explain our recommendation, and the fee, before any transaction is made." Registrant's current website at http://www.criterionwealth.com/our-fees-1/ (site last visited on March 30, 2017).

### B. Misleading Advertising Regarding Conflicts of Interest

Examples of misleading advertising regarding conflicts of interest included the following:

- "**Transparency.** In the institutional investing arena, trusting your advisors is critical. Criterion operates as an independent fiduciary advisor, which means we are sworn to avoid or to clearly disclose any potential conflicts of interest." File

captioned "Q3-2015.10 Blog Posts (10.2015-Current)," produced in response to Request No. 38; and Registrant's current website at http://www.criterionwealth.com/non-profit-services/ (site last visited on March 30, 2017).

### C. Misleading Advertising Regarding Due Diligence

Registrant's website contains the following misleading statements regarding due diligence:

- "At Criterion, our investment decisions are firmly rooted in the teachings and traditions established back in the 1930's by Benjamin Graham and David Dodd. Our portfolios are built one investment at a time and a margin of safety is demanded for every holding. This means that each holding stands on its own merit, not its diversification benefits. Furthermore, this means each purchase for our clients undergoes a rigorous due diligence process and has a well-defined investment thesis. If we do not understand the business or the investment, then we do not buy it." Registrant's current website at http://www.criterionwealth.com/investment-consulting/ (site last visited on March 30, 2017).

### D. Improper Testimonial

Registrant's website also contains the following improper testimonial:

- "Our favorite compliment from clients says it all: 'We had no idea what we were missing.'" Registrant's current website at http://www.criterionwealth.com/why-were-different (site last visited on March 30, 2017).

For the reasons noted throughout this letter, the above advertising is misleading and inconsistent with Section 206 and Rule 206(4)-1 thereunder.

## VI. Incomplete and Inaccurate Form ADV; Failure to Deliver Brochure Supplements - Rules 204-1 and 204-3

Registered investment advisers are required to amend their registration forms (Form ADV) at least annually, within 90 days of their fiscal year end and more frequently if required by instructions to the form. Updates to Part 1A of Form ADV must be filed annually through FINRA's Investment Adviser Registration Depository. In addition to making annual filings, advisers must promptly file an amendment to its Form ADV whenever certain information contained in its Form ADV becomes inaccurate. Form ADV filing requirements are specified in Rule 204-1 under the Advisers Act and in the General Instructions to Form ADV. Rule 204-3(b)(3) requires that a current brochure supplement must be delivered to each client or prospective client "for a supervised person before or at the time that supervised person begins to provide advisory services to the client...."

The Staff reviewed Registrant's March 18, 2014 Form ADV Part 1A and its March 10, 2014 Brochure, which were the current filings at the beginning of the Examination Period, and

determined that they contained omissions and/or inaccuracies with respect to the following items (which is not an exhaustive list).

- Fee disclosures. *See* discussion above in Sections II.A. and E.
- Prohibited Transactions under ERISA and the IRC. *See* discussion above in Section I.E.
- Conflicts of Interest. *See* discussion above in Section I.B.2.b. and II.A. and B.
- Proxies. *See* discussion above in Section I.H.

Additionally, as noted in Section II.A. above, Registrant failed to deliver Part 2B disclosures for Messrs. Gravette and MacArthur to clients and potential clients. Registrant should conduct an extensive review of its disclosure documents and all Form ADV instructions, and in response to this letter, identify the steps that it intends to take to correct these deficiencies.

## VII. Whistleblower Rule Compliance - Section 21F of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 21F-17(a) thereunder

The Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted on July 21, 2010, amended the Exchange Act by adding Section 21F, "Whistleblower Incentives and Protection." The congressional purpose underlying the provisions of Section 21F was "to encourage whistleblowers to report possible violations of the securities laws by providing financial incentives, prohibiting employment-related retaliation, and providing various confidentiality guarantees." See "Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934," Release No. 34-64545, at p. 198 (Aug. 12, 2011).

To fulfill this congressional purpose, the Securities and Exchange Commission adopted Rule 21F-17, which provides in relevant part:

> (a) No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement ... with respect to such communications.

The Staff's review of Registrant's documents disclosed language that appears to be inconsistent with Rule 21F-17. For instance:

a. The section of Registrant's Code of Ethics, dated November 4, 2015 (the "Code of Ethics"), captioned "Protecting the Confidentiality of Client Information" contains a confidentiality clause that requires personnel to maintain the confidentiality of information without carving out an exception for communications with the Securities and Exchange Commission.

b. The "Whistleblower Policy" section of the Code of Ethics provides that "[r]eports of violations or suspected violations must be reported to Robert Gravette or, provided the CCO also receives such reports, to other designated members of senior management." The policy fails to state that a whistleblower

may contact the Securities and Exchange Commission regarding possible securities law violations rather than having to rely exclusively on Registrant's internal procedures.

c. Section 6(j) of the Stock Purchase Agreement, dated July 1, 2016, between Mr. MacArthur and Mr. Gravette contains a non-disparagement clause, which, among other things, prohibits the parties from making a disparaging statement regarding the other party, his business, or certain related persons. The agreement defines a disparaging statement as "any communication which, if publicized to another, would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, good character or product quality of the person to whom the communication relates." The provision fails to include an exception for communications with the Securities and Exchange Commission. *See* Response to SR 23.

d. The Independent Contractor Agreement, dated as of July 1, 2016, between Registrant and Mr. MacArthur contains a confidentiality provision in Section 4.c. and a non-disparagement provision in Section 22 (similar to the provisions mentioned above). These provisions fail to include an exception for communications with the Securities and Exchange Commission. *See* Response to SR 23.

The language in these documents may impede Registrant's current or former personnel from communicating with the Commission and, therefore, may be inconsistent with Rule 21F-17(a). Registrant should conduct a comprehensive review of its agreements and policies and procedures to ensure compliance with the Commission's whistleblower regulations, and, in response to this letter, identify the steps that the firm intends to take to address the deficiencies detailed herein, including any steps that Registrant will take to ensure that its current and former personnel are apprised of any such changes. Please provide documentation to support any corrective action taken.