# EXHIBIT 173

***Securities and Exchange Commission***

***v.***

***Criterion Wealth Management Insurance Services, Inc., Robert Allen Gravette, and Mark Andrew MacArthur***

# Expert Report of Andrew D. Richmond

Andrew D. Richmond

September 20, 2021

# Table of Contents


I. Introduction ..... 1

A. My Assignment ..... 1

B. Summary of My Qualifications ..... 2

C. Professional Standards Applicable to My Work in this Matter ..... 3

D. Compensation ..... 3

II. Summary of Opinions ..... 4

III. Background ..... 4

A. Overview of the Relevant Entities ..... 4

1. Criterion ..... 4

2. Mr. Robert Gravette ..... 6

3. Mr. Mark MacArthur ..... 6

4. Ausdal ..... 7

5. T2 Strategic Real Estate Income Fund ..... 8

6. T2 Asset Opportunity Fund IV ..... 10

7. Bird Rock Management, LLC ..... 12

8. Southland Home Mortgage II LLC ..... 13

9. Pacific West Home Mortgage II LLC ..... 14

B. The SEC's Allegations Against the Defendants ..... 14

IV. Basis for My Opinions ..... 15

A. Non-Advisory Compensation Received by the Defendants ..... 15

1. Net Commissions Received by the Defendants Associated with the At-Issue Funds ..... 16

2. Alternative Investment Fees Charged by the Defendants Associated with the At-Issue Funds ..... 19

B. The Combined Fees Earned/Received by Criterion on Alternative Investments Exceed the Fees Earned on Investment Management Services ..... 20

C. The Expected Investor Returns on the T2 SREI's Class C Units Were Inferior to Class A Units ..... 21

D. The Expected Investor Returns on T2 Asset Opportunity Fund IV Are Inferior to T2 Opportunity Fund IV ..... 24

E. The Ausdal Fee Agreements Created Financial Incentives for the Defendants ..... 25

1. T2 SREI Fund Class C Units ..... 25

2. T2 Asset Opportunity Fund IV ..... 26

3. Southland II and Pacific West II ........................................................ 26
4. Impact of the Ausdal Agreements....................................................... 27

# I. Introduction

## A. My Assignment

1. I was retained by the Securities and Exchange Commission ("SEC") to:

   a) Review and analyze the various fees earned and/or received by Criterion Wealth Management Insurance Services, Inc. ("Criterion") and the individual defendants (collectively, the "Defendants") associated with Criterion client investments in the following private placement funds (collectively, the "At-Issue Funds"):

      - T2 Strategic Real Estate Income Fund, LLC;
      - T2 Asset Opportunity Fund IV, LP;
      - Southland Home Mortgage II LLC; and
      - Pacific West Home Mortgage II LLC.

   b) Compare and contrast Criterion's fees earned and/or received associated with Alternative Investments (commissions *plus* Alternative Investment fees) to the fees Criterion earned from Investment Management services.

   c) Analyze the differences, if any, in the expected investor returns associated with investments in the T2 Strategic Real Estate Income Fund's Class C Units as compared to the T2 Strategic Real Estate Income Fund's Class A Units.

   d) Analyze the differences, if any, in the expected investor returns associated with investments in T2 Asset Opportunity Fund IV as compared to T2 Opportunity Fund IV.

   e) Analyze and evaluate the economic incentives to the Defendants associated with the fee agreements (for placement fees, referral fees, and/or commissions) between Ausdal Financial Partners, Inc. ("Ausdal") and the At-Issue Funds.

2. I have not been asked to opine on the conduct of Criterion, Mr. Gravette, Mr. MacArthur, or on any other issue of liability. As such, I offer no such opinion.

3. My findings and opinions are based on my education, training, professional experience, and the list of documents and information considered in Appendix A. The documents I have considered included items such as pleadings, investigative testimony transcripts and related exhibits, deposition transcripts and related exhibits, investment-related

materials, Criterion financial records, records produced by Ausdal, and other documents produced or provided by various parties in this matter. I was supported by a team of professionals at Cornerstone Research working under my direction and supervision.

4. The opinions and analyses presented in this Report are based on currently available information. If new information relating to my analyses or opinions becomes available, I may need to modify this Report. If this matter proceeds to trial, I may use, as exhibits, selected pages of the documents and information relied upon and summaries of that information. Additionally, I may prepare graphical or illustrative exhibits based on the contents of this Report and the underlying data or documents.

### B. Summary of My Qualifications

5. I am a Senior Vice President at Cornerstone Research, a specialized independent consulting firm. I am the Leader of the Corporate Investigations Practice and serve on the Firm's Board of Directors. In addition to these leadership roles, I serve on the firm's Office Management Committee, Risk Management Committee, and Operating Policy Committee.

6. Prior to joining Cornerstone in 2012, I was a Managing Director at Navigant Consulting and the Central Region Practice Leader for its Disputes & Investigations practice. Prior to joining Navigant Consulting in 2003, I was a Director in the Forensics practice of KPMG LLP. Prior to joining KPMG in 2002, I was a Senior Manager in the Economics & Financial Consulting practice of Arthur Andersen LLP.

7. I currently serve on the Board of Directors and chair the Investment Committee of Little City, a non-profit organization that provides educational, housing, and employment support services to people with developmental disabilities. I also serve on the Advisory Board for CARPLS, a pro-bono legal aid organization in Chicago.

8. For over 30 years, I have provided financial, economic, and forensic accounting consulting services to clients and their counsel. I have analyzed the financial condition, including revenues, costs, profitability, and value, of numerous business entities in both litigation and non-litigation matters. I have prepared or analyzed numerous claims for economic damages in numerous types of matters including breach of contract, professional liability, intellectual property, anti-trust, post-acquisition, construction disputes and class actions. My economic damages experience includes analysis of lost profits, out-of-pocket costs, unjust enrichment, valuation, and reasonable-royalty determination. I have conducted numerous forensic accounting investigations related to financial reporting fraud, the

misappropriation of assets, and other corporate misconduct. I have testified as an expert witness in the areas of financial analysis, accounting, fraud and concealment schemes, valuation, causation analysis, and the quantification of economic damages. I am a licensed Certified Public Accountant (CPA) in the state of Illinois. I am a Certified Fraud Examiner (CFE), a globally recognized fraud and investigation credential issued by the Association of Certified Fraud Examiners (ACFE). I am also Certified in Financial Forensics (CFF) and Accredited in Business Valuation (ABV) by the American Institute of Certified Public Accountants (AICPA). I graduated with honors from the University of Southern California where I earned a Bachelor of Science in Business, with an emphasis in Finance and Business Economics.

9. From 2010 to 2013, I was a member of the AICPA's Forensic and Litigation Services Committee. A primary role of the Committee is to draft guidance and Practice Aids for accounting professionals who provide litigation and forensic consulting services. In addition to my role on the Committee, I was a member of the Fraud Task Force and the Economic Damages Task Force.

10. I am a recurring guest lecturer at the University of Illinois and University of Notre Dame on the topics of fraud and forensic accounting.

11. My current resume is included as Appendix B. A list of matters in which I have provided expert testimony over the past four years is included as Appendix C.

### C. Professional Standards Applicable to My Work in this Matter

12. The AICPA publishes professional standards applicable to my work on this engagement. In general, those standards require CPAs engaged in litigation services to: 1) maintain integrity and objectivity; 2) only undertake engagements that are expected to be completed with professional competence; 3) exercise due professional care in performing the services; 4) adequately plan and supervise the performance of the services; and 5) obtain sufficient relevant data to provide a reasonable basis for the conclusions. I have complied with these professional standards in this engagement.

### D. Compensation

13. Cornerstone's hourly rate for my work on this matter is $875. Neither Cornerstone's fees nor my compensation from Cornerstone are contingent upon the outcome of this matter.

## II. Summary of Opinions

14. Based upon my work to date, I have formed the following opinions:

a) From 2014 through 2020, Defendants received net commissions of approximately $1.3 million from Ausdal associated with the At-Issue Funds.

b) The net commissions the Defendants earned on the At-Issue Funds represent approximately 50% of the net commissions the Defendants earned from Ausdal associated with Alternative Investments.

c) The combined fees (commissions *plus* Alternative Investment Fees) earned on Alternative Investments exceed the fees that would have been earned under Criterion's standard Investment Management fee structure.

d) The expected and actual Criterion investor returns on the SREI Class C Units were inferior to the expected and actual returns on SREI Class A Units.

e) The expected returns on the T2 Asset Opportunity Fund IV are inferior to the expected returns on T2 Opportunity Fund IV, if the fund exceeds the 8% Tier 1 "hurdle."

f) The agreements between: 1) Ausdal and the General Partner of the T2 funds; and 2) Ausdal and Bird Rock Management, LLC, the manager of Pacific West Home Mortgage II and Southland Home Mortgage II, created an economic incentive for the Defendants to recommend that Criterion clients invest in and maintain their investments in the At-Issue Funds.

## III. Background

### A. Overview of the Relevant Entities

#### 1. Criterion

15. Criterion began conducting business as an investment adviser in approximately 2004.[1] Until September 2018, Criterion was a SEC-registered investment adviser.[2] Per Criterion's 2015 Part 2A of Form ADV: *Firm Brochure*, it provides portfolio management services

[1] U4 Employment History of Robert Gravette, August 20, 2018, SEC Investigation Exhibit 47, p. 1.
[2] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, p. 3; Criterion IARD–Registration/Reporting Status History, FINRA, November 4, 2019, p. 1.

through an asset allocation portfolio approach, as well as wealth management services.[3] As of December 31, 2014, Criterion managed approximately $186 million of client assets.[4]

16. Criterion charged an annual fee to its clients for its advisory services, based on a percentage of assets under management ("AUM") and the type of securities managed.[5] Its "Investment Management" fee schedule, which included services such as stocks, bonds, and cash management, ranged from 1.50% annually for up to $499,999 AUM, to 0.40% annually for above $10,000,000 AUM.[6] Its "Alternative Investment Fee" schedule, which included hedge fund, private placement, and private equity investments, ranged from 0.50% annually for up to $2 million AUM, to 0.25% annually for above $2 million AUM.[7] In response to the deficiencies identified in the examination performed by the SEC's Office of Compliance, Inspections, and Examinations ("OCIE") described herein, Criterion discontinued the "Alternative Investment Fee" at the end of 2016.[8]

17. Criterion disclosed in its March 2015 Part 2A of Form ADV: *Firm Brochure* that certain of its advisor representatives were separately licensed as representatives of Ausdal, a FINRA member broker dealer and registered investment advisor.[9] Those representatives could recommend alternative investments offered through their broker-dealer, Ausdal, to their advisory clients.[10]

18. In April, 2017, the SEC's examination staff sent Criterion a letter detailing deficiencies identified in an examination by the SEC's Office of Compliance Inspections and Examinations ("OCIE").[11] The letter identified a number of inadequacies in the company's compliance with applicable laws, rules, and regulations, including deficiencies in their

---

[3] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, pp. 3–4.
[4] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, p. 6.
[5] This fee was paid quarterly. Portfolio value was based on the three-month average value as of the last business day of the previous quarter. Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, p. 6.
[6] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, pp. 6–7.
[7] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, p. 7.
[8] Testimony of Jason Stauffer, *In the Matter of Criterion Wealth Management Insurance Services, Inc.*, July 19, 2018 ("Stauffer Testimony"), 129:19–24, 130:5–9.
[9] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, pp. 7, 13.
[10] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, p. 7.
[11] SEC Deficiency Letter to Criterion Wealth Management Insurance Services, Inc., April 20, 2017, SEC Investigation Exhibit 19, p. 1.

disclosure of material conflicts of interest, receipt of non-advisory compensation, misleading advertising, and inadequate controls surrounding client billing.[12] OCIE specifically cited Criterion's lack of disclosure related to the non-advisory compensation the Defendants received (via Ausdal) from private placement investments (including the At-Issue Funds) and the related material conflicts of interest.[13]

### 2. Mr. Robert Gravette

19. As of 2018, Mr. Gravette was the President, CEO, and Chief Compliance Officer of Criterion.[14] Mr. Gravette founded Criterion in approximately 2004 and added Mr. MacArthur as a 50% partner approximately one year later.[15] Mr. Gravette was also a registered representative of Ausdal, a registered broker-dealer.[16]

20. Until Mr. MacArthur became an independent contractor of Criterion on July 1, 2016, Mr. Gravette and Mr. MacArthur split the profits of the Criterion business 50/50.[17] From July 1, 2016 until Mr. MacArthur left Criterion to launch his own advisory business in 2017, the former partners split the fees and commissions according to the terms of the independent contractor agreement.[18]

### 3. Mr. Mark MacArthur

21. Mr. MacArthur was a 50% partner in Criterion.[19] Mr. MacArthur was also a registered representative of Ausdal.[20] In 2016, Mr. MacArthur severed his ownership and

---

[12] SEC Deficiency Letter to Criterion Wealth Management Insurance Services, Inc., April 20, 2017, SEC Investigation Exhibit 19.

