# EXHIBIT 1001

# *Securities and Exchange Commission*
# *v.*
# *Criterion Wealth Management Insurance Services, Inc., Robert Allen Gravette, and Mark Andrew MacArthur*

Expert Report of Sunil Wahal, Ph.D.

September 20, 2021

EXHIBIT
1001

Case
20-cv-01402

Exhibit
1001

# Table of Contents


I. Qualifications ... 1

II. Relevant Parties ... 1

III. Scope of Assignment ... 3

IV. Summary of Opinions ... 4

V. Customs and Practices for Investment Advisers and Broker-Dealers ... 5

A. Customs and Practices for Investment Advisers ... 5

B. Customs and Practices for Broker-Dealers ... 9

VI. Defendants Acknowledged Their Duty to Act in Their Clients' Best Interest and to Disclose Conflicts of Interest ... 11

VII. Background on the T2 Funds Offerings and Their Compensation Arrangements with the Defendants ... 16

A. T2 Capital Created T2 SREI Class C Units under T2 SREI Specifically for Criterion Clients, Because of an Arrangement among T2 Capital, T2 SREI, and Mr. Gravette and Mr. MacArthur ... 16

B. T2 Capital Created T2 AOF IV Specifically for Criterion Clients, Because of an Arrangement among T2 Capital, T2 AOF IV, and Mr. Gravette and Mr. MacArthur ... 18

VIII. Defendants' Compensation Arrangements with T2 Capital, T2 SREI, and T2 AOF IV, through Ausdal, Created Conflicts of Interest and Constituted Substantial Facts That They Failed to Disclose ... 20

A. The Compensation Arrangements with the T2 SREI and T2 Opportunity Funds Created Conflicts of Interest ... 20

B. The Compensation Arrangements Represented Substantial Facts for Consideration by Criterion Clients ... 21

C. Defendants Failed to Sufficiently Disclose the Compensation Arrangements with T2 Capital, T2 SREI, and T2 AOF IV, and the Conflicts of Interest They Created ... 22

1. Criterion's Forms ADV Did Not Contain Sufficiently Specific Disclosures ... 24

2. PPMs Did Not Constitute Investment Adviser Disclosures and Did Not Contain Sufficiently Specific Disclosures ... 28

3. Criterion's Investment Advisory Agreements Did Not Contain Sufficiently Specific Disclosures ... 30

D. Defendants' Disclosures Related to Their Conflicts of Interest with Respect to Investors in T2 SREI Class C and T2 AOF Were Inconsistent with Industry Customs and Practices ........ 31

IX. Background on the Bird Rock Companies Offering ........ 32

X. Defendants' Compensation Arrangements with the Bird Rock Companies Created Conflicts of Interest That They Failed to Disclose ........ 33

A. The Compensation Arrangements with PWHM II and Southland II Constituted Conflicts of Interest ........ 33

B. Defendants Failed to Sufficiently Disclose the Conflicts of Interest Stemming from the Compensation Arrangements with the Bird Rock Companies ........ 34

1. Criterion's Forms ADV Did Not Contain Sufficiently Specific Disclosures ........ 35

2. PPMs Did Not Constitute Investment Adviser Disclosures and Did Not Contain Sufficiently Specific Disclosures ........ 36

3. Criterion's Investment Advisory Agreements Did Not Contain Sufficiently Specific Disclosures ........ 37

C. Defendants' Disclosures Related to Their Conflicts of Interest with Respect to Investors in the Bird Rock Companies Were Inconsistent with Industry Customs and Practices ........ 38

XI. Criterion's Policies and Procedures Were Inconsistent with Industry Customs and Practices ........ 38

## I. Qualifications

1. I am the Jack D. Furst Professor of Finance and Director of the Center for Investment Engineering at the W.P. Carey School of Business, Arizona State University. Prior to joining the Arizona State University faculty in 2005, I was on the faculties at Emory University and Purdue University.

2. I am a consultant to Avantis Investors, an investment brand from global asset manager American Century Investments. From 2005 to 2019, I was a consultant to Dimensional Fund Advisers, a private investment firm, and prior to that, a consultant to AJO Partners, an investment management firm.

3. I am a member of the investment committees of several registered investment advisers. In addition, I am a regular speaker at academic and practitioner conferences and have given numerous presentations to sovereign wealth funds, endowments, foundations, family offices, pension plans, and registered investment advisers.

4. My academic research focuses on topics such as delegated portfolio management and asset allocation for large institutional investors, as well as investment strategies and trading issues as they relate to public equities, fixed income, and private equity. I have published papers in the *Journal of Finance*, the *Journal of Financial Economics*, the *Review of Financial Studies*, and numerous other journals.

5. I hold a Bachelor of Arts degree in Economics from the University of Delhi, India, a Master of Business Administration from Wake Forest University, and a Ph.D. in Finance from the University of North Carolina-Chapel Hill. A copy of my curriculum vitae, which includes a list of my publications in the last ten years, is attached hereto as **Appendix A**. I have not testified as an expert witness in the last four years.

## II. Relevant Parties

6. Relevant parties (collectively, the “Defendants”) to this matter include:

   a. **Criterion Wealth Management Insurance Services, Inc., also doing business as Criterion Wealth Management (“CWM”)**: an SEC-registered investment

adviser that began conducting business in May 2004, and provided investment advice, portfolio management services, and comprehensive wealth management services to clients (the "Criterion Clients").[1]

b. **Criterion Capital Investments ("CCI")**: a business unit of CWM that offered a distinct investment strategy and fee structure. CCI operated as a standalone business unit from 2016 through 2017. CWM and CCI are collectively referred to as "Criterion" or the "Firm."[2]

c. **Robert Allen Gravette**: Part owner, President, and Chief Compliance Officer of CWM, investment adviser at CWM, and registered broker-dealer representative of Ausdal Financial Partners since 2006.[3]

d. **Mark Andrew MacArthur**: Part owner and investment adviser at Criterion until mid-2016, independent contractor with Criterion from July 2016 to 2017, and registered broker-dealer representative of Ausdal Financial Partners since 2006.[4]

7. Other relevant parties include:

a. **T2 Holdings, LLC, doing business as T2 Capital Management, LLC ("T2 Capital")**, a real estate investment management company managing funds investing in real estate, including **T2 Strategic Real Estate Income Fund, LLC ("T2 SREI")**, **T2 Opportunity Fund IV, LP ("T2 OF IV)**, and **T2 Asset Opportunity Fund IV, LP ("T2 AOF IV")**, into which certain Criterion Clients invested.[5] Hereafter these funds are collectively referred to as the "T2 Funds," and the T2 OF IV and T2 AOF IV funds as the "T2 Opportunity Funds."

---

[1] Securities and Exchange Commission ("SEC") Request for Admission to Criterion ("RFA"), Exhibit 103, pp. 3–6.

[2] I understand that, in 2016, Criterion Capital Investments began providing investment advisory services separately from Criterion Wealth Management. See Testimony of Mark MacArthur, June 12, 2018 ("MacArthur Testimony"), pp. 102:17–104:21; Testimony Exhibit 11, p. 2. See also "Part 2A of Form ADV," *Criterion Wealth Management Insurance Services Inc., d.b.a. Criterion Capital Investments*, March 30, 2016 ("March 2016 Criterion Form ADV (CCI)"), CRITERION_SEC_00144778–99, p. 2.

[3] Testimony Exhibit 9, p. 3; Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 42; Testimony of Robert Gravette, August 22, 2018 ("Gravette Testimony"), pp. 26:20–22, 28:11–18; Testimony Exhibit 45, pp. 10–11.

[4] MacArthur Testimony, pp. 30:11–13, 34:22–35:10, 43:12–20, 232:9–20; Testimony Exhibit 3, p. 10; Testimony Exhibit 21, CRITERION_SEC_00093345–56.

[5] Testimony of Jeff Brown, May 29, 2019 ("Brown Testimony"), pp. 25:9–16, 49:10–17, 154:15–21.

b. **Bird Rock Management, LLC ("Bird Rock")**: an investment management firm formed in November 2014 and managed by Daniel and Stephen Niednagel.[6] Bird Rock is the manager of the **Southland Home Mortgage II, LLC ("Southland II")** and **Pacific West Home Mortgage II, LLC ("PWHM II")** companies (collectively, the "Bird Rock Companies"), into which certain Criterion Clients invested.[7]

c. **Ausdal Financial Partners, Inc. ("Ausdal")**: a registered broker-dealer and investment adviser that was party to arrangements with Bird Rock and T2 Capital whereby Ausdal received compensation in exchange for referring investors to T2 SREI, T2 AOF IV, and the Bird Rock Companies.[8]

## III. Scope of Assignment

8. I have been retained by counsel for the SEC to provide expert testimony in the matter *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., Robert Allen Gravette, and Mark Andrew MacArthur*. Specifically, I have been asked to review the compensation arrangements the Defendants had, through Ausdal, with T2 Capital, Bird Rock,T2 SREI, T2 AOF IV, and the Bird Rock Companies into which Criterion Clients invested from 2014 to 2017 (the "Relevant Period"). I have been asked to analyze the disclosures the Defendants made to their clients regarding those compensation arrangements, if any, and opine on whether the Defendants' disclosures were consistent with industry customs and practices. I was also asked to evaluate the adequacy of Criterion's policies and procedures manual during the Relevant Period.

9. A list of the materials I have relied upon to form my opinions is attached hereto as **Appendix B**. These materials include the complaint filed in this matter, investigative and deposition testimony and the accompanying exhibits, Criterion's 2008 Investment Adviser

---

[6] Testimony Exhibit 34, CRITERION_SEC_00626308–20 at 11; Testimony Exhibit 35, BRM0006203–17 at 05.
[7] Testimony Exhibit 35, BRM0006203–17 at 05; MacArthur Testimony, pp. 183:14–16, 207:10–13.
[8] Testimony Exhibit 35, BRM0006203–17 at 10; RFA Exhibit 103, p. 13; Testimony Exhibit 67, T2CAPITAL_SEC_00000013–24 at 13; Testimony Exhibit 80, T2CAPITAL_SEC_00000957–68 at 57; Testimony Exhibit 37, BRM0007210–16 at 10; Testimony Exhibit 29, CRITERION_SEC_00666478.

Policies and Procedures Manual, private placement memoranda ("PPMs") and other agreements, and the documents produced in this matter, among others.

10. My work in this matter is ongoing and I reserve the right to revise my opinions should additional information become available to me, or in response to any expert reports submitted by the Defendants.

11. I am being compensated at a rate of $500 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direct supervision. My compensation in this matter is not in any way contingent or based on the content of my opinion or the outcome of this matter.

## IV. Summary of Opinions

12. Based on my review and analysis of the information provided to me, and as described in more detail in this report, I have formed the following opinions:

a. Defendants' disclosures as to the arrangement among them, Ausdal, and the T2 Funds were inconsistent with industry customs and practices. During the Relevant Period, the Defendants failed to make sufficiently specific disclosures regarding the nature, source, duration, and potential magnitude of the compensation Mr. Gravette and Mr. MacArthur received through Ausdal from T2 SREI and T2 AOF IV, the potential impact of the compensation arrangements on investor returns, and the conflicts of interest they created for the Defendants with respect to investors in T2 SREI Class C and T2 AOF IV.

b. Defendants' disclosures as to the arrangement among them, Ausdal, and the Bird Rock Companies were inconsistent with industry customs and practices. During the Relevant Period, the Defendants failed to make sufficiently specific disclosures regarding the nature, source, duration, and potential magnitude of the compensation Mr. Gravette and Mr. MacArthur received through Ausdal from the Bird Rock Companies, and the conflicts of interest they created for the Defendants with respect to investors in Southland II and PWHM II.

c. The policies and procedures documented in Criterion's policies and procedures manual in connection with the fulfilment of its fiduciary duties and the

management of conflicts of interest were inconsistent with industry customs and practices because they were not regularly updated and inadequate because they were perfunctory.

## V. Customs and Practices for Investment Advisers and Broker-Dealers

13. This section summarizes the industry customs and practices of investment advisers and broker-dealers that are relevant to the issues at hand in this matter.

### A. Customs and Practices for Investment Advisers

14. An investment adviser is any person or firm that, for compensation, is engaged in the business of providing investment advice to others or issuing reports or analyses regarding securities.[9] Unless exempt, investment advisers are required to register with the SEC under the Investment Advisers Act of 1940 (the "Advisers Act") and are commonly referred to as registered investment advisers ("RIAs").[10] SEC registration requires the filing of Form ADV, which must be filed by investment advisory firms at least once a year.[11] During the Relevant Period, Form ADV consisted of two main parts: Part I contains information about the nature and size of the investment adviser's business and disciplinary history; Part II presents disclosures concerning how the adviser is compensated for its services and any actual or potential conflicts of interest.[12]

15. A person is considered to be associated with an investment adviser if said person is a partner, officer, or director of an investment advisory firm, or, more broadly if said person performs functions such as soliciting clients, or providing investment advice or acting as a point of contact to clients on behalf of the investment adviser.[13]

---

[9] Staff of the Investment Adviser Regulation Office Division of Investment Management U.S. Securities and Exchange Commission, "Regulation of Investment Advisers by the U.S. Securities and Exchange Commission," March 2013 ("Regulation of Investment Advisers"), p. 2.

[10] Regulation of Investment Advisers, p. 8.

[11] Hung, Angela A., Clancy Noreen et al., "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers," Rand Institute for Civil Justice Technical Report, 2008 ("Rand Institute Report"), p. 12.

[12] See Form ADV Part 1A, https://www.sec.gov/about/forms/formadv-part1a.pdf; Form ADV Part 1B https://www nasaa.org/wp-content/uploads/2011/08/Form-ADV-Part-1B.pdf; General Instructions for Part 2 of Form ADV.

[13] 15 U.S. Code § 80b–2 (17); Advisers Act Rule 206(4)-3; Regulation of Investment Advisers, p. 36.

16. The Advisers Act establishes a fiduciary duty for investment advisers to act in their clients' best interest, and not to subordinate the client's interests to their own interests.[14] This fiduciary duty encompasses two main requirements. First, the investment adviser must provide investment advice that is in its client's best interest based on the client's investment profile (e.g., retail or institutional investor) and a reasonable understanding of the client's objectives.[15]

17. Second, investment advisers have a duty to make full and fair disclosure of all material facts relating to the advisory relationship, and must eliminate or make full and fair disclosures of conflicts of interest that may lead the investment adviser to provide investment advice that is not disinterested.[16] An adviser must *both* act in the client's best interest *and* disclose conflicts of interest. Discharging one duty is not sufficient. According to the SEC:

> [A]n adviser must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested. We believe that while full and fair disclosure of all material facts relating to the advisory relationship or of conflicts of interest and a client's informed consent prevent the presence of those material facts or conflicts themselves from violating the adviser's fiduciary duty, such disclosure and consent do not themselves satisfy the adviser's duty to act in the client's best interest.[17]

18. Conflicts of interest arise, among other circumstances, when the investment adviser engages in practices in which it has or may have a pecuniary interest in recommending a transaction to a client.[18] Such pecuniary interests could take the form of finder's fees, commissions, or participation in the profits generated by another commercial relationship.[19] Thus, in my experience, a conflict of interest would exist if an investment adviser received compensation from a third party in connection with a product the investment adviser

---

[14] Securities and Exchange Commission, 17 CFR Part 276, Release No. IA-5248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers" ("SEC Release No. IA-5248"), p. 6. See also Securities and Exchange Commission, 17 CFR Parts 275 and 279, Release No. IA-3060, "Amendments to Form ADV," October 12, 2010 ("SEC Release No. IA-3060"), p. 3.

[15] SEC Release No. IA-5248, pp. 12–13. See also SEC Release No. IA-3060, p. 3.

[16] SEC Release No. IA-5248, p. 23. See also "Investment Adviser Guide: A Brief Overview: The Investment Adviser Industry," Disclosure, NASAA, https://www nasaa.org/industry-resources/investment-advisers/investment-adviser-guide/.

[17] SEC Release No. IA-5248, p. 23. See also "Investment Adviser Guide: A Brief Overview: The Investment Adviser Industry," Fiduciary Duty, NASAA, https://www nasaa.org/industry-resources/investment-advisers/investment-adviser-guide/.

[18] Rand Institute Report, p. 13.

[19] Rand Institute Report, p. 13.

recommended to a client. As a result, the investment adviser would have an incentive to disregard the investment adviser obligation to give the client disinterested investment advice.

