# EXHIBIT 1002

***Securities and Exchange Commission***
***v.***
***Criterion Wealth Management Insurance Services, Inc., Robert Allen Gravette, and Mark Andrew MacArthur***

# Rebuttal Expert Report of Sunil Wahal, Ph.D.

October 15, 2021

EXHIBIT
1002

Case
20-cv-01402

Exhibit
1002

# Table of Contents


I. Qualifications ........ 1

II. Introduction ........ 2

III. Summary of Opinions ........ 2

IV. Ms. Jarcho Lacks a Reasonable Basis to Claim That the Investments Were Sold by Mr. Gravette and Mr. MacArthur Solely in Their Capacity as Registered Representatives of Ausdal, and Not as Investment Adviser Representatives ........ 3

- A. Ms. Jarcho Fails to Establish That Mr. Gravette and Mr. MacArthur Sold the Investments Solely in Their Capacity as Broker-Dealer Representatives ........ 4
- B. Ms. Jarcho Does Not Address Industry Customs and Practices Indicating That Dually Registered Advisers Are Expected to Inform Clients of Expected Conflicts of Interest ........ 8

V. Ms. Jarcho Fails to Establish That the Defendants' Disclosures Were Sufficient ........ 10

VI. Ms. Jarcho Fails to Establish That the Defendants' Compensation Arrangements Were Not to the Detriment of Criterion Clients' Investment Returns ........ 13

## I. Qualifications

1. I am the Jack D. Furst Professor of Finance and Director of the Center for Investment Engineering at the W.P. Carey School of Business, Arizona State University. Prior to joining the Arizona State University faculty in 2005, I was on the faculties at Emory University and Purdue University.

2. I am a consultant to Avantis Investors, an investment brand from global asset manager American Century Investments. From 2005 to 2019, I was a consultant to Dimensional Fund Advisers, a private investment firm, and prior to that, a consultant to AJO Partners, an investment management firm.

3. I am a member of the investment committees of several registered investment advisers. In addition, I am a regular speaker at academic and practitioner conferences and have given numerous presentations to sovereign wealth funds, endowments, foundations, family offices, pension plans, and registered investment advisers.

4. My academic research focuses on topics such as delegated portfolio management and asset allocation for large institutional investors, as well as investment strategies and trading issues as they relate to public equities, fixed income, and private equity. I have published papers in the *Journal of Finance*, the *Journal of Financial Economics*, the *Review of Financial Studies*, and numerous other journals.

5. I hold a Bachelor of Arts degree in Economics from the University of Delhi, India, a Master of Business Administration from Wake Forest University, and a Ph.D. in Finance from the University of North Carolina–Chapel Hill. A copy of my curriculum vitae, which includes a list of my publications in the last ten years, is attached hereto as Appendix A. I have not testified as an expert witness in the last four years.

6. I am being compensated at a rate of $500 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direct supervision. My compensation in this matter is not in any way contingent or based on the content of my opinion or the outcome of this matter.

## II. Introduction

7. I have been retained by counsel for the SEC to provide expert testimony in the matter *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., Robert Allen Gravette, and Mark Andrew MacArthur*. I filed an expert report in this matter on September 20, 2021 ("Initial Report") in which I analyze the disclosures the Defendants made to their clients regarding the compensation arrangements the Defendants had, through Ausdal, with T2 Capital, Bird Rock, T2 SREI, T2 AOF IV, and the Bird Rock Companies.[1] In that report, I opine on whether the Defendants' disclosures were consistent with industry customs and practices during the Relevant Period (i.e., between 2014 and 2017). I also evaluate the adequacy of Criterion's policies and procedures during the Relevant Period.

8. I have been asked to evaluate and respond to the analysis and opinions of Ms. Jane Jarcho as expressed in her expert report dated September 20, 2021 (the "Jarcho Report") relevant to the scope of my Initial Report.[2] The materials I considered in forming my opinions in this matter are cited in this report and listed in Appendix B.

9. My work in this matter is ongoing, and I reserve the right to revise my opinions should additional information become available to me, or in response to any expert reports submitted by the Defendants.

## III. Summary of Opinions

10. Based on my analysis of the Jarcho Report, my opinions as stated in my Initial Report have not changed. In this report, I respond to the opinions of Ms. Jarcho. I have concluded the following:

a. Ms. Jarcho fails to establish that Mr. Gravette and Mr. MacArthur sold the investments solely in their capacity as registered representatives of a broker-dealer—not in their capacity as investment adviser representatives.

---

[1] This report supplements my Initial Report. As such, it does not repeat the material included in that report (e.g., Section II: Relevant Parties, and Section V: Customs and Practices for Investment Advisers and Broker-Dealers). Unless otherwise indicated, all defined terms are those used in my Initial Report.

[2] As stated in my Initial Report, I have been asked to provide testimony as an expert in customs and practices of investment advisers and broker-dealers. I have not been asked to provide, nor do I intend to offer, legal opinions.

Her analysis lacks evidentiary support and is inconsistent with relevant facts and circumstances. Moreover, Ms. Jarcho does not address that, consistent with industry customs and practices, dually registered advisers are expected to inform clients of expected conflicts of interest.[3]

b. Ms. Jarcho fails to establish her claim that "all compensation [the Defendants] received was disclosed."[4] To the extent that disclosure of *compensation* as opposed to disclosure of *conflicts of interest* is relevant, her claim is inconsistent with the documentary evidence. Her assertion is also inconsistent with industry customs and practices.

c. Ms. Jarcho does not have a reasonable basis for her assertions that the Defendants' compensation arrangements did not negatively impact Criterion Clients' investment returns.

## IV. Ms. Jarcho Lacks a Reasonable Basis to Claim That the Investments Were Sold by Mr. Gravette and Mr. MacArthur Solely in Their Capacity as Registered Representatives of Ausdal, and Not as Investment Adviser Representatives

11. Ms. Jarcho opines that "Gravette and MacArthur sold the private placement investments to Criterion clients in their capacity as registered representatives of Ausdal, a broker-dealer, not as investment adviser representatives of Criterion."[5] To support her opinion, Ms. Jarcho states "that clients were told that the private placements were being sold by Ausdal or an unnamed broker-dealer."[6] She relies on two sources of disclosures to support this assertion: (1) the PPMs of PWHMII, Southland II, and T2 AOF IV; and (2) Criterion's Forms ADV.[7]

12. As explained in Section IV.A below, Ms. Jarcho fails to establish that Mr. Gravette and Mr. MacArthur sold the investments solely in their capacity as broker-dealers because her analysis lacks sufficient support and does not evaluate whether Criterion Clients were adequately

---

[3] Consistent with industry customs and practices, I refer to individuals and/or firms that are both investment advisers and broker-dealers as "dually registered advisers."

[4] Report of Jane Jarcho, Expert Witness, On Behalf of Criterion Wealth Management Insurance Services, Inc., Robert A. Gravette, and Mark A. MacArthur, September 14, 2021 ("Jarcho Report"), ¶ 12.

[5] Jarcho Report, ¶ 23.

[6] Jarcho Report, ¶ 26.

[7] Jarcho Report, ¶¶ 26–27.

informed about relevant facts and circumstances related to the advice Mr. Gravette and Mr. MacArthur provided to them. Further, as explained in Section IV.B below, Ms. Jarcho does not address that, consistent with industry customs and practices, dually registered advisers are expected to inform clients of expected and actual conflicts of interest.

### A. Ms. Jarcho Fails to Establish That Mr. Gravette and Mr. MacArthur Sold the Investments Solely in Their Capacity as Broker-Dealer Representatives

13. Ms. Jarcho states that the capacity in which an adviser sells an investment to a client "is essential to determining the disclosure obligations Defendants had to clients."[8] She then asserts that, based on her analysis, the Defendants "were acting in their capacity as a registered representative of Ausdal, the broker-dealer."[9] Her conclusion is inconsistent with relevant facts and circumstances.

14. As an initial matter, Ms. Jarcho's assertion that a dually registered adviser can be acting solely a registered representative of a broker-dealer or solely an investment adviser representative on individual transactions for the same advisory clients is inconsistent with industry customs and practices. As described in more detail below, the roles of broker-dealers and investment advisers have converged over time as each continues to provide a greater range of advice and services. Therefore, there is no bright-line test at the transaction level. Instead, as acknowledged by Ms. Jarcho, the analysis should be based on the facts and circumstances.[10]

15. Second, Ms. Jarcho's assertion that the PPMs disclosed that the investments were being sold by Ausdal or another selling agent[11] is misleading. Specifically, contrary to Ms. Jarcho's claim,[12] the disclosure that Ausdal was engaged as a selling agent is insufficient for a client to determine whether Mr. Gravette and Mr. MacArthur were acting as broker-dealer representatives.

