CHARLES CANTER (Cal. Bar No. 263197)
Email: canterc@sec.gov
DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katherine Zoladz, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

CRITERION WEALTH MANAGEMENT INSURANCE SERVICES, INC.; ROBERT ALLEN GRAVETTE; and MARK ANDREW MACARTHUR

Defendants.

Case No. 2:20-cv-01402-SPG-JEM

**DECLARATION OF JEFF BROWN**

Pre-Trial Conf. Date: April 26, 2023
Trial Date: May 16, 2023

Judge: Hon. Sherilyn Peace Garnett

I, Jeff Brown, declare pursuant to 28 U.S.C. § 1746 the following:

1. I am an individual over 18 years of age and have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

2. I am a founding member, Chief Executive Officer, and Chief Investment Officer of T2 Holdings, LLC, d/b/a T2 Capital Management, LLC ("T2"), a registered investment adviser founded in 2011 and based in Wheaton, Illinois. T2 operates a series of private real estate funds.

**SREI**

3. One of these funds is the T2 Strategic Real Estate Income Fund ("SREI"). SREI was first offered in 2014.

4. Initially, T2 made investments in SREI available solely through Class A units.

5. Under the performance allocation formulas set forth in the April 1, 2014 and April 2015 Class A Supplements to the April 1, 2014 SREI Private Placement Memorandum, Class A unitholders would receive: (1) a preferred return of 6% (the "hurdle"), then (2) the general partner (i.e., T2) would receive 100% of net new profits until the general partner had received 20% of the amounts allocated (the "catch up"), and then (3) the investors would split any remaining profits with the general partner 80%/20%. A true and correct copy of the April 1, 2014 SREI Private Placement Memorandum is attached hereto as Exhibit 14. True and correct copies of the April 1, 2014 and April 2015 Class A Supplements to the Private Placement Memorandum are attached hereto, respectively, as Exhibit 138 and Exhibit 69.

6. Investments in Class A units did not provide for commission payments to a broker-dealer.

7. Defendant MacArthur had a pre-existing professional and personal relationship with T2's principals, John Southard ("Southard") and myself.

8. On or around April 1, 2014, Ausdal Financial Partners, Inc. ("Ausdal"),

the broker-dealer at which Defendants MacArthur and Gravette were dually registered, entered into a Placement Agreement with SREI and its affiliates ("SREI Placement Agreement"). A true and correct copy of the SREI Placement Agreement is attached hereto as Exhibit 67.

9. Under the SREI Placement Agreement, T2 agreed to pay Ausdal an amount equal to 50% of the performance allocation the fund manager was entitled to receive for as long as Criterion's clients remained invested in the fund.

10. Pursuant to the SREI Placement Agreement, a "Fee Disclosure Statement" was to be "delivered to each person to whom Ausdal makes an offer of a Unit." Further, there is a placeholder for the "Fee Disclosure Statement" at the end of the SREI Placement Agreement. T2 never received the Fee Disclosure Statement. In any event, Defendant Criterion was responsible for providing such a statement to Criterion investors.

11. Before T2 and Ausdal executed the SREI Placement Agreement, Mr. Southard and I at T2 had informed Defendants Gravette and MacArthur of the existence and terms of the SREI Class A units during multiple phone calls and in-person meetings.

12. The SREI Placement Agreement refers to Class C Units. T2 had created these Class C units, a separate share class designed specifically for Defendant Criterion's clients, at Defendants Gravette and MacArthur's suggestion.

13. Prior to April 2014, and after multiple phone calls and in-person meetings, Defendants Gravette and MacArthur proposed to Mr. Southard and me that a separate share class be created.

14. The only material difference between SREI Class A and SREI Class C units was the performance allocation formula, also known as the "waterfall." Unlike Class A unitholders, and pursuant to the April 1, 2014 Class C Supplement to the SREI Private Placement Memorandum, Class C unitholders were entitled to receive: (1) a preferred return of 6%, then (2) the general partner (i.e., T2) would receive

100% of net new profits until the general partner had received 40% of the amounts allocated, and then (3) the investors would split any remaining profits with the general partner 60%/40%. In other words, Class C investors were entitled to 20% less of the fund's profits than Class A investors, Class C investors would be deprived of 100% of net new profits for a longer period of time than Class A investors. T2's economics remained the same regardless of investor class. Notably, the only economic beneficiaries of the Class C unitholders were Defendant Gravette, Defendant MacArthur, and Ausdal. A true and correct copy of the April 1, 2014 Class C Supplement to the SREI Private Placement Memorandum is attached hereto as Exhibit 68.

