# EXHIBIT 69

EXHIBIT NO. 69
J. Brown
5-29-19
Tracy Jones, CSR, RPR, CLR

# CLASS A UNITS SUPPLEMENT

**to**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**relating to**

**T2 STRATEGIC REAL ESTATE INCOME FUND, LLC**
**(a Delaware Limited Liability Company)**

**T2 SREI Fund GP, LLC**
**Manager**

**April 2015**

This Supplement dated April 2015 ("Supplement") to the Confidential Private Placement Memorandum dated November 2014 (the "Memorandum") of the T2 Strategic Real Estate Income Fund, LLC (the "Fund") sets forth the terms relating to the Class A limited liability company units in the Fund ("Class A Units"). Capitalized terms used but not defined herein are defined in the Memorandum.

Except as provided herein, the Class A Units have the same rights, obligations and participate in the same investment portfolio as the other Classes of Units in the Fund as set forth in the Memorandum. The following is a summary of certain terms that apply to Class A Units. *Subscribers for Class A Units must review the Memorandum prior to making an investment in the Class A Units.*

| | |
|---|---|
| **Minimum Capital Commitment** | The minimum Capital Commitment is one hundred thousand dollars ($100,000); provided that the Manager, in its sole discretion, may accept Capital Commitments for a lesser amount and subject to the investor meeting the suitability standards established by the Manager. |
| Capital Contributions | Members will be required to pay for Units issued to them at Closings by making capital contributions to the Fund ("Capital Contributions"), up to the amount of their Capital Commitments, from time to time in accordance with the terms of the LLC Agreement. Class A Units issued in connection with the Initial Closing and any subsequent Contribution Date will be offered at $100 per Unit. Capital Contributions for additional Class A Units will be accepted in increments of at least fifty thousand dollars ($50,000), subject to the Manager's sole discretion |
| Management Fee | The Master Fund will pay to the Investment Manager an annual Management Fee payable quarterly in advance. The Management Fee for Class A Units shall equal: (i) for any Member who has a Capital Commitment of less than $3 million, 1.25% per annum of the NAV per Unit, as of the first day of the quarter, of each such Member's Class A Units; and (ii) for any Member with a Capital Commitment equal to or greater than $3 million, 1.00% per annum of the NAV per Unit, as of the first day of the quarter, of each such Member's Class A Units.<br><br>The Investment Manager may agree to reduce or waive the foregoing fees with respect to a particular Member, including |

employees and affiliates of the Investment Manager. Any such reduction or waiver will be made without notification or consent of the other Members.

**Performance Allocation**

For each Class A Unit, the General Partner of the Master Fund will be allocated a performance allocation ("Performance Allocation") (calculated and allocated annually or as of any date on which interests are redeemed or distributions are made from the Master Fund and calculated separately in respect of each Member of the Fund) equal to 20% of the amount of net new profits of the limited partner interests in the Master Fund attributable to such Class A Unit subject to (i) a non-cumulative "hurdle amount" which is calculated from the first day of each calendar year of the Master Fund at a rate of 6% (prorated for any period less than a full calendar year) and (ii) a catch-up whereby the General Partner is allocated 100% of the net new profits once the hurdle amount is exceeded and until the catch up equals 20% of the sum of the allocations under the catch up and the hurdle amount. The Performance Allocation is made on a "high watermark" basis, which means that the Performance Allocation is made only with respect to net new profits. If, with respect to a Member's indirect interest in the Master Fund, the Master Fund has a net loss in any period followed by net profit, no Performance Allocation will be made with respect to such subsequent appreciation until such net loss has been recovered. The high watermark will be appropriately adjusted for redemptions.

In order to properly allocate the Performance Allocation assessed at the Master Fund, a new series of Class A Units generally will be issued on each date that such Class A Units are purchased. At the end of each fiscal year, each series of Class A Units (other than the series of Class A Units issued upon the Initial Closing of such Class A Units (the "Initial Series")) will be redesignated and converted into the Initial Series (after taking into account the Performance Allocation). Such conversion and redesignation will be effected at the prevailing NAV per Unit of the Initial Series; provided, that no redesignation or conversion will occur with respect to a series of Class A Units if at the end of such year either the NAV of such series is below its high watermark or the NAV of the applicable Initial Series is below its high watermark.

The Manager reserves the right, in its sole discretion, to modify, waive or rebate all or a portion of the Performance Allocation with respect to affiliates or employees of the Manager or other designated large or strategic investors. Any such modification, waiver or rebate will made without notification or consent of the other Members.

**Expense Waiver**

The Investment Manager (or its affiliate) shall bear (or reimburse the Fund for) the amount of all valuation, administration, accounting, Organizational Expenses, legal, tax and audit expenses incurred by the Fund (but excluding all other expenses of the Fund, such as

| | |
|---|---|
| | taxes, interest and borrowing expenses, Investment-related expenses, the Management Fee, the Performance Allocation and extraordinary expenses) (collectively, the "Waived Expenses") during the period beginning on the Initial Closing date and ending on March 31, 2015 (the "Waiver Period"); provided, however, if at the end of any calendar quarter during the three (3) year period beginning immediately after the Waiver Period, the expenses detailed above for that calendar quarter plus the Waived Expenses would not exceed an amount calculated at an annual rate equal to 1.50% of the Fund's NAV for such quarter (the "Recoupment Cap"), the Investment Manager (or its affiliate) shall be entitled to recoup any Waived Expenses previously paid to the extent such expenses have not already been recouped and so long as such recoupment would not exceed the Recoupment Cap. |
| **Redemptions** | Members owning Class A Units will be subject to the same limitations on redemptions as described in the Memorandum. |
| **Suitability/Minimum Eligibility Requirements** | Unless waived by the Manager in its sole discretion, after consultation with its legal counsel, all persons interested in investing in the Fund must attest that they are "accredited investors" within the meaning of Regulation D under the Securities Act of 1933, as amended, and are "qualified clients" as defined in Rule 205-3 of the Investment Advisers Act of 1940, as amended. Persons interested in investing in the Fund are required to complete and return to the Manager (or its designee) the subscription documents for the Fund, a copy of which will be made available to each prospective investor. Subscriptions may be rejected in whole or in part in the Manager's sole discretion. |

## Certain Risk Factors

The Class A Units are intended for sophisticated investors who are able to understand the risks associated with an investment in the Fund. An investment in the Fund is speculative and subject to a variety of risks, including the risk of loss of all or substantially all of the Fund's capital. See "*Certain Investment Considerations*" in the Memorandum.

* * * * *

*This Supplement forms a part of and should be read in conjunction with the Memorandum, the Fund's Second Amended and Restated Limited Liability Company Agreement and the material contracts to which the Fund is a party. Inquiries concerning the Fund, the Manager, the Investment Manager, the administrator or the subscription procedures should be directed to the Manager as described in the Memorandum.*

INVESTMENTS
WORTH
BUILDING

T2 | CAPITAL MANAGEMENT™

# T2 Strategic Real Estate Income Fund, LLC

## LIMITED LIABILITY COMPANY UNITS

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

November 2014

CHICAGO/#2515692.16

## IMPORTANT CONSIDERATIONS

IN MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE LIMITED LIABILITY COMPANY UNITS (THE "UNITS") AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE UNITS OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE UNITS HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION, NOR IS SUCH REGISTRATION CONTEMPLATED. THE UNITS ARE OFFERED AND SOLD, UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER, AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING IS MADE. AS A RESULT, THE UNITS MAY NOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT AND SUCH LAWS OR SUCH RESALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE AND OTHER SECURITIES LAWS. IN ADDITION, T2 STRATEGIC REAL ESTATE INCOME FUND, LLC ("THE FUND") IS RELYING ON AN EXEMPTION FROM REGISTRATION UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), AND NO TRANSFER OF A UNIT MAY BE MADE THAT WOULD REQUIRE THE FUND TO REGISTER AS AN "INVESTMENT COMPANY" UNDER THE INVESTMENT COMPANY ACT. THE UNITS ARE ALSO SUBJECT TO FURTHER RESTRICTIONS ON TRANSFERS DESCRIBED HEREIN. BECAUSE OF SUCH RESTRICTIONS, IT IS UNLIKELY THAT A SECONDARY TRADING MARKET FOR THE UNITS WILL DEVELOP, AND PURCHASERS MUST BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THIS "MEMORANDUM") IS SUBMITTED ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH THE CONSIDERATION OF THE PURCHASE OF THE UNITS REFERRED TO HEREIN. THIS MEMORANDUM MAY NOT BE REDISTRIBUTED OR REPRODUCED IN WHOLE OR IN PART. PROSPECTIVE INVESTORS WILL BE RESPONSIBLE FOR COMMUNICATING THE CONFIDENTIAL NATURE OF THIS MEMORANDUM TO OTHERS AND THE COMPLIANCE BY ALL SUCH PERSONS WITH THE CONFIDENTIALITY RESTRICTIONS SET FORTH HEREIN. EXCEPT AS OTHERWISE PROVIDED IN A WRITTEN AGREEMENT BETWEEN A PROSPECTIVE INVESTOR AND T2 SREI FUND GP, LLC (THE "MANAGER") OR ITS AFFILIATES, IF A PROSPECTIVE INVESTOR OR ANY OF ITS CLIENTS (AS APPLICABLE) RECEIVE A REQUEST UNDER ANY APPLICABLE PUBLIC DISCLOSURE LAW TO PROVIDE, COPY OR ALLOW INSPECTION OF THIS MEMORANDUM OR OTHER INFORMATION RELATING TO THE FUND, THE MANAGER OR ITS AFFILIATES, SUCH PROSPECTIVE INVESTOR SHALL AGREE TO (I) PROVIDE PROMPT NOTICE OF THE REQUEST TO THE MANAGER, (II) ASSERT ALL APPLICABLE EXEMPTIONS AVAILABLE UNDER LAW AND (III) COOPERATE WITH THE MANAGER AND ITS AFFILIATES TO SEEK TO PREVENT DISCLOSURE OR TO OBTAIN A PROTECTIVE ORDER OR OTHER ASSURANCE THAT THE INFORMATION REGARDING THE FUND, THE MANAGER OR ITS AFFILIATES WILL BE ACCORDED CONFIDENTIAL TREATMENT. BY ACCEPTING DELIVERY OF THIS

MEMORANDUM, EACH PROSPECTIVE INVESTOR SHALL AGREE TO THE FOREGOING AND TO RETURN THIS MEMORANDUM PROMPTLY IF SUCH PROSPECTIVE INVESTOR OR ITS CLIENT(S) (AS APPLICABLE) DO NOT INVEST IN THE FUND.

NOTWITHSTANDING ANYTHING IN THIS MEMORANDUM TO THE CONTRARY, EACH INVESTOR OR PROSPECTIVE INVESTOR IN THE FUND (AND ANY EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF AN INVESTOR OR A PROSPECTIVE INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTIONS CONTEMPLATED BY THIS MEMORANDUM (INCLUDING OPINIONS OR OTHER TAX ANALYSES THAT ARE PROVIDED TO IT RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE). HOWEVER, ANY SUCH INFORMATION RELATING TO THE TAX TREATMENT OR TAX STRUCTURE IS REQUIRED TO BE KEPT CONFIDENTIAL TO THE EXTENT NECESSARY TO COMPLY WITH ANY APPLICABLE U.S. FEDERAL OR STATE SECURITIES LAWS. FOR THIS PURPOSE, TAX TREATMENT AND TAX STRUCTURE SHALL NOT INCLUDE (I) THE IDENTITY OF THE FUND, THE MANAGER OR ANY INVESTOR IN THE FUND (OR, IN EACH CASE, ANY AFFILIATE THEREOF), (II) ANY SPECIFIC PRICING INFORMATION OR (III) OTHER NONPUBLIC BUSINESS OR FINANCIAL INFORMATION (INCLUDING, WITHOUT LIMITATION, THE AMOUNT OF ANY FEES, EXPENSES, RATES OR PAYMENTS) THAT IS NOT RELEVANT TO AN UNDERSTANDING OF THE TAX TREATMENT OR TAX STRUCTURE OF THE TRANSACTIONS CONTEMPLATED BY THIS MEMORANDUM.

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION WITH RESPECT TO THIS OFFERING NOT CONTAINED IN THIS MEMORANDUM OR IN THE FUND'S SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OR ITS SUBSCRIPTION AGREEMENT, WHICH WILL BE PROVIDED BY THE MANAGER UPON REQUEST AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE UNITS IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW. PLEASE SEE THE VARIOUS U.S. SECURITIES LAW LEGENDS BELOW. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY UNITS IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER IN SUCH JURISDICTION. NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT A PUBLIC OFFERING OF THE UNITS. ACCORDINGLY, THE UNITS MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION. UNITS THAT ARE ACQUIRED BY PERSONS NOT ENTITLED TO HOLD THEM WILL BE COMPULSORILY REDEEMED. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF UNITS, AND ANY FOREIGN EXCHANGE RESTRICTIONS THAT MAY BE RELEVANT THERETO.

THIS MEMORANDUM IS SOLELY INTENDED TO PROVIDE PROSPECTIVE INVESTORS WITH AN INTRODUCTION TO THE OFFERING, THE FUND STRUCTURE AND THE FUND AND ITS PROPOSED ACTIVITIES. THE SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT SHOULD BE REVIEWED THOROUGHLY BY

EACH PROSPECTIVE INVESTOR. PROSPECTIVE INVESTORS WILL BE REQUIRED TO SATISFY THE INVESTOR SUITABILITY STANDARDS IMPOSED BY THE FUND.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT, FINANCIAL OR OTHER ADVICE. EACH PROSPECTIVE INVESTOR SHOULD MAKE ITS OWN INQUIRIES AND CONSULT ITS OWN ADVISORS AS TO THE APPROPRIATENESS AND DESIRABILITY OF AN INVESTMENT IN THE FUND AND AS TO THE LEGAL, TAX, FINANCIAL OR OTHER MATTERS RELEVANT TO AN INVESTMENT IN THE FUND. NEITHER THE FUND, THE MANAGER OF THE FUND NOR ANY OF THEIR RESPECTIVE AFFILIATES MAKES ANY RECOMMENDATION AS TO THE MERITS OR SUITABILITY OF AN INVESTMENT IN THE FUND FOR ANY PARTICULAR PERSON OR ENTITY.

VEDDER PRICE P.C. HAS BEEN ENGAGED TO ACT AS COUNSEL TO THE FUND AND THE FUND'S MANAGER IN CONNECTION WITH THE FUND'S ORGANIZATION. SUCH COUNSEL HAS NOT BEEN ENGAGED TO PROTECT THE INTERESTS OF PROSPECTIVE INVESTORS OR MEMBERS OF THE FUND AND SHOULD NEVER BE VIEWED AS REPRESENTING ANY PROSPECTIVE INVESTOR IN THE FUND OR ANY MEMBER OF THE FUND. MEMBERS OF THE FUND AND PROSPECTIVE INVESTORS SHOULD CONSULT WITH AND RELY UPON THEIR OWN COUNSEL CONCERNING INVESTMENT IN THE FUND, INCLUDING, WITHOUT LIMITATION, TAX CONSEQUENCES TO THEM AND THE ERISA AND OTHER ISSUES RELATING TO ANY INVESTMENT IN THE FUND.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM CONSTITUTES "FORWARD-LOOKING STATEMENTS" THAT CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "WILL," "SHOULD," "EXPECT," "ANTICIPATE," "ESTIMATE," "INTEND," "CONTINUE" OR "BELIEVE" OR THE NEGATIVES THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. FURTHERMORE, ANY PROJECTIONS OR OTHER ESTIMATES IN THIS MEMORANDUM, INCLUDING ESTIMATES OF RETURNS OR PERFORMANCE, ARE "FORWARD-LOOKING STATEMENTS" AND ARE BASED UPON CERTAIN ASSUMPTIONS THAT MAY CHANGE. DUE TO VARIOUS RISKS AND UNCERTAINTIES, INCLUDING THOSE SET FORTH UNDER "CERTAIN INVESTMENT CONSIDERATIONS," ACTUAL EVENTS OR RESULTS OR THE ACTUAL PERFORMANCE OF THE FUND MAY DIFFER MATERIALLY FROM THOSE REFLECTED OR CONTEMPLATED IN SUCH FORWARD-LOOKING STATEMENTS. MOREOVER, ACTUAL EVENTS ARE DIFFICULT TO PROJECT AND OFTEN DEPEND UPON FACTORS THAT ARE BEYOND THE CONTROL OF THE FUND AND ITS MANAGER. IN CONSIDERING THE PAST PERFORMANCE INFORMATION CONTAINED IN THIS MEMORANDUM, PROSPECTIVE INVESTORS SHOULD BEAR IN MIND THAT PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS, AND THERE CAN BE NO ASSURANCE THAT THE FUND WILL ACHIEVE COMPARABLE RESULTS, THAT UNREALIZED RETURNS WILL BE MET, OR THAT THE FUND WILL BE ABLE TO MAKE INVESTMENTS SIMILAR TO THE HISTORICAL INVESTMENTS PRESENTED HEREIN. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME AFTER THE EARLIER OF THE RELEVANT DATE SPECIFIED HEREIN OR THE DATE OF THIS MEMORANDUM.

**NOTICES TO RESIDENTS OF THE UNITED STATES**

**NOTICE TO RESIDENTS OF FLORIDA**

**THE UNITS HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT. IF SALES ARE MADE TO 5 OR MORE INVESTORS IN FLORIDA, ANY FLORIDA INVESTOR MAY, AT HIS OR HER OPTION, VOID ANY PURCHASE HEREUNDER WITHIN A PERIOD OF 3 DAYS AFTER HE OR SHE (A) FIRST TENDERS OR PAYS TO THE FUND, AN AGENT OF THE FUND OR AN ESCROW AGENT THE CONSIDERATION REQUIRED HEREUNDER OR (B) DELIVERS HIS OR HER EXECUTED SUBSCRIPTION AGREEMENT, WHICHEVER OCCURS LATER. TO ACCOMPLISH THIS, IT IS SUFFICIENT FOR A FLORIDA INVESTOR TO SEND A LETTER OR TELEGRAM TO THE FUND WITHIN SUCH 3-DAY PERIOD STATING THAT HE OR SHE IS VOIDING AND RESCINDING THE PURCHASE. IF AN INVESTOR SENDS A LETTER, IT IS PRUDENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT THE LETTER IS RECEIVED AND TO EVIDENCE THE TIME OF MAILING.**

## TABLE OF CONTENTS

Table of Contents .......... v
Directory .......... ii
Investment Strategy .......... 1
Fund management team .......... 3
Summary of Principal Terms .......... 5
Certain Investment Considerations .......... 20
Certain Legal Matters .......... 37
Certain U.S. Federal Income Tax Considerations .......... 41
*Exhibit A – Second Amended and Restated Limited Liability Company Agreement of the Fund*
*Exhibit B – Subscription Agreement*
*Exhibit C – Redemption Request Form*
*Exhibit D – Additional Subscription Form*

# DIRECTORY

| | |
|---|---|
| **The Fund:** | T2 Strategic Real Estate Income Fund, LLC<br>111 W. Wesley Street, Suite 5<br>Wheaton, IL 60187 |
| **Master Fund** | T2 Strategic Real Estate Income Fund Master, LP<br>111 W. Wesley Street, Suite 5<br>Wheaton, IL 60187 |
| **Manager:** | T2 SREI Fund GP, LLC<br>111 W. Wesley Street, Suite 5<br>Wheaton, IL 60187 |
| **Investment Manager** | T2 Realty Capital Management, LLC<br>111 W. Wesley Street, Suite 5<br>Wheaton, IL 60187 |
| **Administrator:** | Woodfield Fund Administration, LLC<br>1 North Wacker, Suite 2150<br>Chicago, Illinois 60606 |
| **Auditor:** | Grant Thornton LLP<br>175 W. Jackson Blvd., 20th Floor<br>Chicago, Illinois 60604 |
| **Legal Advisor:** | Vedder Price P.C.<br>222 North LaSalle Street<br>Chicago, Illinois 60601 |

# INVESTMENT STRATEGY

## Overview

T2 Strategic Real Estate Income Fund, LLC (the "Fund") will employ an opportunistic investment strategy focused on generating recurring income for investors primarily through short-term debt instruments and equity investments in commercial real estate within the United States. To achieve its investment objective, the Fund will invest all of its assets in T2 Strategic Real Estate Income Fund Master, LP (the "Master Fund"), except those assets needed for cash management purposes. References to the Fund shall include the Master Fund unless the context requires otherwise.

The Master Fund estimates that its investment portfolio will consist of approximately 75% to 100% debt instruments and up to 25% equity investments, with any uninvested capital or balance held in cash or cash equivalents. Specifically, the Master Fund will seek to originate, invest in, acquire or own first, junior or participation interests in loans, debt instruments and other financings secured by a broad range of commercial real properties or interests in commercial real properties, including commercial mortgage-backed securities ("CMBS"). Master Fund investments will be structured as senior debt (secured by first mortgages on the related property), mezzanine debt (secured by junior mortgages on a property or properties), preferred equity investments or hybrid investments in entities that own the related property (each such loan, debt interest, equity investment or other financing, an "Investment," and collectively, "Investments").

The Master Fund will seek to invest in projects that the Fund's investment manager, T2 Realty Capital Management, LLC (the "Investment Manager"), believes provide opportunistic discounts to present market value, as well as non-institutional assets, often in out-of-favor categories, where yields may be more attractive and debt coverage is higher. Where partnering opportunities arise, the Master Fund will seek experienced partners that the Investment Manager believes will be effective collaborators.

### *Senior and Mezzanine Debt Investments*

The Master Fund may seek to acquire commercial real estate loans secured by various property types throughout the U.S., subject to availability and completion of due diligence. The loans may be single loans or portfolios of loans that are current or in default. The Master Fund will generally target loans with a balance of less than $5 million. A typical senior loan, or first mortgage, transaction will provide a qualified borrower with debt financing of 60% to 75% of the property's value and be senior to the borrower's 25% to 40% cash equity investment, while mezzanine loans may provide a qualified borrower with debt financing of up to 100% of the property's value. The average loan duration across the portfolio is estimated to be between two and three years. The underlying properties may be stabilized or non-stabilized, and may involve elements of leasing, renovation or development. The Investment Manager may alter the typical investment parameters of the Master Fund's Investments in light of changing market conditions. The Master Fund may also invest up to 35% of its assets in CMBS.

### *Equity Investments*

The Master Fund may seek to acquire equity Investments in commercial real estate by taking a preferred equity position in a property-owning entity or by acquiring an equity position if it forecloses on a loan as lender. In other circumstances, the Master Fund may purchase securities or other instruments from other investment funds and financial institutions.

**Experience of the Management Team**

The Investment Manager will proactively monitor the portfolio through its in-house, hands-on asset management team (the "Management Team"). Having developed considerable experience in the marketplace, the Management Team will continue to provide borrowers and partners with a focused, responsive and knowledgeable decision-making process. The Management Team's local market knowledge and efficient decision-making develops customer confidence and has generated solid risk management, repeat business, significant origination flow and competitive transaction terms. See "*Fund Management Team*" below.

**Investment Process**

***Due Diligence Process***

The Investment Manager's investment process starts with due diligence. The Investment Manager conducts due diligence on each Investment. The Investment Manager's due diligence process attempts to maximize value and minimize risk through disciplined investing and active management. The Investment Manager's investments have been national in scope, and the Investment Manager has managed and overseen investments on behalf of itself and other funds in several major U.S. cities, as well as secondary and tertiary locations. While the Investment Manager targets investments in the Midwest, the Fund may invest throughout the U.S. The Investment Manager believes its strengths lie in its relationships, its experience with multiple classes of commercial real estate and its ability to quickly and intelligently deploy capital. The Investment Manager seeks to design flexible and creative capital structures that can be tailored to the needs of its partners and the requirements of each situation.

***Loan Origination***

The Investment Manager has a demonstrated history of sourcing loans through the Management Team's extensive relationships throughout the U.S. with both national and regional real estate operators and investors as well as national and regional mortgage and sale broker intermediaries. The Investment Manager and its affiliates have originated and closed over $100 million in transactions.

***Loan Processing***

Loan processing will be controlled in-house, utilizing the experience, skills and relationships of the Management Team.

The Management Team has extensive experience in all facets of the origination process, including negotiating and structuring financings, conducting due diligence and working with legal personnel to ensure that the desired documentation and collateral package is obtained.

The Investment Manager believes that in-house control of the closing and due diligence process is critical to a quality credit culture as well as ensuring the highest level of customer service in order to drive satisfaction and repeat business.

***Servicing and Asset Management***

The Investment Manager will be responsible for loan servicing and asset management, but retains the authority to outsource servicing to an affiliate or an unaffiliated third party. The Investment Manager believes that control of servicing and asset management is critical for monitoring and understanding credit quality and for loss avoidance. In many cases, with proper monitoring and communication with borrowers, the lender can anticipate and address potential problems before a loan defaults.

*Loan Restructuring and Workouts*

The Management Team has deep and experienced asset management personnel and capabilities, enabling proactive asset management and capital preservation efforts. The Management Team has deep experience and backgrounds in high intensity work-outs, restructurings and real estate ownership.

## FUND MANAGEMENT TEAM

### Overview

The Fund's manager, T2 SREI Fund GP, LLC, has delegated to the Investment Manager the day-to-day responsibility for managing the Fund. The Investment Manager is led by Jeff D. Brown and John W. Southard, each of whom are experienced investment professionals with extensive real estate and structured finance experience in the U.S. The Management Team has the breadth of experience and long-standing relationships that are expected to enhance the Fund's ability to achieve attractive current and total risk-adjusted returns for investors.

### Management Team Biographies

*Jeff D. Brown—Founder, CEO and CIO*

Mr. Brown has over 17 years of commercial real estate investment experience. As founder and CEO of T2 Capital Management, LLC, Mr. Brown works closely with Mr. Southard in providing T2's corporate direction as well as overseeing implementation. As CIO of T2 Realty Capital Management, LLC ("T2"), Mr. Brown oversees the origination, underwriting, and management of all portfolio investments. Prior to T2, Mr. Brown was the President of a privately held, entrepreneurial commercial real estate finance company based in the Chicago suburbs (2001-2010). Before being promoted to President, Mr. Brown was an Executive Vice President at the firm responsible for overseeing the Credit and Syndications division. In that capacity, he originated, evaluated, underwrote, and syndicated a total of over $1 billion in commercial real estate financings across the United States while co-managing the company's over $300 million loan portfolio. The portfolio consisted of a wide variety of financing structures on multiple different property types including office, retail, industrial, healthcare, multi-family, residential, hospitality, mixed-use, and land.

Prior to 2001, Mr. Brown worked as an institutional bond trader at a privately held financial services firm (1998-2001) and an analyst at a market-neutral hedge fund of funds (1997-1998). Mr. Brown received his Bachelor's degree in Business/Economics and Psychology from Wheaton College (Wheaton, Illinois). While at Wheaton College, Mr. Brown was captain of the football team and a First Team GTE Academic All-American quarterback. Mr. Brown is currently a part-time student at The University of Chicago Booth School of Business pursuing his MBA.

*John W. Southard—Founder and Principal*

Mr. Southard has over twenty years of experience in the areas of portfolio management, product development and quantitative modeling. As founder and principal of T2, Mr. Southard provides capital and strategic direction to the company. He is involved in fund formation, administration and key client relationships for the firm.

Prior to T2, Mr. Southard co-founded PowerShares Capital Management, LLC, an exchange traded fund (ETF) company established in 2002. Mr. Southard oversaw all the research initiatives,

portfolio management and trading operations of the company. PowerShares was sold to Invesco in 2006. Mr. Southard left the company at the end of 2009.

Before PowerShares, Mr. Southard was a Senior Equity Analyst for Charles Schwab & Co. and was involved in the development of the quantitative modeling behind Schwab's research initiatives. In addition, Mr. Southard was involved in the formation research of a mutual fund and other equity products utilized for Schwab's advice initiative.

Mr. Southard is a Chartered Financial Analyst, has a Master's degree in Finance from DePaul University and a Bachelor's degree in Business/Economics with an emphasis in Mathematics from Wheaton College (Wheaton, Illinois). He is a member of the CFA Society of Chicago and the CFA Institute.

***Linda Searcy—Chief Operating Officer***

Ms. Searcy has over 20 years of experience in the commercial real estate finance industry. As Chief Operating Officer of T2, Ms. Searcy oversees fund administration, compliance, and operations. Prior to joining T2, Ms. Searcy was a director at a privately-held commercial real estate company in the Chicago suburbs and oversaw all aspects of managing its $300 million loan portfolio. Prior to this, Ms. Searcy was Vice President of the Specialty Finance division of a $13 billion publicly traded finance company based in Scottsdale, Arizona. During her 15-year tenure with the company, Ms. Searcy's various roles included overseeing loan administration, underwriting, due diligence, compliance, strategic planning and financial reporting. Ms. Searcy has a Master's degree in Accountancy with Distinction from DePaul University and a Bachelor's degree in Finance and Economics from Western Illinois University. Ms. Searcy is also a CPA candidate.

***Jeff Baxter—Vice President***

Mr. Baxter spearheads the investor relations and fund raising efforts for T2. Prior to T2, Mr. Baxter was a broker at a national investment real estate company. Prior to this, he served his alma mater, Wheaton College, as the Director of Principal Gifts. During his time there, Jeff assisted in securing leadership level planned and outright gifts as part of the $260 million Promise of Wheaton campaign. Prior to working at Wheaton College, Mr. Baxter worked in Private Client Services for UBS Financial Services, Inc. While at UBS, Mr. Baxter excelled in business development, portfolio management, and generating tax-efficient strategies for high net worth clients. Mr. Baxter graduated from Wheaton College with his Bachelor's degree in Business/Economics. While at Wheaton, Mr. Baxter was a member of the baseball, lacrosse, and debate teams.

***John Felker—Associate***

Mr. Felker joined T2 in July 2013 as an Associate. In this capacity he evaluates prospective investments, conducts due diligence, manages existing investments and assists with various fund administration activities. Prior to joining T2, Mr. Felker was a Senior Analyst at a private equity real estate firm based in Colorado, which focuses on properties across the United States and has approximately $500 million under management. Mr. Felker was primarily responsible for completing due diligence on prospective investments, managing existing real estate holdings, and working with various financiers to assist with both acquisitions and recapitalizations. He joined the firm in 2010 after working as an intern within the research department at Invesco PowerShares. Mr. Felker graduated summa cum laude from Wheaton College (Wheaton, Illinois) where he received his Bachelor's degrees in Economics and Mathematics. Mr. Felker has passed all three Chartered Financial Analyst (CFA) exams.

## SUMMARY OF PRINCIPAL TERMS

*The following is a summary of the principal terms of T2 Strategic Real Estate Income Fund, LLC (the "Fund"). This description is qualified in its entirety by reference to the supplement related to each Class of Units (each, a "Supplement"), the Second Amended and Restated Limited Liability Company Agreement dated as of October 1, 2014 (the "LLC Agreement"), and the subscription documents related thereto (collectively, the "Subscription Agreement"), and should be read in conjunction therewith. This Summary of Principal Terms, together with the other information provided in this Confidential Private Placement Memorandum (this "Memorandum"), summarizes certain provisions of the LLC Agreement and the Subscription Agreement and is qualified in its entirety by reference to such documents. Prospective investors should also carefully consider the information contained in this Memorandum under the heading "Certain Investment Considerations." All capitalized terms used in this Memorandum and not otherwise defined herein shall have the meaning ascribed to them in the LLC Agreement.*

The Fund and Master Fund: T2 Strategic Real Estate Income Fund, LLC, a Delaware limited liability company. To achieve its investment objective, the Fund will invest all of its assets in T2 Strategic Real Estate Income Fund Master, LP, a Delaware limited partnership (the "Master Fund"), except those assets needed for cash management purposes. References to the Fund shall include the Master Fund unless the context requires otherwise.

The Master Fund will employ an opportunistic investment strategy focused on generating recurring income for investors primarily through short-term debt instruments and equity investments in commercial real estate within the United States. The Master Fund estimates that its investment portfolio will consist of approximately 75% to 100% debt instruments and up to 25% equity investments, with any uninvested capital or balance held in cash or cash equivalents. Specifically, the Master Fund will seek to originate, invest in, acquire or own first, junior or participation interests in loans, debt instruments and other financings secured by a broad range of commercial real properties or interests in commercial real properties, including commercial mortgage-backed securities ("CMBS"). Master Fund investments will be structured as senior debt (secured by first mortgages on the related property), mezzanine debt (secured by junior mortgages on a property or properties), preferred equity investments or hybrid investments in entities that own the related property (each such loan, debt interest, equity investment or other financing, an "Investment," and collectively, "Investments").

The Manager: T2 SREI Fund GP, LLC, a Delaware limited liability company, is the manager of the Fund (the "Manager"). The Manager has appointed the Investment Manager (as

defined below) as the investment manager to the Fund. The Manager also serves as the general partner of the Master Fund ("General Partner").

Investment Manager: ........................................ T2 Realty Capital Management, LLC ("Investment Manager") serves as the investment manager to the Fund and the Master Fund. As such, the Investment Manager is responsible for the day-to-day management of the Investments.

Parallel Funds: ........................................ The Manager or its affiliates may, at its discretion, create one or more parallel investment entities to accommodate the investment requirements of certain non-U.S. and other investors ("Parallel Funds"), the structure of which may differ from that of the Fund. Parallel Funds will either (i) invest all of their assets directly in the Master Fund (except those assets needed for cash management purposes), (ii) invest proportionately in all transactions on effectively the same terms and conditions as the Master Fund, except as necessary to address tax, regulatory or other investor considerations or (iii) invest in an entity owned by the Master Fund and the Parallel Fund, in proportion to their commitments to such entity, to make Investments. To the extent a Parallel Fund invests directly in the Master Fund, the Master Fund shall be responsible for the fees and expenses of such entity. A Parallel Fund may contain different terms and conditions than the Fund or Master Fund and other Parallel Funds, including different fees. As used herein, the term the "Fund" shall, unless the context otherwise makes clear, include any Parallel Funds.

Investment Objective: ........................................ The Fund's primary objective is income generation while also benefitting from capital appreciation.

Overview of Offering........................................ The Manager will seek capital commitments ("Capital Commitments") on an ongoing basis from qualified investors who will become members in the Fund (each, a "Member" and together, the "Members") on the terms and subject to the conditions described herein and set forth in the LLC Agreement.

Limited liability company units in the Fund ("Units") will be offered for an indefinite period. The Manager reserves the right to suspend or terminate the offering at any time. Members will be required to pay for Units issued to them at Closings (as defined below) by making capital contributions to the Fund ("Capital Contributions"), up to the amount of their Capital Commitments, from time to time in accordance with the terms of the LLC Agreement. Units issued in

connection with the Initial Closing (as defined below) or any subsequent Contribution Date will be at $100 per Unit.

In order to properly allocate the Performance Allocation (as defined below) assessed at the Master Fund among the Members that invest at different times, the Fund will issue a separate series of Units within each Class on each Closing. Additional Series of Units within the same Class shall be issued at $100 per Unit (exclusive of any sales charges).

Classes of Units: ........................................ The Fund may, from time to time, offer additional or customized classes of Units (each, a "Class" and together, the "Classes"). Each Class will be offered by a Supplement to this Memorandum. The Classes are subject to different terms — which may include fee structure, subscription terms, redemption terms and reporting — as the Manager may determine, without notice to, or the consent of, the Members.

Closings: ........................................ The Fund anticipates that the initial closing (the "Initial Closing") will occur on or about April 1, 2014, or at such later time as determined by the Manager in its sole discretion. After the Initial Closing, the Fund is expected to have closings (each, a "Closing") on a quarterly basis or at such other times as determined by the Manager in its sole discretion, at which time new Capital Commitments will be accepted and existing Members may increase their Capital Commitments to the Fund in increments of at least fifty thousand dollars ($50,000), subject to the Manager's sole discretion.

Minimum Capital Commitment: .................. No investor may be permitted to make a Capital Commitment of less than one hundred thousand dollars ($100,000); provided, that the Manager, in its sole discretion, may accept Capital Commitments for a lesser amount.

Subscription Queue - Drawdowns: .............. The Fund may call down Capital Commitments, except any call for Capital Contributions made in connection with the Closing where such prospective investor becomes a Member, with a minimum of ten (10) days prior written notice to the Members (each date on which a Capital Contribution is required to be made, a "Contribution Date"), for such purposes as the Manager deems appropriate in its sole discretion, including, without limitation, to make Investments, meet operational needs, pay expenses (including, without limitation, the Management Fee (as defined below)), establish reserves or to pay redemptions. The Manager,

in its sole discretion, will determine the percentage of the aggregate amount of undrawn capital pursuant to outstanding Capital Commitments to be drawn down from Members on a particular Contribution Date; provided, that the Manager will be required to call the entire amount of the unfunded Capital Commitment of a Member made at a particular Closing (as specified in such Member's Subscription Agreement) before calling any portion of the unfunded Capital Commitment of any Member made at a subsequent Closing; provided further, that unfunded Capital Commitments made by Members at a particular Closing to the Fund will be drawn down pro rata (based upon unfunded Capital Commitments made at that Closing) among the Members which made such unfunded Capital Commitments. If a Contribution Date occurs on a date that is other than the last day of a quarter, Units will be issued using the most recent Valuation Date (as defined below) if within the first forty-five days of the quarter-end and as of the next subsequent Valuation Date if after forty-five days of the quarter-end.

Conflicts of Interest: .................................... The Fund is subject to actual and potential conflicts of interest. Please see "*Conflicts of Interest*" below for more information.

Term: .................................................................. The Fund is intended to have a perpetual life and, as such, there is no fixed time within which the Fund will be dissolved. It may, however, be terminated at any time upon (i) the determination of the Manager, in its sole discretion, that, due to legal, regulatory, tax, economic or other changes, it is impracticable to continue to seek out and make Investments on behalf of the Fund or (ii) the withdrawal, resignation, dissolution or bankruptcy of the Manager if there is no replacement manager.

If the Fund is terminated, the Manager will cease accepting subscriptions and will commence an orderly liquidation of the Fund.

