# EXHIBIT 78

INVESTMENTS
WORTH
BUILDING

T2 | CAPITAL MANAGEMENT

EXHIBIT NO. 78
J Brown
5.29.19
Tracy Jones, CSR, RPR, CLR

# T2 Asset Opportunity Fund IV, LP

## $100,000,000

## LIMITED PARTNERSHIP INTERESTS

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

February 2015

CHICAGO/#2574756.7

# T2 ASSET OPPORTUNITY FUND IV, LP

(A Delaware Limited Partnership)

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

This Private Placement Memorandum (this "Memorandum") is furnished on a confidential basis for the purpose of evaluating an investment in limited partner interests in T2 Asset Opportunity Fund IV, LP (the "Fund"). This Memorandum and the information contained herein may not be reproduced or used by or distributed to others, at any time, in whole or in part, for any other purpose without the prior written consent of T2 Asset Opportunity Fund IV GP, LLC (the "General Partner" or "T2"), and all recipients agree that they will keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms. Notwithstanding anything else contained in this Memorandum, each prospective investor may disclose, without limitation, the tax treatment and tax structure (as such terms are used in § 6011 of the U.S. Internal Revenue Code of 1986, as amended, and the U.S. Treasury regulations promulgated thereunder) of the Fund and of any transactions entered into by the Fund; provided that this authorization is not intended to permit disclosure of any term or detail not relevant to the tax treatment or the tax structure of the Fund or of transactions entered into by it.

Prospective investors are not to construe the contents of this Memorandum as legal, tax, accounting, investment, or other advice. Each prospective investor should consult its own advisers as to legal, business, tax, accounting, U.S. Employee Retirement Income Security Act of 1974, as amended, and other related matters concerning an investment in the Fund.

The limited partner interests are being offered as a private placement to a limited number of investors and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or non-U.S. jurisdiction and may not be sold or transferred without compliance with all applicable U.S. federal and state and non-U.S. securities laws. The Fund will not be registered as an investment company under the U.S. Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder (collectively, the "Investment Company Act"). The Fund shall be exempt from registration under Section 3(c)(5) of the Investment Company Act. Consequently, investors will not be afforded the protections of the Investment Company Act. Neither the U.S. Securities and Exchange Commission nor any state or non-U.S. securities commission has reviewed or passed upon the accuracy or adequacy of this Memorandum or the merits of the offering described herein. Any representation to the contrary is unlawful.

Investment in the limited partner interests will involve significant risks due to, among other things, the nature of the Fund's investments. See Section III—"Risk Factors" in this Memorandum. Investors must have the financial ability and willingness to accept the risks and lack of liquidity characteristic of the investment described herein. There will be no public market for the limited partner interests and such interests, subject to certain limited exceptions, will not be transferable.

This Memorandum is not an offer to sell to any person, or a solicitation to any person to buy, limited partner interests in the Fund in any state or jurisdiction in which such an offer would be prohibited by law or to any person who is not an "accredited investor" as defined in the rules and regulations promulgated under the Securities Act. Interests in the Fund will be offered only in such non-U.S. jurisdictions, if any, as the General Partner approves in advance at its sole discretion. No person other than the General Partner has been authorized to give any information or to make any representation concerning the Fund or this offering outside of this Memorandum. To invest in the Fund, each prospective limited partner will be required to execute an agreement of limited partnership, a limited power of attorney, and a subscription agreement. In the event that any terms, conditions, or other provisions of such agreements (or any related agreements) are inconsistent with or contrary to the description of terms set forth in this Memorandum, the terms, conditions, and other provisions of such agreements shall control. Before the final closing of the Fund, the General Partner and its affiliates reserve the right to modify any of the terms of the offering and the limited partner interests described

herein. Upon request, this Memorandum and any copies thereof are to be returned in their entirety to the General Partner.

Certain information contained in this Memorandum constitutes "forward-looking statements" that can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "estimate," "intend," "continue," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Furthermore, any projections or other estimates in this Memorandum, including estimates of returns or performance, are "forward-looking statements" and are based upon certain assumptions that may change. Due to various risks and uncertainties, including those set forth under Section III – "Risk Factors" actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements. Moreover, actual events are difficult to project and often depend upon factors that are beyond the control of the General Partner and its affiliates. Neither the delivery of this Memorandum at any time nor any sale hereunder shall under any circumstances create an implication that the information contained herein is correct as of any time after the earlier of the relevant date specified herein or the date of this Memorandum.

The representation by Vedder Price P.C. of the Fund and the General Partner in connection with the private placement described herein is limited to the specific matters discussed under Section IV – "Legal and Tax Matters – Legal Counsel" in this Memorandum.

Any questions regarding this Memorandum should be directed to Jeff Baxter at (630) 590-9511. The General Partner is located at 111 W. Wesley Street, Suite 5, Wheaton, Illinois 60187.

**February 2015**

# *TABLE OF CONTENTS*

**Section** **Page**

I. Executive Summary .......... 1
II. Summary of Principal Terms .......... 4
III. Risk Factors .......... 12
IV. Legal and Tax Matters .......... 19
V. Additional Information .......... 32

*Appendix A – Amended and Restated Agreement of Limited Partnership*

*Appendix B – Subscription Agreement*

# I. Executive Summary

## The Fund and the General Partner

The Fund employs an opportunistic investment strategy focused on exploiting idiosyncratic price dislocations among commercial real estate assets within the Midwestern United States. Specifically, the Fund will seek to acquire real estate properties that have a clear value-add component and also originate, invest in, or acquire first, junior or participation interests in loans, debt instruments and other financings secured by a broad range of commercial real properties or interests in commercial real properties. Financings will be structured as senior debt (secured by first mortgages on the related property), mezzanine debt (secured by junior mortgages on a property or properties or equity interests in the entities owning a property or properties), preferred equity investments or hybrid investments in entities that own the related property (each such loan, debt interest, equity investment or other financing, an "Investment," and collectively, "Investments").

The Fund's general partner, T2 Asset Opportunity Fund IV GP, LLC (the "General Partner" or "T2"), conducts due diligence on each Investment. T2's due diligence process attempts to maximize value and minimize risk through disciplined investing and active management. While T2's investments typically have been focused in the Midwest, T2 has managed and overseen investments on behalf of itself and other funds throughout the U.S. T2 believes its strengths lie in its relationships, experience and its ability to quickly, creatively and intelligently deploy and manage capital.

The Fund is a Parallel Fund (as defined below) of T2 Opportunity Fund IV, LP (the "Flagship Fund"). In general, the Fund will invest proportionately in all transactions on effectively the same terms and conditions as the Flagship Fund, except as necessary to address tax, regulatory or other investor considerations. The Fund is not identical to the Flagship Fund which is subject to different investor qualification standards and charges different fees than the Flagship Fund.

## Fund Investment Strategy and Criteria

The Fund will focus primarily on property types that the General Partner believes to be undervalued or poised for recovery, including assets that may be overlooked by other institutional investors. The Fund expects to seek Investments in turnaround situations, repositioning opportunities, recapitalizations, partner buyouts, and value-added situations.

The Fund will seek to invest in projects that the General Partner believes provide opportunistic discounts to present market value, as well as non-institutional assets, often in out-of-favor categories, where yields may be more attractive and debt coverage is higher. Where partnering opportunities arise, the Fund will seek experienced partners that T2 believes will be effective collaborators.

The General Partner also intends to offer through the Fund a bridge-financing program to real estate developers and mortgage brokers. Both debt and preferred equity financing may be provided for borrowers seeking an opportunity that may require a rapid closing or loans discounted by conventional lenders due to special situations relating to the property or borrower.

The Fund may seek to acquire commercial real estate loans secured by various property types throughout the U.S., subject to availability and completion of due diligence. The loans may be single loans or portfolios of loans that are current or in default.

## Prior Performance

The following is a summary of T2's performance for its prior vintage real estate funds from inception through September 30, 2014:

| | Fund | Investment period | Capital invested | % capital returned | Net IRR (1) |
|---|---|---|---|---|---|
| 1. | Fund I | 2011 | $8,790,859 | 86% | 15.5% |
| 2. | Fund II | 2012 - 13 | $55,813,087 | 46% | 15.5% |
| 3. | Fund III | 2013 - Present | $51,997,101 | 3% | 12.0% |
| | Total / Avg. | — | $116,601,047 | 32.5% (2) | 14.1% (2) |

(1) For illustrative purposes only. Past performance is not indicative of future results. IRR represents the internal rate of return of the fund. IRR is a time-weighted average expressed as a percentage. The IRR of an investment is the discount rate at which the net present value of costs (negative cash flows) of the investment equals the net present value of the benefits (positive cash flows) of the investment, including the current value of unrealized investments. The Net IRR is calculated net of all fees and expenses. The Net IRRs presented herein may not be indicative of the ultimate performance of the fund due to a number of factors.

(2) The percentage of capital returned and Net IRR were calculated on an asset weighted basis.

## *Fund Management Team*

The Fund's General Partner is led by Jeff D. Brown and John W. Southard, each of whom are experienced investment professionals.

***Jeff D. Brown—Founder, CEO and CIO***

As founder and CEO of T2 Capital Management, LLC, upon which T2 is a relying investment adviser, Mr. Brown works closely with the principals of the firm in providing corporate direction, investment strategies, and overseeing implementation of both. As CIO of the firm, Mr. Brown also oversees the origination, underwriting, closing, and management of all portfolio investments.

Prior to T2 Capital Management, LLC, Mr. Brown was the President of a privately held, entrepreneurial commercial real estate finance company based in the Chicago suburbs (2001-2010). Before being promoted to President, Mr. Brown was an Executive Vice President at the firm responsible for overseeing the Credit and Syndications division. In that capacity, he originated, evaluated, underwrote, and syndicated a total of over $1 billion in commercial real estate financings across the United States while co-managing a $300 million portfolio. The portfolio consisted of a wide variety of financing structures on multiple different property types including office, retail, industrial, healthcare, multi-family, for-sale residential, and hospitality.

Mr. Brown received his MBA from the University of Chicago Booth School of Business and Bachelor's degree from Wheaton College (Wheaton, Illinois). While at Wheaton, Mr. Brown was captain of the football team and a First Team GTE Academic All-American quarterback.

***John W. Southard—Founder and Principal***

Mr. Southard has over twenty years of experience in the areas of portfolio management, product development and quantitative modeling. As founder and principal of T2 Capital Management, LLC, Mr. Southard provides capital and strategic direction to the company. He is involved in fund formation, administration and key client relationships for the firm.

Prior to T2 Capital Management, LLC, Mr. Southard co-founded PowerShares Capital Management, LLC, an exchange traded fund (ETF) company established in 2002. Mr. Southard oversaw all research initiatives, portfolio management and trading operations of the company. PowerShares was

sold to Invesco in 2006, and Mr. Southard left the company in 2009. Before PowerShares, Mr. Southard was a Senior Equity Analyst for Charles Schwab & Co. and was involved in the development of the quantitative modeling behind Schwab's research initiatives.

Mr. Southard has been quoted in the *Wall Street Journal, Crain's, Investment News, Morningstar, TheStreet.com* and other periodicals. He is a CFA charterholder, has a Master's degree in Finance from DePaul University and a Bachelor's degree in Business/Economics with an emphasis in Mathematics from Wheaton College (Wheaton, Illinois). He is a member of the CFA Society of Chicago and the CFA Institute.

***Linda Searcy—Chief Operating Officer***

Ms. Searcy has over 20 years of experience in the commercial real estate finance industry. As Chief Operating Officer of T2 Capital Management, LLC, Ms. Searcy oversees fund administration, compliance and operations.

Prior to joining T2 Capital Management, LLC, Ms. Searcy was a director at a privately-held commercial real estate company in the Chicago suburbs and oversaw all aspects of managing its $300 million portfolio. Prior to this, Ms. Searcy was Vice President of the Specialty Finance division of a $13 billion publicly traded finance company based in Scottsdale, Arizona. During her 15-year tenure with the company, Ms. Searcy's various roles included overseeing loan administration, underwriting, due diligence, compliance, strategic planning and financial reporting.

Ms. Searcy has a Master's degree in Accounting with Distinction from DePaul University and a Bachelor's degree in Finance and Economics from Western Illinois University. Ms. Searcy is also a CPA candidate.

***Jeff Baxter—Vice President***

Mr. Baxter spearheads the investor relations and fund raising efforts for T2 Capital Management, LLC. Prior to T2 Capital Management, LLC, Mr. Baxter was a broker at a national investment real estate company. Prior to this, he served his alma mater, Wheaton College, as the Director of Principal Gifts. During his time there, Jeff assisted in securing leadership level planned and outright gifts as part of the $260 million Promise of Wheaton campaign. Prior to working at Wheaton College, Mr. Baxter worked in Private Client Services for UBS Financial Services, Inc. While at UBS, Mr. Baxter excelled in business development, portfolio management, and generating tax-efficient strategies for high net worth clients.

