# EXHIBIT 166-1

SEC v Criterion
EXHIBIT
166
J. Jarcho 11.9.2021

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Securities & Exchange Commission,<br><br>Plaintiff,<br><br>vs.<br><br>Criterion Wealth Management Insurance Services, Inc., Robert A. Gravette, and Mark A. MacArthur,<br><br>Defendants. | ) | Case No. 20 CV 01402 |

**REPORT OF JANE JARCHO, EXPERT WITNESS, ON BEHALF OF CRITERION WEALTH MANAGEMENT INSURANCE SERVICES, INC., ROBERT A. GRAVETTE, AND MARK A. MACARTHUR**

1. I have been retained as an expert witness, on behalf of defendants Criterion Wealth Management Insurance Services, Inc. (Criterion), Robert A. Gravette (Gravette), and Mark A. MacArthur (MacArthur) (collectively Defendants) to provide expert testimony in this matter.

2. I have been asked to provide my opinion on: (1) whether the individual Defendants acted in the capacity of an investment adviser representative or in the capacity of a registered representative of a broker-dealer in the sale of private placement investments to Criterion clients; and (2) assuming the individual Defendants acted in the capacity of an investment adviser representative, whether Defendants breached their fiduciary duty by failing to disclose conflicts of interests relating to compensation in the sale of the private placement investments to Criterion clients.

3. I have reviewed various pleadings in this matter and documents related to the Defendants' disclosure of compensation they received in the sale of the private placement

investments to Criterion clients, including, but not limited to, Criterion's Forms ADV, investment advisory agreements, private placement memoranda, TD Ameritrade brokerage account statements, client fee statements, private placement selling agreements and testimony transcripts.

**I. Qualifications and Experience**

4. I am currently self-employed and engage in consulting services for regulatory and compliance issues relating to the federal securities laws and expert witness services related to the same. My regular and customary fee for expert services is $900 per hour, which I am charging in this case.

5. From April 1990 through August 2018, I was employed by the Securities and Exchange Commission (SEC). I was in the Division of Enforcement for eighteen years in several positions including Senior Trial Counsel and Assistant Regional Director. In those positions, I investigated, supervised, and/or prosecuted actual or potential violations of the federal securities laws, including numerous cases involving alleged violations by investment advisers (including private equity and hedge fund advisers), investment companies, broker-dealers, issuers, and related persons.

6. Beginning in April 2008, I became a Senior Officer in the SEC's Office of Compliance Inspections and Examinations (OCIE). For five years, I was the Senior Officer with supervisory responsibilities over the Chicago Regional Office's investment adviser and investment company (IA/IC) program. In that role, I supervised more than 750 examinations of IAs and ICs. In March 2013, I was promoted to the position of National Associate with responsibilities over the IA/IC examination program for the entire country. In this position, I supervised approximately 10,000 examinations of IAs and ICs.

7. From February 2016 to August 2019, in addition to my position as National Associate of the IA/IC examination program, I also was the Deputy Director of OCIE, with responsibilities for examination programs of broker-dealers, clearing agencies, transfer agents, national securities exchanges, self-regulatory agencies and municipal advisers. My *curriculum vitae* with additional detail on my duties and responsibilities at the SEC is attached as Exhibit A.

8. While at the Commission, I spoke regularly at industry events and also represented the SEC at international conferences in Hong Kong, Istanbul, London, Malaysia, Saudi Arabia and Swaziland.

9. Since leaving the SEC, I have been retained as an expert in several matters. I have testified in two arbitrations and been deposed in two matters. These matters are identified in Exhibit B.

10. Additionally, I continue to speak at industry conferences, and have authored articles on SEC examination priorities and trends. These articles are identified in Exhibit C.

