Kenneth E. Yeadon Ill. Bar No. 6273281
Email: kyeadon@hinshawlaw.com
Attorney for Defendants Criterion Wealth Management Insurance Services, Inc. and Robert Allen Gravette
Hinshaw & Culbertson LLP
151 N. Franklin Blvd., Ste. 2500
Chicago, Illinois 60606
Telephone: (312) 704-3524
Facsimile: (312) 704-3000

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

CRITERION WEALTH MANAGEMENT INSURANCE SERVICES, INC., et al.

Defendants.

**Case No. 2:20-cv-01402-SPG-JEM**

**DECLARATION OF ROBERT A. GRAVETTE**

Ctrm: 5C
Judge: Hon. Sherilyn Peace Garnett

Pre-Trial Conf. Date: 4/26/2023
Trial Date: 5/16/2023

I, Robert A. Gravette, declare pursuant to 28 U.S.C. § 1746 that:

1. I am over 21 years of age, and have personal knowledge of the facts set forth in this declaration unless otherwise stated.

2. I submit this declaration in support of my direct testimony in my defense case in the above-captioned matter.

**BACKGROUND**

3. I am 56 years old, and a long-time resident of Valencia, California. I have been married to my wife Shauna for thirty years. We have three children between the ages of eighteen and twenty-eight years old, all of whom live at home.

Our oldest son cannot work due to an illness, and our youngest daughter has special needs. My wife and I devote much of our time to caring for our children.

4. Following graduation from college in 1989, and until approximately two years ago, I worked in the securities industry. From 2004 until its demise in December 2022, I was the President of Criterion Wealth Management Insurance Services, Inc. ("Criterion"). Criterion was an investment advisory firm based in Valencia, California.

5. From approximately 2006 until July 2016, I co-owned Criterion with Mark MacArthur. Mark's primary role was Chief Investment Officer. I was President and Chief Compliance Officer. Between 2014 and 2018, Criterion managed $58 million to $190 million in investments for clients. The majority of Criterion's clients were individual investors, although its largest relationship was with Southern Baptist Theological Seminary. Mark and I equally split the profits from Criterion.

6. While Mark and I owned Criterion, Criterion was a wealth management firm that provided general financial advice to its clients. Following Mark's departure, Criterion changed its focus to money management with the firm helping its clients manage their money.

7. Criterion was a small operation. Mark and I were the only investment advisers to clients for most of the time period at issue in this case. We employed several administrative and support people to help us.

8. As a result of the SEC's lawsuit against Criterion and me, Criterion is now defunct. Criterion's registrations were terminated with the SEC in September 2018 and with California and Idaho in December 2020. I have filed a Certificate of Dissolution with the State of California Secretary of State. As of February 20, 2023, Criterion had a bank account balance of $20.90.

9. I am no longer employed in the securities industry, and it is unlikely that I will ever return to work in the securities industry. Prior to the SEC's lawsuit,

I had never had an issue with a regulator. I am currently unemployed, and considering filing bankruptcy due to my family's severe financial situation.

**Ausdal Financial Partners, Inc.**

10. Mark and I were registered representatives of Ausdal Financial Partners, Inc. ("Ausdal"). Ausdal is a registered broker-dealer based in Davenport, Iowa. I have never been an owner of or held an executive position with Ausdal.

11. Because we were investment representatives through Criterion and registered representatives through Ausdal, we were "dually registered." The reason we were registered representatives of Ausdal was to offer to Criterion's clients access to alternative investments (Reg. D), four of which are at issue in this case.

12. My wholehearted belief and understanding was that any Reg. D private investment had to go through a broker-dealer in order to offer it to a client, and that offering and selling an Reg. D investment outside of a selling agreement with a broker dealer would violate the "selling away" rules. I entered the securities industry in 1989 as a registered representative of a broker-dealer, and it had been strongly impressed upon me that any non-traditional, alternative, or Reg D investments could only be offered to clients through a broker-dealer. If not, I would be in violation of the rules against selling away and terminated immediately by my broker-dealer.

