Jeffrey R. Thomas, Cal. Bar No. 179327
Email: jthomas@thomaslawllc.com
Attorney for Defendant Mark A. MacArthur
Thomas Law LLC
3801 E Florida Ave, Ste 107
Denver, Colorado 80210
Telephone: 720.330.2805

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>CRITERION WEALTH MANAGEMENT INSURANCE SERVICES, INC., et al.<br><br>Defendants. | **Case No. 2:20-cv-01402-SPG-JEM**<br><br>**DECLARATION OF DIRECT TESTIMONY OF MARK A. MACARTHUR**<br><br>Ctrm: 5C<br>Judge: Hon. Sherilyn Peace Garnett<br><br>Pre-Trial Conf. Date: 4/26/2023<br>Trial Date: 5/16/2023 |

I, Mark A. MacArthur, declare:

1. My full name is Mark Andrew MacArthur. I am over the age of 21 and have personal knowledge of the facts stated in this Declaration.

2. I submit this Declaration in support of my direct testimony in my defense case in the above-captioned case.

**Background**

3. I am 54 years old and a resident of Newhall, California. I have been married for 31 years. My wife Erika has been a full-time homemaker while all or some of our four children, now ranging from 22 to 29 years of age, have been part of our home.

4. Since 1994, I have worked in the financial services industry in Wheaton, Illinois and Valencia, California. During that time, I have never had a "Disclosure Event" (customer complaint or arbitration, regulatory action, employment termination, bankruptcy filing, or criminal or judicial proceeding) other than this case.

5. Since 2017, I have been an investment adviser representative of M2 Capital Advisors ("M2"), a state-registered investment adviser that I own. Since 2006, I have also been a registered representative of Ausdal Financial Partners, Inc., a FINRA-member broker-dealer ("Ausdal"). I have never been an owner or held an executive position with Ausdal.

6. I am currently (and was at all times relevant to this case) "dually-registered" as an investment adviser representative and a registered representative of a broker-dealer. Although most of my business is advisory, I remain associated with a broker-dealer primarily to be able to recommend investments in private placements, which are generally not well-suited to being treated as advisory assets. Private securities are typically illiquid and must be held for long periods of time. Accordingly, while some monitoring may be appropriate after the asset is purchased, there is typically no "advice" to be offered or discretion to be exercised during the holding period. Also, investors would incur recurring advisory fees for long periods of time, regardless of performance. Additionally, because there is no public market, private securities are typically difficult to value.

7. A true and correct copy of my Web CRD U4 Employment History is attached as **Exhibit 200**. A true and correct copy of my Registered Representative's Agreement with Ausdal is attached as **100**.

**Criterion**

8. From 2008 to August 2017, I was an investment adviser representative of Criterion Wealth Management Insurance Services, Inc. ("Criterion"), a SEC-registered investment adviser. I was a co-owner (with Robert Gravette) of Criterion

until mid-2016 and an independent contractor until mid-2017, when I left Criterion. During the entire time I was there, Mr. Gravette was Criterion's Chief Compliance Officer.

9. At most relevant times, Mr. Gravette and I were the only investment adviser representatives at Criterion and, like me, Mr. Gravette was dually registered with Ausdal. Criterion employed several administrative and support people to help us.

10. All Criterion clients received a copy of Criterion's Form ADV Part 2A ("Firm Brochure"). The Firm Brochure stated:

> When appropriate and suitable, our adviser representatives may recommend certain Alternative Asset investments (i.e. private securities) to CWM client in which the associated person may receive separate and typical compensation (i.e. commissions) when acting in their separate capacities as registered representatives of Ausdal Financial Partners, Inc. Clients are under no obligation to purchase such securities. If a CWM client chooses to invest in these securities and an associated person of CWM receives separate commission compensation from the sale of an Alternative Asset Investment, that Asset will be excluded from the CWM fee calculation as described above. This creates a conflict of interest between the CWM and its clients. Please see the important disclosures below "Commission Compensation" and additional disclosures in Item 10 "Other Industry Affiliations".
>
> …
>
> **Commission Compensation**
>
> As disclosed in Item 10, management and associated persons of our firm are separately licensed as registered representatives of Ausdal Financial Partners, Inc. a FINRA member broker dealer. Associated

persons may also be licensed as insurance agents or brokers of various companies. In their separate capacity(ies), these individuals are able to implement investment recommendations for advisory clients for separate and typical compensation (i.e., commissions, 12-b1 fees or other sales-related forms of compensation). In some instances, depending on the size of the transaction, advisory fees will be discounted or waived in lieu of commissions earned. Commissions will not be credited to any future advisory fees. This presents a conflict of interest to the extent that these individuals recommend that a client invest in a security which results in a commission being paid to the individuals. Clients are not under any obligation to engage these individuals when considering implementation of advisory recommendations. The implementation of any or all recommendations is solely at the discretion of the client.