[13] SEC Deficiency Letter to Criterion Wealth Management Insurance Services, Inc., April 20, 2017, SEC Investigation Exhibit 19.

[14] Testimony of Robert Gravette, *In the Matter of Criterion Wealth Management Insurance Services, Inc.*, August 22, 2018 ("Gravette Testimony"), 26:20–22.

[15] Gravette Testimony, 28:17–18, 28:24–25.

[16] Gravette Testimony, 35:1–5.

[17] Independent Contractor Agreement between Criterion and Mark A. MacArthur, SEC Investigation Exhibit 21, CRITERION_SEC_00093345 at 45; Stauffer Testimony, 62:24–63:11.

[18] Independent Contractor Agreement between Criterion and Mark A. MacArthur, SEC Investigation Exhibit 21, CRITERION_SEC_00093345; Gravette Testimony, 178:7–10.

[19] Criterion Wealth Management Insurance Services, Inc. Form ADV Part 2A, SEC Investigation Exhibit 9, p. 3; Testimony of Mark MacArthur, *In the Matter of Criterion Wealth Management Insurance Services, Inc.*, June 12, 2018 ("MacArthur Testimony"), 35:9–14.

[20] MacArthur Testimony, 30:11–17.

employee interests in Criterion.[21] Per an agreement dated July 1, 2016, Mr. MacArthur became an independent contractor of Criterion. That agreement set forth the terms of Mr. MacArthur's continued relationship with Criterion regarding the allocation of clients and related fees.[22]

22. In 2017, Mr. MacArthur left Criterion to launch his own state-registered investment adviser M2 Financial, LLC ("M2") based in Valencia, California.[23] Mr. MacArthur is M2's sole owner.[24]

#### 4. Ausdal

23. Ausdal is a registered investment advisor and broker dealer.[25] It was founded in Davenport, Iowa in 1979 and has since expanded with offices across the Midwest.[26] Mr. Gravette and Mr. MacArthur have been registered representatives of Ausdal's broker-dealer business since 2006.[27] Messrs. Gravette and MacArthur offered alternative investments to Criterion clients and routed those investments through Ausdal.[28]

24. Messrs. Gravette and MacArthur facilitated agreements between Ausdal and the managers of the At-Issue Funds so that they could collect amounts in addition to the alternative asset fee they charged their advisory clients.

25. Messrs. Gravette and MacArthur also facilitated agreements between Ausdal and Bird Rock Management, LLC ("Bird Rock"), the fund manager of Southland Home Mortgage II, LLC and Pacific West Home Mortgage, II, LLC. Per the testimony of Mr. Daniel Niednagel, manager and co-owner of Bird Rock,[29] the agreement related to Pacific West Home Mortgage, II was written and executed between the parties, while the agreement related to

---

[21] MacArthur Testimony, 43:12–16.
[22] Independent Contractor Agreement between Criterion and Mark A. MacArthur, SEC Investigation Exhibit 21, CRITERION_SEC_00093345 at 45.
[23] U4 Employment History of Mark MacArthur, June 6, 2018, SEC Investigation Exhibit 5, p. 2. ; MacArthur Testimony, 21:3–16; SEC Investigation Exhibit 3 at Item 35, p. 10.
[24] MacArthur Testimony, 22:5–10.
[25] Ausdal Financial Partners Form ADV, July 9, 2021.
[26] Ausdal Financial Partners, "Fast Facts," available at https://www.ausdal.com/ (accessed on September 19, 2021).
[27] Gravette Testimony, 23: 22–24:9; MacArthur Testimony, 30:14–17.
[28] Gravette Testimony, 39:14–20.
[29] Testimony of Daniel Niednagel, *In the Matter of Criterion Wealth Management Insurance Services, Inc.*, August 16, 2018, ("Niednagel Testimony"), 30:8–21.

Southland Home Mortgage II was verbal.[30] Under these agreements, Ausdal receives an annual fee of two percent of the investment amount associated with Criterion clients, paid at least annually.[31]

26. As a result of these agreements, Ausdal received payments from the At-Issue Funds and/or the funds' General Partner. In the normal course of business, Ausdal prepares Commission Statements indicating the timing, source(s), and amount(s) of fees received from parties such as T2 Capital Management and Bird Rock.[32] According to Ausdal's records, Ausdal remits "commissions" of approximately 95% of the fees Ausdal received from T2 Capital Management and Bird Rock to Criterion.[33]

### 5. T2 Strategic Real Estate Income Fund

27. T2 Strategic Real Estate Income Fund, LLC ("T2 SREI") was managed by T2 Capital Management.[34] T2 Capital Management started T2 SREI in April 2014 with a strategy to invest in debt instruments and equity investments in U.S. commercial real estate.[35] T2 SREI invested all of its assets in the T2 Strategic Real Estate Income Fund Master, LP, which then invested in the portfolio assets.[36]

28. In order to facilitate the payment of commissions to Messrs. Gravette and MacArthur, T2 SREI entered into a Placement Agreement with Ausdal that entitled Ausdal to a fee equal to half of T2's "performance allocation" as the General Partner of the fund:

> …with respect to each investor referred by Ausdal that invests in the fund (each, an "Ausdal Client"), a fee equal to 50 percent (50%) of the Performance Allocation (as defined in the Offering materials) that would otherwise be paid to T2, in its role as the general partner of the T2 Strategic Real Estate Income

---

[30] Engagement Agreement between Pacific West Home Mortgage II, LLC and Ausdal, June 21, 2016, SEC Investigation Exhibit 37, BRM0007210; Niednagel Testimony, 110:16–19.

[31] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 10; Engagement Agreement between Pacific West Home Mortgage II, LLC and Ausdal, June 21, 2016, SEC Investigation Exhibit 37, BRM0007210 at 11–12; Niednagel Testimony, 66:3–22; 68:6–13.

[32] Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329; Ausdal Commission/Fee Statement for Mark MacArthur, January 2014–September 2018, AUSDAL 002330–769.

[33] Gravette Testimony, 24:14–21. See, e.g., AUSDAL 001760–AUSDAL 001767; Mark MacArthur's Registered Representative Agreement with Ausdal, November 7, 2006, AUSDAL 001482; Robert Gravette's Registered Representative Agreement with Ausdal, November 13, 2006, AUSDAL 001477.

[34] T2 Strategic Real Estate Income Fund, LLC PPM, April 1, 2014, SEC Investigation Exhibit 14, CRITERION_SEC_00052549–606 at 49.

[35] T2 Strategic Real Estate Income Fund, LLC PPM, April 1, 2014, SEC Investigation Exhibit 14, CRITERION_SEC_00052549–606 at 49, 56.

[36] T2 Strategic Real Estate Income Fund, LLC PPM, April 1, 2014, SEC Investigation Exhibit 14, CRITERION_SEC_00052549–606 at 56.

Fund Master, LP, attributable to the Ausdal Client for so long as the Ausdal Client remains invested in the fund.[37]

29. T2 SREI did not have any other placement agreements with other broker/dealers.[38] The only Ausdal representatives that referred clients to T2 SREI were Messrs. Gravette and MacArthur.[39]

30. T2 SREI offered two classes of units – Class A and Class C.[40] The two unit classes differed only in the performance allocation formula and the clients to whom they were sold.[41] The majority of T2 SREI investors were offered Class A Units.[42] T2 SREI Class C Units were only offered to, and acquired by, Criterion clients.[43]

31. The performance allocation formula for Class A Units was set forth in a Class A Supplement. According to the Class A formula, profits are split as follows:

a) Tier 1 = The first 6% to Investors[44]
b) Tier 2 = The next 1.5% to the General Partner[45]
c) Tier 3 = Split any additional returns 80% to Investors / 20% to the General Partner.[46]

32. Class C Units were created specifically for Criterion clients and included a different performance allocation formula in order to compensate Defendants, through Ausdal, for referral services.[47] For T2 SREI Class C Units, the performance allocation fees earned by the General Partner were to be split 50/50 between T2 Capital Management and Ausdal.[48] The

---

37 T2 SREI Placement Agreement with Ausdal, April 1, 2014, Searcy Deposition Exhibit 9, T2CAPITAL_SEC_00000013 at 13–14.
38 Deposition of Linda Searcy, *SEC v. Criterion Wealth Management Insurance Services, Inc., Robert Gravette, and Mark MacArthur,* August 25, 2021 ("Searcy Deposition"), 55:1–3.
39 Testimony of Jeff Brown, *In the Matter of Criterion Wealth Management Insurance Services, Inc.*, May 29, 2019 ("Brown Testimony"), 69:13–16.
40 T2 SREI Class A Supplement, April 2015, SEC Investigation Exhibit 69, T2CAPITAL_SEC_00000237; T2 SREI Class C Supplement, April 1, 2014, SEC Investigation Exhibit 68, T2CAPITAL_SEC_00006469.
41 Searcy Deposition, 119:19–120:6.
42 Searcy 30(b)(6) Deposition, 184:1–5.
43 Testimony of John Southard, *In the Matter of Criterion Wealth Management Insurance Services, Inc.*, December 16, 2019 ("Southard Testimony"), 79:6–10.
44 T2 SREI Class A Supplement, April 2015, SEC Investigation Exhibit 69, T2CAPITAL_SEC_00000237 at 238.
45 According to the waterfall formula Tier 3 begins at 7.5%, which is the level at which combined investor returns equal 80% of the total return.
46 Brown Testimony, 75:24–76:1, 69:21–70:1.
47 Brown Testimony, 59:4–12; Southard Testimony, 79:6–10.
48 T2 SREI Placement Agreement with Ausdal, April 1, 2014, SEC Investigation Exhibit 67, T2CAPITAL_SEC_00000013–24 at 14; Brown Testimony, 69:17–70 :1.

performance allocation formula for Class C Units was set forth in a Class C Supplement.[49] According to the Class C formula, profits are split as follows:

a) Tier 1 = The first 6% to Investors[50]
b) Tier 2 = The next 4% to the General Partner[51]
c) Tier 3 = Split any additional returns 60% to Investors / 40% to the General Partner.[52]

33. T2 Capital Management has withheld payment of fees to Ausdal related to T2 SREI since 2018.[53] According to T2 Capital Management, there are no longer any Class C Units outstanding, as all Class C Units were either redeemed or converted to Class A Units.[54]

### 6. T2 Asset Opportunity Fund IV

34. T2 Asset Opportunity Fund IV, LP ("T2 Asset Opportunity Fund IV") was launched in January 2015 by T2 Capital Management.[55] T2 Asset Opportunity Fund IV was created as a direct counterpart to the flagship fund, T2 Opportunity Fund IV, LP, which was launched in August 2014.[56] The investment strategy of these funds was to focus on assets deemed to be "undervalued or poised for recovery," and both funds were to invest proportionately in all transactions with the same terms and conditions.[57]

35. Messrs. Gravette and MacArthur facilitated an agreement between Ausdal and T2 Asset Opportunity Fund IV that entitled Ausdal to a fee equal to half of T2's "carried interest" as the General Partner in the fund:

---

49 T2 SREI Class C Supplement, April 1, 2014, SEC Investigation Exhibit 68, T2CAPITAL_SEC_00006469 at 70.
50 T2 SREI Class C Supplement, April 1, 2014, SEC Investigation Exhibit 68, T2CAPITAL_SEC_00006469 at 70.
51 According to the waterfall formula Tier 3 begins at 10%, which is the level at which combined investor returns equal 60% of the total return.
52 Brown Testimony, 75:24–76:2, 69:21–70:1.
53 T2 Capital Management claims that it is justified in withholding such fees for two reasons: 1) because it is entitled to reimbursement of the legal costs associated with its response to the SEC's document and testimony subpoenas, and 2) because T2 had advanced fees on T2 Asset Opportunity III for which T2 was seeking a clawback. Searcy 30(b)(6) Deposition, 229:11–23, 230:6–11, 234:20–24.
54 Searcy 30(b)(6) Deposition, 168:16–20, 220:12–18
55 Form D for T2 Asset Opportunity Fund IV, Searcy Deposition Exhibit 20; T2 Asset Opportunity Fund IV PPM, December 1, 2014, SEC Investigation Exhibit 15, CRITERION_SEC_00049644–79 at 44.
56 T2 Asset Opportunity Fund IV PPM, February 2015, SEC Investigation Exhibit 78, CRITERION_SEC_00033785-820 at 87; T2 Opportunity Fund IV, LLC PPM, August 1, 2014, SEC Investigation Exhibit 91, T2CAPITAL_SEC_00012920–56 at 20.
57 T2 Asset Opportunity Fund IV Form D, filed January 30, 2015, Searcy Deposition Exhibit 20; T2 Asset Opportunity Fund IV, LLC PPM, February 2015, SEC Investigation Exhibit 78, CRITERION_SEC_00033785-820 at 85.