19. Other material facts relating to the advisory relationship that investment advisers must disclose to clients include the capacity in which the firm is acting with respect to the advice provided.[20] An investment adviser that is dually registered as a broker-dealer should provide full and fair disclosures about the circumstances in which they intend to act in their brokerage capacity and the circumstances in which they intend to act in their advisory capacity.[21]

20. Facts related to the types of fees and compensation investment advisers receive for their services also constitute substantially important items for disclosure. In my experience, most investment advisers charge an advisory fee equal to a percentage of assets under management and/or a fixed or hourly fee in exchange for their services.[22] Investment advisers do not typically receive compensation in forms other than an advisory fee or an asset-based remuneration.[23]

21. In contrast, broker-dealers do not typically receive asset-based compensation for their advisory services and are instead compensated through commissions, markups, and markdowns on specific trades.[24] As such, the receipt of atypical compensation warrants disclosure in the investment adviser's public materials. In fact, the SEC requires investment advisers to describe their fees and compensation in their Forms ADV.[25] Those required disclosures include information about the nature of the fees charged and whether the adviser received any other types of fees or expenses such as brokerage expenses. Investment advisers are also required to describe whether they or any of their employees accept compensation for the sale of securities or other investment products.[26] If so, the investment adviser should "[e]xplain that this practice presents a conflict of interest and gives [the investment adviser or its employees] an incentive to recommend investment products based on the compensation received, rather than on a client's

---

[20] SEC Release No. IA-5248, p. 22.
[21] SEC Release No. IA-5248, p. 22. See also U.S. Securities and Exchange Commission, Office of Compliance Inspections and Examinations, "OCIE's 2016 Share Class Initiative," July 23, 2016, p. 1.
[22] See Bob Veres, "2017 Planning Profession Fee Survey," Inside Information, p. 3.
[23] Bob Veres, "2017 Planning Profession Fee Survey," Inside Information, p. 3.
[24] Rand Report, p. 14.
[25] General Instructions for Part 2 of Form ADV, Item 5. See also U.S. Securities and Exchange Commission, "Investor Bulletin: Form ADV – Investment Adviser Brochure and Brochure Supplement," June 26, 2017.
[26] General Instructions for Part 2 of Form ADV, Item 5. See also U.S. Securities and Exchange Commission, "Investor Bulletin: Form ADV – Investment Adviser Brochure and Brochure Supplement," June 26, 2017.

needs."[27] Similarly, if an investment adviser accepts performance-based fees (i.e., fees that are based on a share of the client's total returns) in connection with certain accounts, it is required to disclose that fact in its Form ADV and explain the conflicts of interest the adviser may face in managing such accounts, the incentives the adviser may have to favor such accounts, and how the adviser addresses such conflicts of interest.[28]

22. For disclosure to be full and fair as required under the Advisers Act, it should be sufficiently specific. Sufficiently specific disclosure is disclosure that includes the nature of the client, nature of the financial products being offered, any facts that could be of substantial importance to prospective investors, and conflicts of interest the investment adviser may be facing.[29] For instance, disclosure that is deemed sufficient for an institutional client may not be considered full and fair for an individual investor who has fewer resources to analyze and understand the complexity of niche financial products and their implications.[30]

23. In addition, in my experience, prospective investors should not need to seek out information across multiple sets of documents to be apprised with key facts about recommended investments and any conflicts of interest their investment adviser may be facing.

24. Furthermore, for disclosure to be considered full and fair, it must be specific enough for the client to be able to understand the facts that could be of substantial importance to prospective investors and/or conflicts of interest the investment adviser may be facing, and make an informed decision as to whether to provide consent.[31] As such, there is a duty to disclose both expected and actual conflicts. The fact that a contingency exists does not mean that disclosure is not necessary or warranted. Moreover, the SEC has noted that broad disclosures that merely report that the investment adviser has or may have conflicts of interest without further description are inadequate:

[27] General Instructions for Part 2 of Form ADV, Item 5. See also U.S. Securities and Exchange Commission, "Investor Bulletin: Form ADV – Investment Adviser Brochure and Brochure Supplement," June 26, 2017.

[28] General Instructions for Part 2 of Form ADV, Item 6. See also U.S. Securities and Exchange Commission, "Investor Bulletin: Form ADV – Investment Adviser Brochure and Brochure Supplement," June 26, 2017.

[29] SEC Release No. IA-5248, p. 25. See also "Investment Adviser Guide: A Brief Overview: The Investment Adviser Industry," Disclosure, NASAA, https://www nasaa.org/industry-resources/investment-advisers/investment-adviser-guide/.

[30] SEC Release No. IA-5248, p. 25. See also SEC Release No. IA-4048, p. 11.

[31] SEC Release No. IA-5248, p. 22. See also General Instructions for Part 2 of Form ADV, Item 3.

> It would be inadequate to disclose that the adviser has "other clients" without describing how the adviser will manage conflicts between clients if and when they arise, or to disclose that the adviser has "conflicts" without further description. Similarly, disclosure that an adviser "may" have a particular conflict, without more, is not adequate when the conflict actually exists. For example, we would consider the use of "may" inappropriate when the conflict exists with respect to some (but not all) types or classes of clients, advice, or transactions without additional disclosure specifying the types or classes of clients, advice, or transactions with respect to which the conflict exists.[32]

25. In addition to establishing a fiduciary duty for investment advisers, the Advisers Act, in Section 206(4)-7 (also known as the "Compliance Rule"), requires RIAs to, among other things, adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act.[33] In my experience and consistent with industry customs and practices, investment advisers typically adopt policies and procedures that are tailored to the unique risks associated with the services offered, and commit to abide by them in internal manuals to ensure conformity with industry rules and regulations. Thus, an investment adviser's policies and procedures manual reflects the set of conventions to which the company holds itself accountable.

26. Moreover, the Compliance Rule requires annual review of both the adequacy of the written policies and procedures and the effectiveness of their implementation.[34] In my experience, the conduct of such a periodic review is required because an adviser's business and the regulatory landscape in which it operates can change over time, requiring an adviser to revise its policies and procedures to reflect such changes.

### B. Customs and Practices for Broker-Dealers

27. A broker-dealer buys or sells securities (e.g., stocks, bonds, mutual funds, and certain other investment products) on behalf of its customers (as broker), for its own account (as dealer),

---

[32] SEC Release No. IA-5248, pp. 24-25. See also *In the Matter of The Robare Group, Ltd., et al.*, Investment Advisers Act Release No. 4566, November 7, 2016, p. 9.

[33] 17 CFR § 275.206(4)-7(a). See also Regulation of Investment Advisers, p. 40.

[34] 17 CFR § 275.206(4)-7(a). See also Regulation of Investment Advisers, p. 41.

or both.[35] Not all securities issued in private placements are sold through broker-dealers.[36] Most broker-dealers register with the SEC under Section 15(b) of the Securities Act of 1934 and join a self-regulatory organization ("SRO") such as the Financial Industry Regulatory Authority ("FINRA"), which is a government-authorized not-for-profit organization that oversees U.S. broker-dealers.[37]

28. The standards of care that apply to the brokerage profession are different from those that apply to investment advisers. Broker-dealers are not subject to a fiduciary standard but have to meet certain requirements. Those requirements include that they must have a reasonable basis to believe a recommended transaction or investment strategy is suitable for the client.[38] The suitability evaluation should be based on information obtained through the conduct of reasonable diligence into the client's investment profile.[39] Broker-dealers must also conduct reasonable diligence to identify the best market for the securities they buy or sell, and execute transactions in such market to secure as favorable a price for their clients as possible.[40] In terms of disclosure, broker-dealers must provide to their customers, prior to completing a transaction, information that includes the timing, size, and price of the order, and the source and amount of any third-party remuneration they have received or will receive in connection with the trade, among other information.[41] Finally, broker-dealers are required to maintain numerous records pertaining to client accounts, transaction records, and records of associated persons, among other documentation.[42]

29. Broker-dealers may provide services that require them to provide more disclosures than the basic regulatory requirements to which they are subject and cause them to have a fiduciary

[35] FINRA, Registered Financial Professionals, https://www finra.org/investors/learn-to-invest/choosing-investment-professional/registered-financial-professionals. See also Securities and Exchange Act of 1934, §3(a)(4)–(5).
[36] For instance, investors in T2 Capital's funds were referred by investment advisers. See Deposition of Linda Searcy, August 25, 2021 ("Searcy Deposition"), pp. 33:22–34:6.
[37] SEC Division of Trading and Markets, "Guide to Broker-dealer Registration," April 2008; FINRA, Registered Financial Professionals, https://www finra.org/investors/learn-to-invest/choosing-investment-professional/registered-financial-professionals; FINRA, About, https://www finra.org/about.
[38] FINRA Rule 2111 (formerly known as NASD Rule 2310). See https://www finra.org/rules-guidance/rulebooks/retired-rules/2310.
[39] FINRA Rule 2111 (formerly known as NASD Rule 2310). See https://www finra.org/rules-guidance/rulebooks/retired-rules/2310.
[40] FINRA Rule 5310.
[41] SEC Division of Trading and Markets, "Guide to Broker-dealer Registration," April 2008.
[42] 17 CFR §240.17a-3; FINRA Rule 4511.

duty.[43] Indeed, when broker-dealers provide services that are not merely limited to executing specific orders (i.e., non-discretionary account handling), such as when they are authorized by the client to purchase or sell securities on an ongoing basis without obtaining the client's consent for each individual transaction (i.e., discretionary account handling), broker-dealers are given discretion to exercise judgment.[44] Furthermore, broker-dealers are only excluded from the definition of investment advisers if their performance of advisory services is solely incidental to the conduct of their business as brokers and dealers, and they do not receive any special compensation for their advisory services.[45] A registered representative that acts as a financial planner outside the scope of the financial planner's employment with the broker employer is not exempt from being considered as an investment adviser, and may therefore be deemed to be subject to an investment adviser's fiduciary duty.[46]

## VI. Defendants Acknowledged Their Duty to Act in Their Clients' Best Interest and to Disclose Conflicts of Interest

30. Criterion acknowledged the fact that it had a fiduciary duty to act in its clients' best interest and to disclose the conflicts of interest it may face both in publicly available documents and in its internal investment adviser policies and procedures manual.

31. The Defendants' background and business activities were consistent with the definition of investment advisers because Criterion was an SEC-registered adviser that filed Forms ADV, Mr. Gravette and Mr. MacArthur were co-owners of Criterion and provided investment advice to clients, Criterion entered into advisory agreements with its clients, and Criterion charged annual fees for advisory services to its clients.[47] Accordingly, Criterion asserted in its annually filed

---

[43] Rand Institute Report, pp. 10–11.
[44] Rand Institute Report, pp. 10–11.
[45] 15 U.S. Code § 80b–2 (a)(11)(C); SEC Division of Investment Management, "General Information on the Regulation of Investment Advisers," March 11, 2011. See also *Thomas v. Metropolitan Life Insurance Company*, 631 F.3d 1153 (10th Cir. 2011).
[46] 15 U.S. Code § 80b–2 (a)(11)(C); SEC Division of Investment Management, "General Information on the Regulation of Investment Advisers," March 11, 2011. See also *Thomas v. Metropolitan Life Insurance Company*, 631 F.3d 1153 (10th Cir. 2011).
[47] See, e.g., Gravette Testimony, pp. 28:11–18, 20:6–11; 29:21–30:2; 31:8–31:18; Testimony Exhibit 3; Testimony Exhibit 48; RFA Exhibit 103, pp. 6–7; Testimony Exhibit 12, CRITERION_SEC_00606920–25; Testimony Exhibit 13, CRITERION_SEC_00309944–50; CRITERION_SEC_00583609; CRITERION_SEC_00207323; Answer of Defendant Mark A. MacArthur, at ¶ 11.

Forms ADV Part II that it was an SEC-registered investment adviser that provided individually tailored investment advice to its advisory clients. For example, in its 2014 Form ADV Part II, which was publicly available, Criterion stated:

> Our firm provides continuous advice to a client regarding the investment of client funds based on the individual needs of the client. During personal discussions in which goals and objectives based on a client's particular circumstances are established, we develop a client's personal investment policy and create and provide investment advisory services to our clients based on that policy.[48]

32. Furthermore, Criterion affirmed that it (1) was a fiduciary, (2) was required to act in the best interest of its advisory clients, and (3) would make full and fair disclosure of conflicts of interest. For example, in its 2015 Form ADV Part II, Criterion disclosed, "CWM and our personnel owe a duty of loyalty, fairness and good faith towards our clients."[49] Criterion further acknowledged that it had a duty to act in the best interest of its clients and "endeavor[ed] at all times to put the interest of its clients first as part of [its] **fiduciary duty** as a registered investment adviser."[50] To that end, Criterion disclosed that it had adopted a Code of Ethics that was "designed to assure that the personal securities transactions, activities and interest of employees will not interfere with (i) making decisions in the best interests of advisory clients and (ii) implementing such decisions while at the same time allowing employees to invest for their own accounts."[51] Moreover, Criterion pledged to disclose in writing any material conflicts of

---

[48] RFA Exhibit 103, p. 3. See also Testimony Exhibit 9, p. 3; "Part 2A of Form ADV," *Criterion Wealth Management Insurance Services Inc. d.b.a. Criterion Wealth Management*, March 30, 2016 ("March 2016 Criterion Form ADV (CWM)"), CRITERION_SEC_00570436–56, p. 4; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 4; "Part 2A of Form ADV," *Criterion Wealth Management Insurance Services Inc., d.b.a. Criterion Capital Investments*, August 9, 2016 ("August 2016 Criterion Form ADV (CCI)"), CRITERION_SEC_00531757–79, p. 4; "Part 2A of Form ADV," *Criterion Wealth Management Insurance Services Inc. d.b.a. Criterion Wealth Management*, March 31, 2017 ("March 2017 Criterion Form ADV (CWM)"), CRITERION_SEC_00443031–60, p. 4; "Part 2A of Form ADV," *Criterion Wealth Management Insurance Services Inc., d.b.a. Criterion Capital Investments*, March 31, 2017 ("March 2017 Criterion Form ADV (CCI)"), CRITERION_SEC_00636133–65, p. 4.

[49] Testimony Exhibit 9, p. 14. See also RFA Exhibit 103, p. 14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, p. 15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, p. 17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, p. 15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, p. 16.

[50] Testimony Exhibit 9, p. 13 (emphasis added). See also RFA Exhibit 103, p. 13; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, p. 15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 16; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, p. 16; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, p. 14; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, p. 14.

[51] Testimony Exhibit 9, p. 15. See also RFA Exhibit 103, p. 15; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, p. 16; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 17;

interest, including conflicts of interest arising from its referral of advisory clients to third parties.[52] For example in its 2014 Form ADV Part II, Criterion stated:

> How We Handle Our Conflicts of Interest… Clients should be aware that the receipt of additional compensation by CWM and its management persons or employees creates conflict of interest that may impair the objectivity of our firm and these individuals when making advisory recommendations. CWM endeavors at all times to put the interest of its clients first as part of our fiduciary duty as a registered investment adviser, we take the following steps to address this conflict:
>
> - we disclose to clients the existence of all material conflicts of interest, including the potential for us or our employees to earn compensation from the referral of clients to other registered investment advisers;
> - we disclose to the client in a separate disclosure document the compensation we receive in exchange for the client's referral to the selected investment adviser;
>
> …
>
> - we educate our employees regarding the responsibilities of a fiduciary, including the need for having a reasonable and independent basis for the investment advice provided to clients.[53]

33. Criterion's internal investment adviser policies and procedures manual contained similar acknowledgments regarding its fiduciary duty and obligation to disclose conflicts of interest. During the Relevant Period, Criterion policies and procedures were codified in a manual dated April 2008 (the "Policies and Procedures Manual").[54] The Policies and Procedures Manual acknowledged that by virtue of being an investment adviser, Criterion was a fiduciary and was subject to standards of care including the duty to act in the client's best interest, ensure its investment advice was suitable, and execute transactions in the manner most favorable for its

---

August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, p. 17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, p. 16; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, p. 16.

[52] RFA Exhibit 103, pp. 13–14. See also Testimony Exhibit 9, pp. 13–14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 14–15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 16–17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, pp. 16–17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, pp. 14–15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, p. 15–16.

[53] RFA Exhibit 103, pp. 13–14. See also Testimony Exhibit 9, pp. 13–14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 14–15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 16–17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, pp. 16–17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, pp. 14–15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, pp. 15–16.