16. Moreover, the PPMs did not disclose to Criterion Clients that Mr. Gravette and Mr. MacArthur were acting as agents of Ausdal at the time they recommended T2 SREI Class C, T2

---

[8] Jarcho Report, ¶23
[9] Jarcho Report, ¶ 25.
[10] Jarcho Report, ¶ 24.
[11] Jarcho Report, ¶ 26.
[12] Jarcho Report, ¶ 26.

AOF IV, and the Bird Rock Companies. Specifically, the PPMs for the T2 Funds and the Bird Rock Companies do not mention Mr. Gravette and Mr. MacArthur by name, and Criterion did not include a disclosure in its Form ADV filing describing the Ausdal affiliation of Mr. Gravette and Mr. MacArthur until 2017—after Criterion Clients had invested in the funds at issue.[13] As such, as explained in Section V below and as shown in my Initial Report, the PPMs and Forms ADV do not contain disclosures that specifically identify Mr. Gravette and Mr. MacArthur as registered representatives of Ausdal, nor do they identify the potential conflicts of interest that resulted from the compensation arrangements Mr. Gravette and Mr. MacArthur had entered into with the fund managers of T2 SREI, T2 AOF IV, and the Bird Rock Companies.[14]

17. Third, Ms. Jarcho fails to point to evidence that Criterion Clients were informed that Mr. Gravette and Mr. MacArthur recommended investment in T2 SREI Class C, T2 AOF IV, and the Bird Rock Companies solely as registered representatives of Ausdal, and not also as investment adviser representatives of Criterion. Specifically, Ms. Jarcho does not identify evidence that Criterion Clients were specifically informed before 2017 that Mr. Gravette and Mr. MacArthur were providing broker-dealer services rather than investment advisory services.[15]

18. Fourth, Ms. Jarcho does not reconcile her opinion that the Defendants acted solely in their capacity as broker-dealer representatives with the fact that Mr. Gravette and Mr. MacArthur recommended investment in the funds at issue as part of an ongoing investment advisory relationship. Criterion Clients were charged alternative investment consulting fees based on the amount of capital (i.e., asset value) invested in the private placements at issue in this matter,[16] and received quarterly fee statements from Criterion—their investment adviser—summarizing these charges.[17] The fact that the Defendants earned asset-based advisory fees from these

[13] Stauffer Testimony, pp. 101:15–102:8.

[14] Initial Report, Sections VIII. X.

[15] Indeed, in his deposition, Mr. MacArthur responded "No" when asked "Did you ever tell your clients that Criterion does not owe them a fiduciary duty when you recommended a private placement investment?" (Deposition of Mark Andrew MacArthur (rough draft), October 14, 2021, pp. 117:17–20.

[16] See, e.g., Testimony Exhibit 12, CRITERION_SEC_00606920–25 at 20–21 ("In certain situations, CWM will allow access to an alternative investment on a stand-alone basis to accredited investors only. This access is offered through Criterion Capital Investments and in most cases, both the investment management and alternative fee schedule (as described in section 2) will apply.… The alternative fee includes investment research and due diligence, on-site travel and follow-up, ongoing monitoring, opportunity identification, tax coordination, and report integration."). See, also, Testimony Exhibit 13, CRITERION_SEC_00309944–50 at 46

[17] See, e.g., CRITERION_SEC_00021486; CRITERION_SEC_00665192.

products and that these investments were often made in accounts identified in clients' Criterion advisory agreements, suggests that these investments were part of the Criterion Clients' investment advisory relationship with the Defendants.[18]

19. Furthermore, the compensation received by the Defendants from the T2 Funds and the Bird Rock Companies was recurring and was calculated as a percentage of the capital invested by Criterion Clients, which is akin to the type of compensation that investment advisers typically charge.[19] Conversely, broker-dealer compensation is typically transaction-based (such as a markup or commission), *not* asset-based and *not* recurring.[20] Indeed, Ms. Jarcho concedes that the asset-based compensation, such as the alternative investment consulting fee received by Mr. Gravette and Mr. MacArthur, was not typical for broker-dealers.[21] The SEC Office of Compliance Inspection and Examination, in its 2015 *Examination Priorities*, suggests that the variety of the fees charged by a dually registered representative may help define the nature of the client relationship:

> Financial professionals serving retail investors are increasingly choosing to operate as an investment adviser or dually registered investment Adviser/broker-dealer, rather than solely as a broker-dealer. **Unlike broker-dealers, which typically charge investors a commission or mark-up on purchases and sales of securities, investment advisers employ a variety of fee structures for the services offered to clients, including fees based on assets under management, hourly fees, performance-based fees, wrap fees, and unified fees.** Where an adviser offers a variety of fee arrangements, we will focus on recommendations of account types and whether they are in the best interest of the client at the inception of the arrangement and thereafter, including fees charged, services provided, and disclosures made about such relationships.[22]

20. Not only did the Defendants charge an alternative investment consulting fee based on the amount of their clients' invested capital—a fee that is typical of investment advisers (i.e., not a transaction-based fee typical of broker-dealers)—but the Defendants deducted that fee from the

---

[18] See, e.g., CRITERION_SEC_00070602–7; CRITERION_SEC_00664648; CRITERION_SEC_00073186–91; CRITERION_SEC_00666245.

[19] See Initial Report, ¶ 20.

[20] Initial Report, ¶ 21.

[21] Jarcho Report, ¶ 28.

[22] U.S. Securities and Exchange Commission, National Exam Program Office of Compliance Inspections and Examinations, "Examination Priorities for 2015," p. 2 (emphasis added).

same accounts on which they provided advisory services and from which they deducted the investment management fee.[23] Indeed, a footer to the alternative investment consulting fee confirmation explains: "The above is a breakdown of the investment management fees deducted from the account stated above which are attributable to Criterion Wealth Management ('CWM') for the stated period."[24] Moreover, Criterion's advisory agreements disclosed that the alternative investment consulting fee would cover, among other services, ongoing monitoring services,[25] which, in my experience, are also a service typically provided by investment advisers, not representatives of broker-dealers.[26]

21. Fifth, Ms. Jarcho fails to point to evidence that Criterion Clients received specific disclosures that Mr. Gravette and Mr. MacArthur would personally receive third-party compensation in return for a Client's investment in T2 SREI Class C, T2 AOF IV, and the Bird Rock Companies. Based on my review of Criterion Clients' declarations, certain Criterion Clients were introduced to the private placements at issue in this matter by Mr. Gravette or Mr. MacArthur as part of a larger conversation about their investment objectives. According to the declarations, Criterion Clients were not informed of the fact that Mr. Gravette and Mr. MacArthur would potentially receive compensation from the T2 SREI Class C and T2 AOF IV funds and from the managers of the Bird Rock Companies.[27]

22. Sixth, as described in Section IV.B below and in my Initial Report, dually registered advisers are expected to disclose the capacity in which they are acting when they provide investment advice to retail investors.[28] The majority of Criterion Clients were retail investors.[29] As such, they should have been provided with sufficiently specific disclosures about Mr. Gravette and Mr. MacArthur's outside affiliations, compensation arrangements, and conflicts of interest so that they could properly evaluate the Defendants' recommendations to invest in T2

[23] See, e.g., CRITERION_SEC_00666245; Jarcho Report, ¶ 28.
[24] See, e.g., CRITERION_SEC_00664646.
[25] See, e.g. Testimony Exhibit 13, CRITERION_SEC_00309944–50, -46.
[26] See also "Relationship Summary: Investment Advisory," Schwab Private Client Disclosure Brochure, 2021.
[27] Denard Declaration, ¶¶ 8–16, 19; Chow Declaration, ¶¶ 13–27, 30, 32.
[28] Initial Report, Section V. A.
[29] Testimony Exhibit 21, CRITERION_SEC_00093345–56 at 53, 55.