15. Indeed, the eligibility criteria and underlying real estate assets for both classes of shares were the same. Further, T2 could have accepted investments into Class A units from Criterion clients.

16. The different performance allocation formula meant that Class C unitholders could expect to receive a lower yield than Class A unitholders, all else being equal.

17. At least 20 other investment advisers provided investors for SREI, none of whom entered into the type of compensation arrangement as Defendants.

18. Defendant Criterion's clients who invested in SREI purchased only Class C units. All other investors in SREI purchased Class A units.

19. Since the initial discussions between T2 and Defendants, Mr. Southard and I told Defendants that their compensation arrangement would depress the returns of Defendant Criterion's clients who invested in SREI Class C units.

20. Defendants' compensation arrangement reduced the returns to Class C Units compared to Class A Units. In fact, audited financial statements indicate that Class A units outperformed Class C Units by more than 2%. A true and correct copy of the Audited SREI Financial Statements for the year ending December 31, 2015 is attached hereto as Exhibit 76. A true and correct copy of the Audited SREI Financial

Statements for the year ending December 31, 2016 is attached hereto as Exhibit 77. Page 12 of Exhibit 76 and page 13 of Exhibit 77 both show that Class A units outperformed Class C units by more than 2%.

21. T2 sent Audited Financial Statements to Defendants Criterion, Gravette, and MacArthur annually.

22. Additionally, due to the small size of Class C relative to Class A, Defendant Criterion's clients bore a disproportionate share of SREI expenses. On or about January 7, 2015, Mr. Southard emailed Defendants Gravette and MacArthur regarding the higher expenses. A true and correct copy of that email exchange, on which I was copied, is attached hereto as Exhibit 75.

23. A different set of offering documents was created for Defendant Criterion's clients. They included the aforementioned Class C supplement and a two-page fact sheet. The key portions of those documents that differed from the offering materials distributed to Class A investors related to the performance allocation and expected returns. Specifically, the anticipated returns in the fact sheet for SREI Class C were lower than the corresponding figures for the SREI Class A fact sheet due to the performance allocation formulae for the respective investments. True and correct copies of the Class A and Class C Fact Sheets are attached hereto, respectively, as Exhibits 14-1 and 70.

24. T2 and Criterion both expected SREI to meet the 6% hurdle. Defendants' compensation arrangement with T2 was expected to dilute and did in fact dilute the returns of Criterion clients who invested in SREI.

**AOFIV**

25. T2 Opportunity Fund IV (Master), L.P. was initially launched in 2014 with a single "feeder" fund called T2 Opportunity Fund IV.

26. At the request of Defendants Gravette and McArthur, T2 created a parallel feeder fund called T2 Asset Opportunity IV ("AOFIV") that was only available to defendant Criterion's clients. T2 launched AOFIV in approximately

January 2015.

27. Under the performance allocation formula set forth in the August 1, 2014 T2 Opportunity Fund IV Private Placement Memorandum, investors (known as limited partners) would receive: (1) a preferred return of 8% (the "hurdle"), then (2) the general partner would receive 80% of net new profits until the general partner has received 20% of distributions (the "catch up"), and then (3) the investors would split any remaining carried interest with the general partner 80%/20%. A true and correct copy of the August 1, 2014 T2 Opportunity Fund IV Private Placement Memorandum is attached hereto as Exhibit 91.

28. The T2 Opportunity Fund IV Private Placement Memorandum included a chart describing the internal rate of return for T2's "vintage" real estate funds as between 15.5% and 22.7%.

29. Under the performance allocation formula set forth in the February 2015 T2 AOFIV Private Placement Memorandum, AOFIV shareholders would receive: (1) a preferred return of 8%, then (2) the general partner would receive 100% of net new profits until the general partner has received 40% of distributions, and then (3) the investors would split any remaining carried interest with the general partner 60%/40%. A true and correct copy of the February 2015 T2 AOFIV Private Placement Memorandum is attached hereto as Exhibit 78.

30. The AOFIV Private Placement Memorandum included a chart describing the internal rate of return for T2's "vintage" real estate funds as between 12% and 15%. This chart reflected lower returns than the chart included in the Opportunity Fund IV Private Placement Memorandum because it reflected the lower investment returns earned by Criterion investors for those vintage T2 funds.