Redemption Queue and Transfers: ............... Subject to the limitation described herein, Members may seek to redeem their Units on the last day of any calendar quarter (each, a "Redemption Date") on sixty (60) days' prior written notice to the Manager; provided, however, that each redemption of Units is subject to (i) sufficient liquid assets being available to satisfy the redemption request and (ii) a separate twelve-month lock-up period whereby a Member cannot redeem Units issued in connection with a Capital Contribution for a period of twelve months from the date of the Capital

Contribution (the "Lock-Up"). For the avoidance of doubt, Members will be subject to a separate Lock-Up for Units issued in connection with additional Capital Contributions to the Fund. The Manager will consider (but is not required to approve) redemptions at other times.

A partial redemption will only be permitted in increments of ten thousand dollars ($10,000) and will not be permitted for amounts less than fifty thousand dollars ($50,000).

As noted above, outstanding redemption requests with respect to redeemable Units will be accommodated as liquid assets permit. To the extent that liquid assets are insufficient during any calendar quarter to satisfy all outstanding redemption requests with respect to redeemable Units, redeemable Units subject to outstanding redemption requests will be redeemed on a pro rata basis based on the outstanding redemption amounts within the applicable calendar quarter of the Members that have submitted valid redemption requests. Members will be redeemed sequentially by the calendar quarter in which their redemption requests were received, with each Member in a given calendar quarter being redeemed prior to any Member that submitted a redemption request in a subsequent calendar quarter. For the avoidance of doubt, the Fund does not guarantee it will have liquid assets sufficient to satisfy all redemption requests for any one calendar quarter. Accordingly, Members should be prepared to hold the Units indefinitely.

The Manager will have the sole discretion to determine the extent to which liquid assets are available for redemption or are necessary for the ongoing expenses (including debt payments), Investments, capital expenditures or reserves. Units will be redeemed at the NAV per Unit (as defined below) of the relevant Class as of the Redemption Date, as adjusted for additional distributions, if any, received by the redeeming Member subsequent to the Redemption Date. The Fund will not be obligated to sell, finance or refinance any Investments to satisfy redemption requests.

No distribution or payments in connection with a redemption will be permitted if the liabilities of the Fund would exceed the value of the assets of the Fund following such distribution or redemption. In addition, payment of all or a portion of redemption proceeds may

be delayed in certain circumstances at the sole discretion of the Manager.

The Manager, in its sole discretion, may waive the Lock-Up period, any notice requirement, limitations on minimum or maximum redemptions, or other requirements in connection with any redemption.

Only with the consent of the Manager, which consent may be withheld in its sole discretion, may (a) a Member pledge, assign, sell, exchange or transfer, directly or indirectly, all or any part of its Units or (b) any assignee, purchaser or transferee of any Units be admitted as a substitute Member. To the extent employed, the redemption and transfer of Units will be restricted when necessary to maintain the REIT Subsidiary's (as defined below) qualification as a real estate investment trust ("REIT") or to prevent the assets of the Fund or a Parallel Fund from being deemed "plan assets" subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"). Moreover, transfers of Units will be restricted if the Manager determines that such transfer would or may (i) violate, or require registration or qualification under, applicable federal, state or foreign securities laws, (ii) cause the Fund to be classified as an association taxable as a corporation for U.S. federal income tax purposes or (iii) create a material risk of adverse tax consequences to the Fund, any Parallel Fund or any Member, as applicable (other than the transferor and transferee), including any material risk that any of the Fund or any Parallel Fund, as applicable, will be treated as a "publicly traded partnership" under Section 7704 of the Code taxable as a corporation for U.S. federal income tax purposes. In addition, if a transfer of Units in the Fund or shares of the REIT Subsidiary (if any) or of any direct or indirect ownership interest in a Member causes shares of the REIT Subsidiary to be converted into "excess shares" pursuant to the REIT Subsidiary's governing documents, the transferee of such interest may be subject to adverse consequences, including being required to repay certain distributions received by it from the Fund that are attributable to such "excess shares" and having its right to certain future distributions reduced.

Transfers to third parties will be subject to a right of first refusal, on the same economic terms, exercisable by the Manager; provided, that the Manager may, in its sole discretion, waive the right of first refusal requirement.

Under certain circumstances, the Manager may suspend the right or obligation to redeem Units. See "*Suspension of Valuation and Redemptions*" below.

No Redemptions: ........................................ Except in connection with a redemption request or otherwise with the consent of the Manager, no Member will be permitted to redeem from the Fund or to redeem any portion of its Units.

Mandatory Redemptions: ............................ The Manager shall have the right, at any time upon written notice, to require a Member to redeem from the Fund if the Manager determines, in its sole discretion, that a significant delay, extraordinary expense, violation by the Fund, the Master Fund or any Parallel Fund of the provisions of any law, statute, rule, regulation or order applicable to the Fund, the Master Fund, any Parallel Fund, an Investment or any other Member or a material adverse effect on the Fund, the Master Fund, any Parallel Fund, any of their respective affiliates, an Investment or any existing or future Investment or any other Member is likely to result, or that such Member has made a material misrepresentation in, or breached or violated any representation, warranty or covenant of the LLC Agreement or such Member's Subscription Agreement that results in or is likely to result in a material adverse effect on the Fund, the Master Fund, any Parallel Fund, any of its affiliates, an Investment or any existing or future Investment or any other Member or that such Member is a prohibited person under anti-money laundering laws.

Upon the giving of such notice, such Member will be required to withdraw as a Member and shall cease to be a Member of the Fund for all purposes, except for its right to receive the applicable amount related to the redemption of its Units.

Net Asset Value: ......................................... The net value of the assets of the Fund (the "NAV") will be maintained on the books of the Fund and will be calculated by the Manager as of the last business day of each calendar quarter and as of any other date as may be determined by the Manager in its sole discretion (each, a "Valuation Date"). "NAV per Unit" means, as of a particular Valuation Date, the NAV attributable to a Class of Units as of such date, divided by the number of Units then outstanding in the Class.

The values of the Investments will be established in accordance with the Manager's valuation policy statement and as set forth below in "*Summary of Principal Terms—Valuation Policy*," as in effect from time to time. The Fund's NAV will be, at each

Valuation Date, the fair value of the Fund's assets, including cash, decreased by the fair value of all liabilities of the Fund, including contingent liabilities on an accrual basis, valued in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP") Fair Value Accounting. To the extent that any Parallel Funds are established, the NAV for the Fund and the Parallel Funds will be determined in the same manner and consolidated.

Valuation Policy: ............................................ The Fund's Investments will be fair valued on a quarterly basis by or under the direction of the Manager. The Manager may determine all matters concerning valuation of the Fund's Investments, respectively, as well as allocations among the Members and accounting procedures, not expressly provided for in the LLC Agreement, whose determination is to be final and conclusive as to all Members. The Manager may engage one or more third parties to provide valuation determinations on a quarterly or less frequent basis. Such valuation determination may employ appraisals or other methods to value of the Fund's Investments. For more information regarding the risks of relying on valuations and appraisals see "*Certain Investment Considerations—Uncertainty of Net Asset Values*" below. The Master Fund will employ the same valuation policy as the Fund.

Suspension of Valuation and Redemptions: ............................................ The Manager may suspend the valuation of the assets and/or the right or obligation to redeem Units for any period when: (i) there exists any state of affairs which, as determined by the Manager in its sole discretion, constitutes an emergency as a result of which disposition of the assets of the Fund or Master Fund would not be reasonably practicable or could be seriously prejudicial to the Members; (ii) when for any reason the prices or values of any Investments of the Fund or Master Fund cannot reasonably be promptly and accurately ascertained; (iii) in any other circumstances that the Manager deems necessary or appropriate in its sole discretion; or (iv) the Master Fund suspends redemptions.

Default Provision: ............................................ A Member that does not fund a capital call within the applicable time period will be considered to be in default and will be subject to certain remedies specified in the LLC Agreement, including, among others, redemptions of its Units, interest charges, and set-off against or withholding of distributions or redemptions otherwise payable to such Member. A default by any one Member

will not relieve any other Member from its obligations to fund a capital call. In addition, the other Members may be required to contribute additional amounts to cover any defaulted amounts, but the aggregate Capital Commitments of the other Members will not be increased.

Investment Structure: ..................................... The Master Fund is permitted, but not required, to utilize a subsidiary that will elect to be taxed as a REIT (the "REIT Subsidiary") for some or all Investments that the Master Fund makes in assets that may be held by a REIT under the applicable provisions of the Code. To the extent the REIT Subsidiary is not utilized, and for other assets which may not be held by a REIT, the Master Fund intends to utilize limited liability companies or other limited liability entities that will be directly or indirectly owned by the Fund.

The governing documents of the REIT Subsidiary will contain provisions (the "Ownership Restrictions") that restrict the beneficial ownership of the REIT Subsidiary's shares by a single person (other than the Fund) or persons acting as a group. The purpose of the Ownership Restrictions is to assist in protecting and preserving the REIT Subsidiary's status as a REIT.

Each Member will be required to provide to the Fund such information as the Manager may reasonably request to determine the effect of that Member's ownership of Units in the Fund on the ability of the REIT Subsidiary to qualify as a REIT.

Subscription-Backed Credit Facility: ............ The Fund or the Master Fund may arrange for one or more credit facilities (each, a "Credit Facility") (including, if available, an equity commitment line of credit secured by the Fund's pledge of its rights in the Members' unfunded Capital Commitments and the Units pledged to the Fund as security therefor (the "Subscription-Backed Facility")) to enable the Fund or Master Fund to pay expenses, make deposits and acquire assets through borrowings in lieu of, or in advance of, Capital Contributions. It is contemplated that a REIT Subsidiary will be the borrower for all Investments that it holds. The Subscription-Backed Facility will not exceed 100% of the Capital Commitments of the Master Fund. Members' ability to use the Units in the Fund as collateral for other indebtedness may be restricted by a Credit Facility.

Under the terms of any Subscription-Backed Facility, the Members may be required to confirm the terms of their Capital Commitments to the lenders under such equity

commitment line, honor capital calls made by such lenders under certain circumstances, provide certain financial information to such lenders and execute certain documents in connection with such commitment line.

Distributions: Net cash flow is generally expected to be distributed to the Members quarterly and will be allocated among the Members pro rata based on the aggregate value of their Units.

Reinvestment of Distributions: The Manager may establish a program to facilitate the re-investment in the Fund of distributions that are otherwise payable to a Member ("Distribution Reinvestment"). Participation in any Distribution Reinvestment will be at the option of each Member. Members may alter their Distribution Reinvestment participation upon ninety (90) days' prior written notice to the Manager. Participating Members will be issued additional Units, or a fraction thereof, at the prevailing NAV per Unit, as determined as of the close of the day such cash distribution was effective, rather than cash. Such issuance of new Units will be effective the day after the effective date of the cash distribution otherwise payable to such Member. The Manager may elect to suspend Distribution Reinvestment from time to time or restrict participation in the program as it deems appropriate.

Use of Special Purpose Vehicles: In order to insulate Investments against liabilities arising from particular Investments, to facilitate the financing to be incurred in order to acquire Investments and to provide flexibility in disposing of Investments, the Master Fund intends to use special purpose vehicles to make Investments. The Master Fund may guarantee the financing incurred by such special purpose vehicles.

Side Letter: The Fund or the Manager, without any further act, notice, approval or vote of any Member, may enter into side letters or other similar agreements with certain Members that have the effect of establishing rights under, or altering or supplementing the terms of, the LLC Agreement.

Co-investment Policy: The Manager may, but will be under no obligation to, provide co-investment opportunities to one or more Members. Affiliates of the Manager may make co-investments with the Fund. In addition, the Manager may advise other entities, including Parallel Funds, which may co-invest with the Fund. For any particular co-investment, the investment terms applicable to the

| | |
|---|---|
| | Fund will be no less favorable than the investment terms applicable to the co-investor. |
| Expected Holding Period: ............................ | Investments in debt instruments are expected to be held until maturity, although particular Investments may be held for shorter periods depending upon the dynamics of each situation. |
| Investment Limitations: ................................ | Once the Master Fund's NAV exceeds $50 million, Investments by the Master Fund will be subject to the following limitation – no more than 15% of total capital may be committed to any individual Investment. |
| Leverage:....................................................... | The Master Fund may incur indebtedness on certain assets if available and as deemed appropriate by the Master Fund in seeking to achieve its investment objective. To the extent the Master Fund utilizes a REIT Subsidiary, it is contemplated that the REIT Subsidiary will be the borrower for all Investments it holds. The Master Fund does not anticipate borrowing in excess of an overall loan to value of 50% (excluding certain debt such as the Subscription-Backed Facility), determined at the time such indebtedness is incurred. The Master Fund may finance certain assets in its portfolio through a variety of debt instruments including lines of credit, repurchase financings, collateralized debt obligations, securitized financing and other secured and unsecured borrowings. |
| Organizational Expenses:............................ | The Master Fund will bear all of the Fund's organizational and offering expenses, including printing, legal and accounting expenses incurred in connection with the formation of the Fund ("Organizational Expenses"). |
| Administrative & Operating Expenses: ........ | The Manager will bear the following ordinary day-to-day expenses incidental to the administration of the Fund: (i) all costs and expenses relating to office space, facilities, utility services, supplies and necessary administrative and clerical functions; and (ii) compensation of all employees engaged in the Fund's and the Manager's business. The Master Fund will bear all other costs and expenses of the Fund's activities, including, but not limited to, in house or external legal, third-party accounting and tax, insurance, annual audit, due diligence, pursuit costs, loan servicing expenses, annual meetings, collateral manager fees and expenses and all costs relating in any way to any Unit offerings following the Initial Closing, including, without limitation, costs relating to preparing offering documents, verifying Member suitability requirements |

and complying with any and all applicable laws, orders and regulations related thereto, as determined by the Manager in its sole discretion, including complying with the laws of applicable jurisdictions and the payment of filing fees. The Fund may bear certain expenses to the extent the Manager determines such expenses should be paid by the Fund.

Management Fees: ........................................ The Master Fund will pay to the Investment Manager an annual management fee (the "Management Fee") as set forth in the applicable Class Supplement to this Memorandum. The Management Fee shall be payable quarterly, in advance. The Investment Manager may agree to reduce or waive the foregoing fees with respect to a particular Member, including employees and affiliates of the Investment Manager.

Management Fee Offset: ............................ To the extent deemed appropriate by the Investment Manager and for the benefit of the Members, the Investment Manager may receive an allocation of profits or income from the Master Fund as an offset to the Management Fee. For the avoidance of doubt, the offset shall not exceed 100% of the Management Fee.

Performance Allocation: ............................... The General Partner of the Master Fund will be allocated a performance allocation (the "Performance Allocation") (calculated and allocated annually or as of any date on which interests are redeemed or distributions are made from the Master Fund and calculated separately in respect of each Member of the Fund) as set forth in the Class Supplement. The Performance Allocation is made on a "high watermark" basis, which means that the Performance Allocation is made only with respect to net new profits. If, with respect to a Member's interest in the Master Fund, the Master Fund has a net loss in any period followed by net profit, no Performance Allocation will be made with respect to such subsequent appreciation until such net loss has been recovered.

The Manager reserves the right, in its sole discretion, to modify, waive or rebate all or a portion of the Performance Allocation with respect to affiliates or employees of the Manager or other designated large or strategic investors. Any such modification, waiver or rebate will made without notification or consent of the other Members.

Transaction Fees: ........................................... Subject to the offset right set forth herein, all origination, acquisition, disposition, financing, break-up and similar transaction fees which are directly related to the investment activities or operations of the Fund or any

special purpose vehicle through which the Fund invests and are received by the Investment Manager shall be for the account of the Fund. All fees received by the Investment Manager that are not directly related to the investment activities or operations of the Fund and such special purpose vehicles shall be for the account of the Manager.

Indemnification and Exculpation: ................

The LLC Agreement provides that the Manager, the Investment Manager and their Affiliates will not be liable to any Member or to the Fund for losses resulting from mistakes of judgment, negligence or other fault, provided that the Manager's, Investment Manager's or their Affiliate's action or failure to act did not constitute fraud, gross negligence or willful misconduct. The foregoing provisions (as well as the indemnification provisions described below) shall not be construed to relieve the Manager of any liability to the extent that such liability may not be waived, modified or limited under applicable laws.

The LLC Agreement provides that the Fund shall indemnify and hold harmless any Person from any losses, damages, expenses (including attorneys' fees), judgments, penalties, fines, settlements and amounts reasonably incurred by such Person in the performance of services on the Fund's behalf or in furtherance of the Fund's interests, undertaken at the Manager's or Investment Manager's request, provided that such liability was not the result of gross negligence, fraud or willful misconduct. The LLC Agreement authorizes the Manager to advance monies from the Fund for legal expenses and other costs subject to an undertaking to repay such advances if it is determined that indemnification is not proper. Such indemnification or agreement to hold harmless, however, shall only be recoverable out of the property of the Fund and not from the Members personally beyond their investment in the Fund. No indemnity shall increase the liability of any Member to the applicable Fund beyond the amount of his or her Capital Commitment and proportional share of profits (if any) in the Fund. Prospective investors should be aware that under the provisions of the LLC Agreement, they may have a more restricted right of action against the Manager than would be the case absent these provisions.

The Fund may obtain appropriate insurance for the persons covered by the foregoing indemnification obligations for any loss or damage incurred by them.

Circular 230 Notice: ........................................ Any discussion of the tax consequences of an investment in the Fund contained herein is not intended or written by the Fund, the Manager or the Manager's counsel to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed under U.S. tax laws. This discussion is provided to support the promotion or marketing by the Fund of the Units offered hereby. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor concerning the potential tax consequences of an investment in the Fund.

U.S. Tax Considerations: ............................ The Fund expects to be classified as a partnership (and not as a corporate entity) for U.S. federal income tax purposes and, consequently, the character of the income of the Fund will flow through to the Members. The Manager expects that the Master Fund will also be so classified. Tax-exempt investors may, with respect to certain possible investment activities, incur unrelated business taxable income ("UBTI"). The Fund may, but is not required to, implement alternative legal and financial structures so as to minimize, to the extent reasonably possible and not inconsistent with the objective of maximizing pre-tax returns, the amount of UBTI, including the formation of the REIT Subsidiary and/or the establishment of one or more Parallel Funds. Prospective non-U.S. investors should be aware that an investment in the Fund may give rise to effectively connected income ("ECI") in certain circumstances.

Each prospective Member should consult with its own tax advisor regarding all U.S. federal, state, local and non-U.S. tax considerations applicable to an investment pursuant to this offering.

ERISA and Other U.S. Employee Benefit Plans and Accounts: ................... U.S. employee benefit plans and accounts may generally purchase Units in the Fund or a Parallel Fund subject to the considerations described in this Memorandum. The Manager intends to conduct the operations of the Fund and each Parallel Fund so that the assets of the Fund and each Parallel Fund will not be considered "plan assets" of any plan investor. Fiduciaries of such plans and accounts are urged to review carefully the matters discussed in this Memorandum and consult with their own legal and financial advisors before making an investment decision. See "*Certain Considerations Applicable to ERISA, Governmental and Other U.S. Plan Investors.*"

| | |
|---|---|
| Reporting: | Audited financial statements will be prepared annually in accordance with U.S. GAAP Fair Value Accounting. Unaudited fair value financial statements will be prepared on a quarterly basis, as well as (i) a status report of the Fund's Investments and (ii) an estimate of the value of each Member's Units, prepared by the Manager. |
| Amendments: | The LLC Agreement may be amended by the Manager in accordance with its terms. |
| Suitability/Minimum Eligibility Requirements: | Unless waived by the Manager in its sole discretion, after consultation with its legal counsel, all persons interested in investing in the Fund must attest that they are accredited investors within the meaning of the rules under the Securities Act. Persons interested in investing in the Fund are required to complete and return to the Manager (or its designee) the subscription documents for the Fund, a copy of which will be made available to each prospective investor. Subscriptions may be rejected in whole or in part in the Manager's sole discretion. |
| Placement Agent: | The Fund may engage selling agents to offer and sell the Units. Such selling agents may be paid a sales commission out of the Manager's Management Fee or Performance Allocation or an assets-based "distribution fee" charged to the Members introduced by such selling agents, in addition to a portion of the Management Fee and/or Performance Allocation. Accordingly, depending on the type of sales commissions paid, such commissions may increase the aggregate expenses of any person investing in Units of the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund. |
| Fiscal Period: | The Fund's fiscal year end shall be December 31. |
| Counsel: | Vedder Price P.C. serves as legal counsel to the Manager and the Investment Manager. Vedder Price does not represent the Members. No independent counsel has been retained to represent the Members. See "*Certain Investment Consideration—Legal Representation.*" |
| Administrator: | Woodfield Fund Administration, LLC. |
| Auditors: | Grant Thornton LLP. |

## CERTAIN INVESTMENT CONSIDERATIONS

*Prospective investors should carefully consider the following risk factors, together with all of the other information included in this Memorandum, before deciding to purchase Units. As a result of these factors, as well as other risks inherent in any investment, there can be no assurance that the Fund will be able to meet its investment objectives or otherwise be able to successfully carry out its investment program.*

### General Investment Risks

The business of the Fund is to invest primarily in debt and equity investments in commercial real estate properties within the United States, which may include properties and projects that are undervalued, distressed or require unconventional financing to become viable, as well as in loans that may be non-performing. Such Investments involve a high degree of business and financial risk that can result in substantial losses. Investors in the Fund should not subscribe to or invest in the Fund unless they can readily bear the consequences of losses on their investment.

### Investing in Real Estate Will Expose the Fund to a High Degree of Risk

Real estate historically has experienced significant fluctuations and cycles in value that may result in reductions in the value of real estate-related investments. The marketability and value of the Fund's Investments will depend on many factors beyond the control of the Fund. The ultimate performance of the Fund's Investments will be subject to the varying degrees of risk generally incident to the financing, ownership and operation of the underlying real property. The ultimate value of the Fund's Investment in the underlying real property depends upon the real property owner's ability to operate the real property in a manner sufficient to maintain or increase revenues in excess of operating expenses and debt service or, in the case of real property leased to a single lessee, the ability of the lessee to make rental payments. Revenues may be adversely affected by changes in national or international economic conditions; changes in local market conditions due to changes in general or local economic conditions and neighborhood characteristics; the financial condition of tenants, buyers and sellers of properties; competition from other properties offering the same or similar services; changes in interest rates and in the availability, cost and terms of mortgage funds; the impact of present or future environmental legislation and compliance with environmental laws; the ongoing need for capital improvements (particularly in older structures); changes in real estate tax rates and other operating expenses; adverse changes in governmental rules and fiscal policies; civil unrest; acts of God, including earthquakes, hurricanes and other natural disasters; acts of war; acts of terrorism (any of which may result in uninsured losses); adverse changes in zoning laws; and other factors that are beyond the control of the real property owners and the Fund. In the event that any of the properties underlying the Fund's Investments experience any of the foregoing events or occurrences, the value of and return on such Investments would be negatively impacted.

### Junior and Mezzanine Loan Risks

Loans or debt interests in which the Fund may invest may be among the most junior in a company's or project's capital structure and, thus, subject to the greatest risk of loss. Due to their lower place in a borrower or project's capital structure and possible unsecured status, junior loans and interests involve a higher degree of overall risk than senior loans of the same borrower or project. Junior loans that are bridge loans generally carry the expectation that the borrower will be able to obtain permanent financing in the near future. Any delay in obtaining permanent financing subjects the bridge loan investor to increased risk. In cases where the Fund extends bridge loans to a borrower, the Fund will bear the risk

that the borrower may be unable to locate permanent financing to replace the bridge loan, in a timely manner or at all, which could adversely affect the Fund's associated Investment.

The Fund may make or make Investments in mezzanine loans. Unlike conventional mortgage loans, many mezzanine loans are not secured by a mortgage on the underlying real property but rather by a pledge of equity interests (such as a partnership or limited liability company membership) in the property owner or another company in the ownership structure that has control over the property. Generally, mezzanine loans may be more highly leveraged than other types of loans and subordinate in the capital structure of the borrower. While foreclosure of a mezzanine loan generally takes substantially less time than foreclosure of a traditional mortgage, the holders of a mezzanine loan have different remedies available versus the holder of a first lien mortgage loan. In addition, a sale of the underlying real property would not be unencumbered, and thus would be subject to encumbrances by more senior mortgages and liens of other creditors. Upon foreclosure of a mezzanine loan, the holder of the mezzanine loan typically acquires an equity interest in the borrower or other obligor. However, because of the subordinate nature of a mezzanine loan, the real property continues to be subject to the lien of the mortgage and other liens encumbering the real estate. In the event the holder of a mezzanine loan forecloses on its equity collateral, the holder may need to cure the borrower or other obligor's existing mortgage defaults or, to the extent permissible, sell the property to pay off other creditors. To the extent that the amount of mortgages and senior indebtedness and liens exceed the value of the real estate, the collateral underlying the mezzanine loan may have little or no value.

**Foreclosure Risk**

There may be additional costs associated with enforcing a Fund's remedies under a loan including additional legal costs and payment of real property transfer taxes upon foreclosure in certain jurisdictions. As a result of these additional costs, the Fund may determine that pursuing foreclosure on the loan collateral is not worth the associated costs. In addition, if the Fund incurs costs and the collateral loses value or is not recovered by the Fund in foreclosure, the Fund could lose more than its original investment in the loan. Foreclosure risk is heightened for junior loans, including certain mezzanine loans.

**Concentration of Investments**

The Fund will participate in a limited number of investments that will be primarily focused in the commercial real-estate industry. As a result, the Fund's investment portfolio is likely to be highly concentrated, and the performance of a few holdings may substantially affect its aggregate return. Furthermore, to the extent that the capital raised is less than anticipated, the Fund may invest in a smaller number of projects, properties and loans than it otherwise could have and thus will be comparatively less diversified.

**The Success of the Fund Will Be Dependent upon the Availability of, and the Degree of Competition for, Attractive Investments**

The Fund's operating results will be dependent upon the availability of, as well as the Fund's and the Investment Manager's ability to identify, consummate, manage and realize, appropriate commercial real estate debt and equity investment opportunities. It may take considerable time for the Fund to identify and consummate appropriate Investments. In general, the availability of desirable commercial real estate debt and equity investment opportunities and the Fund's investment returns will be affected by the level and volatility of interest rates, by conditions in the financial markets and general economic conditions. No assurance can be given that the Fund will be successful in identifying, underwriting and then consummating Investments which satisfy the Fund's investment objective or that such Investments, once consummated, will perform as intended. The Fund will be engaged in a competitive business and

will be competing for attractive investments with traditional lending sources, as well as existing funds, or funds formed in the future, with similar investment objectives.

**Varying Collateral Risks**

The Fund's debt Investments may not be secured by a mortgage but may instead be secured by partnership interests or other collateral that may provide weaker rights than a mortgage. In any case, in the event of default, the Fund's source of repayment will be limited to the value of the collateral and may be subordinate to other lienholders. The collateral value of an underlying property may be less than the outstanding amount of the Fund's Investment. In cases in which the Fund's collateral consists of partnership or similar interests, the Fund's rights and level of security may be less than if it held a mortgage loan. The underlying properties may be stabilized or non-stabilized, and may involve elements of leasing, renovation or development.

**Limited Information**

In certain circumstances with respect to Investments purchased from other parties, the Fund may not receive access to all available information to determine fully the origination, credit appraisal and underwriting practices utilized with respect to the Investments or the manner in which the Investments have been serviced and/or operated. In certain circumstances with respect to assets originated by the Fund, the Fund may not receive access to all available information or may choose to depart from its extended underwriting policies, including where the constraints exist on the origination of the Investment.

**Risk of Default or Insolvency by Underlying Investments**

The leveraged capital structure of the real estate companies and properties underlying the Fund's Investments will increase their exposure to adverse economic factors (such as rising interest rates, competitive pressures, downturns in the economy or deterioration in the condition of the real estate company or property) and to the risk of unforeseen events. This leverage may result in more serious adverse consequences to such underlying real estate companies or properties (including to overall profitability or solvency) in the event these factors or events occur than the consequences for less leveraged entities or properties. For example, rising interest rates may significantly increase interest expense, or a significant market downturn may affect ability to generate positive cash flow, in either case causing an inability to service outstanding debt, which may include the debt Investments held by the Fund. If an underlying real estate company or property cannot generate adequate cash flow to meet debt obligations, it may default on its loan agreements or be forced into bankruptcy. As a result, the Fund may suffer a loss of invested capital, particularly in light of the leveraged position of the Fund's Investments. In this regard, please also refer to the section below entitled "*The Fund May Securitize Its Assets*."

**Deterioration of Credit Markets May Affect Ability to Finance and Consummate Investments**

Continuing events in the sub-prime mortgage market and other areas of the fixed income markets have caused significant dislocations, illiquidity and volatility in the structured credit, leveraged loan and high-yield bond markets, as well as in the wider global financial markets. These forces resulted in the bankruptcy or acquisition of, or government sponsored assistance to, several major domestic and international financial institutions and sovereign governments. These factors, combined with volatile commodity prices and foreign exchange rates, have contributed to recessionary economic conditions globally and a resultant loss of investor confidence in the financial system, which has resulted in a historically unprecedented lack of liquidity and decline in asset values. The deterioration of the global credit markets has made it more difficult for funds to obtain favorable financing for their investments. The Fund's ability to generate attractive investment returns may be adversely affected to the extent the Fund is unable to obtain favorable financing terms for its Investments. These conditions have had an

adverse impact on the availability of credit to businesses generally and have led to an overall weakening of the U.S. and global economies. The global recession could adversely affect the financial resources of the Fund and its Investments and its ability to make principal and interest payments on, or refinance, outstanding debt when due. Similarly, the global recession could also adversely affect the financial resources of tenants of the Fund's Investments and their ability to make rent payments. In the event of such circumstances, the Fund could lose both invested capital in and anticipated profits from the affected Investments.

**New Regulation**

As a result of highly-publicized financial scandals and the on-going financial turmoil and related government bailout measures, investors, regulators and the general public have expressed concerns over the integrity of both the U.S. financial markets and the regulatory oversight of these markets and their participants. As a result, the regulatory environment in which the Fund and the Investment Manager operate is subject to heightened regulation. With respect to alternative asset management funds, in recent years there has been debate in both the U.S. and non-U.S. governments about new rules or regulations to be applicable to hedge funds, private equity funds or other alternative investment products and the advisers thereto. The Dodd-Frank Act seeks to reform the regulation of many previously unregulated markets, market participants and financial instruments. Because many provisions of the Dodd-Frank Act require rulemaking and agency reports and studies (which could lead to additional legislation or regulatory action), it is difficult to predict the impact of the Dodd-Frank Act on the Fund and the Investment Manager, the markets in which they invest and/or the Fund's ability to carry out its investment strategy. It is impossible to determine the scope and extent of the impact of any additional new laws, regulations or initiatives that may be proposed, or whether any of the proposals will become law. Compliance with the Dodd-Frank Act and other new laws or regulations could make compliance more difficult and expensive and affect the manner in which the Fund and the Investment Manager operate. Moreover, as calls for additional regulation have increased, there may be a related increase in regulatory investigations of the investment activities of alternative asset management funds, including the Fund and the Investment Manager. Such investigations may impose additional expenses on the Fund, may require the attention of the Investment Manager's in-house asset management team (the "Management Team") and may result in fines if the Fund is deemed to have violated any regulations.

**Creditor Risks**

The Fund's Investments are generally subject to various creditor risks, including (i) the possible invalidation of an Investment transaction as a "fraudulent conveyance" under the relevant creditors' rights laws, (ii) so-called lender liability claims by the issuer of the obligations and (iii) environmental liabilities that may arise with respect to collateral securing the obligations. Additionally, adverse credit events with respect to any underlying company or property, such as missed or delayed payment of interest and/or principal, bankruptcy, receivership or distressed exchange, can significantly diminish the value of the Fund's Investment in any such company or property. In this case, the risk of loss of principal in the Investment will be exacerbated.

**Commercial Mortgage-Backed Securities ("CMBS") Risks**

CMBS are subject to the risks generally associated with mortgage-backed securities. CMBS may not be backed by the full faith and credit of the U.S. Government and are subject to risk of default on the underlying mortgages. CMBS issued by non-government entities may offer higher yields than those issued by government entities, but also may be subject to greater volatility than government issues. CMBS react differently to changes in interest rates than other bonds and the prices of CMBS may reflect adverse economic and market conditions. Small movements in interest rates (both increases and decreases) may quickly and significantly reduce the value of CMBS.

**The Fund Will Be Dependent on the Manager, the Investment Manager and their Key Personnel**

The Manager's and the Investment Manager's ability to successfully manage the Fund's affairs currently depends on each organization's ability to identify, structure and manage Investments. The Investment Manager also will be relying to a substantial extent on the experience, relationships and expertise of the Management Team and other key employees of the Investment Manager. There can be no assurance that these individuals will remain in the employ of the Investment Manager, or otherwise continue to be able to carry on their current duties throughout the Fund's term. The loss of the services of the Investment Manager's organization, or any of the Management Team, could have a material adverse effect on the Fund's operations.

**Members Will Not Participate in the Management of the Fund**

The offering of Units is a non-specified investment offering and investors will not have an opportunity to evaluate or approve specific Investments prior to investing. Decisions with respect to the Fund's management will be made exclusively by the Investment Manager and the Management Team. The Members have no right or power to take part in the Fund's management. The Members will not receive the detailed financial information issued by the borrowers in which the Fund invests that will be available to the Investment Manager and the Management Team. Accordingly, no person should purchase Units unless such person is willing to entrust all aspects of the Fund's management to the Investment Manager and the Management Team.

**The Past Performance of the Investment Manager's Management Team is Not a Predictor of Future Results of the Fund**

Neither the track record of the Management Team or the Investment Manager nor the performance of their affiliates shall imply or predict (directly or indirectly) any level of future performance of the Management Team, the Investment Manager or the Fund. The Investment Manager's performance and the performance of the Fund is dependent upon future events and is, therefore, inherently uncertain. Past performance cannot be relied upon to predict future events due to a variety of factors, including, without limitation, varying business strategies, different local and national economic circumstances, different supply and demand characteristics, varying degrees of competition and varying circumstances pertaining to the real estate capital markets.

**The Fund May Not Be Able to Obtain Leverage; the Use of Leverage Will Expose the Fund to Certain Risks**

To the extent employed, the Fund's ability to obtain the leverage necessary on attractive terms will depend upon many factors including market conditions and the Fund's performance. The failure to obtain leverage at the contemplated advance rates, pricing and other terms could have a material adverse effect on the Fund. Leverage creates an opportunity for increased returns, but at the same time creates risks. There can be no assurance that the Fund's use of leverage will prove to be beneficial. Moreover, there can be no assurance that the Fund will be able to meet its debt service obligations or its margin calls and, to the extent that it cannot, the Fund risks the loss of some or all of its assets or a financial loss if the Fund is required to liquidate assets at a commercially inopportune time. In addition, the Fund's Investments may be cross-collateralized and cross-defaulted and the debt may be recourse to the Fund so an impairment or potential impairment of an Investment may create a risk of loss of some or all of its assets.

**Restrictive Covenants Relating to the Fund's Operations**

In the event that the Fund obtains financing, a credit facility lender may impose restrictions on the Fund that would affect its ability to incur additional debt, make certain Investments, reduce liquidity below certain levels, make distributions to the Fund's Members and impact the Fund's flexibility to determine its operating policies and investment strategies. For example, the Fund's loan agreements may contain negative covenants that limit, among other things, the Fund's ability to distribute more than a certain amount of the Fund's net cash flow to the Members, employ leverage beyond certain amounts, sell assets and enter into transactions with affiliates. If the Fund fails to meet or satisfy any of these covenants, it would be in default under such agreements, and a lender could elect to declare outstanding amounts due and payable, terminate its commitment, require the posting of additional collateral and enforce its interests against existing collateral.

**Use of Valuations**

The Fund may obtain independent third-party valuations or appraisals for the purpose of valuing the underlying real estate collateral to determine the size of each Investment; however, the Fund may use its own internal real estate valuations from time to time. Unlike publicly traded securities, real estate assets generally cannot be marked to an established trading value. An appraisal or valuation is only an estimate of value and is not a precise measure of realizable value. Real estate valuations are subject to numerous assumptions and limitations. For any valuations prepared by the Fund, the Fund expects to utilize, with respect to most asset classes, the following methods: a discounted cash flow model in accordance with general industry standards, capitalization rates applicable in the relevant markets and comparable market transactions. However, ultimate realization of the market value of a real estate asset depends to a great extent on economic and other conditions beyond the control of the Investment Manager and the Fund. Further, appraised or otherwise determined values do not necessarily represent the price at which a real estate investment would sell, since market prices of real estate Investments can only be determined by negotiation between a willing buyer and seller. As a result, if the Fund were to liquidate a particular Investment, the realized value of the underlying real estate collateral may be more or less than the appraised value or valuation of such asset.

**The Fund May Not Achieve its Targeted Rate of Return on its Investments**

The Fund will make Investments based on the Investment Manager's estimates or projections of internal rates of return and current returns, which in turn are based on, among other considerations, assumptions regarding the performance of Fund assets, the amount and terms of available financing and the manner and timing of dispositions, including possible asset recovery and remediation strategies, all of which are subject to significant uncertainty. In addition, events or conditions that have not been anticipated may occur and may have a significant effect on the actual rate of return received on the Fund's Investments. Moreover, the Fund's ability to achieve its targeted returns may be adversely impacted by increased competition from other investors, which may lead to more competitive pricing for certain types of Investments.

**Possibility of Future Terrorist Activity**

The terrorist attacks of September 11, 2001 disrupted the U.S. financial and insurance markets and negatively impacted the U.S. economy in general, increasing many of the risks noted in this Memorandum. The properties in which the Fund invests may be located in or near major metropolitan areas of the United States.

Such properties or the areas in which they are located could be subject to future acts of terrorism. In addition to the potential direct impact of any such future act, future terrorist attacks and the anticipation

of any such attacks could have an adverse impact on the U.S. financial and insurance markets and economy, thus harming leasing demand for and the value of the certain properties. It is not possible to predict the severity of the effect that such future events would have on the U.S. financial and insurance markets and economy or the Fund's Investments. These events may have a negative effect on the business and performance results of the properties underlying the Fund's Investments, including by raising insurance premiums and deductibles and limiting available insurance coverage.