Mr. Baxter graduated from Wheaton College (Wheaton, Illinois) with his Bachelor's degree in Business/Economics. While at Wheaton, Mr. Baxter was a member of the baseball, lacrosse, and debate teams.

***John Felker—Associate***

Mr. Felker joined T2 Capital Management, LLC in July 2013 as an Associate. In this capacity he evaluates prospective investments, conducts due diligence, manages existing investments and assists with various fund administration activities. Prior to joining T2 Capital Management, LLC, Mr. Felker was a Senior Analyst at a private equity real estate firm based in Colorado, which focuses on properties across the United States and has approximately $500 million under management. Mr. Felker was primarily responsible for completing due diligence on prospective investments, managing existing real estate holdings, and working with various financiers to assist with both acquisitions and recapitalizations. He joined the firm in 2010 after working as an intern within the research department at Invesco PowerShares.

Mr. Felker is a CFA charterholder and graduated summa cum laude from Wheaton College (Wheaton, Illinois) where he received his Bachelor's degrees in Economics and Mathematics. He is a member of the CFA Society of Chicago and the CFA Institute.

## *II. Summary of Principal Terms*

The following summary of the terms of the offering and the limited partner interests of the Fund is subject to the detailed provisions of the Amended and Restated Agreement of Limited Partnership of T2 Asset Opportunity Fund IV, LP (as amended, restated or otherwise modified from time to time, the "Partnership Agreement") and is qualified in its entirety by reference to the Partnership Agreement, a copy of which is attached as Appendix A to this memorandum. In the event that the description of terms in this Summary of Principal Terms is inconsistent with or contrary to the description in, or terms of, the Partnership Agreement or related documents (including the subscription agreement), the terms of the Partnership Agreement and the related documents will control.

| | |
|---|---|
| **The Fund** | T2 Asset Opportunity Fund IV, LP, a Delaware limited partnership (the "Fund"). The Fund is a Parallel Fund (as defined below) of T2 Opportunity Fund IV, LP (the "Flagship Fund"). In general, the Fund will invest proportionately in all transactions on effectively the same terms and conditions as the Flagship Fund, except as necessary to address tax, regulatory or other investor considerations. The Fund is not identical to the Flagship Fund, which is subject to different investor qualification standards and charges different fees than the Flagship Fund. In addition, the portfolio of the Flagship Fund may differ from the Fund for various reasons, including the launch date for each fund. The Flagship Fund is expected to commence operations in January 2015. |
| **The Flagship Fund** | T2 Opportunity Fund IV, LP, a Delaware limited partnership, is managed by T2 Capital Management IV, LLC, an affiliate of the General Partner (as defined below). |
| **The General Partner** | The general partner of the Fund will be T2 Asset Opportunity Fund IV GP, LLC, a Delaware limited liability company (the "General Partner"). The General Partner will control the business and affairs of the Fund. |
| **Management of the Fund** | The General Partner may cause the Fund to appoint a management company (the "Management Company") to manage the affairs of the Fund. The Management Company shall be included in all references to the General Partner herein as appropriate. |
| **Committed Capital** | The Fund is seeking partner commitments aggregating $100 million, including the General Partner's commitment (each, a "Commitment" and collectively, the "Commitments"). The General Partner will not accept Commitments in excess of $100 million. The aggregate Commitments may include Commitments received by one or more parallel funds that invest substantially all of their assets in the Fund. See "Parallel Investment Entities" below. |
| **Minimum Investment** | The minimum Commitment of a limited partner in the Fund (collectively, the "Limited Partners") will be $250,000, although individual Commitments of lesser amounts may be accepted at the discretion of the General Partner. The General Partner and the Limited Partners are sometimes referred to collectively as the "Partners." |

| | |
|---|---|
| **Investor Qualifications** | The Fund only will offer and sell interests to a limited number of "accredited investors," as defined in Regulation D promulgated under the U.S. Securities Act of 1933, as amended, and "qualified clients" as that term is defined under Rule 205-3 of the Investment Advisers Act of 1940, as amended ("Advisers Act"). |
| **General Partner Commitment** | The principals of the General Partner (the "Principals") will commit to the Flagship Fund an aggregate amount of at least $1 million. |
| **Closing** | The initial closing is expected to occur in the first quarter of 2015 (the "Initial Closing Date"). Thereafter, one or more additional closings may occur. The last closing for this offering (the "Final Closing") will occur 12 months after the Initial Closing Date (the "Final Closing Date") subject to the General Partner's ability to close earlier than the Final Closing Date in its sole discretion. The General Partner may extend the Final Closing Date by up to three months in its sole discretion. |
| **Investment Period** | At the end of the period commencing on the Initial Closing Date and ending on the date that is 18 months from the Final Closing Date or such earlier date as determined by the General Partner (the "Investment Period"), all Partners will be released from any further obligation with respect to their unfunded Commitments, except to the extent necessary to: (i) cover expenses, liabilities and obligations of the Fund, including Management Fees (as defined below); (ii) fund then existing commitments; (iii) effect follow-on investments in existing Investments (as defined under "Executive Summary"); and (iv) repay any advances made by a creditor of the Fund to fund existing Investments and secured by the unfunded Commitments. |
| **Term** | The term of the Fund will terminate on the third anniversary of the Final Closing Date, but may be extended for 2 additional one-year periods at the discretion of the General Partner. Further extensions require the approval of the General Partner and at least 80% of the Limited Partners who are not affiliated with the General Partner. The Fund's term is subject to earlier termination upon certain circumstances as set forth in the Partnership Agreement, including upon the agreement of all the Partners. |
| **Investment Guidelines and Restrictions** | As an investment guideline, once the Fund has accepted in excess of $50 million in Commitments, the Fund generally will not invest in any Investment that exceeds more than 15% of the Fund's aggregate Commitments at the time of the Investment. For purposes of the guidelines and restrictions, each loan in a portfolio of Investments not originated by the Fund shall be treated as a separate Investment. No Investment of the Fund shall be made outside the United States. For the avoidance of doubt, these investment guidelines shall not apply to subsidiary entities created by the General Partner to make Investments. This may include subsidiary entities which include Parallel Investment Entities as investors. |
| **Drawdowns** | Commitments are expected to be drawn down as needed, with not less than 10 days' prior written notice. Any amounts returned to the Partners (i) as a return of Commitments called in anticipation of an unconsummated Fund Investment or (ii) at the General Partner's sole discretion, as repayment or recoupment of capital contributions with respect to an Investment realized during the Investment Period will be |

available for future Fund Investments (as described in "Reinvestment," below) and payment of expenses. In addition, (a) to the extent Partners' capital contributions are used to pay Fund expenses (including Management Fees (as defined below)), any amounts returned to the Partners will be available for future Fund Investments and expenses, and (b) distributions to the Partners will be subject to recall by the Fund pursuant to the partner giveback described in "Partner Giveback" below.

The initial drawdown for each Limited Partner generally will include such Limited Partner's proportionate share of: (i) the Management Fee (as defined below) retroactive to the Initial Closing Date or such later date when Management Fees were first taken; (ii) organizational and other expenses attributable to the Fund; and (iii) the original cost of any Investment made at or prior to such drawdown. In addition, Limited Partners admitted after the first 3 months following the Initial Closing Date generally will be required to pay to the Fund an amount calculated at the greater of (a) the prime rate plus 3.5% per annum, and (b) 8% per annum, on the amount of such drawdown from the date such amount would have been due if such Limited Partner had been admitted as such for its full Commitment on the Initial Closing Date. Additional amounts paid by a Limited Partner who is admitted at any closing subsequent to the Initial Closing Date pursuant to this paragraph will not reduce such Limited Partner's unfunded Commitment to the Fund.

**Reinvestment**

During the Investment Period, any amounts received by the Fund as a repayment or recoupment of capital contributions (as determined by the General Partner in its sole discretion) with respect to a Fund Investment may, in the discretion of the General Partner, be retained by the Fund, without reducing the Partners' unfunded Commitments, for the purpose of making Fund Investments and/or paying Fund expenses, or may be returned to the Partners, thereby increasing their unfunded Commitments (but not above their total Commitments to the Fund).

**Subscription Line**

The Fund may arrange for one or more credit facilities (including, if available, an equity commitment line of credit secured by the Fund's pledge of its rights in the Limited Partners' unfunded Capital Commitments (the "Subscription-Backed Facility")) to enable the Fund to pay expenses, make deposits and acquire assets through borrowings in lieu of, or in advance of, Capital Contributions. The Subscription-Backed Facility will not exceed 100% of its Commitments to fund Investments.

Under the terms of any Subscription-Backed Facility, the Limited Partners may be required to confirm the terms of their Capital Commitments to the lenders under such equity commitment line, honor capital calls made by such lenders under certain circumstances, provide certain financial information to such lenders and execute certain documents in connection with such commitment line.

**Leverage**

The Fund may incur indebtedness on certain assets if available and as deemed appropriate by the Fund in seeking to achieve its investment objective. To the extent the Fund utilizes a REIT Subsidiary, it is contemplated that the REIT Subsidiary will be the borrower for all Investments it holds. The Fund does not anticipate borrowing in excess of 50% of its net asset value, excluding indebtedness under any Subscription-Backed Facility and indebtedness of entities in which an Investment is an equity interest, determined at the time such indebtedness is incurred. The Fund may finance certain assets in its portfolio through a variety of debt instruments including lines of credit, repurchase financings, collateralized debt obligations, securitized financing and other secured and unsecured borrowings.

**Distributions**

Subject to repayments of amounts due under a Subscription-Backed Facility or other Fund indebtedness, net proceeds attributable to the disposition of Investments (other than temporary Investments), as well as distributions of securities in kind, together with any dividends or interest income received with respect to any Investments, generally will be distributed to all Partners (other than a Defaulting Partner) participating in such Investment pro rata according to their respective capital contributions in respect of such Investment. Each Limited Partner's pro rata share thereof will be further divided between such Limited Partner and the General Partner in the following order of priority:

(a) first, 100% to such Limited Partner until the cumulative amount distributed to such Limited Partner in respect of Investments then and previously disposed of equals the aggregate of the following:

(i) the funded Commitments of such Limited Partner attributable to all realized Investments, plus the amount of write-down, if any, with respect to each unrealized Investment written down;

(ii) the funded Commitments of such Limited Partner attributable to all organizational expenses, Management Fees and other expenses paid to date and allocated to realized Investments and unrealized Investments to the extent they are permanently written down as of that time; and

(iii) a preferred return on such Limited Partner's funded Commitments attributable to all realized Investments in an amount sufficient to cause the internal rate of return on such funded Commitments (measured beginning on the date each applicable capital contribution was due) to equal 8% per annum (the "Preferred Return");

(b) second, 100% to the General Partner until such time as the General Partner has received, as its carried interest, 40% of the sum of the distributed Preferred Return and distributions made or being made to such Limited Partner and General Partner pursuant to this paragraph (b); and

(c) thereafter, 60% to such Limited Partner and 40% to the General Partner as carried interest.

Half of the General Partner's carried interest received under provisions (b) and (c) above will be paid to Ausdal Financial Partners, Inc., a

placement agent retained by the Fund ("Ausdal"), pursuant to a placement agreement entered into by and among the Fund, the General Partner and Ausdal.

All short-term interest income, other than short-term interest income received from Investments, will be distributed 100% to the Partners in proportion to Commitments; provided that any short-term Investment income on the undistributed net profits from the disposition of, or otherwise with respect to, an Investment will be distributed to the Partners pro rata according to their respective shares of such undistributed net profits. Current income such as interest received from an Investment that is not a realized Investment will be distributed in the same manner as if such Investment were a realized Investment.

The Fund will, subject to the reinvestment rights described above, distribute net cash proceeds from disposition of Investments within 30 days of realization and will distribute dividends, interest and other income received with respect to Investments at least quarterly or such other frequency the General Partner determines in its discretion, in each case after paying Fund expenses and setting aside reserves to satisfy Fund expenses, obligations and liabilities.

**Tax Distributions**

Notwithstanding the priority of Distributions set forth above, the Fund may make distributions to the General Partner to enable its beneficial owners to pay tax on allocations of taxable income attributable to the General Partner's carried interest. Any such distributions shall reduce future distributions of carried interest otherwise payable to the General Partner.

**General Partner Clawback**

Upon termination of the Fund, the General Partner will be required to restore distributions to the Fund to the extent that it received cumulative distributions in excess of amounts otherwise distributable to the General Partner pursuant to the distribution formula set forth above, applied on an aggregate basis covering all transactions of the Fund, but in no event more than the cumulative distributions received by the General Partner with respect to its 40% carried interest, less income taxes thereon.