**II. Summary of Opinions**

11. As described in more detail below, this litigation involves the sale of units in four private placement investments – Pacific West Home Mortgage II, LLC (Pacific West Fund II), Southland Home Mortgage II, LLC (Southland Fund II), T2 Asset Opportunity Fund IV, LP (Asset Opportunity Fund IV), and T2 Strategic Real Estate Income Fund, LLC (SREI Fund) – and the capacity in which the individual Defendants acted at the time of the sale of such units. In my opinion, the sales of the private placement units were conducted through Ausdal Financial Partners, Inc. (Ausdal), the broker dealer, not Criterion. As such, Gravette and MacArthur acted in their capacity as registered representatives of Ausdal. The private placement memoranda and Criterion's Forms ADV disclosed that private securities would be sold through Ausdal. The

SEC's Complaint admits numerous indicia that the sale was through Ausdal, including that Criterion clients opened brokerage accounts at Ausdal to participate in private securities transactions and the commissions for the sale of the private placement units were paid to Ausdal. In my opinion, the SEC has contorted straightforward facts to allege that Ausdal was a passthrough to hide that Criterion was actually the entity retained by the private placement fund managers to sell the investments. This interpretation ignores that dual-registration as both a broker-dealer (or registered representative of a broker-dealer) and as an investment adviser (or investment adviser representative) is both common and permissible in the financial services industry and that in this instance the services that would be provided by Ausdal and Criterion were fully disclosed. In my opinion, the facts are clear that Defendants did not try to hide the capacity in which the individual Defendants were acting in the sale of the units, but rather, the individual Defendants acted as disclosed to clients and sold the private placement investments in their capacity as representatives of a broker-dealer. At the time of the sale of the private placement units, the individual Defendants were acting in the capacity as registered representatives of a broker dealer, not as investment adviser representatives, and thus Defendants could not have violated the Investment Advisers Act provisions cited in the claims for relief in the SEC's Complaint.

12. Although I believe the individual Defendants acted in their capacity as registered representatives of a broker-dealer, if the Court determines they acted in their capacity as investment adviser representatives, in my opinion Defendants satisfied their fiduciary duty as all compensation they received was disclosed and they did not sell investors a disadvantaged share class or feeder fund as the SEC alleges. The documents in this case make clear that the commissions related to the sale of the investments were fully disclosed. The private placement

memoranda reflect the actual commissions received and Criterion's Forms ADV disclosed that its investment adviser representatives could receive such commissions when acting in their capacity as registered representatives of Ausdal. The Commission's share class and feeder fund argument with respect to two of the private placements is equally unsupportable. The SEC characterizes the share class and feeder fund sold to Criterion clients as paying lower returns in order to compensate Gravette and MacArthur. However, the SEC has offered no evidence that investors in the other share class or feeder fund paid lower fees or made higher returns than Criterion's clients. The SEC has also not considered that many of those investors likely paid advisory fees to other investment advisers and the impact such fees had on returns. In fact, because one of the funds - Asset Opportunity Fund IV - never met its hurdle rate of return, Defendants received no commissions on the sale of the investment and non-Criterion investors who invested through other investment advisers likely received a lower return. These facts illustrate that the SEC's allegations are unsupported and do not support its breach of fiduciary duty claim. For these reasons, if the individual Defendants are found to have acted in the capacity as investment adviser representatives, in my opinion, Defendants satisfied their fiduciary duty.

## III. Relevant Facts

13. At all relevant times, Criterion was an investment adviser registered with the SEC. Criterion withdrew its registration with the SEC on or about September 26, 2018.

14. At all relevant times, Gravette was a 50% owner and president of Criterion.

15. MacArthur was a 50% owner through on or about July 1, 2016, and an independent contractor of Criterion for approximately one year after.

16. At all relevant times, Ausdal, located in Davenport, Iowa, was a registered broker-dealer. Gravette and MacArthur were registered representatives of Ausdal. Neither Gravette nor MacArthur at any time was an owner or held any executive positions with Ausdal. Ausdal acted as the selling agent for the four private placement offerings at issue in this matter.[1]

17. At all relevant times, Defendants opened brokerage accounts for their clients at Ausdal to execute private placement unit purchases.

18. All compensation Defendants and Ausdal received for the sale and monitoring of private placement units was disclosed to clients in several places including, but not limited to, investment advisory agreements, fee billing statements, and private placement memoranda.