13. When clients entered into a relationship with Criterion, they also opened a brokerage account with Ausdal to invest in alternative (Reg. D) investments. The Four Funds at issue in this case, discussed below, were alternative (Reg. D) investments. Ausdal, acting through me, brokered the transactions in those investments for Criterion's clients.

14. Each client who was to invest in an alternative investment completed and signed an Ausdal New Account Form. True and accurate copies of Ausdal New Account Forms are attached as Exhibits 250 and 255.[1] Before a client made an

---

[1] Exhibits attached to, and referenced in, this declaration are on the Joint Exhibit List filed by the parties on March 22, 2023 at Dkt. 25.

investment in an alternative investment, the client completed and signed an Ausdal Private Placement Information Form. Exhibit 251 is attached, and is a true and accurate copy of an Ausdal Private Placement Form. The client also received copies of the alternative investment's offering documents, including the private placement memorandum. The private placement memorandum for the Four Funds are discussed below.

15. Exhibits 250, 251, and 255 and all similar documents were made at or near the time shown on the documents by a person with knowledge. These documents were kept in the course of a regularly conducted activity of Criterion's business, and making these documents was a regular practice of that activity.

16. Additionally, the private securities investments that we offered were typically illiquid and intended to be held for long periods of time. While some monitoring may have been appropriate after the asset was purchased, there was typically no "advice" to be offered or discretion to be exercised during the holding period. Investors would incur recurring advisory fees for long periods of time, regardless of performance. Because there was no public market, private securities were typically very difficult to value.

## The Court's Order

17. The SEC's lawsuit involves four alternative investments sold to clients (the "Four Funds"). The Four Funds are: T2 Strategic Real Estate Income Fund, LLC ("SREI"); T2 Asset Opportunity Fund IV, LP ("AOFIV"); Pacific West Home Mortgage II, LLC ("PHMII"); and Southland Home Mortgage II, LLC ("SHMII"). The T2 funds were offered by T2 Holdings, LLC. PHMII and SHMII were offered by Bird Rock Ventures. Although these were important investments, these four alternative investments were just one part of Criterion's business.

18. In its Order Granting the SEC's Motion for Summary Judgment, the Court found that I did not adequately disclose conflicts of interest relating to compensation received for the Four Funds. Nevertheless, the Court did not find that

I acted with scienter and I did not. As the Court found, this is not a case where there were not any disclosures to clients.

19. While Criterion was in operation, each year the firm filed Forms ADV with the SEC. I also provided clients with private placement memoranda for the Four Funds, and had personal conversations with clients about the Four Funds. I did not act with scienter, recklessly, or willfully, and did not withhold any information from my clients or the SEC. The revenue sharing structure of these investments were unique to our industry and were a selling point. Offering a minimum annual return of 6-8% and a revenue share above the stated minimum returns aligned our interests with our clients and put Criterion at financial risk if the funds did not perform as expected. In addition, these investments would be excluded from our investment management fee. It was not hard for our clients to understand the value of this structure. These investment compensation structures will be discussed in more detail.

20. As described above in the Ausdal Financial Partners, Inc. section, I believed that I had no option but to offer the Four Funds through a broker-dealer. Additionally, in order to create a client first and equitable compensation formula, a new fund had to be created. I took my obligations to my clients very seriously, and provided them with the information they needed to be well-informed. I believed that the disclosures were legally sufficient. We also relied on Ausdal's compliance review of our disclosure of the Four Funds, and there was never an issue raised. Ausdal was responsible for reviewing the private placement memoranda as it related to the compensation disclosures. In addition, on an annual basis, Ausdal reviewed Criterion's Forms ADV and other disclosure documents.

## **The Four Funds**

### *SREI and AOFIV*

21. The Court's Summary Judgment Order found, in relevant part, that T2 had essentially identical funds to the funds, SREI and AOFIV, offered to Criterion

clients except that the funds offered to Criterion clients had a lower profit sharing percentage. For SREI and AOFIV, my receipt of any compensation was contingent on the clients first achieving a certain return – either 6% or 8%. This contingent commission structure through Ausdal benefitted the clients in at least two ways:

22. First, I explained to my clients that SREI and AOFIV aligned my interests with their interests because the investments did not pay me until clients were first paid. If, for example, SREI or AOFIV did not meet or fell short of their financial hurdles, then Ausdal, and therefore, me, did not receive any commissions. That is exactly what happened with AOFIV. AOFIV has never met its hurdle, and neither Ausdal nor I have received any commissions on investments in AOFIV.