…

**Item 10 Other Financial Industry Activities and Affiliations**

*BROKER DEALER REGISTRATIONS*

Associated persons of CWM are registered securities representatives and investment adviser representatives of Ausdal Financial Partners, Inc., a registered broker-dealer, member of the Financial Industry Regulatory Authority, Inc. ("FINRA") and a registered investment adviser. In these capacities associated persons may recommend securities, insurance, advisory, or other products or services, and receive compensation if products are purchased through Ausdal Financial Partners, Inc. Thus, a conflict of interest exists between the interests of the associated persons and those of the advisory clients.

11. True and correct copies of Criterion's March 10, 2014, March 17, 2015, and March 30, 2016 Firm Brochures are attached as **Exhibits 103, 9, and 11**, respectively.

12. All Criterion clients signed Criterion's Investment Advisory Agreement ("IAA"). The IAA stated:

> In the event CWM is compensated directly by the fund manager or broker dealer per SEC regulation D requirements, this asset is not subject to the investment management fee. Only the alternative fee will apply.

13. A true and correct copy of Criterion's IAA is attached as **Exhibit 12**.

**<u>Ausdal</u>**

14. All Criterion clients were required to open brokerage accounts with Ausdal. As part of that process, each client completed and signed an Ausdal New Account Form.

15. A true and correct copy of Ausdal's New Account Form is attached as **Exhibit 201**.

16. At the time a client entered into a relationship with Criterion, I explained to the client that I was associated with Ausdal, a broker-dealer. I further explained that, if suitable, I may recommend investments in private placements, and that I would be acting as a registered representative of Ausdal with respect to any such recommendations. I also explained the differences between investment advisers and broker-dealers, including that investment advisers provide ongoing advice, exercise discretion, receive fee-based compensation, and are regulated by the SEC, while broker-dealers provide transaction-specific recommendations, do not exercise discretion, receive commissions, and are regulated by both the SEC and the Financial Industry Regulatory Authority ("FINRA").

## The Private Placements

17. Between 2014 and 2017, Ausdal – my affiliated broker-dealer – entered into Placement Agreements under which it agreed to introduce prospective investors to the following funds: Strategic Real Estate Income Fund, LLC ("SREI"); (2) Asset Opportunity Fund IV, LP ("AOFIV"); (3) Southland Home Mortgage II, LLC ("Southland II"); and (4) Pacific West Home Mortgage II, LLC ("Pacific West II") (collectively, the "Funds"). SREI and AOFIV were offered by T2 Holdings, LLC ("T2") and Southland II and Pacific West II were offered by Bird Rock Management, LLC ("Bird Rock").

18. True and correct copies of the Ausdal/SREI Placement Agreement, Ausdal/AOFIV Placement Agreement, and Ausdal/Pacific West Placement Agreement are attached as **Exhibits 67, 80, and 127**, respectively.

19. Acting as a registered representative of Ausdal, I recommended that certain Criterion clients (the "Investors") invest in one or more of the Funds. I recommended investments in the Funds to only a small portion of my Criterion clients. I was the only Ausdal registered representative who communicated with the Investors concerning the Funds.

20. Prior to each investment (the "Investment"), each Investor received a copy of the Fund's offering documents, including the Fund's private placement memorandum ("PPM"), and was required to execute a subscription agreement, an investor questionnaire, and an operating/partnership agreement.

21. True and correct copies of the PPMs for SREI (including Class C Units Supplement), AOFIV, Southland II, and Pacific West II are attached as **Exhibits 14, 68, 15, 16, and 17**, respectively.

22. The Fund offering documents (a) stated that the Fund was a limited liability company or limited partnership and the Investor's interest in the Fund (the "Interest") had limited liquidity, and (b) required the Investor to attest that they were an Accredited Investor.