> …with respect to each investor referred by Ausdal that invests in the Fund (each, an "Ausdal Client"), a fee equal to fifty percent of the carried interest (as defined in the Offering Materials) that would otherwise be paid to General Partner attributable to the Ausdal Client for so long as the Ausdal Client remains invested in the fund.[58]

36. Neither T2 Asset Opportunity Fund IV nor T2 Opportunity Fund IV had any other placement agreements with any other broker-dealers besides Ausdal.[59]

37. T2 Asset Opportunity Fund IV was sold only to Criterion clients.[60] All non-Criterion investors purchased shares in the flagship fund, T2 Opportunity Fund IV.[61] The only difference between the two funds was the amount of carried interest due to the General Partner.[62]

38. For the flagship fund, T2 Opportunity Fund IV, the allocation of the profits of the fund was specified in a Confidential Private Placement Memorandum ("PPM").[63] According to this PPM, profits are split between the Investors and the General Partner (T2 Capital Management IV, LLC) as follows:

a) Tier 1 = The first 8% to Investors[64]
b) Tier 2 = Any profits between 8.00% and 10.67% are split 80% to the General Partner / 20% to the Investors[65]
c) Tier 3 = Any profits over 10.67% are split 80% to the Investors / 20% to the General Partner.[66]

39. For T2 Asset Opportunity Fund IV (the fund created specifically for Criterion investors) the formula to allocate fund profits was different. Similar to the flagship fund, the allocation formula for T2 Asset Opportunity Fund IV was specified in a Confidential Private

---

[58] T2 Asset Opportunity Fund IV Placement Agreement with Ausdal, March 2, 2015, Searcy Deposition 21, T2CAPITAL_SEC_00000957 at 58.
[59] Searcy 30(b)(6) Deposition, 55:1–3; Brown Testimony, 161:9–13.
[60] Brown Testimony, 154:15–21.
[61] Brown Testimony, 154:15–21.
[62] Brown Testimony, 154:1–14, 155:7–10; Searcy 30(b)(6) Deposition 180:1–11.
[63] T2 Opportunity Fund IV, LLC PPM, August 1, 2014, SEC Investigation Exhibit 91, T2CAPITAL_SEC_00012920.
[64] T2 Opportunity Fund IV, LLC PPM, August 1, 2014, SEC Investigation Exhibit 91, T2CAPITAL_SEC_00012920 at 31.
[65] According to the waterfall formula, Tier 3 begins at 10.67%, which is the level where the combined Tier 1 and Tier 2 returns allocated to the investors and the General Partner would equal 80% and 20%, respectfully.
[66] T2 Opportunity Fund IV, LLC PPM, August 1, 2014, SEC Investigation Exhibit 91, T2CAPITAL_SEC_00012920 at 31.

Placement Memorandum.[67] According to this PPM, profits are split between the Investors and the General Partner (T2 Asset Opportunity Fund IV GP, LLC) as follows:

a) Tier 1 = The first 8% to Investors[68]

b) Tier 2 = Any profits between 8.00% and 13.33% are allocated 100% to the General Partner[69]

c) Tier 3 = Any profits over 13.33% are split 60% to the Investors / 40% to the General Partner.[70]

40. Effective January 1, 2017, T2 Asset Opportunity Fund IV was collapsed into T2 Opportunity Fund IV, but the differing carried interest formula for T2 Asset Opportunity Fund IV investors remained in effect.[71] As of 2017, the internal rate of return for the fund was below the 8% Tier 1 preferred return due to investors; thus, no performance fee was due to the General Partner (and Ausdal).[72] Per the testimony of Ms. Linda Searcy, T2 Holding's Chief Operating Officer, and Mr. Jeffrey Brown, co-founder and Chief Executive Officer of T2 Holdings, no placement fees have been paid to Ausdal to date from this fund, which is still active today but in the process of being wound down.[73] Thus, the final amount of placement fees, if any, owed to Ausdal from the fund's performance is not yet finalized.[74]

### 7. Bird Rock Management, LLC

41. Bird Rock is a California-based registered investment adviser that manages two real estate investment funds, Southland Home Mortgage II, LLC and Pacific West Home Mortgage II, LLC.[75] It is fifty percent owned by Schism.com, which is controlled by Daniel Niednagel, and fifty percent owned by Three Arch Capital, Inc., which is controlled by

---

[67] T2 Asset Opportunity Fund IV PPM, February 2015, SEC Investigation Exhibit 78, CRITERION_SEC_00033785 at 95.
[68] T2 Asset Opportunity Fund IV PPM, February 2015, SEC Investigation Exhibit 78, CRITERION_SEC_00033785 at 95.
[69] According to the waterfall formula, Tier 3 begins at 13.33%, which is the level where the combined Tier 1 and Tier 2 returns allocated to the investors and the General Partner would equal 60% and 40%, respectfully.
[70] T2 Asset Opportunity Fund IV PPM, February 2015, SEC Investigation Exhibit 78, CRITERION_SEC_00033785 at 95.
[71] Searcy 30(b)(6) Deposition, 50:7–17, 214:3–20; T2 Opportunity Fund IV, LP Financial Statements, December 31, 2017, Searcy Deposition Exhibit 27, T2CAPITAL_SEC_00002848–73 at 58.
[72] T2 Opportunity Fund IV, LP Financial Statements, December 31, 2017, Searcy Deposition Exhibit 27, T2CAPITAL_SEC_00002848–73 at 73.
[73] Searcy 30(b)(6) Deposition, 31:14–15, 178:15–21; Brown Testimony 13:15–16, 170:8–12.
[74] Ms. Searcy anticipates that the fund will be wound down in 18 months. Searcy 30(b)(6) Deposition,178:15–21.
[75] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 5; Niednagel Testimony, 29:15–30:7.

Daniel's brother, Stephen Niednagel.[76] According to its 2017 Form ADV Part 2, Bird Rock had approximately $24 million in assets under management.[77] Daniel Niednagel testified that approximately half of the investments in Bird Rock's funds were sourced through Criterion.[78] Bird Rock and its funds entered into agreements with Ausdal that entitled Ausdal to an annual fee of two percent of the investments associated with Criterion clients, paid at least annually.[79] By the end of 2017, due to Mr. MacArthur's separation from Criterion, Bird Rock paid Ausdal via separate wires for each representative (Messrs. Gravette and MacArthur), based on a list of clients provided by Criterion.[80]

### 8. Southland Home Mortgage II LLC

42. Southland Home Mortgage II, LLC ("Southland II") is another fund managed by Bird Rock.[81] Bird Rock started Southland II in 2014 as it began to liquidate Southland Home Mortgage, LLC ("Southland") a prior fund in which Criterion clients also participated.[82] Investments in Southland were liquidated and transferred to Southland II as properties were sold.[83] Southland II's investment strategy is to purchase California real estate and generate cash flow through the sale of rehabilitated properties.[84] Southland II pays an 8% preferred return on net capital contributions to investors.[85] Bird Rock earns management fees of any returns in excess of the investors' stated preferred return rate of 8%, less any discretionary returns allocated to investors.[86] As the manager of Southland II, Bird Rock pays Ausdal a 2%

---

[76] Niednagel Testimony, 20:24–21:1, 30:8–13.
[77] Niednagel Testimony, 34:8–24. As of December 31, 2016, Bird Rock Management had approximately $24.5 in assets under management. Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 5.
[78] Niednagel Testimony, 37:3–12.
[79] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 10; Engagement Agreement between Pacific West Home Mortgage II, LLC and Ausdal, June 21, 2016, SEC Investigation Exhibit 37, BRM0007210 at 11–12; Niednagel Testimony, 66:3–22; 68:6–13, 106:21–107:8.
[80] Niednagel Testimony, 181:20–23, 182:22–183:17.
[81] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 5.
[82] Niednagel Testimony, 122:5–9.
[83] Niednagel Testimony, 123:4–18, 124:6–19.
[84] Southland Home Mortgage, LLC PPM, June 25, 2008, SEC Investigation Exhibit 38, CRITERION_SEC_00026019 at 19; Southland Home Mortgage II, LLC PPM, February 16, 2015, SEC Investigation Exhibit 16, CRITERION_SEC_00034607.
[85] Southland Home Mortgage II, LLC PPM, February 16, 2015, SEC Investigation Exhibit 16, CRITERION_SEC_00034607 at 18–19.
[86] Niednagel Testimony, 54:14–24.

annual fee based on the investment amount associated with Criterion clients, paid out quarterly.[87]

### 9. Pacific West Home Mortgage II LLC

43. Pacific West Home Mortgage II, LLC ("Pacific West II") is a fund managed by Bird Rock.[88] Bird Rock formed Pacific West II in 2014 as it liquidated Pacific West Home Mortgage, LLC.[89] Pacific West II's investment strategy is to make loans to Bird Rock Home Mortgage, LLC, which invests in California real estate and repays Pacific West II with cash flows generated through the sale of rehabilitated properties.[90] Pacific West II pays an 8% preferred return on net capital contributions to investors.[91] Bird Rock receives an annual "Manager Fee" for investment advisory services it provides to Pacific West II clients. However, the 2% Manager Fee is earned only after investors have received the 8% preferred return rate, and may be waived partially or entirely.[92] If Pacific West II earns returns in excess of 10%, the additional returns are allocated to investors.[93] As the manager of Pacific West II, Bird Rock pays Ausdal a 2% annual fee based on the investment amount associated with Criterion clients, paid out quarterly.[94]

### B. The SEC's Allegations Against the Defendants

44. It is my understanding that the SEC is claiming, amongst other things, the following:

a) The Defendants failed to properly disclose to their clients facts giving rise to certain material conflicts of interest including the source, nature, and amount of non-advisory compensation that Criterion, Mr. Gravette, and Mr.

---

[87] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 10; Engagement Agreement between Pacific West Home Mortgage II, LLC and Ausdal, June 21, 2016, SEC Investigation Exhibit 37, BRM0007210 at 11–12; Niednagel Testimony, 66:3–22; 68:6–13, 77:25–78:4.
[88] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 5.
[89] Niednagel Testimony, 122:5–9.
[90] Pacific West Home Mortgage II, LLC PPM, May 25, 2016, SEC Investigation Exhibit 17, CRITERION_SEC_00050753 at 753.
[91] Pacific West Home Mortgage II, LLC PPM, May 25, 2016, SEC Investigation Exhibit 17, CRITERION_SEC_00050753 at 764.
[92] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 5; Niednagel Testimony, 55:8–56:24, 58:12–59:4.
[93] Niednagel Testimony, 59:25–60:2.
[94] Bird Rock Management, LLC Form ADV Part 2A, March 29, 2017, SEC Investigation Exhibit 35, BRM0006202 at 10; Engagement Agreement between Pacific West Home Mortgage II, LLC and Ausdal, June 21, 2016, SEC Investigation Exhibit 37, BRM0007210 at 11–12; Niednagel Testimony, 66:3–22, 68:6–13, 77:25–78:4.