[54] Testimony Exhibit 7, CRITERION_SEC_00606927–60.

clients.[55] The Firm's Policies and Procedures Manual stated that Criterion "owes its clients/investors the highest duty of loyalty"[56] and that "[a]s an investment advisory firm…Criterion…has a fiduciary and fundamental duty to seek best execution for client/investor transactions."[57] In addition, the Policies and Procedures Manual identified the following "principles that should pervade all investment related activities:"[58]

> (l) [T]he interests of the Adviser's clients/investors come before the Adviser's or any employee's interests; (2) each employee's professional activities and personal investment activities must be consistent with this Code and avoid any actual or potential conflict between the interests of clients/investors and those of the Adviser or the employee; and (3) those activities must be conducted in a way that avoids any abuse of an employee's position of trust with and responsibility to the Adviser and its clients/investors, including taking inappropriate advantage of that position.[59]

34. The Policies and Procedures Manual further asserted:

> As an adviser and a fiduciary to our clients, our clients' interests must always be placed first and foremost, and our trading practices and procedures prohibit unfair trading practices and seek to disclose and avoid any actual or potential conflicts of interests or resolve such conflicts in the client's favor.[60]

35. The Policies and Procedures Manual provided examples of compromising situations that "must be avoided" such as "[e]ngaging in any financial transaction with any of the Adviser's vendors, clients/investors or employees, including but not limited to:…accepting, directly or indirectly, from any person or entity, other than the Adviser, compensation of any nature such as a bonus, commission, fee, gratuity or other consideration in connection with any transaction on behalf of the Adviser."[61]

---

[55] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 39, 47, 61.
[56] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 47.
[57] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 39.
[58] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 47.
[59] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 47.
[60] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 57.
[61] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 49–50.

36. In addition to acknowledging the Firm's fiduciary duties, the Policies and Procedures Manual outlined certain processes to monitor and ensure that the Firm's policies were observed. Those processes included:[62]

a. Maintaining a disclosure document (i.e., Form ADV Part II) providing current and accurate information about the Firm's advisory services, business practices, professionals, policies, and any actual and potential conflicts of interest, among other things, to conform to the provisions of the Advisers Act.[63]

b. Distributing the disclosure document to new clients prior to or at the time of entering into an investment advisory agreement with them.[64]

c. Sending a notice to clients once each year offering a current copy of the disclosure document.[65]

d. Maintaining documentation including: copies of the annual offer, disclosure document offered to clients, lists of the clients to whom the annual offer was sent, and copies of letters to clients or requests from clients regarding the disclosure document.[66]

e. Maintaining any record(s) that document the review of its written policies and procedures performed in connection with Rule 206(4)-7.[67]

37. Moreover, the Policies and Procedures Manual represents that "the CCO or an individual he/she designates with responsibility for licensing, will conduct periodic reviews of its regulatory filings, including at minimum an annual amendment, and amendments upon any material change in its business practices."[68]

38. Finally, during his testimony Mr. Gravette, who served as Criterion's Chief Compliance Officer during most of the Relevant Period,[69] also acknowledged that Criterion owed its clients a fiduciary duty.[70]

---

[62] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 36–37.
[63] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 37.
[64] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 37.
[65] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 37.
[66] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 37.
[67] Testimony Exhibit 7, CRITERION_SEC_00606927–60 at 34.
[68] Testimony Exhibit 7, p. 4.
[69] Testimony of Jason Stauffer, July 19, 2018 ("Stauffer Testimony"), pp. 41:6–8, 43:4–7.
[70] Gravette Testimony, pp. 107:25–108:5.

## VII. Background on the T2 Funds Offerings and Their Compensation Arrangements with the Defendants

39. As introduced in Section II, Criterion Clients bought units or shares into T2 SREI and the T2 Opportunity Funds during the Relevant Period based on the Defendants' recommendation. This section provides background on the terms of those fund offerings, their structure, and the compensation arrangements Mr. Gravette and Mr. MacArthur had, through Ausdal, with T2 Capital, T2 SREI, and T2 AOF IV.

### A. T2 Capital Created T2 SREI Class C Units under T2 SREI Specifically for Criterion Clients, Because of an Arrangement among T2 Capital, T2 SREI, and Mr. Gravette and Mr. MacArthur

40. The T2 SREI fund was formed to invest all of its assets in a master fund focused on generating recurring income for investors primarily through short-term debt instruments and equity investments in commercial real estate.[71] Beginning in 2014, T2 SREI offered multiple classes of units subject to different terms,[72] including Class A and Class C units.[73] Most T2 SREI investors were offered and purchased Class A units.[74] As summarized in **Exhibit 1**, when fund performance exceeded a 6% hurdle rate, Class A unitholders shared profits with the fund's general partner (i.e., T2 SREI Fund GP, LLC) according to the terms of the performance allocation clause of the T2 SREI Class A Units Supplement to the T2 SREI PPM.[75] According to that performance allocation clause, Class A unitholders were entitled to 80% of the profits associated with their interest in T2 SREI Fund, with the T2 SREI general partner receiving the remaining 20%.[76] The performance allocation was subject to a "catch up" provision according to which the general partner was entitled to 100% of the Class A units' profits after the hurdle rate was passed, until the general partner received 20% of the Class A units' overall profits.[77]

---

[71] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 247.
[72] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 253; Brown Testimony, p. 47:19–21.
[73] Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71 at 69; Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 237.
[74] Brown Testimony, pp. 60:24–61:1; Searcy Deposition, pp. 141:5–17, 184:1–184:5; Testimony Exhibit 88, T2Capital_SEC_00000145–72 at 53.
[75] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 238.
[76] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 238, 323.
[77] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 238.

41. In contrast, as summarized in **Exhibit 1**, Class C unitholders were entitled to 60% of the profits associated with their interest in T2 SREI Fund, with the T2 SREI general partner receiving the remaining 40%, after the 6% hurdle rate was achieved.[78] The Class C units' performance allocation clause also provided for a "catch up" period during which the general partner was entitled to 100% of the Class C unit profits until the general partner received 40% of the Class C units' overall profits.[79] As such, once the 6% hurdle rate was satisfied, Class C unitholders would receive a lower overall return than Class A unitholders based on the terms of their respective offerings in the Class A and Class C supplements to the T2 SREI PPM, all other conditions being the same.

42. Criterion Clients invested in Class C units.[80] Class C was designed specifically to accommodate an arrangement among T2 Capital, T2 SREI, and Mr. Gravette and Mr. MacArthur, through Ausdal.[81] Under this arrangement Mr. Gravette and Mr. MacArthur received compensation for referring investors to the T2 SREI Class C units through Ausdal, a broker-dealer of which they were registered representatives.[82] Specifically, as illustrated in **Exhibit 1**, Ausdal was to receive 50% of the general partner's performance allocation for T2 SREI Class C units, as compensation for referring investors to the T2 SREI Class C units.[83] In turn, Ausdal paid Mr. Gravette and Mr. MacArthur 95% of the compensation Ausdal received from the T2 SREI general partner.[84]

43. T2 disclosed to the Defendants the existence of Class A units and the terms of the performance allocation applicable to investors in that class of units.[85] The offering materials for Class A units were made available to Mr. Gravette and Mr. MacArthur but not distributed to Criterion Clients who were only provided with the Class C unit offering materials.[86]

---

[78] Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71 at 70.
[79] Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71 at 70.
[80] Searcy Deposition, p. 121:19–21. See also Brown Testimony, pp. 57:23–58:19.
[81] Brown Testimony, pp. 60:1–61:6; Searcy Deposition, pp. 143:1–22, 124:14–125:12.
[82] Testimony Exhibit 67, T2CAPITAL_SEC_00000013–24 at 14; Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6, p. 1; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24; Testimony Exhibit 45, p. 10.
[83] Testimony Exhibit 67, T2CAPITAL_SEC_00000013–24 at 14; Testimony Exhibit 80, T2CAPITAL_SEC_00000957–67 at 58.
[84] Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.
[85] Brown Testimony, p. 62:16–25; Testimony Exhibit 75, CRITERION_SEC_00433377–83 at 77.
[86] Searcy Deposition, pp. 129:16–130:12, 143:1–7.

44. Based on my review of the Class A and Class C Units Supplements to the Confidential Private Placement Memorandum of T2 SREI, there was no substantive difference in rights between Class A and Class C units except for the manner in which profits were allocated between unitholders and the general partner.[87] Testimony by Mr. John Southard, co-founder of T2 Capital,[88] Mr. Jeff Brown, CEO and co-founder of T2 Capital,[89] and Linda Searcy, Chief Operating Officer of T2 Capital,[90] confirms that there was no difference between the two classes of units aside from the performance allocation between investors and the T2 SREI general partner.[91]

### B. T2 Capital Created T2 AOF IV Specifically for Criterion Clients, Because of an Arrangement among T2 Capital, T2 AOF IV, and Mr. Gravette and Mr. MacArthur

45. T2 launched T2 OF IV and T2 AOF IV in 2014.[92] T2 OF IV was formed to invest in commercial real estate assets within the Midwestern United States and was referred to as the "Flagship Fund" in offering materials.[93] T2 created T2 AOF IV as a parallel fund mirroring the investments made by T2 OF IV.[94] T2 AOF IV fund units were not redeemable until the fund's closing and were subject to substantial transferability restrictions.[95] Therefore, investments in the T2 Opportunity Funds were illiquid.[96]

46. As summarized in **Exhibit 1**, investors shared fund distributions with the T2 OF IV general partner in accordance with the terms of the T2 OF IV PPM.[97] Per those terms, investors were entitled to receive 100% of the T2 OF IV fund's distributions until they received their funded commitments and a preferred return of 8%.[98] After that point, the general partner was

---

[87] See, e.g., Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71; Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 237–239.
[88] Testimony of John Southard, December 16, 2019 ("Southard Testimony"), p. 31:3–18.
[89] Brown Testimony, p. 13:15–16.
[90] Searcy Deposition, pp. 31:13–14, 119:19-120:25.
[91] Southard Testimony, pp. 80:12–25; Brown Testimony, pp. 63:1–10, 86:18–23.
[92] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56; Testimony Exhibit 15, CRITERION_SEC_00049644–79.
[93] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56 at 24; Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 48.
[94] Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 57–58.
[95] Searcy Deposition, pp. 177:13–178:24.
[96] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56 at 42; Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 65; Searcy Deposition, pp. 177:13–178:24.
[97] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56 at 31.
[98] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56 at 31.

entitled to receive 80% of the T2 OF IV fund distributions as carried interest until the general partner had received 20% of the fund's cumulative distributions.[99] After that "catch-up" period, 80% of fund distributions were allocated to investors and 20% to the general partner.[100]

47. In contrast, as summarized in **Exhibit 1**, under the terms of the T2 AOF IV PPM, investors were entitled to receive 100% of the T2 AOF IV fund's distributions until they received their funded commitments and a preferred return of 8%.[101] After that point, the general partner was entitled to receive 100% of the T2 AOF IV fund distributions as carried interest until the general partner had received 40% of the fund's cumulative distributions.[102] After that catch-up period, only 60% of fund distributions were allocated to investors and the remaining 40% to the general partner.[103] Thus, after having received their 8% preferred return, T2 AOF IV investors would receive a lower overall return than T2 OF IV investors based on the terms of their respective PPMs, all other conditions being the same.[104]

48. Criterion Clients subscribed to T2 AOF IV units and were only provided with the terms of the T2 AOF IV fund offering.[105] T2 AOF IV was created at Mr. Gravette and Mr. MacArthur's request, specifically for Criterion Clients.[106]

49. Mr. Gravette and Mr. MacArthur arranged to receive compensation, through Ausdal, from T2 Capital and T2 AOF IV, for referring investors to the T2 AOF IV fund.[107] Specifically, as summarized in **Exhibit 1**, Ausdal was entitled to 50% of the general partner's carried interest remuneration as compensation for referring investors to the T2 AOF IV fund.[108] In turn, Mr. Gravette and Mr. MacArthur were paid 95% of the compensation Ausdal received from the fund manager.[109]

---

[99] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56 at 31.
[100] Testimony Exhibit 91, T2CAPITAL_SEC_00012920–56 at 31.
[101] Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 54.
[102] Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 54.
[103] Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 54.
[104] Searcy Deposition, p. 214:3–20; Southard Testimony, p. 83:7–20; Brown Testimony, p. 52:10–19.
[105] Brown Testimony, p. 52:2–9; Searcy Deposition, pp. 176:8–11, 193:20–194:14.
[106] Brown Testimony, pp. 60:1–61:7; Searcy Deposition, pp. 96:9–97:5.
[107] Testimony Exhibit 67, T2CAPITAL_SEC_00000013–24 at 14; Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6, p. 1; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.
[108] Testimony Exhibit 80, T2CAPITAL_SEC_00000957–67 at 58.
[109] Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.

50. The T2 OF IV and T2 AOF IV funds invested proportionately in the same assets and did not substantively differ except for the manner in which distributions were allocated between investors and the general partner.[110] According to testimony by Mr. Jeff Brown, T2 Capital's CEO, the "sole difference" in fund distribution terms across the two funds was that "the carried interest provision in…the Asset Opportunity Fund…was two times the size of the…Opportunity Fund."[111]

## VIII. Defendants' Compensation Arrangements with T2 Capital, T2 SREI, and T2 AOF IV, through Ausdal, Created Conflicts of Interest and Constituted Substantial Facts That They Failed to Disclose

51. As described in this section, the Defendants had compensation arrangements with T2 Capital and the T2 Funds through Ausdal, which resulted in Criterion Clients having to pay greater remuneration to the T2 Funds' general partner than other similarly situated investors. This represented a conflict of interest. The Defendants' arrangements, and their failure to make sufficiently specific disclosures were contrary to industry customs and practices.

### A. The Compensation Arrangements with the T2 SREI and T2 Opportunity Funds Created Conflicts of Interest

52. As described in Section V above, conflicts of interest arise when investment advisers have a pecuniary interest in recommending an investment to their clients, including through the receipt of fees, commissions, or other compensation.[112] As noted in Section VI above, Criterion's Form ADV acknowledged that third-party compensation arrangements could give rise to conflicts of interest.[113]

---

[110] Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 48; Southard Testimony, pp. 114:24–116:10; Searcy Deposition, p. 214:3–20.
[111] Brown Testimony, p. 154:10–13. See also Searcy Deposition, p. 196:2–11.
[112] Rand Institute Report, p. 13.
[113] See, e.g., Testimony Exhibit 9, pp. 13–14; RFA Exhibit 103, pp. 13–14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 14–15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 16–17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, pp. 16–17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, pp. 14–15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, pp. 15–16.