SREI Class C, T2 AOF IV, and the Bird Rock Companies.[30] However, as described in my Initial Report and reiterated in Section V below, I have not seen evidence that Mr. Gravette and Mr. MacArthur disclosed the fact that they were acting as registered representatives of Ausdal when they were recommending investments in T2 SREI Class C, T2 AOF IV, and the Bird Rock Companies to Criterion Clients.[31]

23. Finally, Ms. Jarcho fails to reconcile her opinion with industry guidelines indicating circumstances in which a broker-dealer is excluded from the definition of investment adviser. As noted in my Initial Report,[32] broker-dealers are excluded from the definition of investment advisers if (1) their performance of advisory services is **solely incidental** to the conduct of their business as brokers and dealers, and (2) they **do not receive any special compensation** for their advisory services.[33] Ms. Jarcho does not address how the Defendants qualify for this exemption given that their principal business was to provide investment advisory services and they received an asset-based fee from the securities at issue.[34]

### B. Ms. Jarcho Does Not Address Industry Customs and Practices Indicating That Dually Registered Advisers Are Expected to Inform Clients of Expected Conflicts of Interest

24. Ms. Jarcho acknowledges that the investments at issue in this matter were made by clients of Criterion.[35] She also acknowledges that Mr. Gravette and Mr. MacArthur were dually registered as investment adviser representatives and registered representatives of Ausdal.[36] In

---

[30] Initial Report, ¶ 88.

[31] Initial Report, Sections VIII., X.

[32] Initial Report, ¶ 29.

[33] 15 U.S. Code § 80b–2 (a)(11)(C); SEC Division of Investment Management, "General Information on the Regulation of Investment Advisers," March 11, 2011. See also Rand Report, p. 14 ("Because of the distinct regulatory structures of registration, disclosure, and legal duties placed on investment advisers and broker-dealers, the dividing line between these two categories has always been an important (though also an elusive) one. Under the 1940 act, registered brokers and dealers are excluded from the terms of the 1940 act so long as the following are true: Any advice that the broker-dealer gives to clients is 'solely incidental' to its business as a broker-dealer. The broker-dealer does not receive any 'special compensation' for rendering such advice.").

[34] Initial Report, ¶¶ 31, 75. In addition to the assertions discussed in this section, Ms. Jarcho asserts that because the "private placement investments were initially held in a brokerage account at Ausdal," the Defendants were acting in their capacity as registered representatives of Ausdal. (Jarcho Report, ¶ 29.) In my experience, the nature of the account in which investments are initially held does not discharge a dually registered adviser of the requirement to make disclosures about the nature of the service provided and any associated conflicts of interest.

[35] Jarcho Report, ¶ 23.

[36] Jarcho Report, ¶ 38.

my experience, once an advisory relationship has been established, the investment adviser cannot reduce his/her responsibilities without sufficiently specific disclosure. The customs and practices surrounding the disclosure of information in the investment advisory and brokerage industry are largely driven by clients' need for information, not by the individual investment adviser or broker-dealer's "belief" as to what is appropriate to disclose.

25. Ms. Jarcho asserts that "[t]he suitability standard requires broker-dealers to provide suitable investments to and deal fairly with clients but does not impose a fiduciary duty on broker-dealers."[37] While that may be appropriate for broker-dealer representatives who are not dually registered, it does not describe the customs and practices for *dually registered* investment advisers such as Mr. Gravette and Mr. MacArthur. As such, Ms. Jarcho merely refers to the suitability standard applicable to broker-dealers as the only standard applicable to the Defendants and fails to analyze whether the disclosures to which she points in support of her opinions are adequate in light of the Defendants' *dual* registration. Her analysis is, therefore, incomplete.

26. In my experience, dually registered advisers are expected to inform clients about important aspects of the advisory (and brokerage) relationship and investment opportunities they are presented. Moreover, dually registered advisers typically are expected to act in their clients' best interest. The expectation for dually registered advisers to inform clients is especially true when dealing with retail clients who are less likely to be familiar with the nuances associated with the differences between registered investment advisers and broker-dealers. As explained in my Initial Report, retail investors have fewer resources than institutional investors to analyze and understand the complexity of niche financial products and their implications.[38] The same may be said about their level of information as to the different duties and responsibilities of broker-dealers and investment advisers. Indeed, the SEC Investor Advisory Committee has observed that "personalized investment advice to retail customers should be governed by a fiduciary duty, regardless of whether that advice is provided by an investment adviser or a broker-dealer" and that "the fiduciary duty for investment advice should include, first and foremost, an enforceable,

---

[37] Jarcho Report, ¶ 23.
[38] Initial Report, ¶ 57.

principles-based obligation to act in the best interest of the customer."[39]

27. Consistent with the foregoing, in my experience, dually registered advisers typically disclose the scope of their services, related conflicts of interest, and other relevant facts regarding the relationship with the client or the investment they are recommending. Thus, in my experience, it is common and best practice for dually registered investment advisers to design disclosure processes based on their responsibility to prevent confusion among clients regarding the capacity in which investment advice is provided. As an example, a report by Pershing / BNY Mellon recognizes the importance of disclosing conflicts of interests and placing the client's interest first:

> Under the Advisers Act, a registered investment Adviser is always obligated to serve the "best interest" of its clients and not to subordinate the interests of the client to its own. In other words, a registered investment Adviser is obligated to always put client interests first. Notwithstanding that general rule, for purposes of the federal securities laws, a registered investment Adviser is permitted to render advice and make recommendations to clients in instances where it may have a conflict of interest so long as that conflict has been fully disclosed to the client and the client has consented to the advice relationship on a fully informed basis.[40]

28. In addition to the industry publication cited above, Ausdal's own supervisory procedures manual (the "Ausdal Manual") acknowledges that, under certain circumstances, a broker-dealer representative "is held to have a 'fiduciary duty' to the client."[41] As such, Ms. Jarcho fails to reconcile her opinion with the industry customs and practices.

## V. Ms. Jarcho Fails to Establish That the Defendants' Disclosures Were Sufficient

29. Ms. Jarcho asserts that "the compensation received by Defendants was fully disclosed."[42] Specifically, she asserts that "[t]hrough a series of documents, Defendants' clients received full

---

[39] SEC Investor Advisory Committee, "Recommendation of the Investor Advisory Committee Broker-Dealer Fiduciary Duty," p. 2, https://www.sec.gov/spotlight/investor-advisory-committee-2012/fiduciary-duty-recommendation-2013.pdf .

[40] Pershing and BNY Mellon, "Conflicts in a Rapidly Changing Fiduciary Landscape, Part Two: A Focus on Dually Registered or 'Hybrid' Challenges," 2016, p. 6.

[41] "Supervisory Procedures Manual," Ausdal Financial Partners, Inc., September 9, 2015 ("Ausdal Manual"), AUSDAL_000326–760 at 416.

[42] Jarcho Report, ¶ 36.

disclosure regarding their compensation and the possible conflict of interest associated with such compensation."[43] Her assertion, however, is inconsistent both with industry customs and practices, and the documentary evidence in this matter.[44]

30. As set forth in my Initial Report, in my opinion, the Defendants' disclosures as to the compensation arrangements among them, Ausdal, and the T2 Funds/Bird Rock Companies were perfunctory and thus not sufficiently specific.[45] Moreover, Ms. Jarcho fails to address Criterion's disclosure in its Forms ADV that the Firm would provide separate written disclosure of any conflicts of interest arising from referral arrangements with third parties.[46] Thus, not only are the Defendants' disclosures inconsistent with industry customs and practices, but they are also inconsistent with the Defendants' own policies, procedures, and commitments to Criterion Clients regarding disclosure of conflicts.

31. To support her opinion that the Defendants made full disclosure of the compensation, Ms. Jarcho refers to certain disclosures in (1) PPMs, (2) Forms ADV, and (3) investment advisory agreements. First, she asserts that "[t]he PPMs accurately disclosed the compensation Ausdal received and Criterion's advisory agreements accurately disclosed the advisory fees it received."[47] As described in my Initial Report, the T2 SREI PPM did not even set forth the performance allocation formula through which Ausdal would be paid. That formula appeared in a Class C Supplement that did not disclose the existence of the T2 SREI Class A units or the difference in fees charged to the investors in those units. Similarly, the T2 AOF IV PPM did not disclose the existence of the T2 OF IV fund or the difference in fees charged to the investors in that fund.[48] These documents also did not mention the specific compensation Criterion, Mr.

---

[43] Jarcho Report, ¶ 37.

[44] Ms. Jarcho's assertion is made in support of her opinion that the "Defendants satisfied their fiduciary duty to clients" (Jarcho Report, ¶ 12). Although I address the assertions underlying Ms. Jarcho's opinion, I understand that the opinion on whether the Defendants satisfied their fiduciary duty is a legal determination. Therefore, I do not intend to offer opinions whether the Defendants satisfied or breached their fiduciary duties.

[45] Initial Report, ¶ 12.