31. On or around March 2, 2015, Ausdal entered into a Placement Agreement with AOFIV and its affiliates ("AOFIV Placement Agreement"). A true and correct copy of the AOFIV Placement Agreement is attached hereto as Exhibit 80.

32. Under the AOFIV Placement Agreement, T2 agreed to pay Ausdal an amount equal to 50% of the general partner's carried interest for as long as Criterion's clients remained invested in the fund. T2's economics remained the same regardless of fund class.

33. Pursuant to the AOFIV Placement Agreement, a "Fee Disclosure Statement" was to be "delivered to each person to whom Ausdal makes an offer of a Unit." Further, there is a placeholder for the "Fee Disclosure Statement" at the end of the AOFIV Placement Agreement. T2 never received the Fee Disclosure Statement. Defendant Criterion was responsible for providing such a statement to Criterion investors.

34. The eligibility criteria and underlying real estate assets for both the T2 Opportunity Fund IV and AOFIV were the same. Further, T2 would have accepted investments into T2 Opportunity Fund IV from Criterion clients.

35. The main material difference between T2 Opportunity Fund IV and AOFIV was their respective distribution formulae, also known as the waterfall. Specifically, AOFIV investors were entitled to 20% less of the carried interest than T2 Opportunity Fund IV investors, and AOFIV investors were deprived of 100% of net new profits for a longer period of time than T2 Opportunity Fund IV investors.

36. T2 and Criterion expected AOFIV to meet the 8% hurdle, based at least in part on the success of prior legacy funds, i.e., T2 Opportunity Fund II and T2 Opportunity Fund III.

37. T2 did not provide offering kits—i.e., private placement memorandums, operating agreements, and subscription documents—related to either feeder fund to Criterion clients.

38. None of the AOFIV offering materials intended for Criterion clients disclosed that shares of T2 Opportunity Fund IV were available.

39. Exhibit 82 is the Audited AOFIV Financial Statements for the year 2016. Exhibit 97 is the Audited T2 Opportunity Fund IV Financial Statements for the

year 2016. Page 10 of the respective financial statements for the two feeder funds show lower reported returns for AOFIV than for T2 Opportunity Fund IV.

40. As mentioned previously, a true and correct copy of the Audited Financial Statements prepared for AOFIV covering the commencement of operations in February 2015 to December 31, 2015 is attached as Exhibit 76. There is no information regarding the performance of T2 Opportunity Fund IV in these Statements.

41. T2 provided these Audited Financial Statements to Defendants on or about upon their completion on an annual basis.

42. Criterion's clients contributed approximately 5% of the capital raised for T2 Opportunity Fund IV Master L.P.

43. Due to the relatively small size of AOFIV, AOFIV investors bore a disproportionately higher share of expenses than T2 Opportunity Fund IV investors.

44. In 2017, due to the extra expenses associated with operating two feeder funds, AOFIV was collapsed into the main feeder fund.

45. T2 is in the process of winding down the T2 Opportunity Fund IV (Master) and disposing of its assets. Due to the impact of adverse market conditions at the time the assets were sold, the fund failed to meet the 8% hurdle as expected and neither T2 nor Ausdal received any carried interest from the fund.

46. During the period when Defendant Criterion's clients were investing in SREI and AOFIV, T2 referred any questions from Defendant Criterion's clients to Defendants MacArthur and Gravette.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Wheaton, Illinois, on March 29, 2023.

[signature]

Jeff Brown

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On March 29, 2023, I caused to be served the document entitled **DECLARATION OF JEFF BROWN** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 29, 2023

*/s/ Charles E. Canter*
CHARLES E. CANTER

***SEC v. Criterion Wealth Management Insurance Services, Inc., et al.***
**United States District Court for the Central District of California**
**Case No. 2:20-cv-01402-SPG-JEM**

**SERVICE LIST**

Kenneth E. Yeadon, Esq.
Hinshaw & Culbertson LLP
151 N. Franklin Blvd., Ste. 2500
Chicago, IL 60606
Email: kyeadon@hinshawlaw.com
***Attorney for Defendants Criterion Wealth Management Insurance Services, Inc., and Robert Allen Gravette***

Jeffrey R. Thomas, Esq.
Thomas Law LLC
3801 E. Florida Ave.
Suite 107
Denver, CO 80210
Email: jthomas@thomaslawllc.com
***Attorney for Defendant Mark Andrew MacArthur***