It is possible that the economic impact of any future terrorist attacks will adversely affect the credit quality of some of the Fund's Investments. Some of the Fund's Investments will be more susceptible to the adverse effects than others, such as hotel loans, which may experience a significant reduction in occupancy rates following any future attacks. The Fund may suffer losses as a result of the adverse impact of any future attacks and these losses may adversely impact investors' returns.

In this regard, please also refer to the section entitled "*The Fund May Securitize Its Assets*."

**Risks Associated with Equity Ownership**

In certain circumstances the Fund expects to take a preferred equity position in a property-owning entity, or the Fund may also acquire an equity position if it forecloses on a loan as lender. In other circumstances, the Fund may purchase securities or other instruments from other investment funds and financial institutions. In any of the foregoing cases, the Fund's interests will be subordinate to both general and secured creditors of the asset. This subordination could increase the Fund's risk of loss. There will be no fixed period for return of the Fund's capital. Moreover, holding equity interests involves certain risks not present in real property loans or direct property ownership. For example, there is the possibility that other equity owners may have economic or business interests or goals which are inconsistent with those of the Fund. Further, the value of securities or other instruments purchased may fluctuate in value in a manner dependent on many criteria not directly related to the risks associated with real property, including the terms and conditions of the equity, the relative seniority of the equity and the general prospects and conditions of the issuer.

**Interest Rate Changes May Adversely Affect Value**

The market value of the Fund's Investments may be affected by changes in interest rates. In general, the market value of a debt Investment will change in inverse relation to an interest rate change where a debt Investment has a fixed interest rate or only limited interest rate adjustments. Accordingly, in a period of declining interest rates, debt Investments without adequate call protection may benefit less than other fixed income securities due to accelerated prepayments. This risk is mitigated by the Fund's strategy of generally holding Investments to maturity. Interest rate changes may also affect the Fund's return on new Investments. If there is a period of declining rates, the amounts becoming available to the Fund for Investment due to repayment of its Investments may be re-invested at lower rates than the Fund had been able to obtain in prior Investments. Increases in the interest rates on debt incurred by the Fund in originating or acquiring Investments may not be reflected in increased rates of return on the related Investments, adversely affecting the Fund's return on those Investments. Accordingly, interest rate changes may adversely affect the total return on the Fund's portfolio.

**Hedging Policies/Risks**

The Fund may employ hedging techniques designed to protect it against adverse movements in interest rates and other risks. While such transactions may reduce certain risks, the transactions themselves may entail certain other risks. Thus, while the Fund may benefit from the use of these hedging mechanisms, unanticipated changes in interest rates or other factors may result in a poorer overall performance for the Fund than if they had not entered into such hedging transactions.



FOIA CONFIDENTIAL TREATMENT REQUESTED BY T2 CAPITAL MANAGEMENT T2CAPITAL_SEC_00000272

If the hedging arrangements are terminated at any time in accordance with their terms, whether as a result of an event of default thereunder or otherwise, the Fund may be liable to make a payment to or receive a payment from the hedging provider in connection with such termination reflecting the market value of the transactions comprising such hedging arrangements (or, in certain circumstances, the loss or gain, as applicable, of the party making the relevant determination). If the Fund is required to make such a payment, it may be required to liquidate Investments to fund any such payment.

The Fund will seek to closely match its credit facilities with its loans, but such matching may not be achievable and the Fund does not guarantee that such matching is possible or achievable. As a consequence, the Fund could face funding risks.

**Uncertainty of Net Asset Values**

As described in "*Summary of Principal Terms—Appraisal Policy*," the Manager will prepare or arrange for quarterly valuations of each Investment and other assets and liabilities in accordance with industry standards or as deemed necessary by the Manager. Valuations and appraisals are (i) inherently subjective in certain respects and rely on a variety of assumptions, including assumptions about projected cash flows for the remaining holding periods for the Investments and (ii) based in large part on information as of the end of a calendar quarter, and market, property and other conditions may change materially after that date. Furthermore, real estate assets generally cannot be marked to an established market or readily tradable assets. Accordingly, the appraised values of the Investments and other assets and liabilities may not accurately reflect their actual market values and the Fund's value as determined in accordance with the valuation procedures described above may be inexact and may not accurately reflect the value of the Fund's underlying Investments, and, thus, investors may make decisions as to whether to invest in or redeem Units without complete and accurate valuation information.

In addition, any valuation is a subjective analysis of the fair market value of an asset and requires the use of techniques that are costly and time-consuming and ultimately provide no more than an estimate of value. Similarly, certain of the Fund's liabilities may be valued on the basis of estimates. Accordingly, there can be no assurance that the Fund's NAV, as calculated based on such valuations, will be accurate on any given date. If at any time the Fund's NAV is lower than the true value of the Fund portfolio, those Members who redeem all or some of their Units at such time will be underpaid and Members who retain their Units would be adversely affected if more Units were to be issued than redeemed at the low price. Conversely, if the Fund's NAV as determined by the Manager is higher than its true value, investors who purchase Units at such time will overpay, and if redemptions of Units based on a high Fund NAV were to exceed purchases of Units at that value, Members who do not redeem Units will be adversely affected.

Similarly, as the Master Fund Performance Allocation will be determined based on the Fund's NAV and because the Performance Allocation is calculated on a basis which includes unrealized appreciation of the Fund's assets, the risks detailed above are magnified. Please see "*Certain Investment Considerations— General Partner's Performance Allocation.*"

**Redemptions**

Although Members have the option to enter a redemption queue for the purchase by the Fund of all or a portion of their Units, there are several limitations on the Fund's obligation to honor redemption requests that may delay such redemption. See the restrictions described under "*Summary of Principal Terms—Redemption Queue and Transfers*." Redemption requests may only be made by Members upon sixty (60) days' prior written notice to the Manager. Furthermore, Members may not redeem any Capital Contributions during such contribution's twelve-month Lock-Up period. In funding amounts required pursuant to redemptions, the Fund is not obligated to sell Investments, borrow funds, alter investment or

capital improvement plans, or reduce reserves. As described elsewhere in this Memorandum, to the extent employed, the redemption and transfer of Units also will be restricted when necessary to maintain the REIT Subsidiary's qualification as a REIT under the Code.

Outstanding redemption requests with respect to redeemable Units will be accommodated as liquid assets permit. To the extent that liquid assets are insufficient during any calendar quarter to satisfy all outstanding redemption requests with respect to redeemable Units, redeemable Units subject to outstanding redemption requests will be redeemed on a pro rata basis based on the outstanding redemption amounts within the applicable calendar quarter of the Members that have submitted redemption requests. Investors will be redeemed sequentially by the calendar quarter in which their redemption requests were received, with each Member in a given calendar quarter being redeemed prior to any Member that submitted a redemption request in a subsequent calendar quarter. For the avoidance of doubt, the Fund does not guarantee it will have liquid assets sufficient to satisfy all redemption requests for any one calendar quarter. Accordingly, Members should be prepared to hold the Units indefinitely.

The Manager will have the discretion to determine the extent to which liquid assets are available for redemption or are necessary for the ongoing expenses (including debt payments), Investments, capital expenditures or reserves. Units will be redeemed at a price that reflects the Fund's NAV as of the Redemption Date, as adjusted for additional distributions. The Fund will not be obligated to sell, finance or refinance any Investments to satisfy redemption requests. **As a consequence, substantial delays may occur in satisfying any Member's redemption request.** To the extent that available cash is insufficient to provide for outstanding redemption requests, Members may not receive their requested distribution at the desired requested time. Consequently, there can be no assurance as to the extent or timing of any redemption, particularly if other Members are seeking to redeem at the same time. Members might therefore be unable to use redemption as an effective means of terminating their Investment in the Fund.

A Member who submits a redemption request to the Manager will not know the redemption price until its Interest subject to such redemption request is actually redeemed. The redemption price ultimately paid may not accurately reflect the fair value of the Units being redeemed.

**Involuntary Redemptions**

The Manager may in its sole discretion at any time call for redemption of all or any portion of the Units held by any Member in the event the Fund deems it necessary or advisable to do so for any reason described under "*Summary of Principal Terms—Mandatory Redemptions*."

**Closed-End Funds**

The Investment Manager may form one or more closed-end funds to invest side-by-side with the Fund in Investments. Because such closed-end funds will have limited terms, such closed-end funds will likely invest in only some of the Investments in which the Fund invests. Such closed-end funds may invest in Investments with maturity dates later than the date on which such closed-end fund is expected to terminate. Such closed-end funds may also sell portions of Investments to the Fund at the net asset value of such Investment. Such sales may be made at a disadvantageous time as a result of dissolution. Such closed-end funds may have different terms and conditions than the Fund, including different fees. As a result, the Investment Manager may face different incentives with respect to Investments in which one or more closed-end funds participate. To the extent that any of the sales described above are affected, they will be subject to restrictions, including the Investment Manager's policies and procedures relating to such transactions and requirements under applicable law.

**The Fund's Investments May Be Illiquid**

Real estate investments generally and commercial mortgages, in particular, are relatively illiquid. Such illiquidity may limit the Fund's ability to vary its portfolio of Investments in response to changes in economic and other conditions. Illiquidity may result in the absence of an established market for Investments as well as the legal or contractual restrictions on their resale. In addition, illiquidity may result from changes in the capital markets or the decline in value of a property securing one of the Fund's Investments. There can be no assurances that either the capital market conditions will change from their current state or that the fair market value of any of the real property serving as security will not decrease in the future, leaving the Fund's Investment under-collateralized or not collateralized at all.

**The Fund May Not Be Able to Achieve Diversification in its Investments**

While the Fund intends to diversify its Investments, there is no assurance as to the degree of diversification that will actually be achieved in the Fund's Investments. The Fund may not be able to originate a diverse portfolio. Furthermore, the Fund may make Investments involving contemplated sales or refinancings that do not actually occur as expected, which could lead to increased risk as a result of the Fund's having an unintended long-term investment and reduced diversification. See "*Summary of Principal Terms—Investment Limitations*" for detailed descriptions of the Fund's diversification requirements.

**Potential Environmental Liability**

The real properties underlying the Fund's Investments will be subject to U.S. federal and state environmental laws, regulations and administrative rulings which, among other things, establish standards for the treatment, storage and disposal of solid and hazardous waste. Real property owners are subject to U.S. federal and state environmental laws which impose joint and several liability on past and present owners and users of real property for hazardous substance remediation and removal costs. Therefore, the Fund may be exposed to substantial risk of loss from environmental claims arising in respect of any real properties underlying the Investments with undisclosed or unknown environmental problems or as to which inadequate reserves have been established.

**Investment in Distressed Assets**

The Fund may make Investments that become non-performing or otherwise troubled. These Investments may experience financial difficulties that may never be overcome. Investments in properties operating under the close supervision of a mortgage lender or under certain bankruptcy laws are, in certain circumstances, subject to certain additional potential liabilities, which may exceed the value of the Fund's original Investment. In addition, lenders who have inappropriately exercised control over the management and policies of a debtor may have their claims subordinated or disallowed or may be found liable for damages suffered by parties as a result of such actions. If the Fund or a Parallel Fund is operated to qualify as an "operating company" to avoid having its assets treated as "plan assets" of investors which are subject to the fiduciary provisions of ERISA, or the prohibited transaction rules of Section 4975 of the Code ("Benefit Plan Investors"), the rights the Fund and/or a Parallel Fund negotiates in order to qualify as an operating company may increase the risk of lender liability. In addition, under certain circumstances, payments to the Fund and distributions by the Fund to the Members may be required to be returned if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment. Finally, the Fund may become the owner of a property that is the subject of a mortgage if the Fund forecloses on its collateral.

**Possibility of Litigation**

The Fund's investment activities may include activities that will subject it to the risks of becoming involved in litigation by third parties. The expense of defending claims against the Fund by third parties and paying any amounts pursuant to settlements or judgments would be borne by the Fund and would reduce net assets and could require the Members to return distributed capital and earnings to the Fund. The Investment Manager will be indemnified by the Fund in connection with such litigation, subject to certain conditions.

**Uninsured Losses**

The Fund will attempt to maintain insurance coverage against liability to third parties. In addition, the Fund will require borrowers to maintain insurance against property damage as is customary for similarly situated businesses. However, there can be no assurance that insurance will be available or sufficient to cover all such risks. Insurance against certain risks, such as earthquakes or floods, may be unavailable, available in amounts that are less than the full market value or replacement cost of Investments or underlying assets or subject to a large deductible. In addition, there can be no assurance the particular risks that are currently insurable will continue to be insurable on an economically feasible basis.

**Expedited Transactions**

Investment analyses and decisions by the Investment Manager may frequently be required to be undertaken on an expedited basis to take advantage of investment opportunities. In such cases, the information available to the Investment Manager at the time of making an investment decision may be limited, and it may not have access to detailed information regarding the investment property, such as physical characteristics, environmental matters, zoning regulations or other local conditions affecting an investment property. Therefore, no assurance can be given that the Investment Manager will have knowledge of all circumstances that may adversely affect an Investment. In addition, the Investment Manager expects to rely upon independent consultants in connection with its evaluation of proposed investment properties, and no assurance can be given as to the accuracy or completeness of the information provided by such independent consultants.

**Controlling Person Liability**

If the Fund is required to foreclose on its security to protect its Investment, the Fund may have controlling interests in such security. The exercise of control over an entity can impose additional risks of liability for environmental damage, failure to supervise management, violation of government regulations (including securities laws) or other types of liability in which the limited liability characteristic of business ownership may be ignored. If these liabilities were to arise, the Fund might suffer a significant loss.

**Performance of the Fund and Limited Operating History**

The Fund has a limited operating history upon which prospective investors may evaluate its performance. There can be no assurance that the Fund will be able to implement its investment strategy and investment approach or achieve its investment objective or that a Member will receive a return of its capital. Past performance is not necessarily indicative of future results and there can be no assurance that the Fund will achieve comparable results or that return objectives will be met. Accordingly, investors should draw no conclusions from the performance of any prior investments by the Management Team on behalf of its clients and should not expect to achieve similar returns.

**Risks Associated with Unspecified Transactions**

As of the date of this Memorandum, the Fund's Investments have not been identified. Investors will be relying on the ability of the Investment Manager to identify and evaluate the Investments to be made by the Fund. Because such Investments may occur over a substantial period of time, the Fund faces the risks of changes in long-term interest rates and adverse changes in the real estate markets. Even if the Investments of the Fund are successful, the returns will not be realized by the Members for a period of several years.

**The Fund May Securitize Its Assets**

The Fund may engage in securitization of its assets. The Fund's securitization of assets, if any, may be cross-collateralized. In such case, the Fund may lose more than 100% of its equity invested in any Investment. In addition, securitization of the Fund's assets could generate UBTI for certain tax-exempt investors.

**Investments May be Subject to Usury Limitations**

Interest charged on loans owned by the Fund may be subject to state and foreign usury laws imposing maximum interest rates and penalties for violation, including restitution of excess interest and unenforceability of debt.

**Speculative Nature of Investments**

The Investments to be made by the Fund are speculative in nature, and the possibility of partial or total loss of capital will exist. Investors should not subscribe to or invest in the Fund unless they can readily bear the consequences of such loss.

**Dilution from Additional Closings**

Newly admitted Members or existing Members that increase their Capital Commitments will participate in existing Investments, thereby diluting the Units of existing Members.

**The Fund May Not Have Control over its Investments**

In certain situations, the Fund may co-invest with third parties through loan participations or partnerships, joint ventures or other entities, thereby acquiring non-controlling interests in certain Investments. The Fund may not have control over these Investments and therefore may have a limited ability to protect its position therein. Nevertheless, such Investments may involve risks not present in Investments where a third party is not involved, including the possibility that the participating lender or a third party partner or co-venturer may have financial difficulties resulting in a negative impact on such Investment, may have economic or business interests or goals which are inconsistent with or adverse to those of the Fund, or may be in a position to take action contrary to the Fund's investment objectives. In addition, the Fund may in certain circumstances be liable for the actions of its third-party partners, loan participants or co-venturers.

**Lack of Operating Control of Underlying Investments**

The day-to-day operations of the real estate companies and properties underlying the debt Investments of the Fund will be the responsibility of the owners and developers of such companies and properties. Although the Investment Manager will be responsible for monitoring the performance of each Investment and intends to finance underlying real estate companies and properties that are operated by

strong management, there can be no assurance that the owners and developers will be able to operate the underlying companies or properties in accordance with their business plans or the expectations of the Fund.

**Lack of Member Control over Fund Policies**

The management, financing, leasing and disposition policies of the Fund and its policies with respect to certain other activities, including its distributions and operating policies, are determined by the Investment Manager. These policies may be changed from time to time at the sole discretion of the Manager or Investment Manager without a vote of the Members of the Fund. Any such changes could be detrimental to the Members' Units.

**Restrictions on Transfers**

No public or substantial private market presently exists for the Units being offered. The Units have not been, and it is not presently contemplated that they will be, registered under the Securities Act. Accordingly, it is not likely that a public market will develop and no assurances can be given that an active private market will develop. Transferability of the Units is subject to compliance with applicable securities laws and tax law requirements and the restrictions set forth in the LLC Agreement, which (among other restrictions) requires the consent of the Manager for any transfer of Units (which consent may not be unreasonably withheld). Thus, an investor desiring to liquidate its investment may have to rely on the redemption provisions described under "*Summary of Principal Terms—Redemption Queue and Transfers*."

**Members May Suffer Adverse Consequences if They Default in Making Capital Contributions**

If a Member fails to pay in full any requested Capital Contributions, the Fund may take certain actions which may result in the redemption of a defaulting Member's Units or a sale of a defaulting Member's Units.

**The Members Will Have Limited Recourse Against the Manager**

The Fund's governing documents limit the circumstances under which the Manager and its affiliates, including its directors, officers, partners, employees, shareholders, members, managers and other agents, can be held liable to the Fund and the Members. As a result, investors may have a more limited right of action in certain cases than they would have in the absence of such a limitation.

**Fund Books and Records**

Unless otherwise required by law, Members' access to the books and records and other information of the Fund will be limited to the financial statements, tax and other information provided in accordance with the LLC Agreement.

**Risks Relating to Admission of ERISA Investors to the Fund or a Parallel Fund**

As discussed under "*Certain Considerations Applicable to ERISA, Governmental and Other U.S. Plan Investors*," the Manager intends to conduct the operations of the Fund and each Parallel Fund so that the assets of the Fund and each Parallel Fund will not be deemed to constitute "plan assets" of investors that are subject to the fiduciary provisions of ERISA or the prohibited transaction rules of Section 4975 of the Code ("Benefit Plan Investors"). If, however, the Fund or a Parallel Fund were deemed to hold "plan assets" of Benefit Plan Investors, (i) if any such Benefit Plan Investors are subject to ERISA, ERISA's fiduciary standards would apply to the Fund or Parallel Fund, as applicable, and might materially affect

the operations of the Fund or such Parallel Fund, as applicable, and (ii) any transaction with the Fund or Parallel Fund, as applicable, could be deemed a transaction with each Benefit Plan Investor and may cause transactions into which the Fund or Parallel Fund, as applicable, might enter in the ordinary course of business to constitute prohibited transactions under ERISA and/or Section 4975 of the Code. In order to avoid having the Fund's or Parallel Fund's assets treated as "plan assets," the Investment Manager may seek to manage the assets and activities of the Fund or any Parallel Fund so as to qualify as an "operating company," and that may adversely affect the operations of the Fund or such Parallel Fund. For example, the Manager may decide not to make an otherwise favorable Investment because it would not count as a qualifying Investment for purposes of the operating company requirements, or the Investment Manager may decide to liquidate a given Investment at an otherwise disadvantageous time based on these requirements. As an alternative means of avoiding the Fund's or a Parallel Fund's assets being treated as "plan assets," the Investment Manager may restrict the acquisition, redemption and transfers of Units to ensure that the ownership interest of Benefit Plan Investors does not become "significant" with respect to any class of the Fund's or a Parallel Fund's equity interests (and such restrictions could delay or preclude an investor's ability to redeem or transfer its Units) or may cause an early termination of the Fund or a Parallel Fund. See "*Certain Considerations Applicable to ERISA, Governmental and Other U.S. Plan Investors*."

**The Fund May Be Subject to the Provisions of the Investment Company Act of 1940**

The Fund intends not to become regulated as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Accordingly, the Fund does not expect to be subject to the restrictive provisions of the Investment Company Act. If the Fund were to be required to register as an investment company, its ability to use leverage would be substantially reduced and it may be unable to conduct its business as described herein. Any such failure to qualify for such exemption could have a material adverse effect on the Fund. See "*Certain Legal Matters—Investment Company Act of 1940*."

**There Are No Assurances of the Fund's Ability to Pay Distributions in the Future**

The Fund intends to make quarterly distributions to the Members in amounts such that all or substantially all of the Fund's net cash flow in each year, subject to certain adjustments, is distributed to the Members. All distributions will be made at the sole discretion of the Manager and will depend on the Fund's earnings, financial condition and such other factors as the Manager may deem relevant from time to time. There are no assurances as to the Fund's ability to make distributions in the future. There may be little or no near-term cash flow available to investors. In addition, some of the Fund's distributions may include a return of capital.

**Investment of Capital Subscriptions**

The Fund intends to make capital calls as funds are needed; however, Investments consistent with the Fund strategy may not be available at certain times. Full investment of proceeds may be delayed for indefinite periods. The Fund will face significant competition for Investments from both private and public investors, some of which have greater financial and other resources than the Fund and more extensive experience than the Fund and the Investment Manager. Interim investments may offer returns lower than those targeted for long-term investment by the Fund and the Investment Manager.

THE FOREGOING IS A SUMMARY OF CERTAIN SIGNIFICANT RISKS RELATING TO AN INVESTMENT IN THE FUND. THIS SUMMARY SHOULD NOT BE INTERPRETED AS A REPRESENTATION THAT THE RISKS IDENTIFIED AND DISCUSSED IN THIS SECTION ARE THE ONLY RISKS ASSOCIATED WITH AN INVESTMENT IN THE FUND, OR THAT THE MAGNITUDE OF SUCH RISKS IS NECESSARILY EQUAL.

## Tax Risks

**Notice Pursuant to IRS Circular 230**

The following discussion regarding certain tax risks is not intended or written by the Fund, the Manager or the Manager's counsel to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that might be imposed under U.S. tax laws. This discussion is provided to support an offering of Units in the Fund and accordingly is written in support of the promotion or marketing of the Units in the Fund. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor concerning the potential tax consequences of an investment in the Fund.

**Classification of Fund**

The Fund believes that under Treasury Regulations it will be treated as a partnership for federal income tax purposes. The Manager expects the Master Fund will also be treated as a partnership. If the Fund (or Master Fund) were instead taxable as a corporation, then the income of the Fund (or Master Fund) would be subject to an additional entity-level income tax, which would likely result in a net economic detriment to the Members.

**A Member's Tax Liability Could Exceed Cash Distributions Received From the Fund**

For U.S. federal income tax purposes, any taxable income and gain of the Fund generally will be allocated among the Members in accordance with their respective Units in the Fund, regardless of whether corresponding distributions are made to the Members or whether the Member is a Distribution Reinvestment participant. The amount of cash, if any, that would otherwise be distributed to a Member for that year may also be further reduced if such Member is a Distribution Reinvestment participant. Thus, a Member may have to make an out-of-pocket expenditure to cover its tax liability.

The LLC Agreement may also provide that capital gains resulting from a capital event may first be allocated to those Members who redeem all or any portion of their Units to the extent that they receive cash distributions in connection with such redemption that would otherwise exceed their adjusted tax bases in their redeemed Units. If such special allocations were not respected by the Internal Revenue Service (the "Service"), the Service could cause the capital gains from a capital event to be reallocated, in which case the tax liability of the Members may be adjusted.

**UBTI**

The Fund may generate UBTI for tax-exempt investors. Prospective investors that are tax-exempt entities should consult with their own advisors prior to making an investment in the Fund as to the potential UBTI and other tax consequences that may apply to their particular situations.

**ECI**

Prospective non-U.S. investors in the Fund should be aware that an investment in the Fund may give rise to ECI. In such case, a non-U.S. investor may have an obligation to pay tax to and file returns with the Service.

* * *

**Conflicts of Interest**

Certain potential conflicts of interest are discussed below. Investors should be aware that there may be occasions when the Manager and its affiliates will encounter potential conflicts of interest in

connection with the activities of the Fund. The below discussion enumerates certain actual and potential conflicts of interest that should be carefully evaluated before making an investment in the Fund. By acquiring Units in the Fund, each Member will be deemed to have acknowledged the existence of such actual and potential conflicts of interest and to have waived any claim with respect to the existence of any such conflict of interest.

**General Partner's Performance Allocation.**

The fact that the General Partner's Performance Allocation is based on a percentage of net new profits may create an incentive for the General Partner to cause the Investment Manager to make more-speculative Investments than otherwise would be the case, which may increase Members' risks for significant losses on their investment in the Fund.

The General Partner's interest in the Performance Allocation, operates to align, to some extent, the interest with the Members, although the General Partner may have an economic interest in such other investment funds and investments as well and receives management fees and performance allocations relating to these interests, which may differ from the Management Fee and Performance Allocation applicable to the Fund. Such other investment funds, including Parallel Funds, and investments that the Management Team may control may compete with the Fund with respect to opportunities in which by the Fund may invest. With the exception of Parallel Funds, the allocation of investment opportunities may not be pro rata among clients. To the extent investment funds managed by the Investment Manager have unallocated capital the potential for conflict exists and the Management Team may and likely will, from time to time, focus their investment activities on other opportunities and areas unrelated to the Fund's Investments.

**Conflicts with the Investment Manager and its Affiliates**

Conflicts of interest may arise between the Investment Manager and the Fund with respect to the management of the Fund. The Investment Manager and its affiliates may invest in investments that are senior or junior to, participations in, or have rights and interests different from or adverse to, the investment opportunities of the Fund for the Investment Manager's own account or the account of other funds, separate accounts or investment programs under its management. The Investment Manager's interests in such investments may conflict with the interests of the Fund in related investments at the time of origination or in the event of default or restructuring of the investment. The Management Team currently manages other investment funds, including the T2 Asset Opportunity Fund III, LP that has a similar investment strategy as the Fund, and may manage other investments similar to those in which the Fund will be investing. Accordingly, the Investment Manager may direct certain relevant investment opportunities to those investment funds and investments, and the Investment Manager will continue to manage and monitor such investment funds and investments.

With the exception of Parallel Funds, the allocation of investment opportunities may not be pro rata among clients. The restrictions on managing other investment funds set forth in this Memorandum serve to alleviate conflicts with the respect to the allocation of investment opportunities, but to the extent investment funds managed by the Investment Manager have unallocated capital the potential for conflict exists.

**Co-Investments by Investment Manager Affiliates or Members**

Under certain circumstances, the Fund may be offered an opportunity to make an investment in connection with a transaction in which a principal or another affiliate of the Investment Manager ("Investment Manager Affiliate") is expected to participate or in an investment in which the Investment Manager Affiliate already has made, or concurrently will make, an investment. In connection with such

investments, the Fund and the Investment Manager Affiliate may have conflicting interests and investment objectives.

Similarly, to the extent the Master Fund offers a co-investment opportunity to a Member, such Member may participate in an investment of the Master Fund. In connection with such an investment, the Master Fund and the Member may have conflicting interests and investment objectives. Generally, the terms of any co-investment involving the Master Fund and a Member will be no less favorable than those given to the Master Fund, however, the Master Fund cannot guarantee the parties will invest on the same terms, and the Member may take a junior or senior creditor position to the Fund in relation to such co-investment.

**Conflicting Investor Interests.**

Members may have conflicting investment, tax, and other interests with respect to their investments in the Fund, including conflicts relating to the structuring of investment acquisitions and dispositions. Conflicts may arise in connection with decisions made by the Member regarding an Investment that may be more beneficial to one Member than another, especially with respect to tax matters. In structuring, acquiring and disposing of Investments, the Manager generally will consider the investment and tax objectives of the Fund and its Members as a whole, not the investment, tax, or other objectives of any Member individually.

**Relationship of Affiliates to the Fund**

Subject to applicable law, the Manager, the Investment Manager, the Management Team and their affiliates are not prohibited from providing services to, and otherwise dealing or doing business with, the Fund or persons who deal with the Fund. Transactions between the Fund and the Manager, the Management Team or their affiliates must be no less favorable to the Fund than those generally available from experienced and unaffiliated parties providing similar services and any such contract outside of the ordinary course of business may be subject to the prior written approval of the Members to the extent required by applicable law.

**Devotion of Management Attention**

The Manager, the Investment Manager and their affiliates may enter into arrangements to provide investment advisory and other services to various clients. Conflicts may arise in connection with the management of the Fund by the Investment Manager, including those relating to the Investment Manager allocating management time, services, or functions between the Fund and those clients and other future investment programs sponsored by the Investment Manager or its affiliates. The Principals and the officers and managers of the Investment Manager will devote such time to the Fund's affairs as they, in their sole discretion, determine necessary for the discharge of their responsibilities as officers and managers.

**Diverse Investor Group**

The Fund's Members may include tax-exempt entities in addition to taxable investors and may include persons or entities organized in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager that may be more beneficial for one type of investor than for another type of investor.

**Legal Representation**

Vedder Price represents the Manager and not the Members in relation to the formation and organization of the Fund (notwithstanding that such counsel's fees will be included as Organizational Expenses paid by the Fund, and therefore absorbed by the Members). It is not anticipated that the Fund will engage counsel separate from counsel to the Manager in connection with the formation or organization of the Fund. In addition to being counsel to the Manager, Vedder Price may be employed by the Manager or the Investment Manager to advise it (or by the Fund to represent it) in connection with the management and operation of the Fund (including, without limitation, in connection with making, financing, holding and disposing of Investments). Vedder Price neither has been, nor will be, engaged on behalf of investors in the Fund. Potential investors should consult with and rely upon their own legal, tax and other advisors concerning the Fund (including, without limitation, as to the terms and tax consequences of an investment in the Fund, as well as concerning any issues relating to any investment in the Fund by an employee benefit plan or other retirement plan or arrangement). This Memorandum was prepared based on information furnished by the Manager; Vedder Price has not independently verified such information.

## CERTAIN LEGAL MATTERS

**Certain Considerations Applicable to ERISA, Governmental and other U.S. Plan Investors**

Employee benefit plans that are subject to the fiduciary provisions of ERISA (including, without limitation, pension and profit-sharing plans), plans that are subject to Section 4975 of the Code (including, without limitation, IRAs and Keogh plans) and entities deemed to hold "plan assets" of any of the foregoing (each, a "Benefit Plan Investor"), as well as governmental plans and other U.S. employee benefit plans, accounts or arrangements that are not subject to the fiduciary provisions of ERISA or Section 4975 of the Code, and trusts or other entities supporting or holding the assets of any of the foregoing (collectively, with Benefit Plan Investors, referred to as "Plans"), may generally invest in the Fund or a Parallel Fund, subject to the following considerations.

- **General Fiduciary Considerations for Investment in the Fund or a Parallel Fund by U.S. Plan Investors.** The fiduciary provisions of ERISA and the fiduciary provisions of pension codes applicable to governmental or other U.S. employee benefit plans or retirement arrangements that are not subject to ERISA may impose limitations on investment in the Fund or a Parallel Fund. Fiduciaries of Plans, in consultation with their advisors, should consider, to the extent applicable, the impact of such fiduciary rules and regulations on an investment in the Fund or a Parallel Fund. Among other considerations, the fiduciary of a Plan should take into account the composition of the Plan's portfolio with respect to diversification; the cash flow needs of the Plan and the effects thereon of the illiquidity of the investment; the economic terms of the Plan's investment in the Fund or a Parallel Fund; the Plan's funding objectives; the tax effects of the investment and the tax and other risks described in the sections of this Memorandum discussing tax considerations and risk factors; the fact that the investors in the Fund or a Parallel Fund are expected to consist of a diverse group of investors (including taxable, tax-exempt, domestic and non-U.S. entities) and the fact that the management of the Fund and Parallel Funds will not take the particular objectives of any investors or class of investors into account.

  Plan fiduciaries should also take into account the fact that, while the Manager will have certain general fiduciary duties to the Fund and Parallel Funds, the Manager will not have any direct fiduciary relationship with or duty to any investor, either with respect to its investment in Units or with respect to the management and investment of the assets of the Fund or any

Parallel Fund. Similarly, it is intended that the assets of the Fund and each Parallel Fund will not be considered plan assets of any Plan or be subject to any fiduciary or investment restrictions that may exist under pension codes specifically applicable to such Plans. Each Plan will be required to acknowledge and agree in connection with its investment in Units to the foregoing status of the Fund or Parallel Fund, as applicable, and the Manager and that there is no rule, regulation or requirement applicable to such investor that is inconsistent with the foregoing description of the Fund or Parallel Fund, as applicable, and the Manager.

Plan fiduciaries may be required to determine and report annually the fair market value of the assets of the Plan. Since it is expected that there will not be any public market for the Units, there may not be an independent basis for the Plan fiduciary to determine the fair market value of such Units.

- **ERISA and Other Benefit Plan Investors.** A fiduciary acting on behalf of a Benefit Plan Investor, in addition to the matters described above, should take into account the following considerations in connection with an investment in the Fund or any Parallel Fund.

*ERISA Restrictions If the Fund or Parallel Fund Holds Plan Assets*. If the Fund or Parallel Fund, as applicable, is deemed to hold plan assets of the investors that are Benefit Plan Investors, the investment in the Fund or Parallel Fund, as applicable, by each such Benefit Plan Investor could constitute an improper delegation of investment authority by the fiduciary of such Benefit Plan Investor. In addition, any transaction the Fund or Parallel Fund, as applicable, enters into would be treated as a transaction with each such Benefit Plan Investor and any such transaction (such as a property lease, acquisition, sale or financing) with certain "parties in interest" (as defined in ERISA) or "disqualified persons" (as defined in Section 4975 of the Code) with respect to a Benefit Plan Investor could be a "prohibited transaction" under ERISA or Section 4975 of the Code. If the Fund or Parallel Fund, as applicable, were subject to ERISA, certain aspects of the structure and terms of the Fund or Parallel Fund could also violate ERISA.

*ERISA Plan Assets*. Under ERISA and regulations issued thereunder by the U.S. Department of Labor (the "Regulation"), generally, a Benefit Plan Investor's assets would be deemed to include an undivided interest in each of the underlying assets of the Fund or Parallel Fund, as applicable, unless investment in the Fund or such Parallel Fund by Benefit Plan Investors is not "significant" or the Fund or such Parallel Fund constitutes an "operating company" (each as defined below).

*Significant Investment by Benefit Plan Investors*. Investment by Benefit Plan Investors would not be "significant" if less than 25% of the value of each class of equity interests in the Fund or a Parallel Fund (excluding the interests of the Manager and any other person who has discretionary authority or control, or provides investment advice for a fee (direct or indirect) with respect to the assets of the Fund or a Parallel Fund, as applicable, and affiliates of any of the foregoing persons (other than a Benefit Plan Investor)), is held by Benefit Plan Investors. A commingled vehicle that is subject to ERISA will generally count as a Benefit Plan Investor for this purpose only to the extent of investment in such entity by Benefit Plan Investors.

The Manager reserves the right to reject subscriptions in whole or in part for any reason, including that the investor is a Benefit Plan Investor. In the event that the Manager elects to limit investment in the Fund or a Parallel Fund by Benefit Plan Investors, the Manager may have the authority to restrict transfers or redemptions of Units, and may require a full or

partial redemption of any Benefit Plan Investor to the extent it deems appropriate to avoid having the assets of the Fund or a Parallel Fund be deemed to be plan assets of any Benefit Plan Investor (see discussion in the sections in this Memorandum on redemptions, transfers and withdrawals). In addition, the Manager has broad authority to take any action to maintain the no plan asset status of the Fund or a Parallel Fund or remedy a plan asset problem.

*Operating Company Status of the Fund or a Parallel Fund.* If participation by Benefit Plan Investors in the Fund or a Parallel Fund is "significant" as defined above, the Manager intends to conduct the operations of the Fund or such Parallel Fund so as to qualify as an "operating company," including a "venture capital operating company," so that the assets of the Fund or such Parallel Fund will not be considered "plan assets" of any Benefit Plan Investor. In order to constitute a "venture capital operating company" under the Regulation, an entity such as the Fund or a Parallel Fund must, on its initial valuation date and during an annual valuation period, have at least 50% of its assets (valued at cost, excluding short-term investments pending long-term commitment or distribution) invested in operating companies with respect to which the entity obtains direct contractual rights to participate significantly in management decisions, and must regularly exercise such rights in the ordinary course of its business.

There is very little authority regarding the application of ERISA and the Regulation to entities such as the Fund or any Parallel Funds, and there can be no assurance that the U.S. Department of Labor or the courts would not take a position or promulgate additional rules or regulations that could significantly impact the "plan asset" status of the Fund or a Parallel Fund.

*Prohibited Transaction Considerations.* Fiduciaries of Benefit Plan Investors should also consider whether an investment in the Fund or a Parallel Fund could involve a direct or indirect transaction with a "party in interest" or "disqualified person" as defined in ERISA and Section 4975 of the Code, and if so, whether such prohibited transaction may be covered by an exemption. ERISA contains a statutory exemption that permits a Benefit Plan Investor to enter into a transaction with a person who is a party in interest or disqualified person solely by reason of being a service provider or affiliated with a service provider to the Benefit Plan Investor, provided that the transaction is for "adequate consideration." There are also a number of administrative prohibited transaction exemptions that may be available to certain fiduciaries acting on behalf of a Benefit Plan Investor. Fiduciaries of Benefit Plan Investors should also consider whether investment in the Fund or a Parallel Fund could involve a conflict of interest. In particular, a prohibited conflict of interest could arise if the fiduciary acting on behalf of the Benefit Plan Investor has any interest in or affiliation with the Fund, a Parallel Fund or the Manager.