**Allocation of Income, Expenses, Gains and Losses**

Income, expenses, gains, and losses of the Fund generally will be allocated among the Partners in a manner consistent with the distribution of proceeds described above.

**Partner Giveback**

If the Fund incurs any liability, the General Partner may, subject to certain limitations set forth in the Partnership Agreement, cause each Partner to contribute to the Fund its pro rata share of such liability (based upon the amount by which such Partner's distributions from the Fund would have been reduced if the amount to be returned to the Fund by the Partners had not been distributed but rather had been used by the Fund to pay such liability).

**Management Fee**

Commencing on the Initial Closing Date, the Fund will pay to the General Partner an annual management fee (the "Management Fee"), payable monthly in arrears. During the Investment Period, the per annum Management Fee will be equal to 1.5% of the Commitments. To the extent that the General Partner does not call all Commitments on or before the end of the Investment Period, the Management Fee assessed against such uncalled Commitments will be refunded. After the Investment Period, the

per annum Management Fee will equal 1.5% of Commitments attributable to unrealized Investments. The General Partner may elect to waive all or a portion of the Management Fee or carried interest for certain investors, including employees and affiliates of the General Partner.

Notwithstanding the above, the Management Fee otherwise assessed against a Limited Partner shall be reduced: (i) by 25 basis points per annum, if such Limited Partner commits $3 million or more to the Fund (regardless of when such Commitment is made), and (ii) by 25 basis points per annum, if such Limited Partner makes its Commitment during the first 3 months following the Initial Closing Date (regardless of the amount of such Commitment). For the avoidance of doubt, a Limited Partner that commits the minimum amount set forth in clause (i) and also makes such commitment within the time period set forth in clause (ii) shall be entitled to a reduction of 50 basis points per annum.

No Management Fee will be charged beyond the term of the Fund. The Management Fee will be paid out of current income and disposition proceeds realized by the Fund and, in the General Partner's discretion, from drawdowns that will reduce unfunded Commitments.

**Organizational and Operational Expenses**

The Fund will reimburse the General Partner for all costs, fees and expenses incurred by the General Partner associated with (i) the Fund's organization, including legal, accounting and other organizational costs and (ii) the pursuit and investigation of any Investment to be made by the Fund and the operation of the Fund such as travel and related expenses in originating and monitoring Investments and including subsequent legal, accounting and other costs.

**Other Expenses**

The General Partner will bear the costs of its overhead expenses, including employees' salaries, rent and utilities.

In addition to the Management Fee, the Fund will pay all other costs and expenses of the Fund, including legal, auditing, consulting, financing, accounting and custodian fees and expenses; expenses associated with the Fund's financial statements, tax returns and Schedule K-1s; out-of-pocket expenses incurred in connection with transactions not consummated; insurance; other expenses associated with the acquisition, holding and disposition of its Investments, including extraordinary expenses (such as litigation, if any); and any taxes, fees or other governmental charges levied against the Fund.

**Co-investment Policy**

The General Partner may, but will be under no obligation to, provide co-investment opportunities to one or more Limited Partners. Affiliates of the General Partner may make co-investments with the Fund. In addition, the General Partner may advise other entities, including Parallel Funds (as defined below), which may co-invest with the Fund. For any particular co-investment, the investment terms applicable to the Fund will be no less favorable than the investment terms applicable to the co-investor.

**Other Funds**

The General Partner will not form or commence management of a pooled investment fund with objectives substantially similar to those of the Fund until the earlier of: (i) the expiration of the Investment Period; or (ii) such time as at least 75% of the Commitments have been invested or have been committed for investment, as determined by the General Partner in its

sole discretion. Notwithstanding the foregoing, the General Partner may establish Parallel Funds (as defined below) to invest substantially all of their assets in the Fund or proportionately alongside the Fund and on effectively the same terms as the Fund. For the avoidance of doubt, a pooled investment fund that invests primarily in either short-term debt or equity investments in commercial real estate (i.e., does not primarily invest in equity investments in commercial real estate like the Partnership) shall not be deemed to have a substantially similar investment objective to Partnership.

**Default Provisions**

The Partnership Agreement includes default provisions to address situations in which a Limited Partner fails to fund any portion of its Commitment when called by the General Partner or to otherwise make a payment when due. If a Limited Partner is a "Defaulting Partner," one-half of the Defaulting Partner's capital account may be forfeited and the forfeited portion will be allocated to the remaining non-defaulting Limited Partners in proportion to their percentage interest in the Fund. Prospective Limited Partners should carefully review the Fund's default provisions. In addition, the forfeiture of a Defaulting Partner's capital account may not relieve such Defaulting Partner from its obligation to make capital contributions for the purpose of satisfying certain existing Fund liabilities.

**Investment Structure**

The Fund is permitted, but not required, to utilize a subsidiary (the "REIT Subsidiary") that will elect to be taxed as a real estate investment trust ("REIT") for some or all Investments that the Fund makes in assets that may be held by a REIT under the applicable provisions of the Code (as defined below). To the extent the REIT Subsidiary is not utilized, and for other assets which may not be held by a REIT, the Fund intends to utilize limited liability companies or other limited liability entities that will be directly or indirectly owned by the Fund.

The governing documents of the REIT Subsidiary will contain provisions (the "Ownership Restrictions") that restrict the beneficial ownership of the REIT Subsidiary's shares by a single person (other than the Fund) or persons acting as a group. The purpose of the Ownership Restrictions is to assist in protecting and preserving the REIT Subsidiary's status as a REIT.

Each Limited Partner will be required to provide to the Fund such information as the General Partner may reasonably request to determine the effect of that Limited Partner's investment in the Fund on the ability of the REIT Subsidiary to qualify as a REIT.

**Alternative Investment Vehicles**

For legal, tax, regulatory, or other reasons, the Fund may form one or more alternative investment entities to make investments outside of the Fund. Generally, in such event, each Limited Partner would participate in such an alternative investment vehicle on substantially the same terms and conditions as it participates in the Fund. See the Partnership Agreement for details on alternative investment vehicles.

**Parallel Investment Entities**

The General Partner or its affiliates may, at its discretion, create one or more parallel investment entities to accommodate the investment requirements of certain non-U.S. and other investors ("Parallel Funds"), the structure of which may differ from that of the Fund. Parallel Funds will either (i) invest substantially all of their assets directly in the Fund,

(ii) invest proportionately in all transactions on effectively the same terms and conditions as the Fund, except as necessary to address tax, regulatory or other investor considerations or (iii) invest in an entity owed by the Fund and the Parallel Fund, in proportion to their commitments to such entity, to make Investments. To the extent a Parallel Fund invests directly in the Fund, the Fund shall be responsible for the fees and expenses of such entity. The Fund is a Parallel Fund to the Flagship Fund.

It is possible that due to the timing of an Investment or the initial closing date of the Parallel Fund, both the Parallel Fund and Fund may not be able to participate or there will be a delay in when both the Fund and Parallel Fund can participate. While it is intended that each Parallel Fund and the Fund participate on the same terms and in the same proportion to their aggregate capital commitments, it is possible that a Parallel Fund will invest under scenario (ii) or (iii) above at a later time than the Fund or not at all. To the extent a Parallel Fund invests after the Fund in a particular Investment, the Fund's ownership of such Investment will be decreased by the amount of the Parallel Fund's investment and the Fund's opportunity for returns will be reduced accordingly. Investors should also understand that because of regulatory, tax or for other reasons the portfolio of the Fund and a Parallel Fund may differ.

**Reports to Limited Partners**

The Fund will furnish to the Limited Partners (i) audited financial statements annually commencing with the first year in which it either is in operation for the full year or makes an Investment and (ii) annual tax information necessary for each Partner's U.S. tax returns.

**Side Letters**

The Fund or the General Partner, without any further act, approval or vote of any Partner, may enter into side letters or other similar agreements with certain Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, the Partnership Agreement.

**UBTI; ECI**

The Fund may make investments that would cause a U.S. tax-exempt Partner to have "unrelated business taxable income" ("UBTI") within the meaning of Section 512 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), or cause a non-U.S. Partner to have income "effectively connected with the conduct of a trade or business within the United States," as defined in the Code.

**ERISA**

The Fund will use its reasonable best efforts to conduct the affairs and operations of the Fund so as to avoid being a plan assets vehicle under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA").

**Transfers and Withdrawals**

Generally, a Limited Partner may not resign from the Fund or sell, assign, or transfer any interest in the Fund without the prior written consent of the General Partner, which generally may be withheld in the General Partner's sole discretion. In addition, generally, a Limited Partner may not withdraw any amounts from the Fund during its term.

**Indemnification and Exculpation**

The Fund will indemnify and hold harmless the General Partner; the Principals; and the General Partner's and its general partner's partners, members, managers, employees, agents, advisors, affiliates, and personnel against all claims, liabilities, costs, and expenses, including legal fees, judgments, and amounts paid in defense and settlement, as

incurred by them, by reason of their activities on behalf of the Fund or the Partners, other than for bad faith, gross negligence, willful malfeasance or such other limitations as set forth in the Partnership Agreement.

**Risks and Certain Potential Conflicts of Interest**

An investment in the Fund involves significant risks and there can be no assurance that the Fund's investment objectives will be achieved. There may occur potential or actual conflicts of interest involving the General Partner, its affiliates and the Fund. For further discussion of risks and certain potential conflicts of interest, see Section III—"Risk Factors."

**Investment Considerations**

Each prospective investor should consult its own advisers as to legal, business, tax, accounting, ERISA and other related matters concerning an investment in the Fund.

Each prospective non-U.S. investor should consult its own tax and other advisers in determining the possible tax, exchange control, or other consequences to such investor under the laws of the jurisdictions of which it is a citizen, resident, or domiciliary; in which it conducts business; or in which it otherwise may be subject to tax, of the purchase and ownership of limited partner interests in the Fund.

For further discussion of certain investment considerations, see Section IV—"Legal and Tax Matters."

**Placement Agent**

The Fund has engaged Ausdal, and may in the future engage other selling agents, to offer and sell interests in the Fund. Such selling agents may be paid a sales commission: (i) by the Fund; (ii) out of the General Partner's Management Fee; (iii) out of the General Partner's carried interest; and/or (iv) an assets-based "distribution fee" charged to the Partners introduced by such selling agents. Accordingly, depending on the type of sales commissions paid, such commissions may increase the aggregate expenses of any person investing in the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund.

**Legal Counsel to the General Partner**

Vedder Price P.C. serves as legal counsel to the General Partner. Vedder Price does not represent the Limited Partners. No independent counsel has been retained to represent the Limited Partners. See Section IV–"Legal and Tax Matters – Legal Counsel."

**Fund Auditors**

Grant Thornton LLP

**Administrator**

Woodfield Fund Administration, LLC

## *III. Risk Factors*

Investing in the Fund involves various risks. Prospective investors should consider carefully the following risk factors and the other information in this memorandum before deciding to invest. The risks described below are those that the General Partner currently believes are the material risks the Fund will face, but are not the only risks associated with an investment in the Fund. If any of the events contemplated by the following risks or other risks that have not been identified or that are currently considered immaterial or unlikely should occur, the Fund's results and the performance of an investment in the Fund could be adversely affected.

## *Investment Risks*

*General Investment Risks.* The business of the Fund is to invest primarily in short-term debt and equity investments in commercial real estate properties within the United States, which may include properties and projects that are undervalued, distressed or require unconventional financing to become viable, as well as in loans that may be non-performing. Such investments involve a high degree of business and financial risk that can result in substantial losses. Investors in the Fund should not subscribe to or invest in the Fund unless they can readily bear the consequences of losses on their investment.

*General Real Estate Investment Risks.* Because the Fund will concentrate its assets in the real-estate industry, the Fund's performance will be closely linked to and will be directly affected by changes in and the performance of the local and regional real estate markets in which the Fund invests. Real estate markets in the United States generally have been subject to substantial and often unpredictable fluctuations and declines on a local, regional and national basis over the past several years and such trends may continue in the future. Borrowers in projects in which the Fund may invest or to whom the Fund may extend loans may fail to pay their loans, in a timely manner or at all, and/or the value of the properties underlying, securing or associated with the Fund's Investments may decline. A number of factors may contribute to a borrower failing to pay a loan or a decline in the value of a property, including, among other things, over-supply or lack of demand, defaults by borrowers or tenants, increases in vacancy rates, declines in rental income, property taxes, changes in zoning laws, increased operating expenses or capital expenditures and the availability and pricing of financing. Real estate risks also arise where borrowers fail to carry adequate insurance, or become liable for costs related to compliance with environmental laws. Lastly, in certain cases, there may be no collateral to protect an Investment after it has been made, or the collateral or portion thereof available to the Fund may have a value that is significantly less than amount of the associated Investment, particularly after taking into account the rights to the collateral held by more senior lien holders.