19. Defendants disclosed their relationship with Ausdal in numerous documents including Forms ADV. For example, Criterion's 2014, 2015 and 2016 Forms ADV contained the following disclosure:

> When appropriate and suitable, our adviser representatives **may recommend certain Alternative Asset investments (i.e. private securities) to CWM client in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as a registered representative of Ausdal Financial Partners, Inc.** Clients are under no obligation to purchase such securities. This creates a conflict of interest between CWM and its clients. [emphasis added]
>
> …
>
> **Commission Compensation**
>
> As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity(ies),

---

[1] Private Placements offer securities that do not follow the public registration requirements of the Securities Act of 1933 and SEC rules. They are described to potential investors through offering documents, rather than a prospectus, and usually have no public advertising. Investors in private placements sign subscription agreements and usually must qualify as accredited investors. A registered broker-dealer may act as a placement agent to sell the investment on behalf of the issuer or the issuer can offer the investment directly to investors.

> these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation …. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals.
>
> …
>
> **Item 10 Other Financial Industry Activities and Affiliations**
>
> *BROKER DEALER REGISTRATIONS*
>
> Associated persons of CWM are registered securities representatives and investment adviser representatives of Ausdal Financial Partners, Inc. a registered broker dealer, member of the [FINRA] and a registered investment adviser. In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal Financial Partners, Inc. Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients.

20. Client investment advisory agreements also were clear that a Criterion investment advisor representative may be compensated in their capacity as a broker-dealer registered representative. In discussing the Alternative Investment Consulting Fee (AIF), which was different than a previously disclosed Investment Management Fee, the agreement stated:

> "In the event CWM is compensated directly by the fund manager or broker dealer per SEC regulation D requirements, this asset is not subject to the investment management fee. Only the alternative fee will apply."

The investment advisory agreement also disclosed that the AIF was for services including

> "research and due diligence, on-site travel and follow-up, ongoing monitoring, opportunity identification, tax coordination, and report integration."

The AIF ranged from 0.25-0.50% annually in contrast to the more expensive Investment Management Fee which for most clients ranged from 1.0-1.5% annually.

21. The SEC's allegations against Defendants focus on four private placement investments. Two of the investments, Pacific West Fund II and Southland Fund II, are managed by Bird Rock Management LLC (Bird Rock). The other two investments, Asset Opportunity

Fund IV and SREI Fund, are managed by companies associated with T2 Realty Capital Management, LLC (T2).

22. All clients were provided private placement memoranda (PPMs) for the investments they made. These PPMs were very clear that the investments were being purchased for clients through Ausdal, the broker dealer, and not Criterion, the investment adviser. The PPMs also accurately disclosed any compensation Ausdal would receive from the sale of the units. The PPMs stated as follows:

> <u>T2 Asset Opportunity Fund IV (February 2015 PPM):</u>
>
> **The Fund has engaged Ausdal**, and may in the future engage other selling agents, to offer and sell interests in the Fund. Such selling agents may be paid a sales commission: (i) by the Fund; (ii) out of the General Partner's Management Fee; (iii) out of the General Partner's carried interest; and/or an assets based "distribution fee" charged to the Partners introduced by such selling agents. Accordingly, depending on the type of sales commissions paid, such commission may increase the aggregate expenses of any person investing in the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund. [emphasis added]
>
> …
>
> Half of the General Partner's carried interest received under the provisions (b) and (c) above will be paid to Ausdal Financial Partners, Inc., a placement agent retained by the Fund ("Ausdal"), pursuant to a placement agreement entered into by and among the Fund, the General Partner and Ausdal. [Subsections (b) and (c) accurately described the General Partner's carried interest distributions.]
>
> <u>T2 Strategic Real Estate Income Fund (April 2014 PPM):</u>
>
> **The Fund may engage selling agents to offer and sell the Units**. Such selling agents may be paid a sales commission out of the Manager's Management Fee or Performance Allocation or an assets-based "distribution fee" charged to the Members introduced by such selling agents, in addition to a portion of the Management Fee and/or Performance Allocation. Accordingly, depending on the type of sales commission paid, such commission may increase the aggregate expenses of any person investing in the Units of the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund. [emphasis added]

…

The Management Fee for Class C Units shall equal 1.25% per annum of the NAV per unit.