23. I believe that I gave my clients a better deal by securing for them a preferred return and a 60/40 split while charging reduced investment adviser fees because clients would receive a better return on their investment if the funds fell short of their hurdles, met their hurdles, or slightly exceeded them. I felt this arrangement represented the cheapest way to own this type of asset over the course of time. Of course, hindsight is 20/20. Had these investments not had such amazing returns that benefited our clients, we would not have received any compensation.

24. Second, the contingent commission structure reduced clients' downside risk by eliminating or reducing a recurring investment advisory fee, which clients would have paid even if the investments underperformed. Because AOFIV did not achieve its hurdle, the difference between profits splits for Criterion and non-Criterion investors did not come into play. The only fee that clients have paid relating to AOFIV is the alternative investment fee charged by Criterion, which was lower than a typical investment management fee and which Criterion stopped charging in early 2016.

25. I did not conceal from my clients that there were essentially identical funds available through T2 for SREI and AOFIV. My wholehearted belief and understanding is that any Regulation D investment had to go to a broker-dealer to

sell it. As a result, my clients were not offered another investment option. Furthermore, when T2 set up SREI and AOFIV for Criterion clients, T2 entered into placement agreements with Ausdal, which permitted me to offer the funds to Criterion's client. Because the placement agreements were limited to SREI and AOFIV, I was not able to offer the other funds to my clients through Ausdal, and therefore did not tell my clients that the other funds existed.

26. When commissions were paid to Ausdal for SREI, AOFIV, or SHMII or PHMII, Ausdal kept 5% of the commissions and paid 95% of the commissions to Mark or me. I deposited the commissions in Criterion's bank account along with Criterion's other revenue sources, and used the money to pay Criterion's expenses. One of Criterion's monthly expenses was the salary paid to me. I do not know how much of the commissions I actually received as part of my salary.

*PHMII and SHMII*

27. For SHMII and PHMII, Ausdal was paid an annual commission equal to 2% of the assets referred to the funds for as long as investors remained invested in the funds. As with SREI and AOFIV, I received 95% of the 2% commission. At the same time, Criterion charged clients an alternative investment fee on the amounts invested in SHMII and PHMII.

28. For SHMII and PHMII, there is no allegation that clients were disadvantaged with respect to other investors. Rather, the SEC's only allegation with respect to those funds is that my receipt of commissions was not disclosed.

29. There was disclosure regarding the payment of commissions. As described below, the private placement memoranda for SHMII and PHMII disclosed that Ausdal received "commissions of 2% annually on the purchase price of the [units] sold by Ausdal . . .. Any commissions will be paid by [Bird Rock] and not from the proceeds of the Offering." Bird Rock also disclosed a form of this information in its Form ADVs for the two funds.

**Clients Received Forms ADV That Disclosed Conflicts of Interest**

30. Since 2014, Criterion's Forms ADV disclosed the conflict of interest arising out of my recommending alternative investments and receiving commissions from Ausdal for recommending investments. Because Mark and I were Criterion's only two adviser representatives and the only two Ausdal representatives, clients knew that the "associated person" identified in the disclosure below was us. There were only two possibilities at Criterion, and both of us (Mark and me) recommended alternative investments to clients. To that point, Criterion's Form ADV stated:

> When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to CWM client in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CWM client chooses to invest in these securities and an associated person of CWM receives separate commission compensation from the sale of an Alternative Asset Investment, that Asset will be excluded from the CWM fee calculation as described above.
>
> This creates a conflict of interest between the CWM and its clients. Please see the important disclosures below "Commission Compensation" and additional disclosures in Item 10 "Other Industry Affiliations".

*See* Exhibits 9, p. 7, 11, p. 7, which are true and accurate copies of Criterion's Forms ADV.