23. The Fund offering documents further stated:

**SREI (April 2014 PPM)**

The Fund may engage selling agents to offer and sell the Units. Such selling agents may be paid a sales commission out of the Manager's Management Fee or Performance Allocation or an assets-based "distribution fee" charged to the Members introduced by such selling agents, in addition to a portion of the Management Fee and/or Performance Allocation. Accordingly, depending on the type of sales commission paid, such commission may increase the aggregate expenses of any person investing in the Units of the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund.

…

The Management Fee for Class C Units shall equal 1.25% per annum of the NAV per unit.

…

The Performance Allocation is "equal to 40% of the amount of net new profits of the limited partner interests in the Master Fund attributable to such Class C Unit subject to … a non-cumulative "hurdle amount" … at a rate of 6% … and … a catch-up …

**AOFIV (February 2015 PPM)**

Half of the General Partner's carried interest received under provisions (b) and (c) above will be paid to Ausdal Financial Partners, Inc., a placement agent retained by the Fund ("Ausdal"), pursuant to a placement agreement entered into by and among the Fund, the General Partner and Ausdal.

…

The Fund has engaged Ausdal, and may in the future engage other selling agents, to offer and sell interests in the Fund. Such selling agents may be paid a sales commission: (i) by the Fund; (ii) out of the General Partner's Management Fee; (iii) out of the General Partner's carried interest; and/or (iv) an assets-based "distribution fee" charged to the Partners introduced by such selling agents. Accordingly, depending on the type of sales commissions paid, such commission may increase the aggregate expenses of any person investing in the Fund; provided, however, that investors will be informed of any assets-based fees applicable to them prior to their investing in the Fund.

**Southland II (February 16, 2015 PPM)**

The Units are being offered and sold by the Manager. The Company has also engaged Ausdal Financial Partners, a broker-dealer regulated by the Financial Industry Regulatory Authority, to offer and sell Units on a "best efforts" basis. Ausdal Financial Partners will receive commissions of 2% annually on the purchase price of the Units sold by Ausdal Financial Partners, paid on a quarterly basis. Any commission will be paid by the Manager and not from the proceeds of this Offering.

…

The Units are being sold on a "best efforts" basis. The Units being sold in the Offering are being sold directly by the Company's Manager and its managers, directors and executive officers, none of whom will receive any commissions or other renumeration for such sales. We have also engaged Ausdal Financial Partners to assist in selling Units, but there is no firm commitment by Ausdal Financial Partners or any other firm to buy, sell or place any of the Units.

**<u>Pacific West II (May 25, 2016 PPM)</u>**

The Units are being offered and sold by the Manager. The Company has also engaged Ausdal Financial Partners, a broker-dealer regulated by the Financial Industry Regulatory Authority, to offer and sell Units on a "best efforts" basis. Ausdal Financial Partners will receive commissions of 2% annually on the purchase price of the Units sold by Ausdal Financial Partners, paid on a quarterly basis. Any commission will be paid by the Manager and not from the proceeds of this Offering.

…

The Units are being sold on a "best efforts" basis. The Units being sold in the Offering are being sold directly by the Company's Manager and its managers, directors and executive officers, none of whom will receive any commissions or other renumeration for such sales. We have also engaged Ausdal Financial Partners to assist in selling Units, but there is no firm commitment by Ausdal Financial Partners or any other firm to buy, sell or place any of the Units.

24. Prior to each Investment, each Investor completed and signed an Ausdal Private Placement Information Form for the particular Fund in which they were investing. The Ausdal Private Placement Information Form (a) stated that it was from Ausdal, (b) identified me as the Ausdal registered representative, and (c) identified the Fund to which it applied.

25. A true and correct copy of an Ausdal Private Placement Information Form is attached as **Exhibit 202**.

26. Prior to the Investment, I explained to each Investor that the Investor's Interest would be considered a non-billable asset – *i.e.,* it would be excluded from the calculation of Criterion's standard investment management fee – because the Fund Manager would compensate me (if eligible) through Ausdal – my affiliated broker-dealer.

27. The Interests were excluded from Criterion's investment management fee calculation.

28. After each Investment, each Investor received quarterly Management Fee Confirmations from Criterion that excluded the Interests from the billable asset value. The Management Fee Confirmations stated "[t]his Report does not include alternative investments" or otherwise identified the Interests as being excluded from the billable value.