MacArthur received from the four At-Issue Funds in the form of placement fees, performance allocation, or carried interest payments;[95]

b) The Defendants failed to disclose to their Investment Advisory clients that due to Criterion's, Mr. Gravette's, and Mr. MacArthur's non-advisory compensation, the returns Criterion clients would receive on Class C Units of the T2 SREI would be inferior to Class A Units if the funds available for distribution surpassed the Tier 1 "hurdle";[96]

c) Criterion failed to disclose to its Investment Advisory clients that due to Criterion's, Mr. Gravette's and Mr. MacArthur's non-advisory compensation, the returns Criterion clients would receive on investment in the T2 Asset Opportunity Fund IV would be inferior to the T2 Opportunity Fund IV if the funds available for distribution surpassed the Tier 1 "hurdle";[97]

d) Criterion, Mr. Gravette, and Mr. MacArthur failed to act in their clients' best interests in recommending that their clients invest in the At-Issue Funds;[98]

e) Criterion, Mr. Gravette, and Mr. MacArthur breached their fiduciary duties to Criterion's Investment Advisory clients;[99] and

f) As a result of the breach(es), Criterion, Mr. Gravette, and Mr. MacArthur received improper benefits that are subject to disgorgement.[100]

## IV. Basis for My Opinions

### A. Non-Advisory Compensation Received by the Defendants

45. As part of my work, I was asked to quantify the amount of non-advisory compensation received by the Defendants associated with the At-Issue Funds. Based on my review of Criterion's financial data and other records produced in discovery, the Defendants received at least two forms of non-advisory compensation associated with the At-Issue

---

[95] Complaint, *SEC vs. Criterion Wealth Management Insurance Services, Inc., Robert Gravette and Mark MacArthur*, February 12, 2020 ("Complaint"), ¶ 26–27.
[96] Complaint, ¶ 46.
[97] Complaint, ¶¶ 58–59.
[98] Complaint, ¶¶ 112–113.
[99] Complaint, ¶¶ 4, 130.
[100] Complaint, ¶ 6.

Funds: 1) net commissions received from Ausdal; and 2) Alternative Investment Fees charged to Criterion clients who invested in the At-Issue Funds.

### 1. Net Commissions Received by the Defendants Associated with the At-Issue Funds

46. To quantify the commissions received by the Defendants associated with the At-Issue Funds, I reviewed and analyzed business records produced by Ausdal and Criterion to date related to various fees Ausdal received associated with Criterion investors. It is my understanding that Ausdal produced an electronic Microsoft Excel workbook reflecting the gross "commissions" received by Ausdal and the net "commissions" paid by Ausdal to Criterion.[101] The electronic workbook contains numerous fields, including:

a) Client Name and ID (Criterion Investors);
b) Trade ID and Trade Date;
c) The "product" (the underlying investment);
d) Whether the "product" was a mutual fund or a Criterion "Alternative Investment";
e) The party that paid the "commission" (such as Pacific West Home Mortgage or T2 Capital Management);
f) The "Gross Revenue" received by Ausdal for each transaction;
g) Criterion's "commission rate" (the portion of Ausdal's gross revenue payable to Criterion);
h) Criterion's net commission per transaction per client; and
i) The identification of the broker associated with the commission.[102]

47. A comparison of Ausdal's contemporaneous commission statements to Ausdal's electronic commission data indicates that two minor deductions from the Defendant's net commissions were not presented in the electronic commission data. The contemporaneous commission statements indicated that on each gross commission, Ausdal deducted approximately 0.33% for SIPC and FINRA assessments from commissions owed to Messrs.

[101] Ausdal Excel Commissions Detail, SEC-AUSDAL-E-0006835.
[102] The column "Rep ID" identified whether the commissions were attributable to Mr. MacArthur (Rep. No. 55) or Mr. Gravette (Rep. No. 56). Ausdal Excel Commissions Detail, SEC-AUSDAL-E-0006835.

Gravette and MacArthur.[103] As a result, I estimated the SIPC and FINRA assessment deductions and adjusted the Defendant's net commissions as detailed in the Ausdal electronic commission data.

48. As detailed in Richmond Exhibit 1, based on the data produced by Ausdal, from January 2014 through December 2020, Defendants received $1,266,198 in net commissions associated with the four At-Issue Funds:

a) Pacific West II = $591,306
b) Southland II = $257,435
c) T2 SREI = $417,457[104]
d) T2 Asset Opportunity Fund IV = $0 (commissions, if any, are to be determined when the fund is wound down and its assets are sold)[105]

49. As detailed in Richmond Exhibit 2, the net commissions (adjusted for SIPC and FINRA assessments) associated with the four At-Issue Funds represent approximately 50% of the net commissions the Defendants received from Ausdal from January 2014 through December 2020.

50. According to business records produced by Ausdal, Ausdal remits approximately 95% of the fees it receives from the At-Issue Funds to the Defendants.[106] For example, per Ausdal's February 10, 2016 Commission/Fee Statement for Mr. Gravette, Ausdal remitted to the Defendants a net $84,840.05 out of $85,296.67 received that period.[107] Ausdal deducted and retained a 5% fee on the commissions earned and also deducted SIPC and FINRA assessments associated with the commissions earned.[108]

51. Per the Ausdal business records, the net commissions were paid to the order of either Mr. Gravette or Mr. MacArthur.[109] Mr. Gravette testified that while Mr. MacArthur was affiliated with Criterion, such commissions were routed through Criterion's bank account.[110]

---

[103] Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329; Ausdal Commission/Fee Statement for Mark MacArthur, January 2014–September 2018, AUSDAL 002330–769.

[104] I understand that T2 may be holding certain amounts owed to Ausdal amounts in escrow and thus not reflected in the Ausdal commission runs or the amounts reported herein. Searcy 30(b)(6) Deposition, 229:7–23.

[105] Searcy 30(b)(6) Deposition, 43:22–44:8, 44:22–24, 178:15–21.

[106] See, for example, Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329.

[107] Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556 at 1776.

[108] See, for example, Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329.

[109] See, for example, SEC Investigation Exhibit 48.

[110] Gravette Testimony, 45:24–46:15.

According to the testimony of Jason Stauffer, Criterion's former Director of Operations,[111] Messrs. Gravette and MacArthur drew equal salaries and split the profits of the business evenly through June 30, 2016.[112] Starting around August of 2017, it is my understanding that Mr. MacArthur's specific net commissions were paid either directly to him or his new firm, M2.[113]

52. As detailed in Richmond Exhibit 1, net commissions received on the At-Issue Funds were split 50/50 between Messrs. Gravette and MacArthur through June 30, 2016. For all subsequent periods, the net commissions are delineated between Messrs. Gravette and MacArthur based on the Rep ID associated with each commission.[114] A summary of the net commissions earned from Ausdal by Defendant is below:

| | Pacific West II | Southland II | T2 SREI | T2 Asset Opportunity Fund IV | Total |
|---|---|---|---|---|---|
| Total At-Issue Funds - Gravette | $237,243 | $195,855 | $230,606 | $0 | $663,705 |
| Total At-Issue Funds - MacArthur | $354,063 | $61,579 | $186,851 | $0 | $602,493 |
| **Total At-Issue Funds - Criterion** | **$591,306** | **$257,435** | **$417,457** | **$0** | **$1,266,198** |

53. Ausdal's business records provide commission information by Criterion investor and underlying investment. For example, in the February 10, 2016 Commission/Fee Statement for Mr. Gravette, Ausdal reported that it received $68,282.48 of fees associated with The Southern Baptist Theological Seminary's investment in T2 SREI.[115] Richmond Exhibit 3 shows the breakdown of the net commissions earned by the Defendants by Criterion client.

54. According to the testimony of Ms. Searcy, the General Partner of the T2 SREI Fund stopped remitting Ausdal's 50% share of the T2 SREI performance allocation received by the General Partner sometime in 2018.[116] Ms. Searcy testified that the General Partner is holding the withheld Ausdal fees in an escrow account.[117] Ms. Searcy indicated that the General Partner withheld payment of this amount due to: 1) costs incurred by T2 associated with responding to SEC testimony and document subpoenas; and 2) a prepayment to Ausdal of

[111] Jason Stauffer's Background Questionnaire, SEC Investigation Exhibit 23, p. 5.
[112] Stauffer Testimony, 62:24–63:11. According to the testimony of Mr. Gravette, between July of 2017 and approximately August of 2017, his net commissions were paid to Criterion. MacArthur Testimony, 177:8–14.
[113] MacArthur Testimony, 177:8–14.
[114] The column "Rep ID" identified whether the commissions were attributable to Mr. MacArthur (Rep. No. 55) or Mr. Gravette (Rep. No. 56). Ausdal Excel Commissions Detail, SEC-AUSDAL-E-0006835.
[115] Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556 at 1777.
[116] Searcy 30(b)(6) Deposition, 232:7–233:8.
[117] Searcy 30(b)(6) Deposition, 232:7–233:8.

carried interest fees associated with a different T2 fund that is now subject to clawback.[118] Thus, the $417,457 of net commissions associated with the T2 SREI fund does not include any of the unpaid performance allocation owed to Ausdal for 2018 through 2020.

55. As indicated above, Ausdal has not yet received any fees associated with the T2 Asset Opportunity IV Fund. According to the testimony of Ms. Searcy, the fund is still active and as a result, the final accounting of the performance allocation has not yet been determined.[119] If the amounts available for distribution exceed 8%, then Ausdal will be owed its 50% portion of the General Partner's carried interest. Thus, Ausdal's fees associated with T2 Asset Opportunity IV Fund are to be determined depending on the final performance of the T2 Asset Opportunity IV Fund.

### 2. Alternative Investment Fees Charged by the Defendants Associated with the At-Issue Funds

56. According to Criterion's Part 2A of Form ADV: *Firm Brochure*, Criterion charged its clients an "Alternative Investment Fee" for advisory services associated with the following types of investments: 1) hedge fund investments; 2) private placement investments; and 3) private equity investments.[120] For client AUM up to $2.0 million dollars, Criterion charged an annual Alternative Investment Fee of 0.5%.[121] For clients with an AUM over $2.0 million dollars, Criterion charged an annual Alternative Investment Fee of 0.25%.[122]

57. During discovery, Criterion produced electronic copies of its general ledger for the periods November 1, 2014 through December 31, 2014, January 1, 2015 through December 31, 2015, and January 1, 2016 through June 30, 2016.[123] A general ledger reflects an entity's financial statement account balance activity as of and for specified points in time. One of the accounts in Criterion's general ledger is titled "Alternative Investment fees." According to the limited general ledger data available, Criterion's total Alternative Investment fees (not limited to the At-Issue Funds) were as follows:

a) November and December 2014 = $174,733[124]

---

[118] Searcy 30(b)(6) Deposition, 229:11–23, 230:6–11, 234:20–24.
[119] Searcy 30(b)(6) Deposition, 43:22–44:8, 44:22–24, 178:15–21.
[120] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation, p. 7.
[121] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation, p. 7.
[122] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation, p. 7.
[123] Criterion General Ledger, June 30, 2016, CRITERION_SEC_00632770.
[124] Criterion General Ledger, June 30, 2016, CRITERION_SEC_00632770, tab *112014 - 122014*.

b) 2015 = $199,949[125]

c) Through June 30, 2016 = $103,181[126]

58. These Alternative Investment Fees are in addition to the commissions paid by Ausdal to the Defendants. During the period January 1, 2015 through December 31, 2015, Criterion's general ledger indicates that Criterion earned $631,370 in net commissions from Ausdal.[127] Thus, across all Alternative Investments in 2015, Criterion's general ledger indicates that Criterion earned a combined $831,319 in commission plus fees associated with alternative investments (which include the At-Issue Funds). The combined $831,319 in reported fees associated with Alternative Investments was approximately 50% of Criterion revenues as reported in its 2015 general ledger.[128]

59. Criterion's general ledger does not show the amount of Alternative Investment Fees by investment and/or client. Due to the lack of detail and lack of data after June 30, 2016, I am unable to identify the amount of Alternative Investment Fees Criterion earned associated with the At-Issue Funds.

### B. The Combined Fees Earned/Received by Criterion on Alternative Investments Exceed the Fees Earned on Investment Management Services

60. I was asked by the SEC to compare Criterion's actual fees earned on Alternative Investments (a combination of net commissions from Ausdal and Alternative Investment Fees charged to Criterion clients) to the fees that Criterion would have earned had Criterion charged an Investment Management Fee on those client assets.

61. Per Criterion's 2015 Part 2A of Form ADV: *Firm Brochure*, Criterion charged an Investment Management Fee for advisory services on the following types of investments: 1) stocks, bonds, and cash management; 2) asset allocation, diversification strategies; 3) strategic and tactical management using multiple asset categories and securities; and 4) account reporting.[129] According to the Form ADV, the annual fee ranged from 0.4% to 1.5% depending on any given client's AUM.[130]

[125] Criterion General Ledger, June 30, 2016, CRITERION_SEC_00632770, tab *012015-122015*.
[126] Criterion General Ledger, June 30, 2016, CRITERION_SEC_00632770, tab *012016-062016*.
[127] Criterion General Ledger, June 30, 2016, CRITERION_SEC_00632770, tab *012015-122015*.
[128] Criterion General Ledger, June 30, 2016, CRITERION_SEC_00632770. For November and December 2014, Alternative Investment fees were approximately 43% of Criterion revenues as reported in its November and December 2014 general ledger. CRITERION_SEC_00632770, tab *112014 - 122014*.
[129] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, p. 6.
[130] Criterion Part 2A of Form ADV: Firm Brochure, March 17, 2015, SEC Investigation Exhibit 9, pp. 6–7.