53. The compensation arrangements, described in Section VII.A above and summarized in **Exhibit 1**, among the T2 SREI Class C, T2 AOF IV fund, Ausdal, and Mr. Gravette and Mr. MacArthur created conflicts of interest consistent with industry customs and practices. Because Mr. Gravette and Mr. MacArthur were entitled to receive 95% of the compensation paid to Ausdal for placing clients, they had a pecuniary interest in recommending investment in the T2 SREI Class C and T2 AOF IV fund that competed with their duty to act in the best interests of Criterion Clients.[114]

54. This conflict of interest was twofold. First, the compensation arrangements created an incentive for the Defendants to recommend that Criterion Clients invest in the T2 SREI Class C and T2 AOF IV fund rather than other comparable investments such as the T2 SREI Class A and T2 OF IV fund. Second, the compensation arrangements created an incentive for the Defendants to advise that Criterion Clients keep their capital invested in the T2 SREI Class C and T2 AOF IV fund because the compensation payable to Mr. Gravette and Mr. MacArthur was not a one-time transaction-related commission but an ongoing stream of income. The compensation was ongoing because Ausdal was to receive a share of the general partner's performance allocation, so long as its clients remained invested in the 2 SREI Class C and the T2 AOF IV fund.[115]

### B. The Compensation Arrangements Represented Substantial Facts for Consideration by Criterion Clients

55. In my experience, the dual structure of the T2 Funds and the fact that they offered different performance allocation terms, constituted facts that could be of substantial importance to prospective investors into the T2 SREI Class C units and T2 AOF IV fund. As noted in Sections VII.A and VII.B above, the dual class structure of the T2 SREI fund and the feeder fund structure of the T2 Opportunity Funds were primarily driven by the compensation arrangements among Mr. Gravette and Mr. MacArthur, T2 Capital, and T2 SREI and T2 AOF IV through Ausdal. There was no substantive difference between Class A and Class C units, or between T2 OF IV and T2 AOF IV, except for the manner in which profits or fund distributions were

[114] Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6, p. 1; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.
[115] Testimony Exhibit 67, T2CAPITAL_SEC_00000013–24 at 14–15; Testimony Exhibit 80, T2CAPITAL_SEC_00000957–67 at 58–59.

allocated between investors and the general partner. As a result of those differences in performance allocation terms, including carried interest, investors in T2 SREI Class C and T2 AOF IV, all Criterion Clients, were likely to receive lower overall returns than investors in T2 SREI Class A and T2 OF IV did, all other conditions being the same. As such, information about the dual class or fund structure would be relevant to an investor's decision-making, and therefore constitutes a substantial fact to disclose to investors. Indeed, one investor in T2 AOF IV asserted that he was not made aware of certain facts that would have had a bearing on his decision to invest, including details concerning the compensation the Defendants stood to earn from his investment and how such compensation could negatively affect his returns.[116]

### C. Defendants Failed to Sufficiently Disclose the Compensation Arrangements with T2 Capital, T2 SREI, and T2 AOF IV, and the Conflicts of Interest They Created

56. As introduced in Section V above, investment advisers are required to make full and fair disclosure of conflicts of interest and other facts relating to an investment recommendation, such as the capacity in which the adviser provides investment advice to the client. For disclosure to be full and fair, it should be sufficiently specific, taking into account the nature of the client, scope of services being offered, and conflicts of interest or facts that could be of substantial importance to prospective investors.[117] Furthermore, for disclosure to be considered full and fair, it must be tailored to the client's profile, such that the client is able to understand the material fact or conflict of interest and make an informed decision as to whether to provide consent.[118]

57. The majority of the Criterion Clients were retail investors.[119] As noted in Section V, such investors typically do not have the same resources as institutional investors to evaluate the risks associated with alternative investment products and their suitability. Thus, in my experience, they should have been provided with sufficiently specific disclosures about the terms of their investments in T2 SREI Class C and T2 AOF IV relative to those of T2 SREI Class A and T2 OF

[116] Denard Declaration, ¶ 19.
[117] See SEC Release No. IA-5248, p. 25; SEC Release No. IA-4048, p. 11.
[118] See SEC Release No. IA-5248, p. 22; SEC Release No. IA-3060, p. 15; *SEC v. Capital Gains Research Bureau, Inc., et al.*, 375 U.S. 180 (1963), p. 12; SEC Release No. IA-4048, p. 11.
[119] Testimony Exhibit 21, CRITERION_SEC_00093345–56 at 53, 55.

IV, and any related conflicts of interest, to enable them to make an informed investment decision.

58. As detailed in Section VI above, Criterion committed in its Forms ADV and Policies and Procedures Manual to disclose the existence of all conflicts of interest to clients, and committed in its Forms ADV to disclose the compensation it received in exchange for investor referral services in writing in a separate disclosure document.[120] However, based on my review and analysis of the information provided to me, there is no evidence of specific disclosures or of a separate disclosure document disclosing the following facts: that (1) Mr. Gravette and Mr. MacArthur would receive compensation from Ausdal for referring investors to T2 SREI Class C and T2 AOF IV; (2) as a result of the compensation arrangements, the Defendants faced conflicts of interest; and (3) investors in T2 SREI Class C and T2 AOF IV would likely receive a lower overall return than other similarly situated investors in T2 SREI Class A and T2 OF IV when performance exceeded the hurdle rates stipulated in their respective offering materials.

59. During his testimony, Mr. Gravette asserted that verbal disclosures about the compensation arrangements were made to Criterion Clients.[121] Even if such verbal disclosures were made, because they were not documented in writing, they would be inconsistent with both (1) Criterion's acknowledgement in its Forms ADV that it would disclose conflicts of interest in writing,[122] and (2) industry customs and practices to disclose conflicts of interest in writing as shown in the examples below.

60. I understand that the Defendants point to three main sets of documents as containing disclosures about the compensation arrangements: Criterion's Forms ADV, Investment advisory agreements,[123] and the PPMs of the products in which clients invested.[124] However, as shown below, even when considered together, those documents do not contain sufficiently specific disclosure of the relevant facts listed above.

---

[120] See, e.g., Testimony Exhibit 9, pp. 13–14. See also RFA Exhibit 103, pp. 13–14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 14–15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 16–17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, pp. 16–17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, pp. 14–15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, pp. 15–16; Testimony Exhibit 7, CRITERION_SEC_00606927–61 at 57.
[121] Gravette Testimony, pp. 105:13–106:7.
[122] See Section VI above.
[123] Gravette Testimony, p. 58:15–19.
[124] Gravette Testimony, pp. 101:21–103:16; MacArthur Testimony, pp. 51:23–52:23.

### 1. Criterion's Forms ADV Did Not Contain Sufficiently Specific Disclosures

61. As summarized in **Exhibit 2**, Criterion's Forms ADV included broad disclosures describing the fact that Criterion's representatives may, hypothetically, receive compensation for recommending certain investments to clients. For example, Item 5 of Criterion's 2014 Form ADV Part II stated:

> When appropriate and suitable, our adviser representatives **may** recommend certain Alternative Asset investments (i.e. private securities) to CWM client in which the associated person **may** receive separate and typical compensation (i.e. compensations) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CWM client chooses to invest in these securities and an associated person of CWM receives separate compensation from the sale of an Alternative Asset Investment, that Asset will be excluded from the CWM fee calculation as described above. This creates a conflict of interest between the CWM and its clients.[125]

62. The use of the hypothetical term "may" in the aforementioned disclosure renders it insufficient where the circumstances giving rise to the conflict already exist. Mr. Gravette and Mr. MacArthur were receiving, through Ausdal, compensation for investor referrals from legacy funds launched by T2 Capital (e.g., T2 Asset Opportunity Funds II and III) at the time the Defendants were recommending T2 SREI Class C and T2 AOF IV to Criterion Clients.[126]

63. Item 5 then referenced Item 10 of the same Form ADV Part II as containing "important disclosures" about those potential conflicts of interest.[127] However, Item 10 did not contain sufficiently specific disclosures about the source and nature of compensation arrangements with the T2 SREI Class C and T2 AOF IV fund. Instead, it merely alluded to the relationship between

---

[125] See, e.g., RFA Exhibit 103, p. 7; Testimony Exhibit 9, p. 7; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, p. 7; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 9; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, p. 9; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, p. 7; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, p. 8. (emphasis added).

[126] Testimony Exhibit 6, p. 6.

[127] See, e.g., RFA Exhibit 103, p. 7; Testimony Exhibit 9, p. 7; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, p. 7; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 9; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, p. 9; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, p. 7; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, p. 8.

associated persons of Criterion and Ausdal, without (1) naming those associated persons, (2) describing which investment products they received compensation for referring investors to, or (3) divulging the source and terms of said compensation and their impact on client returns, or the conflicts of interest:

> Item 10 Other Financial Industry Activities and Affiliations
>
> BROKER-DEALER REGISTRATIONS
>
> Associated persons of CWM are registered securities representatives and investment adviser representatives of Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and a registered investment adviser. In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal Financial Partners, Inc. Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients.[128]

64. In fact, during his testimony, Mr. Gravette acknowledged that the Form ADV did not include specific disclosures about his and Mr. MacArthur's relationship with Ausdal and was not able to point to disclosures about the compensation arrangements with T2 Capital, T2 SREI, and T2 AOF IV in Criterion's Forms ADV.[129] The failure to disclose Mr. Gravette and Mr. MacArthur's outside affiliations is exacerbated by the fact that, as Mr. Gravette acknowledged during testimony, the structure of the compensation arrangements with T2 Capital, T2 SREI, and T2 AOF IV were "unique in the industry."[130]

65. The perfunctory nature of the conflicts of interest disclosures contained in Criterion's Forms ADV in connection with the compensation it received through Ausdal for investor referrals, can be contrasted with the more detailed disclosures Criterion made in the same Forms ADV about its relationship with TD Ameritrade. Indeed, in its 2016 Forms ADV Part II, Criterion provided extensive disclosures detailing its brokerage practices with TD Ameritrade,

---

[128] See, e.g., RFA Exhibit 103; CRITERION_SEC_00607050–7068; CRITERION_SEC_00570436–0456; CRITERION_SEC_00144778–4799; CRITERION_SEC_00531757–1779; CRITERION_SEC_00443031–3060; CRITERION_SEC_00636133–6165.
[129] Gravette Testimony, pp. 41:18–42:9, 139:18–140:8.
[130] Gravette Testimony, p. 101:14–20.

the types of services TD Ameritrade provided, compensation Criterion's representatives could receive from TD Ameritrade (including through an investor referral program), and the conflicts of interest such economic benefits could create.[131] For instance, with respect to its participation in TD Ameritrade's investor referral program, Criterion disclosed information concerning the amount, duration, and source of the referral fees payable to TD Ameritrade in connection with the AdvisorDirect referral program:

> CWM pays TD AMERITRADE an on-going fee for each successful c1ient referral. This fee is usually a percentage (not to exceed 25%) of the advisory fee that the client pays to CWM ("Solicitation Fee"). CWM will also pay TD AMERITRADE the Solicitation Fee on any advisory fees received by CWM from any of a referred c1ient's family members, including a spouse, child or any other immediate family member who resides with the referred client and hired CWM on the recommendation of such referred client. CWM will not charge clients referred through AdviserDirect any fees or costs higher than its standard fee schedule offered to its clients or otherwise pass Solicitation Fees paid to TD AMERITRADE to its clients. For information regarding additional or other fees paid directly or indirectly to TD AMERITRADE, please refer to the TD AMERITRADE AdviserDirect Disclosure and Acknowledgement Form.
>
> CWM's participation in AdviserDirect raises potential conflicts of interest. TD AMERITRADE will most likely refer clients through AdviserDirect to investment advisers that encourage their clients to custody their assets at TD AMERITRADE and whose client accounts are profitable to TD AMERITRADE. Consequently, in order to obtain client referrals from TD AMERITRADE, CWM may have an incentive to recommend to clients that the assets under management by CWM be held in custody with TD AMERITRADE and to place transactions for client accounts with TD AMERITRADE. In addition, CWM has agreed not to solicit clients referred to it through AdviserDirect to transfer their accounts from TD AMERITRADE or to establish brokerage or custody accounts at other custodians, except when its fiduciary duties require doing so. CWM's participation in AdviserDirect does not diminish its duty to seek best execution of trades for client accounts.[132]

66. Criterion's conflict of interest disclosures can also be contrasted with disclosures made by other registered investment advisers. For example, the Form ADV Part II of Park Place

---

[131] See March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 17–19; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 18–20.
[132] See March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 18–19. See also March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 19–20.

Capital, an investment adviser with $69.5 million of assets under management, includes the following disclosure about referral fees, their recurring nature, and conflicts of interest:

> **Fees for Referral Activities.** The firm receives fees based on the referral of clients to other registered investment advisers. A referral generally occurs if a client desires or needs to pursue an investment strategy that is not offered by the Firm. The referral fees are generally 25% of the advisory fee received by the third party adviser, and are paid on a recurring basis over the life of the relationship when the third party adviser receives its advisory fee for managing the referred account.[133]
>
> **Conflicts of Interest.** In addition to the compensation for investment services described above, we are also compensated for providing other financial services.… Our charges for investment services and for other financial services will include a reasonable profit for the Firm, our affiliates, and our representatives. This profit incentive creates a conflict of interest that could influence us to recommend opening or maintaining accounts that may have higher costs or less favorable services than other suitable alternatives which do not provide equivalent compensation to the Firm, our affiliates or our representatives. The Firm has established various policies and processes to address these conflicts of interest, including the following:
>
> - Disclosure to our clients of the fees described above and our affiliations in Item 10;
> - Waiver of the Firm's Management Fees otherwise due…;
> - Suitability review process at the time each account is established; and
> - Periodic account reviews after an account is established.[134]

67. As noted in Section V above, the SEC has remarked that broad, generic disclosures that merely report that the investment adviser has or may have conflicts of interest without specifically describing what circumstances give rise to those conflicts and how the investment adviser proposes to resolve them, are inadequate.[135] Based on the foregoing, the above-cited disclosures in Criterion's Forms ADV, which generally described *potential* conflicts of interest, did not contain sufficiently specific disclosures of Criterion's *actual* conflicts of interest and of

---

[133] Park Place Capital Corporation, Form ADV Part 2A, April 14, 2021, p. 4.

[134] Park Place Capital Corporation, Form ADV Part 2A, April 14, 2021, pp. 4–5. See also Bridgeworth Capital, Form ADV Part 2A, June 2018, pp. 12–14, 22.

[135] SEC Release No. IA-5248, p. 24. See also *In the Matter of The Robare Group, Ltd., et al.*, Investment Advisers Act Release No. 4566, November 7, 2016, p. 9.

the impact the compensation arrangements with T2 SREI Class C and T2 AOF IV could have on investment returns in a manner appropriate to its largely retail client base.

### 2. PPMs Did Not Constitute Investment Adviser Disclosures and Did Not Contain Sufficiently Specific Disclosures

68. The T2 SREI PPM and T2 SREI Class C Supplement to the T2 SREI PPM, and the T2 AOF IV PPM, were issued by the fund sponsors and did not constitute Criterion documents.[136] Hence, they did not constitute Defendants' disclosure. Any information the PPMs may have contained regarding the compensation arrangements with Ausdal could not directly fulfill Criterion's obligation to provide clients with specific disclosures about conflicts of interest and any material facts relating to the investment advisory relationship.

69. Even assuming the T2 Funds PPMs could substitute for Criterion's own disclosures, which they cannot, they did not contain sufficiently specific disclosures of the compensation arrangements among Mr. Gravette and Mr. MacArthur and T2 Capital, T2 SREI, and T2 AOF IV, through Ausdal. Indeed, while the T2 SREI and T2 AOF IV PPMs note that the funds *may* engage selling agents to offer and sell units in exchange for a compensation paid out of the manager's management fee or profit allocation, the PPMs do not list Mr. Gravette and Mr. MacArthur as placement agents or as affiliates to the placement agents.[137]

70. Moreover, neither the T2 SREI PPM nor the Class C Supplement to the T2 SREI PPM (the "T2 SREI Class C Supplement") disclosed the existence of Class A and the fact that Class A's performance allocation terms were more favorable than Class C's. Instead, the PPM merely disclosed the *possibility* that the T2 SREI could offer "additional or customized classes of Units,…as the Manager may determine, without notice to, or the consent of, the Members" (i.e., the investors).[138] The Class C Supplement to the T2 SREI PPM also did not disclose the existence of Class A or its specific, more favorable, performance allocation terms.[139]

---

[136] Testimony Exhibit 14, CRITERION_SEC_00052549–606; Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71; Testimony Exhibit 15, CRITERION_SEC_000494644–79.
[137] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 265; Testimony Exhibit 15, CRITERION_SEC_00049644–79; Denard Declaration, Exhibit 3B, pp. 8–9.
[138] Testimony Exhibit 69, T2CAPITAL_SEC_00000237–376 at 253; Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71.
[139] Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71.

71. While the T2 SREI Class C Supplement did present the details of the fees payable by investors and the methodology according to which profits were to be allocated between investors and the general partner, it did not disclose how those terms differed from other classes of units.[140] Moreover, Criterion did not furnish the details of its third-party compensation arrangements even *after* Criterion Clients had invested their capital. Specifically, Criterion provided quarterly alternative investment fee confirmations to clients in connection with their investments in T2 SREI and T2 AOF IV, and therefore could have disclosed the details of the compensation Mr. Gravette and Mr. MacArthur earned through Ausdal from the funds in those documents.[141] They did not.

72. Finally, neither the T2 SREI PPM nor the T2 SREI Class C Supplement disclosed that Ausdal would receive half of the general partner's performance allocation in exchange for referring investors, and that Mr. Gravette and Mr. MacArthur were entitled to 95% of Ausdal's compensation. Thus, the T2 SREI PPM and T2 SREI Class C Supplement did not provide sufficiently specific disclosure of the existence of a dual fee and performance allocation structure within T2 SREI and its potential impact on investor returns. Nor did they disclose the conflicts of interest the Defendants faced as a result of their compensation arrangements.