[46] RFA Exhibit 103, pp. 13–14. See also Testimony Exhibit 9, pp. 13–14; March 2016 Criterion Form ADV (CWM), CRITERION_SEC_00570436–56, pp. 14–15; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, pp. 16–17; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, pp. 16–17; March 2017 Criterion Form ADV (CWM), CRITERION_SEC_00443031–60, March 31, 2017, pp. 14–15; March 2017 Criterion Form ADV (CCI), CRITERION_SEC_00636133–65, pp. 15–16.

[47] Jarcho Report, ¶ 38.

[48] Initial Report, Section VIII.C.

Gravette, and/or Mr. MacArthur would receive from the transactions.[49]

32. Second, Ms. Jarcho asserts that the Forms ADV disclosed that individuals associated with Criterion were also associated with Ausdal.[50] She adds that the Forms ADV were "clear" that alternative investments would be offered through Ausdal and that the receipt of compensation created a conflict of interest.[51] As described in my Initial Report, the Form ADV disclosures merely alluded to the relationship between associated persons of Criterion and Ausdal, without (1) naming those associated persons; (2) describing which investment products they received compensation for when referring investors; or (3) divulging the source and terms of said compensation, the attendant conflicts of interest, and the potential impact on client returns.[52] Moreover, Ms. Jarcho points to no documents specifically identifying Mr. Gravette and Mr. MacArthur as the individuals associated with Criterion who were also Ausdal affiliates before June 2017.[53] The Forms ADV did not contain sufficiently specific disclosures of Criterion's expected and actual conflicts of interest and how the compensation arrangements impacted Criterion Clients.[54]

33. Third, Ms. Jarcho asserts that "the selling agreements between T2 and Bird Rock are with Ausdal and an officer of Ausdal, not Gravette or MacArthur."[55] However, Mr. Gravette and Mr. MacArthur received a large majority of the compensation under the agreements. Ausdal only retained 5% of the compensation while 95% was paid to Mr. Gravette and Mr. MacArthur.[56] The 5% compensation is inconsistent with Ausdal acting as the principal in the transaction.[57]

34. Finally, she asserts that "the advisory agreements were clear that **if Defendants acted in their capacity as a broker-dealer**, an investment management fee typically between 1.0-1.5% of assets under management would not be charged. Rather, Criterion, the adviser, would receive

---

[49] Initial Report, Section VIII.C.

[50] Jarcho Report, ¶ 38.

[51] Jarcho Report, ¶ 38.

[52] Initial Report, ¶ 63.

[53] Testimony Exhibit 20; Jarcho Report, ¶ 38.

[54] Initial Report, ¶ 67. As explained in my Initial Report, the fact that a contingency exists does not mean that disclosure is not necessary or warranted (Initial Report, ¶ 24).

[55] Jarcho Report, ¶ 38.

[56] Initial Report, Sections VIII.A–B, X.A.

[57] Initial Report, Sections VIII.A–B, X.A.

an Alternative Investment Consulting Fee for monitoring the investment which typically ranged from 0.25-0.50%."[58] This is inconsistent with the advisory agreement, which discloses only which of Criterion's two fee schedules will apply to a particular product: "In the event [Criterion] is compensated directly by the fund manager or broker dealer…, this asset is not subject to the investment management fee. Only the alternative fee will apply."[59] The advisory agreements do not indicate that, with respect to such investments, Mr. Gravette and Mr. MacArthur would only act as registered representatives of Ausdal (or any broker-dealer) and thus would not be subject to the responsibilities of an investment adviser. Similarly, the advisory agreements do not stipulate that the responsibilities of the Defendants toward their clients would depend on the fee structure. Moreover, Ms. Jarcho has not shown that Criterion Clients would be able to infer the change in responsibilities from the disclosures.

35. In sum, the partial disclosures scattered across the various documents relied upon by Ms. Jarcho are insufficient to adequately disclose the compensation arrangements and resulting conflicts of interest. Even if a prospective investor were to gather and collate all of the disclosures across multiple sets of documents, he/she would have an incomplete picture of the conflicts of interest.[60]

## VI. Ms. Jarcho Fails to Establish That the Defendants' Compensation Arrangements Were Not to the Detriment of Criterion Clients' Investment Returns

36. Ms. Jarcho opines that the Defendants "did not sell investors a disadvantaged share class or feeder fund."[61] She then asserts that the allegation that the Defendants received "special" or enhanced compensation to the detriment of their clients' returns "is inaccurate."[62] To support her claim, she makes three main assertions:

i) At the time the four funds were created, the compensation of the Defendants was not

---

[58] Jarcho Report, ¶ 38 (emphasis added).

[59] See, e.g., Testimony Exhibit 12, CRITERION_SEC_000606920–2525 at 21; Testimony Exhibit 13, CRITERION_SEC_00309944 –50, at 46.

[60] Initial Report, ¶ 99.

[61] Jarcho Report, ¶ 12.

[62] Jarcho Report, ¶¶ 33–34.

known because the fund performance was not known.[63]

ii) The Defendants "believed" that the compensation aligned their interests with their clients.[64]

iii) The Defendants were not required to offer or disclose the existence of Class A units to their clients.[65]

37. Ms. Jarcho does not have a reasonable basis for her assertions and thus she fails to establish that the Defendants' compensation arrangements were not to the detriment of Criterion Clients' investment returns. First, how an investment will perform is generally uncertain at inception. Moreover, a fund's future performance is irrelevant to a disclosure analysis. Indeed, a conflict of interest can exist *ex ante* even if compensation is contingent on a target rate of return, *ex post*. As described in my Initial Report, industry customs and practices indicate that investment advisers have a duty to disclose facts giving rise to expected as well as actual conflicts of interest.[66] Here, the compensation arrangements already existed at the time of investment, and their terms could and should have been disclosed.[67] Indeed, Mr. Gravette testified that the fee structure related to T2 SREI units, T2 AOF IV units, Southland II, and PWHM II created a conflict of interest that needed to be disclosed.[68] As described in Section IV.A above, the analysis of the compensation arrangement at the time of inception is consistent with the 2015 *Examination Priorities* of the SEC Office of Compliance Inspection and Examination's statement that "we will focus on recommendations of account types and whether they are in the **best interest of the client at the inception of the arrangement and thereafter**…."[69]

38. Second, Ms. Jarcho's reference to the Defendants' claimed "belief" that their interests

---

[63] Jarcho Report, ¶ 34.
[64] Jarcho Report, ¶ 34.
[65] Jarcho Report, ¶ 35.
[66] Initial Report, ¶ 80.
[67] Initial Report, ¶ 80.
[68] Deposition of Robert Gravette (rough draft), October 12, 2021, pp. 121:14–17; 151:5–9; 170:10–14.
[69] U.S. Securities and Exchange Commission, Office of Compliance Inspections and Examinations, "Examination Priorities for 2015," p. 2 (emphasis added).

aligned with those of their clients is flawed.[70] Ms. Jarcho does not provide, nor am I aware of, evidence supporting her assertion related to the state of mind or intent of the Defendants. Even though she states that she has reviewed testimony transcripts, she cites to no testimony transcripts in support of her opinions.[71]

39. Even accepting her assertion as true, the Defendants' subjective belief that their interests converged with those of their clients is irrelevant to whether Criterion's disclosures were sufficiently specific. As explained in my Initial Report, investment advisers have two separate and independent responsibilities: (1) they are required to make full and fair disclosures; and (2) they are required to act in their clients' best interest, and not to subordinate their clients' interests to their own interests.[72] For that reason, notwithstanding an adviser's subjective belief that the adviser is acting in the client's best interest, the adviser needs to make full and fair disclosures of conflicts of interest.[73] Ms. Jarcho fails to analyze whether the disclosures contained in the Forms ADV, investment advisory agreements, and other documents Criterion prepared for its clients fully disclosed potential conflicts of interests related to the compensation arrangements among Mr. Gravette, Mr. MacArthur, T2 SREI, T2 AOF IV, and the Bird Rock Companies.

40. Third, Ms. Jarcho's assertion that the Defendants believed that their interests aligned with those of their clients is contradicted by documentary evidence such as offering documents, which indicate that Criterion Clients would pay higher fees and thus earn lower returns from T2 SREI Class C and T2 AOF IV than investors in comparable investments, all other conditions being equal.[74] As discussed in my Initial Report, the only substantive difference between Class A and Class C was the performance allocation terms, and those terms for Class C units were designed specifically to accommodate the compensation arrangements between Mr. Gravette, Mr. MacArthur, and T2 SREI, through Ausdal.[75] Similarly, the only substantive difference between T2 AOF IV and T2 OF IV was the performance allocation terms, and those terms for T2 AOF IV

---

[70] Jarcho Report, ¶ 34.