- **Governmental Plans**. Government sponsored plans are not subject to the fiduciary provisions of ERISA and are also not subject to the prohibited transaction provisions under Section 4975 of the Code. However, U.S. federal, state or local laws or regulations governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code discussed above and may include other limitations on permissible investments. Accordingly, fiduciaries of governmental plans, in consultation with their advisors, should consider the requirements of their respective pension codes with respect to investments in the Fund or a Parallel Fund, as well as the general fiduciary considerations discussed above.

The fiduciary of each prospective governmental plan investor will be required to represent and warrant that investment in the Fund or Parallel Fund, as applicable, is permissible, complies in all respects with applicable law and has been duly authorized.

- **Individuals Investing with IRA Assets.** Units sold by the Fund or a Parallel Fund may be purchased or owned by investors who are investing assets of their IRAs. The Fund's or a Parallel Fund's acceptance of an investment by an IRA should not be considered to be a determination or representation by the Manager or any of its respective affiliates that such an investment is appropriate for an IRA. In consultation with its advisors, each prospective IRA investor should carefully consider whether an investment in the Fund or a Parallel Fund is appropriate for, and permissible under the terms of its IRA governing documents. Investors that are IRAs should consider in particular that the Units will be illiquid and that it is not expected that a significant market will exist for the resale of the Units, as well as the other general fiduciary considerations described above.

Although IRAs are not generally subject to ERISA, they are subject to the provisions of Section 4975 of the Code, prohibiting transactions with "disqualified persons" and investments and transactions involving fiduciary conflicts. A prohibited transaction or conflict of interest could arise if the fiduciary making the decision to invest has a personal interest in or affiliation with the Fund or Parallel Fund, as applicable, the Manager or any of their respective affiliates. In the case of an IRA, a prohibited transaction or conflict of interest that involves the beneficiary of the IRA could result in disqualification of the IRA. A fiduciary for an IRA who has any personal interest in or affiliation with the Fund, a Parallel Fund, the Manager or any of their respective affiliates, should consult with his or her tax and legal advisors regarding the impact such interest or affiliation may have on an investment in Units with assets of the IRA.

Investors that are IRAs should consult with their counsel and advisors as to the prohibited transaction, conflict of interest and other provisions of the Code applicable to an investment in the Fund or a Parallel Fund.

ACCEPTANCE OF SUBSCRIPTIONS OF ANY PLAN IS IN NO RESPECT A REPRESENTATION BY THE FUND, A PARALLEL FUND, THE MANAGER OR ANY OTHER PARTY THAT SUCH INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO THAT PLAN OR THAT THE INVESTMENT IS APPROPRIATE FOR SUCH PLAN. EACH PLAN FIDUCIARY SHOULD CONSULT WITH HIS OR HER OWN LEGAL ADVISORS AS TO THE PROPRIETY OF AN INVESTMENT IN THE FUND OR A PARALLEL FUND IN LIGHT OF THE SPECIFIC REQUIREMENTS APPLICABLE TO THAT PLAN.

**Investment Company Act of 1940**

The Fund intends not to become regulated as a registered investment company under the Investment Company Act. Accordingly, the Fund intends to conduct its activities so as not to be subject to the restrictions to which a registered investment company under the Investment Company Act would be subject and will differ significantly in many respects from a registered investment company. Investors do not have the benefits and protections arising out of registration under the Investment Company Act. However, if the Fund were to become subject to the Investment Company Act because of a change of law or otherwise, the various restrictions imposed by that act and the substantial costs and burdens of compliance therewith could adversely affect the operating results and financial performance of the Fund. Moreover, parties to a contract with an entity that has improperly failed to register as an investment

company under the Investment Company Act may be entitled to cancel or otherwise void their contracts with the unregistered entity.

**Investment Advisers Act of 1940**

The Investment Manager and its affiliates are currently an exempt reporting adviser under the Investment Advisers Act of 1940, as amended, with the U.S. Securities and Exchange Commission (the "SEC"). As such, the Investment Manager is subject to limited oversight by the SEC.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

**General**

The following description is a summary of certain U.S. federal income tax considerations of an investment in the Fund and does not address every potential tax consequence that may be applicable to investors subject to special rules, including tax-exempt investors and foreign investors. This summary is based on the provisions of the Code, applicable Treasury regulations, Service rulings and judicial decisions, as of the date of this Memorandum. No assurance can be given that future legislative, regulatory or administrative changes or court decisions will not significantly modify the statements made herein. Any such changes or decisions may be retroactive and thereby be applied to transactions entered into prior to the date of their enactment or release. No assurance can be given that the Service will not challenge any of the positions taken by the Fund or the Master Fund and that such challenge, if any, will not be successful.

Prospective investors that are exempt from U.S. federal income taxation, non-U.S. investors and other types of investors should consult with their own tax advisors regarding other U.S. federal, state and local tax effects of investing in the Fund. In particular, this Memorandum does not address any alternative minimum tax effects of investing in the Fund or the limitations imposed by the Code on the ability of Members to deduct net losses, if any, incurred by the Fund. Because the specific Investments that may be made by the Fund have not yet been determined, no representation is made as to any tax benefits, including deductions or credits, being available as a result of an investment in the Fund. It is not expected that an investment in the Fund will reduce the cumulative tax liability of an investor with respect to any year. The Fund's primary objective is to generate income through debt and equity investments in real estate, not to reduce the tax liabilities of the Members.

For purposes of the discussion that follows, Members that are U.S. Persons and are generally exempt from U.S. federal income taxation are referred to as "U.S. Tax-Exempt Members." Members that are U.S. Persons and are not generally exempt from U.S. federal income taxation are referred to as "Taxable U.S. Investors." "U.S. Persons" include: (a) citizens and residents of the United States; (b) corporations and partnerships created or organized in the United States or under the laws of the United States or of any state thereof or the District of Columbia; (c) estates whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; and (d) trusts if a United States court is able to exercise primary supervision over the administration of such trust, and one or more United States fiduciaries have the authority to control all substantial decisions of such trust. Finally, Members that are not U.S. Persons are referred to as "Non-U.S. Members."

**Notice Pursuant to I.R.S. Circular 230**

THIS DISCUSSION IS NOT INTENDED OR WRITTEN BY THE FUND, THE MANAGER OR THE MANAGER'S COUNSEL TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER U.S. TAX

LAWS. THIS DISCUSSION IS PROVIDED TO SUPPORT THE PROMOTION AND MARKETING BY THE FUND OF THE UNITS. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR CONCERNING THE POTENTIAL TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

**Partnership Status of the Fund and the Master Fund**

Pursuant to the "check-the-box" regulations, an entity such as the Fund will generally be classified as a partnership for U.S. federal income tax purposes unless it makes an election to be classified as an association taxable as a corporation. The Manager does not intend to make such an election for the Fund. Therefore, the Fund is expected to be classified as a partnership for U.S. federal income tax purposes. The Manager also believes the Master Fund will be so treated. However, neither the Fund nor the Master Fund has sought a ruling from the Service that it will be treated for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation.

Section 7704 of the Code provides that a "publicly traded partnership" will generally be treated as a corporation for U.S. federal income tax purposes. Section 7704 defines a "publicly traded partnership" as any partnership if interests in such partnership are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof. Given the limited circumstances in which a Member may redeem its Units, the Manager believes that interests in the Fund should not be considered traded on a secondary market or the substantial equivalent thereof. However, there can be no assurance the Service will accept this conclusion.

An entity, or portion of an entity, may be classified as a "TMP" under Section 7701(i) of the Code if (i) substantially all of its assets consist of debt obligations or interests in debt obligations; (ii) more than 50% of those debt obligations are real estate mortgages or interests in real estate mortgages as of specified testing dates; (iii) the entity has issued debt obligations (liabilities) that have two or more maturities; and (iv) the payments required to be made by the entity on its debt obligations "bear a relationship" to the payments to be received by the entity on the debt obligations that it holds as assets. Under Treasury regulations, if less than 80% of the assets of an entity (or a portion of an entity) consists of debt obligations, these debt obligations are considered not to comprise "substantially all" of its assets, and therefore the entity would not be treated as a TMP. Where an entity, or portion of an entity, is classified as a TMP, it is generally treated as a taxable corporation for U.S. federal income tax purposes.

If the Fund or the Master Fund were classified as an association (or a publicly traded partnership or TMP) taxable as a corporation, the Fund or the Master Fund, as applicable, would pay U.S. federal income tax at corporate rates on its net income, and distributions to the Members in general would be dividends to the extent of the earnings and profits of the Fund (or the Master Fund), with distributions in excess thereof being treated first as a return of capital and thereafter as capital gain. Such tax would result in a reduction in the amount of cash available for distribution to the Members. The remainder of this discussion assumes that the Fund and the Master Fund will be treated as partnerships for U.S. federal income tax purposes.

**Taxation of Members on Income of the Fund**

*Members, rather than Fund, subject to Tax.* As a partnership, the Master Fund and Fund generally will not be subject to federal income tax. Instead, the income, gain, loss and deductions resulting from the Master Fund's and Fund's operations will be allocated to its Members. Each Member must report on its income tax return its share of ordinary income or loss, net long-term capital gain or loss, and net short-term capital gain or loss that it is allocated by the Fund. Each Member must pay taxes on its allocated share whether or not it has received a distribution from the Fund. If the Fund's

preparation of its return is delayed, it may be advisable for its Members to request extensions for filing their own income tax returns

The tax information returns filed by the Master Fund and Fund may be audited by the Service. Adjustments, if any, resulting from such an audit or from other Service determinations may require each Member to file an amended tax return and may possibly result in an audit of such return. Any audit of a Member's return could result in adjustments of non-Fund as well as Fund items.

*Tax Allocations of Profits and Losses*. Under Code Section 704(b), the Fund's allocations of taxable income or loss to the Members generally will be respected for U.S. federal income tax purposes if they have "substantial economic effect" or they are in accordance with the partners' interests in the partnership. If the Fund's allocations do not comply with Code Section 704(b), the Service may reallocate partnership tax items in accordance with the interests of the Members in the Fund. In such case, a Member may be required to file an amended return and pay any additional tax liability (together with interest and potentially penalties) resulting from such adjustment.

The LLC Agreement permits a special allocation of taxable income and capital gain (including short-term capital gain) and loss to a withdrawing Member. On a complete or partial withdrawal, gain may be specially allocated to the extent that the amount withdrawn exceeds the withdrawing Member's tax basis in the Units redeemed (generally, its tax basis in its interest, computed without the Member's share of liabilities and adjustments to basis for transactions outside the Fund). Such an allocation could result in the withdrawing Member recognizing taxable income on an accelerated basis, or of a different character (e.g., ordinary income or short-term gain rather than long-term capital gain), as compared to the consequences if such allocation were not in the LLC Agreement. Losses may be specially allocated to the extent that the withdrawing Member would otherwise recognize a loss on the withdrawal.

The Service may not accept these special allocations. If there were a successful challenge to the special allocation of gain, the taxable gains allocable to the remaining Members could be increased.

For income tax purposes, gains and losses generally are taken into account only when realized. Thus, a Member's economic allocations of net profit and loss may not be the same as the taxable income or loss that is allocated to it for tax purposes. A Member could be allocated net economic loss in a year and yet be required to pay tax on net taxable income allocated to it for that year by the Fund.

*Investment in Master Fund*. The Fund intends to invest substantially all of its assets in the Master Fund. The tax treatment of the Master Fund's investments will flow through to the Fund (and then to the investors in the Fund). The discussion below addresses the tax treatment of certain investments in the hands of the Fund and the Master Fund.

*Original Issue Discount*. The Fund (directly, through the Master Fund, or through a special purpose entity owned by the Master Fund) may originate or acquire loans, including loans with appreciation interests, that are deemed to have original issue discount for U.S. federal income tax purposes. Original issue discount is generally equal to the difference between an obligation's issue price and its stated redemption price at maturity. The Fund must recognize as income in each year the portion of the original issue discount that accrues during that year, even though it does not receive cash in that year in the amount of the original issue discount. As a result, a Member will be required to include in its taxable income its allocable share of the amount of such original issue discount accrued with respect to such a debt obligation, regardless of whether it receives cash from the Fund in such amount.

*Market Discount*. The Fund (directly, through the Master Fund, or through a special purpose entity owned by the Master Fund) may also hold or purchase debt instruments that are subject to the "market discount" provisions contained in Sections 1276-1278 of the Code. These rules generally

provide that if a holder acquires a debt instrument at a discount from, in general, its stated redemption price at maturity, which discount equals or exceeds one-fourth of one percent (0.25%) of the principal amount times the number of remaining complete years to maturity, or weighted average maturity in some cases, and thereafter disposes of such an instrument, the lesser of (a) the gain realized or (b) the portion of the market discount that accrued while the debt instrument was held by such holder will be treated as ordinary income at the time of the disposition. Any accrued market discount will also be recognized in the event that principal payments are made on the debt instrument. The market discount rules also provide that the net direct interest expense with respect to any market discount bond is allowed as a deduction for the taxable year only to the extent that such expense exceeds the portion of the market discount allocable to the days during the taxable year on which such bond was held by the taxpayer (as determined under the rules of Section 1276(b) of the Code).

*Sale of Investments*. The Fund expects to generate a significant amount of ordinary income from its investment activities, including interest income and OID (discussed above). In certain cases, the Fund's (direct or indirect) sale or disposition of an investment may result in capital gains or losses. If such investment was held longer than twelve months, the capital gain or loss will be "long-term." "Long-term capital gains" realized by non-corporate taxpayers are taxed at rates lower than the rates for ordinary income and capital gains on assets held for twelve months or less. Currently, the maximum federal long-term capital gain rate for non-corporate taxpayers is 20%. Capital losses of individuals and other non-corporate taxpayers are deductible only to the extent of the taxpayer's capital gains for the taxable year plus up to $3,000 of the taxpayer's ordinary income for such year. Individuals and non-corporate taxpayers are permitted to carry unused capital losses forward to succeeding taxable years indefinitely until such losses are utilized. Capital gains of corporate taxpayers are subject to the regular corporate tax rates, and corporations are permitted to apply capital losses only against capital gains and have a limited period to which such losses can be carried back or forward.

Notwithstanding the above, the Fund's sale or disposition of certain investments (or the sale of investments by the Master Fund or a flow-through entity in which the Master Fund invests) could result in ordinary income in whole or in part, including (a) as a result of the "market discount" rules discussed above, (b) the sale of so-called "dealer" property (e.g., real estate considered to be held for sale to customers in the ordinary course of a trade or business), (c) the sale of loans that are not considered capital assets under Section 1221 of the Code, and (d) the sale of property that has depreciation recapture under Section 1245 or Section 1250 of the Code. In addition, in the case of non-corporate taxpayers, gain attributable to the recapture of certain real estate depreciation deductions is subject to a 25% rate in lieu of the general 20% rate applicable to long term capital gains.

*Tax on Net Investment Income*. In addition, individuals are required to pay a 3.8% Medicare surtax on the lesser of (i) their "net investment income" including interest, dividends, gains from the sale of securities, and other passive income, or (ii) the excess of their modified adjusted gross income for such taxable year over $200,000 ($250,000 in the case of joint filers). A similar tax applies to estates and trusts, with certain modifications. Prospective investors should consult their tax advisers regarding the effect, if any, of this tax on their ownership and disposition of Units.

*REIT Subsidiary*. The Manager is permitted, but not required, to cause the Master Fund to establish a subsidiary taxable as a "REIT" for United States federal income tax purposes.

To qualify for taxation as a REIT, the REIT Subsidiary would have to satisfy certain requirements, including requirements relating to ownership of shares in the REIT Subsidiary, gross income tests, and asset ownership tests. Under the share ownership test, the REIT Subsidiary must have at least 100 shareholders, and five or fewer individuals cannot own more than 50% by value of the REIT Subsidiary's stock (applying constructive ownership rules). Under the gross income test, at least 75% of

the REIT's gross income each year must be derived from enumerated real estate sources (including qualifying rents from real property, interest on debt secured by real property, and gains from the sale of interests in non-dealer real property). Moreover, at least 95% of the REIT's gross income must be from specified passive sources, including from sources satisfying the 75% test. Under the asset test, at least 75% of the REIT's assets (measured quarterly) must be interests in real property, mortgages on real property, and certain other qualified investments. A REIT is also subject to concentration limits on certain investments that are not real estate assets.

If the REIT Subsidiary qualifies as a REIT, then the REIT Subsidiary would be entitled to a deduction for dividends paid to its shareholders. This substantially eliminates the "double taxation" that generally results from the use of corporations. However, the REIT Subsidiary would nonetheless be subject to a 100% excise tax if it sells "dealer property," which is property held primarily for sale to customers in the ordinary course of a trade or business. There can be no assurance that the REIT Subsidiary would not be subject to this tax.

As long as the REIT Subsidiary qualifies as a REIT, distributions to the Fund out of the current and accumulated earnings and profits of the REIT Subsidiary, and not designated as capital gains dividends, would be taken into account by Taxable U.S. Investors as ordinary dividends, and corporate Taxable U.S. Investors would not be entitled to a dividends received deduction on such amounts. Distributions and undistributed amounts designated as capital gain dividends would be taxed as long-term capital gains up to the REIT Subsidiary's net capital gain for the year. Distributions in excess of earnings and profits would first be applied to reduce the Fund's tax basis in its REIT shares (but not below zero), and then would be treated as capital gain.

If the REIT Subsidiary fails to qualify as a REIT and certain relief provisions do not apply, the REIT Subsidiary would be subject to tax on its taxable income at regular corporate rates, which could substantially reduce the anticipated returns to investors.

The taxation of a REIT is complex and the above is only a general summary of certain of the applicable rules and requirements. Investors should consult their tax advisors.

*Passive Loss and At-Risk Limitations*. Under the "passive activity loss" rules set forth in the Code, non-corporate taxpayers and certain corporations are generally able to claim losses from passive activities only (i) to the extent of any current income generated by passive activities, or (ii) when certain dispositions of the investment generating the passive loss occur. It is possible the Fund will generate passive activity losses. Accordingly, a taxpayer subject to the passive loss rules could not use such losses to offset such taxpayer's active business income, compensation income, and portfolio income (e.g., interest, dividends, and royalties not derived in the ordinary course of a trade or business, and capital gains from portfolio investments). Income and gain of the Fund not treated as passive activity income generally will be treated as portfolio income, and a Member generally will not be able to use passive activity losses to offset such portfolio income from the Fund.

Under the "at-risk" rules set forth in the Code, losses from business and income-producing activities are generally limited to the amount a non-corporate taxpayer or closely held, corporate taxpayer has at-risk in such investment. Generally, the amount at-risk is a Member's allocable share of capital invested in such investment and such Member's share of recourse debt for which the Member is liable. Amounts representing nonrecourse financing of an investment are generally not considered to be at-risk, with an exception for certain nonrecourse financing borrowed to hold real estate. Losses that cannot be claimed under the "at-risk" rules or the passive loss rules are generally deferred and carried forward by a taxpayer until such taxpayer has income from the investment that generated such loss (in the case of a loss subject to the "at-risk" rules) or passive activity income (that may be from other investments) in the case of a loss subject to the passive loss rules.

*Expense Limitations*. In the case of Members that are individuals, the ability to utilize certain specific items of deduction attributable to the investment activities of the Fund (as opposed to its activities that represent a trade or business for U.S. federal income tax purposes) may be limited, among other things, under the investment interest limitation in Code Section 163(d) and the 2% floor on miscellaneous itemized deductions (including investment expenses) in Code Section 67. Moreover, an individual whose adjusted gross income exceeds a threshold amount is required to reduce the amount allowable for itemized deductions by 3% of the excess over the threshold (but not to exceed 80% of the amount of the itemized deductions).

The extent to which any of the foregoing provisions of the Code will be applicable will depend upon the nature of the Fund's future operations and the tax situations of each of the taxable Members.

*Organization and Syndication Expenses*. Expenses paid in connection with the organization and syndication of a partnership must be capitalized. Up to $5,000 of the expenses of organizing (but not syndicating) a partnership may be deducted in the year in which the partnership begins (except to the extent that the total organization expenses exceed $50,000) and any remaining organization expenses may be amortized for tax purposes over a period of 180 months (beginning with the month in which the partnership begins). If the Service were successful in challenging the Master Fund's or the Fund's treatment of any expenditures as organization expenditures or in reclassifying expenditures as syndication expenditures, any amortization or other deductions with respect to such expenditures would be disallowed and the taxable income of the Master Fund and/or the Fund would be increased.

**Sale, Transfer or Redemption of Units**

Upon a sale or redemption of a Member's Units in the Fund, a Member will recognize gain or loss equal to the difference between (a) the proceeds of such sale plus such Member's share of the Fund's non-recourse liabilities and (b) such Member's tax basis in its Units. Such gain or loss recognized on a sale of Units by a Member who does not hold such Units as a "dealer" and who has held such Units for more than 12 months, will generally be long-term capital gain or loss, as the case may be, except that the portion of the selling Member's gain allocable to (or amount realized, in excess of basis, attributable to) "inventory items" and "unrealized receivables" of the Fund as defined in Code Section 751 will be treated as ordinary income.

As discussed above, the Fund may specially allocate items of its income and gain (or loss and deduction) to a Member that redeems all or any portion of its Units to the extent the amount redeemed would otherwise exceed or be less than, as the case may be, its adjusted tax basis in its redeemed Units in the Fund. Such a special allocation of income and gain may result in the withdrawing Member recognizing income or gain in the taxable year of the Member's withdrawal, thereby reducing the amount of long-term capital gain recognized during the tax year in which it receives its distribution upon such withdrawal.

**Liquidation of the Fund**

Upon liquidation of the Fund, its property will be distributed in kind or sold and any gain or loss on any such sales will be allocated in accordance with the LLC Agreement.

In the event of the liquidation of the Fund, each taxable Member will recognize gain to the extent that the cash and marketable securities received in the liquidation exceed his adjusted basis for his Interest. See "*Sale, Transfer or Redemption of Units*" above.

Upon liquidation, a loss would be recognized only in the event that the Member receives only cash, "unrealized receivables" or "inventory items" and then only if (and to the extent that) the Member's

adjusted basis for his Units exceed the sum of money distributed and his share of the adjusted basis for unrealized receivables and inventory items. During the year of liquidation, each Member may be allocated income from the operations of the Fund.

**Taxation of U.S. Tax-Exempt Members.**

*Unrelated Business Taxable Income.* Under Code Section 501(a), U.S. tax-exempt entities are generally exempt from U.S. federal income tax. U.S. tax-exempt entities otherwise exempt from U.S. federal income taxation may, however, be subject to tax on UBTI if income is derived from either (a) an "unrelated trade or business" carried on by the Fund (directly or through the Master Fund) or (b) "debt-financed" property owned by the Fund or the Master Fund. For each tax-exempt investor, the unrelated business income tax generally only applies to UBTI in excess of $1,000 for any taxable year.

*Unrelated Trade or Business.* The first category of UBTI is income derived from an unrelated trade or business. To constitute an unrelated trade or business, an activity must be regularly carried on by a tax-exempt organization (or by a partnership, such as the Master Fund, or limited liability company in which the tax-exempt investor is a partner or member) and not substantially related to the organization's tax-exempt purposes. UBTI can arise from incidental business activities such as the receipt of fee income or the sale of property held typically for sale. However, income may qualify for one of several exclusions from UBTI so long as it is not attributable to debt-financed property.

Income excludable from UBTI includes: (a) dividends and interest, (b) amounts received as consideration for entering into agreements to make loans, (c) qualified rents from real property, (d) qualified rents from personal property leased in connection with real property (provided that the amount of rent attributable to the personal property does not exceed 10% of the total rent received under the lease) and (e) gains or losses from the sale, exchange or other disposition of property (except for property that is determined to be inventory or property held primarily for sale to customers in the ordinary course of the trade or business). The exclusion from UBTI for rents from real property is not applicable if (a) more than 10% of the total rents received or accrued under the lease of space in the property is attributable to personal property, (b) the determination of the amount of rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage of receipts or sales) or (c) services are rendered to the occupant primarily for its convenience or are in addition to those customarily rendered in connection with the rental of space for occupancy only.

If the Fund (directly or through the Master Fund) is at any time determined to be holding one or more of its assets primarily for sale to customers in the ordinary course of business ("dealer property") or if one or more of its assets constituted property of a kind which would properly be includible in inventory if on hand at the end of the year ("inventory property"), any gain or loss realized upon the sale or exchange of those assets would generally be treated as UBTI to the U.S. Tax-Exempt Members of the Fund. Moreover, the Fund may generate UBTI if it receives (directly or indirectly) business income or certain fee income that does not fall within one of the exclusions set forth above.

*Debt-Financed Property.* Notwithstanding the foregoing exclusions, UBTI generally includes income derived from property to the extent that there is "acquisition indebtedness" with respect to the property. Acquisition indebtedness is the unpaid amount of any indebtedness incurred directly or indirectly to acquire or improve the property, including (a) indebtedness incurred in acquiring or improving property, (b) indebtedness incurred before the acquisition or improvement of property if such indebtedness would not have been incurred but for the acquisition or improvement of the property and (c) indebtedness incurred after the acquisition or improvement of property if such indebtedness would not have been incurred but for such acquisition or improvement and such indebtedness was reasonably foreseeable at the time of the acquisition or improvement. During the period that acquisition indebtedness

is outstanding, a pro rata share of the tax-exempt entity's income from the property will generally give rise to UBTI based on the ratio of the average outstanding principal balance of such debt to the average basis of the property during the applicable taxable year. If debt-financed property is sold or otherwise disposed of, there shall be included in computing UBTI an amount with respect to gain which is the same percentages of the total gain derived from such sale or other disposition as: (i) the highest acquisition indebtedness with respect to such property during the 12-month period preceding the date of disposition, is of (ii) the average of the adjusted basis of the property as of the first day during the taxable year that the property was held and the adjusted basis of the property as of the last day during the taxable year that the property was held.

In addition, if a U.S. Tax-Exempt Member incurs acquisition indebtedness in connection with its investment in the Fund, an investment in the Fund may give rise to UBTI.

The Fund (directly, through the Master Fund, or through a flow-through entity in which the Master Fund invests) may incur "acquisition indebtedness" to finance its investments. Therefore, U.S. Tax-Exempt Members may realize UBTI as a result of their investment in the Fund.

*REIT Subsidiary*. As discussed above, the Manager is permitted, but not required, to cause the Master Fund to form a REIT Subsidiary. In such case, amounts distributed by the REIT Subsidiary to the Fund generally would not constitute UBTI, assuming the shares in the REIT Subsidiary are not debt-financed. If the REIT Subsidiary is considered "pension held," however, then a portion of the dividends paid to a qualified pension trust may constitute UBTI if the pension trust owns (directly or indirectly) more than 10% of the interests in the REIT. A REIT is "pension held" if the closely held prohibition is avoided due to certain provisions relating to pension ownership, and if at least one qualified trust owns (directly or indirectly) more than 25% of the interests in the REIT, or if more than 50% of the interests in the REIT are owned (directly or indirectly) by such trusts who each own more than 10%.

**TAX-EXEMPT MEMBERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF OWNING UNITS IN THE FUND.**

**Taxation of Non-U.S. Members**

The following is a discussion of selected U.S. federal income tax consequences of the ownership and disposition an Interest in the Fund applicable to Non-U.S. Members in the Fund. The discussion is based on current law, and is for general information only. It addresses only selected, and not all, aspects of U.S. federal income taxation. A Non-U.S. Member should consult its tax adviser with respect to U.S. federal income tax consequences of a sale of its Units in the Fund.

As stated above, because the Fund will be classified as a partnership for U.S. federal income tax purposes, each of the Non-U.S. Member will be treated as though they directly earned their share of the income earned by the Fund.

*Taxation of ECI*. The U.S. federal income tax treatment of Non-U.S. Members of the Fund depends upon the activities of the Fund. If the Fund (directly or through the Master Fund) is engaged in a U.S. trade or business, the Fund would be required to withhold and pay over to the U.S. tax authorities a percentage equal to the highest applicable U.S. tax rate of each Non-U.S. Member's share of the Fund's ECI, and each Non-U.S. Member would be required to file U.S. tax returns and pay U.S. tax on its share of the Fund's ECI. In such a case, all or a portion of the gain on the disposition by a Non-U.S. Member of its Units may be taxed as ECI to the extent such gain is attributable to assets of the Fund that generate ECI. In addition, a Non-U.S. Member that is a non-U.S. corporation may also be subject to an additional

branch profits tax of 30% on its share of the Fund's effectively connected earnings and profits, adjusted as provided by law (subject to possible reduction by an applicable tax treaty).

If the Fund (or the Master Fund or a flow-through entity in which the Master Fund invests) was regarded as engaged in a U.S. trade or business, Non-U.S. Members would be viewed as being engaged in a trade or business in the United States and as maintaining an office or other fixed place of business in the United States. Certain other income of a Non-U.S. Member that is unrelated to the Fund could thus be treated as ECI as a result of such Non-U.S. Member's investment in the Fund. Non-U.S. Members may in certain circumstances be deemed to have established a taxable presence or to be engaged in a trade or business in the states and localities in which the Fund's activities are conducted, thus becoming subject to tax return filing and tax payment obligations in such jurisdictions.

The amount of ECI that will be realized by Non-U.S. Members will depend on the nature of the Fund's operation and investments. ECI earned by the Fund is subject to withholding under Code Section 1446. Any amounts properly withheld under Code Section 1446 generally can be applied as a credit against the U.S. federal income tax liability of a Non-U.S. Member and can be recovered as a refund in the event of overpayment. Under Code Section 1446, the Fund is required to make periodic installment payments to the IRS of withholding tax based on the amount of its Non-U.S. Members' allocable share of ECI. The applicable rate for calculating such withholding tax is the highest corporate or individual rate, whichever is applicable. A Non-U.S. Member will be required to file U.S. federal income tax returns with respect to its ECI, even if the Fund withholds taxes under Section 1446. In addition to filing an annual income tax return, Non-U.S. Members may be required to comply with certain reporting requirements under applicable Regulations.

Based on the contemplated investment activities described herein, it is possible that the Fund (or the Master Fund) will be considered to be engaged in a "U.S. trade or business" for these purposes or to have received ECI from such a trade or business. **Prospective Non-U.S. Members should consult their tax advisors.**

*Taxation of Non-ECI.* If the Fund earns (directly or through the Master Fund) certain types of periodic income from U.S. sources that is not ECI (such as dividends or interest to the extent such income is not ECI), each Non-U.S. Member will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income. This 30% tax is sometimes reduced or eliminated by income tax treaty, or, in the case of interest, under the portfolio interest exception, provided that proper certification is supplied when necessary and other requirements are met. This tax is collected through withholding by the Fund. With respect to income of the Fund that is not ECI, Non-U.S. Members who are not themselves engaged in a U.S. trade or business will not be subject to any U.S. tax with respect to gains from the sale of portfolio securities held for investment (except, as noted below, in cases where FIRPTA applies and subject to FATCA). However, a Non-U.S. Member who is an individual present in the United States for 183 or more days in the taxable year of the sale would be taxed by the United States on any such gain if either (a) such individual's tax home for U.S. federal income tax purposes is in the United States, or (b) the gain is attributable to an office or other fixed place of business maintained in the United States by such individual.

*FIRPTA.* The Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA"), imposes a tax on gain realized on disposition by a non-U.S. person of a U.S. real property interest ("USRPI") by treating such gain as ECI, generally giving rise to the tax consequences described above. A USRPI held by a partnership is deemed to be owned proportionately by its partners. A partnership interest in certain circumstances can itself be deemed a USRPI for purposes of computing the withholding of proceeds from a sale of such interest. Subject to certain exceptions, if the Fund (or the Master Fund) disposes of a USRPI, the Fund will be required to treat the gain recognized as ECI and withhold under

Section 1446 (discussed above) with respect to Non-U.S. Members. Where a Non-U.S. Member's interest in the Fund itself is deemed to be a USRPI, and the Non-U.S. Member disposes of such interest, by sale or otherwise, the transferee of such interest would be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition. Any amounts so withheld can be applied as a credit against the U.S. federal income tax liability of the Non-U.S. Member and can be recovered as a refund in the event of overpayment. Non-U.S. Members may be required to comply with certain reporting requirements to the extent provided in Treasury regulations.

*Other Considerations.* Non-U.S. Members may also be required to file returns with and pay taxes to state or local taxing jurisdictions in the United States in connection with the holding or disposition of Units in the Fund. Each Non-U.S. Member is advised to consult its tax advisor regarding the tax effects of an investment in the Fund, including information return and reporting requirements, the possible applicability of tax treaties, potential tax liability that may be imposed by the country or other jurisdiction of which such investor is a citizen or in which such person resides or is otherwise located, and other U.S. and non-U.S. tax matters.

***FATCA***

In addition to the rules described above regarding the potential imposition of U.S. withholding taxes on payments to Non-U.S. Members, U.S. withholding taxes could also be imposed under Section 1471 through Section 1474 of the Code (referred to as "FATCA").

Under FATCA, a new withholding tax of 30% will apply to "withholdable payments" made to a "foreign financial institution" (an "FFI") unless the FFI enters into an agreement with the IRS (an "FFI Agreement"), complies with an applicable intergovernmental agreement, or an exception applies. Under an FFI agreement, a foreign financial institution is generally required, among other things, to gather information regarding its U.S. account holders, report information regarding such holders to the IRS, and withhold a 30% tax from certain payments to "recalcitrant" account holders or to FFIs that have not entered into an FFI Agreement with the IRS and are not otherwise exempt.

The term "withholdable payment" generally includes any payment (or allocation from a partnership, if no corresponding payment is made) of (i) U.S. source interest, dividends, royalties, and other fixed or determinable annual or periodical gains, profits, and income (FDAP income), and (iii) the gross proceeds from the disposition of stock, debt, or other property that can produce U.S.-source dividends or interest.

A FFI generally means any non-U.S. entity that (a) accepts deposits in the ordinary course of a banking or similar business, (b) holds financial assets for the benefit of one or more persons as a substantial portion of its business, or (c) is an investment entity, which includes an entity engaged primarily in the business of investing or trading in securities or partnership interests, or an entity that functions or holds itself out as a collective investment vehicle, a private equity fund, a hedge fund, a venture capital fund, a leveraged buyout fund, or a similar entity. The 30% withholding tax also generally applies to withholdable payments to a non-U.S. entity that is not an FFI, unless the entity provides certification as to the substantial U.S. owners of the entity.

FATCA withholding begins on July 1, 2014 (for FDAP income) and on January 1, 2017 (for payments of gross proceeds described above). Once withholding under FATCA begins, the Fund generally will be required to withhold 30% of withholdable payments received by the Fund that are distributable to an investor that is an FFI or other non-U.S. entity unless such investor complies with the applicable requirements under FATCA or an exception applies. Prospective investors should consult their tax advisors.

**Possible Legislative or Other Actions Affecting Tax Consequences**

Prospective Members should recognize that the present U.S. federal income tax treatment of an investment in the Fund may be modified by legislative, judicial or administrative action at any time and that any such action may affect investments and commitments previously made. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the Service and the Treasury, resulting in revisions of regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations of these laws could adversely affect the tax consequences of an investment in the Fund.

*State and Local Tax Consequences*. Prospective investors should consider the state and local tax consequences of an investment in the Fund. The Fund and/or the Members (including U.S. Tax-Exempt Members) may be subject to state and local taxes or filing requirements (including, potentially, withholding and estimated tax payment obligations) in various jurisdictions, including not only the states in which they are deemed to reside, but also the states in which the Fund may be deemed to be doing business. Such taxes may include (but are not limited to) real property and income taxes. Any tax paid to a particular state or local jurisdiction by the Fund on behalf of a Member as a result of a state or local withholding or estimated tax payment obligation will be treated as a distribution to such Member from the Fund.

**ADDITIONAL INFORMATION**

Before the consummation of the offering, the Fund or the Manager will provide to each prospective investor and such investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this offering and to obtain any additional information that the Fund or Manager may possess or can obtain without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished in this Memorandum. No person other than the Fund and the Manager has been authorized to give information or to make any representations concerning the Fund or this offering outside of this Memorandum, and if given or made, such other information or representations must not be relied upon as having been authorized by the Fund.

This Memorandum is intended to present a general outline of the policies and structure of the Fund and the Manager. Each prospective Member should thoroughly review the LLC Agreement, which specifies the rights and obligations of the Members, and the Subscription Agreement, which contains various representations each prospective investor must make, and details certain conditions to a prospective investor's participation in the offering. The Summary of Principal Terms of certain provisions of the LLC Agreement contained herein is necessarily incomplete and is qualified in its entirety by reference to the LLC Agreement. Copies of the LLC Agreement and the Subscription Agreement are attached hereto as Exhibit A and Exhibit B, respectively, and copies are also available upon request to the Manager.

**Exhibit A**

# T2 STRATEGIC REAL ESTATE INCOME FUND, LLC

## SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

**Manager**

**T2 SREI Fund GP, LLC**

---

**October 1, 2014**

THE LIMITED LIABILITY COMPANY INTERESTS (THE "UNITS") CREATED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER APPLICABLE SECURITIES LAWS. THE SALE OR OTHER TRANSFER OF THESE UNITS REQUIRES THE MANAGER'S CONSENT.