*Junior and Mezzanine Loan Risks.* Loans or debt interests in which the Fund may invest may be among the most junior in a company's or project's capital structure and, thus, subject to the greatest risk of loss. Due to their lower place in a borrower or project's capital structure and possible unsecured status, junior loans and interests involve a higher degree of overall risk than senior loans of the same borrower or project. Junior loans that are bridge loans generally carry the expectation that the borrower will be able to obtain permanent financing in the near future. Any delay in obtaining permanent financing subjects the bridge loan investor to increased risk. In cases where the Fund extends bridge loans to a borrower, the Fund will bear the risk that the borrower may be unable to locate permanent financing to replace the bridge loan, in a timely manner or at all, which could adversely affect the Fund's associated Investment.

The Fund may make Investments in mezzanine loans. Unlike conventional mortgage loans, many mezzanine loans are not secured by a mortgage on the underlying real property but rather by a pledge of equity interests (such as a partnership or limited liability company membership) in the property owner or another company in the ownership structure that has control over the property. Generally, mezzanine loans may be more highly leveraged than other types of loans and subordinate in the capital structure of the borrower. While foreclosure of a mezzanine loan generally takes substantially less time than foreclosure of a traditional mortgage, the holders of a mezzanine loan have different remedies available versus the holder of a first lien mortgage loan. In addition, a sale of the underlying real property would not be unencumbered, and thus would be subject to encumbrances by more senior mortgages and liens of other creditors. Upon foreclosure of a mezzanine loan, the holder of the mezzanine loan typically acquires an equity interest in the borrower or other obligor. However, because of the subordinate nature of a mezzanine loan, the real property continues to be subject to the lien of the mortgage and other liens encumbering the real estate. In the event the holder of a mezzanine loan forecloses on its equity collateral, the holder may need to cure the borrower or other obligor's existing mortgage defaults or, to the extent permissible, sell the property to pay off other creditors. To the extent that the amount of mortgages and senior indebtedness and liens exceed the value of the real estate, the collateral underlying the mezzanine loan may have little or no value.

*Foreclosure Risk*. There may be additional costs associated with enforcing a Fund's remedies under a loan including additional legal costs and payment of real property transfer taxes upon foreclosure in certain jurisdictions. As a result of these additional costs, the Fund may determine that pursuing foreclosure on the loan collateral is not worth the associated costs. In addition, if the Fund incurs costs and the collateral loses value or is not recovered by the Fund in foreclosure, the Fund could lose more than its original investment in the loan. Foreclosure risk is heightened for junior loans, including certain mezzanine loans.

*Past Performance Not Indicative of Future Results*. The performance of the Principals' prior investments is not necessarily indicative of the Fund's future results. While the General Partner intends for the Fund to make investments that have estimated returns commensurate with the risks undertaken, there can be no assurances that the targeted internal rate of return will be achieved. On any given investment, loss of principal is possible.

*Concentration of Investments*. The Fund will participate in a limited number of investments that will be primarily focused in the commercial real-estate industry. As a result, the Fund's investment portfolio is likely to be highly concentrated, and the performance of a few holdings may substantially affect its aggregate return. Furthermore, to the extent that the capital raised is less than the targeted amount, the Fund may invest in an smaller number of projects, properties and loans than it otherwise could have and thus will be comparatively less diversified.

*Borrowing Risk*. The use of borrowings may result in greater losses to the Fund than would be the case if borrowings were not used. To the extent the Fund realizes an Investment with borrowings outstanding with respect to that investment, the Fund will be required to repay the borrowings prior to making distributions to investors.

*Lack of Sufficient Investment Opportunities*. It is possible that the Fund will never be fully invested if enough sufficiently attractive investments are not identified. The business of identifying, structuring and diligencing suitable investments in commercial real-estate is highly competitive, time consuming and involves a high degree of uncertainty.

*Restricted Nature of Investment Positions*. Generally, there will be no readily available market for the Fund's Investments, and hence, most of the Fund's Investments will be difficult to value. Dispositions of or exiting from such Investments may require a lengthy time period or may result in distributions in kind to the Partners.

*Enhanced Scrutiny and Potential for Increased Industry Regulation*. There has been significant discussion recently regarding enhanced governmental scrutiny and/or increased regulation of the private investment fund industry. There can be no assurance that any such scrutiny or regulation will not have an adverse impact on the Fund's activities, including the ability of the Fund to implement operating improvements or otherwise execute its investment strategy or achieve its investment objectives.

*Need for Follow-On Investments*. Following an initial investment in a given loan, property or project, the Fund may determine that additional funds are necessary or the Fund may be provided with an opportunity to increase its initial investment. There is no assurance that the Fund will make follow-on investments or that the Fund will have sufficient funds to make all or any of such investments. Any decision by the Fund not to make follow-on investments or its inability to make such investments may have a substantial negative effect on a property or project in need of such an investment. Additionally, failing to make such investments may result in a lost opportunity for the Fund to increase its participation in a successful property or project or the dilution of the Fund's ownership in a company affiliated with the property or project if a third party invests in such company instead of the Fund.

*Leveraged Investments*. If the Fund borrows funds to make investments, the Fund would be exposed to the risk of leverage, which magnifies the potential for gain and loss on amounts invested.

*Co-Investment Risk* The Fund will face risks relating to joint ventures or partnerships that are not present with other methods of investing. The Fund may enter into joint ventures or partnerships with unaffiliated third parties for the acquisition, financing, development and construction of real estate projects. Such Investments may involve risks not otherwise present with other methods of investment, including, for example, the possibility that:

- the co-venturer or project sponsor in an Investment might become bankrupt, in which case the Fund's Investment might become subject to the rights of the co-venturer or project sponsor's creditors, and the Fund may be forced to liquidate its Investment before it otherwise would choose to do so;

- such co-venturer or project sponsor may at any time have economic or business interests or goals that are or that become inconsistent with the Fund's business interests or goals, which may cause the Fund to disagree with its co-venturer or project sponsor as to the best course of action with respect to the Investment and which disagreement may not be resolved to the Fund's satisfaction; however, the written agreements with such co-venturer or project sponsor may grant to the Fund certain approval rights with respect to major decisions related to the Investment;

- such co-venturer or project sponsor may be in a position to take action contrary to the Fund's instructions or requests or contrary to the Fund's policies or objectives, which may cause the Fund not to realize the return anticipated from its Investment; or

- it may be difficult for the Fund to sell its Investment in any such joint venture or partnership.

*Geographic Risk* The Fund intends to invest in real estate projects throughout the United States. It is possible that a higher percentage of its Investments will relate to property located in one or more states. If the real estate markets or general economic conditions in the geographic areas in which the Fund invests unexpectedly decline to an extent greater than the Fund forecasts, or recover to a lesser extent than the Fund forecasts, the value of the real properties in which the Fund invests and that are underlying its Investments in these areas could decline. Any of these events could materially adversely affect the Fund's business, financial condition or results of operations.

*Compliance with Environmental and/or Human Health Laws and Regulations* All real property and the operations conducted in connection with real property are subject to federal, state and local laws, ordinances and regulations relating to environmental protection and human health and safety. These laws and regulations generally govern wastewater discharges, air emissions, the operation and removal of underground and above-ground storage tanks, the use, storage, treatment, transportation and disposal of solid and hazardous materials and the remediation of contamination associated with disposals. Under limited circumstances, a secured lender, in addition to the owner of real property, may be liable for clean-up costs or have the obligation to take remedial actions under environmental laws, including, but not limited to, the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or CERCLA. Some of these laws and regulations may impose joint and several liability for the costs of investigation or remediation of contaminated properties, regardless of fault or the legality of the original disposal. In addition, the presence of these substances, or the failure to properly remediate these substances, may adversely affect the Fund's ability to sell such property or to use the property as collateral for future borrowing.

The Fund may become subject to environmental liabilities associated with an Investment if it participates in the management of the related real estate. Environmental laws may impose restrictions on the manner in which property may be used or businesses may be operated, and these restrictions may require substantial expenditures. It is possible that property in which the Fund holds an interest may contain hazardous substances, wastes, contaminants or pollutants that the Fund may be required to remove or remediate. The Fund may also incur liability to tenants or other users of property in which the Fund holds an interest or neighboring properties. The Fund cannot guarantee that it will not incur full recourse liability for the entire cost of removal and cleanup, that the cost of such removal and cleanup will

not exceed the value of the property or that it will recover any of these costs from any other party. It may be difficult or impossible to sell a property following discovery of hazardous substances or wastes on the property. The cost of defending against claims of liability, of compliance with environmental regulatory requirements, of remediating any contaminated property or of paying personal injury claims could materially adversely affect the Fund's business, financial condition and results of operations and, consequently, amounts available for distribution to the Limited Partners.

*Borrowings by Sponsors of Investments* The sponsor of any Investment may incur indebtedness at the project level. The Fund's ability to achieve its investment and leverage objective depends on the ability of its project sponsors to borrow money in sufficient amounts and on favorable terms. If lenders do not allow these borrowings to be renewed or if the sponsor cannot replace maturing borrowings on favorable terms or at all, the sponsor might have to sell its Investment assets under adverse market conditions, which would harm the Fund's results of operations and may result in permanent losses.

*Limited Number of Tenants* An Investment's results of operations may rely on only one or a few tenants and therefore the insolvency, bankruptcy or receivership of any of these limited number of tenants could adversely affect the results of the Investment. There is a significant creditworthiness risk where only a single or a few tenants lease all or a significant portion of a property underlying the Fund's Investment.

*Possibility of Fraud and Other Misconduct* When the Fund invests in an Investment, the Fund may not have custody of the Investment's assets. Therefore, there is the risk that the Investment sponsor could divert or abscond with those assets, provide false reports of operations or engage in other misconduct.

### *Structural Risks*

*Reliance on the General Partner.* The Fund has no operating history and will be entirely dependent on the General Partner. Control over the operation of the Fund will be vested entirely with the General Partner, and the Fund's future profitability will depend largely upon the business and investment acumen of the Principals. The loss of service of one or more of the Principals could have an adverse effect on the Fund's ability to realize its investment objectives. Limited Partners generally have no right or power to take part in the management of the Fund, and as a result, the investment performance of the Fund will depend entirely on the actions of the General Partner.

*Significant Adverse Consequences for Default.* The Partnership Agreement provides for significant adverse consequences in the event a Limited Partner defaults on its Commitment or other payment obligations. In addition to losing its right to potential distributions from the Fund, a defaulting Limited Partner will be forced to forfeit half of its interest in the Fund. If a Limited Partner defaults, it may be difficult for the Fund to make up the shortfall and could have a negative impact on the Fund's returns.

*Dilution.* Limited Partners admitted to the Fund at subsequent closings will participate in then-existing investments of the Fund, thereby diluting the interest of existing Limited Partners in such investments. Although any such new Limited Partner will be required to contribute its pro rata share of previously made capital contributions, there can be no assurance that this contribution will reflect the fair value of the Fund's existing investments at the time of such contributions. Similarly, to the extent a Parallel Fund invests in a then-existing investment of the Fund, such investment will dilute the interest of the Fund in such investment.

*General Partner's Carried Interest.* The fact that the General Partner's carried interest is based on a percentage of net profits may create an incentive for the General Partner to cause the Fund to make riskier or more-speculative investments than otherwise would be the case, which may increase Limited Partners' risks for significant losses on their investment in the Fund.

*Transfer by General Partner*. To the extent the General Partner, its partners, the Principals and/or their respective affiliates commit to make an investment in the Fund, a material participation in or a portion of such investment may thereafter be transferred to others, subject to any express limitations thereon in the Partnership Agreement.

*Adverse Market Conditions*. Any material adverse change in the economic environment, such as adverse changes in interest rates or consumer confidence, or continued economic uncertainty or anemic economic growth could have a negative impact on the performance and/or valuation of the Fund's Investments. The Fund's performance can be affected by deterioration in the real estate markets and by market events, such as the onset of the credit crisis in the summer of 2007.

*Side Letters* The General Partner or the Fund may enter into a side letter or other written agreement with one or more investors. Such Side Letter may entitle an investor to make an investment in the Fund on terms other than those described in the Partnership Agreement or the Subscription Agreement. Any such terms may be more favorable than those offered to other investors.

*Use of Valuations* The Fund may obtain independent third-party valuations or appraisals for the purpose of valuing the underlying real estate collateral to determine the size of each Investment; however, the Fund may use its own internal real estate valuations from time to time. Unlike publicly traded securities, real estate assets generally cannot be marked to an established trading value. An appraisal or valuation is only an estimate of value and is not a precise measure of realizable value. Real estate valuations are subject to numerous assumptions and limitations. However, ultimate realization of the market value of a real estate asset depends to a great extent on economic and other conditions beyond the control of the General Partner and the Fund. Further, appraised or otherwise determined values do not necessarily represent the price at which a real estate investment would sell, since market prices of real estate Investments can only be determined by negotiation between a willing buyer and seller. As a result, if the Fund were to liquidate a particular Investment, the realized value of the underlying real estate collateral may be more or less than the appraised value or valuation of such asset.