…

The Performance Allocation is "equal to 40% of the amount of net new profits of the limited partner interests in the Master Fund attributable to such Class C Unit subject to …a non-cumulative "hurdle amount"…at a rate of 6% … and … a catch-up…"

Pacific West Home Mortgage II and Southland Home Mortgage II

The Units are being offered and sold by the Manager. **The Company has also engaged Ausdal Financial Partners, a broker-dealer regulated by the Financial Industry Regulatory Authority, to offer and sell Units** on a "best efforts" basis. Ausdal Financial Partners will receive commissions of 2% annually on the purchase price of the Units sold by Ausdal Financial Partners, paid on a quarterly basis. Any commissions will be paid by the Manager and not from the proceeds of this Offering. [emphasis added]

The Units being sold in the Offering are being sold directly by the Company's Manager and its managers, directors and executive officers, none of whom will receive any commissions or other renumeration for such sales. **We have also engaged Ausdal Financial Partners to assist in selling Units,** but there is no firm commitment by Ausdal Financial Partners or any other firm to buy, sell or place any of the Units. [emphasis added]

The Manager will receive an annual fee of 2% of the amount invested in the Company, but only after the Members have received their 8% Preferred Return, and subject to waiver by the Manager. (Pacific West Fund II)

The distributions and allocations to the Manager described above are subordinated to the Members receiving an 8% cumulative but not compounded return on their Net Capital Contributions. (Southland Fund II)

## IV. Analysis

### A. The Private Placements were Sold to Clients through Ausdal, the Broker Dealer, not Defendant Criterion, the Investment Adviser

23. In my opinion, Gravette and MacArthur sold the private placement investments to Criterion clients in their capacity as registered representatives of Ausdal, a broker-dealer, not as

investment adviser representatives of Criterion. This "capacity" issue is essential to determining the disclosure obligations Defendants had to clients. Courts and the SEC have recognized that unlike investment advisers which are subject to a fiduciary standard, broker-dealers, at the time of the conduct relevant in this matter,[2] were subject to a less stringent "suitability" standard. The suitability standard requires broker-dealers to provide suitable investments to and deal fairly with clients but does not impose a fiduciary duty on broker-dealers. See FINRA Rule 2111. The Complaint does not allege that Defendants have violated the less stringent suitability standard.

24. It is both common and permissible for an individual to be "dually registered," that is associated with both a broker-dealer and investment adviser. As the SEC noted in *Reg BI*, "determining the capacity in which a dual-registrant is making a recommendation is a facts and circumstances test, with no one factor being determinative, but the Commission considers, among other factors, the type of account, how the account is described, the type of compensation and the extent to which the dual-registrant made clear to the customer or client the capacity in which it was acting." *Reg BI* at 127.

25. As stated above, facts and circumstances determine whether a dually registered person is acting in their capacity as an investment adviser representative or registered representative of a broker-dealer. In my opinion, the facts and circumstances related to the sale of the private placement investments by the Defendants clearly establish that they were acting in their capacity as a registered representative of Ausdal, the broker-dealer.

26. In my opinion, the single most significant factor in this analysis is that clients were told that the private placements were being sold by Ausdal or an unnamed broker-dealer.

---

[2] On June 5, 2019, the SEC issued *Regulation Best Interest: The Broker-Dealer Standard of Conduct* which heightened the standard of conduct owed to clients, although it did not raise it to the fiduciary standard. Regulation Best Interest (Reg BI) was not effective at the time of the conduct alleged in the Complaint. See *Reg BI* at: https://www.sec.gov/rules/final/2019/34-86031.pdf.