31. Criterion's Forms ADV also disclosed that "management and associated persons of [the] firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc., a FINRA member broker-dealer." Because

Criterion was just Mark and me, clients knew that we were the "management and associated persons" licensed as registered representatives with Ausdal. *See* Exhibits 9, p. 7, 11, p. 7. Indeed, the Form ADV, Item 4, Advisory Business, on page 2, shows just two people – Mark and me.

32. The Forms ADV further stated that there was a conflict of interest where "management and associated person," meaning Mark or me, "licensed as registered representative of Ausdal," again, Mark or me, recommended that a client invest in a security that paid Mark or me a commission. Right under the heading "Commission Compensation," the Form ADV stated:

> As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity(ies), these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client.

*See* Exhibits 9, p. 7, 11, p. 7. Again, Criterion had just two principals – Mark and me. There was no confusion regarding the identities of the "individuals" in the paragraph above.

33. The Forms ADV provided yet more disclosure regarding that same conflict. Item 10 of the Forms ADV addressed Other Financial Industry Activities and Affiliations, and disclosed that there was a conflict of interest between the interests of associated persons and those of the advisory clients. Clients knew that Mark and I were the "associated persons" because Mark and I were Criterion. There was no one else to be the "associated persons." When the disclosure below identifies the conflict of interest, the associated person who has the conflict of interest as a result of receiving commissions through Ausdal was Mark or me. Because Criterion was just two people, it could have been no one else. The Form ADV stated:

> BROKER DEALER REGISTRATIONS
>
> Associated persons of CWM are registered securities representatives and investment adviser representatives of Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and a registered investment adviser. In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal Financial Partners, Inc. Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients.

*See* Exhibits 9, p. 13, 11, p. 14.

34. Finally, Criterion's Form ADV explained to clients under a heading titled "HOW WE HANDLE OUR CONFLICT OF INTEREST" the steps taken to address conflicts:

> Clients should be aware that the receipt of additional compensation by CWM and its management persons or employees creates a conflict of

interest that may impair the objectivity of our firm and these individuals when making advisory recommendations. CWM endeavors at all times to put the interest of its clients first as part of our fiduciary duty as a registered investment adviser; we take the following steps to address this conflict:

- we disclose to clients the existence of all material conflicts of interest, including the potential for us or our employees to earn compensation from the referral of clients to other registered investment advisers;
- we disclose to the client in a separate disclosure document the compensation we receive in exchange for the client's referral to the selected investment adviser;
- we collect, maintain and document accurate, complete and relevant client background in formation, including the client's financial goals, objectives and risk tolerance;
- our firm's management conducts regular reviews of each client account to verify that all recommendations made to a client are suitable to the client's needs and circumstances;
- we require that our employees seek prior approval of any outside employment activity so that we may ensure that any conflicts of interests in such activities are properly addressed;
- we periodically monitor these outside employment activities to verify that any conflicts of interest continue to be properly addressed by our firm ; and
- we educate our employees regarding the responsibilities of a fiduciary, including the need for having a reasonable and independent basis for the investment advice provided to clients.

*See* Exhibits 9, pp. 13-14, 11, pp. 14-15.

**Personal Discussions With Clients**

35. I provided my clients with information in person when I met with them regarding the compensation that I received and the conflicts of interest from that compensation.

36. As part of my initial meeting with new clients, I explained that I was dually registered, meaning that I was both a registered representative for Ausdal and associated with Criterion. I explained that my association with Ausdal allowed me to offer alternative investments and offerings under Regulation D of the Securities Act of 1933. I explained that I would be acting as a registered representative of Ausdal with respect to any recommendations relating to alternative investments.

37. I also explained that broker-dealers are regulated by the SEC and FINRA. I also explained the differences between investment advisers and broker-dealers, generally including that investment advisers typically provide ongoing advice, exercise discretion, receive fee-based compensation, and are regulated by the SEC, while broker-dealers typically provide transaction-specific recommendations, do not exercise discretion, receive commissions, and are regulated by both the SEC and FINRA.

38. Furthermore, I explained that I received commissions on alternative investments. I explained that when I received commissions on alternative investments there was a conflict of interest with my role as an investment adviser because the potential payment of commissions gave me a financial motive to recommend the investment. I know that clients understood what I meant when I disclosed the conflict of interest to them.