29. True and correct copies of Criterion Management Fee Confirmations are attached as **Exhibits 143 and 203**, respectively.

30. As compensation for its services, Ausdal was eligible to receive commissions from the Fund Managers. Under my Registered Representative's Agreement with Ausdal, Ausdal allocated 95% of any commissions it received to me.

31. A true and correct copy of an Ausdal Commission/Fee Statement is attached as **Exhibit 204**.

32. I did not receive the entire amount of commissions Ausdal allocated to me because some of that amount was used to pay expenses at Criterion or M2. Any commissions I received from Ausdal were paid through Criterion or M2, and the expenses Criterion or M2 incurred also supported my broker-dealer activities. Such an arrangement is common. In fact, numerous financial services firms are dually-registered. *See, e.g.*, https://brokercheck.finra.org/firm/summary/361. Those firms necessarily receive both brokerage commissions and advisory fees.

33. Attached hereto as **Exhibit 211** is a summary chart showing, for the period 2015 through 2020 (1) Ausdal commissions allocable to me based on the Investments, according to the report of the SEC's expert Andrew D. Richmond; (2) gross income, including Ausdal commissions, received by Criterion or M2; (3) expenses incurred by Criterion or M2; and (4) Criterion's or M2's net profit margins based on the gross income and expenses. **Exhibit 211** is an accurate reflection of

true and correct copies of my tax returns and copies of Criterion's tax returns, which I have examined. Those documents are voluminous, cannot conveniently be examined in court, and were made available to all parties.

34. Until early-2016, Criterion charged Investors an annual Alternative Investment Consulting Fee ("AIF") of 0.25 – 0.50% of the Investment amount.

35. The AIF, which was fully disclosed, was for *post-transaction* monitoring and other services. As stated in the IAA (**Exhibit 12**), such services included "investment research and due diligence, on-site travel and follow-up, ongoing monitoring, opportunity identification, tax coordination, and report integration."

36. For the period in which Criterion charged the AIF, Criterion provided the Investors with separate quarterly statements – entitled "Alternative Investment Fee Confirmation" – identifying the amount of the AIF.

37. A true and correct copy of an Alternative Investment Fee Confirmation is attached as **Exhibit 205**.

38. The AIF was substantially less than Criterion's standard investment management fee, which for most clients ranged from 1.0 to 1.5% annually.

39. Since 2014, the Investors have paid Criterion a total (all Investors, all Funds) of approximately $25,457 in AIFs.

40. I never had any ability, discretionary or otherwise, to purchase, sell, exchange, or otherwise effect transactions in the Interests.

41. I believed at all times that I was acting solely in my capacity as a registered representative of Ausdal when recommending the Investments. I also believed all conflicts of interest should be disclosed, regardless of whether there was a legal obligation to do so. And I believed at all times that the conflicts of interest associated with the Investments – *i.e.,* my receipt of commissions – *were* disclosed through the written and oral disclosures identified above.

42. I was never the Chief Compliance Officer at Criterion. While I tried to ensure that all conflicts of interest were disclosed to clients through written and oral communications, I was not primarily responsible for Criterion's Forms ADV and other written disclosures. I believed that Criterion's Chief Compliance Officer and compliance consultant were ensuring that Criterion's written disclosures met applicable legal requirements.

**The Court's Order**

43. I have read the Court's April 25, 2022 Order. In the Order, the Court found that, in addition to acting as a registered representative of Ausdal, I was also acting as an investment adviser representative of Criterion when recommending the Investments. The Court also found that I did not adequately disclose certain conflicts of interest relating to the Investments. The Court, however, declined to find that I acted with scienter. In fact, I did not act with scienter. To the contrary, I sought to structure the Investments and my compensation (if any) in a manner that placed the Investors' interests first and acted in good faith at all times. And as stated, I believed the conflicts of interest were disclosed.

44. For both SREI and AOFIV, my receipt of commissions was contingent on the Investors first achieving a certain return – either 6% or 8%. This contingent commission structure through Ausdal benefitted the Investors in at least two ways.

45. First, it aligned my interests with those of the Investors by requiring that the Investors receive a certain return before I received any commissions. When the Investors invested in the Funds, it was not known whether the Investors would achieve those returns and, therefore, whether I would receive any commissions. In fact, for AOFIV, the Investors have not received their preferred return and I therefore have not received any commissions.