62. Assuming an Alternative Investment Fee rate of 0.5% (for AUM up to $2.0 million), Criterion's $199,949 of Alternative Investment Fees earned in 2015 indicate that approximately $40 million of client investments were subject to this fee. Had Criterion charged its clients a 1.25% Investment Management Fee on approximately $40 million of client AUM, the Investment Management Fee would have been approximately $500,000.

63. As detailed above, during 2015, Criterion earned net commissions of $631,370 in addition to the Alternative Investment Fees of $199,949. Thus, Criterion received greater combined fees (net commissions received from Ausdal *plus* Alternative Investment fees paid by Criterion clients) than it would have earned had Criterion charged a 1.25% Investment Management fee on approximately $40 million of client AUM.

64. The fact that the Defendants earned higher combined fees on Alternative Investments is consistent with my understanding of the record. For example, for Criterion client investments into the two funds managed by Bird Rock, the Defendants earned a 2% annual referral fee plus a 0.5% Alternative Investment Fee for AUM up to $2 million. For T2 SREI and T2 Asset Opportunity Fund IV, if the returns available for distribution cleared the respective Tier 2 "hurdles," the Defendants would earn at least 2% in Ausdal commissions *plus* the Alternative Investment Fee of 0.5%.

### C. The Expected Investor Returns on the T2 SREI's Class C Units Were Inferior to Class A Units

65. As discussed in the background section, the T2 SREI offered two classes of Units to investors: Class A Units (for non-Criterion investors) and Class C Units (for Criterion investors). The key difference between the Class A Units and the Class C Units was the "Performance Allocation" to the General Partner of the Master Fund.[131]

66. For the Class A Units, the Performance Allocation was calculated in a three "tier" waterfall as follows:

a) The first 6% of returns available for distribution were 100% allocated to Class A investors

b) The next 1.5% of returns available for distribution were 100% allocated to the General Partner

---

[131] Brown Testimony, 63:1–6; T2 Strategic Real Estate Income Fund, LLC PPM, April 1, 2014, SEC Investigation Exhibit 14, CRITERION_SEC_00052549 at 71.

c) Any returns available for distribution in excess of 7.5% would be split 80% to the Class A investors and 20% to the General Partner.

67. For the Class C Units, the Performance Allocation was calculated in a three "tier" waterfall as follows:

a) The first 6% of returns available for distribution were 100% allocated to Class C investors

b) The next 4% of returns available for distribution were allocated to the General Partner

c) Any returns available for distribution in excess of 10% would be split 60% to the Class C investors, 40% to the General Partner.

68. As discussed herein, per its agreement with Ausdal, the General Partner of T2 SREI agreed to split its Performance Allocation fees associated with Class C Units 50/50 with Ausdal. Thus, if there were total returns of 10% available for distribution, the Class C unit holders would receive 60% of the returns, T2 would receive 20%, and Ausdal would receive 20%.

69. As a direct result of the differences in the fee structure between the Class A and Class C Units, the expected returns on Class C Units (offered only to Criterion investors) were inferior to the expected returns on Class A Units (offered to non-Criterion investors). The leadership of T2 (Jeff Brown, John Southard, and Linda Searcy) discussed this issue in January 2015 via a series of emails.[132] A January 2015 T2 email chain discusses that if the T2 SREI fund performs "as expected" and earns a 10–11% gross yield, the Class C investors from Criterion would expect a net return of only 6–7% due to the increased "Performance Allocation" associated with Class C Units and the corresponding fee sharing agreement with Ausdal/Criterion.[133] Mr. Brown described the inferior Class C expected returns as "not surprising but also not a pretty picture."[134]

70. Attached to the email chain was a Microsoft Excel spreadsheet that Mr. Brown created that quantifies the different expected returns between Class A and Class C Units.[135] Mr. Brown's spreadsheet demonstrates that if the T2 SREI fund had $30 million of Assets

---

[132] Email from Jeff Brown to John Southard and Linda Searcy, "criterion workup" with attached document "Criterion carry_15_0113.xlsx", January 13, 2015, SEC Investigation Exhibit 74, T2CAPITAL_SEC_00018275 at 75 ("SEC Investigation Exhibit 74").
[133] SEC Investigation Exhibit 74 at 75.
[134] SEC Investigation Exhibit 74 at 75.
[135] SEC Investigation Exhibit 74.

Under Management and achieved a "Gross Yield" of 11.5%, the expected net returns to the investors would be as follows:

a) Class A investors would expect to receive a net 8.1% return totaling $2,424,000[136]

b) Class C investors would expect to receive a net 6.1% return totaling $1,818,000[137]

c) The difference in % and dollar returns is due the higher "Performance Allocation" owed to the General Partner, half of which T2 agreed to pay Ausdal.

71. Attached as Richmond Exhibit 4 to this report is a similar Microsoft Excel spreadsheet that I prepared to assist the trier of fact with understanding and quantifying the expected impact of the Ausdal fee sharing agreement on Class C Units. Using the same structure and related inputs as Mr. Brown's model, Richmond Exhibit 4 quantifies the differing percentage and dollar returns between Class A Units and Class C Units based on various Assets Under Management and gross return scenarios. Richmond Exhibit 4 shows that if the fund achieved a gross return (prior to management fees) of at least 9.0% in any given year, the Class C share returns would be inferior to the Class A returns (both in dollars and percentage).

72. The expected return differences quantified in Mr. Brown's analysis and Richmond Exhibit 4 are consistent with the actual financial performance of T2 SREI Class A and Class C. The audited financial statements for the T2 SREI from 2015–2017 report the comparative performance of T2 SREI Class A Units and T2 SREI Class C Units for each year.[138] The

[136] SEC Investigation Exhibit 74.
[137] SEC Investigation Exhibit 74.
[138] T2 SREI 2017 Financial Statements, December 31, 2017, Searcy Deposition Exhibit 18, T2CAPITAL_SEC_00000204 at 18; T2 SREI 2016 Financial Statements, December 31, 2016, SEC Investigation Exhibit 77, T2CAPITAL_SEC_00000173 at 187; T2 SREI 2015 Financial Statements, December 31, 2015, SEC Investigation Exhibit 76, T2CAPITAL_SEC_00000115 at 28.

following table details the inferior returns to Class C investors per T2 SREI's audited financial statements:

| | **Class A Yield** | **Class C Yield** |
|---|---|---|
| **2015** | 11.32% | 8.66% |
| **2016** | 10.42% | 7.98% |
| **2017** | 8.22% | 6.33% |

73. Thus, not only was it expected that the T2 SREI Class C investors would receive lower yields due to the Ausdal fee agreement, this actually occurred. Attached as Richmond Exhibit 5 is a chart comparing the expected investor returns of T2 SREI Class A and T2 SREI Class C Units at various increments of "Total Returns Available for Distribution." This chart demonstrates the diverging expected investor returns once the fund's annual performance exceeded 7.5%.

### D. The Expected Investor Returns on T2 Asset Opportunity Fund IV Are Inferior to T2 Opportunity Fund IV

74. As discussed in the background section, the T2 Asset Opportunity Fund IV (offered only to Criterion investors) had a different fee structure than T2's flagship fund, T2 Opportunity Fund IV (offered to non-Criterion investors). The key difference between the two funds was the waterfall calculation of the General Partner's carried interest.[139]

75. For the flagship fund, T2 Opportunity Fund IV, the distribution of returns was calculated in a three "tier" waterfall as follows:

a) The first 8% of returns available for distribution were to be 100% allocated to investors

b) The next 2.67% of returns available for distribution were to be split 80% to the General Partner and 20% to investors

c) Any returns available for distribution in excess of 10.67% were to be split 80% to the investors and 20% to the General Partner.

76. For the T2 Asset Opportunity Fund IV, the distribution of returns was calculated in a three "tier" waterfall as follows:

---

[139] Brown Testimony, 154:7–14.

a) The first 8% of returns available for distribution were to be 100% allocated to investors
b) The next 5.33% of returns available for distribution were to be 100% allocated to the General Partner
c) Any returns available for distribution in excess of 13.33% would be split 60% to the investors and 40% to the General Partner.

77. As discussed herein, per its agreement with Ausdal, the General Partner of T2 Asset Opportunity Fund IV agreed to split its carried interest 50/50 with Ausdal. Thus, if there were total returns of 13.33% available for distribution, the investors would receive 60% of the returns, T2 would receive 20%, and Ausdal would receive 20%.

78. As a direct result of the differences in the fee structure between the funds, the expected returns on T2 Asset Opportunity Fund IV (offered only to Criterion investors) were inferior to the expected returns on T2 Opportunity Fund IV (offered to non-Criterion investors) if the fund exceeded the 8% Tier 1 “hurdle.” Attached as Richmond Exhibit 6 is a chart comparing the expected investor returns of T2 Opportunity Fund IV and T2 Asset Opportunity Fund IV Class C at various increments of “Total Returns Available for Distribution.” This chart demonstrates the diverging expected investor returns once T2 Asset Opportunity Fund IV’s annualized performance exceeds 8.0%.

### E. The Ausdal Fee Agreements Created Financial Incentives for the Defendants

79. The Ausdal Fee agreements with each of the At-Issue Funds created financial incentives for the Defendants. As discussed herein, the combination of net commissions and Alternative Investment Fees exceeded the fees Criterion would have earned under its “standard” investment advisory fee structure.[140]

#### 1. T2 SREI Fund Class C Units

80. As discussed above, T2 SREI’s Class C Units were only offered to Criterion clients. The expected (and actual) returns to the Criterion investors were inferior to the non-Criterion investors that invested in Class A Units. Attached as Richmond Exhibit 7 is a model that

---

[140] MacArthur testified that: “Advisory fees were standard structure for clients.” MacArthur Testimony, 48:3–4.

compares and contrasts investor returns, General Partner fees, and Ausdal fees at varying returns available for distribution. This model demonstrates that once the Class C Units exceed a 6% return available for distribution, Ausdal (and the Defendants) earned incremental fees.

### 2. T2 Asset Opportunity Fund IV

81. As discussed above, T2 Asset Opportunity Fund IV was only offered to Criterion clients. The expected returns to the Criterion investors were inferior to the non-Criterion investors that invested in T2 Opportunity Fund IV if the fund exceeded the 8% Tier 1 Preferred Return. Attached as Richmond Exhibit 8 is a model that compares and contrasts investor returns, General Partner carried interest, and Ausdal fees at varying returns available for distribution. This model demonstrates that once the T2 Asset Opportunity Fund IV returns exceeds an annualized 8% return available for distribution, Ausdal (and the Defendants) will earn incremental fees.

### 3. Southland II and Pacific West II

82. As discussed above, Messrs. Gravette and MacArthur facilitated an agreement between Ausdal and Bird Rock, the manager of Southland II and Pacific West II.

83. According to the testimony of Mr. Niednagel, Bird Rock had a referral arrangement with Ausdal that included "a tailing referral fee as long as the investors referred to our clients by [Ausdal/Criterion] remain invested with our clients that are managed by Bird Rock Management, LLC."[141] Mr. Niednagel explained that the tailing referral fee paid to Ausdal "is not paid only upfront but is continued to be paid on an annual basis" and has been and will continue to be paid as long as the Criterion investors remain in the funds.[142] As a result of the Ausdal agreements with Bird Rock, the Defendants earned upfront and continuing fees associated with Criterion clients that invested in Pacific West II and Southland II.

[141] Niednagel Testimony, 66:12–16.
[142] Niednagel Testimony, 66:20–22, 68:17–69:2.

#### 4. Impact of the Ausdal Agreements

84. Due to the Ausdal agreements with the General Partner of the T2 funds and Bird Rock, Defendants had a financial incentive to: 1) recommend the At-Issue Funds to Criterion clients over products on which Defendants earned a standard investment advisory fee; and 2) maintain their clients' investments in those funds going forward.