73. The same conclusions can be drawn from a review of the T2 AOF IV PPM. Although the PPM alluded to a separate "Flagship Fund," it did not mention its specific distribution terms, the details surrounding the compensation arrangement existing between Mr. Gravette and Mr. MacArthur and the T2 AOF IV fund through Ausdal, or the conflicts of interest that arose from that compensation arrangement.[142]

74. In sum, the PPMs did not constitute Criterion disclosures. Even if the PPMs were considered Criterion disclosures, they did not contain sufficiently specific disclosures about the Defendants' conflicts of interest because they (1) did not mention Criterion, Mr. Gravette, or Mr. MacArthur and their relationship with Ausdal; and (2) did not contain sufficiently specific disclosures of the compensation arrangements that gave rise to the conflicts of interest.

---

[140] Testimony Exhibit 68, T2CAPITAL_SEC_00006469–71.
[141] See, e.g., CRITERION_SEC_00021486; CRITERION_SEC_00665192.
[142] Testimony Exhibit 15, CRITERION_SEC_00049644–79 at 57–58.

### 3. Criterion's Investment Advisory Agreements Did Not Contain Sufficiently Specific Disclosures

75. Based on my review of a sample of Criterion's investment advisory agreements, these agreements disclosed the management fees Criterion was to receive from its clients but they did not contain specific disclosures about the compensation arrangements among Ausdal, T2 Capital, T2 SREI, and T2 AOF IV, or the conflicts of interest those compensation arrangements created for the Defendants.[143] The investment advisory agreements also did not disclose Mr. Gravette and Mr. MacArthur's relationship with Ausdal. Instead, they merely disclosed the following in connection with the alternative consulting fee that would be charged to clients:

> In the event CWM is compensated directly by the fund manager or broker-dealer per SEC regulation D requirements. [*sic*] this asset is not subject to the investment management fee. Only the alternative fee will apply.[144]

76. This disclosure was incomplete because it did not mention the fact that, in addition to the alternative fee, Defendants stood to receive recurring compensation, through Ausdal, from T2 Capital, T2 SREI, and T2 AOF IV as a result of the compensation arrangements.[145] In addition, the aforementioned disclosure did not explain the potentially negative impact such double compensation may have had on the net total returns of Criterion Clients.

77. As noted in Section V above, the SEC has remarked that broad disclosures that merely report that the investment adviser has or may have conflicts of interest without specifically describing what circumstances give rise to those conflicts and how the investment adviser proposes to resolve them, are inadequate.[146] Thus, the above-cited disclosures also do not constitute sufficiently specific disclosure of the Defendants' conflicts of interest and of the impact of the compensation arrangement on the Firm's clients.

---

[143] See, e.g., Testimony Exhibit 12, CRITERION_SEC_00606920–25; Testimony Exhibit 13, CRITERION_SEC_00309944–50; CRITERION_SEC_00583609; CRITERION_SEC_00207323.

[144] See, e.g., Testimony Exhibit 12, CRITERION_SEC_00606920–25 at 21.

[145] See Section VIII.A.–B. The same observation can be made with respect to Criterion Clients' investments in the Bird Rock Companies, which are discussed in more detail in Section X below

[146] SEC Release No. IA-5248, p. 24. See also *In the Matter of The Robare Group, Ltd., et al.*, Investment Advisers Act Release No. 4566, November 7, 2016, p. 9.

78. Based on the above, even assuming an investor was apprised of the three sets of documents the Defendants point to as evidence that disclosure occurred (i.e., the PPMs, Forms ADV, and investment advisory agreements), the disclosures contained therein were not sufficiently specific to discharge the Defendants' disclosure obligations. Indeed, the disclosures did not make it possible for an investor to identify the following facts: that (1) through Ausdal, Mr. Gravette and Mr. MacArthur received compensation from T2 Capital, T2 SREI, and T2 AOF IV for referring investors to those two funds; (2) as a result of the compensation arrangements, the Defendants faced conflicts of interest in relation to their investment recommendations; and (3) investors in T2 SREI Class C and T2 AOF IV would receive a lower overall return than other similarly situated investors in T2 SREI Class A and T2 OF IV. Furthermore, in my experience, prospective investors should not need to seek out information across multiple sets of documents to be apprised with key facts about potential investments and any conflicts of interest their investment adviser may be facing.

### D. Defendants' Disclosures Related to Their Conflicts of Interest with Respect to Investors in T2 SREI Class C and T2 AOF Were Inconsistent with Industry Customs and Practices

79. As explained in Section V above, the investment adviser fiduciary duty requires investment advisers to either (1) abstain from providing investment advice when they face a conflict of interest, or (2) fully disclose the conflict and receive consent from their clients.[147] Defendants' disclosures were inconsistent with industry customs and practices because they failed to disclose the existence, duration, magnitude, and details of the compensation arrangements with T2 Capital. In addition, in recommending T2 SREI Class C and T2 AOF IV without making sufficiently specific disclosures of the source, nature, duration, and impact of the compensation arrangements, Defendants did not act in their clients' best interest. Indeed, as explained in Sections VII and VIII.B above, the compensation arrangements resulted in Criterion Clients in T2 SREI Class C or T2 AOF IV earning lower returns than other similarly situated investors in T2 SREI Class A or T2 OF IV.

[147] SEC Release No. IA-5248, pp. 12–13, 23; General Instructions for Part 2 of Form ADV, Disclosure Obligations as a Fiduciary.

80. Defendants' disclosures were inconsistent with industry customs and practices even though the compensation was contingent upon clearing the hurdle rate. As discussed above in Section V.A, investment advisers have a duty to disclose expected and actual conflicts of interest. Moreover, the compensation arrangements already existed, even if the hurdle rate had not yet been cleared. Thus, Defendants are not relieved of their duty to disclose just because the precise amount and timing of the compensation was unknown.

81. Based on the foregoing, it is my opinion that during the Relevant Period, the Defendants failed to make sufficiently specific disclosures regarding the nature, source, duration, and magnitude of the compensation Mr. Gravette and Mr. MacArthur received through Ausdal from T2 SREI and T2 AOF IV, the potential impact of the compensation arrangements on investor returns, and the conflicts of interest they created for the Defendants with respect to investors in T2 SREI Class C and T2 AOF IV. As a result, Defendants' disclosures were inconsistent with industry customs and practices.

## IX. Background on the Bird Rock Companies Offering

82. Southland II was formed to invest in commercial and residential real estate to be rehabilitated and made available for sale, and was offered to investors in 2016.[148] PWHM II was formed to invest in the debt of one or more investment vehicles formed to invest in commercial and residential real estate to be rehabilitated and made available for sale, and was offered to investors in 2015.[149]

83. As summarized in **Exhibit 1**, the Defendants had arrangements with the Bird Rock Companies and their managers to receive compensation, through Ausdal, in exchange for referring investors (the "Bird Rock Compensation Arrangements"). Specifically, under the Bird Rock Compensation Arrangements, Ausdal was to receive a recurring "placement fee" equal to 2% of the price of the units sold to Criterion Clients, annually, provided the companies generated

[148] Testimony Exhibit 16, CRITERION_SEC_00034607–60 at 07–08.
[149] Testimony Exhibit 17, CRITERION_SEC_00050753–808 at 753–754.

a preferred return equal to or greater than 8%.[150] This compensation was to be paid by the managers of the Bird Rock Companies.[151] In turn, Mr. Gravette and Mr. MacArthur were paid 95% of the compensation paid to Ausdal.[152]

## X. Defendants' Compensation Arrangements with the Bird Rock Companies Created Conflicts of Interest That They Failed to Disclose

84. As described in this section, the Defendants received compensation from the Bird Rock Companies and their managers, through Ausdal, that created conflicts of interest. Entering such arrangements through Ausdal, and failing to make sufficiently specific disclosures about them and the resulting conflicts of interest, was inconsistent with industry customs and practices.

### A. The Compensation Arrangements with PWHM II and Southland II Constituted Conflicts of Interest

85. The compensation arrangements described in Section IX and summarized in **Exhibit 1** among the Bird Rock Companies, Ausdal, and Mr. Gravette and Mr. MacArthur created conflicts of interest. Because Mr. Gravette and Mr. MacArthur were entitled to receive 95% of the fee paid to Ausdal for placing clients in the Bird Rock Companies, they had a pecuniary interest in recommending investment in those companies that competed with the best interests of Criterion Clients.[153] As noted in Section IX, because the compensation Mr. Gravette and Mr. MacArthur received was based on the value of the capital committed by referred investors, the Bird Rock Compensation Arrangements created an incentive for the Defendants to recommend that Criterion Clients invest in the Bird Rock Companies rather than other investments.

---

[150] Testimony Exhibit 16, CRITERION_SEC_00034607–60 at 09; Testimony Exhibit 17, CRITERION_SEC_00050753–808 at 755; Gravette Testimony, p. 101:9–20; Testimony Exhibit 29, CRITERION_SEC_00666478; Testimony of Daniel Niednagel, August 16, 2018 ("Niednagel Testimony"), pp. 59:12–24, 67:9–24.

[151] Testimony Exhibit 17, CRITERION_SEC_00050753–808 at 755; Testimony Exhibit 16, CRITERION_SEC_00034607–60 at 09.

[152] Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.

[153] Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6, p. 1; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.

### B. Defendants Failed to Sufficiently Disclose the Conflicts of Interest Stemming from the Compensation Arrangements with the Bird Rock Companies

86. As introduced in Section V above, an investment adviser is required to make full and fair disclosure of conflicts of interest and other material facts relating to the advisory relationship, such as the capacity in which it provides investment advice to the client. For disclosure to be full and fair, it should be sufficiently specific, including the nature of the client, scope of services being offered, and the material fact or conflict of interest.[154]

87. Furthermore, for disclosure to be considered full and fair, it must be tailored to the clients' profile so that they are able to understand key facts related to the investment product being offered, or any related conflicts of interest, and make an informed decision as to whether to provide consent.[155] In my experience, where the conflict of interest arises from third-party compensation or referral arrangements, disclosure of the fact, source, nature, and duration of the compensation is required for disclosure to be considered sufficiently specific.[156]

88. The majority of the Criterion Clients were retail investors.[157] As noted in Section V above, such investors typically do not have the same resources as institutional investors to evaluate the risks associated with alternative investment products and their suitability. Thus, in my experience, they should have been provided with sufficiently specific disclosures about conflicts of interest that Defendants encountered with respect to recommendations to invest in the Bird Rock Companies in order to enable the Criterion Clients to make informed investment decisions.

89. As detailed in Section VI above, Criterion asserted in its Forms ADV and Policies and Procedures Manual that it would disclose the existence of all conflicts of interest to clients, and committed in its Forms ADV to disclose the compensation received in exchange for investor referral services in writing in a separate disclosure document.[158] However, based on my review

---

[154] See SEC Release No. IA-5248, p. 25; SEC Release No. IA-4048.
[155] See SEC Release No. IA-5248, p. 22; SEC Release No. IA-3060, p. 15; *SEC v. Capital Gains Research Bureau, Inc., et al.*, p. 12; SEC Release No. IA-4048, p. 11.
[156] See General Instructions for Part 2 of Form ADV, Item 5.
[157] Testimony Exhibit 21, CRITERION_SEC_00093345–56 at 53, 55.
[158] See, e.g., Testimony Exhibit 9, pp. 13–14. See also RFA Exhibit 103, pp. 13–14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 14–15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 16–17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, pp. 16–17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, pp. 14–15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, pp. 15–16; Testimony Exhibit 7, CRITERION_SEC_00606927–61 at 57.

and analysis of the information provided to me, there is no evidence of specific disclosures or of a separate disclosure document disclosing the following facts: (1) Mr. Gravette and Mr. MacArthur received compensation from Bird Rock through Ausdal for referring investors to the Bird Rock Companies; and (2) as a result of the compensation arrangements, the Defendants faced conflicts of interest.

90. Mr. Gravette acknowledged during testimony that the Form ADV did not include specific disclosures about the Defendants' conflicts of interest with respect to recommendations to invest in the Bird Rock Companies.[159] Mr. Gravette also asserted that verbal disclosures about the compensation arrangements were made to Criterion Clients.[160] In my experience, even if such verbal disclosures were made, because they were not documented in writing, they would be inconsistent with both (1) Criterion's acknowledgement in its Forms ADV that it would disclose conflicts of interest in writing,[161] and (2) industry customs and practices.

91. I understand that the Defendants point to three main sets of documents as containing disclosures about the compensation arrangements: Criterion's Forms ADV, investment advisory agreements,[162] and the PPMs of the products in which clients invested.[163] However, as shown below, even when considered together, those documents do not contain full and fair disclosure of the facts listed above.

### 1. Criterion's Forms ADV Did Not Contain Sufficiently Specific Disclosures

92. As shown in Section VIII.C.1 above and **Exhibit 2**, Criterion's Forms ADV included broad disclosures describing the fact that Criterion's representatives may, hypothetically, receive compensation for recommending certain investments to clients. Among other things, consistent with industry customs and practices, the use of the hypothetical verb "may" in those disclosures renders them insufficient because Mr. Gravette and Mr. MacArthur had been receiving similar

[159] Gravette Testimony, pp. 68:13–23, 138:24–139:24.
[160] Gravette Testimony, pp. 105:13–106:7.
[161] See Section VI above.
[162] Gravette Testimony, p. 58:15–19.
[163] Gravette Testimony, pp. 101:21–103:16; MacArthur Testimony, pp. 51:23–52:23.

compensation for referring investors to other funds sponsored by Bird Rock for years before the start of the Relevant Period.[164]

93. As can be noted from **Exhibit 2**, Criterion's Forms ADV did not contain sufficiently specific disclosures about the nature of the Bird Rock Compensation Arrangements and the conflicts of interest they created. Mr. Gravette acknowledged as much during testimony.[165]

94. The SEC notes that broad disclosures that merely report that the investment adviser has or may have conflicts of interest without specifically describing what circumstances give rise to those conflicts and how the investment adviser proposes to resolve them, are inadequate.[166] Thus, disclosures contained in Criterion's Forms ADV were not sufficiently specific disclosures of Criterion's conflicts of interest with respect to the compensation arrangements with the Bird Rock Companies.

### 2. PPMs Did Not Constitute Investment Adviser Disclosures and Did Not Contain Sufficiently Specific Disclosures

95. The Southland II and PWHM II PPMs were issued by Bird Rock and do not constitute Criterion documents.[167] Hence, they do not constitute Defendants' disclosure, and any information they may contain regarding the compensation arrangements with Ausdal does not fulfill Criterion's obligation to provide clients with specific disclosures about conflicts of interest it may face in recommending investment in the Bird Rock Companies.

96. Even assuming the Bird Rock Companies' PPMs could substitute for Criterion's own disclosures, which they did not, they did not contain sufficiently specific disclosures of the compensation arrangements among Mr. Gravette and Mr. MacArthur, Ausdal, and the Bird Rock Companies. While the PWHM II and Southland II PPMs noted that Ausdal had been engaged to offer and sell units in exchange for a 2% compensation paid out of the manager's funds, they did not explicitly disclose the link between Ausdal and Mr. Gravette and Mr. MacArthur, or the fact that 95% of Ausdal's compensation was to flow through to Mr. Gravette and Mr. MacArthur

[164] Testimony Exhibit 36, BRM0008974–77; Niednagel Testimony, pp. 85:13–87:3.
[165] Gravette Testimony, pp. 68:13–23, 138:24–139:24.
[166] SEC Release No. IA-5248, p. 24. See also *In the Matter of The Robare Group, Ltd., et al.*, Investment Advisers Act Release No. 4566, November 7, 2016, p. 9.
[167] Testimony Exhibit 16, CRITERION_SEC_00034607–60; Testimony Exhibit 17, CRITERION_SEC_00050753–808.

each year.[168] Thus, the Bird Rock Companies' PPMs do not constitute sufficiently specific disclosure of the conflict of interest the Bird Rock Compensation Arrangements created for Criterion.

97. Based on the above, the Bird Rock Companies' PPMs do not constitute Criterion disclosures and do not contain sufficiently specific disclosures of the Defendants' conflicts of interest or of the Bird Rock Compensation Arrangements.

### 3. Criterion's Investment Advisory Agreements Did Not Contain Sufficiently Specific Disclosures

98. As shown in Section VIII.C.3 above, based on my review of the investment advisory agreements of Criterion that were provided to me, these agreements disclosed the management fees and alternative investment fees Criterion was to receive from its clients, but they did not contain specific disclosures about the Bird Rock Compensation Arrangements or the conflicts of interest those compensation arrangements created for Defendants.[169] Thus, as concluded in Section VIII.C.3 the disclosures contained in the investment advisory agreements did not constitute sufficiently specific disclosure of Criterion's conflicts of interest.