[71] Jarcho Report, ¶ 3.

[72] Initial Report, ¶ 16.

[73] Initial Report, ¶ 17.

[74] Initial Report, Sections VIII.A–B. I understand that Mr. Gravette acknowledged that T2 SREI Class C and T2 AOF IV would earn a lower return past the hurdle/preferred rate than T2 SREI Class A and T2 OF IV investors. See Deposition of Robert Gravette (rough draft), October 12, 2021, pp. 109:10–15, 149:13–23.

[75] Initial Report, Sections VIII.A–B.

were designed specifically to accommodate the compensation arrangements between Mr. Gravette, Mr. MacArthur, and T2 SREI, through Ausdal.[76] Similarly, Ms. Jarcho fails to address whether the compensation received by the Defendants from T2 SREI and T2 AOF IV, through Ausdal, provided a better alignment of the interests than compensation based on the amount of an investor's assets under management, which is typical for investment advisers.

41. Fourth, Ms. Jarcho asserts that Criterion Clients benefitted from not being charged a standard investment management fee.[77] This is misleading for three main reasons. As an initial matter, the Defendants did charge Criterion Clients an asset-based fee typical of investment advisers: the alternative investment consulting fee. Criterion's Forms ADV expressly state that the alternative investment consulting fee is for "advisory services."[78] A footer on the quarterly fee statements sent to investors refers to the reported alternative investment consulting fees as "investment management fees."[79] The fee was charged by Criterion, which is an investment advisory firm and not a brokerage company.[80] And, even assuming that the alternative investment consulting fee charged to Criterion Clients was lower than Criterion's standard advisory fee and similar fees charged by other investment advisers (for which Ms. Jarcho does not provide evidence), Ms. Jarcho's argument is fundamentally flawed because it implies that dually registered advisers may circumvent their responsibility to provide full and fair disclosures, including disclosure of the capacity in which they are acting by reducing the fees they charge to the client. In my experience, this is inconsistent with industry customs and practices, especially with regard to retail investors. Moreover, as described in Section V.A above, neither the investment advisory agreements nor the Forms ADV disclose that Mr. Gravette and Mr. MacArthur could toggle from an advisory to brokerage relationship with Criterion Clients simply based on the nature of the fees they charged. Instead, both fee schedules were presented as part of Criterion's advisory business.

---

[76] Initial Report, Sections VIII.A–B.

[77] Jarcho Report, ¶ 34.

[78] See, e.g., RFA Exhibit 103, p. 7; Testimony Exhibit 9, p. 7; March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 9; August 2016 Criterion Form ADV (CCI), CRITERION_SEC_00531757–79, p. 9.

[79] See, e.g., CRITERION_SEC_00665192; CRITERION_SEC_00666245.

[80] SEC RFA, Exhibit 103, pp. 3–6. See also March 2016 Criterion Form ADV (CCI), CRITERION_SEC_00144778–99, p. 2.

42. Finally, Ms. Jarcho asserts that the Defendants did not have to disclose the existence of lower-cost alternatives offered by T2 because "advisers [are] only required to offer the lowest cost share class available to them to execute for their clients."[81] Ms. Jarcho does not cite to evidence that SREI Class C units and T2 AOF IV were the only investments in their respective funds available to Criterion Clients. Ms. Jarcho fails to address the fact that lower-cost shares were offered to clients of **other investment advisers**, which suggests that they could also be available to Criterion Clients. Ms. Jarcho also fails to provide reasonable support for her assertion that Criterion Clients could not be offered the same T2 investments available to other non-Criterion investors.[82] Indeed, Ms. Searcy, T2's Chief Operating Officer, testified that the eligibility criteria for T2 AOF IV and T2 OF IV were the same.[83] As described in my Initial Report, T2 SREI Class C units and T2 AOF IV units were designed specifically to accommodate the Defendants' compensation arrangements with the fund manager.[84]

Executed this 15th of October, 2021

Sunil Wahal, Ph.D.

[81] Jarcho Report, ¶ 35.

[82] Searcy Deposition, p. 33:15–23 ("Q. What type of investors does T2 market its funds to? A. So all of our investors are -- represent that they're at least an accredited investor status. And then our channels, we work with generally with investors directly or through investment advisor firms.").

[83] Searcy Deposition, p. 196:8–11.

[84] Brown Testimony, pp. 60:1–61:6; Searcy Deposition, pp. 143:1–22, 124:14–125:12; Initial Report, ¶ 42.

# Appendix A

## SUNIL WAHAL

WP Carey School of Business
Arizona State University
Tempe, AZ 85287-3906
Sunil.Wahal@asu.edu
Tel: 480-965-8755

**EMPLOYMENT**

Jack D. Furst Professor of Finance, 2005-present
Director, Center for Investment Engineering, 2018-present
Arizona State University, WP Carey School of Business

Dimensional Fund Advisors, 2008 – 2010
On leave from Arizona State University

Associate Professor of Finance, Area Chair
Emory University, Goizueta Business School, 2002 - 2005.

Assistant Professor of Finance
Emory University, Goizueta Business School, July 1997 - 2002.

Assistant Professor of Finance
Purdue University, Krannert Graduate School of Management, July 1995 - June 1997.

**PUBLICATIONS**

"Is Idiosyncratic Risk Conditionally Priced?," co-authored with Rajnish Mehra and Daruo Xie. Forthcoming, *Quantitative Economics*.

"Do properly anticipated prices fluctuate randomly? Evidence from VIX futures markets," co-authored with George Aragon and Rajnish Mehra. *Journal of Portfolio Management*. 2020, 144-159.

"The term structure of liquidity provision," co-authored with Jennifer Conrad. *Journal of Financial Economics*. 2020, 239-259.

"The profitability and investment premium: Pre-1963 evidence." *Journal of Financial Economics*. 2019, 362-371.

"High Frequency Quotation, Trading, and the Efficiency of Prices," co-authored with Jennifer Conrad and Jin Xiang. *Journal of Financial Economics*. 2015, 116, 271-291.

"Is momentum an echo," co-authored with Amit Goyal, *Journal of Financial and Quantitative Analysis*. 2015, 1237-1267.

"Investing in a global world," co-authored with Jeff Busse and Amit Goyal, *Review of Finance* 2014, 18, 561-590. Spängler IQAM Prize for the best paper on Investments.

"Style investing, comovement and return predictability," co-authored with M. Deniz Yavuz, *Journal of Financial Economics*. 2013, 107, 136-155.

"Competition among mutual funds", co-authored with Albert Wang, *Journal of Financial Economics* 2011, 99, 40-59. [Presented at CRSP Forum, 2008, Western Finance Association Meetings, 2009.]

"Performance and persistence in institutional investment management," co-authored with Amit Goyal and Jeff Busse, *Journal of Finance*.2010, 65, 765-790.

"The selection and termination of investment management firms by plan sponsors," co-authored with Amit Goyal, *Journal of Finance* 2008,63, 1805-1847. [Presented at American Finance Association Meetings, 2005 and European Finance Association Meetings, 2005.]

"Grandstanding, certification and the underprice of venture capital backed IPOs," co-authored with Peggy Lee, *Journal of Financial Economcis* 2004, 73, 375-407. [Presented at Western Finance Association Meetings, 2003, and EVI Conference, Yale University, 2001.]

"Institutional Trading and Alternative Trading Systems," co-authored with Jennifer Conrad and Kevin Johnson, *Journal of Financial Economics* 2003, 70, 99-134, [Presented at Western Finance Association Meetings, 2001.]

"Momentum Trading by Institutions," co-authored with S.G. Badrinath, *Journal of Finance* December 2002, pg 2449-2478. [Presented at American Finance Association Meetings, 2000.]

"Agency Conflicts in Closed-End Funds: The Case of Rights Offerings," co-authored with Ajay Khorana and Marc Zenner. *Journal of Financial and Quantitative Analysis*. 2002, volume 37, number 2 (lead article).

"Institutional Trading and Soft Dollars," co-authored with Jennifer Conrad and Kevin Johnson. *Journal of Finance*, 2001, volume 56. [Presented at Western Finance Association Meetings, 1998.]

"Spinoffs, Ex ante," co-authored with John McConnell and Mehment Ozbilgin. *Journal of Business*, 2001, volume 74.