CHICAGO/#2555162.7

# TABLE OF CONTENTS

**Page**


| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| ARTICLE 2 | GENERAL PROVISIONS | 5 |
| 2.1 | Formation | 5 |
| 2.2 | Name | 5 |
| 2.3 | Principal Place of Business | 5 |
| 2.4 | Registered Office and Registered Agent | 5 |
| 2.5 | Term | 6 |
| 2.6 | Records | 6 |
| ARTICLE 3 | BUSINESS OF COMPANY | 6 |
| ARTICLE 4 | CONTRIBUTIONS TO THE COMPANY | 6 |
| 4.1 | Units; Classes; Certificates | 6 |
| 4.2 | Capital Commitments | 7 |
| 4.3 | Interest on and Return of Capital Contributions | 8 |
| ARTICLE 5 | RIGHTS AND OBLIGATIONS OF MEMBERS; MEETINGS | 9 |
| 5.1 | Limitation of Liability; No Voting Rights | 9 |
| 5.2 | Redemptions of Units | 9 |
| 5.3 | Limitations on Redemptions | 10 |
| 5.4 | Company Books | 12 |
| 5.5 | Priority and Return of Capital | 12 |
| 5.6 | No Preemptive Rights | 12 |
| 5.7 | Resignation | 12 |
| 5.8 | Meetings | 12 |
| ARTICLE 6 | MANAGEMENT | 13 |
| 6.1 | Management by Manager | 13 |
| 6.2 | Authority of the Manager | 13 |
| 6.3 | Reliance by Third Parties | 16 |
| 6.4 | Investment Manager Engagement and Management Fee | 16 |
| 6.5 | Expenses | 17 |
| 6.6 | Activities of Manager; Conflicts of Interest | 18 |
| 6.7 | Related Party Transactions | 18 |
| ARTICLE 7 | STANDARD OF CARE; INDEMNIFICATION; EXCULPATION | 19 |
| 7.1 | Standard of Care | 19 |
| 7.2 | Indemnification | 19 |
| 7.3 | Exculpation | 21 |

**TABLE OF CONTENTS**
(continued)


| | | Page |
|---|---|---|
| 7.4 | Interpretation | 21 |
| ARTICLE 8 | CAPITAL ACCOUNTS | 21 |
| 8.1 | Capital Accounts; Performance Allocation. | 21 |
| 8.2 | Compliance with Treasury Regulations | 23 |
| ARTICLE 9 | ALLOCATIONS, DISTRIBUTIONS AND TAXES | 23 |
| 9.1 | Allocation of Certain Withholding Taxes and Other Expenditures | 23 |
| 9.2 | Income Tax Allocations | 24 |
| 9.3 | Distributions | 25 |
| 9.4 | Allocation among Members Subsequent to Assignment | 25 |
| 9.5 | Determination by Manager of Certain Matters | 25 |
| 9.6 | No Deficit Make-up | 26 |
| 9.7 | Federal and State Income Taxes | 26 |
| 9.8 | Accounting Principles | 26 |
| ARTICLE 10 | DISSOLUTION AND TERMINATION | 27 |
| 10.1 | Dissolution | 27 |
| 10.2 | Liquidator | 27 |
| 10.3 | Winding Up, Liquidation and Distribution of Assets | 28 |
| 10.4 | Distribution of Noncash Items | 28 |
| 10.5 | Certificate of Cancellation | 28 |
| ARTICLE 11 | RESTRICTIONS ON TRANSFERS; NEW MEMBERS | 29 |
| 11.1 | Requirements for Transfer | 29 |
| 11.2 | Admission of Substitute Member | 29 |
| 11.3 | Admission of New Members | 29 |
| 11.4 | Adjustments to Take Account of Interim Admissions and Redemptions | 29 |
| ARTICLE 12 | MEMBERS' LIABILITY | 30 |
| 12.1 | Members' Liability | 30 |
| ARTICLE 13 | RESIGNATION AND REPLACEMENT OF MANAGER | 30 |
| 13.1 | Resignation and Replacement of Manager | 30 |
| 13.2 | Effect of Changes in Members, Partners, Managers, Directors or Officers of the Manager | 31 |
| 13.3 | Notice of Change in Ownership of Manager | 31 |
| ARTICLE 14 | MISCELLANEOUS PROVISIONS | 31 |
| 14.1 | Entire Agreement | 31 |

**TABLE OF CONTENTS**
(continued)


| | | Page |
|---|---|---|
| 14.2 | Notices | 32 |
| 14.3 | Defaulting Members | 32 |
| 14.4 | Amendments | 35 |
| 14.5 | Written Consent | 36 |
| 14.6 | Power of Attorney | 36 |
| 14.7 | Waiver of Action for Partition | 37 |
| 14.8 | Severability | 37 |
| 14.9 | Assignment; Successors; No Third Party Rights | 37 |
| 14.10 | No Waiver | 37 |
| 14.11 | Governing Law | 37 |
| 14.12 | Survival | 38 |
| 14.13 | Variations of Pronouns | 38 |
| 14.14 | Captions and References | 38 |
| 14.15 | Counterparts | 38 |

# T2 STRATEGIC REAL ESTATE INCOME FUND, LLC

## SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Second Amended and Restated Limited Liability Company Agreement (this "Agreement") is made as of October 1, 2014 by and among the Members for the organization and operation of the above named limited liability company (the "Company").

## AGREEMENT

The Company is governed by an Amended and Restated Limited Liability Company Agreement dated as of June 25, 2014 (the "Prior Agreement"); and

The Members desire to amend and restate the Prior Agreement in its entirety and adopt this Agreement as the limited liability company agreement of the Company.

The parties, intending to be legally bound, amend and restate the Prior Agreement and agree as follows:

## ARTICLE 1 DEFINITIONS

For purposes of this Agreement, the following terms have the meanings indicated (unless otherwise expressly provided herein):

"Accounting Period" of the Company (A) shall commence as of the effective date of the Prior Agreement and on each of the following dates: (i) on the first day of each subsequent calendar quarter; (ii) as of the day that any Capital Contribution is accepted by the Company (if other than the first day of a calendar quarter); and (iii) as of the day (if other than the first day of a calendar quarter) immediately following any Redemption Date or any distribution; and (B) shall end on (i) the day immediately preceding the beginning of the next Accounting Period, and (ii) the date of the dissolution of the Company. The Company shall make allocations of increases and decreases in its Net Asset Value as of the end of each Accounting Period.

"Advisers Act" means the Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Affiliate" means a Person that directly or indirectly, through one or more intermediaries, has control of or is controlled by, or is under common voting control with, the Person specified. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Bankruptcy" has the meaning given it in Section 18-101 of the Delaware Act.

"Capital Account" means an individual capital account maintained for each Member pursuant to Section 8.1 hereof.

"Capital Call Notice" has the meaning set forth in Section 4.2.

"Capital Commitment" with respect to any Member, means the aggregate amount of cash that such Member has agreed to contribute to the Company pursuant to its Subscription Agreement.

"Capital Contribution" means, with respect to each Member, the amount set forth in the books and records of the Company to reflect a contribution of capital to the Company by such Member pursuant to its Capital Commitment.

"Certificate" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State, as the same may be amended from time to time.

"Class" is defined in Section 4.1(a)(i).

"Class NAV" means, for each Class, the sum of the Series NAVs for all Series within such Class. For the avoidance of doubt, the sum of the Class NAVs for all Classes shall equal Net Asset Value.

"Code" means the Internal Revenue Code of 1986, as amended.

"Credit Facility" means a credit facility under which the Company is an obligor and that is secured by, among other things, the unfunded or unutilized Capital Commitments of the Members.

"Credit Facility Contribution" means any Capital Contribution made for the purpose of paying principal, interest or other amounts payable to a Lender under a Credit Facility.

"Custodian" means the person appointed as the Company's custodian by the Manager who provides custody services for the Company.

"Defaulted Amounts" has the meaning set forth in Section 14.3.

"Defaulting Member" has the meaning set forth in Section 14.3.

"Designated Account" means an account designated by a Lender into which all Capital Contributions, when called, are to be directly deposited by the Members.

"Designee" shall have the meaning set forth in Section 12.1(e) of this Agreement.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, et seq., as amended from time to time.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, the related provisions of the Code, and the respective rules and regulations promulgated thereunder, in each case as amended from time to time, and judicial rulings and interpretations thereof.

"Fees" means transaction fees, closing fees and other similar fees (whether in the form of cash, securities or otherwise) received as a result of, or arising out of, any investment made by

the Company; provided that such amounts are, in each case, net of any amount necessary to reimburse the Manager, the Manager or any of their respective Affiliates or employees for all costs and expenses incurred by them in connection with any activities or operations generating any such fees which have not been previously reimbursed.

"High Water Mark" shall have the meaning set forth in Section 8.1(b)(ii)(A) of this Agreement.

"Hurdle" shall have the meaning set forth in Section 8.1(b)(ii)(B) of this Agreement.

"Initial Class Series" means, for each Class, the first Series of Units issued within such Class as provided in Section 4.1(a)(ii).

"Investment Management Agreement" has the meaning set forth in Section 6.4(a) of this Agreement.

"Investment Manager" means T2 Realty Capital Management, LLC, a Delaware limited liability company, the current investment manager of the Company, or any successor entity thereto appointed by the Manager performing similar functions for the Company.

"Lender" means the administrative agent, servicer, and each lender under a Credit Facility, together with their respective participants, successors, and assigns.

"Liquidator" shall have the meaning set forth in Section 10.2 of this Agreement.

"Lock-Up Period" shall have the meaning set forth in Section 5.3(d) of this Agreement.

"Management Fee" shall have the meaning set forth in Section 6.4(b).

"Manager" means T2 SREI Fund GP, LLC, a Delaware limited liability company, or any other person or entity selected as the Company's manager pursuant to the terms of this Agreement and Section 18-401 of the Delaware Act.

"Master Fund" means T2 Strategic Real Estate Income Fund Master, LP, a Delaware limited partnership.

"Master Fund Agreement" means the limited partnership agreement in effect for the Master Fund, as amended, restated, and supplemented from time to time.

"Member" means a holder of Units of the Company who has been admitted as a member pursuant to the terms hereof.

"Memorandum" means the Company's Confidential Private Placement Memorandum, as amended or supplemented from time to time.

"NAV per Unit" means for the applicable Unit of a particular Class (and, if applicable, Series within such Class): (i) if such Class has a single Series, the Class NAV divided by the number of Units in such Class, or (ii) if such Class of Units is subdivided into more than one

Series, the Series NAV for the applicable Series, divided by the number of Units in such Series. For the avoidance of doubt, NAV per Unit will be separately computed with respect to each Class of Units (and if applicable, with respect to each separate Series within a Class).

"Net Asset Value" means the market value of the Company's total assets, less an amount equal to all accrued debts, liabilities and obligations of the Company calculated as of the date of measurement, using such valuation methods as shall be adopted by the Manager and as amended or revised from time to time.

"Net NAV Increase" shall have the meaning set forth in Section 8.2(b) of this Agreement.

"Performance Allocation" means the allocation(s), if any, made or to be made under Section 8.2(b) of this Agreement from time to time.

"Performance Allocation Date" shall have the meaning set forth in Section 8.2(b)(ii)(C) of this Agreement.

"Person" means an individual or a corporation, partnership, limited liability company, limited liability partnership, trust, estate, unincorporated organization, association or other entity.

"Plan Asset Regulations" means U.S. Department of Labor rules and regulations, including 29 C.F.R. §2510.3-101 *et seq*, as amended by Section 3(42) of ERISA, that address the applicability of ERISA to entities in which employee benefit plans directly or indirectly invest.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Redemption Date" is defined in Section 5.2(a).

"Securities" shall have the meaning set forth in Section 6.2(a).

"Series NAV" means, for each Series (including the Initial Class Series) within a Class, the portion of the Capital Account balance of the Master Fund attributable to such Series, plus (or minus) the portion of the Fund's net assets (other than its interest in the Master Fund), if any, attributable to such Series. To determine the portion of the Capital Account balance in the Master Fund attributable to each Series, the Manager may treat the members in such Series as if they had directly invested in the Master Fund, and shall take into account Performance Allocations, Management Fees, contributions, withdrawals and other adjustments made or assessed at the Master Fund level against such Series.

"Series" shall have the meaning set forth in Section 4.1(a)(ii).

"Series NAV per Unit" means, for each Unit of a Series within a Class, the applicable Series NAV divided by the number of Units in such Series.

"Subscription Agreement" means the subscription documents attached as Exhibit B to the Memorandum whereby an investor may subscribe for the Units being offered pursuant to the Memorandum.

"Supplement" shall have the meaning set forth in Section 4.1(a)(i).

"Tax Matters Member" is defined in Section 9.7.

"Transfer" means any sale, transfer, assignment, gift, bequest, donation, pledge, hypothecation, encumbrance, mortgage, assignment as collateral, or disposition by any other means, whether for value or no value and whether voluntary or involuntary (including, without limitation, by realization upon any encumbrance, by operation of law or by judgment, levy, attachment, garnishment, bankruptcy or other legal or equitable proceedings).

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unit" means a "limited liability company interest" in the Company, as that term is defined in the Delaware Act. As provided herein, Units shall be issued in separate Classes, and may be issued in separate Series within each Class.

## ARTICLE 2
## GENERAL PROVISIONS

### 2.1 Formation

The Company has been organized as a Delaware limited liability company by executing and delivering the Certificate to the Secretary of State of the State of Delaware in accordance with and pursuant to the Delaware Act.

### 2.2 Name

The Company's name shall be T2 Strategic Real Estate Income Fund, LLC. However, the Company's business may be conducted under any other name designated in writing by the Manager.

### 2.3 Principal Place of Business

The principal place of business of the Company will be 111 W. Wesley Street, Suite 5, Wheaton, Illinois 60187. The Company may locate its places of business at any other place or places as the Manager may deem advisable.

### 2.4 Registered Office and Registered Agent

The Company's initial registered office is at the office of its registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and the name of its initial registered agent is The Corporation Trust Company. At any time, the Manager may designate another registered agent and/or registered office.

**2.5 Term**

The term of the Company will be perpetual, unless terminated earlier (i) upon the terms of this Agreement, or (ii) by operation of law.

**2.6 Records**

The Company will maintain records and accounts of its operations and expenditures. At a minimum, the Company will keep at its principal place of business the following records:

(a) a current list of the full name and last known business or mailing address of each Member;

(b) a copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendments have been executed;

(c) copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the three (3) most recent years; and

(d) copies of the Company's currently effective written Agreement, as amended.

**ARTICLE 3**
**BUSINESS OF COMPANY**

(a) The business of the Company will be:

(i) to originate, invest in, acquire or own real estate or other investments, including investing all of the Company's assets, except those needed for cash management purposes, in the Master Fund; and

(ii) to carry on any other lawful business or activity in connection with the foregoing or otherwise, and to have and exercise all of the powers, rights and privileges that a limited liability company organized pursuant to the Delaware Act may have and exercise.

(b) No provision in this Agreement shall be construed as guaranteeing the return, either by the Manager or by the Company, of all or any part of any Member's Capital Contributions.

**ARTICLE 4**
**CONTRIBUTIONS TO THE COMPANY**

**4.1 Units; Classes; Certificates**

(a) <u>Classes; Series</u>.

(i) Units shall be issued in one or more classes (each, a "Class"), with each such Class having such relative rights, powers and duties as may from time to time be established by the Manager, so long as such relative rights, powers and duties do not adversely affect any of the rights, powers and duties of any Members who are Members at the time of the creation of such Class. The Managing Member may amend, without the consent of any of the Members, the terms and provisions of this Agreement to reflect such relative rights, powers and duties as are applicable to such Class or Classes which have been created pursuant to this Agreement. Each Class may be offered by a separate "Supplement" to the Memorandum and/or an amendment to this Agreement. As of the date hereof, two Classes are authorized: Class A Units and Class C Units, with each having the rights, powers, and duties as set forth herein and in the associated Supplement for each such Class.

(ii) Within each Class, unless the Manager determines otherwise, a new series of Units (each, a "Series") will be established on the first date that Units within such Class are issued (the "Initial Class Series") and on each subsequent date that Units within such Class are issued. After the issuance of the Initial Class Series, unless the Manager determines otherwise, each additional Series of Units within the same Class shall be issued at $100 per Unit.

(b) Conversion of Series. If, as of the end of a calendar year (or at such other times as determined by the Manager) and after taking into account any Performance Allocation(s), redemptions, and distributions made as of such date (i) a Class of Units is subdivided into more than one Series, and (ii) with respect to such Class, the Series NAV per Unit of the Initial Class Series at least equals its High Water Mark per Unit, then each other Series within such Class is subject to conversion into the Initial Class Series as follows. With respect to each other Series within such Class (other than the Initial Class Series), if any, having a NAV per Unit at least equal to its High Water Mark per Unit (each, a "Converted Series") each Unit within such Converted Series may in the discretion of the Manager be converted into a number of Units of the Initial Class Series equal to one (1) multiplied by a fraction, the numerator of which is the Series NAV per Unit of the Converted Series, and the denominator of which is the Series NAV per Unit of the Initial Series, in each case determined as of the effective date of the conversion. Each Unit in the Converted Series shall thereafter have the same High Water Mark as each Unit in the Initial Class Series.

(c) Records. The number, Class, and Series of Units owned by each Member in the Company will be set forth in the books and records of the Company. The Manager may make such rules and regulations as it may deem appropriate concerning the issuance and registration of the Units, including the issuance of certificates representing the Units. Unless the Manager resolves otherwise, the Units will be issued without certificates.

**4.2 Capital Commitments**

(a) Subject to Section 14.3 and this Section 4.2, (i) each Member shall make contributions to the capital of the Company in an aggregate amount no greater than its

Capital Commitment by contributing installments in cash when and as called by the Manager upon at least ten days' prior written notice (a "Capital Call Notice"), (ii) each Capital Contribution shall be made by wire or ACH transfer of immediately available funds to a bank account designated by the Manager, or during the duration of a Credit Facility, to a Designated Account, and (iii) the Manager will be required to call the entire amount of the unfunded Capital Commitment of a Member made at a particular capital raise (as specified in such Member's Subscription Agreement) before calling any portion of the unfunded Capital Commitment of any Member made at a subsequent capital raise; provided further, that unfunded Capital Commitments made by Members at a particular capital raise to the Company will be drawn down pro rata (based upon unfunded Capital Commitments made at that capital raise) among the Members which made such unfunded Capital Commitments.

(b) Notwithstanding Section 4.2(a)(i), but subject to Section 4.2(d), a Member may be required to make a Credit Facility Contribution. A Member's obligation to make a Credit Facility Contribution shall be without defense, counterclaim or setoff of any kind, but shall in all events be subject to Sections 4.2(a)(ii) and (iii). In the event a Member makes a Credit Facility Contribution, such Contribution shall be treated as a Capital Contribution and a purchase of Units by the Member.

(c) Class A Units and Class C Units issued in connection with any Capital Call Notice by the Company for such Units will be issued at $100 per Unit.

(d) Once the Company has called a Member's Capital Commitment, no Member will be required to make additional Capital Contributions to the Company. The Manager, in its sole and absolute discretion, may accept additional cash Capital Commitments from new or existing Members at any time. Subject to Section 4.1(a)(ii), Units issued after the initial Capital Contributions to the Company (including such Units issued pursuant to a Capital Call Notice or a Credit Facility Contribution) will be issued at $100 per Unit. Units issued as of a date not occurring at the beginning of a quarter shall be determined as of the last time the Net Asset Value of the Fund was determined if within forty-five (45) days of such quarter-end or as of the next date the Net Asset Value of the Fund is determined if after the forty-fifth day following the quarter-end. Any minimum investment in Units that a Member may make by way of additional Capital Commitment shall be set forth in the Memorandum. Additional Capital Commitments may be rejected, in whole or in part, by the Manager in its sole discretion.

### 4.3 Interest on and Return of Capital Contributions

Except as otherwise specifically set forth in this Agreement, no Member will be entitled to interest on its Capital Contributions or to a return of its Capital Contributions.

## ARTICLE 5
## RIGHTS AND OBLIGATIONS OF MEMBERS; MEETINGS

### 5.1 Limitation of Liability; No Voting Rights

No Member will be personally liable to the Company's creditors for any of the Company's debts, obligations, liabilities or losses, whether arising in contract, tort or otherwise, beyond such Member's Capital Commitment under Section 4.2 and such Member's share of the assets and any undistributed profits of the Company; provided, however, that under applicable law a current or former Member may under certain circumstances be liable to the Company to the extent of previous distributions and returns of capital if the Company does not have sufficient assets to discharge its liabilities. No Member, in its capacity as such, has the authority or the power to act for or on behalf of the Company, to do any act that would be binding on the Company, or make any expenditures or incur any indebtedness on behalf of the Company. Unless otherwise required by the Delaware Act or as provided in this Agreement, no Member shall have the right to vote on any matter with respect to the Company.

### 5.2 Redemptions of Units

(a) Subject to limitations set forth in Section 5.3, any Member may request that the Company redeem all or part of his or her Units as of the last day of any calendar quarter or on such other dates as may be determined by the Manager (a "Redemption Date") pursuant to the terms and subject to the conditions set forth in the Memorandum. The Manager may, in its sole discretion, waive any notice requirement. In no event shall a Member be entitled to redeem all or any part of its Units nor shall the Manager be required to honor a redemption request in the calendar quarter during which the Company shall dissolve pursuant to Section 10.1 hereof or any calendar quarter thereafter. Following a complete redemption of Units, the redeeming Member, to the extent of Units redeemed, shall have no interest in the Company, except as an unsecured creditor until the redemption proceeds are paid, and will no longer share in any profits or losses, unrealized or realized, generated by the Company. Members shall not have the right to receive property other than cash in return for their Units.

(b) The Manager, in its sole and absolute discretion, may require the whole or partial redemption of Units of any Member for any reason whatsoever at any time upon prior written notice to the Member. In addition, the Manager may require a Member to redeem Units immediately if the Manager, in its sole discretion, has determined that (i) such Units are held for the benefit of, or by, any person that, at the time of investment, did not meet any eligibility standard set by the Manager, (ii) the aggregate value of the Units held by the Member is less than a minimum amount determined from time to time by the Manager, (iii) the ownership of such Units by the Member is unlawful or may be harmful or injurious to the business or reputation of the Company or the Manager, (iv) such Member's participation in the Company could result in adverse tax or regulatory consequences for the Company, (v) such Member attempted to Transfer all or a portion of its Units other than pursuant to this Agreement, or (vi) any litigation is commenced or threatened against the Company or the Manager arising out of or relating to the participation of such Member in the Company. In the event of the giving of any

such special notice of redemption pursuant to this Section 5.2(b), such Member's Units shall continue at the risk of the Company business until the last day of the month in which such event takes place.

(c) In the event of a partial redemption, the redemption proceeds shall be paid pursuant to the terms set forth in the Memorandum. No interest is payable on any redemption proceeds.

(d) Upon liquidation of the Company, liquidating distributions will be made in accordance with Section 10.3 and Section 14.3, as determined by the Manager.

(e) A Member's request to receive a distribution in a form other than cash will be considered and made at the Manager's sole discretion. The Company may make any payment pursuant to this Section, including in connection with a redemption, in cash or in a form other than cash, in each case as determined by the Manager. For such purposes, the value of any non-cash assets distributed shall be as determined in good faith by the Manager pursuant to the valuation procedures adopted by the Manager for purposes of calculating Net Asset Value. In the event of a redemption in kind, the Member shall be responsible for all brokerage commissions or other expenses incurred in connection with the ultimate disposition of such securities.

**5.3 Limitations on Redemptions**

(a) Outstanding redemption requests with respect to redeemable Units will be accommodated as liquid assets permit. To the extent that liquid assets are insufficient on any Redemption Date to satisfy all outstanding redemption requests with respect to redeemable Units, redeemable Units subject to outstanding redemption requests will be redeemed on a pro rata basis based on the outstanding redemption amounts on the applicable Redemption Date of the Members that have submitted valid redemption requests. Members will be redeemed sequentially by the Redemption Date in which their redemption requests were received, with each Member on a Redemption Date being redeemed prior to any Member that submitted a redemption request in a subsequent Redemption Date. The Company does not guarantee it will have liquid assets sufficient to satisfy all redemption requests for any Redemption Date.

(b) The Manager has sole discretion to determine the extent to which liquid assets are available for redemption or are necessary for the ongoing expenses (including debt payments), investments, capital expenditures or reserves. Units will be redeemed at the NAV per Unit of the relevant Class (and Series) as of the Redemption Date (after taking into account any Performance Allocation), as adjusted for additional distributions, if any, received by the redeeming Member subsequent to the Redemption Date. The Company will not be obligated to sell, finance or refinance any investments to satisfy redemption requests.

(c) No distribution or payments in connection with a redemption will be permitted if the liabilities of the Company would exceed the value of the assets of the Company following such distribution or redemption.

(d) A Member may not redeem any Units until twelve (12) months from the date of the Capital Contribution received by the Company to purchase such Units (the "Lock-Up Period"); provided, however, the Manager may, in its sole and absolute discretion allow certain Members to redeem all or any portion of their Units at a time prior to the expiration of the Lock-Up Period. Units issued in exchange for additional Capital Contributions will not be subject to a separate Lock-Up Period.

(e) Notwithstanding anything herein to the contrary, the right of any Member to redeem its Capital Contribution (and any gains attributable thereto) pursuant to this Article 5 is subject to the provision by the Manager for all liabilities of the Company in accordance with Sections 18-215(h) and 18-607 of the Delaware Act, and for reserves and contingencies established by the Manager in good faith. The unused portion of any Company reserves shall be added to the Company's net asset value after the need therefor shall have ceased.

(f) The Company may offset damages for breach of this Agreement by, or other obligations of, a Member whose Units are liquidated against the amount otherwise distributable to such Member pursuant to this Section.

(g) The Manager may, in its sole and absolute discretion, determine to suspend the determination of Net Asset Value and the right, if granted herein, of each Member to have the Company redeem all or a portion of such Member's Units during any period when: (i) there exists any state of affairs which, as determined by the Manager in its sole discretion, constitutes an emergency as a result of which disposition of the assets of the Company or Master Fund would not be reasonably practicable or could be seriously prejudicial to the Members; (ii) when for any reason the prices or values of any investments of the Company or Master Fund cannot reasonably be promptly and accurately ascertained; (iii) in any other circumstances that the Manager deems necessary or appropriate in its sole discretion; (iv) the Master Fund suspends redemptions; or (v) in the Manager's sole discretion, if permitting such redemption could jeopardize the tax status of the Company. Any suspension of redemptions or delay of payment of redemption proceeds will be applied on a pro rata basis across the Company to all eligible redemptions, as applicable made with respect to a particular redemption date.

(h) Unsatisfied requests for redemption from earlier Redemption Dates will be satisfied in preference to later requests for redemptions subject to the foregoing provisions. The Manager may, in its discretion, satisfy requests for redemptions that remain unsatisfied following a Redemption Date at earlier times than are provided for in the preceding sentence and in priority to later requests. Amounts not redeemed from the Company by virtue of the foregoing restrictions will remain at risk of the Company's business until the effective date of the redemption.

(i) The Manager shall have the right to restrict the redemption of and/or the payment to a redeeming Member at any time by written notice to such Member if the Manager deems such action necessary, in its sole and absolute discretion, to comply with applicable anti-money laundering regulations.

### 5.4 Company Books

The Manager will maintain and preserve at the Manager's principal place of business, during the Company's term, the accounts, books and other relevant Company documents. In accordance with the Delaware Act, each Member and its duly authorized representative may have the right, at a time during ordinary business hours as reasonably determined by the Manager, to inspect and copy such Company documents (at the requesting Member's expense) that the requesting Member deems appropriate for any purpose reasonably related to the requesting Member's interest in the Company; provided, however, the Manager shall have the right to keep confidential from the Members, for such period of time as the Manager deems reasonable, any information that the Manager reasonably believes to be in the nature of trade secrets, Member identifying information or other information the disclosure of which the Manager in good faith believes is not in the best interests of the Company or its Members or could damage the Company business or which the Company is required by law or by agreement with a third party to keep confidential.

### 5.5 Priority and Return of Capital

Except as may be expressly provided in this Agreement, no Member will have priority over any other Member, either as to the return of Capital Contributions or as to net profits, net losses or distributions.

### 5.6 No Preemptive Rights

Except as otherwise provided in this Agreement, no Member will have any preemptive or preferential right, including any such right with respect to (a) additional Capital Contributions; (b) issuance or sale of Units, whether unissued or hereafter created; (c) issuance of any obligations, evidences of indebtedness or other securities of the Company convertible into or exchangeable for, or carrying or accompanied by any rights to receive, purchase or subscribe to, any such unissued Units; (d) issuance of any right of, subscription to or right to receive, or any warrant or option for the purchase of, any of the foregoing securities; or (e) issuance or sale of any other securities that may be issued or sold by the Company.

### 5.7 Resignation

No Member will have the right to voluntarily resign as a Member of the Company prior to the Company's dissolution and winding up, provided that a Member may redeem all or any portion of its Units in accordance with Article 5 of this Agreement.

### 5.8 Meetings

Meetings of the Members, for any purpose or purposes, may only be called by the Manager. The Manager shall designate the place, either within or outside the State of Delaware, of any meeting of the Members. The Manager shall provide written notice stating the place, day, hour and purpose of any meeting to the Members entitled to vote at such meeting not less than five (5) nor more than thirty (30) days before the date of the meeting. The affirmative vote of Members holding more than 50% of the Company's Units (exclusive of any Defaulting

Members) will be the act of the Members for purposes of any action required by the Delaware Act.

## ARTICLE 6
## MANAGEMENT

**6.1 Management by Manager**

The management of the Company shall be vested exclusively in the Manager and any agents selected by it. Subject to the requirements of applicable law, the Manager may delegate or assign any of its duties or authority arising in connection with the management of the Company or its assets to any Person, including one or more administrators, investment managers or sub-investment managers. No Member, in its capacity as such, shall have any part in the management of the Company, and no Member shall have any authority or right to act on behalf of the Company in connection with any matter, and any such Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member.

**6.2 Authority of the Manager**

The Manager shall have the power by itself on behalf and in the name of the Company to carry out, directly or indirectly, any and all of the objects and purposes of the Company set forth in Article 3 or hereafter determined by the Manager and to perform all acts and enter into and perform all contracts and other undertakings, including with its Affiliates, which it may deem necessary, advisable or incidental thereto, including, without limitation, the power to:

(a) invest all or a portion of the Company's assets in the Master Fund or similar investment vehicles;

(b) originate, invest in, acquire or own real estate or other investments;

(c) rent or lease any real estate investments;

(d) invest in publicly traded, private or restricted common and preferred stock, other evidences of equity ownership, debt securities of any credit quality or seniority including, without limitation, defaulted debt securities, secured and unsecured debt securities, or any options or securities convertible into or exercisable for any of the foregoing, fixed-income securities (including obligations of the United States, any other government or international agency or instrumentalities and agencies of any of them); and to acquire, hold, sell, dispose of, or otherwise invest in other instruments and property for investment or speculation or risk management purposes or with the purpose of acquiring an interest in companies to effect a change in management or control;

(e) open, maintain and close accounts with brokers, dealers, banks, and others and issue all instructions and authorizations to entities regarding the purchase and sale or entering into, as the case may be, of any investment, certificates of deposit, bankers acceptances, repurchase and reverse repurchase agreements, agreements for the borrowing and lending of any investment and other assets, instruments and investments

for the purpose of seeking to achieve the Company's purposes as well as to facilitate distributions, redemptions, the payment of expenses of the Company and the business and affairs of the Company in general;

(f) borrow money from banks, broker-dealers and other lenders and enter into appropriate credit agreements and arrange for credit facilities for the purpose of purchasing an investment for the Company or funding redemptions on a short-term basis, and secure the payment of any obligations of the Company by hypothecation or pledge of all or part of the assets of the Company;

(g) open, maintain and close bank accounts and authorize the drawing of checks or other orders for the payment of monies;

(h) acquire, lease, sell, hold or dispose of any assets or investments in the name or for the account of the Company or enter into any contract or endorsement in the name or for the account of the Company with respect to any such assets or investments or in any other manner bind the Company to acquire, lease, sell, hold or dispose of any such assets or investments whatsoever on such terms as the Manager shall determine and to otherwise deal in any manner with the assets of the Company in accordance with the purposes of the Company;

(i) organize one or more Persons formed to hold an investment or serve as record title as nominee for the Company;

(j) enter into a contract with a Person or Persons selected by the Manager to act as investment manager or as sub-investment manager for the Company, including Affiliates of the Manager, and direct the formulation and implementation of investment policies and strategies for the Company in accordance with this Agreement and the Memorandum;

(k) enter into contracts with a Person or Persons selected by the Manager to act as custodian, administrator and transfer agent for the Company in accordance with the Memorandum;

(l) engage attorneys, independent auditors or such other Persons as the Manager may deem necessary or advisable, and to do all such other acts as the Manager, or such personnel or employees acting within the scope of authority granted to them by the Manager or this Agreement, may deem necessary or advisable in connection with carrying out the business of the Company;

(m) make such elections for the Company under the Code and other relevant tax laws as to the treatment of, and accounting for, items of income, gain, loss, deduction and credit, and as to all other relevant matters, as the Manager deems necessary or appropriate, including, without limitation, elections referred to in Section 754 of the Code, determination of which items of cash outlay are to be capitalized or treated as current expenses, and selection of the method of accounting and bookkeeping procedures to be used by the Company;

(n) bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(o) deposit, redeem, invest, pay, retain and distribute the assets of the Company in a manner consistent with the provisions of this Agreement;

(p) cause the Company to carry such insurance as the Manager deems necessary or advisable;

(q) do any and all acts on behalf of the Company, and exercise all rights of the Company with respect to its interest in any property or any Person, including, without limitation, the voting of proxies with respect to any investment, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(r) authorize any officer, director, employee or other representative of the Manager, as employee or agent of the Company, to act for and on behalf of the Company in any or all of the foregoing matters and all matters incidental thereto as fully as if such Person were the Manager;

(s) create any Class of Units as provided in Section 4.1(a)(i);

(t) offer Units and engage a member firm of FINRA, as selling agent for the offering of such Units, and to pay fees, expenses and other compensation to such Persons;

(u) accept subscriptions of investors and admit investors as Members;

(v) incur all expenditures permitted by this Agreement;

(w) cause the Company's Certificate to be filed of record in the State of Delaware and anywhere required and to execute and record any documents that the Manager deems necessary to enable the Company to do its business as herein contemplated;

(x) invest all or a portion of the Company's assets in private investment funds or similar investment vehicles;

(y) engage in any lawful transactions in Securities that the Manager from time to time determines;

(z) take all actions that the Manager deems necessary or desirable to cause the Company to comply with all applicable provisions of law;

(aa) invest in the sole and absolute discretion of the Manager all or any portion of the investable assets of the Company through a "master-feeder" structure or similar investment vehicle, and to purchase, create, finance, invest in, or organize (alone or in conjunction with others including Affiliates of the Manager) or otherwise utilize special purpose subsidiaries or other special purpose vehicles, swaps or other derivatives or

structured products to access or finance investments or source opportunities for the Company;

(bb) carry out any other activity set forth in the Memorandum but not specified herein; and

(cc) act for the Company in all other matters.

The Manager may perform its obligations hereunder itself or through its Affiliates.

### 6.3 Reliance by Third Parties

Persons dealing with the Company are entitled to rely conclusively upon the certificate of the Manager to the effect that it is then acting as the Manager and upon the power and authority of the Manager and any employee or agent of the Manager or the Company as herein set forth.

### 6.4 Investment Manager Engagement and Management Fee

(a) The Master Fund and the Company have entered into an Investment Management Agreement, dated April 1, 2014, as amended, supplemented or otherwise modified from time to time (the "Investment Management Agreement"), with the Investment Manager pursuant to which the Investment Manager has agreed to provide investment management and investment advisory services to the Master Fund and the Company.

(b) The Company shall pay the Investment Manager a management fee (the "Management Fee") after the beginning of each calendar quarter, as set forth in an Investment Management Agreement. The Management Fee shall be payable in advance, prorated for any partial calendar quarter, and calculated at a rate set forth in the Class Supplement. Subject to an applicable Supplement, the Management Fee shall be equal to a percentage of the NAV per Unit for all of such Member's Units of the applicable Class and Series (after taking into account any Capital Contributions) as of the beginning of each calendar quarter, and (if other than the beginning of a calendar quarter) as of the date of a Member's admission or additional Capital Contribution. The Management Fee shall be debited directly from the applicable Member's Capital Account(s) and the Members' ownership of Units (or the applicable Series NAV) shall be adjusted as required by Section 8.1. The Manager with the consent of the Investment Manager may, in its sole and absolute discretion, reduce the Management Fee paid by the Company and charged against the Capital Accounts of certain Members to reflect the reduction or waiver of the Management Fee with respect to any such Member for whom the Manager, in its sole and absolute discretion, reduces or waives the Management Fee; provided, however, that any such waiver shall not result in an increase in the Management Fee assessed on any other Member's Capital Account(s). The Management Fee may be assessed at the Master Fund level rather than at the Company level.

**6.5 Expenses**

(a) The Manager shall pay all ordinary and recurring expenses of providing its services to the Company, including, without limitation, compensation of the Manager's officers and employees, general overhead, office rent and salary expenses. In addition, the Manager will pay expenses attributable to regulatory filings which are made with respect to the assets of the Company, except that the Manager may seek reimbursement from the Company for these expenses at its discretion.

(b) Except as otherwise provided in this Agreement, the Company shall bear all of its organizational expenses and all ongoing operating expenses, including: the performance allocation and other fees and expenses of the Master Fund, the Management Fee; brokerage commissions and other charges for transactions in securities, other instruments and investments; governmental charges; licensing costs; quotation or valuation expenses; financing; insurance, loan servicing expenses, collateral management fees, due diligence, investment related research (including travel, computer software and news and information services which benefit the Company); custodial fees and expenses; administrative fees and expenses; verifying Member suitability requirements and complying with any and all applicable laws, orders and regulations related thereto, reporting expenses; taxes; interest; fees and expenses of legal counsel; accounting, auditing and tax preparation fees; expenses associated with preparing, mailing and reproducing the Memorandum, any amendments thereto and other communications with Members; all expenses incurred in connection with any threatened, pending or anticipated litigation, examination or proceeding; all expenses incurred as a result of the Company's obligation to indemnify the Manager, the Investment Manager, their Affiliates and certain other parties against losses, liabilities and expenses incurred in connection with the performance of their duties on behalf of, or the provision of services to, the Company; all other expenses and liabilities incurred in connection with or arising out of its business, including extraordinary or non-recurring charges; and reimbursements due to the Manager or the Investment Manager for all such costs and expenses, if any, borne by the Manager or the Investment Manager on behalf of the Company. The expenses set forth above may be paid by the Master Fund on behalf of the Company.

(c) Appropriate reserves may be created, accrued and charged for contingent expenses and liabilities, if any, as of the date any such contingent expense or liability becomes known to the Manager. Such reserves shall reduce the Company's ending net asset value for all purposes, including redemptions. Subject to the provisions of this Section 6.5, the Manager is hereby authorized to pay compensation from the Company for accounting, administrative, legal, expert, custodial, computer support, technical and investment management services rendered to the Company and, through independent contractors hired as necessary from time to time, may provide all personnel to perform the services required by the Company.