## *Conflicts of Interest*

*Conflicts of Interest with Principals/General Partner*. During the Investment Period, the Principals will pursue all appropriate investment opportunities through the Fund, subject to certain limited exceptions. However, the Principals currently manage other investment funds, including the Flagship Fund, that have a similar investment strategy as the Fund, and other investments similar to those in which the Fund will be investing. The Principals also currently manage prior vintages of this Fund. The investment period for each prior vintage has ended. The Principals also manage T2 Strategic Real Estate Fund, LP ("SREI"), an open-end fund that invests the majority of its assets in debt related real estate investment. The Fund may invest in investments with SREI.

Accordingly, the General Partner may direct certain relevant investment opportunities to those investment funds and investments, and the General Partner will continue to manage and monitor such investment funds and investments. The significant expected investment of the Principals in the Fund, as well as the Principals' interest in the carried interest, operate to align, to some extent, the interest of the Principals with the interest of the Limited Partners, although the Principals have economic interests in such other investment funds and investments as well and receive management fees and carried interests relating to these interests, which may differ from the Management Fee and Carried Interest applicable to the Fund. Such other investment funds, including Parallel Funds, and investments that the Principals may control may compete with the Fund with respect to opportunities in which by the Fund may invest. With the exception of Parallel Funds, the allocation of investment opportunities may not be pro rata among clients and allocations may differ for a variety of reasons, including cash flow and investment restrictions. The restrictions on managing other investment funds set forth in this Memorandum serve to alleviate conflicts with the respect to the allocation of investment opportunities, but to the extent investment funds managed by the General Partner have unallocated capital the potential for conflict exists. Following the Investment Period, the Principals may and likely will focus their investment activities on other opportunities and areas unrelated to the Fund's investments.

*Co-Investments by General Partner Affiliates or Limited Partners*. Under certain circumstances, the Fund may be offered an opportunity to make an investment in connection with a transaction in which a Principal or another affiliate of the General Partner ("General Partner Affiliate") is expected to participate or in an investment in which the General Partner Affiliate already has made, or concurrently will make, an investment. In connection with such investments, the Fund and the General Partner Affiliate may have conflicting interests and investment objectives. Generally, the terms of any such co-investment applicable to the Fund will be no less favorable than the investment terms applicable to the General Partner Affiliate.

Similarly, to the extent the Fund offers a co-investment opportunity to a Limited Partner, such Limited Partner may participate in an investment of the Fund. In connection with such an investment, the Fund and the Limited Partner may have conflicting interests and investment objectives. Generally, the terms of any such co-investment applicable to the Fund will be no less favorable than the terms applicable to the Limited Partner; however, the Fund cannot guarantee the parties' investment will be structured in the same manner, and the Limited Partner may take a junior or senior creditor position to the Fund in relation to such co-investment.

*Conflicting Investor Interests*. Limited Partners may have conflicting investment, tax, and other interests with respect to their investments in the Fund, including conflicts relating to the structuring of investment acquisitions and dispositions. Conflicts may arise in connection with decisions made by the General Partner regarding an investment that may be more beneficial to one Limited Partner than another, especially with respect to tax matters. In structuring, acquiring and disposing of investments, the General Partner generally will consider the investment and tax objectives of the Fund and its Partners as a whole, not the investment, tax, or other objectives of any Limited Partner individually.

## Liquidity Risks

*Illiquidity; Lack of Current Distributions*. An investment in the Fund should be viewed as illiquid and suitable only for long-term investors. It is uncertain as to when profits, if any, will be realized. Losses on unsuccessful investments may be realized before gains on successful investments are realized. While an investment may be sold at any time, the Fund may be unable to easily convert or exit an investment on a timely basis, or at all, without realizing a substantial loss. Before such time, there may be no current return on the investment. Furthermore, the expenses of operating the Fund (including the annual Management Fee payable to the General Partner) may exceed its income, thereby requiring that the difference be paid from the Fund's capital.

*Limited Transferability of Fund Interests*. There will be no public market for the Fund interests, and none is expected to develop. There are substantial restrictions upon the transferability of Fund interests under the Partnership Agreement and applicable securities laws. In general, withdrawals of Fund interests are not permitted. In addition, Fund interests are not redeemable.

## Tax Risks

*Taxable Income May Exceed Cash Distributions*. The federal tax liability of a taxable Investor resulting from the disposition by the Fund of investments, the disposition of interests in the Fund or the ongoing operations of the Fund may substantially exceed the cash, if any, received by the Investor as a result of such disposition or operations. Thus, a Limited Partner may have to make an out-of-pocket expenditure to cover its tax liability.

*Tax-Exempt Investors*. A tax-exempt investor that invests in the Fund may realize unrelated business taxable income ("UBTI"). Prospective investors that are tax-exempt entities should consult with their own advisors prior to making an investment in the Fund as to the potential UBTI and other tax consequences that may apply to their particular situations.

*Non-U.S. Investors*. Prospective non-U.S. investors in the Fund should be aware that an investment in the Fund may give rise to effectively connected income ("ECI"). In such case, a non-U.S. investor may have an obligation to pay tax to and file returns with the Service. In addition, a non-U.S. investor's share of certain types of income from the Fund may be subject to a 30% withholding tax under FATCA, unless an exception applies. Prospective investors that are non-U.S. persons are strongly urged to consult their advisors prior to making an investment in the Fund. *See Certain U.S. Federal Income Tax Matters – Taxation of Non-U.S. Limited Partners.*

*Delayed Schedule K-1s*. The Fund may not be able to provide final Schedule K-1s to Limited Partners for any given fiscal year until after April 15 of the following year. Thus, Limited Partners may be required to obtain extensions of the filing dates for their U.S. federal, state, and local income tax returns. Each prospective investor should consult with its own adviser as to the advisability and tax consequences of an investment in the Fund.

### Regulatory Risks

*No Registration Under the Investment Company Act or Federal or State Securities Laws*. The Fund will not be registered with the SEC as an investment company under the Investment Company Act in reliance upon an exemption from the Investment Company Act. Accordingly, the provisions of the Investment Company Act that are applicable to registered investment companies (e.g., mutual funds) will not be applicable. The interests of the Fund will not be registered with the SEC under the Securities Act in reliance on the exemptive provisions of Section 4(2) and/or Regulation D thereunder. The Fund shall be exempt from registration under Section 3(c)(5) of the Investment Company Act. Similar reliance has been placed on apparently available exemptions from securities registration and qualification requirements under applicable state securities laws. No assurance can be given that the offering currently qualifies or will continue to qualify under one or more of such exemptive provisions due to, among other things, the manner of distribution, reliance on investor representations or retroactive changes in securities law, regulations or interpretations thereof.

THE FOREGOING IS A SUMMARY OF CERTAIN SIGNIFICANT RISKS RELATING TO AN INVESTMENT IN THE FUND. THIS SUMMARY SHOULD NOT BE INTERPRETED AS A REPRESENTATION THAT THE RISKS IDENTIFIED AND DISCUSSED IN THIS SECTION ARE THE ONLY RISKS ASSOCIATED WITH AN INVESTMENT IN THE FUND, OR THAT THE MAGNITUDE OF SUCH RISKS IS NECESSARILY EQUAL.

# IV. Legal and Tax Matters

## Employee Benefit Plan Considerations

The following is a summary of certain factors arising under the Employee Retirement Income Security Act of 1974, as amended, including the regulations thereunder ("ERISA") and the Code that should be considered before a "fiduciary" (as defined in Section 3(21) of ERISA or Section 4975(e)(3) of the Code) of an "employee benefit plan" (as defined in Section 3(3) of ERISA) or a "plan" (as defined in Section 4975(e)(1) of the Code) (a "Plan") commits to an investment in the Fund. The following summary is as of the date hereof and is not intended to be complete, but it addresses certain questions under ERISA and the Code which should be considered by a Plan fiduciary and its counsel. Any Plan fiduciary should consult with its counsel regarding the consequences under ERISA, the Code or other similar statutes of an investment in the Fund.

In considering an investment in the Fund, a Plan fiduciary should consider, among other things: (i) whether the investment is in accordance with the documents governing the Plan; (ii) whether the investment satisfies the diversification requirements of Section 404(a)(1)(C) of ERISA; and (iii) the nature of an investment in, and the compensation structure of, the Fund (e.g., that certain of the Fund's activities may generate UBTI).

Section 406 ERISA and Section 4975 of the Code prohibit certain transactions (a "Prohibited Transaction") involving the assets of a Plan and persons or entities who have certain specified relationships to the Plan ("parties in interest" within the meaning of ERISA or "disqualified persons" within the meaning of the Code) unless a statutory or administrative exemption applies to the transaction. If the General Partner or any of its affiliates is or may be a party in interest or a disqualified person with respect to a Plan considering an investment in the Fund, the Plan fiduciary must determine that its investment will not directly or indirectly give rise to a non-exempt Prohibited Transaction.

Section 3(42) of ERISA and U.S. Department of Labor regulations (see 29 CFR § 2510.3-101) (the "Plan Asset Regulations") provide, generally, that, when a "benefit plan investor" (currently defined to include employee benefit plans subject to Part 4 of Title I of ERISA, any plan to which Section 4975 of the Code applies, and any entity whose underlying assets include plan assets by reason of a plan's investment in such entity, that are deemed to hold plan assets under ERISA) invests in an entity such as the Fund, such investor's assets include the limited partner interest and an undivided interest in each of the underlying assets of the Fund, unless (i) the equity participation in the Fund by benefit plan investors is not "significant" (currently defined as 25% of any class of the Fund's equity interests, excluding such interests held by the General Partner or its affiliates), (ii) the Fund complies with the "venture capital operating company" ("VCOC") exception, (iii) the Fund complies with the "real estate operating company" ("REOC") exception, or (iv) the Fund qualifies for another exception under the Plan Asset Regulations. If the underlying assets of the Fund were to be considered plan assets of such benefit plan investor, the General Partner of the Fund would be a fiduciary under ERISA, subject to burdensome ERISA requirements with which the General Partner could not presently comply, and the Fund would be subject to prohibited transaction rules of ERISA and Section 4975 of the Code that could adversely impact the General Partner's ability to invest the assets of the Fund.

The Fund does not intend at this time to limit investment by benefit plan investors, and therefore it is possible that investment by benefit plan investors will be significant. If the General Partner determines that equity participation by benefit plan investors is significant, the General Partner will use its reasonable best efforts to cause the Fund to comply with the VCOC or REOC exception. If the General Partner determines that equity participation by benefit plan investors is not significant and the General Partner determines that the Fund may be able to operate more effectively if it is not required to comply with conditions necessary for qualification as a VCOC or REOC, the General Partner may elect, in lieu of VCOC or REOC compliance, to use its reasonable best efforts to limit transfers and take other actions permitted under the Partnership Agreement designed to assure that participation by benefit plan investors does not become significant. If the Fund qualifies for the VCOC or REOC exception or if equity participation by benefit plan investors is not significant, the General Partner will not be considered a fiduciary under ERISA, and the underlying assets of the Fund will not be deemed "plan assets" of any benefit plan investor.

The Fund will qualify as a VCOC if (i) it has direct contractual rights to substantially participate in or substantially influence the management of operating companies constituting at least 50% of its portfolio (measured at cost) and (ii) in the ordinary course of its business, actively exercises such management rights with respect to at least one of the operating companies in which it invests. An "operating company" is an entity engaged in the production or sale of a product or service, as distinguished from a reinvesting entity. Determination as to whether the Fund qualifies as a VCOC is made at the time the Fund makes its first long-term investment and thereafter during a ninety-day annual valuation period each year, the first day of which shall begin no later than the anniversary of the Fund's first long-term investment. In order to qualify as a VCOC, the Fund must meet the requirements for a VCOC on at least one day of each such ninety-day annual valuation period. Special rules apply to any wind-up of the Fund when it enters into its "distribution period," as defined in the Plan Asset Regulations.

The Fund will qualify as a REOC if (i) on its initial valuation date (and annually thereafter) at least 50% of its assets (valued at cost) are invested in real estate that is managed or developed and with respect to which such entity has the right to substantially participate directly in the management or development activities, and (ii) in the ordinary course of its business, the entity is engaged directly in real estate management or development activities. The Fund must actively exercise such management rights

on an ongoing basis in the ordinary course of business. The 50% test must be met at the time of the Fund's first long-term investment and annually thereafter.