As shown in paragraph 22 of this Report, the private placement memoranda for the Pacific West II, Southland II and Asset Opportunity IV Funds fully disclosed that the investment was being sold through Ausdal. The SREI Fund PPM stated that the units may be sold through a selling agent, which is typically a broker-dealer. These disclosures on their own are sufficient to establish that the Defendants acted in their capacity as a representative of Ausdal and not Criterion. As the SEC made clear in *Reg BI*, providing clients with information "can be satisfied to varying degrees with existing documents provided to retail customers, such as account opening documents, with a standalone document, or by some combination." *Reg BI* at 125.

27. As the Forms ADV excerpt in paragraph 19 of this Report shows, Criterion's Form ADVs also made it clear that investments in private securities such as private placements would be offered through Ausdal. They stated: "When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to [Criterion] client in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc." This disclosure also made it clear to clients that alternative asset investments such as the funds would be sold through Ausdal, not Criterion.

28. Similarly, the fact that Ausdal, Gravette and MacArthur's compensation was a commission and not based on assets under management is another hallmark of acting as a broker-dear, not investment adviser. This fact was also disclosed in the PPMs (<u>see</u> paragraph 22 above).

29. The SEC's Complaint itself indicates Ausdal sold the private placement investments, not Criterion. For example, paragraph 67 admits that the compensation was paid to Ausdal: "Fund Manager B [Bird Rock] paid these referral fees to Broker-Dealer [Ausdal]."

Similarly, paragraphs 47 and 60 acknowledge that Fund Manager A [T2] negotiated the compensation agreements with Ausdal, not Criterion. The SEC tries to characterize Ausdal's participation as a mere pass through for Criterion. However, in my opinion, this twists facts to fit a legal theory and ignores the plain reading and actions of the participants. The more straightforward reading of the arrangements is that the Fund Managers engaged Ausdal, not Criterion, to sell units of the Funds and that Gravette and MacArthur sold the units in their capacity as registered representatives of Ausdal, the broker-dealer.

30. Finally, the SEC's Complaint also admits that the private placement investments were initially held in a brokerage account at Ausdal (paragraphs 30 and 65) a factor the SEC listed to consider in determining the capacity in which a dually registered individual acted on behalf of the client.[3]

31. Based on the above, and other information I have reviewed, in my opinion it is clear that Defendants acted in their capacity as registered representatives of a broker dealer not an investment adviser and therefore could not have violated the Investment Advisers Act provisions cited in the claims for relief in the SEC's complaint.

### B. If the Court Determines the Private Placement Investments Were Sold by Defendants in Their Capacity as an Investment Adviser, Defendants Satisfied their Fiduciary Duty in Disclosing the Compensation to Clients

32. Although in my opinion there is no basis to conclude that Defendants were acting in the capacity of an investment adviser, if the Court decides that Defendants were in fact acting in such capacity, I believe that Defendants satisfied their fiduciary duty to clients.

---

[3] The fact that the private placement units were reflected on TD Ameritrade brokerage account statements, which also reflected assets for which Criterion was the investment adviser, is not evidence that the units were sold by Defendants in their capacity as a broker-dealer. This was done so that the investments could be monitored by Criterion, as disclosed in the advisory agreements, and to provide Criterion clients with a consolidated statement of their holdings.

33. The SEC's theory of liability appears to rest on two assertions. First, for the investments offered by T2, namely, the Asset Opportunity IV and SREI Funds, that Defendants received a "special" or enhanced compensation to the detriment of their clients' returns. In particular, the SEC alleges that T2 created a share class or separate feeder fund in which their clients received lower returns in exchange for receiving non-advisory compensation (hereinafter referred to as "share class theory") (Complaint, paragraphs 32 and 33). For investments offered by Bird Rock, the SEC alleged that Defendants received a "special" 2% annual trailing fee compensation from Bird Rock for the sale of the investment (Complaint paragraphs 64 and 66).