39. Following the initial meetings, I put together investment recommendations for clients. My recommendations might include the Four Funds if one or more of the Four Funds was suitable for the client.

40. As described above, the T2 Funds were unique in that Ausdal and I only earned commissions if client investors first received a return. Similarly, Ausdal, and

I received a trailing commission for the Bird Rock funds only if clients first received a return. Commissions paid by Bird Rock were made from Bird Rock's funds, and not from the returns for investors. I explained to clients that the commission structure put investors' interests first because I was only paid if the investors were paid.

41. Before the time of the investment, I explained to each client in person or by phone that the client's interest in one or more of the Four Funds was a nonbillable asset. I explained that the client's interest in the Four Funds was excluded from Criterion's standard investment management fee because the fund manager compensated me through Ausdal contingent upon the investor first receiving a certain return.

42. I believe that clients knew that I was paid commissions from SREI, PHMII, and SHMII because one of the selling points I used in discussing the investments with clients was that investors were paid before I was paid. I describe this in detail above. I consistently emphasized that selling point to clients in discussing the Four Funds. It put us on the same side of the table as the client. We only benefitted if the clients benefitted. Clients liked that I was paid directly by the fund managers, and that they would not be charged an investment management fee on the Four Funds.

**Clients Received Private Placement Memoranda**

43. The SEC has claimed that no document shows that Ausdal would receive compensation from SREI, or the other funds, as long as Criterion clients remained invested in the funds. In fact, before clients purchased the Four Funds, they received private placement memoranda that disclosed that commissions were paid. Three of the four private placement memoranda referred directly to Ausdal as the recipient of the commissions. The earliest private placement memoranda, for SREI from April 2014, referred to "selling agents," but when T2 offered AOFIV the following year "selling agents" was clarified to refer to "Ausdal." The private placement memoranda for PHMII and SHMII referred to "Ausdal."

44. As shown below, the private placement memoranda for the Four Funds disclosed that commissions were paid to Ausdal. In light of the disclosure in the Forms ADV, as discussed above, clients knew that Mark and I were the representatives for Ausdal getting commissions.

**SREI (April 2014 PPM)**

> The Fund may engage selling agents to offer and sell the Units. Such selling agents may be paid a sales commission out of the Manager's Management Fee or Performance Allocation or an assets-based "distribution fee" charged to the Members introduced by such selling agents, in addition to a portion of the Management Fee and/or Performance Allocation. Accordingly, depending on the type of sales commission paid, such commission may increase the aggregate expenses of any person investing in the Units of the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund.
>
> The Performance Allocation is "equal to 40% of the amount of net new profits of the limited partner interests in the Master Fund attributable to such Class C Unit subject to … a non-cumulative "hurdle amount" … at a rate of 6% … and … a catch-up …"

*See* Exhibit 14, p. 19, which is a true and accurate copy of the SREI private placement memorandum for April 2014.

**AOFIV (2/15 PPM):**

> Half of the General Partner's carried interest received under provisions (b) and (c) above will be paid to Ausdal Financial Partners, Inc., a placement agent retained by the Fund ("Ausdal"), pursuant to a placement agreement entered into by and among the Fund, the General Partner and Ausdal.

*See* Exhibit 78, pp. 7-8, which is a true and accurate copy of the AOFIV private placement memorandum for February 2015.

> The Fund has engaged Ausdal, and may in the future engage other selling agents, to offer and sell interests in the Fund. Such selling agents may be paid a sales commission: (i) by the Fund; (ii) out of the General Partner's Management Fee; (iii) out of the General Partner's carried interest; and/or an assets based "distribution fee" charged to the Partners introduced by such selling agents. Accordingly, depending on the type of sales commissions paid, such commission may increase the aggregate expenses of any person investing in the Fund; . . ..

*See* Exhibit 78, pp. 12.

**<u>SHMII (2/16/15) and PHMII (5/25/16) PPMs:</u>**

> The Units are being offered and sold by the Manager. The Company has also engaged Ausdal Financial Partners, a broker-dealer regulated by the Financial Industry Regulatory Authority, to offer and sell Units on a "best efforts" basis. Ausdal Financial Partners will receive commissions of 2% annually on the purchase price of the Units sold by Ausdal Financial Partners, paid on a quarterly basis. Any commission will be paid by the Manager and not from the proceeds of this Offering.