46. Second, the contingent commission structure reduced the Investors' downside risk by eliminating or reducing a recurring investment advisory fee, which the Investors would have otherwise paid regardless of the Investments' performance.

In fact, AOFIV has not achieved its "hurdle," and the difference between the profit splits for AOFIV and T2 Opportunity Fund IV investors did not come into play. My clients who invested in AOFIV are therefore better off than they would have been if the Interests had been treated as advisory assets and been subject to Criterion's recurring standard investment advisory fee. My clients who invested in AOFIV are also better off than the T2 Opportunity Fund IV (non-Criterion client) investors, who were referred to that fund by investment advisers and paid recurring investment advisory fees.

47. It did not occur to me to tell the Investors about the SREI Class A shares or the T2 Opportunity Fund IV, as I specifically sought to prioritize my clients' interests by structuring the Investments and my compensation in a way that was better for the clients than charging a recurring standard advisory fee on an illiquid asset that was difficult to value. I believed that the contingent commission structure was the best way for the Investors to own this type of asset over time, accounting for both return and risk. I never had any intent to withhold information from or deceive my clients. If I had known that the SEC would take the position that I needed to disclose the existence of the Class A shares and T2 Opportunity Fund IV, I would have gladly done so.

48. For Southland II and Pacific West II, there is no evidence (or even an allegation) that the Investors were disadvantaged with respect to other investors. Rather, the SEC's only allegation with respect to those Funds is that my receipt of commissions was not disclosed. But based on the disclosures described above, I believed my receipt of commissions was disclosed.

**<u>Other</u>**

49. I am the Chief Compliance Officer at M2. In that role, I have focused heavily on making M2's compliance processes better than those that existed at Criterion. Among the improvements I have made is requiring that each client who

invests in a private placement receives a separate, comprehensive, investment-specific disclosure document before investing.

50. Since I left Criterion, neither I nor M2 have been the subject of any regulatory actions, and I am not aware of any securities law violations by me or M2. I am committed fully to ensuring that no such violations occur in the future.

51. Because of the SEC's filing of this case, I have lost key client relationships and my income has been severely impacted. While I am confident in my abilities as a financial professional, it has been a daily challenge to avoid professional and financial ruin.

**Jeff Brown Declaration**

52. In his Declaration, Jeff Brown references a "Fee Disclosure Statement" that was supposed to be attached to the SREI and AOFIV Placement Agreements. I do not know what the Fee Disclosure Statement said or why it was not attached to the Placement Agreements.

53. Mr. Brown also states that "Defendant Criterion was responsible for providing such a statement to Criterion investors." That statement is incorrect. Criterion was not a party to the Placement Agreements and had no obligations under those Agreements.

54. Mr. Brown asserts that SREI Class C unitholders could expect to receive a lower return than Class A unitholders. That statement is also incorrect because Mr. Brown fails to account for the fact that the Class A unitholders invested through investment advisers and paid recurring advisory fees on their investments, which reduced their returns. If SREI had failed to achieve its "hurdle" (or even exceeded it slightly), then the Class A investors would have been worse off than the Class C investors.

55. As discussed above, that is precisely what happened with AOFIV. Neither AOFIV nor T2 Opportunity Fund IV achieved the 8% hurdle, but investors in the T2 Opportunity Fund IV nevertheless continued to pay recurring advisory fees

on their investments. The difference between the profit splits for the AOFIV and T2 Opportunity Fund IV investors did not come into play, and neither Ausdal nor I received any commissions.

**<u>Daniel Niednagel Declaration</u>**

56. In his Declaration, Daniel Niednagel states that "Bird Rock had a similar referral arrangement [to that of the Bird Rock legacy funds] with Criterion, Gravette and MacArthur for the Bird Rock funds." That statement is incorrect. Bird Rock never had a referral arrangement with Criterion relating to the Bird Rock funds.

**<u>Patrick Denard Declaration</u>**

57. Patrick Denard was Robert Gravette's client. I never gave any investment advice or made any investment recommendations to Dr. Denard. The SEC has not submitted any declarations from my clients.

*[signature page follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 10th day of April 2023 at Valencia, California.

Mark A. MacArthur 4-10-23