# Appendix A
# Richmond Documents Considered

| No. | Document Title/Bates |
|---|---|
| | **Legal Documents** |
| 1. | Complaint, *SEC vs. Criterion Wealth Management Insurance Services, Inc., Robert Gravette and Mark MacArthur* , February 12, 2020. |
| | **Testimony, Depositions, Declarations and Related Exhibits** |
| 2. | Testimony of Mark MacArthur and SEC Investigation Exhibits 1–21, *In the Matter of Criterion Wealth Management Insurance Services, Inc* ., June 12, 2018. |
| 3. | Testimony of Robert Gravette and SEC Investigation Exhibits 44–50, *In the Matter of Criterion Wealth Management Insurance Services, Inc.,* August 22, 2018. |
| 4. | Testimony of Jason Stauffer and SEC Investigation Exhibits 22–30, *In the Matter of Criterion Wealth Management Insurance Services, Inc.,* July 19, 2018. |
| 5. | Testimony of Daniel Niednagel and SEC Investigation Exhibits 31–43, *In the Matter of Criterion Wealth Management Insurance Services, Inc* ., August 16, 2018. |
| 6. | Testimony of Larry Nakamura and SEC Investigation Exhibits 51–62, *In the Matter of Criterion Wealth Management Insurance Services, Inc* ., October 19, 2018. |
| 7. | Testimony of Jeff Brown and SEC Investigation Exhibits 63–84, *In the Matter of Criterion Wealth Management Insurance Services, Inc.* , May 29, 2019. |
| 8. | Testimony of John Southard and SEC Investigation Exhibits 85–99, *In the Matter of Criterion Wealth Management Insurance Services, Inc* ., December 16, 2019. |
| 9. | Deposition of Linda Searcy and Exhibits 1–28, *SEC v. Criterion Wealth Management Insurance Services, Inc., Robert Gravette, and Mark MacArthur,* August 25, 2021. |
| 10. | Declaration of Patrick Denard and Exhibits, *In the Matter of Criterion Wealth Management Insurance Services, Inc.* , October 17, 2018. |
| 11. | Declaration of David Chow and Exhibits, *In the Matter of Criterion Wealth Management Insurance Services, Inc.* , January 22, 2020. |
| | **Public Materials** |
| 12. | Ausdal Financial Partners, “Fast Facts,” available at https://www.ausdal.com/. |
| 13. | Ausdal Financial Partners Form ADV, July 9, 2021. |
| 14. | IARD–Registration/Reporting Status History for Criterion Wealth Management Insurance Services, Inc., FINRA, November, 4, 2019. |
| | **Produced and Provided Documents** |
| 15. | AUSDAL 001556–AUSDAL 002769 |
| 16. | CRITERION_SEC_00632770 |
| 17. | SEC-AUSDAL-E-0006835 |
| 18. | SEC-AUSDAL-E-0006834 |
| 19. | SEC-AUSDAL-E-0006585 |
| 20. | SEC-AUSDAL-E-0004900 |
| 21. | T2 Bank Records from MB Financial and Fifth Third Bank from April 2017 through August 2021 |
| | **Note: Even if not included in this list, I also considered and relied upon any other documents cited in my report or exhibits.** |

# ANDREW D. RICHMOND
## Senior Vice President

**Cornerstone Research**
181 W. Madison Street, Suite 4300
Chicago, IL 60602
312.345.7310
arichmond@cornerstone.com

## SUMMARY

Mr. Richmond has thirty years of litigation consulting and expert witness experience. He has addressed forensic accounting, fraud and concealment schemes, valuation, causation, and economic damages issues in a wide variety of commercial disputes. Mr. Richmond has also led forensic accounting investigations for boards, special committees, management and Monitoring Trustees. He is a Certified Public Accountant (CPA), Accredited in Business Valuation (ABV), Certified in Financial Forensics (CFF), and a Certified Fraud Examiner (CFE).

In dispute-related matters, Mr. Richmond's clients have included both public and private companies in professional services, manufacturing, banking, real estate, healthcare, energy, insurance, entertainment, and technology. In investigation-related matters, he has examined financial reporting fraud, Ponzi schemes, asset misappropriation, and other forms of corporate misconduct.

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1987 – 1991 | **University of Southern California**<br>*BS, Finance & Business Economics, Cum Laude* | Los Angeles, CA |

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2012 – Present | **Cornerstone Research, Inc.**<br>*Senior Vice President* | Chicago, IL |
| 2003 – 2012 | **Navigant Consulting, Inc.**<br>*Managing Director* | Chicago, IL |
| 2002 – 2003 | **KPMG LLP**<br>*Director* | Chicago, IL |
| 1991 – 2002 | **Arthur Andersen LLP**<br>*Senior Manager* | Los Angeles, CA |

## SUMMARY OF EXPERT REPORTS AND TESTIMONY

» Analyzed a wireless carrier's claims for breach of contract damages against a former business partner. Recalculated a series of annual dashboards and quantified the economic impact over time. Analyzed and critiqued the damages and loss causation claims brought by the Respondent.

» Analyzed the design, execution and concealment of a $25 million embezzlement scheme. Quantified the fraud losses and related recoveries. Critiqued Claimant's claims related to loss causation and damages.

» Analyzed and critiqued the damages and loss causation claims asserted by a failed commodities exchange in a billion dollar antitrust dispute. Analyzed the business plans and financial condition of the exchange and the underlying causes of the exchange's failure.

» Researched and analyzed the design, execution and concealment of the Madoff, Stanford Financial, and Petters Ponzi schemes. Provided expert testimony regarding the various means and methods utilized by the participants.

» Researched and analyzed the design, execution and concealment of a series of evolving fraud schemes. Identified, evaluated and quantified over $1 billion of fraudulent transactions.

» Analyzed and critiqued plaintiff's causation and damages claims in a $100 million dispute related to a failed manufacturing company. Provided expert testimony on the timing and causes of plaintiff's deteriorating financial condition, enterprise value, and claimed damages.

» Provided expert testimony at a private arbitration regarding the costs incurred by a client on a failed software implementation project. Over $100 million in damages were awarded to the client.

» Analyzed and critiqued the damages and causation claims asserted by a private equity investor due to fraud at an acquired company. Provided expert testimony on the impact of the fraud, loss causation and claimed damages at the arbitration.

» Analyzed the liability, damages and loss causation claims made by a receivables factoring business that was victimized by a series of 3rd party fraud schemes. Provided expert testimony regarding the nature of fraud schemes, the financial condition of the business, loss causation and claimed damages.

» Served as the accounting expert in a post-acquisition dispute related to a series of annual revenue and profit earn outs. Approximately $30 million in damages were awarded to the client.

» Analyzed and critiqued a deepening insolvency claim brought by a Liquidating Trustee against a former auditor. Analyzed the impact of fraudulent conduct by the company's Controller and the causes of the company's failure.

- Analyzed the accounting for and financial reporting of a series of transactions involving a group of investment funds.

- Analyzed the damages associated with the breach of an agreement to supply wind turbines to a new wind farm development.

## REPRESENTATIVE CONSULTING MATTERS

### Accounting & Auditing Disputes

- Analyzed plaintiffs' liability claims in a series of litigation matters related to a multi-billion dollar financial reporting fraud and accounting restatement. Accounting issues included revenue recognition, improper capitalization of expenses, acquisition accounting and reserves, falsified assets, and impairments.

- Analyzed plaintiffs' claims in a multi-billion dollar securities class action related to a financial reporting fraud and an accounting restatement. Accounting issues included revenue recognition, earnings management, acquisition reserves, operating accruals, materiality, and prior period adjustments.

- Assisted counsel with responding to PCAOB Investigations, Charging Letters, and SEC Enforcement actions.

- Analyzed the damages and causation claims brought by several plaintiffs in an accounting malpractice matter stemming from a multi-billion dollar financial reporting fraud.

- Analyzed and critiqued claimant's $400 million damages claim in an accounting malpractice dispute. Analyzed the timing and causes of plaintiff's deteriorating financial condition and bankruptcy.

- Analyzed and critiqued plaintiff's damages and causation claims in a securities fraud/Ponzi scheme case. Issues included tracing the flow of funds, deepening insolvency, impact of changes in economic conditions, detrimental reliance, and adequacy of lead plaintiffs.

- Analyzed the financial condition of a manufacturing company to determine the causes of its financial decline and ultimate bankruptcy. Critiqued the claimant's causation theories and calculations of alleged damages.

- Analyzed and critiqued the $100 million claim by a Liquidating Trust for alleged consequential damages related to an accounting restatement.

## REPRESENTATIVE CONSULTING MATTERS

### Post-Acquisition Disputes

» Analyzed the due diligence conducted by the buyer (a private equity fund) in a post-acquisition dispute with the seller. Work included reviewing and analyzing the buyer's due diligence, the transaction and data room documents, the seller's historical financial information and forecasts, and the buyer's internal financial models.

» Analyzed the events surrounding the merger between two major movie studios in a $100 million minority shareholder dispute. Reviewed the post-closing audits and the accounting for the combination.

» Analyzed the profitability of the subject company in a $60 million post-acquisition dispute relating to an alleged material adverse change. Calculated the impact on earnings stemming from the renegotiation of three major supply agreements.

» Retained as the accounting expert for the buyer in a multi-million post-acquisition dispute involving a financial reporting fraud at the acquired company. Analyzed and quantified the impact of the fraud on prior period financial statements, the closing balance sheet, the purchase price, and previously filed tax returns.

» Analyzed a buyer's claims for a purchase price adjustment related to an alleged material financial misstatement.

### Breach of Contract Disputes

» Analyzed and critiqued the damages claimed against a major financial institution related to a breach of a loan generation agreement.

» Determined the amount of damages that arose as a result of a major tuna processing company breaching their contract with a group of suppliers. Analyzed the mitigating factors that offset the plaintiffs' lower sales.

» Calculated the damages due to the breach of an oral contract in a high profile entertainment lawsuit.

» Analyzed and critiqued the opposing lost profits damage claim for a dispute involving the distribution of surgical equipment.

» Determined the amount of the earnout payable to the seller in a healthcare services acquisition.

## REPRESENTATIVE CONSULTING MATTERS

### Intellectual Property Disputes

» Analyzed the damages issues in a series of technology patent infringement cases across multiple jurisdictions. Client received approximately $140 million in the settlement of all pending claims.

» Developed a lost profits damage analysis related to the infringement of a patent on carbon fiber racing clutches. Also determined damages for an anti-trust cause of action. Damages of over $20 million dollars were ordered for the client.

» Analyzed reasonable royalty rates related to an alleged infringement of sunglass lens technology.

» Developed an unjust enrichment analysis and a reasonable royalty claim for a global medical supply firm that arose from a theft of confidential information by a former employee.

» Analyzed the value of a trademark that had been permanently damaged due to a willful infringement in the snack food industry. Calculated the lost profits and lost royalty revenue.

» Analyzed the alleged reasonable royalty damages associated with certain transistor and optical chip technologies.

» Analyzed the alleged reasonable royalty damages associated with certain mobile banking patents.

### Antitrust/Anticompetitive Behavior

» Retained by the USDOJ to analyze the economic impacts of a multi-billion horizontal merger. Assisted with developing a series of structural and contractual remedies that were approved by the parties and the Court. Assisted the Monitoring Trustee with a multi-year review of the parties' implementation of the remedies and other contractual commitments.

» Analyzed the cost structure of multiple products for an international manufacturer in a federal antitrust/predatory pricing claim. Conducted site visits in Japan, China, Singapore, and Malaysia. Reviewed and critiqued the opposing side's contentions regarding the cost of the products and the impact of certain pricing changes.

» Retained as the forensic accountant for a Monitoring Trustee tasked with investigating and reporting a global company's compliance with a DOJ Consent Decree.

» Calculated the lost profits for a leading shoe/apparel manufacturer stemming from a competitor interfering with a critical customer relationship.

» Analyzed the lost profits for a temporary services company stemming from the loss of key employees and confidential information to a competitor.

## REPRESENTATIVE CONSULTING MATTERS

### Real Estate & Construction Disputes

» Owner's Representative in an approximate $1 billion dollar construction project on the Las Vegas strip. Analyzed significant time delays and cost overruns to determine what amounts, if any, were recoverable from the Owner in a Guaranteed Maximum Price contract.

» Reviewed and critiqued a plaintiff's $100 million dollar damage claim for lost profits and out-of-pocket costs for a development project that was allegedly delayed by a soil remediation problem. Prepared a valuation model to determine the project's economic viability. Analyzed the financial effect of surrounding externalities.

» Reviewed and critiqued the claims of multiple commercial property owners for damages due to the construction of subway stations and related tunneling. Analyzed and projected the lost rents from decreased occupancy allegedly caused by the Agency. Researched the market factors that were impacting the properties during the same period in question.

» Analyzed the alleged damages suffered by a General Contractor that was terminated from a public works remodeling project. Examined the alleged profitability of the job at the time of the bid, the impact of time delays and cost overruns, and the historical profitability of the company on similar projects.