99. Based on the above, even assuming an investor was apprised of the three sets of documents the Defendants point to as evidence that disclosure occurred (i.e., the PPMs, Forms ADV, and investment advisory agreements), the disclosures contained therein were not sufficiently specific. Indeed, the disclosures did not enable an investor to identify the facts that (1) Mr. Gravette and Mr. MacArthur received compensation from Ausdal for referring investors to the Bird Rock Companies; and (2) as a result of the compensation arrangements, the Defendants faced conflicts of interest in relation to their investment recommendations. Furthermore, in my experience, prospective investors should not need to seek out information across multiple sets of documents to be apprised with key facts about potential investments and any conflicts of interest their investment adviser may be facing.

[168] Testimony Exhibit 16, CRITERION_SEC_00034607–60 at 09; Testimony Exhibit 17, CRITERION_SEC_00050753–808 at 755; Testimony Exhibit 29, CRITERION_SEC_00666478; Testimony Exhibit 48, CRITERION_SEC_00292942–55 at 44; Testimony Exhibit 6; Gravette Testimony, pp. 24:12–21, 44:19–23, 46:1–15; MacArthur Testimony, p. 195:20–24.

[169] See, e.g., Testimony Exhibit 12, CRITERION_SEC_00606920–25; Testimony Exhibit 13, CRITERION_SEC_00309944–50; CRITERION_SEC_00583609; CRITERION_SEC_00207323.

### C. Defendants' Disclosures Related to Their Conflicts of Interest with Respect to Investors in the Bird Rock Companies Were Inconsistent with Industry Customs and Practices

100. As explained in Section V above, the investment adviser fiduciary duty requires investment advisers to either (1) abstain from acting with a conflict of interest, or (2) fully disclose its conflicts of interest and receive consent from clients.[170] Defendants failed to make sufficiently specific disclosures regarding the nature of their compensation arrangements with the Bird Rock Companies and the conflicts of interest they created for the Defendants with respect to investors in Southland II and PWHM II. As a result, Defendants' disclosures were not consistent with industry customs and practices.

101. Based on the foregoing, it is my opinion that, during the Relevant Period, the Defendants failed to make sufficiently specific disclosures regarding the nature, source, duration, and magnitude of the compensation Mr. Gravette and Mr. MacArthur received through Ausdal from the Bird Rock Companies and the conflicts of interest it created for the Defendants with respect to investors in Southland II and PWHM II. As a result, the Defendants' disclosures were not consistent with industry customs and practices.

## XI. Criterion's Policies and Procedures Were Inconsistent with Industry Customs and Practices

102. As introduced in Section V above, the Compliance Rule requires investment advisers to adopt, implement, and annually review policies and procedures that are designed to prevent violations of the Advisers Act.[171] Mr. Gravette testified that he was aware of the Compliance Rule and its requirements.[172] Criterion codified its approach for managing and disclosing conflicts of interest and other facts relevant to investors in its Policies and Procedures Manual.[173] As explained hereafter, Criterion's Policies and Procedures Manual was inconsistent with

---

[170] SEC Release No. IA-5248, pp. 12–13, 23; General Instructions for Part 2 of Form ADV, Disclosure Obligations as a Fiduciary.
[171] 17 CFR § 275.206(4)-7(a)–(b).
[172] Gravette Testimony, pp. 47:16–48:11.
[173] See Section V above.

industry customs and practices because it was not regularly updated and was inadequate because it was perfunctory (i.e., it was not tailored to Criterion's business).

103. First, the policies and procedures in place at Criterion during the Relevant Period do not appear to have been updated after 2008, the year the Policies and Procedures Manual was created.[174] According to testimony by Mr. Jason Stauffer (Criterion's Chief Compliance Officer from December 2016 to November 2017)[175] and Mr. Larry Nakamura (Criterion's compliance consultant),[176] Criterion was still using the 2008 Policies and Procedures Manual during the Relevant Period.[177]

104. In addition, Mr. Nakamura and Mr. Stauffer confirmed that while there existed draft updated policies and procedures manuals dated 2015 and 2017 that included revisions to the 2008 version, these were not finalized and implemented.[178] Therefore, the revisions were not in effect during the Relevant Period, and Criterion's Policies and Procedures Manual was outdated since at least 2010. Further, Criterion's failure to update its Policies and Procedures Manual despite the fact that it was "consistently…a work in progress" as Mr. Stauffer testified,[179] suggests that Criterion's review of the adequacy of its Policies and Procedures Manual was incomplete and not effective. During his testimony, Mr. Nakamura explained that when he conducted his compliance consultation in 2014, Criterion did not have policies and procedures that were sufficiently formalized to allow for testing and validation.[180]

105. In my experience, such failures to devise adequately documented and regularly updated policies and procedures are inconsistent with industry customs and practices. Notably, the SEC's Office of Compliance Inspections and Examinations stated in its deficiency letter dated April 20, 2017:

[174] Testimony Exhibit 7, CRITERION_SEC_00606927–61; Stauffer Testimony, pp. 64:20–65:17; Testimony Exhibit 19, Exhibit A, p. 1.
[175] Stauffer Testimony, p. 43:4–7; Testimony Exhibit 24.
[176] Testimony of Larry Nakamura, October 19, 2018 ("Nakamura Testimony"), pp. 29:23–30:19, 41:7–42:4.
[177] Stauffer Testimony, p. 176:1–19; Testimony Exhibit 19, Exhibit A, p. 1.
[178] Testimony Exhibit 8, CRITERION_SEC_00036120–211; Nakamura Testimony, pp. 129:14–130:25; Stauffer Testimony, p. 176:1–19.
[179] Stauffer Testimony, p. 65:4–17.
[180] Nakamura Testimony, pp. 70:22–71:11. See also Nakamura Testimony, pp. 56:5–10, 71:12–72:6, 98:7–16.

> From the state of [the Policies and Procedures Manual], it is evident that Registrant has not revised its written policies and procedures in over seven years, despite significant changes to its business and applicable regulatory requirements. Registrant's failure to have enacted policies and procedures reasonably designed to prevent violations of the Advisers Act constitute a violation of Rule 206(4)-7.[181]

106. Second, Criterion's Policies and Procedures Manual was not sufficiently tailored to the needs and demands of its business. Criterion offered a broad and varied range of investment advisory services to its clients, including portfolio management, comprehensive wealth management, and investment in alternative private assets.[182] Based on my experience, when a RIA offers such a broad and diverse set of services, it should develop a policies and procedures manual that addresses the unique risks the RIA faces as a result of each type of services it offers, the conflicts of interest that may arise in connection with those services, and the specific policies and procedures the RIA commits to adopt to mitigate those risks. Consistent with this approach, Staff of the Investment Adviser Regulation Office of the SEC's Division of Investment Management has stated that an RIA's policies and procedures manual should cover at the minimum:

- Portfolio management processes, including allocation of investment opportunities among clients and consistency of portfolios with clients' investment objectives, disclosures by the adviser, and applicable regulatory restrictions;
- Trading practices, including procedures by which the adviser satisfies its best execution obligation, uses client brokerage to obtain research and other services ("soft dollar arrangements"), and allocates aggregated trades among clients;
- Proprietary trading of the adviser and personal trading activities of supervised persons;
- The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements;
- Safeguarding of client assets from conversion or inappropriate use by advisory personnel;

---

[181] Testimony Exhibit 19, Exhibit A, p. 1.
[182] See, e.g., RFA Exhibit 103, pp. 3–7; Testimony Exhibit 9, pp. 3–6; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–0456, pp. 4–5; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–4799, pp. 4–7; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–1779, pp. 4–7; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–3060, pp. 4–6; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–6165, pp. 4–6.

- The accurate creation of required records and their maintenance in a manner that secures them from unauthorized alteration or use and protects them from untimely destruction;
- Marketing advisory services, including the use of solicitors;
- Processes to value client holdings and assess fees based on those valuations;
- Safeguards for the privacy protection of client records and information; and
- Business continuity plans.[183]

107. However, Criterion's Policies and Procedures Manual did not contain sections describing the steps Criterion personnel should take to mitigate the specific risks associated with the types of services and products Criterion offered. As noted in its Forms ADV, Criterion recommended alternative assets (i.e., private securities).[184] Such assets are generally more complex, riskier, and more illiquid than publicly traded assets.[185] In my experience, disclosing the complexity and implications of investing in such assets is important when the RIA's client base includes investors that do not possess sophisticated financial knowledge. Thus, in my experience, the provision of investment advice regarding alternative assets to such investors necessitates adopting and implementing policies and procedures that ensure that advisers exercise proper care when recommending alternative assets, including when disclosing the facts that would be of substantial importance to investors, such as the nature of the investment product, fee and return expectations, and conflicts of interest.

108. Moreover, Criterion's Policies and Procedures Manual did not include guidance for disclosing the capacity in which Criterion employees provided investment advice to clients in cases where, like Mr. Gravette and Mr. MacArthur, they were also registered as broker-dealers. Relatedly, the Policies and Procedures Manual did not address the conflicts of interest such dual registration or affiliation with third party broker-dealers (e.g., Ausdal) may create for the Defendants, much less provide guidance for how to disclose or mitigate such conflicts. Indeed, Ausdal commissions represented up to 50% of Criterion's annual income.[186] The magnitude of this income stream supports the inclusion of guidance outlining the steps Criterion personnel

---

[183] Regulation of Investment Advisers, p. 41.
[184] See, e.g., RFA Exhibit 103, p. 7.
[185] See U.S. Securities and Exchange Commission, "Investor Bulletin: Private Placements Under Regulation D," September 24, 2014.
[186] Gravette Testimony, p. 43:5–9.

should take to disclose, manage, and resolve the resulting conflicts of interest in Criterion's Policies and Procedures Manual.

109. Criterion's compliance consultant, Mr. Nakamura, observed several shortcomings when advising on how to improve Criterion's compliance program. Indeed, Mr. Nakamura noted that his team recommended that the Defendants bolster the Firm's Policies and Procedures Manual by adding sections concerning the recommendations of private placements and related due diligence procedures, among other sections.[187] Based on my review, those recommendations were not reflected in the Policies and Procedures Manual in use during the Relevant Period, which had not been updated since 2008.[188]

110. Mr. Nakamura also explained that Criterion's compliance documents failed to contain procedures "one would typically find…in well drafted policies and procedures in a compliance program" to address affiliations with third-party broker dealers, or employees being registered representatives of such third parties.[189] Such procedures would have also included controls to ensure clients understood the risks associated with alternative investments such as private placements and the conflicts of interest Criterion faced in giving such investment advice.[190]

111. Based on the foregoing, it is my opinion that the policies and procedures documented by the Defendants in connection with their fulfilment of their fiduciary duties and the management of conflicts of interest were inconsistent with industry customs and practices because they were not regularly updated, and inadequate because they were perfunctory.

Executed this 20th of September, 2021

Sunil Wahal, Ph.D.

[187] Nakamura Testimony, pp. 111–112:8, 125:23–127:13; Testimony Exhibit 58, SEC-NRS-E-0001643.
[188] Testimony Exhibit 7, CRITERION_SEC_00606927–61; Stauffer Testimony, pp. 64:20–65:17; Testimony Exhibit 19, Exhibit A, p. 1.
[189] Nakamura Testimony, pp. 58:4–59:7.
[190] See Nakamura Testimony, pp. 114:18–115:5.

# Exhibit 1
# SEC vs. Criterion Wealth Management Services et al.
# Summary of Compensation Arrangements

| Fund or Company | Management Fee[1] | Preferred Rate[2] | Overall Performance Allocation To Investor[3] | Overall Performance Allocation to General Partner/Manager[3] | Ausdal Commission[4] | Individual Defendants Share of Ausdal Commission |
|---|---|---|---|---|---|---|
| T2 Opportunity Fund IV | 1.0%–1.5% | 8% | 80% | 20% | N/A | N/A |
| T2 Asset Opportunity Fund IV | 1.0%–1.5% | 8% | 60% | 40% | 50% | 95% |
| T2 Strategic Real Estate Income Fund Class A | 1.0%–1.25% | 6% | 80% | 20% | N/A | N/A |
| T2 Strategic Real Estate Income Fund Class C | 1.0%–1.25% | 6% | 60% | 40% | 50% | 95% |
| Southland Home Mortgage II | 0% | 8% | 0% | 100% | 2% | 95% |
| Pacific West Home Mortgage II | 2%[1] | 8% | 100% | 0% | 2% | 95% |

Source: Testimony Exhibit 16; Testimony Exh bit 15; Testimony Exhibit 17; Testimony Exh bit 37; Testimony Exhibit 67; Testimony Exh bit 68; Testimony Exhibit 69; Testimony Exh bit 70; Testimony Exhibit 80; Testimony Exhibit 91; Testimony of Robert Gravette

Note:
[1] The management fee varies based on the investors' commitment to each fund, as well as the timing of the commitments. Management fees are assessed as a percentage of assets under management or commitments regardless of fund performance except for Pacific West Home Mortgage II, where the management fee is only payable if the company exceeds its preferred return.
[2] The preferred rate is the minimum internal rate of return that investors are entitled to receive before the general partner/manager can receive carried interest or a share of net profits/ income from operations.
[3] The performance allocation between the investors and the general partner/manager denotes the allocation of profits or distr butions when both the preferred rate and catch-up performance provisions of the PPM are satisfied. Except for Southland Home Mortgage II, and Pacific West Home Mortgage II, a catch-up provision allows for the general partner to receive a greater share of profits than investors, after investors have received their preferred rate of return, until the overall performance allocation is reached. Thereafter, any additional net profit or net income from operations is split between investors and the general partner/manager in accordance with the performance allocation.
[4] Ausdal receives a commission from the general partner/manager for clients in exchange for referring investors to the funds or companies. For the T2 funds, this commission is profit-based (i.e. Ausdal receives 50% of general partner profits.) For Southland II and Pacific West Home Mortgage II, the commission is asset-based (i.e. Ausdal receives 2% of the value of referred investors' capital commitments to each company, annually) and the commission is paid by the company manager.

## Exhibit 2.A
## SEC vs. Criterion Wealth Management Services et al.
## Select Form ADV Part II Disclosures
## Criterion Wealth Management

| Item | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| tem 5 Fees and Compensation – Alternative Investment Fee | "When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i e. private securities) to CWM client in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CWM client chooses to invest in these securities and an associated person of CWM receives separate commission compensation from the sale of an Alternative Asset Investment, that Asset will be excluded from the CWM fee calculation as described above. This creates a conflict of interest between the CWM and its clients. Please see the important disclosures below “Commission Compensation” and additional disclosures in  tem 10 “Other Industry Affiliations”.<br>Commission Compensation<br>As disclosed in  tem 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a F NRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity(ies), these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client." | Id. | "When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i e. private securities) to CWM client in which the associated person may receive separate and typical compensation (i e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CWM client chooses to invest in these securities and an associated person of CWM receives separate commission compensation from the sale of an ~~Alternative Asset Investment, that Asset~~ alternative investment, that asset will be excluded from the CWM fee calculation as described above. This creates a conflict of interest between the CWM and its clients. Please see the important disclosures below “Commission Compensation” and additional disclosures in Item 10 “Other Industry Affiliations”.<br>Commission Compensation<br>As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity(ies), these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client." | "When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to CWM ~~client~~ clients in which the associated person may receive separate and typical compensation (i e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CWM client chooses to invest in these securities and an associated person of CWM receives separate commission compensation from the sale of an alternative investement, that asset will be excluded from the CWM fee calculation as described above. This creates a conflict of interest between the CWM and its clients. Please see the important disclosures below “Commission Compensation” and additional disclosures in  tem 10 “Other Industry Affiliations”.<br>Commission Compensation<br>As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity(ies), these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client." |
| tem 10 Other Financial Industry Activities and Affiliations – Broker Dealer Registrations | "Associated persons of CWM are registered securities representatives and investment adviser representatives of Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("F NRA") and a registered investment adviser. In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal Financial Partners, Inc. Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients." | Id. | Id. | Id. |

# Exhibit 2.A
## SEC vs. Criterion Wealth Management Services et al.
## Select Form ADV Part II Disclosures
## Criterion Wealth Management

| Item | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| tem 10 Other Financial Industry Activities and Affiliations – How We Handle Our Conflicts of Interest | "Clients should be aware that the receipt of additional compensation by CWM and its management persons or employees creates a conflict of interest that may impair the objectivity of our firm and these individuals when making advisory recommendations. CWM endeavors at all times to put the interest of its clients first as part of our fiduciary duty as a registered investment adviser; we take the following steps to address this conflict:<br>• we disclose to clients the existence of all material conflicts of interest, including the potential for us or our employees to earn compensation from the referral of clients too other registered investment advisers;<br>• we disclose to the client in a separate disclosure document the compensation we receive in exchange for the client's referral to the selected investment adviser;<br>• we collect, maintain and document accurate, complete and relevant client background information, including the client's financial goals, objectives and risk tolerance;<br>• our firm's management conducts regular reviews of each client account to verify that all recommendations made to a client are suitable to the client's needs and circumstances;<br>• we require that our employees seek prior approval of any outside employment activity so that we may ensure that any conflicts of interests in such activities are properly addressed;<br>• we periodically monitor these outside employment activities to verify that any conflicts of interest continue to be properly addressed by our firm; and<br>• we educate our employees regarding the responsibilities of a fiduciary, including the need for having a reasonable and independent basis for the investment advice provided to clients." | Id. | Id. | Id. |
| Appendix Disclosures[1] | NA | NA | NA | "Mr. Gravette is licensed to sell securities through Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and a registered investment adviser. In this capacity, Mr. Gravette will receive commission-based compensation in connection with the purchase and sale of securities. Compensation earned by Mr. Gravette in his capacity as a registered representative is separate and in addition to our advisory fees. This practice presents a conflict of interest because Mr. Gravette has an incentive to effect securities transactions for the purpose of generating commissions rather than solely based on your needs." |

Sources: Testimony Exhibit 9; 2014 Criterion Wealth Management Form ADV; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60.