"Do Institutional Investors Exacerbate Managerial Myopia?" co-authored with John McConnell. *Journal of Corporate Finance,* 2000, volume 6.

"Entry, Exit, Market Makers and the Bid-Ask Spread," *Review of Financial Studies*, 1997, Volume 10, Number 3. [Presented at Western Finance Association Meetings, 1993.]

"Pension Fund Activism and Firm Performance," *Journal of Financial and Quantitative Analysis*, 1996, Volume 31, Number 1 (lead article).

"Who Opts Out of State Antitakeover Legislation? The Case of Pennsylvania's SB 1310", co-authored with Kenneth Wiles and Marc Zenner*, Financial Management*, 1995, Volume 24, Number 3.

**NON-REFERRED AND INVITED PUBLICATIONS**

"Electronic markets and trading algorithms", *Journal of Trading*, Spring 2012

"Institutional trading costs and trading systems", co-authored with Jennifer Conrad and Kevin Johnson, *Equity Trading: Execution and Analysis*, AIMR 2003.

"The trading of Institutional Investors: Theory and Evidence", co-authored with Jennifer Conrad and Kevin Johnson, *Journal of Applied Finance*, 2002, volume 12.

**WORKING PAPERS**

"Choosing investment managers," co-authored with Amit Goyal and Deniz Yavuz.

"The anatomy of trading algorithms," co-authored with Tyler Beason.

"On the conjoint nature of value and profitability: Global evidence," co-authored with Eduardo Repetto.

"Picking partners: Manager selection in private equity," co-authored with Amit Goyal and Deniz Yavuz.

**RESEARCH IN PROGRESS**

"The shadow price of trading constraints" with Tyler Beason

"Flow volatlity and divesification" with Albert Wang.

**EDUCATION**

Ph.D., University of North Carolina at Chapel Hill, 1995.
M.B.A., Wake Forest University, 1991.
B.A. (Hons-Economics), University of Delhi, India, 1989.

**TEACHING**

Arizona State University, WP Carey School of Business:

*ASU-SAIF DBA Program in Shanghai*
Global Financial Systems: Institutional Investors
*Executive Program*
Applied Financial Management
*Evening Program*
Corporate Finance
*MBA Program*
Portfolio Engineering
Student Investment Management Fund*
*Undergraduate Program*
Entrepreneurial Finance and Private Equity
Portfolio Engineering
Student Investment Management Fund*

The Student Investment Management (SIM) Fund is managed separately for MBA and UG students. Assets are managed using quantitative strategies (not fundamental analysis) derived from verified academic research. Students integrate the portfolio management experience with the ability to write code and assess tradeoffs in live portfolios (see https://wpcarey.asu.edu/finance-degrees/investment-management). Students are frequently placed at top notch asset managers (both quatatitative investment management and hedge funds). A handful go to on graduate quantitative degrees at the very best universities.

Emory University, Goizueta Business School:

*Executive Program*
Corporate Control (WEMBA Program)
Corporate Control (Modular EMBA Program)
Financial Decision Making (DLHPM Program)
*MBA Program*
Corporate Control
*BBA Program*
Corporate Control
Corporate Finance

Purdue University, Krannert Graduate School of Management:

*Ph.D Program*
Seminar in Corporate Finance
*Undergraduate Program*
Financial Management

University of North Carolina, Kenan Flagler Business School:

Financial Management

**ACADEMIC PRESENTATIONS AND DISCUSSIONS**

AQR, 2021
Q-Group, 2021
NBER, 2020
Market Microstructure Exchange, 2020
Microstructure Online Asia-Pacific, 2020
SMU, 2020
Purdue University, 2019
NBER Summer Institute, 2019
University of Virginia, 2019
NFA, 2018
Napa Valley Conference, 2017
Finance Down Under, 2017
NBER Microstructure, 2016
ITAM, 2016
WU Guttman Center, 2016
Vienna University of Economics and Business, 2016
Bank of Korea Academy, 2015
Tokyo Stock Exchange, 2014
SEC-Center for Financial Policy Conference, 2014
Stern Microstructure Conference, 2014
Texas Quantitative Finance Festival, 2013
Financial Market Conference, Vanderbilt University, 2013
European Finance Association, 2013
Hitotsubashi University, 2013
5th Hedge Fund Research Conference, 2013
Instinet Global Conference, 2013
Pensions Investment Association of Canada, 2013
American Finance Association, 2012
University of Toronto, 2011
Babson College, 2011
Texas Christian University, 2011
Univeristy of Utah, 2011
Cass Business School, 2010, "Leading Lights in Fund Management"
Western Finance Association, 2009
NBER, 2008
CRSP Forum, 2008
Dimensional Fund Advisors, annually 2007-current
University of Virginia, 2007
University of Calgary, 2007
National University of Singapore, 2006
Singapore Management University, 2006
University of North Carolina at Chapel Hill, 2006
American Finance Association, 2006
European Finance Association, 2005, 2006
Mitsui Life Symposium, University of Michigan, 2005

Boston College, 2005
UC Irvine, 2005
Barclays Global Investors, 2005
Arizona State University, 2005
Goldman Sachs, 2005
Roudtable for Engineering Entrepreneurship Research, 2004
University of Washington, 2004
Hong Kong University of Science and Technology, 2004
Vanderbilt University, 2004
New York Stock Exchange, 2004
Western Finance Association, 2003
Atlanta Society of Financial Analysts, 2003
Yale EVI conference, 2002
Instinet Inc, 2001
Western Finance Association, 2001
University of Florida, 2001
American Finance Association, 2000
University of Kansas, 2000
Southern Methodist University, 2000
University of Western Ontario, 2000
Association of Financial Economists (ASSA), 1999
Equity Investment Strategies Summit (Practitioner Conference), 1998
Plexus Conference (Practitioner Conference), 1998
Western Finance Association, 1998
Georgia State University, 1998
University of Utah, 1997
University of Miami, 1997
University of Georgia, 1997
Association of Financial Economists (ASSA), 1996
University of Georgia, 1995
Case Western Reserve University, 1995
Purdue University, 1995
University of Notre Dame, 1995
University of North Carolina, 1995
Western Finance Association, 1993
Financial Management Association, 1993

**NON-ACADEMIC PRESENTATIONS**

5-8 presentations per year to a variety of audiences including but not limited to Sovreign Wealth Funds, Endowments, Foundations, Pension Plans, and Registered Investment Advisors (RIAs). Audience is global. Topic ranges from asset allocation and investment strategies to trading issues.

***AD HOC* REVIEWS AND EDITIORIAL POSITIONS**

*Associate Editor: Journal of Banking and Finance (2015-current)*
*Editorial Board: Annals of Finance (2017 - current)*
*Associate Editor: Financial Management (2011-2016)*
*Editorial Board: FMA Survey and Synthesis Series*

*Ad Hoc Referee for:*
*American Economic Review*
*Financial Management*
*Journal of Corporate Finance*
*Journal of Finance*
*Journal of Financial Economics*
*Journal of Financial and Quantiative Analysis*
*Journal of Financial Services Research*
*Managerial and Decision Economics*
*Quarterly Review of Economics and Finance*
*Review of Financial Studies*
*Review of Financial Economics*
*Review of Asset Pricing Studies*
*National Science Foundation*

**HONORS AND AWARDS**

Inquire Europe Award, 2020
Spängler IQAM Prize for the best paper on Investments, 2014
Distinguished Alumni Speaker, University of North Carolina, 2006
Q-Group Grant, 2004
Emory Williams Distinguished Teaching Award, 2001
Purdue Research Foundation Grant, 1997
Jay N. Ross Young Faculty Scholar Award, 1995

**SERVICE**

External expert for tenure candidates at a variety of institutions, 2010-current
External expert for NSF grants and HKUGC grants
Program Committee, Western Finance Association, 2012-present
Program Committee, Napa Valley Conference, FMA, 2012-present
Awards Committee, Financial Management Association, 2006
Track Chair, Financial Management Association, 2003
Program Committee, European Finance Association, 2003-present
Program Committee, Financial Management Association, various years
Program Committee, ASU Sonoran Winter Finance Conference, 2012-present

Investment Committee, Strategy Research Foundation (Pro Bono)
Various advice to charitable organizations (501 (c) 3))