(d) Upon written substantiation and verification, the Manager and the Investment Manager shall be entitled to receive out of Company funds available for reimbursement, all amounts expended by it in payment out of its own funds of properly incurred Company obligations.

**6.6 Activities of Manager; Conflicts of Interest**

(a) The Manager and its members, managers, officers, directors, employees or other agents and agents of any of them and employees of the Company, if any, shall devote so much of their time to the affairs of the Company as in their judgment the conduct of such business shall reasonably require. The Manager and its members, managers, officers, directors, employees or agents and agents of any of them and employees of the Company, if any, shall not be obligated to do or perform any act or thing in connection with the business of the Company not expressly set forth herein. Notwithstanding anything to the contrary in this Agreement, the members, partners, managers, officers, directors, employees or other agents of the Manager and the Investment Manager and any of their respective Affiliates and any employees of the Company, if any, shall be permitted to perform similar duties for any entity.

(b) Nothing herein contained shall be deemed to preclude the Manager, the Investment Manager or their respective members, managers, officers, directors, employees or other agents or agents of any of them or employees of the Company, if any, from engaging directly or indirectly in any other business or from directly or indirectly purchasing, selling or holding securities, options, separate accounts, investment contracts, currency, currency units or any other asset and any interests therein for their own accounts or for the account of any other Person, whether as investment manager, dealer, broker or otherwise. No Member shall, by reason of being a Member of the Company, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Manager, the Investment Manager or their respective members, managers, officers, directors, employees or other agents, from the conduct of any business other than the business of the Company or from the conduct of any activities for any account other than that of the Company. It is the express understanding of the Members that the doctrine of "corporate opportunity" shall not apply to the Company and each Member hereby waives, relinquishes and renounces any such right or claim, whether now in existence or arising in the future.

(c) The Manager and the Investment Manager shall have the right to cause the Company or entities that the Company controls or invests in to do business with any other investment partnership or limited liability company of which the Manager, the Investment Manager or their respective Affiliates are the general partner or manager of or entities that such other partnership or limited liability company controls or invests in, in each case on terms that are arm's length and fair to the parties, consistent with the fiduciary standards applicable to the Manager and the Investment Manager.

**6.7 Related Party Transactions**

Each Member hereby authorizes the Manager, on behalf of such Member, to select one or more Persons, who shall not be an Affiliate of the Manager, to serve on a committee, the purpose of which is to review and, on behalf of the Company, approve or disapprove, to the extent required by applicable law or deemed advisable by the Manager, transactions that may be viewed as conflicts of interest or related party transactions, including without limitation principal transactions (as such term is used under the Advisers Act) between the Company, on one hand,

and the Manager or its Affiliates, on the other hand. Each Member acknowledges that such committee may approve of such transactions prior to or contemporaneous with, or ratify such transactions subsequent to, the consummation of such transactions. In no event shall any such transaction be entered into unless it complies with applicable law. The Person(s) so selected may be indemnified by the Company for any loss, cost or expense arising out of their services to such committee to the fullest extent permitted by law; provided, that such loss, cost or expense did not involve bad faith on the part of the Member(s). Any decision of such committee shall be binding on all Members. By entering into the Subscription Agreement, each Member acknowledges and agrees to (i) the delegation of the authority to approve conflicts of interests and/or related party transactions, including without limitation principal transactions, to such committee; (ii) the appointment of the Member(s) of such committee by the Manager; and (iii) the Company entering into transactions involving conflicts of interests and related party transactions to the fullest extent permitted under applicable law.

## ARTICLE 7
## STANDARD OF CARE; INDEMNIFICATION; EXCULPATION

### 7.1 Standard of Care

Neither the Manager, the Investment Manager, any person or persons designated pursuant to Section 10.2, nor any of their respective Affiliates, nor any of their respective partners, officers, directors, members, employees, shareholders, managers or agents (the "Indemnified Persons") shall be liable to the Company or to any Member by reason of any acts or omissions of such person in the conduct of the Company's business based upon errors of judgment, negligence or other fault in connection with the Company's business or affairs (including any such act or omission by the Manager in its capacity as Tax Matters Member), except for fraud, gross negligence or willful misconduct. In addition, neither the Manager nor its Affiliates will be liable to the Company for any losses due to the mistakes, negligence, misconduct or bad faith of any broker or other agent or third-party service provider of the Company selected by such Person with reasonable care. The Manager and its Affiliates may consult with counsel, accountants and other professional advisers in respect of the affairs of the Company and shall be fully protected and justified in any action or inaction that is taken in good faith in reliance on and in accordance with the advice or opinion of such advisers, so long as such advisers were selected with reasonable care.

### 7.2 Indemnification

(a) The Company shall, to the fullest extent to which it is empowered to do so by the Delaware Act or any other applicable law, indemnify, hold harmless and make advances for expenses to any Person, including the Indemnified Persons, who was or is a party, or is threatened to be made a party, to any Proceeding by reason of its activities undertaken at the Manager's or the Investment Manager's request on the Company's behalf or in furtherance of the Company's interest or otherwise arising out of or in connection with the Company, the Manager, the Investment Manager or the Company's investments, against losses, damages, expenses (including attorneys' fees), judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and amounts reasonably incurred by it in connection with such Proceeding; provided,

however, that this indemnification shall apply only so long as the conduct of such Person did not constitute fraud, gross negligence or willful misconduct.

(b) The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that a Person acted with gross negligence, fraud or willful misconduct. For purposes of this Section 7.2, acts or failures to act undertaken upon the advice of counsel shall be deemed to be actions in good faith, within the scope of authority and in the Company's best interests.

(c) The right to indemnification conferred by Section 7.2(a) shall include the right to be paid or advanced by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to a Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that such Person has met the standard of conduct necessary for indemnification under this Section 7.2 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such party is not entitled to be indemnified under this Section 7.2 or otherwise.

(d) Indemnification under this Section 7.2 shall continue as to any Person who has ceased to serve in the capacity that initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Section 7.2 shall be deemed contract rights, and no amendment, modification or repeal of this Section 7.2 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

(e) The right to indemnification and the advancement and payment of expenses conferred by this Section 7.2 shall not be exclusive of any other right that a Person may have or hereafter acquire under law (common or statutory), this Agreement, the Investment Management Agreement, any other agreements, decisions of the Manager or otherwise.

(f) If Section 7.2 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless a Person as to costs, charges and expenses (including, without limitation, reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any Proceeding to the full extent permitted by any applicable provision of this Article 7 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(g) Notwithstanding anything herein to the contrary, the Manager is authorized to take any action that it reasonably determines to be necessary or appropriate to cause the Company to comply with any foreign or U.S. federal, state or local withholding requirements with respect to any allocation or distribution by the Company to any Member or Person. All amounts so withheld shall be treated as distributions to the

applicable Member. Each Member hereby indemnifies and agrees to hold harmless the Company, the Manager and each other Member in accordance with Section 7.2(a) with respect to any taxes, including any penalties, assessed by any taxing authority with respect to such allocation or distribution by reason of any failure by the Manager or the Company to withhold a portion, or the requisite portion, of such allocation or distribution.

**7.3 Exculpation**

(a) To the fullest extent permitted by the Delaware Act or other applicable law, the Indemnified Persons shall not have any personal liability to the Company or any other Member for monetary damages for breach of any fiduciary or other duty owed to any Person; provided, however, that this exculpation shall apply only so long as the conduct of the Manager did not constitute fraud, gross negligence or willful misconduct.

(b) The Indemnified Persons will not be liable to the Company, any Member, or any former Member for any trading errors (including those which result in losses and those which result in gains) as for the account of the Company, unless such errors are the result of conduct on the part such Person which is inconsistent with the standard set forth in Section 7.1.

(c) The Indemnified Persons will not be liable for any tax imposed on the Company or the Members in any jurisdiction, for any costs incurred in respect of any tax audit or similar procedure, or for any tax position taken by such Person which was not clearly contrary to law when taken.

(d) The Indemnified Persons will not be liable to the Company, any Member, or any former Member if a price reasonably believed by the Manager, the Investment Manager or their Affiliates to be an accurate valuation of a particular direct or indirect investment of the Company is subsequently found to be inaccurate.

**7.4 Interpretation**

Notwithstanding any of the foregoing to the contrary, the provisions of this Article 7 shall not be construed so as to relieve (or attempt to relieve) any Person of any liability, to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Article 7 to the fullest extent permitted by law.

## ARTICLE 8
## CAPITAL ACCOUNTS; PERFORMANCE ALLOCATION

**8.1 Capital Accounts; Performance Allocation.**

(a) Capital Accounts. A Capital Account shall be maintained for each Member. As of any date, the Capital Account of a Member shall be equal to the sum of the following amounts: for each Series of Units held by such Member, the Series NAV per Unit as of such date, multiplied by the number of Units in such Series then held by such Member. The Capital Accounts shall be so adjusted on the date of any Capital

Contribution and on the last day of each Accounting Period. As of the close of each Performance Allocation Date, the Capital Account of each Member shall be tentatively determined without regard to the Performance Allocations (if any) to be made as of such date, the Performance Allocations (if any) shall be assessed as provided in Section 8.1(b) and reflected in the Series NAV of the relevant Series, and thereafter the final Capital Accounts as of such date shall be determined. Any amounts charged or debited against a Member's Capital Account under this Article 8 or Article 9, other than among all Members in accordance with the number of Units held by each such Member, shall be treated as a partial redemption of such Member's Units for no additional consideration as of the date on which the Manager determines such charge or debit is required to be made, and such Member's Units shall be reduced thereby as appropriately determined by the Company; provided, that the Performance Allocation shall be reflected in Series NAV (rather than as an adjustment to Unit ownership) as provided in Section 8.1(b). Any amounts credited to a Member's Capital Account under this Article 8 or Article 9, other than among all Members in accordance with the number of Units held by each such Member, shall be treated as an issuance of additional Units to such Member for no additional consideration as of the date on which the Manager determines such credit is required to be made, and such Member's Units shall be increased thereby as appropriately determined by the Company. Notwithstanding the prior two sentences, the Manager may elect to adjust the Series NAV of a particular Series to reflect adjustments (at the Fund level or the Master Fund level) that affect such Series and that would otherwise require a redemption or issuance of Units. Moreover, the Manager shall be authorized to issue or redeem Units to reflect debits or credits made to the Company's Capital Account at the Master Fund level with reference to a particular Member. No loan made by a Member to the Company shall constitute a Capital Contribution for any purpose. No interest shall be paid on any Capital Contribution to the Company.

(b) Performance Allocation. Except as provided in a Supplement, if as of the close of a Performance Allocation Date, a Unit's NAV per Unit exceeds its High Water Mark (such excess, the "Net NAV Increase"), then such Unit shall be subject to a Performance Allocation as determined below. The Performance Allocation shall be computed at the Company level but shall be assessed at the Master Fund level (as provided in the Master Fund Agreement), and thus shall reduce the Series NAV of the Series in respect of which the Performance Allocation is made.

(i) With respect to each Class A Unit or Class C Unit, if the Net NAV Increase exceeds its Hurdle Amount, the Performance Allocation shall equal the lesser of (A) the percentage set forth in the Supplement of the Net NAV Increase for such Unit above its Hurdle Amount, plus the percentage set forth in the Supplement of the Hurdle Amount, or (B) the amount by which the Net NAV Increase exceeds the Hurdle Amount. If a Performance Allocation cannot be fully made due to the limitation in clause (B), the shortfall may be assessed as additional Performance Allocation against such Unit in future periods (subject to clause (B)) when a Performance Allocation against such Unit is being made.

(ii) For purposes of the above, the following definitions apply:

(A) "High Water Mark" for each Unit means such Unit's NAV per Unit, as determined immediately after the most recent Performance Allocation against such Unit, or if no Performance Allocation has been so assessed, determined as of the initial capital contribution made in exchange for such Unit. In the event Units are distributed under Section 9.3(b), the Manager is authorized to make appropriate adjustments to the High Water Mark of any Company Unit to reflect such distribution.

(B) "Hurdle Amount" means a per-Unit amount computed in the same manner as interest on the High Water Mark for such Unit at a rate of 6% per annum (pro-rated for any period less than a full calendar year). The Hurdle Amount is non-cumulative and resets to zero at the end of each year.

(C) "Performance Allocation Date" means (i) the end of each calendar year, (ii) with respect to a Unit, the effective date (if other than the end of a calendar year) of a distribution made upon, or a redemption of, such Unit, and (iii) the date of dissolution of the Company. The Manager may waive or establish additional Performance Allocation Dates as necessary in the discretion of the Manager to effectuate the intent of this Agreement.

(iii) The Manager may cause the Company to issue other Classes or Units having subject to differing Performance Allocations (or to no Performance Allocation).

**8.2 Compliance with Treasury Regulations**

The provisions of this Article 8 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) and other applicable sections of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with them. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts are computed in order to comply with the Treasury Regulations, the Manager may make such modifications, provided they do not have a material adverse effect on the amounts distributable to any Member.

## ARTICLE 9
## ALLOCATIONS, DISTRIBUTIONS AND TAXES

**9.1 Allocation of Certain Withholding Taxes and Other Expenditures**

(a) If the Master Fund and/or the Company incurs a withholding tax or other tax obligation with respect to the share of Company income allocable to any Member, then the Manager, without limitation of any other rights of the Company or the Manager, will cause the amount of the obligation to be debited against the Capital Account of the Member when the Company pays the obligation, and the Member's ownership of Units shall be reduced as provided in Section 8.1. If the amount of the taxes exceeds the value of all such Member's Units, then the Member and any successor to the Member's Units will pay to the Company as a Capital Contribution, upon demand by the Manager, the

amount of the excess. The Manager will not be obligated to apply for or obtain a reduction of, or exemption from, withholding tax on behalf of any Member that may be eligible for the reduction or exemption, except that, in the event that the Manager determines that a Member is eligible for a refund of any withholding tax, the Manager may, at the request and expense of the Member, assist the Member in applying for such refund.

(b) Except as otherwise provided for in this Agreement, any expenditures payable by the Master Fund and/or the Company (including the Management Fee), to the extent determined by the Manager to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Members, will be charged to only those Members on whose behalf the payments are made or whose particular circumstances gave rise to such payments. The charges will be debited from the Capital Accounts of the Members as of the close of the Accounting Period (or at such other time(s) determined by the Manager) during which the items were paid or accrued by the Master Fund and/or the Company and the Unit ownership of such Members (or the applicable Series NAV) will be adjusted as provided in Section 8.1.

**9.2 Income Tax Allocations**

(a) Except as provided in Section 9.2(b), for each Accounting Period, items of Company income, deduction, gain, loss or credit that are recognized for tax purposes shall be allocated in such manner as to equitably reflect amounts credited or debited to each Member's Capital Account for the current and prior Accounting Periods (or relevant portions thereof). Such allocations (including allocations with respect to contributed and revalued property) shall take into account the principles of section 704(b) and section 704(c) of the Code and the Treasury Regulations thereunder, including Treasury Regulation sections 1.704-1(b)(2)(iv)(f)(1) through (5), section 1.704-1(b)(4)(i), and section 1.704-3, or any successor provisions. At the Manager's sole and absolute discretion, the Company may aggregate realized gains and losses for this purpose in any manner permitted by Treasury Regulation section 1.704-3 or IRS guidance.

(b) Notwithstanding Section 9.2(a), in the event that all or a portion of a Member's Units are redeemed, the Manager may, in its sole and absolute discretion, specially allocate items of Company income and gain to that Member for tax purposes to reduce the amount, if any, by which the amount of the redemption exceeds such Member's "adjusted tax basis," for federal income tax purposes, in the allocable portion of such Member's Units in the Company as of such time (as determined by the Manager, which determination may be made without regard to any adjustments made to such "adjusted tax basis" by reason of any transfer or assignment of such Units, including by reason of death, termination or dissolution (except to the extent any such adjustment resulted in a corresponding adjustment under section 743 of the Code), and by disregarding such Member's share of liabilities under section 752 of the Code). Company net realized losses may be specially allocated by the Manager in a similar manner.

**9.3 Distributions**

(a) The Manager may, in its sole discretion, cause the Company to make such interim distributions as the Manager will determine.

(b) Distributions made, other than pursuant to Section 9.3(a) or Article 10, shall be made in the form of additional Units (of such Class and Series as determined by the Manager), at the sole discretion of the Manager. Such Units will be issued at the prevailing NAV per Unit of the relevant Class (and Series), as of the close of the day such distribution was effective, and will adjust each Member's Capital Account in accordance with Section 8.1. Notwithstanding the foregoing, Members may make an election, in accordance with procedures to be determined by the Manager in its sole discretion, to receive distributions under this sub-section in the form of cash. Such an election will continue in effect until otherwise revoked by the electing Member, in accordance with procedures to be determined by the Manager in its sole discretion. Units issued in accordance with this sub-section shall not be subject to the Lock-Up Period.

(c) Notwithstanding sub-sections (a) and (b) above, no distributions (whether in the form of cash or Units) shall be made: (i) if such distribution would violate any contract or agreement to which the Company is then a party or any law, rule, regulation, order or directive of any governmental authority then applicable to the Company; (ii) to the extent that the Manager, in its sole and absolute discretion, determines that any amount otherwise distributable should be retained by the Company to pay, or to establish a reserve for the payment of, any liability or obligation of the Company, whether liquidated, fixed, contingent or otherwise; (iii) if such distribution shall interfere with an attempt to hedge an existing investment or an obligation to make a follow-on investment; or (iv) to the extent that the Manager, in its sole and absolute discretion, determines that the cash available to the Company is insufficient to permit such distribution.

**9.4 Allocation among Members Subsequent to Assignment**

Each item of income, gain, loss, deduction and credit of the Company attributable to a transferred Unit shall, for federal income tax purposes, be determined on an annual basis (or other periodic basis, as required or permitted by Section 706 of the Code) and shall be allocated to the Members of the Company who own Units as of the close of business on the day preceding the first day of the quarter in which the transfer is recognized by the Company; provided, however, that gain or loss on a sale or other disposition of all or a substantial portion of the assets of the Company, shall be allocated to the owner of record of the Units on the date of sale. The Manager may revise, alter or otherwise modify such methods of determination and allocation as it determines necessary, to the extent permitted by Section 706 of the Code and regulations or rulings promulgated thereunder.

**9.5 Determination by Manager of Certain Matters**

All matters concerning computation of Capital Accounts, the allocation of items of Company income, gain, loss, deduction and expense for tax purposes, the making of any elections and the adoption of any accounting procedures not expressly provided for by the terms

of this Agreement shall be determined by the Manager in its sole and absolute discretion. Such determination shall be final and conclusive as to all Members. Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the Manager shall determine, in its sole and absolute discretion, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Members as reflected in this Agreement, the Manager may make such modification.

**9.6 No Deficit Make-up**

Notwithstanding anything herein to the contrary, upon liquidating the Company, no Member shall be required to make any Capital Contribution to the Company in respect of any deficit in such Member's Capital Account.

**9.7 Federal and State Income Taxes**

The Manager, at the expense of the Company, shall arrange for the preparation and timely filing of all returns of the Company showing all income, gains, deductions, and losses necessary for federal and state income tax purposes, and shall furnish to the Members the tax information reasonably required for federal and state income tax reporting purposes. The Company will provide the Members with tax information on Schedule K-1 annually for their use in filing individual tax returns. The Manager is designated the "Tax Matters Member," as provided in Section 6231 of the Code, if either the Manager is a Member or if Section 6231 or Treasury Regulations thereunder permit a person other than a Member to be a Tax Matters Member. Otherwise, the Manager shall designate one of the Members as Tax Matters Member. The Tax Matters Member shall have all the powers and duties assigned to a Tax Matters Member under the Treasury Regulations and Sections 6221-6232 of the Code. If a Member other than the Manager is the Tax Matters Member, Sections 7.1 and 7.2 shall apply to any actions taken by such Member in good faith or in reliance on instructions of the Manager. The Manager further is authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of its affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend assets of the Company for professional services and costs associated therewith. Each Member agrees to cooperate with the Manager and to do or refrain from doing any or all things reasonably required by the Manager to conduct such proceedings. The Tax Matters Member, in its sole discretion shall have the authority to cause the Company to make or revoke any elections (except an election to be treated as a corporation) permitted under the Code, the Treasury Regulations, or any state or local tax law, including without limitation the election referred to in Section 754 of the Code.

**9.8 Accounting Principles**

The Company's financial statements will be prepared in accordance with generally accepted accounting principles using the method of accounting determined by the Manager.

## ARTICLE 10
## DISSOLUTION AND TERMINATION

**10.1 Dissolution**

(a) Notwithstanding anything in this Agreement to the contrary, the Company may be dissolved only upon the occurrence of any of the following events:

(i) the Manager's Bankruptcy, dissolution, withdrawal from the Company or resignation as sole Manager without appointing another Person to act as Manager prior to its resignation pursuant to Article 13;

(ii) the sole Manager resigns and its designated successor fails to receive the approval of Members as specified in Section 13.1(d), upon the effective date of such resignation;

(iii) the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act;

(iv) any event that would make the Company's continued existence unlawful;

(v) due to legal, tax, regulatory, economic or other changes it is impracticable for the Company to continue to make investments; or

(vi) the determination by the Manager upon giving at least ninety (90) days' advance written notice to Members.

(b) The Company's dissolution will be effective on the day on which an event described in Section 10.1(a) occurs, but the Company will not terminate until a certificate of cancellation is filed with the Secretary of State of the State of Delaware and the Company's assets are distributed as provided in Section 10.3. Notwithstanding the Company's dissolution, prior to the Company's termination, the business of the Company will continue to be governed by this Agreement.

**10.2 Liquidator**

Upon dissolution, the Company will be liquidated in an orderly manner. The Manager or, if there is no Manager, a person or persons designated by a vote of the holders of more than 50% of the issued and outstanding Units of the Company (exclusive of any Defaulting Members), will be the liquidator (the "Liquidator") to wind up the affairs of the Company pursuant to this Agreement. The Liquidator may direct the Custodian to reserve, in connection with any transfer or distribution of assets, an amount adequate to assure payment of the Management Fee and to provide for any other liabilities of the Company properly incurred, to be incurred or reasonably anticipated, and finally to dispose of such amount to the same parties and in the same proportions as the balance of the assets were disposed of.

**10.3 Winding Up, Liquidation and Distribution of Assets**

(a) Upon dissolution, an accounting will be made of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager will:

(i) sell or otherwise liquidate all of the Company's assets as promptly as practicable;

(ii) allocate any profit or loss resulting from such sales to the Member's Capital Account pursuant to Article 9;

(iii) discharge all liabilities of the Company, including liabilities to the Members as creditors of the Company to the extent permitted by law; and

(iv) distribute the remaining assets to Members in accordance with the positive balance (if any) in their Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs). The Company may make any payment pursuant to this Section, including in connection with a liquidating distribution, in cash or in a form other than cash, in each case as determined by the Manager. For such purposes, the value of any non-cash assets distributed shall be as determined in good faith by the Manager.

(b) Subject to Section 9.1, if any Member has a deficit balance in such Member's Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member will have no obligation to make any Capital Contribution, and the deficit balance will not be considered a debt owed by the Member to the Company or to any other person for any purpose whatsoever.

**10.4 Distribution of Noncash Items**

The Liquidator will use its best efforts to convert all assets of the Company to cash for distribution to the applicable Members; provided, however, that distributions may include a proportionate share of assets of the Company.

**10.5 Certificate of Cancellation**

When all debts, liabilities and obligations of the Company have been paid and discharged, or adequate provisions have been made for their payment or discharge, and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation setting forth the information required by the Delaware Act will be executed by one or more authorized persons and filed with the Delaware Secretary of State. Upon such filing, the existence of the Company will cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Delaware Act.

## ARTICLE 11
## RESTRICTIONS ON TRANSFERS; NEW MEMBERS

### 11.1 Requirements for Transfer

Members may not Transfer their Units except (i) by testamentary disposition or by the laws of intestacy upon the death of the Member, (ii) by operation of law, and (iii) in any case, with the prior written consent of the Manager. Notwithstanding the foregoing, a Transfer is not permitted and shall be null and void *ab initio* if such Transfer (a) may not be effected without registration of the Units proposed to be transferred under the Securities Act of 1933 or any applicable state or other securities laws, (b) would cause the Company to become a "publicly traded partnership" as defined in Section 7704 of the Code, or (c) would require the Company to register as an investment company under the Investment Company Act of 1940. The purported transferee under any Transfer described in the foregoing sentence shall have no rights with respect to the Company, or the Units. A Transfer which is permitted under this Section 11.1 shall entitle the transferee to receive, as an assignee, allocations of profit and loss of the Company and distributions with respect to the Units transferred, but the transferee shall not become a Member, and shall have no rights to participate in the management of the Company, or to vote or consent with respect to any matter, unless admitted as a substitute Member pursuant to Section 11.2.

### 11.2 Admission of Substitute Member

A transferee of Units pursuant to Section 11.1 shall be admitted as a Member with respect to the Units transferred only upon the prior written consent of the Manager, which consent may be withheld for any reason in the Manager's sole discretion. Any transferee admitted to the Company as a Member shall execute a counterpart signature page to this Agreement, and such other documentation as the Manager deems appropriate, and upon admission as a Member will succeed to all rights and be subject to all obligations of the transferring or assigning Member with respect to the Units transferred or assigned. The Manager may require any transferee to reimburse the Company for any expenses associated with its admission as a substitute Member.

### 11.3 Admission of New Members

From the date of the formation of the Company, any person with the consent of the Manager may be admitted as a Member by the Company's issuing an additional Series of Units at $100 per Unit. By executing this Agreement, each Member consents to the admission of any Person whose subscription to become a Member is accepted by the Manager. Admission of a new Member to the Company shall not be cause for dissolution of the Company. No new Members will be entitled to any retroactive allocation of any item of Company income, gain, loss, deduction or credit.

### 11.4 Adjustments to Take Account of Interim Admissions and Redemptions

In the event that (a) a Member shall redeem or be required to redeem from the Company other than at the time required by the Memorandum, or (b) a Member is admitted to the Company pursuant to Section 11.3 other than at the time required by the Memorandum, the calculation of NAV per Unit and/or Net Asset Value for the Company or any Class or Series,

including the taxes thereon and accounting procedures, shall equitably take into account such interim event and accrued income and expense items and the determination thereof by the Manager shall be binding and conclusive as to all of the Members and former Members of the Company.

## ARTICLE 12
## MEMBERS' LIABILITY

### 12.1 Members' Liability

(a) To the fullest extent permitted by the Delaware Act and all other applicable law, no Member shall be personally liable or obligated under a judgment, decree or order of a court, or in any other manner, for the Company's debts, liabilities, or obligations, whether arising in contract, tort or otherwise.

(b) If a Member has received the return of any part of its Capital Contribution in violation of this Agreement or the Delaware Act, such Member shall be liable to the Company for a period of three (3) years thereafter for the amount of the Capital Contribution wrongfully returned.

(c) Any liability of a Member to the Company under this Article 12 can be waived or compromised by the Manager. A Member who is subject to an obligation to repay any Capital Contribution to the Company as required by this Agreement shall make such repayment on demand by the Company. No Member shall be liable to the Company, its creditors or any other Member with respect to any amounts paid to such Member as distributions that are not paid to such Member as a return of such Member's Capital Contribution.

## ARTICLE 13
## RESIGNATION AND REPLACEMENT OF MANAGER

### 13.1 Resignation and Replacement of Manager

The Manager may be changed in the following manner:

(a) the Manager may resign as Manager of the Company upon ninety (90) days' prior written notice to all of the Members without designating a successor Manager, and Article 10 shall apply;

(b) the Manager may resign as Manager of the Company upon ninety (90) days' prior written notice to all of the Members, and may designate an Affiliate of the Manager to serve as Manager effective upon its resignation, without the consent of the Members;

(c) the Manager may designate an Affiliate of the Manager to be added as a manager of the Company without the consent of the Members;

(d) the Manager may resign as Manager of the Company upon ninety (90) days' prior written notice to all of the Members, and may designate a non-Affiliate of the Manager to be substituted as Manager and thereby assign its rights and obligations under this Agreement by notice mailed to the address of record of each Member that is not objected to in writing within thirty (30) days of such mailing by Members representing more than 50% of the issued and outstanding Units of the Company (exclusive of any Defaulting Members);

(e) the Manager may designate a non-Affiliate of the Manager to be added as a manager of the Company by notice mailed to the address of record of each Member that is not objected to in writing within thirty (30) days of such mailing by Members representing more than 50% of the issued and outstanding Units of the Company (each such designate in sub-sections (b), (c), (d) and (e), a "Designee") (exclusive of any Defaulting Members); or

(f) the Manager without the consent of the Members may make a Transfer of all or any portion of its Units by operation of law.

If the Members fail to approve the appointment of a Designee pursuant to sub-section (d) above, the resignation of the Manager shall nevertheless be effective, and Article 10 shall apply. Any Designee to be added as a manager shall be deemed to be admitted upon its execution of a counterpart or other applicable document related to this Agreement. Any such Designee to be substituted shall be deemed to be admitted immediately prior to the effective date of the resignation of the Manager. Upon admission to the Company, a Designee shall become, and have all of the rights, powers and duties of, the Manager for all purposes of this Agreement.

**13.2 Effect of Changes in Members, Partners, Managers, Directors or Officers of the Manager**

Except as required by applicable law, changes in the members, partners, managers, directors or officers of the Manager shall not require the consent of the Members and shall not dissolve the Company.

**13.3 Notice of Change in Ownership of Manager**

The Manager shall promptly notify each Member in writing of any change in the ownership of the Manager if, in the reasonable and good faith determination of the Manager, such notice is required by the Advisers Act.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

**14.1 Entire Agreement**

This Agreement, together with the Memorandum and the Subscription Agreement, contains the entire understanding of the Members with respect to the subject matter of this Agreement, and supersedes any prior written or oral understanding, agreement or commitment with respect to such subject matter.

**14.2 Notices**

All notices, consents, waivers, and other communications under this Agreement will be in writing and will be deemed given to a party or to the Company when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment, or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the addresses, facsimile numbers or e-mail address and marked to the attention of the individual (by name or title) (if any) as shown in the books and records of the Company and to the Company at its principal office, or to such other address, facsimile number, e-mail address or individual as a Member or the Company may designate by notice to the other parties.

**14.3 Defaulting Members**

(a) If any Member (a "Defaulting Member") fails to make full payment when due (a "Payment Default") of any portion of its Capital Commitment or any other payment required under this Agreement or such Member's Subscription Agreement for its Units in the Company (the amount of such defaulted payments in the aggregate, including all accrued and unpaid interest thereon, and together with any other unpaid amounts that are due and owing by such Member thereunder, the "Defaulted Amounts") and such Payment Default is not cured within ten (10) business days after written notice to such Defaulting Member from the Manager with respect to such Payment Default, the Manager in its sole discretion, on its own behalf or on behalf of the Company, may (but shall not be obligated to) pursue and enforce any and all rights and remedies the Company and/or the Manager may have against such Defaulting Member at law, in equity or pursuant to any other provision of this Agreement or otherwise with respect thereto, including taking any one or more of the following actions in any order of priority:

(i) In addition to all Defaulted Amounts owed by the Defaulting Member, the Company may (A) accrue and collect interest computed on all Defaulted Amounts and any amount due to the Company or the Manager pursuant to this Section 14.3 at an annual compounded rate not to exceed ten percentage points per annum (but not in excess of the highest rate per annum permitted by law) as such rate shall be determined by the Manager in its sole discretion with respect to each failure to make such payments, and/or (B) require reimbursement from the Defaulting Member for all out-of-pocket expenses (including for attorneys' fees) incurred by the Company and the Manager in connection with the collection and other efforts in respect of the Defaulted Amounts (which payment of such interest and expense reimbursement shall not be treated as a Capital Contribution by the Defaulting Member). The Manager may require the payment of such interest and expense reimbursement whether or not it exercises any rights or remedies.

(ii) So long as any Defaulted Amounts remain unpaid, the Company may withhold all distributions (or portions thereof) that would otherwise be made

to the Defaulting Member pursuant to this Agreement and apply such withheld distributions to offset any Defaulted Amounts owing by the Defaulting Member to the Company or the Manager under this Agreement or any other agreement.

(iii) The Manager may assist the Defaulting Member in finding a buyer for all or any part of the Defaulting Member's Units in the Company; provided that the Manager shall not have any obligation to contact any particular Member or other Person with regard to such sale and shall have no liability to any Member, including the Defaulting Member, if no such buyer is found.

(iv) The Company and the Manager may pursue a lawsuit to collect the Defaulted Amounts due to the Company and the Manager including amounts owed pursuant to Section 14.3(a)(i) and/or 14.3(a)(ix). The Manager may require the payment of such interest and expense reimbursement whether or not it exercises any rights or remedies.

(v) Subject to Section 14.3(a)(vii), the Manager may cause the Defaulting Member to forfeit up to 10% of its Units in the Company without payment or other consideration therefor, and the Manager shall offer to transfer, for no consideration, such forfeited Units of the Defaulting Member to the other Members (other than any Defaulting Members) pro rata according to their respective Capital Commitments or the forfeited Units may be cancelled. The Manager shall provide a notice to each Member (other than Defaulting Members) setting forth the amount of the forfeited Units of the Defaulting Member offered to such Member. In the event that any Member does not elect to accept its pro rata share of the forfeited Units of a Defaulting Member, such forfeited Units will be offered again by the Manager according to the provisions of this Section 14.3(a)(v) as if such forfeited Units had not previously been offered until either all of such Units are acquired or no Member wishes to accept any further portion.

(vi) Subject to Section 14.3(a)(vii), to the extent a Defaulting Member's Units are not forfeited and reallocated pursuant to Section 14.3(a)(v) (including the remaining portion of such Defaulting Member's Units not subject to forfeiture), the Manager may offer to the other Members (other than any Defaulting Members) the portion of the Defaulting Member's Units that are not forfeited and reallocated pursuant to Section 14.3(a)(v) at the applicable NAV per Unit on the effective date such Defaulting Member's interest is sold. If the remaining portion of the Defaulting Member's Units are not purchased in the manner set forth herein, the Manager in its sole discretion may offer the remaining Units to a third party or parties on terms not more favorable than originally offered to the Members, in which case such third party or parties shall, as a condition of purchasing such interest, become a party to this Agreement.

(vii) The Manager may reduce (and such reduction shall be deemed to be effective as of the actual date of the Payment Default, without giving effect to any applicable cure period, or as of such later date as is determined by the

Manager) any portion of such Defaulting Member's Capital Commitment (which has not been assumed by another Partner or third party) to the amount of the Capital Contributions (which have not been acquired by another Partner or third party) made by such Defaulting Member and the aggregate Capital Commitments of the Company shall be commensurately reduced; provided that no such reduction in a Defaulting Member's Capital Contribution shall be effective as against a Lender that has advanced funds to the Company on account of such Capital Commitment.

(b) No consent of any Member shall be required as a condition precedent to any Transfer of a Defaulting Member's Units, or the admission of a transferee as a substitute Member with respect to such Units, pursuant to this Section 14.3.

(c) The Manager shall handle the procedures of making the offers set forth in this Section 14.3 and shall in its discretion set time limits for acceptance. In connection with any purchase of Units pursuant to this Section 14.3, upon the Manager's request, the Defaulting Member shall make customary representations and warranties to each purchaser and will execute a customary transfer agreement.

(d) The failure of any Member to fulfill an obligation hereunder shall not relieve any other Member of any of its obligations under this Agreement.

(e) Notwithstanding the notice requirements of Section 4.2, additional Capital Contributions may be called by the Manager on five (5) business days' notice following a Member failing to fund any amount due pursuant to a Capital Call Notice. In addition, the Manager is authorized to apply amounts that would otherwise be distributed to a Member to satisfy such Member's obligation to make a Capital Contribution pursuant to Section 4.2 or any other payment required under this Agreement. Such amounts applied shall be deemed distributed to such Member by the Company and then contributed by such Member to the Company as Capital Contributions or paid by such Partner to the Company, as applicable.

(f) Notwithstanding anything in this Agreement to the contrary and unless otherwise determined by the Manager in its sole discretion, during any period of time that a Member is a Defaulting Member, such Defaulting Member shall not be entitled to receive any of the reports, or information contained therein, or any other information regarding the Company or any investment, other than (i) a statement of such Defaulting Member's closing Capital Account balance as and when provided by the Manager to the other Members, (ii) the Defaulting Member's Schedule K-1s, as and when provided by the Manager to the other Members, and (iii) any additional reports and information that are required by applicable law.

(g) Each Member hereby acknowledges that certain provisions of this Agreement (including this Section 14.3) provide for specific consequences in the event of a breach of this Agreement by a Partner. Each Partner hereby agrees that the default provisions of this Agreement are fair and reasonable and, in light of the difficulty of determining actual damages, represent a prior agreement among the Partners as to

appropriate liquidated damages. Without limiting the general effect of the preceding sentence, the Partners hereby specifically acknowledge and agree that the enforceability of this Section 14.3 is essential to the stability of the Company as an organization and to the ability of the Company to effectively serve its purpose and conduct its business operations.

(h) Each Member hereby specifically agrees that, in the event such Member becomes a Defaulting Member, regardless of the reason therefor, such Member shall not be entitled to claim that the Company or any of the other Members are precluded, on the basis of any fiduciary or other duty arising in respect of such Member's status as such or other equitable claim or theory, from seeking any of the penalties or other remedies permitted under this Agreement or applicable law.