Plan fiduciaries should consult with their counsel and other advisors as to the provisions of ERISA applicable to an investment in the Fund. In particular, the fiduciary of a Plan should consider whether an investment in the Fund meets the prudence and diversification requirements of ERISA and is consistent with the terms of the Plan's underlying documents.

## *Legal Counsel*

Vedder Price P.C. represents the General Partner solely with respect to the specific matters as to which it has been retained and consulted by the General Partner, including certain matters with respect to the Fund. Other matters may exist that could have a bearing on the Fund, its Investments, the General Partner and/or its respective affiliates as to which Vedder Price has been neither retained nor consulted. Vedder Price does not undertake to monitor compliance by the General Partner and its affiliates with respect to the Fund's Investments and investment guidelines and procedures set forth in this Memorandum and the Partnership Agreement, nor does Vedder Price monitor compliance by the Fund, the General Partner and/or their affiliates with applicable laws, unless in each case Vedder Price has been specifically retained to do so. Vedder Price does not investigate or verify the accuracy and completeness of information set forth in this Memorandum concerning the Fund, the General Partner or any of their respective affiliates, personnel or investments. Furthermore, Vedder Price is not providing any advice, representation, warranty or other assurance of any kind as to any matter to any Limited Partner of the Fund, and Limited Partners will be required to authorize and agree in the subscription materials as to the Vedder Price's representation.

## *Certain U.S. Federal Income Tax Matters*

### *General*

The following description is a summary of certain U.S. federal income tax considerations of an investment in the Fund. It does not address every potential tax consequence, and except as noted below does not discuss particular considerations that may be applicable to investors subject to special rules, including tax-exempt investors, real estate investment trusts, dealers in securities, and foreign investors. The statements in this summary are based upon various provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and existing and currently proposed Treasury Regulations under the Code, legislative history of the Code, existing administrative rulings and practices of the Internal Revenue Service ("Service"), and judicial decisions as of the date of this Memorandum. No assurance can be given that future legislative, regulatory or administrative changes or court decisions will not significantly modify the statements made herein. Any such changes or decisions may be retroactive and thereby be applied to transactions entered into prior to the date of their enactment or release. No assurance can be given that the Service will not challenge any of the positions taken by the Fund and that such challenge, if any, will not be successful.

Prospective investors that are exempt from U.S. federal income taxation, non-U.S. investors and other types of investors should consult with their own tax advisors regarding other U.S. federal, state and local tax effects of investing in the Fund. In particular, this Memorandum does not address any alternative minimum tax effects of investing in the Fund or the limitations imposed by the Code on the ability of Limited Partners to deduct net losses, if any, incurred by the Fund. Because the specific Investments that may be made by the Fund have not yet been determined, no representation is made as to any tax benefits, including deductions or credits, being available as a result of an investment in the Fund. It is not expected that an investment in the Fund will reduce the cumulative tax liability of an investor with respect to any year. The Fund's primary objective is to generate income through debt and equity investments in real estate, not to reduce the tax liabilities of the Limited Partners.

For purposes of the discussion that follows, Limited Partners that are U.S. Persons and are generally exempt from U.S. federal income taxation are referred to as "U.S. Tax-Exempt Limited

Partners." Limited Partners that are U.S. Persons and are not generally exempt from U.S. federal income taxation are referred to as "Taxable U.S. Investors." "U.S. Persons" include: (a) citizens and residents of the United States; (b) corporations and partnerships created or organized in the United States or under the laws of the United States or of any state thereof or the District of Columbia; (c) estates whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; and (d) trusts if a United States court is able to exercise primary supervision over the administration of such trust, and one or more United States fiduciaries have the authority to control all substantial decisions of such trust. Finally, Limited Partners that are not U.S. Persons are referred to as "Non-U.S. Limited Partners."

THIS DISCUSSION IS NOT INTENDED OR WRITTEN BY THE FUND, THE GENERAL PARTNER/OR THE GENERAL PARTNER'S COUNSEL TO BE USED BY ANY PERSON FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER U.S. TAX LAWS. THIS DISCUSSION IS PROVIDED TO SUPPORT THE PROMOTION AND MARKETING BY THE FUND OF THE FUND INTERESTS. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR CONCERNING THE POTENTIAL TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

*Partnership Status of the Fund*

Pursuant to the "check-the-box" regulations, an entity such as the Fund will generally be classified as a partnership for U.S. federal income tax purposes unless it makes an election to be classified as an association taxable as a corporation. The General Partner does not intend to make such an election for the Fund. Therefore, the Fund is expected to be classified as a partnership for U.S. federal income tax purposes. However, the Fund has not sought a ruling from the Service that it will be treated for U.S. federal income tax purposes as a partnership rather than as an association taxable as a corporation.

Section 7704 of the Code provides that a "publicly traded partnership" will generally be treated as a corporation for U.S. federal income tax purposes. Section 7704 defines a "publicly traded partnership" as any partnership if interests in such partnership are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof. Given the limited circumstances in which a Limited Partner may transfer its Fund interest, the General Partner believes that interests in the Fund should not be considered traded on a secondary market or the substantial equivalent thereof. However, there can be no assurance the Service will accept this conclusion.

An entity, or portion of an entity, may be classified as a "TMP" under Section 7701(i) of the Code if (i) substantially all of its assets consist of debt obligations or interests in debt obligations; (ii) more than 50% of those debt obligations are real estate mortgages or interests in real estate mortgages as of specified testing dates; (iii) the entity has issued debt obligations (liabilities) that have two or more maturities; and (iv) the payments required to be made by the entity on its debt obligations "bear a relationship" to the payments to be received by the entity on the debt obligations that it holds as assets. Under Treasury regulations, if less than 80% of the assets of an entity (or a portion of an entity) consists of debt obligations, these debt obligations are considered not to comprise "substantially all" of its assets, and therefore the entity would not be treated as a TMP. Where an entity, or portion of an entity, is classified as a TMP, it is generally treated as a taxable corporation for U.S. federal income tax purposes.

If the Fund were classified as an association (or a publicly traded partnership or TMP) taxable as a corporation, the Fund would pay U.S. federal income tax at corporate rates on its net income, and distributions to the Limited Partners in general would be dividends to the extent of the earnings and profits of the Fund, with distributions in excess thereof being treated first as a return of capital and thereafter as capital gain. Such tax would result in a reduction in the amount of cash available for distribution to the Limited Partners.

The remainder of this discussion assumes that the Fund will be treated as a partnership for U.S. federal income tax purposes.

*Taxation of Limited Partners on Income of the Fund*

*Limited Partners, rather than Fund, subject to Tax.* As a partnership, the Fund generally will not be subject to federal income tax. Instead, the income, gain, loss and deductions resulting from the Fund's operations (and the Fund's share of such items from each flow-through entity in which the Fund invests) will be allocated to its Limited Partners. Each Limited Partner must report on its income tax return its share of ordinary income or loss, net long-term capital gain or loss, and net short-term capital gain or loss that it is allocated by the Fund. Each Limited Partner must pay taxes on its allocated share whether or not it has received a distribution from the Fund.

The tax information returns filed by the Fund may be audited by the Service. Adjustments, if any, resulting from such an audit or from other Service determinations may require each Limited Partner to file an amended tax return and may possibly result in an audit of such return. Any audit of a Limited Partner's return could result in adjustments of non-Fund as well as Fund items.

*Tax Allocations of Profits and Losses.* Under Code Section 704(b), the Fund's allocations of taxable income or loss to the Limited Partners generally will be respected for U.S. federal income tax purposes if they have "substantial economic effect" or they are in accordance with the partners' interests in the partnership. If the Fund's allocations do not comply with Code Section 704(b), the Service may reallocate partnership tax items in accordance with the interests of the Limited Partners in the Fund. In such case, a Limited Partner may be required to file an amended return and pay any additional tax liability (together with interest and potentially penalties) resulting from such adjustment.

It is possible that a Limited Partner's U.S. federal income tax liability with respect to its allocable share of the Fund's earnings in a particular taxable year could exceed the cash distributions to such Limited Partner for such year. For example, the Fund may recognize (directly or through a flow-through entity in which the Fund invests) taxable income in advance of the receipt of corresponding cash as a result of investments that generate "original issue discount" or "market discount," as discussed below, or with respect to an investment that generates cash flow that is applied to debt service. Moreover, the Fund may recognize taxable income from an Investment organized as a flow-through entity without the receipt of cash distributions corresponding to such income.

*Investment in Flow-Through Entities.* The Fund may invest a portion of its assets in one or more Investments or special purpose vehicles organized as a flow-through entity for U.S. federal income tax purposes. In such case, the tax treatment of the flow-through entity's investment(s) will flow through to the Fund (and then to the investors in the Fund). The discussion below addresses the tax treatment of certain investments in the hands of the Fund and any flow-through entity in which the Fund may invest.

*Original Issue Discount.* The Fund (directly or through a flow-through entity owned by the Fund) may originate or acquire loans, including loans with appreciation interests, that are deemed to have original issue discount for U.S. federal income tax purposes. Original issue discount is generally equal to the difference between an obligation's issue price and its stated redemption price at maturity. The Fund must recognize as income in each year the portion of the original issue discount that accrues during that year, even though it does not receive cash in that year in the amount of the original issue discount. As a result, a Limited Partner will be required to include in its taxable income its allocable share of the amount of such original issue discount accrued with respect to such a debt obligation, regardless of whether it receives cash from the Fund in such amount.

*Market Discount.* The Fund (directly or through a flow-through entity owned by the Fund) may also hold or purchase debt instruments that are subject to the "market discount" provisions contained in Sections 1276-1278 of the Code. These rules generally provide that if a holder acquires a debt instrument at a discount from, in general, its stated redemption price at maturity, which discount equals or exceeds one-fourth of one percent (0.25%) of the principal amount times the number of remaining complete years to maturity, or weighted average maturity in some cases, and thereafter disposes of such an instrument, the lesser of (a) the gain realized or (b) the portion of the market discount that accrued while the debt instrument was held by such holder will be treated as ordinary income at the time of the disposition. Any accrued market discount will also be recognized in the event that principal payments are made on the debt instrument. The market discount rules also provide that the net direct interest expense with respect to

any market discount bond is allowed as a deduction for the taxable year only to the extent that such expense exceeds the portion of the market discount allocable to the days during the taxable year on which such bond was held by the taxpayer (as determined under the rules of Section 1276(b) of the Code).

*Sale of Investments*. The Fund expects to generate ordinary income from certain of its investment activities, including rental income, interest income and OID (discussed above). In certain cases, the Fund's (direct or indirect) sale or disposition of an investment may result in capital gains or losses. If such investment was held longer than twelve months, the capital gain or loss will be "long-term." "Long-term capital gains" realized by non-corporate taxpayers are taxed at rates lower than the rates for ordinary income and capital gains on assets held for twelve months or less. Currently, the maximum federal long-term capital gain rate for non-corporate taxpayers is 20%. Capital losses of individuals and other non-corporate taxpayers are deductible only to the extent of the taxpayer's capital gains for the taxable year plus up to $3,000 of the taxpayer's ordinary income for such year. Individuals and non-corporate taxpayers are permitted to carry unused capital losses forward to succeeding taxable years indefinitely until such losses are utilized. Capital gains of corporate taxpayers are subject to the regular corporate tax rates, and corporations are permitted to apply capital losses only against capital gains and have a limited period to which such losses can be carried back or forward.

Notwithstanding the above, the Fund's sale or disposition of certain investments (or the sale of investments by a flow-through entity in which the Fund invests) could result in ordinary income in whole or in part, including (a) as a result of the "market discount" rules discussed above, (b) the sale of so-called "dealer" property (e.g., real estate considered to be held for sale to customers in the ordinary course of a trade or business), (c) the sale of loans that are not considered capital assets under Section 1221 of the Code, and (d) the sale of property that has depreciation recapture under Section 1245 or Section 1250 of the Code. In addition, in the case of non-corporate taxpayers, gain attributable to the recapture of certain real estate depreciation deductions is subject to a 25% rate in lieu of the general 20% rate applicable to long term capital gains.

*Tax on Net Investment Income*. In addition, individuals are required to pay a 3.8% Medicare surtax on the lesser of (i) their "net investment income" including interest, dividends, gains from the sale of securities, and other passive income, or (ii) the excess of their modified adjusted gross income for such taxable year over $200,000 ($250,000 in the case of joint filers). A similar tax applies to estates and trusts, with certain modifications. Prospective investors should consult their tax advisers regarding the effect, if any, of this tax on their ownership and disposition of interests in the Fund.

*REIT Subsidiary*. The General Partner is permitted, but not required, to cause the Fund to establish a subsidiary taxable as a real estate investment trust ("REIT") for United States federal income tax purposes.