34. This claim, however, is inaccurate for several reasons. First, at the time all four funds were created, it was not known whether Defendants would in fact be compensated since their compensation depended on the investments obtaining a certain rate of return before they were compensated (hurdle amount). At the time of the sale of the units, it was impossible to know whether the hurdle amount would be achieved and in fact for the Asset Opportunity Fund IV it was not and Defendants did not receive any compensation from T2 related to that fund. Contrary to the nefarious intentions the SEC attributes to the Defendants for this compensation arrangement, Defendants believed that this aligned their interests with their clients. If the investment met expectations, they would be compensated; if it did not, they would not be compensated. Moreover, the SEC's compensation analysis ignores the fact that if the units had been sold in the capacity as an investment adviser, Criterion clients would have been charged an investment management fee which would have reduced their returns. Finally, in my experience it is likely that non-Criterion clients who purchased units of the four Funds from other investment advisers paid asset-based management fees to the adviser. Without knowing the amount of the

fee, it is impossible for the SEC to know whether non-Criterion clients had better or worse returns than Criterion clients.

35. Second, the SEC's "share class theory" is inapplicable to this situation. The SEC has brought numerous actions based on the theory that investment advisers failed to adequately disclose conflicts of interest related to the sale of high-cost mutual fund share classes when a lower-cost share class was available. (See Press Release on Share Class Initiative at https://www.sec.gov/news/press-release/2019-28). This theory, however, has never been applied to private funds because it is inapplicable. As the PPMs made clear, the units could be purchased through Ausdal or directly from T2. The SEC has never taken the position that a financial professional, whether investment adviser or broker-dealer, must consider lower-cost share classes offered directly from a fund manager. For example, many mutual funds can be purchased directly from a fund manager and the share class offered by such direct purchases often have lower costs than any share class purchased through a financial professional. As shown by the Share Class Initiative, the SEC did not require the investment adviser to disclose to clients they could purchase a lower-cost share class directly from the fund manager. Rather, investment advisers were only required to offer the lowest cost share class available to them to execute for their clients; they do not have to direct clients to purchase shares through the fund manager if they cost less. For the Asset Opportunity IV and SREI Funds, the only share class available not offered directly though T2 was the share class offered through the placement agent, Ausdal. For this reason, Defendants were not required to disclose that a less expensive share class was available if purchased directly through T2.

36. The second assertion upon which the SEC's theory of liability rests is that the compensation received by Defendants was not adequately disclosed. I disagree with this assertion and in my opinion the compensation received by Defendants was fully disclosed.

37. As with broker-dealers, adequate disclosure of conflicts of interest by an investment adviser is not required to be made in a specific document. As the SEC stated in *Commission Interpretation Regarding Standards of Conduct for Investment Advisers*,[4] disclosure of conflicts can be made "through a combination of Form ADV and other disclosure" (at footnote 68). Through a series of documents, Defendants' clients received full disclosure regarding their compensation and the possible conflict of interest associated with such compensation.

38. As the documents show, the compensation that the Defendants received was disclosed. The PPMs accurately disclosed the compensation Ausdal received and Criterion's advisory agreements accurately disclosed the advisory fees it received. In my experience, the facts in this case are unlike other SEC cases based on "undisclosed fees" in which clients do not receive any documents disclosing the alleged undisclosed fee. In order to fit the facts in this case to its undisclosed compensation theory, the SEC contorts the facts to allege that Ausdal was a pass through for Criterion. For many reasons this makes no sense. First, the fact that Defendants were dually registered was not hidden. The Forms ADV were clear that individuals associated with Criterion were also associated with Ausdal and might execute private investment transactions for Criterion clients in their Ausdal capacity. Second, Criterion's Forms ADV were clear that alternative investments such as the private placements would be offered through Ausdal in the capacity of a broker-dealer (See Forms ADV, Item 5) and that the receipt of such

[4] The *Commission Interpretation Regarding Standards of Conduct for Investment Advisers*, issued on June 5, 2019, can be found here: https://www.sec.gov/rules/interp/2019/ia-5248.pdf .