*See* Exhibit 16, pp. ii, 12., which is a true and accurate copy of a SHMII private placement memorandum for February 2015.

> The Units are being sold on a "best efforts" basis. The Units being sold in the Offering are being sold directly by the Company's Manager and its managers, directors and executive officers, none of whom will receive any commissions or other renumeration for such sales. We have also engaged Ausdal Financial Partners to assist in selling Units, but there is no firm commitment by Ausdal Financial Partners or any other firm to buy, sell or place any of the Units.

*See* Exhibit 17, pp. ii, 14, which is a true and accurate copy of a PHMII private placement memorandum for May 2016.

**June 2017 Letter To Clients**

45. In 2017, the SEC concluded an examination of Criterion that resulted in a number of findings. Following the examination, I sent the letter attached as Exhibit 20 to Criterion clients. This is a true and accurate copy of the letter. The letter is dated June 9, 2017, and around this time, Mark was in the process of leaving Criterion. I do not believe this letter was sent to any of the clients that were anticipated to follow Mark.

46. I sent the letter because I wanted to provide Criterion's clients with information regarding Criterion, their investments, and conflicts of interest. Clients continued to be invested in the Four Funds, and I wanted to ensure that clients had full information regarding their investments and conflicts of interest.

47. In the letter, on page two, I provided historical background regarding compensation, and explained the following:

> Seeking to find and provide AI [alternative investment] opportunities for our clients, CWM established a relationship with Ausdal Financial Partners ("Ausdal"), a broker dealer who specialize in AI's. Most of these investments were sourced and sponsored by Ausdal and typically paid a one-time sales commission of 5-7%. Other AI's were sourced by our relationships in the investment community. When given the opportunity to structure compensation on investments we sourced, we preferred to structure our compensation based on the success of the investment. In other words, we were only paid if the investment was a success.

48. I went on to provide a description of the five investments with this type of compensation structures, including the Four Funds at issue in this case:

T2 Asset Opportunity Fund IV. Investors are paid an annual preferred rate of 8% and Ausdal receives 50% of the profits above this preferred rate (until 40% of cumulative returns paid to investors are matched and thereafter, receives 20% profits. Ausdal then pays the registered representatives (Bob Gravette and Mark MacArthur).

T2 Strategic Real Estate Income Fund. Investors are paid an annual preferred rate of 6% and Ausdal receives 20% of the profits above this preferred rate. Ausdal then pays the registered representatives (Bob Gravette and Mark MacArthur).

Southland Home Mortgage II LLC, and Pacific West Home Mortgage II LLC Funds. Investors are paid all revenue up to the preferred rate (currently 8%) before any expenses including management or finder's fees. If and only when the annual preferred rate is satisfied a finder's fee of 2% is paid annually to Ausdal directly from management, not investor returns. Ausdal then pays the registered representatives (Bob Gravette and Mark MacArthur).

49. I confronted the issue of conflicts of interest head on in the letter. I wrote that:

Given the potentially considerable amounts of non-advisory compensation from the above-mentioned funds, we should have provided more disclosure around the potential conflicts of interest in offering these funds to our clients. Although disclosures of non-advisory compensation from commissions or finder's fees were provided in our Investment Management Agreement and Firm Brochure, a straight forward clear description would have been in your best interest. Having known in more detail these arrangements would have left our clients better informed in making a decision to invest. Detailed disclosure always needs to be our priority. Our updated

brochures include a supplement known as Part 2B of Form ADV: Brochure Supplement. This document clearly lays out the existence of non-advisory compensation arrangements for all Criterion key personnel. We included a link to this document on our last Annual Disclosure Letter mailed to you in early April 2017. We have attached a printed copy to this letter as well.

50. I know that clients received the letter, but I do not recall any clients raising concerns over the information in the letter or asking to make any changes as a result of the information in the letter. To my knowledge, no clients have lost any money in the Four Funds.