### Securities and Valuation Claims

» Retained by a Plan Sponsor to analyze and rebut multiple ESOP valuation claims made by a class of Plan Participants and the US Department of Labor.

» Retained by a Fortune 100 company to analyze Plaintiffs' claims in a multi-billion dollar securities class action. Issues included accounting for loss contingencies, ICOFR, disclosure policies and procedures, loss causation, and damages. Supported four outside experts through reports and depositions.

» Prepared a valuation of a privately-held restaurant group relating to dispute with the former CEO.

» Retained by a Fortune 50 company to analyze Plaintiffs' claims in a billion dollar securities class action. Issues included revenue recognition, EPS forecasting, disclosure policies and procedures, loss causation and damages. Assisted counsel through successful mediation.

» Performed valuations of two privately-held businesses to determine an individual's net worth.

## REPRESENTATIVE CONSULTING MATTERS

### Forensic Investigations

» Investigated and uncovered a massive financial reporting fraud at a manufacturing company. Identified and isolated the fraudulent journal entries and assisted the company with correcting its books and records.

» Investigated the historical financial reporting of a technology company for compliance with GAAP. Identified a systematic revenue recognition fraud scheme. Presented the findings to the Company's Audit Committee, independent auditors, DOJ, and SEC.

» Investigated the historical financial reporting for a group of Investment Funds that had suffered significant losses in certain investments. Presented the findings to the Funds' Investment Manager, independent auditors, DOJ, and SEC.

» Performed an investigation for the audit committee of a publicly traded utility related to the disposition of over $1 billion in corporate assets.

» Investigated and analyzed a real estate based Ponzi scheme. Work included mapping the flow of funds, external asset tracing, and determining potential recovery percentages.

» Assisted counsel to the audit committee of a publicly traded manufacturing company with an investigation of certain accounting and financial reporting issues raised by a potential whistleblower.

» Investigated an alleged embezzlement by an employee for a publicly traded automotive retailer. Identified and documented a theft of several million dollars. Assisted the client with its proof of loss and its pursuit of a criminal conviction.

» Performed an investigation for the audit committee of a publicly traded financial services company related to alleged misreported personal expenses, improper use of corporate assets, and unauthorized corporate expenditures by the CEO. Testified at trial regarding the results of the investigation.

» Investigated the conduct of an Accounts Receivable Manager who had been "re-aging" numerous receivable balances.

» Conducted a financial reporting investigation for a publicly traded software company. Work included interviewing current and former management, analysis of certain accounting entries and balances, and assessing the need for a potential restatement.

» Performed a royalty audit of record and publishing income earned by a world-famous musician.

» Performed an investigation of the former Controller of a publicly traded financial services company.

## PROFESSIONAL CERTIFICATIONS

Certified Public Accountant (Licensed in Illinois)

Certified Fraud Examiner (CFE)

Certified in Financial Forensics (CFF)

Accredited in Business Valuation (ABV)

## OTHER PROFESSIONAL ACTIVITIES

Recurring Guest Lecturer:
- University of Illinois
- University of Notre Dame

Board of Directors – Little City / Countryside Association for People with Disabilities

Board of Directors – CARPLS (Coordinated Advice & Referral Program for Legal Services)

Committee Member – AICPA Forensic & Litigation Services Committee (2010 – 2013)

AICPA Forensic and Litigation Services Task Force Member – Fraud Task Force (2010-2012) and Economic Damages Task Force (2012-2014)

# Appendix C

## Reports and Testimony of Andrew D. Richmond

United States District Court, Northern District of Illinois
County of Cook v. Wells Fargo & Co., et al.
Analysis of claimed economic damages.
Expert Report. September 2021.

United States District Court, Northern District of Ohio
In re: Sonic Corp. Customer Data Breach Litigation (Financial Institutions)
Analysis of claimed economic damages.
Expert Report. September 2021.

Private Arbitration
Donnelley Financial Solutions, Inc. v. R.R. Donnelley & Sons Company
Analysis of financial condition of the parties.
Expert Report. August 2021.

Private Arbitration
Peter Kravitz for and on behalf of the AAI Litigation Trust v. Dov Charney
Analysis of claimed lost profits and out-of-pocket expenses.
Expert Report and deposition. August 2021.

High Court of Ireland
Defender v. HSBC Institutional Trust Services (Ireland)
Investigation and evaluation of fraud and concealment schemes.
Expert Report. April 2021.

Private Arbitration
USCC Services, Inc. v. Assurant Service Protection, Inc.
Analysis of breach of contract claims.
Expert Reports and deposition. April 2021.

United States District Court, Northern District of Illinois
County of Cook v. Wells Fargo & Co.
Analysis of fee revenues and associated costs.
Expert Declaration. March 2021.

Ontario, Superior Court of Justice
Joint Liquidators of Stanford International Bank Limited v. The Toronto-Dominion Bank
Investigation and evaluation of fraud and concealment schemes.
Expert Report and trial testimony. March 2021.

# Appendix C

## Reports and Testimony of Andrew D. Richmond

United States District Court, Eastern District of Michigan
*In Re* Flint Water Cases
Analysis of claimed economic damages.
Expert Declaration and deposition. February 2021.

United States District Court, District of Columbia
The Wharf, Inc., et al. v. The District of Columbia
30(b)(6) Representative.
Deposition. February 2020.

United States Bankruptcy Court, District of Minnesota
Douglas A. Kelley, Trustee of the PCI Liquidating Trust v. Opportunity Finance, et al.
Investigation and evaluation of fraud and concealment schemes.
Expert Report and deposition. September 2019.

Private Arbitration
F.W. Sims, Inc. v. Baker Tilly Virchow Krause, LLP
Analysis of fraud scheme, causation and damages.
Expert Report and testimony. June 2019.

High Court of Ireland
Defender v. HSBC Institutional Trust Services (Ireland)
Investigation and evaluation of fraud and concealment schemes.
Expert Report and trial testimony. November 2018.

United States District Court, Northern District of Illinois
Frances Gecker, Trustee for Emerald Casino v. Estate of Kevin Flynn, et al.
Analysis of financial transactions and financial statements.
Expert Reports and deposition. September 2018.

United States District Court, Middle District of Louisiana
Firefighters' Retirement System, et al. vs. Citco Group Limited, et al.
Analysis of financial transactions and financial statements.
Expert Report and deposition. July 2018.

St. Tammany Parish, State of Louisiana
Ernst & Young LLP v. Anthony S. Sciortino, Sr.
GAAP, PCAOB Standards, SEC Filings.
Trial testimony. March 2018.

# Appendix C

## Reports and Testimony of Andrew D. Richmond

United States District Court, Western District of Michigan
Todd A. Stacy v. ASR Corporation, et al.
Analysis of breach of contract claims.
Expert Reports and deposition. February 2018.

United States District Court, Northern District of Illinois
U.S. Futures Exchange v. Board of Trade of the City of Chicago and Chicago Mercantile Exchange
Analysis of financial condition and claims for economic damages.
Expert Report and deposition. February 2018.

United States District Court, Northern District of Texas
Ralph S. Janvey, as Receiver for the Stanford Receivership Estate v. Proskauer Rose
Investigation and evaluation of fraud and concealment schemes.
Expert Report and deposition. January 2018.

## Richmond Exhibit 1
### Summary of Net Commissions Paid by Ausdal for the At-Issue Funds

| At-Issue Funds | 2014 [1] | 2015 [1] | 2016 (Jan–Jun) [1] | 2016 (Jul–Dec) [2] | 2017 [2] | 2018 [2] | 2019 [2] | 2020 [2] | Total |
|---|---|---|---|---|---|---|---|---|---|
| Pacific West Home Mortgage II | $0 | $0 | $0 | $50,837 | $212,124 | $123,592 | $120,676 | $84,078 | $591,306 |
| Southland Home Mortgage II, LLC | - | - | 58,599 | 46,037 | 43,208 | 52,927 | 48,977 | 7,686 | 257,435 |
| T2 Strategic Real Estate Income Fund, LLC | - | 45,990 | 122,127 | - | 140,428 | 108,912 | - | - | 417,457 |
| T2 Asset Opportunity Fund, IV LP | - | - | - | - | - | - | - | - | - |
| **Total At-Issue Funds** [4] | **$0** | **$45,990** | **$180,726** | **$96,874** | **$395,759** | **$285,431** | **$169,653** | **$91,764** | **$1,266,198** |

| At-Issue Funds - Gravette | 2014 [1] | 2015 [1] | 2016 (Jan–Jun) [1] | 2016 (Jul–Dec) [2] | 2017 [2] | 2018 [2] | 2019 [2] | 2020 [2] | Total |
|---|---|---|---|---|---|---|---|---|---|
| Pacific West Home Mortgage II | $0 | $0 | $0 | $22,137 | $110,458 | $43,028 | $43,580 | $18,041 | $237,243 |
| Southland Home Mortgage II, LLC | - | - | 29,300 | 38,944 | 36,115 | 43,460 | 41,093 | 6,944 | 195,855 |
| T2 Strategic Real Estate Income Fund, LLC | - | 22,995 | 61,063 | - | 82,714 | 63,834 | - | - | 230,606 |
| T2 Asset Opportunity Fund, IV LP | - | - | - | - | - | - | - | - | - |
| **Total At-Issue Funds - Gravette** [4] | **$0** | **$22,995** | **$90,363** | **$61,081** | **$229,287** | **$150,322** | **$84,673** | **$24,984** | **$663,705** |

| At-Issue Funds - MacArthur [3] | 2014 [1] | 2015 [1] | 2016 (Jan–Jun) [1] | 2016 (Jul–Dec) [2] | 2017 [2] | 2018 [2] | 2019 [2] | 2020 [2] | Total |
|---|---|---|---|---|---|---|---|---|---|
| Pacific West Home Mortgage II | $0 | $0 | $0 | $28,700 | $101,665 | $80,564 | $77,096 | $66,037 | $354,063 |
| Southland Home Mortgage II, LLC | - | - | 29,300 | 7,093 | 7,093 | 9,467 | 7,884 | 742 | 61,579 |
| T2 Strategic Real Estate Income Fund, LLC | - | 22,995 | 61,063 | - | 57,714 | 45,078 | - | - | 186,851 |
| T2 Asset Opportunity Fund, IV LP | - | - | - | - | - | - | - | - | - |
| **Total At-Issue Funds - MacArthur** [4] | **$0** | **$22,995** | **$90,363** | **$35,793** | **$166,473** | **$135,109** | **$84,981** | **$66,779** | **$602,493** |

Source: SEC-AUSDAL-E-0006835 (Ausdal Excel Commissions Detail); Gravette Testimony, 28:17-18; SEC Investigation Exhibit 21 (Independent Contractor Agreement); Searcy Deposition, 229:7–23; Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329; Ausdal Commission/Fee Statement for Mark MacArthur, January 2014–September 2018, AUSDAL 002330–769.

Note:
[1] Prior to Mr. MacArthur's departure from Criterion, effective June 30, 2016, Messrs. Gravette and MacArthur shared net commissions earned from Ausdal 50/50.
[2] For all periods after June 2016, the net commissions on the At-Issue Funds are based on the details contained in the Ausdal commission workbook.
[3] This analysis excludes amounts associated with net commissions earned by Mr. MacArthur as a result of Mr. MacArthur's investments in Pacific West Home Mortgage II.
[4] The $417,457 of net commissions associated with the T2 SREI fund does not include any of the unpaid performance allocation owed to Ausdal for 2018 through 2020.