Note:
[1] Appendix disclosures were only included in the 2017 form ADV

# Exhibit 2.B
## SEC vs. Criterion Wealth Management Services et al.
## Select Form ADV Part II Disclosures
## Criterion Capital Investments

| Item | 2014[1] | 2015[1] | March 2016 | August 2016 | 2017 |
|---|---|---|---|---|---|
| Item 5 Fees and Compensation – Alternative Investment Fee | NA | NA | "When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to CCI client in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CCI client chooses to invest in these securities and an associated person of CCI receives separate commission compensation from the sale of an Alternative Asset Investment, that Asset will be excluded from the CCI fee calculation as described above.<br>This creates a conflict of interest between the CCI and its clients. Please see the important disclosures below "Commission Compensation" and additional disclosures in Item 10 "Other Industry Affiliations".<br>CCI reserves the right to waive the Alternative Investment Fee if deemed appropriate.<br>Commission Compensation<br>As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity, these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client." | Id. | "When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to CCI ~~client~~ clients in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CCI client chooses to invest in these securities and an associated person of CCI receives separate commission compensation from the sale of an alternative investment, that asset will be excluded from the CCI fee calculation as described above.<br>This creates a conflict of interest between the CCI and its clients. Please see the important disclosures below "Commission Compensation" and additional disclosures in Item 10 "Other Industry Affiliations".<br>~~CCI reserves the right to waive the Alternative Investment Fee if deemed appropriate.~~<br>Commission Compensation<br>As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity~~(ies)~~, these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client." |
| Item 10 Other Financial Industry Activities and Affiliations – Broker Dealer Registrations | NA | NA | "Associated persons of CCI are registered securities representatives and investment adviser representatives of Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and a registered investment adviser. In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal Financial Partners, Inc. Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients." | Id. | Id. |

# Exhibit 2.B
## SEC vs. Criterion Wealth Management Services et al.
## Select Form ADV Part II Disclosures
## Criterion Capital Investments

| Item | 2014[1] | 2015[1] | March 2016 | August 2016 | 2017 |
|---|---|---|---|---|---|
| Item 10 Other Financial Industry Activities and Affiliations – How We Handle Our Conflicts of Interest | NA | NA | "Clients should be aware that the receipt of additional compensation by CCI and its management persons or employees creates a conflict of interest that may impair the objectivity of our firm and these individuals when making advisory recommendations. CCI endeavors at all times to put the interest of its clients first as part of our fiduciary duty as a registered investment adviser; we take the following steps to address this conflict:<br>• we disclose to clients the existence of all material conflicts of interest, including the potential for us or our employees to earn compensation from the referral of clients too other registered investment advisers;<br>• we disclose to the client in a separate disclosure document the compensation we receive in exchange for the client's referral to the selected investment adviser;<br>• we collect, maintain and document accurate, complete and relevant client background information, including the client's financial goals, objectives and risk tolerance;<br>• our firm's management conducts regular reviews of each client account to verify that all recommendations made to a client are suitable to the client's needs and circumstances;<br>• we require that our employees seek prior approval of any outside employment activity so that we may ensure that any conflicts of interests in such activities are properly addressed;<br>• we periodically monitor these outside employment activities to verify that any conflicts of interest continue to be properly addressed by our firm; and<br>• we educate our employees regarding the responsibilities of a fiduciary, including the need for having a reasonable and independent basis for the investment advice provided to clients." | Id. | Id. |
| Appendix Disclosures[2] | NA | NA | NA | NA | "Mr. Gravette is licensed to sell securities through Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and a registered investment adviser. In this capacity, Mr. Gravette will receive commission-based compensation in connection with the purchase and sale of securities. Compensation earned by Mr. Gravette in his capacity as a registered representative is separate and in addition to our advisory fees. This practice presents a conflict of interest because Mr. Gravette has an incentive to effect securities transactions for the purpose of generating commissions rather than solely based on your needs." |

Sources: March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65.

Note:
[1] Criterion Capital Investment filed its first form ADV in March 2016.
[2] Appendix disclosures were only included in the 2017 form ADV.

# Appendix A

## SUNIL WAHAL

WP Carey School of Business
Arizona State University
Tempe, AZ 85287-3906
Sunil.Wahal@asu.edu
Tel: 480-965-8755

**EMPLOYMENT**

Jack D. Furst Professor of Finance, 2005-present
Director, Center for Investment Engineering, 2018-present
Arizona State University, WP Carey School of Business

Dimensional Fund Advisors, 2008 – 2010
On leave from Arizona State University

Associate Professor of Finance, Area Chair
Emory University, Goizueta Business School, 2002 - 2005.

Assistant Professor of Finance
Emory University, Goizueta Business School, July 1997 - 2002.

Assistant Professor of Finance
Purdue University, Krannert Graduate School of Management, July 1995 - June 1997.

**PUBLICATIONS**

"Is Idiosyncratic Risk Conditionally Priced?," co-authored with Rajnish Mehra and Daruo Xie. Forthcoming, *Quantitative Economics*.

"Do properly anticipated prices fluctuate randomly? Evidence from VIX futures markets," co-authored with George Aragon and Rajnish Mehra. *Journal of Portfolio Management*. 2020, 144-159.

"The term structure of liquidity provision," co-authored with Jennifer Conrad. *Journal of Financial Economics*. 2020, 239-259.

"The profitability and investment premium: Pre-1963 evidence." *Journal of Financial Economics*. 2019, 362-371.

"High Frequency Quotation, Trading, and the Efficiency of Prices," co-authored with Jennifer Conrad and Jin Xiang. *Journal of Financial Economics*. 2015, 116, 271-291.

"Is momentum an echo," co-authored with Amit Goyal, *Journal of Financial and Quantitative Analysis*. 2015, 1237-1267.

"Investing in a global world," co-authored with Jeff Busse and Amit Goyal, *Review of Finance* 2014, 18, 561-590. Spängler IQAM Prize for the best paper on Investments.

"Style investing, comovement and return predictability," co-authored with M. Deniz Yavuz, *Journal of Financial Economics*. 2013, 107, 136-155.

"Competition among mutual funds", co-authored with Albert Wang, *Journal of Financial Economics* 2011, 99, 40-59. [Presented at CRSP Forum, 2008, Western Finance Association Meetings, 2009.]

"Performance and persistence in institutional investment management," co-authored with Amit Goyal and Jeff Busse, *Journal of Finance*.2010, 65, 765-790.

"The selection and termination of investment management firms by plan sponsors," co-authored with Amit Goyal, *Journal of Finance* 2008,63, 1805-1847. [Presented at American Finance Association Meetings, 2005 and European Finance Association Meetings, 2005.]

"Grandstanding, certification and the underprice of venture capital backed IPOs," co-authored with Peggy Lee, *Journal of Financial Economcis* 2004, 73, 375-407. [Presented at Western Finance Association Meetings, 2003, and EVI Conference, Yale University, 2001.]

"Institutional Trading and Alternative Trading Systems," co-authored with Jennifer Conrad and Kevin Johnson, *Journal of Financial Economics* 2003, 70, 99-134, [Presented at Western Finance Association Meetings, 2001.]

"Momentum Trading by Institutions," co-authored with S.G. Badrinath, *Journal of Finance* December 2002, pg 2449-2478. [Presented at American Finance Association Meetings, 2000.]

"Agency Conflicts in Closed-End Funds: The Case of Rights Offerings," co-authored with Ajay Khorana and Marc Zenner. *Journal of Financial and Quantitative Analysis*. 2002, volume 37, number 2 (lead article).

"Institutional Trading and Soft Dollars," co-authored with Jennifer Conrad and Kevin Johnson. *Journal of Finance*, 2001, volume 56. [Presented at Western Finance Association Meetings, 1998.]

"Spinoffs, Ex ante," co-authored with John McConnell and Mehment Ozbilgin. *Journal of Business*, 2001, volume 74.

"Do Institutional Investors Exacerbate Managerial Myopia?" co-authored with John McConnell. *Journal of Corporate Finance,* 2000, volume 6.

"Entry, Exit, Market Makers and the Bid-Ask Spread," *Review of Financial Studies*, 1997, Volume 10, Number 3. [Presented at Western Finance Association Meetings, 1993.]

"Pension Fund Activism and Firm Performance," *Journal of Financial and Quantitative Analysis*, 1996, Volume 31, Number 1 (lead article).

"Who Opts Out of State Antitakeover Legislation? The Case of Pennsylvania's SB 1310", co-authored with Kenneth Wiles and Marc Zenner*, Financial Management*, 1995, Volume 24, Number 3.

**NON-REFERRED AND INVITED PUBLICATIONS**

"Electronic markets and trading algorithms", *Journal of Trading*, Spring 2012

"Institutional trading costs and trading systems", co-authored with Jennifer Conrad and Kevin Johnson, *Equity Trading: Execution and Analysis*, AIMR 2003.

"The trading of Institutional Investors: Theory and Evidence", co-authored with Jennifer Conrad and Kevin Johnson, *Journal of Applied Finance*, 2002, volume 12.

**WORKING PAPERS**

"Choosing investment managers," co-authored with Amit Goyal and Deniz Yavuz.

"The anatomy of trading algorithms," co-authored with Tyler Beason.

"On the conjoint nature of value and profitability: Global evidence," co-authored with Eduardo Repetto.

"Picking partners: Manager selection in private equity," co-authored with Amit Goyal and Deniz Yavuz.

**RESEARCH IN PROGRESS**

"The shadow price of trading constraints" with Tyler Beason

"Flow volatlity and divesification" with Albert Wang.

**EDUCATION**

Ph.D., University of North Carolina at Chapel Hill, 1995.
M.B.A., Wake Forest University, 1991.
B.A. (Hons-Economics), University of Delhi, India, 1989.

**TEACHING**

Arizona State University, WP Carey School of Business:

*ASU-SAIF DBA Program in Shanghai*
Global Financial Systems: Institutional Investors
*Executive Program*
Applied Financial Management
*Evening Program*
Corporate Finance
*MBA Program*
Portfolio Engineering
Student Investment Management Fund*
*Undergraduate Program*
Entrepreneurial Finance and Private Equity
Portfolio Engineering
Student Investment Management Fund*

The Student Investment Management (SIM) Fund is managed separately for MBA and UG students. Assets are managed using quantitative strategies (not fundamental analysis) derived from verified academic research. Students integrate the portfolio management experience with the ability to write code and assess tradeoffs in live portfolios (see https://wpcarey.asu.edu/finance-degrees/investment-management). Students are frequently placed at top notch asset managers (both quatatitative investment management and hedge funds). A handful go to on graduate quantitative degrees at the very best universities.

Emory University, Goizueta Business School:

*Executive Program*
Corporate Control (WEMBA Program)
Corporate Control (Modular EMBA Program)
Financial Decision Making (DLHPM Program)
*MBA Program*
Corporate Control
*BBA Program*
Corporate Control
Corporate Finance

Purdue University, Krannert Graduate School of Management:

*Ph.D Program*
Seminar in Corporate Finance
*Undergraduate Program*
Financial Management

University of North Carolina, Kenan Flagler Business School:

Financial Management

**ACADEMIC PRESENTATIONS AND DISCUSSIONS**

AQR, 2021
Q-Group, 2021
NBER, 2020
Market Microstructure Exchange, 2020
Microstructure Online Asia-Pacific, 2020
SMU, 2020
Purdue University, 2019
NBER Summer Institute, 2019
University of Virginia, 2019
NFA, 2018
Napa Valley Conference, 2017
Finance Down Under, 2017
NBER Microstructure, 2016
ITAM, 2016
WU Guttman Center, 2016
Vienna University of Economics and Business, 2016
Bank of Korea Academy, 2015
Tokyo Stock Exchange, 2014
SEC-Center for Financial Policy Conference, 2014
Stern Microstructure Conference, 2014
Texas Quantitative Finance Festival, 2013
Financial Market Conference, Vanderbilt University, 2013
European Finance Association, 2013
Hitotsubashi University, 2013
5th Hedge Fund Research Conference, 2013
Instinet Global Conference, 2013
Pensions Investment Association of Canada, 2013
American Finance Association, 2012
University of Toronto, 2011
Babson College, 2011
Texas Christian University, 2011
Univeristy of Utah, 2011
Cass Business School, 2010, “Leading Lights in Fund Management”
Western Finance Association, 2009
NBER, 2008
CRSP Forum, 2008
Dimensional Fund Advisors, annually 2007-current
University of Virginia, 2007
University of Calgary, 2007
National University of Singapore, 2006
Singapore Management University, 2006
University of North Carolina at Chapel Hill, 2006
American Finance Association, 2006
European Finance Association, 2005, 2006
Mitsui Life Symposium, University of Michigan, 2005

Boston College, 2005
UC Irvine, 2005
Barclays Global Investors, 2005
Arizona State University, 2005
Goldman Sachs, 2005
Roudtable for Engineering Entrepreneurship Research, 2004
University of Washington, 2004
Hong Kong University of Science and Technology, 2004
Vanderbilt University, 2004
New York Stock Exchange, 2004
Western Finance Association, 2003
Atlanta Society of Financial Analysts, 2003
Yale EVI conference, 2002
Instinet Inc, 2001
Western Finance Association, 2001
University of Florida, 2001
American Finance Association, 2000
University of Kansas, 2000
Southern Methodist University, 2000
University of Western Ontario, 2000
Association of Financial Economists (ASSA), 1999
Equity Investment Strategies Summit (Practitioner Conference), 1998
Plexus Conference (Practitioner Conference), 1998
Western Finance Association, 1998
Georgia State University, 1998
University of Utah, 1997
University of Miami, 1997
University of Georgia, 1997
Association of Financial Economists (ASSA), 1996
University of Georgia, 1995
Case Western Reserve University, 1995
Purdue University, 1995
University of Notre Dame, 1995
University of North Carolina, 1995
Western Finance Association, 1993
Financial Management Association, 1993

**NON-ACADEMIC PRESENTATIONS**

5-8 presentations per year to a variety of audiences including but not limited to Sovreign Wealth Funds, Endowments, Foundations, Pension Plans, and Registered Investment Advisors (RIAs). Audience is global. Topic ranges from asset allocation and investment strategies to trading issues.