Chair Search Committee

University Promotion and Tenure Committee, ASU 2013-2016
Faculty Council, ASU, 2010-2012
Chair, Promotion and Tenure Committee, ASU, 2005-2008, 2010-2011
Member, Recruiting Committee, ASU, 2005-2008, 2010-2011
Governance Committee, ASU, 2010-2011
Area Coordinator, Finance Area, Emory University, 2003-2005
Member, External Affairs Committee, Emory University, 2004-2005
Academic Council, Emory University, 2003-2005
Chair, Research Committee, Emory University, 2002-2004
Chair, Computing and Education Committee, Emory University, 2000-2002
Member, Computing and Education Committee, Emory University 1999-2000

## CONSULTING

Avantis Investors (2019-Current)
Dimensional Fund Advisors (2005-2019)
Wipfli Financial Advisors, Investment Committee (Current)
Versant Capital Management, Investment Committee (Current)
Heritage Financial Services, Investment Committee
Mercer Investment Advisors, Investment Committee
Aronson+Johnson+Ortiz
MEI Corporation
Wachovia
Goodwill Industries

## DISSERATION COMMITTEES

Tyler Beason (2021)
Pedram Jahangiry, 2016
Daruo Xie (Co-Chair), 2015
Jin Xiang (Co-Chair), 2013
Zhiyi Qian (Chair), 2012
Marko Svetina (Chair), 2008
Zhi Li, 2008
Chris Clifford, 2008
George Cashman, 2007
Albert Wang, 2007
Bharath Thothadri, 1997
Erik Lie, 1996
David Haushalter, 1996
Tim Kruze, 1996

## PROFESSIONAL AFFILIATIONS

American Finance Association
Financial Management Association

Society for Financial Studies

# Appendix B

## Documents Considered by Sunil Wahal, Ph.D.

| **Document Title, Bates Numbers** | **Document Date** |
| --- | --- |
| **Legal Pleadings** | |
| Complaint in *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.* | February 11, 2020 |
| Joint Answer and Defenses of Defendants Criterion Wealth Management Insurance Service, inc. and Robert Allen Gravette in *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.* | May 13, 2020 |
| Answer of Defendant Mark A. MacArthur in *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.* | May 13, 2020 |
| **Requests for Admission and Exhibits** | |
| Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions to Defendant Criterion Wealth Management Insurance Services, Inc., with Exhibits 102–106, 108, 111–117 | September 3, 2021 |
| Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions to Defendant Robert Gravette, with Exhibits 102–106, 108, 111–117 | September 3, 2021 |
| Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions to Defendant Mark MacArthur, with Exhibits 102–106, 108, 111–117 | September 3, 2021 |
| **Depositions and Exhibits** | |
| Deposition of Linda Searcy, with Exhibits 1–28 | August 25, 2021 |
| Uncertified Realtime Rough Draft Deposition of Robert Allen Gravette | October 12, 2021 |
| Uncertified Realtime Rough Draft Deposition of Mark Andrew MacArthur | October 14, 2021 |
| **Testimonies and Exhibits** | |
| Testimony of Mark MacArthur, with Exhibits 1–21 | June 12, 2018 |
| Testimony of Jason Stauffer, with Exhibits 22–30 | July 19, 2018 |
| Testimony of Daniel Deans Niednagel, with Exhibits 31–43 | August 16, 2018 |
| Testimony of Robert A. Gravette, with Exhibits 44–50 | August 22, 2018 |
| Testimony of Larry Nakamura, with Exhibits 51–62 | October 19, 2018 |
| Testimony of Jeffrey D. Brown, with Exhibits 63–84 | May 29, 2019 |
| Testimony of John Southard, with Exhibits 85–99 | December 16, 2019 |
| **Expert Reports** | |
| Expert Report of Sunil Wahal, Ph.D., with exhibits and appendices | September 20, 2021 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Defendants' Joint Fed. R. Civ. P. 26(a)(2) Disclosures, *Securities and Exchange Commission v. Criterion Wealth Management Insurance Services, Inc., et al.*, Case No. 2:20-cv-01402-ODW-JEM | September 20, 2021 |
| **Declarations and Exhibits** | |
| Declaration of Patrick Denard, M.D., with Exhibits 1–11 | January 16, 2020 |
| Declaration of David Chow | January 17, 2020 |
| **Regulatory Materials** | |
| Advisers Act Rule 206(4)-3 | |
| 15 U.S. Code § 80b–2 (17) | |
| 17 CFR § 275.206(4)-7(a) | |
| 17 CFR §240.17(a)(3) | |
| Securities and Exchange Commission, 17 CFR Parts 240 and 249, Release No. 34-70073 "Broker-Dealer Reports" | |
| Securities and Exchange Commission, 17 CFR Parts 275 and 279, Release No. IA-3060, "Amendments to Form ADV" | October 12, 2010 |
| Securities and Exchange Commission, 17 CFR Part 276, Release No. IA-5248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers" | |
| SEC Release No. IA-4048 | |
| Securities and Exchange Act of 1934, §3(a)(4)–(5) | |
| FINRA Rule 2111 | |
| FINRA Rule 4511 | |
| FINRA Rule 5310 | |
| Staff of the Investment Adviser Regulation Office Division of Investment Management U.S. Securities and Exchange Commission, "Regulation of Investment Advisers by the U.S. Securities and Exchange Commission", Securities and Exchange Commission | March 2013 |
| Securities and Exchange Commission, "Recommendation of the Investor Advisory Committee Broker-Dealer Fiduciary Duty" | November 2013 |
| **Research Papers** | |
| Hung, Angela A., Clancy Noreen et al., "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers," Rand Institute for Civil Justice Technical Report, 2008 | |
| Stephen Foerster, et al., "Retail Financial Advice: Does One Size Fit All?" (Chicago Booth Paper No. 1438, Chicago, IL, July 2015) | |
| Juhani T. Linnainmaa, et al. "The Misguided Beliefs of Financial Advisors," *The Journal of Finance* 76, Issue 2, November 28, 2020, pp. 587–621 | |
| **Other Materials and Webpages** | |
| Bob Veres, "2017 Planning Profession Fee Survey," *Inside Information* | |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Bridgeworth, LLC, Form ADV Part 2A Brochure | June 2018 |
| FINRA, About, https://www finra.org/about | |
| FINRA, Registered Financial Professionals, https://www.finra.org/investors/learn-to-invest/choosing-investment-professional/registered-financial-professionals | |
| Form ADV Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers, Annual Amendment for Criterion Wealth Management Insurance Services, Inc., dba Criterion Wealth Management, Securities and Exchange Commission | March 30, 2016 |
| Form ADV Part 2A, Park Place Capital Corporation | April 14, 2021 |
| NASAA, Investment Adviser Guide | |
| Opinion of the Commission Investement Adviser Proceeding Cease-and-Desist Proceeding in the matter of *The Robare Group, Ltd., Mark L. Robare and Jack L. Jones, Jr.* | |
| SEC Division of Trading and Markets, "Guide to Broker-dealer Registration," https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html#II | April 2008 |
| Securities and Exchange Commission, "General Instructions for Part 2 of Form ADV," https://www.sec.gov/about/forms/formadv-part2.pdf | |
| Securities and Exchange Commission, 17 CFR Part 276, Release No. IA-5248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers," https://www.sec.gov/rules/interp/2019/ia-5248.pdf | |
| Securities and Exchange Commission, Form ADV Part 1A, https://www.sec.gov/about/forms/formadv-part1a.pdf | |
| Securities and Exchange Commission, Form ADV Part 1B, https://www nasaa.org/wp-content/uploads/2011/08/Form-ADV-Part-1B.pdf | |
| Securities and Exchange Commission, Form ADV Part 2, https://www.sec.gov/about/forms/formadv-part2.pdf | |
| Securities and Exchange Commission, Investor Bulletin: Form ADV – Investment Adviser Brochure and Brochure Supplement, https://www.sec.gov/oiea/investor-alerts-bulletins/ib_formadv.html | June 24, 2016 |
| Securities and Exchange Commission, National Exam Program Risk Alert, OCIE's 2016 Share Class Initiative, Volume V, Issue 2 | July 13, 2016 |
| *Thomas v. Metropolitan Life Insurance Company* 631 F.3d 1153 (10th Cir. 2011) | |
| *SEC v. Capital Gains Research Bureau, Inc., et al.* 375 U.S. 180 (1963) | |
| "Conflicts in a Rapidly Changing Fiduciary Landscape – Part Two: A Focus on Dually Registered or 'Hybrid' Challenges," *BNY Mellon* | 2016 |
| "Examination Priorities for 2015," *National Exam Program* | 2015 |
| Joan, M. Neri, "Comparing the Standard of Conduct: Broker-Dealers vs. Investment Advisers," Faegre Drinker Biddle & Reath LLP | August 10, 2020 |