**14.4 Amendments**

(a) The terms and provisions of this Agreement may be modified or amended at any time and from time to time: (i)(a) with the written consent of the affected Members whose Units, in the aggregate, represent more than 50% of the Units of all affected Members (excluding any Defaulting Members) or (b) by the "negative consent" of affected Members by notice mailed to the address of record of each affected Member that is not objected to in writing within thirty (30) days of mailing by the affected Members whose Units, in the aggregate, represent more than 50% of the Units of affected Members (excluding any Defaulting Members); and (ii) with the written consent of the Manager. Notwithstanding the foregoing, the Manager may, without the consent of any Member, amend this Agreement to: (i) reflect the admission of new Members or the redemption of existing Members in accordance with the provisions of this Agreement and changes validly made in the Capital Contributions of the Members; (ii) reflect a change in the name of the Company; (iii) make a change that is necessary or, in the Manager's opinion, advisable to qualify the Company as a limited liability company in which the Members have limited liability under the laws of any state, or ensure that the Company will not be treated as an association taxable as a corporation for federal income tax purposes; (iv) make a change that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, in each case so long as such change does not adversely affect the Members; (v) enter into side letters with Members that are in variance with the terms of this Agreement; (vi) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state statute, so long as such change is made in a manner that minimizes any adverse effect on the Members, or make a change that is required or contemplated by this Agreement; (vii) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Manager or the Company pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; (viii) prevent the Company or the Manager from in any manner being deemed an "investment company" subject to the provisions of the Investment Company Act of 1940, as amended; (ix) prevent the Manager from becoming a fiduciary (as such term is used in the Employee Retirement Income Security Act of 1974, as amended); (x)

make any amendment which does not adversely affect the Members; (xi) enable the Company to invest substantially all of its assets in an offshore vehicle controlled by the Manager or one of its Affiliates to accommodate investment by foreign residents and U.S. tax exempt investors in the same investment strategy adopted by the Company; or (xii) make any other amendments similar to the foregoing. Notwithstanding any provision in this Agreement to the contrary, no amendment to this Agreement shall increase the liability of a Member without such Member's consent.

(b) Notwithstanding anything in Section 14.4(a) to the contrary, no amendment will be valid as to any Member (including a Defaulting Member) which increases or decreases such Member's Capital Commitment without the written consent of such Member.

(c) Notwithstanding anything in Section 14.4(a) to the contrary, so long as a Credit Facility is outstanding, no amendment of or supplement to this Agreement will be valid as to any Lender under such Credit Facility (unless such Lender provides its prior written consent) that would materially adversely affect such Lender.

**14.5 Written Consent**

Unless otherwise specified in this Agreement or in the Delaware Act, any action to be taken on any matter may be submitted to the Members and shall be deemed approved if a consent in writing, setting forth the action or matter, is signed by the Members owning more than 50% of the issued and outstanding Units of the Company (exclusive of Defaulting Members); provided that the Manager shall give prompt notice to Members who have not given consent of the taking of action by written consent of the Members. Any written consent may be executed in any number of counterparts, each of which shall be deemed an original. The Manager may require Members to respond in the negative within a reasonable amount of time to a proposed action or be deemed to have consented thereto.

**14.6 Power of Attorney**

Each Member hereby irrevocably constitutes and appoints the Manager and each officer of the Manager, as his true and lawful representative and attorney-in-fact, with full power of substitution and revocation, in his name, place and stead, to make, execute, sign and file (i) any amendment to the Certificate and all such other instruments, documents and certificates which may, from time to time, be required by the laws of the United States of America, the State of Delaware or any other state or political subdivision in which the Company shall determine to do business, to effectuate, implement and continue the valid existence of the Company, (ii) this Agreement, including any amendments and/or restatements hereto duly adopted as provided herein, (iii) any limited liability company certificate, business certificate, fictitious name certificate, or amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business purpose and objectives of the Company, or required by any applicable federal, state, local or foreign law, (iv) all conveyances and other instruments which may be required to be filed by the Company or the Members under the laws of any jurisdiction or under any amendments or successor statutes to the Delaware Act, to reflect the dissolution or termination of the Company or the Company being governed by any amendments or successor

statutes to the Delaware Act or to reorganize the Company in a different jurisdiction, and (v) to file, prosecute, defend, settle or compromise litigation, claims or arbitrations on behalf of the Company. The Power of Attorney granted herein shall be irrevocable and deemed to be a power coupled with an interest (including, without limitation, the interest of the other Members in the Manager being able to rely on its authority to act as contemplated by this Section 14.5) and shall survive and shall not be affected by the subsequent incapacity, disability or death of a Member.

**14.7 Waiver of Action for Partition**

Each Member irrevocably waives during the Company's term any right it may have to maintain any act for partition with respect to the Company's property.

**14.8 Severability**

If a court of competent jurisdiction holds any provision of this Agreement invalid or unenforceable, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**14.9 Assignment; Successors; No Third Party Rights**

No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties except to a transferee in connection with a Transfer permitted under Section 11.1. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of each Member's heirs, executors, administrators and permitted assigns. Nothing expressed or referred to in this Agreement will be construed to give any person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement except such rights as may inure to a successor or permitted assignee under this Section.

**14.10 No Waiver**

The failure of any Member or the Manager to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act that would have constituted a violation from having the effect of an original violation. No provision of this Agreement shall be deemed to have been waived except if the giving of such waiver is contained in a written notice given to the party claiming such waiver, and no such waiver shall be deemed to be a waiver of any other or future obligation or liability of the party or parties in whose favor the waiver was given.

**14.11 Governing Law**

This Agreement will be governed by and construed under the laws of the State of Delaware, without regard to conflicts of laws principles that would require the application of any other law.

**14.12 Survival**

All indemnities and reimbursement obligations made pursuant to this Agreement shall survive dissolution and liquidation of the Company until the expiration of the longest applicable statute of limitations (including extensions and waivers) with respect to the matter for which a party would be entitled to be indemnified or reimbursed, as the case may be.

**14.13 Variations of Pronouns**

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

**14.14 Captions and References**

Titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

**14.15 Counterparts**

This Agreement may be executed in two or more counterparts.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the day and year first above written.

**T2 STRATEGIC REAL ESTATE INCOME FUND, LLC**
as Manager

By: ______________________
Name: ______________________
Title: ______________________

All Members now and hereafter admitted as Members of the Company, pursuant to the authority granted hereunder to the Manager

By: **T2 SREI Fund GP, LLC**,
as Manager

By: ______________________
Name: ______________________
Title: ______________________

INVESTMENTS
WORTH
BUILDING

T2 | CAPITAL MANAGEMENT™

# T2 Strategic Real Estate Income Fund, LLC

*Subscription Documents for Limited Liability Company Units*

**T2 Strategic Real Estate Income Fund, LLC**
**Instructions for Completion of the Subscription Documents**

To purchase Units in T2 Strategic Real Estate Income Fund, LLC (the "Fund"), please review and complete all of the Subscription Documents contained in this package. By signing the attached Subscription Agreement, the Investor also agrees to become a party to, and be bound and governed by, the Fund's Second Amended and Restated Limited Liability Company Agreement dated as of October 1, 2014 (the "LLC Agreement").

A. Completing the Subscription Documents: *If you have any questions regarding the completion of the Subscription Documents, please call Jeff Baxter at* (630) 590-9511.

1. On the first page, fill in the legal name of the individual or entity making the investment (the "Investor") and the total amount of the investment.

2. On page 14, following your careful review of the Subscription Agreement, fill in the date and the amount of your investment. *If the Investor is an individual*: The Investor must sign and print the Investor's name. *If the Investor is an entity*: An authorized party of the Investor must print the entity's legal name, sign and print the authorized party's name and title or capacity in which such party is signing on behalf of the investing entity.

3. On pages 16 through 18, please complete the investor identification, distribution, contact information, and private fund reporting information as requested. *This information must be completed in full.*

4. On Exhibit A, complete the Benefit Plan Investor representations (pages A-1 to A-2).

5. On Exhibit B:

   - If the Investor is an individual (including IRAs and revocable trusts), please (a) complete the *Eligibility Questionnaire for Individuals* (two pages) AND (b) sign the *Eligibility Questionnaire Signature Page for Individuals* (immediately following the Eligibility Questionnaire for Individuals).

   - If the Investor is an entity (excluding IRAs and revocable trusts), please (a) complete the *Eligibility Questionnaire for Entities*, including the supplemental data questions (two pages) AND (b) sign the *Eligibility Questionnaire Signature Page for Entities* (immediately following the Eligibility Questionnaire for Entities).

6. On Exhibit E, complete the Electronic Delivery of Schedules K-1 Consent and Disclosures Statement (2 pages).

7. Review Annex A, the Privacy Statement of T2 SREI Fund GP, LLC, the Fund's manager.

8. If the Investor is a United States individual or entity, please complete Form W-9.

9. If the Investor is a non-United States individual, non-United States corporation, non-United States partnership or other non-United States entity, please complete Form W-8BEN, W-8ECI, W-8IMY or W-8EXP, as applicable. Each of these forms can be found on the Internal Revenue Service's website at www.irs.gov or by contacting Jeff Baxter at (630) 590-9511.

B. Delivery of the Subscription Documents: Please deliver one completed and signed copy of the Subscription Documents either in hard copy, electronic .pdf format or facsimile as soon as possible to Woodfield Fund Administration, LLC (the "Administrator") at the following address:

Woodfield Fund Administration, LLC
1 N. Wacker Drive, Suite 2150
Chicago, IL 60606
Attn: Investor Services Department
T2admin@woodfieldllc.com
Facsimile: (847) 255-3566
Phone: (847) 255-3500

C. Capital Contributions to the Fund: A capital call notice will be provided at least ten (10) days prior to the due date for the initial capital call. The capital call notice will include ACH transfer instructions.

D. Additional Required Documents. The Fund reserves the right to request any additional documentation reasonably necessary to verify the identity of a prospective limited partner. Please be aware that your failure to provide such documentation may delay the acceptance of your subscription or cause your subscription request to be rejected entirely. The Fund shall be held harmless by any such prospective limited partner against loss arising as a result of a failure to provide requested documentation. If the subscription is rejected, the Fund will refund (without interest) to the subscriber any subscription payments received by the Fund.

**T2 Strategic Real Estate Income Fund, LLC**
**SUBSCRIPTION AGREEMENT**

| |
|---|
| ______________________________ Legal Name of Investor |
| $ ______________________________ Amount of Commitment |
| Class A |

To: T2 Strategic Real Estate Income Fund, LLC
c/o T2 SREI Fund GP, LLC
111 W. Wesley Street, Suite 5
Wheaton, IL 60187

Ladies and Gentlemen:

The undersigned subscribing investor (the "Investor") acknowledges receipt of the Confidential Private Placement Memorandum dated as of October 2014, as updated from time to time and as supplemented by the Class A Units Supplement (the "Memorandum"), of T2 Strategic Real Estate Income Fund, LLC, a Delaware limited liability company (the "Fund"), with respect to the offering of the limited liability company units in the Fund. To achieve its investment objective, the Fund will invest all of its assets in T2 Strategic Real Estate Income Fund Master, LP (the "Master Fund"), except those assets needed for cash management purposes. References to the Fund shall include the Master Fund unless the context requires otherwise. The Investor hereby agrees as follows:

1. **Subscription for Units**. Subject to the terms and conditions set forth in this Subscription Agreement, the Second Amended and Restated Limited Liability Company Agreement dated as of October 1, 2014 of the Fund (the "LLC Agreement") and the Agreement of Limited Partnership dated as of April 1, 2014 of the Master Fund (the "Partnership Agreement"), the Investor agrees to (a) subscribe for and irrevocably purchase from the Fund Class A limited liability company units (the "Units" or the "Class A Units") in the Fund in the aggregate amount of its Commitment (as set forth above), payable in the manner and at the times provided in the LLC Agreement, (b) become a party to and be governed and bound by the terms and conditions of the LLC Agreement, and (c) become a Member of the Fund. Capitalized terms used but not defined herein shall have the respective meanings given to them in the LLC Agreement. The Memorandum, LLC Agreement, Partnership Agreement, this Subscription Agreement and the other written materials furnished to the Investor by the Fund are sometimes referred to herein collectively as the "Offering Materials."

Units issued in connection with any subscriptions to the Fund will be offered at $100 per Unit. If a Contribution Date occurs on a date that is other than the last day of a quarter, Units will be issued using the most recent Valuation Date (as defined in the Memorandum) if within the first forty-five days of the quarter-end and as of the next subsequent Valuation Date if after forty-five days of the quarter-end.

2. **Terms Specific to the Class A Units**. The terms specific to the Class A Units are set forth in the Class A Supplement. Prospective investors must read the Supplement prior to subscribing for Units in the Fund. Subject to the other terms and restrictions set forth in the Memorandum, the Investor understands that it may only redeem all or part of its Units after a period of twelve (12) months from the date of the purchase of such Units.

3. **Representations, Covenants and Warranties of the Investor**. The Investor hereby represents, covenants and warrants to the Fund, Master Fund, Investment Manager and to T2 SREI Fund GP, LLC (the "Manager") and to each other person or entity who acquires an interest in the Fund as follows:

**(a) Suitability. THE INVESTOR HAS READ CAREFULLY AND UNDERSTANDS THE OFFERING MATERIALS AND HAS CONSULTED ITS OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR THE INVESTOR. ANY SPECIFIC ACKNOWLEDGMENT SET FORTH BELOW WITH RESPECT TO ANY STATEMENT CONTAINED IN THE OFFERING MATERIALS SHALL NOT BE DEEMED TO LIMIT THE GENERALITY OF THESE REPRESENTATIONS AND WARRANTIES. THE INVESTOR IS PURCHASING UNITS IN THE FUND RELYING SOLELY ON THE INFORMATION CONTAINED IN THE OFFERING MATERIALS, AND NOT ON ANY OTHER STATEMENT (WHETHER ORAL OR WRITTEN) WITH RESPECT TO THE OFFERING OF UNITS MADE BY THE FUND, THE MANAGER OR ANY OFFICER, DIRECTOR, EMPLOYEE, STOCKHOLDER, MEMBER, PARTNER OR AFFILIATE OF EITHER OF THEM. NEITHER THE MANAGER NOR ANY OTHER PERSON ACTING ON THE FUND'S BEHALF OFFERED TO SELL THE INVESTOR UNITS IN THE FUND BY MEANS OF ANY FORM OF GENERAL SOLICITATION OR ADVERTISING, SUCH AS MEDIA ADVERTISING OR PUBLIC SEMINARS.**

**(b) Opportunity to Verify Information**. The Investor acknowledges that representatives of the Fund have made available to the Investor, during the course of this transaction and prior to the purchase of the Units, the opportunity to ask questions of and receive answers from them concerning the terms and conditions of the offering described in the Offering Materials and to obtain any additional information necessary to verify the information contained in the Offering Materials or otherwise relative to the proposed activities of the Fund. The Investor acknowledges having received satisfactory answers to all of its questions from representatives of the Fund and having obtained all additional information requested by it of the Fund and its representatives.

**(c) Fee Arrangements**. The Investor acknowledges and understands the fee arrangements discussed in the Memorandum and the LLC Agreement.

**(d) Purchase for Investment; Transferability**.

(i) The Investor understands that the Investor must bear the economic risk of its investment until the termination of the Fund, and that the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act") in reliance on the exemption contained in Section 4(2) thereof and the provisions of Rule 506 of Regulation D promulgated thereunder, and, therefore, cannot be resold or otherwise disposed of unless they are subsequently registered under the Securities Act or unless an exemption from such registration is available. The Investor also acknowledges and understands that (1) the offering and sale of the Units has not been registered under the securities laws of any state or any other jurisdiction and that the Offering Materials have not been subject to review or comment by the United States Securities and Exchange Commission ("SEC") or any state securities commission or any similar body or agency of any other jurisdiction; (2) the Fund is not being registered as an "investment company" as the term is defined in Section 3(a) of the Investment Company Act of 1940, as amended (the "Investment Company Act"); and (3) the Investor is purchasing the Units for its own account and without a view towards resale or distribution thereof. The Investor agrees not to resell or otherwise dispose of all or any part of the Units purchased by the Investor, except as permitted by law, including, without limitation, any regulations under the Securities Act, and any and all applicable provisions of the LLC Agreement.

(ii) The Investor understands that the Fund does not have any obligation or intention to register the Units for sale under the Securities Act or any state securities laws or of

supplying the information which may be necessary to enable the Investor to sell its Units; and that the Investor has no right to require the registration of the Units under the Securities Act, any state securities laws or other applicable securities regulations. The Investor also understands that sales or transfers of Units are further restricted by the provisions of the LLC Agreement. There is no public or other market for the Units, and none is expected to develop. For the foregoing reasons, the Investor may be required to retain ownership of the Units and bear the economic risk of this investment for an indefinite period.

(iii) The Investor represents and warrants further that it has no contract, understanding, agreement or arrangement with any person to sell, transfer or pledge to such person or anyone else any of the Units for which the Investor hereby subscribes (in whole or in part); and the Investor represents and warrants that it has no present plans to enter into any such contract, undertaking, agreement or arrangement.

(iv) The Investor understands that the Units cannot be sold or transferred without the prior written consent of the Manager, which consent may be withheld in its sole and absolute discretion and which consent will be withheld if any such transfer could cause the Fund to become subject to regulation under federal law as an investment company or would subject the Fund to adverse tax consequences.

(v) By executing this Subscription Agreement, the Subscriber affirmatively consents to the description of the Fund set forth in the Offering Materials, the actual and potential risks and conflicts of interest involved with an investment in the Fund, and the costs and charges involved in an investment in the Fund.

**(e) <u>Full Contribution</u>.** The Investor understands that, except as otherwise provided in the LLC Agreement, the Investor is not permitted to make less than the full amount of any required investment, and that the LLC Agreement contains default provisions with respect thereto pursuant to which the Investor may lose a material portion of its investment in the Fund.

**(f) <u>Eligible Purchaser Status</u>.** The Investor is an "accredited investor" within the meaning of Regulation D under the Securities Act and is a "qualified client" as defined in Rule 205-3 of the Investment Advisers Act of 1940, as amended ("Advisers Act"). The Investor has completed and signed, or had its authorized representative complete and sign, the applicable Eligibility Questionnaire attached hereto as Exhibit B and all statements, answers and information therein are correct.

**(g) <u>No Need for Liquidity and Suspension of Redemptions</u>.** The Investor has no need for liquidity in connection with its purchase of the Units, can bear the substantial economic risks of its investment in the Fund for an indefinite period of time and can afford to suffer the complete loss thereof. The Investor acknowledges the limited rights of redemption provided in the LLC Agreement. The Fund may suspend redemption rights, payments or the calculation of Net Asset Value, in whole or in part, as set forth in the Memorandum. In addition, the Fund, by written notice to any Member, may suspend the payment of redemption proceeds payable to such Member if the Fund reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager and their affiliates, subsidiaries or associates or any of the Fund's other service providers. Finally, the undersigned acknowledges that distributions, including, without limitation, the proceeds of redemptions, may be paid in cash, in kind or partly in cash and partly in kind.

**(h) <u>Investment Objectives</u>.** The purchase of the Units by the Investor is consistent with the general long-term investment objectives of the Investor.

**(i) <u>Investment Management Agreement</u>.** The Investor consents to the terms of the Investment Management Agreement among the Investment Manager, the Master Fund and the Fund.

(j) **Investment Company Act**. Unless otherwise permitted under the Investment Company Act, if the Investor is a corporation, trust, partnership, limited liability company or other organization or entity, (i) it has not been formed, organized, reorganized, capitalized or recapitalized for the purpose of acquiring or holding the Units, or the Investor's Commitment is less than 40% of its total assets and committed capital; (ii) its stockholders, partners, members or other beneficial owners do not have and will not have individual discretion as to their participation in particular investments made by the Investor; and (iii) it is not an investment company registered or required to register under the Investment Company Act; provided, that if the Investor is unable to make any of the representations set forth in this paragraph (j), it shall have so notified the Manager in writing and shall have provided to the Manager such additional information as the Manager may reasonably request.

(k) **Knowledge and Experience**. The Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of any offer regarding the Fund, such knowledge and experience in tax, financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund and, in making a decision to proceed with this investment (unless the Investor has a purchaser representative), the Investor has not relied upon any representations, warranties or agreements other than those set forth in this Subscription Agreement and the other Offering Materials, if any.

(l) **Investment Risks**. The Investor is aware that an investment in the Fund involves substantial risks, including the risks summarized in the Memorandum under "Risk Factors," and has determined that the purchase of the Units is a suitable investment for it. The Investor is aware that (i) the Fund has no financial or operating history, (ii) any historical or projected investment returns set forth in the Offering Materials or any supplemental materials are not necessarily comparable to or indicative of returns, if any, that may be achieved on investments made by the Fund, and (iii) the Manager or a person or entity selected by the Manager (which may be a manager, member or affiliate thereof) will receive substantial compensation in connection with the management of the Fund. The Investor has sufficient financial resources to bear the loss of its entire investment in the Fund.

(m) **Purchaser Representative**. If the Investor has utilized a purchaser representative for the purpose of evaluating an investment in the Fund, the Investor has previously given the Fund written notice of such fact, specifying that such representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

(n) **Special Purpose Entities**. The Investor is not an entity that has been organized, reorganized, capitalized, recapitalized for the principal or specific purpose (or as one of the principal or specific purposes) of investing in the Fund, or a substantial portion of its assets consist (or will consist) of an interest in the Fund (a "Special Purpose Entity"); provided that if the Investor is a Special Purpose Entity, the Investor shall (i) so indicate in its Eligibility Questionnaire and (ii) provide the Manager with such information (including such representations and warranties) relating to such entity and its ultimate beneficial owners as may be reasonably requested in order to assure compliance with all applicable laws, rules and regulations (including those under the Securities Act, the Investment Company Act, the "publicly traded partnership" provisions of the United States Internal Revenue Code of 1986, as amended (the "Code"), and the United States Treasury Regulations promulgated thereunder). Restrictions (substantially similar to the restrictions contained in the LLC Agreement on the assignment or transfer of Units in the Fund) shall be imposed on the ability of the direct or indirect beneficial or record owners of such special purpose entity (or entities) to transfer directly or indirectly their Units in such entity (or entities).

(o) **Certain Flow-Through Entities**. If the Investor is (or will be at any time during the period which the Investor holds any interest in the Fund) a partnership, limited liability company, grantor trust or S corporation for United States federal income tax purposes (a "flow-through entity"), then either (i) less than seventy percent (70%) of the value of the Investor (as well as the value of any flow-through entity that is a direct or indirect beneficial owner of the Investor) is attributable to the Investor's interest in the Fund or (ii) the Investor was not formed, availed of or reorganized for the principal purpose to

permit the Fund to satisfy (or have as one of its principal purposes the satisfaction of) the 100 partner limitation of United States Treasury Regulation Section 1.7704-1(h)(ii).

(p) **Covenant to Provide Tax Information**. The Investor covenants that it (1) will provide any form, certification or other information reasonably requested by and acceptable to the Manager that is necessary for the Fund (x) to prevent, qualify for a reduced rate of, and/or otherwise determine the proper rate of withholding or backup withholding in any jurisdiction from or through which the Fund receives payments or (y) to satisfy reporting or other obligations under the Code and the Treasury Regulations, (2) will update or replace such form, certification or other information in accordance with its terms or subsequent amendments, and (3) will otherwise comply with any reporting obligations imposed by the U.S. or any other jurisdiction with respect to Investor's investment in the Fund, including reporting obligations that may be imposed by future legislation.

(q) **No View to Tax Benefits**. The Investor is not acquiring the Units with a view to realizing any benefits under U.S. federal income tax laws, and no representations have been made to the Investor that any such benefits will be available as a result of the Investor's acquisition, ownership or disposition of the Units.

(r) **No Borrowings**. The Investor has not borrowed and will not borrow any portion of its contribution to the Fund, either directly or indirectly, from the Fund, the Manager or any affiliate of the foregoing.

(s) **No Independent Counsel to Represent Investors**. The Investor understands that Vedder Price P.C. ("Vedder Price") has been engaged as legal counsel by the Manager and the Investment Manager to represent them and the Fund and their affiliates in connection with the organization of the Fund and the Master Fund and the offering of Units. The Investor also understands that no separate counsel has been engaged to independently represent the Members in connection with the formation of the Fund and the Master Fund or the offering of Units. The Investor understands that other counsel may also be retained where the Manager or Investment Manager on their own behalf or on behalf of the Fund determines that to be appropriate.

The Investor understands that, in advising the Fund, the Master Fund, the Manager and the Investment Manager with respect to the preparation of the Memorandum, Vedder Price has relied upon information that has been furnished to it by the Fund, the Master Fund, the Manager and the Investment Manager and their affiliates, and has not independently investigated or verified the accuracy or completeness of the information set forth in the Memorandum. In addition, the Investor understands that Vedder Price does not monitor the compliance of the Fund, the Master Fund, the Manager or the Investment Manager with the investment guidelines set forth in the Memorandum, the Fund's or the Master Fund's terms or applicable laws.

The Investor acknowledges that there may be situations in which there is a "conflict" between the interests of the Manager or the Investment Manager and those of the Fund and the Master Fund. The Investor understands that, in these situations, the Manager, the Investment Manager, the Fund and the Master Fund will determine the appropriate resolution thereof, and may seek advice from Vedder Price in connection with such determinations. The Manager, the Investment Manager, the Fund and the Master Fund have consented to Vedder Price's concurrent representation of such parties in such circumstances.

(t) **Final Form of Agreements**. The Investor understands and acknowledges that its investment in the Fund shall be subject to the terms and conditions of this Subscription Agreement and the LLC Agreement in such final forms as shall be executed by the parties thereto, and as the same may be amended from time to time in accordance with their respective terms.

(u) **Certain Tax Matters**. The Investor acknowledges and understands that the Fund is being organized and managed so as to avoid being classified as a "publicly traded partnership" taxable as a corporation under Section 7704 of the Code, the effect of which shall be to restrict the transferability of the Investor's Units.

(v) **Authorization**. If the Investor is an individual, the Investor has the legal capacity and authority to execute, deliver and perform the Investor's obligations under this Subscription Agreement. If the Investor is a corporation, partnership, limited liability company, trust or other entity, (i) the person executing this Subscription Agreement has the full power and authority to execute and deliver this Subscription Agreement on behalf of the subscribing entity; (ii) such entity is duly formed and organized, validly existing, and in good standing under the laws of its jurisdiction of formation; (iii) such entity is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement and to become a Member in the Fund; and (iv) the Investor shall deliver to the Fund such evidence of such authority as the Fund may reasonably require.

(w) **Electronic Delivery of Reports**. The Investor consents to receiving the periodic financial reports and tax information described in the LLC Agreement by e-mail or by means of having access to a database or other forum hosted on a website designated by the Manager (the "Reporting Site"), with such parameters regarding access and availability of information for review as the Manager deems reasonably necessary to protect the confidentiality and proprietary nature of the information contained therein. If at any time the Investor cannot or does not want to access such reports and information by email or via the Reporting Site, the Investor will notify the Manager, in which case the Manager will provide the Investor paper copies of such reports.

(x) **Master-Feeder Structure**. The Investor acknowledges that all of the Fund's assets will be invested in the Master Fund, except for those assets needed for cash management purposes, and the Fund will not make any independent investments. The Fund will report the level of investment by benefit plan investors in the Fund to the Master Fund for purposes of determining whether the Master Fund is a "plan assets entity" within the meaning of Employee Retirement Income Security Act of 1974, as amended.

(y) **Indemnification and Exculpation.** The Investor specifically agrees to and acknowledges the exculpation and indemnification provisions set forth in the LLC Agreement and that such provisions shall survive the undersigned's withdrawal as a Member and the Fund's dissolution. The undersigned hereby waives any personal liability on the part of the Manager, Investment Manager or its officers, employees and agents, in connection with the Fund's management, provided that the acts or omissions of the person in question did not constitute fraud, gross negligence or willful misconduct.

(z) **"Bad Actor" Disqualification.** The Investor has not engaged in a "disqualifying event" as defined within Rule 506 of Regulation D under the Securities Act, including:

(i) being convicted of a felony or misdemeanor within the last ten (10) years that was in connection with the purchase or sale of a security, involving the making of a false filing with the SEC or arose out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of securities;

(ii) being subject to an order, judgment or decree of any court of competent jurisdiction, entered within the last five (5) years, that restrains or enjoins the Investor from engaging or continuing to engage in any conduct or practice (whether or not appealable or subject to a pending appeal) in connection with the purchase or sale of a security, involving the making of a false filing with the SEC or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of securities;

(iii) being subject to a final order of a state securities commission (or any agency or officer of a state performing similar functions), a state authority that supervises or examines banks, savings associations or credit unions, a state insurance commission (or any agency or officer of a state performing similar functions), an appropriate federal banking agency, the CFTC or the National Credit Union Administration that bars the Investor from association with an entity regulated by such commission, authority, agency or officer, or is barred from engaging in the business of securities, insurance or banking or engaging in savings association or credit union activities or whereby such final order is based on a violation of any law or regulation

that prohibits fraudulent, manipulative, or deceptive conduct and was issued within ten years of the date of this Subscription Agreement;

(iv) being subject to an SEC order entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or Section 203(e) or (f) of the Advisers Act that suspends or revokes the Investor's registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations in connection with such activities, or bars the Investor from being associated with any entity or from participating in the offering of any penny stock;

(v) being subject to any order of the SEC entered within the last five (5) years that, as of the date of this Subscription Agreement, orders the Investor to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including without limitation Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and 17 CFR 240.10b-5, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act, or any other rule or regulation thereunder or Section 5 of the Securities Act;

(vi) is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within the last five (5) years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) is subject to a United States Postal Service false representation order entered within five (5) years of the date of this Subscription Agreement, or is, as of the date of this Subscription Agreement, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

If the Investor engaged in one of the "disqualifying events" described above or as otherwise set forth in Rule 506 of Regulation D, it must inform the Manager and provide information regarding the disqualifying event including the date of such event. If in the future, the Investor can no longer make this representation, it must promptly notify the Manager and provide information regarding the disqualifying event including the date of any such event. The Investor specifically consents to the disclosure of any such disqualifying event to any other Member and third-parties as the Manager may deem necessary to ensure the Fund can continue to claim the Rule 506 safe harbor.

4. **ERISA Representations.** If the Investor is a Benefit Plan Investor (as defined below), the Investor represents and warrants that the Investor's purchase of the Units and the subsequent holding of the Units do not and will not constitute a "non-exempt prohibited transaction" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Code. The term "Benefit Plan Investor" refers to (i) any "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of ERISA, (ii) any "plan" as defined in and subject to Section 4975 of the Code and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already-described Benefit Plan Investors. If the Investor is a Benefit Plan Investor and if the Fund or the Master Fund is or becomes a Plan Assets Entity, the investment by such Benefit Plan Investor in the Fund constitutes the appointment by the Named Fiduciary as described below, in accordance with the written requirements governing the underlying plan(s), of the Manager as an "investment manager" as defined in Section 3(38)

of ERISA, with the authority to manage the Fund's assets and the authority to appoint other "investment managers" with respect to any Fund assets which are deemed to be plan assets of the Benefit Plan Investor. The Manager hereby acknowledges to each Benefit Plan Investor subject to Title I of ERISA or Section 4975 of the Code its status, for any period during which the Fund and/or the Master Fund is a Plan Assets Entity, as a "fiduciary" as defined by Section 3(21) of ERISA with respect to such Plan Assets.

Furthermore, by executing this Subscription Agreement, any Investor that is a Benefit Plan Investor represents and warrants to the Fund and the Manager that:

**(a)** The person(s) or entities responsible for the investment decision (the "Named Fiduciary") has determined that, in view of such considerations, the purchase of an Interest in the Fund is consistent with the Named Fiduciary's responsibility under ERISA, Section 4975 of the Code or similar law and has considered the following with respect to the Benefit Plan Investor's investment in the Fund: (i) the role such investment or investment course of action plays in that portion of the Benefit Plan Investor's portfolio that the Named Fiduciary manages; (ii) whether the investment or investment course of action is reasonably designed as part of that portion of the Benefit Plan Investor's portfolio managed by the Named Fiduciary to further the purposes of the Benefit Plan Investor, taking into account both the risk of loss and the opportunity for gain that could result therefrom; (iii) the composition of that portion of the portfolio that the Named Fiduciary manages with regard to diversification; (iv) the liquidity and current rate of return of that portion of the Benefit Plan Investor's portfolio managed by the Named Fiduciary relative to its anticipated cash flow requirements; (v) the projected return of that portion of the portfolio managed by the Named Fiduciary relative to the Benefit Plan Investor's funding objectives; (vi) the risks associated with an investment in the Fund, including the limited right to withdraw from the Fund; (vii) whether the risk, structure and operation of the fee arrangements have been adequately disclosed and whether such arrangements further the interests of the Benefit Plan Investor; (viii) that the investment in the Fund and the investment program employed by the Manager as described in the Memorandum are not prohibited by ERISA, Code Section 4975 or similar law; and (ix) whether the investment is permitted under the Benefit Plan Investor's governing documents.

**(b)** The Named Fiduciary (i) is authorized to make, and responsible for, the decision to invest in the Fund; (ii) is independent of the Fund, the Manager, any sales agent and each of their affiliates; (iii) is qualified to make such investment decision and has, to the extent it deems necessary, consulted its own investment advisors and legal counsel regarding the investment in the Fund; (iv) in making its decision to invest in the Fund has not relied on any advice or recommendation of the Fund, the Manager, any sales agent or any of their affiliates; and (v) if the Named Fiduciary is subject to Title I of ERISA, the Named Fiduciary is a named fiduciary as defined in Section 402(a)(2) of ERISA authorized by the underlying plan documents to appoint the Manager as a fiduciary and investment manager to the plan or is otherwise authorized to appoint the Investment Manager as a fiduciary and investment manager to the plan.

**(c)** The Named Fiduciary agrees to deliver to the Manager all of the information that it may request in order to avoid violations of any provisions of ERISA or any other laws applicable to the Investor, and promptly will notify the Manager, in writing, of any change in the information so furnished; and

**(d)** If the Named Fiduciary is subject to Title I of ERISA, the Named Fiduciary understands and represents that (i) its copy of this Subscription Agreement is the Investor's indicia of ownership of the Units in the Fund for purposes of Section 403(a) of ERISA and (ii) a copy of this Subscription Agreement will be held in trust by the Benefit Plan Investor's trustee.

**5. <u>Closing; Capital Contributions and Fees</u>.**

**(a)** **<u>Closing</u>.** The closing of the sale and purchase of the Investor's Units (the "Closing") shall take place at such date and time as the Manager may determine as set detailed in the Offering Materials. As soon as practicable following the Closing, the Manager will deliver to the Investor a copy of the LLC

Agreement and a counterpart of this Subscription Agreement, which shall be executed by the Investor, the Manager and the Fund.

**(b)** **Capital Contributions and Fees**. The initial capital contribution for the purchase of the Investor's Units, each subsequent capital contribution and the payment of fees to the Fund and the Manager, as the case may be, shall take place at such times and in the manner specified in the Offering Materials.

**6.** **Agreements with Other Members**. The Manager and the Fund represent that each other Member has executed and delivered or will execute and deliver a subscription agreement substantially identical to this Subscription Agreement (except as to the differences between the classes of Units and the amount of the Units to be purchased), in which each such other Member agrees to subscribe for and purchase Units from the Fund and makes substantially identical representations and warranties as are made by the Investor in Section 3. The purchases of the Units by the Investor and the other Members are to be separate purchases from the Fund and the sales of the Units to the Investor and the other Members are to be separate sales by the Fund.

**7.** **Survival of Agreements and Representations and Warranties**. All agreements, representations and warranties of the parties contained herein, or made in writing by or on behalf of the Manager or the Fund in connection with the transactions contemplated by this Subscription Agreement, shall survive the execution and delivery of this Subscription Agreement, any investigation at any time made by the Investor or on its behalf, and the sale and purchase of the Investor's Units in the Fund and payment therefor.

**8.** **Further Assurances**.

**(a)** The Investor acknowledges that, unless it notifies the Fund and the Manager in writing to the contrary prior to such time as it acquires the Units, all of its representations and warranties contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire) will be deemed to have been repeated as of the date it purchases the Units. If at any time during the term of the Fund, the Investor is no longer in compliance with any of its representations, warranties and acknowledgments contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire), the Investor shall so advise the Manager promptly in writing.

**(b)** Under penalties of perjury, the Investor declares that the following statements are true, correct and complete: (i) that unless an Internal Revenue Service Form W-8BEN, W-8ECI, W-8IMY, or W-8EXP, as applicable, has been completed, the Investor is not a foreign person for purposes of U.S. income taxation (i.e., the Investor is not a nonresident alien, nor executing this document as an officer of a foreign corporation, as a partner in a foreign partnership, or as a fiduciary of a foreign employee benefit plan, foreign trust or foreign estate); (ii) that the following information contained elsewhere in the subscription documents is true, correct and complete: the U.S. taxpayer identification number (i.e., social security number or employer identification number), the home address (in the case of an individual) or office address (in the case of an entity) and the place of incorporation (in the case of a corporation); and (iii) that the Investor agrees to inform the Manager promptly if the Investor becomes a nonresident alien (in the case of an individual) or other foreign person (in the case of an entity) following the date hereof.

**(c)** The Investor will provide the Manager with such information as it may reasonably request from time to time with respect to its citizenship, residency, ownership or control so as to permit the Manager to evaluate and comply with any legal, regulatory and tax requirements applicable to the Fund, the Investor's investment in the Fund or any of the investments (or proposed investments) to be made by the Fund or the Master Fund.

**(d)** The attached Investor Information page and Eligibility Questionnaire (collectively, the "Investor Questionnaire") that the Investor has completed is incorporated herein by reference in its entirety and made a part hereof, and all of the statements, answers and information in the Investor

Questionnaire are true and correct as of the date hereof, and will be true and correct as the date of acceptance of this subscription, and do not omit to state any material fact necessary in order to make the statements contained therein not misleading.

9. **Indemnification**. The Investor (i) acknowledges that the Fund, Master Fund, Investment Manager and the Manager (as well as their officers, directors, managers, employees, stockholders, partners, members, counsel and affiliates) are relying on the representations, warranties and acknowledgments of the Investor contained herein (including, without limitation, the answers, statements and information set forth in the Eligibility Questionnaire), and (ii) agrees to indemnify each of them and their agents, representatives, officers, directors, managers, employees, stockholders, partners, members and affiliates against any and all claims, demands, losses, damages, costs and expenses whatsoever arising as a result of, or in connection with, any breach by the Investor of any such representations, warranties or acknowledgments.