To qualify for taxation as a REIT, the REIT Subsidiary (as defined above) would have to satisfy certain requirements, including requirements relating to ownership of shares in the REIT Subsidiary, gross income tests, and asset ownership tests. Under the share ownership test, the REIT Subsidiary must have at least 100 shareholders, and five or fewer individuals cannot own more than 50% by value of the REIT Subsidiary's stock (applying constructive ownership rules). Under the gross income test, at least 75% of the REIT's gross income each year must be derived from enumerated real estate sources (including qualifying rents from real property, interest on debt secured by real property, and gains from the sale of interests in non-dealer real property). Moreover, at least 95% of the REIT's gross income must be from specified passive sources, including from sources satisfying the 75% test. Under the asset test, at least 75% of the REIT's assets (measured quarterly) must be interests in real property, mortgages on real property, and certain other qualified investments. A REIT is also subject to concentration limits on certain investments that are not real estate assets.

If the REIT Subsidiary qualifies as a REIT, then the REIT Subsidiary would be entitled to a deduction for dividends paid to its shareholders. This substantially eliminates the "double taxation" that generally results from the use of corporations. However, the REIT Subsidiary would nonetheless be subject to a 100% excise tax if it sells "dealer property," which is property held primarily for sale to

customers in the ordinary course of a trade or business. There can be no assurance that the REIT Subsidiary would not be subject to this tax.

As long as the REIT Subsidiary qualifies as a REIT, distributions to the Fund out of the current and accumulated earnings and profits of the REIT Subsidiary, and not designated as capital gains dividends, would be taken into account by Taxable U.S. Investors as ordinary dividends, and corporate Taxable U.S. Investors would not be entitled to a dividends received deduction on such amounts. Distributions and undistributed amounts designated as capital gain dividends would be taxed as long-term capital gains up to the REIT Subsidiary's net capital gain for the year. Distributions in excess of earnings and profits would first be applied to reduce the Fund's tax basis in its REIT shares (but not below zero), and then would be treated as capital gain.

If the REIT Subsidiary fails to qualify as a REIT and certain relief provisions do not apply, the REIT Subsidiary would be subject to tax on its taxable income at regular corporate rates, which could substantially reduce the anticipated returns to investors.

The taxation of a REIT is complex and the above is only a general summary of certain of the applicable rules and requirements. Investors should consult their tax advisors.

*Passive Loss and At-Risk Limitations.* Under the "passive activity loss" rules set forth in the Code, non-corporate taxpayers and certain corporations are generally able to claim losses from passive activities only (i) to the extent of any current income generated by passive activities, or (ii) when certain dispositions of the investment generating the passive loss occur. It is possible the Fund will generate passive activity losses. Accordingly, a taxpayer subject to the passive loss rules could not use such losses to offset such taxpayer's active business income, compensation income, and portfolio income (e.g., interest, dividends, and royalties not derived in the ordinary course of a trade or business, and capital gains from portfolio investments). Income and gain of the Fund not treated as passive activity income generally will be treated as portfolio income, and a Limited Partner generally will not be able to use passive activity losses to offset such portfolio income from the Fund.

Under the "at-risk" rules set forth in the Code, losses from business and income-producing activities are generally limited to the amount a non-corporate taxpayer or closely held, corporate taxpayer has at-risk in such investment. Generally, the amount at-risk is a Limited Partner's allocable share of capital invested in such investment and such Limited Partner's share of recourse debt for which the Limited Partner is liable. Amounts representing nonrecourse financing of an investment are generally not considered to be at-risk, with an exception for certain nonrecourse financing borrowed to hold real estate. Losses that cannot be claimed under the "at-risk" rules are generally deferred and carried forward by a taxpayer until such taxpayer has income from the investment that generated such loss.

*Expense Limitations.* In the case of Limited Partners that are individuals, the ability to utilize certain specific items of deduction attributable to the investment activities of the Fund (as opposed to its activities that represent a trade or business for U.S. federal income tax purposes) may be limited, among other things, under the investment interest limitation in Code Section 163(d) and the 2% floor on miscellaneous itemized deductions (including investment expenses) in Code Section 67. Moreover, an individual whose adjusted gross income exceeds a threshold amount is required to reduce the amount allowable for itemized deductions by 3% of the excess over the threshold (but not to exceed 80% of the amount of the itemized deductions).

The extent to which any of the foregoing provisions of the Code will be applicable will depend upon the nature of the Fund's future operations and the tax situations of each of the taxable Limited Partners.

*Organization and Syndication Expenses.* Expenses paid in connection with the organization and syndication of a partnership must be capitalized. Up to $5,000 of the expenses of organizing (but not syndicating) a partnership may be deducted in the year in which the partnership begins business (except to the extent that the total organization expenses exceed $50,000) and any remaining organization

expenses may be amortized for tax purposes over a period of 180 months (beginning with the month in which the partnership begins business). If the Service were successful in challenging the Fund's treatment of any expenditures as organization expenditures or in reclassifying expenditures as syndication expenditures, any amortization or other deductions with respect to such expenditures would be disallowed and the taxable income of the Fund would be increased.

*Sale or Transfer of Fund Interests*

Upon a sale of a Limited Partner's interest in the Fund, a Limited Partner will recognize gain or loss equal to the difference between (a) the proceeds of such sale plus such Limited Partner's share of the Fund's non-recourse liabilities and (b) such Limited Partner's tax basis in its Fund interest. Such gain or loss recognized on a sale of Fund interests by a Limited Partner who does not hold such interests as a "dealer" and who has held such interests for more than 12 months, will generally be long-term capital gain or loss, as the case may be, except that the portion of the selling Limited Partner's gain allocable to (or amount realized, in excess of basis, attributable to) "inventory items" and "unrealized receivables" of the Fund as defined in Code Section 751 will be treated as ordinary income. A Limited Partner will begin a new holding period in a portion of its interest in the Fund on each date a cash capital contribution is made.

*Liquidation of the Fund*

Upon liquidation of the Fund, its property will be distributed in kind or sold and any gain or loss on any such sales will be allocated in accordance with the Partnership Agreement.

In the event of the liquidation of the Fund, each taxable Limited Partner will recognize gain to the extent that the cash and marketable securities received in the liquidation exceed his adjusted basis for Fund interest. See "*Sale or Transfer of Fund Interests*" above.

Upon liquidation, a loss would be recognized only in the event that the Limited Partner receives only cash, "unrealized receivables" or "inventory items" and then only if (and to the extent that) the Limited Partner's adjusted basis for his Fund interest exceeds the sum of money distributed and his share of the adjusted basis for unrealized receivables and inventory items. During the year of liquidation, each Limited Partner may be allocated income from the operations of the Fund.

*Taxation of U.S. Tax-Exempt Limited Partners*

*Unrelated Business Taxable Income.* Under Code Section 501(a), U.S. tax-exempt entities are generally exempt from U.S. federal income tax. U.S. tax-exempt entities otherwise exempt from U.S. federal income taxation may, however, be subject to tax on UBTI if income is derived from either (a) an "unrelated trade or business" carried on by the Fund (directly or through a flow-through entity in which the Fund invests) or (b) "debt-financed" property owned by the Fund or a flow-through entity in which the Fund invests. For each tax-exempt investor, the unrelated business income tax generally only applies to UBTI in excess of $1,000 for any taxable year.

*Unrelated Trade or Business.* The first category of UBTI is income derived from an unrelated trade or business. To constitute an unrelated trade or business, an activity must be regularly carried on by a tax-exempt organization (or by a partnership, such as the Fund, or limited liability company in which the tax-exempt investor is a partner or member) and not substantially related to the organization's tax-exempt purposes. UBTI can arise from incidental business activities such as the receipt of fee income or the sale of property held typically for sale. However, income may qualify for one of several exclusions from UBTI so long as it is not attributable to debt-financed property.

Income excludable from UBTI includes: (a) dividends and interest, (b) amounts received as consideration for entering into agreements to make loans, (c) qualified rents from real property, (d) qualified rents from personal property leased in connection with real property (provided that the amount of rent attributable to the personal property does not exceed 10% of the total rent received under

the lease) and (e) gains or losses from the sale, exchange or other disposition of property (except for property that is determined to be inventory or property held primarily for sale to customers in the ordinary course of the trade or business). The exclusion from UBTI for rents from real property is not applicable if (a) more than 10% of the total rents received or accrued under the lease of space in the property is attributable to personal property, (b) the determination of the amount of rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage of receipts or sales) or (c) services are rendered to the occupant primarily for its convenience or are in addition to those customarily rendered in connection with the rental of space for occupancy only.

If the Fund (or a flow-through entity in which the Fund invests) is at any time determined to be holding one or more of its assets primarily for sale to customers in the ordinary course of business ("dealer property") or if one or more of its assets constituted property of a kind which would properly be includible in inventory if on hand at the end of the year ("inventory property"), any gain or loss realized upon the sale or exchange of those assets would generally be treated as UBTI to the U.S. Tax-Exempt Limited Partners of the Fund. Moreover, the Fund may generate UBTI if it receives (directly or indirectly) business income or certain fee income that does not fall within one of the exclusions set forth above.

*Debt-Financed Property*. Notwithstanding the foregoing exclusions, UBTI generally includes income derived from property to the extent that there is "acquisition indebtedness" with respect to the property. Acquisition indebtedness is the unpaid amount of any indebtedness incurred directly or indirectly to acquire or improve the property, including (a) indebtedness incurred in acquiring or improving property, (b) indebtedness incurred before the acquisition or improvement of property if such indebtedness would not have been incurred but for the acquisition or improvement of the property and (c) indebtedness incurred after the acquisition or improvement of property if such indebtedness would not have been incurred but for such acquisition or improvement and such indebtedness was reasonably foreseeable at the time of the acquisition or improvement. During the period that acquisition indebtedness is outstanding, a pro rata share of the tax-exempt entity's income from the property will generally give rise to UBTI based on the ratio of the average outstanding principal balance of such debt to the average basis of the property during the applicable taxable year. If debt-financed property is sold or otherwise disposed of, there shall be included in computing UBTI an amount with respect to gain which is the same percentage of the total gain derived from such sale or other disposition as: (i) the highest acquisition indebtedness with respect to such property during the 12-month period preceding the date of disposition, is of (ii) the average of the adjusted basis of the property as of the first day during the taxable year that the property was held and the adjusted basis of the property as of the last day during the taxable year that the property was held.

In addition, if a U.S. Tax-Exempt Limited Partner incurs acquisition indebtedness in connection with its investment in the Fund, an investment in the Fund may give rise to UBTI.

The Fund (directly or through a flow-through entity in which the Fund invests) may incur "acquisition indebtedness" to finance its investments. In addition, the Fund may recognize other income includable as UBTI discussed above. Therefore, U.S. Tax-Exempt Limited Partners may realize UBTI as a result of their investment in the Fund.

*REIT Subsidiary*. As discussed above, the General Partner is permitted, but not required, to cause the Fund to form a REIT Subsidiary. In such case, amounts distributed by the REIT Subsidiary to the Fund generally would not constitute UBTI, assuming the shares in the REIT Subsidiary are not debt-financed. If the REIT Subsidiary is considered "pension held," however, then a portion of the dividends paid to a qualified pension trust may constitute UBTI if the pension trust owns (directly or indirectly) more than 10% of the interests in the REIT. A REIT is "pension held" if the closely held prohibition is avoided due to certain provisions relating to pension ownership, and if at least one qualified trust owns (directly or indirectly) more than 25% of the interests in the REIT, or if more than 50% of the interests in the REIT are owned (directly or indirectly) by such trusts who each own more than 10%.

**TAX-EXEMPT LIMITED PARTNERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF OWNING INTERESTS IN THE FUND.**

*Tax Information Reporting*

The Fund will furnish annually to each Limited Partner a report containing an IRS Form 1065, Schedule K-1 that indicates such Limited Partner's distributive share for such year of the Fund's taxable income or loss, and other tax items for use in the preparation of the Limited Partner's income tax return. The preparation and filing of the Limited Partner's income tax return, however, will be the responsibility of each Limited Partner and not of the Fund. Each Limited Partner will be required to treat Fund items on his, her or its tax return consistently with the treatment on the Fund's tax return. It is expected that annual tax information regarding the Investments will not be received in sufficient time to permit the Fund to incorporate such information into its annual tax information and distribute such information to Limited Partners prior to April 15 of each year. As a result, Limited Partners will likely be required to obtain extensions for filing federal, state and local income tax returns each year.

*Tax Shelter Registration*

Certain tax shelter reporting requirements apply to "reportable transactions," which include transactions having a potential for tax avoidance or evasion as determined under Treasury Regulations, including transactions specifically identified by the IRS as "listed transactions."