compensation created a conflict of interest (See Forms ADV, Items 5 and 10). Third, the selling agreements between T2 and Bird Rock are with Ausdal and an officer of Ausdal, not Gravette or MacArthur. Finally, the advisory agreements were clear that if Defendants acted in their capacity as a broker-dealer, an investment management fee typically between 1.0-1.5% of assets under management would not be charged. Rather, Criterion, the adviser, would receive an Alternative Investment Consulting Fee for monitoring the investment which typically ranged from 0.25-0.50%. The AIF was appropriate as, unlike investment advisers, broker-dealers have no duty to monitor customers' accounts. (See *Reg BI* at page 60). Thus, Criterion received a fully disclosed reduced fee for the activities it undertook to monitor the private placements in its capacity as an adviser. It did not charge or receive the higher investment management fee. Given the clear disclosure of all fees received by Ausdal and Criterion, the SEC's theory hangs on a badly shredded thread that asks the Court to ignore the plain reading of all the documents and perfectly permissible conduct under the securities laws and replace that reading with a contorted interpretation that conduct undertaken as a broker-dealer was actually conduct undertaken by the adviser. In my opinion, this SEC's reading should be rejected as it is unsupported by the facts.

## V. Conclusion

As discussed in detail above, in my opinion, the SEC has misread the facts in this case, choosing to ignore the interpretation that is most straight forward and most supported by the documents. It is clear that Defendants acted in their capacity as a broker-dealer, or representative of such, when they sold the private placement investments to clients. In the broker-dealer capacity, they could not have violated the Investment Advisers Act provisions cited in the claims for relief in the SEC's complaint. Moreover, if the Court determines Defendants were acting in their capacity as investment advisers, or representatives of such, in my opinion, they satisfied

their fiduciary duty to clients. Again, it is clear that the documents received by clients, including the Forms ADV, advisory agreements, fee billing statements and PPMs, disclosed the compensation Defendants would receive. Further, the share class theory advanced by the SEC is disproved by the facts. Defendants received less compensation, not more, from sales of the Asset Opportunity Fund IV as the hurdle rate was not reached. Further, the SEC has not proved that Defendants' clients were disadvantaged as they have provided no evidence regarding fees paid to other investment advisers for sales of other share class or feeder funds. It is entirely possible that when advisory fees are added into the equation, clients of other advisers had lesser returns and paid more in fees than Defendants' clients. Without such evidence, the SEC cannot prove an essential aspect of its allegations (although for the reasons stated above, even with this proof, I believe the Defendants satisfied their fiduciary duty). Thus, in my opinion, Defendants did not violate the provisions of the securities laws alleged in the SEC Complaint.

Respectfully submitted,

Jane Jarcho

Date: September 14, 2021

# EXHIBIT A

**JANE E. JARCHO**
jjarcho@promontory.com
**773.290.0158**

**Jane Jarcho Consulting and Expert Witness Services.** **December 2018 to present**

- **Consultant, Promontory Financial Group** – regulatory compliance and consulting to financial service companies including investment advisers, investment companies, private funds and broker-dealers.
- **Expert Witness Services** – area of expertise, federal securities laws, with focus on investment advisers, investment companies, and private funds.

**U.S. Securities & Exchange Commission**

**Office of Compliance Inspections & Examinations (OCIE)**

**Deputy Director** **February 2016 to August 2018**

**Primary duties include:**

- With Director, responsible for management of over 1000 attorneys, accountants and examiners conducting examinations and inspections of Investment Advisers, Investment Companies, Broker-Dealers, Clearing Agencies, Transfer Agents, National Securities Exchanges, Self Regulatory Agencies and Municipal Advisers.
- Oversight responsibility for over 2800 examinations and inspections in 2017.
- Member of team drafting Cyber Incident Playbook.
- Responsible for 2016 reorganization of OCIE in which approximately 100 staff were moved to IAIC program in order to increase exam coverage in this area. Duties included negotiations with the Union, preparing and presenting information to staff about the reorganization and working with HR to post jobs and effectuate transfers.
- Establishing and maintaining relationships with senior officers in other Divisions and SEC Offices.
- Participating and leading programs and meetings with other regulators. Including foreign regulators, and industry groups to discuss and communicate agency priorities.