51. I wrote and sent the letter months before I learned that Criterion was under investigation by the SEC's Enforcement Division. I did not learn that Criterion was under investigation until I saw a subpoena from the SEC in late October 2017.

## Compliance

52. Criterion had adopted policies and procedures designed to prevent violations of the Investment Advisers Act of 1940. On a yearly basis, I met with compliance consultants to discuss Criterion's policies and procedures. Criterion was in the process of revising its policies and procedures manual when the SEC examination commenced. In light of the fact that Criterion was under examination, it made little sense to implement changes to the policies and procedure manual that might have to be changed again based on the findings of the examination.

53. In any event, as described above, Criterion is no longer registered with the SEC as an investment adviser. Criterion is defunct, and, as soon as the California Secretary of State processes the documents, Criterion will no longer be registered with the State of California as a corporation.

## Chart

54. Attached as Exhibit 262 is a draft summary chart showing from 2015 to 2020 (a) commissions paid to me based on the Four Funds as shown in the expert

report of Andrew D. Richmond; and (b) income and expense information from Criterion's Form 1120-S tax returns. True and accurate copies of the tax returns for 2014 to 2020 are identified on Criterion's exhibit list as Exhibits 161 to 167.

**Jeff Brown Declaration**

55. In the Declaration of Jeff Brown submitted by the SEC, Dkt. 136, Jeff Brown references a "Fee Disclosure Statement" that was supposed to be attached to the SREI and AOFIV Placement Agreements. Dkt. 136, p. 2, lns. 8-13 and p. 6, lns. 5-10. I do not know what the Fee Disclosure Statement said, or why it was not attached to the Placement Agreements.

56. Mr. Brown also states that "Defendant Criterion was responsible for providing the Fee Disclosure Statement to Criterion investors." Dkt. 136, p. 2, lns. 8-13 and p. 6, lns. 5-10. Mr. Brown's statement is inaccurate. Criterion was not a party to the Placement Agreements, and had no obligations under the Agreements.

57. Mr. Brown asserts that SREI Class C unitholders could expect to receive a lower return than Class A unitholders. Dkt. 136, p. 4., lns 14-16. Mr. Brown's statement does not take into account the fact that the Class A unitholders invested through investment advisors and paid recurring advisory fees on their investments, which reduced their returns. If SREI had failed to achieve its "hurdle" (or even exceeded it slightly), then the Class A investors would have been worse off than the Class C investors.

58. As discussed above, that is precisely what happened with AOFIV. AOFIV did not achieve its hurdle, but investors in the Master Fund nevertheless continued to pay recurring advisory fees on their investments. The difference between the profit splits for the AOFIV and Master Fund investors did not come into play, and neither Ausdal nor I received any commissions.

**Daniel Niednagel Declaration**

59. In the Declaration of Daniel Niednagel submitted by the SEC, Dkt. 132, Mr. Niednagel states that "Bird Rock had a similar referral arrangement [to that of

the Bird Rock legacy funds] with Criterion, Gravette and MacArthur for the Bird Rock funds." *Id.*, p. 2 lns. 1-2. That statement is not correct. Bird Rock did not have a referral arrangement with Criterion relating to the Bird Rock funds.

*signature page to follow*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 10th day of April 2023.

Robert A. Gravette

# CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April 2023, I served **DEFENDANT ROBERT A. GRAVETTE'S DECLARATION** by electronic mail on the following counsel:

Charles E. Canter (Cal. Bar No. 263197)
Email: canterc@sec.gov
DoHoang T. Duong (Cal. Bar No. 219127)
Email: duongdo@sec.gov
Michael Raymond Sew Hoy (Cal. Bar No. 243391)
Email: sewhoym@sec.com
444 South Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904
***Attorneys for Plaintiff***
***Securities and Exchange Commission***

Jeffrey R. Thomas, Cal. Bar No. 179327
Email: jthomas@thomaslawllc.com
Thomas Law LLC
3801 E Florida Ave, Ste. 107
Denver, Colorado 80210
Telephone: (720) 330-2805
***Attorney for Defendant Mark A. MacArthur***

*/s/ Kenneth E. Yeadon*