## Richmond Exhibit 2
### Summary of Net Commissions Paid by Ausdal on Criterion Alternative Investments

| Funds/Investments [1] | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| Pacific West Home Mortgage II | $0 | $0 | $50,837 | $212,124 | $123,592 | $120,676 | $84,078 | $591,306 |
| T2 Asset Opportunity Fund, II LP | - | 236,425 | - | 236,425 | - | - | - | 472,850 |
| T2 Strategic Real Estate Income Fund, LLC | - | 45,990 | 122,127 | 140,428 | 108,912 | - | - | 417,457 |
| Southland Home Mortgage II, LLC | - | - | 104,636 | 43,208 | 52,927 | 48,977 | 7,686 | 257,435 |
| Coachman Bakken Drilling Fund IV LP | 183,675 | - | - | - | - | - | - | 183,675 |
| T2 Asset Opportunity Fund, III LP | - | 141,855 | - | - | - | - | - | 141,855 |
| Coachman Bakken Income Fund LLC | 84,391 | - | - | - | - | - | - | 84,391 |
| Brightwater R&B Mezzanine Partners, LLC | 82,327 | - | - | - | - | - | - | 82,327 |
| Coachman Energy VIB LLC | - | 71,164 | - | - | - | - | - | 71,164 |
| Coachman Energy VI LP | - | 43,029 | - | - | - | - | - | 43,029 |
| Brightwater Holdings Series D Investors, LLC | 36,593 | - | - | - | - | - | - | 36,593 |
| CMK DG Income Fund, LLC | - | - | 14,942 | - | - | - | - | 14,942 |
| DG Investments X, LLC | - | - | - | 8,520 | - | - | - | 8,520 |
| DG Investments III, LLC | - | - | - | 4,216 | - | - | - | 4,216 |
| John Hancock Growth And Income Cl A | - | 18 | 55 | 67 | 74 | 74 | 73 | 361 |
| John Hancock Financial Industries Cl A | - | 21 | 47 | 62 | 22 | - | - | 153 |
| John Hancock MF Product | 52 | 39 | 17 | 7 | - | - | - | 115 |
| Macon County Healthcare Cl C Unit | - | - | - | - | - | - | - | - |
| **Total Ausdal Alternative Investments** [2] | **$387,038** | **$538,543** | **$292,662** | **$645,056** | **$285,527** | **$169,727** | **$91,837** | **$2,410,389** |

| At-Issue Funds [1] | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| Pacific West Home Mortgage II | $0 | $0 | $50,837 | $212,124 | $123,592 | $120,676 | $84,078 | $591,306 |
| Southland Home Mortgage II, LLC | - | - | 104,636 | 43,208 | 52,927 | 48,977 | 7,686 | 257,435 |
| T2 Strategic Real Estate Income Fund, LLC | - | 45,990 | 122,127 | 140,428 | 108,912 | - | - | 417,457 |
| T2 Asset Opportunity Fund, IV LP | - | - | - | - | - | - | - | - |
| **Total At-Issue Funds** [2] | **$0** | **$45,990** | **$277,601** | **$395,759** | **$285,431** | **$169,653** | **$91,764** | **$1,266,198** |

*Total At-Issue Funds as a percent of Total Ausdal Alternative Investments* *52.5%*

Source: SEC-AUSDAL-E-0006835 (Ausdal Excel Commissions Detail); Searcy Deposition, 229:7–23; Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329; Ausdal Commission/Fee Statement for Mark MacArthur, January 2014–September 2018, AUSDAL 002330–769.

Note:
[1] This analysis excludes amounts associated with net commissions earned by Mr. MacArthur as a result of Mr. MacArthur's investments in Pacific West Home Mortgage II and CMK DG Income Fund, LLC.
[2] The $417,457 of net commissions associated with the T2 SREI fund does not include any of the unpaid performance allocation owed to Ausdal for 2018 through 2020.

## Richmond Exhibit 3

### Summary of Net Commissions Paid by Ausdal for the At-Issue Funds by Criterion Client

| Client [1] | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| The Southern Baptist Theological Seminary | $0 | $29,468 | $69,045 | $69,092 | $51,645 | $0 | $0 | $219,249 |
| David C. Chow & Vicky W. Chow | - | 3,801 | 17,856 | 39,932 | 37,646 | 29,916 | 26,089 | 155,240 |
| Kathy Schreiber | - | - | 18,357 | 14,284 | 13,254 | 13,254 | 1,657 | 60,805 |
| George A. Wade | - | - | 14,398 | 10,555 | 10,224 | 10,224 | 3,075 | 48,477 |
| DLW Orthopedics | - | - | 4,062 | 19,076 | 9,846 | 9,846 | 4,923 | 47,752 |
| Glen W. Hall | - | - | 2,919 | 13,946 | 7,574 | 7,574 | 6,605 | 38,618 |
| James G. Peterson & Barbara J. Silton | - | 2,947 | 9,280 | 11,328 | 9,035 | - | - | 32,589 |
| Roger V. Larson | - | - | 2,529 | 9,175 | 9,603 | 5,680 | 2,840 | 29,827 |
| Dennis D. Johnson & Carol A. Johnson | - | 1,523 | 10,778 | 7,936 | 3,787 | 3,787 | 872 | 28,683 |
| Patricia J. Stageberg | - | - | 11,189 | 5,249 | 7,006 | 4,638 | - | 28,082 |
| Specialty Polymers & Services, Inc. | - | - | 2,367 | 6,619 | 6,627 | 6,627 | 5,779 | 28,019 |
| Deena D. Narwitz | - | 1,179 | 4,251 | 5,392 | 5,824 | 3,787 | 3,302 | 23,734 |
| Stanley Family Trust | - | - | 9,877 | 6,310 | 4,849 | 1,893 | 437 | 23,367 |
| Pressler Family Trust | - | - | 6,854 | 5,842 | 5,802 | 2,840 | 301 | 21,639 |
| Mary Ruth Lindsey & Charles Ernest Lindsey | - | - | 5,409 | 6,520 | 5,607 | 1,541 | 588 | 19,664 |
| Robert T. Schroeder | - | - | 1,686 | 8,011 | 3,787 | 3,787 | 1,893 | 19,164 |
| Kirk J. Lewis | - | - | 4,883 | 9,530 | 1,893 | 1,893 | 947 | 19,146 |
| Rita M. Tilkian | - | - | 1,619 | 6,081 | 3,976 | 3,976 | 3,468 | 19,120 |
| Ronald W. Dixon | - | - | 2,719 | 8,703 | 6,941 | - | - | 18,364 |
| Douglas Hammonds & Jeanne D. Hammonds | - | 3,536 | 5,438 | 5,109 | 4,075 | - | - | 18,158 |
| Brian L. Miller & Kimberly S. Miller | - | 1,179 | 6,433 | 8,899 | 1,443 | - | - | 17,954 |
| Steven E. Chamberlain, M.D. | - | - | 1,398 | 6,973 | 3,787 | 3,787 | 1,893 | 17,838 |
| Felix Martin del Campo, Jr. & Janet R. Martin del Campo | - | - | 617 | 3,546 | 4,734 | 4,734 | 4,128 | 17,758 |
| Jay T. Hartman | - | - | 6,641 | 2,837 | 3,787 | 3,787 | 401 | 17,453 |
| Victor D. Faraci | - | - | 1,573 | 5,939 | 3,787 | 3,787 | 1,893 | 16,979 |
| Kevin Nealon | - | - | 1,552 | 8,009 | 3,787 | 2,528 | - | 15,876 |
| James M. Johnston & Lynn Johnston | - | - | 2,734 | 12,126 | - | - | - | 14,860 |
| Lawrence Blanton & Starr Sachs | - | - | 4,981 | 2,128 | 2,840 | 2,840 | 656 | 13,445 |
| Smith Family Trust | - | - | 3,070 | 4,954 | 3,952 | - | - | 11,976 |
| Todd R. Engstrom & Olivia A. Engstrom | - | 1,179 | 6,024 | 3,344 | 970 | - | - | 11,516 |
| Virginia E. Wade & George A. Wade | - | - | 3,971 | 1,773 | 2,367 | 2,367 | 547 | 11,025 |
| Lehmann Family Trust | - | - | 964 | 2,128 | 2,840 | 2,840 | 1,812 | 10,584 |
| Starr S. Sachs | - | - | 838 | 4,521 | 1,893 | 1,893 | 947 | 10,092 |
| William E. Slawson | - | - | 3,691 | 1,655 | 2,209 | 1,736 | 174 | 9,465 |
| Charles E. Lindsey | - | - | 658 | 3,487 | 1,893 | 1,893 | 1,469 | 9,401 |
| Omar Abdul Hadi, M.D. | - | - | 3,248 | 1,419 | 1,893 | 1,893 | 437 | 8,890 |
| Richard Albert Mohler, Jr. | - | - | 3,012 | 1,424 | 1,900 | 1,900 | 439 | 8,674 |
| Mary K. Mohler | - | - | 3,001 | 1,419 | 1,893 | 1,893 | 437 | 8,643 |
| Steven W. Presley & Pamela S. Presley | - | 1,179 | 2,719 | 2,554 | 2,037 | - | - | 8,490 |
| Dennis Hohn Cho | - | - | 833 | 2,517 | 1,704 | 1,704 | 1,486 | 8,244 |

## Richmond Exhibit 3

### Summary of Net Commissions Paid by Ausdal for the At-Issue Funds by Criterion Client

| Client [1] | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| Carla R. Davis | - | - | 786 | 1,419 | 1,893 | 1,893 | 1,651 | 7,643 |
| Mark D. Peterson | - | - | 812 | 3,487 | 1,893 | 1,420 | - | 7,612 |
| Rebecca K. Johnson | - | - | 730 | 1,419 | 1,893 | 1,893 | 1,651 | 7,586 |
| William M. Hayes | - | - | 529 | 1,419 | 1,893 | 1,893 | 1,651 | 7,386 |
| J. Craig Johnson | - | - | 463 | 1,419 | 1,893 | 1,893 | 1,651 | 7,319 |
| Jean Y. Pressler | - | - | 644 | 2,098 | 1,420 | 1,420 | 1,238 | 6,820 |
| Joshua P. Mitchell | - | - | 439 | 2,098 | 1,420 | 1,420 | 1,238 | 6,616 |
| Susan W. Borden | - | - | 2,401 | 3,226 | 617 | - | - | 6,243 |
| The Johnson Family Trust | - | - | - | 2,086 | 4,081 | - | - | 6,167 |
| Michael M. Churukian | - | - | 709 | 1,064 | 1,420 | 1,420 | 1,238 | 5,852 |
| Guice Slawson, Jr. | - | - | 2,127 | 946 | 1,262 | 1,262 | 134 | 5,731 |
| Caroline Slawson-Stinson Child Trust | - | - | 2,117 | 946 | 1,262 | 1,262 | 134 | 5,721 |
| Wendy M. Churukian | - | - | 567 | 1,885 | 1,136 | 1,136 | 991 | 5,715 |
| Charles N. Versteeg, Jr., M.D. | - | - | 350 | 2,777 | 947 | 947 | 473 | 5,494 |
| Carol A. Johnson | - | - | 406 | 2,777 | 947 | 947 | 216 | 5,293 |
| Anthony N. La Rocca | - | - | - | 3,102 | - | - | - | 3,102 |
| Ronald G. Luallen | - | - | - | 3,102 | - | - | - | 3,102 |
| David L. Galt | - | - | 524 | 2,423 | - | - | - | 2,947 |
| Paul L. Sternenberg, M.D. | - | - | 524 | 2,423 | - | - | - | 2,947 |
| Julie A. Simpson | - | - | - | 1,599 | 1,275 | - | - | 2,874 |
| Michael S. Davis | - | - | - | 1,226 | 1,460 | - | - | 2,687 |
| James J. Kehrli | - | - | - | 1,448 | - | - | - | 1,448 |
| Linda Luallen | - | - | - | 1,034 | - | - | - | 1,034 |
| **Total Net Commissions** [2] | **$0** | **$45,990** | **$277,601** | **$395,759** | **$285,431** | **$169,653** | **$91,764** | **$1,266,198** |

Source: SEC-AUSDAL-E-0006835 (Ausdal Excel Commissions Detail); Searcy Deposition, 229:7–23; Ausdal Commission/Fee Statement for Robert Gravette, January 2014–September 2018, AUSDAL 001556–2329; Ausdal Commission/Fee Statement for Mark MacArthur, January 2014–September 2018, AUSDAL 002330–769.

Note:
[1] This analysis excludes amounts associated with net commissions earned by Mr. MacArthur as a result of Mr. MacArthur's investments in Pacific West Home Mortgage II and CMK DG Income Fund, LLC.
[2] Excludes net commissions associated with the T2 SREI fund for the unpaid performance allocation owed to Ausdal for 2018 through 2020.

Richmond Exhibit 4 - Produced in native

**Richmond Exhibit 5**

# T2 Strategic Real Estate Income Fund
## Class A Units vs. Class C Units
## Investor Returns by Total Returns Available for Distribution




Source: SEC Investigation Exhibit 68 (Class C Units Supplement to T2 SREI PPM); SEC Investigation Exhibit 69 (Class A Units Supplement to T2 SREI PPM)

**Richmond Exhibit 6**

# T2 Opportunity Fund IV vs. T2 Asset Opportunity Fund IV

## Investor Returns by Total Returns Available for Distribution




Source: SEC Investigation Exhibit 15 (T2 Asset Opportunity Fund PPM); SEC Investigation Exhibit 91 (T2 Opportunity Fund IV PPM)

Richmond Exhibits 7 and 8 - Produced in native