***AD HOC* REVIEWS AND EDITIORIAL POSITIONS**

*Associate Editor: Journal of Banking and Finance (2015-current)*
*Editorial Board: Annals of Finance (2017 - current)*
*Associate Editor: Financial Management (2011-2016)*
*Editorial Board: FMA Survey and Synthesis Series*

*Ad Hoc Referee for:*
*American Economic Review*
*Financial Management*
*Journal of Corporate Finance*
*Journal of Finance*
*Journal of Financial Economics*
*Journal of Financial and Quantiative Analysis*
*Journal of Financial Services Research*
*Managerial and Decision Economics*
*Quarterly Review of Economics and Finance*
*Review of Financial Studies*
*Review of Financial Economics*
*Review of Asset Pricing Studies*
*National Science Foundation*

**HONORS AND AWARDS**

Inquire Europe Award, 2020
Spängler IQAM Prize for the best paper on Investments, 2014
Distinguished Alumni Speaker, University of North Carolina, 2006
Q-Group Grant, 2004
Emory Williams Distinguished Teaching Award, 2001
Purdue Research Foundation Grant, 1997
Jay N. Ross Young Faculty Scholar Award, 1995

**SERVICE**

External expert for tenure candidates at a variety of institutions, 2010-current
External expert for NSF grants and HKUGC grants
Program Committee, Western Finance Association, 2012-present
Program Committee, Napa Valley Conference, FMA, 2012-present
Awards Committee, Financial Management Association, 2006
Track Chair, Financial Management Association, 2003
Program Committee, European Finance Association, 2003-present
Program Committee, Financial Management Association, various years
Program Committee, ASU Sonoran Winter Finance Conference, 2012-present

Investment Committee, Strategy Research Foundation (Pro Bono)
Various advice to charitable organizations (501 (c) 3))

Chair Search Committee

University Promotion and Tenure Committee, ASU 2013-2016
Faculty Council, ASU, 2010-2012
Chair, Promotion and Tenure Committee, ASU, 2005-2008, 2010-2011
Member, Recruiting Committee, ASU, 2005-2008, 2010-2011
Governance Committee, ASU, 2010-2011
Area Coordinator, Finance Area, Emory University, 2003-2005
Member, External Affairs Committee, Emory University, 2004-2005
Academic Council, Emory University, 2003-2005
Chair, Research Committee, Emory University, 2002-2004
Chair, Computing and Education Committee, Emory University, 2000-2002
Member, Computing and Education Committee, Emory University 1999-2000

**CONSULTING**

Avantis Investors (2019-Current)
Dimensional Fund Advisors (2005-2019)
Wipfli Financial Advisors, Investment Committee (Current)
Versant Capital Management, Investment Committee (Current)
Heritage Financial Services, Investment Committee
Mercer Investment Advisors, Investment Committee
Aronson+Johnson+Ortiz
MEI Corporation
Wachovia
Goodwill Industries

**DISSERATION COMMITTEES**

Tyler Beason (2021)
Pedram Jahangiry, 2016
Daruo Xie (Co-Chair), 2015
Jin Xiang (Co-Chair), 2013
Zhiyi Qian (Chair), 2012
Marko Svetina (Chair), 2008
Zhi Li, 2008
Chris Clifford, 2008
George Cashman, 2007
Albert Wang, 2007
Bharath Thothadri, 1997
Erik Lie, 1996
David Haushalter, 1996
Tim Kruze, 1996

**PROFESSIONAL AFFILIATIONS**

American Finance Association
Financial Management Association

Society for Financial Studies

# Appendix B

## Documents Considered by Sunil Wahal, Ph.D.

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Pleadings** | |
| Complaint in *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.* | February 11, 2020 |
| Joint Answer and Defenses of Defendants Criterion Wealth Management Insurance Service, inc. and Robert Allen Gravette in *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.* | May 13, 2020 |
| Answer of Defendant Mark A. MacArthur in *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.* | May 13, 2020 |
| **Requests for Admission and Exhibits** | |
| Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions to Defendant Criterion Wealth Management Insurance Services, Inc., with Exhibits 102–106, 108, 111–117 | September 3, 2021 |
| Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions to Defendant Robert Gravette, with Exhibits 102–106, 108, 111–117 | September 3, 2021 |
| Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions to Defendant Mark MacArthur, with Exhibits 102–106, 108, 111–117 | September 3, 2021 |
| **Depositions and Exhibits** | |
| Deposition of Linda Searcy, with Exhibits 1–28 | August 25, 2021 |
| **Testimonies and Exhibits** | |
| Testimony of Mark MacArthur, with Exhibits 1–21 | June 12, 2018 |
| Testimony of Jason Stauffer, with Exhibits 22–30 | July 19, 2018 |
| Testimony of Daniel Deans Niednagel, with Exhibits 31–43 | August 16, 2018 |
| Testimony of Robert A. Gravette, with Exhibits 44–50 | August 22, 2018 |
| Testimony of Larry Nakamura, with Exhibits 51–62 | October 19, 2018 |
| Testimony of Jeffrey D. Brown, with Exhibits 63–84 | May 29, 2019 |
| Testimony of John Southard, with Exhibits 85–99 | December 16, 2019 |
| **Declarations and Exhibits** | |
| Declaration of Patrick Denard, M.D., with Exhibits 1–11 | January 16, 2020 |
| Declaration of David Chow | January 17, 2020 |
| **Regulatory Materials** | |
| Advisers Act Rule 206(4)-3 | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| 15 U.S. Code § 80b–2 (17) | |
| 17 CFR § 275.206(4)-7(a) | |
| 17 CFR §240.17(a)(3) | |
| Securities and Exchange Commission, 17 CFR Parts 240 and 249, Release No. 34-70073 "Broker-Dealer Reports" | |
| Securities and Exchange Commission, 17 CFR Parts 275 and 279, Release No. IA-3060, "Amendments to Form ADV" | October 12, 2010 |
| Securities and Exchange Commission, 17 CFR Part 276, Release No. IA-5248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers" | |
| SEC Release No. IA-4048 | |
| Securities and Exchange Act of 1934, §3(a)(4)–(5) | |
| FINRA Rule 2111 | |
| FINRA Rule 4511 | |
| FINRA Rule 5310 | |
| Staff of the Investment Adviser Regulation Office Division of Investment Management U.S. Securities and Exchange Commission, "Regulation of Investment Advisers by the U.S. Securities and Exchange Commission", Securities and Exchange Commission | March 2013 |
| Securities and Exchange Commission, "Recommendation of the Investor Advisory Committee Broker-Dealer Fiduciary Duty" | November 2013 |
| **Research Papers** | |
| Hung, Angela A., Clancy Noreen et al., "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers," Rand Institute for Civil Justice Technical Report, 2008 | |
| Stephen Foerster, et al., "Retail Financial Advice: Does One Size Fit All?" (Chicago Booth Paper No. 1438, Chicago, IL, July 2015) | |
| Juhani T. Linnainmaa, et al. "The Misguided Beliefs of Financial Advisors," *The Journal of Finance* 76, Issue 2, November 28, 2020, pp. 587–621 | |
| **Other Materials and Webpages** | |
| Bob Veres, "2017 Planning Profession Fee Survey," *Inside Information* | |
| Bridgeworth, LLC, Form ADV Part 2A Brochure | June 2018 |
| FINRA, About, https://www finra.org/about | |
| FINRA, Registered Financial Professionals, https://www.finra.org/investors/learn-to-invest/choosing-investment-professional/registered-financial-professionals | |
| Form ADV Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, Annual Amendment for Criterion Wealth Management Insurance Services, Inc., dba Criterion Wealth Management, Securities and Exchange Commission | March 30, 2016 |
| Form ADV Part 2A, Park Place Capital Corporation | April 14, 2021 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| NASAA, Investment Adviser Guide | |
| Opinion of the Commission Investement Adviser Proceeding Cease-and-Desist Proceeding in the matter of *The Robare Group, Ltd., Mark L. Robare and Jack L. Jones, Jr.* | |
| SEC Division of Trading and Markets, "Guide to Broker-dealer Registration," https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm html#II | April 2008 |
| Securities and Exchange Commission, "General Instructions for Part 2 of Form ADV," https://www.sec.gov/about/forms/formadv-part2.pdf | |
| Securities and Exchange Commission, 17 CFR Part 276, Release No. IA-5248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers," https://www.sec.gov/rules/interp/2019/ia-5248.pdf | |
| Securities and Exchange Commission, Form ADV Part 1A, https://www.sec.gov/about/forms/formadv-part1a.pdf | |
| Securities and Exchange Commission, Form ADV Part 1B, https://www nasaa.org/wp-content/uploads/2011/08/Form-ADV-Part-1B.pdf | |
| Securities and Exchange Commission, Form ADV Part 2, https://www.sec.gov/about/forms/formadv-part2.pdf | |
| Securities and Exchange Commission, Investor Bulletin: Form ADV – Investment Adviser Brochure and Brochure Supplement, https://www.sec.gov/oiea/investor-alerts-bulletins/ib_formadv.html | June 24, 2016 |
| Securities and Exchange Commission, National Exam Program Risk Alert, OCIE's 2016 Share Class Initiative, Volume V, Issue 2 | July 13, 2016 |
| *Thomas v. Metropolitan Life Insurance Company* 631 F.3d 1153 (10th Cir. 2011) | |
| *SEC v. Capital Gains Research Bureau, Inc., et al.* 375 U.S. 180 (1963) | |
| **Produced Documents** | |
| Part 2A of Form ADV, Bird Rock Management, LLC<br>*CRITERION_SEC_00626308–20* | January 26, 2014 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services Inc. | March 10, 2014 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments<br>*CRITERION_SEC_00607050–68* | March 23, 2015 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments<br>*CRITERION_SEC_00144778–99* | March 30, 2016 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services Inc. d.b.a. Criterion Wealth Management<br>*CRITERION_SEC_00570436–56* | March 30, 2016 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services Inc., d.b.a. Criterion Capital Investments<br>*CRITERION_SEC_00531757–79* | August 19, 2016 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Part 2A of Form ADV, Bird Rock Management, LLC<br>*BRM000602–17* | March 29, 2017 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services Inc., d.b.a. Criterion Capital Investments<br>*CRITERION_SEC_00636133–65* | March 31, 2017 |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services Inc. d.b.a. Criterion Wealth Management<br>*CRITERION_SEC_00443031–60* | March 31, 2017 |
| Agreement between Ausdal Financial Partners and Pacific West Home Mortgage II, LLC<br>*BRM0007210–6* | June 26, 2016 |
| Class A Units Supplement to Confidential Private Placement Memorandim relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2_00000244* | April 2015 |
| Class A Units Supplement to Confidential Private Placement Memorandim relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2CAPITAL_SEC_00007911* | June 2015 |
| Class A Units Supplement to Confidential Private Placement Memorandim relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2_00031721* | February 2020 |
| Class A Units Supplement to Confidential Private Placement Memorandim relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2_00031548* | July 2020 |
| Class C Units Supplement to Confidential Private Placement Memorandum relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2CAPITAL_SEC_00006469–71* | April 1, 2014 |
| Class C Units Supplement to Confidential Private Placement Memorandum relating to T2 SREI Fund CA, LLC, et al.<br>*T2_00015353; T2_00011570* | September 30, 2014 |
| Class C Units Supplement to Confidential Private Placement Memorandum relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2CAPITAL_SEC_00008693* | June 2015 |
| Class C Units Supplement to Confidential Private Placement Memorandum relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2CAPITAL_SEC_00000237–376* | April 2015 |
| Class C Units Supplement to Confidential Private Placement Memorandim relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*CRITERION_SEC_00588576* | May 2017 |
| Confidential Private Placement Memorandum relating to T2 SREI Fund CA, LLC, et al.<br>*T2_00011938* | September 30, 2014 |
| Confidential Private Placement Memorandum relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*T2CAPITAL_SEC_00000013* | April 1, 2014 |
| Confidential Private Placement Memorandum relating to T2 Strategic Real Estate Income Fund, LLC, et al.<br>*CRITERION_SEC_00031497* | May 2015 |

| Document Title, Bates Numbers | Document Date |
| --- | --- |
| Confidential Private Placement Memorandum, Pacific West Home Mortgage II, LLC<br>*CRITERION_SEC_00585766; BRM0002387* | February 16, 2015 |
| Confidential Private Placement Memorandum, Pacific West Home Mortgage II, LLC<br>*CRITERION_SEC_00050753–808* | May 2016 |
| Confidential Private Placement Memorandum, Pacific West Home Mortgage II, LLC<br>*CRITERION_SEC_00253686* | May 25, 2016 |
| Confidential Private Placement Memorandum, Southland Home Mortgage II, LLC<br>*CRITERION_SEC_00034607–60* | February 2015 |
| Confidential Private Placement Memorandum, T2 Asset Opportunity Fund IV, LP<br>*T2CAPITAL_SEC_00012920–56* | August 1, 2014 |
| Confidential Private Placement Memorandum, T2 Asset Opportunity Fund IV, LP<br>*CRITERION_SEC_00461657* | December 1, 2014 |
| Confidential Private Placement Memorandum, T2 Asset Opportunity Fund IV, LP, February 2015<br>*CRITERION_SEC_00033785* | February 2015 |
| Confidential Private Placement Memorandum, T2 Asset Opportunity Fund IV, LP<br>*CRITERION_SEC_00112652* | March 2015 |
| Confidential Private Placement Memorandum, T2 Opportunity Fund IV, LP<br>*CRITERION_SEC_00046933* | August 1, 2014 |
| Confidential Private Placement Memorandum, T2 Opportunity Fund IV, LP<br>*T2CAPITAL_SEC_00029858* | March 2015 |
| *CRITERION_SEC_00093345–56* | |
| Draft Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments<br>*CRITERION_SEC_00189050* | January 1, 2016 |
| Email from John Felker to Jeff Baxter, et al., Re: T2 SREI Fund Fact Sheet - Class C Shares<br>*T2Capital_SEC_00013594–7* | June 20, 2014 |
| Email from Odama, Yumiko to Denard, Patrick, Re: Memorandum, T2 Asset Opportunity Fund IV<br>*CRITERION_SEC_00118968* | March 6, 2015 |
| Form ADV, T2 Capital Management, LLC | |
| Investment Adviser Policies and Procedures Manual<br>*CRITERION_SEC_00369585* | June 12, 2015 |
| Investment Adviser Policies and Procedures Manual<br>*CRITERION_SEC_00036120* | June 6, 2017 |
| Investment Adviser Policies and Procedures Manual, 2015<br>*CRITERION_SEC_00252302* | |
| Investment Adviser Policies and Procedures Manual, 2017<br>*CRITERION_SEC_00207685* | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00076000* | October 1, 2009 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00066872* | October 22, 2009 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00075796* | October 28, 2009 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00070710* | September 17, 2013 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00606920–5* | May 1, 2014 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00070008* | June 10, 2014 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00077181* | November 1, 2014 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00073451* | August 4, 2015 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00631372* | September 1, 2015 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00078859* | March 30, 2016 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00562489* | March 31, 2016 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00148426* | December 20, 2016 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00309944–50* | December 26, 2016 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00207323* | March 1, 2017 |
| Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments *CRITERION_SEC_00583609* | March 31, 2017 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Letter from Mark MacArthur and Robert Gravette of Criterion Capital Investments to Mr. and Mrs. David C. Chow, Re: Recent Material Changes<br>*CRITERION_SEC_00015251* | August 12, 2016 |
| Letter from Sang W. Lee, of Securities and Exchange Commission to Robert A. Gravette, et al. Re Examination of Criterion Wealth Management Insurance Services, Inc. ("Registrant")(SEC File No. 801-67247)<br>*CRITERION_SEC_00000025–62* | April 20, 2017 |
| Placement Agreement by and among T2 Asset Opportunity Fund IV, et al. and Ausdal Financial Partners, Inc.<br>*T2CAPITAL_SEC_00000957–68* | March 2, 2015 |
| Placement Agreement by and among T2 Strategic Real Estate Income Fund, LLC, et al. and Ausdal Financial Partners, Inc.<br>*T2CAPITAL_SEC_00000013–24* | April 1, 2014 |
| Registered Representative's Agreement by and between Mark A. MacArthur and Robert B. Ausdal & Co., Inc.<br>*AUSDAL_001482–5* | November 7, 2006 |
| Registered Representative's Agreement by and between Robert A. Gravette and Robert B. Ausdal & Co., Inc.<br>*AUSDAL_001477–80* | November 13, 2006 |
| Sample Investment Advisory Agreement by Criterion Wealth Management Insurance Services, Inc. dba Criterion Capital Investments<br>*CRITERION_SEC_00122148* | May 1, 2014 |
| David C. and Vicky W. Chow Alternative Investment Fee Confirmation as of 6/30/2016<br>*CRITERION_SEC_000212486* | |
| James M. and Lynn Johnston Alternative Investment Fee Confirmation for the period 10/1/2015 – 12/31/2015<br>*CRITERION_SEC_00665192* | |

**Note: In addition to the documents on this list, I considered any other document cited in my report and exhibits to form my opinions.**