| Document Title, Bates Numbers | Document Date |
| --- | --- |
| "Recommendation of the Investor Advisory Committee: Broker-Dealer Fiduciary Duty," *SEC Investor Advisory Committee* | |
| "Relationship Summary: Broker-Dealer," *Charles Schwab* | March 2021 |
| "Relationship Summary: Investment Advisory," *Charles Schwab* | March 2021 |
| "Schwab Private Client Disclosure Brochure," *Charles Schwab* | September 21, 2021 |
| **Produced Documents** | |
| Part 2A of Form ADV, Criterion Wealth Management Insurance Services Inc. | |
| *CRITERION_SEC_00626308–20* | |
| *CRITERION_SEC_00607050–68* | |
| *CRITERION_SEC_00144778–99* | |
| *CRITERION_SEC_00570436–56* | |
| *CRITERION_SEC_00531757–79* | |
| *BRM000602–17* | |
| *CRITERION_SEC_00636133–65* | |
| *CRITERION_SEC_00443031–60* | |
| *BRM0007210–6* | |
| *T2_00000244* | |
| *T2CAPITAL_SEC_00007911* | |
| *T2_00031721* | |
| *T2_00031548* | |
| *T2CAPITAL_SEC_00006469–71* | |
| *T2_00015353; T2_00011570* | |
| *T2CAPITAL_SEC_00008693* | |
| *T2CAPITAL_SEC_00000237–376* | |
| *CRITERION_SEC_00588576* | |
| *T2_00011938* | |
| *T2CAPITAL_SEC_00000013* | |
| *CRITERION_SEC_00031497* | |
| *CRITERION_SEC_00585766; BRM0002387* | |
| *CRITERION_SEC_00050753–808* | |
| *CRITERION_SEC_00253686* | |
| *CRITERION_SEC_00034607–60* | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| *T2CAPITAL_SEC_00012920–56* | |
| *CRITERION_SEC_00461657* | |
| *CRITERION_SEC_00033785* | |
| *CRITERION_SEC_00112652* | |
| *CRITERION_SEC_00046933* | |
| *T2CAPITAL_SEC_00029858* | |
| *CRITERION_SEC_00093345–56* | |
| *CRITERION_SEC_00189050* | |
| *T2Capital_SEC_00013594–7* | |
| *CRITERION_SEC_00118968* | |
| Form ADV, T2 Capital Management, LLC | |
| *CRITERION_SEC_00369585* | |
| *CRITERION_SEC_00036120* | |
| *CRITERION_SEC_00252302* | |
| *CRITERION_SEC_00207685* | |
| *CRITERION_SEC_00076000* | |
| *CRITERION_SEC_00066872* | |
| *CRITERION_SEC_00075796* | |
| *CRITERION_SEC_00070710* | |
| *CRITERION_SEC_00606920–5* | |
| *CRITERION_SEC_00070008* | |
| *CRITERION_SEC_00077181* | |
| *CRITERION_SEC_00073451* | |
| *CRITERION_SEC_00631372* | |
| *CRITERION_SEC_00078859* | |
| *CRITERION_SEC_00562489* | |
| *CRITERION_SEC_00148426* | |
| *CRITERION_SEC_00309944–50* | |
| *CRITERION_SEC_00207323* | |
| *CRITERION_SEC_00583609* | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| *CRITERION_SEC_00015251* | |
| *CRITERION_SEC_00000025–62* | |
| *T2CAPITAL_SEC_00000957–68* | |
| *T2CAPITAL_SEC_00000013–24* | |
| *AUSDAL_001482–5* | |
| *AUSDAL_001477–80* | |
| *CRITERION_SEC_00122148* | |
| *CRITERION_SEC_000212486* | |
| *CRITERION_SEC_00665192* | |
| *AUSDAL 000326–760* | |
| *CRITERION_SEC_00057070–5* | |
| *CRITERION_SEC_00057369–74* | |
| *CRITERION_SEC_00065359–64* | |
| *CRITERION_SEC_00066872–6* | |
| *CRITERION_SEC_00067090–5* | |
| *CRITERION_SEC_00069366–88* | |
| *CRITERION_SEC_00069751–6* | |
| *CRITERION_SEC_00070008–13* | |
| *CRITERION_SEC_00070517–22* | |
| *CRITERION_SEC_00070602–7* | |
| *CRITERION_SEC_00070787–92* | |
| *CRITERION_SEC_00070840–5* | |
| *CRITERION_SEC_00070930–5* | |
| *CRITERION_SEC_00071189–94* | |
| *CRITERION_SEC_00071195–200* | |
| *CRITERION_SEC_00071406–11* | |
| *CRITERION_SEC_00071460–5* | |
| *CRITERION_SEC_00071724–9* | |
| *CRITERION_SEC_00071732–7* | |
| *CRITERION_SEC_00071970–5* | |

| Document Title, Bates Numbers | Document Date |
| --- | --- |
| *CRITERION_SEC_00072122–7* | |
| *CRITERION_SEC_00072301–6* | |
| *CRITERION_SEC_00072345–50* | |
| *CRITERION_SEC_00072491–6* | |
| *CRITERION_SEC_00072698–703* | |
| *CRITERION_SEC_00072955–60* | |
| *CRITERION_SEC_00072974–9* | |
| *CRITERION_SEC_00072980–5* | |
| *CRITERION_SEC_00073126–31* | |
| *CRITERION_SEC_00073177–82* | |
| *CRITERION_SEC_00073186–91* | |
| *CRITERION_SEC_00073198–203* | |
| *CRITERION_SEC_00073242–7* | |
| *CRITERION_SEC_00073274–9* | |
| *CRITERION_SEC_00073303–8* | |
| *CRITERION_SEC_00073451–6* | |
| *CRITERION_SEC_00073576–81* | |
| *CRITERION_SEC_00074114–9* | |
| *CRITERION_SEC_00074194–9* | |
| *CRITERION_SEC_00074362–7* | |
| *CRITERION_SEC_00074490–6* | |
| *CRITERION_SEC_00074850–5* | |
| *CRITERION_SEC_00074885–90* | |
| *CRITERION_SEC_00074906–11* | |
| *CRITERION_SEC_00074966–71* | |
| *CRITERION_SEC_00074992–7* | |
| *CRITERION_SEC_00075067–72* | |
| *CRITERION_SEC_00075083–8* | |
| *CRITERION_SEC_00075104–9* | |
| *CRITERION_SEC_00075276–81* | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| *CRITERION_SEC_00075351–6* | |
| *CRITERION_SEC_00075796–801* | |
| *CRITERION_SEC_00075861–6* | |
| *CRITERION_SEC_00075943–8* | |
| *CRITERION_SEC_00075981–6* | |
| *CRITERION_SEC_00076057–62* | |
| *CRITERION_SEC_00076069–74* | |
| *CRITERION_SEC_00076090–5* | |
| *CRITERION_SEC_00076193–8* | |
| *CRITERION_SEC_00076199–204* | |
| *CRITERION_SEC_00076238–43* | |
| *CRITERION_SEC_00076306–12* | |
| *CRITERION_SEC_00076375–80* | |
| *CRITERION_SEC_00076481–6* | |
| *CRITERION_SEC_00076621–6* | |
| *CRITERION_SEC_00076875–80* | |
| *CRITERION_SEC_00076900–5* | |
| *CRITERION_SEC_00076931–6* | |
| *CRITERION_SEC_00076938–43* | |
| *CRITERION_SEC_00076944–9* | |
| *CRITERION_SEC_00077046–51* | |
| *CRITERION_SEC_00077108–13* | |
| *CRITERION_SEC_00077181–6* | |
| *CRITERION_SEC_00077227–32* | |
| *CRITERION_SEC_00220801* | |
| *CRITERION_SEC_00375369–74* | |
| *CRITERION_SEC_00520591–7* | |
| *CRITERION_SEC_00597703–43* | |
| *CRITERION_SEC_00664646* | |
| *CRITERION_SEC_00664648* | |
| *CRITERION_SEC_00665571* | |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| *CRITERION_SEC_00665572* | |
| *CRITERION_SEC_00665574* | |
| *CRITERION_SEC_00665576–7* | |
| *CRITERION_SEC_00665578–9* | |
| *CRITERION_SEC_00665580–1* | |
| *CRITERION_SEC_00666245* | |
| *CRITERION_SEC_00666247* | |

**Note: In addition to the documents on this list, I considered any other document cited in my report and exhibits to form my opinions.**