10. **Compliance with Anti-Money Laundering Regulations, etc**. The Investor acknowledges that due to anti-money laundering regulations within their respective jurisdictions, the Fund, its Manager, and/or any administrator acting on behalf of the Fund may require further documentation verifying the Investor's identity and the source of funds used to purchase the Units before this Subscription Agreement can be processed or accepted. To comply with applicable U.S. anti-money laundering legislation and regulations, the Investor agrees that all payments by the Investor to the Fund and all distributions to the Investor from the Fund will only be made in the Investor's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the United States Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended (the "Bank Secrecy Act"), and the regulations promulgated thereunder by the United States Department of the Treasury, as such regulations may be amended from time to time. The Investor further agrees to provide the Manager at any time during the term of the Fund with such information as the Manager determines to be necessary and appropriate to verify compliance with the anti-money laundering regulations of any applicable jurisdiction or to respond to requests for information concerning the identity of Members from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, and to update such information as necessary.

The Investor represents that the amounts to be contributed by the Investor to the Fund will not be directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.[1] The Investor represents and warrants that none of: (i) the Investor; (ii) any Person controlling or controlled by the Investor; (iii) if the Investor is a privately held entity, any Person having a beneficial interest in the Investor; (iv) any Person for whom the Investor is acting as agent or nominee in connection with the purchase of the Units is (1) a country, territory, individual or entity named on a list maintained by OFAC, (2) a Person prohibited under the OFAC Programs, (3) a senior foreign political figure,[2] or any immediate family member or close

---

[1] Federal regulations and executive orders administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs, including the List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time, or any executive order administered by OFAC. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at www.treasury.gov/resource-center/sanctions. In addition, certain programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the lists maintained by OFAC.

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" (cont'd)

associate[3] of a senior foreign political figure as such terms are defined in the footnotes below, (4) a "foreign shell bank" within the meaning of the Bank Secrecy Act and the regulations promulgated thereunder by the United States Department of the Treasury or (5) a person or entity subject to additional restrictions imposed by the following statutes or regulations and executive orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act, the National Emergencies Act, the Antiterrorism and Effective Death Penalty Act of 1996, the International Emergency Economic Powers Act, the United Nations Participation Act, the International Security and Development Cooperation Act, the Nuclear Proliferation Prevention Act of 1994, the Foreign Narcotics Kingpin Designation Act, the Iran and Libya Sanctions Act of 1996, the Cuban Democracy Act, the Cuban Liberty and Democratic Solidarity Act and the Foreign Operations, Export Financing and Related Programs Appropriations Act, or any other law of similar import as to any non-U.S. country, as each such act or law has been or may be amended, adjusted, modified or reviewed from time to time or (6) a person or entity resident in or whose subscription funds are transferred through a jurisdiction identified as non-cooperative[4] by the Financial Action Task Force. Such Persons in (1) through (6) are collectively referred to as "Prohibited Persons."

In addition, if the Investor is a "financial institution" as such term is defined in the Bank Secrecy Act and the regulations promulgated thereunder by the United States Department of the Treasury, as such regulations may be amended from time to time, the Investor represents and warrants that the Investor has anti-money laundering policies and procedures in place reasonably designed to collect information with respect to and verify the identity of the Investor's investors or customers. In this regard, the Investor hereby represents and warrants that it is not a Prohibited Person. The representations and warranties set forth in this Section 10 shall be deemed repeated and reaffirmed by the Investor as of each date that the Investor is required to make a contribution of capital to the Fund, and if at any time during the term of the Fund the representations and warranties set forth in this Section 10 shall cease to be true, the Investor shall promptly so notify the Manager of the Fund in writing.

To the extent the Investor has beneficial owners or is an intermediary subscribing for an Interest on behalf of one or more investors or beneficial owners (collectively, "Owners"): (i) the Investor has carried out due diligence as required by applicable law to establish the identities of all such Owners; (ii) based on such due diligence, the Investor reasonably believes that no such Owners are Prohibited Persons; (iii) the Investor has conducted enhanced due diligence on any Owner who is a senior foreign political figure; (iv) based on such enhanced due diligence, the Investor has no reason to believe that the funds invested by each such senior foreign political figure involve the proceeds of official corruption; (v) the Investor has no reason to believe that the funds invested or to be invested by Owners were derived from activities that may contravene any U.S. or non-U.S. anti-money laundering laws or regulations; (vi) the Investor holds the evidence of such identities and status and will maintain all such evidence for at least five (5) years from the date of the Investor's complete withdrawal from the Fund; and (vii) the Investor will make available such information and any additional information requested by the Fund or the Manager that is required under applicable regulations, to the extent permitted by applicable law.

---

(cont'd)
includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[4] Non-cooperative jurisdictions are non-U.S. countries that have been designated as high-risk or non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering ("FATF"), of which the U.S. is a member and with which designation the U.S. representative to the group or organization continues to concur. The FATF list of non-cooperative jurisdictions is found at http://www.fatf-gafi.org.

The Investor understands and agrees that the Fund may not accept any amounts from a prospective Member if such Member cannot make the representations set forth in this Section 10. If an existing Member cannot make these representations at any time after the admission of such Member to the Fund, the Manager may require the withdrawal of such Member's Units. The Investor further understands and agrees that, by law, the Fund may be obligated to "freeze" the Investor's account, by prohibiting additional contributions from the Investor, declining any withdrawal requests and/or segregating the assets in the account in compliance with governmental regulations and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the Manager may, by written notice to the Investor, suspend the Investor's withdrawal rights if the Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, its Manager, the Manager or any of the Fund's other service providers.

11. **Non-Disclosure**. The Investor acknowledges that the Fund and the Master Fund are furnishing or have furnished to the Investor certain proprietary information ("Confidential Information") relating to the business affairs and current and proposed operations of the Fund and the Master Fund for study and evaluation by the Investor for possibly investing in the Units. The Investor acknowledges that the information provided by the Fund or the Master Fund is confidential; therefore, the Investor agrees not to disclose it and not to disclose that any discussions or contracts with the Fund or the Master Fund have occurred or are intended, other than as provided for in the following paragraph.

The Investor acknowledges that the information furnished is in all respects confidential in nature, other than information which is in the public domain through other means and that any disclosure or use of same by the Investor, except as provided in this Subscription Agreement, may cause serious harm or damage to the Fund, the Master Fund, the Manager, the Investment Manager and the Members. Therefore, the Investor agrees that the Investor will not use the information furnished for any purpose other than as otherwise permitted herein, and agrees that the Investor will not either directly or indirectly including through any agent, employee, or representative, disclose this information, either in whole or in part, to any third party; provided, however that (a) information furnished may be disclosed to those directors, officers and employees of the Investor and to the Investor's advisors who need such information for the purpose of evaluating the investment in the Units (it being understood that those directors, officers, employees and advisors shall be informed by the Investor of the confidential nature of such information and shall be directed by the Investor to treat such information confidentially), and (b) any disclosure of information may be made to which the Fund consents in writing.

12. **Expenses**. Each party hereto will pay its own expenses relating to this Subscription Agreement and the purchase of the Investor's Units in the Fund hereunder.

13. **Amendments**. Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except with the written consent of the Investor and the Manager.

14. **Rejection of Subscription**. The Investor acknowledges that the subscription for the Units contained herein may be rejected by the Manager in its sole discretion at any time prior to the Closing.

15. **Acceptance of Subscription**. The Manager may accept in its sole discretion all or any portion of the amount of the Commitment set forth on the signature page hereto by delivery to the Fund of a counterpart signature page hereto setting forth the portion of the Investor's Commitment accepted by the Manager. Prompt notice of such acceptance also will be given to the Investor either by delivery of this Subscription Agreement countersigned by the Manager or by notice of such execution.

16. **Counterparts**. This Subscription Agreement may be executed in any number of counterparts, each of which shall be an original but all of which taken together shall constitute one Subscription Agreement.

17. **General**. This Subscription Agreement (i) shall be irrevocable by the Investor and binding upon the Investor and the legal representatives, successors and assigns of the Investor, (ii) shall survive the admission of the Investor as a Member of the Fund, and (iii) shall, if the Investor consists of more than

one person, be the joint and several obligation of all such persons. This Subscription Agreement shall be governed by the internal laws of the State of Delaware, except insofar as affected by the "Blue Sky" laws of the jurisdiction in which the offering described herein has been made to the Investor or applicable federal securities law as set forth in Section 3.

18. **Jurisdiction.** To the fullest extent permitted by applicable law, any action or proceeding brought by the Investor against the Manager or Investment Manager (or their respective direct or indirect owners, officers, directors, managers, employees or consultants in their capacity as such, or in any related capacity) or the Fund or Master Fund, or relating in any way to this Subscription Agreement or the Offering Materials, shall be brought and enforced in the courts of the State of Illinois located in DuPage County, or (to the fullest extent subject matter jurisdiction exists therefore) the United States District Court for the Northern District of Illinois and, to the extent permitted by applicable law, the Investor irrevocably submits to the non-exclusive jurisdiction of both courts in respect of any action or proceedings between it and the Manager (or their respective direct or indirect owners, officers, directors, managers, employees or consultants in their capacity as such, or in any related capacity) or the Fund, or relating in any way to this Subscription Agreement or the Offering Materials. The Investor irrevocably waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Illinois located in DuPage County or the United States District Court for the Northern District of Illinois and any claim and any such action or proceeding brought in either court has been brought in an inconvenient forum. THE INVESTOR AND THE MANAGER, ON BEHALF OF ITSELF AND THE FUND, IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY ACTION OR PROCEEDING BY OR AGAINST THE MANAGER (OR ITS RESPECTIVE DIRECT OR INDIRECT OWNERS, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES OR CONSULTANTS IN THEIR CAPACITY AS SUCH, OR IN ANY RELATED CAPACITY) OR THE FUND, OR IN ANY WAY RELATING TO THIS SUBSCRIPTION AGREEMENT OR THE OFFERING MATERIALS.

19. **Severability.** Each provision of this Subscription Agreement, including each representation made in the Investor Questionnaire incorporated herein, shall be considered severable. If it is determined by a court of competent jurisdiction that any provision of this Subscription Agreement is invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Subscription Agreement.

*** * * SIGNATURE PAGE FOLLOWS * * ***

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the Investor has executed this Subscription Agreement for the purchase of Units in T2 Strategic Real Estate Income Fund, LLC (the "Fund") and represents that the execution of this signature page constitutes the execution of the signature page of each of (i) the Subscription Agreement for the purchase of the Units in the Fund in the aggregate amount set forth below, and (ii) the Second Amended and Restated Limited Liability Company Agreement of the Fund dated as of October 1, 2014 and as may be amended from time to time (the "LLC Agreement") in which the Investor agrees to become a Member of the Fund and be bound and governed by the LLC Agreement as if the Investor were an original signatory thereto. Upon acceptance below by the Manager on behalf of the Fund, the Investor shall be admitted as a Member of the Fund and hereby authorizes the signature page to be attached to a counterpart of the LLC Agreement executed by the Manager.

The foregoing Subscription Agreement is hereby accepted by and agreed to by the Investor as of the date first above written:

**Distribution Election**: Net cash flow of the Fund is generally expected to be distributed to Investors quarterly and will be allocated among Investors pro rata in accordance with their Units. At the option of the Investor, such distributions may be made in the form of cash or as additional Units in the Fund. Accordingly, please elect one of the following (your election will continue in effect until otherwise revoked in accordance with procedures to be determined by the Manager in its sole discretion):

☐ The Investor hereby elects to receive Fund distributions in the form of *cash*, rather than as additional Units in the Fund.

☐ The Investor hereby elects to receive Fund distributions in the form of additional *Units* in the Fund, rather than as cash.

Date: ____________________ Commitment Amount: ________________________

If Investor is an individual: *Joint Signature, if applicable*:

Sign: ______________________________ Sign: ______________________________

Print Name: ________________________ Print Name: ________________________

If Investor is an entity (fund, partnership, corporation, LLC, etc.):

Print legal name of investing entity: ______________________________

Signature of authorized person: ______________________________

Print name and title: ______________________________

*Additional signature, if applicable*:

Signature: ______________________________

Print name and title: ______________________________

**T2 STRATEGIC REAL ESTATE INCOME FUND, LLC**

**SUBSCRIPTION AGREEMENT**
**MANAGER ACCEPTANCE PAGE**
**(To be completed by the Manager)**

T2 SREI Fund GP, the Manager of T2 Strategic Real Estate Income Fund, LLC, hereby accepts the foregoing subscription on behalf of T2 Strategic Real Estate Income Fund, LLC either (a) for the Capital Commitment amount set forth below or (b) if the Capital Commitment amount below is left blank, then the Investor's requested Capital Commitment amount set forth above the Investor's signature on its signature page to the Subscription Agreement.

Capital Commitment Amount: $________________

**T2 STRATEGIC REAL ESTATE INCOME FUND, LLC**

By: T2 SREI Fund GP, LLC,
its Manager

By:______________________________
Name:
Title:

**T2 SREI FUND GP, LLC**

By:______________________________
Name:
Title:

## I. Distribution Information

**A. Investor ACH Instructions:** *Please indicate below where you would like to receive distributions from the Fund.*

Bank Name:____________________
Bank City/State/Country:____________________
Bank ABA#:____________________
Account Name:____________________
Account #:____________________

Swift Code**:____________________
For Further Credit to:____________________
Account Name:____________________
Account #:____________________
**Required for U.S. dollar ACH transfer to non-U.S. banks. Please contact your bank for more information.

☐ Check this box if you require a wire transfer instead of an ACH transfer and instead list your wire instructions above.

## II. Investor Contact Information

**A. Investor's Domicile (*for tax purposes*)**

Name:____________________
Address:____________________
____________________
City:__________ State:_____ Zip:_____

SSN/Tax ID:____________________

Telephone:____________________
Fax:____________________
E-mail:____________________
☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

**B. Investor's Adviser (if any)**

If applicable, please provide the name of the investment adviser firm, wealth manager or consultant that is working with you in connection with this investment: ________________________________________.

If you would like the above-named entity or person to be copied on all correspondence related to this investment, please provide this entity's or person's full contact information below:

Company:____________________
Attention:____________________
Address:____________________
____________________
City:__________ State:_____
Zip:__________

Telephone:____________________
Fax:____________________
E-mail:____________________
☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

C. **Additional Correspondence Contacts (if any)**

Name:______________________ Telephone:______________________
Address:______________________ Fax:______________________
______________________ E-mail:______________________
City:__________ State:_____ Zip:_____

☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

Name:______________________ Telephone:______________________
Address:______________________ Fax:______________________
______________________ E-mail:______________________
City:__________ State:_____ Zip:_____

☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

D. **Contact Person for Tax Matters (including K-1 distribution) if different from primary contact**

*Please note that K-1's will be mailed only to the Primary Correspondence Contact or to the contact denoted below.*

Name:______________________ Telephone:______________________
Address:______________________ Fax:______________________
______________________ E-mail:______________________
City:__________ State:_____ Zip:_____

☐ Check this box if you do not have an e-mail address.
(A substantial amount of correspondence and reporting related to this investment will be provided electronically. If you cannot access such electronic communications, please check this box to receive paper copies.)

## III. Private Fund Reporting Information

**PRIVATE FUND REPORTING INFORMATION**

*To enable the Manager to complete Form PF (if applicable), please indicate which one of the following categories best describes Subscriber* **[initial only one blank]:**

______ Individual that is a United States person[5] (including their trust)

______ Individual that is not a United States person (including their trust)

______ Broker-dealer

______ Insurance company

______ Investment company registered with the SEC

______ Private fund[6]

______ Non-profit

______ Pension plan (excluding government pension plans)

______ Banking or thrift institution (proprietary)

______ State or municipal government entity[7] (excluding government pension plans)

______ State or municipal government pension plan

______ Sovereign wealth fund or foreign official institution

______ Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries

______ Other

If Subscriber indicated "Other," please describe the nature of Subscriber:

____________________________________________________________

[5] A "United States Person" for this purpose means (a) any natural person resident in the United States; (b) any partnership or corporation organized or incorporated under the laws of the United States; (c) any estate of which any executor or administrator is a U.S. person; (d) any trust of which any trustee is a U.S. person; (e) any agency or branch of a foreign entity located in the United States; (f) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and (h) any partnership or corporation if: (i) organized or incorporated under the laws of any foreign jurisdiction; and (ii) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act of 1933, unless it is organized or incorporated, and owned, by accredited investors who are not natural persons, estates or trusts. Any discretionary account or similar account that is held for the benefit of a United States person by a dealer or other professional fiduciary is a United States person if the dealer or professional fiduciary is a related person of the Investment Manager and is not organized, incorporated, or (if an individual) resident in the United States.

[6] A "private fund" means any issuer that would be an investment company as defined in the Investment Company Act, section 3 but for the Investment Company Act, section 3(c)(1) or 3(c)(7) .

[7] A "government entity" means any state or political subdivision of a state, including (a) any agency, authority, or instrumentality of the state or political subdivision; (b) a plan or pool of assets controlled by the state or political subdivision or any agency, authority, or instrumentality thereof; and (c) any officer, agent, or employee of the state or political subdivision or any agency, authority, or instrumentality thereof, acting in their official capacity.

**EXHIBIT A**

## BENEFIT PLAN INVESTOR STATUS

The Memorandum states that the Manager will use commercially reasonable efforts to operate the Fund as a "real estate operating company" or "venture capital operating company" under the "plan asset" regulations of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Manager may decide to limit Units held by Partners subject to ERISA to less than 25% of aggregate Units (not including any investments by the Manager and certain other persons and their respective affiliates).

The term "Benefit Plan Investor" refers to (i) any "employee benefit plan" as defined in, and subject to the fiduciary responsibility provisions of, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) any "plan" as defined in and subject to Section 4975 of the Code and (iii) any entity ("Plan Assets Entity") deemed for any purpose of ERISA or Section 4975 of the Code to hold assets of any such employee benefit plan or plan due to investments made in such entity by already-described benefit plan investors. Benefit Plan Investors include, but are not limited to, corporate pension and profit sharing plans, "simplified employee pension plans," Keogh plans for self-employed individuals (including partners), individual retirement accounts ("IRAs"), medical benefit plans, life insurance plans, church plans that have elected to be subject to ERISA, bank commingled trust funds, insurance company separate accounts for such plans and accounts and, under certain circumstances, all or a portion of the general account of an insurance company.

The Investor represents that it is (please check all applicable boxes):

(i) ☐ not a Benefit Plan Investor; or

(ii) ☐ a Benefit Plan Investor that is:

(1) ☐ an employee benefit plan or trust that is subject to the fiduciary responsibility provisions of ERISA – this includes U.S. pension plans and U.S. profit-sharing and 401(k) plans, "Multiemployer Plans" and "Taft-Hartley Plans" but does not include U.S. governmental plans, church plans that have not made the election under Section 410(d) of the Code and non-U.S. employee pension and welfare benefit plans;

(2) ☐ an IRA, Keogh Plan and/or other plan subject to Section 4975 of the Code, but not subject to the fiduciary responsibility provisions of ERISA; or

(3) ☐ a Plan Assets Entity (as defined above) (including an entity in which 25% or more of the total value of any class of equity interests in the entity is held by other Benefit Plan Investors).

If the Investor is a Plan Assets Entity, the percentage of such entity's assets that constitutes "plan assets" within the meaning of Section 3(42) of ERISA is not more than the amount indicated below (please check an applicable box). To ease the administrative burden related to monitoring and updating this percentage, the Fund recommends that the Investor build in some cushion so that the Investor will not have to notify the Manager if the percentage changes slightly.

| | | | | |
|---|---|---|---|---|
| ☐ 10% ** | ☐ 20% ** | ☐ 30% | ☐ 40% | ☐ 50% |
| ☐ 60% | ☐ 70% | ☐ 80% | ☐ 90% | ☐ 100% |

**Applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors.

The Investor agrees to promptly notify the Manager in writing if there is any change to the foregoing representations, including in the percentages as set forth above and at such time or times as the Manager may request.

**EXHIBIT B**

**ELIGIBILITY QUESTIONNAIRE FOR INDIVIDUALS**

Name of Investor: ______________________________________________

**INDIVIDUALS (including IRA and Revocable Trust Investors)**: ***Please complete Parts I and II of this Questionnaire***

**I. Verification of Status as "Accredited Investor" under Regulation D**

*The Investor represents and warrants that he/she is an "accredited investor" within the meaning of Regulation D under the Securities Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor is a natural person whose net worth, taken together with the net worth of such person's spouse, exceeds $1,000,000. For purposes of this Questionnaire, "net worth" means the excess of total assets at fair market value (excluding the value of the Investor's primary residence) over total liabilities. Total liabilities may exclude the amount of indebtedness secured by the Investor's primary residence up to its fair market value, but must include any indebtedness in excess of the primary residence's fair market value.[1]

2. ☐ The Investor is a natural person who had an individual income in excess of $200,000 in each of the two previous years, or joint income with such person's spouse in excess of $300,000 in each of those years, and who reasonably expects to reach the same income level in the current year.

3. ☐ The Investor is a revocable trust and the settler(s) or grantor(s) of the trust meet the criteria set forth in either 1 or 2 above.

*Note*: To qualify as an "accredited investor," at least one of the first three statements must be checked.

Disclosure of Foreign Citizenship.

1. ☐ The Investor is a citizen of a country other than the United States.

2. If you checked the box next to the preceding question, specify the country of which the Investor is a citizen.______________________________

[1] Any increase in the amount of debt secured by the primary residence in the 60 days prior to the date of the Subscription Agreement associated with this Questionnaire that was incurred other than in connection with the purchase of your primary residence should be included as a liability, even if the value of the primary residence exceeds the amount of debt secured by such primary residence.

**II. Verification of Status as a "Qualified Client"**

*The Investor represents and warrants that he/she is a "qualified client" as defined in Rule 205-3 under the Advisers Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor is a natural person who immediately after investing in the Fund has or will have at least $1,000,000 of assets under the management of the Manager.

2. ☐ The Investor is a natural person who immediately after investing in the Fund has or will have a net worth (together with assets held jointly with a spouse) of more than $2,000,000 (excluding the value of the Investor's primary residence). (See I.1. above for a definition of "net worth.")

3. ☐ The Investor is a "qualified purchaser" under the Investment Company Act of 1940. The Fund may request information on the basis for which the representation is made.

Question 4 to be answered ONLY by "insiders" of the Fund or the Manager.

4. ☐ With respect to Fund or the Manager, the Investor is:

(a) a director, trustee, Manager, managing member or advisory board member;

(b) an executive officer; OR

(c) an employee who regularly participates in the investment activities of the Manager and/or its affiliates (or affiliated funds) and has performed such role for at least 12 months.

**ELIGIBILITY QUESTIONNAIRE SIGNATURE PAGE FOR INDIVIDUALS**

The Investor understands that the foregoing information will be relied upon by the Fund, the Master Fund, the Manager and the Investment Manager for the purpose of determining the eligibility of the Investor to purchase and own Units in the Fund. The Investor agrees to notify the Manager immediately if any representation or warranty contained in this Subscription Agreement, including this Eligibility Questionnaire, becomes untrue at any time. The Investor agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Investor's status as an accredited investor or to otherwise determine the eligibility of the Investor to purchase Units in the Fund. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Fund, the Master Fund, the Manager, the Investment Manager and each Member thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signature:________________________________

Print Name:________________________________

Joint signature, if applicable:____________________

Print Name:________________________________

## ELIGIBILITY QUESTIONNAIRE FOR ENTITIES

Name of Investor: ______________________________

***ENTITIES (non-individuals, other than IRA and Revocable Living Trust Investors): Please complete Parts I and II of this Questionnaire***

### I. Verification of Status as "Accredited Investor" under Regulation D

*The Investor represents and warrants that it is an "accredited investor" within the meaning of Regulation D under the Securities Act and has checked the applicable statement or statements below, pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor has total assets in excess of $5 million AND was not formed for the specific purpose of acquiring the Units, AND is any of the following:
   - ☐ a corporation;·
   - ☐ a partnership;·
   - ☐ a limited liability company;
   - ☐ a Massachusetts or similar business trust; or
   - ☐ an organization described in Section 501(c)(3) of the Code.

2. ☐ The Investor is any of the following:
   - ☐ a bank, or any savings and loan association or other institution acting in its individual or fiduciary capacity;
   - ☐ a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;
   - ☐ an insurance company;
   - ☐ an investment company registered under the Investment Company Act;·
   - ☐ a business development company as defined under the Investment Company Act;
   - ☐ a Small Business Investment Company licensed by the U.S. Small Business Administration;
   - ☐ an employee benefit plan (within the meaning of ERISA) whose investment decision is being made by a plan fiduciary, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan whose total assets are in excess of $5 million or a self-directed employee benefit plan whose investment decisions are made solely by persons that are accredited investors; or
   - ☐ a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5 million.

3. ☐ The Investor is a trust, not formed for the specific purpose of acquiring the Units, with total assets in excess of $5 million and whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of investing in the Units).

4. ☐ The Investor is an entity as to which all the equity owners (for example, in a limited partnership, all of the limited partners) are accredited investors. *If only statement (4) has been checked, please have each equity owner fill out the Eligibility Questionnaire for Individuals or this Eligibility Questionnaire for Entities, as applicable. Please feel free to make copies of these pages for each equity owner.*

## II. Verification of Status as a "Qualified Client"

*The Investor represents and warrants that he/she is a "qualified client" as defined in Rule 205-3 under the Advisers Act and has checked the applicable statement or statements below pursuant to which the Investor so qualifies. (Please check all that apply.)*

1. ☐ The Investor is an entity that immediately after investing in the Fund has or will have at least $1,000,000 of assets under the management of the Manager.

2. ☐ The Investor is an entity that immediately after investing in the Fund has or will have a net worth of more than $2,000,000.

3. ☐ The Investor is a "qualified purchaser" under the Investment Company Act of 1940. The Fund may request information on the basis for which the representation is made.

## III. Supplemental Data

1. Legal form of entity (corporation, partnership, trust, etc.):______________________

   Jurisdiction of organization:______________________

2. Is the Investor a registered investment company or a private investment fund which is not registered under the Investment Company Act in reliance on Section 3(c)(1) or 3(c)(7) thereof? Note: If the answer is "Yes," the Fund may be required to limit your investment such that your investment in the Fund constitutes less than 10% of the Fund.

   ______ Yes ______ No

3. If the Investor is a Section 3(c)(1) or Section 3(c)(7) fund and was formed prior to June 19, 1996, has it obtained all requisite consents from its equity holders to be treated as a Qualified Purchaser?

   ______ Yes ______ No

4. The fiscal year-end of the Investor is ______________
   (Month/Day)

5. The taxable year-end of the Investor, for purposes of reporting any income tax or filing tax information returns, is ______________
   (Month/Day)

## ELIGIBILITY QUESTIONNAIRE SIGNATURE PAGE FOR ENTITIES

The Investor understands that the foregoing information will be relied upon by the Fund, the Master Fund, the Manager and the Investment Manager for the purpose of determining the eligibility of the Investor to purchase and own Units in the Fund. The Investor agrees to notify the Manager immediately if any representation or warranty contained in this Subscription Agreement, including this Eligibility Questionnaire, becomes untrue at any time. The Investor agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Investor's status as an accredited investor or to otherwise determine the eligibility of the Investor to purchase Units in the Fund. To the fullest extent permitted by law, the Investor agrees to indemnify and hold harmless the Fund, the Master Fund, the Manager, the Investment Manager and each Member thereof from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Name of Entity:______________________________

By (signature):______________________________

Print Name:______________________________

Print Title:______________________________

Additional signature, if applicable:____________________

Print Name:______________________________

Print Title:______________________________

**Exhibit C**

**T2 STRATEGIC REAL ESTATE INCOME FUND, LLC**

**REDEMPTION REQUEST FORM**

______________, ______
*(Please Date)*

T2 Strategic Real Estate Income Fund, LLC
c/o Woodfield Fund Administration, LLC
3601 Algonquin Road, Suite 900
Rolling Meadows, IL 60008
Attn: Frank Yavaraski

The undersigned hereby requests redemption of all or the following portion of its limited liability company interests ("Units") as may be redeemed for $____________________[9] from the T2 Strategic Real Estate Income Fund, LLC (the "Fund").

(*Note*: Redemption requests must be received by the Manager at least sixty (60) days prior to calendar quarter end.)

The undersigned hereby represents and warrants that it is the true and lawful owner of the Units to which this request relates with full power and authority to request a redemption with respect to such Units. Such Units are not subject to any pledge or otherwise encumbered in any fashion. This redemption will be governed by the terms of the Fund's Confidential Private Placement Memorandum, as updated from time to time and as supplemented by the Class A Units Supplement (the "Memorandum"), the Fund's Second Amended and Restated Limited Liability Company Agreement, as amended from time to time (the "LLC Agreement") and the Subscription Agreement executed by the Investor. Subject to the terms of the Memorandum and the LLC Agreement, the Fund will generally honor redemption requests provided that the Fund has sufficient liquid assets to satisfy the redemption request and the Lock-Up with respect to the Units has expired. For the avoidance of doubt, Members will be subject to a separate Lock-Up for Units issued in connection with additional Capital Contributions to the Fund. The Manager will consider (but is not required to approve) redemptions at other times. No interest is payable on any redemption proceeds.

*The undersigned acknowledges that bank wiring fees will be deducted from redemption proceeds.*

[9] Units will be redeemed at the NAV per Unit of the relevant class, as determined on the last business day of the immediately preceding month. "NAV per Unit" means, as of a particular date, the net asset value of the Fund attributable to a class as of such date, divided by the number of Units in the class then outstanding.

Please forward redemption proceeds by ACH transfer to the undersigned's account at the bank below.

____________________________________________
Name of Bank

____________________________________________
ABA/BIC Number

____________________________________________
Account Name

____________________________________________
Account Number

MEMBER'S SIGNATURE(S) MUST BE IDENTICAL TO NAME IN WHICH UNITS ARE REGISTERED

____________________________________________
Name

____________________________________________
Partner, Trustee or Authorized Officer Signature(s)

**Exhibit D**

**T2 STRATEGIC REAL ESTATE INCOME FUND, LLC**

**ADDITIONAL SUBSCRIPTION FORM**

______________________, __________
*(Please Date)*

T2 Strategic Real Estate Income Fund, LLC
c/o Woodfield Fund Administration, LLC
3601 Algonquin Road, Suite 900
Rolling Meadows, IL 60008
Attn: Frank Yavaraski

The undersigned (the "Investor") hereby subscribes for and agrees to purchase as many additional limited liability company interests ("Units") as may be purchased for an additional commitment of $________________[10] in T2 Strategic Real Estate Income Fund, LLC (the "Fund").

Such additional investment is subject to the relevant terms and conditions set forth in the Fund's Confidential Private Placement Memorandum, as updated from time to time and as supplemented by the Class A Units Supplement (the "Memorandum"), the Fund's Second Amended and Restated Limited Liability Company Agreement, as amended from time to time (the "LLC Agreement"), and the Subscription Agreement executed by the Investor. The Investor acknowledges that the Units are subject to the Management Fee and Performance Allocation set forth in the Memorandum. Any capitalized term undefined on this form shall have the meaning set forth in the Memorandum.

Representations, Warranties and Covenants. All representations, warranties and covenants which the Investor has made in the Subscription Agreement and all information which the Investor has provided to the Fund, the Manager or the Investment Manager concerning itself, its status, financial condition and knowledge and experience of financial, tax and business matters, or, in the case of an investor that is an entity, the knowledge and experience of the person making the investment decision on behalf of such entity, are true, correct and complete as of the date hereof. The Investor agrees to notify the Fund immediately should the Investor become aware that any of the foregoing representations, warranties, covenants and other information provided to the Fund, the Manager or the Investment Manager is no longer true, correct or complete.

**Payment Instructions:**

No interest will be paid on subscription amounts received prior to the effective date of investment. To the extent the Manager has issued a capital call in connection with this additional subscription, payment may be made by ACH transfer to:

| | |
|---|---|
| Bank: | [__________] |
| ABA#: | [__________] |
| F/A/O: | [__________] |
| A/C#: | [__________] |
| F/F/C Account Name: | |
| Account Number: | [__________] |
| Address: [__________] | |

[10] Units issued in connection with any subscriptions to the Fund will be offered at $100 per Unit. If a Contribution Date occurs on a date that is other than the last day of a quarter, Units will be issued using the most recent Valuation Date (as defined in the Memorandum) if within the first forty-five days of the quarter-end and as of the next subsequent Valuation Date if after forty-five days of the quarter-end.

Unless otherwise agreed to by the Manager, subscriptions are payable in full, in readily available funds, at least one (1) business day prior to the closing date specified by the Manager. The acceptance or rejection of subscriptions is within the sole discretion of the Manager. The Subscriber may be required to provide additional information prior to an acceptance determination by the Manager.

**Additional Information:**

Please contact Jeff Baxter, Vice President – Investor Relations at (630) 590-9511.

MEMBER'S SIGNATURE(S) MUST BE IDENTICAL TO NAME IN WHICH EXISTING UNITS ARE REGISTERED

________________________________________
Name

By:______________________________________

Accepted:

By:______________________________________
T2 SREI Fund GP, the Manager

**Exhibit E**

## ELECTRONIC DELIVERY OF SCHEDULES K-1 CONSENT AND DISCLOSURE STATEMENT

Pursuant to IRS Revenue Procedure 2012-17, intended recipients of Schedules K-1 who wish to receive their Schedules K-1 solely through electronic transmission are required to provide affirmative consent.

In order to receive your Schedules K-1 from T2 Strategic Real Estate Income Fund, LLC (the "Fund") through electronic transmission you must affirmatively consent in writing by properly reviewing, completing, executing and delivering this Consent and Disclosure Statement to Woodfield Fund Administration, LLC (the "Administrator") at the address noted below.

***Paper Statement***. If you do not consent to receive your Schedules K-1 electronically, they will be furnished to you on paper instead.

***Scope and Duration of Consent & Notice of Termination***. If you do consent to the electronic delivery of your Schedules K-1, all Schedules K-1 will only be furnished by such method for the Fund until the earliest of: (A) your withdrawal of consent (in the manner described below); (B) the full redemption of your Units in the Fund; (C) the dissolution and winding up of the Fund; or (D) any other date effective as of which we notify you that we will no longer provide such Schedules K-1 electronically (which effective date is generally expected to be no earlier than the date we send out such notice).

***Post-Consent Request for a Paper Statement***. If you consent to electronic delivery of Schedules K-1 and you wish to obtain a paper copy, please contact the Administrator at the address noted below. A request for a paper copy (or copies) of Schedules K-1 will not be considered to be a withdrawal of consent to receive Schedules K-1 electronically.

***Withdrawal of Consent***. You may withdraw your consent to receive Schedules K-1 electronically by writing (electronically or on paper) to the Administrator at the address noted below. The withdrawal of your consent will take effect on the date your correspondence is received by us. We will confirm your withdrawal of consent and the date on which it takes effect in writing (either electronically or on paper). Please note that a withdrawal of consent will not apply to a statement that is furnished electronically in the manner described above before the effective date of such withdrawal of consent.

***Notice of Termination***. We will cease to provide Schedules K-1 electronically to you (and, except as required by law, cease to provide Schedules K-1 in any other form) upon your withdrawal from the Fund.

***Updating Information***. In the event that your contact information changes, please furnish your updated information in writing (either electronically or on paper) to the Administrator at the address noted below. We will inform you of any change to this contact information.

***Hardware & Software Requirements***. After you consent to receive your Schedules K-1 electronically, you will need a computer, access to email, a printer and available memory on your computer hard drive in order to access, print and retain your electronic Schedule K-1. Your Schedule K-1 will be attached to that email.

***Please note that, notwithstanding electronic delivery, a Schedule K-1 may be required to be printed and attached to a Federal, State or local income tax return.***

Please fill in the name of the investor below and check the following and return a copy of this consent by email to T2admin@woodfielddllc.com:

Investor Name: ____________________________________________

☐ consents to electronic delivery of Schedules K-1 on such terms and conditions as described in this Consent and Disclosure Statement.

If you have any questions or concerns, please do not hesitate to contact the Fund's Administrator at the following address, phone and email:

Woodfield Fund Administration, LLC
1 N. Wacker Drive, Suite 2150
Chicago, IL 60606
Attn: Investor Services Department
T2admin@woodfielddllc.com
Facsimile: (847) 255-3566
Phone: (847) 255-3500

ANNEX A

T2 CAPITAL MANAGEMENT

**PRIVACY STATEMENT**

The following privacy statement is issued by T2 Capital Management, LLC ("T2 Capital") and each of the funds (collectively, the "Funds") managed or advised by T2 Capital or its affiliates.

T2 Capital considers privacy a fundamental right of the Fund's limited partners and takes seriously the obligation to safeguard limited partner information. Accordingly, we do not share any non-public personal information of any current or former limited partner with any unaffiliated third parties, except as permitted by law or as authorized by our limited partners.

In the course of providing investment products and services to you, we collect non-public personal information about you from sources such as subscription agreements and related documents as well as from transactions related to your account. In the normal course of serving our limited partners, information we collect may be shared with companies that perform various services such as custodians, accountants, attorneys, broker-dealers and financial institutions for the Fund. Specifically, we may disclose to these service providers all non-public information we collect, including:

- Information we receive on subscription agreements or other forms, such as a limited partner's name, address, social security or tax identification number, amount of investment(s), and bank account information; and

- Information about transactions with us, such as a limited partner's capital account balance and other account data.

Finally, as required or permitted by the Funds' respective governing agreements, we may distribute to the investors in a Fund certain personal financial information of the investors, such as commitment amounts, which may be recorded in schedules attached to such Fund's governing agreements.

Any service provider or organization receiving your personal information will be authorized to use such information only to perform the services required and as permitted by applicable law. Access to limited partners' non-public personal information is restricted to those employees and managers of T2 Capital who require access to provide services to the Funds and their limited partners. A limited partner's right to privacy extends to all forms of contact with T2 Capital, including telephone, written correspondence and electronic media, such as the Internet.

For questions concerning this policy, please contact Jeff Baxter at (630) 590-9511 or via email at jbaxter@t2investments.com.