Although the Fund does not anticipate participating in any reportable transactions, it may directly or indirectly through an investment in a flow-through entity engage in a transaction which is a reportable transaction. If this occurs, the Fund (or anyone that is considered a "material advisor") may have to disclose the reportable transaction to the Internal Revenue Service and maintain a list of investors that participated in the reportable transaction. In addition, those Limited Partners that participated in the reportable transaction by reason of their investment in the Fund may have an obligation to disclose their participation in such a transaction by attaching a completed copy of Treasury Form 8886 to their federal income tax return and possibly filing such form with the IRS Office of Tax Shelter Analysis. Failure to properly disclose such information could result in the imposition of significant penalties. If the Fund is aware that it has engaged in a reportable transaction, the General Partner will provide notice to the investors. INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS WITH RESPECT TO THE ABOVE TAX SHELTER REPORTING REQUIREMENTS.

*Taxation of Non-U.S. Limited Partners*

The following is a discussion of selected U.S. federal income tax consequences of the ownership and disposition a Fund interest applicable to Non-U.S. Limited Partners in the Fund. The discussion is based on current law, and is for general information only. It addresses only selected, and not all, aspects of U.S. federal income taxation. A Non-U.S. Limited Partner should consult its tax adviser with respect to U.S. federal income tax consequences of a sale of its interests in the Fund.

As stated above, because the Fund will be classified as a partnership for U.S. federal income tax purposes, each of the Non-U.S. Limited Partner will be treated as though they directly earned their share of the income earned by the Fund.

*Taxation of ECI.* The U.S. federal income tax treatment of Non-U.S. Limited Partners of the Fund depends upon the activities of the Fund. If the Fund (directly or through a flow-through entity in which the Fund invests) is engaged in a U.S. trade or business, the Fund would be required to withhold and pay over to the U.S. tax authorities a percentage equal to the highest applicable U.S. tax rate of each Non-U.S. Limited Partner's share of the Fund's effectively connected income ("ECI"), and each Non-U.S. Limited Partner would be required to file U.S. tax returns and pay U.S. tax on its share of the Fund's ECI. In such a case, all or a portion of the gain on the disposition by a Non-U.S. Limited Partner of its Fund interest may be taxed as ECI to the extent such gain is attributable to assets of the Fund that generate ECI. In

addition, a Non-U.S. Limited Partner that is a non-U.S. corporation may also be subject to an additional branch profits tax of 30% on its share of the Fund's effectively connected earnings and profits, adjusted as provided by law (subject to possible reduction by an applicable tax treaty).

If the Fund (directly or through a flow-through entity in which the Fund invests) was regarded as engaged in a U.S. trade or business, Non-U.S. Limited Partners would be viewed as being engaged in a trade or business in the United States and as maintaining an office or other fixed place of business in the United States. Certain other income of a Non-U.S. Limited Partner that is unrelated to the Fund could thus be treated as ECI as a result of such Non-U.S. Limited Partner's investment in the Fund. Non-U.S. Limited Partners may in certain circumstances be deemed to have established a taxable presence or to be engaged in a trade or business in the states and localities in which the Fund's activities are conducted, thus becoming subject to tax return filing and tax payment obligations in such jurisdictions.

The amount of ECI that will be realized by Non-U.S. Limited Partners will depend on the nature of the Fund's operation and investments. ECI earned by the Fund is subject to withholding under Code Section 1446. Any amounts properly withheld under Code Section 1446 generally can be applied as a credit against the U.S. federal income tax liability of a Non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment. Under Code Section 1446, the Fund is required to make periodic installment payments to the IRS of withholding tax based on the amount of its Non-U.S. Limited Partners' allocable share of ECI. The applicable rate for calculating such withholding tax is the highest corporate or individual rate, whichever is applicable. A Non-U.S. Limited Partner will be required to file U.S. federal income tax returns with respect to its ECI, even if the Fund withholds taxes under Section 1446. In addition to filing an annual income tax return, Non-U.S. Limited Partners may be required to comply with certain reporting requirements under applicable Regulations.

Based on the contemplated investment activities described herein, it is likely that the Fund (or a flow-through entity in which the Fund invests) will be considered to be engaged in a "U.S. trade or business" for these purposes or to have received ECI from such a trade or business. **Prospective Non-U.S. Limited Partners should consult their tax advisors.**

*Taxation of Non-ECI*. If the Fund earns (directly or through a flow-through entity in which the Fund invests) certain types of periodic income from U.S. sources that is not ECI (such as dividends or interest to the extent such income is not ECI), each Non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income. This 30% tax is sometimes reduced or eliminated by income tax treaty, or, in the case of interest, under the portfolio interest exception, provided that proper certification is supplied when necessary and other requirements are met. This tax is collected through withholding by the Fund. With respect to income of the Fund that is not ECI, Non-U.S. Limited Partners who are not themselves engaged in a U.S. trade or business will not be subject to any U.S. tax with respect to gains from the sale of portfolio securities held for investment (except, as noted below, in cases where FIRPTA applies and subject to FATCA). However, a Non-U.S. Limited Partner who is an individual present in the United States for 183 or more days in the taxable year of the sale would be taxed by the United States on any such gain if either (a) such individual's tax home for U.S. federal income tax purposes is in the United States, or (b) the gain is attributable to an office or other fixed place of business maintained in the United States by such individual.

*FIRPTA*. The Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA"), imposes a tax on gain realized on disposition by a non-U.S. person of a USRPI by treating such gain as ECI, generally giving rise to the tax consequences described above. A USRPI held by a partnership is deemed to be owned proportionately by its partners. A partnership interest in certain circumstances can itself be deemed a USRPI for purposes of computing the withholding of proceeds from a sale of such interest. Subject to certain exceptions, if the Fund (or a flow-through entity in which the Fund invests) disposes of a USRPI, the Fund will be required to treat the gain recognized as ECI and withhold under Section 1446 (discussed above) with respect to Non-U.S. Limited Partners. Where a Non-U.S. Limited Partner's interest in the Fund itself is deemed to be a USRPI, and the Non-U.S. Limited Partner disposes of such interest, by sale or otherwise, the transferee of such interest would be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition. Any amounts so withheld

can be applied as a credit against the U.S. federal income tax liability of the Non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment. Non-U.S. Limited Partners may be required to comply with certain reporting requirements to the extent provided in Treasury regulations.

*Other Considerations*. Non-U.S. Limited Partners may also be required to file returns with and pay taxes to state or local taxing jurisdictions in the United States in connection with the holding or disposition of interest in the Fund. Each Non-U.S. Limited Partner is advised to consult its tax advisor regarding the tax effects of an investment in the Fund, including information return and reporting requirements, the possible applicability of tax treaties, potential tax liability that may be imposed by the country or other jurisdiction of which such investor is a citizen or in which such person resides or is otherwise located, and other U.S. and non-U.S. tax matters.

*FATCA*

In addition to the rules described above regarding the potential imposition of U.S. withholding taxes on payments to Non-U.S. Limited Partners, U.S. withholding taxes could also be imposed under Section 1471 through Section 1474 of the Code (referred to as "FATCA").

Under FATCA, a withholding tax of 30% applies to "withholdable payments" made to a "foreign financial institution" (an "FFI") unless the FFI enters into an agreement with the IRS (an "FFI Agreement"), complies with an applicable intergovernmental agreement, or an exception applies. Under an FFI agreement, a foreign financial institution is generally required, among other things, to gather information regarding its U.S. account holders, report information regarding such holders to the IRS, and withhold a 30% tax from certain payments to "recalcitrant" account holders or to FFIs that have not entered into an FFI Agreement with the IRS and are not otherwise exempt.

The term "withholdable payment" generally includes any payment (or allocation from a partnership, if no corresponding payment is made) of (i) U.S. source interest, dividends, royalties, and other fixed or determinable annual or periodical gains, profits, and income (FDAP income), and (ii) the gross proceeds from the disposition of stock, debt, or other property that can produce U.S.-source dividends or interest.

A FFI generally means any non-U.S. entity that (a) accepts deposits in the ordinary course of a banking or similar business, (b) holds financial assets for the benefit of one or more persons as a substantial portion of its business, or (c) is an investment entity, which includes an entity engaged primarily in the business of investing or trading in securities or partnership interests, or an entity that functions or holds itself out as a collective investment vehicle, a private equity fund, a hedge fund, a venture capital fund, a leveraged buyout fund, or a similar entity. The 30% withholding tax also generally applies to withholdable payments to a non-U.S. entity that is not an FFI, unless the entity provides certification as to the substantial U.S. owners of the entity.

FATCA withholding began on July 1, 2014 with respect to FDAP income (described above), and will begin on January 1, 2017 (for payments of gross proceeds described above). As a result, and subject to the foregoing effective dates, the Fund generally will be required to withhold 30% of withholdable payments received by the Fund that are distributable to an investor that is an FFI or other non-U.S. entity unless such investor complies with the applicable requirements under FATCA, an applicable IGA, or an exception applies.

Whether a non-U.S. entity is an FFI, and the requirements and conditions imposed on an entity that is an FFI under FATCA, may depend on or be modified by an IGA between the United States and the home country of such non-U.S. entity. Prospective investors should consult their tax advisors.

*Possible Legislative or Other Actions Affecting Tax Consequences*

Prospective Limited Partners should recognize that the present U.S. federal income tax treatment of an investment in the Fund may be modified by legislative, judicial or administrative action at any time

and that any such action may affect investments and commitments previously made. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the Service and the Treasury, resulting in revisions of regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations of these laws could adversely affect the tax consequences of an investment in the Fund.

## *State and Local Tax Consequences*

Prospective investors should consider the state and local tax consequences of an investment in the Fund. The Fund and/or the Limited Partners (including U.S. Tax-Exempt Limited Partners) may be subject to state and local taxes or filing requirements (including, potentially, withholding and estimated tax payment obligations) in various jurisdictions, including not only the states in which they are deemed to reside, but also the states in which the Fund may be deemed to be doing business. Such taxes may include (but are not limited to) real property and income taxes. Any tax paid to a particular state or local jurisdiction by the Fund on behalf of a Limited Partner as a result of a state or local withholding or estimated tax payment obligation will be treated as a distribution to such Limited Partner from the Fund.

## *Investment Company and Investment Advisers Regulation*

The Fund does not intend to register as an investment company under the U.S. Investment Company Act of 1940, as amended, and the General Partner does not intend to register as an investment adviser under the Advisers Act, unless it is required to do so. The General Partner is currently an exempt reporting adviser with the SEC. The General Partner's Form ADV is available at www.adviserinfo.sec.gov.

## *Private Placement Status*

The limited partner interests described herein are not registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or U.S. state securities laws and are being offered and sold in reliance upon the exemptions for transactions not involving a public offering. As a purchaser of limited partner interests in a private placement not registered under the Securities Act, each investor will be required to make certain representations to the Fund, including that it is acquiring such interests for investment, and not with a view to resale or distribution, and that it is an accredited investor, as defined in Regulation D under the Securities Act. Further, each investor must be prepared to bear the economic risk of the investment for an indefinite period, since these interests cannot be sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available. It is extremely unlikely that the limited partner interests will ever be registered under the Securities Act or any state securities act.

During the course of the offering and before sale, each prospective investor of limited partner interests and its investor representatives, if any, are invited to ask questions of the General Partner concerning the terms and conditions of the offering and to obtain any additional information necessary to verify the accuracy of the information furnished in this Memorandum, to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense. See "Additional Information."

## *Restrictions on Transfer*

Generally, limited partner interests will not be assignable or transferable without the prior written consent of the General Partner. One of the requisites to such consent may be an opinion of the Fund's counsel that such a transfer would not subject the Fund or the General Partner to any regulatory or tax requirements or result in the violation of any applicable law or governmental regulation, the cost of which the transferor and transferee may be required to bear.

## V. *Additional Information*

Before the consummation of the offering, the Fund or the General Partner will provide to each prospective investor and such investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this offering and to obtain any additional information that the Fund or General Partner may possess or can obtain without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished in this Memorandum. No person other than the Fund and the General Partner has been authorized to give information or to make any representations concerning the Fund or this offering outside of this Memorandum, and if given or made, such other information or representations must not be relied upon as having been authorized by the Fund.

This Memorandum is intended to present a general outline of the policies and structure of the Fund and the General Partner. Each prospective Limited Partner should thoroughly review the Partnership Agreement, which specifies the rights and obligations of the Partners, and the subscription agreement, which contains various representations each prospective investor must make, and details certain conditions to a prospective investor's participation in the offering. The Summary of Principal Terms of certain provisions of the Partnership Agreement contained herein is necessarily incomplete and is qualified in its entirety by reference to the Partnership Agreement. Copies of the Partnership Agreement and the subscription agreement are attached hereto as Appendix A and Appendix B, respectively, and copies also are available upon request to the General Partner.