**National Associate Investment Adviser/Investment Company Examination Program** **March 2013 to August 2018**

**Primary duties include:**

- Supervision of examinations conducted to determine whether violations of the federal securities laws, and rules thereunder, have occurred, to detect fraud, to inform policy and to monitor risk.
- Determining IAIC National Priorities.
- Supervision of Private Fund Unit since its inception in 2015.
- Determining topics for Risk Alerts and editing for publication. Risk Alerts provide information to the industry on OCIE exam initiatives and findings, most common findings and alerts on new and emerging risks.
- Responsible for enacting risk-based exams resulting in increased efficiency, including increasing IA registrant exam coverage in the last 5 year from 9% to 15% and more than doubling the number of exams completed per year.

- Led the creation and nation-wide implementation of move from paper based examination documentation system to web-based program (TRENDS). TRENDS allows for standardized workflow process that ensures proper documentation of exam activities and findings. Additionally, TRENDS allows real-time access to on-going exams and on-line access to search closed exams and facilitate review of all

exams conducted. TRENDS also facilities and simplifies the reporting of important OCIE metrics.

- Supervision of Exams of National Priorities in the following areas, among others:
  - Cybersecurity
  - ETFs and Mutual Funds
  - Money market funds
  - Share class selection exams
  - Robo advisers
  - Target date funds
  - Wrap fees
  - Supervision of IARs with disciplinary history
  - New and never-before-examined IA Registrants
  - Alternative mutual funds
  - High yield funds
  - Internet advisers
  - Proxy voting
  - Securities lending
  - 12b-1 fees
  - Multi-branch advisers
  - VIPs
  - Disclosure of cost of investing
  - Senior investors and Retirement accounts and products

**Chicago Regional Associate Director Investment Adviser/**
**Investment Company Examination Program** **April 2008 to March 2013**

**<u>Division of Enforcement (Chicago Regional Office)</u>**

| | |
|---|---|
| **Assistant Regional Director** | August 1999 to March 2008 |
| **Senior Trial Counsel** | July 1994 to July 1999 |
| **Branch Chief** | October 1992 to June 1994 |
| **Senior Attorney and Staff Attorney** | April 1990 to September 1992 |

Duties and responsibilities included supervising and conducting investigations and litigation of possible violations of the federal securities laws. These included investigations and litigation of cases involving investment advisers, investment companies, broker-dealers, financial frauds, clearing corporations, internet stock manipulations, Ponzi schemes, offering frauds and insider trading cases.

**<u>Law Firm Experience</u>**

| | |
|---|---|
| **D'Ancona & Pflaum, Chicago, Illinois** | April 1988 to March 1990 |
| **Portes, Sharp, Herbst & Kravets, Chicago Illinois** | Sept. 1986 to March 1988 |

**<u>Education</u>**

**University of Wisconsin Law School, Madison WI** J.D. 1986

Law Review, 1985-86, note and comment editor
Law Review, 1984-85, member

**Middlebury College, Middlebury VT** B.A. 1982

Political Science major and Russian minor

# EXHIBIT B

## Jane Jarcho Articles

**Hedge Fund Law Reporter,** *Division of Examinations' 2021 Exam Priorities: New and Emerging Focus Areas*, April 15, 2021, and *Perennial Focus Areas for Private Fund Managers*, April 22, 2021.

**Hedge Fund Law Reporter,** *Focus Areas for Private Fund Managers from OCIE's 2020 Exam Priorities*, February 27, 2020.

# EXHIBIT C

Jane Jarcho Expert Engagements

1. *Brian and Sharon Taylor vs. Coppell Advisory Services dba Fusion Investment Advisors*, American Arbitration Association Case No. 01-19-0001-8980, testified at hearing in September 2020.

2. *Robert Hellman vs. Matthew Carbone, et al.*, JAMS Ref. NO. 1100107113, deposed on December 15, 2020; testified at hearing on January 4, 2021.

3. *BxC General Partners, LLC vs. Axxcess Wealth Management, LLC and Michael Seid,* JAMS Arbitration No. 1240024020, deposed on January 22, 2021.